# Exhibit 9

Michael J. Flynn, Admitted *Pro Hac Vice*
One Central Plaza, Suite 240
Boston, MA 02108
Telephone: 858-775-7624
Facsimile:  858-759-0711
Email: mike@mjfesq.com

*Attorney for Timothy Blixseth*

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF MONTANA

| | | |
|---|---|---|
| *In re:* | ) | Case No. 08-61570-11 |
| | ) | |
| Yellowstone Mountain Club, LLC, | ) | |
| *et al.,* | ) | |
| | ) | |
| Debtors. | ) | |

_____

### AFFIDAVIT OF MICHAEL J. FLYNN

_____

    I, Michael J. Flynn depose and state that I have personal knowledge of the facts contained in this affidavit, unless stated to be based upon information and belief.  Where facts are stated to be based on information and belief, I believe them to be true and accurate to the best of my knowledge.

    1.  I am an  attorney licensed in Massachusetts appearing in this matter  pro hac vice on behalf of Timothy Blixseth.

    2.  Attached hereto as Exhibit 1  is a true and correct copy of a financial statement of Edra Blixseth dated August 15, 2008, two days  after CIP Yellowstone  Lending, LLC, ("CIP YC")  loaned Edra Blixseth $35 Million Dollars ("the Predatory Loan") on August 13, 2008 represented by  two 48 day promissory notes secured by "Community" assets she received from

– 1 –

the Blixseth Marital Settlement Agreement ("MSA") on August 13, 2008.  The secured Community assets are "Porcupine Creek," ("PC"), and the "Family Compound" at the Yellowstone Club, ("YC").  I first received Exhibit 1 from Gary Peters shortly before the commencement of phase 1 of the AP 14 trial.   I am informed and believe that this document was subsequently recovered from the Edra Blixseth computers in the possession of Jory Russell, (hereinafter the "Russell computers"). On said financial statement, Edra Blixseth ("EB") records the "current market value" of PC to be $207 M;  the "Family Compound" at $40 M;  Farcheville at $63 M;  and the YC to be  $500 M, for a total of $ 810 M.    EB states that except for the "Family Compound" these  assets are owned by "BGI." EB states her "Net Worth", based on her sole ownership of BGI,  on Exhibit 1 as $849.5 M, and her projected "net cash flow" for 12 months at $40. 4 M,  derived from PC, YC, "Big Springs Realty", "Blixware"  and BFI" revenues. As hereinafter recited, I believe that Exhibit 1 may be based, in part, both on the "control" exercised by SB and his entities based on the "Predatory Loan;  and the "lending advisory control" exercised by SB in the planning and implementation of the Predatory Loan.

3.   Attached hereto as Exhibit 2 is a true and correct copy of a "Post -Settlement" financial statement dated July 15, 2008.  I am informed and believe that Exhibit 2 was recovered from the Russell computers and that the "Post-Settlement" reference relates to EB's financial status after the scheduled closing on the MSA based on the division of marital Community assets based on the executed MSA on June 26,  2008, which closing was originally scheduled for July 3. 2008; and which closed on August 13, 2008. I am informed and believe based upon emails recovered from the Russell computers that Exhibit 2 or a similar financial statement was given to Samuel Byrne ("SB"), and or Cross Harbor Capital Partners, ("CHC"), and / or CIP YC, before,

on, or after July 15, 2008. I believe based on recovered documents from the Russell computers, and inferences derived from said documents that there are deleted or destroyed documents from the Russell computers that may be in the possession of SB or his entities, CIP YC and CHC; and that said deleted documents may relate to Exhibit 2, <u>or a similar version thereof,</u> as part of the "Deal" between EB and SB to use the $35 M Predatory Loan to plan, implement and transfer "control" of the YC to SB and CHC. Exhibit 2 states an EB "Net Worth" of $1.3 B <u>based on a YC value of $900 M</u>. I believe that the $900 M "Post-Settlement" value on the YC may be based on the "Total Net Value" Credit Suisse appraisal method, previously condemned by the court in its "Interim Order."

4. Attached as <u>Exhibit 3</u> is a "Discussion" Memo between "Edra/YC Entities and Cross Harbor Capital Partners" dated August 1, 2008, approximately two weeks *before* the MSA and Predatory Loan closing. Exhibit 3 states on p. 3 that CHC has "RECEIVED" "All divorce settlement related documents"; required "Detailed, updated financial statements for EB" (the inference is that EB had previously provided financial statements and "updates" were needed); required "All underwriting materials provided to PEM, Archer and other "Potential Sources of Capital" establishing that CHC required complete and thorough knowledge and possession of "All" documents relating to EB's financial status *based on her submissions to other lenders* - (the inference, coupled with several emails, is that Exhibit 2 had been submitted to other lenders and was also possessed by CHC *before* the closing). Significantly, CHC required "**full recognition of its existing rights through the execution <u>of the previously agreed upon Letter Agreement."</u>** I am informed and believe that said "**Letter Agreement**" has not been recovered

— 3 —

from the Russell computers and remains concealed or destroyed. Exhibit 3 states on p. 4 that

**"CH Will control distributions of YC working capital."** This establishes SB "control" over

the YC as a component of the Predatory Loan. Exhibit 3 also establishes SB and his entities

assumption of a position as a "Lending Advisor" to EB as contained in numerous statements in

their "Discussion" including: (i) who, why, the amount, and how to "Secure additional financing

from Archer Capital Management ($55.1MM,net)" and how it gets paid; (ii) the sale of

