UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

DENNIS L. MONTGOMERY,

       Plaintiff,

v.                              CASE NO. 1:15-cv-20782-JEM

JAMES RISEN, HOUGHTON MIFFLIN
HARCOURT PUBLISHING CO., HMH
HOLDINGS, INC.,

       Defendants.

_____/

**DEFENDANTS' SPECIAL MOTION TO DISMISS THE COMPLAINT
UNDER THE D.C. ANTI-SLAPP STATUTE AND MEMORANDUM IN SUPPORT**

**HOLLAND & KNIGHT LLP**
Sanford L. Bohrer
  Sandy.Bohrer@hklaw.com
Brian W. Toth
  Brian.Toth@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, Florida  33131
Tel: (305) 374-8500
Fax: (305) 789-7799

**DAVIS WRIGHT TREMAINE LLP**
Laura R. Handman (*pro hac* pending)
  laurahandman@dwt.com
Micah J. Ratner (*pro hac* pending)
  micahratner@dwt.com
1919 Pennsylvania Ave., NW, Suite 800
Washington, D.C.  20006
Tel.: (202) 973-4200
Fax: (202) 973-4499

*Counsel for Defendants*

# TABLE OF CONTENTS

<div align="right"><u>**Page**</u></div>

I.     PRELIMINARY STATEMENT ........................................................................ 1

II.    STATEMENT OF FACTS .............................................................................. 2

    A.    Media Coverage of Montgomery Before the Book ................................. 2

    B.    Reliance on Official Records ................................................................. 4

III.   ARGUMENT ................................................................................................. 6

    A.    The District of Columbia Anti-SLAPP Statute, and other Relevant Anti-SLAPP Statutes, Provide Substantive Protections Against Claims Targeting the Exercise of Free Speech about Issues of Public Concern ............................... 6

    B.    Montgomery's Claims Fall Within the Scope of the D.C. Anti-SLAPP Statute, and Any Other Applicable Anti-SLAPP Statute ..................................... 11

    C.    Montgomery Cannot Demonstrate a "Likelihood of Success" on the Merits ...... 11

        1.    Montgomery is a Limited-Purpose Public Figure .................................... 12

        2.    Montgomery Cannot Demonstrate Actual Malice ................................... 14

    D.    The Anti-SLAPP Statute's Stay of Discovery Should Be in Place Pending Decision on the Special Motion to Dismiss .......................................... 18

IV.   CONCLUSION ............................................................................................ 19

<div align="center">i</div>

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*3M Co. v. Boulter*,
842 F. Supp. 2d 85 (D.D.C. 2012) ......................................................................................8

*Abbas v. Foreign Policy Grp., LLP*,
975 F. Supp. 2d 1 (D.D.C. Sept. 27, 2013) ...............................................................7, 11, 12

*Adelson v. Harris*,
774 F.3d 803 (2d Cir. 2014)..........................................................................8, 9, 10, 18

*Aeroplate Corp. v. Arch Ins. Co.*,
2006 WL 3257487 (E.D. Cal. Nov. 9, 2006) ...................................................................18

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986).........................................................................................................14

*Armington v. Fink*,
2010 WL 743524 (E.D. La. Feb. 24, 2010) ......................................................................18

*Aronson v. Dog Eat Dog Films, Inc.*,
738 F. Supp. 2d 1104 (W.D. Wash. 2010), *recon. denied*,
2010 U.S. Dist. LEXIS 105025 (W.D. Wash. Sept. 28, 2010)...........................................8

*Beckham v. Bauer Publ'g Co.*,
2011 WL 977570 (C.D. Cal. Mar. 17, 2011) ...................................................................10

*Bell v. Associated Press*,
584 F. Supp. 128 (D.D.C. 1984) ......................................................................................16

*Biro v. Condé Nast*,
963 F. Supp. 2d 255 (S.D.N.Y. 2013)...............................................................................15

*Boley v. Atl. Monthly Grp.*,
950 F. Supp. 2d 249 (D.D.C. 2013) .........................................................................8, 9, 11

*Brueggenmeyer v. ABC*,
684 F. Supp. 452 (N.D. Tex. 1988) ..................................................................................13

*CACI Premier Tech., Inc. v. Rhodes*,
536 F.3d 280 (4th Cir. 2008) ......................................................................................13, 16

*CanaRx Servs. v. LIN Television Corp.*,
2008 WL 2266348 (S.D. Ind. May 29, 2008) ...................................................................10

*Card v. Pipes*,
398 F. Supp. 2d 1126 (D. Or. 2004) ...................................................................9

*Chaiken v. VV Publ'g Corp.*,
119 F.3d 1018 (2d Cir. 1997)..........................................................................17

*Church of Scientology Int'l v. Behar*,
238 F.3d 168 (2d Cir. 2001)............................................................................16

*Clyburn v. News World Commc'ns, Inc.*,
903 F.2d 29 (D.C. Cir. 1990) ....................................................................13, 14

*D.C. Comics v. Pac. Pictures Corp.*,
706 F.3d 1009 (9th Cir. 2013) ..........................................................................8

*Farah v. Esquire Magazine*,
863 F. Supp. 2d 29 (D.D.C. 2012), *aff'd on 12(b)(6) grounds*,
736 F.3d 528 (D.C. Cir. 2013).........................................................7, 8, 9, 11

*Forras v. Rauf*,
39 F. Supp. 3d 45, 54-57 (D.D.C. 2014), *appeal pending*,
No. 14-7070 (D.C. Cir. May 21, 2014).............................................................7

*Garrison v. Louisiana*,
379 U.S. 64 (1964) ..........................................................................................14

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)........................................................................................14

*Global Relief v. New York Times Co.*,
2002 WL 31045394 (N.D. Ill. Sept. 11, 2002) ...............................................8

*Godin v. Schencks*,
629 F.3d 79 (1st Cir. 2010)...............................................................................8

*Haack v. City of Carson City*,
2012 WL 3638767 (D. Nev. Aug. 22, 2012) ..................................................19

*Henry v. Lake Charles Am. Press, LLC*,
566 F.3d 164 (5th Cir. 2009) ............................................................................8

*Klayman v. City Pages*,
No. 5:13-cv-00143-ACC-PRL, ECF No. 124
(M.D. Fla. Apr. 3, 2015) .................................................................................16

*Liberty Lobby, Inc. v. Dow Jones*,
838 F.2d 1287 (D.C. Cir. 1988).....................................................................15

iii

*Liberty Lobby, Inc. v. Rees*,
   852 F.2d 595 (D.C. Cir. 1988) ...................................................................................12

