## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

DENNIS L. MONTGOMERY

               Plaintiff,

    v.

JAMES RISEN, ET AL.,

               Defendants.

Civil Action No. 1:15-cv-20782-JEM

**ORAL ARGUMENT REQUESTED**

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR TRANSFER FOR LACK OF PERSONAL JURISDICTION OVER RISEN AND HOUGHTON MIFFLIN HARCOURT COMPANY, DISMISS OR TRANSFER FOR IMPROPER VENUE, TRANSFER UNDER 28 U.S.C. § 1404(a), OR DISMISS FOR FAILURE TO STATE A CLAIM AND MEMORANDUM IN SUPPORT

## I.      INTRODUCTION

Plaintiff respectfully submits this Memorandum of Law in Opposition to the Defendant's Motion to Dismiss for lack of personal jurisdiction under Federal Rules of Civil Procedure ("FCRP") Rule 12(b)(2), (3) and Rule 12(b)(6), motion to transfer venue as improper under 28 U.S.C. § 1406(a) and/or motion to transfer venue based on *forum non conveniens.*

Defendants filed an omnibus Motion to Dismiss or Transfer for Lack of Personal Jurisdiction over Risen and Houghton Mifflin Harcourt Company, Dismiss or Transfer for Improper Venue, Transfer under 28 U.S.C. § 1404(a), or Dismiss for Failure to State a Claim.

First, and fundamentally, a plaintiff has a right to pick the forum in which to bring his claim. Venue is proper in Florida and this state has personal jurisdiction over all Defendants. Defendant Houghton Mifflin Harcourt Publishing Company has a general office in Orlando, Florida, and is registered to do business in the State of Florida with the Florida Department of

State, Division of Corporations.  *See* Montgomery Aff. ¶¶ 11, 12 (Exhibit A). The causes of action arise directly from regular business of the publisher in its Orlando office and other offices from the publication and sale of books. Clearly, the Defendant publisher thought Florida to be important enough of a state to establish a separate, general office here.

The Plaintiff is a citizen and resident of Florida. Exhibit A at ¶ 8. In 2011, the Plaintiff incorporated two businesses with another partner in Florida to pursue contracts with the military and U.S. Government at bases in Florida. Exhibit A ¶ 23, 24.  He is registered to vote and has a permanent residence in in Miami-Dade County, Florida (along with a Miami telephone number), although the Defendants misled this Court and falsely claimed he was not registered in Florida in an affidavit by Laura Handman.  Handman's affidavit, which she submitted in support of Defendants' two motions to dismiss, was false, as previously discussed in the conference before the Court on April 14, 2015. Exhibit A ¶ 10.

Readers of the Book being exposed to the defamatory statements are in Florida.  The damage to Plaintiff occurred primarily in Florida, among other places.  As set forth in Section C of the Argument below, the essence of defamation is injury in one's reputation, community, and home, which here is in Florida.  It is the damage and harm in that community which counts most, particularly under Florida law. This is the principal reason Florida is the appropriate place to bring suit. The jury needs to be one's peers in the community.  Moreover, the Plaintiff seeks to call important witnesses in Florida from Macdill Air Force Base and Eglin Air Force Base, which are the center of U.S. counterterrorism military and intelligence operations, through U.S. Special Operations Command ("SOCOM") and the U.S. Central Command ("CENTCOM"). These witnesses and offices are also where much of the Plaintiff's loss of reputation has taken and is taking place. Exhibit A ¶ 34. Defendants, each and every one of them, have subjected

those involved in his work to the negative, defamatory and false reports about the Plaintiff.

Plaintiff has stated a valid and indeed overwhelming claim of defamation in Causes of Action I-III as well as for intentional infliction of emotional distress in Cause of Action  IV, tortious interference with prospective advantage in Cause of Action V, and common law assault under Cause of Action VI.

Defendants published several libelous and slanderous statements in Defendants' Book and in radio, television, and newspaper interviews, alongside many other statements in addition. Defendants published both defamatory and non-defamatory statements.  The fact that Defendants also may have made non-defamatory statements about Plaintiff does not immunize their clearly defamatory statements which they actually did publish in Florida and elsewhere.

Moreover, Defendants' defamation is not "fair reporting."  As Defendants tout at the beginning of the Book, the publication is based on new, confidential and likely classified information from various Government sources, and is not the result of simply republishing previous Playboy and New York Times articles. Otherwise there logically would be no reason for the Book. Certainly tongue in check, looking at Playboy would be a more sexy read. But, by publishing new and never before disclosed false and misleading sensational information, this allowed Defendants to draw readers and sell books in Florida and elsewhere. Thus, Defendants boast to the reader at page ix of their Book, **"[m]any people have criticized the use of anonymous sources. Yet all reported know that the very best stories – the most important, the most sensitive rely on them. This book would not be possible without the cooperation of many current and former government officials and other individuals who were willing to discuss sensitive matters only on the condition of anonymity."** (emphasis added).

Even where Defendants sometimes did put their defamation occasionally in the voice of

other persons in previously published materials, still Defendants conspicuously reported only a narrow slice of the overall story, massively tilted unfairly and dishonestly.  Defendants cannot claim to be engaged in "fair reporting" while presenting only one small part of the story dramatically distorting the truth so as to defame Plaintiff.

Similarly, Defendants published non-opinion, non-hyperbole defamation against Plaintiff, harming his profession.  The fact that Defendants did include a few examples of opinion (that is, throwing in adjectives or mentioning greed) or hyperbole mixed in among clear defamation does not transform their clearly defamatory statements.

In addition, the totality of the communication is also relevant.  Statements which might not be defamatory on their own can and do add to the total message of defamation.  The defamatory statements are set forth in excruciating detail in the Complaint and Amended Complaint. *See* Complaint at ¶¶ 92-123, 127, 131, 135, 137, 143, 153, 165, 167, 169, 170-179, 185-219; *See* Amended Complaint at ¶¶ 106, 109, 111, 116, 119-137, 141, 145, 149, 151, 157, 168, 181, 183, 185-235.

Finally, Plaintiff is not a public figure, despite Defendants suggestion that unrelated events turn Plaintiff into a "limited public figure. Plaintiff worked undercover for U.S. intelligence agencies in Florida in particular. To become a public figure would have put him and his family at great risk from domestic terrorists and others. ." The key word is of course "limited."

## II.     STATEMENT OF FACTS RELEVANT TO MOTION

### A)  <u>The Case and Tortious Harm Took Place Inside Florida</u>

Defendants published a physical book "<u>Pay Any Price:  Greed, Power and Endless War</u>" (referred to as "the Book" or "Book") by author Defendant James Risen, Copyright (c) 2014 by

Defendant James Risen, designated by the Library of Congress by its index system as ISBN 978-0-544-34141-8 (hardback edition).  *See* title pages, Exhibit B, attached.

