**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

DENNIS L. MONTGOMERY



                              Plaintiff,

       v.

JAMES RISEN, an individual,
c/o <u>The New York Times</u>
1627 "I" Street N.W., Suite 700
Washington, D.C. 20006-4007                 Civil Action No.  15-cv-20782

                 and

HOUGHTON MIFFLIN HARCOURT PUBLISHING
COMPANY
222 Berkeley Street
Boston, Massachusetts 02116

                 and

HMH HOLDINGS, INC.
222 Berkeley Street
Boston, Massachusetts 02116

                 and

HOUGHTON MIFFLIN HARCOURT COMPANY
222 Berkeley Street
Boston, Massachusetts 02116

                     Defendants.

## **AMENDED COMPLAINT (REDACTED)[1]**

       Plaintiff Dennis L. Montgomery, by counsel, sues the Defendants, acting in concert,

jointly and severally, in this civil action for Common Law Defamation *Per Se* (libel and slander),

---

[1] Address and Miami-Dade phone number of Plaintiff have been redacted for security reasons.
The address and phone number are being filed by motion in a Sealed Amended Complaint.

General Defamation (libel and slander), Defamation by Implication (libel and slander),

Intentional Infliction of Emotional Distress, Tortious Interference with Prospective Advantage,

and Assault, as a result of Defendants causing actual damages, compensatory damages, and

giving rise to punitive damages as well, including continuing and aggravated harm to the

Plaintiff's professional, business and personal reputation and livelihood.  As grounds therefore,

Plaintiff alleges as follows:

I.      **JURISDICTION AND VENUE**

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332 under diversity of citizenship. The parties are citizens of different states and the amount in

controversy exceeds $75,000. Also, the Causes of Action arose in this judicial district.

2.      Venue is proper for Defendants pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C.

§ 1391(e).

3.      The Causes of Action and the injuries were caused to the Plaintiff by the

Defendants' defamation and other tortious conduct in this district, Florida in general, nationwide,

and internationally.

4.      In addition, some of the most recent commercial opportunities for the Plaintiff's

work were contracts and projects made available through military bases and Government

facilities in Florida.

5.      The State of Florida is the third (3rd) largest state by population within the entire

United States such that a huge and substantial portion of the nationwide harm has occurred in

Florida.

6.      The United States Central Command ("CENTCOM") is located at MacDill Air

Force Base, in Tampa, Florida. Central Command, then under the leadership of General Tommy

Ray Franks, led the attack on the Taliban in Afghanistan in response to the September 11 attacks on the World Trade Center and The Pentagon in 2001. CENTCOM also led the 2003 invasion of Iraq and the overthrow of Saddam Hussein.  CENTCOM has been the center of the United States' war on terror and related intelligence gathering during the past fifteen years.

7.     United States Southern Command ("SOCOM"), responsible for all U.S. military and intelligence gathering activities in South America and Central America, is located in located in Doral, Florida.  The U.S. Southern Command works with CENTCOM. Al Qaeda, ISIS, and other groups and interests, including the Islamic Republic of Iran are active and engaged in South America and in Central America and in 1994 Iran blew up a synagogue in Buenos Aires, Argentina.

8.     In addition, the U.S. Air Force maintains six (6) active military bases in Florida, the U.S. Navy maintains ten (10) active military bases and two (2) hospital bases in Florida, the U.S. Coast Guard maintains three (3) active military bases, and the U.S. Marines and the U.S. Army each maintain one active military base in Florida.

9.     Many of the drones used for the wars in Iraq and Afghanistan have been operated out of Florida.  For example, the 2d Special Operations Squadron ("2 SOS") is an Air Force Reserve Command unit Stationed at Hurlburt Field, Florida. The 2 SOS unit operates MQ-9 Reaper Remotely Piloted Vehicles.

10.    Defendants knew or should have known of the large counter-terrorism, military, and intelligence presence within the state of Florida. Defendant Risen is a "national security expert" who has intimate knowledge of the U.S. Military.

11.    Given the large counter-terrorism, military, and intelligence presence in Florida, Defendants marketed the Book Pay Any Price into the state for Florida, as there is a large

3

readership there from military and intelligence personnel and retirees in these services, as well as the general population at large. Pay Any Price specifically deals with the United States' efforts in the war on terrorism and related intelligence gathering activities, and as such there would be substantial interest from those living within Florida, which has the largest military and intelligence presence in the nation.

12.     Defendants knew or should have known of Plaintiff's substantial ties to counter-terrorism, military, and intelligence contracts and intended on harming Plaintiff in Florida, which continues to be center of the war on terror. Defendants knew that if Plaintiff's reputation was harmed in Florida, the large military presence in Florida would ensure that Plaintiff would lose jobs and contracts and not be hired for any more jobs and contracts.

II.     **THE PARTIES**

13.     Dennis L. Montgomery is a natural person, an individual, and a citizen of the United States. He is a citizen of Florida, which as set forth above, is where much of this work has taken place and will continue to take place. He resides at ███████████████ Miami, FL ██████ and has a Miami-Dade telephone number of ███████████. Mr. Montgomery is also registered to vote in Florida and has had multiple and ongoing business dealings within the state of Florida. Plaintiff is in poor health. He suffered a brain aneurysm and a related multi-infarct stroke on May 12, 2014. He suffered both a hemorrhagic stroke (caused by ruptured blood vessels that cause brain bleeding) and an ischemic stroke (loss of blood flow). He was in the hospital for two months, through July 2014. He has been left permanently disabled and partially paralyzed. Plaintiff could suffer a similar or repeated event causing him to die at any time. He is currently in outpatient physical therapy to work on ongoing left-sided weakness and speech therapy for stroke related cognitive and memory impairments along with swallowing difficulties.

14.     James Risen is a natural person who is a Pulitzer Prize-winning journalist for <u>The New York Times</u>, previously for <u>The Los Angeles Times</u>. He has written or co-written many articles concerning U.S. Government ("Government") activities and is the author or co-author of two books about the National Security Agency ("NSA") and the Central Intelligence Agency ("CIA").

15.     Defendant Houghton Mifflin Harcourt Publishing Company is the publisher of Risen's Book, "<u>Pay Any Price: Greed, Power and Endless War</u>" and is located in Boston, Massachusetts.

16.     Defendant HMH Holdings, Inc. is the parent company and owner of the Houghton Mifflin Harcourt Publishing Company and is incorporated in the State of Delaware.

17.     Defendant Houghton Mifflin Harcourt Company is the parent company and owner of the Houghton Mifflin Harcourt Publishing Company and is incorporated in the State of Delaware.

18.      Houghton Mifflin Harcourt Company and/or Houghton Mifflin Harcourt Publishing Company maintains offices throughout the United States, including an office in Orlando, Florida.

19.     With regard to each of the allegations in this complaint, all of the Defendants have acted in concert, jointly and severally, thus giving rise to joint and several liability for each of them. Thus, when a tortious act is attributed (and pled as) to Defendant Risen, it also applies to the other defendants, Houghton Mifflin Harcourt Publishing Company, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company.

20.    All of the allegations of this Complaint refer or relate to the tortious, illegal conduct of each and every named Defendant, who acted individually and in concert, jointly and severally, to severely damage Plaintiff Montgomery.

III.    **FACTS COMMON TO ALL COUNTS**

21.    Plaintiff Montgomery sues for harm and thus damages in this district, Florida in general, nationwide and internationally to himself as an individual, which damages include financial harm to his business reputation as an individual and his business and professional opportunities as an individual, intentional infliction of emotional distress, and assault for placing Plaintiff Montgomery in immediate fear of bodily harm, injury, and death, by terrorists who have sworn to attack those assisting the U.S. military and Government.

22.    Plaintiff Montgomery sues for harm to his financial interests as an individual owner, investor, partner, shareholder and/or employee of companies impacted by these events, which has resulted in financial harm to Plaintiff Montgomery as an individual through the loss of value of his ownership interests in those companies as a result of Defendants' defamation and other tortious conduct.

23.    Plaintiff Montgomery sues for harm to his financial interests as an individual in the intellectual property of computer software, computer software techniques and encoding and decryption technologies which he developed and which have been harmed by Defendants' defamation and other tortious conduct, as well as other harm and thus damages to be uncovered during discovery.

**Dennis Montgomery Not a Public Figure**

24.    Plaintiff Montgomery is a private citizen and at all material times acted individually and in business.

25.     Plaintiff Montgomery has not sought any form of publicity, public note or prominence outside of implementing his own business affairs in private transactions.

26.     Plaintiff Montgomery has not sought or held any public office or Government position within the Government.

27.     Plaintiff Montgomery thus is not a public figure based on facts, including his work for the Government, which was secret, while he in effect worked undercover for the Government outside of the public eye.

28.     Plaintiff Montgomery has not sought or acquired any position of public power or influence which would give him the ability to protect himself apart from the courts within the meaning of *New York Times v. Sullivan*, 376 U.S. 254 (1964).

29.     Plaintiff Montgomery is not a public figure within the meaning of *New York Times v. Sullivan,* 376 U.S. 254 (1964) or its progeny.


**Defamation of Plaintiff Dennis Montgomery by Defendant James Risen in Recent Bestselling Book**

30.     On October 14, 2014,[2] the publishing 'house' of Defendant Houghton Mifflin Harcourt Publishing Company at 215 Park Avenue South, New York, New York 10003, whose parent is Defendant HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company, published a book titled "Pay Any Price:  Greed, Power and Endless War" (referred to as "the Book" or "Book" below) by author Defendant James Risen, Copyright (c) 2014 by Defendant James Risen, designated by the Library of Congress by its index system as ISBN 978-0-544-

---

[2]     A book's official publication date is somewhat artificial for marketing, and books are often available and being promoted a week or two ahead of the official publication date.  In part, this is due to the task of distributing books to bookstores and on the Internet all across the nation by the official date of publication.

34141-8 (hardback edition).  This publication dated October 14, 2014, was the first publication of the Book in this district, Florida in general, domestically, and worldwide, in any language and the first printing run of the Book.  The Book was physically printed in the United States.

31.     On information and belief, the Book Pay Any Price was sold starting in October 2014, in mainstream bookstores throughout this district, Florida in general, the United States as a whole, internationally, and on the Internet.

32.     Defendants advertised the sale of the Book Pay Any Price throughout this district, Florida in general, the United States as a whole, internationally, and on the Internet.

33.     The Book Pay Any Price was available for sale and was and is sold throughout book stores such as Barnes and Noble, Books-A-Million bookstores, and throughout the state of Florida and the United States.

34.     The Book Pay Any Price was and is similarly sold throughout the internet on websites such as Amazon.com and barnesandnoble.com, where it was purchased by citizens and residents of Florida. As of April 27, 2015, Pay Any Price is still ranked by Amazon.com as the fourteenth (14th) highest bestseller in books on national and international security.[3]

35.     A complete copy of Chapter 2 of Pay Any Price is attached for the Court as Exhibit A.

36.     Chapter 2 of the Book Pay Any Price is devoted to the Plaintiff Montgomery – though curiously not to Warren Trepp, Montgomery's much more politically connected business partner, after whom their company eTreppid was named.

37.     The Book could have been written and still be complete by omitting Plaintiff Montgomery entirely from the Book.  Plaintiff Montgomery is not necessary to the theme or

---

[3] *See* http://www.amazon.com/gp/bestsellers/books/3049231/ref=pd_zg_hrsr_b_1_5_last

message of the Book, but indeed the reports about Plaintiff Montgomery actually conflict with the Book overall.

38.     The Book was rated as #18 in the greatest quantity of sales nationwide on The New York Times' list rating the nation's bestselling books for the week of November 9 to 16, 2014, and #20 in quantity of sales nationwide for the week of October 26 to November 9, 2014.

39.     The Book was rated as #11 in the greatest quantity of sales nationwide on The Los Angeles Times' list rating the nation's bestselling books as of November 2, 2014, and #17 in quantity of sales nationwide as of November 16, 2014.

40.     The Book is listed on The New York Times' list of the 100 most notable books published in the year 2014.

41.     Apart from the Book itself, Defendant Risen also engaged in a flurry of radio and television news interviews and talk show interviews in and around September 2014 and October 2014, associated with the "roll out" of his Book in which Defendant Risen made further defamatory factual publications of and concerning Plaintiff Montgomery, in addition to the words and content of the Book itself.  In these interviews, Defendant Risen and the other Defendants repeated the false and misleading statements from the Book itself, and also added to those claims and even at times falsely and misleadingly contradicted the defamatory claims of his own Book.

42.     Many of Defendant Risen's and the other Defendants' libelous and slanderous statements were made during written news and talk show interviews during September 2014, October 2014, and November, 2014, some spoken, some in print and elsewhere, surrounding the publication of his Book rather than in the Book itself.  Defendants were purposely and intentionally marketing the book through the sensational defamatory statements made about

Plaintiff. In fact, Plaintiff is the focal point of the Book and that explains why he has been defamed and thus trashed not just in the Book but Defendant's published interviews about the Book, intended to get readers to buy the Book in Florida and elsewhere.

43.     Counsel for Plaintiff Montgomery served a demand for a retraction upon Jon Stewart and "The Daily Show" airing on November 6, 2014 on the Comedy Central nationwide television network after Defendant Risen's television interview on "The Daily Show."  Stewart and the "The Daily Show" production did not air a correction or retraction, but later removed the interview from its website. However, the publication is still out on - and being published on - the Internet and other media sites.

44.     Plaintiff Montgomery also sent two demand letters to the Defendant publishers pursuant to Florida Statute § 770.02. One was served on January 14, 2015 and the other was served on February 13, 2015. Defendants responded on January 20, 2014, refusing to retract the false information and pay damages. (Composite Exhibit B). To date, Defendants' have not responded to Plaintiff Montgomery's letter of February 13, 2015. These are incorporated herein by reference.

45.     Defendants' defamation that Plaintiff Montgomery convinced the Government of false terror threats is false and misleading including but not limited to the fact that Plaintiff Montgomery never offered any interpretation of the hidden data he uncovered, even when pressured to give his conjecture about what the hidden data was, meant, or referred to.  Plaintiff Montgomery left it up to intelligence experts of the Government to analyze and determine what the hidden data and clues that he found actually meant.

46.     Defendants' defamation of Plaintiff Montgomery is false and misleading, including but not limited to the fact that Plaintiff Montgomery and his partners turned down

other contracts of equal or greater profitability with private companies, but were urged by Government officials to help the Government for national defense instead.

47.     Defendants' defamation of Plaintiff Montgomery publishing that he defrauded the Government to make money out of greed is false and misleading, including but not limited to the fact that Plaintiff Montgomery was only a minority stockholder who did not receive any distribution of company profits.  Warren Trepp was the President and CEO and controlled all shareholder activities and financial decisions in the company, eTreppid.  Plaintiff Montgomery owned no stock in Edra Blixseth's later company BLIXWARE.

48.     Defendants' defamation of Plaintiff Montgomery publishing that he defrauded the Government is false and misleading including but not limited to the fact that the Government conducted its own independent tests of Plaintiff Montgomery's software and confirmed its effectiveness and reliability.

49.     Defendants' publications that Plaintiff Montgomery defrauded the Government are false and misleading including but not limited to the fact that the Government has continued to use Plaintiff Montgomery's software and technology.

50.     Defendant Risen and the other Defendants have misrepresented the truthful story of these events by faulting the wrong parties and thus defaming Plaintiff Montgomery.

51.     Defendants' defamation of Plaintiff Montgomery is false and malicious, including but not limited to the fact that Defendant Risen's Government sources would bear the blame and legal consequences if they did not portray Plaintiff Montgomery as at fault.

52.     In the alternative, Defendants, all of them, jointly and severally, manufactured the alleged facts pled in this Complaint and did not have confidential sources in Government.

53.     Defendants' defamation of Plaintiff Montgomery was made with actual malice. Defendants had knowledge of the falsity of the defamatory statements, and/or made the defamatory statements with reckless disregard to the truth. *See* Plaintiff's Affidavit, Exhibit C, incorporated herein by reference.

54.     Despite being a Pulitzer Prize-winning author, Defendant Risen has previously been alleged to engage in a pattern and practice of defaming individuals for profit. As one example revealed on Defendant Risen's Wikipedia page, specifically, Wen Ho Lee co-wrote a book called My Country Versus Me in which he described Defendant Risen as a "hatchet job on me, and a sloppy one at that." The New York Times and The Los Angeles Times jointly decided to settle the case brought by Wen Ho Lee on behalf of Defendant Risen and agreed to pay damages to settle the lawsuit.

**Use of False And Misleading Classified Information by Defendants or Failure to Fact Check**

55.     Thus, either the Defendants, all of them, had in their possession classified national security and intelligence information from the Government and details of confidential private conversations and events within the Government (and falsified that information) or Defendants made up the entire defamatory story about Plaintiff Montgomery for sensationalism and thus just to sell more books and reap huge profits.

56.     Defendants Houghton Mifflin Harcourt Publishing Company ("Houghton Mifflin") and its parent, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company, were required to fulfill their legal and ethical responsibilities before publishing a book of this nature and especially a book containing Chapter 2 and related passages which singles out a private citizen for intense defamation, to "fact check" and review the evidence for defamatory factual recitations made in the Book concerning Plaintiff Montgomery before publication.

57.     Houghton Mifflin and HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company, were required to ensure that the author, Defendant Risen, had sufficient factual basis for the Book's statements and claims about Plaintiff Montgomery.

58.     Here, however, even if true, the substance of the Book's published criticisms and descriptions of Plaintiff Montgomery would have required Defendant Risen to admittedly base his Book on information from the Government which is classified or secret or otherwise legally restricted on the grounds of national security or intelligence sources and methods.

59.     In the Book's preliminary pages, Defendant Risen writes and Defendants Houghton Mifflin, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company published and admitted the following:

### A NOTE ON SOURCES

"Many people have criticized the use of anonymous sources. Yet all reporters know that the very best stories – the most important, the most sensitive – rely on them. This book would not be possible without the cooperation of many current and former government officials and other individuals who were willing to discuss sensitive matters only on the condition of anonymity."

60.     Thus, Defendants admit that the Book is based upon inside, Governmental classified information, however false and misleading, from "many current and former government officials…"

61.     Among other occasions, Defendant Risen described in The New York Times telephone[4] interview posted on October 24, 2014, titled **"Inside The New York Times Book Review: James Risen's 'Pay Any Price'"**, that he was alerted about Plaintiff Montgomery by sources within the CIA.

---

[4]     Accessible at: http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/

62.     Thus, the substance of the Book's false and misleading publications about Plaintiff Montgomery, if true or otherwise, would have required Defendants Houghton Mifflin, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company to review information from the Government which is classified or secret or otherwise legally restricted on the grounds of national security or intelligence sources and methods. Since this would be illegal, one can only conclude that Defendants fabricated the defamatory publications as alleged herein.

63.     Defendant Risen and the other Defendants' defamatory and false and misleading factual assertions, descriptions, and reports in Chapter 2 of the Book Pay Any Price concerning Plaintiff Montgomery relate in specific detail conversations, incidents, events, decisions, etc., that Defendant Risen could not possibly know without receiving information from the Government that is classified, secret, or legally restricted.

64.     For example, the Book related and published conversations within the Oval Office of The White House with President George W. Bush and his foreign policy team and the national command authority of the United States, communications between the intelligence services of France and the United States, deliberations within the CIA and NSA, and so on and so forth.

65.     Plaintiff Montgomery developed various software including software that successfully decoded hidden messages from broadcast video.[5]

66.     However, as to why the Bush Administration cancelled flights from Europe and ordered potential shoot-downs (see below), including the full range of their information, only the

_____

[5]     Plaintiff Montgomery's company began originally developing software to colorize black-and-white movies, which requires an extraordinarily sophisticated ability to recognize specific objects and shapes – such as faces, individual parts of clothing, etc., as they are moving in three dimensional perspective and changing distances (affecting size in relation to other objects in the view) and to follow and track every object requiring a slightly different shade of color, brightness, including as impacted by shadows, etc.

14

Government intelligence officials themselves and the President of the United States at the time know why they did what they did.

67.    Defendants Risen, Houghton Mifflin, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company, were used as tools by the CIA, NSA, and other Government agencies and their affiliates to maliciously destroy Plaintiff Montgomery because he came forward as a whistleblower in an attempt to reveal their unconstitutional and illegal actions in spying on all American citizens, regardless of whether there was probable cause that they were communicating with and/or aiding and abetting terrorists and/or committing crimes.

**<u>Actual Malice and Punitive Damages:  Defendant James Risen is an Expert in Journalism</u>**

68.    Actual malice can be found if Defendants published defamatory statements with a reckless disregard of the truth or used slipshod or sketchy investigative techniques.

69.    Reckless disregard of the truth can be shown when there is little investigative effort expended initially or signals of the falsehood of reporting are ignored, or no additional inquires were made after the editors knew or should have known that the published accounts were untrue.

70.    Actual malice can also be proved by circumstantial evidence. Evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity. *Reader's Digest Assn. v. Superior Court* 37 Cal.3d 244, 257 (1984).

71.    In his interview posted on October 24, 2014, called  "titled **"Inside The New York Times Book Review: James Risen's 'Pay Any Price:**  This week, James Risen and Lucy Worsley," **Defendant Risen admits that ….**

**" . . . it is very difficult to tell what is actually true."**[6]

72.     Defendant Risen is a Pulitzer Prize-winning investigative reporter for <u>The New York Times</u>, and accordingly trained, experienced, and disciplined in journalistic standards and ethics.

73.     Regarding Defendant Risen's status as an expert in accurate and reliable reporting as a journalist, <u>Newsweek</u> praises Defendant Risen on October 20, 2014, by claiming

> "At long last we can retire Bob Woodward and Carl Bernstein as the icons of investigative reporting. With his second book probing the dark tunnels of the so-called war on terror, James Risen has established himself as the finest national security reporter of this generation, a field crowded with first-rank talent at *The Washington Post*, *Wall Street Journal*, Associated Press, Reuters, McClatchy Newspapers and the *New York Times*, his employer and sometimes bane."[7]

74.     As "the finest national security reporter of this generation" according to <u>Newsweek</u>, Defendant Risen should have understood what Dan Aykroyd's character (Naval Intelligence Captain Raymond Thurman)  in the movie <u>Pearl Harbor</u> explains to Admiral Chester Nimitz:

> **Admiral Chester W. Nimitz**:   So, sir, you would have us mobilize the entire fleet, at the cost of millions of dollars, based on this 'spine-tingling' feeling of yours?
>
> **Captain Raymond Thurman**:   No, sir. I understand my job is to gather and interpret material. Making difficult

---

[6]     ArtsBeat: Book Review Podcast: James Risen's 'Pay Any Price', by John Williams, <u>New York Times</u>, October 24, 2014,  http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/ , based upon Louise Richardson's book review of Risen's book and publishing a podcast interview of James Risen with Lousia Worsley **"Inside The New York Times Book Review: James Risen's 'Pay Any Price'"** accessible at that website address.

[7]     **"Hustlers, Con Men & Dupes Cashing in on the War on Terror,"**by Jeff Stein, <u>Time Magazine</u>, October 20, 2014, http://www.newsweek.com/hustlers-con-men-dupes-cashing-war-terror-278503.   Risen did not make any new statements in the <u>Newsweek</u> article and apparently was not interviewed for the article.  However, <u>Newsweek</u> did republish the libel from Risen's Book.

decisions based on incomplete information from my
limited decoding ability is your job, sir.[8]

75.     Yet, Defendant Risen and the other Defendants defame a private citizen, Plaintiff

Montgomery, as responsible for the alleged decision of President George W. Bush's to ban many

incoming international flights around Christmas 2003 from entering U.S. airspace and to

(allegedly) nearly order the U.S. Air Force to shoot down around ten civilian aircraft over the

Atlantic Ocean as a result of Plaintiff Montgomery's claimed fraud and hoax.  Defendant Risen

portrays this as Plaintiff Montgomery's fault, not Bush's, assuming there is any truth at all to this

false and misleading account.

76.     At a time when the Government was encouraging people to: " . . . If you see

something, say something,"[9] Plaintiff Montgomery said something about what he saw,

innocently, diligently, legally and appropriately.

77.     The thesis of Defendant Risen's and the other Defendants' Book is that the war on

terror is illegitimate and unnecessary, motivated by personal greed, irrational paranoia, or

politics, and that the French government is wise and smart while our Government is stupid,

foolish, greedy, incompetent and criminally-minded.

78.     That is, Defendant Risen and the other Defendants' Book is not a neutral report,

in which errors could be classified as simply inadvertent.  The Book is an intentional, politically-

driven, falsified, and misleading attack on U.S. foreign, military, and intelligence policies in the

"war on terror" against Islamic terrorism, meant to mock and ridicule a strong national defense.

---

[8]     "Pearl Harbor" (2001) (Touchstone Pictures and Jerry Bruckheimer Films)
[9]     http://www.dhs.gov/if-you-see-something-say-something%E2%84%A2 .  In fact, the
DHS encourages partners, announcing "If you are interested in establishing a partnership with
DHS and the "If You See Something, Say Something™" Campaign, please email
seesay@hq.dhs.gov."  DHS has set up a special email address seesay@hq.dhs.gov to promote
this concept of vigilance.

Plaintiff Montgomery is illegally used as a whipping boy by Defendants in this regard to sensationalize and sell more books for a great profit.

79.     Defendant Risen sets out to discredit what he calls "The Endless War" as being motivated by corruption, greed, personal profit, and irrational paranoia.

80.     Yet curiously Defendant Risen goes very far out of his way to gratuitously and irrelevantly defame Plaintiff Montgomery as the villain and Government officials as Plaintiff Montgomery's unsuspecting victims, in conflict with the theme of his Book.  Defendant Risen also deliberately looks past Warren Trepp, the owner of eTreppid, to oddly single out and blame only Plaintiff Montgomery.

81.     That is, Defendant Risen and the other Defendants' defamation of Plaintiff Montgomery contradicts and undermines his own thesis in the Book Pay Any Price, curiously shifting the blame from Government officials to a lone private citizen, whom he falsely and misleadingly portrays as having no intelligence or defense background.

82.     Defendant Risen ignores evidence that should have warned him and the other Defendants that their false and misleading publications are wrong into yet another example that Plaintiff Montgomery kept defrauding the Government.

83.     The Government repeatedly rehiring Plaintiff Montgomery should have warned Defendant Risen that there is more than meets the eye to this falsified and misleading story, yet instead Risen portrays this as Plaintiff Montgomery defrauding it, the Government.

84.     More than the average lay person, Defendant Risen knows or should know the unreliability of some sources and the information they provide and the motivations of sources.

85.     A central claim of Defendant Risen's and the Defendants' defamation of Plaintiff Montgomery is that the stupid, foolish, Government was defrauded by Plaintiff Montgomery's

hoax until a private French firm opened its eyes and Government officials were tutored by the French to discover enlightenment.

86.     But in fact, Defendant Risen actually knew or should have known in advance of the Book's publication that France was an opponent of the Bush Administration's foreign policies in the relevant time period after Christmas 2003 and would neither have been trusted by the Government with such secrets nor believed.  Certainly, a private French firm would not have been so trusted.

87.     France at the time was actively involved in opposing the Bush Administration's foreign policy.[10]

88.     In particular, France's animosity toward U.S. foreign, military, and intelligence policies were driven by France's extensive commercial interests with the Middle East, such that a private French high-tech firm would be the least likely source to be believed by U.S. Government officials.

89.     In fact, so disgusted with France's opposition to U.S. foreign, military, and intelligence policies was President Bush's political party that the name of "French fries" was

---

[10]     *See* "**France raises terror war concerns**," <u>CNN</u>, February 7, 2002, ("A senior French government minister has attacked the U.S. approach to fighting terrorism as "simplistic.") http://www.cnn.com/2002/WORLD/europe/02/07/france.bush/  and "**France and allies rally against war,**" <u>BBC News,</u>  March 5, 2003, http://news.bbc.co.uk/2/hi/middle_east/2821145.stm and "**Israeli Analysts: France Ignored Islamic Terror Directed at Jewish Targets:  'Didn't want to deal with Islamic terror for political reasons,'**" <u>Washington Free Beacon</u>, January 12, 2015 ("Columnist Alex Fishman, who writes on security issues for the Tel Aviv daily, Yediot Achronot, said that French intelligence agencies "just didn't want to deal with Islamic terror for political reasons, both because of France's involvement in the Arab world and because 10 percent of its residents are Moslem. The French security services insisted on not touching Islamic terror professionally") http://freebeacon.com/national-security/israeli-analysts-france-ignored-islamic-terror-directed-at-jewish-targets/   With France as an outspoken opponent to President Bush's war on terror policies, perceived as driven by France's lucrative business opportunities in the Middle East, it is highly improbable that the CIA would share sensitive, classified information with France at that period in time.

changed to "Freedom Fries" in the cafeterias and restaurants in the Republican-controlled U.S. House of Representatives, as CNN reported on March 12, 2003.[11]  CNN reported:  "But House Majority Leader Tom DeLay, R-Texas, said he didn't think Congress needed to take any formal steps to signal its disapproval of France. 'I don't think we have to retaliate against France,' he said. '***They have isolated themselves. They have resigned from any responsibility for the war on terror.***'" (Emphasis added.)

90.    Thus Defendant Risen actually knew or should have known, as a Pulitzer Prize-winning expert reporter on national security, the war on terror, and foreign, military, and intelligence policies, that it was nearly impossible for the claim to be true that Plaintiff Montgomery pulled off a hoax against the Government until a private French high-tech firm blew the whistle on Plaintiff Montgomery's fraud using highly-classified intelligence.

91.    With regard to Defendant Risen's reporting about a Christmas 2003 alert concerning possible terrorism involving airliners, Defendant Risen actually knows and should have known that the French government does not have the authority to demand an explanation from the CIA.[12]

92.    Defendant Risen also knows and should have known that the Bush Administration would never have believed France's analysis as being unbiased and trustworthy, rather than politicized manipulation.

---

[11]    "**House cafeterias change names for 'french' fries and 'french' toast**," By Sean Loughlin, CNN, March 12, 2003.  http://www.cnn.com/2003/ALLPOLITICS/03/11/sprj.irq.fries/
[12]    Defendant Risen himself is under a court order in another case to divulge his sources as a journalist, which Risen has refused to comply with.  Risen knows that even journalists often do not reveal their sources.  See http://dissenter.firedoglake.com/2014/10/30/in-leak-prosecution-attorneys-demand-to-know-if-government-has-agreement-with-reporter-james-risen/

93.     Moreover, Defendant Risen repeatedly complains and admits in his Book and in interviews that <u>The New York Times</u> refused to publish many of his articles written on these topics.

94.     Thus, Risen has actual knowledge that experienced and well-established news sources such as <u>The New York Times</u> had serious doubts about the truthfulness of Defendant Risen's reporting on these and related topics, such that <u>The New York Times</u> refused to run many of Risen's filed reports, despite his Pulitzer Prize background. If anyone or entity was motivated by greed, it was not Plaintiff Montgomery but Defendants Risen, Houghton Mifflin, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company, who fabricated false and misleading information and then published it for financial gain.

95.     Defendants' acts were willful malicious, deliberate, or were done with reckless indifference to the likelihood that such behavior would cause severe emotional distress and with utter disregard for the consequences of such actions, as well as encourage terrorists and others to threaten Plaintiff Montgomery with severe bodily injury or death; in effect causing a Fatwah to be placed on Plaintiff Montgomery's head and on his family.

IV.     **<u>CAUSES OF ACTION</u>**

**<u>FIRST CAUSE OF ACTION</u>**
***Common Law Defamation "Per Se"***

96.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

97.     The Defendants – all of the Defendants – together and each of them acting in concert, jointly and severally, and individually, have defamed the Plaintiff by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff which they knew or should have known to be false.

98.     Defendants' defamation of Plaintiff Montgomery was made with actual malice. Defendants had knowledge of the falsity of the defamatory statements, or made the defamatory statements with reckless disregard to the truth.

99.     Defendants together and each of them acting in concert, jointly and severally, and individually, made false statements that are Defamation *Per Se*, accusing Plaintiff of fraud, crime, scams, and being a con-artist.

100.    Among other accusations, Defendants state that Plaintiff Montgomery defrauded CIA Director George Tenet with regard to contracts with the Government, which published and accused Plaintiff Montgomery of having committed crimes under the False Claims Act, 31 U.S.C. §§ 3729 – 3733, and also common law and statutory fraud.  This is Libel *Per Se.*

101.    Defendants, together and each of them acting in concert, jointly and severally, and individually, knew that their public statements about the Plaintiff would cause severe damage to the reputation, business opportunities, social relationships, and the career of Plaintiff Montgomery.

102.    A statement is per se defamatory if it falsely imputes to another conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession or office; in other words, or if it tended to injure Plaintiff in his trade or profession.

103.    A statement is also per se defamatory if "it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession, or office, or (d) the other being a woman, acts of unchastity." *Campbell v. Jacksonville Kennel Club, Inc*., 66 So. 2d 495, 497 (Fla. 1953) citing Restatement, Torts, Section 570.

104.    For Defamation Per Se, actual malice need not be shown because damages are

presumed. *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So. 2d 495, 497 (Fla. 1953); *Wolfson*

*v. Kirk*, 273 So. 2d 774 (Fla. Dist. Ct. App. 4th Dist. 1973).

105.    Statements are "*defamatory per se,*" recognized under Florida law when

statements are so powerful in their ability to hurt someone that Florida law presumes harmful as

a matter of law. *Montgomery v. Knox,* 23 Fla. 595, 3 So. 211, 217 (1887), such that a court will

allow damages to be awarded in these cases even if no evidence of harm has been presented.

"[T]he law presumes malice in their utterance," *Abraham v. Baldwin*, 52 Fla. 151, 42 So. 591,

592 (1906), where the words are "… of such common notoriety established by the general

consent of men, that the courts must of necessity take judicial notice of its harmful effect." *Layne*

*v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 236 (1933).

106.    ***First***, on Page 32 of the Book, the Defendants published:[13]

> "Whatever else he was, Dennis Montgomery was a man who
> understood how best to profit from America's decade of fear. He saw
> the post-9/11 age for what it was, a time to make money. Montgomery
> was the maestro behind what many current and former U.S. officials
> and others familiar with the case now believe was one of the most
> elaborate and dangerous hoaxes in American history, a ruse that was so
> successful that it nearly convinced the Bush administration to order
> fighter jets to start shooting down commercial airliners filled with
> passengers over the Atlantic. Once it was over, once the fever broke
> and government officials realized that they had been taken in by a
> grand illusion, they did absolutely nothing about it**.** The Central
> Intelligence Agency buried the whole insane episode and acted like it
> had never happened. The Pentagon just kept working with
> Montgomery. Justice Department lawyers fanned out across the country
> to try to block any information about Montgomery and his schemes
> from becoming public, invoking the state secrets privilege in public, a
> series of civil lawsuits involving Montgomery.  It was as if everyone in

---

[13]    Note that several statements may qualify under different theories, but are presented in full
for proper context.  Some statements are repeated for that portion of the statement that qualifies
under different theories of defamation under Florida law.

Washington was afraid to admit that the Emperor of the War on Terror had no clothes."

107.    As Libel *Per Se*, Defendants published about Plaintiff's actions and work that "many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic."

108.    As Libel *Per Se*, Defendants published about the Plaintiff that "once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it …"

109.    **Second, on Page 32 of the Book, the Defendants published:**

"Consider the example of Dennis Montgomery.  He provides a perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist was able to create a rogue intelligence operation with little or no adult supervision. Crazy became the new normal in the war on terror, and the original objectives of the war got lost in the process."

110.    As Libel *Per Se*, Defendants published that out of "greed" Plaintiff Montgomery "create[d] a rogue intelligence operation with little or no adult supervision" which was "crazy" and that he was "someone who has been accused of being a con artist."

111.    **Third, on Page 33 of the Book, the Defendants published:**

"A former medical technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing scope, he still had die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Montgomery was a fake, and who rejected the notion that the

super-secret computer software that he foisted on the Pentagon and CIA was anything other than America's salvation."

112.   As Libel *Per Se*, Defendants published that Plaintiff's work "now appears to have been an elaborate hoax."

113.   As Libel *Per Se*, Defendants published that "die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Plaintiff Montgomery was a fake."

114.   As Libel *Per Se*, Defendants published "that he foisted on the Pentagon and CIA" super-secret computer software.

115.   As Libel *Per Se*, Defendants published with reckless disregard for the lives of thousands of airplane passengers on approximately ten civilian aircraft, that Plaintiff Montgomery nearly caused Government policy to shoot down those airplanes causing certain death, despite being a private citizen, rather than looking to Government officials as responsible for the decisions.

116.   **Fourth, on Page 34 of the Book, the Defendants published:**

> "Montgomery was an overweight, middle-aged, incorrigible gambler, a man who liked to play long odds because he was convinced that he could out-think the house. He once boasted to a business partner that he had a system for counting an eight-deck blackjack shoe, quite a difficult feat for even the best card sharks, and he regularly tested his theories at the El Dorado and the Peppermill Casino in Reno. He usually came up short but that didn't stop him from playing blackjack on a nightly basis, racking up unwieldy debts that eventually led to his 2010 arrest for bouncing more than $1 million in bad checks at Caesar's Palace in Las Vegas."

117.   As Libel *Per Se*, Defendants published about the Plaintiff that he was an "incorrigible gambler," meaning in effect that Plaintiff Montgomery was a gambling addict who

was "playing blackjack on a nightly basis."  Historically, gambling, and in particular an

uncontrollable gambling addiction, is a loathsome social status.

118.    As Libel *Per Se*, Defendants published about the Plaintiff that he bounced more

than $1 million in bad checks.

119.    ***Fifth,* on Page 36 of the Book, the Defendants published:**

"Michael Flynn, Montgomery's former lawyer— who later
concluded that Montgomery was a fraud."

120.    As Libel *Per Se*, Defendants published about the Plaintiff that the Plaintiff's

lawyer "concluded that Montgomery was a fraud."

121.    ***Sixth,* on Page 37 of the Book, the Defendants published:**

"By the spring and summer of 2003, eTreppid was awarded contracts
by both the air force and U.S. Special Operations Command.
Montgomery was able to win over the government in part by offering
field tests of his technology — tests that former employees say were
fixed to impress visiting officials. Warren Trepp later told the FBI
that he eventually learned that Montgomery had no real computer
software programming skills, according to court documents that
include his statements to the FBI. Trepp also described to federal
investigators how eTreppid employees had confided to him that
Montgomery had asked them to help him falsify tests of his object
recognition software when Pentagon officials came to visit. Trepp
said that on one occasion, Montgomery told two eTreppid employees
to go into an empty office and push a button on a computer when they
heard a beep on a cell phone. Meanwhile, Montgomery carried a toy
bazooka into a field outside eTreppid. He was demonstrating to a
group of visiting U.S. military officials that his technology could
recognize the bazooka from a great distance."

122.    As Libel *Per Se*, Defendants published about the Plaintiff that he committed fraud

including defrauding the Government, prohibited under the False Claims Act codified at 31

U.S.C. §§ 3729 – 3733.

123.    ***Seventh,* on Page 37 of the Book, the Defendants published:**

"After he was in place in the field, he used a hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of a bazooka on another screen prominently displayed in front of the military officers standing in another room, according to court documents. The military officers were convinced that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands. (Montgomery insists that the eTreppid employees lied when they claimed that he had asked them to fix the tests, and also says that the air force issued a report showing that it had verified the tests.)"

124.    As Libel *Per Se*, Defendants published about the Plaintiff that he committed fraud including defrauding the Government, prohibited under the False Claims Act codified at 31 U.S.C. §§ 3729 – 3733.

125.    ***Eighth,* on Page 40 of the Book, the Defendants published:**

"Montgomery brilliantly played on the CIA's technical insecurities as well as the agency's woeful lack of understanding about al Qaeda and Islamic terrorism. He was able to convince the CIA that he had developed a secret new technology that enabled him to decipher al Qaeda codes embedded in the network banner displayed on the broadcasts of Al Jazeera, the Qatar-based news network. Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks. And only he had the technology to decode those messages, thus saving America from another devastating attack. The CIA— more credulous than Hollywood or Las Vegas— fell for Montgomery's claims. In short, he convinced CIA officials that he could detect terrorist threats by watching television."

126.    As Libel *Per Se*, Defendants published about the Plaintiff that "Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks."

127.    As Libel *Per Se*, Defendants published about the Plaintiff that he defrauded the CIA.

128.    ***Ninth,* on Page 42 of the Book, the Defendants published:**

"A CIA official defensively pointed out that the agency did not actually have a contract with eTreppid at the time Montgomery was providing data from the Al Jazeera videotapes. While they were working closely together during the final months of 2003, the CIA had not yet started paying Montgomery, the official said. The agency never finalized a contract with him because agency staff eventually realized they had been conned, according to this official. But that does not diminish the fact that for a few crucial months, the CIA took Montgomery and his technology very seriously."

129. As Libel *Per Se*, Defendants published about the Plaintiff that "agency staff eventually realized they had been conned, according to this official."

130. **Tenth, on Page 46 of the Book, the Defendants published:**

"It did not take long for the French firm to conclude that the whole thing was a hoax.  The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers.  The firm reported back to the French government that the supposed intelligence was a fabrication."

131. As Libel *Per Se*, Defendants published about the Plaintiff that "the whole thing" (Plaintiff Montgomery's work) "was a hoax" and a "fabrication."

132. **Eleventh, on Page 46 of the Book, the Defendants published:**

"The CIA never investigated the apparent hoax nor examined how it had been handled inside the agency. No one involved in promoting Montgomery, in vouching for his information to the president, or in proposing to shoot down planes based on his claims ever faced any consequences."

133. As Libel *Per Se*, Defendants published about the Plaintiff that his work was a hoax.

134. **Twelfth, on Page 47 of the Book, the Defendants published:**

"At the time of the Christmas 2003 scare, John Brennan was head of the newly created Terrorist Threat Integration Center and in charge of distributing terrorism-related intelligence throughout the government. That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration. But Brennan was never

admonished for his role in the affair. After Barack Obama became president, Brennan was named to be his top counterterrorism advisor in the White House. He later became CIA director."

135. As Libel *Per Se*, Defendants published about the Plaintiff that "That meant that Brennan's office was responsible for circulating Plaintiff Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration."

136. As Libel *Per Se*, Defendants published about the Plaintiff that "Brennan was never admonished for his role in the affair," to suggest that Brennan should have been admonished for his involvement with Plaintiff Montgomery's work with the Government.

137. **Thirteenth, on Page 50 of the Book, the Defendants published:**

"Edra Blixseth was Dennis Montgomery's latest mark. After being introduced to him by a former Microsoft executive and then hearing Montgomery explain his software, she agreed in 2006 to bankroll Montgomery to launch a new company, to be called Blxware. Montgomery needed new government contracts for Blxware, and Edra Blixseth had the money and contacts to try to make it happen."

138. As Libel *Per Se*, Defendants published about the Plaintiff that "Edra Blixseth was Dennis Montgomery's latest mark," clearly publishing that Plaintiff Montgomery is a con man.

139. **Fourteenth,** on November 6, 2014, Defendant Risen appeared as an interview guest on "The Daily Show with Jon Stewart," by Comedy Central, and was interviewed by Jon Stewart. The television interview was taped at The Daily Show's studio 11th Avenue between 51st and 52nd Street, New York (Manhattan), New York, and broadcast for the first time in this district, Florida in general, nationwide across the United States, internationally, and through cable television, satellite television, and on YouTube and other Internet sites, on "The Comedy Central" channel.

140.    On November 13, 2014, Plaintiff Montgomery's undersigned counsel sent a letter to Mr. Stewart requesting that he allow Mr. Montgomery to appear on his show to correct the false and misleading publications of Defendants. Mr. Stewart declined to extend this courtesy.

141.    Defendant Risen stated in said television interview for his statements to be broadcast on television and widely broadcast elsewhere that his favorite story is the story of –

> Dennis Montgomery who is this guy was as a computer software expert, supposed expert. Who convinced the CIA in 2003 that he had the super-secret technology to read Al Jazeera news broadcasts and decipher Al Qaeda codes inside the [interrupted by Jon Stewart]
>
> [Jon Stewart]  An Enigma machine for Al Qaeda...?
>
> [Defendant Risen] Right.  And he convinced the CIA in 2003 that he could read numbers and letters hidden in the Al Jazeera broadcasts that corresponded with flights that Al Qaeda was going to shoot down, knock--- or blow up….
>
> President Bush was so convinced of this that they grounded flights all over the world at Christmas 2003 based on this guy's intelligence or supposed intelligence.  It took the French intelligence service, which had gotten very mad because they grounded flights from Paris to Los Angeles.  And they demanded that the CIA tell them where they were getting this information.   And so they finally [non-verbal interruption].  They finally got the information.   The French told them this is a hoax.  This is a fabrication.
>
> And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it.  And Montgomery kept getting more contracts after that.
>
> [Other, extended discussion with Jon Stewart on other topics]
>
> There is lots of raw intelligence every day that says there is an attack about to happen.   You really have to be a pretty sophisticated consumer of intelligence after several years to begin to realize what's real and what's not really a credible threat.

142.    As Libel *Per Se*, Defendant Risen published about the Plaintiff that "he convinced the CIA in 2003 that he could read numbers and letters hidden in the Al Jazeera broadcasts that

corresponded with flights that Al Qaeda was going to shoot down, knock -- or blow up [something] ….”

143.   As Libel *Per Se*, Defendant Risen published about the Plaintiff that “The French told them this is a hoax.  This is a fabrication.  And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it.  And Montgomery kept getting more contracts after that.”  The statement that “the CIA agreed with them” is Risen’s assertion about Plaintiff Montgomery’s work that “this is a hoax.  This is a fabrication.”

144.   As Libel *Per Se*, Defendant Risen published about the Plaintiff that “they covered the whole thing up, and refused to ever talk about it,” as a way of saying that the CIA had been conned because the CIA was not openly discussing in public national security activities.

145.   **Fifteenth,** on October 13, 2014, Defendant James Risen gave a television interview[14] with Judy Woodruff which was broadcast nationwide by the Public Broadcasting System (PBS).   In that interview, Defendant James Risen made the following statements for broadcast on television, and Judy Woodruff repeated many points from James Risen’s Book which Risen agreed with and endorsed.  Much of the interview involved other chapters not relevant here.

> JUDY WOODRUFF:  In the next chapter, JAMES RISEN, you write about millions of dollars spent on programs that were completely fraudulent.  One was run by a man named Dennis Montgomery.  He was a, He was a .... I guess he had worked in computer software... but he was a GAMBLER![15]
>
> JAMES RISEN:   Right.
>
> JUDY WOODRUFF:  And he sold the CIA and the Pentagon on technology that turned out to be not at all what he said it was.

---

[14]   http://www.pbs.org/newshour/bb/costs-security-price-high/
[15]   Emphasis, by exclamation in tone of voice, the in original conversation.

JAMES RISEN:  It is difficult to tell in some of these cases who is scamming who.  If you talk to Montgomery, he argues that the CIA wanted him to do what he was doing.  And so its a fascinating dynamic that's developed in the war on terror, between people who recognize the opportunities for this gold rush and the agencies which are... who have so much money to spend now, they're getting so much more money than they ever had before, that in some cases they don't know what to do with.

In this case, they began to believe, in this sort of war fever, that you could find Al Qaeda messages hidden in Al Jazeera broadcasts.  And so that.. that program, that highly secret program, was used to ground planes all over Europe and the United States

JUDY WOODRUFF:  When actually there was nothing to it.

JAMES RISEN:  Right

JUDY WOODRUFF:  It was a hoax.

JAMES RISEN:  Right.  Right.

JUDY WOODRUFF:  And then there was another part of it where he was saying he had special facial recognition software....

JAMES RISEN:  Right.  Right

JUDY WOODRUFF: ... used on drones?

JAMES RISEN:  Yeah.  There were cases in which people said that he was fooling the military and the CIA about his operations and how... what kind of techniques and technologies he had.  He would argue that the CIA actually wanted him and or the army believed him and tested it.  So it's this very complicated story about a man recognizing an opportunity who had never been involved in national security before and the CIA and the military all just hungry for whoever could come up with the latest idea.

146.    As Libel *Per Se*, Defendant Risen published about the Plaintiff that "you write about millions of dollars spent on programs that were completely fraudulent.  One was run by a man named Dennis Montgomery," which Defendant Risen confirms by saying, "Right." (Where

the discussion is about "the next chapter," that chapter is exclusively about Plaintiff Montgomery alone.).

147.    As Libel *Per Se*, Defendant Risen published about the Plaintiff that "When actually there was nothing to it," which Risen confirms by saying "Right." And also "It was a hoax," which Risen confirms by saying "Right.  Right."

148.    As Libel *Per Se*, Defendant Risen published about the Plaintiff that "There were cases in which people said that he was fooling the military and the CIA about his operations and how . . . what kind of techniques and technologies he had."

149.    **Sixteenth,** on October 24, 2014, Defendant Risen gave an audio interview with Lucy Worsley published on <u>The New York Times</u> website, titled **"Inside <u>The New York Times</u> Book Review: James Risen's 'Pay Any Price'"** which is accessible at that website address. [16] In this interview  **"Inside <u>The New York Times</u> Book Review,"** with Pamela Paul, October 24, 2014, Defendant Risen stated for national broadcast:

> PAMELA PAUL:   How do we count and account for the costs of the government's war on terror.  We'll talk to  James Risen, author of Pay Any Price:  Greed, Power, and Endless War.
>
> JAMES RISEN ("tease" audio clip):   It seems to me that what the war on terror had become in thirteen years was a search for cash and a search for power and status.
>
> PAMELA PAUL:   What is the British fascination with murder?  Lucy Worsley will explain all joining us to talk with us about her new book:  The Art of the English Murder.
>
> LUCY WORSLEY ("tease" audio clip):  The public used to consume murder in a way that you can still see the modern media doing it today.  Just look at the Pistorius trial.

---

[16]     *See* ArtsBeat: Book Review Podcast: James Risen's 'Pay Any Price', by John Williams, <u>New York Times</u>, October 24, 2014,  http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/ , based upon Louise Richardson's book review of Risen's book.

PAMELA PAUL:   Alexander Alter will be here with Notes from the Publishing world.  And Greg Cole has bestseller news.  This is "Inside the New York Times Book Review."  I am Pamela Paul.

James Risen joins me now.  His new book is Pay Any Price:  Greed, Power, and Endless War.  Hi James.

JAMES RISEN:   Hi, thanks for having me.

PAMELA PAUL:  Thanks for being here. Now this is a book that covers a lot of territory.  Tell us briefly about what it is you set out to write about in the book.

JAMES RISEN:   What I wanted to do was, I'd written one book before about the war on terror, and I wanted to follow up with a new book that kind of looked at where we were 13 years after 9/11 and how we had what started out in the immediate aftermath of 9/11 as kind of a search for justice or a search for retribution or whatever you want to think, say we were doing right after 9/11 as a country.  It seemed to me that what the war had become in 13 years was a search for cash and a search for power and status and that it was becoming an endless war in which we had a new mercenary class of people who were taking advantage of the war on terror.  And that enormous unintended consequences had happened.  And I began to hear about just some really crazy things that were going on.  And so I thought it would make a good story.

[The discussion then covers the Chapter "Rosetta" not relevant here, concerning a lawsuit for 9/11 families against Saudi Arabia, except the ending]

JAMES RISEN [winds up the Chapter on "Rosetta" by saying]:    .... in the war on terror became so complicated and so difficult to tell what was really going on, to me it was like a case study in how the war on terror had been turned for other uses, and become a.... something that you could never tell what was the truth and what was not the truth.  And that to me was at the heart of the problems with the war on terror, that you could never tell what's real and what was concoction today.

[The discussion then covers how Risen went about researching the book, not relevant here]

PAMELA PAUL:   Did a lot of it arise out of stories that, reporting that you'd originally done for the Times?

JAMES RISEN:   Some of it. For instance, I did a chapter The Emperor of the War on Terror, about Dennis Montgomery who [laughs] who's a strange character, who I'd done a story about him for the New York Times along with Eric Lichtbau my colleague there at the Times.  He's one of the most fascinating characters in the war on terror.  He...  He was a computer software expert who convinced the CIA that he could decipher secret codes from Al Qaeda in the Al Jazeera news broadcasts.  And that he could tell the CIA numbers and letters that corresponded with flights that Al Qaeda wanted to attack. And the CIA took this so seriously that they grounded, that the Bush Administration grounded a bunch of international flights in Christmas 2003 based on what this guy was telling them.  And when they realized it was a hoax, they covered the whole thing up and never did anything about it.  So I had done a story for the Times with....  about that and then expanded on that and got a lot more information for the book.

PAMELA PAUL:   How did you find out about him?

JAMES RISEN:   Well he had been written about a little bit before we wrote about it.  But I had also, even before he was written about by other people, I had heard from people in the CIA that there was this crazy operation that nobody wanted to talk about, that they were all embarrassed by.  To me that, it was like a case study in just how crazy the war on terror has become. And the only thing that makes sense about why it's gotten so crazy, is I think we kind of have deregulated national security and we took all, you know, Cheney said we're going to take the gloves off.  And that means we deregulated national security at the same time we poured hundreds of billions of dollars into counter-terrorism.  And so it's had enormous unintended consequences from what is essentially a national security crisis that is kind of like the banking crisis.

[The interview discussion then turns to the alleged deregulation of national security on other topics not relevant here.]

150.    As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that "And when they [the CIA] realized it was a hoax, they covered the whole thing up and never did anything about it."

151.    **Seventeenth,** Defendant Risen sat for a nationwide television news interview on the television show **DEMOCRACY NOW!** A Daily Independent Global News Hour, with Amy

Goodman & Juan González, at 207 W. 25th Street, Floor 11, New York, NY 10001 on October

14, 2014.  On this nationwide television news broadcast, the conversation turned to:

AMY GOODMAN: Dennis Montgomery?

JAMES RISEN: Dennis Montgomery is a fascinating character, who—he was a computer software person, self-styled expert, who developed what he said was special technology that would allow him to do things with computers that other people couldn't do. One of the things that he developed was this imaging technology that he said he could find images on broadcast network news tapes from Al Jazeera. He said that he could read special secret al-Qaeda codes in the banners on the broadcasts of Al Jazeera. And the CIA believed this. And he was giving them information based on watching hours and hours of Al Jazeera tapes, saying that "I know where the next al-Qaeda attack is going to be based—is going to happen." And the Bush administration and the CIA fell for this.

AMY GOODMAN: And it was in the news zipper at the bottom of the Al Jazeera broadcasts?

JAMES RISEN: Well, he says it was in the banner. But anyway. And so, it was this great—if you talk to him, he argues, well, they—that's what they were looking for. You know, they convinced him to look for this. You know, it depends on who you talk to. But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts.

And then there's a whole number of other things, like Alarbus, which was this covert program at the Pentagon where a Palestinian involved in that was actually trying to use the bank account set up by the secret program, Pentagon program, to launder hundreds of millions of dollars. And the FBI investigated this, but then tried to keep the whole thing quiet.

AMY GOODMAN: How much did the Government give to Dennis Montgomery?

JAMES RISEN: Millions of dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that. So, it's a strange—to me, the Dennis Montgomery story is one of the strangest, because what it shows is, early on in the war on terror, as I said, the CIA and all these other agencies had so

36

much money to spend on counterterrorism that they were willing to throw it at everything. They were so afraid of the next terrorist attack that they were willing to believe anybody who came up with some idea. And I called that chapter about Montgomery, you know, "The Emperor of the War on Terror," because nobody wanted to say that the emperor had no clothes.

AMY GOODMAN: I mean, it had very real effects, aside from spending all that money.

JAMES RISEN: Yeah.

AMY GOODMAN: For example, planes being sent back.

JAMES RISEN: Yes, yes. There were planes grounded. International flights between the United States and Europe and Mexico were grounded. There was talk at the White House even of shooting down planes based on this information.

AMY GOODMAN: Because they could be used, as with September 11th, as weapons?

JAMES RISEN: Yeah, as missiles or whatever. And so, it was crazy. It was absolutely insane.

AMY GOODMAN: And it was only the French government who then did a study?

JAMES RISEN: Yes, yes. Yeah, the French government finally—you know, the U.S.—the CIA and the Bush administration didn't want to tell anybody what was really happening, where they were getting this information. You know, "This supersecret information about Al Jazeera, we can't tell you." And finally, the French intelligence service and the French government said, "You know, you're grounding our planes. You've got to tell us where you're getting this information." And they got—they finally shared the information with them, and the French got a French tech firm to look at this, and they said, "This is nuts. This is fabrication." And after a while, the CIA was finally convinced maybe the French were right, and they stopped talking about it. They didn't do anything else. They just like shut it down eventually, but never wanted to talk about what had really happened.

AMY GOODMAN: Then Dennis Montgomery, revealed as a con man—

JAMES RISEN: Yeah, yeah.

AMY GOODMAN: —in jail for that?

JAMES RISEN: Well, no, he's not in jail. But it was a—he actually got more contracts after that, with the Pentagon and other agencies. And he continued to operate for a long time. You know, he kind of went from one agency to the other.

AMY GOODMAN: We're talking to James Risen, Pulitzer Prize-winning investigative journalist for *The New York Times*. His new book, just out today, *Pay Any Price: Greed, Power, and Endless War*. When we come back, war corrupts, endless war corrupts absolutely. Stay with us.

[break]

152.    As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that "But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts."

153.    As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff when asked "How much did the Government give to Dennis Montgomery?" Risen answered in reply: "Millions of dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that."

154.    As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that "the French got a French tech firm to look at this, and they said, 'This is nuts. This is fabrication.'"

155.    As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff when asked "Then Dennis Montgomery, revealed as a con man—" Risen confirmed in reply: "Yeah, yeah."

156.    As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other

Defendants, published about the Plaintiff that he should be in jail, publishing that Plaintiff

Montgomery committed a crime.

157.    ***Eighteenth***, Defendant James Risen gave an interview with "**Conversations with**

**Great Minds**" of "The Big Picture RT with talk show host Thom Hartmann on October 24,

2014.[17]

> THOM HARTMAN:   ...  [Abrupt change of topic starting at about
> time 5:27]  ...  There's just this enormous amount of government
> money.  Let's throw it at the private sector.  They'll make things well.
> One of the members of the private sector who came forward and said
> I've got a secret, I can figure this stuff out, was a guy by the name of
> Dennis Montgomery.
>
> JAMES RISEN:   Right.  Uh, Dennis Montgomery is one of the best
> stories in the war on terror.  I think somebody should make a movie
> about him.  Dennis Montgomery was a computer software expert who
> said that he had developed technology that basically could find objects
> hidden in the video on television.  And so he convinced, through a
> whole series of contacts and meetings that I detail in the book, he was
> able to get to the CIA  and convince the CIA that he had the technology
> to decipher Al Qaeda codes that were he said were hidden in Al Jazeera
> news broadcasts.
>
> THOM HARTMAN:   They were hidden in the Chiron or the --
>
> JAMES RISEN:   In the banner.  In the banner, actually.  He said that
> he could find numbers and letters that were constantly showing up, or
> not showing up but were being hidden, embedded deeply in the video.
> And he would then give these  numbers and letters to the CIA.  And the
> CIA, either he told them or they convinced themselves that these
> numbers and letters corresponded to flights, international airline flights,
> that Al Qaeda was going to attack.  And so in December, in Christmas
> 2003, the Bush Administration and the CIA took this so seriously that
> they actually grounded a whole series of international flights coming
> into and out of the United States, and the White House even considered
> shooting down some of these flights over the Atlantic.
>
> THOM HARTMAN:   Whoa.

---

[17]    https://www.youtube.com/watch?v=jc_8f4Pp9Zc

JAMES RISEN:   And once the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist and that these supposed Al Qaeda codes weren't really in the Al Jazeera newscasts, the CIA covered the whole thing up and never went public with it and just tried to act like it never happened.

THOM HARTMAN:   Well we know how aggressively this and particularly the Obama Administration right now has gone after whistleblowers and reporters.  You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison.

JAMES RISEN:   Well, no, he ended up getting more contracts from the military... and the Pentagon.  And he was continuing, he continued to operate for several years.  It's really a remarkable story.

THOM HARTMAN:   Yeah, it really and truly is.

[Topic changes abruptly to discussions of torture in the war on terror]

158.   As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that "the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist."

159.   As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that he belongs in prison, responding to the question "You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison," by Risen answering in reply:  "Well, no, he ended up getting more contracts from the military... and the Pentagon.  And he was continuing, he continued to operate for several years.  It's really a remarkable story."

## SECOND CAUSE OF ACTION
### *Common Law General Defamation*

160.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

161.    The Defendants – all of the Defendants – together and each of them acting in concert, jointly and severally, and individually, have defamed Plaintiff by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff which they knew or should have known to be false or misleading.

162.    Defendants' defamation of Plaintiff Montgomery was made with actual malice. Defendants had knowledge of the falsity of the defamatory statements, or made the defamatory statements with reckless disregard to the truth. *See* Plaintiff's Affidavit, Exhibit C, incorporated herein by reference.

163.    To establish General Defamation, a plaintiff need only show: (1) publication; (2) falsity; (3) that the defendant acted with knowledge or reckless disregard as to the falsity on a matter concerning a public figure; (4) actual damages; and (5) the statement must be defamatory.

164.    Pleading in the alternative to the First Cause of Action, Plaintiff re-alleges each of the statements alleged under the First Cause of Action, *supra*, as Defamation *Per Se*, and here alleges that each of those statements are also General Defamation under Florida law.

165.    Plaintiff Montgomery thus claims here that if the Court finds that any of the statements labeled "First" through "Eighteenth" under the First Cause of Action above do not constitute as Defamation *Per Se*, than in the alternative the Plaintiff claims here that any and all such statements not qualifying as Defamation *Per Se* constitute General Defamation against the Plaintiff.

166.     Plaintiff therefore re-alleges and incorporates by reference as if set forth fully herein each and all of the statements labeled "First" through "Eighteenth" above.

167.     In addition, Defendants also made other defamatory statements that are also General Defamation.

168.     ***Nineteenth*, on Page 49 of the Book, the Defendants published:**

> "Trepp was furious. According to court documents, he told the FBI that Montgomery had stolen the software eTreppid had used on secret Pentagon contracts. As federal investigators moved in to investigate the alleged theft of the technology, they heard from Trepp and others that Montgomery's alleged technology wasn't real."

169.     As General Defamation, Defendants published about the Plaintiff that Montgomery had stolen valuable software – yet Defendants also assert that the software "wasn't real."  That is, Defendants simultaneously accuse Plaintiff Montgomery of profiting from defrauding the Government with Plaintiff Montgomery's software, yet allege that the software actually belonged to Warren Trepp and never belonged to Plaintiff Montgomery (that Montgomery later stole it), but also allege that the software was worthless, yet the FBI energetically investigated the alleged theft of software that was worth nothing.  The Defendants randomly construct every possible way to defame the Plaintiff, no matter how inconsistent, including with the FBI investigating the theft of a worthless item.

## THIRD CAUSE OF ACTION
### *Common Law Defamation By Implication*

170.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

171.     The Defendants – all of the Defendants – together and each of them individually, have defamed Plaintiff by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff which they knew or should have known to be false or misleading.

172.     Defendants' defamation of Plaintiff Montgomery was made with actual malice. Defendants had knowledge of the falsity of the defamatory statements, or made the defamatory statements with reckless disregard to the truth. *See* Plaintiff's Affidavit, Exhibit C, incorporated herein by reference.

173.     For Defamation by Implication: " . . . [L]iterally true statements can be defamatory where they create a false impression. This variation is known as Defamation by Implication and has a longstanding history in defamation law." *See Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008). Defamation by Implication occurs when a publication states facts that are literally true, but produces a defamatory meaning apparent from a plain reading of the publication in its entirety. *See Chapin v. Knight-Ridder, Inc.* 993 F.3d 1087 (4th Cir. 1993).

174.     Pleading in the alternative, Plaintiff re-alleges that each of the statements alleged under the First and Second Causes of Action, *supra*, are in the alternative also Defamation by Implication under Florida law.

175.     Plaintiff thus alleges here that if the Court finds that any of the statements labeled "First" through "Nineteenth" above do not constitute Defamation *Per Se* or General Defamation, then in the alternative the Plaintiff re-alleges here that any and all such statements not constituting as Defamation *Per Se* or General Defamation are Defamation by Implication against the Plaintiff.

176.     Plaintiff therefore re-alleges and incorporates by reference as if set forth fully herein each and all of the statements labeled "First" through "Nineteenth" above.

177.     Across the many examples of libelous statements from the Book or slanderous interviews, Defendants published that the Plaintiff deceived the Government as to the meaning,

purpose, or interpretation of hidden data and clues that Plaintiff Montgomery uncovered,

publishing that Plaintiff Montgomery defrauded and conned the Government.

178.    Thus, Defendants libel and slander Plaintiff Montgomery by implication that he

defrauded and scammed the Government concerning the meaning of the information Plaintiff

Montgomery uncovered, publishing that Plaintiff Montgomery obtained millions of dollars by

frightening and fooling child-like and gullible CIA officials.

179.    Across the many examples of defamatory statements from the Book or slanderous

interviews, Defendants published that President George W. Bush's alleged decisions to ground

and almost shoot down passenger aircraft around Christmas 2003 (which Defendants would have

no way of knowing about) were a result of Plaintiff Montgomery's fraud and scams, deceptively

manipulating the President of the United States and the U.S. national command authority.

180.    Across the many examples of defamatory statements from the Book or interviews,

Defendants published that Plaintiff Montgomery should be indicted and convicted of crimes and

sentenced to prison for his actions.

181.    Among the other statements, in particular, the *Second* example of libel**, on Page

32 of the Book,** states that:

> "Consider the example of Dennis Montgomery.  He provides a perfect
> case study to explain how during the war on terror greed and ambition
> have been married to unlimited rivers of cash to create a climate in
> which someone who has been accused of being a con artist was able to
> create a rogue intelligence operation with little or no adult supervision.
> Crazy became the new normal in the war on terror, and the original
> objectives of the war got lost in the process."

182.    Thus, as Defamation by Implication, Defendants published that Plaintiff

Montgomery committed fraud and went to any lengths motivated by greed, to obtain money at

any cost.

183.    Among the other statements, in particular, in the ***Eleventh*** example of defamation**,**

**on Page 46 of the Book,** states that:

> "The CIA never investigated the apparent hoax nor examined how
> it had been handled inside the agency."

184.    Here, as Defamation by Implication, even if it is true (which it is not) that "The

CIA never investigated" what Defendants describe as an "apparent hoax," the implication is that

Plaintiff Montgomery perpetrated a hoax upon the CIA, and in return for money, which would be

both a fraud and a crime.

185.    Similarly, in the ***Sixteenth*** example of slander from an interview, Defendant

Risen publishes that:

> "It seemed to me that what the war had become in 13 years was a
> search for cash and a search for power and status and that it was
> becoming an endless war in which we had a new mercenary class of
> people who were taking advantage of the war on terror,"

publishing that Plaintiff Montgomery's work is fraudulent in being merely an effort to get cash.

186.    Among the other statements, in particular, the ***Nineteenth*** example of defamation**,**

**on Page 49 of the Book,** states that:

> "Trepp was furious. According to court documents, he told the FBI
> that Montgomery had stolen the software eTreppid had used on secret
> Pentagon contracts. As federal investigators moved in to investigate
> the alleged theft of the technology, they heard from Trepp and others
> that Montgomery's alleged technology wasn't real."

187.    As Defamation by Implication, Defendants published that the Plaintiff stole

valuable software yet at the same time the software that the Plaintiff used to provide services to

the Government was in fact worthless.

188.    In addition, Defendants also made and published other defamatory statements that

are also Defamation by Implication under Florida law.

189. ***Twentieth,*** **on the Preface Page of the Book, the Defendants publish:**

"I've come back," he repeated. "I was the King of Kafiristan – me and Dravot – crowned Kings we was! In this office we settled it – you setting there and giving us the books. I am Peachey – Peachey Taliaferro Carnehan – and you've been setting here ever since – Oh, Lord!"

I was more than a little astonished and expressed my feelings accordingly.

"It's true," said Carnehan, with a dry cackle, nursing his fee, which were wrapped in rags. "True as gospel. Kings we were, with crowns upon our head – me and Dravot – poor Dan – oh, poor, poor Dan, that would never take advice, not though I begged of him!"

-- Rudyard Kipling, *The Man Who Would be King.*

190. As Defamation by Implication, Defendants published that Plaintiff Montgomery (along with others addressed in the Book) is a fraud and/or con man as in *The Man Who Would be King.*

191. ***Twenty-first,*** **in the Prologue on Page xiv of the Book, the Defendants publish:**

"The new homeland security-industrial complex operates differently. It is largely made up of a web of intelligence agencies and their contractors, companies that mostly provide secret services rather than large weapons systems and equipment. These contractors are hired to help Washington determine the scale and scope of the terrorist threat; they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end."

192. As Defamation by Implication, Defendants state "they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end," suggesting that Plaintiff Montgomery's profits were *contingent* upon results, such that Plaintiff Montgomery would make greater profits by providing false results at that.

193. ***Twenty-second,*** **in the Prologue on Page xv of the Book, the Defendants published:**

"Thus, the creation of a homeland security complex at a time of endless war has bequeathed us with the central narrative of the war on terror – modern tales of greed joined hand in hand with stories of abuse of power.  It was inevitable that those wise in the ways of the world would flock to Washington to try to cash in on the war on terror gold rush – and they have.  This book offers just a few of those stories. But those trying to monetize America's obsession with terrorism are not the only ones who have sought to exploit 9/11."

"Opportunism comes in many forms and is driven by more than just greed.  Ambition and a hunger for power, status, and glory have become great engines of post-9/11 opportunism as well.  The more troubling stories here concern abuses of power that have extended across two presidencies for well over a decade.  After 9/11, the United States deregulated national security, stripping away the post-Watergate intelligence reforms of the 1970's that had constrained executive power for thirty years.  The results are morally challenging – and continue to this day."

194.     Thus, as Defamation by Implication, Defendants published that Plaintiff

Montgomery committed fraud and went to any lengths motivated by greed, to obtain money at

any cost.

195.     ***Twenty-third,*** **in the Prologue on Page xvii of the Book, the Defendants**

**published:**

"Washington's global war on terror is now in its second decade, thanks to the bipartisan veneer it has gained under Bush and Obama. It shows no signs of slowing down, hustlers and freebooters continue to take full advantage, and the war's unintended consequences continue to pile up.  All too often, things are not what they seem."

196.     As Defamation by Implication, Defendants published that Plaintiff Montgomery –

one of the key objects of the Book – is a "hustler" and a "freebooter."

197.     ***Twenty-fourth,*** **Part 1 of the Book,** including but not limited to Chapter 2 which

is focused entirely on Plaintiff Montgomery, the Defendants have labeled "Part 1: Greed."

198.     Thus, by placing the chapter focused on Plaintiff Montgomery under a label for

the section of the Book of "Greed," Defendants defame the Plaintiff by implication as being

motivated by greed to commit fraud and carry out the alleged hoaxes identified in the rest of the

Chapter 2.

199.    **Twenty-fifth,** the Defendants have labeled Chapter 2 of the Book which is

focused entirely on Plaintiff Montgomery:  "Chapter 2: The Emperor of the War on Terror."

200.    By naming the chapter focused on Plaintiff Montgomery "The Emperor of the

War on Terror," Defendants defame the Plaintiff by implication as being the mastermind of the

fraud that Risen seeks to portray the war on terror to be.

201.    **Twenty-Sixth,** on Page 40 of the Book, the Defendants published:

> "The CIA's Science and Technology Directorate, which had
> largely been stuck on the sidelines of the war on terror, saw in
> Dennis Montgomery an opportunity to get in the game.  The
> directorate had played an important role in the Cold War, but in the
> first few years of the war on terror, it was struggling to determine
> how technology could be leveraged against groups of terrorists
> who were trying to stay off the grid."

202.    As Defamation by Implication, again, Defendant Risen falsely and misleadingly

published statements which blamed Plaintiff Montgomery for the decisions of government

officials and published that Plaintiff Montgomery defrauded the Government.

203.    **Twenty-Seventh,** on Page 42 of the Book, the Defendants published:

> "Montgomery was telling the CIA exactly what it wanted to hear.  At
> the time, the Bush Administration was obsessed with Al Jazeera, not
> only because of the networks' unrelenting criticism of the invasion of
> Iraq, but also because it had become Osama Bin Laden's favorite
> outlet for broadcasting his videotaped messages to the world."

204.    As Defamation by Implication, Defendants published that Plaintiff Montgomery

defrauded and conned the CIA by "telling the CIA exactly what it wanted to hear."

205.    **Twenty-Eighth,** on Page 42 of the Book, the Defendants published:

> "What remains unclear is how Montgomery was able to convince all
> of them that he had developed secret software that could decode Al

Qaeda's invisible messages.  While he had gotten by a few credulous military officers who came to view his demonstrations, he apparently found it just as easy to persuade the CIA as well."

206.    As Defamation by Implication, Defendants published that Plaintiff Montgomery conned the Government with a hoax.  That is, it would be clear "how Montgomery was able to convince all of them" if Plaintiff Montgomery's work and technology are legitimate.

207.    ***Twenty-Ninth,* on Page 46 of the Book, the Defendants published:**

"Finally the French brought an end to it.  Since Air France flights to the United States were among those that had been grounded, French officials had taken a dim view of the entire episode.  They began demanding answers from the Americans.  The French applied so much pressure on Washington that the CIA was finally forced to reveal to French intelligence the source of the threat information. Once they heard the story of Dennis Montgomery and eTreppid, French officials arranged for a French high-tech firm to reverse-engineer Montgomery's purported technology.  The French wanted to see for themselves whether the claims of hidden messages in Al Jazeera broadcasts made any sense."

208.    As Defamation by Implication, if not explicit, the passage published that Plaintiff Montgomery is a fraud and that his work is a scam and a hoax.

209.    ***Thirtieth,* on Page 52 of the Book, the Defendants publish:**

"Montgomery continued to get defense contracts even during the Obama administration.  In 2009, Montgomery was awarded another air force contract, and later claimed that he had provided the government with warning of a threatened Somali terrorist attack against President Obama's inauguration.  Joseph Liberatore, an air force official who described himself as one of "the believers" in Montgomery and said he had heard from 'various federal agencies thanking us' for the support Montgomery and his company provided during Obama's inauguration.  The threat, however, later proved to be a hoax."

210.    As Defamation by Implication, Defendants published that Plaintiff Montgomery's ability to continue to receive contracts is due to Plaintiff Montgomery's ability to defraud the

Government (and stupidity of government officials) rather than an endorsement of the legitimacy of Plaintiff Montgomery's work.

211.     ***Thirty-First,*** **on Page 31 of the Book, the Defendants published:**

"and a new breed of entrepreneur learned that one of the surest and easiest paths to riches could be found not in Silicon Valley building computers or New York designing clothes but rather in Tysons Corner, Virginia, coming up with new ways to predict, analyze, and prevent terrorist attacks— or, short of that, at least in convincing a few government bureaucrats that you had some magic formula for doing so."

212.     As Defamation by Implication, Defendants published that the Plaintiff engaged in fraud to convince a few government bureaucrats that he had a magic formula as an easy path to riches.

213.     ***Thirty-Second,*** **on Page 33 of the Book, the Defendants published:**

"Montgomery's story demonstrates how hundreds of billions of dollars poured into the war on terror went to waste. With all rules discarded and no one watching the bottom line, government officials simply threw money at contractors who claimed to offer an edge against the new enemies. And the officials almost never checked back to make sure that what they were buying from contractors actually did any good— or that the contractors themselves weren't crooks. A 2011 study by the Pentagon found that during the ten years after 9/ 11, the Defense Department had given more than $ 400 billion to contractors who had previously been sanctioned in cases involving $ 1 million or more in fraud."

214.     As Defamation by Implication, Defendants published that the money provided to Plaintiff Montgomery (among others) went to "waste."

215.     ***Thirty-Third,*** **on Page 33 of the Book, the Defendants published:**

 "The Montgomery episode teaches one other lesson, too: the chance to gain promotions and greater bureaucratic power through access to and control over secret information can mean that there is no incentive for government officials to question the validity of that secret information. Being part of a charmed inner circle holds a seductive power that is difficult to resist."

216.     As Defamation by Implication, Defendants published that Plaintiff Montgomery's

work was fraudulent.

217.     **Thirty-Fourth, on Page 33 of the Book, the Defendants published:**

> "How his technology worked was a secret. Dennis Montgomery's
> computer code became the great treasure behind eTreppid
> Technologies, the company he and Trepp founded. Later, many of
> those around Montgomery began to suspect the reason why
> Montgomery had to guard his technological innovations so
> carefully. They came to believe that at least some of the
> technology didn't really exist."

218.     As Defamation by Implication, Defendants published that Plaintiff Montgomery

committed fraud.

219.     **Thirty-Fifth, on Page 35 of the Book, the Defendants published:**

> "Montgomery was on the lookout for somebody to bankroll him,
> and had put out the word to his friends at the casinos that he
> frequented the most. A year later, Montgomery and Trepp were in
> business together. Trepp was one of the first, but hardly the last, to
> be beguiled by Montgomery's claims that he had achieved
> breakthroughs in computer technology of historic significance."

220.     As Defamation by Implication, Defendants published that Plaintiff Montgomery

"beguiled" Warren Trepp by committing fraud.

221.     **Thirty-Sixth, on Page 39 of the Book, the Defendants published:**

> "For a few months in late 2003, the technology from Dennis
> Montgomery and eTreppid so enraptured certain key government
> officials that it was considered the most important and most sensitive
> counterterrorism intelligence that the Central Intelligence Agency had
> to offer President Bush. Senior officials at the CIA's Directorate of
> Science and Technology began to accept and vouch for Montgomery
> to officials at the highest levels of the government. Montgomery's
> claims grew ever more expansive, but that only solidified his position
> inside the national security arena. His technology became too
> impossible to disbelieve."

222.     As Defamation by Implication, the Defendants published that Plaintiff

Montgomery committed fraud and is a con man.

223.     ***Thirty-Seventh,*** **on Page 40 of the Book, the Defendants published:**

> *"*Montgomery persuaded the spy agency that his special computer
> technology could detect hidden bar codes broadcast on Al Jazeera,
> which had been embedded into the video feed by al Qaeda. Allegedly,
> al Qaeda was using that secret method to send messages to its terrorist
> operatives around the world about plans for new attacks. Montgomery
> convinced the CIA that his technology had uncovered a series of
> hidden letters and numbers that appeared to be coded messages about
> specific airline flights that the terrorists were targeting.

224.     As Defamation by Implication, the Defendants published that Plaintiff convinced

the CIA of claims that are not (were not) true.

225.     ***Thirty-Eighth,*** **on Page 42 of the Book, the Defendants published:**

> "Based on Montgomery's information, President Bush ordered the
> grounding of a series of international flights scheduled to fly into the
> United States. This step caused disruptions for thousands of
> travelers."

226.     As Defamation by Implication, the Defendants published that Plaintiff convinced

President Bush and the national command authority of conclusions drawn from Plaintiff

Montgomery's work.

227.     ***Thirty-Ninth,*** **on Page 42 of the Book, the Defendants published:**

> "One former senior CIA official recalled attending a White House
> meeting in the week following Christmas to discuss what to do next
> about the information coming from Montgomery. The official claims that
> there was a brief but serious discussion about whether to shoot down
> commercial airliners over the Atlantic based on the intelligence."

228.     As Defamation by Implication, the Defendants published that Plaintiff convinced

President Bush and the national command authority of conclusions drawn from Plaintiff

Montgomery's work.

229.    **Fortieth,** on Page 47 of the Book, the Defendants published:

"Even more stunning, after the debacle over the bogus Christmas
2003 terrorist threats, Montgomery kept getting classified government
contracts awarded through several different corporate entities.
Montgomery's problems with the CIA did not stop him from peddling
variations of his technology to one government agency after another.
The secrecy that surrounded his work once again worked in his favor.
CIA officials were reluctant to tell their Pentagon counterparts much
about their experiences with Montgomery, so Defense Department
officials apparently did not realize that his technology was considered
suspect at CIA headquarters."

230.    As Defamation by Implication, Defendants published that Plaintiff continued to

defraud, con, and scam the government, rather than concluding that the Government recognized

the legitimacy of Plaintiff Montgomery's work.

231.    **Forty-First,** on Page 48 of the Book, the Defendants published:

"He successfully infused a sense of mystery around himself. He was
like the Wizard of Oz, but now people were beginning to try to
examine the man behind the curtain."

232.    As Defamation by Implication, Defendants published that the Plaintiff engaged in

fraud and a hoax by keeping details mysterious, including the mystery was caused by Plaintiff

Montgomery rather than by Warren Trepp or the Government.

233.    **Forty-Second,** on Page 48 of the Book, the Defendants published:

"The technology didn't meet the requirements for us," said a Special
Operations Command spokesman drily. Still, there is no evidence that
officials at Special Operations Command ever talked with their
counterparts at the CIA to check up on Montgomery before awarding
him a contract. Special Operations Command paid a total of $ 9.6
million to eTreppid under its contract with the firm."

234.    As Defamation by Implication, the Defendants published that Plaintiff

Montgomery again repeated his fraud and hoax against a new government agency.

235.　　　***Forty-Third,* on Page 54 of the Book, in the Chapter "The New Oligarchs,"**

**the Defendants published:**

> **CHAPTER 3**:　The New Oligarchs
> Page 54:　"Dennis Montgomery is, of course, an extreme example of
> the new kind of counterterrorism entrepreneur who prospered in the
> shadows of 9/11.　But he was hardly alone in recognizing the lucrative
> business opportunities that the war on terror has presented.　In fact, as
> trillions of dollars have poured into the nation's new homeland
> security-industrial complex, the corporate leaders at its vanguard can
> rightly be considered the true winners of the war on terror."

236.　　　As Defamation by Implication, Defendants published that Plaintiff engaged in

fraud and a hoax motivated by greed.

237.　　　**As additional instances of Defendants' defamation of Plaintiff Montgomery,**

on information and belief, Plaintiff alleges that Defendant Risen has spoken on these topics on

radio and on television in additional interviews about the Book and Plaintiff Montgomery since

the publication of the Book in October 2014, which the Plaintiff is continuing to investigate.

238.　　　**As additional instances of Defendants' defamation of Plaintiff Montgomery,**

on information and belief, discovery during this litigation will disclose additional instances of

Defendants having defamed Plaintiff Montgomery since October 2014.

239.　　　**As additional instances of Defendants' defamation of Plaintiff Montgomery,**

Defendants' defamation of Plaintiff Montgomery has been and is being republished through

book reviews and commentary since October 2014, and such republication of the defamation is

widespread and continuing on radio, television, written publications, and proliferating daily on

the Internet in this district, Florida in general, nationally, and internationally.

<u>**FOURTH CAUSE OF ACTION**</u>
***Common Law Intentional Infliction of Emotional Distress***

240.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

241.    Defendants' knowing and intentional publication of the harmful statements against the Plaintiff has foreseeably and proximately caused the Plaintiff emotional distress.

242.    Defendants' intentional actions were committed with the knowledge that they would cause extreme physical pain and suffering and cause severe emotional distress to the Plaintiff.

243.    Defendants' actions were willful malicious, deliberate, and were done with reckless or negligent indifference to the likelihood that such behavior would cause severe emotional distress and with utter disregard for the consequences of such actions.

## FIFTH CAUSE OF ACTION
### *Common Law Tortious Interference with Prospective Advantage*

244.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

245.    Defendants understood that Plaintiff was pursuing the future full value of his software, intellectual property and software technology and techniques and was over time negotiating to make further licenses and sales of the intellectual property.

246.    Defendants were aware that their publication of false and misleading statements about Plaintiff Montgomery harmed Plaintiff Montgomery's career and livelihood and his ability to earn a living, including the opportunity to sell his professional services and software.

247.    Defendants' defamation disparaged Plaintiff's intellectual property and software so as to render it commercially worthless, by claiming that it did not work.

248.    Defendants acted knowingly, willfully and with reckless and negligent disregard of the harm that their publication of their false statements would cause to Plaintiff Montgomery's

livelihood, career, and ability to earn a living, including his opportunity to enter into contracts for the sale of his services and/or intellectual property.

249.     Defendants acted with the intentional malicious purpose of defaming Plaintiff Montgomery as a way to smear aspects of U.S. foreign, military, and intelligence polices with which they disagree in pursuit of their ideological and political agenda.

### SIXTH CAUSE OF ACTION
*Common Law Assault (Apprehension)*

250.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

251.     Plaintiff Montgomery was in-effect working undercover and in secret for the CIA, NSA, and other agencies of the Government on classified programs of counter-terrorism and national security.

252.     Defendants' especially high profile publications of the defamatory factual statements have placed Plaintiff Montgomery's life at risk by revealing and disclosing him to public notice by Al Qaeda and its successors such as the Islamic State (I.S.I.S.), as well as other terrorists and terrorist groups, in Florida, domestically and internationally.

253.     ISIS has openly pledged to kill members of the U.S. military and persons who are associated with the U.S. military and their families and those assisting the U.S. military and Government, particularly in counter-terrorism efforts against Islamic Jihad organizations and terrorists.

254.     Defendants have subjected Plaintiff Montgomery to what is in effect a Fatwah, which is an open call that any and all militant Jihadi Muslims should kill Plaintiff Montgomery.

255.     Defendants have placed Plaintiff Montgomery in immediate fear of bodily harm, injury, and death to him and his family members.

256.     Defendants' tortious actions alleged herein were furthered and aided and abetted by the CIA and the NSA, who want to destroy Plaintiff Montgomery to prevent him from disclosing as a whistleblower the full extent of their unconstitutional and illegal Government surveillance on American citizens to the Congress, the Inspector General, and to the courts, specifically in cases styled *Klayman v. Obama*, No. 13-851, 13-881, 14-92 (D.D.C.); *Klayman v. Obama*, No. 14-5004, 14-5005, 14-5016, 14-5017 (D.C. Cir.).

## DAMAGES WITH REGARD TO ALL COUNTS

257.     As a direct and proximate result of the intentional, willful, malicious or negligent actions of Defendants, Plaintiff Montgomery demands judgment be entered against Defendants each and every one of them, jointly and severally, including an award of compensatory and actual damages in an amount to be determined at trial, as pled below, punitive damages, reasonable attorneys fees, pre-judgment interest, post-interest and costs, and such other relief as the Court may deem just and proper.

258.     As a result of Defendants' actions, Plaintiff Montgomery suffered significant personal harm, including to his business and professional endeavors and prospects, career, and finances.

259.     As just one example, Plaintiff Montgomery negotiated for the sale of his technology to the Government for the price of $100 million.

260.     Plaintiff Montgomery was able to obtain a Top Secret clearance in less than a year in 2003.  He passed all of the security issues that were involved in obtaining that level of clearance. His clearance allowed him to courier top-secret material worldwide.  In 2007, the Plaintiff entered The White House and the Pentagon with full access to Top Secret material. As of 2010, the Plaintiff still held that clearance level, and to the best of his knowledge still does.

261.    As a result of his security clearances, the Plaintiff would be employable in high-paying jobs but for the defamation of his character and other tortious actions by the Defendants.

262.    Plaintiff Montgomery has been harmed by the loss of the economic value of his intellectual property, and the value of licensing the intellectual property and/or providing services based upon or incorporating his intellectual property.

263.    Defendants' conduct was unreasonable and outrageous and exceeds the bounds tolerated by decent society, and was done willfully, maliciously and deliberately, or with reckless indifference or negligence, to cause Plaintiff severe mental and emotional pain, distress, and anguish and loss of enjoyment of life, so as to also justify the award of punitive and exemplary damages.

264.    On information and belief, at least the Defendant Houghton Mifflin Harcourt Co., as a publicly traded corporation, was required to publicly disclose the Plaintiff's threatened lawsuit on reports filed with the Securities and Exchange Commission.  A liability or contingent liability, including threatened litigation must be reported under Item 103 "Legal Proceedings," in Management's Discussion and Analysis (MD&A) -- Item 303, and/or in Item 503(c) "Risk Factors."

265.    This information was required on Defendant's regularly scheduled SEC Form 10-Q (quarterly report) and/or SEC Form 10-K (annual report) but also on SEC Form 8-K triggered (within four days) by certain events, because "Form 8-K is the 'current 'report' companies must file with the SEC to announce major events that shareholders should know about."  http://www.sec.gov/answers/form8k.htm.

266.    Defendant's SEC Form 10-Q for the fourth quarter of 2014 was due on February 10, 2015, but is not publicly on file.  Defendant's quarterly SEC Form 10-Q filed on November

6, 2014, covered the period ended September 30, 2014.

267.     In the most recent exchange of correspondence, on January 20, 2015, Houghton

Mifflin's Associate General Counsel David Eber replied to Larry Klayman's January 14, 2015,

litigation demand concerning Defendants' defamation of Plaintiff Montgomery, copied by Ebers

to General Counsel William Bayers, and refused to take any corrective action.

268.     In addition, on information and belief, the Defendant was required to disclose the

litigation as non-public information prior to engaging in trades.  On January 31, 2015, and

February 17, 2015, General Counsel William Frederick Bayers reported the sales of HMHC

stock on SEC Form 4.

## **PRAYER FOR RELIEF**

With regard to all counts, Plaintiff demands that judgment be entered against Defendants,

each and every one of them, acting in concert, jointly and severally, for compensatory and actual

damages in excess of $120 million U.S. Dollars resulting from their financial, reputational,

emotional and professional injury to Plaintiff, as well as equitable relief as may be appropriate,

and such other relief the Court may deem just and proper.  Plaintiff further prays for an award of

punitive damages in an amount in excess of $350,000,000.00 U.S. Dollars, to punish Defendants

for their outrageous, deceitful, unprecedented, vicious and malicious conduct toward Plaintiff

Montgomery designed so Defendants can reap huge profits for their defamatory works.

Defendants' actions have left Plaintiff in ruins. According to Bloomberg Business, the market

capitalization of Houghton Mifflin Harcourt is $2.8 Billion U.S Dollars. Large punitive damages

will deter Defendants from committing such egregious acts in the future against Plaintiff

Montgomery and others similarly situated.

## <u>JURY DEMAND</u>

**Plaintiff respectfully demands a jury trial on all issues so triable.**

Dated: April 27, 2015

Respectfully submitted,

*/s/ Larry Klayman*      
Larry Klayman, Esq.
Klayman Law Firm
FL Bar No. 246220
7050 W Palmetto Park Rd.
Suite 15-287
Boca Raton, FL 33433
(310) 595-0800
leklayman@gmail.com
Attorney for Plaintiff

Exhibit A

# PAY ANY PRICE

**GREED, POWER, AND ENDLESS WAR**

# JAMES RISEN

Author of *STATE OF WAR*

much Iraqi
the Ameri-

matter, the
cash in Leb-
use no one
ed with the

nker is one
c rules and
nlikely that
Most of the
d to still be
iting to be

as a fitting
It certainly
lventure in
Hussein in
2003 when

# 2



# THE EMPEROR OF THE
# WAR ON TERROR

Greed and power, when combined, can be devastating. In the case of
the missing cash of Baghdad, greed tempted Americans and Iraqis
alike, while the power of the Coalition Provisional Authority to make
fast, sweeping decisions with little oversight allowed that greed to
grow unchecked. Billions of dollars disappeared as a result.

Throughout the war on terror, greed and power have flourished
just as readily back home in the United States, where the govern-
ment's surging counterterrorism spending created a new national
security gold rush. The post-9/11 panic led Congress to throw cash
at the FBI, CIA, and Pentagon faster than they were able to spend
it. Soon, a counterterrorism bubble, like a financial bubble, grew in
Washington, and a new breed of entrepreneur learned that one of the
surest and easiest paths to riches could be found not in Silicon Valley
building computers or New York designing clothes but rather in Ty-
sons Corner, Virginia, coming up with new ways to predict, analyze,
and prevent terrorist attacks — or, short of that, at least in convincing
a few government bureaucrats that you had some magic formula for
doing so.

Consider the example of Dennis Montgomery. He provides the

31

GREED

perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist was able to create a rogue intelligence operation with little or no adult supervision. Crazy became the new normal in the war on terror, and the original objectives of the war got lost in the process.

★

Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money.

Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it. The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in a series of civil lawsuits involving Montgomery.

It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes.

★

A former medical technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what

32

d and
e a cli-
artist
a adult
or, and



under-
aw the

and for-
eve was
history,
ush ad-
amercial
as over,
hey had
ag about
episode
working
cross the
r and his
ivilege in

: that the



tware ex-
airs, Den-
ient Bush
d on what

now appears to have been an elaborate hoax. Even after it appeared
that Montgomery had pulled off a scheme of amazing scope, he still
had die-hard supporters in the government who steadfastly refused
to believe the evidence suggesting that Montgomery was a fake, and
who rejected the notion that the super-secret computer software that
he foisted on the Pentagon and CIA was anything other than Ameri-
ca's salvation.

Montgomery's story demonstrates how hundreds of billions of
dollars poured into the war on terror went to waste. With all rules
discarded and no one watching the bottom line, government offi-
cials simply threw money at contractors who claimed to offer an edge
against the new enemies. And the officials almost never checked back
to make sure that what they were buying from contractors actually
did any good—or that the contractors themselves weren't crooks.
A 2011 study by the Pentagon found that during the ten years after
9/11, the Defense Department had given more than $400 billion to
contractors who had previously been sanctioned in cases involving
$1 million or more in fraud.

The Montgomery episode teaches one other lesson, too: the
chance to gain promotions and greater bureaucratic power through
access to and control over secret information can mean that there is
no incentive for government officials to question the validity of that
secret information. Being part of a charmed inner circle holds a se-
ductive power that is difficult to resist.

Montgomery strongly denies that he peddled fraudulent tech-
nology. He insists that the charges have been leveled by critics with
axes to grind, including his former lawyer and former employees. He
claims that he was following direct orders from both the NSA and the
CIA, and says that the CIA, NSA, and U.S. military took his technol-
ogy so seriously that it was used to help in the targeting of Predator
strikes and other raids. Montgomery adds that he is limited in what
he can say about his software and business dealings with the CIA and
Pentagon without the approval of the Justice Department. The fact
that the government is blocking public disclosure of the details of its
relationship with him, he adds, shows that his work was considered

GREED

serious and important. "Do you really think," he asked, "the government invoked the state secrets privilege just from being embarrassed or conned?"



The strange tale of Dennis Montgomery and his self-proclaimed plan to win the war on terror begins, appropriately enough, inside the El Dorado Casino in downtown Reno.

Montgomery was an overweight, middle-aged, incorrigible gambler, a man who liked to play long odds because he was convinced that he could out-think the house. He once boasted to a business partner that he had a system for counting an eight-deck blackjack shoe, quite a difficult feat for even the best card sharks, and he regularly tested his theories at the El Dorado and the Peppermill Casino in Reno. He usually came up short but that didn't stop him from playing blackjack on a nightly basis, racking up unwieldy debts that eventually led to his 2010 arrest for bouncing more than $1 million in bad checks at Caesar's Palace in Las Vegas.

Gambling is how he met his first backer, Warren Trepp. Trepp got rich in the biggest casino of them all, Wall Street. He had been Michael Milken's right-hand man in the heyday of Milken's famous Beverly Hills trading desk during the "greed is good" era of insider trading in the 1980s. When a hungry federal prosecutor named Rudolph Giuliani went after Milken for insider trading, he tried to get Trepp to roll over on his boss. Trepp refused, even in the face of a threat that he would be charged himself if he failed to cooperate. Milken went to jail, but Giuliani never could nail Trepp. Instead of facing criminal charges, Trepp became the subject of a marathon investigation by the Securities and Exchange Commission (SEC), which tried to impose civil sanctions for Trepp's alleged part in Milken's insider-trading bonanza. It took nearly a decade, but Trepp finally beat the feds. In 1997, the SEC's case against him was dismissed. He walked away from the Milken years with a fortune.

Warren Trepp may have been able to defeat Rudy Giuliani and a

34

l. "the govern-
g embarrassed

oclaimed plan
inside the El

rrigible gam-
onvinced that
iness partner
k shoe, quite
ularly tested
in Reno. He
ing blackjack
ally led to his
iecks at Cae-

p. Trepp got
ad been Mi-
famous Bev-
sider trading
Rudolph Gi-
get Trepp to
threat that
filken went
icing crimi-
westigation
tried to im-
isider-trad-
at the feds.
alked away

liani and a

whole legion of federal investigators, but he couldn't outwit Dennis Montgomery.

By the late 1990s, Trepp was living in Incline Village, a wealthy enclave on the Nevada side of Lake Tahoe, where he was shaking off his past and trying to remake himself into a respected philanthropist, theater angel, and canny private investor. And then he met Montgomery.

Trepp was introduced to Montgomery by a casino host at the El Dorado in 1997. Montgomery was on the lookout for somebody to bankroll him, and had put out the word to his friends at the casinos that he frequented the most. A year later, Montgomery and Trepp were in business together. Trepp was one of the first, but hardly the last, to be beguiled by Montgomery's claims that he had achieved breakthroughs in computer technology of historic significance. The two founded a company together and tried to find buyers for Montgomery's alleged miracle software.

Montgomery convinced Trepp that he had achieved a series of major technological advances in computer software that could be worth millions. One was the development of software that he argued provided a new method of video compression, allowing for greater video storage and transmission than was ever available before. Another innovation was stunningly detailed video facial recognition. But the most dazzling claim of all involved software that Montgomery said could identify objects and anomalies embedded in video with unprecedented detail. He claimed that his technology could even find and identify objects hidden inside videotape that were not visible to the naked eye.

How his technology worked was a secret. Dennis Montgomery's computer code became the great treasure behind eTreppid Technologies, the company he and Trepp founded. Later, many of those around Montgomery began to suspect the reason why Montgomery had to guard his technological innovations so carefully. They came to believe that at least some of the technology didn't really exist.

*

GREED

To commercialize his technology, Montgomery first tried to convince Hollywood that he had developed a new and efficient means of colorizing old movies. His object identification software, he claimed, could speed the process of deciding where and how to colorize each frame of film. Warren Trepp later told a court that Montgomery had given him a demonstration of his software's ability to identify patterns and images in a video of the 1939 black-and-white classic *Gunga Din*.

But after failing to strike it big in Hollywood, Montgomery and Trepp shifted their focus to the casino industry in Reno and Las Vegas. Montgomery later bragged that he had developed pattern recognition software specifically for casinos that could help identify cheaters. He even claimed he had technology that could identify high-value chips inside piles of chips on gaming tables, to detect when dealers tried to steal from the casinos by slipping valuable chips to friends. Montgomery also said he had developed video compression software that would allow casinos to more easily store thousands of hours of surveillance tapes, rather than erase all of their old footage.

But his technology was never a big hit with the casino industry, either. So Montgomery turned to Washington. There, Montgomery finally succeeded in his new search for clients through a series of coincidences and chance encounters, along with strong political and financial connections that helped to smooth the way. And it all started, like so many other things in his life, in a casino.

In 2002, Warren Trepp arranged for the MGM Grand Casino to take a look at Montgomery's technology. An air force colonel who had heard about Montgomery's work decided to come and see it as well. Impressed, he helped Montgomery and eTreppid land a contract with the air force.

Michael Flynn, Montgomery's former lawyer—who later concluded that Montgomery was a fraud—said that Montgomery had told him that Montgomery had won over the visiting air force officer, who became convinced that Montgomery's object recognition and video compression technologies could help the air force's Predator drone program. The CIA and air force were flying Predator drones over Afghanistan at the time, and they were sending back thousands of hours of video that needed to be analyzed and stored. Just like

36

y first tried to convince
fficient means of color-
ware, he claimed, could
> colorize each frame of
tgomery had given him
ntify patterns and im-
ssic *Gunga Din.*

ood, Montgomery and
y In Reno and Las Ve-
ieveloped pattern rec-
at could help identify
at could identify high-
ables, to detect when
ping valuable chips to
ed video compression
fly store thousands of
l of their old footage.
a the casino industry,
. There, Montgomery
hrough a series of co-
trong political and fi-
way. And it all started,

GM Grand Casino to
force colonel who had
ne and see it as well.
l land a contract with

er—who later con-
at Montgomery had
isiting air force offi-
s object recognition
the air force's Preda-
ring Predator drones
ling back thousands
nd stored. Just like

Las Vegas casinos, the air force needed a way to maintain the mas-
sive piles of video generated by its own version of the eye in the sky.
Montgomery's object recognition technology could provide new ways
for the air force to track suspected terrorists with the Predator. Mont-
gomery claimed that his facial recognition software was so good that
he could identify individual faces from the video camera flying on a
Predator high above the mountains of southern Afghanistan.

By the spring and summer of 2003, eTreppid was awarded con-
tracts by both the air force and U.S. Special Operations Command.
Montgomery was able to win over the government in part by offering
field tests of his technology—tests that former employees say were
fixed to impress visiting officials. Warren Trepp later told the FBI that
he eventually learned that Montgomery had no real computer soft-
ware programming skills, according to court documents that include
his statements to the FBI. Trepp also described to federal investiga-
tors how eTreppid employees had confided to him that Montgomery
had asked them to help him falsify tests of his object recognition soft-
ware when Pentagon officials came to visit. Trepp said that on one
occasion, Montgomery told two eTreppid employees to go into an
empty office and push a button on a computer when they heard a beep
on a cell phone. Meanwhile, Montgomery carried a toy bazooka into
a field outside eTreppid. He was demonstrating to a group of visiting
U.S. military officials that his technology could recognize the bazooka
from a great distance.

After he was in place in the field, he used a hidden cell phone to
buzz the cell phone of one the eTreppid employees, who then pushed
a key on a computer keyboard, which in turn flashed an image of a
bazooka on another screen prominently displayed in front of the
military officers standing in another room, according to court docu-
ments. The military officers were convinced that Montgomery's com-
puter software had amazingly detected and recognized the bazooka
in Montgomery's hands. (Montgomery insists that the eTreppid em-
ployees lied when they claimed that he had asked them to fix the
tests, and also says that the air force issued a report showing that it
had verified the tests.)

Montgomery had a lot of support when it came to dealing with the

government. Through Warren Trepp, he had excellent political connections, and in Washington that can take you a very long way.

To help eTreppid get more government business, Trepp brought in Letitia White, a Washington lobbyist with ties to congressional Republicans. She was particularly close with her former boss, California congressman Jerry Lewis. He, in turn, was chairman of the powerful House Defense Appropriations Subcommittee (he later became chairman of the full appropriations committee) and so was able to steer billions of dollars in spending to programs he favored throughout the Pentagon. Letitia White, who had been one of Lewis's closest aides, had left to go to work with the Washington lobbying firm of Copeland Lowery, where she specialized in arranging custom-built earmarks in the defense and intelligence budgets for her clients.

The connections among Lewis, White, and Copeland Lowery later became the subject of a long-running criminal investigation by the Justice Department. The U.S. attorney in Los Angeles probed whether Lewis had steered huge amounts of money to Copeland Lowery's clients in return for large campaign donations from the lobbying firm and from the defense contractors that were its clients. The investigation of Jerry Lewis was ongoing when the U.S. attorney handling the case, Carol Lam, was fired by the Bush administration in 2007, making her one of eight U.S. attorneys pushed aside by the Bush White House in a famously controversial, possibly political decision. The investigation into Lewis and his ties to Copeland Lowery was eventually dropped, but the lobbying firm broke up under the pressure, and Letitia White moved to a new firm. In 2009, Citizens for Responsibility and Ethics in Washington (CREW) named Lewis one of the fifteen most corrupt members of Congress.

But Trepp wasn't finished after hiring White. He convinced another heavyweight Nevada investor, Wayne Prim, to put money into eTreppid. In September 2003, Prim hosted a dinner that brought together Trepp, Montgomery, and Rep. Jim Gibbons of Nevada, a former airline pilot and rising star among congressional Republicans. Gibbons, an influential member of the House Intelligence Committee, almost certainly played a critical role in helping Montgomery to gain access to the Central Intelligence Agency.

ellent political con-
ery long way.
s, Trepp brought in
y congressional Re-
ner boss, California
ian of the powerful
later became chair-
o was able to steer
red throughout the
wis's closest aides,
g firm of Copeland
i-built earmarks in
i.

eland Lowery later
vestigation by the
ies probed whether
eland Lowery's cli-
the lobbying firm
nts. The investiga-
rney handling the
ion in 2007, mak-
y the Bush White
l decision. The in-
wery was eventu-
the pressure, and
is for Responsibil-
one of the fifteen

He convinced an-
o put money into
r that brought to-
of Nevada, a for-
onal Republicans.
lligence Commit-
g Montgomery to

Gibbons did not need much coaxing to try to assist eTreppid. Not only was the company based in his home state, but both Prim and Warren Trepp were longtime campaign contributors. After the dinner at Prim's house, Gibbons went to work immediately opening doors in Washington for eTreppid. Flynn said that Montgomery later told him that Gibbons quickly arranged to meet with Porter Goss, then the chairman of the House Intelligence Committee, to discuss eTreppid and Montgomery's technology.

By the fall of 2003, Dennis Montgomery had made a series of impressive moves to gain access to the black budget of the government's national security apparatus. He had the backing of two wealthy investors, had one of the nation's most influential lobbyists scouring the federal budget for earmarks on his behalf, and had the support of a key member of the CIA's oversight committee. After obtaining a series of small contracts with the air force and the Special Operations Command, Montgomery was ready for the big time.

★

For a few months in late 2003, the technology from Dennis Montgomery and eTreppid so enraptured certain key government officials that it was considered the most important and most sensitive counterterrorism intelligence that the Central Intelligence Agency had to offer President Bush. Senior officials at the CIA's Directorate of Science and Technology began to accept and vouch for Montgomery to officials at the highest levels of the government. Montgomery's claims grew ever more expansive, but that only solidified his position inside the national security arena. His technology became too impossible to disbelieve.

Montgomery's big moment came at Christmas 2003, a strange time of angst in the American national security apparatus. It was two years after the 9/11 attacks, and the war in Iraq was getting worse. Iraq was turning into a new breeding ground for terrorism, and Osama bin Laden was still on the loose, regularly thumbing his nose at the Americans by issuing videotaped threats of further terrorist strikes. The CIA, still stumbling in the aftermath of the two greatest

GREED

intelligence failures in its history—missing 9/11 and getting it wrong on Iraq's supposed weapons of mass destruction—was desperate for success, a quick win with which to answer its critics.

The CIA's Science and Technology Directorate, which had largely been stuck on the sidelines of the war on terror, saw in Dennis Montgomery an opportunity to get in the game. The directorate had played an important role in the Cold War, but in the first few years of the war on terror, it was still struggling to determine how technology could be leveraged against small groups of terrorists who were trying to stay off the grid.

Montgomery brilliantly played on the CIA's technical insecurities as well as the agency's woeful lack of understanding about al Qaeda and Islamic terrorism. He was able to convince the CIA that he had developed a secret new technology that enabled him to decipher al Qaeda codes embedded in the network banner displayed on the broadcasts of Al Jazeera, the Qatar-based news network. Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks. And only he had the technology to decode those messages, thus saving America from another devastating attack. The CIA—more credulous than Hollywood or Las Vegas—fell for Montgomery's claims. In short, he convinced CIA officials that he could detect terrorist threats by watching television.

By late 2003, CIA officials began to flock to eTreppid's offices in Reno to see Montgomery's amazing software. Michael Flynn, Montgomery's former lawyer, said that Montgomery had dealings with or knew the identities of at least sixteen different CIA officials. These people now joined the senior military officers who had frequented the company since the previous spring, when it first began to work on the Predator program.

Montgomery persuaded the spy agency that his special computer technology could detect hidden bar codes broadcast on Al Jazeera, which had been embedded into the video feed by al Qaeda. Allegedly, al Qaeda was using that secret method to send messages to its terrorist operatives around the world about plans for new attacks. Montgomery convinced the CIA that his technology had uncovered a series

1 and getting it wrong
n—was desperate for
itics.

ate, which had largely
. saw in Dennis Mont-
directorate had played
st few years of the war
w technology could be
ho were trying to stay

LA's technical insecu-
nderstanding about al
nvince the CIA that he
abled him to decipher
nner displayed on the
's network. Montgom-
as using the broadcasts
rist attacks. And only
ges, thus saving Amer-
—more credulous than
y's claims. In short, he
orist threats by watch-

to eTreppid's offices in
Michael Flynn, Mont-
y had dealings with or
nt CIA officials. These
who had frequented the
it began to work on the

at his special computer
adcast on Al Jazeera,
by al Qaeda. Allegedly,
messages to its terror-
or new attacks. Mont-
had uncovered a series

of hidden letters and numbers that appeared to be coded messages about specific airline flights that the terrorists were targeting.

Montgomery insists that he did not come up with the idea of analyzing Al Jazeera videotapes—he says that the CIA came to him in late 2003 and asked him to do it. CIA officials brought Montgomery two different versions of al Qaeda videotapes, he claims. They gave him original al Qaeda videotapes obtained independently by the CIA, and then also gave him recordings of the same videotapes recorded as they had been broadcast on Al Jazeera. The CIA wanted him to compare the two, he claims.

But even if it wasn't Montgomery's idea, he ran with it as fast as he could. He told the CIA that he had found that the versions of the tapes broadcast on Al Jazeera had hidden letters and numbers embedded in them. He says that he found that each bin Laden video broadcast on al Jazeera had patterns and objects embedded in the network's own banner displayed with the video recordings.

Montgomery let the CIA draw its own conclusions based on the information he gave them. After he reported to the CIA that he had detected a series of hidden letters and numbers, he left it up to the CIA to conclude that those numbers and letters referred to specific airline flights. He insists that he did not offer the CIA his own conclusions about what the data meant.

By the middle of December 2003, Montgomery reported to the CIA that he had discovered certain combinations of letters and numbers. For example, coded messages that included the letters "AF" followed by a series of numbers, or the letters "AA" and "UA" and two or three digits, kept repeating. In other instances, he told the agency that he had found a series of numbers that looked like coordinates for the longitude and latitude of specific locations.

The CIA made the inevitable connections. "They would jump at conclusions," says Montgomery. "There would be things like C4, C4, and they would say that's explosives. They jumped to conclusions." He added that he "never suggested it was airplanes or a threat."

Montgomery's data triggered panic at the CIA and the White House—and urgent demands that Montgomery produce more. On Christmas Eve, CIA officials showed up at Montgomery's house in

Reno and told him that he had to go back to his office to keep digging through incoming videotapes and Al Jazeera broadcasts throughout the holidays, Montgomery recalled.

Montgomery was telling the CIA exactly what it wanted to hear. At the time, the Bush administration was obsessed with Al Jazeera, not only because of the network's unrelenting criticism of the invasion of Iraq, but also because it had become Osama bin Laden's favorite outlet for broadcasting his videotaped messages to the world. Each time bin Laden released a new video, the American media immediately turned to the CIA for a quick response and analysis of whether the recording was genuine and where and when it had been taped. Each new broadcast on Al Jazeera forced the CIA to scramble to stay one step ahead of Western reporters baying for answers. At first, when bin Laden released videotapes filmed outdoors in what appeared to be the mountainous terrain of northwestern Pakistan, the CIA even tried to conduct a geological analysis of the rocky outcroppings that served as the backdrop for the video, to try to figure out where bin Laden was. His broadcast statements prompted the CIA to look for new methods of analyzing the news network, and also led some American officials to suspect that there was a covert relationship between Al Jazeera and al Qaeda.

Former senior CIA officials say that officials from the CIA's Science and Technology Directorate, including the directorate's chief, Donald Kerr, believed Montgomery's claims about al Qaeda codes. They also convinced CIA director George Tenet to take the technology and intelligence flowing from Montgomery's software seriously. As a result, in December 2003, Tenet rushed directly to President Bush when information provided by Montgomery and his software purported to show that a series of flights from France, Britain, and Mexico to the United States around Christmas were being targeted by al Qaeda. The data strongly suggested that the terrorist group was planning to crash the planes at specific coordinates.

Based on Montgomery's information, President Bush ordered the grounding of a series of international flights scheduled to fly into the United States. This step caused disruptions for thousands of travelers on both sides of the Atlantic, while further stoking public fears of an-

42

to his office to keep digging
seera broadcasts throughout

ly what it wanted to hear. At
ssessed with Al Jazeera, not
; criticism of the invasion of
na bin Laden's favorite out-
ges to the world. Each time
terican media immediately
nd analysis of whether the
en it had been taped. Each
IA to scramble to stay one
answers. At first, when bin
in what appeared to be the
istan, the CIA even tried to
utcroppings that served as
out where bin Laden was.
A to look for new methods
id some American officials
nship between Al Jazeera

ials from the CIA's Science
irectorate's chief, Donald
al Qaeda codes. They also
the technology and intel-
te seriously. As a result, in
esident Bush when infor-
ftware purported to show
and Mexico to the United
ed by al Qaeda. The data
was planning to crash the

esident Bush ordered the
scheduled to fly into the
or thousands of travelers
toking public fears of an-

*The Emperor of the War on Terror*

other spectacular al Qaeda attack just two years after the 9/11 attacks on New York and Washington.

★

Years later, several former CIA officials who eventually pieced together what had happened in those frenzied days became highly critical of how Montgomery's information was handled by Tenet and other senior CIA managers. The critics came to believe that top officials in the CIA's Science and Technology Directorate became fierce advocates for Montgomery's information because they were eager to play a more prominent role in the Bush administration's war on terror. The scientists were tired of being shunted aside, and Montgomery gave them what they wanted: technology that could prove their worth. "They wanted in," said one former senior CIA official, "they wanted to be part of the game."

But former CIA officials blame Tenet even more; the CIA director enabled the overeager scientists. He allowed them to circumvent the CIA's normal reporting and vetting channels, and rushed the raw material fed to the agency by Montgomery directly to the president. Bush himself had no way of vetting the material he was being handed by the CIA. "Tenet made George Bush the case officer on this," said one former senior CIA official. "The president was deciding how this was being handled."

One former senior CIA official said that for two or three months in late 2003 and early 2004, the intelligence from Montgomery was treated like it was the most valuable counterterrorism material at the CIA. Special briefings were given almost daily on the intelligence, but only a handful of CIA officials were told where the intelligence was coming from. "They treated this like the most important, most sensitive compartmented material they had on terrorism," said one former CIA official.

Officially, the CIA still refuses to discuss any details of the episode. One CIA official offered a qualified defense of Tenet's handling of Montgomery's information, saying that the decision to share the threat information with President Bush was debated and approved by

GREED

the administration's so-called principals committee, made up of Vice President Dick Cheney, the secretaries of state and defense, and other members of the cabinet. Only after the principals agreed did Tenet take the intelligence in to Bush. In other words, Tenet wasn't the only one who appears to have been hoodwinked. Dennis Montgomery's information received the stamp of approval by the entire upper echelon of the Bush administration.

★

What remains unclear is how Montgomery was able to convince all of them that he had developed secret software that could decode al Qaeda's invisible messages. While he had gotten by a few credulous military officers who came to view his demonstrations, he apparently found it just as easy to persuade the CIA as well.

A CIA official defensively pointed out that the agency did not actually have a contract with eTreppid at the time Montgomery was providing data from the Al Jazeera videotapes. While they were working closely together during the final months of 2003, the CIA had not yet started paying Montgomery, the official said. The agency never finalized a contract with him because agency staff eventually realized they had been conned, according to this official. But that does not diminish the fact that for a few crucial months, the CIA took Montgomery and his technology very seriously.

Montgomery was able to succeed with the CIA in part because senior agency officials considered his technology so important that they turned the knowledge of its existence into a highly compartmented secret. Few at the CIA knew any more than that there was a new intelligence source providing highly sensitive information about al Qaeda's plans for its future terrorist strikes. In other words, the CIA officials working with Montgomery—people who had already bought into Montgomery—controlled who else was told about the man and his technology. By limiting access to the information, they enhanced their own standing within the CIA; they were the high priests in on the agency's biggest secret. There would be no second-guessing.

The fact that Montgomery and eTreppid had such powerful con-

44

e, made up of Vice
iefense, and other
agreed did Tenet
et wasn't the only
Montgomery's in-
tire upper echelon

le to convince all
t could decode al
· a few credulous
ns, he apparently

ncy did not actu-
gomery was pro-
ey were working
CIA had not yet
ency never final-
lly realized they
les not diminish
ontgomery and

art because sen-
rtant that they
compartmented
e was a new in-
ation about al
words, the CIA
already bought
it the man and
they enhanced
h priests in on
guessing.
powerful con-

*The Emperor of the War on Terror*

nections in Washington also reduced the incentives for anyone at the CIA to speak up. Raising questions about Dennis Montgomery would almost certainly lead to a grilling in front of the House Intelligence Committee and Jim Gibbons. It might also incur the wrath of Jerry Lewis and the Defense Appropriations Subcommittee, which, along with the House intelligence panel, controlled the intelligence budget.

★

For those few allowed into the CIA's charmed circle of secret knowledge, Montgomery seemed to be providing powerful and frightening information.

The string of numbers flowing inexorably from Dennis Montgomery's computers prompted President Bush to act. One set of flights he ordered grounded were Air France flights from Paris to Los Angeles. French security detained seven men at Charles de Gaulle Airport in Paris for questioning, but then released them after no further evidence of a pending attack was uncovered. Christmas 2003 came and went with no attacks. But that did not make the White House any more skeptical of Dennis Montgomery.

One former senior CIA official recalled attending a White House meeting in the week following Christmas to discuss what to do next about the information coming from Montgomery. The official claims that there was a brief but serious discussion about whether to shoot down commercial airliners over the Atlantic based on the intelligence. The former CIA official said that during the meeting, Frances Townsend—then a counterterrorism official on the National Security Council—discussed with an NSC lawyer the fact that the president had the legal authority to shoot down planes believed to be terrorist threats, and that it might be time to exercise that authority. "I couldn't believe they were talking about it," the former senior CIA official said. "I thought this was crazy."

Townsend denied ever having such a discussion. The former CIA official repeated his version of events after being told of her denial.

★

GREED

Finally, the French brought an end to it. Since Air France flights to the United States were among those that had been grounded, French officials had taken a dim view of the entire episode. They began demanding answers from the Americans. The French applied so much pressure on Washington that the CIA was finally forced to reveal to French intelligence the source of the threat information. Once they heard the story of Dennis Montgomery and eTreppid, French officials arranged for a French high-tech firm to reverse-engineer Montgomery's purported technology. The French wanted to see for themselves whether the claims of hidden messages in Al Jazeera broadcasts made any sense.

It did not take long for the French firm to conclude that the whole thing was a hoax. The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers. The firm reported back to the French government that the supposed intelligence was a fabrication.

At first, CIA officials were taken aback by the French company's findings and did not want to believe that they had been fooled. Montgomery says that CIA officials continued to work with him for months after Christmas 2003, and that CIA personnel were still showing up at his offices in Nevada until late 2004.

Once the CIA officials finally accepted the truth, however, and agreed with the French findings, George Tenet and others at the CIA who had been Montgomery's advocates tried to forget all about him. They never talked about the operation again. Within the CIA, it was as if Dennis Montgomery had never existed.

The CIA never investigated the apparent hoax nor examined how it had been handled inside the agency. No one involved in promoting Montgomery, in vouching for his information to the president, or in proposing to shoot down planes based on his claims ever faced any consequences. Donald Kerr, the head of the CIA's Science and Technology Directorate at the time, was never held to account for the role the CIA's technical experts played in advocating for Montgomery. Instead, Kerr kept getting promoted. He received several other senior assignments in the intelligence community, and was eventually

named deputy direc
to requests for comi

At the time of th
of the newly created
of distributing terr
ment. That meant t
ing Montgomery's
reaches of the Bush
ished for his role in
Brennan was name
White House. He la

In 2013, while
Brennan to run th
can who was vice
submitted a writter
gence community's
denied that he had
nology, and insiste
was merely a recipi
had been passed c
Montgomery's dat
not to know what
pid, "other than it
information."

There was no f
body was blamed."
got promoted."

Even more stur
2003 terrorist thr
ment contracts aw
Montgomery's pro
variations of his te
The secrecy that su
CIA officials were
about their experi

Air France flights to
m grounded, French
ode. They began de-
ach applied so much
y forced to reveal to
armation. Once they
ppid, French officials
engineer Montgom-
to see for themselves
sera broadcasts made

aclude that the whole
at there were simply
hidden bar codes or
French government

he French company's
id been fooled. Mont-
with him for months
are still showing up at

truth, however, and
and others at the CIA
forget all about him.
Within the CIA, it was

ax nor examined how
nvolved in promoting
to the president, or in
claims ever faced any
IA's Science and Tech-
to account for the role
ting for Montgomery.
ved several other sen-
y, and was eventually

named deputy director of national intelligence. Kerr did not respond to requests for comment.

At the time of the Christmas 2003 scare, John Brennan was head of the newly created Terrorist Threat Integration Center and in charge of distributing terrorism-related intelligence throughout the government. That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration. But Brennan was never admonished for his role in the affair. After Barack Obama became president, Brennan was named to be his top counterterrorism advisor in the White House. He later became CIA director.

In 2013, while the Senate was considering whether to confirm Brennan to run the CIA, Sen. Saxby Chambliss, a Georgia Republican who was vice chairman of the Senate Intelligence Committee, submitted a written question to Brennan about his role in the intelligence community's dealings with Montgomery. In response, Brennan denied that he had been an advocate for Montgomery and his technology, and insisted that the Terrorism Threat Integration Center was merely a recipient of Montgomery's information and data, which had been passed on by the CIA. He said that the center included Montgomery's data "in analytic products as appropriate." He claimed not to know what had become of the CIA's program with eTreppid, "other than it was determined not to be a source of accurate information."

There was no further inquiry on the matter from Congress. "Nobody was blamed," complains one former CIA official. "Instead, they got promoted."

Even more stunning, after the debacle over the bogus Christmas 2003 terrorist threats, Montgomery kept getting classified government contracts awarded through several different corporate entities. Montgomery's problems with the CIA did not stop him from peddling variations of his technology to one government agency after another. The secrecy that surrounded his work once again worked in his favor. CIA officials were reluctant to tell their Pentagon counterparts much about their experiences with Montgomery, so Defense Department

officials apparently did not realize that his technology was considered suspect at CIA headquarters.

In February 2004, just two months after the Christmas 2003 airplane scare, eTreppid was awarded a new contract with Special Operations Command. The contract was for both data compression and "automatic target recognition software," Montgomery's purported technology to recognize the faces of people on the ground filmed in videos on Predator drones. Special Operations Command gave eTreppid access to video feeds from Predator drones controlled from Nellis Air Force Base in Nevada. It is not certain how long officials there tested Montgomery's facial recognition technology before realizing that eTreppid had no secret formula for identifying terrorists from Predator drone video feeds. But eventually, Special Operations Command also began to see through Montgomery.

"The technology didn't meet the requirements for us," said a Special Operations Command spokesman drily. Still, there is no evidence that officials at Special Operations Command ever talked with their counterparts at the CIA to check up on Montgomery before awarding him a contract. Special Operations Command paid a total of $9.6 million to eTreppid under its contract with the firm.

★

By late 2005, Dennis Montgomery was in trouble. Employees at eTreppid were becoming more openly skeptical of Montgomery and trying to get access to his secret technology to see if it really existed. For years, Montgomery had somehow managed to hide the truth about his secret work for the government from the small number of employees he had hired. He successfully infused a sense of mystery around himself. He was like the Wizard of Oz, but now people were beginning to try to examine the man behind the curtain.

Sloan Venables, hired by Montgomery to be eTreppid's director of research and development, later told the FBI that another employee, Patty Gray, began to suspect that Montgomery "was doing something other than what he was actually telling people he was doing." Venables added in his statement to the FBI that he knew that "Montgom-

logy was considered

Christmas 2003 air-
ct with Special Op-
ta compression and
omery's purported
1e ground filmed in
mmand gave eTrep-
ontrolled from Nel-
long officials there
gy before realizing
ing terrorists from
al Operations Com-

for us," said a Spe-
:here is no evidence
er talked with their
try before awarding
a total of $9.6 mil-

ible. Employees at
f Montgomery and
: if it really existed.
to hide the truth
1e small number of
a sense of mystery
it now people were
irtain.

reppid's director of
another employee,
is doing something
e was doing." Ven-
w that "Montgom-

---

ery promised products to customers that had not been completed or
even assigned to programmers."

At the same time, Montgomery was arguing with Warren Trepp
over money; Montgomery needed cash and claimed that Trepp had
shortchanged him on his share of the revenue from eTreppid's con-
tracts. In December 2005, Montgomery asked Trepp for a personal
loan of $275,000, on top of the $1.375 million Trepp had already
loaned him since 1999, according to court documents. This was too
much for Trepp, who finally became fed up with Montgomery.

But Montgomery moved first. Over the Christmas holidays,
Montgomery allegedly went into eTreppid's offices and deleted all of
the computer files containing his source code and software develop-
ment data, according to court documents. He broke with Trepp, left
eTreppid, and began looking for new backers. Trepp soon discovered
that Montgomery had asked yet another casino host at the El Dorado
if he knew of any wealthy gamblers who would be willing to invest
$5 to $10 million in a new business he was about to launch. Trepp
later told the FBI that on his way out the door at eTreppid, Montgom-
ery screamed at one employee, "You're an asshole and I will see you
again!"

Trepp was furious. According to court documents, he told the FBI
that Montgomery had stolen the software eTreppid had used on se-
cret Pentagon contracts. As federal investigators moved in to investi-
gate the alleged theft of the technology, they heard from Trepp and
others that Montgomery's alleged technology wasn't real. Yet they
doggedly kept probing Montgomery's theft of secret technology, and
even raided Montgomery's home searching for the computer codes,
all the while largely ignoring the evidence that he had perpetrated a
hoax.

After their partnership broke up, Montgomery and Trepp re-
mained locked in a series of nasty and lingering legal battles. The
worst involved Montgomery's allegations that Jim Gibbons, the Ne-
vada Republican congressman whom he had met at Wayne Prim's
house, had received bribes from Warren Trepp in return for help-
ing eTreppid to obtain defense contracts. Montgomery's accusations
were explosive because they became public just as Gibbons was be-

GREED

ing elected governor of Nevada. They helped to trigger a federal corruption investigation, but the inquiry was eventually shelved amid questions about whether e-mails that Montgomery claimed showed that Gibbons had accepted money and a Caribbean cruise in exchange for help in winning contracts for eTreppid—and thus supposedly provided evidence of bribery—may have been forgeries. Dennis Montgomery was widely suspected of having fabricated the e-mails in an effort to damage both Trepp and Gibbons.

In 2008, Abbe Lowell, the Washington attorney representing Gibbons, announced that Gibbons had been cleared of wrongdoing and that prosecutors had told him that he would not be charged in the corruption investigation. Lowell said, "It should be crystal clear that the only persons who should be investigated or charged are those who made false allegations of wrongdoing and who tried to fuel this investigation for their own private purposes," according to an account of his statement in the Associated Press. Gibbons added that "today, I am exceedingly pleased that the FBI and the Justice Department have vindicated me from the allegations and claims of Mr. Montgomery."

*

Montgomery was able to recover from his battle with Trepp once he landed another wealthy patron, Edra Blixseth, the wife of billionaire Tim Blixseth. Tim Blixseth had made his fortune in timber land swaps in the Pacific Northwest, and then turned his focus to developing a mountain resort for the uber-rich in Montana called the Yellowstone Club. Set in the Rocky Mountains not far north of Yellowstone National Park, the 13,600-acre club was said to be the only private ski resort in the world. It attracted jet-setters who were willing to pay to avoid mixing with the rabble at public ski resorts.

Developing the Yellowstone Club helped to secure for Tim Blixseth the ultimate status symbol—a spot on the Forbes 400. Tim and Edra enjoyed all of the perks of the super-rich—among many other things, they owned a private jet, a yacht, and a massive estate in Rancho Mirage, California, called Porcupine Creek, which came with its own private golf course. Their wealth and ownership of the Yellow-

*The Emperor of the War on Terror*

gger a federal cor-
ally shelved amid
y claimed showed
cruise in exchange
as supposedly pro-
es. Dennis Mont-
the e-mails in an

representing Gib-
f wrongdoing and
be charged in the
crystal clear that
rged are those who
l to fuel this inves-
g to an account of
ded that "today, I
Department have
r. Montgomery."

rith Trepp once he
wife of billionaire
timber land swaps
as to developing a
ed the Yellowstone
f Yellowstone Na-
te only private ski
re willing to pay to

cure for Tim Blix-
rbes 400. Tim and
mong many other
sive estate in Ran-
tich came with its
hip of the Yellow-

stone Club also meant that the Blixseths were networking with some of the most famous and powerful people in the world, from Bill Gates to Jack Kemp to Benjamin Netanyahu.

Edra Blixseth was Dennis Montgomery's latest mark. After being introduced to him by a former Microsoft executive and then hearing Montgomery explain his software, she agreed in 2006 to bankroll Montgomery to launch a new company, to be called Blxware. Montgomery needed new government contracts for Blxware, and Edra Blixseth had the money and contacts to try to make it happen. Jack Kemp, the former congressman and onetime Republican vice presidential candidate, was a member of the Yellowstone Club, and in 2006 he helped to arrange a White House meeting for Montgomery to push his technology. Thanks to Kemp, Montgomery met with Samantha Ravich, a national security aide to Vice President Dick Cheney, who was an old friend of Kemp. Montgomery explained his technology to Ravich and then tried to convince her that Cheney should support his bid for more government funding. But unlike other officials who had dealt with Montgomery in the past, Ravich demanded proof. She told Montgomery that she could not do anything for him unless some technical experts in the government vouched for his technology. He was never able to get anyone from the Pentagon to call Ravich on his behalf, and so she dropped the matter. She said in an interview that she never tried to help him obtain any new government business.

Montgomery also sought to convince Israeli officials to use his technology, but, like Samantha Ravich, the Israelis were unimpressed and rejected his offer. Still, Montgomery continued to find ways to get Pentagon contracts. He says that his technology was often used to provide targeting information in raids in Iraq and Afghanistan, and that he was given access to the Predator Operations Center at Nellis Air Force Base—a sign that his work was playing a role in Predator strikes. "Months of testing and validation at Nellis," as well as at other bases, "confirmed the value of the technology," insists Montgomery.

Edra Blixseth refused a request for an interview.

★

GREED

Montgomery continued to get defense contracts even during the Obama administration. In 2009, Montgomery was awarded another air force contract, and later claimed that he had provided the government with warning of a threatened Somali terrorist attack against President Obama's inauguration. Joseph Liberatore, an air force official who described himself as one of "the believers" in Montgomery and his technology, e-mailed Montgomery and said he had heard from "various federal agencies thanking us" for the support Montgomery and his company provided during Obama's inauguration. The threat, however, later proved to be a hoax.

&#42;

Inevitably, Montgomery had a falling out with Edra Blixseth. He then turned to Tim Blixseth to invest and back his operation. By then, Tim and Edra Blixseth were going through an extremely bitter divorce, and Montgomery became caught up in their legal battles. Mysteriously, government lawyers sometimes sought to intervene in their court cases, with vague references to the need to keep classified information stemming from Montgomery's work with the intelligence community out of the public record.

When Montgomery approached him, Tim Blixseth had no intention of giving money to Montgomery, his ex-wife's erstwhile partner. Blixseth was interested in finding out what Montgomery was really doing, however, and so he played along when Montgomery called desperate for money. At one point, Montgomery's wife even called Blixseth to plead for help with bail after Montgomery was arrested for passing bad checks at Caesar's Palace in Las Vegas. (Eventually, Montgomery was forced into personal bankruptcy proceedings.) Blixseth refused to help but kept talking to Montgomery.

In 2010, Blixseth finally went to see Montgomery's latest computer software operation, hidden away in a nondescript warehouse near Palm Springs. Blixseth says that throughout the darkened office, Montgomery had mounted at least eight large-screen televisions, all tuned to Al Jazeera and all tied in to a computer in the middle of the room.

Dennis Montg
ing technology to
given up on his se
Blixseth took in tl
his Al Jazeera dat

In fact, Mont
wavering. He clai
network broadca
Olympics in the s

Today, Dennis M
that his technolc
tive and valuable
NSA contractor E
domestic surveill
me that he could
that he had been
top U.S. intellige
erations.

But Montgon
his assertions."

&#42; Eric Lichtblau and
Aram Roston also wr

*The Emperor of the War on Terror*

ts even during the
as awarded another
rovided the govern-
orist attack against
ore, an air force of-
vers" in Montgom-
d said he had heard
the support Mont-
s inauguration. The

a Blixseth. He then
ation. By then, Tim
ely bitter divorce,
il battles. Mysteri-
intervene in their
keep classified in-
th the intelligence

seth had no inten-
erstwhile partner.
gomery was really
gomery called des-
le even called Blix-
y was arrested for
Eventually, Mont-
eedings.) Blixseth

nery's latest com-
script warehouse
e darkened office,
en televisions, all
the middle of the

Dennis Montgomery was once again using his top-secret decoding technology to scour Al Jazeera broadcasts. Montgomery had not given up on his secret project, despite being abandoned by the CIA. As Blixseth took in the bizarre scene, Montgomery proudly told him that his Al Jazeera data was all being fed "straight to the Pentagon."

In fact, Montgomery says that his focus on Al Jazeera was unwavering. He claims that he recorded every minute of Al Jazeera's network broadcast nonstop from February 2004 until the London Olympics in the summer of 2012. "That's over 8 billion frames."

★

Today, Dennis Montgomery continues to argue that he is not a fraud, that his technology is genuine, and that he performed highly sensitive and valuable work for the CIA and the Pentagon. After former NSA contractor Edward Snowden leaked documents about the NSA's domestic surveillance operations in 2013, Montgomery suggested to me that he could provide the documents that would prove not only that he had been telling the truth, but that he had also been used by top U.S. intelligence officials in highly questionable intelligence operations.

But Montgomery has never provided the documents to back up his assertions.*

---

\* Eric Lichtblau and James Risen reported about Montgomery for the *New York Times*. Aram Roston also wrote an excellent story about Montgomery for *Playboy* magazine.

Exhibit B

# Klayman Law Firm

2020 Pennsylvania Avenue, N.W., Suite 800, Washington, DC 20006-1811 ❖ Telephone: (310) 595-0800 ❖ leklayman@gmail.com

VIA FEDERAL EXPRESS AND CERTIFIED MAIL

January 14, 2015

 **URGENT**

Linda K. Zecher
President, Chief Executive Officer and Director

William Bayers
Executive Vice President and General Counsel

Houghton Mifflin Harcourt
222 Berkeley Street
Boston, MA 02116

## Re: Defamation of Dennis Montgomery in "Pay Any Price" by James Risen.

Dear Ms. Zecher and Mr. Bayers:

I am counsel for Dennis Montgomery.

My client has brought it my attention that the recent publication of "Pay Any Price," written by James Risen, is defamatory. In a later correspondence, I will outline in detail all of the defamatory statements, which are actionable as libel per se. And because Mr. Montgomery is not a public figure, in fact having worked with various intelligence agencies and The White House, he was "undercover" given his duties and responsibilities in gathering intelligence concerning various matters related to terrorism. Thus, to prove a case for defamation, which we will file in Florida if this matter cannot be resolved, one need not even show malice, although it arises in any event from libel per se.

In Risen's book, as just one example of the defamatory conduct, he writes at pages 32-33:

> Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money.

Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it. The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in a series of civil lawsuits involving Montgomery.

It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes.

A former medial technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing scope, he still had die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Montgomery was a fake, and who rejected the notion that the super-secret computer software that he foisted on the Pentagon and CIA was anything other than America's salvation.

It is therefore clear that Houghton Mifflin Harcourt, in order to fact-check Risen's statements to responsibly exercise due diligence, even assuming that Risen's statements are not defamatory, would have had to have had access to top secret highly classified information. However, for you the publisher, to have access to this information, without the authorization of the government, would constitute crimes.

Thus, I want to understand how you fact checked Risen before you both decided to defame my client and how, after publication of his book, you furthered Risen's continuing defamatory statements in the print, television and radio media. In short, you not only have corporate and personal significant civil liability to my client, but have you also collectively engaged what is in effect a criminal enterprise for profit.

If you would like to discuss this matter before Mr. Montgomery takes other avenues of redress, please contact me immediately. I am available to meet with you at the end of this month if such a meeting could prove productive to try to resolve this serious matter. Let me know if there is an interest by January 20, 2015 to discuss how you fact-checked Risen's statements; otherwise we will contact the Federal Bureau of Investigation and seek other suitable redress.

Although I am representing Mr. Montgomery in my private capacity, as also a public interest advocate, there is a duty and responsibility on my part not to accede to top secret classified

information being strewn all over the public record, particularly given the rise of Islamic terrorism in recent months and the even heightening risks this presents to the this nation and the free world.

Please govern yourselves accordingly.

Sincerely,

Larry Klayman

cc:     Dennis Montgomery
        James Risen



**Houghton
Mifflin
Harcourt**

David Eber
Vice President
Associate General Counsel

January 20, 2015

VIA U.S. MAIL AND ELECTRONIC MAIL

Larry Klayman
Klayman Law Firm
2020 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC  20006-1811
leklayman@gmail.com

      Re: *Pay any Price*, by James Risen

Dear Mr. Klayman:

      We have received your letter dated January 14, 2015, to Linda Zecher and William Bayers at Houghton Mifflin Harcourt Publishing Company ("HMH").

      We deny your allegations that *Pay any Price* contains defamatory statements concerning your client Dennis Montgomery, or that HMH or Mr. Risen engaged in any criminal conduct in preparing and vetting the book.  We also decline your invitation to meet to discuss HMH's manuscript review processes.

                              Sincerely,

                              David Eber

cc:     William Bayers
        James Risen

# Klayman Law Firm

2020 Pennsylvania Avenue, N.W., Suite 800, Washington, DC 20006-1811 ⊗   Telephone: (310) 595-0800 ⊗   leklayman@gmail.com

Via Fax and Mail

February 13, 2015

Mr. William Bayers, Esq.
General Counsel
Houghton Mifflin Harcourt Publishing Company
222 Berkeley Street, FL 1-11
Boston, Massachusetts 02116

Mr. James Risen
c/o The New York Times
1627 "I" Street N.W., Suite 700
Washington, D.C. 20006-4007

Mr. James Risen
c/o Houghton Mifflin Harcourt Publishing Company
222 Berkeley Street, FL 1-11
Boston, Massachusetts 02116

Re:   **Demand for Retraction of Defamation Pursuant to § 770.02 Florida Statutes (2012)**

Dear Mr. Bayers and Mr. Risen:

I am writing as legal counsel for Mr. Dennis Montgomery, who is the subject of Chapter 2 and other portions of a book published by Houghton Mifflin Harcourt Publishing Company titled "Pay Any Price: Greed, Power and Endless War" authored by James Risen.

This letter is to place you on notice pursuant to § 770.02 Florida Statutes (2012) "Notice condition precedent to action or prosecution for libel or slander" that you have published statements concerning our client Dennis Montgomery which constitute defamation *per se*, general defamation and defamation by inference (hereafter "defamatory statements").

You are now on notice that these materials have resulted in severe damage to Dennis Montgomery personally and in his trade and profession, for which you may be held to account for legally.

Your defamatory statements were first and continue to be published in a book with publication date October 14, 2014, by Houghton Mifflin Harcourt Publishing Company at 215 Park Avenue South, New York, New York 10003, under the title "Pay Any Price: Greed, Power and Endless War" (referred to as "the Book) by author James Risen, Copyright (c) 2014 by James Risen, designated by the Library of Congress by its index system as ISBN 978-0-544-34141-8 (hardback edition).

Retraction Letter
February 13, 2015
Page | 2

The publication dated October 14, 2014, was the first publication of the book worldwide in any language and the first printing run of the book. The book was physically printed in the United States of America. We understand that copies of the Book were distributed to bookstores and/or the public up to a week or two earlier than the designated date of publication (a book's designated publication date being primarily of marketing significance, not necessarily the earliest date of a book's release).

Apart from the book itself, James Risen on behalf of himself and the publisher also engaged in a flurry of news interviews and talk show interviews starting in September, and continuing until the present time, associated with the publication 'roll out' of his book in which Risen made further statements in addition to the words of the book itself and repeated claims from the book itself.

Many of Risen's libelous and slanderous statements were made during written news and talk show interviews in September 2014, October 2014, and November, 2014, and since then, some spoken, some in print, surrounding the publication of his book rather than in the book itself.

Your defamatory statements against Dennis Montgomery are exceedingly numerous, extensive, detailed, and often each defamatory in numerous respects. Many statements each include multiple and overlapping topics of defamation against Dennis Montgomery.

As a result, we have attached as "Attachment A" to this letter a 28-page restatement, summary, and analysis of at least 43 examples of defamatory statements. We expect that James Risen also made other statements during additional radio, television, and print interviews about the Book.

You are now on notice that this article resulted in severe damage to Mr. Montgomery personally and in his trade and profession, for which you all will be held to legally account for.

We demand that you issue a retraction immediately. In your previous letter of January 20, 2015, you denied that any defamatory statements were made. We strongly suggest that you reconsider. Please govern yourselves accordingly.

Sincerely,

Larry Klayman

cc: Dennis Montgomery

## ATTACHMENT A

## LIST OF EXAMPLES OF DEFAMATORY STATEMENTS, COMMENTS

## DEFAMATION *PER SE*

1.       The following statements are "*defamatory per se,*" recognized under Florida law

when statements are so powerful in their ability to hurt someone that Florida law presumes

harmful as a matter of law. *Montgomery v. Knox*, 23 Fla. 595, 3 So. 211, 217 (1887), such that a

judge will allow damages to be awarded in these cases even if no evidence of harm has been

presented. "[T]he law presumes malice in their utterance," *Abraham v. Baldwin*, 52 Fla. 151, 42

So. 591, 592 (1906), where the words are "… of such common notoriety established by the

general consent of men, that the courts must of necessity take judicial notice of its harmful

effect." *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 236 (1933).  [1]

2.       **First, on Page 32 of the Book, Risen writes:** [2]

"Consider the example of Dennis Montgomery.  He provides a
perfect case study to explain how during the war on terror greed and
ambition have been married to unlimited rivers of cash to create a
climate in which someone who has been accused of being a con
artist was able to create a rogue intelligence operation with little or
no adult supervision. Crazy became the new normal in the war on
terror, and the original objectives of the war got lost in the process."

3.       As libel *per se*, Risen asserted that out of "greed" Montgomery "create[d] a rogue

intelligence operation with little or no adult supervision and that he was "someone who has been

accused of being a con artist."

---

[1]      Examples of defamation *per se* include those that hurt one's profession, business or trade;
falsely state that a person has a socially unacceptable illness or disease;  or falsely state that a
person has been involved in some kind of criminal activity.  *Lawnwood Medical Center Inc. v.
Sadow*, 43 So. 3d 710, 729 (Fla. 4th DCA 2010).
[2]      Note that several statements may qualify under different theories, but are presented in full
for proper context.  Some statements are repeated for that portion of the statement that qualifies
under different theories of defamation under Florida law.

4.      **Second, on Page 32 of the Book, the Risen writes:**

"Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money. Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it**.** The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in public, a series of civil lawsuits involving Montgomery.  It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes."

5.      As libel *per se*, Risen asserted Montgomery's work "many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic."

6.      As libel *per se*, Risen asserted about the Montgomery that "once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it …"

7.      **Third, on Page 33 of the Book, Risen writes:**

"A former medical technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing

scope, he still had die-hard supporters in the government who
steadfastly refused to believe the evidence suggesting that
Montgomery was a fake, and who rejected the notion that the
super-secret computer software that he foisted on the Pentagon and
CIA was anything other than America's salvation."

8.      As libel *per se*, Risen asserted that Montgomery's work "now appears to have

been an elaborate hoax."

9.      As libel *per se*, Risen asserted that "die-hard supporters in the government who

steadfastly refused to believe the evidence suggesting that Montgomery was a fake."

10.     As libel *per se*, Risen asserted that he "that he foisted on the Pentagon and CIA"

super-secret computer software.

11.     **Fourth, on Page 34 of the Book, the Risen writes:**

"Montgomery was an overweight, middle-aged, incorrigible gambler,
a man who liked to play long odds because he was convinced that he
could out-think the house. He once boasted to a business partner that
he had a system for counting an eight-deck blackjack shoe, quite a
difficult feat for even the best card sharks, and he regularly tested his
theories at the El Dorado and the Peppermill Casino in Reno. He
usually came up short but that didn't stop him from playing blackjack
on a nightly basis, racking up unwieldy debts that eventually led to his
2010 arrest for bouncing more than $ 1 million in bad checks at
Caesar's Palace in Las Vegas."

12.     As libel *per se*, Risen asserted about the Montgomery that he was an "incorrigible

gambler," meaning in effect that Montgomery was a gambling addict who was "playing

blackjack on a nightly basis."  Historically, gambling and in particular an uncontrollable

gambling addict is a loathsome social status.

13.     *Fifth,* **on Page 36 of the Book, Risen writes:**

"Michael Flynn, Montgomery's former lawyer— who later
concluded that Montgomery was a fraud."

3

14.     As libel *per se*, Risen asserted about the Montgomery that Montgomery's lawyer

"concluded that Montgomery was a fraud."

15.     **Sixth, on Page 37 of the Book, Risen writes:**

> "By the spring and summer of 2003, eTreppid was awarded contracts
> by both the air force and U.S. Special Operations Command.
> Montgomery was able to win over the government in part by offering
> field tests of his technology —tests that former employees say were
> fixed to impress visiting officials. Warren Trepp later told the FBI
> that he eventually learned that Montgomery had no real computer
> software programming skills, according to court documents that
> include his statements to the FBI. Trepp also described to federal
> investigators how eTreppid employees had confided to him that
> Montgomery had asked them to help him falsify tests of his object
> recognition software when Pentagon officials came to visit. Trepp
> said that on one occasion, Montgomery told two eTreppid employees
> to go into an empty office and push a button on a computer when they
> heard a beep on a cell phone. Meanwhile, Montgomery carried a toy
> bazooka into a field outside eTreppid. He was demonstrating to a
> group of visiting U.S. military officials that his technology could
> recognize the bazooka from a great distance."

16.     As libel *per se*, Risen asserted about Montgomery that he committed fraud

including defrauding the U.S. Government, prohibited under the False Claims Act codified at 31

U.S.C. §§ 3729 – 3733.

17.     **Seventh, on Page 37 of the Book, Risen writes:**

> "After he was in place in the field, he used a hidden cell phone to
> buzz the cell phone of one the eTreppid employees, who then pushed
> a key on a computer keyboard, which in turn flashed an image of a
> bazooka on another screen prominently displayed in front of the
> military officers standing in another room, according to court
> documents. The military officers were convinced that Montgomery's
> computer software had amazingly detected and recognized the
> bazooka in Montgomery's hands. (Montgomery insists that the
> eTreppid employees lied when they claimed that he had asked them to
> fix the tests, and also says that the air force issued a report showing
> that it had verified the tests.)"

18.     As libel *per se*, Risen asserted about Montgomery that he committed fraud including defrauding the U.S. Government, prohibited under the False Claims Act codified at 31 U.S.C. §§ 3729 – 3733.

19.     ***Eighth*, on Page 40 of the Book, Risen writes:**

> "Montgomery brilliantly played on the CIA's technical insecurities as well as the agency's woeful lack of understanding about al Qaeda and Islamic terrorism. He was able to convince the CIA that he had developed a secret new technology that enabled him to decipher al Qaeda codes embedded in the network banner displayed on the broadcasts of Al Jazeera, the Qatar-based news network. Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks. And only he had the technology to decode those messages, thus saving America from another devastating attack. The CIA— more credulous than Hollywood or Las Vegas— fell for Montgomery's claims. In short, he convinced CIA officials that he could detect terrorist threats by watching television."

20.     As libel *per se*, Risen asserted about Montgomery that "Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks."

21.     As libel *per se*, Risen asserted about Montgomery that he defrauded the CIA.

22.     ***Ninth*, on Page 42 of the Book, Risen writes:**

> "A CIA official defensively pointed out that the agency did not actually have a contract with eTreppid at the time Montgomery was providing data from the Al Jazeera videotapes. While they were working closely together during the final months of 2003, the CIA had not yet started paying Montgomery, the official said. The agency never finalized a contract with him because agency staff eventually realized they had been conned, according to this official. But that does not diminish the fact that for a few crucial months, the CIA took Montgomery and his technology very seriously."

23.     As libel *per se*, Risen asserted about Montgomery that "agency staff eventually realized they had been conned, according to this official."

24. ***Tenth,*** **on Page 46 of the Book, the Risen writes:**

"It did not take long for the French firm to conclude that the whole thing was a hoax.  The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers.  The firm reported back to the French government that the supposed intelligence was a fabrication."

25. As libel *per se*, Risen asserted about Montgomery that "the whole thing" (Montgomery's work) "was a hoax" and a "fabrication."

26. ***Eleventh,*** **on Page 46 of the Book, the Risen writes:**

"The CIA never investigated the apparent hoax nor examined how it had been handled inside the agency. No one involved in promoting Montgomery, in vouching for his information to the president, or in proposing to shoot down planes based on his claims ever faced any consequences."

27. As libel *per se*, Risen asserted about Montgomery that his work was a hoax.

28. ***Twelfth,*** **on Page 47 of the Book, the Risen writes:**

"At the time of the Christmas 2003 scare, John Brennan was head of the newly created Terrorist Threat Integration Center and in charge of distributing terrorism-related intelligence throughout the government. That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration. But Brennan was never admonished for his role in the affair. After Barack Obama became president, Brennan was named to be his top counterterrorism advisor in the White House. He later became CIA director."

29. As libel *per se*, Risen asserted about Montgomery that "That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration."

30. ***Thirteenth,*** **on Page 50 of the Book, Risen writes:**

"Edra Blixseth was Dennis Montgomery's latest mark. After being introduced to him by a former Microsoft executive and then hearing Montgomery explain his software, she agreed in 2006 to bankroll Montgomery to launch a new company, to be called Blxware.

> Montgomery needed new government contracts for Blxware, and
> Edra Blixseth had the money and contacts to try to make it happen."

31.     As libel *per se*, Risen asserted about Montgomery that "Edra Blixseth was Dennis

Montgomery's latest mark," clearly asserting Montgomery to be a con man.

32.     The libel is false, including because Montgomery owed no stock or ownership in

BLIXWARE so as to be able to make a "mark" of Edra Blixseth.

33.     ***Fourteenth,*** on November 6, 2014, James Risen appeared as an interview guest

on "The Daily Show with Jon Stewart," by Comedy Central, interviewed by Jon Stewart.

Exhibit A, attached. The television interview was taped at The Daily Show's studio 11th Avenue

between 51st and 52nd Street, New York (Manhattan), New York, and broadcast for the first time

nationwide across the United States of America through cable television and satellite television

on "The Comedy Central" channel.

34.     James Risen stated in said television interview for his statements to be broadcast

on TV that his favorite story is the story of –

> Dennis Montgomery who is this guy was as a computer software
> expert, supposed expert. Who convinced the CIA in 2003 that he had
> the super-secret technology to read Al Jazeera news broadcasts and
> decipher Al Qaeda codes inside the [interrupted by Jon Stewart]
>
> [Jon Stewart]  An Enigma machine for Al Qaeda...?
>
> [Dennis Montgomery] Right.  And he convinced the CIA in 2003 that
> he could read numbers and letters hidden in the Al Jazeera broadcasts
> that corresponded with flights that Al Qaeda was going to shoot down,
> knock--- or blow up….
>
> President Bush was so convinced of this that they grounded flights all
> over the world at Christmas 2003 based on this guy's intelligence or
> supposed intelligence.  It took the French intelligence service, who had
> gotten very mad because they grounded flights from Paris to Los
> Angeles.  And they demanded that the CIA tell them where they were
> getting this information.    And so they finally [non-verbal

interruption].  They finally got the information.   The French told them this is a hoax.  This is a fabrication.

And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it.  And Montgomery kept getting more contracts after that.

[Other, extended discussion with Jon Stewart on other topics]

There is lots of raw intelligence every day that says there is an attack about to happen.   You really have to be a pretty sophisticated consumer of intelligence after several years to begin to realize what's real and what's not really a credible threat.

35.     As libel *per se*, Risen asserted about Montgomery that "he convinced the CIA in 2003 that he could read numbers and letters hidden in the Al Jazeera broadcasts that corresponded with flights that Al Qaeda was going to shoot down, knock---  or blow up….

36.     As libel *per se*, Risen asserted about Montgomery that "The French told them this is a hoax.  This is a fabrication.  And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it.  And Montgomery kept getting more contracts after that."  The statement that "the CIA agreed with them" is Risen's assertion about Montgomery's work that "this is a hoax.  This is a fabrication."

37.     As libel *per se*, Risen asserted about Montgomery that "they covered the whole thing up, and refused to ever talk about it,"  as a way of saying that the CIA had been conned.

38.     ***Fifteenth,*** on October 13, 2014, James Risen gave a television interview [3] with Judy Woodruff which was broadcast nationwide by the Public Broadcasting System (PBS).   In that interview, James Risen made the following statements for broadcast on television, and Judy Woodruff repeated many points from James Risen's book which Risen agreed with and endorsed.  Much of the interview involved other chapters not relevant here.

---

[3]     http://www.pbs.org/newshour/bb/costs-security-price-high/

JUDY WOODRUFF:  In the next chapter, JAMES RISEN, you write about millions of dollars spent on programs that were completely fraudulent.  One was run by a man named Dennis Montgomery.  He was a, He was a .... I guess he had worked in computer software... but he was a GAMBLER! [4]

JAMES RISEN:  Right.

JUDY WOODRUFF:  And he sold the CIA and the Pentagon on technology that turned out to be not at all what he said it was.

JAMES RISEN:   It is difficult to tell in some of these cases who is scamming who.  If you talk to Montgomery, he argues that the CIA wanted him to do what he was doing.  And so its a fascinating dynamic that's developed in the war on terror, between people who recognize the opportunities for this gold rush and the agencies which are... who have so much money to spend now, they're getting so much more money than they ever had before, that in some cases they don't know what to do with.

In this case, they began to believe, in this sort of war fever, that you could find Al Qaeda messages hidden in Al Jazeera broadcasts.  And so that.. that program, that highly secret program, was used to ground planes all over Europe and the United States

JUDY WOODRUFF:  When actually there was nothing to it.

JAMES RISEN:  Right

JUDY WOODRUFF:  It was a hoax.

JAMES RISEN:  Right.  Right.

JUDY WOODRUFF:  And then there was another part of it where he was saying he had special facial recognition software....

JAMES RISEN:  Right.  Right

JUDY WOODRUFF:  ... used on drones?

JAMES RISEN:   Yeah.  There were cases in which people said that he was fooling the military and the CIA about his operations and how... what kind of techniques and technologies he had.  He would argue that the CIA actually wanted him and or the army believed him

---

[4]     Emphasis, by exclamation in tone of voice, the in original conversation.

and tested it.  So it's this very complicated story about a man
recognizing an opportunity who had never been involved in national
security before and the CIA and the military all just hungry for
whoever could come with the latest idea.

39.     As libel *per se*, Risen asserted about Montgomery that "you write about millions of dollars spent on programs that were completely fraudulent.  One was run by a man named Dennis Montgomery," which Risen confirms by saying "Right." (Actually where the discussion is about "the next chapter" that chapter is exclusively about Dennis Montgomery alone.)

40.     As libel *per se*, Risen asserted about Montgomery that "When actually there was nothing to it," which Risen confirms by saying "Right." And also "It was a hoax," which Risen confirms by saying "Right.  Right."

41.     As libel *per se*, Risen asserted about Montgomery that "There were cases in which people said that he was fooling the military and the CIA about his operations and how... what kind of techniques and technologies he had."

42.     **Sixteenth,** on October 24, 2014, James Risen gave an audio interview with Lucy Worsley published on the New York Times website, titled **"Inside The New York Times Book Review: James Risen's 'Pay Any Price'"** which is accessible at that website address. [5]  In this interview  "**Inside The New York Times Book Review**," with Pamela Paul, October 24, 2014, James Risen stated for national broadcast:

> PAMELA PAUL:   How do we count and account for the costs of the
> government's war on terror.  We'll talk to  James Risen, author of Pay
> Any Price:  Greed, Power, and Endless War.

---

[5]     See:  ArtsBeat: Book Review Podcast: James Risen's 'Pay Any Price', by John Williams, New York Times, October 24, 2014, http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/ , based upon Louise Richardson's book review of Risen's book.

JAMES RISEN ("tease" audio clip):   It seems to me that what the war on terror had become in thirteen years was a search for cash and a search for power and status.

PAMELA PAUL:   What is the British fascination with murder? Lucy Worsley will explain all joining us to talk with us about her new book:  The Art of the English Murder.

LUCY WORSLEY ("tease" audio clip):  The public used to consume murder in a way that you can still see the modern media doing it today.  Just look at the Pistorius trial.

PAMELA PAUL:   Alexander Alter will be here with Notes from the Publishing world.  And Greg Cole has bestseller news.  This is "Inside the New York Times Book Review."  I am Pamela Paul.

James Risen joins me now.  His new book is Pay Any Price:  Greed, Power, and Endless War.  Hi James.

JAMES RISEN:   Hi, thanks for having me.

PAMELA PAUL:  Thanks for being here. Now this is a book that covers a lot of territory.  Tell us briefly about what it is you set out to write about in the book.

JAMES RISEN:   What I wanted to do was, I'd written one book before about the war on terror, and I wanted to follow up with a new book that kind of looked at where we were 13 years after 9/11 and how we had what started out in the immediate aftermath of 9/11 as kind of a search for justice or a search for retribution or whatever you want to think, say we were doing right after 9/11 as a country.  It seemed to me that what the war had become in 13 years was a search for cash and a search for power and status and that it was becoming an endless war in which we had a new mercenary class of people who were taking advantage of the war on terror.  And that enormous unintended consequences had happened.  And I began to hear about just some really crazy things that were going on.  And so I thought it would make a good story.

[The discussion then covers the Chapter "Rosetta" not relevant here, concerning a lawsuit for 9/11 families against Saudi Arabia, except the ending]

JAMES RISEN [winds up the Chapter on "Rosetta" by saying]:   .... in the war on terror became so complicated and so difficult to tell what was really going on, to me it was like a case study in how the

war on terror had been turned for other uses, and become a....
something that you could never tell what was the truth and what was
not the truth.  And that to me was at the heart of the problems with the
war on terror, that you could never tell what's real and what was
concoction today.

[The discussion then covers how Risen went about researching the
book, not relevant here]

PAMELA PAUL:   Did a lot of it arise out of stories that, reporting
that you'd originally done for the Times?

JAMES RISEN:   Some of it. For instance, I did a chapter The
Emperor of the War on Terror, about Dennis Montgomery who
[laughs] who's a strange character, who I'd done a story about him for
the New York Times along with Eric Lichtbau my colleague there at
the Times.  He's one of the most fascinating characters in the war on
terror.  He...  He was a computer software expert who convinced the
CIA that he could decipher secret codes from Al Qaeda in the Al
Jazeera news broadcasts.  And that he could tell the CIA numbers and
letters that corresponded with flights that Al Qaeda wanted to attack.
And the CIA took this so seriously that they grounded, that the Bush
Administration grounded a bunch of international flights in Christmas
2003 based on what this guy was telling them.  And when they
realized it was a hoax, they covered the whole thing up and never did
anything about it.  So I had done a story for the Times with....  about
that and then expanded on that and got a lot more information for the
book.

PAMELA PAUL:   How did you find out about him?

JAMES RISEN:   Well he had been written about a little bit before we
wrote about it.  But I had also, even before he was written about by
other people, I had heard from people in the CIA that there was this
crazy operation that nobody wanted to talk about, that they were all
embarrassed by.  To me that, it was like a case study in just how crazy
the war on terror has become. And the only thing that makes sense
about why it's gotten so crazy, is I think we kind of have deregulated
national security and we took all, you know, Cheney said we're going
to take the gloves off.  And that means we deregulated national
security at the same time we poured hundreds of billions of dollars
into counter-terrorism.  And so it's had enormous unintended
consequences from what is essentially a national security crisis that is
kind of like the banking crisis.

[The interview discussion then turns to the alleged deregulation of national security on other topics not relevant here.]

43.     As libel *per se*, Risen asserted about Montgomery that "And when they [the CIA] realized it was a hoax, they covered the whole thing up and never did anything about it."

44.     The libel is false, for the reasons identified above, and including that Montgomery never purported to be an expert in intelligence but left interpretation of the data he uncovered to intelligence experts of the U.S. Government.

45.     **Seventeenth,** James Risen sat for a nationwide television news interview on the television show **DEMOCRACY NOW!** A Daily Independent Global News Hour, with Amy Goodman & Juan González, at 207 W. 25th St., Floor 11, New York, NY 10001 on October 14, 2014.  On this nationwide television news broadcast, the conversation turned to:

**AMY GOODMAN:** Dennis Montgomery?

**JAMES RISEN:** Dennis Montgomery is a fascinating character, who—he was a computer software person, self-styled expert, who developed what he said was special technology that would allow him to do things with computers that other people couldn't do. One of the things that he developed was this imaging technology that he said he could find images on broadcast network news tapes from Al Jazeera. He said that he could read special secret al-Qaeda codes in the banners on the broadcasts of Al Jazeera. And the CIA believed this. And he was giving them information based on watching hours and hours of Al Jazeera tapes, saying that "I know where the next al-Qaeda attack is going to be based—is going to happen." And the Bush administration and the CIA fell for this.

**AMY GOODMAN:** And it was in the news zipper at the bottom of the Al Jazeera broadcasts?

**JAMES RISEN:** Well, he says it was in the banner. But anyway. And so, it was this great—if you talk to him, he argues, well, they— that's what they were looking for. You know, they convinced him to look for this. You know, it depends on who you talk to. But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they

were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts.

And then there's a whole number of other things, like Alarbus, which was this covert program at the Pentagon where a Palestinian involved in that was actually trying to use the bank account set up by the secret program, Pentagon program, to launder hundreds of millions of dollars. And the FBI investigated this, but then tried to keep the whole thing quiet.

**AMY GOODMAN:** How much did the U.S. government give to Dennis Montgomery?

**JAMES RISEN:** Millions of dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that. So, it's a strange—to me, the Dennis Montgomery story is one of the strangest, because what it shows is, early on in the war on terror, as I said, the CIA and all these other agencies had so much money to spend on counterterrorism that they were willing to throw it at everything. They were so afraid of the next terrorist attack that they were willing to believe anybody who came up with some idea. And I called that chapter about Montgomery, you know, "The Emperor of the War on Terror," because nobody wanted to say that the emperor had no clothes.

**AMY GOODMAN:** I mean, it had very real effects, aside from spending all that money.

**JAMES RISEN:** Yeah.

**AMY GOODMAN:** For example, planes being sent back.

**JAMES RISEN:** Yes, yes. There were planes grounded. International flights between the United States and Europe and Mexico were grounded. There was talk at the White House even of shooting down planes based on this information.

**AMY GOODMAN:** Because they could be used, as with September 11th, as weapons?

**JAMES RISEN:** Yeah, as missiles or whatever. And so, it was crazy. It was absolutely insane.

**AMY GOODMAN:** And it was only the French government who then did a study?

14

**JAMES RISEN:** Yes, yes. Yeah, the French government finally—you know, the U.S.—the CIA and the Bush administration didn't want to tell anybody what was really happening, where they were getting this information. You know, "This supersecret information about Al Jazeera, we can't tell you." And finally, the French intelligence service and the French government said, "You know, you're grounding our planes. You've got to tell us where you're getting this information." And they got—they finally shared the information with them, and the French got a French tech firm to look at this, and they said, "This is nuts. This is fabrication." And after a while, the CIA was finally convinced maybe the French were right, and they stopped talking about it. They didn't do anything else. They just like shut it down eventually, but never wanted to talk about what had really happened.

**AMY GOODMAN:** Then Dennis Montgomery, revealed as a con man—

**JAMES RISEN:** Yeah, yeah.

**AMY GOODMAN:** —in jail for that?

**JAMES RISEN:** Well, no, he's not in jail. But it was a—he actually got more contracts after that, with the Pentagon and other agencies. And he continued to operate for a long time. You know, he kind of went from one agency to the other.

**AMY GOODMAN:** We're talking to James Risen, Pulitzer Prize-winning investigative journalist for *The New York Times*. His new book, just out today, *Pay Any Price: Greed, Power, and Endless War*. When we come back, war corrupts, endless war corrupts absolutely. Stay with us.

[break]

46.     As libel *per se*, Risen asserted about Montgomery that "But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts."

47.     As libel *per se*, Risen asserted about Montgomery when asked "How much did the U.S. government give to Dennis Montgomery?" Risen answered in reply: "Millions of

dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that."

48.    As libel *per se*, Risen asserted about Montgomery that "the French got a French tech firm to look at this, and they said, 'This is nuts. This is fabrication.'"

49.    As libel *per se*, Risen asserted about Montgomery when asked "Then Dennis Montgomery, revealed as a con man—" Risen confirmed in reply: "Yeah, yeah."

50.    As libel *per se*, Risen asserted about Montgomery that he should be in jail.

51.    ***Eighteenth***, James Risen gave an interview with "Conversations with Great Minds" of "The Big Picture RT with talk show host Thom Hartmann on October 24, 2014. [6]

> THOM HARTMAN:   ...  [Abrupt change of topic starting at about time 5:27]  ...  There's just this enormous amount of government money.  Let's throw it at the private sector.  They'll make things well.  One of the members of the private sector who came forward and said I've got a secret, I can figure this stuff out, was a guy by the name of Dennis Montgomery.
>
> JAMES RISEN:   Right.  Uh, Dennis Montgomery is one of the best stories in the war on terror.  I think somebody should make a movie about him.  Dennis Montgomery was a computer software expert who said that he had developed technology that basically could find objects hidden in the video on television.  And so he convinced, through a whole series of contacts and meetings that I detail in the book, he was able to get to the CIA  and convince the CIA that he had the technology to decipher Al Qaeda codes that were he said were hidden in Al Jazeera news broadcasts.
>
> THOM HARTMAN:   They were hidden in the Chiron or the --
>
> JAMES RISEN:   In the banner.  In the banner, actually.  He said that he could find numbers and letters that were constantly showing up, or not showing up but were being hidden, embedded deeply in the video. And he would then give these  numbers and letters to the CIA.  And the CIA, either he told them or they convinced themselves that these numbers and letters corresponded to flights, international airline flights, that Al Qaeda was going to attack.  And so in December, in Christmas

---

[6]    https://www.youtube.com/watch?v=jc_8f4Pp9Zc

2003, the Bush Administration and the CIA took this so seriously that they actually grounded a whole series of international flights coming into and out of the United States, and the White House even considered shooting down some of these flights over the Atlantic.

THOM HARTMAN:   Whoa.

JAMES RISEN:    And once the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist and that these supposed Al Qaeda codes weren't really in the Al Jazeera newscasts, the CIA covered the whole thing up and never went public with it  and just tried to act like it never happened.

THOM HARTMAN:   Well we know how aggressively this and particularly the Obama Administration right now has gone after whistleblowers and reporters.  You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison.

JAMES RISEN:   Well, no, he ended up getting more contracts from the military... and the Pentagon.  And he was continuing, he continued to operate for several years.  It's really a remarkable story.

THOM HARTMAN:   Yeah, it really and truly is.

[Topic changes abruptly to discussions of torture in the war on terror]

52.      As libel *per se*, Risen asserted about Montgomery that "the CIA later was

convinced by French intelligence that this was all a fabrication and that this kind of technology

didn't exist."

53.      As libel *per se*, Risen asserted about Montgomery that he belongs in prison,

responding to the question "You would think they would also go after people who had scammed

the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you,

and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis

Montgomery, you'd think he would end up in prison," by Risen answering in reply:  "Well, no,

he ended up getting more contracts from the military... and the Pentagon.  And he was continuing, he continued to operate for several years.  It's really a remarkable story."

## **GENERAL DEFAMATION**

54.     In addition, Risen also made additional defamatory statements that are explicit defamation under Florida law.

55.     *Nineteenth,* **on Page 49 of the Book, Risen writes:**

> "Trepp was furious. According to court documents, he told the FBI that Montgomery had stolen the software eTreppid had used on secret Pentagon contracts. As federal investigators moved in to investigate the alleged theft of the technology, they heard from Trepp and others that Montgomery's alleged technology wasn't real."

56.     As explicit libel, Risen asserted about Montgomery that Montgomery had stolen valuable software – yet also asserted that the software "wasn't real."

## **DEFAMATION BY IMPLICATION UNDER FLORIDA LAW**

### **Analogous to False Light**

57.     For defamation by implication: " . . . [L]iterally true statements can be defamatory where they create a false impression. This variation is known as defamation by implication and has a longstanding history in defamation law." *See Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008). Defamation by implication occurs when a publication states facts that are literally true, but produces a defamatory meaning apparent from a plain reading of the publication in its entirety. See *Chapin v. Knight-Ridder, Inc.* 993 F.3d 1087 (4th Cir. 1993).

58.     Montgomery thus claims here that if the Court finds that any of the statements labeled "First" through "Nineteenth" do not qualify as defamation *per se* or general defamation,

then in the alternative Montgomery claims here that any and all such statements not qualifying as defamation *per se* or general defamation are defamation by implication against Montgomery.

59.     Across the many examples of libelous statements from the Book or slanderous interviews, Risen implies that Montgomery deceived the U.S. Government as to the meaning, purpose, or interpretation of hidden data and clues that Montgomery uncovered, implying that Montgomery defrauded and conned the U.S. Government.

60.     In fact, Montgomery refused to speculate as to the interpretation or meaning of the data and analyses he uncovered, even when pressed to state what he thought the data might mean, but Montgomery left the role of interpretation to U.S. Government intelligence experts.

61.     Thus, throughout the statements presented herein, Risen libels and slanders Montgomery by implication that Montgomery defrauded and scammed the U.S. Government concerning the meaning of the information Montgomery uncovered, implying that Montgomery obtained millions of dollars by frightening and fooling child-like and gullible CIA officials.

62.     Across the many examples of libelous statements from the Book or slanderous interviews, Risen implies that President George W. Bush's alleged decisions to ground and almost shoot down passenger aircraft around Christmas 2003 (which Risen would have no way of knowing about) were a result of Montgomery's fraud and scams, deceptively manipulating the President of the United States and the U.S. national command authority.

63.     Across the many examples of libelous statements from the Book or slanderous interviews, Risen implies that Montgomery should be in jail.

64.     Among the other statements, in particular, the ***First*** example of libel**, on Page 32 of the Book,** states that:

> "Consider the example of Dennis Montgomery.  He provides a perfect
> case study to explain how during the war on terror greed and ambition

> have been married to unlimited rivers of cash to create a climate in
> which who has been accused of being a con artist was able to
> create a rogue intelligence operation with little or no adult supervision.
> Crazy became the new normal in the war on terror, and the original
> objectives of the war got lost in the process."

65.   Thus, as libel by implication, Risen implies that Montgomery committed fraud

and went to any lengths motivated by greed, to obtain money at any cost.

66.   Among the other statements, in particular, in the ***Eleventh*** example of libel**, on

Page 46 of the Book,** states that:

> "The CIA never investigated the apparent hoax nor examined how it
> had been handled inside the agency."

67.   Here, as libel by implication, even if it is true that "The CIA never investigated"

what Risen describes as an "apparent hoax," the implication is that Montgomery perpetrated a

hoax upon the CIA, and in return for money, which would be both a fraud and a crime.

68.   Similarly, in the ***Sixteenth*** example of slander from an interview, Risen states that

"It seemed to me that what the war had become in 13 years was a search for cash and a search

for power and status and that it was becoming an endless war in which we had a new mercenary

class of people who were taking advantage of the war on terror," implying that Montgomery's

work is fraudulent in being merely an effort to get cash.

69.   Among the other statements, in particular, the ***Nineteenth*** example of libel**, on

Page 49 of the Book,** states that:

> "Trepp was furious. According to court documents, he told the FBI
> that Montgomery had stolen the software eTreppid had used on secret
> Pentagon contracts. As federal investigators moved in to investigate
> the alleged theft of the technology, they heard from Trepp and others
> that Montgomery's alleged technology wasn't real."

70.   As libel by implication, Risen implies that Montgomery stole valuable software

yet at the same time the software was in fact worthless.

71.     In addition, Risen also made additional defamatory statements that are defamation by implication under Florida law.

72.     ***Twentieth,*** **on the Preface Page of the Book, Risen writes:**

> "I've come back," he repeated.  "I was the King of Kafiristan – me and Dravot – crowned Kings we was!  In this office we settled it – you setting there and giving us the books.  I am Peachey – Peachey Taliaferro Carnehan – and you've been setting here ever since – Oh, Lord!"
>
> I was more than a little astonished and expressed my feelings accordingly.
>
> "It's true," said Carnehan, with a dry cackle, nursing his fee, which were wrapped in rags.  "True as gospel.  Kings we were, with crowns upon our head – me and Dravot – poor Dan – oh, poor, poor Dan, that would never take advice, not though I begged of him!"
>
> -- Rudyard Kipling, *The Man Who Would be King.*

73. As libel by implication, Risen implies that Montgomery (along with others addressed in the book) is a fraud and/or con man as in *The Man Who Would be King.*

74. ***Twenty-first,*** **in the Prologue on Page xiv of the Book, Risen writes:**

> "The new homeland security-industrial complex operates differently.  It is largely made up of a web of intelligence agencies and their contractors, companies that mostly provide secret services rather than large weapons systems and equipment.  These contractors are hired to help Washington determine the scale and scope of the terrorist threat; they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end."

75.     As libel by implication, Risen states "they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end," suggesting that Montgomery's and eTreppid's profits were *contingent* upon results, and false results at that.

76.     ***Twenty-second,*** **in the Prologue on Page xv of the Book, Risen writes:**

"Thus, the creation of a homeland security complex at a time of endless war has bequeathed us with the central narrative of the war on terror – modern tales of greed joined hand in hand with stories of abuse of power.  It was inevitable that those wise in the ways of the world would flock to Washington to try to cash in on the war on terror gold rush – and they have.  This book offers just a few of those stories. But those trying to monetize America's obsession with terrorism are not the only ones who have sought to exploit 9/11."

"Opportunism comes in many forms and is driven by more than just greed.  Ambition and a hunger for power, status, and glory have become great engines of post-9/11 opportunism as well.  The more troubling stories here concern abuses of power that have extended across two presidencies for well over a decade.  After 9/11, the United States deregulated national security, stripping away the post-Watergate intelligence reforms of the 1970's that had constrained executive power for thirty years.  The results are morally challenging – and continue to this day."

77.     Thus, as libel by implication, Risen implies that Montgomery committed fraud and went to any lengths motivated by greed, to obtain money at any cost.

78.     ***Twenty-third,*** **in the Prologue on Page xvii of the Book, Risen writes:**

"Washington's global war on terror is now in its second decade, thanks to the bipartisan veneer it has gained under Bush and Obama. It shows no signs of slowing down, hustlers and freebooters continue to take full advantage, and the war's unintended consequences continue to pile up.  All too often, things are not what they seem."

79.     As libel by implication, Risen implies that Montgomery – one of the key objects of the Book – is a "hustler" and a "freebooter."

80.     ***Twenty-fourth,*** **Part 1 of the Book,** including Chapter 2 which is focused entirely on Dennis Montgomery, Risen have labeled "Part 1:  Greed"

81.     Thus, by placing the chapter focused on Dennis Montgomery under a label for the section of the Book of "Greed," Risen libels Montgomery by implication as being motivated by greed to commit fraud and carry out the alleged hoaxes identified in the rest of the Chapter 2.

82. **_Twenty-fifth,_** Risen have labeled Chapter 2 of the Book which is focused entirely on Dennis Montgomery:  "Chapter 2: The Emperor of the War on Terror."

83. By naming the chapter focused on Dennis Montgomery "The Emperor of the War on Terror," Risen libels Montgomery by implication as being the mastermind of the fraud that Risen seeks to portray the war on terror to be.

84. **_Twenty-Sixth,_** **on Page 40 of the Book, Risen writes:**

> "The CIA's Science and Technology Directorate, which had largely been stuck on the sidelines of the war on terror, saw in Dennis Montgomery an opportunity to get in the game.  The directorate had played an important role in the Cold War, but in the first few years of the war on terror, it was struggling to determine how technology could be leveraged against groups of terrorists who were trying to stay off the grid."

85. As libel by implication, again, Risen blames Montgomery for the decisions of government officials.

86. **_Twenty-Seventh,_** **on Page 42 of the Book, Risen writes:**

> "Montgomery was telling the CIA exactly what it wanted to hear.  At the time, the Bush Administration was obsessed with Al Jazeera, not only because of the networks' unrelenting criticism of the invasion of Iraq, but also because it had become Osama Bin Laden's favorite outlet for broadcasting his videotaped messages to the world."

87. As libel by implication, Risen implies that Montgomery defrauded and conned the CIA by "telling the CIA exactly what it wanted to hear."

88. **_Twenty-Eighth,_** **on Page 42 of the Book, Risen writes:**

> "What remains unclear is how Montgomery was able to convince all of them that he had developed secret software that could decode Al Qaeda's invisible messages.  While he had gotten by a few credulous military officers who came to view his demonstrations, he apparently found it just as easy to persuade the CIA as well."

89. As libel by implication, Risen implies that Montgomery conned the U.S. Government

with a hoax.  It would of course be entirely clear "how Montgomery was able to convince all of

them" if Montgomery's work and technology are legitimate.

90. ***Twenty-Ninth,*** **on Page 46 of the Book, Risen writes:**

> "Finally the French brought an end to it.  Since Air France flights
> to the United States were among those that had been grounded,
> French officials had taken a dim view of the entire episode.  They
> began demanding answers from the Americans.  The French
> applied so much pressure on Washington that the CIA was finally
> forced to reveal to French intelligence the source of the threat
> information. Once they heard the story of Dennis Montgomery and
> eTreppid, French officials arranged for a French high-tech firm to
> reverse-engineer Montgomery's purported technology.  The
> French wanted to see for themselves whether the claims of hidden
> messages in Al Jazeera broadcasts made any sense."

91. As libel by implication, if not explicit, the passage implies that Montgomery is a fraud

and that his work is a scam and a hoax.

92. ***Thirtieth,*** **on Page 52 of the Book, Risen writes:**

> "Montgomery continued to get defense contracts even during the
> Obama administration.  In 2009, Montgomery was awarded another
> air force contract, and later claimed that he had provided the
> government with warning of a threatened Somali terrorist attack
> against President Obama's inauguration.  Joseph Liberatore, an air
> force official who described himself as one of "the believers"  in
> Montgomery and said he had heard from 'various federal agencies
> thanking us' for the support Montgomery and his company provided
> during Obama's inauguration.  The threat, however, later proved to be
> a hoax."

93. As libel by implication, Risen implies that Montgomery's ability to continue to receive

contracts is due to Montgomery's ability to defraud the government (and stupidity of government

officials) rather than an endorsement of the legitimacy of Montgomery's work.

94. ***Thirty-First,*** **on Page 31 of the Book, Risen writes:**

> "and a new breed of entrepreneur learned that one of the surest and easiest paths to riches could be found not in Silicon Valley building computers or New York designing clothes but rather in Tysons Corner, Virginia, coming up with new ways to predict, analyze, and prevent terrorist attacks— or, short of that, at least in convincing a few government bureaucrats that you had some magic formula for doing so."

95. As libel by implication, Risen implies that Montgomery engaged in fraud to convince a few government bureaucrats that he had a magic formula as an easy path to riches.

96. ***Thirty-Second,*** **on Page 33 of the Book, Risen writes:**

> "Montgomery's story demonstrates how hundreds of billions of dollars poured into the war on terror went to waste. With all rules discarded and no one watching the bottom line, government officials simply threw money at contractors who claimed to offer an edge against the new enemies. And the officials almost never checked back to make sure that what they were buying from contractors actually did any good— or that the contractors themselves weren't crooks. A 2011 study by the Pentagon found that during the ten years after 9/ 11, the Defense Department had given more than $ 400 billion to contractors who had previously been sanctioned in cases involving $ 1 million or more in fraud."

97. As libel by implication, Risen implies that the money provided to Montgomery (among others) went to "waste."

98. ***Thirty-Third,*** **on Page 33 of the Book, Risen writes:**

> "The Montgomery episode teaches one other lesson, too: the chance to gain promotions and greater bureaucratic power through access to and control over secret information can mean that there is no incentive for government officials to question the validity of that secret information. Being part of a charmed inner circle holds a seductive power that is difficult to resist."

99. As libel by implication, Risen implies that Montgomery's work was fraudulent.

100. ***Thirty-Fourth,*** **on Page 33 of the Book, Risen writes:**

> "How his technology worked was a secret. Dennis Montgomery's computer code became the great treasure behind eTreppid Technologies, the company he and Trepp founded. Later, many of

those around Montgomery began to suspect the reason why Montgomery had to guard his technological innovations so carefully. They came to believe that at least some of the technology didn't really exist."

101.    As libel by implication, Risen implies that Montgomery committed fraud.

102.    ***Thirty-Fifth*, on Page 35 of the Book, Risen writes:**

"Montgomery was on the lookout for somebody to bankroll him, and had put out the word to his friends at the casinos that he frequented the most. A year later, Montgomery and Trepp were in business together. Trepp was one of the first, but hardly the last, to be beguiled by Montgomery's claims that he had achieved breakthroughs in computer technology of historic significance."

103.    As libel by implication, Risen implies that Montgomery "beguiled" Warren Trepp by committing fraud.

104.    ***Thirty-Sixth*, on Page 39 of the Book, Risen writes:**

"For a few months in late 2003, the technology from Dennis Montgomery and eTreppid so enraptured certain key government officials that it was considered the most important and most sensitive counterterrorism intelligence that the Central Intelligence Agency had to offer President Bush. Senior officials at the CIA's Directorate of Science and Technology began to accept and vouch for Montgomery to officials at the highest levels of the government. Montgomery's claims grew ever more expansive, but that only solidified his position inside the national security arena. His technology became too impossible to disbelieve."

105.    As libel by implication, Risen imply that Montgomery committed fraud and is a con man.

106.    ***Thirty-Seventh*, on Page 40 of the Book, Risen writes:**

"Montgomery persuaded the spy agency that his special computer technology could detect hidden bar codes broadcast on Al Jazeera, which had been embedded into the video feed by al Qaeda. Allegedly, al Qaeda was using that secret method to send messages to its terrorist operatives around the world about plans for new attacks. Montgomery convinced the CIA that his technology had uncovered a series of

hidden letters and numbers that appeared to be coded messages about specific airline flights that the terrorists were targeting.

107.     As libel by implication, Risen imply that Montgomery convinced the CIA of

claims that are not (were not) true.

108.     ***Thirty-Eighth,*** **on Page 42 of the Book, Risen writes:**

"Based on Montgomery's information, President Bush ordered the grounding of a series of international flights scheduled to fly into the United States. This step caused disruptions for thousands of travelers."

109.     As libel by implication, Risen imply that Montgomery convinced President Bush

and the national command authority of conclusions drawn from Montgomery's work.

110.     ***Thirty-Ninth,*** **on Page 42 of the Book, Risen writes:**

"One former senior CIA official recalled attending a White House meeting in the week following Christmas to discuss what to do next about the information coming from Montgomery. The official claims that there was a brief but serious discussion about whether to shoot down commercial airliners over the Atlantic based on the intelligence."

111.     As libel by implication, Risen imply that Montgomery convinced President Bush

and the national command authority of conclusions drawn from Montgomery's work.

112.     ***Fortieth,*** **on Page 47 of the Book, Risen writes:**

"Even more stunning, after the debacle over the bogus Christmas 2003 terrorist threats, Montgomery kept getting classified government contracts awarded through several different corporate entities. Montgomery's problems with the CIA did not stop him from peddling variations of his technology to one government agency after another. The secrecy that surrounded his work once again worked in his favor. CIA officials were reluctant to tell their Pentagon counterparts much about their experiences with Montgomery, so Defense Department officials apparently did not realize that his technology was considered suspect at CIA headquarters."

113.     As libel by implication, Risen implies that Montgomery continued to defraud,

con, and scam the government, rather than concluding that the U.S. Government recognized the

legitimacy of Montgomery's work.

114.     ***Forty-First,*** **on Page 48 of the Book, Risen writes:**

> "He successfully infused a sense of mystery around himself. He was
> like the Wizard of Oz, but now people were beginning to try to
> examine the man behind the curtain."

115.     As libel by implication, Risen implies that the Montgomery engaged in fraud and

a hoax by keeping details mysterious.

116.     ***Forty-Second,*** **on Page 48 of the Book, Risen writes:**

> "The technology didn't meet the requirements for us," said a Special
> Operations Command spokesman drily. Still, there is no evidence that
> officials at Special Operations Command ever talked with their
> counterparts at the CIA to check up on Montgomery before awarding
> him a contract. Special Operations Command paid a total of $ 9.6
> million to eTreppid under its contract with the firm."

117.     As libel by implication, Risen imply that Montgomery again repeated his fraud

and hoax against a new government agency.

118.     ***Forty-Third,*** **on Page 54 of the Book, in the Chapter "The New Oligarchs,"**

**Risen writes:**

> CHAPTER 3:  The New Oligarchs
> Page 54:  "Dennis Montgomery is, of course, an extreme example of
> the new kind of counterterrorism entrepreneur who prospered in the
> shadows of 9/11.  But he was hardly alone in recognizing the lucrative
> business opportunities that the war on terror has presented.  In fact, as
> trillions of dollars have poured into the nation's new homeland
> security-industrial complex, the corporate leaders at its vanguard can
> rightly be considered the true winners of the war on terror."

119.     As libel by implication, Risen implies that Montgomery engaged in fraud and a

hoax motivated by greed.

Exhibit C

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

DENNIS L. MONTGOMERY

                    Plaintiff,

      v.

JAMES RISEN, ET AL.,

                    Defendants.

Civil Action No. 1:15-cv-20782-JEM

**<u>DECLARATION OF PLAINTIFF DENNIS MONTGOMERY, IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
CHALLENGING FLORIDA JURISDICTION AND VENUE</u>**

Pursuant to 28 U.S.C. §1746, I, Dennis Montgomery, hereby declare under penalty of perjury that the following is true and correct:

1) I am over the age of 18 years old and I make this affidavit on personal knowledge and belief. I am mentally and legally competent to make this affidavit sworn under oath, despite having suffered a brain aneurism and serious related health issues. *See* Exhibits 9, 10, 11, attached to this affidavit.

2) Reporter James Risen of <u>The New York Times</u> and publisher Houghton Mifflin Harcourt Publishing Company published a book <u>Pay Any Price: Greed, Power and Endless War</u> in October 2014 (hereafter "the Book").

3) In Chapter 2 of the Defendants' Book, James Risen and Houghton Mifflin Harcourt Publishing Company lie about me and my work and libel me extensively.

4) Chapter 2 involves me and James Risen focuses almost exclusively on defaming me alone to sell copies of the Book in marketing interviews. Having read the book, I am

its centerpiece, that is, Defendants "punching boy" to sell books. Risen conspicuously ignores the many other events and incidents in the Book and focuses almost exclusively on me when promoting his book for sales in Florida and elsewhere.

5) Whereas, the Defendants, especially Houghton Mifflin Harcourt Publishing Company, have great resources and no doubt have "errors and omissions" insurance to finance their legal defense, I have no money or resources at all.  I lost my house in foreclosure.  The Defendants will be able to afford to litigate the claims in Florida.

6) My finances, employment, career and business opportunities have been severely devastated and destroyed by the false and misleading statements made by the Defendants, contributing to the loss of my previous house in foreclosure and driving me into poverty just at the time I have also been diagnosed with serious medical problems.

7) The Defendants' published defamatory and false and misleading statements which are not opinion or hyperbole and are not fair reporting of their sources or public records. The defamation is specifically false and misleading in factually verifiable terms, including in that:

   a. Defendants published defamatory material and statements from confidential government sources in the intelligence and military communities. The false and misleading statements did not result from fair reporting of previously published material. They admit this on page ix of the Book stating, "Many people have criticized the use of anonymous sources. Yet all reporters know that the very best stories – the most important, the most sensitive – rely on them. This book would not be possible without the cooperation of may current

2

and former government officials and other individuals who were willing to discuss sensitive matters only on the condition of anonymity." Indeed, this is a big selling point of Defendants' book. It publishes new information, however defamatory, that had not been accessible or published before. This is why the Book is a bestseller in Florida and elsewhere, particularly given that Florida is at the center of U.S. Government counterterrorism military and intelligence operations, as I testify to below.

b.  The Defendants actually know that their U.S. Government sources are the ones who will bear the public blame for their own poor decisions if they do not shift the blame implausibly to me with the Defendants' concerted help.

c.  Defendant James Risen intentionally omitted several important facts while fabricating defamatory statements and stories about me.

d.  The Defendants actually knew that Warren Trepp received most of the money, yet accuse me of fraud to obtain money while excusing politically-connected Warren Trepp who took and kept the money and controlled the company.

e.  The Defendants' falsely and misleadingly state that I fabricated intelligence to make money.  In fact, eTreppid was paid for software work and analysis, not contingent upon results or conditional upon finding any terrorist threats.  Our work was complete and payment due merely for doing the analysis the CIA and other Government officials asked us to do.

f.  My software and technology did work, does work, and is still being used successfully by the U.S. Government today.

g.  The Defendants actually know that Warren Trepp has never paid back any of

3

the $30 million that eTreppid received from the U.S. Government nor offered to pay any of it back nor has the U.S. Government asked for any of the money back.  Therefore, James Risen actually knows that his defamation of me is false and misleading.  If eTreppid received $30 million from the U.S. Government for the use of my software and technology that was a purported fraud or a hoax, eTreppid would have to pay the money back to the U.S. Government.  But the U.S. Government knows that my software and technology actually worked and works and is valuable, which is why eTreppid does not have to pay any of the $30 million back.

h.  In fact, the Defendants ignore and intentionally omit my ten (10) patent applications, which attest to and show my expertise.

i.  The U.S. Government independently tested and verified the results of my software and technology and did not rely upon my word alone. The U.S. Government officials sought me and my technology out.

j.  The data detected by my software and technology did predict actual terrorist incidents and/or meetings in advance.

k.  I could not have fabricated intelligence from my work, as Defendants defame me, without being certain that no one else would independently verify my work in any number of other ways available to the CIA, NSA, and military.

l.  I and the companies I worked with had equal or better opportunities to provide my services to private sector companies, and had no need to work for the U.S. Government to make the same amount of money or less.

m.  I was motivated by patriotism, not greed, in turning down equivalent

4

opportunities to provide services to the private sector to answer requests for help in the war on terror by the U.S. Government.

n.   The Central Intelligence Agency ("CIA") wanted experts to analyze Al Qaeda videos.

o.   It was the CIA who proposed to eTreppid that we would analyze Al Qaeda videos.  The defamation of me states that I fraudulently sold the CIA and U.S. Government on a fantasy using fabricated intelligence.  In fact, the CIA and the U.S. Government approached us with what they wanted analyzed.

p.   The Defendants actually knew that Warren Trepp closed the "sales" of contracts by persuading the U.S. Government, yet falsely accuse me of selling a fantasy of fabricated intelligence to the U.S. Government, while excusing Trepp, as a fraudulent scheme to obtain money.

q.   Defendants' falsely state that I persuaded the President George W. Bush to ban international passenger aircraft from entering U.S. airspace and nearly shoot down passenger aircraft. However, I never provided any interpretation of what the hidden data we uncovered meant.  We merely provided the uncovered data to the U.S. Government experts for their interpretation.  Even when pressed, I refused to offer any national security interpretation of the data.

r.   As obvious from the records and documents that the Defendants rely upon, the Defendants' so-called sources Michael Flynn, Tim Blixseth, and Warren Trepp went to extraordinary and expensive legal and extra-legal (self help) efforts to furiously get ownership of my work as being extremely valuable,

5

while simultaneously stating that my work had no value.

s.   Michael Flynn, Tim Blixseth, and Warren Trepp were attempting to invoke

the fraud exception to bankruptcy laws to invalidate my bankruptcy, and

therefore the Defendants knew that they had motives to fabricate or embellish

their false statements against me.

t.   The public records that the Defendants claim to be relying upon – though

voluminous – overwhelmingly contradict the Defendants defamation of me.

u.   On September  28, 1998, I and Warren Trepp co-founded eTreppid

Technologies ("eTreppid") based on  a "Contribution Agreement" of that date

in which we agreed to own the LLC in equal 50% shares. Trepp put up money

and I conveyed his "software compression technology contained on CD No.

1" to eTreppid. The business plan of eTreppid and the application of the

"compression technology" were to compress VHS videotapes used for

surveillance in casinos for archiving and more efficient storage.  Over the

preceding 20 years I developed and copyrighted other types of software

technology, including but not limited to "Object Detection Software" which is

a crucial component of, among other things, colorizing black and white

movies.  In order for the computer to add color, it must be able to recognize

individual objects in the movie which are moving in three dimensions, (that is

moving toward or away from the camera and changing in apparent size),

aspect angle, orientation, etc.  This was not conveyed to eTreppid and which,

per the terms of the "Contribution Agreement", was expressly excluded.

Shortly after the formation of eTreppid, I offered to sell one part of his

6

"Object Detection System" ("ODS") software to Warren Trepp for the sum of $10 million dollars, which Trepp rejected.

v. As reflected in a form SF-95 Attachment A prepared by me with my then attorney Michael Flynn for presentation to the Government, "Beginning on or about November 2002, on behalf of the US Air Force, Montgomery began work on military applications of his technology at Eglin Air Force base [in Florida] to demonstrate the application of his technologies in the war on terror."

w. Defendants make the technically absurd and false statement that "The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers," only by falsely misrepresenting that the data was contained only in the "crawl" at the bottom of the screen. This falsified and misleading misdirection and deception to focus only on the crawl is deceptive. It is patently unbelievable, which Defendant Risen should have known as an expert in national security, that a television signal could not contain such simple data as latitude and longitude coordinates, consisting of only six numbers and two letters (East or West longitude, North or South latitude).

8) I am a citizen of the State of Florida, with a residence in an apartment community in Miami, Florida. I have a Florida telephone number in this district. I am reporting my address and Miami-Dade, Florida phone number under seal.

9) I am registered to vote in Florida, as shown in Exhibit 1, attached to this affidavit. I previously had a temporary address while settling on the permanent address that I

have now.  I have updated my voter registration to reflect my current Miami address.

10) I have reviewed the affidavit of defense counsel Laura Handman attached to the Defendants' motion stating that I had not registered to vote in Florida.  The Defendants' affidavit is false.  I am registered to vote in the State of Florida, and am now updating my voter registration with my new address. I was registered to vote in Florida when Ms. Handman signed her affidavit. She misled this Court.

11) I found on the website of the publisher Houghton Mifflin Harcourt, that Houghton Mifflin Harcourt Publishing Company maintains permanent and general offices in Orlando, Florida at 9400 Southpark Center Loop, Orlando, Florida 32819. Exhibit 2, attached to this affidavit, which I downloaded from the Defendant publisher's website at  http://www.hmhco.com/about-hmh/our-offices.  These are statements made by the Defendants about themselves.

12) On the website of the Florida Department of State Division of Corporations, I found that Defendant Houghton Mifflin Publishing Company is registered to do business in Florida through the Florida Department of State Division of Corporations. Exhibit 3, attached to this affidavit, which I downloaded from the Florida Department of State's website.

13) As shown in those Florida Government documents, in 2008 Defendant changed its name from "Houghton Mifflin Harcourt" to "Houghton Mifflin Publishing Company." *Id.*  These are statements made by Defendants about themselves.

14) My research of the publisher also uncovered that Defendants rely significantly upon sales in the Southeast of the United States through a company "Amazon" for very substantial sales over the internet.  Amazon's regional distribution centers or

8

"fulfillment centers" are located in Ruskin, Florida in Hillsborough County and Lakeland, Florida, in Polk County.  *See* Exhibit 4, attached to this affidavit.

15) Much of the defamation which my lawsuit contests is contained within the physical product physically shipped into Florida for sale, the Book written by James Risen and published by Houghton Mifflin Harcourt Publishing Company.

16) In 2012, Edra Blixseth brought Chris Pipes, from the U.S. Special Operations Command ("SOCOM") from MacDill Air Force Base in Florida to our Palm Desert offices. SOCOM was interested in pursuing object tracking, mass surveillance, and research on cloaking technologies. Chris Pipes met at our facility, with a representative of the CIA. While he was in our building, Chris Pipes then received a telephone call from SOCOM in Florida, and then told us that SOCOM could not pursue the technology because of what was written about me in the news media. Exhibit 18, attached to this affidavit.

17) SOCOM is the Unified Combatant Command charged with overseeing the various Special Operations Component Commands of the Army, Air Force, Navy and Marine Corps of the United States Armed Forces. The command is part of the Department of Defense and is the only Unified Combatant Command legislated into being by the U.S. Congress. SOCOM is headquartered at MacDill Air Force Base in Tampa, Florida. *See*, Exhibit 12, attached to this affidavit.

18) U.S. Central Command ("CENTCOM") is a theatre-level Unified Combatant Command of the U.S. Department of Defense, established in 1983. CENTCOM Area of Responsibility includes countries in the Middle East, North Africa, and Central Asia, most notably Afghanistan and Iraq. CENTCOM has been the main American

presence in many military and intelligence operations. It is headquartered in Tampa,

Florida. *See*, Exhibit 12, attached to this affidavit.

19) The Defendant author James Risen actually knew or should have known that most of

my work was with U.S. Government organizations in Florida and the contracting

offices for my work are in Florida.  A competent Pulitzer Price winning New York

Times reporter who wrote the Book over a four-year period from 2011 through 2014

would have reviewed the Wall Street Journal article from November 1, 2006,

attached, which includes the explanation:

**Source of Secret Funds**

**One source of secret funds for eTreppid and other companies is the Special Operations Command. Based in Tampa, Fla., the command fields special-operations military and intelligence forces around the globe and is at the forefront of the fight in Iraq and Afghanistan. It has also been rocked by a criminal investigation of a former contracting officer. The investigation is continuing, according to a spokesman for the U.S. attorney in Tampa.**

In a separate inquiry, Pentagon investigators last year found evidence that the command kept special accounts for "unrequested congressional plus-ups," or earmarks. The plus-ups were used to reward lawmakers with projects in their districts, according to declassified investigators' notes reviewed by The Wall Street Journal. The Pentagon's inspector general closed the inquiry after finding that the accounts weren't illegal.

Mr. Trepp said eTreppid won classified work on its merits and already had a number of government contracts before Mr. Gibbons starting making introductions on the company's behalf. Mr. Gibbons's campaign manager, Robert Uithoven, said the congressman has been a strong supporter of new defense technology, particularly after 9/11. But he said there was "no quid pro quo whatsoever" for contributions from contractors. And while some funding was secret, "it was because of the sensitive nature of the work," Mr. Uithoven said, not to avoid public scrutiny.

For Mr. Trepp, eTreppid's success at winning multimillion-dollar federal contracts marks a comeback from his Drexel days. He sat at Mr. Milken's right arm on the firm's famous X-shaped trading desk in Beverly Hills, sometimes trading as much as $2 billion in securities a day. Federal regulators filed a civil securities-fraud claim against him in 1995, and a Securities and Exchange Commission administrative judge found that his violations had been "egregious, recurring and intentional." But she dismissed the proceeding against him, noting that the allegations were old and he had left the securities business years earlier. (Emphasis added).

20) This article and dozens of others, as well as court documents, caused Risen to know or he should have known upon reasonable inquiry over four years that Warren Trepp was furiously trying to take ownership of my software and technology, which directly calls into question his self-serving false statements that the software and technology he was trying to acquire rights to was worthless.  The same article also reports:

Mr. Gibbons also got other, unreported gifts of cash and casino chips from Mr. Trepp, according to sworn testimony in a civil lawsuit brought by a former executive at eTreppid, Dennis Montgomery. The suit, filed in February in federal court in Reno, involves a dispute between Messrs. Trepp and Montgomery over the rights to certain software code . . .

The suit has raised alarms in Washington because of concern that national secrets will be revealed if it goes to trial. For example, one of the entities that funded eTreppid is code-named Big Safari and is a classified program, documents in the case show. The nation's top intelligence official, John D. Negroponte, recently filed a statement with the court seeking to seal the case. He wrote that after personally reviewing the matter, he has concluded that disclosure of some information connected with the case could do "exceptionally grave damage" to national security.

21) My greatest opportunities for employment, business, and/or an income are at either Macdill Air Base near Tampa, Florida and Eglin Air Force Base near Fort Walton Beach, Florida, which is at the center of U.S. Government intelligence and counterterrorism operations. *See* Exhibit 12, attached to this affidavit.

11

22) As a result, I have settled in Florida not just for professional reasons but also because of my failing health and desire to enjoy Florida at this stage in my life. Florida has no personal income tax as well as a Homestead exception should I buy a home. Florida is a great place to live.

23) In 2011, I incorporated a business with a partner in Florida to contract with the military and U.S. Government at bases in Florida to continue the same type of services and software and technological work that I had performed under eTreppid and BLXWARE.  This business was named Alex James LLC, which I incorporated through the "Legal Zoom" service company. I set up the articles of incorporation, paid for and set up this company. Judy Crowhurst is the woman I chose to run it. Exhibit 17, attached to this affidavit.

24) Exhibit 5, attached to this affidavit, presents the papers I processed through the "Legal Zoom" company and my payment information paying for the company in Florida in 2011.

25) As an expert in national security issues, Defendant James Risen knows that the war in Afghanistan was and is run largely from Florida electronically and by drone controllers located in Florida. For instance, following September 11, 2001, General Tommy Franks rarely set foot in Afghanistan and fought the war from U.S. Air Force Bases in Florida, including from SOCOM and CENTCOM. This explains my work with SOCOM and CENTOM in large part and why it continued there.

26) Defendant James Risen also knows that the U.S. military leadership and personnel are concentrated mainly in Florida. Because U.S. military servicemen can choose their state of residence despite being deployed elsewhere, Florida's lack of an income tax

12

makes Florida a very attractive State for U.S. servicemen, often poorly paid.  As a result, most of the nation's top military leaders, current and former servicemen, chose Florida as their residency.

27) Defendant Risen knew in publishing the Book that Florida is an enormous market as the nation's now third largest State, including Florida's significant military and intelligence and counterterrorism personnel, with many retirees (including retired U.S. Government employees in the military and intelligence fields) with more time to read books than the average American. For instance, former Secretary of Defense Donald Rumsfeld now lives in Florida, as well as former Chairman of the U.S. Senate Intelligence Committee and CIA Director Porter Goss, who lives in Miami.

28) The team on which I worked had contracts directly with the intelligence agencies at the military bases **in Florida**.  I have video showing the work.  The contracting officers are out of those military bases, many of which are classified. I met and worked with CIA officials in Florida at various military bases.  However, I cannot identify here the exact units stationed at those bases, which is classified information. Exhibit 19, attached to this affidavit.

29) We at eTreppid and later BLXWARE did most of our work with units stationed at MacDill Air Force Base and Eglin Air Force Base, whose identity is secret.  *See* February 14, 2004, "Order for Supplies or Services" attached, with the "Ship To" address of UQ USSOCOM/SOAL-SP (Mohr), 7701 Tampa Point Boulevard, MacDill Air Force Base, Florida 33621.

30) Most of the payments for our work, the work I did for eTreppid and later BLXWARE, came out of the CIA offices in Florida and SOCOM, the U.S. Special

Operations Command of the U.S. military at Macdill Air Force Base, Florida.

31) SOCOM of the U.S. military is located at 7701 Tampa Point Boulevard, MacDill Air Force Base, Florida. *See* Exhibit 6, attached to this affidavit.

32) CENTCOM of the U.S. military is located at MacDill Air Force Base near Tampa, Florida.  *See* Exhibit 7, attached to this affidavit.

33) Relating to my work conducting surveillance of international communications, major fiber optics cables run from Florida across the ocean, which is partly why my work opportunities for my experience and capabilities are in Florida.

34) I intend to call witnesses who can testify that my defamed software and technology does indeed work and is not a hoax. These witnesses are personnel based at Macdill Air Base near Tampa, Florida and at Eglin Air Force Base near Fort Walton Beach, Florida, where I did a lot of his work. The organizational units housed at Macdill and Eglin used my software, technology, and work extensively during the time period addressed by Defendants' defamation of me.  Those witnesses will testify and thus help me prove that the defamatory statements about me are indeed false and misleading.

35) Relevant officials at Macdill and Eglin (and all facilities that my work has provided services to anywhere) make their own contracting decisions and do not rely upon contracting offices in Washington, D.C., nor even at the CIA in Langley, Virginia, the Pentagon in Arlington, Virginia, or the NSA in Fort Meade, Maryland.

36) Many of the witnesses in this case, with whom I have worked, are largely in Florida, including, but not limited to:

Goss, Porter, former Director of CIA, now in Miami, Florida

14

Johns, Ken, Macdill AFB, Florida

Lyons, XXXXX, Macdill AFB, Florida

Macbeth, W. Rhys, Eglin AFB, Florida

Nazelrod, Craig, Eglin AFB, Florida

Pipes, XXXXX, Macdill AFB, Florida

Roche, James, Macdill, Florida

Rumsfeld, Donald, now in Florida

Stillman, Phillip, Attorney for Dennis Montgomery, now in Miami, Florida

Madden, Tom, Boca Raton, Florida

Olivia, Adrian, Eglin AFB, Florida

Bartholomew, Mary L, Eglin AFB, Florida

Fiamengo, Nicholas A, Eglin AFB, Florida

Freeman, Gregory J, Eglin AFB, Florida

Savage, Cynthia, Eglin AFB, Florida

McCool, John C, Eglin AFB, Florida

Temple, James K, Eglin AFB, Florida

Griffin, Susan M., Macdill AFB, Florida

Russell, Deborah, Macdill AFB, Florida

Nettelhorst, Doug M, Macdill AFB, Florida

Stallworth, Hugh T, Macdill AFB, Florida

Bob McCaskey, Macdill AFB, Florida

Crutchfield, Chris, Macdill AFB, Florida

Melnyk, Michael S., Macdill AFB, Florida

Lopez, Tina M, Macdill AFB, Florida

Cerny, Jeffrey D., Macdill AFB, Florida

Muccio, Anthony B., Eglin AFB, Florida

McKinney, Scott E Lt.Col., Eglin AFB, Florida

Purvis, Brad Civ, Eglin AFB, Florida

'Kirsch, Jim', Eglin AFB, Florida

Hughes, Stacey L, Eglin AFB, Florida (*See* Exhibit 13, attached to this affidavit).

37) Ultimately, I became aware that James Risen had published these false reports in the Book and that Risen was conducting a nationwide publicity campaign to sell the Book.

38) I heard and watched James Risen repeatedly in national  and radio interviews discussing his book but primarily about me, mostly ignoring and intentionally omitting the rest of his Book in those interviews while attacking and defaming me as a private individual.

39) In radio, television, and newspaper interviews, James Risen mainly focused on slandering me in order to sell the Book in Florida and elsewhere.

40) Risen's appearances on radio and television were not just commentary but attempts to stimulate the sale of books inside Florida and elsewhere.

41) Risen was speaking on the radio and television shows in order to move books off of Florida bookstore shelves and to the checkout counters in Florida and elsewhere.

42) The defamation by Defendants of me is not a criticism of the U.S. Government in the District of Columbia, but *excuses* the U.S. Government as an innocent and unsuspecting victim, while blaming me. Therefore, the U.S. Government has not

suffered harm within Washington, D.C.

43) I had relatively little contact with the U.S. Government in Washington, D.C., Maryland or Virginia. It was the companies that I worked under, eTreppid and later BLXWARE, who contracted with regional offices at various U.S. Government bases or facilities.  I interacted almost entirely with technical people pursuant to the contracts.

44) It was Warren Trepp and later Edra Blixseth who used their contacts with the U.S. Government to seek and arrange contracts for our work.  I did not persuade the U.S. Government to hire me, Trepp and Blixseth did.  My own interaction with offices or officials in Washington, D.C. was very limited because I was not the one running the companies nor primarily interacting with the U.S. Government.

45) Starting as early as 2011, I was contacted by James Risen asking about my secret work under contract for the U.S. Government in support of anti-terrorism efforts.

46) I see that in James Risen's Declaration attached to the Defendants' Motion to Dismiss, Risen states that he has been working on the Book since 2011.

47) I continually provided numerous warnings, in writing, to James Risen that the false statements he mentioned and later published in October 2014 in the Book are false.

48) However, James Risen attempted to blackmail me by demanding that I provide classified documents and information to him or else he would publish the false and misleading statements that he later did publish in the Book.  That is, when I warned him that the reports were false and misleading, James Risen responded to me by telling me that he would not publish those false statements if instead I provided him with classified information and documents.  That is, James Risen demanded that I

17

commit multiple crimes as the price for Risen not publishing the false and misleading reports about me.  Of course, I refused to be blackmailed into breaking the law as the price for not being defamed.

49) Writers Aram Roston and James Risen were both after John Brennan's information. They both knew that I had worked for John Brennan. Both wanted his emails.

50) Roston and Risen published false and defamatory information about me to try to pressure me into releasing classified information about John Brennan and others in the war on terror to them as the price for them telling the truth.

51) However, Roston and Risen knew that my work was real and legitimate, because they sought to obtain secret and classified information from Brennan from me.

52) Roston and Risen published defamation about me to punish and pressure me for not illegally disclosing classified information and material to them.

53) In both cases, I told Risen and Roston I would have to turn over classified information, a road I wasn't willing to go down. I was never what they were after. They were writing these stories to hurt me so that I would provide classified information about the various administrations. I was just their pawn.

54) Attached to this affidavit as Exhibit 8 are a few of my communications to James Risen informing him in advance of the publication of the Book that his statements were not only false but preposterous and that his sources were clearly unreliable.

55) In fact, on November 1, 2012, discussing the Book that he was then writing, I warned James Risen under the email address "TheAgencyInsider@Hotmail.com" that his reporting was false including because Warren Trepp was the CEO of eTreppid and kept all the money. *See* Exhibit 8, attached to this affidavit.

56) Risen also promised in that same email thread: "If you give us the Brennan emails, we will write a story." *See* Exhibit 8, attached to this affidavit.

57) However, this response was in the context of a long back-and-forth discussion concerning the falsehood of Risen's false and misleading statements against me.

58) Risen also promised in the attached email thread: "As I said on the phone, I protect my sources. I will never divulge the identify of my sources in a leak investigation. But I also have to know that the source is telling me the truth. Jim"

59) So Risen admitted that it was his professional responsibility to determine that the sources he used to defame me are telling the truth. But Risen did not do that. The sources he relied upon were obviously not telling the truth, as is patently obvious.

60) I warned James Risen concerning the falsehood of his reporting in that November 1, 2012, email thread, attached:

> There is a reason the CIA and NSA were there, you must know that.
>
> Do you really think the government invoked the State Secrets Privilege from being embarrassed or conned? Negroponte in his in camera declaration, if ever released, was spell it all of out.
>
> They government never wanted information to come out regarding the other work. The program started out spying on terrorist, and under Obama quickly moved to spying on Americans!! A program which was started by Brennan in 2003 and continues to this day. This technology is being used today to spy on Americans, including candidate Romney.
>
> I don't see you ever publishing that information? *See* Exhibit 8[1],

attached to this affidavit.

---

[1] While my counsel turned over these initial disclosures to Defendants' counsel, Defendants did not turn over initial disclosure documents to my counsel in violation of the Court's Order of April 1, 2015. I have asked my counsel to file a motion for order to show cause.

61) Furthermore, this November 1, 2012, exchange concerning Risen's plans writing the Book which was eventually published on October 14, 2014, was seven (7) months before the revelations by Edward Snowden that mass surveillance of Americans was occurring. Therefore, Risen actually knew in 2013 that I was telling the truth and was being lied about by his so-called sources. My discussions with James Risen on November 1, 2012, were proven true in mid-2013. Therefore, Risen had actual knowledge that I was indeed a whistleblower and that the sources he relied upon were falsely discrediting me to cover up wrong-doing. In this, of course, Pulitzer Prize winning New York Times reporter James Risen intentionally and falsely omitted the real story.

62) I made it clear to James Risen, in the phone call referenced in the email, that the Obama administration used mass surveillance technology to alter the 2012 election *in Florida*, and that they will use the technology again in 2016.

63) In June of 2012, in a telephone call, I told James Risen and Eric Lichtblau that their information about me in their 2011 New York Times story was incorrect, and they needed to correct it. I also made it clear that I was under a federal court Protective Order in Nevada, and a State Secrets Privilege order by the Director of National Intelligence not allowing me to discuss my work. In addition, there were sealed documents still in the Nevada case. I also made it clear, that the State secrets privilege was also issued, to protect the work I did on domestic surveillance. I told them I knew they met with my ex attorney Mike Flynn, for several days, in regards to their story, and suggested, he had other motives for his conduct.

64) I also made it clear in June of 2012 that I had a brain aneurysm that was going to be

20

repaired soon, and a risky procedure, and wanted my name cleared in case I died.

65) Therefore, the Defendants believed they could get away with their defamation because I would probably die in the meantime.

66) In 2013, going over Risen's and Lichtblau's heads, I sent emails directly to the editors of <u>The New York Times</u> telling them their story was wrong and to retract it.

67) I sent an email to the Editors of <u>The New York Times</u>, demanding that they correct the false reporting about me in 2012.

68) I believe that <u>The New York Times</u> conveyed my emails requesting a retraction of the false statements to James Risen.

69) In 2012-2014, on at least 10 different occasions I made it clear to Aram Roston of Playboy that his story was wrong and told him to retract it.

70) Carlotta Wells, a U.S. Department of Justice attorney assigned to matters involving me, told me that if I talk to the press or leaked information, I will be charged with treason for disclosing my work with the NSA and CIA.  She told me when I signed my Top Secret clearance, I forfeited my right to protect my first amendment rights.

71) Carlotta Wells additionally said that "If the US Government wants to leak false information to the press to hide successful work, and to confuse terrorist groups, they will do it irrespective of my rights. Deal with it!"

72) Carlotta Wells also stated to me and Jack Kemp, about my legal matters with the CIA that "I [Carlotta Wells] am just a foot solder doing what I am told of to do from the White House.  I don't agree with their strategy, but that is the way it is."  Jack Kemp replied, "You are a senior litigation attorney for the DOJ, hard for me to believe that you were listening to them."  Carlotta Wells in turn replied "Take it up with you

friend George Bush."

73) I am personally aware that, through my counsel, two separate letters were sent to executives at Houghton Mifflin requesting a retraction of the false and misleading publication.

74) The first letter was sent on January 14, 2015 to Linda K. Zecher, President and Chief Executive Officer and Director of Houghton Mifflin Harcourt, William Bayers, Executive Vice President and General Counsel, and Houghton Mifflin Harcourt located in Boston. *See* Exhibit 14, attached to this affidavit.

75) The second letter was sent on February 13, 2015, pursuant to Florida Statute § 770.02 again requesting a retraction of the false and misleading published statements. *See* Exhibit 15, attached to this affidavit.

76) On January 20, 2015, I, through my counsel, received a letter from David Eber, cc'ing James Risen and William Bayers, declining to redact the false and misleading statements and also declining to meet my counsel to resolve matters amicably. *See* Exhibit 16, attached to this affidavit.

I hereby swear under oath and penalty of perjury that the foregoing facts are true and correct to the best of my personal knowledge and belief:


April 27, 2015


//Dennis Montgomery// _____

Mr. Dennis Montgomery


22

Exhibit 1



Voter Registration as of: 4/7/2015    Republican: 4,183,006    Democrat: 4,613,370    Other: 3,212,454    Total: 12,008,830

# Check Your Voter Status

## Verifique su estado como votante

**Below is your voter information as it appears on your voter record.**

**A continuación encontrará sus datos de votante según nuestros registros.**

Full Name
Nombre completo : **DENNIS LEE MONTGOMERY**

Street Address
Dirección : ███████████

City
Ciudad : **MIAMI**

Zip Code
Código postal : █████

County Name
Condado : **MIAMI-DADE**

Voter Gender
Género del votante : **Male**

Date Of Registration
Fecha de inscripción : **02/23/2015**

Party
Partido : **Republican Party Of Florida**

Voter Status
Calificación como votante : **Active\***

**The following 2 links will take you to your County's Supervisor of Elections Website where you can get additional information on:**

**Los siguientes dos vínculos lo conectarán con el Sitio de su Supervisor de Elecciones del Condado para obtener información sobre:**

☑ Your Absentee Ballot Status. /
Estado como votante en ausencia. ⇲

☑ Your Precinct Location. /
Localización de su Distrito. ⇲

*An active voter refers to a registered voter who is eligible to vote.
*El votante activo es un votante inscrito en el padrón, que cumple con los requisitos necesarios para votar.

[ New Search / Nueva búsqueda ]

If you are experiencing a problem with this web site please email BVRS Help for assistance.
Si tiene problemas con esta página web por favor contáctese por correo electrónico BVRS Help con la División de Elecciones.
Florida Department of State Division of Elections Accessibility Privacy Policy Contact Us

Exhibit 2

Case 1:15-cv-20782-JEM   Document 44   Entered on FLSD Docket 04/28/2015   Page 147 of 271



Houghton
Mifflin
Harcourt

# Corporate Headquarters

**Boston**
222 Berkeley Street
Boston, MA 02116
(617) 351-5000

# United States Offices

**Austin**
10801 North Mopac Expressway
Austin, TX 78759
(512) 721-7000

**Denver**
5680 Greenwood Plaza Blvd
Suite 550
Greenwood Village, CO 80111
(303) 504-9312

**Evanston**
909 Davis St # 300
Evanston, IL 60201
(847) 869-2300

**Geneva**
1900 South Batavia Avenue
Geneva, IL 60134-3399
(630) 232-2550

**Indianapolis**
2700 North Richart Avenue
Indianapolis, IN 46219

**Itasca**
761 District Drive
Itasca, IL 60143

**New York City**
215 Park Ave S # 12
New York, NY 10003-1621
(212) 420-5800

345 Seventh Avenue
New York, NY 10001

**Orlando**
9400 Southpark Center Loop
Orlando, FL 32819
(407) 345-2000

**Portsmouth**
361 Hanover Street
Portsmouth, NH 03801

**Puerto Rico**
B7 Calle Tabonuco, Suite 1410
Guaynabo, PR 00968-3003
(787) 520-9599/9585

**Rolling Meadows**
3800 Golf Road
Rolling Meadows, IL 60008
(630) 467-7000

**Troy**
465 South Lincoln Drive
Troy, MO 63379
636-528-8110

**Wilmington**
181 Ballardvale Street
Wilmington, MA 01887
(978) 661-1300

# International Offices

**Canada**
4200 Boulevard St. Laurent
Suite 1203
Montreal, Qc H2W 2R2
Tel: (514) 598-0444

**China**
59 A Zhongguancun Street
Haidian District
Room 1004
HMH
Beijing, 100872
Tel: 86 10 62602236

**Dubai**
Standard Chartered Tower, Level 5
PO 35482, Emaar Square,
Downtown Burj Khalifa
Dubai
United Arab Emirates

**Ireland**
152 – 160 Pearse Street
Dublin 2
Ireland
Tel: +353 1 240 5900

**Singapore**
67 Ubi Road 1
#05-08 Bizhub
Singapore 408730
Tel: +65 6635 6825

**South Korea**
#501 KGIT SangAm Center
1601, SangAm-dong
Mapo-gu, Seoul
123-913, S. Korea
Tel: +82 (0)2 6393
5790/5792

Exhibit 3

Division of Corporations **803695**   Page 1 of 1

## Florida Department of State
### Division of Corporations
Public Access System

Electronic Filing Cover Sheet

**Note: Please print this page and use it as a cover sheet. Type the fax audit number (shown below) on the top and bottom of all pages of the document.**

(((H08000044388 3)))



H080000443883ABC2

**Note: DO NOT hit the REFRESH/RELOAD button on your browser from this page. Doing so will generate another cover sheet.**

To:
    Division of Corporations
    Fax Number    : (850)617-6380

From:
    Account Name   : C T CORPORATION SYSTEM
    Account Number : FCA000000023
    Phone          : (850)222-1092
    Fax Number     : (850)878-5926

## OR AMND/RESTATE/CORRECT OR O/D RESIGN

### HOUGHTON MIFFLIN COMPANY

| Certificate of Status | 0 |
|---|---|
| Certified Copy | 0 |
| Page Count | 03 |
| Estimated Charge | $35.00 |

Electronic Filing Menu    Corporate Filing Menu    Help

FEB 2 1 2008

## PROFIT CORPORATION
## APPLICATION BY FOREIGN PROFIT CORPORATION TO FILE AMENDMENT TO
## APPLICATION FOR AUTHORIZATION TO TRANSACT BUSINESS IN FLORIDA
(Pursuant to s. 607.1504, F.S.)

**SECTION I**
(1-3 MUST BE COMPLETED)

8621.95

(Document number of corporation (if known)

1. HOUGHTON MIFFLIN COMPANY

(Name of corporation as it appears on the records of the Department of State)

2. Massachusetts                    3. 03/27/1930
(Incorporated under laws of)       (Date authorized to do business in Florida)

**SECTION II**
(4-7 COMPLETE ONLY THE APPLICABLE CHANGES)

4. If the amendment changes the name of the corporation, when was the change effected under the laws of
its jurisdiction of incorporation? 12/12/2007

5. Houghton Mifflin Harcourt Publishing Company
(Name of corporation after the amendment, adding suffix "corporation," "company," or "incorporated," or
appropriate abbreviation, if not contained in new name of the corporation)

(If new name is unavailable in Florida, enter alternate corporate name adopted for the purpose of transacting
business in Florida)

6. If the amendment changes the period of duration, indicate new period of duration.

(New duration)

7. If the amendment changes the jurisdiction of incorporation, indicate new jurisdiction.

(New jurisdiction)

8. Attached is a certificate or document of similar import, evidencing the amendment, authenticated not more than
90 days prior to delivery of the application to the Department of State, by the Secretary of State or other official
having custody of corporate records in the jurisdiction under the laws of which it is incorporated.

(Signature of a director, president or other officer - if in the hands
of a receiver or other court appointed fiduciary, by that fiduciary)

Kathleen Rideaut                              Asst Secretary
(Typed or printed name of person signing)     (Title of person signing)

CR2E031 - 06/27/2007 C of Filing Manager Online



*The Commonwealth of Massachusetts*

*Secretary of the Commonwealth*

*State House, Boston, Massachusetts 02133*

William Francis Galvin
Secretary of the
Commonwealth

**February 14, 2008**

TO WHOM IT MAY CONCERN:

I hereby certify that

### HOUGHTON MIFFLIN COMPANY

appears by the records of this office to have been incorporated under the General Laws of this Commonwealth on **May 18, 1908.**

I also certify that by Articles of Amendment filed here **December 12, 2007,** the name of said corporation was changed to

### HOUGHTON MIFFLIN HARCOURT PUBLISHING COMPANY

I also certify that so far as appears of record here, said corporation still has legal existence.



In testimony of which,

I have hereunto affixed the

Great Seal of the Commonwealth

on the date first above written.

Secretary of the Commonwealth

Processed By crm

Exhibit 4



# Amazon confirms fulfillment centers in Ruskin, Lakeland

 **Susan Thurston, Times Staff Writer**

**Tuesday, October 22, 2013 4:56pm**

TAMPA — Online retailer Amazon confirmed Tuesday that it will open a 1-million-square-foot distribution center in Hillsborough County and announced plans for a second, similar warehouse about an hour away in Polk County.

The announcement came nearly two weeks after Hillsborough officials said the retailer had completed a real estate deal for a center in Ruskin, and it ended speculation about whether Amazon wanted two facilities so close to each other.

Amazon said the centers will process different kinds of orders from customers.

The Ruskin center will pick, pack and ship small items, including books, electronics and consumer goods. A center to be located on Lakeland will ship large goods such as kayaks and televisions.

Seattle-based Amazon said it would create more than 1,000 full-time jobs at the centers with health care, stock awards and other benefits. It didn't say when the distribution centers would open or when they would start hiring.

Site work has already begun on the Hillsborough location at Interstate 75 and State Road 674, and at the Lakeland location at 1760 County Line Road.

"We appreciate the state, city and county officials who have worked with us to bring these fulfillment centers to Florida,'' said a statement from Mike Roth, Amazon's vice president of North America operations. "We're excited to join the community, bringing great jobs and investment to the area."

Gov. Rick Scott announced in June that Amazon would invest $300 million in new warehouses and hire 3,000 people as part of a deal that would eventually require Amazon to charge Florida customers sales tax on purchases. Currently, those taxes are not collected on purchases because Amazon doesn't have a physical presence in the state.

But the issue of online sales taxes is being debated in other states and could be resolved nationally by Congress or courts.

In a statement Tuesday, Scott applauded Amazon for choosing Florida for its new warehouses, known as fulfillment centers.

"I would like to thank Amazon for recognizing that Florida's business-friendly environment we've helped create is the perfect place for their latest expansion," he said.

Amazon spokeswoman Kelly Cheeseman said the centers combined would employ more than 1,000 full-time workers but didn't have an exact figure. Amazon prefers to hire full-time workers but may employ part-timers who request it, she said.

Thousands more could work at the centers as seasonal employees to handle the holiday shopping rush.

Both Hillsborough and Polk counties lured Amazon with financial incentives. Hillsborough approved $6.4 million in property tax breaks over seven years and $1.1 million in payments to Amazon for bringing 375 above-average paying jobs. Polk okayed a $4.5 million package that would require Amazon to create at least 100 high-paying jobs and make a minimum investment of $10 million.

Founded by Jeff Bezos, Amazon is expected to post $75 billion in revenue this year — but not a lot of profit.

Despite its stock reaching a record high, Amazon lost money last year. Analysts expect another loss when the company releases third-quarter results Thursday.

By contrast, McDonald's restaurants this week reported a $1.52 billion profit for the quarter.

*Information from the New York Times supplemented this report.*

**Amazon confirms fulfillment centers in Ruskin, Lakeland 10/22/13**
**Photo reprints | Article reprints**

© 2015 Tampa Bay Times

80     Tweet ‹ 6            86

Commenting Guidelines    Abuse Policy

Ads by Adblade

# Articles and offers from around the Web

Exhibit 5

 Print



## RECEIPT

| | |
|---|---|
| **Order Confirmation Number:** | 27340424 |
| **Date of Purchase:** | 09-01-2011 |
| **Grand Total:** | $612.00 |

| Order Summary | Amount |
|---|---|
| **Express Gold LLC − Alex James LLC** | $359.00 |
|     Filed Articles of Organization | Included |
|     Operating Agreement | Included |
|     Corporate Kit | Included |
|     Priority Rush Service | Included |
|   FL State-required filing fee | $155.00 |
|   Tax ID Obtainment | $49.00 |
|   Two-Day Delivery (Two Business Days) | $0.00 |
| **30-Day Trial of Business Advantage Pro** | $0.00 |
|     BAP Member Center Access | Included |
|     Access to Forms Library | Included |
| **State Tax ID** | $49.00 |
|   Standard Shipping | $0.00 |
| **Registered Agent Fee (One Month Free)** | $0.00 |
| **Total Charges:** | $612.00 |

### Contact Info

Dennis Montgomery
760.799.5908
dennis@ncoder.net
75180 Mediterranean
Palm Desert, CA 92211

### Shipping Info

Dennis Montgomery
760.799.5908
dennis@ncoder.net
75180 Mediterranean
Palm Desert, CA 92211

### Payments & Credits

| Date | Transaction | Payment Method | Payment Status | Amount |
|---|---|---|---|---|
| 9/1/11 | Initial Payment | Charge To Visa Card xxxx0790 | Approved | $612.00 |
| | | | **Total Payment/Credits:** | $612.00 |
| | | | **Customer Balance Due:** | $0.00 |

Exhibit 6

Search

ABOUT        FORCE & FAMILY        NEWS & PUBS        CARE COALITION        ACQUISITION







### Healing Afghanistan: A Soldier's Story

JUNCTION, Texas – More than 10,000 miles away from home, four Afghan National Army wounded soldiers sit with their sergeant major and some American men and women in the heart land of America for a weeklong seminar, March 31- April 3, 2015, to learn skills that will better enable them to take care of their Afghan brothers wounded in combat.











CULTURAL SUPPORT PROGRAM        THE PARA-COMMANDOS        PRESERVATION OF THE FORCE & FAMILY

    

Headquarters, United States Special Operations Command
7701 Tampa Point Boulevard
MacDill Air Force Base, Florida 33621

SERVICE LINKS                        USSOCOM LINKS
Army | Navy | Air Force | Marines        Contact | Employment | FOIA | Accessibility/Section 508 | Privacy Policy

COMMON ACCESS CARD (CAC) REQUIRED LINKS
SOF Portal | USSOCOM Web Mail | Concord Residences | USSOCOM Lessons Learned | SO-P Equipment Help Desk | SOCOM Training Portal

Exhibit 7

Case 1:15-cv-20782-JEM   Document 44   Entered on FLSD Docket 04/28/2015   Page 161 of 271

# UNITED STATES CENTRAL COMMAND

EGYPT | IRAN | IRAQ | JORDAN | KAZAKHSTAN | KUWAIT | KYRGYZSTAN
SYRIA | TAJIKISTAN | TURKMENISTAN | U.A.E. | UZBEKISTAN | SAUDI ARABIA

Home | Contact Us

## Contact Us

**U.S. Central Command**
*Address:*

7115 South Boundary Boulevard
MacDill AFB, FL
33621-5101
USA

*MacDill AFB Base Operator*
(813) 828-1110

*MacDill AFB Base Locator:*
(813) 828-2444

**Central Command Communications Integration Public Affairs (CCCI PA)**
*For Public Affairs*
(813) 529-0214
DSN: (312) 529-0214

*For Media Queries*
(813) 529-0220
(813) 529-0213
After hours: (813) 966-8937

*For Community Relations Questions*
(813) 529-0235
(813) 529-0218

**CENTCOM Reserve Affairs**
Army: (813) 529-1074
Air Force: (813) 529-1004
Marine Corps: (813) 529-1088
Navy: (813) 529-1098

**CENTCOM Inspector General**
(813) 529-0275

**MacDill AFB Public Affairs**
(813) 828-2215

Case 1:15-cv-20782-JEM   Document 44   Entered on FLSD Docket 04/28/2015   Page 162 of 271

**ISAF Public Affairs**

*ISAF HQ Public Affairs Office in Kabul*

pressoffice@hq.isaf.nato.int

+93 (0) 700 13 - 2114 / 2928 / 2482

*ISAF Joint Command Public Affairs Office*

ijc.media@afghan.swa.army.mil

jcmediaopsnu@apod-kaia.isaf.nato.int

+93 (0) 799 51 3999 (Wait For Voice Prompt) 688-4441/4447

+93 (0) 701 13 2000 (Wait For Voice Prompt) 318-449-9244/9153/9154

*NATO Public Information Office*

Media Operations Center

NATO Headquarters

Blvd Leopold III

1110 Brussels, Belgium

moc.web@hq.nato.int

---

**U.S. Department of Defense**

*Public Affairs*

703-697-5131

Exhibit 8

From:           james risen
To:             Sectec Astronomy
Subject:        Re: Agency
Date:           Thursday, November 01, 2012 1:44:59 PM

If you give us the Brennan emails, we will write a story

On Thu, Nov 1, 2012 at 4:34 PM, Sectec Astronomy <theagencyinsider@hotmail.com>
wrote:
    Hard to imagine that you guys would ever report on anything negative regarding
    Obama?

    DM made it clear who was at the building, and why they were all there.  There is a
    reason the CIA and NSA were there, you must know that.

    Do you really think the government invoked the State Secrets Priviledge from beiing
    embarrassed or conned?  Negroponte in his in camera declaration, if ever released,
    was spell it all of out.

    They governemnt never wanted information to come out regarding the other
    work.  The program started out spying on terrorist, and under Obama quickly moved
    to spying on Americans!!  A program which was started by Brennan in 2003 and
    continues to this day.  This technology is being used today to spy on Americans,
    including candidate Romney.

    I don't see you ever publishing that information?

    Date: Thu, 1 Nov 2012 16:07:07 -0400

    Subject: Re: Agency
    From: jrisen31@gmail.com
    To: theagencyinsider@hotmail.com

    Hi. As you recall, we had a very long phone conversation recently where we
    discussed how it would be good to report on many of the things that we didn't
    report on previously. I would like to include all of the points that you have raised in
    my book, and also to write about many of these issues in the newspaper. For the
    newspaper, I am particularly interested in the issue of Brennan, and his emails and
    related documents, which you said when we last talked that you might be willing to
    share with me. So I am open to discussing everything with you.
    Jim

    On Thu, Nov 1, 2012 at 3:58 PM, Sectec Astronomy
    <theagencyinsider@hotmail.com> wrote:

        You didn't answer my question:

        *You reported on FBI documents, as if they were accurate, when that the
        Judge tossed out all of the claims in their report. The FBI refused to
        produce any of the people in their report for examination by the court.
        That include Daniel Bogden, who was reinstated by Obama as the US
        Attorney for Nevada.*

*Why did you not mention in your story Judge Cooke scathing report against the Warren Trepp, FBI, and other government officials? Judge Cooke reported that DM had his 4th admendment constituional rights violated?*

How can I ever trust that you will report accurate information when your prior story was based on information provided to you by Mike Flynn my ex attorney?

---

Date: Thu, 1 Nov 2012 15:21:02 -0400

Subject: Re: Agency
From: jrisen31@gmail.com
To: theagencyinsider@hotmail.com

I have tried West and Venables.  I am writing a chapter in my book about all this largely because we weren't able to tell much of the story in the paper. I would like your input, and your voice in the chapter.

On Thu, Nov 1, 2012 at 3:16 PM, Sectec Astronomy <theagencyinsider@hotmail.com> wrote:

> DM doesn't need another hachet job on him.  Have you tried Agent West or Sloan Venables?
>
> You reported on FBI documents, as if they were accurate, when that the Judge tossed out all of the claims in their report.  The FBI refused to produce any of the people in their report for examination by the court.  That include Daniel Bogden, who was reinstated by Obama as the US Attorney for Nevada.
>
> Why did you not mention in your story Judge Cooke scathing report against the Warren Trepp, FBI, and other government officials?  Judge Cooke reported that DM had his 4th admendment constituional rights violated?
>
> This is so much you guys missed.

---

Date: Thu, 1 Nov 2012 14:54:31 -0400

Subject: Re: Agency
From: jrisen31@gmail.com
To: theagencyinsider@hotmail.com

Well, I would like to write more about him and everyone else involved in my book now.

On Thu, Nov 1, 2012 at 12:51 PM, Sectec Astronomy
<theagencyinsider@hotmail.com> wrote:

His role?  He is the CEO of eTreppid.  He got all
of the money.  Why was he not in your story?

Date: Thu, 1 Nov 2012 12:36:09 -0400

Subject: Re: Agency
From: jrisen31@gmail.com
To: theagencyinsider@hotmail.com

I have tried to talk to Warren Trepp. If you
have any information about his role, I would
like to talk to you about it.

On Thu, Nov 1, 2012 at 12:18 PM, Sectec
Astronomy <theagencyinsider@hotmail.com>
wrote:

Why have you not chased the
money, and contacted Warren
Trepp who kept all of the money?
I don't get that?

Date: Thu, 1 Nov 2012 11:41:01 -
0400

Subject: Re: Agency
From: jrisen31@gmail.com
To: theagencyinsider@hotmail.com

Both. We discussed how you have
information that would be very
good for a story about his
involvement.
But I also want to talk to you more
generally about your experiences
and work during the war on terror.
On Thu, Nov 1, 2012 at 10:55 AM,
Sectec Astronomy
<theagencyinsider@hotmail.com>
wrote:

Is talking to me or
Brennan emails what
your after?

What other information
are you after?

Date: Wed, 31 Oct
2012 23:25:56 -0400

Subject: Re: Agency
From:
jrisen31@gmail.com
To:
theagencyinsider@hotmail.com

I thought what we
discussed before was
really interesting, and I
would like to continue
our discussion. As I
mentioned, I am
writing about it in my
book, and I would like
to talk to you for
that.But I would also
like to talk about what
you said about
Brennan and the White
House.

On Wed, Oct 31, 2012
at 7:06 PM, Sectec
Astronomy
<theagencyinsider@hotmail.com
> wrote:

Regarding?
 So DM
get attack
in another
article?

_____

Date: Wed,
31 Oct
2012
16:47:58 -
0400

Subject:
Re:
Agency
From:
jrisen31@gmail.com

To:
theagencyinsider@hotmail.com

Hi. Can we
talk?
Jim Risen


On Fri, Oct
5, 2012 at
6:51 PM,
Sectec
Astronomy
<theagencyinsider@hotmail.com
> wrote:

I
guess
you
can
investigate
what
I
disclosed
and
then
decide.

.
Date:
Fri,
5
Oct
2012
18:47:34
-
0400

Subject:
Re:
Agency

From:
jrisen31@gmail.com

To:
theagencyinsider@hotmail.com

As
I
said
on
the
phone,
I

protect my sources. I will never divulge the identify of my sources in a leak investigation. But I also have to know that the source is telling me the truth.

Jim

On Fri, Oct 5, 2012 at 5:51 PM, Sectec Astronomy <theagencyinsider@hotmail.com> wrote:

Before documents are sent,

you
agree
that
you
will
protect
Dennis
Montgomery
as
a
protected
source.
If
the
US
Government
attacks
Dennis
Montgomery
you,
and
your
organization
will
do
everything
possible
to protect
and
defend
Dennis
Montgomery.
Agreed.

.

Date:
Fri,
5
Oct
2012
17:32:30
-
0400

Subject:
Re:
Agency

From:
jrisen31@gmail.com

To:
theagencyinsider@hotmail.com

got
it,
thanks

Jim
Risen

On
Fri,
Oct
5,
2012
at
5:11
PM,
Sectec
Astronomy
<theagencyinsider@hotmail.com
>
wrote:

> This
> is
> my
> email
> address…

Exhibit 9

 **SWEDISH** MEDICAL CENTER

May 27, 2014

Re: Dennis Lee Montgomery (DOB 7/11/1953)

To Whom It May Concern:

Mr. Dennis Montgomery underwent aneurysm surgery on 5/16/2014 that was unfortunately complicated by multi-infarct strokes with resultant severe left sided weakness and impaired vision. He is currently on the Swedish inpatient rehab unit and will be here until at least late June 2014. He will not be able to testify out of state as a result of his current disability.

Please feel free to contact me if you have any questions.

Sincerely,

**Paul Chuwn Lim, MD**
Medical Director of Swedish Rehabilitation Services
Swedish Physical Medicine and Rehabilitation
1600 E Jefferson Street, Suite #600 | Seattle, WA 98122
(clinic) 206-320-2600 | (fax) 206-320-4054

Exhibit 10


**SWEDISH** MEDICAL CENTER

January 6, 2015

Re: Dennis Lee Montgomery  (DOB 7/11/1953)

To Whom It May Concern:

Mr. Dennis Montgomery unfortunately sustained recent multi-infarct strokes with resultant severe left sided weakness and impaired vision.  He completed Swedish inpatient rehab unit under my guidance on 6/21/2014.  He is now in outpatient PT, OT to work on ongoing left sided weakness and speech therapy for stroke related cognitive and memory impairments along with swallowing difficulties.  He has severe left shoulder pain impacting his stroke recovery.  He will also undergo neuropsychological testing to evaluate his cognitive strengths and weakness.

Lastly, he is having false visual imagery related to his stroke and is being followed by neuro-ophthalmology with Dr. Eugen May.

Please feel free to contact me if you have any questions.

Sincerely,

**Paul Chuwn Lim, MD**
Medical Director of Swedish Rehabilitation Services
Swedish Physical Medicine and Rehabilitation
1600 E Jefferson Street, Suite #600 | Seattle, WA 98122
(clinic) 206-320-2600 | (fax) 206-320-4054

# Exhibit 11

# Joe Eskridge, M.D.

Swedish  Neuroscience Institute
550 17th Ave #500
Seattle WA 98122
206.320.4144

June 27, 2014

To Whom It May Concern

Dear Sirs,

I, Dr. Joe Eskridge recently treated Dennis Montgomery who is a 60 year old man who suffered from a cerebral aneurysm.  His aneurysm was detected in 2011.  He does not smoke and does not have any congenital blood vessel diseases that contribute to aneurysm development.

High blood pressure can accelerate aneurysm growth and increase the risk of rupture and stroke.  Stress can increase blood pressure and contribute to aneurysm growth.  On a more probable than not basis stress related hypertension caused the development and growth of his aneurysm.

I have performed over 5000 brain artery repair and embolization procedures over the past 30 years.  I was Professor of Radiology and Neurosurgery at the University of Washington Medical School from 1987-2004.

Sincerely yours,

Joe Eskridge, M.D.

Exhibit 12

Case 1:15-cv-20782-JEM     Document 44     Entered on FLSD Docket 04/28/2015     Page 179 of 271



# United States Special Operations Command

From Wikipedia, the free encyclopedia

The **United States Special Operations Command** (USSOCOM or SOCOM) is the Unified Combatant Command charged with overseeing the various Special Operations Component Commands of the Army, Air Force, Navy and Marine Corps of the United States Armed Forces. The command is part of the Department of Defense and is the only Unified Combatant Command legislated into being by the U.S. Congress. USSOCOM is headquartered at MacDill Air Force Base in Tampa, Florida.

The idea of a unified special operations command had its origins in the aftermath of Operation Eagle Claw, the disastrous attempted rescue of hostages at the American embassy in Iran in 1980. The ensuing investigation, chaired by Admiral James L. Holloway III, the retired Chief of Naval Operations, cited lack of command and control and inter-service coordination as significant factors in the failure of the mission.[2] Since its activation on 16 April 1987, U.S. Special Operations Command has participated in many operations, from the 1989 invasion of Panama to the ongoing Global War on Terrorism.[3][4]

USSOCOM conducts several covert and clandestine missions, such as direct action, special reconnaissance, counter-terrorism, foreign internal defense, unconventional warfare, psychological warfare, civil affairs, and counter-narcotics operations. Each branch has a Special Operations Command that is unique and capable of running its own operations, but when the different special operations forces need to work together for an operation, USSOCOM becomes the joint component command of the operation, instead of a SOC of a specific branch.[5]

## Contents

- 1 History
    - 1.1 Operation Earnest Will
    - 1.2 Somalia
    - 1.3 Iraq
- 2 Current role
    - 2.1 War in Afghanistan
    - 2.2 Global presence
- 3 Subordinate Commands
    - 3.1 Joint Special Operations Command
    - 3.2 Special Operations Command – Joint Capabilities
    - 3.3 Army
    - 3.4 Navy
    - 3.5 Air Force
    - 3.6 Marine Corps
- 4 List of USSOCOM Combatant Commanders
- 5 USSOCOM medal
- 6 See also
- 7 References
    - 7.1 Citations
    - 7.2 Bibliography
- 8 External links



| United States Special Operations Command (USSOCOM) | |
|---|---|
| United States Special Operations Command Emblem | |
| Active | April 16, 1987 – present[1] |
| Country | United States of America |
| Type | Special operations |
| Role | Provide fully capable special operations forces to defend the United States and its interests and plan and synchronize operations against terrorist networks[1] |
| Size | 63,000[1] |
| Part of | Department of Defense |
| Garrison/HQ | MacDill AFB, Florida, U.S. |
| Nickname | "USSOCOM", "SOCOM" |
| Engagements | Operation Earnest Will Invasion of Panama Persian Gulf War Unified Task Force Operation Gothic Serpent |
| | • Battle of Mogadishu |
| | Operation Uphold Democracy Global War on Terrorism |
| | • War in Afghanistan • Iraq War |
| Commanders | |
| Current commander | General Joseph L. Votel[1] |

## History

The unworkable command and control structure of separate U.S. military special operations forces (SOF), which led to the failure of Operation Eagle Claw in 1980, highlighted the need within the Department of Defense for reform and reorganization. Since the incident, the Army Chief of Staff, General Edward C. "Shy" Meyer, called for a further restructuring of special operations capabilities, eventually helping to create the U.S. Delta Force.[6] Although unsuccessful at the joint level, Meyer nevertheless went on to consolidate Army SOF units under the new 1st Special Operations Command in 1982, a significant step to improve the U.S. Army's SOF.

By 1983, there was a small but growing sense in the Congress for the need for military reforms. In June, the Senate Armed Services Committee (SASC) began a two-year-long study of the Defense Department, which included an examination of SOF spearheaded by Senator Barry Goldwater (R-AZ). With concern mounting on Capitol Hill, the Department of Defense created the Joint Special Operations Agency on 1 January 1984; this agency, however, had neither operational nor command authority over any SOF.[7][8] The Joint Special Operations Agency thus did little to improve SOF readiness, capabilities, or policies, and therefore was insufficient. Within the Defense Department, there were a few staunch SOF supporters. Noel Koch, Principal Deputy Assistant Secretary of Defense for International Security Affairs, and his deputy, Lynn Rylander, both advocated SOF reforms.[9]

At the same time, a few on Capitol Hill were determined to overhaul United States Special Operations Forces. They included Senators Sam Nunn (D-GA) and William Cohen (R-ME), both members of the Armed Services Committee, and Representative Dan Daniel (D-VA), the chairman of the United States House Armed Services Subcommittee on Readiness. Congressman Daniel had become convinced that the U.S. military establishment was not interested in special operations, that the country's

capability in this area was second rate, and that SOF operational command and control was an endemic problem.[9] Senators Nunn and Cohen also felt strongly that the Department of Defense was not preparing adequately for future threats. Senator Cohen agreed that the U.S. needed a clearer organizational focus and chain of command for special operations to deal with low-intensity conflicts.[7]

In October 1985, the Senate Armed Services Committee published the results of its two-year review of the U.S. military structure, entitled "Defense Organization: The Need For Change."[10] Mr. James R. Locher III, the principal author of this study, also examined past special operations and speculated on the most likely future threats. This influential document led to the Goldwater-Nichols Defense Reorganization Act of 1986.[11][12] By spring 1986, SOF advocates had introduced reform bills in both houses of Congress. On 15 May, Senator Cohen introduced the Senate bill, co-sponsored by Senator Nunn and others, which called for a joint military organization for SOF and the establishment of an office in the Defense Department to ensure adequate funding and policy emphasis for low-intensity conflict and special operations.[13] Representative Daniel's proposal went even further—he wanted a national special operations agency headed by a civilian who would bypass the Joint Chiefs and report directly to the Secretary of Defense; this would keep Joint Chiefs and the Services out of the SOF budget process.[8]


Senator Barry Goldwater, Former Chairman of the Senate Armed Services Committee

Congress held hearings on the two bills in the summer of 1986. Admiral William J. Crowe Jr., Chairman of the Joint Chiefs of Staff, led the Pentagon's opposition to the bills. He proposed, as an alternative, a new Special Operations Forces command led by a three-star general. This proposal was not well received on Capitol Hill—Congress wanted a four-star general in charge to give SOF more clout. A number of retired military officers and others testified in favor of the need for reform.[9] By most accounts, retired Army Major General Richard Scholtes gave the most compelling reasons for change. Scholtes, who commanded the joint special operations task force in Grenada, explained how conventional force leaders misused SOF during the operation, not allowing them to use their unique capabilities, which resulted in high SOF casualties. After his formal testimony, Scholtes met privately with a small number of Senators to elaborate on the problems that he had encountered in Grenada.[14]

Both the House and Senate passed SOF reform bills, and these went to a conference committee for reconciliation. Senate and House conferees forged a compromise. The bill called for a unified combatant command headed by a four-star general for all SOF, an Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict, a coordinating board for low-intensity conflict within the National Security Council, and a new Major Force Program (MFP-11) for SOF (the so-called "SOF checkbook").[15][16] The final bill, attached as a rider to the 1987 Defense Authorization Act, amended the Goldwater-Nichols Act and was signed into law in October 1986. Congress clearly intended to force DOD and the Administration to face up to the realities of past failures and emerging threats. DOD and the Administration were responsible for implementing the law, and Congress subsequently had to pass two additional bills to ensure proper implementation.[9] The legislation promised to improve SOF in several respects. Once implemented, MFP-11 provided SOF with control over its own resources, better enabling it to modernize the force. Additionally, the law fostered interservice cooperation: a single commander for all SOF promoted interoperability among the forces assigned to the same command. The establishment of a four-star Commander in Chief and an Assistant Secretary of Defense for Special Operations and Low Intensity Conflict eventually gave SOF a voice in the highest councils of the Defense Department.[15]


General James Lindsay the first Commander in Chief, Special Operations Command

Implementing the provisions and mandates of the Nunn-Cohen Act, however, was neither rapid nor smooth. One of the first issues to surface was appointing an ASD (SO/LIC), whose principal duties included monitorship of special operations activities and low-intensity conflict activities of the Department of Defense. The Congress even increased the number of assistant secretaries of defense from 11 to 12, but the Department of Defense still did not fill this new billet. In December 1987, the Congress directed Secretary of the Army John O. Marsh to carry out the ASD (SO/LIC) duties until a suitable replacement was approved by the Senate. Not until 18 months after the legislation passed did Ambassador Charles Whitehouse assume the duties of ASD (SO/LIC).[17]

Meanwhile, the establishment of USSOCOM provided its own measure of excitement. A quick solution to manning and basing a brand new unified command was to abolish an existing command. United States Readiness Command (USREDCOM), with an often misunderstood mission, did not appear to have a viable mission in the post Goldwater-Nichols era, and its Commander in Chief, General James Lindsay, had had some special operations experience. On 23 January 1987, the Joint Chiefs of Staff recommended to the Secretary of Defense that USREDCOM be disestablished to provide billets and facilities for USSOCOM. President Ronald Reagan approved the establishment of the new command on 13 April 1987. The Department of Defense activated USSOCOM on 16 April 1987 and nominated General Lindsay to be the first Commander in Chief Special Operations Command (USCINCSOC). The Senate accepted him without debate.[9]

## Operation Earnest Will

USSOCOM's first tactical operation involved SEALs, Special Boat Teams (SBT), and 160th Special Operations Aviation Regiment (Airborne) ("Night Stalkers") aviators working together during Operation Earnest Will in September 1987. During Operation Earnest Will, the United States ensured that neutral oil tankers and other merchant ships could safely transit the Persian Gulf during the Iran–Iraq War. Iranian attacks on tankers prompted Kuwait to ask the United States in December 1986 to register 11 Kuwaiti tankers as American ships so that they could be escorted by the U.S. Navy. President Reagan agreed to the Kuwaiti request on 10 March 1987, hoping it would deter Iranian attacks.[9] The protection offered by U.S. naval vessels, however, did not stop Iran, which used mines and small boats to harass the convoys steaming to and from Kuwait. In late July 1987, Rear Admiral Harold J. Bernsen, commander of the Middle East Force, requested NSW assets. Special Boat Teams deployed with six Mark III Patrol Boats and two SEAL platoons in August.[9] The Middle East Force decided to convert two oil servicing barges, Hercules and Wimbrown VII, into mobile sea bases. The mobile sea bases allowed SOF in the northern Persian Gulf to thwart clandestine Iranian mining and small boat attacks.


MH-60 landing on Hercules

On 21 September, Nightstalkers flying MH-60 and Little Birds took off from the frigate USS Jarrett to track an Iranian ship, the Iran Ajr. The Nightstalkers observed the Iran Ajr turn off its lights and begin laying mines. After receiving permission to attack, the helicopters fired guns and rockets, stopping the ship. As the Iran Ajr's crew began to push mines over the side, the helicopters resumed firing until the crew abandoned ship. Special Boat Teams provided security while a SEAL team boarded the vessel at first light and discovered nine mines on the vessel's deck, as well as a logbook revealing areas where previous mines had been laid. The logbook implicated Iran in mining international waters.[9]

Within a few days, the Special Operations forces had determined the Iranian pattern of activity; the Iranians hid during the day near oil and gas platforms in Iranian waters and at night they headed toward the Middle Shoals Buoy, a navigation aid for tankers. With this knowledge, SOF launched three Little Bird helicopters and two patrol craft to the buoy. The Little Bird helicopters arrived first and were fired upon by three Iranian boats anchored near the buoy. After a short but intense firefight, the helicopters sank all three boats. Three days later, in mid-October, an Iranian Silkworm missile hit the tanker Sea Isle City near the oil terminal outside Kuwait City. Seventeen crewmen and the American captain were injured in the missile attack.[9][18] During Operation Nimble Archer, four destroyers shelled two oil platforms in the Rostam oil field. After the shelling, a SEAL platoon and a demolition unit planted explosives on one of the platforms to destroy it. The SEALs next boarded and searched a third platform 2 miles (3 km) away. Documents and radios were taken for intelligence purposes.

On 14 April 1988, 65 miles (100 km) east of Bahrain, the frigate USS Samuel B. Roberts (FFG-58) hit a mine, blowing an immense hole in its hull.[19] Ten sailors were injured. During Operation Praying Mantis the U.S. retaliated fiercely, attacking the Iranian frigate Sahand and oil platforms in the Sirri and Sassan oil fields.[18] After U.S. warships bombarded the Sirri platform and set it ablaze, a UH-60 with a SEAL platoon flew toward the platform but was unable to get close enough because of the roaring fire. Secondary explosions soon wrecked the platform.[9] Thereafter, Iranian attacks on neutral ships dropped drastically. On 3 July 1988, the USS Vincennes shot down an Iranian civilian airliner, Iran Air Flight 655, killing all 290 people on board, including 66 children. On 18 July, Iran accepted the United Nations cease fire; on 20 August 1988, the Iran–Iraq War ended. The remaining SEALs, patrol boats, and helicopters then returned to the United States.[9] Special operations forces provided critical skills necessary to help CENTCOM gain control of the northern Persian Gulf and balk Iran's small boats and minelayers. The ability to work at night proved vital, because Iranian units used darkness to conceal their actions. Additionally, because of Earnest Will operational requirements, USSOCOM would acquire new weapons systems—the patrol coastal ships and the Mark V Special Operations Craft.[9]

## Somalia



One of two Iranian oil platform set ablaze after shelling by American destroyers.

Special Operations Command first became involved in Somalia in 1992 as part of Operation Provide Relief. C-130s circled over Somali airstrips during delivery of relief supplies. Special Forces medics accompanied many relief flights into the airstrips throughout southern Somalia to assess the area. They were the first U.S. soldiers in Somalia, arriving before U.S. forces who supported the expanded relief operations of Restore Hope.[9][20][21] The first teams into Somalia were CIA Special Activities Division paramilitary officers with elements of JSOC. They conducted very high risk advanced force operations prior to the entry of the follow on forces. The first casualty of the conflict came from this team and was a Paramilitary officer and former Delta Force operator name Larry Freedman. Freedman was awarded the Intelligence Star for "extraordinary heroism" for his actions.[22]

The earliest missions during Operation Restore Hope were conducted by Navy SEALs. The SEALs performed several hydro-graphic reconnaissance missions to find suitable landing sites for Marines. On 7 December, the SEALs swam into Mogadishu Harbor, where they found suitable landing sites, assessed the area for threats, and concluded that the port could support offloading ships. This was a tough mission because the SEALs swam against a strong current which left many of them overheated and exhausted. Furthermore, they swam through raw sewage in the harbor, which made them sick.[9] When the first SEALs hit the shore the following night, they were surprised to meet members of the news media. The first Marines came ashore soon thereafter, and the press redirected their attention to them. Later, the SEALs provided personal security for President George Bush during a visit to Somalia.[9][21] In December 1992, Special Forces assets in Kenya moved to Somalia and joined Operation Restore Hope. January 1993, a Special Forces command element deployed to Mogadishu as the Joint Special Operations Forces-Somalia (JSOFOR) that would command and control all special operations for Restore Hope. JSOFOR's mission was to make initial contact with indigenous factions and leaders; provide information for force protection; and provide reports on the area for future relief and security operations. Before redeploying in April, JSOFOR elements drove over 26,000 miles (42,000 km), captured 277 weapons, and destroyed over 45,320 pounds (20,560 kg) of explosives.[9]



Bravo Company, 3rd Battalion of the 75th Ranger Regiment in Somalia, 1993.

In August 1993, Secretary of Defense Les Aspin directed the deployment of a Joint Special Operations Task Force (JSOTF) to Somalia in response to attacks made by General Mohamed Farrah Aidid's supporters upon U.S. and UN forces. The JSOTF, named Task Force (TF) Ranger, was charged with a mission named Operation Gothic Serpent to capture Aidid. This was an especially arduous mission, for Aidid had gone underground, after several Lockheed AC-130 air raids and UN assaults on his strongholds.[9][23][24]

While Marines from the 24th MEU provided an interim QRF (Force Recon Det and helicopters from HMM-263), the task force arrived in the country, and began training exercises. The Marines were asked to take on the Aidid snatch mission, but having the advantage of being in the area for more than two months, decided after mission analysis that the mission was a "no-go" due to several factors, centered around the inability to rescue the crew of a downed helicopter (re: the indigenous forces technique of using RPGs against helicopters and blocking the narrow streets in order to restrict the movement of a ground rescue force). This knowledge was not passed on to the Rangers, due to the Marines operating from the USS Wasp and the Rangers remaining on land. TF Ranger was made up of operators from Delta Force, 75th Ranger Regiment, 160th SOAR, Air Force special tactics units, and SEALs from the Naval Special Warfare Development Group.[9][23] During August and September 1993, the task force conducted six missions to Mogadishu, all of which were successes. Although Aidid remained free, the effect of these missions seriously limited his movements.[24]

On 3 October, TF Ranger launched its seventh mission, this time into Aidid's stronghold the Bakara Market to capture two of his key lieutenants. The mission was expected to take only one or two hours.[23] Helicopters carried an assault and a ground convoy of security teams launched in the late afternoon from the TF Ranger compound at Mogadishu airport. The TF came under increasingly heavy fire, more intense than during previous missions. The assault team captured 24 Somalis including Aidid's lieutenants and were loading them onto the convoy trucks when a MH-60 Blackhawk was hit by a rocket-propelled grenade (RPG).[9][24] A small element from the security force, as well as an MH-6 assault helicopter and an MH-60 carrying a fifteen man combat search and rescue (CSAR) team, rushed to the crash site.[9][23][24] The battle became increasingly worse. An RPG struck another MH-60, crashing less than 1 mile (1.6 km) to the south of the first downed helicopter. The task force faced overwhelming Somali mobs that overran the crash sites, causing a dire situation.[23] A Somali mob overran the second site and, despite a heroic defense, killed everyone except the pilot, whom they took prisoner. Two defenders of this crash site, Master Sergeant Gary Gordon and Sergeant First Class Randall Shughart, were posthumously awarded the Medal of Honor.[9][23][24] About this time, the mission's quick reaction force (QRF) also tried to reach the second crash site. This force too was pinned by Somali fire and required the fire support of two AH-6 helicopters before it could break contact and make its way back to the base.[9]

The assault and security elements moved on foot towards the first crash area, passing through heavy fire, and occupied buildings south and southwest of the downed helicopter. They fought to establish defensive positions so not to be pinned down by very heavy enemy fire, while treating their wounded, and worked to free the pilot's body from the downed helicopter. With the detainees loaded on trucks, the ground convoy force attempted to reach the first crash site. Unable to find it amongst the narrow, winding alleyways, the convoy came under devastating small arms and RPG fire. The convoy had to return to base after suffering numerous casualties, and sustaining substantial damage to their vehicles.

Reinforcements, consisting of elements from the QRF, 10th Mountain Division soldiers, Rangers, SEALs, Pakistan Army tanks and Malaysian armored personnel carriers, finally arrived at 1:55 am on 4 October. The combined force worked until dawn to free the pilot's body, receiving RPG and small arms fire throughout the night.[9] All the casualties were loaded onto the armored personnel carriers, and the remainder of the force was left behind and had no choice but to move out on foot.[23] AH-6 gunships raked the streets with fire to support the movement. The main force of the convoy arrived at the Pakistani Stadium-compound for the QRF-at 6:30 am,[23] thus concluding one of the bloodiest and fiercest urban firefights since the Vietnam War. Task Force Ranger experienced a total of 17 killed in action and 106 wounded. Various estimates placed Somali casualties above 1,000.[23] Although Task Force Ranger's few missions were successes, the overall outcome of Operation Gothic Serpent was deemed a failure because of the Task Force's failure to complete their stated mission, capturing Mohamed Farrah Aidid.[23] Most U.S. forces pulled out of Somalia by March 1994.

The withdrawal from Somalia, was completed on March 1995.[9] Even though Operation Gothic Serpent failed, USSOCOM still made significant contributions to operations in Somalia. SOF performed reconnaissance and surveillance missions, assisted with humanitarian relief, protected American forces and conducted riverine patrols. Additionally, they ensured the safe landing of the Marines and safeguarded the arrival of merchant ships carrying food.[9][18]

## Iraq

USSOCOM's 10th Special Forces Group, elements of JSOC and CIA/SAD Paramilitary Officers linked up again and were the first to enter Iraq prior to the invasion. Their efforts organized the Kurdish Peshmerga to defeat Ansar Al Islam in Northern Iraq before the invasion. This battle was for control of a territory in Northeastern Iraq that was completely occupied by Ansar Al Islam, an ally of Al Qaeda. This was a very significant battle and led to the termination of a substantial number of terrorists and the uncovering of a chemical weapons facility at Sargat. These terrorists would have been in the subsequent insurgency had they not been eliminated during this battle. Sargat was the only facility of its type discovered in the Iraq war. This battle may have been the Tora Bora of Iraq, but it was a sound defeat for Al Qaeda and their ally Ansar Al Islam. This combined team then led the Peshmerga against Saddam's northern Army. This effort kept Saddam's forces in the north and denied the ability to redeploy to contest the invasion force coming from the south. This effort may have saved the lives of hundreds if not thousands of coalition service men and women.[25]

At the launch of the Iraq War dozens of 12-member Special Forces teams infiltrated southern and western Iraq to hunt for Scud missiles and pinpoint bombing targets. Scores of Navy SEALs seized oil terminals and pumping stations on the southern coast.[26] Air Force combat controllers flew combat missions in MC-130H Combat Talon IIs and established austere desert airstrips to begin the flow of soldiers and supplies deep into Iraq. It was a far cry from the Persian Gulf war of 1991, where Special Operations forces were kept largely on the sidelines. But it would not be a replay of Afghanistan, where Army Special Forces and Navy SEALs led the fighting. After their star turn in Afghanistan, many special operators were disappointed to play a supporting role in Iraq. Many special operators felt restricted by cautious commanders.[27] From that point, USSOCOM has since killed or captured hundreds of insurgents and Al-Qaeda terrorists. It has conducted several foreign internal defense missions successfully training the Iraqi security forces.[28][29]

# Current role

United States Special Operations Command played a pivotal role in fighting the former Taliban government in Afghanistan in 2001[30] and toppling it thereafter, as well as combating the insurgency and capturing Saddam Hussein in Iraq. USSOCOM in 2004 was developing plans to have an expanded and more complex role in the global campaign against terrorism,[31] and that role continued to emerge before and after the killing of Osama bin Laden in Pakistan in 2011.[32][33] In 2010, "of about 13,000 Special Operations forces deployed overseas, about 9,000 [were] evenly divided between Iraq and Afghanistan."[32]


Map of the main battle sites during the Battle of Mogadishu.

## War in Afghanistan

In the initial stages of the War in Afghanistan, USSOCOM forces linked up with CIA Paramilitary Officers from Special Activities Division to defeat the Taliban without the need for large-scale conventional forces.[34] This was one of the biggest successes of the global War on Terrorism.[35] These units linked up several times during this war and engaged in several furious battles with the enemy. One such battle happened during Operation Anaconda the mission to squeeze life out of a Taliban and Al-Qaeda stronghold dug deep into the Shah-i-Kot mountains of eastern Afghanistan. The operation was seen as one of the heaviest and bloodiest fights in the War in Afghanistan.[36] The battle on an Afghan mountaintop called Takur Ghar featured special operations forces from all 4 services and the CIA. Navy SEALs, Army Rangers, Air Force Combat Controllers, and Pararescuemen fought against entrenched Al-Qaeda fighters atop a 10,000-foot (3,000 m) mountain. Subsequently, the entrenched Taliban became targets of every asset in the sky. According to an executive summary, the battle of Takur Ghar was the most intense firefight American special operators have been involved in since 18 U.S. Army Rangers were killed in Mogadishu, Somalia, in 1993.[37][38][39] During Operation Red Wings on 28 June 2005, four Navy SEALs, pinned down in a firefight, radioed for help. A Chinook helicopter, carrying 16 service members, responded but was shot down. All members of the rescue team and three of four SEALs on the ground died. It was the worst loss of life in Afghanistan since the invasion in 2001. The Navy SEAL Marcus Luttrell alone survived.[40][41] Team leader Michael P. Murphy was awarded the Medal of Honor for his actions in the battle.

A 7th SFG Special Forces medic in Kandahar Province, Afghanistan, in September 2008.

## Global presence

SOC chief Olson said in 2011 that SOCOM "is a microcosm of the Department of Defense, with ground, air, and maritime components, a global presence, and authorities and responsibilities that mirror the Military Departments, Military Services, and Defense Agencies."[33] In 2010, special operations forces were deployed in 75 countries, compared with about 60 at the beginning of 2009.[32] In 2011, SOC spokesman Colonel Tim Nye (Army[42]) was reported to have said that the number of countries with SOC presence will likely reach 120 and that joint training exercises will have been carried out in most or all of those countries during the year. One study identified joint-training exercises in Belize, Brazil, Bulgaria, Burkina Faso, Germany, Indonesia, Mali, Norway, Panama, and Poland in 2010 and also, through mid-year 2011, in the Dominican Republic, Jordan, Romania, Senegal, South Korea, and Thailand, among other nations. In addition, SOC forces executed the high profile killing of Osama bin Laden in Pakistan in 2011.[33]

Wikileaks' releases of cables from the U.S. Embassy, Pakistan, revealed the presence of a detachment of SOCOM (or possibly United States Army Special Operations Command) referred to as SOC(FWD)-PAK (09ISLAMABAD2449, 9 August 2010). This unit or headquarters may be, in full form, Special Operations Command (Forward)-Pakistan. It seems unlikely that the – symbol refers to the minus sign that sometimes means that the unit or headquarters is operating at less than full strength. The unit or headquarters includes a Military Information Support Team (MIST [1] (http://www.africom.mil/getArticle.asp?art=4866)).[43] Another story that reported on JSOC/Blackwater anti-terrorist operations in Pakistan was Jeremy Scahill's "The Secret U.S. War in Pakistan" (http://www.thenation.com/article/secret-us-war-pakistan), in the 7 November 2009, issue of The Nation.

In 2010, White House counterterrorism director John O. Brennan said that the United States "will not merely respond after the fact" of a terrorist attack but will "take the fight to al-Qaeda and its extremist affiliates whether they plot and train in Afghanistan, Pakistan, Yemen, Somalia and beyond." Olson said, "In some places, in deference to host-country sensitivities, we are lower in profile. In every place, Special Operations forces activities are coordinated with the U.S. ambassador and are under the operational control of the four-star regional commander."[32]

The conduct of actions by SOC forces outside of Iraq and Afghan war zones has been the subject of internal U.S. debate, including between representatives of the Bush administration such as John B. Bellinger III, on one hand, and the Obama administration on another. The United Nations in 2010 also "questioned the administration's authority under international law to conduct such raids, particularly when they kill innocent civilians. One possible legal justification – the permission of the country in question – is complicated in places such as Pakistan and Yemen, where the governments privately agree but do not publicly acknowledge approving the attacks," as one report put it.[32]

## Subordinate Commands



Special Operations Command Structure (Media:U.S. Special Operations Command.png).

### Joint Special Operations Command

[44] Joint Special Operations Command is a component command of the USSOCOM and is charged to study special operations requirements and techniques to ensure interoperability and equipment standardization, plan and conduct special operations exercises and training, and develop Joint Special Operations Tactics.[1] It was established in 1980 on recommendation of Col. Charlie Beckwith, in the aftermath of the failure of Operation Eagle Claw.[45]

Units

- The U.S. Army's 1st Special Forces Operational Detachment-Delta, popularly known as Delta Force, is the first of the two primary counter-terrorist units of JSOC and SOCOM.[46] Modeled after the British Special Air Service, Delta Force is regarded as one of the premier special operations forces in the world.[47] This is because of Delta's stringent training and selection process. Delta recruits primarily from the most talented and highly skilled operators in the Army Special Forces and the 75th Ranger Regiment although Delta will take anyone and everyone that can pass their screening.[23][47] Recruits must pass a rigid selection course before beginning training. Delta has received training from numerous U.S. government agencies and other tier one SOF and has created a curriculum based on this training and techniques that it has developed.[47] Delta conducts clandestine and covert special operations all over the world.[47] It has the capability to conduct myriad special operations missions but specializes in counter-terrorism and hostage rescue operations.[23][46][48]

- The Naval Special Warfare Development Group (DEVGRU, SEAL Team Six) is the second of the two primary counter-terrorist units of JSOC and SOCOM.[46] DEVGRU is Naval Special Warfare's counterpart to Delta. Like Delta, DEVGRU recruits the best operators from the best units in its branch, the Navy SEALs. DEVGRU is capable of performing any type of special operations mission, but trains especially for counter-terrorist and hostage rescue operations.[23][46]

- The Intelligence Support Activity (ISA, The Activity) is the support branch of JSOC and USSOCOM. Its primary missions are to provide Human Intelligence (HUMINT) and Signal Intelligence (SIGINT) mainly for Delta and DEVGRU's operations.[46][49] Before the establishing of the Strategic Support Branch in 2001, the ISA needed the permission of the CIA to conduct its operations, which sometimes caused it to be less effective in its support of JSOC's primary units.[46][50][51]

- The Air Force 24th Special Tactics Squadron (24th STS) is the AFSOC component of JSOC. The 24th STS usually operates with Delta and DEVGRU because of the convenience of 24th STS ability to synchronize and control the different elements of air power and enhance air operations deep in enemy territory.[23]

Portions of JSOC units have made up the constantly changing special operations task force, operating in the U.S. Central Command area of operations. The Task Force 11, Task Force 121, Task Force 6-26 and Task Force 145 are creations of the Pentagon's post-11 September campaign against terrorism, and it quickly became the model for how the military would gain intelligence and battle insurgents in the future. Originally known as Task Force 121, it was formed in the summer of 2003, when the military merged two existing Special Operations units, one hunting Osama bin Laden in and around Afghanistan, and the other tracking Sadaam Hussein in Iraq.[52][53]

### Special Operations Command – Joint Capabilities

Special Operations Command – Joint Capabilities (SOC-JC) was transferred to USSOCOM from the soon to be disestablished United States Joint Forces Command.[54]

Primary Mission: SOC-JC trains conventional and SOF commanders and their staffs, supports USSOCOM international engagement training requirements, and supports implementation of capability solutions in order to improve strategic and operational Warfighting readiness and joint interoperability. SOC-JC must also be prepared to support deployed Special Operations Joint Task Force (SOJTF) Headquarters (HQ).

As a joint sub-unified command under USSOCOM, SOC-JC's core function is to enhance the interoperability of conventional and Special Operations Forces (SOF) commanders and staffs through robust strategic and operational level joint training. In coordination with the USSOCOM J3, J7/9 and Joint Special Operations University (JSOU), SOC-JC provides excellent training and support to the education for SOF and Conventional Forces (CF) worldwide. Additionally, SOC-JC supports the joint SOF capabilities development process while maintaining the flexibility to support emerging initiatives.

The Joint Special Operations Command insignia

Case 1:15-cv-20782-JEM    Document 44    Entered on FLSD Docket 04/28/2015    Page 184 of 271

## Army

On 1 December 1989 the United States Army Special Operations Command (USASOC) activated as the 16th major Army command. These special operations forces have been America's spearhead for unconventional warfare for more than 40 years. USASOC commands such units as the well known Special Forces (SF, or the "Green Berets") and Rangers, and such relatively unknown units as the Psychological Operations Group (PSYOP) and Civil Affairs Brigade (CA). These are one of the USSOCOM's main weapons for waging unconventional warfare and counter-insurgency. The significance of these units is emphasized as conventional conflicts are becoming less prevalent as insurgent and guerrilla warfare increases.[55][56]



USASOC patch.

### Units

- The 75th Ranger Regiment (U.S. Army Rangers) is the premier light-infantry unit of the United States Army and is headquartered at Fort Benning, Georgia. The 75th Ranger Regiment's mission is to plan and conduct special missions in support of U.S. policy and objectives.[57] The Rangers are a flexible and rapid-deployable force. Each battalion can deploy anywhere in the world within 18 hours notice. The Army places much importance on the 75th Ranger Regiment and its training; it possesses the capabilities to conduct conventional and most special operations missions. Rangers are capable of infiltrating by land, sea, or air and direct action operations such as conducting raids or assaulting buildings or airfields.[58]

- United States Army Special Forces (SF) aka Green Berets perform several doctrinal missions: unconventional warfare, foreign internal defense, special reconnaissance, direct action and counter-terrorism. These missions make Special Forces unique in the U.S. military, because they are employed throughout the three stages of the operational continuum: peacetime, conflict and war.[59] Foreign internal defense operations, SF's main peacetime mission, are designed to help friendly developing nations by working with their military and police forces to improve their technical skills, understanding of human rights issues, and to help with humanitarian and civic action projects. Special Forces unconventional warfare capabilities provide a viable military option for a variety of operational taskings that are inappropriate or infeasible for conventional forces. Special Forces are the U.S. military's premier unconventional warfare force.[60] Foreign internal defense and unconventional warfare missions are the bread and butter of Special Forces soldiers. For this reason SF candidates are trained extensively in weapons, engineering, communications and medicine. SF soldiers are taught to be warriors first and teachers second because they must be able to train their team and be able to train their allies during a FID or UW mission.[59][61] Often SF units are required to perform additional, or collateral, activities outside their primary missions. These collateral activities are coalition warfare/support, combat search and rescue, security assistance, peacekeeping, humanitarian assistance, humanitarian de-mining and counter-drug operations.[62]



Special Forces on a patrol in Afghanistan.

- The 160th Special Operations Aviation Regiment (Night Stalkers) headquartered at Fort Campbell, Kentucky provides aviation support to units within USSOCOM. The Regiment consists of MH-6 and AH-6 light helicopters, MH-60 helicopters and MH-47 heavy assault helicopters. The capabilities of the 160th SOAR (A) have been evolving since the early 1980s. Its focus on night operations resulted in the nickname, the "Night Stalkers."[63] The primary mission of the Night Stalkers is to conduct overt or covert infiltration, exfiltration, and resupply of special operations forces across a wide range of environmental conditions.[64]

- 4th Military Information Support Group (Airborne) and 8th Military Information Support Group (Airborne) Soldiers use persuasion to influence perceptions and encourage desired behavior.[65][66] PSYOP soldiers supports national objectives at the tactical, operational and strategic levels of operations. Strategic psychological operations advance broad or long-term objectives; global in nature, they may be directed toward large audiences or at key communicators. Operational psychological operations are conducted on a smaller scale. 4th PSYOP Gp is employed by theater commanders to target groups within the theater of operations. 4th PSYOP Gp purpose can range from gaining support for U.S. operations to preparing the battlefield for combat. Tactical psychological operations are more limited, used by commanders to secure immediate and near-term goals. In this environment, these force-enhancing activities serve as a means to lower the morale and efficiency of enemy forces.[67]

- 95th Civil Affairs Brigade (Airborne) specialists identify critical requirements needed by local citizens in war or disaster situations. They also locate civilian resources to support military operations, help minimize civilian interference with operations, support national assistance activities, plan and execute noncombatant evacuation, support counter-drug operations and establish and maintain liaison with civilian aid agencies and other nongovernmental organizations. In support of special operations, these culturally oriented, linguistically capable Soldiers may also be tasked to provide functional expertise for foreign internal defense operations, unconventional warfare operations and direct action missions.[68]

- Sustainment Brigade (Special Operations) (Airborne) (SBSO(A)) has a difficult mission supporting USASOC. In their respective fields, signal and support soldiers provide supplies, maintenance, equipment and expertise allowing Special Operation Forces to "shoot, move and communicate" on a continuous basis. Because USASOC often uses Special Operations Forces-unique items, soldiers assigned to these units are taught to operate and maintain a vast array of specialized equipment not normally used by their conventional counterparts. SBSO(A) also provides the USASOC with centralized and integrated material management of property, equipment maintenance, logistical automation and repair parts and supplies.[69]

- John F. Kennedy Special Warfare Center (USAJFKSWCS) trains USSOCOM and Army Special Operations Forces through development and evaluation of special operations concepts, doctrines and trainings.[70]

## Navy

The United States Naval Special Warfare Command (NAVSPECWARCOM, NAVSOC, or NSWC) was commissioned April 16, 1987, at Naval Amphibious Base Coronado in San Diego as the Naval component to the United States Special Operations Command. Naval Special Warfare Command provides vision, leadership, doctrinal guidance, resources and oversight to ensure component special operations forces are ready to meet the operational requirements of combatant commanders.[71] Today, SEAL Teams and Special Boat Teams comprise the elite combat units of Naval Special Warfare. These teams are organized, trained, and equipped to conduct a variety of

missions to include direct action, special reconnaissance, counter-terrorism, foreign internal defense, unconventional warfare and support psychological and civil affairs operations. Their highly trained operators are deployed worldwide in support of National Command Authority objectives, conducting operations with other conventional and special operations forces.

Units



- United States Navy SEALs have distinguished themselves as an individually reliable, collectively disciplined and highly skilled special operations force. The most important trait that distinguishes Navy SEALs from all other military forces is that SEALs are maritime special operations, as they strike from and return to the sea. SEALs (SEa, Air, Land) take their name from the elements in and from which they operate. SEALs are experts in direct action and special reconnaissance missions. Their stealth and clandestine methods of operation allow them to conduct multiple missions against targets that larger forces cannot approach undetected. Because of the dangers inherent in their missions, prospective SEALs go through what is considered by many military experts to be the toughest training regime in the world.[72][73]

United States Naval Special Warfare Command emblem.

- Naval Special Warfare Development Group (DEVGRU), referred to as SEAL Team Six, the name of its predecessor which was officially disbanded in 1987.
- SEAL Delivery Vehicle Teams are SEAL teams with an added underwater delivery capability who use the SDV MK VIII and the Advanced SEAL Delivery System (ASDS), submersibles that provides NSW with an unprecedented capability that combines the attributes of clandestine underwater mobility and the combat swimmer.[74][75]



- Special Warfare Combatant-craft Crewmen (SWCC) operate and maintain state-of-the-art surface craft to conduct coastal patrol and interdiction and support special operations missions. Focusing on infiltration and exfiltration of SEALs and other SOF, SWCCs provide dedicated rapid mobility in shallow water areas where larger ships cannot operate. They also bring to the table a unique SOF capability: Maritime Combatant Craft Aerial Delivery System—the ability to deliver combat craft via parachute drop.[1] Like SEALs, SWCCs must have excellent physical fitness, highly motivated, combat-focused and responsive in high stress situations.[76]

SEALs emerge from the water during a demonstration.

## Air Force

Air Force Special Operations Command was established May 22, 1990, with headquarters at Hurlburt Field, Florida. AFSOC is one of the 10 Air Force Major Commands or MAJCOMs, and the Air Force component of United States Special Operations Command. It contains the Twenty-Third Air Force and holds operational and administrative oversight of subordinate special operations wings and groups in the regular Air Force, Air Force Reserve Command and the Air National Guard.



AFSOC provides Air Force special operations forces for worldwide deployment and assignment to regional unified commands. The command's SOF are composed of highly trained, rapidly deployable airmen, conducting global special operations missions ranging from precision application of firepower via airstrikes or close air support, to infiltration, exfiltration, resupply and refueling of SOF operational elements.[77] AFSOC's unique capabilities include airborne radio and television broadcast for psychological operations, as well as aviation foreign internal defense instructors to provide other governments military expertise for their internal development.

Air Force Special Operations Command emblem.

The command's core missions include battlefield air operations; agile combat support; aviation foreign internal defense; information operations; precision aerospace fires; psychological operations; specialized air mobility; specialized refueling; and intelligence, surveillance and reconnaissance.[27][78][79]

Units

- Combat Controllers (CCT) are ground combat forces specialized in a traditional pathfinder role while having a heavy emphasis on simultaneous air traffic control, fire support (via airstrikes, close air support and command, control, and communications in covert or austere environments.[80][81]
- Pararescuemen (PJ) are the only Department of Defense specialty specifically trained and equipped to conduct conventional and unconventional personnel recovery operations. A PJ's primary function is as a personnel recovery specialist with emergency trauma medical capabilities in humanitarian and combat environments.
- Special Operations Weather Technicians (SOWT) gather, assess, and interpret weather and environmental intelligence from forward deployed locations, working alongside special operations forces.

Organization

- The 1st Special Operations Wing (1 SOW) is located at Hurlburt Field, Florida. Its mission focus is unconventional warfare: counter-terrorism, combat search and rescue, personnel recovery, psychological operations, aviation assistance to developing nations, "deep battlefield" resupply, interdiction and close air support. The wing's core missions include aerospace surface interface, agile combat support, combat aviation advisory operations, information operations, personnel recovery/recovery operations, precision aerospace fires, psychological operations dissemination, specialized aerospace mobility and specialized aerial refueling.[82] Among its aircraft is the MC-130 Combat Talon II, a low-level terrain following special missions transport that can evade radar detection and slip into enemy territory at a 200-foot (61 m) altitude for infiltration/exfiltration missions, even in zero visibility, dropping off or recovering men or supplies with pinpoint accuracy. It also operates the AC-130 Spooky and Spectre gunships that provide highly accurate airborne gunfire for close air support of conventional and special operations forces on the ground.[46]
- The 24th Special Operations Wing (24 SOW) is located at Hurlburt Field, Florida. It's composed of the 720th Special Tactics Group, 724th Special Tactics Group, Special Tactics Training Squadron and 16 recruiting locations across the United States.[83][84] The Special Tactics Squadrons, under the 720th STG and 724th STG, are made up of Special Tactics Officers, Combat Controllers, Combat Rescue Officers, Pararescuemen, Special Operations Weather Officers and Airmen, Air Liaison Officers, Tactical Air Control Party operators, and a number of combat support airmen which comprise 58 Air Force specialties.[84]

Case 1:15-cv-20782-JEM    Document 44    Entered on FLSD Docket 04/28/2015    Page 186 of 271

- The 27th Special Operations Wing (27 SOW) is located at Cannon AFB, New Mexico. Its primary mission includes infiltration, exfiltration and re-supply of special operations forces; air refueling of special operations rotary wing and tiltrotor aircraft; and precision fire support. These capabilities support a variety of special operations missions including direct action, unconventional warfare, special reconnaissance, counter-terrorism, personnel recovery, psychological operations and information operations.[85]

- The 193d Special Operations Wing (193 SOW) is an Air National Guard (ANG) unit, operationally gained by AFSOC, and located at Harrisburg International Airport/Air National Guard Station (former Olmsted Air Force Base), Pennsylvania. Under Title 32 USC, the 193 SOW performs state missions for the Governor of Pennsylvania as part of the Pennsylvania Air National Guard. Under Title 10 USC, the 193 SOW is part of the Air Reserve Component (ARC) of the United States Air Force. Its primary wartime and contingency operations mission as an AFSOC-gained unit is psychological operations (PSYOP). The 193 SOW is unique in that it is the only unit in the U.S. Air Force to fly and maintain the Lockheed EC-130J Commando Solo aircraft.

- The 919th Special Operations Wing (919 SOW) is an Air Force Reserve Command (AFRC) unit, operationally gained by AFSOC, and located at Eglin AFB Auxiliary Field #3/Duke Field, Florida. The 919 SOW flies and maintains the MC-130E Combat Talon I and MC-130P Combat Shadow special operations aircraft designed for covert operations.



- The 352d Special Operations Wing (352 SOW) at RAF Mildenhall, United Kingdom serves as the core to United States European Command's standing Joint Special Operations Air Component headquarters. The squadron provides support for three flying squadrons, one special tactics squadron and one maintenance squadron for exercise, logistics, and war planning; aircrew training; communications; aerial delivery; medical; intelligence; security and force protection; weather; information technologies and transformation support and current operations.[86]

Air Force Special Operators on a training mission.

- The 353d Special Operations Group (353 SOG) is the focal point for all U.S. Air Force special operations activities throughout the United States Pacific Command (USPACOM) theater. Headquartered at Kadena AB, Okinawa, Japan the group is prepared to conduct a variety of high-priority, low-visibility missions. Its mission is air support of joint and allied special operations forces in the Pacific. It maintains a worldwide mobility commitment, participates in Pacific theater exercises as directed and supports humanitarian and relief operations.[87]

- The United States Air Force Special Operations School (USAFSOS) at Hurlburt Field, Florida is a primary support unit of the Air Force Special Operations Command. The USAFSOS prepares special operations Airmen to successfully plan, organize, and execute global special operations by providing indoctrination and education for AFSOC, other USSOCOM components, and joint/interagency/ coalition partners.[88]

## Marine Corps

In October 2005, the Secretary of Defense directed the formation of United States Marine Corps Forces Special Operations Command, the Marine component of United States Special Operations Command. It was determined that the Marine Corps would initially form a unit of approximately 2500 to serve with USSOCOM. On February 24, 2006 MARSOC activated at Camp Lejeune, North Carolina. MARSOC initially consisted of a small staff and the Foreign Military Training Unit (FMTU), which had been formed to conduct foreign internal defense. FMTU is now designated as the Marine Special Operations Advisor Group (MSOAG).[89]

As a service component of USSOCOM, MARSOC is tasked by the Commander USSOCOM to train, organize, equip, and deploy responsive U.S. Marine Corps special operations forces worldwide, in support of combatant commanders and other agencies. MARSOC has been directed to conduct foreign internal defense, direct action and special reconnaissance. MARSOC has also been directed to develop a capability in unconventional warfare, counter-terrorism, and information operations. MARSOC deployed its first units in August 2006, six months after the group's initial activation. MARSOC reached full operational capability in October 2008.[90]



United States Marine Corps Forces Special Operations Command emblem

## Units

- Marine Special Operations "Raider" Regiment (MSOR) consists of a Headquarters Company and three Marine Special Operations Battalions, the 1st, 2nd and 3rd MSOB. The Regiment provides tailored military combat-skills training and advisor support for identified foreign forces in order to enhance their tactical capabilities and to prepare the environment as directed by USSOCOM as well as the capability to form the nucleus of a Joint Special Operations Task Force. Marines and Sailors of the MRR train, advise and assist friendly host nation forces – including naval and maritime military and paramilitary forces – to enable them to support their governments' internal security and stability, to counter subversion and to reduce the risk of violence from internal and external threats. MRR deployments are coordinated by MARSOC, through USSOCOM, in accordance with engagement priorities for Overseas Contingency Operations.

- Marine Intelligence Battalion (MIB) trains, sustains, maintains combat readiness, and provides intelligence support at all operational levels in order to support MARSOF training and operations worldwide with mission-specific intelligence capability.

- Marine Special Operations Support Group (MSOSG) trains, equips, structures, and provides specially qualified Marine forces, including, operational logistics, intelligence, Military Working Dogs, Firepower Control Teams, and communications support in order to sustain worldwide special operations missions as directed by Commander, U.S. Marine Corps Forces Special Operations Command (COMMARFORSOC).



DA/SR Operators from 1st SOB (Special Operations Battalion) respond to enemy fire in Afghanistan

- The Marine Special Operations School (MSOS) performs the screening, recruiting, training, assessment and doctrinal development functions for MARSOC. It includes two subordinate Special Missions Training Branches (SMTBs), one on each coast.
  - The Special Mission Training Branch—East provide special operations training in tactics, techniques and procedures, and evaluation and certification of MARSOC forces to specified conditions and standards for SOF. The Marines of MSOS are operators with the training, experience and mature judgment to plan,

coordinate, instruct and supervise development of SOF special reconnaissance and direct action skills.[91]

## List of USSOCOM Combatant Commanders

| No. | Image | Name | Branch | Start of Term | End of Term | Time in office |
|-----|-------|------|--------|---------------|-------------|----------------|
| 1. |  | GEN James J. Lindsay | USA | 16 April 1987 | 27 June 1990 | 1,168 days |
| 2. |  | GEN Carl W. Stiner | USA | 27 June 1990 | 20 May 1993 | 1,058 days |
| 3. |  | GEN Wayne A. Downing | USA | 20 May 1993 | 29 February 1996 | 1,015 days |
| 4. |  | GEN Henry H. Shelton | USA | 29 February 1996 | 25 September 1997 | 574 days |
| (Acting) |  | RADM Raymond C. Smith, Jr. | USN | 25 September 1997 | 5 November 1997 | 41 days |
| 5. |  | GEN Peter J. Schoomaker | USA | 5 November 1997 | 27 October 2000 | 1,087 days |
| 6. |  | GEN Charles R. Holland | USAF | 27 October 2000 | 2 September 2003 | 1,040 days |
| 7. |  | GEN Bryan D. Brown | USA | 2 September 2003 | 9 July 2007 | 1,406 days |
| 8. |  | ADM Eric T. Olson | USN | 9 July 2007 | 8 August 2011 | 1,491 days |
| 9. |  | ADM William H. McRaven | USN | 8 August 2011 | 28 August 2014 | 1,116 days |
| 10. |  | GEN Joseph L. Votel | USA | 28 August 2014 | Present | days |

## USSOCOM medal

The United States Special Operations Command Medal was introduced in 1994 to recognize individuals for outstanding contributions to, and in support of, special operations. Since it was created, there have been more than 50 recipients, four of which are not American. Some of which includes: General broni Włodzimierz Potasiński (Poland, 2010, posthumously).[92][93] Kaptein Gunnar Sønsteby (Norway, 2008), Generał brygady Jerzy Gut (Poland, June 2014)[94] and Generał dywizji Piotr Patalong (Poland, October 2014).[95]

## See also

# References

## Citations

1. SOCOM Public Affairs (2013). SOCOM Fact Book 2013 (http://www.socom.mil/News/Documents/USSOCOM_Fact_Book_2013.pdf). SOCOM Public Affairs.
2. "Biography of Admiral James L. Holloway III, US Navy (Ret.)" (http://www.history.navy.mil/bios/holloway_j.htm). June 2006. Retrieved 21 March 2008. |first1= missing |last1= in Authors list (help)
3. Rother, Larry (6 December 1996). "With a Bang, Panama Is Erasing House of Horrors". The New York Times.
4. Shanker, Thom (12 February 2004). "Regime Thought War Unlikely, Iraqis Tell U.S". The New York Times.
5. "USSOCOM Posture Statement" (http://web.archive.org/web/20080227010822/http://www.socom.mil/Docs/USSOCOM_Posture_Statement_2007.pdf) (PDF). USSOCOM. 2007. Archived from the original (http://www.socom.mil/Docs/USSOCOM_Posture_Statement_2007.pdf) on 27 February 2008. Retrieved 12 February 2008.
6. Delta: America's Elite Counterterrorist Force. Terry Griswold, D. M. Giangreco. Zenith Imprint, 2005. ISBN 0-7603-2110-8. p. 35
7. Sloan, Stephen (October 1992). Beating International Terrorism: An Action Strategy for Preemption and Punishment. Diane Pub Co. ISBN 1-56806-104-8.
8. Daniel, W.C. (September 1986). "H.R.5109". A bill to establish a National Special Operations Agency within the Department of Defense to have unified responsibility for all special operations forces and activities within the Department.
9. "USSOCOM Command History" (http://fas.org/irp/agency/dod/socom/2007history.pdf) (PDF). Retrieved 12 October 2014.
10. Goldwater, Barry; Sam Nunn. "S.CON.RES.80". A concurrent resolution to authorize the printing of 2,000 additional copies of the Committee Print of the Committee on Armed Services (99th Congress, 1st Session) entitled "Defense Organization: The Need for Change".
11. Nichols, Bill; Barry Goldwater (1986). "H.R.3622". A bill to amend title 10, United States Code, to strengthen the position of Chairman of the Joint Chiefs of Staff, to provide for more efficient and effective operation of the Armed Forces, and for other purposes.
12. Lederman, Gordon Nathaniel (November 1999). Reorganizing the Joint Chiefs of Staff: The Goldwater-Nichols Act of 1986. Greenwood Press. ISBN 0-313-31085-8.
13. Cohen, William (May 1986). "S.2453". A bill to enhance the capabilities of the United States to combat terrorism and other forms of unconventional warfare.
14. Taubman, Philip (5 December 1984). "U.S. Military tries to catch up in fighting terror". New York Times.
15. "Special Operations/Low Intensity Conflict & Interdependent Capabilities (ASD SO/LIC & IC)" (http://www.defenselink.mil/policy/sections/policy_offices/solic/). DoD. Retrieved 19 March 2008. |first1= missing |last1= in Authors list (help)
16. Giles, James E.; Altizer, Harrell B.; Glass, David V. Parker, Robert W. (March 1989). "Providing Resources for Special Operations Forces: Completing the Transition" (http://stinet.dtic.mil/oai/oai?verb=getRecord&metadataPrefix=html&identifier=ADA210951). Retrieved 19 March 2008.
17. Lewis, Paul (1 July 2001). "Charles S. Whitehouse, 79, Diplomat and C.I.A. Official". New York Times.
18. Andrew Kelley, Stephen (June 2007). "Better Lucky Than Good: Operation Earnest Will as Gunboat Diplomacy" (http://web.archive.org/web/20090318120640/http://www.ccc.nps.navy.mil/research/theses/kelley07.pdf) (PDF). Naval Postgraduate School. Archived from the original (http://www.ccc.nps.navy.mil/research/theses/kelley07.pdf) on 18 March 2009. Retrieved 12 May 2008.
19. Peniston, Bradley (July 2006). No Higher Honor: Saving the USS Samuel B. Roberts in the Persian Gulf. United States Naval Institute Press. ISBN 1-59114-661-5.
20. "A Big Second Step in Somalia". New York Times. 4 May 1993.
21. "Two Tough Tracks in Somalia". New York Times. 10 December 1992.
22. The Book of Honor: Cover Lives and Classified Deaths at the CIA by Ted Gup, 2000
23. Bowden, Mark (2001). Black Hawk Down: A Story of Modern War. Signet. ISBN 0-451-20393-3.
24. Eversmann, Matt; Dan Schilling (July 2006). The Battle of Mogadishu: Firsthand Accounts from the Men of Task Force Ranger. Presidio Press. ISBN 0-345-46668-3.
25. Plan of Attack, Bob Woodward, 2004
26. Dao, James (22 March 2003). "The Commandos; Navy Seals Easily Seize 2 Oil Sites". New York Times.
27. Dao, James (28 April 2003). "Aftereffects: Special Operations Forces; War Plan Drew U.S. Commandos From Shadows". The New York Times.
28. Kruzel, John (26 May 2007). "Navy SEALs share war stories from Anbar province". American Forces Press Service.
29. R. Gordon, Michael (13 June 2003). "After The War: The Allies; In Major Assault, U.S. Forces Strike Hussein Loyalists". New York Times.
30. D. Kozaryn, Linda (14 December 2001). "U.S. Special Operations Forces Change "Face of War" ". American Forces Press Service.
31. Thom Shanker, Eric Schmitt (2 August 2004). "The Reach of War: Military; Special Warriors Have Growing Ranks and Growing Pains in Taking Key Antiterror Role" (http://www.nytimes.com/2004/08/02/world/reach-war-military-special-warriors-have-growing-ranks-growing-pains-taking-key.html). The New York Times. Retrieved 11 March 2008.
32. DeYoung, Karen, and Greg Jaffe, "U.S. 'secret war' expands globally as Special Operations forces take larger role" (http://www.washingtonpost.com/wp-dyn/content/article/2010/06/03/AR2010060304965.html?nav=emailpage), Washington Post, 4 June 2010. Retrieved 6 August 2010.
33. Turse, Nick, "A Secret War in 120 Countries: The Pentagon's New Power Elite" (http://counterpunch.org/turse08042011.html), CounterPunch, 4 August 2011. Retrieved 5 August 2011.
34. Washington Post op-ed, John Lehman former Secretary of the Navy, October 2008
35. Waller, Douglas (3 February 2003). "The CIA Secret Army" (http://www.time.com/time/magazine/article/0,9171,1004145,00.html). Time Magazine (Washington). Retrieved 28 September 2009.
36. "Operation Anaconda" (http://www.time.com/time/covers/1101020318/popup/). Time. 10 March 2002.
37. Garamone, Jim. "The Battle of Takur Ghar" (http://www.defenselink.mil/news/newsarticle.aspx?id=44020). American Forces Press Service.
38. Executive Summary of the Battle of Takur Ghar (http://www.defenselink.mil/news/May2002/d20020524takurghar.pdf) (PDF). |first1= missing |last1= in Authors list (help)
39. MacPherson, Malcolm (2006). Roberts Ridge: A Story of Courage and Sacrifice on Takur Ghar Mountain, Afghanistan. Dell. ISBN 0-553-58680-7.
40. Luttrell, Marcus; Patrick Robinson (2007). Lone Survivor: The Eyewitness Account of Operation Redwing and the Lost Heroes of SEAL Team 10. Little, Brown and Company. ISBN 0-316-06759-8.
41. Blumenfield, Laura (11 June 2007). "The Sole Survivor" (http://www.washingtonpost.com/wp-dyn/content/article/2007/06/10/AR2007061001492.html). Washington Post.
42. Naylor, Sean D., "McRaven tapped to lead SOCOM" (http://www.armytimes.com/news/2011/03/military-mcraven-picked-to-lead-socom-030111/), Army Times, 1 March 2011 16:53:04 EST. Retrieved 5 August 2011.
43. http://www.imgc-global.com/testimonials.html. Retrieved February 2012.
44. Risen, James (20 September 1998). "The World: Passing the Laugh Test; Pentagon Planners Give New Meaning to 'Over the Top' ". New York Times.
45. Emerson 1988, p. 26.
46. Emerson, Steven (13 November 1988). "Stymied Warriors". New York Times.
47. L. Haney, Eric (August 2005). Inside Delta Force: The Story of America's Elite Counterterrorist Unit. Delta. ISBN 0-385-33936-4.
48. Mark Mazzetti (13 January 2007). "Pentagon Sees Move in Somalia as Blueprint". New York Times.

49. Smith, Michael (2007). Killer Elite: The Inside Story of America's Most Secret Special Operations Team. New York, New York: St. Martin's Press. ISBN 0-312-36272-2.

50. Gellman, Barton (23 January 2005). "Secret Unit Expands Rumsfeld's Domain". Washington Post.

51. Gerth, Jeff; Philip Taubman (8 June 1984). "U.s. military creates secret units for use in sensitive tasks abroad". New York Times.

52. Schmitt, Eric (19 March 2006). "In Secret Unit's 'Black Room,' a Grim Portrait of U.S. Abuse". New York Times.

53. E. Schmitt, David (29 February 2004). "New U.S. Effort Steps Up Hunt For bin Laden". New York Times.

54. SOCJFCOM transitions to USSOCOM and becomes Special Operations Command – Joint Capabilities (http://www.jfcom.mil/newslink/storyarchive/2011/pa050211.html), 2 May 2011

55. "USASOC overview" (http://www.soc.mil/sofinfo/story.html). Retrieved 8 January 2008.

56. Schmitt, Eric; Michael R. Gordon (21 September 2001). "A Nation Challenged: The Military: Top Air Chief Sent". New York Times.

57. "75th Ranger Regiment website" (http://web.archive.org/web/20080127071358/http://www.soc.mil/75thrr/75th_home.htm). Archived from the original (http://www.soc.mil/75thrr/75th_home.htm) on 27 January 2008. Retrieved 12 February 2008.

58. "75th Ranger Regiment website" (http://web.archive.org/web/20080208083040/http://www.soc.mil/75thrr/75thrrfs.html). Archived from the original (http://www.soc.mil/75thrr/75thrrfs.html) on 8 February 2008. Retrieved 12 February 2008.

59. Couch, Dick (March 2007). Chosen Soldier: The Making of a Special Forces Warrior. Three Rivers Press. ISBN 0-307-33939-4.

60. Shanker, Thom (21 January 2002). "A Nation Challenged: Battlefield; Conduct of War Is Redefined By Success of Special Forces". New York Times.

61. Schmitt, Eric; Thom Shanker (2 March 2008). "U.S. Plan Widens Role in Training Pakistani Forces in Qaeda Battle". New York Times.

62. "USASF mission" (http://web.archive.org/web/20071211221352/http://www.soc.mil/SF/mission.htm). Archived from the original (http://www.soc.mil/SF/mission.htm) on 11 December 2007. Retrieved 8 January 2008.

63. "Night Stalkers fact sheet" (http://web.archive.org/web/20071217230457/http://www.soc.mil/160soar/soar_home.htm). Archived from the original (http://www.soc.mil/160soar/soar_home.htm) on 17 December 2007. Retrieved 8 January 2008.

64. "160th SOAR,MH-60 Black Hawk Helicopter Fact Sheet" (http://www.soc.mil/160soar/Blkhawk.html). Retrieved 12 February 2008.

65. "PSYOP Recruiting website" (http://web.archive.org/web/20080204120503/http://www.bragg.army.mil/psyop/psyopintro.htm). Archived from the original (http://www.bragg.army.mil/psyop/psyopintro.htm) on 4 February 2008. Retrieved 12 February 2008.

66. "Army Civil Affairs, Psychological Operations Soldiers Deploy in Support of Tsunami Relief Efforts" (http://www.defenselink.mil/home/articles/2005-01/a010705tj1.html) (Press release). Department of Defense. 7 January 2005. Retrieved 14 March 2008.

67. "PSYOP fact sheet" (http://web.archive.org/web/20080203103530/http://www.soc.mil/psyop/psyop_default.htm). Archived from the original (http://www.soc.mil/psyop/psyop_default.htm) on 3 February 2008. Retrieved 12 February 2008.

68. "95th Civil Affairs Fact Sheet" (http://web.archive.org/web/20080119211323/http://www.soc.mil/ca/ca_default.htm). Archived from the original (http://www.soc.mil/ca/ca_default.htm) on 19 January 2008. Retrieved 21 January 2008.

69. "SOSCOM Home Page" (http://web.archive.org/web/20080119210555/http://www.soc.mil/soscom/soscom_default.htm). Archived from the original (http://www.soc.mil/soscom/soscom_default.htm) on 19 January 2008. Retrieved 12 February 2008.

70. "USAJFKSWCS" (http://web.archive.org/web/20080119211345/http://www.soc.mil/swcs/swcs_default.htm). Archived from the original (http://www.soc.mil/swcs/swcs_default.htm) on 19 January 2008. Retrieved 19 February 2008.

71. "NAVSOC info website" (https://www.navsoc.navy.mil/). Retrieved 8 January 2008.

72. "Official U.S. Navy SEAL Info Website" (http://199.208.208.41/seal/introduction.aspx). Retrieved 11 January 2008.

73. Couch, Dick (October 2001). The Warrior Elite: The Forging of SEAL Class 228. Crown. ISBN 0-609-60710-3.

74. "Navy SEALs insertion/extraction page" (http://www.navyseals.com/insertion-extraction). Retrieved 11 January 2008.

75. Tiron, Roxana (February 2002). "New Mini-Sub Gives SEALs Extra Speed, Range, Payload". National Defense Magazine.

76. "Official U.S. Navy SWCC Info Website" (http://www.seal.navy.mil/swcc/introduction.aspx). Retrieved 11 January 2008.

77. Steven Lee Meyers, Thom Shanker (16 October 2001). "A Nation Challenged: The Offensive; Special Operations Gunship Being Used Against Taliban". New York Times.

78. "AFSOC" (http://www2.afsoc.af.mil/). Retrieved 11 January 2008.

79. Meyers, Steven Lee; Thom Shanker (12 March 2002). "A Nation Challenged: Air War; Pilots Told to Fire at Will in Some Zones". New York Times.

80. "Combat Control Fact Sheet" (http://archive.is/8rCmr). Air Force Special Operations Command. United States Air Force. Archived from the original (http://www.af.mil/information/factsheets/factsheet.asp?id=174) on 21 February 2013. Retrieved 13 January 2013.

81. "Combat Control career description" (http://www.airforce.com/careers/detail/combat-control-males-only/). Retrieved 12 January 2013.

82. "1st SOW Fact Sheet" (http://www2.hurlburt.af.mil/library/factsheets/factsheet.asp?id=3485). AFSOC. Retrieved 20 January 2008.

83. "Air Force launches first special tactics wing" (http://archive.is/Do72). 2012-06-13. Archived from the original (http://www.af.mil/news/story.asp?id=123305724) on December 12, 2012. Retrieved January 15, 2013.

84. "24th SOW Factsheet" (http://www.afsoc.af.mil/library/factsheets/factsheet.asp?id=19566). Retrieved January 15, 2013.

85. "N.M. Delegation Welcomes 27th Special Ops. Wing to Cannon" (http://bingaman.senate.gov/news/record.cfm?id=281393) (Press release). 29 August 2007. Retrieved 21 March 2008.

86. "352nd Fact Sheet" (http://www2.afsoc.af.mil/library/factsheets/factsheet.asp?id=224). AFSOC. Retrieved 21 January 2008.

87. "353rd SOG Fact Sheet" (http://www2.afsoc.af.mil/library/factsheets/factsheet.asp?id=225). AFSOC. Retrieved 21 January 2008.

88. "USAFOS Fact Sheet" (http://web.archive.org/web/20080109132212/http://www.af.mil/factsheets/factsheet.asp?id=186). Archived from the original (http://www.af.mil/factsheets/factsheet.asp?id=186) on 9 January 2008. Retrieved 21 January 2008.

89. Kenyon, Henry (May 2006). "Marine Corps Special Operations Command Hits the Beach" (http://www.afcea.org/signal/articles/templates/SIGNAL_Article_Template.asp?articleid=1123&zoneid=182). Signal Magazine. Retrieved 10 April 2008.

90. "MARSOC" (http://www.marsoc.usmc.mil/). Retrieved 8 January 2008.

91. "MARSOC, MSOS Info website" (http://web.archive.org/web/20080209195131/http://www.marsoc.usmc.mil/msos.html). Archived from the original (http://www.marsoc.usmc.mil/msos.html) on 9 February 2008. Retrieved 21 January 2008.

92. USSOCOM Medal recipients (http://www.shadowspear.com/the-unites-states-special-operations-command-medal-to-lt-gen-wlodzimierz-potasiński.6197/)

93. "NEWS | USSOCOM Commander visits POLSOCOM | Dowództwo Wojsk Specjalnych" (http://www.wojskaspecjalne.mil.pl/45,more,129-ussocom_commander_visits_polsocom.html?ln=en). Wojskaspecjalne.mil.pl. 2010-05-14. Retrieved 2013-04-22.

94. "Amerykańskie Dowództwo Operacji Specjalnych docenilo polskiego generała" (http://www.wojsko-polskie.pl/pl/z-zycia-wojska/30655,amerykanskie-dowodztwo-operacji-specjalnych-docenilo-polskiego-generala.html). wojsko-polskie.pl. 2014-06-03. Retrieved 2014-06-03.

95. "Medal USSOCOM dla polskiego generała" (http://mon.gov.pl/aktualnosci/artykul/najnowsze/2014-10-29-medal-dowodztwa-operacji-specjalnych-usa-dla-polskiego-generala/). mon.gov.pl. 2014-10-29. Retrieved 2014-10-29.

Bibliography

- Briscoe, Charles (2001). Weapon of Choice: ARSOF in Afghanistan. Combat Studies Institute Press.
- Couch, Dick (March 2007). Chosen Soldier: The Making of a Special Forces Warrior. Three Rivers Press. ISBN 0-307-33939-4.
- Couch, Dick (2006). Down Range: Navy SEALs in the War on Terrorism. New York, New York: Three Rivers Press. ISBN 1-4000-8101-7.
- Kelley, Stephen Andrew (June 2007). "Better Lucky Than Good: Operation Earnest Will as Gunboat Diplomacy" (http://web.archive.org/web/20090318120640/http://www.ccc.nps.navy.mil/research/theses/kelley07.pdf) (PDF). Naval Postgraduate School. Archived from the original (http://www.ccc.nps.navy.mil/research/theses/kelley07.pdf) on 18 March 2009. Retrieved 12 May 2008.
- Luttrell, Marcus; Patrick Robinson (June 2007). Lone Survivor: The Eyewitness Account of Operation Redwing and the Lost Heroes of SEAL Team 10. Little, Brown and Company. ISBN 0-316-06759-8.
- Pirnie, Bruce R. (August 1998). Assessing Requirements for Peacekeeping, Humanitarian Assistance and Disaster Relief. RAND Corporation. ISBN 0-8330-2594-5.
- Pushies, Fred (2007). U.S. Air Force Special Ops. Osceola, Wisconsin: MBI Publishing Company. ISBN 0-7603-0733-4.
- Smith, Michael (2007). Killer Elite: The Inside Story of America's Most Secret Special Operations Team. New York, New York: St. Martin's Press. ISBN 0-312-36272-2.
- Sweetman, Jack (March 1999). Great American Naval Battles. Naval Institute Press. ISBN 1-55750-794-5.
- David Tucker, Christopher J. Lamb (2007). United States Special Operations Forces. Columbia University Press. ISBN 0-231-13190-9.
- Wise, Harold Lee (May 2007). Inside the Danger Zone: The U.S. Military in the Persian Gulf, 1987–1988. US Naval Institute Press. ISBN 1-59114-970-3.

Web

- USDOD. U.S. DOD Dictionary of Military Terms (http://www.dtic.mil/doctrine/jel/doddict/). United States of America: U.S. Department of Defense. 5 June 2003.
- USDOD. U.S. DOD Dictionary of Military Terms: Joint Acronyms and Abbreviations (http://www.dtic.mil/doctrine/jel/doddict/). United States of America: U.S. Department of Defense. 5 June 2003.
- Talmadge, Eric (27 February 2008). "New US Submarines Trade Nukes for SEALs" (http://www.foxnews.com/wires/2008Feb27/0,4670,StealthatSea,00.html). Fox News. Associated Press.
- Eric Schmitt, Michael R. Gordon (4 February 2008). "Leak on Cross-Border Chases From Iraq" (http://www.nytimes.com/2008/02/04/washington/04rules.html?_r=1&scp=3&sq=Army+Rangers&st=nyt&oref=slogin). New York Times.
- von Zielbauer, Paul (27 April 2007). "Criminal Charges Are Expected Against Marines, Official Says" (http://www.nytimes.com/2007/04/27/world/asia/27abuse.html?scp=1&sq=MARSOC&st=nyt). New York Times.
- Graham, Bradley (2 November 2005). "Elite Marine Unit to Help Fight Terrorism" (http://www.washingtonpost.com/wp-dyn/content/article/2005/11/01/AR2005110102069.html). Washington Post. Retrieved 27 May 2010. Check date values in: |year= / |date= mismatch (help)

## External links

- U.S. Special Operations Command (http://www.socom.mil/)
- Air Force Special Operations Command (http://www2.afsoc.af.mil/)
- U.S. Army Special Operations Command (http://www.soc.mil/)
- U.S. Naval Special Warfare Command (http://www.navsoc.navy.mil/)
- U.S. Marine Corps Forces Special Operations Command (http://www.marines.mil/unit/marsoc/Pages/default.aspx)
- Department of Defense (http://www.defenselink.mil/)
- Joint Special Operations University (https://jsou.socom.mil/)



Wikimedia Commons has media related to United States Special Operations Command.

Retrieved from "http://en.wikipedia.org/w/index.php?title=United_States_Special_Operations_Command&oldid=656910583"

Categories: Special operations commands of the United States Armed Forces | Military units and formations in Florida | Counter-terrorism

- This page was last modified on 17 April 2015, at 15:26.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

# United States Central Command

From Wikipedia, the free encyclopedia

The United States Central Command (USCENTCOM or CENTCOM) is a theater-level Unified Combatant Command of the U.S. Department of Defense, established in 1983, taking over the 1980 Rapid Deployment Joint Task Force (RDJTF) responsibilities.

The CENTCOM Area of Responsibility (AOR) includes countries in the Middle East, North Africa, and Central Asia, most notably Afghanistan and Iraq. CENTCOM has been the main American presence in many military operations, including the Persian Gulf War, the War in Afghanistan (2001–present), and the Iraq War. As of 2015 CENTCOM forces are deployed primarily in Iraq and Afghanistan in combat roles and have support roles at bases in Kuwait, Bahrain, Qatar, the United Arab Emirates, Oman, Pakistan, and central Asia. CENTCOM forces have also been deployed in Jordan, and Saudi Arabia in the past, with a small presence remaining there.as of 2009.

As of 22 March 2013 CENTCOM's commander is General Lloyd J. Austin, U.S. Army.

Of all 6 American regional unified combatant commands CENTCOM is among the three with headquarters outside its area of operations. CENTCOM's main headquarters is located at MacDill Air Force Base, in Tampa, Florida. A forward headquarters was established in 2002 at Camp As Sayliyah in Doha, Qatar, which in 2009 transitioned to a forward headquarters at Al Udeid Air Base in Qatar to serve American strategic interests. On 12 January, 2015, CENTCOM's Twitter and YouTube accounts were hacked.[2]



| United States Central Command | |
|---|---|
| Emblem of the United States Central Command. | |
| Active | 1983–present |
| Country | 🇺🇸 United States of America |
| Type | Unified Combatant Command |
| Headquarters | MacDill Air Force Base Tampa, Florida, U.S. |
| Nickname | CENTCOM |
| Engagements | Persian Gulf War Iraq War War in Afghanistan |
| Commanders | |
| Combatant Commander | General Lloyd Austin, USA |
| Deputy Commander | Vice Admiral Mark Fox, USN [1] |
| Notable commanders | General David Petraeus Admiral William Fallon General John Abizaid General Tommy Franks General Anthony Zinni General James Mattis |

## Contents

- 1 History
- 2 Structure
  - 2.1 War planning

- 3 Geographic scope
- 4 Commanders
  - 4.1 Unit decorations
- 5 See also
- 6 References
- 7 External links



General Norman Schwarzkopf

Insignia

Shoulder sleeve insignia (US Army only)

# History

In 1983, U.S. Central Command was established to succeed the Rapid Deployment Joint Task Force, formed at MacDill AFB, Florida on 1 March 1980, to handle US national security interests in Southwest Asia, Central Asia and the Persian Gulf.[3]

On 17 May 1987, the USS Stark (FFG-31), conducting operations in the Persian Gulf during the Iran-Iraq War, was struck by Exocet missiles fired by an Iraqi aircraft, resulting in 37 casualties. Soon afterward, as part of what became known as the "Tanker War", the Federal government of the United States reflagged and renamed 11 Kuwaiti oil tankers. In Operation Earnest Will, these tankers were escorted by USCENTCOM's Middle East Force through the Persian Gulf to Kuwait and back through the Strait of Hormuz.[3]

With the 1990 Invasion of Kuwait and the subsequent Operation Desert Shield, hundreds of thousands of troops were transferred to Saudi Arabia. Islamists objected to non-Muslim troops in Saudi Arabia, and their use in Operation Desert Storm; this with other attacks on Iraq became a key rallying cry for opposition movements in Saudi Arabia and elsewhere. By the late 1990s, Central Command gradually moved troops to other countries, particularly Bahrain, Kuwait, Qatar, Oman, and the United Arab Emirates.

Exercise Internal Look has been one of CENTCOM's primary planning events. It had frequently been used to train CENTCOM to be ready to defend the Zagros Mountains from a Soviet attack and was held annually.[4] In autumn 1989, the main CENTCOM contingency plan, OPLAN 1002-88, assumed a Soviet attack through Iran to the Persian Gulf. The plan called for five and two-thirds US divisions to deploy, mostly light and heavy forces at something less than full strength (apportioned to it by the Joint Strategic Capability Plan [JSCAP]). The strategy of the original plan called for these five and two-thirds divisions to march from the Persian Gulf to the Zagros Mountains and prevent the Soviet Ground Forces from seizing the Iranian oil fields.[5] After 1990 Norman Schwarzkopf reoriented CENTCOM's planning to fend off a threat from Iraq and the exercise moved to a biennial schedule. The exercise has been employed for explicit war planning on at least two occasions: Internal Look '90, which dealt with a threat from Iraq,[4] and Internal Look '03, which was used to plan what became Operation Iraqi Freedom.

From April to July 1999 CENTCOM conducted Exercise Desert Crossing 1999 centered on the scenario of Saddam Hussein being ousted as Iraq's dictator. It was held in the McLean, Virginia, offices of Booz Allen.[6]:6-7 The exercise concluded that unless measures were taken, "fragmentation and chaos" would ensue after Saddam Hussein's overthrow.

In January 2015, CENTCOM's Twitter feed was reported to have been hacked on 11 January by ISIS sympathizers.[7] for less than one hour. No classified information was posted and "none of the information posted came from CENTCOM's server or social media sites",[8] however, some of the slides came from federally funded Lincoln Laboratory at MIT.[7]

# Structure

CENTCOM headquarters staff directorates include personnel, intelligence, operations, logistics, plans & policy, information systems, training & exercises, and resources, and other functions. The intelligence section is known as Joint Intelligence Center, Central Command, or JICCENT, which serves as a Joint Intelligence Center for the co-ordination of intelligence. Under the intelligence directorate, there are several divisions including the Afghanistan-Pakistan Center of Excellence.

CENTCOM directs four "service component commands" and one subordinate unified command and no fighting units directly subordinate to it:

The United States Army Central (USARCENT), and the United States Air Forces Central Command (USAFCENT), both headquartered at Shaw Air Force Base in South Carolina, the U.S. Marine Forces Central Command (USMARCENT), headquartered at MacDill Air Force Base, Florida and the U.S. Naval Forces Central Command (USNAVCENT), headquartered at Naval Support Activity Bahrain in the Kingdom of Bahrain. MacDill Air Force Base also hosts a Sub-unified command called the Special Operations Command Central (USSOCCENT).

Two major subordinate multi-service commands reporting to Central Command were responsible for Afghanistan: Combined Joint Task Force 180 and Combined Forces Command Afghanistan (CFC-A). CFC-A was disestablished in February 2007.[9] From that point onward, the International Security Assistance Force directed most U.S. forces in Afghanistan, and a U.S. general, General Dan K. McNeill, assumed command of ISAF that same month.[10]

Temporary task forces include the Central Command Forward - Jordan (CF-J), established in Jordan after 2011. The reason for its establishment has been reported as to seize Syrian WMD if necessary.[11]

On 1 October 2008 Combined Joint Task Force - Horn of Africa at Camp Lemonnier in Djibouti was transferred to United States Africa Command (USAFRICOM).[12] The United States Forces – Iraq or USF-I, was a major subordinate multi-service command during the Iraq War order of battle until it was disestablished in 2011.

Elements of other Unified Combatant Commands, especially United States Special Operations Command (USSOCOM), operate in the CENTCOM area. It appears that SOCCENT does not direct the secretive Task Force 77, the ad-hoc grouping of Joint Special Operations Command 'black' units such as Delta Force and Army Rangers, which is tasked to pursue the most sensitive high value targets such as Al Qaeda and the Taliban leadership since 11 September 2001. Rather TF 77, which started out as Task Force 11 and has gone through a number of name/number changes, reports directly to Joint Special Operations Command, part of USSOCOM.

# War planning

Case 1:15-cv-20782-JEM   Document 54   Entered on FLSD Docket 04/28/2015   Page 194 of 271

The following code names are known to have been associated with was planning per William Arkin:[13]:46

- CENTCOM OPORDER 01-97, Force Protection
- SOCEUR SUPPLAN 1001-90, 9 May 1989
- CENTCOM CONPLAN 1010, July 2003
- CENTCOM CONPLAN 1015-98, possibly support to OPLAN 5027 for Korea, 15 March 1991
- CENTCOM 1017, 1999
- CONPLAN 1020
- CONPLAN 1067, for possible Biological Warfare response
- CENTCOM CONPLAN 1100-95, 31 March 1992

Globalsecurity.org also lists OPLAN 1002 (Defense of the Arabian Peninsula).

# Geographic scope

With the 1983 establishment of CENTCOM Egypt, Sudan, Kenya, Ethiopia, Somalia and Djibouti came within the area of responsibility (AOR). Thus CENTCOM directed the 'Natural Bond' exercises with Sudan, the 'Eastern Wind' exercises with Somalia, and the 'Jade Tiger' exercises with Oman, Somalia, and Sudan. Exercise Jade Tiger involved the 31st Marine Expeditionary Unit with Oman from 29 November 82-8 Dec 82.[13]:404



CENTCOM Area Of Responsibility

The Area of Responsibility extends to 27 countries: Afghanistan, Bahrain, Egypt, Iran, Iraq, Jordan, Kazakhstan, Kuwait, Kyrgyzstan, Lebanon, Oman, Pakistan, Qatar, Saudi Arabia, Syria, Tajikistan, Turkmenistan, United Arab Emirates (UAE), Uzbekistan, and Yemen. International waters included are the Red Sea, Persian Gulf, and western portions of the Indian Ocean.[14] Syria and Lebanon were transferred from the United States European Command on 10 March 2004.

Israel is surrounded by CENTCOM countries but remains in United States European Command (EUCOM). General Norman Schwarzkopf expressed the position over Israel frankly in his 1992 autobiography: 'European Command also kept Israel, which from my viewpoint was a help: I'd have had difficulty impressing the Arabs with Central Command's grasp of geopolitical nuance if one of the stops on my itinerary had been Tel Aviv.'[4]:318

On 7 February 2007, plans were announced for the creation of a United States Africa Command which transferred strategic interest responsibility for all of Africa to the new USAFRICOM, except for Egypt. On 1 October 2008, the Africa Command became operational and Combined Joint Task Force - Horn of Africa, the primary CENTCOM force on the continent, started reporting to AFRICOM at Stuttgart instead of CENTCOM in Tampa.

Case 1:15-cv-20782-JEM   Document 54   Entered on FLSD Docket 04/28/2015   Page 195 of 271

The U.S. armed forces use a variable number of base locations depending on its level of operations. With ongoing warfare in Iraq and Afghanistan in 2003, the United States Air Force used 35 bases, while in 2006 it used 14, including four in Iraq. The United States Navy maintains one major base and one smaller installation, with extensive deployments afloat and ashore by U.S. Navy, U.S Marine Corps and U.S. Coast Guard ships, aviation units and ground units.

# Commanders

As of March 2013, GEN Lloyd Austin is commander. He took command from General James Mattis, USMC. Mattis took command from [15][16][17] Lieutenant General John R. Allen, USMC, the deputy commander since July 2008, who took temporary command when the previous commander, General David Petraeus, USA, left to take command of the International Security Assistance Force (ISAF) in Afghanistan on 23 June 2010.[18]

| No. | Image | Name | Service | Start | End | Time in office |
|-----|-------|------|---------|-------|-----|----------------|
| 1. |  | GEN Robert Kingston | United States Army | 1 January 1983 | 27 November 1985 | 1,061 days |
| 2. |  | Gen George B. Crist | United States Marine Corps | 27 November 1985 | 23 November 1988 | 1,092 days |
| 3. |  | GEN H. Norman Schwarzkopf | United States Army | 23 November 1988 | 9 August 1991 | 989 days |
| 4. |  | Gen Joseph P. Hoar | United States Marine Corps | 9 August 1991 | 5 August 1994 | 1,092 days |
| 5. |  | GEN J. H. Binford Peay III | United States Army | 5 August 1994 | 13 August 1997 | 1,104 days |
| 6. |  | Gen Anthony Zinni | United States Marine Corps | 13 August 1997 | 6 July 2000 | 1,058 days |

| | | | | | |
|---|---|---|---|---|---|
| 7. |  | GEN Tommy Franks | United States Army | 6 July 2000 | 7 July 2003 | 1,096 days |
| 8. |  | GEN John Abizaid | United States Army | 7 July 2003 | 16 March 2007 | 1,348 days |
| 9. |  | ADM William J. Fallon | United States Navy | 16 March 2007 | 28 March 2008 | 378 days |
| (Acting) |  | LTG Martin E. Dempsey | United States Army | 28 March 2008 | 31 October 2008 | 217 days |
| 10. |  | GEN David H. Petraeus | United States Army | 31 October 2008 | 30 June 2010 | 607 days |
| (Acting) |  | LtGen John R. Allen | United States Marine Corps | 30 June 2010 | 11 August 2010 | 42 days |
| 11. |  | Gen James Mattis | United States Marine Corps | 11 August 2010 | 22 March 2013 | 954 days |
| 12. |  | GEN Lloyd Austin | United States Army | 22 March 2013 | Incumbent | Expression error: Unexpected number. days |

## Unit decorations

The unit awards depicted below are for Headquarters, US Central Command at MacDill AFB. Award for unit decorations do not apply to any subordinate organization such as the service component commands or any other activities unless the orders specifically address them.

| Award streamer | Award | Dates | Notes |
|---|---|---|---|
|  | Joint Meritorious Unit Award | 2 August 1990 – 21 April 1991 | Department of the Army General Order (DAGO) 1991-22 & 1992-34[19] |
|  | Joint Meritorious Unit Award | 1 August 1992 – 4 May 1993 | DAGO 1994-12 & 1996-01 |
|  | Joint Meritorious Unit Award | 8 October 1994 – 16 March 1995 | DAGO 2001–25 |
|  | Joint Meritorious Unit Award | 1 September 1996 – 6 January 1997 | Joint Staff Permanent Order (JSPO) J-ISO-0012-97 |
|  | Joint Meritorious Unit Award | 1 October 1997 – 15 July 1998 | JSPO J-ISO-0241-98 |
|  | Joint Meritorious Unit Award | 16 July 1998 – 1 November 1999 | JSPO J-ISO-0330-99 / DAGO 2001–25 |
|  | Joint Meritorious Unit Award | 2 November 1999 – 15 March 2001 |  |
|  | Joint Meritorious Unit Award | 11 September 2001 – 1 May 2003 | DAGO 2005–09 |
|  | Joint Meritorious Unit Award | 2 May 2003 – 31 December 2005 |  |
|  | Joint Meritorious Unit Award | 1 January 2006 – 1 March 2008 | JSPO J-ISO-0061-08 |
|  | Joint Meritorious Unit Award | 2 March 2008 – 1 July 2010 |  |
|  | Joint Meritorious Unit Award | 2 July 2010 – 31 July 2012 |  |

# See also

- Strategic Army Corps

Case 1:15-cv-20782-JEM    Document 54    Entered on FLSD Docket 04/28/2015    Page 199 of 271

# References

1. http://www.centcom.mil/en/about-centcom-en/leadership-en
2. "Centcom hacked: This was no more harmful than a teenager's prank" (http://www.telegraph.co.uk/news/worldnews/islamic-state/11342416/Centcom-hacked-This-was-no-more-harmless-than-a-teenagers-prank.html). The Telegraph. Retrieved 12 January 2015.
3. Anthony Cordesman, USCENTCOM Mission and History (http://csis.org/files/media/csis/pubs/uscentcom3%5B1%5D.pdf), Center for Strategic and International Studies, August 1998
4. Norman Schwarzkopf (1993). It Doesn't Take a Hero. Bantam Books paperback edition. pp. 331–2,335–6. ISBN 0-553-56338-6.Harold Coyle's novel Sword Point gives an impression of what such planning envisaged, by a U.S. Army officer who would have had some idea of the general planning approach.
5. Richard Moody Swain, Lucky War: Third Army in Desert Storm, U.S. Army Command and General Staff College Press via Google Books, 6.
6. Michael R. Gordon, Bernard E. Trainor(2012). The Endgame: The Inside Story of the Struggle for Iraq, from George W. Bush to Barack Obama. New York: Pantheon Books. ISBN 978-0-307-37722-7.
7. "U.S. Central Command Twitter feed appears hacked by Islamic State sympathizers" (http://www.reuters.com/article/2015/01/12/us-cybersecurity-centcom-hack-idUSKBN0KL1UZ20150112). Reuters. 12 January 2015. Retrieved 12 January 2015.
8. CHRIS GOOD, JOSHUA COHAN and LEE FERRAN (12 January 2015). "Home> International 'Cybervandalism': ISIS Supporters Hijack US Military Social Media Accounts" (http://abcnews.go.com/International/us-military-twitter-account-apparently-hijacked-isis-supporters/story?id=28170963). ABC (ABC news Internet Venture). Retrieved 12 January 2015.
9. Jan Goldman Ph.D., The War on Terror Encyclopedia: From the Rise of Al-Qaeda to 9/11 and Beyond, 100-101.
10. Auerswald and Saideman, 2014, 96f
11. Nicola Nasser (5 September 2013). "Jordan Invites US Targets for Syrian Retaliation" (http://www.globalresearch.ca/jordan-invites-us-targets-for-syrian-retaliation/5348258). Centre for Research on Globalization.
12. "Africans Fear Hidden U.S. Agenda in New Approach to Africom" (http://www.foxnews.com/story/0,2933,430564,00.html). Associated Press. 2008-09-30. Retrieved 2008-09-30.
13. Arkin, William (25 January 2005). Code Names: Deciphering U.S. Military Plans, Programs and Operations in the 9/11 World (First ed.). Steerforth. ISBN 1586420836.
14. "Central Command" (http://www.globalsecurity.org/military/agency/dod/centcom.htm). Global Security.org. n.d. Retrieved 13 January 2015.
15. "Mattis takes over Central Command, vows to work with Mideast allies in Afghanistan, Iraq" (http://www.foxnews.com/us/2010/08/11/mattis-takes-central-command-vows-work-mideast-allies-afghanistan-iraq/). Fox News Channel. Associated Press. 11 August 2010. Retrieved 15 March 2012.
16. Mitchell, Robbyn (12 August 2010). "Mattis takes over as CentCom chief" (http://www.tampabay.com/news/article1114800.ece). St. Petersburg Times. p. 1. Retrieved 12 August 2010.
17. "Mattis assumes command of CENTCOM" (http://www.centcom.mil/news/mattis-assumes-command-of-centcom). U.S. Central Command. 11 August 2010. Retrieved 12 August 2010.

Case 1:15-cv-20782-JEM    Document 54    Entered on FLSD Docket 04/28/2015    Page 200 of 271

18. "Lt. Gen. Allen named CENTCOM acting commander" (http://www.centcom.mil/en/press-releases/lt-gen-allen-named-centcom-acting-commander) (Press release). U.S. Central Command. 30 June 2010. Retrieved 2 July 2010.

19. "Department of the Army General Orders" (http://armypubs.army.mil/epubs/da_general_orders_1.html). United States Army Publications Directorate. Retrieved 30 April 2011. (Army Knowledge Online account may be required.)

# External links

- U.S. Central Command official website (http://www.centcom.mil/)
- Multi-National Force – Iraq.com mnf-iraq.com (http://www.mnf-iraq.com) (English)
- Multi-National Force – Iraq (http://www.shurakaal-iraq.com) shurakaal-iraq.com (Arabic)
- Combined Joint Task Force – Horn of Africae official site (http://www.hoa.centcom.mil/)
- Spiegel, Peter (5 January 2007). "Naming New Generals A Key Step In Shift On Iraq" (http://articles.latimes.com/2007/jan/05/nation/na-generals5). Los Angeles Times.
- Foreign Policy, Pentagon Ups the Ante in Syria Fight (http://foreignpolicy.com/2015/03/30/the-pentagon-ups-the-ante-in-syria-fight-iraq-islamic-state-delta-force/)
- http://www.armytimes.com/story/military/pentagon/2014/12/30/iraq-1st-infantry-funk/21062071/ - Combined Joint Forces Land Component Command - Iraq

Retrieved from "http://en.wikipedia.org/w/index.php?
title=United_States_Central_Command&oldid=655960119"

Categories: Military units and formations in Florida │ Organizations based in Tampa, Florida │ Unified combatant commands of the United States Armed Forces │ Military units and formations established in 1983 │ 1983 establishments in the United States

- This page was last modified on 11 April 2015, at 11:43.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

# Police show off Homeland Security intelligence center

By **Linda Trischitta**
Sun Sentinel

MARCH 20, 2015, 12:15 AM   |   DORAL

A t a secret location in Miami-Dade County, analysts and investigators tasked with preventing terrorist attacks study tips about possible plots that could be carried out between Key West and Palm Beach.

They are part of the Southeast Florida Fusion Center, one of 78 centers in the United States and Guam, Puerto Rico and the U.S. Virgin Islands that make sure federal and local police agencies talk to one another about pending threats.

On Thursday, the center promoted its "See Something, Say Something" campaign to engage residents of Monroe, Miami-Dade, Broward and Palm Beach counties in its efforts.

Before the Sept. 11, 2001 al-Qaeda attacks when nearly 3,000 died, some of the terrorists trained at Florida air fields before flying jets into the World Trade Center, a field in Pennsylvania and the Pentagon in Washington, D.C.

"There was information out there that wasn't being shared," said Lt. Mario Hernandez of Miami-Dade police, the agency that manages the eight-year-old center. "One agency had a piece of the puzzle, another agency had a piece of the puzzle, nobody had the whole puzzle. We're trying to prevent that from happening again."

Besides crime analysis, they help local authorities prepare for big national events that South Florida frequently hosts and will lend equipment such as cameras to monitor crowds.

The center's director, acting Maj. Janna Bolinger-Heller, of Miami-Dade Police, said she could not disclose most of its success stories or the number of terrorism incidents that have been thwarted.

But officials said they helped investigate Raees Alam Qazi, 22, and his brother Sheheryar Alam Qazi, 32, of Oakland Park, who pleaded guilty March 12 to federal terrorism charges and admitted they plotted a terrorist attack on New York City landmarks.

The center coordinated in 2014 with Miami Gardens police, U.S. Customs and Border Protection and Interpol in an investigation of two Bahamian men here illegally. One was sought in his country for the murder of a U.S. citizen; Bahamian authorities took him into custody. The other man was deported, according to Homeland Security.

An example of what Bolinger-Heller called "unintended benefits" was how the center's cameras that had been lent ounty Fair helped recover lost children.

ban Beach Week in Miami Beach, a camera placed on a causeway showed police racing to a and a burglary suspect jumping off a backyard dock into Biscayne Bay, she said. The camera s to the swimming suspect.

price on the kinds of resources we have here and how we can use them to benefit the

r-Heller said.

ort Lauderdale's air show or a Super Bowl, the center will begin its threat assessment months the other centers in the country for intelligence reports, Lt. Margarita Varela said.

cal criminal activity, concerns for police and public safety in their preparations. Regardless of orts, Varela said, "the bottom line for the public is we can't do it alone. We have to work hand rder to prevent criminal activity or a terrorism attack from happening in our hometown. Our e, our families work here, we go to the malls here, we celebrate here."

center's tip lines — iwatchsouthflorida.com, seffc@mdpd.com and 855-352-7233 — to be e Stoppers.

ype of person being reported on," Varela said. "Look at the behavior. Was a vehicle or item left ve could walk by and not even challenge those things. In today's society, we can't. Bring this authorities and let us follow up on it."

### gns of Terrorism

one recording or monitoring activities, taking notes, drawing diagrams, marking maps or ther visual devices.

or individuals seeking information in person or by mail, phone or email about military ies or personnel.

Attempts to measure reaction times by police to security breaches; efforts to go through onitor procedures to assess strengths and weaknesses.

transactions involving large cash payments, withdrawals or deposits; asking for money for or criminal activities.

g or stealing explosives, weapons or ammunition; acquiring military uniforms, decals, flight lges or equipment to make them and other items.

ople who don't seem to belong, whether in a workplace, neighborhood, business or at border onation of law enforcement, military or corporate employees.

people in place and moving them according to a plan without actually committing a terrorist is activity includes mapping routes and timing traffic lights and flow.

e and supplies getting into position to commit an act. This is the last chance for someone to e a terrorist event happens.

lorida Fusion Center

Ltrischitta@Tribune.com, 954-356-4233 or Twitter @Linda Trischitta

Copyright © 2015, Sun Sentinel

---

## FROM AROUND THE WEB

Sponsored Links by Taboola

1 Dirty Little Secret To Eliminate 15 Years Of Mortgage Payments
LowerMyBills

7 Outrageous Credit Cards For Those Of Us That Have Excellent Credit
NextAdvisor

This $15 Product is Changing a $13 Billion Industry
Harry's

Ex-Microsoft exec is disrupting the traditional broker model
Yahoo! Finance | Motif Investing

Kate Upton and Tracy Morgan's Super Bowl Touchdown Dance
Vogue

30 Highest Paid Performers In The World
Forbes

Why You Should Be Getting Your Wine Online
Betches Love This | Lot 18

Russell Wilson Disagrees With Aaron Rodgers, Says God Does Care About Football
ThePostGame



P O L I T I C S

# Sheriff Joe vs. Uncle Sam

Joe Arpaio, America's most flamboyant lawman, hired a private detective to
investigate the wife of a federal judge considering whether he was in
contempt of court.



Ross D. Franklin / AP

**DAVID A. GRAHAM**
**APR 25, 2015**

Lots of conservatives talk a good game about how citizens should resist
federal control and devolve power to local governments. Few of them are
willing to put their convictions into action in quite the same way that Sheriff
Joe Arpaio is.

The man who calls himself "America's toughest sheriff" was already in
trouble with Uncle Sam, on trial for contempt of court in a U.S. district court.

Case 1:15-cv-20782-JEM  Document 44  Entered on FLSD Docket 04/28/2015  Page 205 of 271

It was only once that was under way that Arpaio and his lawyer apparently had the idea to sic a private investigator on the wife of the federal judge hearing his case. That shows toughness. It shows a willingness to use unorthodox tactics to resist federal interference. It's also not especially bright.

Reporters in the courtroom describe a somewhat shocking scene. Lawyers had completed their questioning when Judge Murray Snow announced he had some questions for Arpaio. After a series of queries, Snow asked: "Are you aware that I've been investigated by anyone?"

The sheriff then admitted that his former attorney had hired the private investigator to look into a tipster's allegation that Snow's wife had told someone at a restaurant that Snow wanted to prevent Arpaio from being reelected. Arpaio's amazing rationalization: "We weren't investigating you. We were investigating some comments that came to our attention."

**RELATED STORY**



Sheriff Joe Arpaio: The Most Lawless Lawman in America

The sheriff was on trial for, well, thumbing his nose at the federal government. In 2011, Judge Murray Snow issued a ruling demanding that Arpaio stop anti-immigration patrols arresting people solely on suspicion of being in the country illegally, while Snow continued to consider whether they

constituted illegal racial profiling. (In 2013, Snow finally ruled that they did, forcing Arpaio to drop the patrols permanently.) Arpaio simply disregarded the order for 18 months—as he now acknowledges. The question is whether that was intentional or not; if the judge decides it's the former, he could find Arpaio in contempt. The sheriff's somewhat improbable explanation is that he simply didn't realize that a federal judge had issued the order.

"I have a deep respect for the courts," Arpaio said. "It really hurts me after 55 years to be in this position. I want to apologize to the judge. I should have known more about these court orders that slipped through the cracks."

There are two problems with that. One is that a deputy testified this week that Arpaio had personally instructed him to continue enforcing federal immigration laws, in defiance of the judge's order. The second is that hiring a PI to investigate the judge who's considering whether you're in contempt of court isn't what most people would consider deep respect.

"It is contemptuous behavior on its face," a former U.S. attorney told The Arizona Republic. "And it is information deserving of further investigation to determine if other criminal misconduct occurred here."

Intimidating or trying to improperly influence a federal judge is in fact a crime. But this isn't the first time Arpaio has pulled a stunt like this—and in fact, he has a long history of launching investigations into political opponents. In 2012, a federal grand jury concluded a three-year investigation into abuse-of-power allegations without charging Arpaio.

The U.S. Department of Justice also has a civil-rights lawsuit pending against the sheriff accusing him of retaliating against critics. In a bizarre Spy vs. Spy moment, Arpaio also admitted to Snow that he had used county funds in 2013 to launch an investigation into … the Justice Department. Elsewhere during the questioning, Arpaio "conced[ed] that the agency employed

unreliable informants, private investigators and an unknown amount of public funds to investigate Arpaio's political enemies," as the *Republic* put it.

Arpaio's current attorney pushed back on the big revelation after the hearing, telling reporters: "These been no evidence that the sheriff ordered the judge's wife to be investigated." But his client's use of the first-person plural ("we were investigating some comments that came to our attention") would seem to contradict that.

Courts have already found that Arpaio violated the law, and there's no longer any question that other aspects of his behavior—even those not yet adjudicated for legality—are outlandish. The law isn't especially conflicted on many of the issues about which he's outspoken. The federal government has authority to enforce immigration laws; Arpaio's racial profiling was unlawful; intimidating a judge, if that's what he's found to be doing, is unlawful too; and yes, Barack Obama was born in the United States.

## "I have a deep respect for the courts. I want to apologize to the judge. I should have known more about these court orders that slipped through the cracks."

But there's a conflict between rule of law and rule of the people, and between the federal government and local authority. Arpaio has won six elections, never by less than six points. The closest was in 2012, when his legal trouble was already underway and well into his ill-advised birther crusade against Obama, but in 2008 he won by a comfortable 13 points. The point is: Maricopa County voters like Arpaio and have kept returning him to office, even as his M.O. has become abundantly clear. Maybe Washington doesn't want him enforcing federal immigration laws, but a majority of Phoenix-area voters apparently do. Besides, not all of the raps on Arpaio have stuck—

Case 1:15-cv-20782-JEM Document 44 Entered on FLSD Docket 04/28/2015 Page 208 of 271

witness the federal grand jury that didn't charge him (though that may have been mostly because of a challenging burden of proof).

This conflict between federal and local authority, never far from the surface in American history, has seen a resurgence in recent years, as conservative governments—mostly at the state level—have reacted to legislation passed by Democrats and backed by Obama by attempting to nullify or reject federal law. On issues from Obamacare to gun control, state legislators have even tried to write laws that would make enforcing federal statutes illegal. Few of these laws have passed, though, and if they did, they'd have little chance of surviving judicial review.

What's interesting about Arpaio is that unlike lawmakers who have pursued doomed legislative attempts to stop the liberal agenda, the sheriff is fighting back using his own executive authority, mixed with street-fighting moves. And when the federal judiciary has smacked him down, he's simply ratcheted up those efforts.

Perhaps investigating a federal judge's wife will be one step too far and spell his demise. If not, he could run for a seventh time in 2016. There's some precedent for voters punishing anti-federal pols in Arizona—they tossed State Senator Russell Pearce, the major proponent of Arizona's controversial illegal-immigration bill, after he seemed to have gone too far. Don't assume the same rules will apply to Joe Arpaio that apply to everyone else, though—he certainly doesn't think they do.

---

**ABOUT THE AUTHOR**



**DAVID A. GRAHAM** is a staff writer at *The Atlantic*, where he covers political and global news. He previously reported for *Newsweek*, *The Wall Street Journal*, and *The National*.

🐦 @GrahamDavidA  ✉ Email

Case 1:15-cv-20782-JEM    Document 44    Entered on FLSD Docket 04/28/2015    Page 209 of 271

# U.S. Air Force Intel Unit Helped Kill 1,200 People in a Year

## 361st Intelligence, Surveillance and Reconnaissance Group fed information to commandos

by DAVID AXE

A secretive group of U.S. Air Force intelligence specialists flying aboard American spy planes helped U.S. military commandos kill more than a thousand enemy combatants in just a single year back in 2012.

That's one startling revelation in the official annual history for 2012 of the Air Force's Intelligence, Surveillance and Reconnaissance Agency, a heavily-redacted copy of which War Is Boring obtained through the Freedom of Information Act.

Linguists and analysts from the 361st Intelligence, Surveillance and Reconnaissance Group at Hurlburt Field in Florida flew on at least 31,180 combat sorties in 2012, supporting no fewer than 960 separate operations that resulted in Special Operations Forces detaining more than 3,980 people and killing at least 1,210, according to the history.

That single year's kill tally probably makes the 361st one of the deadliest individual organizations in the entire U.S. military.



The 361st began as an aerial mapping unit during World War II. In 2008, the Air Force revived the unit as part of a massive expansion of intel units to support counterterrorism operations and the wars in Iraq and Afghanistan.

Between 2008 and 2012, the Pentagon grew its fleet of spy planes and surveillance drones by 238 percent—until they accounted for half of all Air Force aircraft, according to the ISR Agency history. By 2012 the Defense Department was spending $67 billion a year on intelligence and surveillance.



*Above—a U.S. Air Force MC-12W. At top—airmen from the Air Force's ISR Agency at work. Air Force photos*

Many intel flights require specialists to fly aboard the aircraft to quickly analyze the video the plane is shooting or translate the communications between enemy fighters that the aircraft's receivers pick up.

The intelligence personnel can then pass the information they gather to troops on the ground. The info might include the locations and strength of enemy fighters.

The 361st—which oversees two smaller units of linguists and analysts, the 19th and 25th Intelligence Squadrons—provides the specialists for spy flights supporting Special Operations Forces. The group "is heavily tasked around the world," the Air Force stated in a fact sheet.

Tech. Sgt. Brandi Fast from the 25th Intelligence Squadron was the Defense Department's Language Professional of the Year in 2013. That year she deployed twice to Southwest Asia—Afghanistan, presumably—and helped during a mission to rescue 14 crew from a coalition helicopter that crashed.

*Fast has a 16,000-word vocabulary in three languages, according to the Air Force.*

Lt. Col. John Shirley, the 361st's commander since April 2014, called his people "the best and brightest America and the Air Force has to offer."



*A U.S. Air Force U-28. Air Force photo*

The planes the 361st's specialists ride in could include special commando aircraft belonging to the Air Force or the Army. The Air Force's few public releases concerning the 361st specifically mention U-28 and MC-12W spy planes, which are heavily-modified turboprop transports sporting sophisticated sensors.

The MC-12W was a fixture in Afghanistan until recently. The U-28s spend much of their time in Africa.

The 361st's intel personnel also support drone flights, presumably by sitting in the robot planes' command trailers and analyzing video and communications intercepts the drones pipe in. In 2012, 19 percent of the 31,180 sorties the 361st's people supported were drone flights, according to the ISR Agency history.

Case 1:15-cv-20782-JEM   Document 44   Entered on FLSD Docket 04/28/2015   Page 213 of 271

*Based on the more than 1,200 people the 361st helped to kill in 2012, the group's work is certainly deadly to the bad guys. But the unit has also suffered casualties of its own.*

On Feb. 18, 2012, a U-28 crashed in Djibouti in East Africa, killing Senior Airman Julian Scholten from the 25th Intelligence Squadron.

And the 361st's Staff Sgt. Richard Dickson, who operated signals-intercepting gear, died in Afghanistan on April 27, 2013, when his MC-12W went down in hostile territory.





HOMEPAGE



NEWSLETTER



RSS



TWITTER

## The NSA Listened as Chinese MiGs Shot Down American Warplanes

Declassified docs detail Vietnam War air clashes

medium.com

## The U.S. Is Sending Specialists to Iraq to Keep Tabs on Iran's Agents

Counterintelligence troops help guard against spies

medium.com

## The Pentagon Deployed Scent Warfare in Vietnam

Electronic sniffers literally smelled for the enemy

medium.com

Exhibit 13

**IN UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 15-cv-20782-Martinez

DENNIS MONTGOMERY,

                  Plaintiff,

v.

RISEN, ET AL.

                  Defendants.

_____/

**PLAINTIFF'S REVISED INITIAL DISCLOSURE WITNESS LIST**

Montgomery, Dennis
Miami, Florida
Software Validation and all issues relevant to the Complaint

Risen, James
Maryland
Book, defamatory statements, actual malice, communications with Dennis Montgomery and all issues relevant to the Complaint

**FRCP Rule 30(b)(6) witnesses of corporate Defendants**

Mr. William Bayers, Esq.
General Counsel
Boston, Massachusetts 02116
Defamation, classified information, asked to correct defamatory statements, no journalistic standards, Florida contacts and sales, fact checking and all issues relevant to the Complaint

Linda K. Zecher
President, Chief Executive Officer and Director
Boston, Massachusetts 02116
Defamation, classified information, asked to correct defamatory statements, fact checking, Florida contacts and sales and all issues relevant to the Complaint

David Eber
Vice President and Associate General Counsel
Boston, Massachusetts 02116
Defamation, classified information, asked to correct defamatory statements, all issues relevant to the Complaint

Brook Colangelo
VP Houghton Mifflin Harcourt
White House Network Email and Network Infrastructure
all issues relevant to the Complaint

Houghton Mifflin Harcourt Publishing Company
Boston, Massachusetts 02116
all issues relevant to the Complaint

Rosemary Moseley
Lake Placid, Florida
Purchase of Book in Florida
all issues relevant to the Complaint

Kimberly Hines
Ft. Lauderdale, Florida
Montgomery Reputation, Purchase of Book in Florida
all issues relevant to the Complaint

Goss, Porter
Director of CIA
Miami, Florida
Software Validation, White House and Congressional Briefing
all issues relevant to the Complaint

Johns, Ken
Macdill AFB, Florida
Software Validation, White House and Congressional Briefing, Montgomery Reputation
all issues relevant to the Complaint

Lyons, XXXXX
Macdill AFB, Florida
Software Validation, White House and Congressional Briefing, Montgomery Reputation
all issues relevant to the Complaint

Macbeth, W. Rhys
Eglin AFB, Florida
Software Validation, White House and Congressional Briefing, Montgomery Reputation
all issues relevant to the Complaint

Nazelrod, Craig
Eglin AFB, Florida
Software Validation, White House and Congressional Briefing
all issues relevant to the Complaint

Pipes, XXXXX

Macdill AFB, Florida
Reputation Damage
all issues relevant to the Complaint

Roche, James
Macdill, Florida
Software Validation, White House and Congressional Briefing, CIA Visits, eTreppid Visits
all issues relevant to the Complaint

Rumsfeld, Donald
Florida
Software Validation, White House and Congressional Briefing, CIA Visits, Reputation damage
all issues relevant to the Complaint

Stillman, Phillip
Attorney Dennis Montgomery
Miami, Florida
Dennis Montgomery Legal Briefs, Whistleblower complaints
all issues relevant to the Complaint

Madden, Tom
Boca Raton, Florida
Reputation, damage to reputation in FL
all issues relevant to the Complaint

Olivia, Adrian
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Bartholomew Mary L
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Fiamengo, Nicholas A
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Freeman, Gregory J
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Savage Cynthia

Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

McCool John C
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Temple James K
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Griffin Susan M.
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Russell, Deborah
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Nettelhorst Doug M
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Stallworth Hugh T
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Bob McCaskey
Macdill AFB, Florida
Northrop Grumman TASC
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Crutchfield, Chris
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Melnyk, Michael S.

Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Lopez Tina M
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings

Cerny, Jeffrey D.
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Muccio Anthony B
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

McKinney Scott E LtCol
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Purvis Brad Civ
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

'Kirsch, Jim'
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Hughes Stacey L
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Abramson, Jill
Former New York Times Editor in Chief
New York, NY
Dennis Montgomery Reputation, James Risen, Eric Lichtblau
all issues relevant to the Complaint

Anderson, Jesse
Employee eTreppid Technologies

Reno, Nevada
SOCOM work
all issues relevant to the Complaint

Azzinaro, Neil
2006 Search Warrant
Las Vegas, Nevada
2006 Search Warrant
all issues relevant to the Complaint

Bauder, Jim
Employee eTreppid Technologies
Reno, Nevada
SOCOM work
all issues relevant to the Complaint

Blixseth, Edra
Beverly Hills, CA
760-831-1982
Software Works
all issues relevant to the Complaint

Blixseth, Tim
Medina, WA 98004
760-333-9024
Software Works
all issues relevant to the Complaint

Frye, Doug
Malibu, CA
Government Contracts, Montgomery Reputation, eTreppid Bank Accounts
all issues relevant to the Complaint

Sandoval, Michael
Bellevue, WA
Software Functionality, Mass Surveillance Technology, Congressional Briefing, Mike Flynn

Snowden, Edward
Somewhere in Russia
Mass Surveillance Technology, NSA and CIA Briefing
all issues relevant to the Complaint

Trepp, Warren
Reno, NV
US Government contracts, CIA Briefings, Search Warrant, Software Functionality
all issues relevant to the Complaint

6

Venables, Sloan
Virginia City, NV
US Government contracts, CIA Briefings, Search Warrant, Software Functionality
all issues relevant to the Complaint

Wiedermann, Peter
Contractor USAF
Kirkland, WA
US Government contracts, CIA Briefings, Search Warrant, Software Functionality
all issues relevant to the Complaint

- This is an initial disclosure witness list and Plaintiff reserves the right to supplement it as this case proceeds to discovery and trial.

Dated: April 27, 2015                          Respectfully submitted,

                                               /s/ Larry Klayman
                                               Larry Klayman, Esq.
                                               Klayman Law Firm
                                               FL Bar No. 246220
                                               7050 W Palmetto Park Rd.
                                               Suite 15-287
                                               Boca Raton, FL 33433
                                               (310) 595-0800
                                               leklayman@gmail.com
                                               Attorney for Plaintiff

Exhibit 14

# Klayman Law Firm

2020 Pennsylvania Avenue, N.W., Suite 800, Washington, DC 20006-1811 ❖ Telephone: (310) 595-0800 ❖ leklayman@gmail.com

VIA FEDERAL EXPRESS AND CERTIFIED MAIL

January 14, 2015

 **URGENT**

Linda K. Zecher
President, Chief Executive Officer and Director

William Bayers
Executive Vice President and General Counsel

Houghton Mifflin Harcourt
222 Berkeley Street
Boston, MA 02116

## Re: Defamation of Dennis Montgomery in "Pay Any Price" by James Risen.

Dear Ms. Zecher and Mr. Bayers:

I am counsel for Dennis Montgomery.

My client has brought it my attention that the recent publication of "Pay Any Price," written by James Risen, is defamatory. In a later correspondence, I will outline in detail all of the defamatory statements, which are actionable as libel per se. And because Mr. Montgomery is not a public figure, in fact having worked with various intelligence agencies and The White House, he was "undercover" given his duties and responsibilities in gathering intelligence concerning various matters related to terrorism. Thus, to prove a case for defamation, which we will file in Florida if this matter cannot be resolved, one need not even show malice, although it arises in any event from libel per se.

In Risen's book, as just one example of the defamatory conduct, he writes at pages 32-33:

> Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money.

1

Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it. The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in a series of civil lawsuits involving Montgomery.

It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes.

A former medial technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing scope, he still had die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Montgomery was a fake, and who rejected the notion that the super-secret computer software that he foisted on the Pentagon and CIA was anything other than America's salvation.

It is therefore clear that Houghton Mifflin Harcourt, in order to fact-check Risen's statements to responsibly exercise due diligence, even assuming that Risen's statements are not defamatory, would have had to have had access to top secret highly classified information. However, for you the publisher, to have access to this information, without the authorization of the government, would constitute crimes.

Thus, I want to understand how you fact checked Risen before you both decided to defame my client and how, after publication of his book, you furthered Risen's continuing defamatory statements in the print, television and radio media. In short, you not only have corporate and personal significant civil liability to my client, but have you also collectively engaged what is in effect a criminal enterprise for profit.

If you would like to discuss this matter before Mr. Montgomery takes other avenues of redress, please contact me immediately. I am available to meet with you at the end of this month if such a meeting could prove productive to try to resolve this serious matter. Let me know if there is an interest by January 20, 2015 to discuss how you fact-checked Risen's statements; otherwise we will contact the Federal Bureau of Investigation and seek other suitable redress.

Although I am representing Mr. Montgomery in my private capacity, as also a public interest advocate, there is a duty and responsibility on my part not to accede to top secret classified

information being strewn all over the public record, particularly given the rise of Islamic terrorism in recent months and the even heightening risks this presents to the this nation and the free world.

Please govern yourselves accordingly.

Sincerely,

Larry Klayman

cc:      Dennis Montgomery
         James Risen

Exhibit 15

# Klayman Law Firm

2020 Pennsylvania Avenue, N.W., Suite 800, Washington, DC 20006-1811 ⊗   Telephone: (310) 595-0800 ⊗   leklayman@gmail.com

Via Fax and Mail

February 13, 2015

Mr. William Bayers, Esq.
General Counsel
Houghton Mifflin Harcourt Publishing Company
222 Berkeley Street, FL 1-11
Boston, Massachusetts 02116

Mr. James Risen
c/o The New York Times
1627 "I" Street N.W., Suite 700
Washington, D.C. 20006-4007

Mr. James Risen
c/o Houghton Mifflin Harcourt Publishing Company
222 Berkeley Street, FL 1-11
Boston, Massachusetts 02116

Re:     **Demand for Retraction of Defamation Pursuant to § 770.02 Florida Statutes (2012)**

Dear Mr. Bayers and Mr. Risen:

I am writing as legal counsel for Mr. Dennis Montgomery, who is the subject of Chapter 2 and other portions of a book published by Houghton Mifflin Harcourt Publishing Company titled "Pay Any Price:  Greed, Power and Endless War" authored by James Risen.

This letter is to place you on notice pursuant to § 770.02 Florida Statutes (2012) "Notice condition precedent to action or prosecution for libel or slander" that you have published statements concerning our client Dennis Montgomery which constitute defamation *per se*, general defamation and defamation by inference (hereafter "defamatory statements").

You are now on notice that these materials have resulted in severe damage to Dennis Montgomery personally and in his trade and profession, for which you may be held to account for legally.

Your defamatory statements were first and continue to be published in a book with publication date October 14, 2014, by Houghton Mifflin Harcourt Publishing Company at 215 Park Avenue South, New York, New York 10003, under the title "Pay Any Price:  Greed, Power and Endless War" (referred to as "the Book) by author James Risen, Copyright (c) 2014 by James Risen, designated by the Library of Congress by its index system as ISBN 978-0-544-34141-8 (hardback edition).

Retraction Letter
February 13, 2015
Page | 2

The publication dated October 14, 2014, was the first publication of the book worldwide in any language and the first printing run of the book. The book was physically printed in the United States of America. We understand that copies of the Book were distributed to bookstores and/or the public up to a week or two earlier than the designated date of publication (a book's designated publication date being primarily of marketing significance, not necessarily the earliest date of a book's release).

Apart from the book itself, James Risen on behalf of himself and the publisher also engaged in a flurry of news interviews and talk show interviews starting in September, and continuing until the present time, associated with the publication 'roll out' of his book in which Risen made further statements in addition to the words of the book itself and repeated claims from the book itself.

Many of Risen's libelous and slanderous statements were made during written news and talk show interviews in September 2014, October 2014, and November, 2014, and since then, some spoken, some in print, surrounding the publication of his book rather than in the book itself.

Your defamatory statements against Dennis Montgomery are exceedingly numerous, extensive, detailed, and often each defamatory in numerous respects. Many statements each include multiple and overlapping topics of defamation against Dennis Montgomery.

As a result, we have attached as "Attachment A" to this letter a 28-page restatement, summary, and analysis of at least 43 examples of defamatory statements. We expect that James Risen also made other statements during additional radio, television, and print interviews about the Book.

You are now on notice that this article resulted in severe damage to Mr. Montgomery personally and in his trade and profession, for which you all will be held to legally account for.

We demand that you issue a retraction immediately. In your previous letter of January 20, 2015, you denied that any defamatory statements were made. We strongly suggest that you reconsider. Please govern yourselves accordingly.

Sincerely,

Larry Klayman

cc: Dennis Montgomery

**ATTACHMENT A**

**LIST OF EXAMPLES OF DEFAMATORY STATEMENTS, COMMENTS**

**DEFAMATION *PER SE***

1.        The following statements are "*defamatory per se,*" recognized under Florida law

when statements are so powerful in their ability to hurt someone that Florida law presumes

harmful as a matter of law. *Montgomery v. Knox*, 23 Fla. 595, 3 So. 211, 217 (1887), such that a

judge will allow damages to be awarded in these cases even if no evidence of harm has been

presented. "[T]he law presumes malice in their utterance," *Abraham v. Baldwin*, 52 Fla. 151, 42

So. 591, 592 (1906), where the words are "… of such common notoriety established by the

general consent of men, that the courts must of necessity take judicial notice of its harmful

effect." *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 236 (1933). [1]

2.        **First, on Page 32 of the Book, Risen writes: [2]**

        "Consider the example of Dennis Montgomery.  He provides a
        perfect case study to explain how during the war on terror greed and
        ambition have been married to unlimited rivers of cash to create a
        climate in which someone who has been accused of being a con
        artist was able to create a rogue intelligence operation with little or
        no adult supervision. Crazy became the new normal in the war on
        terror, and the original objectives of the war got lost in the process."

3.        As libel *per se*, Risen asserted that out of "greed" Montgomery "create[d] a rogue

intelligence operation with little or no adult supervision and that he was "someone who has been

accused of being a con artist."

---

[1]        Examples of defamation *per se* include those that hurt one's profession, business or trade;
falsely state that a person has a socially unacceptable illness or disease;  or falsely state that a
person has been involved in some kind of criminal activity.  *Lawnwood Medical Center Inc. v.
Sadow*, 43 So. 3d 710, 729 (Fla. 4th DCA 2010).
[2]        Note that several statements may qualify under different theories, but are presented in full
for proper context.  Some statements are repeated for that portion of the statement that qualifies
under different theories of defamation under Florida law.

4.   **Second, on Page 32 of the Book, the Risen writes:**

"Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money. Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it**.** The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in public, a series of civil lawsuits involving Montgomery.  It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes."

5.   As libel *per se*, Risen asserted Montgomery's work "many current and former

U.S. officials and others familiar with the case now believe was one of the most elaborate and

dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the

Bush administration to order fighter jets to start shooting down commercial airliners filled with

passengers over the Atlantic."

6.   As libel *per se*, Risen asserted about the Montgomery that "once the fever broke

and government officials realized that they had been taken in by a grand illusion, they did

absolutely nothing about it …"

7.   **Third, on Page 33 of the Book, Risen writes:**

"A former medical technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing

> scope, he still had die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Montgomery was a fake, and who rejected the notion that the super-secret computer software that he foisted on the Pentagon and CIA was anything other than America's salvation."

8.      As libel *per se*, Risen asserted that Montgomery's work "now appears to have been an elaborate hoax."

9.      As libel *per se*, Risen asserted that "die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Montgomery was a fake."

10.     As libel *per se*, Risen asserted that he "that he foisted on the Pentagon and CIA" super-secret computer software.

11.     **Fourth, on Page 34 of the Book, the Risen writes:**

> "Montgomery was an overweight, middle-aged, incorrigible gambler, a man who liked to play long odds because he was convinced that he could out-think the house. He once boasted to a business partner that he had a system for counting an eight-deck blackjack shoe, quite a difficult feat for even the best card sharks, and he regularly tested his theories at the El Dorado and the Peppermill Casino in Reno. He usually came up short but that didn't stop him from playing blackjack on a nightly basis, racking up unwieldy debts that eventually led to his 2010 arrest for bouncing more than $ 1 million in bad checks at Caesar's Palace in Las Vegas."

12.     As libel *per se*, Risen asserted about the Montgomery that he was an "incorrigible gambler," meaning in effect that Montgomery was a gambling addict who was "playing blackjack on a nightly basis."  Historically, gambling and in particular an uncontrollable gambling addict is a loathsome social status.

13.     **Fifth, on Page 36 of the Book, Risen writes:**

> "Michael Flynn, Montgomery's former lawyer— who later concluded that Montgomery was a fraud."

14.     As libel *per se*, Risen asserted about the Montgomery that Montgomery's lawyer "concluded that Montgomery was a fraud."

15.     **Sixth, on Page 37 of the Book, Risen writes:**

> *"*By the spring and summer of 2003, eTreppid was awarded contracts by both the air force and U.S. Special Operations Command. Montgomery was able to win over the government in part by offering field tests of his technology —tests that former employees say were fixed to impress visiting officials. Warren Trepp later told the FBI that he eventually learned that Montgomery had no real computer software programming skills, according to court documents that include his statements to the FBI. Trepp also described to federal investigators how eTreppid employees had confided to him that Montgomery had asked them to help him falsify tests of his object recognition software when Pentagon officials came to visit. Trepp said that on one occasion, Montgomery told two eTreppid employees to go into an empty office and push a button on a computer when they heard a beep on a cell phone. Meanwhile, Montgomery carried a toy bazooka into a field outside eTreppid. He was demonstrating to a group of visiting U.S. military officials that his technology could recognize the bazooka from a great distance."

16.     As libel *per se*, Risen asserted about Montgomery that he committed fraud including defrauding the U.S. Government, prohibited under the False Claims Act codified at 31 U.S.C. §§ 3729 – 3733.

17.     **Seventh, on Page 37 of the Book, Risen writes:**

> "After he was in place in the field, he used a hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of a bazooka on another screen prominently displayed in front of the military officers standing in another room, according to court documents. The military officers were convinced that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands. (Montgomery insists that the eTreppid employees lied when they claimed that he had asked them to fix the tests, and also says that the air force issued a report showing that it had verified the tests.)"

4

18.     As libel *per se*, Risen asserted about Montgomery that he committed fraud including defrauding the U.S. Government, prohibited under the False Claims Act codified at 31 U.S.C. §§ 3729 – 3733.

19.     ***Eighth,* on Page 40 of the Book, Risen writes:**

> "Montgomery brilliantly played on the CIA's technical insecurities as well as the agency's woeful lack of understanding about al Qaeda and Islamic terrorism. He was able to convince the CIA that he had developed a secret new technology that enabled him to decipher al Qaeda codes embedded in the network banner displayed on the broadcasts of Al Jazeera, the Qatar-based news network. Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks. And only he had the technology to decode those messages, thus saving America from another devastating attack. The CIA— more credulous than Hollywood or Las Vegas— fell for Montgomery's claims. In short, he convinced CIA officials that he could detect terrorist threats by watching television."

20.     As libel *per se*, Risen asserted about Montgomery that "Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks."

21.     As libel *per se*, Risen asserted about Montgomery that he defrauded the CIA.

22.     ***Ninth,* on Page 42 of the Book, Risen writes:**

> "A CIA official defensively pointed out that the agency did not actually have a contract with eTreppid at the time Montgomery was providing data from the Al Jazeera videotapes. While they were working closely together during the final months of 2003, the CIA had not yet started paying Montgomery, the official said. The agency never finalized a contract with him because agency staff eventually realized they had been conned, according to this official. But that does not diminish the fact that for a few crucial months, the CIA took Montgomery and his technology very seriously."

23.     As libel *per se*, Risen asserted about Montgomery that "agency staff eventually realized they had been conned, according to this official."

24.    ***Tenth,*** **on Page 46 of the Book, the Risen writes:**

"It did not take long for the French firm to conclude that the whole thing was a hoax.  The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers.  The firm reported back to the French government that the supposed intelligence was a fabrication."

25.    As libel *per se*, Risen asserted about Montgomery that "the whole thing"

(Montgomery's work) "was a hoax" and a "fabrication."

26.    ***Eleventh,*** **on Page 46 of the Book, the Risen writes:**

"The CIA never investigated the apparent hoax nor examined how it had been handled inside the agency. No one involved in promoting Montgomery, in vouching for his information to the president, or in proposing to shoot down planes based on his claims ever faced any consequences."

27.    As libel *per se*, Risen asserted about Montgomery that his work was a hoax.

28.    ***Twelfth,*** **on Page 47 of the Book, the Risen writes:**

"At the time of the Christmas 2003 scare, John Brennan was head of the newly created Terrorist Threat Integration Center and in charge of distributing terrorism-related intelligence throughout the government. That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration. But Brennan was never admonished for his role in the affair. After Barack Obama became president, Brennan was named to be his top counterterrorism advisor in the White House. He later became CIA director."

29.    As libel *per se*, Risen asserted about Montgomery that "That meant that

Brennan's office was responsible for circulating Montgomery's fabricated intelligence to

officials in the highest reaches of the Bush administration."

30.    ***Thirteenth,*** **on Page 50 of the Book, Risen writes:**

"Edra Blixseth was Dennis Montgomery's latest mark. After being introduced to him by a former Microsoft executive and then hearing Montgomery explain his software, she agreed in 2006 to bankroll Montgomery to launch a new company, to be called Blxware.

> Montgomery needed new government contracts for Blxware, and
> Edra Blixseth had the money and contacts to try to make it happen."

31.     As libel *per se*, Risen asserted about Montgomery that "Edra Blixseth was Dennis Montgomery's latest mark," clearly asserting Montgomery to be a con man.

32.     The libel is false, including because Montgomery owed no stock or ownership in BLIXWARE so as to be able to make a "mark" of Edra Blixseth.

33.     ***Fourteenth,*** on November 6, 2014, James Risen appeared as an interview guest on "The Daily Show with Jon Stewart," by Comedy Central, interviewed by Jon Stewart. Exhibit A, attached. The television interview was taped at The Daily Show's studio 11th Avenue between 51st and 52nd Street, New York (Manhattan), New York, and broadcast for the first time nationwide across the United States of America through cable television and satellite television on "The Comedy Central" channel.

34.     James Risen stated in said television interview for his statements to be broadcast on TV that his favorite story is the story of –

> Dennis Montgomery who is this guy was as a computer software
> expert, supposed expert. Who convinced the CIA in 2003 that he had
> the super-secret technology to read Al Jazeera news broadcasts and
> decipher Al Qaeda codes inside the [interrupted by Jon Stewart]
>
> [Jon Stewart]  An Enigma machine for Al Qaeda...?
>
> [Dennis Montgomery] Right.  And he convinced the CIA in 2003 that
> he could read numbers and letters hidden in the Al Jazeera broadcasts
> that corresponded with flights that Al Qaeda was going to shoot down,
> knock--- or blow up….
>
> President Bush was so convinced of this that they grounded flights all
> over the world at Christmas 2003 based on this guy's intelligence or
> supposed intelligence.  It took the French intelligence service, who had
> gotten very mad because they grounded flights from Paris to Los
> Angeles.  And they demanded that the CIA tell them where they were
> getting this information.    And so they finally [non-verbal

interruption].  They finally got the information.   The French told them this is a hoax.  This is a fabrication.

And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it.  And Montgomery kept getting more contracts after that.

[Other, extended discussion with Jon Stewart on other topics]

There is lots of raw intelligence every day that says there is an attack about to happen.   You really have to be a pretty sophisticated consumer of intelligence after several years to begin to realize what's real and what's not really a credible threat.

35.     As libel *per se*, Risen asserted about Montgomery that "he convinced the CIA in 2003 that he could read numbers and letters hidden in the Al Jazeera broadcasts that corresponded with flights that Al Qaeda was going to shoot down, knock--- or blow up….

36.     As libel *per se*, Risen asserted about Montgomery that "The French told them this is a hoax.  This is a fabrication.  And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it.  And Montgomery kept getting more contracts after that."  The statement that "the CIA agreed with them" is Risen's assertion about Montgomery's work that "this is a hoax.  This is a fabrication."

37.     As libel *per se*, Risen asserted about Montgomery that "they covered the whole thing up, and refused to ever talk about it,"  as a way of saying that the CIA had been conned.

38.     ***Fifteenth,*** on October 13, 2014, James Risen gave a television interview [3] with Judy Woodruff which was broadcast nationwide by the Public Broadcasting System (PBS).   In that interview, James Risen made the following statements for broadcast on television, and Judy Woodruff repeated many points from James Risen's book which Risen agreed with and endorsed.  Much of the interview involved other chapters not relevant here.

---

[3]     http://www.pbs.org/newshour/bb/costs-security-price-high/

JUDY WOODRUFF:  In the next chapter, JAMES RISEN, you write about millions of dollars spent on programs that were completely fraudulent.  One was run by a man named Dennis Montgomery.  He was a, He was a .... I guess he had worked in computer software... but he was a GAMBLER! [4]

JAMES RISEN:  Right.

JUDY WOODRUFF:  And he sold the CIA and the Pentagon on technology that turned out to be not at all what he said it was.

JAMES RISEN:   It is difficult to tell in some of these cases who is scamming who.  If you talk to Montgomery, he argues that the CIA wanted him to do what he was doing.  And so its a fascinating dynamic that's developed in the war on terror, between people who recognize the opportunities for this gold rush and the agencies which are... who have so much money to spend now, they're getting so much more money than they ever had before, that in some cases they don't know what to do with.

In this case, they began to believe, in this sort of war fever, that you could find Al Qaeda messages hidden in Al Jazeera broadcasts.  And so that.. that program, that highly secret program, was used to ground planes all over Europe and the United States

JUDY WOODRUFF:  When actually there was nothing to it.

JAMES RISEN:  Right

JUDY WOODRUFF:  It was a hoax.

JAMES RISEN:  Right.  Right.

JUDY WOODRUFF:  And then there was another part of it where he was saying he had special facial recognition software....

JAMES RISEN:  Right.  Right

JUDY WOODRUFF:  ... used on drones?

JAMES RISEN:   Yeah.  There were cases in which people said that he was fooling the military and the CIA about his operations and how... what kind of techniques and technologies he had.  He would argue that the CIA actually wanted him and or the army believed him

---

[4]      Emphasis, by exclamation in tone of voice, the in original conversation.

> and tested it.  So it's this very complicated story about a man
> recognizing an opportunity who had never been involved in national
> security before and the CIA and the military all just hungry for
> whoever could come with the latest idea.

39.     As libel *per se*, Risen asserted about Montgomery that "you write about millions of dollars spent on programs that were completely fraudulent.  One was run by a man named Dennis Montgomery," which Risen confirms by saying "Right." (Actually where the discussion is about "the next chapter" that chapter is exclusively about Dennis Montgomery alone.)

40.     As libel *per se*, Risen asserted about Montgomery that "When actually there was nothing to it," which Risen confirms by saying "Right." And also "It was a hoax," which Risen confirms by saying "Right.  Right."

41.     As libel *per se*, Risen asserted about Montgomery that "There were cases in which people said that he was fooling the military and the CIA about his operations and how... what kind of techniques and technologies he had."

42.     **Sixteenth,** on October 24, 2014, James Risen gave an audio interview with Lucy Worsley published on the <u>New York Times</u> website, titled **"Inside The New York Times Book Review: James Risen's 'Pay Any Price'"** which is accessible at that website address. [5]  In this interview  "**Inside <u>The New York Times</u> Book Review**," with Pamela Paul, October 24, 2014, James Risen stated for national broadcast:

> PAMELA PAUL:   How do we count and account for the costs of the
> government's war on terror.  We'll talk to  James Risen, author of Pay
> Any Price:  Greed, Power, and Endless War.

---

[5]     See:  ArtsBeat: Book Review Podcast: James Risen's 'Pay Any Price', by John Williams, <u>New York Times</u>, October 24, 2014, http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/ , based upon Louise Richardson's book review of Risen's book.

JAMES RISEN ("tease" audio clip):   It seems to me that what the war on terror had become in thirteen years was a search for cash and a search for power and status.

PAMELA PAUL:   What is the British fascination with murder? Lucy Worsley will explain all joining us to talk with us about her new book:  The Art of the English Murder.

LUCY WORSLEY ("tease" audio clip):  The public used to consume murder in a way that you can still see the modern media doing it today.  Just look at the Pistorius trial.

PAMELA PAUL:   Alexander Alter will be here with Notes from the Publishing world.  And Greg Cole has bestseller news.  This is "Inside the New York Times Book Review."  I am Pamela Paul.

James Risen joins me now.  His new book is Pay Any Price:  Greed, Power, and Endless War.  Hi James.

JAMES RISEN:   Hi, thanks for having me.

PAMELA PAUL:  Thanks for being here. Now this is a book that covers a lot of territory.  Tell us briefly about what it is you set out to write about in the book.

JAMES RISEN:   What I wanted to do was, I'd written one book before about the war on terror, and I wanted to follow up with a new book that kind of looked at where we were 13 years after 9/11 and how we had what started out in the immediate aftermath of 9/11 as kind of a search for justice or a search for retribution or whatever you want to think, say we were doing right after 9/11 as a country.  It seemed to me that what the war had become in 13 years was a search for cash and a search for power and status and that it was becoming an endless war in which we had a new mercenary class of people who were taking advantage of the war on terror.  And that enormous unintended consequences had happened.  And I began to hear about just some really crazy things that were going on.  And so I thought it would make a good story.

[The discussion then covers the Chapter "Rosetta" not relevant here, concerning a lawsuit for 9/11 families against Saudi Arabia, except the ending]

JAMES RISEN [winds up the Chapter on "Rosetta" by saying]:   .... in the war on terror became so complicated and so difficult to tell what was really going on, to me it was like a case study in how the

war on terror had been turned for other uses, and become a.... something that you could never tell what was the truth and what was not the truth.  And that to me was at the heart of the problems with the war on terror, that you could never tell what's real and what was concoction today.

[The discussion then covers how Risen went about researching the book, not relevant here]

PAMELA PAUL:   Did a lot of it arise out of stories that, reporting that you'd originally done for the Times?

JAMES RISEN:   Some of it. For instance, I did a chapter The Emperor of the War on Terror, about Dennis Montgomery who [laughs] who's a strange character, who I'd done a story about him for the New York Times along with Eric Lichtbau my colleague there at the Times.  He's one of the most fascinating characters in the war on terror.  He... He was a computer software expert who convinced the CIA that he could decipher secret codes from Al Qaeda in the Al Jazeera news broadcasts.  And that he could tell the CIA numbers and letters that corresponded with flights that Al Qaeda wanted to attack. And the CIA took this so seriously that they grounded, that the Bush Administration grounded a bunch of international flights in Christmas 2003 based on what this guy was telling them.  And when they realized it was a hoax, they covered the whole thing up and never did anything about it.  So I had done a story for the Times with....  about that and then expanded on that and got a lot more information for the book.

PAMELA PAUL:   How did you find out about him?

JAMES RISEN:   Well he had been written about a little bit before we wrote about it.  But I had also, even before he was written about by other people, I had heard from people in the CIA that there was this crazy operation that nobody wanted to talk about, that they were all embarrassed by.  To me that, it was like a case study in just how crazy the war on terror has become. And the only thing that makes sense about why it's gotten so crazy, is I think we kind of have deregulated national security and we took all, you know, Cheney said we're going to take the gloves off.  And that means we deregulated national security at the same time we poured hundreds of billions of dollars into counter-terrorism.  And so it's had enormous unintended consequences from what is essentially a national security crisis that is kind of like the banking crisis.

[The interview discussion then turns to the alleged deregulation of national security on other topics not relevant here.]

43.    As libel *per se*, Risen asserted about Montgomery that "And when they [the CIA] realized it was a hoax, they covered the whole thing up and never did anything about it."

44.    The libel is false, for the reasons identified above, and including that Montgomery never purported to be an expert in intelligence but left interpretation of the data he uncovered to intelligence experts of the U.S. Government.

45.    **Seventeenth,** James Risen sat for a nationwide television news interview on the television show **DEMOCRACY NOW!** A Daily Independent Global News Hour, with Amy Goodman & Juan González, at 207 W. 25th St., Floor 11, New York, NY 10001 on October 14, 2014.  On this nationwide television news broadcast, the conversation turned to:

**AMY GOODMAN:** Dennis Montgomery?

**JAMES RISEN:** Dennis Montgomery is a fascinating character, who—he was a computer software person, self-styled expert, who developed what he said was special technology that would allow him to do things with computers that other people couldn't do. One of the things that he developed was this imaging technology that he said he could find images on broadcast network news tapes from Al Jazeera. He said that he could read special secret al-Qaeda codes in the banners on the broadcasts of Al Jazeera. And the CIA believed this. And he was giving them information based on watching hours and hours of Al Jazeera tapes, saying that "I know where the next al-Qaeda attack is going to be based—is going to happen." And the Bush administration and the CIA fell for this.

**AMY GOODMAN:** And it was in the news zipper at the bottom of the Al Jazeera broadcasts?

**JAMES RISEN:** Well, he says it was in the banner. But anyway. And so, it was this great—if you talk to him, he argues, well, they— that's what they were looking for. You know, they convinced him to look for this. You know, it depends on who you talk to. But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they

were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts.

And then there's a whole number of other things, like Alarbus, which was this covert program at the Pentagon where a Palestinian involved in that was actually trying to use the bank account set up by the secret program, Pentagon program, to launder hundreds of millions of dollars. And the FBI investigated this, but then tried to keep the whole thing quiet.

**AMY GOODMAN:** How much did the U.S. government give to Dennis Montgomery?

**JAMES RISEN:** Millions of dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that. So, it's a strange—to me, the Dennis Montgomery story is one of the strangest, because what it shows is, early on in the war on terror, as I said, the CIA and all these other agencies had so much money to spend on counterterrorism that they were willing to throw it at everything. They were so afraid of the next terrorist attack that they were willing to believe anybody who came up with some idea. And I called that chapter about Montgomery, you know, "The Emperor of the War on Terror," because nobody wanted to say that the emperor had no clothes.

**AMY GOODMAN:** I mean, it had very real effects, aside from spending all that money.

**JAMES RISEN:** Yeah.

**AMY GOODMAN:** For example, planes being sent back.

**JAMES RISEN:** Yes, yes. There were planes grounded. International flights between the United States and Europe and Mexico were grounded. There was talk at the White House even of shooting down planes based on this information.

**AMY GOODMAN:** Because they could be used, as with September 11th, as weapons?

**JAMES RISEN:** Yeah, as missiles or whatever. And so, it was crazy. It was absolutely insane.

**AMY GOODMAN:** And it was only the French government who then did a study?

14

**JAMES RISEN:** Yes, yes. Yeah, the French government finally—you know, the U.S.—the CIA and the Bush administration didn't want to tell anybody what was really happening, where they were getting this information. You know, "This supersecret information about Al Jazeera, we can't tell you." And finally, the French intelligence service and the French government said, "You know, you're grounding our planes. You've got to tell us where you're getting this information." And they got—they finally shared the information with them, and the French got a French tech firm to look at this, and they said, "This is nuts. This is fabrication." And after a while, the CIA was finally convinced maybe the French were right, and they stopped talking about it. They didn't do anything else. They just like shut it down eventually, but never wanted to talk about what had really happened.

**AMY GOODMAN:** Then Dennis Montgomery, revealed as a con man—

**JAMES RISEN:** Yeah, yeah.

**AMY GOODMAN:** —in jail for that?

**JAMES RISEN:** Well, no, he's not in jail. But it was a—he actually got more contracts after that, with the Pentagon and other agencies. And he continued to operate for a long time. You know, he kind of went from one agency to the other.

**AMY GOODMAN:** We're talking to James Risen, Pulitzer Prize-winning investigative journalist for *The New York Times*. His new book, just out today, *Pay Any Price: Greed, Power, and Endless War*. When we come back, war corrupts, endless war corrupts absolutely. Stay with us.

[break]

46.     As libel *per se*, Risen asserted about Montgomery that "But it was one of the great

hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush

administration, based on information they were getting from Dennis Montgomery's so-called

decryption of Al Jazeera broadcasts."

47.     As libel *per se*, Risen asserted about Montgomery when asked "How much did

the U.S. government give to Dennis Montgomery?" Risen answered in reply: "Millions of

dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that."

48.     As libel *per se*, Risen asserted about Montgomery that "the French got a French tech firm to look at this, and they said, 'This is nuts. This is fabrication.'"

49.     As libel *per se*, Risen asserted about Montgomery when asked "Then Dennis Montgomery, revealed as a con man—" Risen confirmed in reply: "Yeah, yeah."

50.     As libel *per se*, Risen asserted about Montgomery that he should be in jail.

51.     ***Eighteenth***, James Risen gave an interview with "Conversations with Great Minds" of "The Big Picture RT with talk show host Thom Hartmann on October 24, 2014. [6]

> THOM HARTMAN:   ...  [Abrupt change of topic starting at about time 5:27]  ...  There's just this enormous amount of government money.  Let's throw it at the private sector.  They'll make things well.  One of the members of the private sector who came forward and said I've got a secret, I can figure this stuff out, was a guy by the name of Dennis Montgomery.
>
> JAMES RISEN:   Right.  Uh, Dennis Montgomery is one of the best stories in the war on terror.  I think somebody should make a movie about him.  Dennis Montgomery was a computer software expert who said that he had developed technology that basically could find objects hidden in the video on television.  And so he convinced, through a whole series of contacts and meetings that I detail in the book, he was able to get to the CIA  and convince the CIA that he had the technology to decipher Al Qaeda codes that were he said were hidden in Al Jazeera news broadcasts.
>
> THOM HARTMAN:   They were hidden in the Chiron or the --
>
> JAMES RISEN:   In the banner.  In the banner, actually.  He said that he could find numbers and letters that were constantly showing up, or not showing up but were being hidden, embedded deeply in the video.  And he would then give these  numbers and letters to the CIA.  And the CIA, either he told them or they convinced themselves that these numbers and letters corresponded to flights, international airline flights, that Al Qaeda was going to attack.  And so in December, in Christmas

---

[6]        https://www.youtube.com/watch?v=jc_8f4Pp9Zc

2003, the Bush Administration and the CIA took this so seriously that they actually grounded a whole series of international flights coming into and out of the United States, and the White House even considered shooting down some of these flights over the Atlantic.

THOM HARTMAN:   Whoa.

JAMES RISEN:    And once the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist and that these supposed Al Qaeda codes weren't really in the Al Jazeera newscasts, the CIA covered the whole thing up and never went public with it  and just tried to act like it never happened.

THOM HARTMAN:   Well we know how aggressively this and particularly the Obama Administration right now has gone after whistleblowers and reporters.  You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison.

JAMES RISEN:   Well, no, he ended up getting more contracts from the military... and the Pentagon.  And he was continuing, he continued to operate for several years.  It's really a remarkable story.

THOM HARTMAN:   Yeah, it really and truly is.

[Topic changes abruptly to discussions of torture in the war on terror]

52.    As libel *per se*, Risen asserted about Montgomery that "the CIA later was

convinced by French intelligence that this was all a fabrication and that this kind of technology

didn't exist."

53.    As libel *per se*, Risen asserted about Montgomery that he belongs in prison,

responding to the question "You would think they would also go after people who had scammed

the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you,

and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis

Montgomery, you'd think he would end up in prison," by Risen answering in reply:  "Well, no,

he ended up getting more contracts from the military... and the Pentagon.  And he was

continuing, he continued to operate for several years.  It's really a remarkable story."

## GENERAL DEFAMATION

54.     In addition, Risen also made additional defamatory statements that are explicit

defamation under Florida law.

55.     ***Nineteenth,*** **on Page 49 of the Book, Risen writes:**

> "Trepp was furious. According to court documents, he told the FBI
> that Montgomery had stolen the software eTreppid had used on secret
> Pentagon contracts. As federal investigators moved in to investigate
> the alleged theft of the technology, they heard from Trepp and others
> that Montgomery's alleged technology wasn't real."

56.     As explicit libel, Risen asserted about Montgomery that Montgomery had stolen

valuable software – yet also asserted that the software "wasn't real."

## DEFAMATION BY IMPLICATION UNDER FLORIDA LAW

### Analogous to False Light

57.     For defamation by implication: " . . . [L]iterally true statements can be defamatory

where they create a false impression. This variation is known as defamation by implication and

has a longstanding history in defamation law." *See Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098,

1106 (Fla. 2008). Defamation by implication occurs when a publication states facts that are

literally true, but produces a defamatory meaning apparent from a plain reading of the

publication in its entirety. See *Chapin v. Knight-Ridder, Inc.* 993 F.3d 1087 (4th Cir. 1993).

58.     Montgomery thus claims here that if the Court finds that any of the statements

labeled "First" through "Nineteenth" do not qualify as defamation *per se* or general defamation,

then in the alternative Montgomery claims here that any and all such statements not qualifying as

defamation *per se* or general defamation are defamation by implication against Montgomery.

59.     Across the many examples of libelous statements from the Book or slanderous

interviews, Risen implies that Montgomery deceived the U.S. Government as to the meaning,

purpose, or interpretation of hidden data and clues that Montgomery uncovered, implying that

Montgomery defrauded and conned the U.S. Government.

60.     In fact, Montgomery refused to speculate as to the interpretation or meaning of

the data and analyses he uncovered, even when pressed to state what he thought the data might

mean, but Montgomery left the role of interpretation to U.S. Government intelligence experts.

61.     Thus, throughout the statements presented herein, Risen libels and slanders

Montgomery by implication that Montgomery defrauded and scammed the U.S. Government

concerning the meaning of the information Montgomery uncovered, implying that Montgomery

obtained millions of dollars by frightening and fooling child-like and gullible CIA officials.

62.     Across the many examples of libelous statements from the Book or slanderous

interviews, Risen implies that President George W. Bush's alleged decisions to ground and

almost shoot down passenger aircraft around Christmas 2003 (which Risen would have no way

of knowing about) were a result of Montgomery's fraud and scams, deceptively manipulating the

President of the United States and the U.S. national command authority.

63.     Across the many examples of libelous statements from the Book or slanderous

interviews, Risen implies that Montgomery should be in jail.

64.     Among the other statements, in particular, the ***First*** example of libel**, on Page 32

of the Book,** states that:

> "Consider the example of Dennis Montgomery.  He provides a perfect
> case study to explain how during the war on terror greed and ambition

> have been married to unlimited rivers of cash to create a climate in
> which who has been accused of being a con artist was able to
> create a rogue intelligence operation with little or no adult supervision.
> Crazy became the new normal in the war on terror, and the original
> objectives of the war got lost in the process."

65.     Thus, as libel by implication, Risen implies that Montgomery committed fraud

and went to any lengths motivated by greed, to obtain money at any cost.

66.     Among the other statements, in particular, in the ***Eleventh*** example of libel**, on**

**Page 46 of the Book,** states that:

> "The CIA never investigated the apparent hoax nor examined how it
> had been handled inside the agency."

67.     Here, as libel by implication, even if it is true that "The CIA never investigated"

what Risen describes as an "apparent hoax," the implication is that Montgomery perpetrated a

hoax upon the CIA, and in return for money, which would be both a fraud and a crime.

68.     Similarly, in the ***Sixteenth*** example of slander from an interview, Risen states that

"It seemed to me that what the war had become in 13 years was a search for cash and a search

for power and status and that it was becoming an endless war in which we had a new mercenary

class of people who were taking advantage of the war on terror," implying that Montgomery's

work is fraudulent in being merely an effort to get cash.

69.     Among the other statements, in particular, the ***Nineteenth*** example of libel**, on**

**Page 49 of the Book,** states that:

> "Trepp was furious. According to court documents, he told the FBI
> that Montgomery had stolen the software eTreppid had used on secret
> Pentagon contracts. As federal investigators moved in to investigate
> the alleged theft of the technology, they heard from Trepp and others
> that Montgomery's alleged technology wasn't real."

70.     As libel by implication, Risen implies that Montgomery stole valuable software

yet at the same time the software was in fact worthless.

71.     In addition, Risen also made additional defamatory statements that are defamation by implication under Florida law.

72.     **Twentieth, on the Preface Page of the Book, Risen writes:**

"I've come back," he repeated.  "I was the King of Kafiristan – me and Dravot – crowned Kings we was!  In this office we settled it – you setting there and giving us the books.  I am Peachey – Peachey Taliaferro Carnehan – and you've been setting here ever since – Oh, Lord!"

I was more than a little astonished and expressed my feelings accordingly.

"It's true," said Carnehan, with a dry cackle, nursing his fee, which were wrapped in rags.  "True as gospel.  Kings we were, with crowns upon our head – me and Dravot – poor Dan – oh, poor, poor Dan, that would never take advice, not though I begged of him!"

-- Rudyard Kipling, *The Man Who Would be King*.

73. As libel by implication, Risen implies that Montgomery (along with others addressed in the book) is a fraud and/or con man as in *The Man Who Would be King*.

74. **Twenty-first, in the Prologue on Page xiv of the Book, Risen writes:**

"The new homeland security-industrial complex operates differently. It is largely made up of a web of intelligence agencies and their contractors, companies that mostly provide secret services rather than large weapons systems and equipment.  These contractors are hired to help Washington determine the scale and scope of the terrorist threat; they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end."

75.     As libel by implication, Risen states "they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end," suggesting that Montgomery's and eTreppid's profits were *contingent* upon results, and false results at that.

76.     **Twenty-second, in the Prologue on Page xv of the Book, Risen writes:**

> "Thus, the creation of a homeland security complex at a time of endless war has bequeathed us with the central narrative of the war on terror – modern tales of greed joined hand in hand with stories of abuse of power.  It was inevitable that those wise in the ways of the world would flock to Washington to try to cash in on the war on terror gold rush – and they have.  This book offers just a few of those stories. But those trying to monetize America's obsession with terrorism are not the only ones who have sought to exploit 9/11."

> "Opportunism comes in many forms and is driven by more than just greed.  Ambition and a hunger for power, status, and glory have become great engines of post-9/11 opportunism as well.  The more troubling stories here concern abuses of power that have extended across two presidencies for well over a decade.  After 9/11, the United States deregulated national security, stripping away the post-Watergate intelligence reforms of the 1970's that had constrained executive power for thirty years.  The results are morally challenging – and continue to this day."

77.    Thus, as libel by implication, Risen implies that Montgomery committed fraud and went to any lengths motivated by greed, to obtain money at any cost.

78.    **Twenty-third,** in the Prologue on Page xvii of the Book, Risen writes:

> "Washington's global war on terror is now in its second decade, thanks to the bipartisan veneer it has gained under Bush and Obama. It shows no signs of slowing down, hustlers and freebooters continue to take full advantage, and the war's unintended consequences continue to pile up.  All too often, things are not what they seem."

79.    As libel by implication, Risen implies that Montgomery – one of the key objects of the Book – is a "hustler" and a "freebooter."

80.    **Twenty-fourth,** Part 1 of the Book, including Chapter 2 which is focused entirely on Dennis Montgomery, Risen have labeled "Part 1:  Greed"

81.    Thus, by placing the chapter focused on Dennis Montgomery under a label for the section of the Book of "Greed," Risen libels Montgomery by implication as being motivated by greed to commit fraud and carry out the alleged hoaxes identified in the rest of the Chapter 2.

82.     ***Twenty-fifth,*** Risen have labeled Chapter 2 of the Book which is focused entirely on Dennis Montgomery:  "Chapter 2: The Emperor of the War on Terror."

83.     By naming the chapter focused on Dennis Montgomery "The Emperor of the War on Terror," Risen libels Montgomery by implication as being the mastermind of the fraud that Risen seeks to portray the war on terror to be.

84.     ***Twenty-Sixth,*** **on Page 40 of the Book, Risen writes:**

> "The CIA's Science and Technology Directorate, which had largely been stuck on the sidelines of the war on terror, saw in Dennis Montgomery an opportunity to get in the game.  The directorate had played an important role in the Cold War, but in the first few years of the war on terror, it was struggling to determine how technology could be leveraged against groups of terrorists who were trying to stay off the grid."

85. As libel by implication, again, Risen blames Montgomery for the decisions of government officials.

86. ***Twenty-Seventh,*** **on Page 42 of the Book, Risen writes:**

> "Montgomery was telling the CIA exactly what it wanted to hear.  At the time, the Bush Administration was obsessed with Al Jazeera, not only because of the networks' unrelenting criticism of the invasion of Iraq, but also because it had become Osama Bin Laden's favorite outlet for broadcasting his videotaped messages to the world."

87. As libel by implication, Risen implies that Montgomery defrauded and conned the CIA by "telling the CIA exactly what it wanted to hear."

88. ***Twenty-Eighth,*** **on Page 42 of the Book, Risen writes:**

> "What remains unclear is how Montgomery was able to convince all of them that he had developed secret software that could decode Al Qaeda's invisible messages.  While he had gotten by a few credulous military officers who came to view his demonstrations, he apparently found it just as easy to persuade the CIA as well."

89. As libel by implication, Risen implies that Montgomery conned the U.S. Government

with a hoax.  It would of course be entirely clear "how Montgomery was able to convince all of

them" if Montgomery's work and technology are legitimate.

90. ***Twenty-Ninth,*** **on Page 46 of the Book, Risen writes:**

> "Finally the French brought an end to it.  Since Air France flights
> to the United States were among those that had been grounded,
> French officials had taken a dim view of the entire episode.  They
> began demanding answers from the Americans.  The French
> applied so much pressure on Washington that the CIA was finally
> forced to reveal to French intelligence the source of the threat
> information. Once they heard the story of Dennis Montgomery and
> eTreppid, French officials arranged for a French high-tech firm to
> reverse-engineer Montgomery's purported technology.  The
> French wanted to see for themselves whether the claims of hidden
> messages in Al Jazeera broadcasts made any sense."

91. As libel by implication, if not explicit, the passage implies that Montgomery is a fraud

and that his work is a scam and a hoax.

92. ***Thirtieth,*** **on Page 52 of the Book, Risen writes:**

> "Montgomery continued to get defense contracts even during the
> Obama administration.  In 2009, Montgomery was awarded another
> air force contract, and later claimed that he had provided the
> government with warning of a threatened Somali terrorist attack
> against President Obama's inauguration.  Joseph Liberatore, an air
> force official who described himself as one of "the believers"  in
> Montgomery and said he had heard from 'various federal agencies
> thanking us' for the support Montgomery and his company provided
> during Obama's inauguration.  The threat, however, later proved to be
> a hoax."

93. As libel by implication, Risen implies that Montgomery's ability to continue to receive

contracts is due to Montgomery's ability to defraud the government (and stupidity of government

officials) rather than an endorsement of the legitimacy of Montgomery's work.

94. ***Thirty-First,*** **on Page 31 of the Book, Risen writes:**

"and a new breed of entrepreneur learned that one of the surest and easiest paths to riches could be found not in Silicon Valley building computers or New York designing clothes but rather in Tysons Corner, Virginia, coming up with new ways to predict, analyze, and prevent terrorist attacks— or, short of that, at least in convincing a few government bureaucrats that you had some magic formula for doing so."

95. As libel by implication, Risen implies that Montgomery engaged in fraud to convince a few government bureaucrats that he had a magic formula as an easy path to riches.

96. ***Thirty-Second,*** **on Page 33 of the Book, Risen writes:**

"Montgomery's story demonstrates how hundreds of billions of dollars poured into the war on terror went to waste. With all rules discarded and no one watching the bottom line, government officials simply threw money at contractors who claimed to offer an edge against the new enemies. And the officials almost never checked back to make sure that what they were buying from contractors actually did any good— or that the contractors themselves weren't crooks. A 2011 study by the Pentagon found that during the ten years after 9/11, the Defense Department had given more than $400 billion to contractors who had previously been sanctioned in cases involving $1 million or more in fraud."

97. As libel by implication, Risen implies that the money provided to Montgomery (among others) went to "waste."

98. ***Thirty-Third,*** **on Page 33 of the Book, Risen writes:**

"The Montgomery episode teaches one other lesson, too: the chance to gain promotions and greater bureaucratic power through access to and control over secret information can mean that there is no incentive for government officials to question the validity of that secret information. Being part of a charmed inner circle holds a seductive power that is difficult to resist."

99. As libel by implication, Risen implies that Montgomery's work was fraudulent.

100.     ***Thirty-Fourth,*** **on Page 33 of the Book, Risen writes:**

"How his technology worked was a secret. Dennis Montgomery's computer code became the great treasure behind eTreppid Technologies, the company he and Trepp founded. Later, many of

those around Montgomery began to suspect the reason why
Montgomery had to guard his technological innovations
so carefully. They came to believe that at least some of the
technology didn't really exist."

101.     As libel by implication, Risen implies that Montgomery committed fraud.

102.     ***Thirty-Fifth*, on Page 35 of the Book, Risen writes:**

"Montgomery was on the lookout for somebody to bankroll him,
and had put out the word to his friends at the casinos that he
frequented the most. A year later, Montgomery and Trepp were in
business together. Trepp was one of the first, but hardly the last, to
be beguiled by Montgomery's claims that he had achieved
breakthroughs in computer technology of historic significance."

103.     As libel by implication, Risen implies that Montgomery "beguiled" Warren Trepp

by committing fraud.

104.     ***Thirty-Sixth*, on Page 39 of the Book, Risen writes:**

"For a few months in late 2003, the technology from Dennis
Montgomery and eTreppid so enraptured certain key government
officials that it was considered the most important and most sensitive
counterterrorism intelligence that the Central Intelligence Agency had
to offer President Bush. Senior officials at the CIA's Directorate of
Science and Technology began to accept and vouch for Montgomery
to officials at the highest levels of the government. Montgomery's
claims grew ever more expansive, but that only solidified his position
inside the national security arena. His technology became too
impossible to disbelieve."

105.     As libel by implication, Risen imply that Montgomery committed fraud and is a

con man.

106.     ***Thirty-Seventh*, on Page 40 of the Book, Risen writes:**

"Montgomery persuaded the spy agency that his special computer
technology could detect hidden bar codes broadcast on Al Jazeera,
which had been embedded into the video feed by al Qaeda. Allegedly,
al Qaeda was using that secret method to send messages to its terrorist
operatives around the world about plans for new attacks. Montgomery
convinced the CIA that his technology had uncovered a series of

26

hidden letters and numbers that appeared to be coded messages about specific airline flights that the terrorists were targeting.

107.    As libel by implication, Risen imply that Montgomery convinced the CIA of

claims that are not (were not) true.

108.    ***Thirty-Eighth,*** **on Page 42 of the Book, Risen writes:**

"Based on Montgomery's information, President Bush ordered the grounding of a series of international flights scheduled to fly into the United States. This step caused disruptions for thousands of travelers."

109.    As libel by implication, Risen imply that Montgomery convinced President Bush

and the national command authority of conclusions drawn from Montgomery's work.

110.    ***Thirty-Ninth,*** **on Page 42 of the Book, Risen writes:**

"One former senior CIA official recalled attending a White House meeting in the week following Christmas to discuss what to do next about the information coming from Montgomery. The official claims that there was a brief but serious discussion about whether to shoot down commercial airliners over the Atlantic based on the intelligence."

111.    As libel by implication, Risen imply that Montgomery convinced President Bush

and the national command authority of conclusions drawn from Montgomery's work.

112.    ***Fortieth,*** **on Page 47 of the Book, Risen writes:**

"Even more stunning, after the debacle over the bogus Christmas 2003 terrorist threats, Montgomery kept getting classified government contracts awarded through several different corporate entities. Montgomery's problems with the CIA did not stop him from peddling variations of his technology to one government agency after another. The secrecy that surrounded his work once again worked in his favor. CIA officials were reluctant to tell their Pentagon counterparts much about their experiences with Montgomery, so Defense Department officials apparently did not realize that his technology was considered suspect at CIA headquarters."

113.     As libel by implication, Risen implies that Montgomery continued to defraud, con, and scam the government, rather than concluding that the U.S. Government recognized the legitimacy of Montgomery's work.

114.     ***Forty-First,* on Page 48 of the Book, Risen writes:**

> "He successfully infused a sense of mystery around himself. He was like the Wizard of Oz, but now people were beginning to try to examine the man behind the curtain."

115.     As libel by implication, Risen implies that the Montgomery engaged in fraud and a hoax by keeping details mysterious.

116.     ***Forty-Second,* on Page 48 of the Book, Risen writes:**

> "The technology didn't meet the requirements for us," said a Special Operations Command spokesman drily. Still, there is no evidence that officials at Special Operations Command ever talked with their counterparts at the CIA to check up on Montgomery before awarding him a contract. Special Operations Command paid a total of $ 9.6 million to eTreppid under its contract with the firm."

117.     As libel by implication, Risen imply that Montgomery again repeated his fraud and hoax against a new government agency.

118.     ***Forty-Third,* on Page 54 of the Book, in the Chapter "The New Oligarchs,"** Risen writes:

> CHAPTER 3:   The New Oligarchs
> Page 54:  "Dennis Montgomery is, of course, an extreme example of the new kind of counterterrorism entrepreneur who prospered in the shadows of 9/11.  But he was hardly alone in recognizing the lucrative business opportunities that the war on terror has presented.  In fact, as trillions of dollars have poured into the nation's new homeland security-industrial complex, the corporate leaders at its vanguard can rightly be considered the true winners of the war on terror."

119.     As libel by implication, Risen implies that Montgomery engaged in fraud and a hoax motivated by greed.

Exhibit 16



Houghton
Mifflin
Harcourt

David Eber
Vice President
Associate General Counsel

January 20, 2015

VIA U.S. MAIL AND ELECTRONIC MAIL

Larry Klayman
Klayman Law Firm
2020 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC 20006-1811
leklayman@gmail.com

Re: *Pay any Price*, by James Risen

Dear Mr. Klayman:

We have received your letter dated January 14, 2015, to Linda Zecher and William Bayers at Houghton Mifflin Harcourt Publishing Company ("HMH").

We deny your allegations that *Pay any Price* contains defamatory statements concerning your client Dennis Montgomery, or that HMH or Mr. Risen engaged in any criminal conduct in preparing and vetting the book. We also decline your invitation to meet to discuss HMH's manuscript review processes.

Sincerely,

David Eber

cc:     William Bayers
        James Risen

Exhibit 17

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L11000101240
FILED 8:00 AM
September 02, 2011
Sec. Of State
jbryan

## Article I

The name of the Limited Liability Company is:

ALEX JAMES LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

1797 N.E. 15TH ST.
FORT LAUDERDALE, FL, US 33305

The mailing address of the Limited Liability Company is:

1797 N.E. 15TH ST.
FORT LAUDERDALE, FL, US 33305

## Article III

The purpose for which this Limited Liability Company is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The name and Florida street address of the registered agent is:

UNITED STATES CORPORATION AGENTS, INC.
13302 WINDING OAK COURT
SUITE A
TAMPA, FL, 33612

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   MATT PFLEGING, US CORP. AGENTS

## Article V

The name and address of managing members/managers are:

L11000101240
FILED 8:00 AM
September 02, 2011
Sec. Of State
jbryan

Title:  MGRM
JUDY  CROWHURST
1797 N.E. 15TH ST.
FORT LAUDERDALE, FL.  33305  US

Signature of member or an authorized representative of a member

Electronic Signature: MATT PFLEGING, LEGALZOOM.COM, INC.

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

Exhibit 18

# SOCOM & CIA
# Visit 03/20/12

Location:

75180 Mediterranean
Palm Desert, CA 92211



Chris Pipes SOCOM

Exhibit 19

| ORDER FOR SUPPLIES OR SERVICES | | | | | | Form Approved OMB No. 0704-0187 Expires June 30, 1997 | | PAGE 1 | | OF 2 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (Contractor must submit four copies of invoice.) | | | | | | | | | | | |

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Department of Defense. Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0187), Washington, DC 20503.

**PLEASE DO NOT RETURN YOUR FORM TO EITHER OF THESE ADDRESSES.**
**SEND YOUR COMPLETED FORM TO THE PROCUREMENT OFFICIAL IDENTIFIED IN ITEM 6.**

| 1. CONTRACT/PURCH ORDER NO. | 2. DELIVERY ORDER NO. | 3. DATE OF ORDER | 4. REQUISITION/PURCH REQUEST NO. | 5. PRIORITY |
|---|---|---|---|---|
| H92222-04-D-0006 | 0001 | 16-FEB-2004 | 1SP50040420100 | DO-C9 |

| 6. ISSUED BY | CODE | H92222 | 7. ADMINISTERED BY (if other than 6) | S0507A | 8. DELIVERY FOB |
|---|---|---|---|---|---|
| HQ US Special Operations Command ATTN: SOAL-KB (Holland) 7701 Tampa Point Blvd Macdill AFB, FL 33621 | | | DCMA San Francisco Lathrop Office 700 E. Roth Rd French Camp, CA 95231 | | X DEST ☐ OTHER (See Schedule if other) |

| 9. CONTRACTOR | CODE | 3C5X0 | FACILITY CODE | | 10. DELIVER TO FOB POINT BY (Date) (YYMMDD) SEE SCHEDULE | 11. MARK IF BUSINESS IS |
|---|---|---|---|---|---|---|
| NAME AND ADDRESS | eTreppid Technologies, LLC 755 Trademark Dr Reno, NV 89521 | | TEL: FAX: | | 12. DISCOUNT TERMS | ☐ SMALL ☐ SMALL DISADVANTAGED ☐ WOMEN OWNED |
| | | | | | 13. MAIL INVOICES TO See Section G | |

| 14. SHIP TO | CODE | H92222 | 15. PAYMENT WILL BE MADE BY | HQ0339 | |
|---|---|---|---|---|---|
| UQ USSOCOM/SOAL-SP (Mohr) 7701 Tampa Point Blvd MacDill AFB, FL 33621 ATTENTION: SOAL-SP (Brad Mohr) | | | DFAS-Columbus - West Entitlement Operations PO Box 182381 Columbus, OH 43218 | | MARK ALL PACKAGES AND PAPERS WITH CONTRACT OR ORDER NUMBER |

| 16. TYPE OF ORDER | DELIVERY | X | This delivery order is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract. |
|---|---|---|---|
| | | Reference your | furnish the following on terms specified herein |
| | PURCHASE | | ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL OF THE TERMS AND CONDITIONS SET FORTH, AND AGREES TO PERFORM THE SAME. |

ETREPPID TECHNOLOGIES, LLC
NAME OF CONTRACTOR / SIGNATURE

WARREN TREPP, CEO
TYPED NAME AND TITLE

040216
DATE SIGNED (YYMMDD)

☐ If this box is marked, supplier must sign Acceptance and return the following number of copies.

17. ACCOUNTING AND APPROPRIATION DATA/LOCAL USE
ACRN AA: 974/60300 56SF SD4 52SP 54X000 SP10 525700 F25700     $325,125.00

| 18. ITEM NO. | 19. SCHEDULE OF SUPPLIES/SERVICES | 20. QUANTITY ORDERED/ ACCEPTED* | 21. UNIT | 22. UNIT PRICE | 23. AMOUNT |
|---|---|---|---|---|---|
| | SEE CONTINUATION SHEET | | | | |

"If quantity accepted by the Government is same as quantity ordered, indicate by X. If different, enter actual quantity accepted below quantity Ordered and encircle.

| 24. UNITED STATES OF AMERICA BY SUSAN M GRIFFIN | | 25. TOTAL | $325,125.00 |
|---|---|---|---|
| CONTRACTING/ORDERING OFFICER | | 29. DIFFERENCES | |

| 26. QUANTITY IN COLUMN 20 HAS BEEN | | 27. SHIP NO. | 28. D.O. VOUCHER NO. | 30. INITIALS |
|---|---|---|---|---|
| ☐ INSPECTED ☐ RECEIVED ☐ ACCEPTED, AND CONFORMS TO THE CONTRACT EXCEPT AS NOTED | | ☐ PARTIAL ☐ FINAL | 32. PAID BY | 33. AMOUNT VERIFIED CORRECT FOR |
| | | 31. PAYMENT | | 34. CHECK NUMBER |
| DATE SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | | ☐ COMPLETE ☐ PARTIAL ☐ FINAL | | 35. BILL OF LADING NO. |
| 36. I certify this account is correct and proper for payment | | | | |
| DATE SIGNATURE AND TITLE OF CERTIFYING OFFICER | | | | |

| 37. RECEIVED AT | 38. RECEIVED BY (Print) | 39. DATE RECEIVED (YYMMDD) | 40. TOTAL CONTAINERS | 41. S/R ACCOUNT NUMBER | 42. S/R VOUCHER NO. |
|---|---|---|---|---|---|

DD FORM 1155, JUN 94     PREVIOUS EDITION MAY BE USED

H92222-04-D-0006
Task Order 0001
Page 2 of 2

Continuation Sheet

1. **CONTRACT LINE ITEMS**:

| ITEM NO | SUPPLIES/SERVICES | MAX QUANTITY | UNIT | UNIT PRICE | MAX AMOUNT |
|---------|-------------------|--------------|------|------------|------------|
| 0001AA | | 1 | Each | $25,000.00 | $25,000.00 |
| | Falconview (PFPS) Maps - Compression | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB:  Destination | | | | |
| 0001AB | | 1 | Each | $40.00 | $40.00 |
| | Falconview (PFPS) Maps - Plug-in Decoder | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB:  Destination | | | | |
| 0001AC | | 1 | Each | $25,000.00 | $25,000.00 |
| | Still Image Compression | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB:  Destination | | | | |
| 0001AD | | 1 | Each | $10.00 | $10.00 |
| | Still Image Decoder | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB:  Destination | | | | |
| 0001AE | | 1 | Each | $50,000.00 | $50,000.00 |
| | Video Imagery w/ Audio - Compression | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB:  Destination | | | | |
| 0001AF | | 1 | Each | $25.00 | $25.00 |
| | Video Imagery w/ Audio - Decoder | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB:  Destination | | | | |
| 0001AN | | 1 | Each | $125,000.00 | $125,000.00 |
| | Generic Data Compression | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB:  Destination | | | | |

| 0001AP | | 1 | Each | $50.00 | $50.00 |

Generic Data Decompressor
FFP
1 Each = 1 CPU that this software is installed on.

FOB:  Destination

| 0001AQ | | 1 | Each | $100,000.00 | $100,000.00 |

Detection of Human and Non-Human Objects
FFP
1 Each = 1 CPU that this software is installed on.

FOB:  Destination

2. **GOVERNMENT FURNISHED PROPERTY**.

a) The Government will furnish one laptop computer to:
        eTreppid Technologies
        755 Trademark Dr
        Reno NV  89521.

b) Upon receipt of the Government-furnished laptop, the Contractor shall load the software ordered on the task order and return the laptop to:
        HQ USSOCOM
        ATTN: SOAL-SP (Brad Mohr)
        7701 Tampa Point Blvd
        MacDill AFB, FL  33621.

3. **DELIVERY TIMEFRAME**.  The contract shall have 14 days from the receipt of the Government-furnished laptop to load the software and return the laptop to the Government.  If the 14th day falls on a weekend or federal holiday, the due date shall automatically extend to the next business day.

//nothing follows//

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 28th day of April, 2015, a true and correct copy of the foregoing (Case No. 15-cv-20782) was filed via CM/ECF and served upon the following:

**Sanford Lewis Bohrer**
**Brian Toth**
Holland & Knight, LLP
Suite 3000
701 Brickell Ave
Miami, FL 33131
Email: sbohrer@hklaw.com
Email: brian.toth@hklaw.com

**Laura R. Handman**
**Micah Ratner**
Davis Wright Tremaine LLP
1919 Pennsylvania Ave., N.W., Suite 800
Washington D.C. 20006-3401
Email: laurahandman@dwt.com
Email: MicahRatner@dwt.com

*/s/ Larry Klayman*

Larry Klayman, Esq.