UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 15-cv-20782-MARTINEZ/GOODMAN

DENNIS L. MONTGOMERY,

       Plaintiff,

v.

JAMES RISEN, HOUGHTON MIFFLIN
HARCOURT PUBLISHING CO., MIFFLIN
HARCOURT CO., HMH HOLDINGS, INC.,

       Defendants.

_____/

**DEFENDANTS' MOTION TO DISMISS OR TRANSFER
FOR LACK OF PERSONAL JURISDICTION OVER RISEN AND
HOUGHTON MIFFLIN HARCOURT COMPANY, DISMISS OR TRANSFER
FOR IMPROPER VENUE, TRANSFER UNDER 28 U.S.C. § 1404(a), OR DISMISS
FOR FAILURE TO STATE A CLAIM AND MEMORANDUM IN SUPPORT**

**HOLLAND & KNIGHT LLP**
Sanford L. Bohrer
  Sandy.Bohrer@hklaw.com
Brian W. Toth
  Brian.Toth@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, Florida  33131
Tel: (305) 374-8500
Fax: (305) 789-7799

**DAVIS WRIGHT TREMAINE LLP**
Laura R. Handman (admitted *pro hac vice*)
  laurahandman@dwt.com
Micah J. Ratner (admitted *pro hac vice*)
  micahratner@dwt.com
1919 Pennsylvania Ave., NW, Suite 800
Washington, D.C.  20006
Tel.: (202) 973-4200
Fax: (202) 973-4499

***Counsel for Defendants***

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ........................................................................... 1

II.   STATEMENT OF FACTS ................................................................................. 3

      A.   Facts Applicable to Personal Jurisdiction, Improper Venue, and Transfer ........... 4

      B.   Facts Applicable to the Motion to Dismiss for Failure to State a Claim ............... 8

           1.   Media Coverage of Montgomery Before the Book .................................... 8

           2.   Reliance on FBI Reports, Court Documents, and Congressional
                Records for Allegations of Fake Software ................................................. 10

           3.   Reliance on FBI Reports and Court Documents for Allegations of
                Rigged Demonstrations of Software to U.S. Government Officials ......... 13

           4.   Complaint Allegations ............................................................................ 14

III.  ARGUMENT ................................................................................................... 15

      A.   The Court Lacks Personal Jurisdiction Over Risen and HMHC ......................... 15

      B.   The Court Should Dismiss or Transfer for Improper Venue ............................... 21

      C.   The Court Should Transfer Venue Under 28 U.S.C. § 1404(a) ........................... 22

      D.   The Court Should Dismiss Under Rule 12(b)(6) Because Plaintiff Fails
           to Plead a Plausible Claim for Defamation or Other Related Torts ..................... 26

           1.   The Fair Report Privilege Protects the Statements at Issue ..................... 27

           2.   Many of the Challenged Statements Are Non-Actionable Opinion
                and Rhetorical Hyperbole Protected by the First Amendment ................ 30

           3.   The Complaint Should Be Dismissed For Failure to Plausibly Plead
                Actual Malice or Any Other Applicable Fault .......................................... 31

                a.   Montgomery Is a Limited-Purpose Public Figure ....................... 32

                b.   Montgomery Fails to Plausibly Plead Actual Malice, or
                     Any Other Applicable Standard of Fault ..................................... 34

           4.   Montgomery's Other Tort Claims Fail ..................................................... 39

IV.   CONCLUSION ................................................................................................. 40

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Acosta Orellana v. CropLife Int'l*,
    711 F. Supp. 2d 81 (D.D.C. 2010) ........................................................................40

*Adelson v. Harris*,
    973 F. Supp. 2d 467 (S.D.N.Y. 2013), *questions certified*, 774 F.3d 803
    (2d Cir. 2014) ........................................................................................................35

*Algodonera De Las Cabezas S.A. v. Am. Suisse Capital, Inc.*,
    432 F.3d 1343 (11th Cir. 2005) ............................................................................22

*Alternate Energy Corp. v. Redstone*,
    328 F. Supp. 2d 1379 (S.D. Fla. 2004) ..........................................................17, 19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................................26, 34, 35

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
    134 S. Ct. 568 (2013)............................................................................................21

*Baxter v. Palmigiano*,
    425 U.S. 308 (1976)..............................................................................................38

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)....................................................................................26, 27, 35

*Bell v. Associated Press*,
    584 F. Supp. 128 (D.D.C. 1984) ..........................................................................37

*Biro v. Condé Nast*,
    963 F. Supp. 2d 255 (S.D.N.Y. 2013)........................................................35, 36, 39

*Brueggenmeyer v. ABC*,
    684 F. Supp. 452 (N.D. Tex. 1988) ......................................................................32

*Bryant v. Avado Brands Inc.*,
    187 F.3d 1271 (11th Cir. 1999) ..............................................................................8

*Buckley v. N.Y. Times Co.*,
    338 F.2d 470 (5th Cir. 1964) ................................................................................16

*Busch v. Viacom International Inc.*,
    477 F. Supp. 2d 764 (N.D. Tex. 2007) .................................................................................19

*CACI Premier Tech., Inc. v. Rhodes*,
    536 F.3d 280 (4th Cir. 2008) .......................................................................................33, 37

*Calder v. Jones*,
    465 U.S. 783 (1984).....................................................................................................17, 20

*Cellularvision Tech. & Telecomm., L.P. v. Alltel Corp.*,
    508 F. Supp. 2d 1186 (S.D. Fla. 2007) .................................................................23, 24, 25

*Chaiken v. VV Publ'g Corp.*,
    119 F.3d 1018 (2d Cir. 1997)..............................................................................................38

*Chapin v. Knight-Ridder, Inc.*,
    993 F.2d 1087 (4th Cir. 1993) ............................................................................................29

*Church of Scientology Int'l v. Behar*,
    238 F.3d 168 (2d Cir. 2001).................................................................................................37

*Clyburn v. News World Commc'ns, Inc.*,
    903 F.2d 29 (D.C. Cir. 1990)........................................................................................32, 34

*Cohen v. Cowles Media Co.*,
    501 U.S. 663 (1991).............................................................................................................39

*Coles v. Washington Free Weekly, Inc.*,
    881 F. Supp. 26 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996).............................28, 29

*Coquina Investments v. TD Bank, N.A.*,
    760 F.3d 1300 (11th Cir. 2014) ..........................................................................................38

*Crane v. Ariz. Republic*,
    972 F.2d 1511 (9th Cir. 1992) ............................................................................................29

*Dameron v. Wash. Magazine, Inc.*,
    779 F.2d 736 (D.C. Cir. 1985) ............................................................................................29

*Diario El Pais, S.L. v. Nielsen Co. (US)*,
    2008 WL 4833012 (S.D.N.Y. Nov. 6, 2008) ......................................................................35

*Ditton v. Legal Times*,
    947 F. Supp. 227 (E.D. Va. 1996), *aff'd*, 129 F.3d 116 (4th Cir. 1997).................................29

*Dorsey v. Nat'l Enquirer, Inc.*,
    973 F.2d 1431 (9th Cir. 1992) ............................................................................................29

*Dowd v. Calabrese*,
    589 F. Supp. 1206 (D.D.C. 1984) ........................................................29

*Earley v. Gatehouse Media Pa. Holdings, Inc.*,
    2013 WL 5466149 (M.D. Pa. Sept. 30, 2013) ......................................35

*Edwards v. National Audubon Soc'y, Inc.*,
    556 F.2d 113 (2d Cir. 1977)..................................................................36

*Egiazaryan v. Zalmayev*,
    2011 WL 6097136 (S.D.N.Y. Dec. 7, 2011) ........................................35

*Farah v. Esquire Magazine*,
    736 F.3d 528 (D.C. Cir. 2013) ................................................... *passim*

*Fetter v. N. Am. Alcohols, Inc.*,
    2007 WL 551512 (E.D. Pa. Feb. 15, 2007) ..........................................30

*Forbes v. Lenox Fin. Mortg. LLC*,
    2008 WL 2959727 (S.D. Fla. July 30, 2008)........................................22

*Foretich v. Chung*,
    1995 WL 224558 (D.D.C. Jan. 25, 1995) ............................................28

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974)..............................................................................34

*Global Relief Found. Inc. v. N.Y. Times Co.*,
    390 F.3d 973 (7th Cir. 2004) ................................................................29

*Hakky v. Wash. Post Co.*,
    2010 WL 2573902 (M.D. Fla. June 24, 2010)................................34, 35

*Hanks v. Wavy Broad., LLC*,
    2012 WL 405065 (E.D. Va. Feb. 7, 2012).............................................35

*Hargrave v. Wash. Post*,
    2009 WL 1312513 (D.D.C. May 12, 2009), *aff'd*, 365 F. App'x 224
    (D.C. Cir. 2010) ....................................................................................27

*Harper v. Walters*,
    822 F. Supp. 817 (D.D.C. 1993), *aff'd*, 40 F.3d 474 (D.C. Cir. 1994)...................................28

*Heidbrink v. ThinkDirect Mktg. Grp., Inc.*,
    2014 WL 3585698 (M.D. Fla. July 21, 2014) ......................................16

*Hemispherx Biopharma, Inc. v. MidSouth Capital, Inc.*,
    669 F. Supp. 2d 1353 (S.D. Fla. 2009) ...........................................21, 22

*Hoechst Celanese Corp. v. Nylon Eng'g Resins, Inc.*,
    896 F. Supp. 1190 (M.D. Fla. 1995) ................................................................19

*Hustler Magazine v. Falwell*,
    485 U.S. 46 (1988) ...........................................................................................40

*Ins. Co. of N. Am. v. Levin*,
    2011 WL 1398473, at *4 (S.D. Fla. Mar. 28, 2011), *report & recommendation*
    *adopted*, 2011 WL 2610754 (S.D. Fla. July 1, 2011) ......................................26

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945) .........................................................................................15

*Jaisinghani v. Capital Cities/ABC, Inc.*,
    973 F. Supp. 1450 (S.D. Fla. 1997), *aff'd*, 149 F.3d 1195 (11th Cir. 1998) ..........24

*Jenkins Brick Co. v. Bremer*,
    321 F.3d 1366 (11th Cir. 2003) ......................................................................22

*Keeton v. Hustler Magazine*,
    465 U.S. 770 (1984) .........................................................................................17

*Klayman v. City Pages*,
    2015 WL 1546173 (M.D. Fla. Apr. 3, 2015) ..............................................37, 39

*Lavin v. N.Y. News, Inc.*,
    757 F.2d 1416 (3d Cir. 1985) ..........................................................................28

*Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*,
    844 F.2d 955 (2d Cir. 1988) ............................................................................29

*Levan v. Capital Cities/ABC*,
    190 F.3d 1230 (11th Cir. 1999), *cert. denied*, 528 U.S. 1198 (2000) ....................38

*Liberty Lobby, Inc. v. Dow Jones*,
    838 F.2d 1287 (D.C. Cir. 1988) ......................................................................36

*Licciardello v. Lovelady*,
    544 F.3d 1280 (11th Cir. 2008) ......................................................................17

*Lieberman v. Fieger*,
    338 F.3d 1076 (9th Cir. 2003) ........................................................................31

*Loeb v. New Times Commc'ns Corp.*,
    497 F. Supp. 85 (S.D.N.Y. 1980) ....................................................................36

*Logan v. District of Columbia*,
    447 F. Supp. 1328 (D.D.C. 1978) ..................................................................32

*Lohrenz v. Donnelly,*
 350 F.3d 1272 (D.C. Cir. 2003) ...................................................................34, 36

*Madara v. Hall,*
 916 F.2d 1510 (11th Cir. 1990) .................................................................18, 19

*Manuel v. Convergys Corp.,*
 430 F.3d 1132 (11th Cir. 2005) .........................................................................26

*Mason v. Smithkline Beecham Clinical Labs.,*
 146 F. Supp. 2d 1355 (S.D. Fla. 2001) .............................................................25

*Mayfield v. NASCAR, Inc.,*
 674 F.3d 369 (4th Cir. 2012) .............................................................................35

*McDowell v. Paiewonsky,*
 769 F.2d 942 (3d Cir. 1985).............................................................................33

*McFarlane v. Esquire Magazine,*
 74 F.3d 1296 (D.C. Cir. 1996) .............................................................17, 34, 38

*McFarlane v. Sheridan Square Press, Inc.,*
 91 F.3d 1501 (D.C. Cir. 1996) .....................................................................36, 39

*McManus v. Doubleday & Co.,*
 513 F. Supp. 1383 (S.D.N.Y. 1981)....................................................................38

*Medico v. Time, Inc.,*
 643 F.2d 134 (3d Cir. 1981)................................................................................29

*Metcalf v. KFOR-TV,*
 828 F. Supp. 1515 (W.D. Okla. 1992) ...............................................................30

*Meterlogic, Inc. v. Copier Solutions, Inc.,*
 185 F. Supp. 2d 1292 (S.D. Fla. 2002) ...................................................23, 25, 26

*Milkovich v. Lorain Journal Co.,*
 497 U.S. 1 (1990)................................................................................................30

*Moldea v. N.Y. Times Co.,*
 15 F.3d 1137 (D.C. Cir. 1994) ............................................................................30

*Moldea v. N.Y. Times Co.,*
 22 F.3d 310 (D.C. Cir. 1994) .......................................................................30, 39

*Montgomery v. eTreppid Techs., LLC,*
 2010 WL 1416771 (D. Nev. Apr. 5, 2010).........................................................23

*N. Atl. Marine, Ltd. v. Sealine Int'l, Ltd.*,
  2007 WL 5298433 (S.D. Fla. Mar. 29, 2007)..........................................................................8

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964).....................................................................................................................39

*Obsidian Fin. Grp., LLC v. Cox*,
  812 F. Supp. 2d 1220 (D. Or. 2011), *aff'd*, 740 F.3d 1284 (9th Cir. 2014)............................30

*Pan Am Sys., Inc. v. Hardenbergh*,
  871 F. Supp. 2d 6 (D. Me. 2012) ...............................................................................................35

*Parisi v. Sinclair*,
  845 F. Supp. 2d 215 (D.D.C. 2012) ......................................................................................35, 36

