# EXHIBIT 19

Patrick T. Fox (#8071)
DOUBEK & PYFER LLP
PO Box 236
Helena MT 59624
406 442 7830 ph
406 442 7839 fax
patrickfox@doubekpyfer.com

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| YELLOWSTONE MOUNTAIN CLUB, LLC, et al., Debtors. | Chapter 11<br><br>Case No. 08-61570<br><br>Also applicable to Adv. Case No. 09-64, 09-18, 09-14, 10-15, 10-88<br><br>**SUPPLEMENTAL AFFIDAVIT OF TIMOTHY L. BLIXSETH** |

I, Timothy L. Blixseth, declare under penalty of perjury of the laws of the United States follows:

1.    I am a resident of the State of Washington.

2.    I have personal knowledge of the facts testified to herein.

3.    I make this affidavit to supplement the affidavit I have previously filed in support of the Motion to Disqualify Judge Ralph Kirscher.

4.    After reviewing the recent deposition testimony of Edra Blixseth's business partner, Dennis Montgomery, who is out on bail for $2 million in check fraud and was referred to the U.S. Attorney for perjury, and recently discovered emails forensically recovered from the Jory Russell computers, I am certain that Montgomery and Edra Blixseth have engaged in an extensive scheme to defraud the U.S. Government, other Governments, and Banks, and private lenders; and that Judge Kirscher's agenda to approve the Yellowstone Club bankruptcy,

1

regardless of the evidence, including evidence showing that it is a fraudulent bankruptcy planned

and perpetrated by Edra Blixseth and Sam Byrne, has caused Judge Kirscher's appearance of

bias and actual bias toward me because I have attempted to show the true cause of the

bankruptcy. As recited herein, the evidence of these frauds and Judge Kirscher's conduct

regarding his and his clerk's ex parte communications, and his refusal to let me file pleadings the

law permits, and more as recited in my Motion, not only appears to support an *apparent* bias

against me, and that he is not impartial, but that he also has an *actual* bias against me. His bias

has not only resulted in a violation of my right to have a fair and impartial judge, it has, so far,

effectively protected Edra Blixseth from criminal prosecution for her financial frauds of millions

of dollars; attempted to undermine the effectiveness of my lawyers, Michael Flynn, and C.J.

Conant, by advancing inaccurate issues involving the States Secrets Privilege resulting in the

cover up the frauds of Edra Blixseth on the U.S. government and others including myself and

creditors of her Estate, and continued concealment of *ex parte* communications with my

adversaries.

     5.     Consistently, Judge Kirscher has employed *ex parte* communications, false

attacks on my credibility and character,  distortions of the facts, and repeated deprivations of my

due process rights within multiple bankruptcy proceedings resulting in the protection of Edra

Blixseth and Samuel Byrne, and others, while seeking to undo specific Orders, the releases,

discovery and hearings matters in expansively contested divorce proceedings involving my

divorce from Ms. Blixseth, and also involving millions of dollars of attorney fees, CPA's fees,

thousands of pages of discovery in connection with EVERY discovery request ordered by the

Court and given to Ms. Blixseth and her army of lawyers. He has effectively substituted himself

for the divorce judge in California which resulted in Edra Blixseth's use of the divorce

proceedings with Sam Byrne to obtain the Yellowstone Club for a $35 million "predatory loan", which has stopped Ms. Blixseth from "blowing the whistle" on her financial relationship with Mr. Byrne - and others - in the bad faith filing of these bankruptcy matters. The Montana bankruptcy proceedings have been used by them to effectively steal over $700 million of Blixseth Marital Community assets divided up during the divorce proceedings, then seek recovery from me of other Community assets and blame me for their blatant frauds. Collectively, the evidence supports actual bias resulting in bankruptcy proceedings where the appearance of impartiality is completely lost.

6.      In December, 2006, I separated from Edra Blixseth and she filed for divorce. Before our separation, Edra Blixseth became involved with Dennis Montgomery and Michael Sandoval in what is now a demonstrably fraudulent scheme to defraud the United States government and its taxpayers. This scheme has continued from at least April, 2006 to the present. In addition to her attempts, and actual frauds on our government, she also attempted to defraud the governments of Bahrain and Israel, as well as private investors. Conclusive evidence of this fraud is contained within the recent deposition of Dennis Montgomery taken on Nov. 18, 2010 and the exhibits attached thereto, as well as recently discovered documents and emails from the Russell computers and third parties. See Exhibit 68 to Supplemental List of Exhibit. Additionally, there are numerous emails contained on the Jory Russell and Edra Blixseth computers evidencing this fraud – all available to Mr. Samson and Mr. Cotner BEFORE the October 12, 2010 hearing hereinafter discussed. The essence of the fraud is contained within the draft complaint against the Sandoval parties (explained in detail together with the Nevada litigation *and U.S. Protective Order in February, 2010 to Mr. Cotner), and then the complaint was* given to Richard Samson, and his lawyer, David Cotner on February 1, 2010. See Exhibit

3

65 to List of Exhibits [filed under seal] Docket No. 2115-2. They both knew or had access to

extensive documentary evidence of both the technology fraud and the Bank fraud – specifically

Wachovia Bank fraud *involving the technology pledged as collateral long before the Sandoval*

*complaint was given to them.* They had possession of the Russell and Blixseth computers and

had duties as Trustee of the Estate, and under Rule 11 to investigate these matters. The fraud

involves Mr. Montgomery's purported "noise filtering software technology" which was pledged

to Wachovia Bank in March, 2008 in violation of a Federal preliminary injunction – which was

the subject of Ms. Blixseth's Dec. 17, 2009 deposition *attended by Mr. Cotner.* The technology

does not exist, yet has been used repeatedly by Edra Blixseth and Montgomery to commit

financial frauds including the $8 million fraud on Wachovia Bank. See Deposition of Edra

Blixseth, December, 17, 2009, attended by Mr. Cotner, particularly at page 124-135 at Docket

No. 486-8, Case No. 09-14. This Court had possession of this deposition as of January 22, 2010

when it was filed in support of the Mr. Blixseth's motion for summary judgment in AP-14. See

Docket No. 486-8, Case No. 09-14.

      7.      Documentary evidence of some of these financial frauds involving the fraudulent

technology, including the Wachovia fraud, is contained within the Edra Blixseth deposition

transcript. The exhibits attached thereto were available to Mr. Cotner, including the Wachovia

loan fraud documents immediately upon preparation of Ms. Blixseth's deposition transcript.

These facts were also available to Mr. Cotner in the Flynn affidavit filed in connection with Mr.

Blixseth's spoliation motion in AP-14. See Docket Nos. 473-1, pp. 11-17, Case No. 09-14.

These facts are also set forth in the Statement of Undisputed Facts ¶¶ 123-124 (Docket No. 2042-

3, Case No. 08-61570 as well as Docket No. 309, Case No. 09-18) to the Motion to Disqualify.

