**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

DENNIS L. MONTGOMERY

                Plaintiff,

    v.

JAMES RISEN, ET AL.,

              Defendants.

Civil Action No. 1:15-cv-20782-JEM

**ORAL ARGUMENT REQUESTED**

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS OR TRANSFER FOR LACK OF PERSONAL JURISDICTION
OVER RISEN AND HOUGHTON MIFFLIN HARCOURT COMPANY, DISMISS OR
TRANSFER FOR IMPROPER VENUE, TRANSFER UNDER 28 U.S.C. § 1404(a), OR
DISMISS FOR FAILURE TO STATE A CLAIM AND MEMORANDUM IN SUPPORT[1]**

## I.    INTRODUCTION

Plaintiff respectfully submits this Memorandum of Law in Opposition to Defendants'

Motion to Dismiss Or Transfer For Lack of Personal Jurisdiction Over Risen and Houghton

Mifflin Harcourt Company, Dismiss or Transfer for Improper Venue, Transfer Under 28 U.S.C.

§ 1404(a), or Dismiss for Failure to State a Claim and Memorandum in Support.

First, and fundamentally, a plaintiff has a right to pick the forum in which to bring his

claim. Venue is proper in Florida and this state has personal jurisdiction over all Defendants.

Defendant Houghton Mifflin Harcourt Publishing Company has a general office in Orlando,

Florida, and is registered to do business in the state of Florida with the Florida Department of

State, Division of Corporations. *See* Montgomery Declaration II ¶ 58 (Exhibit A). The causes of

---

[1]    In reviewing this pleading, the Court is respectfully asked to read and review carefully
Plaintiff Montgomery's two Declarations (Declaration I and Declaration II) with incorporated
exhibits, sworn to under oath, attached hereto as Exhibit A and M, respectively. These
Declarations support the allegations of the Amended Complaint.

action arise directly from regular business of the publisher in its Orlando office and other offices from the publication and sale of books. Clearly, Defendant publisher thought Florida to be important enough of a state to establish a separate, general office here. Exhibit A ¶ 60.

Plaintiff is a citizen and resident of Florida. Exhibit A ¶ 54. In 2011, Plaintiff incorporated two businesses with another partner in Florida to pursue contracts with the military and U.S. Government at bases in Florida. Exhibit A ¶¶ 67, 68.  He is registered to vote and has a permanent residence in Miami-Dade County, Florida (as well as a Miami telephone number), Exhibit A ¶ 55, even though Defendants misled this Court and falsely claimed that he was not registered to vote in Florida in an affidavit submitted by defense counsel Laura Handman.  Ms. Handman's affidavit, which she submitted in support of Defendants' two motions to dismiss, was false, as previously discussed in the conference before the Court on April 14, 2015. Exhibit A ¶ 56.

Readers of the Book being exposed to the defamatory statements are in Florida.  The damage to Plaintiff occurred primarily in Florida, among other places.  Defamation law provides that the essence of defamation is injury to one's reputation, community, and home, which in this case is in Florida. Simply put, under Florida law, it is the damage and harm in that community which counts most. This is the principal reason Florida is the appropriate place to bring suit. The jury needs to be one's peers in the community.  Moreover, Plaintiff seeks to depose and call at trial important witnesses in Florida from Macdill Air Force Base and Eglin Air Force Base, which are the centers of U.S. counterterrorism military and intelligence operations, through U.S. Special Operations Command ("SOCOM") and the U.S. Central Command ("CENTCOM"). These witnesses and offices are also where much of the Plaintiff's loss of reputation has taken place and is taking place. Exhibit A ¶ 78. Defendants, each and every one of them, have subjected those involved in his work to the negative, defamatory and false reports about the

Plaintiff.  Exhibit A ¶ 7-53.

Plaintiff has stated a valid and indeed overwhelming claim of defamation in Causes of Action I-III as well as for intentional infliction of emotional distress in Cause of Action  IV, tortious interference with prospective advantage in Cause of Action V, and common law assault under Cause of Action VI.

Defendants published several libelous and slanderous statements in Defendants' Book and in radio, television, and newspaper interviews, alongside many other statements in addition. Defendants published both defamatory and a few non-defamatory statements.  The fact that Defendants also may have made a few opinion-based statements in addition to defamatory statements about Plaintiff does not immunize their libelous statements which they actually published in Florida and elsewhere.

Moreover, Defendants' defamation is not fair reporting. Exhibit A ¶7. As Defendants tout at the beginning of the Book, the publication is based on new, confidential information from various Government sources, which has been distorted and falsified knowingly and/or recklessly, and is not the result of simply republishing previous Playboy and The New York Times articles. Otherwise, there logically would be no reason for the Book. Certainly tongue-in-check, looking at Playboy would be a more "sexy" read. But, by publishing new and never before disclosed false and misleading sensational and defamatory "information," this allowed Defendants to draw in readers and sell books in Florida and elsewhere. Thus, Defendants boast to the reader at page ix of their Book:

> "[m]any people have criticized the use of anonymous sources. Yet all reported know that the very best stories – the most important, the most sensitive rely on them. This book would not be possible without the cooperation of many current and former government officials and other individuals who were willing to discuss sensitive matters only on the condition of anonymity."

Even where Defendants sometimes did put their defamation occasionally in the voice of

other persons in previously published materials, still Defendants conspicuously reported only a narrow slice of the overall story, massively tilted unfairly and dishonestly.  Defendants cannot claim to be engaged in "fair reporting" while presenting only one small part of the story, however false, dramatically distorting the truth so as to defame Plaintiff.

Similarly, Defendants published non-opinion, non-hyperbole defamation against Plaintiff, harming him in his profession.  The fact that Defendants did include a few examples of opinion (that is, throwing in adjectives or mentioning greed) or hyperbole mixed in with clear defamatory factually based statements does not transform their intent to harm Plaintiff in Florida and elsewhere.

In addition, the totality of the communication is also highly relevant.  Statements that might not be defamatory on their own can and do add to the total message of defamation.  The defamatory statements are set forth in excruciating detail in the Amended Complaint. *See* Amended Complaint at ¶¶ 106, 109, 111, 116, 119-137, 141, 145, 149, 151, 157, 168, 181, 183, 185-235.

Finally, Plaintiff is not a public figure, despite Defendants' disingenuous suggestion that unrelated events turn Plaintiff into a "limited public figure." Exhibit A ¶¶ 39-43. Plaintiff worked undercover for U.S. intelligence agencies in Florida in particular. To become a public figure would have put him and his family at great risk from domestic and foreign terrorists and others.

## II.     STATEMENT OF FACTS RELEVANT TO MOTION

### A)  <u>The Case and Tortious Harm Took Place Inside Florida</u>

Defendants published a physical book "<u>Pay Any Price:  Greed, Power and Endless War</u>" (referred to as "the Book" or "Book") by author Defendant James Risen, Copyright (c) 2014 by Defendant James Risen, designated by the Library of Congress by its index system as ISBN 978-0-544-34141-8 (hardback edition).  *See* title pages, Exhibit B, attached.

The publisher, Defendant Houghton Mifflin Harcourt Publishing Company, maintains permanent and general offices – and thus does business and has employees in – Orlando, Florida, at 9400 Southpark Center Loop, Orlando, Florida 32819.  *See* Exhibit C, attached; http://www.hmhco.com/about-hmh/our-offices; *see also* Exhibit A ¶ 57.

Defendant Houghton Mifflin Publishing Company is registered to do business in Florida through the Florida Department of State Division of Corporations.  *See* Exhibit D, attached.  In 2008, Defendant changed its name with the State of Florida from "Houghton Mifflin Harcourt" to "Houghton Mifflin Publishing Company." *Id*; Exhibit A at ¶ 59.

Defendants willfully shipped the Book to Florida in order to sell books on Florida bookstore shelves. Defendants' knowingly and intentionally caused physical products, the Book, to be sent to Florida and sold in Florida.  Moreover, the defamation is contained within the physical product physically shipped into Florida for sale for profits.  Exhibit A at ¶ 61. Defendants rely significantly upon sales in Florida and the rest of the Southeast of the United States through a company called "Amazon" for very substantial sales over the Internet. Amazon's regional distribution centers or "fulfillment centers" are located in Ruskin, Florida in Hillsborough County and Lakeland, Florida, and in Polk County, Florida.  *See* Exhibit E, attached; *see also* Exhibit A ¶ 60.

The publisher also makes extensive use of the marketplace in Florida, shipping hundreds of thousands of different books to Florida for sale every year, not only the Book by Defendant Risen. The Book was purchased in Florida, as shown in the affidavit attached under Exhibit F. Defendant James Risen is earning royalties off of the Book physically sold in Florida and he intended to publish his Book with a publisher who would distribute it in every state.  Defendant Risen, and the other Defendants, intended to aim the Book at and into Florida. Amended Complaint at ¶ 12; Exhibit A ¶ 81.

Florida is the third largest state and military, intelligence and other active and retired persons spend time reading books. Thus, the significant intelligence and military personnel in Florida, which has skyrocketed thanks to Florida's wealth, lack of personal income tax, as well as the military facilities located here, form a vast readership along with the rest of the state's citizens and residents. Exhibit A ¶ 66.

Defendant James Risen published false and misleading statements on national television and in radio interviews discussing his book. In doing so, he primarily spoke of and defamed Plaintiff Dennis Montgomery, essentially ignoring the rest of his Book in those interviews while intentionally attacking a private individual, Plaintiff Montgomery. This was intended to sell books by sensationalizing and defaming Montgomery, who is the primary focus. Exhibit A ¶ 83.

However, the purpose and effect of those interviews was to drive sales of the Book as a physical product, including in Florida as the nation's third largest state by population and where huge viewer and readership are present. Exhibit A ¶¶ 66; 83. Thus, Risen's interviews were not comments having an unanticipated effect in Florida, but sales pitches calculated to cause listeners to purchase physical books inside Florida as well as other states. *Id.* Again, Defendant Risen offered a juicy, sensational and defamatory story about a private citizen allegedly defrauding the President of the United States into nearly shooting down civilian airliners. The defamation is a commercial advertising *marketing scam,* however dishonest and defamatory, to sell books and to stimulate large sales of the Book in Florida in particular. Amended Complaint, ¶¶ 42; Exhibit A ¶ 84.

Risen's Book casts his leftist blame on U.S. Government leaders and officials for mishandling the "war on terror" and over-reacting. Risen portrays the global threats as far smaller, less real, and less imminent than national leaders during the Bush Administration. Yet in Chapter 2, the defamatory blame shifts primarily to a private individual, Plaintiff Dennis

Montgomery, who is the focal point and whipping boy of the sensationalized libel.  Defendant

Risen swerves out of his lane to sideswipe and defame Montgomery "big time." This is too much

to be accidental or a result of fair reporting – particularly since the defamatory statements are not

primarily based on republications of Playboy and other articles and documents, but instead new

information, however false, from so-called confidential sources distorted and falsified by Risen,

as the author and publisher boasts at page ix of their Book.