Farcheville and to whom and how to distribute the proceeds and make "**Additional EB**

**Investment directly into YC** with the CH "estimates" to "cover current accounts payable" and

projected "operations through 10/31/2008"; and the planning of a "YC Preferred Equity Offering

and YC Governance" based on a detailed joint venture essentially controlled by SB and his

entities with detailed provisions subsequently contained in the "Agreement to Form." Exhibit 3

states that based upon the SB and CHC analysis, planning, and implementation control

mechanisms, "**early stage analysis indicates future net cash flow to EB of $600 + MM."**

The compelling inference, particularly based upon the last representations of CHC is that SB /

CHC were using their "insider" "Predatory Loan" position as of August 1, 2008 to take

complete control of YC with *full knowledge of EB's financial position*, and representing a $600

M "net cash flow to EB" in order to obtain control. I am informed and believe that based upon

existing case law, and related facts inferred from existing emails and documents recovered from

the Russell computers, that documents remain concealed or destroyed relating to said

representations by CHC; and that SB and CHC made said representations, specifically the "$600

M net cash flow to EB", based upon concealed and / or destroyed documents with knowledge

of EB's financial status based upon her liabilities disclosed in Exhibits 1 and 2; and contained in

– 4 –

the **"UNDERWRITING MATERIALS"** referenced in Exhibit 3. I am further informed and believe that most of the emails between CHC lawyers and EB lawyers have not been found on the Russell computers. **I am further informed and believed that based upon recovered emails and documents the "Letter Agreement" referenced in Exhibit 3 was analyzed by EB's lawyers in the context of mutual releases between EB, the YC and CHC, Said emails and releases have not been produced to Tim Blixseth.**

5. Attached as <u>Exhibit 4</u> is an email chain between EB"s consultant Jim Goldfarb, Jory Russell and EB lawyers from the Liner law firm handling the "Predatory Loan" transaction, stating that as of **July 21, 2008, ten days before the creation of Exhibit 3,** CHC was able to exercise "control" over EB's lending status with "PEM" through the CHC mortgage on the Family Compound, which is not reflected on the July 15, 2008 financial statement prepared with Goldfarb and Liner *just six days before*. The only lien listed is "LeMond." According to Exhibit 1, after the closing on August 13, 2008, CHC owned a first mortgage ($13 M), LeMond a second ($13.5 M) and CHC a third ($22 M) for a total of $48.5 M on the Family Compound then valued at $40 M. The inferences are that there exist emails between *either* the Liner lawyers and / or Goldfarb on the one hand, and the SB lawyers on the other, during the period between June, 2007 - the date of the LOI to sell the YC to SB and the present, particularly in the summer of 2008, which emails have not been recovered - or produced before phase 1 of the trial.

6. Attached as <u>Exhibit 5</u> is a internal **"MEMORANDUM"** dated September 5, 2008, by and among SB and CHC principals and lawyers, circulated just weeks after the CHC Predatory Loan, based on an analysis of the Credit Suisse "Predatory Loan, and inferring that said analysis predated the CHC Predatory Loan, based upon other emails and documents.

Significantly, the "MEMORANDUM" is dated just 4 days after EB had already defaulted on September 1, 2008 on an interest payment inserted into the Predatory Loan thereby causing an almost contemporaneous event of "default" on the promissory note and deed of trust. Exhibit 5 contains graphs planning and implementing total control over the YC and EB based on her already defaulted loan status; but more importantly its control is based on their pre-planned "default" of YC under the Credit Suisse loan by making their Predatory Loan to transfer control and ownership from Tim Blixseth to EB. Paragraph number 2 on page 3 of Exhibit 3 states: Restrictions on Change of Control (Sections 5.19) That Section refers to the Credit Suisse Predatory Loan requiring that BGI or Tim Blixseth "must at all times directly or indirectly control" the YC; "and own, directly or indirectly, 51 %" of the YC , and then references a proposed "Executive Committee" controlled by CHC as being a breach of the Credit Suisse loan. Exhibit 5 then states: "Note that while the 51% ownership test will be met as to YC and YD, this is not the case now with respect to Big Sky Ridge, LLC." I believe that the effect of CHC's own analysis is an admission that CHC knew when it made its Predatory Loan to EB it was creating a default on the Credit Suisse loan permitting it to put the YC into bankruptcy; and CHC knew that EB's financial status was such based on Exhibits 1-3 and subsequent Exhibits herein that she would default as of September 1, 2008 thereby obtaining complete control over the YC. Mr. Blixseth requires the production pursuant to his subpoena to CHC and SB of all emails and documents relating to Exhibit 5.

7. Attached as Exhibit 6 is the loan closing document reflecting complete control by CHC of the use of virtually all of the Predatory Loan proceeds.