*Liberty Synergistics Inc. v. Microflo Ltd.*,
   718 F.3d 138 (2d Cir. 2013) ......................................................................................8

*Loeb v. New Times Commc'ns Corp.*,
   497 F. Supp. 85 (S.D.N.Y. 1980) .............................................................................15

*Logan v. District of Columbia*,
   447 F. Supp. 1328 (D.D.C. 1978) .............................................................................13

*Lohrenz v. Donnelly*,
   350 F.3d 1272 (D.C. Cir. 2003) ...............................................................................15

*Makaeff v. Trump Univ., LLC*,
   736 F.3d 1180 (9th Cir. 2013) .............................................................................8, 10

*McDowell v. Paiewonsky*,
   769 F.2d 942 (3d Cir. 1985) .....................................................................................13

*McFarlane v. Esquire Magazine*,
   74 F.3d 1296 (D.C. Cir. 1996) ...........................................................................14, 17

*McManus v. Doubleday & Co.*,
   513 F. Supp. 1383 (S.D.N.Y. 1981) .........................................................................17

*Parisi v. Sinclair*,
   845 F. Supp. 2d 215 (D.D.C. 2012) ..........................................................................15

*Peter Scalamandre & Sons, Inc. v. Kaufman*,
   113 F.3d 556 (5th Cir. 1997) ....................................................................................16

*Price v. Stossel*,
   620 F.3d 992 (9th Cir. 2010) ....................................................................................11

*Royalty Network, Inc. v. Harris*,
   756 F.3d 1351 (11th Cir. 2014) ..................................................................................8

*Sherrod v. Breitbart*,
   843 F. Supp. 2d 83 (D.D.C. 2012), *aff'd on other grounds*,
   720 F.3d 932 (D.C. Cir. 2013) ...................................................................................8

*Silvester v. ABC*,
   839 F.2d 1491 (11th Cir. 1988) ................................................................................13

*Smith v. Payne*,
   2012 WL 6712041 (N.D. Cal. Dec. 26, 2012) ..........................................................18

iv

*St. Amant v. Thompson*,
   390 U.S. 727 (1968) ......................................................................................................14

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987) (*en banc*) ...........................................................12, 15

*Thomas v. L.A. Times Commc'ns LLC*,
   189 F. Supp. 2d 1005 (C.D. Cal.), *aff'd*, 45 F. App'x 801 (9th Cir. 2002) .............9

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.*,
   190 F.3d 963 (9th Cir. 1999) ........................................................................8, 9

*Waldbaum v. Fairchild Publ'ns, Inc.*,
   627 F.2d 1287 (D.C. Cir. 1980) ..................................................................12

*Winn v. United Press Int'l*,
   938 F. Supp. 39 (D.D.C. 1996) ...................................................................14

**State Cases**

*Foretich v. CBS, Inc.*,
   619 A.2d 48 (D.C. 1993) ............................................................................14

*Gleichenhaus v. Carlyle*,
   591 P.2d 635 (Kan. Ct. App.), *aff'd in relevant part*,
   597 P.2d 611 (Kan. 1979) ...........................................................................13

*Mosesian v. McClatchy Newspapers*,
   285 Cal. Rptr. 430 (Cal. Ct. App. 1991) .....................................................13

*Pegasus v. Reno Newspapers, Inc.*,
   57 P.3d 82 (Nev. 2002) ...............................................................................17

*Phillips v. Evening Star Newspaper Co.*,
   424 A.2d 78 (D.C. 1980) ............................................................................14

**Federal Statutes**

28 U.S.C. § 1404(a) .........................................................................................1

**State Statutes**

Cal. Civ. Proc. Code
   § 425.16 (2009) ...........................................................................................2
   § 425.16(c)(1) .............................................................................................6

District of Columbia's Anti-SLAPP Act of 2010, D.C. Code

 § 16-5501 *et seq.* (the "Act") ............................................................................6, 7, 11

 § 16-5501(1)(A) ......................................................................................................7

 § 16-5501(1)(B) ................................................................................................7, 11

 § 16-5501(3) ...........................................................................................................7

 § 16-5502(a) ...........................................................................................................6

 § 16-5502(b) ....................................................................................................7, 11

 § 16-5502(c) ...........................................................................................................6

 § 16-5502(c)(2) .....................................................................................................18

 § 16-5502(d) ...........................................................................................................6

 § 16-5504(a) ...........................................................................................................6

Nev. Rev. Stat.

 §§ 41.635-41.670 (2013) .......................................................................................2

 § 41.670(1)(a) .........................................................................................................6

Wash. Rev. Code

 §§ 4.24.500-525 (2010) ..........................................................................................2

 § 4.24.525(6)(a)(i) ..................................................................................................6

**Rules**

Fed. R. Civ. P.

 12(b)(6) ...................................................................................................... *passim*

 12(d) ......................................................................................................................10

 56(d) ......................................................................................................................18

**SPECIAL MOTION TO DISMISS AND REQUEST FOR HEARING**

Defendants James Risen ("Risen"), Houghton Mifflin Harcourt Publishing Co. ("HMH"),

and Houghton Mifflin Harcourt Company, improperly sued as HMH Holdings, Inc. (together

"HMH Companies"), through undersigned counsel, respectfully move this Court for an Order

granting the special motion to dismiss under D.C. Anti-SLAPP statute, or any other applicable

anti-SLAPP statute, and awarding reasonable attorneys' fees, costs, and all other awards

authorized by the relevant anti-SLAPP statute, including a stay of discovery while this motion is

pending.  Defendants request a hearing due to the complexity and number of issues involved.

## I.     PRELIMINARY STATEMENT

Plaintiff Dennis Montgomery brings this libel action against Pulitzer Prize-winning author

James Risen, and his publisher HMH, arising from statements in Chapter 2 of his book, *Pay Any*

*Price: Greed, Power, and the Endless War* (the "Book") that report allegations that Montgomery

perpetrated a fraud on the federal government – allegations widely published in articles as far

back as 2008, that were never the subject of a libel claim until now.  If the Court does not dismiss

or transfer for lack of personal jurisdiction over Risen and HMH's parent company or dismiss or

transfer for improper venue, transfer under 28 U.S.C. § 1404(a), or dismiss under Rule 12(b)(6),

the Court should dismiss because Plaintiff cannot show that he is likely to succeed on the merits,

as required under the D.C. anti-SLAPP statute[1] designed to dispose swiftly of meritless claims,

such as this, brought to chill speech on matters of public concern.