The publisher Defendant Houghton Mifflin Harcourt Publishing Company maintains permanent and general offices – and thus does business – in Orlando, Florida, at 9400 Southpark Center Loop, Orlando, Florida 32819.  *See* Exhibit C, attached; http://www.hmhco.com/about-hmh/our-offices; *see also* Exhibit A ¶ 6.

The Defendant Houghton Mifflin Publishing Company is registered to do business in Florida through the Florida Department of State Division of Corporations.  *See* Exhibit D, attached.  In 2008, the Defendant changed its name with the State of Florida from "Houghton Mifflin Harcourt" to "Houghton Mifflin Publishing Company." *Id.*

Defendants willfully shipped the Book to Florida in order to sell books on Florida bookstore shelves. Defendants' knowingly and intentionally caused physical products, the Book, to be sent to Florida and sold in Florida.  Moreover, the defamation is contained within the physical product physically shipped into Florida for sale for profits.  *See* Complaint, ¶¶ 21– 25.

Defendants rely significantly upon sales in Florida and the rest of the southeast of the United States through a company called "Amazon" for very substantial sales over the Internet. Amazon's regional distribution centers or "fulfillment centers" are located in Ruskin, Florida in Hillsborough County and Lakeland, Florida, and in Polk County, Florida.  *See* Exhibit E, attached; *see also* Exhibit A ¶ 8.

The publisher also makes extensive use of the marketplace in Florida, shipping hundreds of thousands of different books to Florida for sale every year, not only the Book by Defendant Risen. The Book was purchased in Florida, as shown in the affidavit attached under Exhibit F. Defendant James Risen is earning royalties off of the Book physically sold in Florida and

intended to publish his Book with a publisher who would distribute it in every state.  Defendant Risen intended to aim his Book at and into Florida.

Florida is the third largest state and military, intelligence and other active and retired persons spend time reading books. Thus, the significant intelligence and military personnel in Florida form a vast readership along with the rest of the state's citizens and residents. Exhibit A ¶ 7a, 8, 27.

The Defendant James Risen then spoke on national television and radio interviews discussing his book yet primarily spoke of and defamed the Plaintiff Dennis Montgomery, essentially ignoring the rest of his Book in those interviews while intentionally attacking a private individual, Plaintiff Montgomery, to sensationalize and sell books. Complaint, ¶¶  29- 30, 125-145; Exhibit A ¶ 38, 39. However, the purpose and effect of those interviews was to drive sales of the Book as a physical product, including in Florida as the nation's third largest state by population and where a huge viewer and relationship is present. Risen's interviews were not comments having an unanticipated effect in Florida, but sales pitches calculated to cause listeners to purchase physical books inside Florida as well as other states. Exhibit A at ¶ 40, 41.

One purpose of the defamation was specifically to sell books in Florida and elsewhere, by offering a juicy, sensational story about a private citizen duping the President of the United States into nearly shooting down civilian airliners.  The defamation is a commercial advertising *marketing stunt,* however dishonest and defamatory, to sell books to stimulate the sales of the Book.  Complaint, ¶¶ 101, 127-130, 135, 143 – 145.

Risen's Book blames U.S. Government leaders and officials for mishandling the "war on terror" and over-reacting.  Risen portrays the global threats as far smaller, less real, and less imminent than national leaders during the Bush Administration.  Yet in Chapter 2, the

defamatory blame shifts to a private individual, Plaintiff Dennis Montgomery, who is the focal

point of the libel.  Defendant Risen swerves out of his lane to sideswipe and defame

Montgomery much too far to be accidental or a result of fair reporting – particularly since the

defamatory statements are not primarily based on republications of Playboy and other articles

and documents, but instead new information, however false, from confidential sources, as the

author and publisher boasts at page ix of their Book.

On Page 32 of the Book, the Defendants published about the Plaintiff:

Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money. Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, **a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it. The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in public, a series of civil lawsuits involving Montgomery.  It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes.**

*See* Complaint ¶ 92. (Emphasis added). On Page 32 of the Book, the Defendants

published about the Plaintiff:

Consider the example of Dennis Montgomery.  He provides a perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist was able to create a rogue intelligence operation with little or no adult supervision. Crazy became the new normal in the war on terror, and the original objectives of the war got lost in the process.

*See* Complaint ¶ 92. On Page 33 of the Book, the Defendants published about

the Plaintiff:

A former medical technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax. **Even after it appeared that Montgomery had pulled off a scheme of amazing scope, he still had die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Montgomery was a fake, and who rejected the notion that the super-secret computer software that he foisted on the Pentagon and CIA was anything other than America's salvation.**

*See* Complaint ¶ 97. (Emphasis added). On Page 33 of the Book, the

Defendants published about the Plaintiff: **Montgomery's story demonstrates how**

**hundreds of billions of dollars poured into the war on terror went to waste.** *See*

Complaint ¶ 197. (Emphasis added). On Page 34 of the Book, the

Defendants published about the Plaintiff:

Montgomery was an overweight, middle-aged, incorrigible gambler, a man who liked to play long odds because he was convinced that he could out-think the house. **He once boasted to a business partner that he had a system for counting an eight-deck blackjack shoe, quite a difficult feat for even the best card sharks, and he regularly tested his theories at the El Dorado and the Peppermill Casino in Reno. He usually came up short but that didn't stop him from playing blackjack on a nightly basis, racking up unwieldy debts that eventually led to his 2010 arrest for bouncing more than $1 million in bad checks at Caesar's Palace in Las Vegas**.

*See* Complaint ¶ 102. (Emphasis added). On Page 36 of the Book, the

Defendants published about the Plaintiff: Michael Flynn, Montgomery's former

lawyer— who later concluded that Montgomery was a fraud. *See* Complaint ¶ 105.

On Page 37 of the Book, the Defendants published about the Plaintiff:

By the spring and summer of 2003, eTreppid was awarded contracts by both the air force and U.S. Special Operations Command. Montgomery was able to win over the government in part by offering field tests of his technology — tests that former employees say were fixed to impress visiting officials. Warren Trepp later told the FBI that he eventually

learned that Montgomery had no real computer software programming
skills, according to court documents that include his statements to the FBI.
**Trepp also described to federal investigators how eTreppid employees
had confided to him that Montgomery had asked them to help him
falsify tests of his object recognition software when Pentagon officials
came to visit. Trepp said that on one occasion, Montgomery told two
eTreppid employees to go into an empty office and push a button on a
computer when they heard a beep on a cell phone. Meanwhile,
Montgomery carried a toy bazooka into a field outside eTreppid. He
was demonstrating to a group of visiting U.S. military officials that his
technology could recognize the bazooka from a great distance.**

*See* Complaint ¶ 107. (Emphasis added). Interestingly, Defendant Risen publishes that

"eTreppid was awarded contracts by both the air force and U.S. Special Operations Command."