*Peter Scalamandre & Sons, Inc. v. Kaufman*,
  113 F.3d 556 (5th Cir. 1997) ......................................................................................................37

*Pierson v. Orlando Reg'l Healthcare Sys., Inc.*,
  2010 WL 1408391 (M.D. Fla. Apr. 6, 2010), *aff'd*, 451 F. App'x 862
  (11th Cir. 2012)............................................................................................................................28

*Piper Aircraft Co. v. Reyno*,
  454 U.S. 235 (1981).....................................................................................................................24

*Poncy v. Johnson & Johnson*,
  414 F. Supp. 551 (S.D. Fla. 1976) .........................................................................................25, 26

*Q Int'l Courier, Inc. v. Seagraves*,
  1999 WL 1027034 (D.D.C. Feb. 26, 1999) ...............................................................................28

*Revell v. Lidov*,
  317 F.3d 467 (5th Cir. 2002) ......................................................................................................19

*Reynolds v. Int'l Amateur Athletic Fed'n*,
  23 F.3d 1110 (6th Cir. 1994) ......................................................................................................20

*Rhodes v. Placer Cnty.*,
  2011 WL 1302240 (E.D. Cal. Mar. 31, 2011) ...........................................................................31

*Schatz v. Republican State Leadership Comm.*,
  669 F.3d 50 (1st Cir. 2012)..........................................................................................................35

*Sculptchair, Inc. v. Century Arts, Ltd.*,
  94 F.3d 623 (11th Cir. 1996) ..................................................................................................15, 16

*Serian v. Penguin Grp. (USA), Inc.*,
  2009 WL 2225412 (N.D. W. Va. July 23, 2009).......................................................................31

*Silvester v. ABC*,
   839 F.2d 1491 (11th Cir. 1988) ...........................................................................33

*Spelson v. CBS, Inc.*,
   581 F. Supp. 1195, 1203 (N.D. Ill. 1984), *aff'd*, 757 F.2d 1291 (7th Cir. 1985) ...................31

*St. Amant v. Thompson*,
   390 U.S. 727 (1968).............................................................................................34

*Stern v. News Corp.*,
   2008 WL 10712037 (S.D. Fla. Aug. 26, 2008).......................................................24

*Tavoulareas v. Piro*,
   759 F.2d 90 (D.C. Cir. 1985), *rev'd on other grounds*, 817 F.2d 762
   (D.C. Cir. 1987) (*en banc*) ...................................................................................39

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987) (*en banc*)........................................................32, 35

*Thomas v. News World Commc'ns*,
   681 F. Supp. 55 (D.D.C. 1988) ............................................................................30

*Van Dusen v. Barrack*,
   376 U.S. 612 (1964)............................................................................................23

*Wai v. Rainbow Holdings*,
   315 F. Supp. 2d 1261 (S.D. Fla. 2004) ...............................................................21

*Waldbaum v. Fairchild Publ'ns, Inc.*,
   627 F.2d 1287 (D.C. Cir. 1980) ..........................................................................32

*Walden v. Fiore*,
   134 S. Ct. 1115 (2014).......................................................................................20

*Washington v. Smith*,
   80 F.3d 555 (D.C. Cir. 1996) ..............................................................................30

*Weinstein v. Friedman*,
   859 F. Supp. 786 (E.D. Pa. 1994) .......................................................................24

*Weyrich v. New Republic, Inc.*,
   235 F.3d 617 (D.C. Cir. 2001) ............................................................................30

*White v. Fraternal Order of Police*,
   909 F.2d 512 (D.C. Cir. 1990) ..............................................................27, 28, 29

*Windmere Corp. v. Remington Prods., Inc.*,
   617 F. Supp. 8 (S.D. Fla. 1985) ..........................................................................24

*Winn v. United Press Int'l*,
    938 F. Supp. 39 (D.D.C. 1996), aff'd, 1997 WL 404959 (D.C. Cir. 1997)............................34

*Yohe v. Nugent*,
    321 F.3d 35 (1st Cir. 2003) ...................................................................................................29

**State Cases**

*Alpine Indus. Computers, Inc. v. Cowles Publ'g Co.*,
    57 P.3d 1178 (Wash. Ct. App. 2002), *amended*, 64 P.3d 49
    (Wash. Ct. App. 2003) ....................................................................................................27, 29

*Fikes v. Furst*,
    61 P.3d 855 (N.M. Ct. App. 2002)........................................................................................31

*Foretich v. CBS, Inc.*,
    619 A.2d 48 (D.C. 1993) ......................................................................................................34

*Gleichenhaus v. Carlyle*,
    591 P.2d 635 (Kan. Ct. App.), *aff'd in relevant part*, 597 P.2d 611
    (Kan. 1979) ...........................................................................................................................33

*Huszar v. Gross*,
    468 So. 2d 512 (Fla. 1st DCA 1985) .....................................................................................28

*Jackson v. District of Columbia*,
    412 A.2d 948 (D.C. 1980) ....................................................................................................40

*Jung v. Jung*,
    791 A.2d 46 (D.C. 2002) ......................................................................................................40

*Mosesian v. McClatchy Newspapers*,
    285 Cal. Rptr. 430 (Cal. Ct. App. 1991)................................................................................33

*O'Brien v. Franich*,
    575 P.2d 258 (Wash. App. Ct. 1978)....................................................................................28

*Pegasus v. Reno Newspapers, Inc.*,
    57 P.3d 82 (Nev. 2002)..........................................................................................................38

*Phillips v. Evening Star Newspaper Co.*,
    424 A.2d 78 (D.C. 1980) ......................................................................................................34

*Quinn v. Jewel Food Stores, Inc.*,
    276 Ill. App. 3d 861 (Ill. App. Ct. 1995) ..............................................................................31

*Rojas v. Debevoise & Plimpton*,
    634 N.Y.S.2d 358 (N.Y. Sup. Ct. 1995) ...............................................................................31

*Sahara Gaming Corp. v. Culinary Workers Union Local*,
    984 P.2d 164 (Nev. 1999) .................................................................................27

*Shaw v. Palmer*,
    197 S.W.3d 854 (Tex. Ct. App. 2006) ...............................................................31

*Sipple v. Found. for Nat'l Progress*,
    83 Cal. Rptr. 2d 677 (Cal. Ct. App. 1999) ........................................................28

*Solers, Inc. v. Doe*,
    977 A.2d 941 (D.C. 2009) .................................................................................40

*Stepien v. Franklin*,
    528 N.E.2d 1324 (Ohio Ct. App. 1988) ............................................................31

*Stewart v. Sun Sentinel Co.*,
    695 So. 2d 360 (Fla. 4th DCA 1997) ...........................................................27, 28

*Yauncey v. Hamilton*,
    786 S.W.2d 854 (Ky. 1989) ..............................................................................31

**Constitutional Provisions**

U.S. Const. amend I ...........................................................................3, 27, 30, 39

U.S. Const. amend. V .......................................................................3, 10, 37, 38

**Federal Statutes**

28 U.S.C. § 1391 ....................................................................................21, 22

28 U.S.C. § 1404(a) ....................................................................................1, 22

28 U.S.C. § 1406(a) ....................................................................................1, 21

**State Statutes**

Cal. Civ. Code § 47(d) ......................................................................................27

Cal. Civ. Code § 47(e) ......................................................................................27

Fla. Stat. § 48.193(2)........................................................................................16

**Rules**

Fed. R. Civ. P. 12(b) .............................................................................. *passim*

S.D. Fla. L.R. 5.4 ..............................................................................................23

## MOTION TO DISMISS OR TRANSFER AND REQUEST FOR HEARING

Defendants James Risen ("Risen"), Houghton Mifflin Harcourt Publishing Company ("HMH"), and Houghton Mifflin Harcourt Company ("HMHC"), improperly sued as HMH Holdings, Inc., (together "HMH Companies"), respectfully move this Court for an Order: (1) dismissing or transferring this action to the U.S. District Court for the District of Columbia for lack of personal jurisdiction over Risen and HMHC under Fed. R. Civ. P. 12(b)(2); (2) dismissing or transferring this action for improper venue under Fed. R. Civ. P. 12(b)(3) and 28 U.S.C. § 1406(a); (3) transferring this action under 28 U.S.C. § 1404(a); or (4) dismissing the complaint with prejudice under Fed. R. Civ. P. 12(b)(6).[1]  Defendants request a hearing due to the number of motions, and the complexity and number of issues involved.

## I.        PRELIMINARY STATEMENT

Plaintiff Dennis Montgomery brings this libel action against Pulitzer Prize-winning author James Risen, who works and lives in the Washington, D.C. ("D.C.") area, and his publisher HMH, a Massachusetts company headquartered in Boston, arising from statements in Chapter 2 ("Chapter") of his book, *Pay Any Price: Greed, Power, and the Endless War* (the "Book"), that report allegations that Montgomery perpetrated a fraud on the federal government – allegations widely published in articles as far back as 2008, that were never the subject of a libel claim until now.  The Court should dismiss or transfer to the district court in D.C. for the following reasons:

***First***, this Court lacks personal jurisdiction over Risen and HMHC, which is merely a holding company in Delaware.  Risen resides in a Maryland suburb of D.C. and works for the *New York Times* in its D.C. bureau.  Montgomery does not assert general jurisdiction, and none

---

[1] If the Court does not grant the relief above, it should grant the concurrently filed Special Motion to Dismiss Under the Applicable Anti-SLAPP Statute.

exists here.  The Court lacks specific jurisdiction over Risen because Risen did not expressly aim the story about Montgomery at Florida and Florida was not the focal point of the tort or the brunt of the alleged harm.  Risen did not rely on Florida sources, gather information for the Chapter in Florida, or even reference Florida.  The focal point of the Chapter is D.C., where Montgomery's reputation as a government contractor lies, where many of the sources are located, and where Risen gathered documents, interviewed sources, and wrote the Chapter.  Montgomery cannot manufacture jurisdiction based on his own alleged contacts – if any – with Florida.  Even if Montgomery moved to Florida when he filed suit, by all accounts, he did not reside in Florida at the critical time when the events took place, he was interviewed and the Book was published.

*Second*, the Court should dismiss or transfer for the independent reason that venue is improper here.  Montgomery failed to meet his burden to show proper venue because the bases for venue he alleges – a district where all defendants reside and a provision that applies only to the federal government – do not apply here.  Since no substantial part of the events giving rise to the claim occurred in Florida, venue is not proper here.

*Third*, even if venue is otherwise proper, the Court may transfer venue for convenience of witnesses and parties.  The Chapter focuses on D.C., and most of the critical witnesses and documents are in the D.C. area.  The military witnesses cited by Montgomery in Florida, even assuming any have relevant knowledge, are not located in this district or within 100 miles.  Thus, the Court should transfer this action to D.C., where Risen and key witnesses are located.

*Fourth*, if the Court does not dismiss or transfer for the above reasons, Montgomery's Amended Complaint should be dismissed because he fails to state a claim, as a matter of law, under Rule 12(b)(6).

a)      Montgomery's Amended Complaint is barred by the fair report privilege.  The privilege protects the Chapter, which accurately summarized official documents, including FBI

2

reports, court records, and statements in congressional records – all of which alleged that Montgomery rigged demonstrations and provided bogus software to the federal government.

b)      Other statements Montgomery challenges are non-actionable expressions of opinion and rhetorical hyperbole, not verifiable statements of fact.  That the hoax Montgomery allegedly perpetuated was "crazy," that he was motivated by "greed" and accused of being a "con artist," are all subjective opinions protected by the First Amendment.

c)      Plaintiff, a limited-purpose public figure, has not and cannot plausibly plead adequate facts to support actual malice or any other applicable standard of fault.  Risen interviewed Montgomery, published his denials, relied on reputable news articles and on official records, including testimony of his former business partner, his former lawyer, and Montgomery's own repeated invocation of the Fifth Amendment privilege against self-incrimination when asked in deposition whether his software was a fraud, and the 2013 Congressional testimony of John Brennan, now Director of the CIA, who testified that Montgomery's software "was determined not to be an accurate source of information."

d)      Montgomery's other tort claims are barred for the same reasons as the libel claims and because he fails to plausibly plead facts to allege the elements of those claims.

## II.      STATEMENT OF FACTS

*Pay Any Price* is a nine-chapter book that describes how the war on terror led to waste, fraud, and abuse by U.S. government officials and the contractors who stood to gain from it. Chapter 2 of the Book titled *The Emperor of the War on Terror* focuses on how, after the terrorist attacks of September 11, 2001, government officials were willing to accept any intelligence – no matter how suspect – that might prevent the next terrorist attack.  In that context, Risen recounts Montgomery's story retreading ground covered by previous media reports, most notably a 2010 *Playboy Magazine* feature titled *The Man Who Conned the*

*Pentagon* ("Playboy Article"), which revealed the central allegations Montgomery now

challenges, and a 2011 *New York Times* article titled, *Hiding Details of Dubious Deal, U.S.*

*Invokes National Security*, which Risen co-authored ("New York Times Article"), attached as

Exhibits 1 and 2, respectively, to the Declaration of Laura Handman ("Handman Decl.").

**A.      Facts Applicable to Personal Jurisdiction, Improper Venue, and Transfer**

Risen has *no* connections to Florida that would give rise to personal jurisdiction over

him.  Risen is not a Florida resident; he resides in a Maryland suburb of D.C. and works for the

New York Times in its D.C. bureau.  (Declaration of James Risen ("Risen Decl.") ¶¶ 2, 3.)

HMH, the publisher of the Book, is incorporated in Massachusetts and has its principal place of

business in Boston.  Its parent company, HMHC, improperly sued as HMH Holdings, Inc., is a

Delaware holding company and is not authorized to do business in Florida.  (Am. Compl. ¶¶ 15-

18; Handman Decl. Exs. 3 and 4.)

Risen gathered documents and information, including about Montgomery, while working

in D.C. and Maryland.  (Risen Decl. ¶¶ 2, 8.)  Risen did much of the newsgathering for the

Chapter about Montgomery for his earlier New York Times Article, published February 19,

2011, which he co-authored with Eric Lichtblau, also in the D.C. bureau of the *New York Times*.