And because the technology was pledged fraudulently as detailed in the documents referenced

herein and in Docket No. 204-2, Case No. 09-60452, then it is impossible for this technology to have been subject to the States Secret privilege.

8.      Notwithstanding this overwhelming evidence sufficient to support a criminal referral by the Senior bankruptcy judge, a multi-agency federal criminal investigation now on-going in Montana, of which I believe Judge Kirscher is informed, and conclusive documentary evidence evidencing the bank frauds, the software frauds, the destruction of evidence *in these bankruptcy proceedings*, bankruptcy fraud involving non-disclosure of millions in debt, the procurement of over $50 million in fraudulent loans *which Ms. Blixseth never intended to pay based on her schemed intention to file bankruptcy proceedings with Judge Kirscher even though she did not reside in Montana*, Judge Kirscher appears to have improperly attempted to disrupt the criminal investigation by ruling that he has NOT seen any of this evidence, and that Ms. Blixseth did not have the requisite "*mens rea*" (criminal intent) given the applicable standard of proof— "beyond a "reasonable doubt." Judge Kirscher improperly applied a criminal standard to the bankruptcy civil proceedings then before him.  Knowing of the pending criminal investigation, WHY did Judge Kirscher do this? See Docket No. 40, p 25, Case No. 09-100.

9.      Despite the fact that Edra Blixseth is being criminally investigated, her and Sam Byrne's bankruptcy fraud is the subject of a criminal referral by another judge, and despite the incontrovertible evidence of Edra Blixseth's bank and tax fraud and that she attempted to get a black budget defense contract based on fraudulent technology, and defrauded multiple creditors of hundreds of millions of dollars in the process, Judge Kirscher has injected gratuitous or unnecessary findings in his rulings which protect her and thus Sam Byrne. The Judge either denied the introduction of or ignored all evidence proving the Byrne/Edra Blixseth "bad faith" bankruptcy filing of the Yellowstone Mountain Club. See Docket No. 309, Case No. 09-18;

Docket Nos. 484, 532, Case No. 09-14, Transcript of April 29, 2009 Trial in Case No. 09-14, pp.

20:11-29:25 filed at Docket No. 2110-7, Case No. 08-6157-. The Judge denied the introduction

of all evidence relating to the destruction and spoliation of evidence. Transcript of February 11,

2010 hearing, Case No. 09-14, pp. 119-136, attached as Exhibit 2 to Motion to Disqualify,

Docket No. 2042-2, Case No. 08-61570. And to top off all of this on-going cover-up, the Judge

has most recently employed the "State Secrets Privilege" and a "U.S. Protective Order" issued by

the Nevada Federal Court which results in attempting to   cover up the Edra Blixseth "noise

filtering" software frauds, and also attacks my counsel, Michael Flynn and C.J. Conant. See

Transcripts of October 12, 2010 Proceedings in Case No. pp. 30-42:7, 71-73, attached as Exhibit

1 to the Motion to Disqualify (Docket No. 2042-1) [hereinafter Oct. 12 Transcript].

10. On October 12, 2010, as recited in the Amended Motion to Disqualify, Judge

Kirscher invited David Cotner , *sua sponte,* in the absence of Mr. Flynn and Mr. Conant, and

with Mr. Park, counsel for Sandoval assisting, and Mr. Samson present, to attack the

"reputation" of Mr. Flynn (*Id.* at pp. 30-33); and Judge Kirscher *sua sponte* challenged the

representation of me by Mr. Conant based on his representation of Western Capital Partners (*Id.*

at pp. 71-73), again, resulting in the concealing Edra Blixseth's frauds. The Judge engaged in

these plainly biased tactics with full knowledge of all of the facts recited in the foregoing

paragraphs. The Judge intentionally used the tactic of blaming Mr. Flynn and Mr. Conant in a

scheme by Mr. Cotner and Mr. Samson to cover up the frauds of Edra Blixseth and Dennis

Montgomery involving the fraudulent software. With knowledge of all of Ms. Blixseth's

financial frauds and her deposition testimony on the bogus software, which was introduced in its

entirety at the trial of AP 14, Judge Kirscher assisted in creating a false record in favor of Ms.

Blixseth then made rulings depriving the creditors of her Estate of an estimated $100 million

6

claim against the Sandoval parties (which was plead in the Complaint and draft pleadings that

Judge Kirscher struck from the record in Case No. 09-105). It is likely that the Judge knew that

if Edra Blixseth was indicted or her Trustee pursued these claims, *Montgomery would squeal on*

*Edra Blixseth and Edra Blixseth's and Sam Byrne's entire charade would unravel.* To create

this record, the Judge used the Nevada Protective Order. In the October 12, 2010 hearing, Judge

Kirscher and Mr. Cotner engaged in the following extended colloquy:

> THE COURT: Okay, okay. I'll tell you, In reviewing these papers -
> and I wasn't going to lead with this and let you state your
> respective arguments on these matters, but let me start with this
> because I think it's important - in reading through the briefs, the
> replies, the responses, and the attachments, I'll be quite candid with
> you: I'm very concerned about representations and filings that have
> been made with this Court that maybe didn't have a sufficient
> factual basis prior to their filing. (Oct. 12 Transcript a p. 6:4-12)
>
> . . .
>
> And I will have some questions for all of you as to what's going
> on, why these things are happening, and if we have inappropriate
> conduct being done. I'm very concerned. (*Id.* at p. 6:18-21)
>
> . . .
>
> [DAVE COTNER]: And in mid January, I interviewed her with
> regard to the basis of the claims, as I understood them to be, and
> understood from Edra that she believed that she had been duped
> into the investment; and secondly, at one point in time she alleged
> that Mr. Sandoval had wrongfully diverted money to his benefit.
> Unfortunately for me, Judge, the focus of that discussion, because
> it was early in the proceeding did not focus on a precise timeline.
> (*Id.* at p. 16:11-19).
>
> . . .
>
> [DAVE COTNER]: At the meeting, a great -- great detail was
> provided to Mr. Samson and myself with regard to the nature of
> the claims that existed and the validity of claims. That was
> presented directly by Mr. Flynn. (*Id.* at p. 17:21-24).
>
> . . .

7

[DAVE COTNER]: And so from a factual perspective, I had heard Edra tell me that she had been duped; from a factual perspective at the time in my mind, I had nothing to disprove that at that time she knew or did not know. (*Id.* at p. 19:11-14).

. . .

[DAVE COTNER]: Well, the details I had, and the details had come from Mr. Flynn. And despite what I now see as, as a lack of solid backing for it, the statements were continuing to be made that it was factually based; and therefore, based upon that, attorneys in our office, with my oversight, drafted the amended pleading. (*Id.* at p. 20:16-21)

. . .

[DAVE COTNER]: And the significance of the meeting that developed was, I would say two principal issues that Edra had with respect to the pleading that had been filed. The most important from the trustee's perspective was: At the time she negotiated the settlement document, she knew or believed that she had been duped with respect to the capabilities of the technology being marketed by Mr. Sandoval. (*Id.* at pp. 21:22-22:4).