On Page 32 of the Book, Defendants knowingly published these **factually false and**

**misleading statements** about Plaintiff:

> Whatever else he was, Dennis Montgomery was a man who understood how best
> to profit from America's decade of fear. He saw the post-9/11 age for what it was,
> a time to make money. Montgomery was the maestro behind what many current
> and former U.S. officials and others familiar with the case now believe was one of
> the most elaborate and dangerous hoaxes in American history, **a ruse that was so**
> **successful that it nearly convinced the Bush administration to order fighter**
> **jets to start shooting down commercial airliners filled with passengers over**
> **the Atlantic. Once it was over, once the fever broke and government officials**
> **realized that they had been taken in by a grand illusion, they did absolutely**
> **nothing about it. The Central Intelligence Agency buried the whole insane**
> **episode and acted like it had never happened. The Pentagon just kept**
> **working with Montgomery. Justice Department lawyers fanned out across**
> **the country to try to block any information about Montgomery and his**
> **schemes from becoming public, invoking the state secrets privilege in public,**
> **a series of civil lawsuits involving Montgomery.  It was as if everyone in**
> **Washington was afraid to admit that the Emperor of the War on Terror had**
> **no clothes.**

*See* Amended Complaint ¶ 106. (Emphasis added). On Page 32 of the Book, Defendants

knowingly published these knowingly **factually false and misleading statements** about the

Plaintiff:

> Consider the example of Dennis Montgomery.  He provides a perfect case study
> to explain how during the war on terror greed and ambition have been married to
> unlimited rivers of cash to create a climate in which someone who has been
> accused of being a con artist was able to create a rogue intelligence operation with
> little or no adult supervision. Crazy became the new normal in the war on terror,
> and the original objectives of the war got lost in the process.

*See* Amended Complaint ¶ 109. On Page 33 of the Book, Defendants knowingly published these

**factually false and misleading statements** about the Plaintiff:

> A former medical technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax. **Even after it appeared that Montgomery had pulled off a scheme of amazing scope, he still had die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Montgomery was a fake, and who rejected the notion that the super-secret computer software that he foisted on the Pentagon and CIA was anything other than America's salvation.**

*See* Amended Complaint ¶ 111. (Emphasis added). On Page 33 of the Book, Defendants

knowingly published **factually false and misleading statements** about Plaintiff: **Montgomery's**

**story demonstrates how hundreds of billions of dollars poured into the war on terror went**

**to waste.** *See* Amended Complaint ¶ 213. (Emphasis added). On Page 34 of the Book,

Defendants knowingly published these **factually false and misleading statements** about

Plaintiff:

> Montgomery was an overweight, middle-aged, incorrigible gambler, a man who liked to play long odds because he was convinced that he could out-think the house. **He once boasted to a business partner that he had a system for counting an eight-deck blackjack shoe, quite a difficult feat for even the best card sharks, and he regularly tested his theories at the El Dorado and the Peppermill Casino in Reno. He usually came up short but that didn't stop him from playing blackjack on a nightly basis, racking up unwieldy debts that eventually led to his 2010 arrest for bouncing more than $1 million in bad checks at Caesar's Palace in Las Vegas.**

*See* Amended Complaint ¶ 116. (Emphasis added). On Page 36 of the Book, Defendants

knowingly published **factually false and misleading statements** about Plaintiff: Michael Flynn,

Montgomery's former lawyer — who later concluded that Montgomery was a fraud. On Page 37

of the Book, Defendants published these **factually false and misleading statements** about

Plaintiff:

By the spring and summer of 2003, eTreppid was awarded contracts by both the air force and U.S. Special Operations Command. Montgomery was able to win over the government in part by offering field tests of his technology — tests that former employees say were fixed to impress visiting officials. Warren Trepp later told the FBI that he eventually learned that Montgomery had no real computer software programming skills, according to court documents that include his statements to the FBI. **Trepp also described to federal investigators how eTreppid employees had confided to him that Montgomery had asked them to help him falsify tests of his object recognition software when Pentagon officials came to visit. Trepp said that on one occasion, Montgomery told two eTreppid employees to go into an empty office and push a button on a computer when they heard a beep on a cell phone. Meanwhile, Montgomery carried a toy bazooka into a field outside eTreppid. He was demonstrating to a group of visiting U.S. military officials that his technology could recognize the bazooka from a great distance.**

See Amended Complaint ¶ 121. (Emphasis added). Interestingly, Defendant Risen publishes that

"eTreppid was awarded contracts by both the Air Force and U.S. Special Operations Command."

The U.S. Special Operations Command is located in Dade County in Florida. Exhibit A ¶ 75. On

Page 37 of the Book, Defendants knowingly published these **factually false and misleading**

**statements** about Plaintiff:

> **After he was in place in the field, he used a hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of a bazooka on another screen prominently displayed in front of the military officers standing in another room, according to court documents. The military officers were convinced that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands.** (Montgomery insists that the eTreppid employees lied when they claimed that he had asked them to fix the tests, and also says that the air force issued a report showing that it had verified the tests.

See Amended Complaint ¶ 123. (Emphasis added). On Page 47 of the Book, Defendants

knowingly published these **factually false and misleading statements** about Plaintiff:

> That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration. But Brennan was never admonished for his role in the affair. After Barack Obama became president, Brennan was named to be his top counterterrorism advisor in the White House. He later became CIA director.

*See* Amended Complaint ¶ 134. On Page 40 of the Book, Defendants knowingly

published these **factually false and misleading statements** about the Plaintiff:

> **Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks. And only he had the technology to decode those messages, thus saving America from another devastating attack.** The CIA— more credulous than Hollywood or Las Vegas— fell for Montgomery's claims. In short, he convinced CIA officials that he could detect terrorist threats by watching television.

*See* Amended Complaint ¶ 125. (Emphasis added). On Page 40 of the Book, Defendants

knowingly published these **factually false and misleading statements** about Plaintiff:

> Montgomery brilliantly played on the CIA's technical insecurities as well as the agency's woeful lack of understanding about al Qaeda and Islamic terrorism. **He was able to convince the CIA that he had developed a secret new technology that enabled him to decipher al Qaeda codes embedded in the network banner displayed on the broadcasts of Al Jazeera, the Qatar-based news network. Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks. And only he had the technology to decode those messages, thus saving America from another devastating attack. The CIA— more credulous than Hollywood or Las Vegas— fell for Montgomery's claims. In short, he convinced CIA officials that he could detect terrorist threats by watching television.**

*See* Amended Complaint ¶ 125. (Emphasis added). On Page 42 of the Book, Defendants

knowingly published these **factually false and misleading statements** about Plaintiff:

> What remains unclear is how Montgomery was able to convince all of them that he had developed secret software that could decode Al Qaeda's invisible messages. **While he had gotten by a few credulous military officers who came to view his demonstrations, he apparently found it just as easy to persuade the CIA as well.**

*See* Amended Complaint ¶ 205. (Emphasis added). On Page 42 of the Book, Defendants

knowingly published these **factually false and misleading statements** about Plaintiff:

> **A CIA official defensively pointed out that the agency did not actually have a contract with eTreppid at the time Montgomery was providing data from the Al Jazeera videotapes. While they were working closely together during the final months of 2003, the CIA had not yet started paying Montgomery, the official said. The agency never finalized a contract with him because agency**

> **staff eventually realized they had been conned, according to this official.  But that does not diminish the fact that for a few crucial months, the CIA took Montgomery and his technology very seriously.**

*See* Amended Complaint ¶ 128. (Emphasis added). Importantly, this passage demonstrates that

Defendant Risen received this from the inside, and then distorted, falsified and perverted –

knowingly and/or recklessly – it to suit his leftist agenda and marketing ends. It is not primarily a

result of "fair privilege" as discussed in detail below.

On Page 46 of the Book, Defendants knowingly published these **factually false and misleading statements** about Plaintiff:

> **It did not take long for the French firm to conclude that the whole thing was a hoax.  The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers.  The firm reported back to the French government that the supposed intelligence was a fabrication.**

*See* Amended Complaint ¶ 130. (Emphasis added). On Page 50 of the Book, the

Defendants knowingly published these **factually false and misleading statements** about the

Plaintiff:

> **Edra Blixseth was Dennis Montgomery's latest mark. After being introduced to him by a former Microsoft executive and then hearing Montgomery explain his software, she agreed in 2006 to bankroll Montgomery to launch a new company, to be called Blxware. Montgomery needed new government contracts for Blxware, and Edra Blixseth had the money and contacts to try to make it happen.**

*See* Amended Complaint ¶ 137. (Emphasis added). Defendants' main defamation that is

destructive of Plaintiff's reputation and business prospects – past, present and future – is

Defendants' nationwide announcement, based on a false and misleading recitation of facts

obtained from so-called intelligence officials that Defendant Risen knew or had a strong reason

to know were false based on the representations by Plaintiff himself, that Plaintiff's work

product and his contracts with intelligence agencies were a hoax.  As a result, Plaintiff and

relevant witnesses and proof confirm, *inter alia*, that Dennis Montgomery's software and technology does work, always did work, was correctly held in high regard by President George W. Bush, Vice President Dick Cheney, the Department of Defense and the intelligence agencies. and is still being used now by the U.S. Government (allowing for updating of versions). *See* Exhibit A ¶ 18.

In sum, Plaintiff, who has been severely defamed by Defendants, is a citizen of Florida. He has a residence in Florida, a Miami-Dade County phone number and he is registered to vote in Florida. *See* Exhibit G, attached; Exhibit A ¶ 54.  In 2011, long before Defendants' Book was published, in furtherance of his longstanding decision to reside to Florida, he created with the Florida Department of State two companies in Florida with a Florida partner to pursue business opportunities and contracts with U.S. Government and military offices and/or bases in Florida. U.S. Central Command ("CENTCOM") and U.S. Special Operations Command ("SOCOM") are located in Florida and Plaintiff Montgomery, as proven by his contracts, dealt with Florida and relied on Florida for business. *See* Exhibit H, attached; Exhibit A ¶ 72. Thus, the defamation was aimed at and severely damaged Plaintiff in his state of Florida.

**B) Events, Connections, and Witnesses**

Plaintiff intends to depose and call witnesses of the legitimacy of his defamed work based at Macdill Air Base near Tampa, Florida and at Eglin Air Force Base near Fort Walton Beach, Florida, where he did a lot of his work, as some of his most significant witnesses are in Florida. Those locales are where the CENTCOM, U.S. Southern Command and SOCOM facilities are located. Exhibit J, Exhibit L, respectively. They were and are the hub of U.S. counterterrorism and military and intelligence operations, particularly since September 11, 2001.  *See* Contract between eTreppid and U.S. Special Operations Command HQ at Macdill Air Force Base, Florida 33621, attached as Exhibit I; *see also* Exhibit A ¶ 67.

There are technical and national security reasons as to why work being done in Florida, especially at Macdill or Eglin, would be well suited to Dennis Montgomery's experience, capabilities, contacts, and opportunities. *Id.*

## III.   FACTS AND LAW SHOWING PERSONAL JURISDICTION AND AGAINST TRANSFER AND VENUE

### A)   Defendants Concede Jurisdiction over Publisher HMH

Defendants' Motion concedes personal jurisdiction of this Court in Florida over the publisher Houghton Mifflin Harcourt Publishing Company.  The Motion appears to challenge personal jurisdiction only with regard to the parent holding company HMH Holdings, Inc. – and James Risen.  *See* Defendants' Motion, Argument, Section A, page 12.

As previously shown, Houghton Mifflin Harcourt maintains permanent and general offices in Orlando, Florida at 9400 Southpark Center Loop, Orlando, Florida 32819.  *See* Exhibit C, attached; http://www.hmhco.com/about-hmh/our-offices.  It is well-established law that a party and corporation may be subject to the jurisdiction of a state if it has minimum contacts with that state. Since Defendant publisher has permanent and general offices in the state of Florida and actively does and solicits business in the state of Florida, the Court has personal jurisdiction over the publisher Houghton Mifflin Harcourt.  *See International Shoe Co. v. Washington*, 326 U.S. 310 (1945); *See also* Exhibit D, Exhibit K.

### B)   Plaintiff's Complaint and Declarations I and II Establish Jurisdiction, Venue

On a motion to dismiss a case claiming lack of jurisdiction, the court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke* v. *United States,* 60 F.3d 795, 797 (Fed. Cir. 1995).  On a motion to dismiss under FRCP Rule 12(b)(1), a federal court must accept as true all material factual allegations contained in the complaint and "'construe the complaint liberally, granting plaintiff the benefit of all inferences

that can be derived from the acts alleged' and upon such facts determine jurisdictional questions." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005) (quoting *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004))); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed. Cir. 1988).