– 6 –

8.    Attached as Exhibit 7 is an email chain between EB, and SB and others, starting on March 11, 2008, just two weeks before SB terminated the YC sale on March 26, 2008, and while EB had her agent Gary Peters were negotiating with SB to make their own deal with SB. EB writes: "Thanks so much for the follow-up. I will wait to hear from you what you come up with both in regard to your (and group) interest in moving forward on something and/or CrossHarbor/Sam." The March 25, 2008 email between TB and SB references SB's bankruptcy plan. The Harris, Arenson, Kidd email dated October 15, 2008, a month before the YC bankruptcy filing demonstrates CHC control with its agent, DLC, based on "DLC's plan." Two days later, SB tells his agent, Joseph Harris that SB is "going to write the 'plan tonight to solve the entire YC debacle. It could be brilliant. Harris then says it is "possibly evil" and "it could be worth over a billion dollars....I hope it includes the dip and filing by Friday." There are no emails and documents in which Byrne sent the "evil plan". Just 4 days before said emails, on October 21, Chris Wright, a present member of the ad hoc Committee, having votes on the Liquidating Trust, emailed EB stating "But right now we aren't even mentioning bankruptcy or a DIP loan". Upon information and belief, I believe said "not mentioning" refers to a plan between CHC and SB not to disclose to the members the planned bankruptcy reflecting control over all aspects of the planned filing by CHC; and the complete relinquishment by EB who states: "thats a good point....i don't care you all decide the when of this." Based on this email chain and other emails referencing emails that have been destroyed or concealed, including the unproduced "Letter Agreement" referenced in Exhibit 3 hereto, I believe that both SB and CHC are in possession of emails and documents relating to a separate deal between EB and SB and CHC which occurred between March 11, 2008 and the CHC Predatory Loan. The compelling

– 7 –

inference is that EB gave up control and ultimately ownership to SB and CHC of over $700 M in assets based on the values in Exhibit 1 of the YC and PC for a "Predatory Loan" of $35 Million Dollars. In addition to the "$600M net cash flow to EB" representations made in Exhibit 3, the compelling inference is that Samuel T. Byrne made undisclosed promises to "EB" for her to forfeit over $650 Million Dollars of Blixseth marital Community assets.

9. Attached as Exhibits 8 through 11 are true copies of emails representing just a sampling of numerous emails containing evidence that: (a) EB planned to falsely accuse Tim Blixseth, and "hit him from all sides" and obtain "control of the YC in violation of Los Angeles Superior Court Orders now merged into the final judgment of divorce; (b) EB and SB misleading the B shareholders; (c) an email with an unrecovered attachment with EB stating "never tell that I am sending you all this" as part of EB's interference with Los Angeles Superior Court orders now merged into the final judgment of divorce. To my knowledge we have not recovered the missing attachment. These issues relating to "bad faith" collusion between EB and SB are now on appeal.

10. Attached as Exhibit 12 is an email whereby Byrne and DLC are agreeing that EB committed "perjury" before this court regarding issues relating to CHC and DLC control of the YC. As seen above in Exhibits 1 - 3, SB and CHC did in fact obtain "control" over the YC through the SB "Predatory Loan;" and thus, SB and DLC *knew she was committing perjury in order to have this Court approve their bankruptcy plan including the Liquidating Trust to sue Tim Blixseth.* SB's knowledge of said post petition "perjury" by EB involves issues relating to "bad faith" and exculpation, and Tim Blixseth's rights to cross-claim against SB, CHC and Credit Suisse, al of which issues are now on appeal.

– 8 –

11.     Attached as exhibit 13 is an email EB sent to Gary Peters, "My Guy," to negotiate and make a separate deal with SB on March 21, 2008, five days *before* SB terminated the YC sale, and  in violation of Los Angeles Superior  Court Orders and in contradiction of her  sworn testimony to said Court on that same date that she was not interfering with the sale.  These issues are now on appeal relating to SB exculpation and "bad faith."

12.    Attached as Exhibits 14 and 15 are two fabricated Grand Jury "Target Letters." Upon information and belief,  these letters were fabricated by Dennis Montgomery acting in collusion with his partner, EB;  and used by EB with the media and SB after January 15, 2008, the date the YC  sales  contract was signed. They were used by EB   to interfere with and ultimately to  kill the YC sale in violation of Los Angeles Superior  Court Orders, now merged into the Final Judgment.

13.     Upon information and belief, the  following facts and events contained in the following chronology are true.  This chronology relates to the "Target Letters" and how they were used to interfere with the YC  sale by TB to SB.  The chronology also relates to the EB and Dennis Montgomery relationship and how that relationship impacts the current case issues, including the computer hacking by Montgomery into Tim Blixseth's and Michael Flynn's computers throughout these proceedings thereby interfering with the attorney client relationship warranting dismissal of all of the claims against Tim Blixseth.  This Court previously denied said motion but new evidence is emerging relating to said computer hacking.   Finally, the chronology relates to the pattern of fraudulent loans procured by Edra Blixseth to finance a plan to obtain control of the YC, including the fraudulent Wachovia loan as it relates to Montgomery's technology, now publicly exposed as involving a massive fraud on the U.S.

– 9 –

government.   The fraudulent technology is owned by EB's company,  "Blxware." The Blxware valuation on EB's financial statements is approximately $22 M.  This is fraudulent. Based upon personal knowledge,  and information and belief, Blxware possesses no marketable technology, the technology as represented does not exist, it was subject to an injunction when EB  pledged it to Wachovia; and Ms. Blixseth knew  throughout the period in which she submitted loan applications and financial statements to the various lenders that the purported Blxware technology did not exist, and that Montgomery was engaged in computer hacking for her benefit . EB paid Montgomery almost $6 Million dollars between April, 2006 and February, 2009 for non-existent technology, which raises the inference that it was paid  to perform computer hacking.