---

[1]  "SLAPP" stands for "Strategic Lawsuits Against Public Participation."  As discussed in greater detail in Defendants' Motion to Dismiss or Transfer for Lack of Personal Jurisdiction over Risen and Houghton Mifflin Harcourt Company, Dismiss or Transfer for Improper Venue, Transfer Under 28 U.S.C. § 1404(a), or Dismiss for Failure to State a Claim and Memorandum in Support ("Motion to Dismiss") at 22-24, concurrently filed, D.C. law applies because it has the most significant relationship to the action as the place where the Chapter was researched and written and as the focal point of the allegations described in the Chapter.  Washington, California and Nevada, three other relevant jurisdictions with significant relationships to this case, also have

*First*, anti-SLAPP statutes are substantive protections that apply in this diversity action.

*Second*, the Book is protected expression on an issue of public interest – alleged fraud in national-security contracting.

*Third*, for the same reasons Montgomery cannot state a claim under Rule 12(b)(6), Plaintiff cannot meet the more difficult burden of showing likelihood of success on the merits required to survive a special motion to dismiss under the anti-SLAPP statute.  Based on the Complaint, the Chapter attached to the Complaint, the public records and news articles subject to judicial notice, the Chapter is protected as a fair report of official proceedings and as opinion.

Beyond that, Plaintiff cannot make the requisite prima facie showing of clear and convincing evidence of actual malice, the daunting standard of fault Montgomery must demonstrate as a limited-purpose public figure.  Indeed, Risen interviewed Montgomery, published his denials, relied on reputable news articles, and on official records, including the 2013 Congressional testimony of John Brennan, now Director of the CIA, who testified that Montgomery's software "was determined not to be an accurate source of information."

Thus, the Court should dismiss the Complaint with prejudice, and award Defendants reasonable attorney's fees and costs authorized by the anti-SLAPP statute.

## II.      STATEMENT OF FACTS

### A.      Media Coverage of Montgomery Before the Book

Montgomery has been the subject of extensive media coverage since at least November 1, 2006, when the *Wall Street Journal* ran a front-page story titled *Congressman's Favors for Friend Include Help in Secret Budget* revealing that Montgomery had accused then-

---

similar anti-SLAPP laws and Defendants move under those statutes as well in the event the Court decides Washington, California, or Nevada law applies.  Wash. Rev. Code §§ 4.24.500-525 (2010); Cal. Civ. Proc. Code § 425.16 (2009); Nev. Rev. Stat. §§ 41.635-41.670 (2013).  Florida does not.

Congressman, subsequently Nevada Governor, Jim Gibbons of taking bribes from Warren Trepp, Montgomery's former business partner at eTreppid Technologies ("eTreppid").  (Handman Decl. Ex. 13.)  In a follow-up *Wall Street Journal* article, titled *Nevada Governor Faces FBI Probe Into Contracts*, Trepp accused Montgomery of giving "false testimony" in their litigation over Montgomery's software.  (Handman Decl. Ex. 14.)  Montgomery exploited the media spotlight, giving an exclusive interview to NBC News on May 11, 2007, in which he repeated the "explosive charge" against Trepp and Gibbons.  (Handman Decl. Ex. 15.)  By creating the controversy over whether Trepp bribed a public official to steer government contracts to eTreppid, Montgomery invited media scrutiny of his work at eTreppid for the U.S. government.  Gibbons was ultimately cleared in 2008 with Associated Press quoting his lawyer as saying, "It should be crystal clear that the only persons who should be investigated or charged are those who made false allegations of wrongdoing and who tried to fuel this investigation for their own private purposes."  (Handman Decl. Ex. 16; Book at 50.)

The allegations that Montgomery provided bogus software to the government were published in an August 2008 *Bloomberg News* article, titled *Yellowstone Club Divorcee Entangled in Terrorist Software Suits*.  (Handman Decl. Ex. 17, at 1-2, 4-5, 9.)  The article summarized Trepp's allegations that Montgomery stole eTreppid's "computer code that purportedly could sift through broadcasts from Qatar-based news network Al-Jazeera and find embedded messages to terrorists," and quoted Montgomery's former attorney's charge that the "software was a sham."  (*Id.*)

Then again in 2010, *Playboy Magazine* published a lengthy feature, titled *The Man Who Conned the Pentagon* ("Playboy Article"), which revealed the central allegations Montgomery now challenges.  Its investigation claimed that Montgomery rigged software demonstrations and

3

sold the U.S. government sham "noise filtering" software to decode purported Al Qaeda messages hidden in Al Jazeera broadcasts – bogus intelligence that led the White House to ground international flights and to consider shooting down transatlantic flights around Christmas in 2003.  (Handman Decl. Ex. 1.)  Soon after, the Playboy Article explained, a French contractor determined that not enough pixels existed in an Al Jazeera broadcasts to include the hidden messages and the CIA and White House soon concluded that they had been hoodwinked. According to the Playboy Article, because of the secrecy surrounding the project, other government agencies continued to contract with Montgomery until 2009.

Risen and Eric Lichtblau's 2011 *New York Times* article, titled *Hiding Details of Dubious Deal, U.S. Invokes National Security*, covered much of the same material, but focused on the U.S. government's invocation of the state-secrets privilege to cover up Montgomery's and the government's misdeeds.  Risen expressly acknowledges in the Book that he relied on the Playboy Article and New York Times Article in the Book.  (Book at 53.)  Further, as catalogued in the Handman Declaration (Ex. 18), reputable media outlets published numerous news stories about Montgomery before release of Risen's book in October 2014.  These include a 2012 article in *Defense News*, "*Obama's Counterterrorism Czar Gave Bogus Intel to Bush White House*," in which the then-head of the CIA's Counterterrorism Center describes Montgomery's software as "crazy" (Handman Decl. Ex. 19).  None of these articles reflect that they were retracted or challenged in a lawsuit.  Montgomery now brings a lawsuit challenging the publication of these facts for the first time after nearly seven years in circulation.