The U.S. Special Operations Command is located at MacDill Air Force Base in Florida. Exhibit

A ¶ 17. On Page 37 of the Book, the Defendants published about the Plaintiff:

**After he was in place in the field, he used a hidden cell phone to buzz the cell
phone of one the eTreppid employees, who then pushed a key on a computer
keyboard, which in turn flashed an image of a bazooka on another screen
prominently displayed in front of the military officers standing in another
room, according to court documents. The military officers were convinced
that Montgomery's computer software had amazingly detected and
recognized the bazooka in Montgomery's hands.** (Montgomery insists that the
eTreppid employees lied when they claimed that he had asked them to fix the
tests, and also says that the air force issued a report showing that it had verified
the tests.

*See* Complaint ¶ 109. (Emphasis added). On Page 47 of the Book, the Defendants

published about the Plaintiff:

That meant that Brennan's office was responsible for circulating
Montgomery's fabricated intelligence to officials in the highest reaches of the
Bush administration. But Brennan was never admonished for his role in the
affair. After Barack Obama became president, Brennan was named to be his
top counterterrorism advisor in the White House. He later became CIA
director.

*See* Complaint ¶ 120. On Page 40 of the Book, the Defendants published

about the Plaintiff:

> **Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks. And only he had the technology to decode those messages, thus saving America from another devastating attack.** The CIA— more credulous than Hollywood or Las Vegas— fell for Montgomery's claims. In short, he convinced CIA officials that he could detect terrorist threats by watching television.

*See* Complaint ¶ 111. (Emphasis added). On Page 40 of the Book, the

Defendants published about the Plaintiff:

> Montgomery brilliantly played on the CIA's technical insecurities as well as the agency's woeful lack of understanding about al Qaeda and Islamic terrorism. **He was able to convince the CIA that he had developed a secret new technology that enabled him to decipher al Qaeda codes embedded in the network banner displayed on the broadcasts of Al Jazeera, the Qatar-based news network. Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks. And only he had the technology to decode those messages, thus saving America from another devastating attack. The CIA— more credulous than Hollywood or Las Vegas— fell for Montgomery's claims. In short, he convinced CIA officials that he could detect terrorist threats by watching television.**

*See* Complaint ¶ 111. (Emphasis added). On Page 42 of the Book, the Defendants

published about the Plaintiff:

> What remains unclear is how Montgomery was able to convince all of them that he had developed secret software that could decode Al Qaeda's invisible messages. **While he had gotten by a few credulous military officers who came to view his demonstrations, he apparently found it just as easy to persuade the CIA as well.**

*See* Complaint ¶ 189. (Emphasis added). On Page 42 of the Book, the

Defendants published about the Plaintiff:

> **A CIA official defensively pointed out that the agency did not actually have a contract with eTreppid at the time Montgomery was providing data from the Al Jazeera videotapes. While they were working closely together during the final months of 2003, the CIA had not yet started paying Montgomery, the official said. The agency never finalized a contract with him because agency staff eventually realized they had been**

> **conned, according to this official.  But that does not diminish the fact
> that for a few crucial months, the CIA took Montgomery and his
> technology very seriously.**

*See* Complaint ¶ 114. (Emphasis added). Importantly, this passage

demonstrates that Defendant Risen received this false and misleading information

from the inside and is not primarily a result of "fair privilege" as discussed in detail

below. On Page 46 of the Book, the Defendants published about the Plaintiff:

> **It did not take long for the French firm to conclude that the whole thing
> was a hoax.  The French company said that there were simply not
> enough pixels in the broadcasts to contain hidden bar codes or unseen
> numbers.  The firm reported back to the French government that the
> supposed intelligence was a fabrication.**

*See* Complaint ¶ 116. (Emphasis added). On Page 50 of the Book, the

Defendants published about the Plaintiff:

> **Edra Blixseth was Dennis Montgomery's latest mark. After being
> introduced to him by a former Microsoft executive and then hearing
> Montgomery explain his software, she agreed in 2006 to bankroll
> Montgomery to launch a new company, to be called Blxware.
> Montgomery needed new government contracts for Blxware, and Edra
> Blixseth had the money and contacts to try to make it happen.**

*See* Complaint ¶ 123. (Emphasis added). The Defendants' main defamation that is

destructive of Plaintiff's reputation and business prospects – past and future – is the Defendants'

nationwide announcement, based on a false and misleading recitation of facts obtained from so-

called intelligence officials, of the Plaintiff as a fraud whose work, including software and

technology, is a hoax.  As a result, relevant witnesses and proof confirm, *inter alia*, that Dennis

Montgomery's software and technology does work, always did work, and is still being used now

by the U.S. Government (allowing for updating of versions).  *See* Declaration, attached as

Exhibit A.

Again, the Plaintiff is a citizen of Florida.  He has a residence in Florida, a Miami-Dade

County phone number and he is registered to vote in Florida. *See* Exhibit G, attached; Exhibit A ¶ 8, 9.  In 2011, long before the Defendants' Book won published, in furtherance of his longstanding decision to reside to Florida, he created with the Florida Department of State two companies in Florida with a Florida partner to pursue business opportunities and contracts with U.S. Government and military offices and/or bases in Florida. U.S. Central Command ("CENTCOM") and U.S. Special Operations Command ("SOCOM") are located in Florida and Plaintiff Montgomery, as proven by his contracts, dealt with Florida and relied on Florida for business. *See* Exhibit H, attached; Exhibit A ¶ 23.

### B) Events, Connections, and Witnesses

The Plaintiff intends to call witnesses of the legitimacy of his defamed work based at Macdill Air Base near Tampa, Florida and at Eglin Air Force Base near Fort Walton Beach, Florida, where he did a lot of his work, as some of his most significant witnesses are in Florida. Those locales are where the CENTCOM, U.S. Southern Command and SOCOM facilities are located. Exhibit J, Exhibit L, respectively. They were and are the hub of U.S. counterterrorism and military and intelligence operations, particularly since September 11, 2001.  *See*, Contract between eTreppid and U.S. Special Operations Command HQ at Macdill Air Force Base, Florida 33621, attached as Exhibit I; *see also* Exhibit A.

There are technical and national security reasons as to why work being done in Florida, especially at Macdill or Eglin, would be well suited to Dennis Montgomery's experience, capabilities, contacts, and opportunities.  *Id.*

### III.   ARGUMENT FOR PERSONAL JURISDICTION, AGAINST TRANSFER AND VENUE

### A) Defendants Concede Jurisdiction over Publisher HMH

The Defendants' Motion concedes personal jurisdiction of this Court in Florida over the

publisher Houghton Mifflin Harcourt Publishing Company.  The Motion appears to challenge

personal jurisdiction only with regard to the parent holding company HMH Holdings, Inc. – and

James Risen.  *See* Defendant's Motion, Argument, Section A, page 12.