(*Id.* ¶ 8.)  For the Chapter, Risen interviewed Montgomery by phone and email while

Montgomery lived in California and/or Washington State ("Washington").  (*Id.* ¶ 6.)

Nothing discussed in the Chapter took place in Florida.  The two businesses with which

Montgomery was involved, eTreppid and Blxware, and which were the subject of Risen's

reporting, were based in Nevada and Washington, respectively.[2]  When Montgomery became

---

[2] eTreppid Technologies, LLC ("eTreppid") was a Nevada corporation headquartered in Reno,
http://nvsos.gov/sosentitysearch/CorpDetails.aspx?lx8nvq=9ugC9Jz33%252bzPvBGw4H3zqw%
253d%253d&nt7=0).  Blxware, LLC was a Delaware corporation headquartered in Bellevue,
Washington (https://delecorp.delaware.gov/tin/controller, last visited May 12, 2015).

involved with eTreppid, the Book says that Montgomery lived in Nevada.  (Book at 35.)  Key events discussed in the Chapter took place in Nevada.[3]  At the time Montgomery was involved with Blxware, the Chapter describes a demonstration of his software at a warehouse in Palm Springs, California (*id.* at 52).  Government officials mentioned in the Chapter who discussed and took action based on Montgomery's software, were in the D.C. area at the CIA, Air Force, the White House, and Congress (*id.* at 39, 51, 52, 53).  The Chapter discusses the high-powered D.C. lobbyist hired to secure contracts for Montgomery's software (*id.* at 38), the high-powered D.C. lawyer who represented Gibbons (*id.* at 50), and the later litigation involving Montgomery and his former partners in Nevada, California, Montana, and Washington.

Risen (and Lichtblau) interviewed key sources – who are also potential witnesses – located in or near D.C., California, New York, and Washington by phone, email, or in person.  (Risen Decl. ¶ 8.)  Past and current Government witnesses and documents are located in or within a 100-mile radius of D.C., including current and former CIA, Air Force, and White House officials with knowledge of Montgomery's software.  (*See* Handman Decl. Ex. 27.)  Key officials in the D.C. area include Donald Kerr, then chief of the CIA's Science and Technology Directorate; Joseph Liberatore, an Air Force official, who allegedly believed in Montgomery's work; John Brennan, then head of the Terrorist Threat Integration Center, now CIA Director, who passed on Montgomery's intelligence and then concluded it was "inaccurate"; George Tenet, then CIA Director who a CIA source in Chapter 2 says "allowed [scientists] to circumvent the CIA's normal reporting and vetting channels, and rushed the raw material fed to the agency by Montgomery directly to the president"; Jose Rodriguez, head of the CIA Counterclaim

---

[3] These include: a meeting with CIA officials (*id.* at 40, 41); a meeting with an Air Force colonel (*id.* at 36); a dinner with a member of congress who became governor of Nevada, Jim Gibbons, later cleared of bribery charges pressed by Montgomery (*id.* at 38-39); claims by Montgomery of access to Predator drone information from Nellis Air Force base in Nevada (*id.* at 48, 51); and his arrest for passing $1 million in bad checks at casinos in Nevada (*id.* at 52).

Center, who said Montgomery's intelligence was "crazy"; Paul Haraldsen, who led the Air Force Special Investigation Inquiry into Montgomery's software; and Samantha Ravich, then advisor to Vice President Dick Cheney, who pressed Montgomery for proof that his software worked. (Risen Decl. ¶¶ 10, 11.)  Other important witnesses are Michael Flynn, Montgomery's former lawyer, who is located in California; Warren Trepp, Montgomery's former partner who is located in Nevada; and Tim Blixseth, the ex-husband of Montgomery's former business partner, who is located in Washington.  (*Id.* ¶ 13.)  None of Defendants' key witnesses is in Florida.  (*Id.*)

With the possible exception of one contact with a spokesperson at Special Operations Command, Risen did not have any contact with Florida, whether by telephone, written communications, or in person, in either preparing the Chapter or in connection with the interviews he has given to promote the Book.  (*Id.* ¶ 9.)  Neither the Chapter about Montgomery nor the television and radio interviews promoting the Book mention Florida and, indeed, Montgomery did not give Risen any reason to believe Montgomery had any connection to Florida.  (*Id.* ¶ 14.)  In Montgomery's initial disclosures served after filing the lawsuit, he lists a number of witnesses apparently located at MacDill Air Force Base in Tampa and Eglin Air Force Base near Pensacola, with whom Montgomery claims to have worked at some point in time (Am. Compl. Ex. 13), unbeknownst to Risen.

In fact, the first Risen and HMH heard of any specific connection with Florida was in the Complaint, filed February 24, 2015, that alleged Montgomery is "a citizen of Florida."  (Compl. ¶ 6.); (Risen Decl. ¶ 7.)  Montgomery did not allege that he resided or was domiciled in Florida and still refuses to disclose his address for "security reasons" (Am. Compl. at 1 n.1), speculating that the Book caused him, "in effect," to be subject to a "fatwah" from "terrorists who have sworn to attack those assisting the U.S. military and Government."  (*Id.* ¶¶ 21, 95, 254.) Apparently, the basis for Montgomery's allegation of citizenship was that Montgomery

6

registered to vote in Florida from Washington by FedEx literally the day before he filed the

Complaint, and listed a temporary address at a hotel in Florida and claims to have since rented an

apartment at an undisclosed location.  (Handman Decl. Ex. 5; Amended Compl. Ex. C ¶¶ 8, 9.)

Montgomery was a resident of Washington at the time the Book was published in

October, 2014; at most, he has only just moved to Florida.  On September 12, 2013,

Montgomery's counsel stipulated to transfer of a defamation action filed against him from the

Central District of California to the Western District of Washington because Montgomery had

"relocated to the State of Washington," was "currently [a] citizen[ ] of the state of Washington,"

and "reside[d] in Yarrow Point, Washington."[4]  On June 10, 2014, a journalist wrote about

meeting Montgomery at his residence in Yarrow Point, Washington.[5]  On January 6, 2015, he

was under the care of a doctor in Seattle, Washington.  (Am. Compl. Ex. 10.)  On February 18,

2015, a Western District of Washington judge issued an order requiring Montgomery and his

wife to vacate their property in Yarrow Point by April 1, 2015.[6]  This order suggests that Mont-

gomery actually resided in Washington when he alleged in his Complaint on February 24, 2015

that he was a "citizen of Florida."  (Compl. ¶ 6.)

Montgomery pleads in support of jurisdiction in Florida that "the most recent commercial

opportunities for the Plaintiff's work were contract and projects made available through military

bases and Government facilities in Florida" (Am. Compl. ¶ 4), but gives no specifics as to who,

what or where.  Given Plaintiff's own allegations of ill health and continuing medical treatment

in Seattle, it is hard to imagine he resides in Florida or is actively pursuing any current

---

[4]  (Handman Decl. Ex. 6.)
[5]  (Handman Decl. Ex. 7.)
[6]  (Handman Decl. Ex. 8.)

commercial opportunities in Florida.  (Am. Compl. ¶ 13 & Ex. 10.)[7]  Plaintiff asserts that a

substantial portion of the harm occurred in Florida, because "Florida is the third (3rd) largest

state by population," and "Defendants knew or should have known of the large counter-

terrorism, military, and intelligence presence within the state of Florida" because "Risen is a

'national security expert' who has intimate knowledge of the U.S. Military."  (Am. Compl. ¶¶ 5,

10, 11, 12.)  By that logic, Florida, by virtue of its population and military and intelligence

installations, would have jurisdiction over every author of a book on national security whose

work enjoyed nationwide distribution.  That is not the law.

**B.      Facts Applicable to the Motion to Dismiss for Failure to State a Claim**

**1.      Media Coverage of Montgomery Before the Book**

Montgomery has been the subject of extensive media coverage since at least November 1,

2006, when the *Wall Street Journal* ran a front-page story, titled *Congressman's Favors for*

*Friend Include Help in Secret Budget*, revealing that Montgomery had accused then-

Congressman, subsequently Nevada Governor, Jim Gibbons of taking bribes from Warren Trepp,

Montgomery's former business partner at eTreppid Technologies ("eTreppid").  (Handman Decl.

Ex. 9.)[8]  In a follow-up *Wall Street Journal* article, titled *Nevada Governor Faces FBI Probe Into*

*Contracts*, Trepp accused Montgomery of giving "false testimony" in their litigation over

---

[7] He claims to have formed a Florida corporation in September, 2011, but the Legalzoom filing, which Montgomery attaches to his Amended Complaint, lists Montgomery as a contact at a Palm Desert, California address.  (Am. Compl. Ex. 5.)  As of 2012, the company referenced in Ex. 17 of the Amended Complaint was inactive.  (Handman Decl. Ex. 10.)

[8] The Court may consider documents subject to judicial notice, such as news articles and court and congressional records, without converting this motion into one for summary judgment.  *N. Atl. Marine, Ltd. v. Sealine Int'l, Ltd.*, 2007 WL 5298433, at *4 (S.D. Fla. Mar. 29, 2007) (Martinez, J.) ("'[t]he Eleventh Circuit has held that, when considering a 12(b)(6) motion to dismiss, a court may take judicial notice of the public record, without converting the motion to one for summary judgment'") (citing *Bryant v. Avado Brands Inc.*, 187 F.3d 1271, 1279-80 (11th Cir. 1999)); *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) ("Judicial notice is properly taken of publicly available historical articles" on a Rule 12(b)(6) motion).

Montgomery's software.  (Handman Decl. Ex. 11.)  Montgomery exploited the media spotlight,

giving an exclusive interview to NBC News on May 11, 2007, in which he repeated the

"explosive charge" against Trepp and Gibbons.  (Handman Decl. Ex. 12.)  By creating the

controversy over whether Trepp bribed a public official to steer government contracts to

eTreppid, Montgomery invited media scrutiny of his work at eTreppid for the U.S. government.

Gibbons was ultimately cleared in 2008 with Associated Press quoting his lawyer as saying, "It

should be crystal clear that the only persons who should be investigated or charged are those who

made false allegations of wrongdoing and who tried to fuel this investigation for their own private

purposes."  (Handman Decl. Ex. 13; Book at 50.)

      The allegations that Montgomery provided bogus software to the government were

published in an August 2008 *Bloomberg News* article, titled *Yellowstone Club Divorcee

Entangled in Terrorist Software Suits*.  (Handman Decl. Ex. 14, at 1-2, 4-5, 9.)  The article

summarized Trepp's allegations in court records that Montgomery stole eTreppid's "computer

code that purportedly could sift through broadcasts from Qatar-based news network Al-Jazeera

and find embedded messages to terrorists," and quoted Montgomery's former attorney's charge

that the "software was a sham."  (*Id.*)

      Then again in 2010, the Playboy Article revealed the central allegations Montgomery

now challenges.  Its investigation claimed that Montgomery rigged software demonstrations and

sold the U.S. government sham "noise filtering" software to decode purported Al Qaeda

messages hidden in Al Jazeera broadcasts – bogus intelligence that led the White House to

ground international flights and to consider shooting down transatlantic flights around Christmas

in 2003.  (Handman Decl. Ex. 1.)  Soon after, the Playboy Article explained, a French contractor

determined that not enough pixels existed in Al Jazeera broadcasts to include the hidden

messages and the CIA and White House soon concluded that they had been hoodwinked.

According to the Playboy Article, because of the secrecy surrounding the project, other government agencies continued to contract with Montgomery until 2009.

Risen and Eric Lichtblau's 2011 New York Times Article, covered much of the same material, but focused on the U.S. government's invocation of the state-secrets privilege to cover up Montgomery's misdeeds and the government's gullibility.  Notably, the New York Times Article said that in Montgomery's deposition in November 2011, "when asked if his software was a 'complete fraud', he answered, 'I'm going to assert my right under the Fifth Amendment.'" (Handman Decl. Ex. 2, at 6.)[9]  Risen expressly acknowledges in the Book that he relied on the Playboy Article and New York Times Article.  (Book at 53.)  The Book added Montgomery's denials to the narrative, obtained after Risen interviewed him.  (*Id*. at 33-34, 37, 51, 53).

Further, as catalogued in the Handman Declaration (Ex. 16), other reputable media outlets published numerous news stories about Montgomery before release of the Book in October 2014. These include a 2012 article in *Defense News*, "*Obama's Counterterrorism Czar Gave Bogus Intel to Bush White House*," in which the then-head of the CIA's Counterterrorism Center describes Montgomery's software as "crazy" (Handman Decl. Ex. 17).  These articles – never retracted, much less the subject of a lawsuit – all track what Risen wrote in the Chapter.   Montgomery now brings suit to challenge publication of these facts after nearly seven years in circulation.

### 2.  Reliance on FBI Reports, Court Documents, and Congressional Records for Allegations of Fake Software

As with his New York Times Article and prior media accounts, Risen primarily based the Chapter on court records and other official documents.  The Chapter refers to FBI interviews of Warren Trepp, Montgomery's partner in the software venture, eTreppid, and its employees.  The

---

[9]  Relevant excerpts of Montgomery's deposition in which he repeatedly asserted the Fifth Amendment to questions about his software, are attached to the Handman Declaration. (Handman Decl. Ex. 15.)

Book expressly states that, "according to court documents that include his statements to the FBI," Montgomery's software was fake because "Trepp later told the FBI that he eventually learned that Montgomery had no real computer software programming skills."  (Book at 37.)[10]  Similarly, the Chapter accurately quotes statements in FBI reports in which an eTreppid employee Sloan Venables began to suspect Montgomery's software was fake.  Venables "*told the FBI* that another employee, Patty Gray, began to suspect that Montgomery 'was doing something other than what he was actually telling people he was doing'" and "added *in his statement to the FBI* that he knew that 'Montgomery promised products to customers that he had not been completed or even assigned to programmers.'" (Book at 48-49) (emphasis added).