. . .

[DAVE COTNER]: And then the second issue that she had some concerns about is that in the amended pleading, there were allegations made with regard to Dennis Montgomery which she believed to be false, and with regard to certain noise-filtering technology which she also said was unrelated to the Atigeo litigation. (*Id.* at p. 22:8-13)

. . .

[DAVE COTNER]: Well, and this, too, has some bearing on the kind of situation we were required to deal with. Immediately when I announced that I was to amend the pleadings, Mr. Flynn contacted the U.S. Attorney's Office and, in essence, was critical of us for trying to amend our pleadings, for abandoning claims, for abandoning the estate. (*Id.* at p. 23:5-11)

. . .

[DAVE COTNER]: It was the same act of deception going on with the U.S. trustee that had taken place with me. You're inundated with paper, you're inundated with statements, you're given

8

deposition transcripts in which things are taken out of context. And I know this now in hindsight. But based upon that, frankly, Mr. Samson and I were being scrutinized as to whether we were taking the right steps on behalf of the estate. (*Id.* at 23:18-25)

. . .

THE COURT: Mr. Cotner, I have a couple of questions for you.

MR. COTNER: Yes, Judge.

THE COURT: You had mentioned that you had been at a meeting here in Butte with Mr. Blixseth, Mr. Flynn, and Mr. Conant. At that time, I assume that Mr. Flynn was representing Mr. Blixseth. Who was Mr. Conant representing?

MR. COTNER: Judge, I believed at the time he was representing Western Capital. I've since learned that there was at least some dialogue in which Mr. Conant's relationship may have been more than just representing Western Capital. I cannot tell you today that I know. I do know today it's been represented that he represents, as an independent contractor, Western Capital on some issues, Tim Blixseth on some issues, and Mike Flynn on some issues. Whether he was in that capacity at that meeting, I do not know.

THE COURT: Okay. Then another statement that was made, I believe in your brief, 1S you make some reference to now you know Mr. Flynn's reputation. What is that? What did you mean by that? (*Id.* at pp. 29:22-30:18)

. . .

[DAVE COTNER]: Because if you read the article, there's nothing that's substantive In the article, and yet the media spin begins to put Edra in a bad light; a person who, frankly, I find to be forthright, straightforward, has nothing to win or lose in this situation, and has been a person that has been, in my opinion, as honest as she could be at all steps.

[DAVE COTNER]: I believe Mr. Flynn has his own biases that arise out of certain prior relationships. It might have been from an attorney relationship with a client that ended, it might have been because of his son working for certain companies. But Mr. Flynn, In my opinion -- and he did it with the U.S. trustee. He is a very, very convincing individual. He's very articulate, he's precise with

9

the facts. My observation with him, though, is, especially now: Listen, take it in, but confirm all before you rely on it.

And that was the mistake that I made, if any, between that January and June date.

THE COURT: Okay. So the documents promised were never submitted and may not even exist?

MR. COTNER: There was multiple documents provided to the U.S. Attorney's Office after I announced my motion to make this most recent amendment.

TRUSTEE SAMSON: To the U.S. Trustee's Office. (*Id.* at 31:10-32:8)

. . .

[DAVE COTNER]: And that's true if you are talking about the Atigeo technology; however, as spun in the pleadings that were put together by Mr. Flynn, it is not true with regard to the Blxware technology, the technology that -- in which was the subject of this Playboy article, which was public. And I'm trying to be careful, Judge, because I don't know what's protected and what's not, but let's just put it like this: She has never questioned the validity of the Blxware technology, but yet you see that statement. And the conclusion made by Mr. Flynn from it is: See, Edra Blixseth is stating under oath that she questions the Blxware technology. That's not true. You could read it and, unless you have an opportunity to meet with Ms. Blixseth and understand the differences between the Blxware technology and the Atigeo technology, you would draw that same conclusion. That's the kind of allusions that I think I was being subjected to and the U.S. Attorney's Office was being subjected to as well.

THE COURT: Could I have you move the mic away just a little bit again? Thanks.

MR. COTNER: Sorry, Judge.

THE COURT: I guess the other thing - and maybe I need to refer this to Mr. Tellis - but the other question I have that came up in my reading of some of the documents is that there was, through the attachment that you made to the motion on the complaint that was the basis of the amended complaint that I believe was at Docket 109, was some of the material that may be contained within that is

in violation of a secrecy order out of the court in Nevada. You kind of alluded to that, Mr. Cotner, I think, when you said you didn't know that that really was covered by whatever orders might exist in that court. I guess I just wanted to clarify that. Because my concern is if, if there's a violation of some order, court order, and I have knowledge of it, I'm not so certain I don't have a responsibility to inform that Court of my knowledge of that and what has occurred for that Court to do whatever it deems appropriate if anything. So I guess I just wanted to kind of clarify on that issue as to where we're at. (*Id.* at pp. 33:2-34:16)

. . .

[BRIAN PARK]: The parties shall not discuss, mention, question, or introduce as evidence any actual or proposed intelligence agency interest in, application, or use of the technology. And "technology" is defined as: The computer source code, software, programs, or technical specifications relating to any technology owned or claimed by any of the parties. When that language is compared to the text of certain passages of Docket 109, specifically at pages 18 to 19, 22, and 24, there seems to be a <u>clear violation</u>. (*Id.* at p. 35:10-20)

. . .

THE COURT: Okay. Mr. Park, A-2 that you referenced attached to the motion, as I recall, that's the drafted complaint submitted to the trustee by Mr. Flynn naming Mr. Blixseth as the plaintiff. (*Id.* at p. 36:19-22)

. . .

MR. COTNER: Thank you, Judge. First of all, with respect to the "secrecy order," as we're calling it, no, I had no knowledge of it until it was brought to my attention by Mr. Park.

THE COURT: You need to speak a little louder. I'm sorry.

MR. COTNER: Okay. What I'm saying, Judge, is initially I had no knowledge of the secrecy order. Mr. Parks brought it to my attention. (*Id.* at p. 36:19-22)

. . .

[MR. PARK]: As to the blame of a third party, Mr. Flynn, for the predicament we're in, the trustee spends a substantial part of its brief and its -- its opening brief and its reply explaining why Mr.

11

> Flynn ultimately should bear responsibility for the allegations that were improperly made and now seek to be retracted. According to the trustee, it's Mr. Flynn's responsibility that an adequate Rule 11 investigation was not done in January or February, in June or July, and ultimately not until shortly before this motion for leave to file was made. With all due respect, that's not how it works. (*Id.* at p. 53:4-14)
>
> . . .
>
> [MR. COTNER] If my brief is trying to pass the buck to Mr. Flynn, I don't. I take responsibility for my own actions. Did Mr. Flynn believe me -- mislead me? I think, yes. Does that make him responsible for my actions? I'm not asking the Court to make that decision. (*Id.* at p. 60:14-20)

11.     After engaging in these tactics, Judge Kirscher then stated that he would be

issuing an order to show cause why the *pro hac* admission of C.J. Conant should not be revoked,

he struck from the docket all pleadings and documents submitted by Cotner that implicated Ms.