The allegations of the Amended Complaint must be taken as true for the purposes of the motion to dismiss, such as Amended Complaint ¶¶ 3-6:

> The Causes of Action and the injuries were caused to Plaintiff by the Defendants' defamation and other tortious conduct in this district, Florida in general, nationwide, and internationally.

> In addition, some of the most recent commercial opportunities for the Plaintiff's work were contracts and projects made available through military bases and Government facilities in Florida.

> The State of Florida is the third (3rd) largest state by population within the entire United States such that a huge and substantial portion of the nationwide harm has occurred in Florida.

> Dennis L. Montgomery is a natural person, an individual, and a citizen of the United States. He is a citizen of Florida, which as set forth above, is where much of this work has taken place and will continue to take place.

### C)  Defendants' Physical Products in Florida Bookstores Distinguish Case

A federal district court in Florida may exercise personal jurisdiction over a nonresident defendant to the same extent that a Florida court may, so long as the exercise is consistent with federal due process requirements. *See* Fed.R.Civ.P. 4(e)(1), (h), and (k); *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626-27 (11th Cir. 1996). If both Florida law and the United States Constitution permit, the federal district court may exercise jurisdiction over the nonresident defendant. *Id.*

The essence of defamation is that a defamed person is injured in his or her community, reputation, and where they live.  As the Supreme Court of Florida has explained:

. . . For the tort of false light, the standard is whether the statement is highly offensive to a reasonable person. Id. § 652E(a). Conversely, a defamatory statement is one that **tends to harm the reputation of another by lowering him or her in the estimation of the community or, more broadly stated, one that exposes a plaintiff to hatred, ridicule, or contempt or injures his business or reputation or occupation**.   Standard Jury Instructions—Civil Cases (No. 00-1), 795 So.2d at 55.

. . . A false light plaintiff must prove that the publicity would be "highly offensive to a reasonable person," whereas a defamation plaintiff must prove *injury to his or her reputation in the community*. As explained by the Ohio Supreme Court in recognizing false light, "in defamation cases the interest sought to be protected is the objective one of reputation, either economic, political, or personal, in the outside world. In privacy cases the interest affected is the subjective one of injury to [the] inner person." *Welling v. Weinfeld*, 113 Ohio St.3d 464,  866 N.E.2d 1051, 1057 (2007) (emphases added) (quoting Crump v. Beckley Newspapers, Inc., 173 W.Va. 699,  320 S.E.2d 70, 83 (1984)).

*Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1109, 2008 WL 4659374 (Fla. 2008) (Emphasis added).

This case is readily distinguishable from general precedents cited by Defendants concerning only nationwide statements without more. Defendants cite *Buckley v. New York Times Co.*, *Calder v. Jones*, *Madera v. Hall*, *Revel v. Lidov*, *Busch v. Viacom International Inc.*, *Walden v. Fiore, Alternate Energy Corp. v. Redstone*, alleging that personal jurisdiction may be improper in Florida. Defendants are incorrect and the cited case law is inapposite to the facts and circumstances presented here.

In *Buckley*, a non-binding U.S. Court of Appeals for the Fifth Circuit ("Fifth Circuit") district, the court held that "mere circulation" does not satisfy due process. *Buckley v. New York Times Co.*, 338 F.2d 470, 474 (5th Cir. 1964). But, Defendants fail to mention that in *Buckley*, part of the court's decision rested with the fact that the corporation being sued had no office, place of business, officers, agents or employees in the state of issue. It had "no assets within the State . . ." *Id*. at 473. Moreover, for the <u>Charleston Gazette</u>, no subscription solicitation was made, for <u>the Cincinnati Post and Times Star</u>, an average of only thirteen copies of this paper

was circulated, The New York Times Company sent less than a thousandth of one per cent, of its newspapers from New York to the state at issue, the Florida Times-Union had an average of only ten subscribers in the state at issue. While "the mere circulation through the mails to subscribers and independent distributors" *id*, does not constitute business activity, that has nothing to do with the facts here. Here, hundreds of thousands of books were distributed to and sold in Florida.

*Calder* ironically supports Plaintiff Montgomery's position that personal jurisdiction exists over Defendants in his state, Florida. There, the Court found jurisdiction proper where the harm occurred to Plaintiff. " . . . [P]etitioners are primary participants in an alleged wrongdoing intentionally directed at a California resident, and jurisdiction over them is proper on that basis." *Calder v. Jones*, 465 U.S. 783, 790 (1984). Here, such as the Court found in *Calder*, the harm intentionally directed at Plaintiff Montgomery occurred in Florida, where Defendants aimed their tortious actions because Defendants intentionally projected themselves into Florida.

In *Madara*, because the defendant had no agents and did not have an office in Florida, the U.S. Court of Appeals for the Eleventh Circuit ("Eleventh Circuit") ruled that "to subject [] Hall to the jurisdiction of a Florida court in this case would offend due process." *Madara v. Hall*, 916 F.2d 1510, 1519 (11th Cir. 1990). Houghton Mifflin Harcourt Publishing Company has a general office in Orlando, Florida, and is registered to do business in the State of Florida with the Florida Department of State, Division of Corporations. Moreover, SOCOM and CENTCOM and other U.S. government facilities, the center of U.S. counterintelligence military and counterterrorism command, are located in Florida. Florida is a huge military state and that Plaintiff Montgomery did and does business here as a result which Defendants knew about, Defendants aimed their defamatory statements into Florida.

*Revell* is also distinguishable. A Fifth Circuit case premised on a website posting is not at all analogous to the situation here. There, the Fifth Circuit dismissed for lack of personal

jurisdiction because the author did not know plaintiff resided in the forum, the article did not

mention the forum, and no newsgathering occurred in the forum. *Revell v. Lidov*, 317 F.3d 467,

473-75 (5th Cir. 2002). Here, Defendants were well aware that the hub of U.S. intelligence and

military counterterrorism operations were and remain in Florida and that is where Plaintiff had

significant contacts and did work. Amended Complaint ¶ 4, 12, 53, 248.

     *Alternate Energy Corp.* supports Plaintiff's claims that personal jurisdiction over

Defendants is proper in Florida. Again, this case deals with an isolated Internet posting. Yet the

court holds that " . . . engaging in commercial activity over the internet constitutes sufficient

minimum contacts to satisfy due process requirements, but merely posting information on the

internet does not." *Alternate Energy Corp. v. Redstone*, 328 F. Supp. 2d 1379, 1382 (S.D. Fla.

2004). Here, the Book was offered for sale, and sold in Florida, a huge market. And Defendant

Houghlin Mifflin has a corporate office in Florida and is registered to do business in the state.

     In *Busch*, a non-binding U.S. District Court for the Northern District of Texas case, the

court found no personal jurisdiction because "[the defendant] did not visit Texas, call Texas or

conduct any interviews or research in Texas related to the piece . . ." *Busch v. Viacom

International Inc.*, 477 F. Supp. 2d 764, 772-73 (N.D. Tex 2007). But here, as discussed above,

there are significant contacts with Florida as detailed above.

     Also distinguishable, in *Walden v. Fiore,* the Court found that "the plaintiff cannot be the

only link between the defendant and the forum." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014).

A defendant's "suit-related conduct" must have a "substantial connection" to the forum . . . *Id.* at

1121. That is more than true here.

     Defendants physically shipped books, as physical products, into Florida with the

knowledge and intent that the books would be placed on Florida bookstore shelves and sold

inside Florida. *See* Exhibit A ¶ 61; Exhibit F. Furthermore, Defendant Risen's appearances on

radio and television were not just commentary but attempts to stimulate the sale of books inside

Florida and elsewhere.  Risen was speaking on radio and television to move books off of Florida

bookstores and shelves and to the checkout counter in Florida. *See* Exhibit F.

Personal jurisdiction under constitutional minimum contacts with Florida and under

Florida's long-arm statute are clearly established under *Renaissance Health v. Resveratrol*

*Partners*, 982 So.2d 739 (Fla. App. 2008), in which the defaming out-of-state defendant made

the statements to help sell their own products and books in competition with the plaintiff.

In *Renaissance Health v. Resveratrol Partners*, the defamation was to co-opt the sales of

competitor's products and books in Florida.  This is similar to, but less direct, than Defendants'

efforts here to sell their own books in Florida.  The Florida Appeals Court there said:

> The purpose of the alleged business defamation in this case ***was to convince***
> ***consumers to purchase the defendants' products and not the plaintiff's***.  Sales to
> Florida residents through the interactive website totaled 2.4% of Resveratrol's
> total gross domestic sales;  Sardi sold books and e-books to Florida residents
> realizing $2,101.83 in sales.  ***Such commercial activity within Florida is***
> ***sufficient to subject the defendants to jurisdiction here***—where a defendant
> disparages a competitor's products to enhance its own commercial sales in a state
> where the competitor has its corporate headquarters, the defendant could
> "reasonably anticipate being haled into court there." *See Calder v. Jones*, 465 U.S.
> 783, 790,  104 S.Ct. 1482,  79 L.Ed.2d 804 (1984) (quoting *World-Wide*
> *Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297,  100 S.Ct. 559,  62 L.Ed.2d
> 490 (1980)); *See Hartoy, Inc. v. Thompson*, 2003 WL 21468079 (S.D.Fla.2003)
> (involving five orders from defendant's website totaling $325); *Nida Corp. v.*
> *Nida*, 118 F.Supp.2d 1223, 1231-32 (M.D.Fla.2000) (involving approximately
> $27,417 in revenue from sales in Florida).  ***This case is distinguishable from***
> ***internet defamation cases involving passive websites not designed to market***
> ***products in the purported forum state.*** *See Revell v. Lidov*, 317 F.3d 467 (5th
> Cir.2002); *Hy Cite Corp. v. Badbusinessbureau.com, L.L.C.*, 297 F.Supp.2d 1154
> (W.D.Wis.2004).

*Id.* at 982 So.2d  at 742-743 (Emphases added).  The instant case does not primarily involve

posting on the internet. But the precedents that have developed about the internet make clear that

nationwide radio and television interviews similarly qualify for Florida's long-arm jurisdiction

and minimum contacts for constitutional due process, particularly where the goal is to drive sales

of physical products in commerce within Florida.

Moreover, Florida's long arm statute 48.193 conferring jurisdiction provides:

6.   Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:

* * *

b.   **Products, materials, or things** processed, serviced, or manufactured by the defendant anywhere **were used or consumed within this state in the ordinary course of commerce, trade, or use**.

(Emphasis added).  Here, the injury and causes of action arise directly from the statements made in the physical product, the Book, shipped to Florida.

Defendant Risen's involvement is not less than the publisher. While the publisher physically shipped books into Florida to be placed on Florida bookstore shelves, Risen wrote the Book to sell it and entered into a contract for the publisher to do exactly that.  Risen submitted his manuscript to Houghton Mifflin for the very purpose of having the books shipped into Florida for sale off of Florida bookshelves.

The Eleventh Circuit upheld jurisdiction in the U.S. District Court for the Middle District of Florida of statements on a website in Tennessee, explaining:

The Florida "long-arm" statute permits the state's courts to exercise jurisdiction over nonresident defendants who commit certain specific acts. Fla. Stat. § 48.193. For example, § (1)(b) of the statute permits a Florida court to assert jurisdiction over any person who "commit[s] a tortious act within this state." Fla. Stat. § 48.193(1)(b).