March 1, 2006:          The FBI raided Dennis Montgomery's house searching for certain "noise filtering" and "compression" software and hard drives he took from eTreppid Technologies, and alleged classified information, involved in then pending litigation in Reno, NV.  Later, in June, 2007, when Montgomery was subpoenaed to produce certain  "bribery emails" before a Washington D.C Grand jury, which  he claimed proved that Warren Trepp bribed  NV Governor Gibbons,  Montgomery took  the boxes of software and hard drives  to EB's residence, Porcupine Creek.   The compelling inference is that Montgomery took approximately 23 boxes filled with hard drives from eTreppid  to conceal his fraud on the U.S. government over the previous several years, because the hard drives may have proved Montgomery's lack of "source codes" with respect to

purported "noise filtering" technology; and may have contained evidence as to *how* Montgomery perpetrated the fraud through hundreds of "parallel" web-sites and email addresses he used as part of his computer hacking scheme. These matters are now at issue in the Nevada litigation. EB and Montgomery confessed $26.5 M in judgments to avoid, inter alia, production of the stolen hard drives.

March - April, 2006:  EB and Montgomery, and Michael Sandoval concluded a deal for Montgomery to turn over the software to their new company, Opsprings - now Blxware. Edra paid Montgomery approximately $3.8 M including a $100K per month salary between April 1, 2006 and July 1, 2007; and continued to pay him $100,000 per month until July, 2008 when they were concealing the hard drives from the Nevada court. Then, in February, 2009 for non-existent technology and after years of computer hacking, she made a final "pay-off" to Montgomery of $753,000. EB also paid Sandoval, who allegedly knew, according to his chief scientist, that the technology did not exist; and that Montgomery was a con, approximately $20 Million dollars. Much of this money came from the Credit Suisse loan. The evidence supports an inference that EB paid Montgomery to hack into TB's computers, which has interfered with TB's ability to defend this case because of their interception of attorney client communications; and to try to perpetuate the fraud on the U.S. Government.

– 11 –

April, 2006 -

September , 2006:  EB attempted to get the U.S. Gov to buy the software using her purported

political contacts with Cheney and others in the Bush Administration in

order to obtain a government contract.  EB isolated  Tim Blixseth from the

deal.  Cheney and the  Bush Admin rejected  EB and Montgomery. EB

then planned and implemented   a media campaign against Gibbons and

the "Republicans"  through her contacts at the Wall Street Journal and

NBC  in order to "pressure" the Bush White House using Montgomery's

fabrication of two purported "bribery emails" allegedly evidencing

Warren Trepp's bribery of Gibbons to get government contracts.  These

are the same media contacts, EB and Montgomery contacted when she

used the fake Grand Jury "Target Letters" to kill YC sale in March, 2008.

The FBI  in DC later concluded (in 2009) that Montgomery fabricated the

emails and dropped the  investigation of Gibbons and Trepp. EB

employed the law firm of Skadden Arps to deal with the "bribery email"

Grand Jury and the  required production of the bribery emails. The same

law firm represented Credit Suisse in the Montana bankruptcy

proceedings

September -

December, 2006:  Montgomery gave the  bribery emails and other documents to EB's

contacts at the Wall Street Journal ("WSJ") and to Lisa Meyers of NBC.

EB had NBC video tape an interview of Montgomery at Porcupine Creek

– 12 –

in early November 2006, the weekend before the elections. The WSJ published a front page article on Nov. 1, 2006 just before November elections in which Gibbons was running for Nevada governor. The WSJ later published two more articles based on the alleged bribery using Montgomery documents. Said evidence supports EB's use of the media to get what she wants. In March - April, 2008 as supported by the emails attached hereto, she used the media to attack Tim Blixseth resulting in damages to the YC.

December, 2006:    EB and Tim Blixseth ("TB") separated and filed for divorce. TB attempted to distance himself from EB's involvement with Montgomery; and later gave EB the software company, Blxware, as a marital Community asset, in which the marital Community had invested approximately 20 million dollars much of which EB received from the Credit Suisse loan.

January -

April, 2007:    TB negotiated and planned the sale of Yellowstone Club to Sam Byrne and Cross Harbor Capitol. EB hired Deborah Klar and the Liner firm to kill the sale and take over Blixseth Group, Inc., ("BGI"), the owner of the Yellowstone Club, ("YC"). TB also planned the sale of Porcupine Creek in order to achieve an equal division of Community assets and to pay off the Credit Suisse loan and other debts.

April, 2007:    EB learned TB had made a tentative deal with Sam Byrne ("SB") to sell

Yellowstone Club. EB and Deborah Klar, a purported bankruptcy expert, began planning to kill the sale by first filing a law suit to control BGI. There is evidence in April, 2007 that Montgomery was hacking into TB's computers and giving information to EB and Klar.

May 1, 2007:   Klar filed a Cal. Civil action and subsequently numerous motions to effectively take control of BGI, the owner of YC and Porcupine Creek in order to undermine TB's negotiations with SB. The case was dismissed and motions denied.

June, 15, 07 -

August 08:   EB borrowed 13 M from Western Capitol Partners through the Story Mills project. There is evidence of fraud. While representing to the lender that she had a  separate net worth of almost a billion dollars, and could pay her debts as they matured, and had never filed bankruptcy, she was filing sworn, sealed affidavits in the divorce proceedings that she was millions of dollars in long overdue debt which she was unable to pay. In fact, EB had previously filed bankruptcy; and her net worth was based on the "total net value" appraisal method condemned by the Montana bankruptcy court.

June 28, 2007:   TB signed "Letter of Intent" to sell YC bulk assets to Sam Byrne / Cross Harbor Capital for $470 -510 million dollars. SB began due diligence.