### B.      Reliance on Official Records

In Chapter 2 of the Book, titled *The Emperor of the War on Terror* (the "Chapter"), Risen recounts Montgomery's story, retreading ground covered by the previous media reports, most notably the 2010 Playboy Article and the 2011 New York Times Article.  What Risen added to

the narrative was Montgomery's denials, obtained after interviewing him extensively (*id*. at 33-34, 37, 51, 53).  As with his New York Times Article and previous media accounts, Risen expressly cites and relies upon official documents, including court records, FBI reports, and statements made in congressional confirmation hearings for CIA Director John Brennan, stating that Montgomery rigged tests and provided bogus software to the government.  (*See* Defs.' Mot. to Dismiss, at 7-11.)  These include statements by Trepp, his former partner, that the Air Force Office of Special Investigation Inquiry had found "Montgomery's programming skills were not what he alleged and that the technology was not real."  (*Id*. at 7-8.)  Trepp told the FBI that Montgomery would signal to them to press a button on a computer keyboard to detect a toy bazooka in staged demonstrations to the Department of Defense of his object recognition software.  (*Id*. at 10-11.)  The ex-husband of his business partner in Blxware told a similar story in court papers of a noise filtering software that did not exist.  (*Id*. at 8-9.)  Montgomery's own former lawyer said at a deposition, "I know you conned me and you conned the U.S. Government . . . .  You're a computer hacker and you're a fraud, Mr. Montgomery."  (*Id*. at 9.)

Government officials and members of Congress reached similar conclusions.  As part of his confirmation process for CIA Director, John Brennan was asked by Senator Saxby Chambliss in a written question titled "Bogus Intelligence" about Montgomery.  Based on media reports and "documents we have reviewed," "CIA officials derided the contractor's information, but, nonetheless, you passed it to the White House and alert levels were raised unnecessarily." Brennan's response, contained in the Congressional Record, claimed that he had just passed on the CIA's information which ultimately "was determined not to be a source of accurate information."  (*Id*. at 10.)  The Book relied on, referenced, and accurately summarized these official court, FBI and congressional records.

### III.    ARGUMENT

In addition to Montgomery's failure to state a claim for defamation under Rule 12(b)(6), Montgomery's claims are subject to dismissal on the merits because he cannot show a likelihood of success in a suit targeting speech on a matter of public concern, a prerequisite to defeat a special motion to dismiss under D.C.'s anti-SLAPP law.

### A.    The District of Columbia Anti-SLAPP Statute, and other Relevant Anti-SLAPP Statutes, Provide Substantive Protections Against Claims Targeting the Exercise of Free Speech about Issues of Public Concern

Like many other jurisdictions, the District of Columbia's Anti-SLAPP Act of 2010 (the "Act"), D.C. Code § 16-5501 *et seq*., was enacted to combat "Strategic Lawsuits Against Public Participation" – frivolous actions, like this one, filed "not to win the lawsuit but punish the opponent and intimidate them into silence."[2]  The Act allows defendants to "file a special motion to dismiss any claim arising from an act in furtherance of the right of advocacy on issues of public interest."  D.C. Code § 16-5502(a).  A presumptive stay of discovery applies, absent a showing of good cause, and as discussed below, discovery in this action should be stayed as a result.  *Id.* § 16-5502(c).  The statute calls for expeditious consideration of the special motion to dismiss.  *Id.* § 16-5502(d).  A prevailing defendant may be entitled to attorney's fees and costs.  *Id.* § 16-5504(a).[3]  Thus, the Act expedites a court's finding that a SLAPP suit is not viable and reallocates the burdens of cost and proof on this subset of claims to winnow out meritless suits.

Under the Act, "[i]f a party filing a special motion to dismiss under this section makes a prima facie showing that the claim at issue arises from an act in furtherance of the right of

---

[2]  Report of the D.C. Committee on Public Safety and the Judiciary, Nov. 18, 2010 ("Committee Report") at 4.

[3]  Although an award of attorney's fees is discretionary under the D.C. anti-SLAPP statute, such an award is mandatory under California, Washington, and Nevada's anti-SLAPP statutes.  Wash. Rev. Code § 4.24.525(6)(a)(i); Cal. Civ. Proc. Code § 425.16(c)(1); Nev. Rev. Stat. § 41.670(1)(a).

advocacy on issues of public interest, then the motion *shall* be granted unless the responding party demonstrates that the claim is *likely* to succeed on the merits." *Id.* § 16-5502(b) (emphasis added). The court considers the anti-SLAPP motion in two steps. First, the moving party bears the initial burden of demonstrating, by a preponderance of the evidence, that the claims concern an action within the scope of the Act. *Id.* Second, the burden then shifts to the non-movant to establish that it has a "likelihood of success the merits" of its claims. *Id.*

Under the first prong, among other things, the Act applies to "[a]ny . . . expression or expressive conduct that involves . . . communicating views to members of the public in connection with an issue of public interest." *Id.* § 16-5501(1)(A), (B). An "issue of public interest" is defined broadly as one "related to health or safety; environmental, economic, or community well-being; the District government; a public figure; or a good, product, or service in the market place." *Id.* § 16-5501(3).

The law applies to *any* claim that "arises from an act in furtherance of the right of advocacy on issues of public interest." *Id.* § 16-5502(b) (emphasis added). The Committee Report expressly recognized that SLAPP cases come in all forms, not just defamation, including "such business torts as interference with contract." (Committee Report at 2.) Courts regularly apply state anti-SLAPP laws to each of the claims alleged by Plaintiff.[4]

Federal district courts have repeatedly applied D.C.'s anti-SLAPP statute to state-law claims as substantive law.[5] And for more than fifteen years, the Ninth Circuit and federal district

---

[4] *See, e.g.*, *Farah v. Esquire Magazine*, 863 F. Supp. 2d 29, 37 (D.D.C. 2012) (applying D.C. anti-SLAPP statute to libel and intentional interference claims), *aff'd on 12(b)(6) grounds*, 736 F.3d 528 (D.C. Cir. 2013); *Forras v. Rauf*, 39 F. Supp. 3d 45, 54-57 (D.D.C. 2014) (applying D.C. anti-SLAPP statute to libel, intentional infliction of emotional distress, and civil assault claims), *appeal pending*, No. 14-7070 (D.C. Cir. May 21, 2014).
[5] *See Forras*, 39 F. Supp. 3d at 51-52 (Rothstein, J.); *Abbas v. Foreign Policy Grp., LLP*, 975 F. Supp. 2d 1, 9-10 (D.D.C. Sept. 27, 2013) (Sullivan, J.), *oral argument held*, No. 13-7171 (D.C.

courts have applied California's analogous law.[6]  Indeed, those "federal appellate courts that have addressed whether they must enforce these state anti-SLAPP statutes in federal proceedings have concluded that they must."  *Godin v. Schencks*, 629 F.3d 79, 81 (1st Cir. 2010).[7]  The Ninth Circuit recently reaffirmed its commitment to applying state anti-SLAPP laws in federal court, declining a request by Chief Judge Alex Kozinski that the *en banc* court reconsider (and reverse) its longstanding precedent.  *Makaeff v. Trump Univ., LLC*, 736 F.3d 1180 (9th Cir. 2013).