As previously shown, Houghton Mifflin Harcourt maintains permanent and general

offices in Orlando, Florida at 9400 Southpark Center Loop, Orlando, Florida 32819.  *See,*

Exhibit C, attached; http://www.hmhco.com/about-hmh/our-offices.  It is well-established law

that a party and corporation may be subject to the jurisdiction of a state if it has minimum

contacts with that state. Since the Defendant publisher has permanent and general offices in the

state of Florida and actively does and solicits business in the state of Florida, the Court has

personal jurisdiction over the publisher Houghton Mifflin Harcourt.  *See International Shoe Co.*

*v. Washington*, 326 U.S. 310 (1945); *See also*, Exhibit D, Exhibit K.

**B)  <u>Plaintiff Has the Right to Choose the Forum</u>**

As a general rule of law, the Plaintiff picks the forum in which to bring his claim.

The federal courts traditionally have accorded a plaintiff's choice of forum
considerable deference. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508,
67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947); 1 J. Moore, J. Lucas, H. Fink, D.
Weckstein & J. Wicker, Moore's Federal Practice p 0.145 (1988). Thus, in
the usual motion for transfer under section 1404(a), the burden is on the
movant to establish that the suggested forum is more convenient.

*In Re: Ricoh Corp*, 870 F.2d 570 (C.A.11 (Ala.), 1989).

A defendant invoking forum non conveniens "bears a heavy burden in
opposing the plaintiff's chosen forum." *Sinochem Intern. Co. Ltd. v.*
*Malaysia Intern. Shipping Corp.*, 549 U.S. 422, 430, 127 S.Ct. 1184
1191, 167 L.Ed.2d 15 (2007). A plaintiff's choice of forum is entitled to
deference, and there is a presumption in favor of a plaintiff's choice of
forum, particularly where the plaintiffs are citizens of the United States.
*SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.,* 382 F.3d
1097, 1100-02 (11th Cir. 2004).

*Wilson v. Island Seas Investments, Ltd.*, 590 F.3d 1264, 1269 (11th Cir. 2009).  Importantly, the

cases on this issue frequently distinguish between foreigners suing in the United States having

less deference than U.S. citizens suing in a U.S. court:

> [W]ith regard to the weighing of the private interests, the plaintiffs' choice
> of forum should rarely be disturbed `unless the balance is strongly in favor
> of the defendant.'"   *SME Racks*, 382 F.3d at 1101 (quoting *Gulf Oil*, 330
> U.S. at 508, 67 S.Ct. 839). This presumption in favor of the plaintiffs'
> initial forum choice in balancing the private interests is at its strongest
> when the plaintiffs are citizens, residents, or corporations of this country.
> *Id.* (citing *Leon v. Million Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir.2001)).

*Id.* at 1270.

### C)   Plaintiff's Complaint, Taken as True, Establishes Jurisdiction, Venue

On a motion to dismiss a case claiming a lack of jurisdiction, the court is "obligated to

assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor."

*Henke* v. *United States,* 60 F.3d 795, 797 (Fed. Cir. 1995).  On a motion to dismiss under FRCP

Rule 12(b)(1), a federal court must accept as true all material factual allegations contained in the

complaint and "'construe the complaint liberally, granting plaintiff the benefit of all inferences

that can be derived from the acts alleged' and upon such facts determine jurisdictional

questions." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas*

*v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005) (quoting *Barr v. Clinton*, 370 F.3d 1196, 1199

(D.C. Cir. 2004))); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed. Cir.

1988).

The allegations of the Complaint must be taken as true for the purposes of the motion to

dismiss, such as in Complaint ¶¶ 3-6; Amended Complaint ¶¶3-6:

> The Causes of Action and the injuries were caused to the Plaintiff by the
> Defendants' defamation and other tortious conduct in this district, Florida
> in general, nationwide, and internationally.

In addition, some of the most recent commercial opportunities for the Plaintiff's work were contracts and projects made available through military bases and Government facilities in Florida.

The State of Florida is the third (3rd) largest state by population within the entire United States such that a huge and substantial portion of the nationwide harm has occurred in Florida.

Dennis L. Montgomery is a natural person, an individual, and a citizen of the United States. He is a citizen of Florida, which as set forth above, is where much of this work has taken place and will continue to take place.

## D) **Defendants' Physical Products in Florida Bookstores Distinguish Case**

A federal district court in Florida may exercise personal jurisdiction over a nonresident defendant to the same extent that a Florida court may, so long as the exercise is consistent with federal due process requirements. *See* Fed.R.Civ.P. 4(e)(1), (h), and (k); *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626-27 (11th Cir. 1996). If both Florida law and the United States Constitution permit, the federal district court may exercise jurisdiction over the nonresident defendant. *Id.*

*Licciardello v. Lovelady*, 544 F.3d 1280 (11th Cir. 2008).

The essence of defamation is that a defamed person is injured in his or her community, reputation, and where they live. As the Florida Supreme Court has explained:

. . . For the tort of false light, the standard is whether the statement is highly offensive to a reasonable person. Id. § 652E(a). Conversely, a defamatory statement is one that ***tends to harm the reputation of another by lowering him or her in the estimation of the community or, more broadly stated, one that exposes a plaintiff to hatred, ridicule, or contempt or injures his business or reputation or occupation***. Standard Jury Instructions—Civil Cases (No. 00-1), 795 So.2d at 55.

. . . A false light plaintiff must prove that the publicity would be "highly offensive to a reasonable person," whereas a defamation plaintiff must prove ***injury to his or her reputation in the community***. As explained by the Ohio Supreme Court in recognizing false light, "in defamation cases the interest sought to be protected is the objective one of reputation, either economic, political, or personal, in the outside world. In privacy cases the interest affected is the subjective one of injury to [the] inner person." *Welling v. Weinfeld*, 113 Ohio St.3d 464, 866 N.E.2d 1051, 1057 (2007) (emphases added) (quoting Crump v. Beckley Newspapers, Inc., 173 W.Va. 699, 320 S.E.2d 70, 83 (1984)).

15

*Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1109, 2008 WL 4659374 (Fla. 2008) (Emphasis added).

This case is readily distinguishable from general precedents cited by the Defendants concerning only nationwide statements without more. Defendants cite *Buckley v. New York Times Co.*, *Calder v. Jones*, *Madera v. Hall*, *Revel v. Lidov*, *Busch v. Viacom International Inc.*, *Walden v. Fiore, Alternate Energy Corp. v. Redstone*, alleging that personal jurisdiction may be improper in Florida. Defendants are incorrect and the cited case law is inapposite to the facts and circumstances presented here.

In *Buckley*, a non-binding Fifth Circuit case, the court held that "mere circulation" does not satisfy due process. *Buckley v. New York Times Co.*, 338 F.2d 470, 474 (5th Cir. 1964). But, Defendants fail to mention that in *Buckley*, part of the court's decision rested with the fact that the corporation being sued had no office, place of business, officers, agents or employees in the state of issue. It had "no assets within the State . . ." *Id*. at 473. Moreover, for the Charleston Gazette, no subscription solicitation was made, for the Cincinnati Post and Times Star, an average of only thirteen copies of this paper was circulated, The New York Times Company sent less than a thousandth of one per cent, of its newspapers from New York to the state at issue, the Florida Times-Union had an average of only ten subscribers in the state at issue. While "the mere circulation through the mails to subscribers and independent distributors" *id*, does not constitute business activity, that has nothing to do with the facts here. Here, hundreds of thousands of books were distributed to and sold in Florida.