Then, citing court documents, the Chapter states:  "Over the Christmas holidays [of 2005], Montgomery allegedly went into eTreppid's offices and deleted all of the computer files containing his source code and software development data, *according to court documents*."  (Book at 49) (emphasis added).  Later, "*[a]ccording to court documents*, [Trepp] *told the FBI* that Montgomery had stolen the software eTreppid had used on secret Pentagon contracts" but "[a]s federal investigators moved in to investigate the alleged theft of the technology, they heard from Trepp and others that Montgomery's alleged technology wasn't real."  (*Id.*) (emphasis added).  The Chapter correctly summarizes FBI reports contained in court records showing that the technology "wasn't real."  (*Id.*)[11]

---

[10] The FBI report contained in court records states, "recently Trepp has found out that Montgomery's skills may not be what he has purported them to be.  Trepp cited a recent Air Force Office of Special Investigation Inquiry, which determined that Montgomery's programming skills were not what he alleged."  (Handman Decl. Ex. 18 at Bates No. 00002)

[11] An eTreppid employee, "Gray said that on 21 Dec 2005 . . . she told Trepp that she had reason to believe [Montgomery] had not written significant software for the company."  (Handman Decl. Ex. 18 at Bates No. 00121.)  Another employee, "Anderson also informed Trepp that [Montgomery] was using open source to develop eTreppid Source Code, [Montgomery] was dishonest," and that "he had suspicions that [Montgomery] was less technically competent than he led people to believe."  (Handman Decl. 18 at Bates No. 00123.)

The Chapter also recounts how Montgomery's later benefactor and business partner at Blxware, Edra Blixseth, was "going through an extremely bitter divorce, and Montgomery became caught up in their legal battles." (Book at 52.) "Mysteriously, government lawyers sometimes sought to intervene in their court cases . . . to keep classified information stemming from Montgomery's work with the intelligence community out of the public records." (*Id.*) In those public court records, Edra's ex-husband, Tim Blixseth, alleged the fraud in an affidavit, stating: "Montgomery and Edra Blixseth have engaged in an extensive scheme to defraud the U.S. Government," a "fraud [that] involves Mr. Montgomery's purported 'noise filtering software technology,' which "does not exist, yet has been used repeatedly by Edra Blixseth and Montgomery to commit financial frauds . . . ."[12]  Michael Flynn, Montgomery's former attorney, stated in an affidavit that, "Based upon personal knowledge, and information and belief, Blxware possesses no marketable technology, the technology as represented does not exist[.]"[13]

The Book recounts that Montgomery's gambling and other debts led to bankruptcy and his arrest for passing $1 million in bad checks. (Book at 34.) In that bankruptcy proceeding, Flynn told Montgomery in a deposition: "I know you conned me and you conned the U.S. Government. . . .  You're a computer hacker and you're a fraud, Mr. Montgomery." (Handman Decl. Ex. 15 at 230.)

The Book also expressly relies on congressional records to confirm that Montgomery's software was fake. The Book explains that, "[a]t the time of the Christmas 2003 scare, John Brennan was the head of the Terrorist Threat Integration Center," which "meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration." (Book at 47.) The Book states that, "[i]n 2013, while

---

[12] (Handman Decl. Ex. 19.)
[13] (Handman Decl. Ex. 20.)

the Senate was considering whether to confirm Brennan to run the CIA, Sen. Saxby Chambliss, a

Georgia Republican who was vice chairman of the Senate Intelligence Committee, submitted a

written question to Brennan about his role in the intelligence community's dealings with

Montgomery." (*Id.*)  Indeed, Senator Chambliss' written question titled "Bogus Intelligence,"

states that "[m]edia reports indicate that when you led the Terrorist Threat Integration Center

(TTIC), you championed a program involving IT contractors in Nevada who claimed to intercept

al-Qaida targeting information encrypted in the broadcasts of TV news network Al Jazeera."[14]  The

written questions confirm in congressional records that not only "[t]he media" but "*documents we*

*have reviewed show*, that CIA officials derided the contractor's information, but nonetheless, you

passed it to the White House and alert levels ended up being raised unnecessarily." (*Id.*) (emphasis

added).  Accurately quoting Brennan's response, the Book states that, "[i]n response": (1)

"Brennan denied that he had been an advocate for Montgomery and his technology"; (2) "insisted

that the Terrorism Threat Integration Center was merely a recipient of the information and data,

which had been passed on by the CIA"; (3) he "included Montgomery's data 'in analytic

products'"; and (4) confirmed that Montgomery's purported software "'was determined *not to be a*

*source of accurate information*.'" (Book at 47) (quoting Brennan Response at 9) (emphasis added).

### 3.    Reliance on FBI Reports and Court Documents for Allegations of Rigged Demonstrations of Software to U.S. Government Officials

The Book also explicitly relies on court records and FBI reports, in which "Trepp also

described to federal investigators how eTreppid employees had confided to him that Montgomery

had asked them to help him falsify tests of his object recognition software when Pentagon

officials came to visit." (Book at 37.)  Indeed, "Trepp said that on one occasion, Montgomery

told two eTreppid employees to go into an empty office and push a button on a computer when

---

[14] (Handman Decl. Ex. 20.)

they heard a beep on a cell phone." (*Id.*)  Then "[a]fter he was in place in the field, he used a hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of a bazooka on another screen prominently displayed in front of the military officers standing in another room, *according to court documents*." (*Id.*) (emphasis added).  Thus, "[t]he military officers were convinced that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands." (*Id.*)  The Book again includes Montgomery's denials. (*Id.* at 15, 37.) Once again, the Book accurately describes the FBI report contained in court documents.[15]

### 4.     Complaint Allegations

Montgomery's 271-page, 268-paragraph Amended Complaint boils down to one central allegation: that Risen and HMH defamed him by publishing allegations that he defrauded the federal government by peddling bogus software.[16]  In particular, Montgomery takes issue with statements that his software, which supposedly decoded hidden Al Qaeda messages in Al Jazeera broadcasts, was a sham, and that the intelligence he passed on to federal agencies led the White House to raise the terrorist threat level in late 2003, ground international flights, and consider shooting down transatlantic flights. (*Id.* ¶¶ 107, 112, 114, 126, 129, 131, 133.)  Montgomery also

---

[15] "Trepp recently learned that Montgomery would require eTreppid employees to falsify the results of live demonstrations for its customers.  Jesse Anderson, a programmer for eTreppid, told Trepp that Montgomery would require Anderson and Jim Bauder, another eTreppid employee, to go into an office at eTreppid while Montgomery was out in a nearby field with a toy bazooka to demonstrate eTreppid's recognition software capabilities.  Montgomery instructed Anderson and Bauder to go into a room and wait to hear a noise on their cell phone and then instructed them to press a button on a computer keyboard that would display an image of a bazooka on the computer screen viewed by the customers, including Department of Defense employees.  Trepp advised that the Department of Defense employees were at the demonstration to make a judgment regarding the purchase of this technology." (Handman Decl. 18 at Bates No. 00002.)  Employees confirmed these accounts in their interviews with the FBI. (*Id.* at Bates Nos. 00125, 00126.)

[16] (Am. Compl. ¶¶ 120, 122, 124, 127, 181, 184, 202, 204, 206, 208, 210, 212, 214, 216, 218, 219, 221, 230, 232, 234, 236.)

14

challenges recitation of allegations former eTreppid employees made in FBI investigative reports that Montgomery rigged demonstrations of his object recognition software.  (*Id*. ¶¶ 122, 124.)  He takes issue with the statements that Montgomery's "lawyer 'concluded that Montgomery was a fraud,'" and "that out of 'greed' Plaintiff Montgomery 'create[d] a rogue intelligence operation with little or no adult supervision' which was 'crazy' and that he was 'someone who has been accused of being a con artist.'"  (*Id*. ¶¶ 110, 120; *see id*. ¶ 194.)  The Amended Complaint states that a retraction was requested after publication of the Book, but HMH rejected the request.  (*Id*. ¶ 44.)

## III.    ARGUMENT

### A.    The Court Lacks Personal Jurisdiction Over Risen and HMHC

Plaintiff fails to allege facts under which this court could assert personal jurisdiction over Risen or HMHC, improperly sued as HMH Holdings, Inc., the parent company.  HMH, the operational company, is not contesting jurisdiction.  The court analyzes whether it has personal jurisdiction over a nonresident defendant under a two-part test.  *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626 (11th Cir. 1996).  *First*, the court examines Florida's long-arm statute.  *Id. Second*, the court must determine whether sufficient minimum contacts exist between the defendant and Florida such that jurisdiction over the defendant comports with "traditional notions of fair play and substantial justice" under the Due Process Clause.  *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  Minimum contacts only exist when: (1) the contacts arise from or relate to the cause of action; (2) the defendant purposefully avails himself of the privilege of conducting activities within the forum, thus invoking the benefits and protections of its laws; and (3) the defendant's contacts within the forum demonstrate that he reasonably anticipated being haled into court there.  *Id.* at 631.

The plaintiff bears the initial burden.  If the plaintiff establishes a *prima facie* case of personal jurisdiction through the allegations of his complaint, the defendant may challenge those

allegations through affidavits, shifting the burden back to the plaintiff to prove jurisdiction. *Sculptchair*, 94 F.3d at 627. If the defendant sustains its burden, the plaintiff must substantiate the jurisdictional allegations by affidavits or other competent proof, not merely repeat allegations in the complaint.

Here, Montgomery does not allege that general jurisdiction exists over Risen or HMHC under Fla. Stat. § 48.193(2), but, rather, attempts to assert specific jurisdiction, claiming that: (1) "[t]he Causes of Action and injuries" occurred in Florida and worldwide; (2) "some of the most recent commercial opportunities for the Plaintiff's work were contracts and projects made available through military bases and Government facilities in Florida"; (3) "a huge and substantial portion of the nationwide harm has occurred in Florida"; (4) he is currently a "citizen of Florida"; (5) "Defendants knew or should have known of Plaintiff's substantial ties to counter-terrorism, military and intelligence contracts and intended on harming Plaintiff in Florida"; and (6) "Defendants knew that if Plaintiff's reputation was harmed in Florida, the large military presence in Florida would ensure that Plaintiff would lose jobs and not be hired for any more jobs and contracts." (Am. Compl. ¶¶ 3-12.) These allegations are insufficient to establish personal jurisdiction over Risen or HMHC[17] under due process.

Nationwide circulation of a book and broadcast of interviews are insufficient to confer personal jurisdiction.[18] For jurisdiction to exist in Florida, Risen himself must have engaged in

---

[17] Plaintiff's allegation that HMHC is the parent company and owner of the publisher is insufficient, as a matter of law, to subject HMHC – a Delaware company not authorized to conduct business in Florida – to personal jurisdiction in Florida. Indeed, "Florida law is clear that the relationship of parent-subsidiary alone is insufficient to confer personal jurisdiction over the foreign parent corporation in the forum in which the subsidiary acts." *Heidbrink v. ThinkDirect Mktg. Grp., Inc.*, 2014 WL 3585698, at *3 (M.D. Fla. July 21, 2014) (collecting cases). Plaintiff does not – and could not – allege facts sufficient to pierce the corporate veil to subject HMHC to jurisdiction in Florida based on HMH's actions.

[18] *See Buckley v. N.Y. Times Co.*, 338 F.2d 470, 474 (5th Cir. 1964) (holding "mere circulation" of national newspaper and "sporadic news gathering by reporters on special assignment" in the

intentional conduct outside of Florida calculated to cause injury to Montgomery in Florida.[19]  In *Calder v. Jones*, the *National Enquirer*'s editor and reporter argued that California lacked jurisdiction over them for an article published in California, but prepared in Florida.  The Supreme Court found that, at the time the article was written and edited, defendants were well aware that plaintiff, Hollywood star Shirley Jones, resided in California, her career was centered in Hollywood, and the *National Enquirer* had a substantial circulation there.  Moreover, in the course of their newsgathering for the story, they had extensive contact with California.  The Court found that because the reporter and editor were "primary participants in an alleged wrongdoing intentionally directed at a California resident, and jurisdiction over them is proper on that basis."  465 U.S. 783, 789 (1984).  As the Eleventh Circuit explained, the "*Calder* effects test for personal jurisdiction" requires (1) "the commission of an intentional tort," (2) "expressly aimed at a specific individual in the forum" (3) "whose effects were suffered in the forum." *Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008).  In *Calder*, "defendants knew that the 'brunt of the harm' . . . would be suffered in California" and "California was the focal point of the tort" so "jurisdiction was proper there."  *Id.* at 1285-86.

Here, in contrast to *Calder*, none of the newsgathering was done in Florida, the "focal point" of Risen's Chapter was Montgomery's alleged fraud on the federal government by selling bogus terrorist detection software from companies located in Nevada, Washington, and California.  Risen's references to Montgomery were "expressly aimed" at CIA, Pentagon, NSA, White House,

---

[19] forum do not satisfy due process); *Alternate Energy Corp. v. Redstone*, 328 F. Supp. 2d 1379, 1383 (S.D. Fla. 2004) ("[U]nder *Calder*, the mere fact that allegedly libelous statements appeared in a publication sold to Florida residents is not sufficient to give a defendant fair warning that he may be haled into court here.").

[19] The Court must assess Risen's contacts with Florida separately from the publisher and holding company.  *E.g.*, *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1300 (D.C. Cir. 1996) ("The writer is not the publisher; [the writer's] contacts must be assessed separately.") (citing *Keeton v. Hustler Magazine*, 465 U.S. 770, 781 n.13 (1984)).

and Congressional officials who were based in the D.C. area.  Nothing in the Chapter about

Montgomery or Risen's remarks on television and radio programs were specifically directed at

Florida and none of Risen's information gathering (with the possible exception of one contact with

a Special Operations Command spokesperson) was conducted in Florida.  (Risen Decl. ¶ 14.)  The

"brunt of the harm," if any, would be felt by Montgomery in the D.C. area, where government

intelligence and military officials make contracting decisions and evaluated his software, or in

Nevada[20] or California where Montgomery lived and worked when the alleged fraud took place, or

California or Washington where he was living when he was interviewed by Risen, and/or

Washington where he was living when the Book was published – at no critical time was he a

resident of Florida.  Contrary to Plaintiff's allegation, the "brunt of the harm" could not occur in

Florida and Florida was not the focal point – indeed, Risen was not aware of the Florida

connection Montgomery now claims.  (*Id.* ¶ 7.)