Blixseth and Mr. Montgomery in their software and financial frauds, and then sent a letter to

Judge Pro of the U.S. District Court for the District of Nevada informing Judge Pro that Mr.

Flynn potentially violated the Protective Order entered by Judge Pro.

12.     While engaging in the foregoing tactics on October 12, 2010, Judge Kirscher

knew, as of January 2010--from the Spoliation Motion, and the Flynn affidavit in support thereof

and the exhibits attached to the Flynn affidavit (Docket No. 473-01), and the Edra Blixseth

deposition of Dec17, 2009, and the exhibits, thereto, and from the Russell depositions and Rule

2004 exams *in Edra Blixseth's Estate proceedings,* in which the Russell computer destruction of

evidence was thoroughly explicated--Mr. Cotner had full access to these transcripts and to the

Edra Blixseth's and Jory Russell's computers, particularly in his capacity as counsel for the

Trustee, and that Russell and Blixseth had attempted to destroy evidence on the computers

including emails relating to the bogus technology (Judge Kirscher had conducted the spoliation

motion hearing on February 11, 2010 with full access to all of the documentary exhibits attached thereto including the Edra Blixseth financial statements and documents relating to the bogus technology, and he had denied my Motions for Summary Judgment and Reconsideration of the Edra Blixseth/Sam Byrne Bad Faith frauds); that Judge Kirscher already had full access to all of Edra Blixseth's deposition testimony on December 17, 2009, discussing the bogus technology and Ms. Blixseth's role in the financial frauds and software frauds (the deposition and exhibits also included Ms. Blixseth's fraudulent financial statements and the FBI reports proving the technology was bogus, introduced into evidence in AP 14 in February, 2010 together with all of the exhibits); and most significantly, Judge Kirscher knew that Ms. Blixseth, Samson and Cotner all knew that the bogus technology was NOT protected by the state secrets privilege because the Nevada Court had entered rulings, orders and penalties that it was NOT protected by the privilege (thus Mr. Park had not told the Court the truth when he said the technology was protected and there was a "clear violation"). Judge Kirscher likely knew on October 12, 2010 that Mr. Flynn did not "mislead" or deceive Mr. Cotner or Mr. Samson about the bogus "noise filtering" technology, that it was not protected by any privilege, that the technology was fraudulent and that Ms. Blixseth had engaged in yet more lies and concealment when she flip-flopped on Mr. Cotner regarding the "noise filtering" technology as described by Cotner in the above colloquy.  It is likely that Judge Kirscher knew that Ms. Blixseth's flip-flop was designed to protect Montgomery, and that if Ms. Blixseth exposed Montgomery, he would then expose her and then all of the *ex parte* communications which have controlled these bankruptcy proceedings would be exposed.

13.    Dennis Montgomery's deposition testimony and exhibits (Docket Nos. 2115-5 to 2115-21, Case No. 08-61570) and attendant assertion of the 5th amendment privilege against

self-incrimination—which was attended by four representatives from the DOJ charged with protection of the state secrets privilege who NEVER ONCE OBJECTED TO DETAILED QUESTIONS CONCERNING THE TECHNOLOGY AND THE WAR ON TERROR FAR SURPASSING ANY PURPORTED "CLEAR VIOLATION" IN THE SANDOVAL COMPLAINT WHICH JUDGE KIRSCHER ORDERED SEALED AND IN CONNECTION WITH WHICH HE THEN COMMUNICATED WITH THE NEVADA COURT—provides conclusive evidence that: (a) the technology is bogus (a fact of which Mr. Cotner should have been well aware, as opposed to accepting Edra Blixseth's lies as the truth); (b) that Edra Blixseth and Montgomery attempted to sell it to the U.S., twice to Israel, to Bahrain as part of a $50M loan scam by Ms. Blixseth (see **Exhibit 1**) and a fake wire transfer by Ms, Blixseth for another $5 million fraud on Palm Desert National Bank (see **Exhibit 2**), both of which are attached hereto; (c) that the technology is NOT protected by any protective order; and (d) that Judge Kirscher continues to use the privilege and protective order to protect Edra Blixseth and cover over her frauds. Judge Kirscher knew on October 12, 2010 that these facts have been given to the multi-agency task force investigating Edra Blixseth; and he knew when he issued multiple orders involving Ms. Blixseth that his orders would have the practical result of protecting her and her criminal conduct.

14. For all of the foregoing reasons, Judge Kirscher "set up" the foregoing record, and then used the state secrets privilege and the Nevada protective order to conceal and gloss over Ms. Blixseth's years of on-going frauds. Judge Kirscher then entered the following Findings and Orders found in **Exhibit 3** (Docket No. 147, Case No. 09-105):

(a) In connection with the filing of an "Answer, Amended Counterclaim and Amended Third Party- Complaint" and a pending "Motion for Leave to File Answer, and Second

Amended Counterclaim and Second amended Third Party Complaint and his Motion to Bifurcate" the Trustee and Cotner were also receiving assistance from Debtor's ex-spouse, Timothy L. Blixseth ('Blixseth')".

        (b)    "The record reflects that Christopher J. Conant ("Conant") of Denver, Colorado was appearing at hearings and filing pleadings on behalf of WCP.[fn 1: "The Court notes that Conant did not seek leave of the Court to appear *pro hac vice* in this adversary proceeding."] In addition, Conant also represents Blixseth in certain matters. The Trustee's counsel, David B. Cotner ("Cotner"), represented that he was working with counsel for WCP and counsel for Blixseth in the joint prosecution of claims against the Plaintiffs and Third Party Defendants. Cotner maintains that another of Blixseth's attorneys, Michael J. Flynn ("Flynn") of Boston, Massachusetts, was encouraging the Trustee to pursue certain claims against the Plaintiffs and Third Party Defendants, making repeated representations and assurances that Debtor had been fraudulently induced to invest money into or with the Plaintiffs and/or Third Part Defendants, and that the fraudulent inducement was unknown to Debtor at the time she executed a certain Letter Agreement and a Release contained therein."

        (c)    The Court then describes Cotner's interactions with Edra Blixseth and Nick Rhoades and his interview with them on January 19, 2010 relating to the "fraudulent inducement claim" (which was recited IN PART in the Sandoval complaint) leading up to a July 12, 2010 meeting with Edra Blixseth - SEVEN MONTHS AFTER THE JANUARY MEETING.

        (d)    Judge Kirscher then enters the following Findings (found on pp. 5-9 in **Exhibit 3**):

> At the July 12, 2010, meeting with Debtor, Cotner learned that his Amended Counterclaim and Amended Third-Party Complaint contained numerous inaccuracies, which Cotner outlines as follows:

- At the time of the execution of the Letter Agreement, which included the Release, Debtor was aware that the xPatterns technology did not perform as represented. Therefore, any claim based on fraudulent inducement would have been released by the terms of the document.