Carman claims that jurisdiction over then nonresident Lovelady is appropriate under this section of the Florida statute. Carman argues that Lovelady's creation in Tennessee of a website containing an allegedly infringing and deceptive use of Carman's trademark is a tortious act "within this state" as contemplated by the statute because the injury from trademark infringement occurs where the holder of the mark resides—in this case, Florida. He relies upon *Nida Corp. v. Nida,* 118 F.Supp.2d 1223, 1231 (M.D.Fla.2000) (allegation of trademark infringement of Florida resident sufficient to trigger Florida long-arm statute). *Accord JB Oxford Holdings, Inc. v. Net Trade, Inc.,* 76 F.Supp.2d 1363, 1368 (S.D.Fla.1999). * * * *

19

We have held that § 48.193(b) of the Florida long-arm statute permits jurisdiction over the nonresident defendant who commits a tort outside of the state that causes injury inside the state. *Posner v. Essex Ins. Co.,* 178 F.3d 1209, 1216 (11th Cir. 1999) (adopting broad interpretation of long-arm statute by Florida courts that permits personal jurisdiction over nonresident defendant alleged to have committed a tort causing injury in Florida). Therefore, although the website was created in Tennessee, the Florida long-arm statute is satisfied if the alleged trademark infringement on the website caused injury in Florida.

*Licciardello v. Lovelady*, 544 F.3d at 1283.

The Supreme Court of Florida recently addressed whether Florida's "long arm statute" reaches nationwide defamation outside of Florida in 2010 in *Internet Solutions Corp. v. Marshall*, 39 So. 3d 1201, 2010 WL 2400390 (Fla. 2010) when the question was certified by the Eleventh Circuit to Florida's Supreme Court:

Because the case involved a question of Florida law for which there is no clear controlling precedent, the Eleventh Circuit certified the question that is before this Court. The Eleventh Circuit did not address the second step of the jurisdictional inquiry, which is whether the exercise of jurisdiction would violate due process.

*Id.* 39 So. 3d at 1215.

First, in the opinion of Florida's Supreme Court this is an area "for which there is no clear controlling precedent." Therefore, the certainty urged by Defendants is misplaced. The Florida Supreme Court rephrased the certified question as:

Accordingly, we rephrase the certified question as follows:

Does a nonresident commit a tortious act within Florida for purposes of section 48.193(1)(b) when he or she makes allegedly defamatory statements about a company with its principal place of business in Florida by posting those statements on a website, where the website posts containing the statements are accessible and accessed in Florida?

We answer the rephrased certified question in the affirmative. We conclude that posting defamatory material on a website alone does not constitute the commission of a tortious act within Florida for purposes of section 48.193(1)(b), Florida Statutes. Rather, the material posted on the website about a Florida resident must not only be *accessible* in Florida, but also be *accessed* in Florida in

order to constitute the commission of the tortious act of defamation within Florida under section 48.193(1)(b).

*Id.*  39 So. 3d at 1203.  *(Capitalization and emphases in original).*

The Florida Supreme Court concluded:

For the reasons explained above, we answer the rephrased certified question in the affirmative. A nonresident defendant commits the tortious act of defamation in Florida for purposes of Florida's long-arm statute when the nonresident makes allegedly defamatory statements about a Florida resident by posting those statements on a website, provided that the website posts containing the statements are accessible in Florida and accessed in Florida. Having answered this question, we return this case to the United States Court of Appeals for the Eleventh Circuit.

*Id.*  39 So. 3d at 1216, 2010 WL 2400390 at 5.

### D)  <u>Florida Contacts Sufficient for Personal Jurisdiction</u>

In terms of constitutional requirements for personal jurisdiction over Defendants, the publisher Houghton Mifflin Harcourt Publishing Company maintains a general office in Orlando, Florida, has registered to do business with the Florida Department of State Division of Corporations and sells physical products, including the Book at issue here, within Florida. Exhibit A ¶ 58; Amended Complaint ¶ 18. Plaintiff initially sued the parent company to insure against Houghton Mifflin Harcourt being only a "doing business name" of the parent company, after noticing inconsistent references.

In addition, Defendant James Risen knew and intended that his publisher Houghton Mifflin Harcourt physically distribute his book, including through the publisher's Orlando, Florida, offices in Florida.  Defendant Risen is earning royalties from the Book physically sold in Florida. Amended Complaint ¶ 30, 31.

Plaintiff disputes Defendants' view of the governing law and precedents on personal jurisdiction. For example, Defendants read *Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), as requiring that Defendants' actions must be "calculated to" cause

injury inside Florida.  But then their own discussion of the case shows otherwise.  "Calculated to" implies a knowing intention to cause injury inside Florida.  The actual rule of *Calder v. Jones* is whether it was reasonably *foreseeable* that harm would result in Florida.  That is, would a person committing a tort "reasonably anticipate being haled into court there."

That is, to satisfy constitutional minimum contacts for personal jurisdiction, Defendants need not have intended that harm result in Florida, but merely acted intentionally with a reasonably-forseeable result of causing defamatory injury within Florida.  *Id.*

The Eleventh Circuit also upheld constitutional minimum contacts for a website in Tennessee causing injury in Florida:

> This "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum, *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), and the litigation results from alleged injuries that "arise out of or relate to" those activities. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). In this way, the defendant could have reasonably anticipated being sued in the forum's courts in connection with his activities there. *Burger King,* 471 U.S. at 472, 105 S.Ct. 2174 (quoting *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154).

> Even where a defendant has purposefully established constitutionally significant contacts within the forum state, jurisdiction must also be evaluated in light of several other factors to determine whether its exercise would comport with "fair play and substantial justice." *International Shoe,* 326 U.S. at 320, 66 S.Ct. 154. These factors include the burden on the defendant of litigating in the forum, the forum's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief and the judicial system's interest in resolving the dispute. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Where these factors do not militate against otherwise permitted jurisdiction, the Constitution is not offended by its exercise. *Id.*

*Licciardello v. Lovelady*, 544 F.3d at 1284.  However, an intentional tort is analyzed differently.

It is also significant that the Amended Complaint alleges *intentional*, not negligent, tortuous acts, Amended Complaint ¶¶ 42, 78, 97, 241, 242, 249, as does Plaintiff Montgomery's Declaration II attached as Exhibit A throughout.

Similarly, the Ninth Circuit has recognized that the defendant's connection with the forum in an intentional tort case should be evaluated under the *Calder* "effects" test, rather than the contracts-oriented "minimum contacts" test. *Ziegler v. Indian River County,* 64 F.3d 470, 473 (9th Cir.1995). In *Ziegler,* the court noted that:

> We apply different purposeful availment tests to contract and tort cases.... Consistent with the Supreme Court's holding in *Burger King,* merely contracting with a resident of the forum state is insufficient to confer specific jurisdiction over a nonresident. In tort case, however, jurisdiction may attach if an out-of-forum defendant merely engages in conduct aimed at, and having effect in, the situs state.

*Licciardello v. Lovelady*, 544 F.3d at 1286.  Explaining further:

> Recently the Middle District of Florida recognized that "a number of courts" have held that "where a defendant's tortuous conduct is intentionally and purposefully directed at a resident of the forum, the minimum contacts requirement is met, and the defendant should anticipate being haled into court in that forum." *New Lenox Industries v. Fenton,* 510 F.Supp.2d 893, 904 (M.D.Fla.2007). In that case, the plaintiff had alleged fraud and misappropriation of trade secrets, and the district court held that jurisdiction was proper inasmuch as "Plaintiff alleges that Defendants committed one or more intentional torts ... against Plaintiff who was injured in Florida." *Id.* at 904-05 (citing *Godfrey v. Neumann,* 373 So.2d 920, 922 (Fla.1979) (Florida Supreme Court similarly applied the effects test to find jurisdiction over the defendant alleged to have committed an intentional tort)).

*Id.* 544 F.3d at 1287.  Explaining further:

> Intentional torts are such acts, and may support the exercise of personal jurisdiction over the nonresident defendant who has no other contacts with the forum. *Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

*Id.*, 544 F.3d at 1285-86.

### E)  <u>Injury to Plaintiff Involves Future Work Opportunities, Not Just the Present and Past</u>

Since the outrageous defamation has been published, Plaintiff has not been able to get work, contracts, or business opportunities. *See* Exhibit A ¶ 24.  But Defendants err in directing their attention only toward past events.  The harm to Plaintiff involves his loss of current and future employment, contract, and business opportunities.  The relevant test is not where Plaintiff

has earned income in the past, as Defendants misleadingly proffer, but whether the defamation prevents him from earning income now and in the future. *See also* Amended Complaint ¶ 245.

Based on past experience, contracts and work, Plaintiff's greatest future opportunities are at either Macdill Air Base near Tampa, Florida and Eglin Air Force Base near Fort Walton Beach, Florida, the names of counterintelligence and counterintelligence operations. Exhibit A ¶ 65; Amended Complaint ¶ 4, 21, 101, 246, 248.

Also the defamation of Plaintiff does not critique the U.S. Government in the District of Columbia, but *excuses* the U.S. Government as Montgomery's innocent, unsuspecting and gullible victims.  Therefore, the suggestion is untrue that the focus of the defamation is the U.S. Government located in Washington, D.C.

**F)   The Laws of Florida Must Apply to This Case**

Defendants disingenuously attempt to apply the laws of the District of Columbia, Washington, California, or Nevada instead of the laws of the state of Florida, where Plaintiff is a citizen.  However, this is simply a strategic move intended to delay and/or improperly have this case transferred and should not be considered as Florida's choice of law standards clearly indicate that Florida law should apply.

In deciding choice of law, the state of Florida utilizes the significant relationship test. *See Bishop v. Fla. Specialty Paint Co*., 389 So. 2d 999, 1001 (Fla. 1980) ("[W]e now adopt the 'significant relationships test' as set forth in the Restatement (Second) of Conflict of Laws §§ 145-146 (1971)."); *Bates v. Cook, Inc*., 509 So. 2d 1112, 1114-15 (Fla. 1987) ("We are now convinced that just as in the case of other issues of substantive law, the significant relationships test should be used to decide conflicts of law questions concerning the statute of limitations."). "The significant relationships test of the Second Restatement, adopted in *Bishop v. Florida Specialty Paint Co.*, 389 So.2d 999 (Fla.1980) and adhered to in *State Farm Mutual Automobile*

*Insurance Co. v. Olsen*, 406 So.2d 1109 (Fla.1981), is clearly the approved approach to conflict

of laws issues in Florida. See *Harris v. Berkowitz*, 433 So.2d 613 (Fla. 3d DCA 1983)."

*Proprietors Ins. Co. v. Valsecchi*, 435 So.2d 290, 294-295 (Fla. App. 3 Dist., 1983).

      The Restatement (Second) promulgated guidelines to aid in the selection of the proper

law through analysis of significant contacts. Restatement (Second) of Conflict of Laws, §§

6 and 145 (1971) and these guidelines are the ones utilized by Florida courts. *Proprietors Ins.*

*Co. v. Valsecchi*, 435 So.2d 290, 294-295 (Fla. App. 3 Dist., 1983) ("Evaluation under

the significant relationships test involves a two-pronged inquiry directed toward review of the

factors listed in section 145 and in section 6.).

      Pursuant to Restatement (Second) of Conflict of Laws, § 145 (2):

> Contacts to be taken into account in applying the principles of § 6 to determine
> the law applicable to an issue include:  (a) the place where the injury occurred, (b)
> the place where the conduct causing the injury occurred, (c) The domicile,
> residence, nationality, place of incorporation and place of business of the parties,
> and (d) the place where the relationship, if any, between the parties is
> centered. These contacts are to be evaluated according to their relative importance
> with respect to the particular issue.

     Courts applying this two-pronged test locate the state with the most significant contacts

in relation to the occurrence and to the parties with due regard for the policies underlying each of

the competing state's pertinent laws. *See Leflar, The Torts Provisions of the Restatement*

*(Second)*, 72 Colum.L.Rev. 267, 268-74 (1972). All of the factors are weighed in determining

which state has the significant relationship that results in that state's laws being applied.