July    2007:   EB through Klar and Jaffee filed motion to enjoin sale of YC claiming inadequate price and lack of knowledge of sale. The inadequate price was

– 14 –

based on their sworn affidavits that the YC was appraised at 1.2 Billion.
This was based on the "Total Net Value" appraisal method. Klar admitted
dealing with LeMond's counsel, who was then suing Tim Blixseth and the
YC. Klar knew LeMond's interests were adverse to the marital
community.

August 14, 2007: EB / Klar's motion to enjoin sale was denied by divorce court judge. EB
was ordered NOT to interfere with sale. There is evidence that EB and
Klar began a "scorched earth" litigation scheme seeking to have TB
investigated and indicted while cooperating with LeMond; and which
"scorched earth" scheme was also pursued in the Nevada eTreppid
litigation to conceal the hard drives and "crush" EB's opponents,
including the affiant. See Nevada "Sanctions Order." at 2009 U.S. Dist.
LEXIS 35543 (D. Nev. March 31, 2009).

August -

November, 2007: EB borrowed approximately $7 M from American Bank based on
questionable financial statements. (TB has not yet received the American
Bank loan documents which have been delivered to the counsel for the
Liquidating Trust.)

January 15, 2008: TB and SB signed $455 M contract for sale of YC. SB claimed to have
spent $4 plus M in due diligence.

Jan. 15, 2008-

March 21, 2008: During this time frame, SB informed Robert Sumpter that he knew about,

– 15 –

and /or had seen, and /or had possession of the fake Target Letters. Sumpter called TB and told him of the SB conversation relative to the fake target letters. TB immediately called SB and demanded an explanation and source of the letters. SB initially refused to disclose, and upon being pressed, stated that EB has read them over the phone to SB. SB told TB that this was a big problem as he was obligated to advise his lenders which could kill the deal. SB sought adjustments and <u>reduction in price</u>. SB advanced plan to put the YC into bankruptcy.

March, 2008:     EB borrowed $5 Mil from Wachovia Bank; and $8 Mil from First Bank & Trust. The Wachovia loan documents evidence extensive and intentional fraud including affirmative falsehoods about her involvement in litigation adversely impacting her financial status. EB also directly concealed the fact that the collateral she pledged for the loan was in fact subject to a preliminary injunction in the concealed litigation. EB and her lawyers and bookkeeper, Jory Russell used financial statements claiming an $800 M "net worth" based on the "TNV" appraisal method while negotiating with Byrne to put YC into bankruptcy.

March 21, 2008:     EB sent Gary Peters to meet with SB in his Boston office to make a separate deal while she appeared in divorce court <u>on that very day</u> testifying that she was not interfering with the sale; and was again ordered not to interfere with the sale.

March 26, 2008:     SB terminated the YC. Sale. Two days later EB planned a massive media

– 16 –

campaign and attempted to intervene in the LeMond litigation to oust TB as Manager of the YC.. They failed BUT YC equity was devastated from the media campaign, as admitted by SB. There is evidence that EB orchestrated the media campaign; and submitted false affidavits to the Montana court to oust TB and obtain control of the YC.

June, 2008:   EB borrowed $3 M more from Wachovia. There is extensive evidence of fraud, including concealment of litigation in which the security pledged for the loans was then subject to an injunction. EB rewrote loan with Western Capitol including fraudulent concealment of litigation. EB rewrote and increased by $2.5 M the loan with American Bank. There is evidence of fraud.

March -

August 13, 2008:   EB and SB negotiated, made and consummated deal to have SB / CHC loan her $35 M to take over YC in divorce proceedings and transfer control of YC to SB and CHC. According to Montgomery, EB and SB made a secret deal for EB to receive $3 M per year for 10 years. In YC bankruptcy, SB stated under oath that the loan to Edra on Porcupine Creek and the LeMond payment was unrelated to the YC bankruptcy, "Its got nothing to do with me" and "had nothing to do with us" See April 9, 2009 deposition pages 96-104 attached hereto as Exhibit 16. There is evidence that this testimony is false. See Exhibit 3 hereto wherein CHC is not only controlling EB and the YC through the "Predatory Loan", it is

– 17 –

actually acting as her "Lending Advisor."  In other words, all of these

matters had EVERYTHING to do with Mr. Byrne

November, 2008:     EB  and SB put YC in to bankruptcy subject to SB's "brilliant" plan to act

as the DIP.

March, 2009:        EB  filed personal bankruptcy having effectively transferred the bulk of her

assets to Mr. Byrne in one form or another..

June 24 - July 8, 2009:  EB's bookkeeper, Jory Russell was caught under oath destroying Edra's

files on two computers. Later, some of the files are forensically

recovered and provide evidence of concealed or destroyed documents.

See below.

September -

October, 2009:      Montgomery informed TB that  he has  evidence against EB  including the

fake Target Letters, the concealment of documents, the concealment of a

server containing all the documents, (not yet produced) and the

concealment of the secret deal between EB and SB .

October,  2009:      On verge of going to jail for writing 1.9 M  in fraudulent checks in

Nevada, Montgomery gave TB  the target letters. Montgomery claimed he

also has a Kinko's fax cover sheet and / or copies of the letters with an

unredacted fax header from Kinko's in Boston relating to SB's  possession

of the letters. Within a day of getting the letters, TB  and I contact and

send them to the DOJ,  the FBI, and the U. S. Attorney's office in

Washington D.C. and Montana.