Similarly, courts routinely apply another state's anti-SLAPP statute as substantive law when, as here, the forum has not enacted an anti-SLAPP law.  *See, e.g.*, *Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014) (applying Nevada anti-SLAPP statute); *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 143-44 (2d Cir. 2013) (applying California anti-SLAPP statute); *Global Relief v. New York Times Co.*, 2002 WL 31045394, at *11 (N.D. Ill. Sept. 11, 2002) (applying California anti-SLAPP statute, finding that "California has a great interest in determining how

---

Cir. Oct. 20, 2014); *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 254 (D.D.C. 2013) (Walton, J.); *Farah*, 863 F. Supp. 2d at 36 n.10 (Collyer, J.).  *See also Sherrod v. Breitbart*, 843 F. Supp. 2d 83, 85 (D.D.C. 2012) (Leon, J.) (D.C. statute is "substantive – or at the very least, has substantive consequences" that would make it applicable in federal court), *aff'd on other grounds*, 720 F.3d 932 (D.C. Cir. 2013).  *But see 3M Co. v. Boulter*, 842 F. Supp. 2d 85 (D.D.C. 2012) (Wilkins, J.) (reasoning expressly rejected and not followed by later D.C. decisions).

[6]  *See, e.g.*, *D.C. Comics v. Pac. Pictures Corp.*, 706 F.3d 1009 (9th Cir. 2013).  The Washington State anti-SLAPP statute has also been applied.  *E.g.*, *Aronson v. Dog Eat Dog Films, Inc.*, 738 F. Supp. 2d 1104, 1111-14 (W.D. Wash. 2010), *recon. denied*, 2010 U.S. Dist. LEXIS 105025 (W.D. Wash. Sept. 28, 2010).

[7]  *See, e.g.*, *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 972-73 (9th Cir. 1999); *Godin*, 629 F.3d at 91; *Henry v. Lake Charles Am. Press, LLC*, 566 F.3d 164, 168-70 (5th Cir. 2009); *Adelson*, 774 F.3d at 809.  The Eleventh Circuit decided that the complaint-verification aspect of Georgia's anti-SLAPP statute did not apply, but expressly distinguished this case "from the cases considered by other circuits that have found state anti-SLAPP laws applicable in federal court," because those other statutes do not include a verification requirement.  *Royalty Network, Inc. v. Harris*, 756 F.3d 1351, 1361-62 (11th Cir. 2014).  The D.C., Washington, California, and Nevada anti-SLAPP statutes do not contain complaint-verification requirements.  *See id.* at 1361 (explaining that cases applying California, Maine, and Louisiana anti-SLAPP statutes in federal court are distinguishable because those statutes do not include a complaint-verification requirement).

much protection to give California speakers," and therefore "the law of California will apply to defenses to defamation").

Recognizing that state anti-SLAPP statutes add an "additional, unique weapon to the pretrial arsenal" (*Newsham*, 190 F.3d at 973), federal courts regularly grant anti-SLAPP motions alongside Rule 12(b)(6) motions where, as here, the plaintiff cannot show likelihood of success, because the libel claim is barred, as here, by the fair report privilege, opinion, and plaintiff cannot plausibly plead or make a prima facie showing of clear and convincing evidence of actual malice.[8]  For example, in *Adelson v. Harris*, a New York federal court applied Nevada's anti-SLAPP law and Rule 12(b)(6) to dismiss libel claims brought by a casino magnate and well-known political contributor, finding that the statements were non-actionable opinion and protected by the fair report privilege.  *Adelson*, 973 F. Supp. 2d at 471, 501-02.

Federal courts also routinely grant anti-SLAPP motions in cases involving the media where, as here, the reporter's newsgathering plainly demonstrates a lack of actual malice.  For example, a D.C. federal court dismissed a libel claim under D.C. anti-SLAPP law arising out of two articles referring to plaintiff as a "warlord," where defendants submitted evidence such as government reports and press releases corroborating plaintiff's status as a former warlord, thus demonstrating lack of actual malice.  *Boley*, 950 F. Supp. 2d at 263.  Similarly, a California federal court granted a special motion to strike soccer star David Beckham's defamation and

---

[8]  *See also, e.g.*, *Farah*, 863 F. Supp. 2d at 39-40 (granting Rule 12(b)(6) and D.C. anti-SLAPP motion against defamation claim over non-actionable satirical blog posts and other non-actionable statements of opinion); *Thomas v. L.A. Times Commc'ns LLC*, 189 F. Supp. 2d 1005, 1009-10 (C.D. Cal.) (granting anti-SLAPP motion, "akin to a Rule 12(b)(6) motion to dismiss," arising out of *L.A. Times* article that questioned plaintiff's claims in published biography that he was a war hero, holding that no reasonable juror could find that defendants intended to convey the impression that plaintiff lied about his past), *aff'd*, 45 F. App'x 801 (9th Cir. 2002); *Card v. Pipes*, 398 F. Supp. 2d 1126, 1136-37 (D. Or. 2004) (granting author's Rule 12(b)(6) and Oregon anti-SLAPP motion against libel claim where statements were non-actionable opinion or not substantially false based on plaintiff's admissions).

intentional infliction of emotional distress lawsuit over an article reporting on his alleged tryst with a call girl. *Beckham v. Bauer Publ'g Co.*, 2011 WL 977570 (C.D. Cal. Mar. 17, 2011).  As part of its motion, the publisher provided not only affidavits, but transcripts of an interview with the article's source.  The court found that the plaintiff would not be able to show that the publisher acted with actual malice when it published, since at that time it had the "interview[] [of] the woman who claims to have had the encounter with" Beckham, had given Beckham an opportunity to respond, and had other evidence showing that plaintiff could not show as a matter of law that the media published with actual malice. *Id.* at *1.[9]  In *Adelson*, applying cases dismissing under Rule 12(b)(6) for failure to plausibly plead actual malice, the court also held that plaintiff failed to show defendants knew that calling on presidential candidate Mitt Romney to reject casino billionaire Sheldon Adelson's "tainted," "dirty" money was false, given allegations in a lawsuit and an ongoing investigation. *Id.* at 501-02.