*Calder* ironically supports Plaintiff Montgomery's position that personal jurisdiction exists over Defendants in his state, Florida. There, the Court found jurisdiction proper where the harm occurred to Plaintiff. " . . . [P]etitioners are primary participants in an alleged wrongdoing

16

intentionally directed at a California resident, and jurisdiction over them is proper on that basis." *Calder v. Jones*, 465 U.S. 783, 790 (1984). Here, such as the Court found in *Calder*, the harm intentionally directed at Plaintiff Montgomery occurred in Florida, where the Defendants aimed their tortious actions because the Defendants intentionally projected themselves into Florida.

In *Madara*, because the defendant had no agents and did not have an office in Florida, the Eleventh Circuit ruled that "to subject [] Hall to the jurisdiction of a Florida court in this case would offend due process." *Madara v. Hall*, 916 F.2d 1510, 1519 (11th Cir. 1990). Houghton Mifflin Harcourt Publishing Company has a general office in Orlando, Florida, and is registered to do business in the State of Florida with the Florida Department of State, Division of Corporations. Moreover, SOCOM and CENTCOM and other U.S. government facilities, the center of U.S. counterintelligence military and counterterrorism command, are located in Florida. Florida is a huge military state and that Plaintiff Montgomery did and does business here as a result which Defendants knew about, Defendants aimed their defamatory statements into Florida.

*Revell* is also distinguishable. A Fifth Circuit case premised on a website posting is not at all analogous to the situation here. There, the Fifth Circuit dismissed for lack of personal jurisdiction because the author did not know plaintiff resided in the forum, the article did not mention the forum, and no newsgathering occurred in the forum. *Revell v. Lidov*, 317 F.3d 467, 473-75 (5th Cir. 2002). Here, Defendants were well aware that the hub of U.S. intelligence and military counterterrorism operations were and remain in Florida and that is where Plaintiff had significant contacts, contracts and did work.

*Alternate Energy Corp.* supports Plaintiff's claims that personal jurisdiction over Defendants is proper in Florida. Again, this case deals with an isolated Internet posting. Yet the court holds that " . . . engaging in commercial activity over the internet constitutes sufficient

minimum contacts to satisfy due process requirements, but merely posting information on the internet does not." *Alternate Energy Corp. v. Redstone*, 328 F. Supp. 2d 1379, 1382 (S.D. Fla. 2004). Here, the Book was offered for sale, and sold in Florida, a huge market. And Defendant Houghlin Mifflin has a corporate office in Florida and is registered to do business in the state.

In *Busch*, a non-binding Northern District of Texas case, the court found no personal jurisdiction because "[the defendant] did not visit Texas, call Texas or conduct any interviews or research in Texas related to the piece . . ." *Busch v. Viacom International Inc*., 477 F. Supp. 2d 764, 772-73 (N.D. Tex 2007). But here, as discussed above, there are significant contacts with Florida as detailed above.

Also distinguishable, in *Walden v. Fiore,* the Court found that "the plaintiff cannot be the only link between the defendant and the forum." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014). A defendant's "suit-related conduct" must have a "substantial connection" to the forum . . . *Id*. at 1121. That is more than true here.

The Defendants physically shipped books, as physical products, into Florida with the knowledge and intent that the books would be placed on Florida bookstore shelves and sold inside Florida. *See* Exhibit F. Furthermore, Defendant Risen's appearances on radio and television were not just commentary but attempts to stimulate the sale of books inside Florida and elsewhere.  Risen was speaking on radio and television to move books off of Florida bookstores and shelves and to the checkout counter in Florida.

Personal jurisdiction under constitutional minimum contacts with Florida and under Florida's long-arm statute are clearly established under *Renaissance Health v. Resveratrol Partners*, 982 So.2d 739 (Fla. App. 2008), in which the defaming out-of-state defendant made the statements to help sell their own products and books in competition with the plaintiff.

In *Renaissance Health v. Resveratrol Partners*, the defamation was to co-opt the sales of competitor's products and books in Florida.  This is similar to, but less direct, than the Defendants' efforts here to sell their own books in Florida.  The Appeals Court there said:

> The purpose of the alleged business defamation in this case ***was to convince consumers to purchase the defendants' products and not the plaintiff's***.  Sales to Florida residents through the interactive website totaled 2.4% of Resveratrol's total gross domestic sales;  Sardi sold books and e-books to Florida residents realizing $2,101.83 in sales.  ***Such commercial activity within Florida is sufficient to subject the defendants to jurisdiction here***—where a defendant disparages a competitor's products to enhance its own commercial sales in a state where the competitor has its corporate headquarters, the defendant could "reasonably anticipate being haled into court there." *See Calder v. Jones*, 465 U.S. 783, 790,  104 S.Ct. 1482,  79 L.Ed.2d 804 (1984) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297,  100 S.Ct. 559,  62 L.Ed.2d 490 (1980)); *See Hartoy, Inc. v. Thompson*, 2003 WL 21468079 (S.D.Fla.2003) (involving five orders from defendant's website totaling $325); *Nida Corp. v. Nida*, 118 F.Supp.2d 1223, 1231-32 (M.D.Fla.2000) (involving approximately $27,417 in revenue from sales in Florida).  ***This case is distinguishable from internet defamation cases involving passive websites not designed to market products in the purported forum state.*** *See Revell v. Lidov*, 317 F.3d 467 (5th Cir.2002); *Hy Cite Corp. v. Badbusinessbureau.com, L.L.C.*, 297 F.Supp.2d 1154 (W.D.Wis.2004).

*Id.* at 982 So.2d  at 742-743 (Emphases added).  The instant case does not primarily involve posting on the internet. But the precedents that have developed about the internet make clear that nationwide radio and television interviews similarly qualify for Florida's long-arm jurisdiction and minimum contacts for constitutional due process, particularly where the goal is to drive sales of physical products in commerce within Florida.

Moreover, Florida's long arm statute 48.193 conferring jurisdiction provides:

6.   Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:

* * *

b.   ***Products, materials, or things*** processed, serviced, or manufactured by the defendant anywhere ***were used or consumed within this state in***

> *the ordinary course of commerce, trade, or use*.

(Emphasis added).  Here, the injury and causes of action arise directly from the statements made in the physical product, the Book, shipped to Florida.

Defendant Risen's involvement is not less than the publisher. While the publisher physically shipped books into Florida to be placed on Florida bookstore shelves, Risen wrote the Book to sell it and entered into a contract for the publisher to do exactly that.  Risen submitted his manuscript to Houghton Mifflin for the very purpose of having the books shipped into Florida for sale off of Florida bookshelves.