The facts here have even less connection with the forum than those that have been found

inadequate to satisfy due process in other defamation cases.  For example, in *Madara v. Hall*,

916 F.2d 1510 (11th Cir. 1990), the Eleventh Circuit affirmed dismissal of a defamation action

brought in Florida against singer Daryl Hall for his comments quoted in a nationally distributed

trade publication about working with plaintiff who, Hall said, was "a small-time . . . guy" and

Hall was "bein' *screwed* by him, basically."  *Id*. at 1513.  Hall had performed in Florida fewer

than eight times during the relevant timeframe.  Although his musical recordings were widely

distributed in Florida and he was an investor in several limited real estate partnerships in Florida,

he had no agents or office there and the claims did not arise from those contacts.  These facts

---

[20] According to a May 2, 2015 letter filed in federal court in Arizona ("*Arpaio* Litigation")by
Montgomery's counsel, "Dennis Montgomery was previously a resident of Nevada for many
years and much of his work in the past occurred in Nevada."  (Handman Decl. Ex. 22, at 8.)

persuaded the court that "to subject [] Hall to the jurisdiction of a Florida court in this case would offend due process."  *Id.* at 1519.

In *Revell v. Lidov*, a professor based in Massachusetts authored an article he posted on a New York website arguing that plaintiff, a former Associate Director of the FBI residing in Texas, conspired with senior Reagan administration officials to refuse to stop a terrorist bombing and to cover up the conspiracy.  317 F.3d 467, 469 (5th Cir. 2002).  Plaintiff sued for libel in Texas, and the Fifth Circuit affirmed dismissal for lack of personal jurisdiction distinguishing *Calder*.  It held that the forum was not the "focal point" of the article, where, as here, the author did not know plaintiff resided in the forum, the article did not mention the forum, and no newsgathering occurred in the forum.  *Id.* at 473-75.  Because the article was about the federal government's alleged failure to stop terrorism and its cover up – just as here where the Chapter addresses fraud in federal government contracting concerning terrorism detection and a cover up – "[i]f the article had a geographic focus it was Washington, D.C."  *Id.* at 476.

Similarly, in *Busch v. Viacom International Inc.*, a Texas district court found no personal jurisdiction in Texas over Jon Stewart – the host of *The Daily Show* whose interview with Risen in New York is also a claim in this case (Am. Compl. ¶¶ 43, 139-141) – because, as here, "[t]he piece was not directed at viewers of *The Daily Show* in Texas, but was broadcast nationwide." 477 F. Supp. 2d 764, 772-73 (N.D. Tex. 2007).  Residence by the plaintiff in the forum state and circulation of allegedly defamatory statements there were insufficient to confer jurisdiction.  *Id.*[21]

Plaintiff also cannot create personal jurisdiction over Risen based on Plaintiff's ***own*** relationships to Florida, which are tenuous at best.  As the Supreme Court recently made clear, "the

---

[21] *See also Redstone*, 328 F. Supp. 2d at 1383 (dismissing under Rule 12(b)(2) when "there is no indication that Defendant 'expressly aimed' its publication at the state of Florida"); *Hoechst Celanese Corp. v. Nylon Eng'g Resins, Inc.*, 896 F. Supp. 1190, 1195 (M.D. Fla. 1995) (dismissing under Rule 12(b)(2) libel claim brought by a company headquartered in Florida arising out of an interview in Ohio that circulated to subscribers in Florida).

plaintiff cannot be the only link between the defendant and the forum." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014).  Defendant's "suit-related conduct" must have a "substantial connection" to the forum; "random, fortuitous, or attenuated contacts" with "persons affiliated with the State" are not sufficient, and plaintiff's own contacts with the forum "cannot be decisive."  *Id.* at 1121-23.

Here, Plaintiff claims jurisdiction in Florida because "some of the most recent commercial opportunities for the Plaintiff's work were contract and projects made available through military bases and Government facilities in Florida."  (Am. Compl. ¶ 4.)  Even if these allegations were true – and his recent filings suggest his opportunities have been in Arizona, not Florida[22] – and even if the key decision makers were actually in Florida and not in D.C., this is precisely the logic rejected by *Walden* as "impermissibly allow[ing] a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis."  *Id.* at 1125; *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1118 (6th Cir. 1994) (holding in libel action that no jurisdiction existed over defendant based in England because plaintiffs' Ohio residence was "merely fortuitous" and plaintiffs' action "unilateral").  Rather, personal jurisdiction "must arise out of contacts that the 'defendant *himself*' creates with the forum."  *Walden*, 134 S. Ct. at 1122 (citation omitted).  Unlike *Calder*, Risen's suit-related conduct had nothing to do with Florida.

Thus, this Court should dismiss the action as to Risen and HMHC for lack of personal jurisdiction in Florida.  Alternatively, the Court should transfer this action as to all defendants, so the action may proceed in one court, to the U.S. District Court for the District of Columbia.

---

[22] Based on Montgomery's own filings seeking to intervene in the *Arpaio* Litigation, his recent job opportunities seem to have been with Sheriff Arpaio in Arizona, not Florida, until the Arizona officials reached the same conclusion as the federal officials – his intelligence was "junk."  (Handman Decl. Ex. 23, ECF No. 1058, Mem. Law in Support of Mot. to Recuse/Disqualify Judge G. Murray Snow under 28 U.S.C. § 144, at 8 (May 7, 2015), Emergency Petition for Writ of Mandamus for Recusal, ECF No. 9533074 (9th Cir. May 11, 2015), Order denying petition, ECF No. 15-71433 (9th Cir. May 12, 2015); *see also* Am. Compl. Ex. 12, *Sheriff Joe vs. Uncle Sam*, The Atlantic (discussing sheriff's investigation of presiding federal judge's wife).

**B.      The Court Should Dismiss or Transfer for Improper Venue**

Even if the Court does not dismiss or transfer for lack of personal jurisdiction over Risen and HMHC, it should do so because venue in this District is "improper."  28 U.S.C. § 1406(a); Fed. Civ. P. 12(b)(3).  "When a defendant objects to venue under Rule 12(b)(3), the plaintiff bears the burden of showing that the venue selected is proper."  *Hemispherx Biopharma, Inc. v. MidSouth Capital, Inc.*, 669 F. Supp. 2d 1353, 1356 (S.D. Fla. 2009).  The court need not accept plaintiff's allegations in the complaint as true if they are "contradicted by the defendants' affidavits."  *Wai v. Rainbow Holdings*, 315 F. Supp. 2d 1261, 1268 (S.D. Fla. 2004). "When an allegation is challenged, the court may then examine facts outside of the complaint to determine whether venue is proper."  *Hemispherx Biopharma*, 669 F. Supp. 2d at 1356.

"[W]hether venue is 'wrong' or 'improper' – is generally governed by 28 U.S.C. § 1391." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 134 S. Ct. 568, 577 (2013).  Venue is proper in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . ; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

*Id.* § 1391(b).  "When venue is challenged, the court must determine whether the case falls within one of the three categories set out in § 1391(b)."  *Atl. Marine Constr.*, 134 S. Ct. at 577.  "[I]f it does not, venue is improper, and the case must be dismissed or transferred under § 1406(a)." *Id.*  Plaintiff invokes § 1391(b)(1) and (e) (Am. Compl. ¶ 2), but neither applies.  Montgomery does not allege – and cannot allege – that Risen and the HMH Companies all reside in Florida under § 1391(b)(1) or that any is a government agency, officer, or employee under § 1391(e). (Am. Compl. ¶¶ 15-16; Risen Decl. ¶¶ 2, 3; Handman Decl. ¶¶ 3, 4.)

Nor could Montgomery plead venue under § 1391(b)(2), which provides venue where "a substantial part of the events or omissions giving rise to the claim occurred." "Only those acts which were, in and of themselves, 'wrongful' or had a 'close nexus' to the wrong could form the basis of proper venue." *Forbes v. Lenox Fin. Mortg. LLC*, 2008 WL 2959727, at *3 (S.D. Fla. July 30, 2008) (quoting *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1372 (11th Cir. 2003)). The events giving rise to the alleged libel did not take place in Florida and it is not the focal point of the harm. (*See* III.A *supra*.) The only connections with Florida are Plaintiff's claim of citizenship – of very recent vintage, if that; a 2004 order for supplies from eTreppid in Reno to MacDill Air Force Base outside this judicial district and alleged but unspecified recent "commercial opportunities." (Am. Compl. ¶¶ 4, 13 & Ex. 19.) But the venue statute "protect[s] defendants" and thus "require[s] courts to focus on relevant activities of the defendant, not of the plaintiff." *Jenkins Brick,* 321 F.3d at 1371-72 (11th Cir. 2003); *Hemispherx Biopharma*, 669 F. Supp. 2d at 1356-57 ("[Plaintiff] focuses largely on its own activities and location, but the proper focus of the venue inquiry is on the relevant activities of the Defendants.").

Finally, Montgomery could not invoke "fallback venue" under § 1391(b)(3), because the action "may otherwise be brought" in D.C. *Algodonera De Las Cabezas S.A. v. Am. Suisse Capital, Inc.*, 432 F.3d 1343, 1345 (11th Cir. 2005) ("[V]enue may be predicated on § 1391([b])(3) only when neither § 1391([b])(1) or (2) are satisfied."). Venue in Florida is improper, so the Court should dismiss or transfer venue to D.C. where venue is proper.

## C.     The Court Should Transfer Venue Under 28 U.S.C. § 1404(a)

Even if the Court does not dismiss or transfer the action for improper venue, it should still transfer the action "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). The purpose of transfer under § 1404(a) "is to prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary

inconvenience and expense[.]"  *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964).  Transfer is

within "the broad discretion of the trial court."  *Meterlogic, Inc. v. Copier Solutions, Inc.*, 185

F. Supp. 2d 1292, 1299 (S.D. Fla. 2002).  Courts generally apply a two-part test:  "(1) whether the

action 'might have been brought' in the proposed transferee court and (2) whether various factors

are satisfied so as to determine if a transfer to a more convenient forum is justified."  *Id.* at 1299

(internal quotation marks omitted).

　　　　First, venue is proper in D.C.  (*See* III.B *supra*.)  Second, as explained below, the

interests of justice and the convenience of witnesses and parties strongly support transfer.

*Meterlogic*, 185 F. Supp. 2d at 1300 (listing factors); *see also Cellularvision Tech. & Telecomm.,*

*L.P. v. Alltel Corp.*, 508 F. Supp. 2d 1186, 1189 (S.D. Fla. 2007).  Indeed, none of the crucial

third-party witnesses can be forced to attend trial in this district.

　　　　**Convenience of the Parties.**  The convenience of the parties weighs strongly in favor of

transferring this action to D.C.  Defendants, all located outside Florida, will be inconvenienced

by being forced to litigate this case in Florida.  In contrast, while Montgomery claims that he has

become a Florida citizen and resident, he refuses to disclose his address in the Amended

Complaint.  (Am. Compl. ¶ 13.)[23]  On September 12, 2013, in support of transfer of an action

from California to Washington, Montgomery's counsel stipulated Montgomery was "currently

[a] citizen[ ] of the state of Washington" and "reside[d] in Yarrow Point, Washington."[24]

Montgomery registered to vote in Florida from Washington by FedEx the day before he filed the

Complaint in this case, and listed a hotel address in Florida.  (Handman Decl. Ex. 5.)  Indeed,

---

[23] Plaintiff violated Local Rule 5.4 by filing the address under seal, and doing so prevents
Defendants from verifying his address.  Montgomery's credibility on such matters is
questionable; a federal judge found Montgomery committed perjury in a declaration supporting
an opposition to a motion for attorneys' fees when he argued that "California, not Nevada, was
the proper forum to resolve the fee dispute."  *Montgomery v. eTreppid Techs., LLC*, 2010 WL
1416771, at *16 (D. Nev. Apr. 5, 2010).
[24] (Handman Decl. Ex. 6.)

Montgomery resided in Yarrow Point, Washington probably as late as April 1, 2015.  (Handman

Decl. Ex. 8, at 2.)  Per his Amended Complaint, he is ill and under the care of a doctor in Seattle.

(Am. Compl. ¶ 13 & Ex. 10.)  Thus, Montgomery may not have been a Florida resident when he

filed the case and may not be one now.  When, as here, "a plaintiff has chosen a forum that is not

its home forum, only minimal deference is required, and it is considerably easier to satisfy the

burden of showing that other considerations make transfer proper."  *Cellularvision*, 508 F. Supp.

2d at 1189 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56 (1981)).

Even if Montgomery, in fact, recently moved to Florida, the Court should still transfer.

Montgomery bears "[t]he burden . . . to demonstrate that he changed his domicile to Florida; the

presumption is that it remained in" his previous domicile.  *Jaisinghani v. Capital Cities/ABC,*

*Inc.*, 973 F. Supp. 1450, 1454 (S.D. Fla. 1997), *aff'd*, 149 F.3d 1195 (11th Cir. 1998).  In *Stern v.*

*News Corp.*, the Southern District of Florida transferred venue to New York when the plaintiff –

a former New York resident also represented by Montgomery's attorney Larry Klayman –

moved to Florida only two-and-a-half months before filing his suit in this court against a New

York-based publisher.  2008 WL 10712037, at *1 (S.D. Fla. Aug. 26, 2008).  In *Stern*, the

defendants, witnesses, and events giving rise to the alleged libel occurred in New York and New

York law applied.  Similarly, here, Risen and many witnesses are in D.C., D.C. law applies, and

none of the operative facts giving rise to the causes of action occurred in Florida.[25]

**Convenience of Witnesses, Access to Proof.**  "Important considerations under this factor

are whether these witnesses have actual knowledge about the issues in the case, where they are

---

[25] *See Weinstein v. Friedman*, 859 F. Supp. 786, 789-90 (E.D. Pa. 1994) (transferring libel action
to S.D.N.Y. where plaintiff was domiciled in Israel, defendant book publishers and author were
located in New York, witnesses were in New York, and the cause of action arose in New York);
*Windmere Corp. v. Remington Prods., Inc.*, 617 F. Supp. 8, 10 (S.D. Fla. 1985) ("[W]here the
operative facts underlying the cause of action did not occur within the forum chosen by the
Plaintiff, the choice of forum is entitled to less consideration.").

located, and whether it will be more convenient for them if the action is in [the transferor state] or

[the transferee state]." *Cellularvision*, 508 F. Supp. 2d at 1190.  In particular, "[t]he convenience

of non-party witnesses is an important factor in determining whether a transfer should be granted."