- Allegations made with respect to Dennis Montgomery are unrelated to the xPatterns technology. More importantly, they were alleged not to be accurate.

- Allegations provided by Mr. Flynn with respect to the capability of the software did not relate to the software technology of xPatterns. Additionally, such allegations were not true. After learning of Debtor's position, Cotner confirmed such representations through communications with third parties. As a result of these disclosures, Cotner chose to file a request to file a second amended pleading.

Since filing the present Motion to Amend on August 31, 2010, Cotner received more troubling information consisting of a copy of an email exchange between WCP's representative Jeff Adams, Blixseth, Flynn and Conant. Cotner attached a copy of the email as Exhibit A to his Reply Brief filed October 5, 2010. In the email dated February 20, 2010, Jeff Adams responds as follows to an inquiry by Blixseth:

"On Liner, Samson will argue that we are only perfected in the proceeds after his expenses."

"On Sandoval, Samson cannot over-ride our ownership of the contract, only the Tort Claim. If we foreclose on the Claim, he can still go after the tort but that money is also ours after he pays his bills. If Mike can blow out the tort claims between Edra/Estate and Sandoval/Atiegeo, then only Mike/Tim Claim and our Contract will remain."

Cotner maintains that the forgoing exchange suggests an intention by WCP, Blixseth and their counsel to lead the Trustee and Cotner astray. Cotner explains that by doing so, WCP and Blixseth could effectively remove the Trustee from this action so that the benefit of claims against Atigeo/Sandoval would flow directly to WCP and Blixseth.

Unfortunately, the Trustee's position may not be aligned with WCP and Blixseth, and the Trustee and Cotner relied too much on

16

information supplied by WCP, Blixseth and Flynn. The alliance between WCP, Blixseth and Flynn is demonstrated by the fact that Conant represents not only WCP, but also Blixseth. Cotner further contends that Conant represents Flynn personally in certain unrelated matters. The Court agrees that Conant's representation of multiple parties raises an inference of impropriety. After such expressing concern at the hearing on October 12, 2010, Conant, immediately following conclusion of the hearing, withdrew as WCP's counsel in this Adversary Proceeding and other related proceedings.

Cotner also expressed his frustration with Flynn's role in these proceedings, explaining that he would have pursued a different course of action had he known Flynn's reputation. To elaborate, Cotner characterized Flynn as articulate, precise and convincing, and opined that when someone levies an attack on Blixseth, Flynn launches a masterful "war of diversion, of media control and an effort to undermine the process." Cotner cautioned that one must listen carefully, digest and then confirm Flynn's statements because the truth is not always exactly as Flynn appears to represent.

For example, Cotner asserts that he was convinced by Flynn and Blixseth that certain facts existed showing Debtor had a valid tort claim against the Plaintiffs and third-party defendants. To that end, Flynn sent an email to Cotner's paralegal on February 1, 2010, wherein Flynn writes: "Attached is a preliminary and incomplete (have not finished claims 8-10 yet) draft of a complaint in pdf and WP against Sandoval and his Board. This should give [Cotner's] office some facts to put together at least some reasonably well plead counterclaim for today's filing." Flynn also purportedly provided Cotner with multiple documents that supported the preliminary and incomplete drafted complaint.

According to Cotner, Flynn presented Cotner with a set of facts that were detailed, consistent and seemingly credible. However, after carefully reviewing all the documents and following his second interview with Debtor, Cotner discovered that facts he took to be true were not necessarily true as against the Plaintiffs and third-party defendants in this Adversary Proceeding.

Under the circumstances, Cotner's reliance was not unreasonable particularly where Flynn, a fellow attorney and officer of the

Court, had a historical relationship with Debtor and various of the entities involved in this Proceeding. Upon learning the complete truth, Cotner sought to do what he could by immediately amending the inaccurate pleadings.

Cotner also explained that his failure to secure all the facts prior to filing his amended pleadings on July 6, 2010, was due, in part, to his decision to stay with a family member during a surgery in Arizona in June. Cotner explains that absent that decision, he would have met with Debtor and discovered the truth prior to filing the amended pleading.

The Court recognizes that the Trustee and Cotner sought to retract their inaccurate pleadings by filing the second amended counterclaim and third-party complaint in a timely manner. The Court agrees with Cotner that Plaintiffs will suffer little, if any, harm if the Trustee is allowed to file the second amended counterclaim and third-party complaint. Indeed, attempting to correct the error was professionally responsible and was ethically the correct step to take. Amendment of the pleadings clearly has no prejudicial effect on the Plaintiffs as the Plaintiffs will no longer have to litigate facts and circumstances arising prior to Debtor's execution of the Letter Agreement.

In addition to Cotner being torn between the needs of both family and work, the Trustee in this case is faced with a potentially insolvent estate with little money available to pursue claims. Given the circumstances surrounding the claim, and the Trustee's limited resources, Cotner acted reasonably under the circumstances.

At the hearing, Cotner accepted complete responsibility for the inaccuracies contained in his pleadings filed July 6, 2010. In his defense, Cotner argued at the hearing that by signing the pleadings he was only certifying to the best of his knowledge, information and belief, formed after an inquiry reasonable under the circumstances, that the claims were warranted, were not presented for any improper purpose, were not intended to raise or cause unnecessary delay or result in a needless increase in the cost of litigation. While the Court does not doubt Cotner's veracity, the Court cannot and will not condone the filing of inaccurate pleadings. The appropriate sanction in this case is denial of the Trustee's motions. However, given the unique facts in this case

18

and because the parties have not yet engaged in any meaningful discovery, the Plaintiffs' request to prohibit any future amendment of the pleadings by the Trustee is denied. This Court allows liberal amendment of pleadings, particularly where a trial date is not yet set. For the reasons discussed above, the request for fees and costs by the Plaintiffs and Third-Party Defendants are denied.

In addition to the foregoing, the Plaintiffs brought to the Court's attention the fact that some of the Trustee's pleadings may violate a secrecy order issued by a court in Nevada. The parties agree that neither the Trustee nor Cotner knew of the secrecy order until the Plaintiffs advised them of the secrecy order, but the Plaintiffs have requested that the Court strike certain documents on grounds they violate the Nevada Court's secrecy order. To prevent any further violation of the Nevada secrecy order, Cotner agreed that such pleadings should be stricken from the record. By agreement of the parties, this Court removed from its docket the Trustee's Answer, Amended Counterclaim and Amended Third-Party Complaint filed July 6, 2010, at docket entry no. 109, and the Trustee's Exhibits A-1 and A-2 filed August 31, 2010, at docket entry no. 125. The Court would note that Exhibit A-2 is a copy of the preliminary and incomplete complaint provided to Cotner by Flynn. This Court will inform the Nevada court of the issue so it can deal with the matter as it deems appropriate.

15.     The foregoing Findings and Orders reflect actual bias towards myself and my

counsel, Mr. Conant and Mr. Flynn. We were never given any opportunity to be heard on these

issues (Mr. Conant was not at the hearing from which this order was derived, nor were he or Mr.