      Further, as the Eleventh Circuit has held, "[i]t is presumed that the law of the place of

injury governs substantive issues until another state is shown to have a more compelling

interest." *Judge v. American Motors Corp*., 908 F.2d 1565, 1579 (11th Cir. 1990) *citing Peoples*

*Bank and Trust Co. v. Piper Aircraft Corp.,* 598 F. Supp. 377, 379 (S.D.Fla.1984); *see also*

*Emmart v. Piper Aircraft Corp*., 659 F. Supp. 843-44 (S.D.Fla. 1987).

There is no state that can make a persuasive claim to be the state with more significant contacts than Florida.  The causes of action and the injuries were caused to Plaintiff by Defendants' defamation and other tortious conduct in this district, and in Florida in general. Amended Complaint ¶ 3.

Florida is the state where the vast majority of Plaintiff's injury occurred. Most of Plaintiffs' work has been and would now be, but for the defamation, with components of the U.S. Government stationed at MacDill Air Force Base and Eglin Air Force Base in Florida. Exhibit A ¶ 63, 72, 73. Amended Complaint ¶¶ 2, 16, 17, 21. Contracting offices and officials are in Florida, not the District of Columbia nor any other state, and the opportunities for Plaintiff for employment, business, and/or an income are at either Macdill Air Base near Tampa, Florida and Eglin Air Force Base near Fort Walton Beach, Florida, which is at the center of U.S. Government intelligence and counterterrorism operations. *Id.*

Moreover, in 2011, Dennis Montgomery incorporated a business with a partner in Florida to contract with the military and U.S. Government at bases in Florida to continue the same type of services and software and technological work that he had performed under eTreppid and BLXWARE. Exhibit A ¶ 67; Amended Complaint ¶23. This business was named Alex James LLC, which Dennis Montgomery incorporated through the "Legal Zoom" service company *Id.*

Further, much of the conflicts and efforts which are colloquially referred to as the war on terror since September 11, 2001, have been run out of the state of Florida. Amended Complaint ¶6.  Most of the war in Afghanistan was run electronically from the U.S. Central Command ("CENTCOM") and U.S. Special Operations Command ("SOCOM").[2] Amended Complaint ¶¶ 6,9,18. And, the Department of Defense, and CIA are located in Virginia. The NSA is located in

---

[2] CENTCOM of the U.S. military is located at MacDill Air Force Base near Tampa, Florida. The U.S. Special Operations Command ("SOCOM") is located at 7701 Tampa Point Boulevard, MacDill Air Force Base, Florida 33621.

Maryland.  No entity at issue is located in the District of Columbia!

Finally, potential witnesses in this case, with whom Dennis Montgomery worked with these projects, are largely in Florida.

Defendants falsely state that this case has some sort of contacts with the District of Columbia and they therefore claim that the laws of the District of Columbia should apply under Florida's choice of law rules looking to the most significant contacts, citing "A federal district court sitting in diversity applies the choice-of-law rules of the forum state." *Castellanos v. Pfizer, Inc.*, 2008 WL 2323876, at *3 (S.D. Fla. May 29, 2008).

First, there is nothing in the record and no basis to speculate that the District of Columbia has anything to do with this Book.  Although Defendant  James Risen, the author, is also employed at a news bureau in the District of Columbia, it was not actually part of his job for The New York Times to write the book.  Therefore, the presence of The New York Times news bureau in the District of Columbia is not relevant to the Book.  Defendant Risen likely wrote the Book in Maryland at his home, since to do otherwise on the time of The New York Times would be improper and unethical.

Second, Defendants further assert that the harm from the Book's defamation of Plaintiff would impact Plaintiff primarily at U.S. Government contracting offices and officers within the District of Columbia.  However, this assumes that contracting decisions are centralized on a national level.  That assumption is not supported by the movants, nor is it true.  Contracting decisions affecting Plaintiff were regional at various bases including in Florida, not in the Washington, D.C. area. But even if contracting decisions were centralized, none of those contracting offices are actually ***in*** the District of Columbia.  As stated above, the CIA is in Langley, Virginia, the NSA is in Fort Meade, Maryland, and the Pentagon is in Arlington, Virginia.  Even the Office of the Director of National Intelligence publishes a Virginia phone

number as its switchboard (while not disclosing a physical address). Exhibit A ¶ 79.

Therefore, there is simply nothing in the record to support the suggestion that under Florida's choice of law provisions the laws of the District of Columbia would even be among the candidates for the law to apply to the case. **In a telling admission, Defendants have today withdrawn their Anti-SLAPP motion, effectively conceding that the laws of the District of Columbia, Washington State, Nevada, and California are not applicable to this case.**

Aside from the District of Columbia, Defendants were disingenuously eager to apply the laws of Washington, California, or Nevada for one simple reason: these are the few states in which the Anti-SLAPP laws were or are still applicable in federal court, as they have been struck down or discredited in the vast majority of jurisdictions.  There is simply no support for the notion that any of these states have significant relationships with this case.

With respect to Washington, Defendants only argue that Washington's law should apply because Plaintiff formerly resided within that state. *See* Withdrawn Renewed Special Motion at p. 3.  This does not establish a significant relationship between this case and Washington.  As Defendants themselves point out, nothing related to the relationship between the parties, nor the writing of the defamatory publication, nor the location of the events discussed in Defendants' defamatory publication, took place in Washington. Plaintiff did reside in Washington, however, he had formed a business in Florida in 2011 and was injured at the time of the publication of Defendants' defamatory publication. There is thus no significant relationship between this lawsuit and the state of Washington.

Nevada and California similarly do not have a significant relationship to this case. Defendants claim Nevada law would be applicable because "[e]vents discussed in the Chapter occurred in Nevada (Book at 41-42), [and] California (*id.* at 52)."  *See* Withdrawn Renewed Special Motion at p. 3.  However, this too is not a significant relationship.  Quite simply, it was

not the events that occurred in Nevada and California that gave rise to this lawsuit; rather it was Defendants' defamatory statements about these events that led to this lawsuit and Plaintiff's injury in Florida.  In fact, the relationship between these two states and this lawsuit is so miniscule that this one sentence by Defendants is the only mention of Nevada and California in the entire Withdrawn Renewed Special Motion. Thus, Nevada and California law clearly should not apply as well.

## IV.    STANDARD OF REVIEW FOR A 12(b)(6) MOTION

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a defense of "failure to state a claim upon which relief can be granted" may be raised by motion in response to a pleading. Fed. R. Civ. P. 12(b)(6). In considering a motion to dismiss under Rule 12(b)(6), a court must take all well pleaded facts in the complaint as true and view them in the light most favorable to Plaintiff.  *See Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S. Ct. 1843, 1849, 23 L. Ed. 2d 404 (1969). The court must only consider those facts alleged in the complaint is considering such a motion. See *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994). A complaint should be dismissed if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232, 81 L. Ed. 2d 59 (1984). We are required to accept the facts as set forth in the plaintiff's complaint as true, and our consideration is limited to those facts contained in the pleadings and attached exhibits. *Thaeter v. Palm Beach County Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006) )(quoting *Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007).

As a result, the allegations of the Amended Complaint are to be taken to be true for present purposes, in addition to adopting reasonable inferences in favor of Plaintiff while rejecting inferences that might otherwise be drawn against the Plaintiff's claim. Plaintiff's

Declarations I and II also support the allegations of the Amended Complaint. Exhibit A.

**V.      PLAINTIFF STATED A VALID CLAIM**

Defendants assert four grounds for arguing that the Amended Complaint fails to state a

claim upon which relief may be granted: (1) That under the Fair Report Privilege Defendants

have merely reported the statements of others, (2) That the publication of opinions and/or

hyperbole are not actionable under defamation law, (3) That Plaintiff is a limited public figure

because years earlier he made public statements about an entirely unrelated issue, (4) That

Plaintiff has not alleged actual malice by Defendants because previous stories were

"unchallenged." (5) That other torts cannot proceed if defamation does not.

**A)      Defendants Reliance on External Evidence Exceeds Rule 12(b)(6)**

Initially, FRCP 12(b)(6) motion to dismiss for failure to state a claim rests upon the

Complaint alone, and any exhibits, which are so integrally part of the allegations of the

Complaint as to be considered part of it, such as a contract, sued upon.

Here, Defendants' motion relies extensively on external documents.  Defendants argue

that the Court may consider those exhibits by taking judicial notice of court filings and court

proceedings and the like.  However, these documents are not even relevant, as Defendants

concede at page ix of the Book that the representations at issue concerning Plaintiff came from

confidential U.S. Government sources and are not a regurgitation of Playboy magazine or other

articles and documents. Indeed, this so-called new information is the selling point of the Book.

And, by cleverly relying on these confidential sources, Defendants try to immunize themselves

from liability for their defamatory false and misleading statements, as they think that no one can

challenge this illegal attack on Plaintiff designed to create a sensational albeit defamatory story

to sell their Book. Exhibit A ¶ 8. In any event, the external documents, particularly when

juxtaposed with the untruthful statements setting forth the defamation at issue in the Amended

Complaint and Plaintiff's Declarations, are clearly issues of fact for the jury to decide. It would be premature to even consider taking these factual issues away from the jury of Plaintiff's peers.

**B) <u>Defendants Statements Are Defamatory and Per Se Defamatory</u>**

The elements of a claim for defamation are as follows: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Internet Solutions Corp. v. Marshall*, 39 So. 3d 1201, 1214 (Fla. 2010) citing *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008).

Here, clearly there was a publication which contained several factual falsities about Plaintiff Montgomery, as set forth in this brief. For example, on page 32 of his Book, Defendant Risen publishes, " . . . Dennis Montgomery was a man who understood how best to profit from America's decade of fear . . . a time to make money . . . lawyers fanned out across the country to try to block any information about Montgomery and his schemes . . ." This is one of many examples outlined above. Yet, in 2012, Plaintiff Montgomery himself told James Risen (via a back and forth email chain between the two) "Why have you [Risen] not chased the money, and contacted Warren Trepp who kept all of the money. I don't get that?" Further, on November 1, 2012, Plaintiff Montgomery wrote to Defendant Risen, "His [Warren Trepp] role? He is the CEO of eTreppid. **He got all of the money**. Why was he not in your story?" (emphasis added). Then again, on November 14, 2012, Plaintiff Montgomery writes to Defendant Risen, "What is it you really want from DM [Dennis Montgomery]? **You don't bother to pressure the people that got the money, Trepp**. You don't bother the people that were there from the CIA, NSA, DIA, Big Safari, Fort Washington, Air Force, etc. You don't bother Tenet, Brennan, Clapper, Salvatori, Secretary Roche, or any of the other people that were involved in the projects . . . Why DM [Dennis Montgomery]?" (emphasis added). *See* Initial Disclosure Documents at Exhibit O.

31

Since 2012, Defendant James Risen has been in personal contact with Plaintiff Montgomery and knew, specifically, that Dennis Montgomery did not benefit financially from his technologies, yet falsely published it anyway. Exhibit A ¶ 16. Plaintiff Montgomery pleaded with Risen to contact the person who truly benefited from the "War on Terror," Warren Trepp. Risen was fully aware and published anyway, with malice, that Montgomery ". . . was a man who understood how best to profit from America's decade of fear . . . a time to make money."

Importantly, **even Defendant Risen admits that " . . . it is very difficult to tell what is actually true."** ArtsBeat: Book Review Podcast: James Risen's 'Pay Any Price', by John Williams, <u>The New York Times</u>, October 24, 2014, [http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/](http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/), based upon Louise Richardson's review of Risen's book and publishing a podcast interview of James Risen with Lucy Worsley. Why then viciously defame Dennis Montgomery, who Risen and the publisher make the "pigeon" in their defamatory and dishonest "shooting gallery" to sell books in Florida and elsewhere by destroying Plaintiff?