December, 2009:        TB located numerous  web-sites and email addresses that "parallel" or

"mirror" sites and addresses of  EB's opponents .  Montgomery  tells TB

that he has the same type of "parallel" sites for TB and the affiant.  On

investigation by a computer expert, who determined that the sites are

registered to a domain company called Network Solutions all registered to

an entity owned or controlled by Montgomery called "Off Shore Ltd."

with Porcupine Creeks address.  Some but not all of these sites are:

"Cross Harbor Capital.net"; "Tim Blixseth.com". "JessicaBlixseth.com"

to name a few.  Based on  statements of Montgomery, and my prior

knowledge of Montgomery's fraud on the U.S. Government, the evidence

suggests that Montgomery used these sites and addresses to  hack into

computers and as part of their technology scam to sell fake  technology to

the U.S. Government.

December, 2009 -

January, 2010:        TB and his technology expert continue to recover deleted emails from the

Russell computers, including Exhibit 3 to this Affidavit.


### THE RUSSELL COMPUTER SPOLIATION

14.    On May 14, 2009, on the motion of Western Capital Partners, this Court ordered

the 2004 exam of Jory Russell, Edra Blixseth's primary financial assistant.  Pursuant to said

Order, Russell was ordered to produce electronic and paper documents including "complete

copies of computer hard drives and other electronic storage media" relating to Edra Blixseth as

"described in the Motion for Rule 2004 Examination."

15. On June 13, 2004 Russell was served with a subpoena requiring his attendance on June 23, 2009 for examination under oath; and the production of all documents, emails, financial records and statements, bank records relating to Edra Blixseth; and specifically including "complete copies of computer hard drives and other electronic storage media which contain any and all accounting, email, and financial information" relating to Edra Blixseth in Russell's possession as described in the subpoena and in the Order incorporating the Motion.

16. Within a "day or two" after receiving the subpoena, Russell spoke to both Gary Deschenes, Ms. Blixseth's personal bankruptcy lawyer, and to Edra Blixseth. (Tr. 11.1.09, p. 30, L. 18-20. He informed them that he had received the subpoena, that he possessed documents stored on computers responsive to the subpoena; and that " I was printing off the documents." (Id p. 30 L. 11 to p. 33, L. 11). Russell testified that during the week before his attendance "I would read the subpoena" and then print out responsive documents including emails. (Id p. 35 L. 8-15). He printed out about a "foot and a half" of responsive documents before he ran out of paper. (Id. P. 36 L. 12-16). He had possession of two computers containing materials responsive to the subpoena, a lap top and a desktop, but only printed from his desktop before the June 24, 2009 exam. (Id. P. 38 L. 8-12)

17. Mr. Deschenes did not file a motion to quash or for a protective order.

18. Mr. Deschenes did <u>not</u> represent Russell at any time in these matters. He represented Edra Blixseth at all times material herein. Thus, at no time did his instructions to Russell as recited herein fall within the attorney client privilege.

19. Russell first testified on June 24, 2009. That volume was designated Vol. 1 in the

– 20 –

Edra Blixseth bankruptcy proceedings.   There are also two additional volumes of his testimony in the Edra Blixseth bankruptcy dated July 8, 2009 and August 5, 2009; and designated Vol. II through III.   There is a fourth day of deposition taken on November 1, 2010 in AP 14.   In this Affidavit, each volume is designated by date.   In the June 24, 2009 examination, as he later admitted on July 8, 2008, neither he, nor Mr. Deschenes, nor Ms. Blixseth,  disclosed his then possession of either the lap top or the desk top, or the "foot and a half" of documents he had printed out "from the desktop", although he knew they were in his possession and responsive to the Court's Order. (Tr. 8.8.09, p. 13 L. 7 to p. 14, L. 16).   He also knew there was a scheme in place to conceal the computers and the responsive documents  orchestrated by Mr. Deschenes. Id. P. 13 - 30.  See specifically Tr. 8.8.09 at p. 15,  L. 21 to p. 18 L. 18 for the possession and non-production of the subpoenaed documents.  As hereinafter recited, Russell  only produced about 4" of documents from his wife's computers which were virtually  the entire subject of his short 52 page deposition permeated with attorney client privilege assertions designed to conceal the un-produced computers and documents.

20.  On the night of June 23, 2009, in preparation for his deposition, Russell picked up Mr. Deschenes at the airport and drove him to Ms. Blixseth's estate, "Porcupine Creek." According to Russell, he informed Mr. Deschenes and Edra Blixseth that evening  that he had in his possession in the "trunk" of his car the lap top and a banker's box with **about a foot and a half of documents** that he had printed out during the previous week from his desktop.  In his July, 8 2009 testimony, he swore that there were different documents on his desktop and lap top that were subject to the subpoena; that he only printed from his desktop; and the lap top and desktop were not synched. Tr. 7.8.09, p. 23,  L 14 - 22.

21.     On the night of June 23, 2009, Mr. Deschenes  then requested Russell to give them the lap top and the printed documents because "I was told that was not my property."  Tr. 7.8.09, p. 35 L. 3 -22.   The desktop was still at his home; (Tr. 11.1.09, p. 51 L. 24-25; from which he had printed  about a "foot and a half" of documents that he knew were responsive but he  gave to Mr. Deschenes and Edra Blixseth the evening before his deposition on June 24th;  but now wasn't sure  if the computers were synched; or who told him not to produce the documents and computers, Mr. Deschenes or Ms. Blixseth.  Tr. 11.1.09 p. 38 L. 8-15; p. 52, L. 4 to p. 54 L.  24.