Where the parties attach material outside the pleadings not otherwise subject to judicial notice, the D.C. statute – like the California law on which they were modeled – establishes a "summary-judgment-like procedure available at an early stage of litigation that poses a potential chilling effect on speech-related activities." *Makaeff*, 736 F.3d at 1183 (quotation marks omitted).  Thus, the anti-SLAPP law functions, "at worst," "merely as a mechanism for considering summary judgment at the pleading stage as is permitted under Rule 12(d)." *Id.*

---

[9] *See also, e.g.*, *CanaRx Servs. v. LIN Television Corp.*, 2008 WL 2266348 (S.D. Ind. May 29, 2008) (granting local broadcaster's anti-SLAPP motion to dismiss claims brought by Canadian pharmaceutical distributor over news report on safety of pharmaceuticals, finding that statements were substantially true and plaintiff could not establish actual malice given reporter's newsgathering efforts).

**B. Montgomery's Claims Fall Within the Scope of the D.C. Anti-SLAPP Statute, and Any Other Applicable Anti-SLAPP Statute**

Defendants easily meet their threshold burden to show that the claims fall within the scope of the Act. Defendants' speech is plainly protected under D.C. Code § 16-5501(1)(B), which broadly extends the statute's protection to any statement made "in connection with an issue of public interest." One can hardly imagine an issue of greater public interest than alleged fraud by government contractors helping to protect national security, the government's reliance on bogus intelligence to make drastic decisions affecting the public, and the government's continued reliance on those contractors coupled with attempts to cover up the malfeasance.[10] The statements are also "related to . . . a public figure," Montgomery, although he self-servingly denies it in the Complaint. Defendants' speech falls within the scope of the anti-SLAPP statute.

**C. Montgomery Cannot Demonstrate a "Likelihood of Success" on the Merits**

Because Defendants made a prima facie showing of protected speech, "the burden now shifts to [Montgomery] 'to demonstrate[ ] that the claim is likely to succeed on the merits.'" *Boley*, 950 F. Supp. 2d at 256-57 (quoting § 16-5502(b)). To show a likelihood of success on merits the plaintiff "must satisfy a standard comparable to that used on a motion for judgment as a matter of law." *Id.* (quoting *Price v. Stossel*, 620 F.3d 992, 1000 (9th Cir. 2010)); *Abbas*, 975 F. Supp. 2d at 12 (same). Thus, the plaintiff must "demonstrate that the complaint is legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." *Id.* (citation and quotation marks omitted). "If a

[10] *See Boley*, 950 F. Supp. 2d at 256 (statements on *The Atlantic's* blog about a former Liberian warlord's arrest, detention, and deportation for alleged war crimes "are quintessentially matters of public rather than private interest"); *Farah*, 863 F. Supp. 2d at 37 (finding issue of public interest in *Esquire*'s satirical blog post lampooning the position of "birther" activists and authors); *Abbas*, 975 F. Supp. 2d at 12 ("[T]he question of U.S. aid to the Palestinian Authority, and the level of corruption in the PA under both Yasir Arafat and Mahmoud Abbas, is fundamentally a matter of the public, not private, interest.").

plaintiff presents an insufficient legal basis for the claims or when no evidence of sufficient substantiality exists to support a judgment for the plaintiff, the anti-SLAPP motion should be granted." *Id.* (citation and quotation marks omitted).

Here, for reasons discussed (Mot. to Dismiss at 24-27), Montgomery cannot show likelihood of success on the merits because the statements are protected under the fair report privilege, as protected opinion, and could not plausibly plead fault.  Even if not dismissible under Rule 12(b)(6) – and we believe it is – the claim is not likely to succeed on the merits under the higher standard imposed on plaintiffs by the anti-SLAPP statute.  In the face of court records, FBI investigations, congressional testimony of high-ranking officials, and unchallenged prior publications.  Plaintiff cannot come forward with the requisite showing of "clear and convincing" evidence of actual malice.  *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 598 (D.C. Cir. 1988).

## 1.    Montgomery is a Limited-Purpose Public Figure

Montgomery's legal conclusion that he is a private figure carries no weight.  (Compl. ¶¶ 15-18.)  "Whether the plaintiff is a public figure is a question of law for the court to resolve." *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1294 n.12 (D.C. Cir. 1980).  As a matter of law, Montgomery is a "limited purpose public figure," having "inject[ed]" himself into and been "drawn into a particular public controversy" centered on widely-publicized allegations that he committed fraud in government-contracting work he performed for the U.S. government. *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987) (*en banc*).

Montgomery became a limited-purpose public figure when he publicly accused his business partner of paying bribes to then Congressman – later Governor – Gibbons, to obtain government contracts for Montgomery's company.  (Handman Decl. Exs. 13, 14.)  By this public accusation, he invited and received national media attention, including an exclusive interview with NBC News – a glaring spotlight that contributed to the exposure of his alleged government-

12

contracting fraud to the public eight years before the Book.[11]  (Handman Decl. Ex. 15.)  By

thrusting himself into the vortex of the debate over government-contracting fraud, he became

embroiled in the controversy surrounding his own government-contracting work.  *See CACI*

*Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 295 (4th Cir. 2008) (government contractor

"became a public figure because," when the U.S. military "engaged [the contractor] to provide

civilian interrogators at Abu Ghraib," it "surely knew when it accepted the interrogation work

that it was potentially exposing itself to the inhospitable climate of media criticism").[12]  Thus, he

is unquestionably – as a matter of law – a limited-purpose public figure regarding his alleged

fraud on the government.

---

[11]  *See, e.g.*, *Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 32 (D.C. Cir. 1990) (a public
controversy, in which plaintiff became embroiled as public figure because he was associated
with the mayor and lied to the press about his involvement in the death of a friend, prompting
"the DEA, the U.S. Attorney's office, and the D.C. Police Department investigat[ion]"); *Logan v.
District of Columbia*, 447 F. Supp. 1328, 1331 (D.D.C. 1978) (holding plaintiff was a limited
purpose public figure because he was arrested in connection with a large undercover operation,
accused of serious crimes, and voluntarily injected himself into the operation by telling an
undercover agent he had committed murder while trying to obtain a position as a hit man);
*Brueggenmeyer v. ABC*, 684 F. Supp. 452, 458 (N.D. Tex. 1988) (finding plaintiff was a limited
purpose public figure because "the course of conduct in which [plaintiff] engaged generated
consumer complaints, government legal actions, BBB investigations, and media attention").
[12]  *See also McDowell v. Paiewonsky*, 769 F.2d 942, 947-51 (3d Cir. 1985) (holding that
architect was a limited-purpose public figure because he accepted government contracts and was
subject to previous media scrutiny about his work on public projects); *Mosesian v. McClatchy
Newspapers*, 285 Cal. Rptr. 430, 439 (Cal. Ct. App. 1991) (president of company who was
subject to media attention in public debate about award of a public contract to company to put on
horse-racing event a limited-purpose public figure); *Gleichenhaus v. Carlyle*, 591 P.2d 635, 641
(Kan. Ct. App.) (contributor to political campaign who later obtained government contract was a
limited-purpose public figure), *aff'd in relevant part*, 597 P.2d 611, 612-13 (Kan. 1979).  *Cf.
Silvester v. ABC*, 839 F.2d 1491, 1495-97 (11th Cir. 1988) (finding jai alai fronton owners public
figures by "entering a strictly regulated, high-profile industry in which there were few major
participants" and "[t]he potential loss of tax revenue because of corruption" evidenced a public
controversy).