The U.S. Court of Appeals for the Eleventh Circuit ("Eleventh Circuit") upheld jurisdiction in the U.S. District Court for the Middle District of Florida of statements on a website in Tennessee, explaining:

> The Florida "long-arm" statute permits the state's courts to exercise jurisdiction over nonresident defendants who commit certain specific acts. Fla. Stat. § 48.193. For example, § (1)(b) of the statute permits a Florida court to assert jurisdiction over any person who "commit[s] a tortious act within this state." Fla. Stat. § 48.193(1)(b).

> Carman claims that jurisdiction over then nonresident Lovelady is appropriate under this section of the Florida statute. Carman argues that Lovelady's creation in Tennessee of a website containing an allegedly infringing and deceptive use of Carman's trademark is a tortious act "within this state" as contemplated by the statute because the injury from trademark infringement occurs where the holder of the mark resides—in this case, Florida. He relies upon *Nida Corp. v. Nida,* 118 F.Supp.2d 1223, 1231 (M.D.Fla.2000) (allegation of trademark infringement of Florida resident sufficient to trigger Florida long-arm statute). *Accord JB Oxford Holdings, Inc. v. Net Trade, Inc.,* 76 F.Supp.2d 1363, 1368 (S.D.Fla.1999). * * * *

> We have held that § 48.193(b) of the Florida long-arm statute permits jurisdiction over the nonresident defendant who commits a tort outside of the state that causes injury inside the state. *Posner v. Essex Ins. Co.,* 178 F.3d 1209, 1216 (11th Cir. 1999) (adopting broad interpretation of long-arm statute by Florida courts that permits personal jurisdiction over nonresident defendant alleged to have committed a tort causing injury in

Florida). Therefore, although the website was created in Tennessee, the
Florida long-arm statute is satisfied if the alleged trademark infringement
on the website caused injury in Florida.

*Licciardello v. Lovelady*, 544 F.3d at 1283.

Florida's Supreme Court recently addressed whether Florida's "long arm statute" reaches

nationwide defamation outside of Florida in 2010 in *Internet Solutions Corp. v. Marshall*, 39 So.

3d 1201, 2010 WL 2400390 (Fla. 2010) when the question was certified by the Eleventh Circuit

to Florida's Supreme Court:

Because the case involved a question of Florida law for which there is no
clear controlling precedent, the Eleventh Circuit certified the question that
is before this Court. The Eleventh Circuit did not address the second step
of the jurisdictional inquiry, which is whether the exercise of jurisdiction
would violate due process.

*Id.* 39 So. 3d at 1215.

First, in the opinion of Florida's Supreme Court this is an area "for which there is no

clear controlling precedent." Therefore, the certainty urged by the Defendants is misplaced.

The Florida Supreme Court rephrased the certified question as:

Accordingly, we rephrase the certified question as follows:

Does a nonresident commit a tortious act within Florida for purposes of
section 48.193(1)(b) when he or she makes allegedly defamatory
statements about a company with its principal place of business in Florida
by posting those statements on a website, where the website posts
containing the statements are accessible and accessed in Florida?

We answer the rephrased certified question in the affirmative. We
conclude that posting defamatory material on a website alone does not
constitute the commission of a tortious act within Florida for purposes of
section 48.193(1)(b), Florida Statutes. Rather, the material posted on the
website about a Florida resident must not only be *accessible* in Florida,
but also be *accessed* in Florida in order to constitute the commission of the
tortious act of defamation within Florida under section 48.193(1)(b).

*Id.* 39 So. 3d at 1203.  *(Capitalization and emphases in original)*.

The Supreme Court concluded:

For the reasons explained above, we answer the rephrased certified question in the affirmative. A nonresident defendant commits the tortious act of defamation in Florida for purposes of Florida's long-arm statute when the nonresident makes allegedly defamatory statements about a Florida resident by posting those statements on a website, provided that the website posts containing the statements are accessible in Florida and accessed in Florida. Having answered this question, we return this case to the United States Court of Appeals for the Eleventh Circuit.

*Id.* 39 So. 3d at 1216, 2010 WL 2400390 at 5.

### E)  <u>Florida Contacts Sufficient for Personal Jurisdiction</u>

In terms of constitutional requirements for personal jurisdiction over the Defendants, the publisher Houghton Mifflin Harcourt Publishing Company maintains a general office in Orlando, Florida, has registered to do business with the Florida Department of State Division of Corporations and sells physical products, including the Book at issue here, within Florida. Plaintiff initially sued the parent company to insure against Houghton Mifflin Harcourt being only a "doing business name" of the parent company, after noticing inconsistent references.

In addition, the Defendant James Risen knew and intended that his publisher Houghton Mifflin Harcourt physically distribute his book, including through the publisher's Orlando, Florida, offices in Florida.  Defendant Risen is earning royalties from the Book physically sold in Florida.

Plaintiff disputes Defendants' view of the governing law and precedents on personal jurisdiction. For example, the Defendants read *Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482,  79 L.Ed.2d 804 (1984), as requiring that the Defendants' actions must be "calculated to" cause injury inside Florida.  But then their own discussion of the case shows otherwise. "Calculated to" implies a knowing intention to cause injury inside Florida.  The actual rule of *Calder v. Jones* is whether it was reasonably *<u>foreseeable</u>* that harm would result in Florida.  That is, would a person committing a tort "reasonably anticipate being haled into court there."

That is, to satisfy constitutional minimum contacts for personal jurisdiction, the

Defendants need not have intended that harm result in Florida, but merely acted intentionally

with a reasonably-forseeable result of causing defamatory injury within Florida.   *Id.*

The Eleventh Circuit also upheld constitutional minimum contacts for a website in

Tennessee causing injury in Florida:

> This "fair warning" requirement is satisfied if the defendant has
> "purposefully directed" his activities at residents of the forum, *Keeton v.
> Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d
> 790 (1984), and the litigation results from alleged injuries that "arise out
> of or relate to" those activities. *Helicopteros Nacionales de Colombia, S.A.
> v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). In this
> way, the defendant could have reasonably anticipated being sued in the
> forum's courts in connection with his activities there. *Burger King,* 471
> U.S. at 472, 105 S.Ct. 2174 (quoting *International Shoe,* 326 U.S. at 316,
> 66 S.Ct. 154).
>
> Even where a defendant has purposefully established constitutionally
> significant contacts within the forum state, jurisdiction must also be
> evaluated in light of several other factors to determine whether its exercise
> would comport with "fair play and substantial justice." *International Shoe,*
> 326 U.S. at 320, 66 S.Ct. 154. These factors include the burden on the
> defendant of litigating in the forum, the forum's interest in adjudicating the
> dispute, the plaintiff's interest in obtaining convenient and effective relief
> and the judicial system's interest in resolving the dispute. *World-Wide
> Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 62
> L.Ed.2d 490 (1980). Where these factors do not militate against otherwise
> permitted jurisdiction, the Constitution is not offended by its exercise. *Id.*

*Licciardello v. Lovelady*, 544 F.3d at 1284.  However, an intentional tort is analyzed differently.