*Mason v. Smithkline Beecham Clinical Labs.*, 146 F. Supp. 2d 1355, 1361 (S.D. Fla. 2001).

The only material witness allegedly in this district or within 100 miles of it is

Montgomery himself, if he lives here at all.[26]  Montgomery lists over two dozen witnesses at

MacDill and Eglin Air Force Bases (Am. Compl. Ex. 13), located outside this district and

beyond this Court's subpoena power, so these witnesses do not weigh against transfer.  In

contrast, many of the key third-party witnesses who have "actual knowledge about the issues"

are located in the D.C. area.[27]  (Risen Decl. ¶¶ 10-12; Handman Decl. Ex. 27.)  *Meterlogic*, 185

F. Supp. 2d at 1301.  If this action remains in Florida, these third-party witnesses could not be

compelled to attend trial in Florida, including crucial current and former CIA, Pentagon, and

White House witnesses.  "The possibility that a case may be tried where certain crucial witnesses

could not be compelled to attend is an important consideration."  *Poncy v. Johnson & Johnson*,

414 F. Supp. 551, 556 (S.D. Fla. 1976) (citation and quotation marks omitted).  The parties could

compel many of the third-party witnesses to testify in D.C. because they are located within a

---

[26] Notably, notwithstanding Montgomery's claimed health issues, he chose not to bring this action in Washington.  Plaintiff has not submitted any medical reports that state that his health is at imminent risk, his most recent doctor's note from January 2015 said he was now in "outpatient PT, OT to work," and the doctor's note indicating that he could not travel to testify is a year old. (Am. Compl. Exs. 9, 10.)  Whatever his current health, he is actively litigating in three jurisdictions, including D.C.  In addition to seeking to intervene in the *Arpaio* Litigation in Arizona (Handman Decl. Ex. 23), on March 20, 2015, Montgomery's counsel, Larry Klayman, asked the federal court in D.C. to take testimony of Montgomery in D.C. *in camera* and *ex parte*. (Handman Decl. Ex. 24.)  Just as it is convenient for Montgomery to appear in D.C. when Klayman is the plaintiff, it would be convenient in this case, when Montgomery is the plaintiff.
[27] Third-party witnesses who are not in D.C. are either in California, Nevada, or Washington, for whom this District and D.C. are equally inconvenient.

100-mile radius of D.C. district court.  (Risen Decl. ¶¶ 10, 11, 12.)  *Meterlogic*, 185 F. Supp. 2d at 1301.

> **The Public Interest.**  The public interest also heavily weighs in favor of transfer to the D.C.[28]  Florida substantive law is not likely to apply, a factor in assessing the convenience of the forum.  *See Poncy*, 414 F. Supp. at 556 (holding that New Jersey federal court "is a more appropriate forum than this Court for applying substantive New Jersey law").  For the reasons more fully discussed in Defendants' Renewed Special Motion to Dismiss under the Applicable Anti-SLAPP Law, II.A, D.C. law – not Florida law – is most likely to apply.[29]  Applicability of D.C. law is another reason favoring transfer to D.C.

> **D.      The Court Should Dismiss Under Rule 12(b)(6) Because Plaintiff Fails to Plead a Plausible Claim for Defamation or Other Related Torts**

> If the Court does not dismiss or transfer for the reasons outlined above, it should dismiss under Rule 12(b)(6).  Although a court must take the well-pleaded *factual* allegations as true for a Rule 12(b)(6) motion, legal conclusions "are not entitled to the assumption of truth."  *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009).  Under *Twombly* and *Iqbal*, a plaintiff must provide "enough facts to state a claim to relief that is *plausible* on its face," rather than merely possible.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (emphasis added); *Iqbal*, 556 U.S. at 695-96.  Where plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

---

[28] The "public interest factors include: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflicts of law or in the application of foreign law."  *Ins. Co. of N. Am. v. Levin*, 2011 WL 1398473, at *4 (S.D. Fla. Mar. 28, 2011) (citation and quotation marks omitted), *report & recommendation adopted*, 2011 WL 2610754 (S.D. Fla. July 1, 2011).  *See also Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005).

[29] Other states with a significant relationship to this action include Washington, California, and Nevada, so if the Court decides D.C. law does not apply, it should apply the law of one of those states, none of which have any substantive conflict as applied to Defendants' 12(b)(6) motion.

Modern litigation is cripplingly expensive regardless of the outcome, so courts have stressed that Rule 12(b)(6) weeds out meritless claims.  *Id.* at 546.  Such concerns are especially present in defamation cases, where forcing defendants to incur unnecessary costs defending ultimately meritless suits can chill speech.[30]  Thus, courts routinely dismiss libel claims at the pleading stage *before* discovery for the deficiencies set forth in this motion.  *See* cases cited at notes 32, 41, and 48 *infra*.  Under D.C. law, or any other applicable law, the outcome is the same: Plaintiff's claims fail as a matter of law and should be dismissed under Rule 12(b)(6).

### 1.   The Fair Report Privilege Protects the Statements at Issue

Montgomery's claim should be dismissed under Rule 12(b)(6) because the challenged statements in the Chapter are privileged under the fair report privilege.  The privilege protects against defamation suits where – as here – a publication accurately summarizes court records, congressional records, and government investigative reports.  It applies as long as "the reports were substantially accurate" and fair, and "concern a governmental proceeding," even if the underlying information ultimately proves to be false.  *White v. Fraternal Order of Police*, 909 F.2d 512, 527 (D.C. Cir. 1990).[31]  Whether the fair report privilege protects the publication is a question of law that courts routinely decide on an initial pre-discovery motion by comparing official records subject to judicial notice with the publication in suit.  *See* note 8 *supra*.[32]

---

[30] *Farah*, 736 F.3d at 534 (recognizing in affirming Rule 12(b)(6) dismissal that "summary proceedings are essential in the First Amendment area because if a suit entails 'long and expensive litigation,' then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails") (quotation omitted); *Stewart v. Sun Sentinel Co.*, 695 So. 2d 360, 363 (Fla. 4th DCA 1997) ("[P]retrial dispositions are 'especially appropriate' because of the chilling effect [libel] cases have on freedom of speech").

[31] The fair report privilege of other potentially relevant states is similar, as is Florida's.  *Alpine Indus. Computers, Inc. v. Cowles Publ'g Co.*, 57 P.3d 1178, 1186 (Wash. Ct. App. 2002), *amended*, 64 P.3d 49 (Wash. Ct. App. 2003); *Sahara Gaming Corp. v. Culinary Workers Union Local*, 984 P.2d 164 (Nev. 1999); Cal. Civ. Code § 47(d), (e); *Stewart*, 695 So. 2d at 362-63.

[32] *See Hargrave v. Wash. Post*, 2009 WL 1312513 (D.D.C. May 12, 2009), *aff'd*, 365 F. App'x 224 (D.C. Cir. 2010) (dismissing libel claim under Rule 12(b)(6) because report of plaintiff's

Here, the Book serves the critical function that the fair report privilege is designed to protect: providing "both a fair and accurate accounting of public proceedings as well as informed commentary"[33] and thus advancing "[t]he purpose of the privilege" by "promot[ing] public scrutiny of governmental affairs."[34]  Indeed, the Book accurately summarizes witness statements made in FBI investigative reports filed in court proceedings, quotes affidavits and deposition transcripts and other filed court documents, and discusses the contents of congressional records. Each of these plainly fall within the fair report privilege. *See White*, 909 F.2d at 527 (explaining that privilege "extends broadly to the report 'of any official proceeding, or any action taken by any officer or agency of the government,'" including not only government proceedings themselves, but also allegations or findings that prompt such proceedings) (citation omitted). Courts routinely hold that reporting on court records, judicial proceedings, and discovery documents, including affidavits and depositions,[35] law enforcement investigations and reports,[36] and congressional records and statements,[37] is protected.

---

criminal testimony protected by fair report privilege); *Q Int'l Courier, Inc. v. Seagraves*, 1999 WL 1027034, at *4-5 (D.D.C. Feb. 26, 1999) (dismissing libel claim on a pre-discovery motion for summary judgment under fair report privilege); *Foretich v. Chung*, 1995 WL 224558, at *1-2 (D.D.C. Jan. 25, 1995) (dismissing on pre-discovery summary judgment motion libel claim against news anchor for reporting allegations in judicial proceedings); *Huszar v. Gross*, 468 So. 2d 512, 513, 516 (Fla. 1st DCA 1985) (affirming dismissal of libel claim with prejudice because newspaper's statements protected by fair report privilege); *Stewart*, 695 So. 2d at 362-63 (affirming pre-discovery motion to dismiss libel claim or summary judgment where newspaper's statements protected by fair report privilege).  *Cf. Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, 2010 WL 1408391, at *9-10 (M.D. Fla. Apr. 6, 2010) (dismissing libel claim for failure to plausibly plead facts to overcome common-law qualified privilege), *aff'd*, 451 F. App'x 862, 864 & n.3 (11th Cir. 2012).

[33] *Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 34 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996).

[34] *Harper v. Walters*, 822 F. Supp. 817, 823 (D.D.C. 1993), *aff'd*, 40 F.3d 474 (D.C. Cir. 1994).

[35] *See Q Int'l Courier*, 1999 WL 1027034, at *4 (privilege applies to report on civil complaint); *O'Brien v. Franich*, 575 P.2d 258, 260 (Wash. App. Ct. 1978) (reports on lawsuits covered by fair report privilege); *Lavin v. N.Y. News, Inc.*, 757 F.2d 1416, 1419 (3d Cir. 1985) (reports of affidavits privileged); *Sipple v. Found. for Nat'l Progress*, 83 Cal. Rptr. 2d 677, 687-88 (Cal. Ct. App. 1999) (report on deposition testimony privileged).

Moreover, the Book *expressly* reports on and refers to the government investigations, congressional records, and court proceedings.  *See Dameron v. Wash. Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985) (fair report privilege applies where "apparent either from specific attribution or from the overall context that the article is quoting, paraphrasing or otherwise drawing upon official documents or proceedings"); *Ditton v. Legal Times,* 947 F. Supp. 227, 230 (E.D. Va. 1996) ("A publisher properly attributes a report if the average reader is likely to understand that the report summarizes or paraphrases from the judicial proceedings."), *aff'd*, 129 F.3d 116 (4th Cir. 1997).

Montgomery has not – and cannot – plausibly allege that the Book is anything but a fair and "substantially accurate," *White*, 909 F.2d at 527, account of the findings and allegations in the investigative reports, congressional records, and court proceedings.[38]  Indeed, Risen obtained and published Montgomery's comments, making the report more than "fair" for purposes of the privilege.[39]  Thus, Montgomery's claims are barred by the fair report privilege and the Amended Complaint should be dismissed under Rule 12(b)(6).

---

[36] *See Medico v. Time, Inc.*, 643 F.2d 134, 139 (3d Cir. 1981) (fair report privilege applies to report on FBI documents that "express only tentative and preliminary conclusions that the FBI has never adopted as accurate"); *White*, 909 F.2d at 527-28 (privilege applies to report of D.C. administrative committee); *Global Relief Found. Inc. v. N.Y. Times Co.*, 390 F.3d 973 (7th Cir. 2004) (affirming dismissal; privilege applies to report of federal investigation into Islamic charity for possible link to terrorism); *Yohe v. Nugent*, 321 F.3d 35, 44 (1st Cir. 2003) (articles giving "rough-and-ready summary" of official statement by police protected by fair report privilege); *Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*, 844 F.2d 955, 960 (2d Cir. 1988) (statement by FBI official about execution of search warrant protected); *Dowd v. Calabrese*, 589 F. Supp. 1206, 1217 (D.D.C. 1984) (report of DOJ investigation protected).

[37] *Crane v. Ariz. Republic*, 972 F.2d 1511, 1517 (9th Cir. 1992) (secret investigation of House Select Committee on Narcotics Abuse and Control was official proceeding under the privilege); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1097 (4th Cir. 1993) ("[A] fair and accurate report of the public remarks of a member of Congress fits within the 'fair report' privilege[.]").

[38] *See Yohe*, 321 F.3d at 44 ("'[A]ccuracy' for fair report purposes refers only to the factual correctness of the events reported and not to the truth about the events that actually transpired."); *Coles*, 881 F. Supp. at 31 n.3; *Alpine Indus. Computers*, 57 P.3d at 1187 ("It is not necessary that it be exact in every immaterial detail[.]").

[39] *See, e.g.*, *Dorsey v. Nat'l Enquirer, Inc.*, 973 F.2d 1431, 1437, 1440 (9th Cir. 1992) (tabloid "did not exceed the degree of flexibility and literary license accorded newspapers in making a

## 2.   Many of the Challenged Statements Are Non-Actionable Opinion and Rhetorical Hyperbole Protected by the First Amendment

Statements of opinion that do "not contain a provably false factual connotation" are protected under the First Amendment. *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 20 (1990); *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 313 (D.C. Cir. 1994) ("*Moldea II*"). In addition, an opinion is also not actionable if it cannot be objectively verified as false or cannot "reasonably [be] interpreted as stating actual facts" about the plaintiff. *Milkovich*, 497 U.S. at 18-20; *Washington v. Smith*, 80 F.3d 555, 556-57 (D.C. Cir. 1996). Rhetorical language that is "loose, figurative [and] hyperbolic" is also not actionable. *Milkovich*, 497 U.S. at 21.