Flynn given notice that Mr. Cotner would be given free reign by the Court to malign their

reputation). Yet Judge Kirscher adopted as truth the representations of Mr. Cotner that Mr.

Flynn committed a fraud on him. I am a $20 million creditor of the Edra Blixseth estate. There

are numerous creditors owed in excess of $100 million dollars. As recited therein, as proven

from all of the evidence, as proven in the Montgomery deposition, as supported by the FBI

reports, as reflected in the on-going Grand Jury proceedings, the Sandoval Complaint is accurate

in all particulars. Incredibly, with no hearing or opportunity to present evidence, Judge Kirscher

maligned myself, my lawyers, and strongly suggested that Mr. Flynn violated the Nevada Orders, and deprived the Blixseth Estate of an approximate $100 million claim against Sandoval based on misrepresentations of Cotner, which the COURT KNEW WERE NOT ACCURATE.

16.    In addition to the plain evidence of bias above, Judge Kirscher ignored the undisputed facts in the "Statement of Undisputed Facts" in AP 18, which are not only undisputed but unrebutted and incontrovertible. No unbiased observer of the following facts could possibly conclude that Edra Blixseth is credible and that I am not. Nor have any facts been raised by any party that Edra Blixseth and Sam Byrne did NOT engage in a scheme in bad faith to use the bankruptcy process based on this Court's bias and possible political agenda to turn over to Mr. Byrne $700 million in Community assets by judicial fiat. All of the following facts were known by Judge Kirscher to be true and accurate before he rendered his decision in AP 14, before he issued his Order on October 21 attacking my counsel, before he ruled on WCP's Motion for Summary Judgment in Case No. 09-100 seeking non-dischargability of Edra Blixseth's debt; before he ruled that Ms. Blixseth was "frozen out", and before he ruled that Ms. Blixseth did not have the "requisite intent beyond a reasonable doubt" to defraud lenders and federally regulated banks of over $50 million. See Docket No. 40, Case No. 09-100. That is, the undisputed facts regarding the genesis of the Yellowstone Club bankruptcy are as follows (see also Docket No. 309, Case No 09-18):

(a)    Sam Byrne and Edra Blixseth entered into an "Agreement to Form" on or about August 12, 2008 in which Byrne agreed to make a $100 million equity investment into the Yellowstone Club which would have precluded bankruptcy; and which Agreement coupled with the "$35 million predatory loan" enabled Byrne to take over control of the Yellowstone Club and put it into bankruptcy in bad faith. Docket No. 309, Case No 09-18.

20

(b)     On August 13, 2008, Mr. Byrne loaned Ms. Blixseth $35 million on a 48-day note to consummate the MSA secured by Porcupine Creek and the Family Compound, which was approved by Steve Brown as the Yellowstone Club lawyer.  Mr. Byrne loaned Ms. Blixseth these monies knowing that Ms. Blixseth had defaulted on over $50 million in fraudulently procured loans, that she was not "institutionally financeable" and that the "money doesn't exist" to pay the loan – both direct quotes from Sam Byrne before and after he provided the "predatory loan."  He knew this "predatory loan" would enable him to control Edra Blixseth, control the Club, put it into bankruptcy, and remove Porcupine Creek and the Family Compound—representing over $250 million in assets that could have been used to satisfy the BGI notes payable to the Club. Nonetheless, Mr. Byrne ended up owning all of these substantial assets together with the Club for less than $40 million. See Docket No. 309, Case No 09-18, and particularly ¶¶ 16-23, 42-100.

(c)     For the purpose of interfering with the $455 million sale of the Club to Byrne and to make her own deal with Byrne, and in violation of two court orders, Edra Blixseth fabricated with Dennis Montgomery, an adjudicated perjurer and Ms. Blixseth's business partner (Judge Kirscher had possession of Montgomery's adjudicated perjury findings and orders by the Nevada Court in April, 2009, when said Orders were filed in AP 14) two "GRAND JURY TARGET LETTERS" fabricated by Montgomery and purporting to implicate me. Both letters were immediately provided to the FBI and other investigative agencies investigating the Edra Blixseth frauds and were quickly determined to be fakes. See Montgomery Deposition, pp. 115-118; Docket No. 309, Case No 09-18 ¶ 34.

(d)     That Edra Blixseth had in fact executed fraudulent loan applications and fraudulent financial statements to defraud banks and lenders of over $50 million dollars.  See

21

Exhibit 7 to List of Exhibits (Docket No. 2106-7, Case No. 08-61570; Docket No. 309, Case No 09-18, ¶¶ 112-124).

(e)    That Edra Blixseth, Deborah Klar, and Dennis Montgomery had in fact defrauded Wachovia Bank of $8 million dollars using the fraudulent "noise filtering" software as collateral, knowing that it was then subject to a preliminary injunction in the Nevada litigation involving the Protective Order (in which Klar was representing both Edra Blixseth and Montgomery). When Mr. Cotner and Mr. Park misrepresented facts to the Court on October 12, 2010, Cotner and Samson knew that this "technology" allegedly subject to the state secrets privilege had been "pledged" as collateral in the fraudulent Wachovia loan and that Edra Blixseth and Klar had lied to the Bank stating that Ms. Blixseth had an approved $100 million contract with the U.S. Government. See Edra Blixseth, deposition particularly at page 127-135 at Docket No. 486-8, Case No. 09-14; see also Docket No. 204, and 204-2, Case No. 09-60452.

(f)    When Judge Kirscher made the findings and Order that he did on October 25, 2010 (Exhibit 3) attacking Mr. Flynn and Mr. Conant, he knew from numerous documents before him including the spoliation motion, the AP 18 SUF, the Wachovia Bank claim adversary proceedings (Docket No. 204, Case No. 09-60452), and in numerous other pleadings, that the fraudulent software technology that Mr. Park said was a "clear violation" of the Protective Order could NOT possibly be a violation because: IT HAD BEEN PLEDGED AS COLLATERAL BY EDRA BLIXSETH WITH WACHOVIA BANK; (NEITHER EDRA NOR THE BANK HELD ANY SECURITY CLEARANCES) AND HAD BEEN SUBJECT TO PRODUCTION IN NEVADA COURT ORDERS; WAS PART OF AN ONGOING SCHEME TO DEFRAUD HER CREDITORS AND THE U.S. GOVERNMENT; AND HAD BEEN THE SUBJECT OF WIDESPREAD MEDIA.  See **Exhibit 4**; Docket Nos. 204 et seq., Case No. 09-60452.