Defamation per se, which is described with the other types of defamation in the Amended Complaint and herein provides: a statement is *per se* defamatory if "it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession, or office, or (d) the other being a woman, acts of unchastity." *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So. 2d 495, 497 (Fla. 1953) citing Restatement, Torts, Section 570.

"The significance of the classification of a communication as actionable per se lies in the fact that its victim need not plead or prove malice (except where a privilege is involved) or special damage because malice and the occurrence of damage are both presumed from the nature

32

of the defamation." *Wolfson v. Kirk*, 273 So. 2d 774, 777 (Fla. Dist. Ct. App. 4th Dist. 1973) cert. denied, 279 So. 2d 32 (Fla. 1973); citing *Sharp v. Bussey*, 137 Fla. 96 (Fla. 1939); *see also Campbell v. Jacksonville Kennel Club, Inc*., 66 So. 2d 495, 497 (Fla. 1953) (proof of general or special damages is unnecessary where the words are actionable per se). "Such a presumption is not an ordinary presumption of fact, but is a presumption of law and is not, therefore, dispelled by the production of evidence." *Wolfson,* 273 So.2d at 777.

Here, Defendants published in Florida and nationwide – **based on knowingly false and misleading published facts** –  that Dennis Montgomery is a con-artist, a fraud, a hoax, and dishonest.  Among other defamatory statements, Defendants state that Plaintiff Montgomery defrauded CIA Director George Tenet and the U.S. Government generally with regard to contracts with the Government, which published and accused Plaintiff Montgomery of having committed crimes under the False Claims Act, 31 U.S.C. §§ 3729 – 3733, and also common law and statutory fraud. Defendants further knowingly falsely published that Dennis Montgomery lied to the U.S. Government which is a criminal violation of 18 U.S.C. § 1001. This is defamation *per se,* as it relates to Plaintiff's trade or profession as it says that Plaintiff committed a crime.

## C)  <u>Defendants' Statements Are Not Protected By the Fair Report Privilege</u>

With great panache and chutzpah, given that Defendants credit their publication as having been based on confidential government source information and not previously published old documents, Defendants assert the Fair Report Privilege. Stated simply, Defendants contend that they are merely reporting on what other people have already said. However, this is simply irrelevant and yet another falsehood, not just because they tout and base their Book on new confidential source information, however much they knew or had reason to know that the information was false and misleading, but because Defendants made many emphatic statements

which are defamatory pronouncements in their own voice, unfiltered by any other speaker or source.

Yet, "[E]ven where a qualified privilege exists, i.e. "statements of a citizen to a political authority regarding matters of public concern," that privilege carries with it the "obligation to employ means that are not improper," *Fla. Fern Growers Ass'n v. Concerned Citizens*, 616 So. 2d 562, 569 (Fla. Dist. Ct. App. 5th Dist. 1993).  "[T]he mode, manner or purpose of the communication would go to the question of abuse or forfeiture of the privilege." *Fla. Fern Growers Ass'n v. Concerned Citizens*, 616 So. 2d 562, 569 (Fla. Dist. Ct. App. 5th Dist. 1993) citing *Nodar v. Galbreath*, 462 So. 2d 803, 809 (Fla. 1984).

Furthermore, and to reemphasize, Defendants publish "[m]any people have criticized the use of anonymous sources. Yet all reported know that the very best stories – the most important, the most sensitive rely on them. This book would not be possible without the cooperation of many current and former government officials and other individuals who were willing to discuss sensitive matters only on the condition of anonymity." Thus, it is highly unethical and misleading for defense counsel to make the Fair Reporting Privilege argument, in light of her own clients' touting of the new confidential source information contained in the Book, which has never been published before. This is the same Washington, D.C. defense counsel that misinformed this Court, even after Plaintiff's counsel told counsel to correct it, that Plaintiff is not a registered voter in Florida. Amended Complaint ¶ 13.

Even if the Fair Reporting Privilege applied, which it does not, the Fair Report Privilege also does not immunize Defendants because they did not engage in fair reporting.  Even a review of the numerous exhibits attached to Defendants' motion raises (1) many red warning flags and (2) overwhelming contrary evidence to the dishonest, lopsided spin published by Defendants.

Just the motion exhibits alone reveal that Defendants' published statements do not fairly present the record that Defendants claim to be reporting from.

Finally, Defendants attempt to claim a Fair Report Privilege premised at one point on their assertion that previous reports about Dennis Montgomery went <u>unchallenged</u>. But that is false. Dennis Montgomery repeatedly, persistently, and overwhelmingly "challenged" all of these reports to all publications and authors involved, including directly to James Risen. Exhibit A ¶ 47. Instead, Defendant Risen attempted to blackmail Plaintiff by demanding that he provide classified documents and information to him or else he would publish the false and misleading statements that he later did publish in the Book. That is, when Plaintiff warned him that the reports were false and misleading, Defendant Risen responded to him by telling him that he would not publish those false statements if instead he provided him with classified information and documents. Exhibit A ¶ 108. Moreover, Defendants make defamatory statements and not opinion.[3]

### D)     <u>Defendants' Statements Amount to Defamation by Implication</u>

---

[3] Defendants argue that the case must be dismissed with regard to statements that are either opinion or rhetorical hyperbole. An opinion is not actionable only if it cannot be objectively verified as false or cannot "reasonably be interpreted as stating actual facts" about the plaintiff. *Milkovich*, 497 U.S. at 18-20. However, a statement of opinion is actionable if it has an explicit or implicit factual foundation and is, therefore, objectively verifiable, which is the case herein. *Guilford Transp. Industries, Inc. v. Wilner*, 760 A.2d 580, 596 (2000); *see also Moldea v. New York Times Co.,* 22 F.3d 310, 313 (D.C. Cir. 1994) (statements of opinion actionable "if they imply a provable false fact, or rely upon stated facts that are provably false"). Here, Appellees statements can objectively be verified as false, both in its explicit as well as implicit reliance in a factual foundation. Moreover, mixed statements of opinion and fact are actionable. *Harper, James and Bray, 2 The Law of Torts 2d, § 5.8 at 66-68; Restatement of Torts 2d § 566 (1977).* This is also true in New York, where the statements were made. *Steinhilber v. Alphonse*, 501 N.E.2d 550, 551 (N.Y. 1986).

Defendants made many different types of statements in great quantity. There are only a few statements that might qualify as opinion or hyperbole. But those are not the statements that Plaintiff is suing upon. There are an abundance of defamatory factually-based statements made by Defendants which are actionable and are neither opinion nor hyperbole.

"Defamation by implication arises, not from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts . . . ." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008).  Defendants committed both forms of defamation by implication. For example, Defendants accuse Plaintiff of being motivated by greed. In fact, greed is one of the themes and in the title of the Book.  Defendants publish that Plaintiff defrauded the Government to make money out of greed. Amended Complaint ¶ 44, 47.  Yet Defendants omit facts and thereby create a defamatory statement.  Defendants knew that Warren Trepp received nearly all of the money from the government contracts while Plaintiff Montgomery did not receive any distribution of company profits and was paid a relatively small salary. Amended Complaint ¶ 47; Exhibit  A ¶ 7. Defendants also omit that the company eTreppid gave up private sector opportunities of equal financial value.  Those omissions create the defamatory implication that Plaintiff defrauded the U.S. Government – a crime – for greed.  Since Plaintiff did not receive any profits from eTreppid, he would not benefit from defrauding the federal government. Furthermore, eTreppid was not paid for results but for computer and technical analysis of videos supplied to it.[4]

As defamation by implication, Defendants further state "[contractors] make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end." Amended Complaint ¶¶ 191,192. However, eTreppid was paid for analyzing videos that the C.I.A. wanted to have analyzed, not contingent upon results. Exhibit A ¶ 17. The Plaintiff's

---

[4] Defendants also make the false claim that Plaintiff's software does not work, and that he defrauded the federal government, a crime.  Defendants intentionally omit the fact that the Government has continued to use Plaintiff Montgomery's software and technology. Amended Complaint ¶ 49.  By omitting this fact, the reader is led to believe that Plaintiff's software was indeed a hoax, and not an integral part of the government's software capabilities. Amended Complaint ¶¶ 207-208; Exhibit A ¶¶ 12-13.

employer was paid for doing the software and technological work requested, not for finding terrorists necessarily. These are just a few examples of defamation by implication committed by Defendants. *Id.*

### E) Defamation Is For the Jury to Decide

When a plaintiff requests a jury trial, it is not for the district court to decide whether a statement is defamatory or not.  "It is only when the court can say that the publication is not reasonably capable of *any* defamatory meaning and cannot be reasonably understood in *any* defamatory sense that it can rule as a matter of law, that it was not libelous."  *Levy v. American Mut. Ins. Co.*, 196 A.2d 475, 476 (D.C. 1964) (Emphasis added); *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001).   "**[I]f the language is capable of two meanings, one actionable and the other not, it is for the jury to determine which of the two meanings would be attributed to it by persons of ordinary understanding under the circumstances.**" *Levy*, 196 A.2d at 476 (Emphasis added). "[A] jury must determine whether these impressions were actually conveyed, whether they were false, and whether the letters were motivated by actual malice." *White v. Fraternal Order of Police*, 909 F.2d 512, 525 (D.C. Cir. 1990); *see also Dunn v. Gannett New York Newspapers, Inc.*, 833 F.2d 446, 449 (3d Cir. 1987) ("if the language at issue is 'capable of both a defamatory and a nondefamatory meaning, there exists a question of fact for the jury.'").

Whether there was a showing of constitutional malice is also a matter for the jury to decide. *See Sco Group, Inc. v. Novell, Inc.,* 439 Fed. Appx. 688, 695 (10th Cir. Utah 2011) ("the jury was instructed to consider slanderous only those statements uttered with constitutional malice"). Recognizing the role of the jury in determining constitutional malice, the U.S. Court of Appeals for the Ninth Circuit has held:

We  must  attempt  to  discharge  our  constitutional  responsibility  to  protect  First

> Amendment values without unduly trenching on the fact-finding role of the jury
> and trial judge. We are mindful that in *New York Times, Bose,* and *Harte-Hanks,*
> the Supreme Court was fashioning a process for reviewing the evidence which
> permits judicial protection of First Amendment values while still paying due
> deference to the fact-finding role of juries, and particularly the jury's opportunity
> to observe the demeanor of the witnesses.

*Newton v. National Broadcasting Co.,* 930 F.2d 662, 672 (9th Cir. 1990). Indeed, the jury's

observation of Plaintiff and especially Defendants' credibility is precisely what is needed here.

Defendants falsely claim that they did not knowingly post false and defamatory information

about Plaintiff.  It is up to the jury to determine whether these Defendants are credible. *See also,*

*St. Amant,* 390 U.S. at 732, *supra* ("The finder of fact must determine whether the publication

was indeed made in good faith.").

### F)  Actual Malice Is Not Necessary As Plaintiff Is Not a Public Figure But Actual Malice Exists and Has Been Shown In Any Event

Dennis Montgomery is not a public figure. He is not even a limited public figure as

discussed below. Plaintiff Montgomery is a private citizen who worked with government

agencies at their request and has continued to seek and has sought a private, nonpublic life with

his wife and children. Therefore, evidence of actual malice, as Defendants disingenuously put

forth, is not required even under the strictest standards of Florida defamation law. However,

actual malice has been pled in any event, as is evidenced in the Amended Complaint and

Plaintiff Montgomery's incorporated Declarations for the purposes of punitive damages to deter

this kind of intentional and malicious behavior from repeating itself against an innocent victim.