22.     Russell makes a series of remarkable admissions and contradictions in  his testimony between July 8 and November 1.  He admits that he was at Porcupine Creek, *one or two days before*  Mr. Deschenes arrived <u>printing off documents off  Edra Blixseth's printers</u> that were also not produced on June 24th, but were supposedly part of the "foot and a half."  Tr. 11.1.09 p. 55, L. 14-25.   But in his November 1 testimony, he said that he had told Blixseth and Deschenes on the night of June 23, 2009 before his deposition that the "stack of documents" representing  the "foot and a half" in the bankers box from his trunk **were  from the "lap top**."  Tr. 11.1.09, p.  54, L. 7 to P. 55 L. 13.  In his three days of testimony after June 24, 2009, July 8, August 5 and November 1, 2009, Russell gives conflicting testimony on what he destroyed and when. On August 5, 2009, he testified that he destroyed "everything pertaining to Edra Blixseth" on the desktop; and  "I  deleted copies of everything that were on Edra's lap top—or — yeah, Edra's lap top, the lap top  that I was using." Tr. 8.5.09 280:10 to 282: 1.

23.     The first mention of being accused of theft of the documents came up in Mr. Deschenes' presence. Tr. 11.1.09 , p. 56 L. 5-20.  Russell testified he had no recollection of any "plan" to shut down his deposition the following day being discussed but he remembers a "John

Roselli" showing up at his deposition to put his deposition "on hold.". Tr. 11.1.08 p. 57, L. 14 to p. 59 L. 5. The next day he deleted documents off his "desktop." Tr. P. 59, L. 6-11. Mr. Russell then asked for a break. Id at p. 61, L. 18.

24.     Russell relied on Mr. Deschenes not to produce the documents or the computers on June 24 at his deposition. Tr. 66 L. 3 to p. 67 L. 3. Neither Russell, nor EB, nor Mr. Deschenes disclosed on June 24, 2009, that just a month before that, on May 19, 2009, five days after the court order, EB's business partner, Montgomery, delivered a "server" at Porcupine Creek, called the "Blxware/Blixseth.com" and related domain names containing thousands of emails, and with what Russell now claims contains "everything" from both computers in his possession. Tr. 11.1.09. That "server" has never been produced; and apparently, has disappeared..

25.     Russell also destroyed two USB hubs by throwing them in the "garbage" containing "accounting software" provide by Pat Yarborough, EB's bookkeeper, and also documents responsive to the Western Capital subpoena that were on the lap top. Tr. 11.1.09 p. 70 L. 10 to p. 71, L. 13.

26.     In his July 8th testimony, Russell admitted destroying documents off *both* the lap top and desktop and that they were not synched. Tr. 7.8.9, p. 38, L. 11 to p. 39, L. 18.

27.     He also stated that on the night of June 23, he then proceeded to print out more documents from the lap top that evening while in the presence of Mr. Deschenes and Ms. Blixseth, and after printing for some time, he stopped. At some time during this entire episode of spoliation, he also put additional documents on a USB hub which he filled; and later threw in the "garbage.". Tr. 11.1.09 p.70, L. 10 top p. 81 L. 13. It is unknown what happened to the

printed documents printed out the evening of June 23, 2009; and the chain of custody of the "foot and a half" is unknown..

28.    At the June 24, 2009 exam, Mr. Deschenes engaged in what can only be called an intentional charade using Russell as a dupe. <u>Neither Russell or Mr. Deschenes ever mentioned the two computers, or the "foot and a half" of documents given to him the night before by Russell, or the 3' of documents printed out the night before from the lap top given to Blixseth / Deschenes that evening.</u>  Instead, Mr. Deschenes <u>had Russell produce about "4 inches" of emails</u> mostly relating to attorneys,  <u>which he claimed were from his "wife's computer",</u> which Deschenes then asserted the attorney client privilege on. (Tr, 6.24.09 pp. 1-51).   The production of the 4" of printed documents from the "wife's computer constitutes an admission that Russell, Mr. Deschenes and EB had a duty to produce the other computers and printed documents.

29.     Mr. Deschenes then carried on this  Roselli  charade in the context of the 4" of produced documents, the attorney client privilege, and a privilege log in what is shocking deception relating to the subpoenaed computers, the subpoenaed foot and a half of documents that  Russell actually possessed, all given to him the night before while using the 4" of documents as a cover, and the subsequent destruction of the contents of the computers the following day. Tr. 6.24.09 p. p. 4o to 50.  Specifically, under the cover of the 4" of emails relating to the attorney client privilege and not providing the non- privileged documents, with Western Capital's lawyer who were demanding that they be given to the court reporter at the June 24th deposition,  Mr. Deschenes stated at p. 46 L. 10-12:

**"No. We're not going to give them to you today because of the other deal. We don't want   to have these things produced if we're...."**

– 24 –

The "other deal" is the Roselli charade. The compelling inference is that Mr. Deschenes knew that the entire June 24th charade with Roselli , and the 4" of documents produced after Russell had produced everything the night before,  was a cover for the violation of the subpoena and  the court order in order to give Blixseth and Russell time to destroy evidence, which he admittedly did. The Western Capital  lawyers heard Edra Blixseth state words to the effect that "Sam is ok with the deal" inferring that Sam Byrne was the source of funding to buy out  the Western Capital note.  Additionally, EB's "partner", Dennis Montgomery, apparently then in conflict with EB, on June 25, 2009, the day after the deposition, called Tim Blixseth and told him  that the Roselli intrusion into the deposition was a "charade" to destroy evidence off the computers, which  Mr. Blixseth immediately reported to her trustee, Mr. Samson. Montgomery also texted TB during that time frame that they engaged in the foregoing conduct so they could buy time to erase emails. Without this tip from Montgomery, it is unlikely that the concealment of the computers and subsequent destruction would have been uncovered.