## 2.   Montgomery Cannot Demonstrate Actual Malice

As a public figure, Montgomery is required to show that he is likely to be able to prove by clear and convincing evidence that Defendants acted with actual malice.[13]  *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 331-32 (1974); *Anderson v. Liberty Lobby*, 477 U.S. 242, 254 (1986) (holding that a public figure libel plaintiff must meet the clear and convincing evidence standard at summary judgment and "there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence."); *Clyburn*, 903 F.2d at 33.  "The standard of actual malice is a daunting one."  *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996).  Plaintiff must plead that the speaker knew the statements were false or "in fact entertained serious doubts as to the truth" when he made defamatory statements.  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964); *see also Gertz*, 418 U.S. at 334 n.6; *Foretich v. CBS, Inc.*, 619 A.2d 48, 59 (D.C. 1993).  For example, a plaintiff could support a defamation claim with allegations of facts evidencing that a defendant was subjectively aware when the defendant published that the story was "'(1) fabricated; (2) so inherently improbable that only a reckless person would have put [it] in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that [defendant] had

---

[13]  Even if Montgomery were not a public figure (which he is), the Complaint must be dismissed because it cannot succeed on a negligence claim, the lower standard applicable to private-figure plaintiffs.  *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 87 (D.C. 1980) ("[T]he basic standard of care in the District of Columbia for media defamation of private individuals . . . [is] that of negligence."); *see also Gertz*, 418 U.S. at 347 (holding that states may not impose "liability without fault" in libel cases brought by private plaintiffs).  Montgomery cannot show negligence, as a matter of law.  As the Chapter reflects, Risen relied on articles previously published in reputable publications, relied on official records and included Montgomery's denials in the Chapter, and HMH relied on a reputable author – all factors that show, as a matter of law, not just no actual malice, but no negligence.  *See, e.g.*, *Winn v. United Press Int'l*, 938 F. Supp. 39, 45 (D.D.C. 1996) ("[A] periodical that relies on articles from other reliable publications is not negligent as a matter of law when it does not verify those articles with their original sources.").

obvious reasons to doubt.'"  *Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003) (citation omitted).  "For [the actual malice] standard to be met, the publisher must come close to willfully blinding itself to the falsity of its utterance."  *Tavoulareas*, 817 F.2d at 776.  Montgomery cannot clear this high hurdle.

Indeed, the facts here conclusively demonstrate an absence of actual malice by Defendants.  The Book reflects that Risen extensively interviewed Montgomery – evidence of the absence of actual malice.  *See Parisi v. Sinclair*, 845 F. Supp. 2d 215, 218-19 (D.D.C. 2012) (dismissing for failure to plausibly allege actual malice when defendant interviewed plaintiff) (citing *Lohrenz*, 350 F.3d at 1283); *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 288 (S.D.N.Y. 2013) (plaintiff failed to plausibly plead actual malice because they interviewed plaintiff); *Loeb v. New Times Commc'ns Corp.*, 497 F. Supp. 85, 93 (S.D.N.Y. 1980) ("It cannot be said that the defendants' conduct constitutes an 'extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.'  Loeb himself was interviewed . . . .").  The Book includes Montgomery's denials throughout the Chapter.  (Book at 33-34, 37, 51, 53.)  This further precludes a finding of actual malice.  *See Lohrenz*, 350 F.3d at 1286 ("[R]eporting perspectives at odds with the publisher's own 'tends to rebut a claim of malice'") (citation omitted); *Biro*, 963 F. Supp. 2d at 288 (finding failure to plausibly plead actual malice when defendant printed plaintiff's denials).

Reliance on previously published material from reputable publications precludes likelihood of success on actual malice, as a matter of law.  *See, e.g.*, *Liberty Lobby, Inc. v. Dow Jones*, 838 F.2d 1287, 1297 (D.C. Cir. 1988) ("[G]ood faith reliance on previously published materials in reputable sources . . . precludes a finding of actual malice as a matter of law."); *Biro*, 963 F. Supp. 2d at 279 (plaintiff could not plausibly plead actual malice because defendants

republished an article from *The New Yorker*, a reputable publication). Here, the Book expressly

cites the comprehensive Playboy Article and New York Times Article, which contain all the

facts Plaintiff now challenges, facts first published in the 2008 article in *Bloomberg News*, also a

reputable publication. None of these prior articles resulted even in a correction, much less a

lawsuit. (Handman Decl. Exs. 1, 2, 17.) Reliance on these reputable, unchallenged sources

defeats actual malice.

Moreover, reliance on official reports or official sources, as Risen did here, cannot

constitute actual malice. No less a prominent official than the Director of the CIA supported the

claim that Montgomery's information was not accurate or, as Senator Chambliss described it

"bogus."[14] *Bell v. Associated Press*, 584 F. Supp. 128, 129, 132 (D.D.C. 1984) (no actual malice

as a matter of law where reporter relied on arrest report); *Klayman v. City Pages*, No. 5:13-cv-

00143-ACC-PRL, ECF No. 124, at 29-31 (M.D. Fla. Apr. 3, 2015) (granting motion for

summary judgment, because, in part, plaintiff could not prove actual malice when newspapers

and authors relied on judicial opinions and public filings in Florida Bar disciplinary

proceedings); *CACI Premier Tech.*, 536 F.3d at 292 (no actual malice as a matter of law where

radio commentator relied on official reports about the conditions set by government contractor

that led to torture, rape, and murder at Abu Ghraib prison); *Peter Scalamandre & Sons, Inc. v.