It is also significant that the Complaint and Amended Complaint alleges *intentional*, not

negligent, tortuous acts, Amended Complaint ¶¶ 42, 78, 97, 241, 242, 249, as does Plaintiff

Montgomery's affidavit attached as Exhibit A at ¶ 7h, 38, 61.

> Similarly, the Ninth Circuit has recognized that the defendant's connection
> with the forum in an intentional tort case should be evaluated under the
> *Calder* "effects" test, rather than the contracts-oriented "minimum
> contacts" test. *Ziegler v. Indian River County,* 64 F.3d 470, 473 (9th
> Cir.1995). In *Ziegler,* the court noted that:

23

We apply different purposeful availment tests to contract and tort cases....
Consistent with the Supreme Court's holding in *Burger King,* merely
contracting with a resident of the forum state is insufficient to confer
specific jurisdiction over a nonresident. In tort case, however, jurisdiction
may attach if an out-of-forum defendant merely engages in conduct aimed
at, and having effect in, the situs state.

*Licciardello v. Lovelady*, 544 F.3d at 1286.  Explaining further:

Recently the Middle District of Florida recognized that "a number of
courts" have held that "where a defendant's tortuous conduct is
intentionally and purposefully directed at a resident of the forum, the
minimum contacts requirement is met, and the defendant should anticipate
being haled into court in that forum." *New Lenox Industries v. Fenton,* 510
F.Supp.2d 893, 904 (M.D.Fla.2007). In that case, the plaintiff had alleged
fraud and misappropriation of trade secrets, and the district court held that
jurisdiction was proper inasmuch as "Plaintiff alleges that Defendants
committed one or more intentional torts ... against Plaintiff who was
injured in Florida." *Id.* at 904-05 (citing *Godfrey v. Neumann,* 373 So.2d
920, 922 (Fla.1979) (Florida Supreme Court similarly applied the effects
test to find jurisdiction over the defendant alleged to have committed an
intentional tort)).

*Id.*, 544 F.3d at 1287.  Explaining further:

 Intentional torts are such acts, and may support the exercise of personal
jurisdiction over the nonresident defendant who has no other contacts with
the forum. *Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d
804 (1984).

*Id.*, 544 F.3d at 1285-86.

### F)  <u>Injury to Plaintiff Involves Future Work Opportunities, Not Just the Past</u>

Since the defamation has been published, the Plaintiff has not been able to get work,

contracts, or business opportunities.  *See* Declaration, Exhibit A.  But the Defendants err in

directing their attention only toward past events.  The harm to the Plaintiff involves his loss of

current and future employment, contract, and business opportunities.  The relevant test is not

where the Plaintiff has earned income in the past, as the Defendants mistakenly assume, but

whether the defamation prevents him from earning income now and in the future.  *See also*

Exhibit A ¶ 12; Amended Complaint ¶ 245.

Based on past experience, contracts and work, Plaintiff's greatest future opportunities are at either Macdill Air Base near Tampa, Florida and Eglin Air Force Base near Fort Walton Beach, Florida, the names of counterintelligence and counterintelligence operations. Exhibit A ¶ 21; Amended Complaint ¶ 4, 21, 101, 246, 248. To some extent, Plaintiff cannot explain why this is so openly on the public record, but can explain under a protective order or under seal. Relevant officials at those bases make their own contracting decisions and do not rely upon contracting offices in Washington, D.C. *Id.*

Also the defamation of the Plaintiff does not critique the U.S. Government in the District of Columbia, but *excuses* the U.S. Government as Montgomery's innocent and unsuspecting victims.  Therefore, the suggestion is untrue that the focus of the defamation is the U.S. Government located in Washington, D.C.

## IV.    STANDARD OF REVIEW FOR A 12(b)(6) MOTION

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a defense of "failure to state a claim upon which relief can be granted" may be raised by motion in response to a pleading. Fed. R. Civ. P. 12(b)(6). In considering a motion to dismiss under Rule 12(b)(6), a court must take all well pleaded facts in the complaint as true and view them in the light most favorable to Plaintiff.  *See Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S. Ct. 1843, 1849, 23 L. Ed. 2d 404 (1969). The court must only consider those facts alleged in the complaint is considering such a motion. See *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994). A complaint should be dismissed if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232, 81 L. Ed. 2d 59 (1984). We are required to accept the facts as set forth

in the plaintiff's complaint as true, and our consideration is limited to those facts contained in the pleadings and attached exhibits. *Thaeter v. Palm Beach County Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006) )(quoting *Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007)

As a result, the allegations of the Complaint are taken to be true for present purposes, in addition to adopting reasonable inferences in favor of the Plaintiff while rejecting inferences that might otherwise be drawn against the Plaintiff's claim.

## V.    ARGUMENT THAT PLAINTIFF STATED A VALID CLAIM

Defendants assert four grounds for arguing that the Complaint fails to state a claim upon which relief may be granted: (1) That under the Fair Report Privilege Defendants have merely reported the statements of others, (2) That the publication of opinions and/or hyperbole are not actionable under defamation law, (3) That Plaintiff is a limited public figure because years earlier he made public statements about an entirely unrelated issue, (4) That Plaintiff has not alleged actual malice by Defendants because previous stories were "unchallenged." (5) That other torts cannot proceed if defamation does not.

### A.  Defendants Reliance on External Evidence Exceeds Rule 12(b)(6)

Initially, a Rule 12(b)(6) motion to dismiss for failure to state a claim rests upon the Complaint alone, and any exhibits which are so integrally part of the allegations of the Complaint as to be considered part of it, such as a contract sued upon.

Here, the Defendants' motion relies extensively on external documents.  The Defendants' argue that the Court may consider those exhibits by taking judicial notice of court filings and court proceedings and the like.  However, these documents are not even relvant, as Defendants concede at page ix of the Book that the representations at issue concerning Plaintiff came from

confidential Government sources and are not a regurgitation of Playboy magazine or other articles and documents. Indeed, this is the selling point of the Book. And, by cleverly relying on these confidential sources, Defendants try to immunize themselves from liability for their defamatory false and misleading statements, as they think that no one can challenge this illegal attack on Plaintiff designed to create a sensational story to sell their Book. In any event, the external documents, particularly when juxtaposed with the untruthful statements setting forth the defamation at issue in the Complaint, Amended Complaint and Plaintiff's affidavit, are issues of fact for the jury to decide. It would be premature to take these factual issues away form the jury of Plaintiff's peers.