Whether the allegedly defamatory statements are non-actionable opinion is a question of law to decide on a motion to dismiss. *Moldea v. N.Y. Times Co*., 15 F.3d 1137, 1144 (D.C. Cir. 1994) ("*Moldea I*"). The court must analyze the challenged statements in their entirety, taking into account both the immediate context and the larger social context in which they appeared. *See Moldea II*, 22 F.3d at 314; *see also Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001); *Thomas v. News World Commc'ns*, 681 F. Supp. 55, 64 (D.D.C. 1988).

Here, Montgomery's allegation that Defendants said that government contractors, including Montgomery, were motivated by "greed"[40] and that "crazy became the new normal in the war on terror"[41] are non-verifiable statements of subjective opinion and rhetorical hyperbole

---

'fair report'" by reporting that petition filed against entertainer said entertainer had AIDS; last paragraph of report included entertainer' statement that charge was an "utter fabrication").

[40] *See Obsidian Fin. Grp., LLC v. Cox*, 812 F. Supp. 2d 1220, 1233 (D. Or. 2011) (blogger's statement plaintiff was "greedy," was "figurative, hyperbolic, imaginative, or suggestive"), *aff'd*, 740 F.3d 1284 (9th Cir. 2014); *Fetter v. N. Am. Alcohols, Inc.*, 2007 WL 551512, at *12 (E.D. Pa. Feb. 15, 2007) (statement "that the plaintiff was greedy, unreasonable, or foolish reflect personal opinion and therefore do not constitute defamation"); *Metcalf v. KFOR-TV*, 828 F. Supp. 1515, 1530 (W.D. Okla. 1992) (statement that organizations were "shams perpetrated on the public by greedy doctors" was protected opinion).

[41] *See Farah*, 736 F.2d at 531 (affirming Rule 12(b)(6) dismissal of claims challenging satirical speech and statements of opinion); *Weyrich*, 235 F.3d at 624 (statement that plaintiff experienced

that are non-actionable.  (Am. Compl. ¶¶ 110, 181.)[42]  Moreover, read in its proper context,

statements that Montgomery "has been accused of being a con artist" (Am. Compl. ¶ 110)

(quoting Book at 32) are non-actionable opinion based on disclosed facts, including that

Montgomery's own former business partner, employees, and lawyer all accused him in court

records of being a con artist and a fraud.[43]  Thus, to the extent the statements are not protected

under the fair report privilege, Montgomery fails to state a claim based on these opinions.

### 3.     The Complaint Should Be Dismissed For Failure to Plausibly Plead Actual Malice or Any Other Applicable Fault

Plaintiff's claim fails for another, independent reason under Rule 12(b)(6):

Montgomery – a limited-purpose public figure – does not and cannot plausibly plead, as a matter

of law, actual malice (or, indeed, any other applicable standard of fault).

---

bouts of "paranoia" was protected opinion); *Lieberman v. Fieger*, 338 F.3d 1076, 1080 (9th Cir. 2003) (statement in Court TV interview that plaintiff, a psychiatric expert, is "crazy," was protected opinion); *Serian v. Penguin Grp. (USA), Inc.*, 2009 WL 2225412, at *9 (N.D. W.Va. July 23, 2009) (statement in national security book that plaintiff was "very crazy" was non-actionable "subjective opinion[]"); *Rhodes v. Placer Cnty.*, 2011 WL 1302240 (E.D. Cal. Mar. 31, 2011) (calling plaintiff "a 'crazy flute player'" was "[s]tatement[] of hyperbole"); *Rojas v. Debevoise & Plimpton*, 634 N.Y.S.2d 358, 362 (N.Y. Sup. Ct. 1995) (statement that plaintiff was "crazy" protected opinion); *Stepien v. Franklin*, 528 N.E.2d 1324, 1327 (Ohio Ct. App. 1988) (same); *Shaw v. Palmer*, 197 S.W.3d 854, 857-58 (Tex. Ct. App. 2006) (same).

[42] That Plaintiff is an "incorrigible gambler" (Am. Compl. ¶¶ 117-118) is also non-actionable opinion where he was arrested for passing a million dollars in bad checks to a casino in Nevada and had to declare bankruptcy.  The FBI Report shows that he was a gambler and "incorrigible" is a subjective assessment of his motivation that is opinion.  (Handman Decl. 18 at Bates Nos. 00002, 00021-22); *Fikes v. Furst*, 61 P.3d 855, 864-65 (N.M. Ct. App. 2002) (statement that plaintiff was "pursuing a bizarre obsession" was protected opinion).

[43] *See Spelson v. CBS, Inc.*, 581 F. Supp. 1195, 1203 (N.D. Ill. 1984) (statement that "individuals are 'cancer con-artists' and 'practitioners of fraud,'" were opinion)), *aff'd*, 757 F.2d 1291 (7th Cir. 1985); *Yauncey v. Hamilton*, 786 S.W.2d 854 (Ky. 1989) (acquaintance of suspected murder's statement to newspaper that suspect was a "con artist" was protected opinion); *Quinn v. Jewel Food Stores, Inc.*, 276 Ill. App. 3d 861, 866-67 (Ill. App. Ct. 1995) (employer's evaluation stating that plaintiff was a "con artist" was protected opinion).

### a. Montgomery Is a Limited-Purpose Public Figure

Montgomery's naked allegation that he is a private figure carries no weight.  (Am. Compl. ¶¶ 24-29.)  "Whether the plaintiff is a public figure is a question of law for the court to resolve."  *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1294 n.12 (D.C. Cir. 1980).  As a matter of law, Montgomery is a "limited purpose public figure," having "inject[ed]" himself into and been "drawn into a particular public controversy" centered on widely-publicized allegations that he committed fraud in government-contracting work he performed for the U.S. government. *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987) (*en banc*).

*First*, Montgomery became a limited-purpose public figure when he publicly accused his business partner of paying bribes to then Congressman – later Governor – Gibbons, to obtain government contracts for Montgomery's company.  (Handman Decl. Exs. 9, 10.)  By publicizing this accusation that Montgomery had made in his lawsuit against Trepp, he invited and received national media attention, including an exclusive interview with NBC News – a glaring spotlight that exposed his alleged government-contracting fraud to the public eight years before the Book. (*Id*. Ex. 11.)  By creating the public controversy about his company's alleged bribes in national security contracting, he opened the door to media scrutiny about his own alleged government-contracting fraud at this and other companies.[44]  *Second*, he also became a limited-purpose figure

---

[44] *See, e.g.*, *Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 32 (D.C. Cir. 1990) (finding a public controversy, in which plaintiff became embroiled as public figure, because he was associated with the mayor and lied to the press about his involvement in the death of a friend, prompting "the DEA, the U.S. Attorney's office, and the D.C. Police Department investigat[ion]"); *Logan v. District of Columbia*, 447 F. Supp. 1328, 1331 (D.D.C. 1978) (holding plaintiff was a limited purpose public figure because he was arrested in connection with a large undercover operation, accused of serious crimes, and voluntarily injected himself into the operation by telling an undercover agent he had committed murder while trying to obtain a position as a hit man); *Brueggenmeyer v. ABC*, 684 F. Supp. 452, 458 (N.D. Tex. 1988) (finding plaintiff was a limited purpose public figure because "the course of conduct in which [plaintiff] engaged generated consumer complaints, government legal actions, BBB investigations, and media attention").

no later than 2008 when Bloomberg, Playboy and other media outlets began reporting that Montgomery had provided bogus software to the U.S. government to decode Al Qaeda messages on Al Jazeera television.  (*Id*. Exs. 1, 2, 7, 9, 11-14, 16, 17.)[45]  *Third*, Montgomery further became a public figure because he sought out U.S. government contracts involving national security even after he was subject to extensive media scrutiny, thus assuming the risk of further public scrutiny about his alleged contracting fraud.  *See CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 295 (4th Cir. 2008) (government contractor "became a public figure because," when the U.S. military "engaged [the contractor] to provide civilian interrogators at Abu Ghraib," it "surely knew when it accepted the interrogation work that it was potentially exposing itself to the inhospitable climate of media criticism").[46]  Thus, he is unquestionably – as a matter of law – a limited-purpose public figure regarding his alleged fraud on the government.

---

[45] Indeed, a Twitter account that, by all indications, is the account of Dennis L. Montgomery at Yarrow Point, Washington, bore as the banner the image of the title page of the 2010 Playboy article, *The Man Who Conned the Pentagon.*  Whether he posted the image himself, thereby exploiting his own public figure status, or someone else set up the Twitter page, it underscores that this controversy has become part of his public persona.  A printout of the Twitter account as of March 19, 2015 is attached to the Handman Declaration as Ex. 25.

[46] *See also McDowell v. Paiewonsky*, 769 F.2d 942, 947-51 (3d Cir. 1985) (holding that architect was limited-purpose public figure because he accepted government contracts and was subject to previous media scrutiny about his work on public projects); *Mosesian v. McClatchy Newspapers*, 285 Cal. Rptr. 430, 439 (Cal. Ct. App. 1991) (president of company who was subject to media attention in public debate about award of a public contract to company to put on horse-racing event a limited-purpose public figure); *Gleichenhaus v. Carlyle*, 591 P.2d 635, 641 (Kan. Ct. App.) (contributor to political campaign who later obtained government contract was a limited-purpose public figure), *aff'd in relevant part*, 597 P.2d 611, 612-13 (Kan. 1979).  *Cf. Silvester v. ABC*, 839 F.2d 1491, 1495-97 (11th Cir. 1988) (finding jai alai fronton owners public figures by "entering a strictly regulated, high-profile industry in which there were few major participants" and "[t]he potential loss of tax revenue because of corruption" was public controversy).

#### b.     Montgomery Fails to Plausibly Plead Actual Malice, or Any Other Applicable Standard of Fault

As a public figure, Montgomery is required to plead facts showing that Defendants acted with actual malice by clear and convincing evidence, but he cannot plausibly do so.[47]  *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 331-32 (1974); *Clyburn*, 903 F.2d at 33.  "The standard of actual malice is a daunting one."  *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996).  Plaintiff must plead that the speaker knew the statements were false or "in fact entertained serious doubts as to the truth" when he made defamatory statements.  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *Foretich v. CBS, Inc.*, 619 A.2d 48, 59 (D.C. 1993).  A plaintiff could support a defamation claim with allegations of facts evidencing that a defendant was subjectively aware when the defendant published that the story was "'(1) fabricated; (2) so inherently improbable that only a reckless person would have put [it] in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that [defendant] had obvious reasons to doubt.'"  *Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003) (citation omitted).  "For [the actual malice] standard to be met, the publisher must come close to willfully

---

[47] Even if Montgomery were not a public figure (which he is), the Complaint must be dismissed because it cannot succeed on a negligence claim, the lower standard applicable to private-figure plaintiffs.  *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 87 (D.C. 1980) ("[T]he basic standard of care in the District of Columbia for media defamation of private individuals . . . [is] that of negligence."); *see also Gertz*, 418 U.S. at 347 (holding that states may not impose "liability without fault" in libel cases brought by private plaintiffs).  Montgomery cannot show negligence, as a matter of law.  As the Chapter reflects, Risen relied on articles previously published in reputable publications, relied on official records and included Montgomery's denials in the Chapter, and HMH relied on a reputable author – all factors that show, as a matter of law, not just no actual malice, but no negligence.  *See, e.g.*, *Winn v. United Press Int'l*, 938 F. Supp. 39, 45 (D.D.C. 1996) ("[A] periodical that relies on articles from other reliable publications is not negligent as a matter of law when it does not verify those articles with their original sources."), aff'd, 1997 WL 404959 (D.C. Cir. 1997); *Hakky v. Wash. Post Co.*, 2010 WL 2573902, at *6 (M.D. Fla. June 24, 2010) (dismissing libel claim against media company because, in part, "under *Iqbal,* Plaintiff failed to allege sufficient facts demonstrating negligence . . . .").

blinding itself to the falsity of its utterance." *Tavoulareas*, 817 F.2d at 776.  Montgomery cannot

clear this high hurdle, even at the pleading stage.

In the wake of *Iqbal* and *Twombly*, a plaintiff cannot state a claim simply by making

conclusory assertions of the elements of actual malice, which is all Montgomery's Amended

Complaint does.  (Am. Compl. ¶¶ 53, 98, 162, 172.)  Indeed, federal courts in Florida and across

the country now routinely dismiss defamation cases for failure to state a claim where, as here, the

plaintiff fails to plead allegations to make actual malice plausible.  *See Hakky*, 2010 WL 2573902,

at *6-7 (dismissing libel claim under Rule 12(b)(6) where plaintiff failed to plausibly allege facts

to support actual malice); *Parisi v. Sinclair*, 845 F. Supp. 2d 215, 219 (D.D.C. 2012) (same).[48]

Because the Chapter expressly relies on previously published articles in reputable publications and

statements in official court records, FBI reports, and the Congressional Record, and includes

Plaintiff's denials, Plaintiff cannot plausibly meet the "daunting" standard of actual malice.[49]

---

[48] *See also Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012)
(dismissing libel complaint because "none of [plaintiff's] allegations . . . plausibly suggest that,
given the articles' reporting," defendant acted with actual malice); *Mayfield v. NASCAR, Inc.*,
674 F.3d 369, 377-78 (4th Cir. 2012) (dismissing libel claim where plaintiffs pleaded only
"conclusory" allegations of actual malice amounting to "a mere recitation of the legal standard");
*Adelson v. Harris*, 973 F. Supp. 2d 467, 471 (S.D.N.Y. 2013) (dismissing libel claims under
Nevada anti-SLAPP law and Rule 12(b)(6) where statements were non-actionable opinion,
protected by fair report privilege, and evidence of actual malice was insufficient), *questions
certified*, 774 F.3d 803 (2d Cir. 2014); *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 279-81, 284-85
(S.D.N.Y. 2013) (dismissing for failure to plausibly allege actual malice); *Earley v. Gatehouse
Media Pa. Holdings, Inc.*, 2013 WL 5466149, at *6 (M.D. Pa. Sept. 30, 2013); *Egiazaryan v.
Zalmayev*, 2011 WL 6097136, at *8 (S.D.N.Y. Dec. 7, 2011); *Diario El Pais, S.L. v. Nielsen Co.,
(US)*, 2008 WL 4833012, at *6-7 (S.D.N.Y. Nov. 6, 2008); *Hanks v. Wavy Broad., LLC*, 2012
WL 405065, at *12 (E.D. Va. Feb. 7, 2012); *Pan Am Sys., Inc. v. Hardenbergh*, 871 F. Supp. 2d
6, 17 (D. Me. 2012).
[49] *Parisi*, 845 F. Supp. 2d at 219 (finding failure to plead actual malice when plaintiff cited
defendant's book showing defendant took steps to verify the statements and relied on multiple
sources); *Diario El Pais, S.L. v. Nielsen Co., (US), Inc.*, 2008 WL 4833012, at *6-7 (S.D.N.Y.
Nov. 6, 2008) (finding failure to plausibly plead actual malice when complaint showed defendant
took actions to ensure accuracy and thus it did not possess a subjective belief of falsity).