22

(g)     Knowing that: (1) the bogus "noise filtering" software had been pledged to Wachovia in March 2008 and June 2008 to secure $8 million after representing that they had in fact a $100 million contract with our government; (2) knowing they were subject to a DAILY $2,500 penalty to produce the source codes in Nevada federal court (see **Exhibit 5**), thus, obviating any possibility that such information was subject to the Protective Order, Ms. Blixseth and Mr. Montgomery then schemed to defraud the government between September 2008 and March 2009, JUST BEFORE SHE FILED BANKRUPTCY IN THIS COURT, with a scheme to obtain a $3 million contract with the government to return archives Mr. Montgomery had stolen to TEST the fake software. The Nevada Federal Court Sanctions Order, and the multiple court orders and hearings relating to these matters in the Nevada cases, conclusively establish, contrary to Mr. Park's representations, and this Court's seizing on these issues to attack my counsel, **that the technology has never been protected by the U.S. Protective Order.** The "TESTING" of the software had been scheduled on numerous prior occasions but every time the testing was scheduled Montgomery fled and tried to find another victim because he knew it was fake. See emails and documents attached hereto as **Exhibit 6**.

(h)     When Cotner made his false representations to the Court on October 12, 2010, and the Court entered its findings and Order on October 25, 2010, Cotner knew that the foregoing facts were true because he had possession of documents, and had discussions with me and Mr. Flynn, proving the truth of said facts. See emails referenced above. Judge Kirscher had sufficient knowledge of all of these facts BEFORE he entered his Order on October 25, 2010.

(i)     Edra Blixseth and Montgomery tried to sell the fake technology to Israel (twice - first in December 2006 and again in 2010 when they were both in bankruptcy. This raises the issues of who owns the technology (Edra Blixseth or Montgomery, or both), which

23

Estate owns this technology; and whether the two of them have engaged in bankruptcy fraud on the ownership issues, notwithstanding Ms. Blixseth paying approximately $25 million for the "noise filtering" technology and then posturing conflicting positions on ownership between her and Montgomery ) See Edra Blixseth deposition transcript at Docket No. 486-8, Case No. 09-14 at pp. 138-144.  At the October 12 hearing, Cotner knew either that the Protective Order did NOT protect the technology; and/or that Edra Blixseth and Montgomery were violating multiple U.S. statutes involving classified technology, and/or that the "noise filtering" was a complete fraud.

(j)      Montgomery and Edra Blixseth tried to sell the "noise filtering" technology to Bahrain as part of a $50 million loan fraud; and as part of a $5 million fabricated wire transfer.  See **Exhibit 1**.

17.      Richard Samson, David Cotner and Edra Blixseth have used the bankruptcy process to defraud her creditors of a $100 million claim as recited in the Sandoval complaint sealed by Judge Kirscher.  The evidence shows that Judge Kirscher had full knowledge of, or all of the evidence at his disposal, before effectively destroying these claims, attacking my lawyers, seeking to effectuate the discharge and exculpation of Edra Blixseth, all while seeking to use the State Secrets Privilege to cover over these facts.  The fact that Dave Cotner has stated that he believed Edra, based on his interview with her, is dubious.  Dave Cotner has had possession of volumes of emails and documents in the form of Jory Russell's' emails and computer hard drives which corroborate the above facts.  He appears to have refused to investigate and review all this information, and instead chose to believe the statements and representations of Edra Blixseth, who lied in loan applications, as recited in her December 17, 2009 deposition, and who has given repeated testimony involving numerous instances of apparent perjury.  Edra Blixseth repeatedly

attempted to assert the State Secrets Privilege in support of alimony requests involving the

technology and Blxware in the amount of approximately $36 million per year, but then attempted

to hide behind the privilege and evade discovery based on the privilege into the validity of the

technology. Ms. Blixseth refused to answer questions about the technology. The divorce court

judge, Sharon Waters, then ruled that if Ms. Blixseth continued to hide behind the privilege, her

alimony hearing would be taken off calendar. At the same time, in April 2008, Ms. Blixseth's

CEO, Steve Crisman was deposed by my divorce lawyers, and he admitted there was no

"product" after over $25 million had been paid out by Ms. Blixseth, of which $23 million went

to Sandoval and others, and approximately $6 million went to Montgomery, who had –just

asserted his 5th Amendment rights in connection with almost all aspects of these frauds. See

Montgomery Deposition and exhibits, Docket Nos. 2115-5 to 2115-21, Case No. 08-61570. Mr.

Crisman's testimony regarding "no product" meant no "noise filtering" technology.

18.     In preparation for the hearing on my Motion to Disqualify, my attorneys

subpoenaed the records of several people who I was informed would have documentary evidence

of *ex parte* communications between opposing parties and Judge Kirscher. The people who my

attorneys subpoenaed were Andy Patten (counsel for the Yellowstone Club debtors), Ross

Richardson (Chapter 7 Trustee for the Yellowstone Club World bankruptcy estate), John

Amsden (attorney for Ross Richardson) and Terry Healow (law clerk for Judge Kirscher).

19.     Of these individuals, my attorneys received documents from Andy Patten and

Ross Richardson.

20.     Andy Patten provided my attorneys with a host of email communications between

him and Judge Kirscher, between him and Judge Kirscher's law clerk, Kelli Herrington, and him

and Senior Bankruptcy Judge Peterson. These emails from Andy Patten are attached hereto as

**Exhibit 7**. As a whole, these emails reflect a close and confidential relationship between Mr. Patten and the Chambers of the Montana bankruptcy court. More troubling for a party who would be an opponent of Mr. Patten's client, as I am, is the fact that specific emails display a relationship between Mr. Patten and the bench of the Montana bankruptcy court that a reasonable person would view as preferential toward Mr. Patten.

21.     In particular, on April 20, 2009, one week before Phase I of the trial in AP-14 where the Yellowstone Club Debtors (Mr. Patten's client) were seeking to impose a $200+ million judgment against me, Senior Judge Peterson sent an email to Mr. Patten regarding this trial and provided Mr. Patten with citations to two cases, apparently that Judge Peterson thought would be helpful to Mr. Patten. This email is attached hereto as **Exhibit 8**.

22.     In relevant part, Judge Peterson states: "Is the case [AP-14] going forward on the 22nd? Also as to that you may want to see Schubent case at 554 f3d 382, appeal from 348 br 234 as well as 391 br 626, 631 (9 BAP) on non statutory insiders applying equitable subordination [sic]. It was bought to my attention last week in a Vegas mediation dealing with lender conduct such as Cs/Blixeth [sic]. Judge."

23.     This email demonstrates that the Montana bankruptcy bench has affirmatively assisted my opposing party in AP-14 on the eve of trial. It is absolutely antithetical of due process for the Montana bankruptcy bench to engage in *ex parte* communications for the purpose of affirmatively advising, on the eve of trial, the party that has sought a $200 million judgment against me and has obtained a bench verdict against me of over $40 million.

24.     Also indicative of a preferential and confidential relationship between Mr. Patten and Judge Kirscher is found in an email exchange of November 19, 2009 between Andy Patten and Judge Kirscher's law clerk, Kelli Herrington. See **Exhibit 9** attached hereto. In this

exchange, Mr. Patten asks Kelli Herrington: "Kelli - if I give the court a heads up about a new case can it be kept confidential until the actual filing?" Kelli Herrington responds by saying "Absolutely Andy."