First, in proving constitutional malice, a plaintiff may use evidence of all of Defendants'

acts in in order to establish that constitutional malice existed. *Goldwater v. Ginzburg*, 414 F.2d

324, 342 (2d Cir. 1969) ("the court properly instructed the jurors that they should consider all the

evidence concerning appellants' acts and conduct in publishing fact in deliberating upon whether

Defendants published with actual malice"); *Harte-Hanks Communications v. Connaughton*, 491

U.S. 657, 668 (1989). In *Harte-Hanks*, the U.S. Supreme Court held that "it is clear that the conclusion concerning the newspaper's departure from accepted standards ***and the evidence of motive*** were merely supportive of the court's ultimate conclusion that the record "demonstrated a reckless disregard as to the truth or falsity of [defendant]'s allegations and thus provided clear and convincing proof of 'actual malice' as found by the jury. ***A plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry***." *Harte-Hanks*, 491 U.S. at 668 (internal citations omitted) (emphasis added).

Second, relying on circumstantial evidence to prove constitutional malice has become the proper method. *See e.g.*, *Khawar v. Globe Int'l, Inc.*, 965 P.2d 696, 709 (Cal. 1998) ("To prove this culpable mental state, the plaintiff may rely on circumstantial evidence, including evidence of motive and failure to adhere to professional standards."), *cert. denied,* 526 U.S. 1114 (1999); *Sprague v. Walter*, 656 A.2d 890, 907 (Pa. Super. Ct. 1995) ("Any competent evidence can be used to establish actual malice."), *Appeal denied,* 670 A.2d 142 (Pa. 1996).

State and federal courts have undoubtedly recognized that:

> "it would . . . be rare for a defendant . . . to admit to having had serious, unresolved doubts . . . ***Requiring proof of recklessness "without being able to adduce proof of the underlying facts from which a jury could infer recklessness . . . would limit successful suits to those cases in which there is direct proof by a party's admission of the ultimate fact.***"

*Eastwood v. Nat'l Enquirer, Inc*., 123 F.3d 1249, 1253 (9th Cir. 1997) *(emphasis added)* ("As we have yet to see a defendant who admits to entertaining serious subjective doubt about the authenticity of an article it published, ***we must be guided by circumstantial evidence. By examining the editors' actions we try to understand their motives***."); *Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1569 (D.C. Cir. 1984) ("The plaintiff need not obtain any admission of fault from the defendant."), *vacated on other grounds,* 477 U.S. 242 (1986); *Goldwater,* 414 F.2d

at 343. If this were not the law, "mere swearing could, as a matter of law, defeat any action to

which the *New York Times* principles are applicable." *Guam Fed'n of Teachers v. Israel,* 492

F.2d 438, 439 (9th Cir. 1974), *cert. denied,* 419 U.S. 872 (1974).

Third, " . . . most authorities suggest that a failure to retract, in conjunction with other

circumstances, may be used to establish the requisite level of [constitutional] malice." John C.

Martin, Comment, The Role of Retraction in Defamation Suits, 1993 U. Chi. Legal F. 293, 295

(1993); accord, e.g., *Tavoulareas v. Piro*, 817 F.2d 762, 794, 260 U.S. App. D.C. 39 (D.C. Cir.

1987) (*en banc*) (refusal to retract can be evidence of actual malice); *Golden Bear Distrib. Sys. of

Tex., Inc. v. Chase Revel, Inc.*, 708 F.2d 944, 950 (5th Cir 1983), abrogated on other grounds

by *Hiller v. Mfrs. Prod. Research Grp. of N. Am., Inc.*, 59 F.3d 1514, 1520-21 (5th Cir.

1995); Restatement (Second) of Torts § 580A, cmt. d (1977) ("Under certain circumstances

***evidence [of a refusal to retract a statement after it has been demonstrated to be false] . . .***

***might be relevant in showing recklessness at the time the statement was published***.") (emphasis

added).

By no stretch of the imagination did Plaintiff Montgomery "make[] conclusory assertions

of the elements of actual malice" as Defendants attempt to put forth in their Motion to Dismiss.

Indeed, actual malice, even if Plaintiff Montgomery were a public figure or limited public figure

– which he is not – is pled more than sufficiently throughout the Amended Complaint and it is

set forth at paragraphs 10 to 12 of Declaration II. In the Amended Complaint's paragraphs 68

through 95, Plaintiff extensively pleads and sets forth actual malice by Defendants, including

that Defendant Risen was warned, according to his own admission and confession, that The New

York Times and other journalistic outlets would not publish many of these claims, ignored many

warning signs that his claims about Montgomery were obviously false and/or preposterous,

ignored contradictory information available, and ignored the Plaintiff's warnings in many communications that the statements were false.

For example in the Amended Complaint's paragraph 69, it states "Defendant Risen ignores evidence that should have warned him and the other Defendants that their false and misleading publications are wrong into yet another example that Plaintiff Montgomery kept defrauding the Government."  Moreover, the Book has a political agenda to attack.  In the Amended Complaint's paragraph 65, the Complaint states, "The Book is an intentional, politically-driven, falsified, and misleading attack on U.S. foreign, military, and intelligence policies in the 'war on terror' against Islamic terrorism, meant to mock and ridicule a strong national defense."

Of even greater importance, Plaintiff's Declarations sets forth with great specificity the actual malice, both in terms of direct and circumstantial evidence. Exhibit A. Declaration I is incorporated as Exhibit C into the Amended Complaint.

### G) Plaintiff Is Not A Public Figure or Limited Public Figure

Because Plaintiff is neither a public figure nor a limited public figure, he may prevail at trial without pleading or proving that Defendants acted with actual malice while defaming him. In contrast, a public figure or limited purpose public figure – to pass constitutional requirements under the First Amendment as taught by *New York Times v. Sullivan,* 376 U.S. 254 (1964) – may prevail at trial only by proving actual malice by the defaming speaker.

> In Florida, our supreme court has adopted negligence as the applicable standard for recovery of actual damages in a case which involved a private figure and a public issue. *Miami Herald Publishing Co. v. Ane*, 458 So.2d 239 (Fla.1984). Although language in *Ane* appears to interpret *Gertz* as eliminating the issue of public interest or concern from a discussion of the standard, the latest case from the United States Supreme Court, decided after *Ane*, interprets *Gertz* and makes clear that courts must consider whether the alleged libel concerns a matter of public or private concern. See *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985).

*Della-Donna v. Gore Newspapers Co.*, 489 So.2d 72, 75-76, 11 Fla. L. Weekly 943 (Fla.App. 4 Dist., 1986)

Nevertheless, despite having no obligation to do so, Plaintiff has convincingly pled extensive allegations of facts establishing in multiple ways that Defendants acted with actual malice in their defamation of Plaintiff Montgomery. See Amended Complaint ¶¶ 87-94.

First, Plaintiff is clearly not a public figure: "Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society," an individual is not a public figure for all purposes. *Gertz*, 418 U.S. at 328, 352.  Working on secret programs under contract to the CIA, Montgomery has not sought or acquired any position of public power or influence which would give him the ability to protect himself apart from the Courts within the meaning of *New York Times v. Sullivan*, 376 U.S. 254 (1964) or its progeny:

> The Court articulated two policy reasons for requiring public figures to show actual malice. First, public figures enjoy "greater access to the channels of effective communication" than private individuals, and are therefore better able to "contradict the lie or correct the error." Id. at 344,  94 S.Ct. 2997. Second, the Court identified a normative consideration, rooted in the observation that public figures became such "by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention."

*Gertz*, 418 U.S. at 342.  As a result, Plaintiff Montgomery is not a public figure.

However, second, Defendants assert their unsupported conclusion that Plaintiff is a "limited purpose public figure."  A limited purpose public figure is treated as a public figure *only limited to certain topics, periods of time, venues*, only when he has voluntarily thrust himself into a *particular* public controversy, and *only with regard to that particular public controversy*:

> Although *Gertz* made it clear that the actual malice standard should apply when the plaintiff is a limited public figure, it provided little guidance for determining when a person has achieved that status. As the parties agree, the issue involves a mixed question of law and fact which was properly presented for the trial court's determination prior to the jury trial. Basically, two factors must be present before a person may be considered a limited public figure. First, the circumstances in which a person achieves public figure status must rise to the level of a public

controversy and may not be a matter of mere public interest. [8] Second, the person must have ***voluntarily thrust himself*** into the vortex of ***that*** controversy. [9]

*Arnold v. Taco Properties, Inc.*, 427 So.2d 216 (Fla. App. 1 Dist., 1983) *(emphases added).*

As the Eleventh Circuit has explained the Court must "examine the plaintiffs' involvement in the controversy" and "determine whether the alleged defamation [was] germane to the plaintiffs' participation in that particular controversy:"

> In *Silvester*, we adopted the three-part analysis for establishing limited public figure status set forth in *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1297 (D.C.Cir.1980). As we stated in Silvester, "[u]nder the *Waldbaum* analysis, the court must (1) isolate the public controversy, (2) examine the plaintiffs' involvement in the controversy, and (3) determine whether 'the alleged defamation [was] germane to the plaintiffs' participation in the controversy.' " 839 F.2d at 1494, quoting *Waldbaum*, 627 F.2d at 1297.

*Long v. Cooper*, 848 F.2d 1202 (11th Cir. (Ala.), 1988) (citing to *Silvester v. American Broadcasting Companies, Inc.*, 839 F.2d 1491, 1493 (11th Cir.1988)); *Saro Corp. v. Waterman Broadcasting Corp.*, 595 So.2d 87 (Fla.App. 2 Dist., 1992). Similarly:

> Under *Gertz*, Trump University must have "thrust [itself] to the forefront" ***of this particular controversy*** "in order to influence the resolution of the issues involved." 418 U.S. at 345, 94 S.Ct. 2997.

*Makaeff v. Trump Univ., LLC*, 715 F.3d 254 (9th Cir., 2013) (emphasis added); *Gertz*, 418 U.S. at 352, 94 S.Ct. 2997.

Here, Dennis Montgomery is not even a "limited public figure" with regard to the topics of Defendants' defamation of him at issue in the case at bar. Defendants' defamation of Plaintiff Montgomery is not "germane" to his prior revelations about Congressman and later Governor Gibbons. Put another way, the topics of Defendants' defamation fall outside of the "limited" aspect of a "limited purpose public figure."

In 2005, Plaintiff quietly filed whistleblower complaints with the Defense Intelligence Agency ("DIA") and CIA. Then in 2006 Plaintiff filed a False Claims Act ("FCA") complaint ("qui tam" action) in court, under seal concerning Gibbons. Eventually the court unsealed that complaint. When the court unsealed the complaint in the court's file, this resulted in news

coverage, which Plaintiff did not seek.  Eventually, on the advice of counsel at the time, and the business owner Edra Blixseth, Plaintiff finally relented to requests for comment and granted (as he recalls) only ***one (1)*** interview with NBC News, which he recalls lasting about 45 seconds to a minute on the air.

By contrast, here, on Page 9 of their Motion to Dismiss, Defendants reference news coverage arising from Warren Trepp's allegations in court filings in litigation.  Plaintiff Montgomery sought to get paid his full share of the income of eTreppid.  Trepp responded to Montgomery's demand for payment by hurling accusations against Montgomery in court.  As conceded on their Page 9, Defendants knew that Trepp's accusations trying to avoid paying Montgomery cannot be trusted as reliable.  But Defendants also concede that Trepp in court, not by the Plaintiff, raised the controversy concerning Montgomery's work.

Next, Defendants point to other defamatory news coverage.  However, a private person cannot be transformed into a limited purpose public figure by defamation.  *Rety v. Green*, 546 So.2d 410, 14 Fla. L. Weekly 1829 (Fla. App. 3 Dist., 1989) highlights that "a defendant in a defamation action cannot by his defamation make the plaintiff a limited public figure for First Amendment purposes." *Id.*

> First, it is clear beyond any doubt that the plaintiff Rety was not a "limited public figure" under *Gertz* prior to the instant controversy, and, consequently, "actual malice" was not required to be proved as an essential element in the plaintiff's cause of action. Rety was a private businessman who owned and operated an exclusive French restaurant in Bay Harbor Islands. He advertised his restaurant as do many other private businessmen, but he was in no sense a public personality. In particular, he did not "thrust [himself] to the forefront of [a] particular public controvers[y] in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 345, 94 S.Ct. at 3009. Indeed, he only became publicly prominent in the Bay Harbor Island community due to the widespread publication of Green's defamatory letter, and obviously a defendant in a defamation action cannot by his defamation make the plaintiff a limited public figure for First Amendment purposes; the said plaintiff, unlike this case, must be a limited public figure prior to the alleged defamation. The trial court therefore properly ruled throughout the case that Rety was "a private individual for purposes of the defamation count."