30.  The evidence suggests that the Rosselli / Byrne charade of buying off Western Capital Partners was a scheme to buy time to conceal and destroy evidence.  According to Russell in a conversation with the affiant, and according to Montgomery in a conversation with TB, Byrne's Vice-president, Matthew Kidd was present at Porcupine Creek throughout the June 24, 2009 deposition and subsequent meetings. The inference and circumstantial evidence is that there was no real intention to pay Western Capital Partners. **Following the suspension of the deposition, Russell admittedly spent the next day destroying documents on his desktop and his lap top**.  (Tr. 7.8.08 p. 23 L. 14 - p. 24 L. 12; Tr. 8.5.09, supra).  Contrary to his testimony on November 1, 2009 that he only printed from his desktop, (see above), on July 8, 2009 he had

testified that he printed from his lap top.  (Id p. 25 L. 4-24)

31.  Beginning on at least June 18, and continuing on June 22, and 23, 2009,  at least three days after informing Mr. Deschenes and Ms. Blixseth of what he was doing to respond to the subpoena, Russell may have also began deleting, concealing or destroying electronically stored files.

32.  Between the date of the Court's Order on May 14, 2009 and June 24, 2009, Russell had possession, custody and control of at least the lap top computer and the desktop computer containing hundreds of thousands of electronically stored documents relating to Edra Blixseth and required to be produced pursuant to the subpoena.  **Neither he, nor Mr. Deschenes, nor Ms. Blixseth complied with the court's order or the subpoena.**  At the time he only took advice from Mr. Deschenes. And Ms. Blixseth.

33.  According to his testimony, Mr. Russell was the  "Vice President of Business Development"  for Ms. Blixseth's software company, "Blxware," and the "Director of Business Operations" for Edra Blixseth personally, who "took direction  from Edra Blixseth on all matters."  (Tr.   11.1.09 p.25 L3-4). Russell had not worked for Ms. Blixseth for about "3 or 4 months" before the deposition; but he still possessed the lap top computer and the desk top computer containing materials sought in the subpoena. (Id p.32 L. 3-20).

34.  .  Russell's testimony as to who owned, and /or had the right to possess the lap top computer as of June 24, 2009, and the instructions he received from Mr. Deschenes and Ms. Blixseth on these issues  evidences concealment, destruction  and obstruction; ( Id 37-57).

35 .  The Russell testimony  is very specific that one or both of them told him not to produce either the foot and a half of documents or the lap top for his deposition the following

day; (Id. 52 L. 9-25) ; and that the "documents" (Id 56 L. 9-12) "was [sic] no longer my property and I shouldn't have it." (Id. L. 19-21). Gary Deschenes specifically told him that the lap top was not Russell's property the night before he was obligated by Court order to produce "copies" of its hard drive.  Mr. Deschenes knew that the Order to produce "copies" made both the actual ownership and possession of the lap top irrelevant because "copies" were required, and regardless of who had the right to possess the laptop - Ms. Blixseth or Russell, he obstructed the discovery process.  The fact that the destruction of material on the computers  occurred the next day  nails the coffin shut on their collective intent.

36.    Neither the  desktop or lap top computers   belonged to Ms. Blixseth. They belonged to YCW and Blxware.  No objection or motions to quash were filed by either entity.  Russell was properly in possession of both.  They each contained material required to be produced. .  Russell printed out the entire foot and a half from the desktop which did not belong to Ms. Blixseth.  Russell's  conflicting testimony as to what computers from which he printed unproduced documents evidences concealment and mens rea.   Mr. Deschenes did not represent either Blxware or YCW.

37.  Prior to the night of June 23, 2009, neither Ms. Blixseth, nor Mr. Deschenes, nor Blxware, nor YCW , or its Trustee, or anyone representing EB,  had requested the turnover of the computers, or any documents relating to Edra Blixseth, notwithstanding Russell's direct, routine and consistent assistance for the previous *nine months* in assisting Blixseth and her lawyers in finding documents and providing them to her lawyers, including Mr. Deschenes, and also to Mr. Byrne and his lawyers and to the lawyers in the YC bankruptcy.  (Exhibits to Russell deposition and emails sought to be destroyed by Russell which have been forensically retrieved from the lap

top and desktop will be produced at an evidentiary hearing.)

38.  Given M. Blixseth's critical role with Samuel Byrne in obtaining ownership of the Yellowstone Club in the Blixseth divorce,  and the subsequent control over the  YC bankruptcy proceedings by both Mr. Byrne and Ms. Blixseth through  the $35 Million dollar Porcupine Creek loan, as recently admitted by Mr. Byrne - but previously the subject of contradictory testimony by Mr. Byrne, as herein recited,  the aforesaid evidence relating to the concealment of evidence before July 17, 2009,  in and of itself should support a finding of bad faith in the YC bankruptcy proceedings, prior to plan confirmation on July 17, 2009.

Signed under the pains and penalties of perjury this 13th day of January, 2010 under the laws of the United States.

_____/S/ Michael J. Flynn_____

Michael J. Flynn