Kaufman*, 113 F.3d 556, 562-63 (5th Cir. 1997) (no actual malice as a matter of law where arson

allegations were based on a police report); *Church of Scientology Int'l v. Behar*, 238 F.3d 168,

175 (2d Cir. 2001) (no actual malice as a matter of law where author relied on sources including

a police report). These official views echoed what Plaintiff's own former business partner in

---

[14] In a 2012 article in *Defense News*, Jose Rodriguez, the man who had been in charge of the
CIA's Counterterrorism Center, said the Center had been "skeptical," viewed the software as
"crazy" and passing it along to the White House "ridiculous." (Handman Decl. Ex. 20.)

eTreppid told the FBI and said in court records: the demonstrations were rigged and the software non-existent.[15]  The court records include what Plaintiff's own former lawyer said: "Based upon personal knowledge, and information and belief, Blxware possesses no marketable technology, the technology as represented does not exist[.]"[16]

Finally, given that the Book was the work of a highly reputable author – the Complaint itself admits that Risen "is a Pulitzer Prize-winning journalist" (Compl. ¶ 7) who had published the same allegations in the *New York Times* in 2011 without legal challenge – Montgomery cannot plausibly plead that HMH was even negligent, much less acted with actual malice, in relying on and publishing Risen's work.  *See Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1032 (2d Cir. 1997) (publisher may not be liable for article "if it relies upon the integrity of a reputable author and has no serious reason to question the accuracy of the information provided by that author"); *McManus v. Doubleday & Co.*, 513 F. Supp. 1383, 1390 (S.D.N.Y. 1981) (co-author and publisher were "entitled as a matter of law to rely on [author's] proven reportorial ability"); *Pegasus v. Reno Newspapers, Inc.*, 57 P.3d 82, 93 (Nev. 2002) (newspaper did not act with actual malice where "there is no evidence that . . . anyone at [the newspaper] had any reason to believe [the freelance reporter] would lie . . .").  Indeed, HMH would have no reason to doubt since other reputable publications had published the same allegations without legal challenge.[17]

---

[15]  These official records are discussed more fully in Defendants' Motion to Dismiss.

[16]  (Handman Decl. Ex. 9, Aff. of Michael J. Flynn at 10, *In re Yellowstone Mountain Club, LLC*, No. 09-00014 (Bankr. Mont. Mar. 1, 2006), ECF No. 473-1.))

[17]  Indeed, Plaintiff does not allege any facts that would suggest that the publisher HMH acted with any degree of fault.  *See McFarlane*, 74 F.3d at 1303 (explaining that, because actual malice is a question of each defendant's subjective state of mind, absent respondeat superior, actual malice will not be imputed from the author to the publisher).  The Complaint also does not allege facts to suggest that Houghton Mifflin Harcourt Company, which Plaintiff alleges is merely a holding company of the publisher (Compl. ¶ 9), had anything to do with publication of the Book or is at fault in any way.  This is an additional reason why the Complaint should be dismissed as to both HMH Companies.

In the face of this mountain of evidence, this is exactly the kind of libel case that the anti-SLAPP laws are designed to weed out early when plaintiff's likelihood of success is virtually nil. As a matter of law, the Court should dismiss the Complaint with prejudice and award attorney's fees.

**D.**     **The Anti-SLAPP Statute's Stay of Discovery Should Be in Place Pending Decision on the Special Motion to Dismiss**

Consistent with the anti-SLAPP law goal to reduce the chilling effect of the cost and burden of defending meritless suits directed at speech on matters of public concern, the anti-SLAPP laws include a stay of discovery pending consideration of the motion and courts routinely enforce such stays.[18]  Much like Rule 56(d), the stay under the D.C. anti-SLAPP law can be lifted upon a showing of good cause where targeted discovery is needed in order to respond to the motion is required.  D.C. Code § 16-5502(c)(2) ("When it appears likely that targeted discovery will enable the plaintiff to defeat the motion and that the discovery will not be unduly burdensome, the court may order that specified discovery be conducted.").  But even then, courts will not permit discovery where, as here, no amount of discovery could suffice to establish a viable claim.  *See*, *e.g.*, *Adelson*, 973 F. Supp. 2d at 503 n.26 (denying Rule 56(d) motion for discovery to oppose Nevada anti-SLAPP motion because "Plaintiff has not alleged knowledge of falsity, facts supporting such a finding, or a reasonable, non-conclusory basis for

---

[18]  *E.g. Aeroplate Corp. v. Arch Ins. Co.*, 2006 WL 3257487, at *9 (E.D. Cal. Nov. 9, 2006) (granting stay under anti-SLAPP statute when "(1) the factual basis of the case has been developed through discovery or similar prior proceedings to the extent a motion for summary judgment would be appropriate"; (2) "the parties agree"; or (3) "the only issue presented by the motion is an issue of law" appropriate for disposition under Rule 12(b)(6)); *Armington v. Fink*, 2010 WL 743524, *3 n.2 (E.D. La. Feb. 24, 2010) (applying the discovery limitation in Louisiana's anti-SLAPP statute because it "permits the Court to order specified discovery where necessary to the plaintiff's opposition," which was "similar to the relief afforded by Rule 56([d])"); *Smith v. Payne*, 2012 WL 6712041, at *4 n.7 (N.D. Cal. Dec. 26, 2012) (applying discovery stay where defendants' anti-SLAPP motion "challenges the legal sufficiency of Plaintiffs' claims … in the nature of a Rule 12(b)(6) motion to dismiss").

believing that discovery will create a genuine issue of material fact, and discovery is therefore unwarranted."); *Haack v. City of Carson City*, 2012 WL 3638767, at *6 (D. Nev. Aug. 22, 2012) (granting Nevada anti-SLAPP motion without discovery).  So here, the stay provision of the applicable anti-SLAPP law should be put into place, particularly where no amount of discovery will be able to defeat dismissal.

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their special motion to dismiss under the D.C. Anti-SLAPP Act, or other applicable anti-SLAPP statute, and award reasonable attorneys' fees, costs, and all other awards authorized by the relevant state anti-SLAPP statute.

Dated:  April 9, 2015

Respectfully submitted,

HOLLAND & KNIGHT LLP

By: s/ Sanford L. Bohrer
      Sanford L. Bohrer
      Brian W. Toth
      701 Brickell Avenue, Suite 3300
      Miami, Florida  33131
      Tel.: (305) 374-8500
      Fax: (305) 789-7799

DAVIS WRIGHT TREMAINE LLP

By: s/ Laura R. Handman
      Laura R. Handman (*pro hac vice* pending)
      Micah J. Ratner (*pro hac vice* pending)
      1919 Pennsylvania Ave., NW, Suite 800
      Washington, D.C.  20006
      Tel.: (202) 973-4200
      Fax: (202) 973-4499

      *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on April 9, 2015, I filed this document with the Clerk of Court using

CM/ECF, which will serve this document on all counsel of record.


s/Sanford L. Bohrer