**Discussion of the merits of the defamation by Defendants is contained in Plaintiff's Opposition to Defendant's Anti-SLAPP Motion at pages 6 to 11.**

**B.  <u>Defamation Is For the Jury to Decide</u>**

When a plaintiff requests a jury trial, it is not for the district court to decide whether a statement is defamatory or not.  "It is only when the court can say that the publication is not reasonably capable of *any* defamatory meaning and cannot be reasonably understood in *any* defamatory sense that it can rule as a matter of law, that it was not libelous."  *Levy v. American Mut. Ins. Co.*, 196 A.2d 475, 476 (D.C. 1964) (Emphasis added); *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001).  "**[I]f the language is capable of two meanings, one actionable and the other not, it is for the jury to determine which of the two meanings would be attributed to it by persons of ordinary understanding under the circumstances.**" *Levy*, 196 A.2d at 476 (Emphasis added). "[A] jury must determine whether these impressions were actually conveyed, whether they were false, and whether the letters were motivated by actual malice." *White v. Fraternal Order of Police*, 909 F.2d 512, 525 (D.C. Cir. 1990); *see also*

*Dunn v. Gannett New York Newspapers, Inc.*, 833 F.2d 446, 449 (3d Cir. 1987) ("if the language at issue is 'capable of both a defamatory and a nondefamatory meaning, there exists a question of fact for the jury.'").

Whether there was a showing of constitutional malice is also a matter for the jury to decide. *See SCo Group, Inc. v. Novell, Inc.,* 439 Fed. Appx. 688, 695 (10th Cir. Utah 2011)("the jury was instructed to consider slanderous only those statements uttered with constitutional malice"). Recognizing the role of the jury in determining constitutional malice, the U.S. Court of Appeals for the Ninth Circuit has held:

> We must attempt to discharge our constitutional responsibility to protect First Amendment values without unduly trenching on the fact-finding role of the jury and trial judge. We are mindful that in *New York Times, Bose*, and *Harte-Hanks*, the Supreme Court was fashioning a process for reviewing the evidence which permits judicial protection of First Amendment values while still paying due deference to the fact-finding role of juries, and particularly the jury's opportunity to observe the demeanor of the witnesses.

*Newton v. National Broadcasting Co.,* 930 F.2d 662, 672 (9th Cir. 1990). Indeed, the jury's observation of the Defendants' credibility is precisely what is needed here. Defendants falsely claim that they did not knowingly post false and defamatory information about Plaintiff. It is up to the jury to determine whether these Defendants are credible. *See also, St. Amant*, 390 U.S. at 732, supra ("The finder of fact must determine whether the publication was indeed made in good faith.").

## C. <u>Other Tort Claims Not Barred on the Basis of Defamation</u>

Defendants assert that Plaintiff's other causes of action must also fail because "[A] plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim." *Moldea II*, 22 F.3d at 319-20 (citing *Cohen v. Cowles Media Co.*, 501 U.S. 663, 670 (1991)).

However, this argument depends upon assuming that constitutional limitations actually do apply in whole or in part to some or all of Defendants' statements.  To the extent that Plaintiff's causes of action are constitutionally valid, the objection will have no application.

The elements of the tort of interference are:

(1) the existence of a business relationship under which the plaintiff has legal rights, (2) an intentional and unjustified interference with that relationship by the defendant, and (3) damage to the plaintiff as a result of the breach of the business relationship.

*Symon v. J. Rolfe Davis, Inc.*, 245 So.2d 278, 280 (Fla. 4th DCA), cert. denied, 249 So.2d 36 (Fla.1971). As is further pointed out in *Azar v. Lehigh Corp.*, 364 So.2d 860, 862 (Fla. 2d DCA 1978):

It is not essential, however, that the business relationship be founded upon an enforceable contract.  *Franklin v. Brown*, 159 So.2d 893 (Fla.1st DCA 1964). Thus, in *Calvary Church, Inc. v. Siegel*, 358 So.2d 1134 (Fla.3d DCA 1978), the court affirmed a judgment against a corporation for interfering with the plaintiff's agreement to purchase property from another even though the agreement was not necessarily enforceable against the seller. Moreover, proof of fraud is not required to sustain a cause of action for this tort.  *Smith v. Ocean State Bank*, 335 So.2d 641 (Fla.1st DCA 1976).

*Zimmerman v. D.C.A. at Welleby, Inc.*, 505 So.2d 1371, 12 Fla. L. Weekly 1042 (Fla.App. 4 Dist., 1987)

As to the tortious interference claim, retailer argues first that it was barred by the economic loss rule. See HTP, Ltd. v. Lineas Aereas Costarricenses, 685 So.2d 1238 (Fla.1997). We agree with the second district that in this kind of circumstance the tort of interference with prospective advantage is sufficiently independent to withstand the economic loss rule. See Bankers Risk Management Serv., Inc. v. Av-Med Managed Care, Inc., 697 So.2d 158 (Fla. 2d DCA 1997).

*Centro Nautico Representacoes Nauticas, LDA. v. International Marine Co-op, Ltd.*, 719 So.2d 967 (Fla.App. 4 Dist., 1998)

VI.     **CONCLUSION**

The Court should deny the Defendants motions to dismiss under FRCP 12(b)(6) and FRCP 12(b)(1). Personal jurisdiction exists in Florida and this district, and venue is proper here.

Moreover, and importantly, Defendants published Book – which is a dishonest hit-piece on

Plaintiff, who becomes their sensationalized whipping boy to market and sell books – based by

their own admission, is derived from confidential Government sources. Thus, Defendants'

disingenuous defense of the Fair Reporting Privilege does not apply.

This case must go to the jury to decide at the earliest practicable date, as Plaintiff is in

poor health due to a brain aneurism and may not survive a long pre-trial period. This is a

relatively simple and straightforward case, as the court suggested at the status conference of

April 14, 2015. Defendants, who have huge financial and other resources and are being

represented by two mega-law firms, simply will make whatever non-meritorious argument is at

their disposal to try to delay adjudication and to avoid their day of reckoning before a jury.

As such, this honorable Court must respectfully deny Defendants' motions.

Dated:  April 27, 2015

<div style="margin-left: 40%;">

Respectfully submitted,

 /s/ *Larry Klayman*
Larry Klayman, Esq.
General Counsel
Freedom Watch, Inc.
D.C. Bar No. 334581
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

</div>

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 27th day of April, 2015, a true and correct copy of the foregoing (Case No. 15-cv-20782) was filed via CM/ECF and served upon the following:

**Sanford Lewis Bohrer**
**Brian Toth**
Holland & Knight, LLP
Suite 3000
701 Brickell Ave
Miami, FL 33131
Email: sbohrer@hklaw.com
Email: brian.toth@hklaw.com

**Laura R. Handman**
**Micah Ratner**
Davis Wright Tremaine LLP
1919 Pennsylvania Ave., N.W., Suite 800
Washington D.C. 20006-3401
Email: laurahandman@dwt.com
Email: MicahRatner@dwt.com

 /s/ *Larry Klayman*
Larry Klayman, Esq.
Florida Bar No. 246220
Freedom Watch, Inc.
2775 NW 49th Ave, Suite 205-345
Ocala, FL 34483
(310) 595-0800
leklayman@gmail.com