Indeed, the facts here, based on these documentary records, conclusively demonstrate an absence of actual malice by Defendants, as a matter of law.  The Book reflects that Risen extensively interviewed Montgomery – facts showing the absence of actual malice.  *See Parisi*, 845 F. Supp. 2d at 218-19 (dismissing for failure to plausibly allege actual malice when defendant interviewed plaintiff) (citing *Lohrenz*, 350 F.3d at 1283).[50]  The Book includes Montgomery's denials throughout the Chapter.  (Book at 33-34, 37, 51, 53.)  This further precludes a finding of actual malice.  *See Lohrenz*, 350 F.3d at 1286 ("[R]eporting perspectives at odds with the publisher's own 'tend[s] to rebut a claim of malice'"); *Biro*, 963 F. Supp. 2d at 288 (finding failure to plausibly plead actual malice when defendant printed plaintiff's denials).[51]

Reliance on previously published material from reputable publications also precludes Montgomery from plausibly pleading actual malice, as a matter of law.  *See, e.g.*, *Liberty Lobby, Inc. v. Dow Jones*, 838 F.2d 1287, 1297 (D.C. Cir. 1988) ("[G]ood faith reliance on previously published materials in reputable sources . . . precludes a finding of actual malice as a matter of law."); *Biro*, 963 F. Supp. 2d at 279 (plaintiff could not plausibly plead actual malice because defendants republished an article from *The New Yorker*, a reputable publication).  Here, the Book expressly cites the comprehensive Playboy Article and New York Times Article, which contain

---

[50] *See also Biro*, 963 F. Supp. 2d at 288 (plaintiff failed to plausibly plead actual malice where they had interviewed plaintiff and included denials); *Loeb v. New Times Commc'ns Corp.*, 497 F. Supp. 85, 93 (S.D.N.Y. 1980) ("It cannot be said that the defendants' conduct constitutes an 'extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.'  Loeb himself was interviewed . . . .").

[51] Montgomery's general denials do not establish knowledge or recklessness as to falsity.  *See Edwards v. National Audubon Soc'y, Inc.*, 556 F.2d 113, 121 (2d Cir. 1977) (actual malice "cannot be predicated on mere denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error"); *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1510-11 (D.C. Cir. 1996) (no actual malice even though plaintiff was not contacted because "Defendant] knew . . . that [plaintiff] had sued . . . for defamation based upon similar allegations; [plaintiff] could reasonably expect [defendant] to deny any involvement regardless of the facts.").

36

all the facts Plaintiff now challenges, facts first published in the 2008 article in *Bloomberg News*,

also a reputable publication.  Plaintiff has not – and could not – allege that he had obtained

retractions or challenged any of these publications in a lawsuit.  Reliance on these reputable

sources defeats actual malice.

Moreover, reliance on official reports or official sources, as Risen did here, cannot

constitute actual malice.[52]  No less a prominent official than the Director of the CIA, in

Congressional testimony, supported the claim that Montgomery's information was not accurate

or, as Senator Chambliss described it "bogus."[53]  These official views echoed what Plaintiff's `

former business partner in eTreppid told the FBI and said in court records: the demonstrations

were rigged and the software non-existent.  The court records include what Plaintiff's former

lawyer said: "Based upon personal knowledge, and information and belief, Blxware possesses no

marketable technology, the technology as represented does not exist[.]"  (Handman Decl. Ex.

20.)  The New York Times Article, co-written and expressly relied upon by Risen in the Book,

reported that Montgomery invoked his Fifth Amendment right against self-incrimination in his

deposition "when asked if his software was a 'complete fraud,'" (Handman Decl. Ex. 2, at 6; Ex.

15 at 57-58, 60, 80-81, 188-191, 199-201, 273).  In a civil case, an adverse inference that the

---

[52] *Bell v. Associated Press*, 584 F. Supp. 128, 129, 132 (D.D.C. 1984) (no actual malice as a matter of law where reporter relied on arrest report); *Klayman v. City Pages*, 2015 WL 1546173, at *16-17 (M.D. Fla. Apr. 3, 2015) (granting motion for summary judgment, because, in part, plaintiff could not prove actual malice when newspapers and authors relied on judicial opinions and public filings in Florida Bar disciplinary proceedings); *CACI Premier Tech.*, 536 F.3d at 292 (no actual malice as a matter of law where radio commentator relied on official reports about the conditions set by government contractor that led to torture, rape, and murder at Abu Ghraib prison); *Peter Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556, 562-63 (5th Cir. 1997) (no actual malice as a matter of law where arson allegations were based on a police report); *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 175 (2d Cir. 2001) (no actual malice as a matter of law where author relied on sources including a police report).
[53] In a 2012 article in *Defense News*, Jose Rodriguez, the man who had been in charge of the CIA's Counterterrorism Center, said the Center had been "skeptical," viewed the software as "crazy" and passing it along to the White House "ridiculous."  (Handman Decl. Ex. 20.)

software was a fraud may be drawn from Montgomery's invocation.[54]  In the face of this adverse inference and "[i]n view of the vast number of objective sources who condemned" Montgomery as a fake, this Court should "conclude as a matter of law" that Defendants "did not entertain serious doubts that the gist" of the Chapter "was true." *Levan v. Capital Cities/ABC*, 190 F.3d 1230, 1244 (11th Cir. 1999) (reversing plaintiff's jury verdict on actual malice and entering judgment for defendant), *cert. denied*, 528 U.S. 1198 (2000).

Moreover, given that the Book was the work of a highly reputable author – the Amended Complaint itself admits that Risen "is a Pulitzer Prize-winning journalist," and a "national security expert" (Am. Compl. ¶¶ 10, 14) who had published the same allegations in the *New York Times* in 2011 without legal challenge – Montgomery cannot plausibly plead that HMH was even negligent, much less acted with actual malice, in relying on and publishing Risen's work. *See Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1032 (2d Cir. 1997) (publisher may not be liable for article "if it relies upon the integrity of a reputable author and has no serious reason to question the accuracy of the information provided by that author").[55]  Indeed, HMH would have no reason to doubt Risen since other reputable publications had also published the same allegations for years without legal challenge.[56]

---

[54] *See, e.g.*, *Coquina Investments v. TD Bank, N.A.*, 760 F.3d 1300, 1310 (11th Cir. 2014) ("In civil cases, . . . 'the Fifth Amendment does not forbid adverse inferences against parties . . . when they refuse to testify . . . .'") (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)).

[55] *See McManus v. Doubleday & Co.*, 513 F. Supp. 1383, 1390 (S.D.N.Y. 1981) (co-author and publisher were "entitled as a matter of law to rely on [author's] proven reportorial ability"); *Pegasus v. Reno Newspapers, Inc.*, 57 P.3d 82, 93 (Nev. 2002) (newspaper did not act with actual malice where "there is no evidence that . . . anyone at [the newspaper] had any reason to believe [the freelance reporter] would lie . . .").

[56] Plaintiff does not allege any facts that would suggest that the publisher HMH acted with any degree of fault. *See McFarlane*, 74 F.3d at 1303 (explaining that, because actual malice is a question of each defendant's subjective state of mind, absent respondeat superior, actual malice will not be imputed from the author to the publisher).  The Amended Complaint also does not allege facts to suggest that Houghton Mifflin Harcourt Company, which Plaintiff alleges is merely a holding company of the publisher (Am. Compl. ¶ 16), had anything to do with

Finally, the allegation that Defendants rejected Montgomery's request for retraction (Am. Compl. ¶ 44) fails to plausibly plead actual malice, again as a matter of law, because it does not prove the wrongful state of knowledge at the time of the initial publication.  *See Biro*, 963 F. Supp. 2d at 281-82, 286 (holding that defendant's after-the-fact refusal to retract fails to plausibly allege actual malice as a matter of law because "a failure to retract occurs, by definition, *after* publication, meaning that its probative value as to a defendant's state of mind at the time of publication is dubious at best."); *Klayman*, 2015 WL 1546173, at \*15 ("[T]hat Plaintiff alerted Defendants after publication that he believed the statements were false and that he wanted some kind of correction or retraction does not help Plaintiff to establish actual malice.").[57]  Here, where there was no plausible allegation of error, the "refusal to retract" is only further evidence of "*no* actual malice."  *Tavoulareas v. Piro*, 759 F.2d 90, 132 n.51 (D.C. Cir. 1985) ("[T]he refusal may show that the publisher believed and still believes that the falsehood was true."), *rev'd on other grounds*, 817 F.2d 762 (D.C. Cir. 1987) (*en banc*).  In sum, Montgomery fails to plausibly plead actual malice, or any other applicable level of fault, and the Court should therefore dismiss the libel claim, with prejudice.

### 4.      Montgomery's Other Tort Claims Fail

Because Montgomery's "defamation claim fails, so do [his] other tort claims based upon the same allegedly defamatory speech."  *Farah*, 736 F.3d at 540.  "[A] plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim."  *Moldea II*, 22 F.3d at 319-20 (citing *Cohen v. Cowles Media Co.*, 501 U.S. 663, 670 (1991)).  "The First

---

publication of the Book or is at fault in any way.  This is an additional reason why the Amended Complaint should be dismissed as to both HMH Companies.

[57] *See McFarlane*, 91 F.3d at 1515 ("McFarlane presents no authority, however, nor are we aware of any, for the proposition that a publisher may be liable for defamation because it fails to retract a statement upon which grave doubt is cast after publication."); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 286 (1964) (the *Times*' "failure to retract upon respondent's demand . . . is likewise not adequate evidence of malice for constitutional purposes").

Amendment considerations that apply to defamation therefore apply also to" Montgomery's claims for tortious interference, intentional infliction of emotional distress, and assault. *Farah*, 736 F.3d at 540 (dismissing tortious interference claim); *Hustler Magazine v. Falwell*, 485 U.S. 46, 50 (1988) (dismissing intentional infliction claims). In addition, Montgomery fails to state facts to plausibly plead the elements of these claims.[58]

## IV.    CONCLUSION

For the foregoing reasons, defendants HMH Companies and Risen respectfully request that the Court grant their motions: (1) to dismiss or transfer for lack of personal jurisdiction over Risen and HMHC; (2) dismiss or transfer for improper venue; (3) transfer for convenience; or (4) dismiss the complaint with prejudice under Fed. R. Civ. P. 12(b)(6).

---

[58] For example, Plaintiff cannot show intent or that the statements were threats of civil assault, and cannot show "extreme and outrageous" conduct, intent, or severe distress as to IIED. *See Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 92 (D.D.C. 2010) (assault if "(a) they act intending to cause a harmful or offensive contact . . . or an imminent apprehension of such a contact, and (b) the other party is thereby put in such imminent apprehension") (alterations omitted); *Jackson v. District of Columbia*, 412 A.2d 948, 955 n.15 (D.C. 1980) (no liability for assault for negligent or reckless behavior lacking the intent to commit an assault); *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009) (dismissing for failure to state a claim because "plaintiff must show that the interference was intentional and that there was resulting damage" to state a tortious interference claim); *Jung v. Jung*, 791 A.2d 46, 50 (D.C. 2002) ("To establish a claim for intentional infliction of emotional distress, a plaintiff must prove that the defendant engaged in: (1) extreme and outrageous conduct that (2) intentionally or recklessly caused (3) severe emotional distress to another.").

## CERTIFICATE OF GOOD-FAITH CONFERENCE; CONFERRED BUT UNABLE TO RESOLVE THE ISSUES PRESENTED IN THE MOTION

In accordance with Local Rule 7.1(a)(3)(A), the undersigned certifies that counsel for Defendants has conferred with all parties or non-parties who may be affected by the relief sought in this motion in a good-faith effort to resolve the issues but has been unable to resolve the issues.

　　　　　　　　　　　　　　　　s/Sanford L. Bohrer

Dated: May 15, 2015

　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　HOLLAND & KNIGHT LLP

　　　　　　　　　　　　　　By: s/ Sanford L. Bohrer
　　　　　　　　　　　　　　　　Sanford L. Bohrer
　　　　　　　　　　　　　　　　Brian W. Toth
　　　　　　　　　　　　　　　　701 Brickell Avenue, Suite 3300
　　　　　　　　　　　　　　　　Miami, Florida  33131
　　　　　　　　　　　　　　　　Tel.: (305) 374-8500
　　　　　　　　　　　　　　　　Fax: (305) 789-7799

　　　　　　　　　　　　　　DAVIS WRIGHT TREMAINE LLP

　　　　　　　　　　　　　　By: s/ Laura R. Handman
　　　　　　　　　　　　　　　　Laura R. Handman (admitted *pro hac vice*)
　　　　　　　　　　　　　　　　Micah J. Ratner (admitted p*ro hac vice*)
　　　　　　　　　　　　　　　　1919 Pennsylvania Ave., NW, Suite 800
　　　　　　　　　　　　　　　　Washington, D.C.  20006
　　　　　　　　　　　　　　　　Tel.: (202) 973-4200
　　　　　　　　　　　　　　　　Fax: (202) 973-4499

　　　　　　　　　　　　　　　　*Counsel for Defendants*

41

**CERTIFICATE OF SERVICE**

I certify that on May 15, 2015, I filed this document with the Clerk of Court using

CM/ECF, which will serve this document on all counsel of record.


s/Sanford L. Bohrer