25.     This email demonstrates two things. First, that Mr. Patten enjoys a confidential relationship with the Montana bankruptcy bench and presumably Judge Kirscher in particular. This would lead any opposing party of Mr. Patten, as I am, to believe he or she will not be afforded impartiality from Judge Kirscher or the Montana bankruptcy court as a whole. Second, this email implies that Mr. Patten and Judge Kirscher had a private conversation wherein Mr. Patten discussed this "new case" with Judge Kirscher. For any party who finds himself opposing a client of Mr. Patten's, as I am, this is incredibly troubling as it would cause that party to question Judge Kirscher's impartiality in any case involving Andy Patten. How many other private or "confidential" conversation has Mr. Patten had with Judge Kirscher regarding cases before Judge Kirscher? Has Mr. Patten had private conversations with Judge Kirscher regarding AP-14? I, and I think anyone else in my position, would have these questions, and, as a result, would question Judge Kirscher's impartiality in a case where Mr. Patten represents a client before him.

26.     My attorneys also received documents from Ross Richardson in response to a subpoena my attorneys served on him. In my original affidavit, I discussed how, on or around June 10, 2010, John Amsden told me that Ross Richardson had a phone conversation with Terry Healow (Judge Kirscher's other law clerk) and during this conversation, Mr. Healow asked about the status of a settlement between myself and Mr. Richardson. Mr. Healow urged Mr. Richardson to hurry up and finalize the settlement before I could renege or change my mind. In the documents my attorneys received from Mr. Richardson, is an email dated June 10, 2010 from

27

Mr. Healow, confirming the fact that he and Mr. Richardson in fact had an *ex parte* phone conversation that day. See **Exhibit 10** attached hereto. Mr. Amsden and I discussed several scenarios as to why Mr. Healow would have said this. Mr. Amsden said it must mean that Judge Kirscher is about to rule in AP 14. Mr. Amsden and I discussed that, if Judge Kirscher was about to rule, how that ruling could impact Mr. Richardson's settlement. JUDGE KIRSCHER RULED ON AUGUST 16, 2010 in a 135 page decision in an apparent attempt to protect and insulate Ms. Blixseth while decimating my position in related proceedings (as described in detail in the preceding paragraphs).

27.     As an additional grounds for perceiving that Judge Kirscher has a bias against me are the facts and circumstances surrounding supplementing the record in my appeal of AP-14 with over 400 emails that Judge Kirscher purportedly reviewed when denying my motion to dismiss AP-14 on the grounds that my former counsel, Stephen Brown, became my adversary in 2009 regarding the very matters for which he previously represented me (i.e., the Credit Suisse loan and the waivers and releases associated with my division of marital assets with Edra Blixseth). Judge Kirscher has twice stated that he reviewed these email communications involving Mr. Brown in denying my motion to dismiss (see Docket Nos. 292, 626, Case No. 09-14). When I asked that these emails be included in the record on appeal so that I could challenge whether Judge Kirscher appropriately denied my motion to dismiss, he denied my request, even though the request was unopposed. See Docket No. 626, Case No. 09-14. From my perspective, from the first half of AP 14 when Judge Kirscher refused to allow me to look at the 400 emails and thereby precluded me from reviewing relevant discovery to the continued protection of the emails, a reasonable person would wonder what could possibly be in these emails that would warrant Judge Kirscher refusing to allow even an appellate court to review them. It seems to me

that Judge Kirscher has purposefully insulated his rulings on these emails from appellate review for some inexplicable reason that suggests bias. My question is WHY?? We have obtained several emails suggesting that "political pressure" was to be applied; that meetings took place with the governor of Montana; and that the state secrets privilege and government protection was to be used. See **Exhibit 11** attached hereto; see also Exhibit 67 to List of Exhibits [filed under seal], Docket No. 2115-4, Case No. 08-61570.

28.     Also indicative of bias is the objective double-standard that Judge Kirscher seems to impose on me with respect to weighing evidence and judging credibility. At the December 2, 2010 status conference before Judge Kirscher, Michael Flynn, argued that under applicable law, there should be no evidentiary hearing on my Disqualification Motion because my affidavit was sufficient to support my motion. In response, Judge Kirscher stated: "THE COURT: Well, I guess I'm not so certain that the case law supports -- as you know from prior appearances, we don't try things in this court by affidavit." Transcript of December 2, 2010 Hearing at p. 18:22-25 (emphasis added) **Exhibit 12**.

29.     Notwithstanding Judge Kirscher's proclamation that "we don't try things in this court by affidavit," he nevertheless entered a $40 million judgment against me in AP-14 based solely on the affidavit of Charles Hingle and did so before my opportunity to oppose Mr. Hingle's affidavit expired. See Disqualification Motion § 4.G. What makes the Court's proclamation that "we don't try things in this court by affidavit" even more indicative of pervasive bias against me, is that when Judge Kirscher entered the $40 million judgment against me based solely on Mr. Hingle's affidavit, Judge Kirscher acknowledged that there was no other evidence in the record other than Mr. Hingle's affidavit upon which to base that $40 million judgment. See Docket No. 580, Case No. 09-14, at p. 4 ("While the Court would have certainly

preferred to enter a more definite Judgment, the Court did not have enough facts to determine what was owed to each of the aforementioned classes.").

30.     From a reasonable person's perspective, the message manifested by the Court in its treatment of me is that it adjudicates matters against me based on affidavits, but if I seek relief from Judge Kirscher, affidavits are insufficient. From my perspective, this is just one manifestation of the pattern and practice Judge Kirscher has employed against me, which is to find facts against me based on his "credibility" assessment of me and my witnesses and therefore effectively insulate those findings from appellate review, while at the same time ignoring all undisputed facts that would favor a resolution of a disputed issue in my favor. For example, Judge Kirscher employed this method in his 135-page memorandum of decision in AP-14 wherein he throughout states that he views me and my witnesses as not credible, while ignoring the undisputed facts of the bad faith and Sam Byrne and Edra Blixseth, the undisputed fact that my marital assets were not divided in collusion with Edra Blixseth but were divided after years of contentious divorce proceedings, the undisputed fact that the releases I received from the Yellowstone Club entities were a material consideration for me relinquishing my ownership of those entities to Edra Blixseth (so that Ms. Blixseth, on behalf of the Yellowstone Club entities, could receive a promised $100 million capital infusion from CrossHarbor, which of course never happened).

I, Timothy L. Blixseth, declare under penalty of perjury of the laws of the United States follows:

DATED this 17th day of January, 2011.

Timothy L. Blixseth

## CERTIFICATE OF SERVICE

I, Patrick Fox, hereby certify under penalty of perjury that on the 17th day of January, 2011, copies of the above document were served electronically by ECF notice to all persons/entities requesting special notice or otherwise entitled to same and that in addition, I hereby certify that I have mailed or served the document to the following non-ECF participants in the manner indicated by the non-participant's name:

No manual recipients.

By /s/ *Patrick Fox*

32