See *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1293 n. 12 (D.C.Cir.), cert. denied, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980).

*Rety v. Green*, 546 So.2d at 424. Similarly:

> Nor does Transmission Kingdom fit into the limited public figure test. WBBH created a public controversy, not Transmission Kingdom. The facts do not support a conclusion that Transmission Kingdom thrust itself into that controversy as a central figure and brought attention upon itself. Further, the facts are certainly not beyond dispute for the purpose of summary judgment; when viewed in the light most favorable to Transmission Kingdom, the facts show Transmission Kingdom was dragged into a limelight it least desired.

*Saro Corp. v. Waterman Broadcasting Corp.*, 595 So.2d at 89.

Finally, Defendants contend that "Montgomery further became a public figure because he sought out U.S. government contracts involving national security even after he was subject to extensive media scrutiny." In fact, however, Plaintiff Montgomery never at any time sought out any U.S. Government contracts, involving national security or otherwise.

Warren Trepp and Edra Blixseth sought out U.S. Government contracts – not Dennis Montgomery. Exhibit A ¶ 88. Defendants persist in curiously skipping over Warren Trepp who actually dealt with the government in order to bizarrely defame Plaintiff as "conning" the U.S. Government. But Plaintiff did not deal with the U.S. Government. Trepp did. Defendants' actual malice and defamation comes sharply into focus upon recognizing that Defendants blame Dennis Montgomery for "greed" and for "conning" the U.S. Government when it wasn't Montgomery who negotiated or contracted with the government. Defendants cleverly seek to exonerate Trepp, who was involved with Michael Milken, Ivan Boskeyin the Drexel Burnham Lambert securities scandal in the 1980s.

Furthermore, eTreppid already had contracts lined up with private sector clients. The U.S. Government sought out eTreppid and Montgomery, not the other way around. So Plaintiff

did not "con" the government out of "greed" when the U.S. Government approached eTreppid.

Exhibit A ¶ 11-15.

Also, an inapposite case cited by Defendants is *CACI Premier Tech., Inc. v. Rhodes*, 536

F.3d 280, 295 (4th Cir. 2008).  Whereas a contractor taking a position in the middle of Iraq might

have understood and voluntarily assumed the risk of being part of the ongoing news story of the

U.S.-led coalition's liberation of Iraq, by contrast Plaintiff Montgomery was contacted and

persuaded by the CIA and NSA to engage in secret work out of the public eye. Exhibit A ¶ 114.

Even so, Plaintiff has pled actual malice.  As Defendants concede:

> A plaintiff could support a defamation claim with allegations of facts evidencing
> that a defendant was subjectively aware when the defendant published that the
> story was "'(1) fabricated; (2) so inherently improbable that only a reckless
> person would have put [it] in circulation; or (3) based wholly on an unverified
> anonymous telephone call or some other source that [defendant] had obvious
> reasons to doubt.'" *Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003)
> (citation omitted).

Motion to Dismiss, Page 34.  However, Defendants' story is "so inherently improbable that only

a [dishonest or at least] reckless person would have put [it] in circulation." *Id*.  Defendants

knowingly and/or recklessly turn a blind eye to:

i)     Sources who will bear the blame in public and Congressional scrutiny themselves
       unless they can shift blame to a scapegoat like Montgomery.
ii)    The preposterous defamatory statement that a lowly private citizen – not the
       President of the United States or John Brennan at the CIA  – is responsible for
       President George W. Bush's decisions to ground aircraft.
iii)   The U.S. Government's continued hiring of Montgomery's services as obviously
       proving the Defendants' accounts false, and Montgomery's work valuable, rather
       than proving that the U.S. Government is stupid.
iv)    The inherently improbable false and misleading statements that the CIA could be
       'conned' by an 'overweight gambler' in its own backyard, within a familiar,
       common language and culture, but the CIA can uncover secrets in foreign
       countries.
v)     The inherently improbable false and misleading statements that the CIA, NSA,
       and DIA would not independently test and confirm the results of Montgomery's
       software.

      vi)     The actual behavior of Trepp and Flynn furiously trying to seize control of Montgomery's software and technology in legal proceedings, demonstrating their belief that the software was extremely valuable.

      vii)    The fact that the U.S. Government has never demanded repayment from eTreppid of one penny of the $30 million it paid for Montgomery's work.

      viii)   The fact that Warren Trepp has not offered to return any of the $30 million he took from the U.S. Government for work he has since called worthless.

Exhibit A ¶ 11-15.

Evidence of a lack of an effective editorial process is used as objective evidence that collectively supports a finding of constitutional actual malice.[5] *See Warford v. Lexington Herald-Leader Co.*, 789 S.W.2d 758 (Ky. 1990), *cert. denied,* 498 U.S. 1047 (1991).  In *Warford,* the reporters made minimal efforts to verify the credibility of their source. *Id.* The defendants transformed the source's ambiguous statement into "the most potentially damaging alternative" creating a "jury question on whether the publication was indeed made without serious doubt as to its truthfulness." *Id.* at 772-73 (quoting *Rebozo v. Wash. Post Co.*, 637 F.2d 375, 382 (5th Cir. 1981)).

In *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 668 (1989), the U.S. Supreme Court held that "it is clear that the conclusion concerning the newspaper's departure from accepted standards ***and the evidence of motive*** were merely supportive of the court's ultimate conclusion that the record:

> "demonstrated a reckless disregard as to the truth or falsity of [defendant]'s allegations and thus provided clear and convincing proof of 'actual malice' as found by the jury. ***A plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry***." *Harte-Hanks*, 491 U.S. at 668.

*Khawar v. Globe Int'l, Inc.*, 965 P.2d 696, 709 (Cal. 1998) (emphasis added). explains that "To prove this culpable mental state, the plaintiff may rely on circumstantial evidence, including

---

[5]    Pursuant to Florida Statute § 770.02, Plaintiff asked Defendants to correct the defamatory statements and they refused. *See* Exhibit B to the Amended Complaint.

evidence of motive and failure to adhere to professional standards.", *cert. denied,* 526 U.S. 1114 (1999).  As *Sprague v. Walter*, 656 A.2d 890, 907 (Pa. Super. Ct. 1995) explains "Any competent evidence can be used to establish actual malice.", *Appeal denied,* 670 A.2d 142 (Pa. 1996).

Moreover, the Book has a political agenda to attack.  The Amended Complaint's paragraph 77 states "The Book is an intentional, politically-driven, falsified, and misleading attack on U.S. foreign, military, and intelligence policies in the 'war on terror' against Islamic terrorism, meant to mock and ridicule a strong national defense."

Of even greater importance, Plaintiff's declarations sets forth with great specificity the actual malice, both in terms of direct and circumstances evidence. Exhibit A and M, throughout.

Actual malice is a term of art, flowing from proof that the defendant made defamatory statements "with knowledge of [their] falsity or with reckless disregard for the truth."  *Gertz*, 418 U.S. at 342, 94 S.Ct. 2997.  Here, any experienced national security reporter would know that the defamation of Montgomery is false or at a minimum his acts would show a reckless disregard for the truth.

**H) Other Tort Claims Not Barred on the Basis of Defamation**

Defendants assert that Plaintiff's other causes of action must also fail because "[A] plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim." *Moldea II*, 22 F.3d at 319-20 (citing *Cohen v. Cowles Media Co.*, 501 U.S. 663, 670 (1991)).

However, this argument depends upon assuming that constitutional limitations actually do apply in whole or in part to some or all of Defendants' statements.  To the extent that Plaintiff's causes of action are constitutionally valid, the objection will have no application.

The elements of the tort of interference are:

(1) the existence of a business relationship under which the plaintiff has legal rights, (2) an intentional and unjustified interference with that relationship by the defendant, and (3) damage to the plaintiff as a result of the breach of the business relationship.

*Symon v. J. Rolfe Davis, Inc.*, 245 So.2d 278, 280 (Fla. 4th DCA), cert. denied, 249 So.2d 36 (Fla.1971). As is further pointed out in *Azar v. Lehigh Corp.*, 364 So.2d 860, 862 (Fla. 2d DCA 1978).

It is not essential, however, that the business relationship be founded upon an enforceable contract. *Franklin v. Brown*, 159 So.2d 893 (Fla.1st DCA 1964). Thus, in *Calvary Church, Inc. v. Siegel*, 358 So.2d 1134 (Fla.3d DCA 1978), the court affirmed a judgment against a corporation for interfering with the plaintiff's agreement to purchase property from another even though the agreement was not necessarily enforceable against the seller. Moreover, proof of fraud is not required to sustain a cause of action for this tort. *Smith v. Ocean State Bank*, 335 So.2d 641 (Fla.1st DCA 1976).

*Zimmerman v. D.C.A. at Welleby, Inc.*, 505 So.2d 1371, 12 Fla. L. Weekly 1042 (Fla.App. 4 Dist., 1987).

As to the tortious interference claim, retailer argues first that it was barred by the economic loss rule. See HTP, Ltd. v. Lineas Aereas Costarricenses, 685 So.2d 1238 (Fla.1997). We agree with the second district that in this kind of circumstance the tort of interference with prospective advantage is sufficiently independent to withstand the economic loss rule. See Bankers Risk Management Serv., Inc. v. Av-Med Managed Care, Inc., 697 So.2d 158 (Fla. 2d DCA 1997).

*Centro Nautico Representacoes Nauticas, LDA. v. International Marine Co op, Ltd.*, 719 So.2d 967 (Fla.App. 4 Dist., 1998).

## VI.    CONCLUSION

The Court should deny Defendants motions to dismiss under FRCP 12(b)(6) and FRCP

12(b)(1). Personal jurisdiction clearly exists in Florida and this district, and venue is proper here.

Moreover, and importantly, Defendants Book – which is a dishonest hit-piece on Plaintiff, who

becomes their sensationalized defamatory whipping boy to market and sell books – based on

their own admissions, is derived from confidential Government sources, however then distorted

and falsified by Defendant Risen, knowingly and/or recklessly. Thus, Defendants' disingenuous

defense of the Fair Reporting Privilege does not and cannot apply in this case.

This case has been scheduled to go to the jury at the earliest practicable date, as Plaintiff is in poor health due to a brain aneurism and may become incapacitated or not survive a long pre-trial period. This is a relatively simple and straightforward case, as the court also acknowledged at the status conference of April 14, 2015. Defendants, who have huge financial and other resources and are being represented by two mega-law firms, simply will make whatever argument is at their disposal to try to delay adjudication and to avoid their day of reckoning before a jury.

As such, based on the facts and the law, this honorable Court must respectfully deny Defendants' Motions to Dismiss.

Dated:  June 1, 2015

Respectfully submitted,

 /s/ *Larry Klayman*

Larry Klayman, Esq.
Florida Bar No. 246220
7050 W Palmetto Park Rd. #15-287
Boca Raton, FL 33433
(310) 595-0800
leklayman@gmail.com

Attorney for Plaintiff

50

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 1, 2015, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following CM/ECF participant(s):

 /s/ *Larry Klayman*
Larry Klayman, Esq.
Florida Bar No. 246220
7050 W Palmetto Park Rd. # 15-287
Boca Raton, FL 33433
(310) 595-0800
leklayman@gmail.com

Attorney for Plaintiff