Exhibit M

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

DENNIS L. MONTGOMERY

                Plaintiff,

     v.

JAMES RISEN, ET AL.,

              Defendants.

Civil Action No. 1:15-cv-20782-JEM

## <u>DECLARATION OF PLAINTIFF DENNIS MONTGOMERY, IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION CHALLENGING FLORIDA JURISDICTION AND VENUE</u>

Pursuant to 28 U.S.C. §1746, I, Dennis Montgomery, hereby declare under penalty of perjury that the following is true and correct:

1) I am over the age of 18 years old and I make this affidavit on personal knowledge and belief. I am mentally and legally competent to make this affidavit sworn under oath, despite having suffered a brain aneurism and serious related health issues. *See* Exhibits 9, 10, 11, attached to this affidavit.

2) Reporter James Risen of <u>The New York Times</u> and publisher Houghton Mifflin Harcourt Publishing Company published a book <u>Pay Any Price: Greed, Power and Endless War</u> in October 2014 (hereafter "the Book").

3) In Chapter 2 of the Defendants' Book, James Risen and Houghton Mifflin Harcourt Publishing Company lie about me and my work and libel me extensively.

4) Chapter 2 involves me and James Risen focuses almost exclusively on defaming me alone to sell copies of the Book in marketing interviews. Having read the book, I am

its centerpiece, that is, Defendants "punching boy" to sell books. Risen conspicuously ignores the many other events and incidents in the Book and focuses almost exclusively on me when promoting his book for sales in Florida and elsewhere.

5) Whereas, the Defendants, especially Houghton Mifflin Harcourt Publishing Company, have great resources and no doubt have "errors and omissions" insurance to finance their legal defense, I have no money or resources at all.  I lost my house in foreclosure.  The Defendants will be able to afford to litigate the claims in Florida.

6) My finances, employment, career and business opportunities have been severely devastated and destroyed by the false and misleading statements made by the Defendants, contributing to the loss of my previous house in foreclosure and driving me into poverty just at the time I have also been diagnosed with serious medical problems.

7) The Defendants' published defamatory and false and misleading statements which are not opinion or hyperbole and are not fair reporting of their sources or public records. The defamation is specifically false and misleading in factually verifiable terms, including in that:

   a. Defendants published defamatory material and statements from confidential government sources in the intelligence and military communities. The false and misleading statements did not result from fair reporting of previously published material. They admit this on page ix of the Book stating, "Many people have criticized the use of anonymous sources. Yet all reporters know that the very best stories – the most important, the most sensitive – rely on them. This book would not be possible without the cooperation of may current

2

and former government officials and other individuals who were willing to discuss sensitive matters only on the condition of anonymity." Indeed, this is a big selling point of Defendants' book. It publishes new information, however defamatory, that had not been accessible or published before. This is why the Book is a bestseller in Florida and elsewhere, particularly given that Florida is at the center of U.S. Government counterterrorism military and intelligence operations, as I testify to below.

b. The Defendants actually know that their U.S. Government sources are the ones who will bear the public blame for their own poor decisions if they do not shift the blame implausibly to me with the Defendants' concerted help.

c. Defendant James Risen intentionally omitted several important facts while fabricating defamatory statements and stories about me.

d. The Defendants actually knew that Warren Trepp received most of the money, yet accuse me of fraud to obtain money while excusing politically-connected Warren Trepp who took and kept the money and controlled the company.

e. The Defendants' falsely and misleadingly state that I fabricated intelligence to make money.  In fact, eTreppid was paid for software work and analysis, not contingent upon results or conditional upon finding any terrorist threats.  Our work was complete and payment due merely for doing the analysis the CIA and other Government officials asked us to do.

f. My software and technology did work, does work, and is still being used successfully by the U.S. Government today.

g. The Defendants actually know that Warren Trepp has never paid back any of

the $30 million that eTreppid received from the U.S. Government nor offered
to pay any of it back nor has the U.S. Government asked for any of the money
back.  Therefore, James Risen actually knows that his defamation of me is
false and misleading.  If eTreppid received $30 million from the U.S.
Government for the use of my software and technology that was a purported
fraud or a hoax, eTreppid would have to pay the money back to the U.S.
Government.  But the U.S. Government knows that my software and
technology actually worked and works and is valuable, which is why eTreppid
does not have to pay any of the $30 million back.

h.  In fact, the Defendants ignore and intentionally omit my ten (10) patent
applications, which attest to and show my expertise.

i.  The U.S. Government independently tested and verified the results of my
software and technology and did not rely upon my word alone. The U.S.
Government officials sought me and my technology out.

j.  The data detected by my software and technology did predict actual terrorist
incidents and/or meetings in advance.

k.  I could not have fabricated intelligence from my work, as Defendants defame
me, without being certain that no one else would independently verify my
work in any number of other ways available to the CIA, NSA, and military.

l.  I and the companies I worked with had equal or better opportunities to provide
my services to private sector companies, and had no need to work for the U.S.
Government to make the same amount of money or less.

m.  I was motivated by patriotism, not greed, in turning down equivalent

opportunities to provide services to the private sector to answer requests for help in the war on terror by the U.S. Government.

n. The Central Intelligence Agency ("CIA") wanted experts to analyze Al Qaeda videos.

o. It was the CIA who proposed to eTreppid that we would analyze Al Qaeda videos.  The defamation of me states that I fraudulently sold the CIA and U.S. Government on a fantasy using fabricated intelligence.  In fact, the CIA and the U.S. Government approached us with what they wanted analyzed.

p. The Defendants actually knew that Warren Trepp closed the "sales" of contracts by persuading the U.S. Government, yet falsely accuse me of selling a fantasy of fabricated intelligence to the U.S. Government, while excusing Trepp, as a fraudulent scheme to obtain money.

q. Defendants' falsely state that I persuaded the President George W. Bush to ban international passenger aircraft from entering U.S. airspace and nearly shoot down passenger aircraft. However, I never provided any interpretation of what the hidden data we uncovered meant.  We merely provided the uncovered data to the U.S. Government experts for their interpretation.  Even when pressed, I refused to offer any national security interpretation of the data.

r. As obvious from the records and documents that the Defendants rely upon, the Defendants' so-called sources Michael Flynn, Tim Blixseth, and Warren Trepp went to extraordinary and expensive legal and extra-legal (self help) efforts to furiously get ownership of my work as being extremely valuable,

while simultaneously stating that my work had no value.

s.  Michael Flynn, Tim Blixseth, and Warren Trepp were attempting to invoke the fraud exception to bankruptcy laws to invalidate my bankruptcy, and therefore the Defendants knew that they had motives to fabricate or embellish their false statements against me.

t.  The public records that the Defendants claim to be relying upon – though voluminous – overwhelmingly contradict the Defendants defamation of me.

u.  On September  28, 1998, I and Warren Trepp co-founded eTreppid Technologies ("eTreppid") based on  a "Contribution Agreement" of that date in which we agreed to own the LLC in equal 50%  shares. Trepp put up money and I conveyed his "software compression technology contained on CD No. 1" to eTreppid. The business plan of eTreppid and the application of the "compression technology" were to compress VHS videotapes used for surveillance in casinos for archiving and more efficient storage.  Over the preceding 20 years I developed and copyrighted other types of software technology, including but not limited to "Object Detection Software" which is a crucial component of, among other things, colorizing black and white movies.  In order for the computer to add color, it must be able to recognize individual objects in the movie which are moving in three dimensions, (that is moving toward or away from the camera and changing in apparent size), aspect angle, orientation, etc.  This was not conveyed to eTreppid and which, per the terms of the "Contribution Agreement", was expressly excluded. Shortly after the formation of eTreppid, I offered to sell one part of his

"Object Detection System" ("ODS") software to Warren Trepp for the sum of $10 million dollars, which Trepp rejected.

v.   As reflected in a form SF-95 Attachment A prepared by me with my then attorney Michael Flynn for presentation to the Government, "Beginning on or about November 2002, on behalf of the US Air Force, Montgomery began work on military applications of his technology at Eglin Air Force base [in Florida] to demonstrate the application of his technologies in the war on terror."

w.   Defendants make the technically absurd and false statement that "The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers," only by falsely misrepresenting that the data was contained only in the "crawl" at the bottom of the screen. This falsified and misleading misdirection and deception to focus only on the crawl is deceptive.  It is patently unbelievable, which Defendant Risen should have known as an expert in national security, that a television signal could not contain such simple data as latitude and longitude coordinates, consisting of only six numbers and two letters (East or West longitude, North or South latitude).

8)  I am a citizen of the State of Florida, with a residence in an apartment community in Miami, Florida. I have a Florida telephone number in this district. I am reporting my address and Miami-Dade, Florida phone number under seal.

9)  I am registered to vote in Florida, as shown in Exhibit 1, attached to this affidavit. I previously had a temporary address while settling on the permanent address that I

have now.  I have updated my voter registration to reflect my current Miami address.

10) I have reviewed the affidavit of defense counsel Laura Handman attached to the

Defendants' motion stating that I had not registered to vote in Florida.  The

Defendants' affidavit is false.  I am registered to vote in the State of Florida, and am

now updating my voter registration with my new address. I was registered to vote in

Florida when Ms. Handman signed her affidavit. She misled this Court.

11) I found on the website of the publisher Houghton Mifflin Harcourt, that Houghton

Mifflin Harcourt Publishing Company maintains permanent and general offices in

Orlando, Florida at 9400 Southpark Center Loop, Orlando, Florida 32819. Exhibit 2,

attached to this affidavit, which I downloaded from the Defendant publisher's website

at  http://www.hmhco.com/about-hmh/our-offices.  These are statements made by the

Defendants about themselves.

12) On the website of the Florida Department of State Division of Corporations, I found

that Defendant Houghton Mifflin Publishing Company is registered to do business in

Florida through the Florida Department of State Division of Corporations. Exhibit 3,

attached to this affidavit, which I downloaded from the Florida Department of State's

website.

13) As shown in those Florida Government documents, in 2008 Defendant changed its

name from "Houghton Mifflin Harcourt" to "Houghton Mifflin Publishing

Company." *Id.*  These are statements made by Defendants about themselves.

14) My research of the publisher also uncovered that Defendants rely significantly upon

sales in the Southeast of the United States through a company "Amazon" for very

substantial sales over the internet.  Amazon's regional distribution centers or

"fulfillment centers" are located in Ruskin, Florida in Hillsborough County and Lakeland, Florida, in Polk County.  *See* Exhibit 4, attached to this affidavit.

15) Much of the defamation which my lawsuit contests is contained within the physical product physically shipped into Florida for sale, the Book written by James Risen and published by Houghton Mifflin Harcourt Publishing Company.

16) In 2012, Edra Blixseth brought Chris Pipes, from the U.S. Special Operations Command ("SOCOM") from MacDill Air Force Base in Florida to our Palm Desert offices. SOCOM was interested in pursuing object tracking, mass surveillance, and research on cloaking technologies. Chris Pipes met at our facility, with a representative of the CIA. While he was in our building, Chris Pipes then received a telephone call from SOCOM in Florida, and then told us that SOCOM could not pursue the technology because of what was written about me in the news media. Exhibit 18, attached to this affidavit.

17) SOCOM is the Unified Combatant Command charged with overseeing the various Special Operations Component Commands of the Army, Air Force, Navy and Marine Corps of the United States Armed Forces. The command is part of the Department of Defense and is the only Unified Combatant Command legislated into being by the U.S. Congress. SOCOM is headquartered at MacDill Air Force Base in Tampa, Florida. *See*, Exhibit 12, attached to this affidavit.

18) U.S. Central Command ("CENTCOM") is a theatre-level Unified Combatant Command of the U.S. Department of Defense, established in 1983. CENTCOM Area of Responsibility includes countries in the Middle East, North Africa, and Central Asia, most notably Afghanistan and Iraq. CENTCOM has been the main American

presence in many military and intelligence operations. It is headquartered in Tampa,

Florida. *See*, Exhibit 12, attached to this affidavit.

19) The Defendant author James Risen actually knew or should have known that most of

my work was with U.S. Government organizations in Florida and the contracting

offices for my work are in Florida.  A competent Pulitzer Price winning <u>New York</u>

<u>Times</u> reporter who wrote the Book over a four-year period from 2011 through 2014

would have reviewed the <u>Wall Street Journal</u> article from November 1, 2006,

attached, which includes the explanation:

### Source of Secret Funds

**One source of secret funds for eTreppid and other companies
is the Special Operations Command. Based in Tampa, Fla., the
command fields special-operations military and intelligence
forces around the globe and is at the forefront of the fight in
Iraq and Afghanistan. It has also been rocked by a criminal
investigation of a former contracting officer. The investigation
is continuing, according to a spokesman for the U.S. attorney
in Tampa.**

In a separate inquiry, Pentagon investigators last year found
evidence that the command kept special accounts for "unrequested
congressional plus-ups," or earmarks. The plus-ups were used to
reward lawmakers with projects in their districts, according to
declassified investigators' notes reviewed by <u>The Wall Street
Journal</u>. The Pentagon's inspector general closed the inquiry after
finding that the accounts weren't illegal.

Mr. Trepp said eTreppid won classified work on its merits and
already had a number of government contracts before Mr. Gibbons
starting making introductions on the company's behalf. Mr.
Gibbons's campaign manager, Robert Uithoven, said the
congressman has been a strong supporter of new defense
technology, particularly after 9/11. But he said there was "no quid
pro quo whatsoever" for contributions from contractors. And while
some funding was secret, "it was because of the sensitive nature of
the work," Mr. Uithoven said, not to avoid public scrutiny.

> For Mr. Trepp, eTreppid's success at winning multimillion-dollar
> federal contracts marks a comeback from his Drexel days. He sat at
> Mr. Milken's right arm on the firm's famous X-shaped trading desk
> in Beverly Hills, sometimes trading as much as $2 billion in
> securities a day. Federal regulators filed a civil securities-fraud
> claim against him in 1995, and a Securities and Exchange
> Commission administrative judge found that his violations had
> been "egregious, recurring and intentional." But she dismissed the
> proceeding against him, noting that the allegations were old and he
> had left the securities business years earlier. (Emphasis added).

20) This article and dozens of others, as well as court documents, caused Risen to know

or he should have known upon reasonable inquiry over four years that Warren Trepp

was furiously trying to take ownership of my software and technology, which directly

calls into question his self-serving false statements that the software and technology

he was trying to acquire rights to was worthless.  The same article also reports:

> Mr. Gibbons also got other, unreported gifts of cash and casino
> chips from Mr. Trepp, according to sworn testimony in a civil
> lawsuit brought by a former executive at eTreppid, Dennis
> Montgomery. The suit, filed in February in federal court in Reno,
> involves a dispute between Messrs. Trepp and Montgomery over
> the rights to certain software code . . .

> The suit has raised alarms in Washington because of concern that
> national secrets will be revealed if it goes to trial. For example, one
> of the entities that funded eTreppid is code-named Big Safari and
> is a classified program, documents in the case show. The nation's
> top intelligence official, John D. Negroponte, recently filed a
> statement with the court seeking to seal the case. He wrote that
> after personally reviewing the matter, he has concluded that
> disclosure of some information connected with the case could do
> "exceptionally grave damage" to national security.

21) My greatest opportunities for employment, business, and/or an income are at either

Macdill Air Base near Tampa, Florida and Eglin Air Force Base near Fort Walton

Beach, Florida, which is at the center of U.S. Government intelligence and

counterterrorism operations. *See* Exhibit 12, attached to this affidavit.

11

22) As a result, I have settled in Florida not just for professional reasons but also because of my failing health and desire to enjoy Florida at this stage in my life. Florida has no personal income tax as well as a Homestead exception should I buy a home. Florida is a great place to live.

23) In 2011, I incorporated a business with a partner in Florida to contract with the military and U.S. Government at bases in Florida to continue the same type of services and software and technological work that I had performed under eTreppid and BLXWARE.  This business was named Alex James LLC, which I incorporated through the "Legal Zoom" service company. I set up the articles of incorporation, paid for and set up this company. Judy Crowhurst is the woman I chose to run it. Exhibit 17, attached to this affidavit.

24) Exhibit 5, attached to this affidavit, presents the papers I processed through the "Legal Zoom" company and my payment information paying for the company in Florida in 2011.

25) As an expert in national security issues, Defendant James Risen knows that the war in Afghanistan was and is run largely from Florida electronically and by drone controllers located in Florida. For instance, following September 11, 2001, General Tommy Franks rarely set foot in Afghanistan and fought the war from U.S. Air Force Bases in Florida, including from SOCOM and CENTCOM. This explains my work with SOCOM and CENTOM in large part and why it continued there.

26) Defendant James Risen also knows that the U.S. military leadership and personnel are concentrated mainly in Florida. Because U.S. military servicemen can choose their state of residence despite being deployed elsewhere, Florida's lack of an income tax

makes Florida a very attractive State for U.S. servicemen, often poorly paid.  As a result, most of the nation's top military leaders, current and former servicemen, chose Florida as their residency.

27) Defendant Risen knew in publishing the Book that Florida is an enormous market as the nation's now third largest State, including Florida's significant military and intelligence and counterterrorism personnel, with many retirees (including retired U.S. Government employees in the military and intelligence fields) with more time to read books than the average American. For instance, former Secretary of Defense Donald Rumsfield now lives in Florida, as well as former Chairman of the U.S. Senate Intelligence Committee and CIA Director Porter Goss, who lives in Miami.

28) The team on which I worked had contracts directly with the intelligence agencies at the military bases **in Florida**.  I have video showing the work.  The contracting officers are out of those military bases, many of which are classified. I met and worked with CIA officials in Florida at various military bases.  However, I cannot identify here the exact units stationed at those bases, which is classified information. Exhibit 19, attached to this affidavit.

29) We at eTreppid and later BLXWARE did most of our work with units stationed at MacDill Air Force Base and Eglin Air Force Base, whose identity is secret.  *See* February 14, 2004, "Order for Supplies or Services" attached, with the "Ship To" address of UQ USSOCOM/SOAL-SP (Mohr), 7701 Tampa Point Boulevard, MacDill Air Force Base, Florida 33621.

30) Most of the payments for our work, the work I did for eTreppid and later BLXWARE, came out of the CIA offices in Florida and SOCOM, the U.S. Special

13

Operations Command of the U.S. military at Macdill Air Force Base, Florida.

31) SOCOM of the U.S. military is located at 7701 Tampa Point Boulevard, MacDill Air Force Base, Florida. *See* Exhibit 6, attached to this affidavit.

32) CENTCOM of the U.S. military is located at MacDill Air Force Base near Tampa, Florida.  *See* Exhibit 7, attached to this affidavit.

33) Relating to my work conducting surveillance of international communications, major fiber optics cables run from Florida across the ocean, which is partly why my work opportunities for my experience and capabilities are in Florida.

34) I intend to call witnesses who can testify that my defamed software and technology does indeed work and is not a hoax. These witnesses are personnel based at Macdill Air Base near Tampa, Florida and at Eglin Air Force Base near Fort Walton Beach, Florida, where I did a lot of his work. The organizational units housed at Macdill and Eglin used my software, technology, and work extensively during the time period addressed by Defendants' defamation of me.  Those witnesses will testify and thus help me prove that the defamatory statements about me are indeed false and misleading.

35) Relevant officials at Macdill and Eglin (and all facilities that my work has provided services to anywhere) make their own contracting decisions and do not rely upon contracting offices in Washington, D.C., nor even at the CIA in Langley, Virginia, the Pentagon in Arlington, Virginia, or the NSA in Fort Meade, Maryland.

36) Many of the witnesses in this case, with whom I have worked, are largely in Florida, including, but not limited to:

Goss, Porter, former Director of CIA, now in Miami, Florida

14

Johns, Ken, Macdill AFB, Florida

Lyons, XXXXX, Macdill AFB, Florida

Macbeth, W. Rhys, Eglin AFB, Florida

Nazelrod, Craig, Eglin AFB, Florida

Pipes, XXXXX, Macdill AFB, Florida

Roche, James, Macdill, Florida

Rumsfeld, Donald, now in Florida

Stillman, Phillip, Attorney for Dennis Montgomery, now in Miami, Florida

Madden, Tom, Boca Raton, Florida

Olivia, Adrian, Eglin AFB, Florida

Bartholomew, Mary L, Eglin AFB, Florida

Fiamengo, Nicholas A, Eglin AFB, Florida

Freeman, Gregory J, Eglin AFB, Florida

Savage, Cynthia, Eglin AFB, Florida

McCool, John C, Eglin AFB, Florida

Temple, James K, Eglin AFB, Florida

Griffin, Susan M., Macdill AFB, Florida

Russell, Deborah, Macdill AFB, Florida

Nettelhorst, Doug M, Macdill AFB, Florida

Stallworth, Hugh T, Macdill AFB, Florida

Bob McCaskey, Macdill AFB, Florida

Crutchfield, Chris, Macdill AFB, Florida

Melnyk, Michael S., Macdill AFB, Florida

Lopez, Tina M, Macdill AFB, Florida

Cerny, Jeffrey D., Macdill AFB, Florida

Muccio, Anthony B., Eglin AFB, Florida

McKinney, Scott E Lt.Col., Eglin AFB, Florida

Purvis, Brad Civ, Eglin AFB, Florida

'Kirsch, Jim', Eglin AFB, Florida

Hughes, Stacey L, Eglin AFB, Florida (*See* Exhibit 13, attached to this affidavit).

37) Ultimately, I became aware that James Risen had published these false reports in the Book and that Risen was conducting a nationwide publicity campaign to sell the Book.

38) I heard and watched James Risen repeatedly in national  and radio interviews discussing his book but primarily about me, mostly ignoring and intentionally omitting the rest of his Book in those interviews while attacking and defaming me as a private individual.

39) In radio, television, and newspaper interviews, James Risen mainly focused on slandering me in order to sell the Book in Florida and elsewhere.

40) Risen's appearances on radio and television were not just commentary but attempts to stimulate the sale of books inside Florida and elsewhere.

41) Risen was speaking on the radio and television shows in order to move books off of Florida bookstore shelves and to the checkout counters in Florida and elsewhere.

42) The defamation by Defendants of me is not a criticism of the U.S. Government in the District of Columbia, but *excuses* the U.S. Government as an innocent and unsuspecting victim, while blaming me. Therefore, the U.S. Government has not

suffered harm within Washington, D.C.

43) I had relatively little contact with the U.S. Government in Washington, D.C., Maryland or Virginia. It was the companies that I worked under, eTreppid and later BLXWARE, who contracted with regional offices at various U.S. Government bases or facilities.  I interacted almost entirely with technical people pursuant to the contracts.

44) It was Warren Trepp and later Edra Blixseth who used their contacts with the U.S. Government to seek and arrange contracts for our work.  I did not persuade the U.S. Government to hire me, Trepp and Blixseth did.  My own interaction with offices or officials in Washington, D.C. was very limited because I was not the one running the companies nor primarily interacting with the U.S. Government.

45) Starting as early as 2011, I was contacted by James Risen asking about my secret work under contract for the U.S. Government in support of anti-terrorism efforts.

46) I see that in James Risen's Declaration attached to the Defendants' Motion to Dismiss, Risen states that he has been working on the Book since 2011.

47) I continually provided numerous warnings, in writing, to James Risen that the false statements he mentioned and later published in October 2014 in the Book are false.

48) However, James Risen attempted to blackmail me by demanding that I provide classified documents and information to him or else he would publish the false and misleading statements that he later did publish in the Book.  That is, when I warned him that the reports were false and misleading, James Risen responded to me by telling me that he would not publish those false statements if instead I provided him with classified information and documents.  That is, James Risen demanded that I

commit multiple crimes as the price for Risen not publishing the false and misleading reports about me.  Of course, I refused to be blackmailed into breaking the law as the price for not being defamed.

49) Writers Aram Roston and James Risen were both after John Brennan's information. They both knew that I had worked for John Brennan. Both wanted his emails.

50) Roston and Risen published false and defamatory information about me to try to pressure me into releasing classified information about John Brennan and others in the war on terror to them as the price for them telling the truth.

51) However, Roston and Risen knew that my work was real and legitimate, because they sought to obtain secret and classified information from Brennan from me.

52) Roston and Risen published defamation about me to punish and pressure me for not illegally disclosing classified information and material to them.

53) In both cases, I told Risen and Roston I would have to turn over classified information, a road I wasn't willing to go down. I was never what they were after. They were writing these stories to hurt me so that I would provide classified information about the various administrations. I was just their pawn.

54) Attached to this affidavit as Exhibit 8 are a few of my communications to James Risen informing him in advance of the publication of the Book that his statements were not only false but preposterous and that his sources were clearly unreliable.

55) In fact, on November 1, 2012, discussing the Book that he was then writing, I warned James Risen under the email address "TheAgencyInsider@Hotmail.com" that his reporting was false including because Warren Trepp was the CEO of eTreppid and kept all the money. *See* Exhibit 8, attached to this affidavit.

56) Risen also promised in that same email thread:  "If you give us the Brennan emails, we will write a story." *See* Exhibit 8, attached to this affidavit.

57) However, this response was in the context of a long back-and-forth discussion concerning the falsehood of Risen's false and misleading statements against me.

58) Risen also promised in the attached email thread:  "As I said on the phone, I protect my sources.  I will never divulge the identify of my sources in a leak investigation. But I also have to know that the source is telling me the truth. Jim"

59) So Risen admitted that it was his professional responsibility to determine that the sources he used to defame me are telling the truth.  But Risen did not do that.  The sources he relied upon were obviously not telling the truth, as is patently obvious.

60) I warned James Risen concerning the falsehood of his reporting in that November 1, 2012, email thread, attached:

> There is a reason the CIA and NSA were there, you must know that.

> Do you really think the government invoked the State Secrets Privilege from being embarrassed or conned? Negroponte in his in camera declaration, if ever released, was spell it all of out.

> They government never wanted information to come out regarding the other work. The program started out spying on terrorist, and under Obama quickly moved to spying on Americans!! A program which was started by Brennan in 2003 and continues to this day. This technology is being used today to spy on Americans, including candidate Romney.

> I don't see you ever publishing that information? *See* Exhibit 8[1],

attached to this affidavit.

---

[1] While my counsel turned over these initial disclosures to Defendants' counsel, Defendants did not turn over initial disclosure documents to my counsel in violation of the Court's Order of April 1, 2015. I have asked my counsel to file a motion for order to show cause.

61) Furthermore, this November 1, 2012, exchange concerning Risen's plans writing the Book which was eventually published on October 14, 2014, was seven (7) months before the revelations by Edward Snowden that mass surveillance of Americans was occurring.  Therefore, Risen actually knew in 2013 that I was telling the truth and was being lied about by his so-called sources.  My discussions with James Risen on November 1, 2012, were proven true in mid-2013.  Therefore, Risen had actual knowledge that I was indeed a whistleblower and that the sources he relied upon were falsely discrediting me to cover up wrong-doing.  In this, of course, Pulitzer Prize winning <u>New York Times</u> reporter James Risen intentionally and falsely omitted the real story.

62) I made it clear to James Risen, in the phone call referenced in the email, that the Obama administration used mass surveillance technology to alter the 2012 election *in* **Florida**, and that they will use the technology again in 2016.

63) In June of 2012, in a telephone call, I told James Risen and Eric Lichtblau that their information about me in their 2011 <u>New York Times</u> story was incorrect, and they needed to correct it.  I also made it clear that I was under a federal court Protective Order in Nevada, and a State Secrets Privilege order by the Director of National Intelligence not allowing me to discuss my work.  In addition, there were sealed documents still in the Nevada case.  I also made it clear, that the State secrets privilege was also issued, to protect the work I did on domestic surveillance.  I told them I knew they met with my ex attorney Mike Flynn, for several days, in regards to their story, and suggested, he had other motives for his conduct.

64) I also made it clear in June of 2012 that I had a brain aneurysm that was going to be

repaired soon, and a risky procedure, and wanted my name cleared in case I died.

65) Therefore, the Defendants believed they could get away with their defamation because I would probably die in the meantime.

66) In 2013, going over Risen's and Lichtblau's heads, I sent emails directly to the editors of <u>The New York Times</u> telling them their story was wrong and to retract it.

67) I sent an email to the Editors of <u>The New York Times</u>, demanding that they correct the false reporting about me in 2012.

68) I believe that <u>The New York Times</u> conveyed my emails requesting a retraction of the false statements to James Risen.

69) In 2012-2014, on at least 10 different occasions I made it clear to Aram Roston of Playboy that his story was wrong and told him to retract it.

70) Carlotta Wells, a U.S. Department of Justice attorney assigned to matters involving me, told me that if I talk to the press or leaked information, I will be charged with treason for disclosing my work with the NSA and CIA.  She told me when I signed my Top Secret clearance, I forfeited my right to protect my first amendment rights.

71) Carlotta Wells additionally said that "If the US Government wants to leak false information to the press to hide successful work, and to confuse terrorist groups, they will do it irrespective of my rights. Deal with it!"

72) Carlotta Wells also stated to me and Jack Kemp, about my legal matters with the CIA that "I [Carlotta Wells] am just a foot solder doing what I am told of to do from the White House.  I don't agree with their strategy, but that is the way it is."  Jack Kemp replied, "You are a senior litigation attorney for the DOJ, hard for me to believe that you were listening to them."  Carlotta Wells in turn replied "Take it up with you

friend George Bush."

73) I am personally aware that, through my counsel, two separate letters were sent to executives at Houghton Mifflin requesting a retraction of the false and misleading publication.

74) The first letter was sent on January 14, 2015 to Linda K. Zecher, President and Chief Executive Officer and Director of Houghton Mifflin Harcourt, William Bayers, Executive Vice President and General Counsel, and Houghton Mifflin Harcourt located in Boston. *See* Exhibit 14, attached to this affidavit.

75) The second letter was sent on February 13, 2015, pursuant to Florida Statute § 770.02 again requesting a retraction of the false and misleading published statements. *See* Exhibit 15, attached to this affidavit.

76) On January 20, 2015, I, through my counsel, received a letter from David Eber, cc'ing James Risen and William Bayers, declining to redact the false and misleading statements and also declining to meet my counsel to resolve matters amicably. *See* Exhibit 16, attached to this affidavit.

I hereby swear under oath and penalty of perjury that the foregoing facts are true and correct to the best of my personal knowledge and belief:


April 27, 2015


                              //Dennis Montgomery//_____

                              Mr. Dennis Montgomery

22

Exhibit A

# PAY ANY PRICE

## GREED, POWER, AND ENDLESS WAR

# JAMES RISEN

Author of *STATE OF WAR*

much Iraqi
the Ameri-

matter, the
cash in Leb-
use no one
ed with the

nker is one
c rules and
nlikely that
Most of the
d to still be
itting to be

as a fitting
It certainly
lventure in
Hussein in
2003 when

2



# THE EMPEROR OF THE
# WAR ON TERROR

Greed and power, when combined, can be devastating. In the case of the missing cash of Baghdad, greed tempted Americans and Iraqis alike, while the power of the Coalition Provisional Authority to make fast, sweeping decisions with little oversight allowed that greed to grow unchecked. Billions of dollars disappeared as a result.

Throughout the war on terror, greed and power have flourished just as readily back home in the United States, where the government's surging counterterrorism spending created a new national security gold rush. The post-9/11 panic led Congress to throw cash at the FBI, CIA, and Pentagon faster than they were able to spend it. Soon, a counterterrorism bubble, like a financial bubble, grew in Washington, and a new breed of entrepreneur learned that one of the surest and easiest paths to riches could be found not in Silicon Valley building computers or New York designing clothes but rather in Tysons Corner, Virginia, coming up with new ways to predict, analyze, and prevent terrorist attacks — or, short of that, at least in convincing a few government bureaucrats that you had some magic formula for doing so.

Consider the example of Dennis Montgomery. He provides the

31

GREED

perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist was able to create a rogue intelligence operation with little or no adult supervision. Crazy became the new normal in the war on terror, and the original objectives of the war got lost in the process.

\*

Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money.

Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it. The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in a series of civil lawsuits involving Montgomery.

It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes.

\*

A former medical technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what

32

d and
e a cli-
artist
adult
er, and

now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing scope, he still had die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Montgomery was a fake, and who rejected the notion that the super-secret computer software that he foisted on the Pentagon and CIA was anything other than America's salvation.

under-
aw the

Montgomery's story demonstrates how hundreds of billions of dollars poured into the war on terror went to waste. With all rules discarded and no one watching the bottom line, government officials simply threw money at contractors who claimed to offer an edge against the new enemies. And the officials almost never checked back to make sure that what they were buying from contractors actually did any good—or that the contractors themselves weren't crooks. A 2011 study by the Pentagon found that during the ten years after 9/11, the Defense Department had given more than $400 billion to contractors who had previously been sanctioned in cases involving $1 million or more in fraud.

and for-
eve was
history,
ush ad-
mercial
as over,
hey had
ig about
episode
working
cross the
and his
vilege in

The Montgomery episode teaches one other lesson, too: the chance to gain promotions and greater bureaucratic power through access to and control over secret information can mean that there is no incentive for government officials to question the validity of that secret information. Being part of a charmed inner circle holds a seductive power that is difficult to resist.

that the

Montgomery strongly denies that he peddled fraudulent technology. He insists that the charges have been leveled by critics with axes to grind, including his former lawyer and former employees. He claims that he was following direct orders from both the NSA and the CIA, and says that the CIA, NSA, and U.S. military took his technology so seriously that it was used to help in the targeting of Predator strikes and other raids. Montgomery adds that he is limited in what he can say about his software and business dealings with the CIA and Pentagon without the approval of the Justice Department. The fact that the government is blocking public disclosure of the details of its relationship with him, he adds, shows that his work was considered

tware ex-
airs, Den-
ient Bush
d on what

GREED

serious and important. "Do you really think," he asked, "the government invoked the state secrets privilege just from being embarrassed or conned?"



The strange tale of Dennis Montgomery and his self-proclaimed plan to win the war on terror begins, appropriately enough, inside the El Dorado Casino in downtown Reno.

Montgomery was an overweight, middle-aged, incorrigible gambler, a man who liked to play long odds because he was convinced that he could out-think the house. He once boasted to a business partner that he had a system for counting an eight-deck blackjack shoe, quite a difficult feat for even the best card sharks, and he regularly tested his theories at the El Dorado and the Peppermill Casino in Reno. He usually came up short but that didn't stop him from playing blackjack on a nightly basis, racking up unwieldy debts that eventually led to his 2010 arrest for bouncing more than $1 million in bad checks at Caesar's Palace in Las Vegas.

Gambling is how he met his first backer, Warren Trepp. Trepp got rich in the biggest casino of them all, Wall Street. He had been Michael Milken's right-hand man in the heyday of Milken's famous Beverly Hills trading desk during the "greed is good" era of insider trading in the 1980s. When a hungry federal prosecutor named Rudolph Giuliani went after Milken for insider trading, he tried to get Trepp to roll over on his boss. Trepp refused, even in the face of a threat that he would be charged himself if he failed to cooperate. Milken went to jail, but Giuliani never could nail Trepp. Instead of facing criminal charges, Trepp became the subject of a marathon investigation by the Securities and Exchange Commission (SEC), which tried to impose civil sanctions for Trepp's alleged part in Milken's insider-trading bonanza. It took nearly a decade, but Trepp finally beat the feds. In 1997, the SEC's case against him was dismissed. He walked away from the Milken years with a fortune.

Warren Trepp may have been able to defeat Rudy Giuliani and a

34

l, "the govern-
g embarrassed

claimed plan
inside the El

rrigible gam-
nvinced that
iness partner
k shoe, quite
ularly tested
in Reno. He
ing blackjack
ally led to his
ecks at Cae-

p. Trepp got
ad been Mi-
famous Bev-
ider trading
Rudolph Gi-
get Trepp to
threat that
filken went
cing crimi-
vestigation
tried to im-
sider-trad-
at the feds.
alked away

liani and a

whole legion of federal investigators, but he couldn't outwit Dennis Montgomery.

By the late 1990s, Trepp was living in Incline Village, a wealthy enclave on the Nevada side of Lake Tahoe, where he was shaking off his past and trying to remake himself into a respected philanthropist, theater angel, and canny private investor. And then he met Montgomery.

Trepp was introduced to Montgomery by a casino host at the El Dorado in 1997. Montgomery was on the lookout for somebody to bankroll him, and had put out the word to his friends at the casinos that he frequented the most. A year later, Montgomery and Trepp were in business together. Trepp was one of the first, but hardly the last, to be beguiled by Montgomery's claims that he had achieved breakthroughs in computer technology of historic significance. The two founded a company together and tried to find buyers for Montgomery's alleged miracle software.

Montgomery convinced Trepp that he had achieved a series of major technological advances in computer software that could be worth millions. One was the development of software that he argued provided a new method of video compression, allowing for greater video storage and transmission than was ever available before. Another innovation was stunningly detailed video facial recognition. But the most dazzling claim of all involved software that Montgomery said could identify objects and anomalies embedded in video with unprecedented detail. He claimed that his technology could even find and identify objects hidden inside videotape that were not visible to the naked eye.

How his technology worked was a secret. Dennis Montgomery's computer code became the great treasure behind eTreppid Technologies, the company he and Trepp founded. Later, many of those around Montgomery began to suspect the reason why Montgomery had to guard his technological innovations so carefully. They came to believe that at least some of the technology didn't really exist.

\*

To commercialize his technology, Montgomery first tried to convince Hollywood that he had developed a new and efficient means of colorizing old movies. His object identification software, he claimed, could speed the process of deciding where and how to colorize each frame of film. Warren Trepp later told a court that Montgomery had given him a demonstration of his software's ability to identify patterns and images in a video of the 1939 black-and-white classic *Gunga Din*.

But after failing to strike it big in Hollywood, Montgomery and Trepp shifted their focus to the casino industry in Reno and Las Vegas. Montgomery later bragged that he had developed pattern recognition software specifically for casinos that could help identify cheaters. He even claimed he had technology that could identify high-value chips inside piles of chips on gaming tables, to detect when dealers tried to steal from the casinos by slipping valuable chips to friends. Montgomery also said he had developed video compression software that would allow casinos to more easily store thousands of hours of surveillance tapes, rather than erase all of their old footage.

But his technology was never a big hit with the casino industry, either. So Montgomery turned to Washington. There, Montgomery finally succeeded in his new search for clients through a series of coincidences and chance encounters, along with strong political and financial connections that helped to smooth the way. And it all started, like so many other things in his life, in a casino.

In 2002, Warren Trepp arranged for the MGM Grand Casino to take a look at Montgomery's technology. An air force colonel who had heard about Montgomery's work decided to come and see it as well. Impressed, he helped Montgomery and eTreppid land a contract with the air force.

Michael Flynn, Montgomery's former lawyer—who later concluded that Montgomery was a fraud—said that Montgomery had told him that Montgomery had won over the visiting air force officer, who became convinced that Montgomery's object recognition and video compression technologies could help the air force's Predator drone program. The CIA and air force were flying Predator drones over Afghanistan at the time, and they were sending back thousands of hours of video that needed to be analyzed and stored. Just like

y first tried to convince
fficient means of color-
ware, he claimed, could
> colorize each frame of
tgomery had given him
intify patterns and im-
ssic *Gunga Din*.

ood, Montgomery and
y In Reno and Las Ve-
leveloped pattern rec-
it could help identify
at could identify high-
ables, to detect when
ping valuable chips to
ed video compression
ily store thousands of
l of their old footage.
s the casino industry,
. There, Montgomery
hrough a series of co-
trong political and fi-
vay. And it all started,

GM Grand Casino to
lorce colonel who had
ne and see it as well.
I land a contract with

ver—who later con-
at Montgomery had
isiting air force offi-
s object recognition
the air force's Preda-
ring Predator drones
ling back thousands
nd stored. Just like

Las Vegas casinos, the air force needed a way to maintain the mas-
sive piles of video generated by its own version of the eye in the sky.
Montgomery's object recognition technology could provide new ways
for the air force to track suspected terrorists with the Predator. Mont-
gomery claimed that his facial recognition software was so good that
he could identify individual faces from the video camera flying on a
Predator high above the mountains of southern Afghanistan.

By the spring and summer of 2003, eTreppid was awarded con-
tracts by both the air force and U.S. Special Operations Command.
Montgomery was able to win over the government in part by offering
field tests of his technology—tests that former employees say were
fixed to impress visiting officials. Warren Trepp later told the FBI that
he eventually learned that Montgomery had no real computer soft-
ware programming skills, according to court documents that include
his statements to the FBI. Trepp also described to federal investiga-
tors how eTreppid employees had confided to him that Montgomery
had asked them to help him falsify tests of his object recognition soft-
ware when Pentagon officials came to visit. Trepp said that on one
occasion, Montgomery told two eTreppid employees to go into an
empty office and push a button on a computer when they heard a beep
on a cell phone. Meanwhile, Montgomery carried a toy bazooka into
a field outside eTreppid. He was demonstrating to a group of visiting
U.S. military officials that his technology could recognize the bazooka
from a great distance.

After he was in place in the field, he used a hidden cell phone to
buzz the cell phone of one the eTreppid employees, who then pushed
a key on a computer keyboard, which in turn flashed an image of a
bazooka on another screen prominently displayed in front of the
military officers standing in another room, according to court docu-
ments. The military officers were convinced that Montgomery's com-
puter software had amazingly detected and recognized the bazooka
in Montgomery's hands. (Montgomery insists that the eTreppid em-
ployees lied when they claimed that he had asked them to fix the
tests, and also says that the air force issued a report showing that it
had verified the tests.)

Montgomery had a lot of support when it came to dealing with the

GREED

government. Through Warren Trepp, he had excellent political connections, and in Washington that can take you a very long way.

To help eTreppid get more government business, Trepp brought in Letitia White, a Washington lobbyist with ties to congressional Republicans. She was particularly close with her former boss, California congressman Jerry Lewis. He, in turn, was chairman of the powerful House Defense Appropriations Subcommittee (he later became chairman of the full appropriations committee) and so was able to steer billions of dollars in spending to programs he favored throughout the Pentagon. Letitia White, who had been one of Lewis's closest aides, had left to go to work with the Washington lobbying firm of Copeland Lowery, where she specialized in arranging custom-built earmarks in the defense and intelligence budgets for her clients.

The connections among Lewis, White, and Copeland Lowery later became the subject of a long-running criminal investigation by the Justice Department. The U.S. attorney in Los Angeles probed whether Lewis had steered huge amounts of money to Copeland Lowery's clients in return for large campaign donations from the lobbying firm and from the defense contractors that were its clients. The investigation of Jerry Lewis was ongoing when the U.S. attorney handling the case, Carol Lam, was fired by the Bush administration in 2007, making her one of eight U.S. attorneys pushed aside by the Bush White House in a famously controversial, possibly political decision. The investigation into Lewis and his ties to Copeland Lowery was eventually dropped, but the lobbying firm broke up under the pressure, and Letitia White moved to a new firm. In 2009, Citizens for Responsibility and Ethics in Washington (CREW) named Lewis one of the fifteen most corrupt members of Congress.

But Trepp wasn't finished after hiring White. He convinced another heavyweight Nevada investor, Wayne Prim, to put money into eTreppid. In September 2003, Prim hosted a dinner that brought together Trepp, Montgomery, and Rep. Jim Gibbons of Nevada, a former airline pilot and rising star among congressional Republicans. Gibbons, an influential member of the House Intelligence Committee, almost certainly played a critical role in helping Montgomery to gain access to the Central Intelligence Agency.

38

ellent political con-
ery long way.
s, Trepp brought in
congressional Re-
ner boss, California
an of the powerful
later became chair-
o was able to steer
red throughout the
wis's closest aides,
g firm of Copeland
-built earmarks in

eland Lowery later
vestigation by the
ies probed whether
eland Lowery's cli-
the lobbying firm
nts. The investiga-
rney handling the
ion in 2007, mak-
y the Bush White
l decision. The in-
wery was eventu-
the pressure, and
is for Responsibil-
one of the fifteen

He convinced an-
o put money into
r that brought to-
of Nevada, a for-
onal Republicans.
lligence Commit-
g Montgomery to

Gibbons did not need much coaxing to try to assist eTreppid. Not only was the company based in his home state, but both Prim and Warren Trepp were longtime campaign contributors. After the dinner at Prim's house, Gibbons went to work immediately opening doors in Washington for eTreppid. Flynn said that Montgomery later told him that Gibbons quickly arranged to meet with Porter Goss, then the chairman of the House Intelligence Committee, to discuss eTreppid and Montgomery's technology.

By the fall of 2003, Dennis Montgomery had made a series of impressive moves to gain access to the black budget of the government's national security apparatus. He had the backing of two wealthy investors, had one of the nation's most influential lobbyists scouring the federal budget for earmarks on his behalf, and had the support of a key member of the CIA's oversight committee. After obtaining a series of small contracts with the air force and the Special Operations Command, Montgomery was ready for the big time.

★

For a few months in late 2003, the technology from Dennis Montgomery and eTreppid so enraptured certain key government officials that it was considered the most important and most sensitive counterterrorism intelligence that the Central Intelligence Agency had to offer President Bush. Senior officials at the CIA's Directorate of Science and Technology began to accept and vouch for Montgomery to officials at the highest levels of the government. Montgomery's claims grew ever more expansive, but that only solidified his position inside the national security arena. His technology became too impossible to disbelieve.

Montgomery's big moment came at Christmas 2003, a strange time of angst in the American national security apparatus. It was two years after the 9/11 attacks, and the war in Iraq was getting worse. Iraq was turning into a new breeding ground for terrorism, and Osama bin Laden was still on the loose, regularly thumbing his nose at the Americans by issuing videotaped threats of further terrorist strikes. The CIA, still stumbling in the aftermath of the two greatest

39

intelligence failures in its history—missing 9/11 and getting it wrong on Iraq's supposed weapons of mass destruction—was desperate for success, a quick win with which to answer its critics.

The CIA's Science and Technology Directorate, which had largely been stuck on the sidelines of the war on terror, saw in Dennis Montgomery an opportunity to get in the game. The directorate had played an important role in the Cold War, but in the first few years of the war on terror, it was still struggling to determine how technology could be leveraged against small groups of terrorists who were trying to stay off the grid.

Montgomery brilliantly played on the CIA's technical insecurities as well as the agency's woeful lack of understanding about al Qaeda and Islamic terrorism. He was able to convince the CIA that he had developed a secret new technology that enabled him to decipher al Qaeda codes embedded in the network banner displayed on the broadcasts of Al Jazeera, the Qatar-based news network. Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks. And only he had the technology to decode those messages, thus saving America from another devastating attack. The CIA—more credulous than Hollywood or Las Vegas—fell for Montgomery's claims. In short, he convinced CIA officials that he could detect terrorist threats by watching television.

By late 2003, CIA officials began to flock to eTreppid's offices in Reno to see Montgomery's amazing software. Michael Flynn, Montgomery's former lawyer, said that Montgomery had dealings with or knew the identities of at least sixteen different CIA officials. These people now joined the senior military officers who had frequented the company since the previous spring, when it first began to work on the Predator program.

Montgomery persuaded the spy agency that his special computer technology could detect hidden bar codes broadcast on Al Jazeera, which had been embedded into the video feed by al Qaeda. Allegedly, al Qaeda was using that secret method to send messages to its terrorist operatives around the world about plans for new attacks. Montgomery convinced the CIA that his technology had uncovered a series

*The Emperor of the War on Terror*

1 and getting it wrong
m—was desperate for
itics.

ste, which had largely
, saw in Dennis Mont-
directorate had played
st few years of the war
w technology could be
ho were trying to stay

IA's technical insecu-
nderstanding about al
nvince the CIA that he
abled him to decipher
nner displayed on the
's network. Montgom-
as using the broadcasts
rrist attacks. And only
ges, thus saving Amer-
—more credulous than
y's claims. In short, he
orist threats by watch-

to eTreppid's offices in
Michael Flynn, Mont-
y had dealings with or
nt CIA officials. These
rho had frequented the
st began to work on the

at his special computer
oadcast on Al Jazeera,
by al Qaeda. Allegedly,
messages to its terror-
ior new attacks. Mont-
had uncovered a series

of hidden letters and numbers that appeared to be coded messages about specific airline flights that the terrorists were targeting.

Montgomery insists that he did not come up with the idea of analyzing Al Jazeera videotapes—he says that the CIA came to him in late 2003 and asked him to do it. CIA officials brought Montgomery two different versions of al Qaeda videotapes, he claims. They gave him original al Qaeda videotapes obtained independently by the CIA, and then also gave him recordings of the same videotapes recorded as they had been broadcast on Al Jazeera. The CIA wanted him to compare the two, he claims.

But even if it wasn't Montgomery's idea, he ran with it as fast as he could. He told the CIA that he had found that the versions of the tapes broadcast on Al Jazeera had hidden letters and numbers embedded in them. He says that he found that each bin Laden video broadcast on al Jazeera had patterns and objects embedded in the network's own banner displayed with the video recordings.

Montgomery let the CIA draw its own conclusions based on the information he gave them. After he reported to the CIA that he had detected a series of hidden letters and numbers, he left it up to the CIA to conclude that those numbers and letters referred to specific airline flights. He insists that he did not offer the CIA his own conclusions about what the data meant.

By the middle of December 2003, Montgomery reported to the CIA that he had discovered certain combinations of letters and numbers. For example, coded messages that included the letters "AF" followed by a series of numbers, or the letters "AA" and "UA" and two or three digits, kept repeating. In other instances, he told the agency that he had found a series of numbers that looked like coordinates for the longitude and latitude of specific locations.

The CIA made the inevitable connections. "They would jump at conclusions," says Montgomery. "There would be things like C4, C4, and they would say that's explosives. They jumped to conclusions." He added that he "never suggested it was airplanes or a threat."

Montgomery's data triggered panic at the CIA and the White House—and urgent demands that Montgomery produce more. On Christmas Eve, CIA officials showed up at Montgomery's house in

GREED

Reno and told him that he had to go back to his office to keep digging through incoming videotapes and Al Jazeera broadcasts throughout the holidays, Montgomery recalled.

Montgomery was telling the CIA exactly what it wanted to hear. At the time, the Bush administration was obsessed with Al Jazeera, not only because of the network's unrelenting criticism of the invasion of Iraq, but also because it had become Osama bin Laden's favorite outlet for broadcasting his videotaped messages to the world. Each time bin Laden released a new video, the American media immediately turned to the CIA for a quick response and analysis of whether the recording was genuine and where and when it had been taped. Each new broadcast on Al Jazeera forced the CIA to scramble to stay one step ahead of Western reporters baying for answers. At first, when bin Laden released videotapes filmed outdoors in what appeared to be the mountainous terrain of northwestern Pakistan, the CIA even tried to conduct a geological analysis of the rocky outcroppings that served as the backdrop for the video, to try to figure out where bin Laden was. His broadcast statements prompted the CIA to look for new methods of analyzing the news network, and also led some American officials to suspect that there was a covert relationship between Al Jazeera and al Qaeda.

Former senior CIA officials say that officials from the CIA's Science and Technology Directorate, including the directorate's chief, Donald Kerr, believed Montgomery's claims about al Qaeda codes. They also convinced CIA director George Tenet to take the technology and intelligence flowing from Montgomery's software seriously. As a result, in December 2003, Tenet rushed directly to President Bush when information provided by Montgomery and his software purported to show that a series of flights from France, Britain, and Mexico to the United States around Christmas were being targeted by al Qaeda. The data strongly suggested that the terrorist group was planning to crash the planes at specific coordinates.

Based on Montgomery's information, President Bush ordered the grounding of a series of international flights scheduled to fly into the United States. This step caused disruptions for thousands of travelers on both sides of the Atlantic, while further stoking public fears of an-

42

Case 1:15-cv-20782-JEM Document 63-13 Entered on FLSD Docket 06/01/2015 Page 38 of 83

to his office to keep digging
eera broadcasts throughout

ly what it wanted to hear. At
sessed with Al Jazeera, not
criticism of the invasion of
na bin Laden's favorite out-
ges to the world. Each time
erican media immediately
nd analysis of whether the
en it had been taped. Each
IA to scramble to stay one
answers. At first, when bin
in what appeared to be the
istan, the CIA even tried to
utcroppings that served as
out where bin Laden was.
A to look for new methods
d some American officials
nship between Al Jazeera

ials from the CIA's Science
irectorate's chief, Donald
al Qaeda codes. They also
the technology and intel-
e seriously. As a result, in
esident Bush when infor-
ftware purported to show
and Mexico to the United
ed by al Qaeda. The data
was planning to crash the

esident Bush ordered the
scheduled to fly into the
or thousands of travelers
oking public fears of an-

*The Emperor of the War on Terror*

other spectacular al Qaeda attack just two years after the 9/11 attacks on New York and Washington.

★

Years later, several former CIA officials who eventually pieced together what had happened in those frenzied days became highly critical of how Montgomery's information was handled by Tenet and other senior CIA managers. The critics came to believe that top officials in the CIA's Science and Technology Directorate became fierce advocates for Montgomery's information because they were eager to play a more prominent role in the Bush administration's war on terror. The scientists were tired of being shunted aside, and Montgomery gave them what they wanted: technology that could prove their worth. "They wanted in," said one former senior CIA official, "they wanted to be part of the game."

But former CIA officials blame Tenet even more; the CIA director enabled the overeager scientists. He allowed them to circumvent the CIA's normal reporting and vetting channels, and rushed the raw material fed to the agency by Montgomery directly to the president. Bush himself had no way of vetting the material he was being handed by the CIA. "Tenet made George Bush the case officer on this," said one former senior CIA official. "The president was deciding how this was being handled."

One former senior CIA official said that for two or three months in late 2003 and early 2004, the intelligence from Montgomery was treated like it was the most valuable counterterrorism material at the CIA. Special briefings were given almost daily on the intelligence, but only a handful of CIA officials were told where the intelligence was coming from. "They treated this like the most important, most sensitive compartmented material they had on terrorism," said one former CIA official.

Officially, the CIA still refuses to discuss any details of the episode. One CIA official offered a qualified defense of Tenet's handling of Montgomery's information, saying that the decision to share the threat information with President Bush was debated and approved by

43

GREED

the administration's so-called principals committee, made up of Vice President Dick Cheney, the secretaries of state and defense, and other members of the cabinet. Only after the principals agreed did Tenet take the intelligence in to Bush. In other words, Tenet wasn't the only one who appears to have been hoodwinked. Dennis Montgomery's information received the stamp of approval by the entire upper echelon of the Bush administration.

★

What remains unclear is how Montgomery was able to convince all of them that he had developed secret software that could decode al Qaeda's invisible messages. While he had gotten by a few credulous military officers who came to view his demonstrations, he apparently found it just as easy to persuade the CIA as well.

A CIA official defensively pointed out that the agency did not actually have a contract with eTreppid at the time Montgomery was providing data from the Al Jazeera videotapes. While they were working closely together during the final months of 2003, the CIA had not yet started paying Montgomery, the official said. The agency never finalized a contract with him because agency staff eventually realized they had been conned, according to this official. But that does not diminish the fact that for a few crucial months, the CIA took Montgomery and his technology very seriously.

Montgomery was able to succeed with the CIA in part because senior agency officials considered his technology so important that they turned the knowledge of its existence into a highly compartmented secret. Few at the CIA knew any more than that there was a new intelligence source providing highly sensitive information about al Qaeda's plans for its future terrorist strikes. In other words, the CIA officials working with Montgomery—people who had already bought into Montgomery—controlled who else was told about the man and his technology. By limiting access to the information, they enhanced their own standing within the CIA; they were the high priests in on the agency's biggest secret. There would be no second-guessing.

The fact that Montgomery and eTreppid had such powerful con-

44

e, made up of Vice
defense, and other
agreed did Tenet
et wasn't the only
Montgomery's in-
tire upper echelon

le to convince all
could decode al
a few credulous
ns, he apparently

ncy did not actu-
gomery was pro-
ey were working
CIA had not yet
ency never final-
illy realized they
les not diminish
ontgomery and

art because sen-
rtant that they
compartmented
e was a new in-
ation about al
words, the CIA
already bought
it the man and
they enhanced
h priests in on
guessing.
powerful con-

nections in Washington also reduced the incentives for anyone at the CIA to speak up. Raising questions about Dennis Montgomery would almost certainly lead to a grilling in front of the House Intelligence Committee and Jim Gibbons. It might also incur the wrath of Jerry Lewis and the Defense Appropriations Subcommittee, which, along with the House intelligence panel, controlled the intelligence budget.

*

For those few allowed into the CIA's charmed circle of secret knowledge, Montgomery seemed to be providing powerful and frightening information.

The string of numbers flowing inexorably from Dennis Montgomery's computers prompted President Bush to act. One set of flights he ordered grounded were Air France flights from Paris to Los Angeles. French security detained seven men at Charles de Gaulle Airport in Paris for questioning, but then released them after no further evidence of a pending attack was uncovered. Christmas 2003 came and went with no attacks. But that did not make the White House any more skeptical of Dennis Montgomery.

One former senior CIA official recalled attending a White House meeting in the week following Christmas to discuss what to do next about the information coming from Montgomery. The official claims that there was a brief but serious discussion about whether to shoot down commercial airliners over the Atlantic based on the intelligence. The former CIA official said that during the meeting, Frances Townsend—then a counterterrorism official on the National Security Council—discussed with an NSC lawyer the fact that the president had the legal authority to shoot down planes believed to be terrorist threats, and that it might be time to exercise that authority. "I couldn't believe they were talking about it," the former senior CIA official said. "I thought this was crazy."

Townsend denied ever having such a discussion. The former CIA official repeated his version of events after being told of her denial.

*

45

GREED

Finally, the French brought an end to it. Since Air France flights to the United States were among those that had been grounded, French officials had taken a dim view of the entire episode. They began demanding answers from the Americans. The French applied so much pressure on Washington that the CIA was finally forced to reveal to French intelligence the source of the threat information. Once they heard the story of Dennis Montgomery and eTreppid, French officials arranged for a French high-tech firm to reverse-engineer Montgomery's purported technology. The French wanted to see for themselves whether the claims of hidden messages in Al Jazeera broadcasts made any sense.

It did not take long for the French firm to conclude that the whole thing was a hoax. The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers. The firm reported back to the French government that the supposed intelligence was a fabrication.

At first, CIA officials were taken aback by the French company's findings and did not want to believe that they had been fooled. Montgomery says that CIA officials continued to work with him for months after Christmas 2003, and that CIA personnel were still showing up at his offices in Nevada until late 2004.

Once the CIA officials finally accepted the truth, however, and agreed with the French findings, George Tenet and others at the CIA who had been Montgomery's advocates tried to forget all about him. They never talked about the operation again. Within the CIA, it was as if Dennis Montgomery had never existed.

The CIA never investigated the apparent hoax nor examined how it had been handled inside the agency. No one involved in promoting Montgomery, in vouching for his information to the president, or in proposing to shoot down planes based on his claims ever faced any consequences. Donald Kerr, the head of the CIA's Science and Technology Directorate at the time, was never held to account for the role the CIA's technical experts played in advocating for Montgomery. Instead, Kerr kept getting promoted. He received several other senior assignments in the intelligence community, and was eventually

named deputy direc
to requests for comi

At the time of th
of the newly created
of distributing terr
ment. That meant
ing Montgomery's
reaches of the Bush
ished for his role in
Brennan was name
White House. He la

In 2013, while
Brennan to run th
can who was vice
submitted a writter
gence community's
denied that he had
nology, and insiste
was merely a recipi
had been passed
Montgomery's dat
not to know what
pid, "other than it
information."

There was no f
body was blamed.
got promoted."

Even more stu
2003 terrorist thr
ment contracts aw
Montgomery's pro
variations of his te
The secrecy that su
CIA officials were
about their experi

Air France flights to
en grounded, French
ode. They began de-
nch applied so much
y forced to reveal to
rmation. Once they
ppid, French officials
engineer Montgom-
to see for themselves
sera broadcasts made

nclude that the whole
at there were simply
hidden bar codes or
: French government

he French company's
d been fooled. Mont-
: with him for months
ere still showing up at

truth, however, and
and others at the CIA
: forget all about him.
Within the CIA, it was

ax nor examined how
nvolved in promoting
to the president, or in
claims ever faced any
IA's Science and Tech-
to account for the role
ting for Montgomery.
ved several other sen-
y, and was eventually

named deputy director of national intelligence. Kerr did not respond to requests for comment.

At the time of the Christmas 2003 scare, John Brennan was head of the newly created Terrorist Threat Integration Center and in charge of distributing terrorism-related intelligence throughout the government. That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration. But Brennan was never admonished for his role in the affair. After Barack Obama became president, Brennan was named to be his top counterterrorism advisor in the White House. He later became CIA director.

In 2013, while the Senate was considering whether to confirm Brennan to run the CIA, Sen. Saxby Chambliss, a Georgia Republican who was vice chairman of the Senate Intelligence Committee, submitted a written question to Brennan about his role in the intelligence community's dealings with Montgomery. In response, Brennan denied that he had been an advocate for Montgomery and his technology, and insisted that the Terrorism Threat Integration Center was merely a recipient of Montgomery's information and data, which had been passed on by the CIA. He said that the center included Montgomery's data "in analytic products as appropriate." He claimed not to know what had become of the CIA's program with eTreppid, "other than it was determined not to be a source of accurate information."

There was no further inquiry on the matter from Congress. "Nobody was blamed," complains one former CIA official. "Instead, they got promoted."

Even more stunning, after the debacle over the bogus Christmas 2003 terrorist threats, Montgomery kept getting classified government contracts awarded through several different corporate entities. Montgomery's problems with the CIA did not stop him from peddling variations of his technology to one government agency after another. The secrecy that surrounded his work once again worked in his favor. CIA officials were reluctant to tell their Pentagon counterparts much about their experiences with Montgomery, so Defense Department

officials apparently did not realize that his technology was considered suspect at CIA headquarters.

In February 2004, just two months after the Christmas 2003 airplane scare, eTreppid was awarded a new contract with Special Operations Command. The contract was for both data compression and "automatic target recognition software," Montgomery's purported technology to recognize the faces of people on the ground filmed in videos on Predator drones. Special Operations Command gave eTreppid access to video feeds from Predator drones controlled from Nellis Air Force Base in Nevada. It is not certain how long officials there tested Montgomery's facial recognition technology before realizing that eTreppid had no secret formula for identifying terrorists from Predator drone video feeds. But eventually, Special Operations Command also began to see through Montgomery.

"The technology didn't meet the requirements for us," said a Special Operations Command spokesman drily. Still, there is no evidence that officials at Special Operations Command ever talked with their counterparts at the CIA to check up on Montgomery before awarding him a contract. Special Operations Command paid a total of $9.6 million to eTreppid under its contract with the firm.

*

By late 2005, Dennis Montgomery was in trouble. Employees at eTreppid were becoming more openly skeptical of Montgomery and trying to get access to his secret technology to see if it really existed. For years, Montgomery had somehow managed to hide the truth about his secret work for the government from the small number of employees he had hired. He successfully infused a sense of mystery around himself. He was like the Wizard of Oz, but now people were beginning to try to examine the man behind the curtain.

Sloan Venables, hired by Montgomery to be eTreppid's director of research and development, later told the FBI that another employee, Patty Gray, began to suspect that Montgomery "was doing something other than what he was actually telling people he was doing." Venables added in his statement to the FBI that he knew that "Montgom-

logy was considered

Christmas 2003 air-
ct with Special Op-
ta compression and
omery's purported
ie ground filmed in
mmand gave eTrep-
ontrolled from Nel-
long officials there
gy before realizing
ing terrorists from
al Operations Com-

for us," said a Spe-
here is no evidence
er talked with their
iry before awarding
a total of $9.6 mil-

ible. Employees at
f Montgomery and
: if it really existed.
to hide the truth
ie small number of
a sense of mystery
it now people were
irtain.

reppid's director of
another employee,
is doing something
e was doing." Ven-
w that "Montgom-

ery promised products to customers that had not been completed or
even assigned to programmers."

At the same time, Montgomery was arguing with Warren Trepp
over money; Montgomery needed cash and claimed that Trepp had
shortchanged him on his share of the revenue from eTreppid's con-
tracts. In December 2005, Montgomery asked Trepp for a personal
loan of $275,000, on top of the $1.375 million Trepp had already
loaned him since 1999, according to court documents. This was too
much for Trepp, who finally became fed up with Montgomery.

But Montgomery moved first. Over the Christmas holidays,
Montgomery allegedly went into eTreppid's offices and deleted all of
the computer files containing his source code and software develop-
ment data, according to court documents. He broke with Trepp, left
eTreppid, and began looking for new backers. Trepp soon discovered
that Montgomery had asked yet another casino host at the El Dorado
if he knew of any wealthy gamblers who would be willing to invest
$5 to $10 million in a new business he was about to launch. Trepp
later told the FBI that on his way out the door at eTreppid, Montgom-
ery screamed at one employee, "You're an asshole and I will see you
again!"

Trepp was furious. According to court documents, he told the FBI
that Montgomery had stolen the software eTreppid had used on se-
cret Pentagon contracts. As federal investigators moved in to investi-
gate the alleged theft of the technology, they heard from Trepp and
others that Montgomery's alleged technology wasn't real. Yet they
doggedly kept probing Montgomery's theft of secret technology, and
even raided Montgomery's home searching for the computer codes,
all the while largely ignoring the evidence that he had perpetrated a
hoax.

After their partnership broke up, Montgomery and Trepp re-
mained locked in a series of nasty and lingering legal battles. The
worst involved Montgomery's allegations that Jim Gibbons, the Ne-
vada Republican congressman whom he had met at Wayne Prim's
house, had received bribes from Warren Trepp in return for help-
ing eTreppid to obtain defense contracts. Montgomery's accusations
were explosive because they became public just as Gibbons was be-

ing elected governor of Nevada. They helped to trigger a federal corruption investigation, but the inquiry was eventually shelved amid questions about whether e-mails that Montgomery claimed showed that Gibbons had accepted money and a Caribbean cruise in exchange for help in winning contracts for eTreppid—and thus supposedly provided evidence of bribery—may have been forgeries. Dennis Montgomery was widely suspected of having fabricated the e-mails in an effort to damage both Trepp and Gibbons.

In 2008, Abbe Lowell, the Washington attorney representing Gibbons, announced that Gibbons had been cleared of wrongdoing and that prosecutors had told him that he would not be charged in the corruption investigation. Lowell said, "It should be crystal clear that the only persons who should be investigated or charged are those who made false allegations of wrongdoing and who tried to fuel this investigation for their own private purposes," according to an account of his statement in the Associated Press. Gibbons added that "today, I am exceedingly pleased that the FBI and the Justice Department have vindicated me from the allegations and claims of Mr. Montgomery."

★

Montgomery was able to recover from his battle with Trepp once he landed another wealthy patron, Edra Blixseth, the wife of billionaire Tim Blixseth. Tim Blixseth had made his fortune in timber land swaps in the Pacific Northwest, and then turned his focus to developing a mountain resort for the uber-rich in Montana called the Yellowstone Club. Set in the Rocky Mountains not far north of Yellowstone National Park, the 13,600-acre club was said to be the only private ski resort in the world. It attracted jet-setters who were willing to pay to avoid mixing with the rabble at public ski resorts.

Developing the Yellowstone Club helped to secure for Tim Blixseth the ultimate status symbol—a spot on the Forbes 400. Tim and Edra enjoyed all of the perks of the super-rich—among many other things, they owned a private jet, a yacht, and a massive estate in Rancho Mirage, California, called Porcupine Creek, which came with its own private golf course. Their wealth and ownership of the Yellow-

gger a federal cor-
ally shelved amid
y claimed showed
cruise in exchange
as supposedly pro-
les. Dennis Mont-
the e-mails in an

representing Gib-
f wrongdoing and
be charged in the
e crystal clear that
rged are those who
l to fuel this inves-
g to an account of
ided that "today, I
Department have
r. Montgomery."

ith Trepp once he
wife of billionaire
timber land swaps
as to developing a
ed the Yellowstone
f Yellowstone Na-
ue only private ski
re willing to pay to

cure for Tim Blix-
rbes 400. Tim and
mong many other
sive estate in Ran-
ich came with its
hip of the Yellow-

stone Club also meant that the Blixseths were networking with some of the most famous and powerful people in the world, from Bill Gates to Jack Kemp to Benjamin Netanyahu.

Edra Blixseth was Dennis Montgomery's latest mark. After being introduced to him by a former Microsoft executive and then hearing Montgomery explain his software, she agreed in 2006 to bankroll Montgomery to launch a new company, to be called Blxware. Montgomery needed new government contracts for Blxware, and Edra Blixseth had the money and contacts to try to make it happen. Jack Kemp, the former congressman and onetime Republican vice presidential candidate, was a member of the Yellowstone Club, and in 2006 he helped to arrange a White House meeting for Montgomery to push his technology. Thanks to Kemp, Montgomery met with Samantha Ravich, a national security aide to Vice President Dick Cheney, who was an old friend of Kemp. Montgomery explained his technology to Ravich and then tried to convince her that Cheney should support his bid for more government funding. But unlike other officials who had dealt with Montgomery in the past, Ravich demanded proof. She told Montgomery that she could not do anything for him unless some technical experts in the government vouched for his technology. He was never able to get anyone from the Pentagon to call Ravich on his behalf, and so she dropped the matter. She said in an interview that she never tried to help him obtain any new government business.

Montgomery also sought to convince Israeli officials to use his technology, but, like Samantha Ravich, the Israelis were unimpressed and rejected his offer. Still, Montgomery continued to find ways to get Pentagon contracts. He says that his technology was often used to provide targeting information in raids in Iraq and Afghanistan, and that he was given access to the Predator Operations Center at Nellis Air Force Base—a sign that his work was playing a role in Predator strikes. "Months of testing and validation at Nellis," as well as at other bases, "confirmed the value of the technology," insists Montgomery.

Edra Blixseth refused a request for an interview.

*

GREED

Montgomery continued to get defense contracts even during the Obama administration. In 2009, Montgomery was awarded another air force contract, and later claimed that he had provided the government with warning of a threatened Somali terrorist attack against President Obama's inauguration. Joseph Liberatore, an air force official who described himself as one of "the believers" in Montgomery and his technology, e-mailed Montgomery and said he had heard from "various federal agencies thanking us" for the support Montgomery and his company provided during Obama's inauguration. The threat, however, later proved to be a hoax.

★

Inevitably, Montgomery had a falling out with Edra Blixseth. He then turned to Tim Blixseth to invest and back his operation. By then, Tim and Edra Blixseth were going through an extremely bitter divorce, and Montgomery became caught up in their legal battles. Mysteriously, government lawyers sometimes sought to intervene in their court cases, with vague references to the need to keep classified information stemming from Montgomery's work with the intelligence community out of the public record.

When Montgomery approached him, Tim Blixseth had no intention of giving money to Montgomery, his ex-wife's erstwhile partner. Blixseth was interested in finding out what Montgomery was really doing, however, and so he played along when Montgomery called desperate for money. At one point, Montgomery's wife even called Blixseth to plead for help with bail after Montgomery was arrested for passing bad checks at Caesar's Palace in Las Vegas. (Eventually, Montgomery was forced into personal bankruptcy proceedings.) Blixseth refused to help but kept talking to Montgomery.

In 2010, Blixseth finally went to see Montgomery's latest computer software operation, hidden away in a nondescript warehouse near Palm Springs. Blixseth says that throughout the darkened office, Montgomery had mounted at least eight large-screen televisions, all tuned to Al Jazeera and all tied in to a computer in the middle of the room.

Dennis Montg
ing technology to
given up on his se
Blixseth took in th
his Al Jazeera dat

In fact, Mont
wavering. He clai
network broadca
Olympics in the s

Today, Dennis M
that his technolo
tive and valuable
NSA contractor E
domestic surveill
me that he could
that he had been
top U.S. intellige
erations.

But Montgo
his assertions."

* Eric Lichtblau and
Aram Roston also wr

ts even during the
as awarded another
rovided the govern-
orist attack against
ore, an air force of-
vers" in Montgom-
d said he had heard
the support Mont-
s inauguration. The

a Blixseth. He then
ation. By then, Tim
ely bitter divorce,
il battles. Mysteri-
intervene in their
keep classified in-
th the intelligence

seth had no inten-
erstwhile partner.
gomery was really
gomery called des-
e even called Blix-
was arrested for
Eventually, Mont-
eedings.) Blixseth

nery's latest com-
script warehouse
darkened office,
en televisions, all
the middle of the

*The Emperor of the War on Terror*

Dennis Montgomery was once again using his top-secret decoding technology to scour Al Jazeera broadcasts. Montgomery had not given up on his secret project, despite being abandoned by the CIA. As Blixseth took in the bizarre scene, Montgomery proudly told him that his Al Jazeera data was all being fed "straight to the Pentagon."

In fact, Montgomery says that his focus on Al Jazeera was unwavering. He claims that he recorded every minute of Al Jazeera's network broadcast nonstop from February 2004 until the London Olympics in the summer of 2012. "That's over 8 billion frames."

★

Today, Dennis Montgomery continues to argue that he is not a fraud, that his technology is genuine, and that he performed highly sensitive and valuable work for the CIA and the Pentagon. After former NSA contractor Edward Snowden leaked documents about the NSA's domestic surveillance operations in 2013, Montgomery suggested to me that he could provide the documents that would prove not only that he had been telling the truth, but that he had also been used by top U.S. intelligence officials in highly questionable intelligence operations.

But Montgomery has never provided the documents to back up his assertions.*

---

* Eric Lichtblau and James Risen reported about Montgomery for the *New York Times*. Aram Roston also wrote an excellent story about Montgomery for *Playboy* magazine.

Exhibit B

# Klayman Law Firm

2020 Pennsylvania Avenue, N.W., Suite 800, Washington, DC 20006-1811 ❖ Telephone: (310) 595-0800 ❖ leklayman@gmail.com

VIA FEDERAL EXPRESS AND CERTIFIED MAIL

January 14, 2015

 **URGENT**

Linda K. Zecher
President, Chief Executive Officer and Director

William Bayers
Executive Vice President and General Counsel

Houghton Mifflin Harcourt
222 Berkeley Street
Boston, MA 02116

**Re: Defamation of Dennis Montgomery in "Pay Any Price" by James Risen.**

Dear Ms. Zecher and Mr. Bayers:

I am counsel for Dennis Montgomery.

My client has brought it my attention that the recent publication of "Pay Any Price," written by James Risen, is defamatory. In a later correspondence, I will outline in detail all of the defamatory statements, which are actionable as libel per se. And because Mr. Montgomery is not a public figure, in fact having worked with various intelligence agencies and The White House, he was "undercover" given his duties and responsibilities in gathering intelligence concerning various matters related to terrorism. Thus, to prove a case for defamation, which we will file in Florida if this matter cannot be resolved, one need not even show malice, although it arises in any event from libel per se.

In Risen's book, as just one example of the defamatory conduct, he writes at pages 32-33:

> Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money.

1

Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it. The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in a series of civil lawsuits involving Montgomery.

It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes.

A former medial technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing scope, he still had die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Montgomery was a fake, and who rejected the notion that the super-secret computer software that he foisted on the Pentagon and CIA was anything other than America's salvation.

It is therefore clear that Houghton Mifflin Harcourt, in order to fact-check Risen's statements to responsibly exercise due diligence, even assuming that Risen's statements are not defamatory, would have had to have had access to top secret highly classified information. However, for you the publisher, to have access to this information, without the authorization of the government, would constitute crimes.

Thus, I want to understand how you fact checked Risen before you both decided to defame my client and how, after publication of his book, you furthered Risen's continuing defamatory statements in the print, television and radio media. In short, you not only have corporate and personal significant civil liability to my client, but have you also collectively engaged what is in effect a criminal enterprise for profit.

If you would like to discuss this matter before Mr. Montgomery takes other avenues of redress, please contact me immediately. I am available to meet with you at the end of this month if such a meeting could prove productive to try to resolve this serious matter. Let me know if there is an interest by January 20, 2015 to discuss how you fact-checked Risen's statements; otherwise we will contact the Federal Bureau of Investigation and seek other suitable redress.

Although I am representing Mr. Montgomery in my private capacity, as also a public interest advocate, there is a duty and responsibility on my part not to accede to top secret classified

information being strewn all over the public record, particularly given the rise of Islamic terrorism in recent months and the even heightening risks this presents to the this nation and the free world.

Please govern yourselves accordingly.

Sincerely,

Larry Klayman

cc:     Dennis Montgomery
        James Risen



**Houghton Mifflin Harcourt**

David Eber
Vice President
Associate General Counsel

January 20, 2015

VIA U.S. MAIL AND ELECTRONIC MAIL

Larry Klayman
Klayman Law Firm
2020 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC 20006-1811
leklayman@gmail.com

Re: *Pay any Price*, by James Risen

Dear Mr. Klayman:

We have received your letter dated January 14, 2015, to Linda Zecher and William Bayers at Houghton Mifflin Harcourt Publishing Company ("HMH").

We deny your allegations that *Pay any Price* contains defamatory statements concerning your client Dennis Montgomery, or that HMH or Mr. Risen engaged in any criminal conduct in preparing and vetting the book. We also decline your invitation to meet to discuss HMH's manuscript review processes.

Sincerely,

David Eber

cc: William Bayers
James Risen

# Klayman Law Firm

2020 Pennsylvania Avenue, N.W., Suite 800, Washington, DC 20006-1811 ⊗   Telephone: (310) 595-0800 ⊗   leklayman@gmail.com

Via Fax and Mail

February 13, 2015

Mr. William Bayers, Esq.
General Counsel
Houghton Mifflin Harcourt Publishing Company
222 Berkeley Street, FL 1-11
Boston, Massachusetts 02116

Mr. James Risen
c/o The New York Times
1627 "I" Street N.W., Suite 700
Washington, D.C. 20006-4007

Mr. James Risen
c/o Houghton Mifflin Harcourt Publishing Company
222 Berkeley Street, FL 1-11
Boston, Massachusetts 02116

Re:   **Demand for Retraction of Defamation Pursuant to § 770.02 Florida Statutes (2012)**

Dear Mr. Bayers and Mr. Risen:

I am writing as legal counsel for Mr. Dennis Montgomery, who is the subject of Chapter 2 and other portions of a book published by Houghton Mifflin Harcourt Publishing Company titled "Pay Any Price: Greed, Power and Endless War" authored by James Risen.

This letter is to place you on notice pursuant to § 770.02 Florida Statutes (2012) "Notice condition precedent to action or prosecution for libel or slander" that you have published statements concerning our client Dennis Montgomery which constitute defamation *per se*, general defamation and defamation by inference (hereafter "defamatory statements").

You are now on notice that these materials have resulted in severe damage to Dennis Montgomery personally and in his trade and profession, for which you may be held to account for legally.

Your defamatory statements were first and continue to be published in a book with publication date October 14, 2014, by Houghton Mifflin Harcourt Publishing Company at 215 Park Avenue South, New York, New York 10003, under the title "Pay Any Price: Greed, Power and Endless War" (referred to as "the Book) by author James Risen, Copyright (c) 2014 by James Risen, designated by the Library of Congress by its index system as ISBN 978-0-544-34141-8 (hardback edition).

Retraction Letter
February 13, 2015
Page | 2

The publication dated October 14, 2014, was the first publication of the book worldwide in any language and the first printing run of the book. The book was physically printed in the United States of America. We understand that copies of the Book were distributed to bookstores and/or the public up to a week or two earlier than the designated date of publication (a book's designated publication date being primarily of marketing significance, not necessarily the earliest date of a book's release).

Apart from the book itself, James Risen on behalf of himself and the publisher also engaged in a flurry of news interviews and talk show interviews starting in September, and continuing until the present time, associated with the publication 'roll out' of his book in which Risen made further statements in addition to the words of the book itself and repeated claims from the book itself.

Many of Risen's libelous and slanderous statements were made during written news and talk show interviews in September 2014, October 2014, and November, 2014, and since then, some spoken, some in print, surrounding the publication of his book rather than in the book itself.

Your defamatory statements against Dennis Montgomery are exceedingly numerous, extensive, detailed, and often each defamatory in numerous respects. Many statements each include multiple and overlapping topics of defamation against Dennis Montgomery.

As a result, we have attached as "Attachment A" to this letter a 28-page restatement, summary, and analysis of at least 43 examples of defamatory statements. We expect that James Risen also made other statements during additional radio, television, and print interviews about the Book.

You are now on notice that this article resulted in severe damage to Mr. Montgomery personally and in his trade and profession, for which you all will be held to legally account for.

We demand that you issue a retraction immediately. In your previous letter of January 20, 2015, you denied that any defamatory statements were made. We strongly suggest that you reconsider. Please govern yourselves accordingly.

Sincerely,

Larry Klayman

cc:  Dennis Montgomery

## ATTACHMENT A

## LIST OF EXAMPLES OF DEFAMATORY STATEMENTS, COMMENTS

## DEFAMATION *PER SE*

1.        The following statements are "*defamatory per se,*" recognized under Florida law

when statements are so powerful in their ability to hurt someone that Florida law presumes

harmful as a matter of law. *Montgomery v. Knox*, 23 Fla. 595, 3 So. 211, 217 (1887), such that a

judge will allow damages to be awarded in these cases even if no evidence of harm has been

presented. "[T]he law presumes malice in their utterance," *Abraham v. Baldwin*, 52 Fla. 151, 42

So. 591, 592 (1906), where the words are "… of such common notoriety established by the

general consent of men, that the courts must of necessity take judicial notice of its harmful

effect." *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 236 (1933).  [1]

2.        **First, on Page 32 of the Book, Risen writes:** [2]

> "Consider the example of Dennis Montgomery.  He provides a
> perfect case study to explain how during the war on terror greed and
> ambition have been married to unlimited rivers of cash to create a
> climate in which someone who has been accused of being a con
> artist was able to create a rogue intelligence operation with little or
> no adult supervision. Crazy became the new normal in the war on
> terror, and the original objectives of the war got lost in the process."

3.        As libel *per se*, Risen asserted that out of "greed" Montgomery "create[d] a rogue

intelligence operation with little or no adult supervision and that he was "someone who has been

accused of being a con artist."

---

[1]        Examples of defamation *per se* include those that hurt one's profession, business or trade; falsely state that a person has a socially unacceptable illness or disease;  or falsely state that a person has been involved in some kind of criminal activity.  *Lawnwood Medical Center Inc. v. Sadow*, 43 So. 3d 710, 729 (Fla. 4th DCA 2010).

[2]        Note that several statements may qualify under different theories, but are presented in full for proper context.  Some statements are repeated for that portion of the statement that qualifies under different theories of defamation under Florida law.

4.      **Second, on Page 32 of the Book, the Risen writes:**

"Whatever else he was, Dennis Montgomery was a man who
understood how best to profit from America's decade of fear. He saw
the post-9/11 age for what it was, a time to make money. Montgomery
was the maestro behind what many current and former U.S. officials
and others familiar with the case now believe was one of the most
elaborate and dangerous hoaxes in American history, a ruse that was so
successful that it nearly convinced the Bush administration to order
fighter jets to start shooting down commercial airliners filled with
passengers over the Atlantic. Once it was over, once the fever broke
and government officials realized that they had been taken in by a
grand illusion, they did absolutely nothing about it**.** The Central
Intelligence Agency buried the whole insane episode and acted like it
had never happened. The Pentagon just kept working with
Montgomery. Justice Department lawyers fanned out across the country
to try to block any information about Montgomery and his schemes
from becoming public, invoking the state secrets privilege in public, a
series of civil lawsuits involving Montgomery.  It was as if everyone in
Washington was afraid to admit that the Emperor of the War on Terror
had no clothes."

5.      As libel *per se*, Risen asserted Montgomery's work "many current and former

U.S. officials and others familiar with the case now believe was one of the most elaborate and

dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the

Bush administration to order fighter jets to start shooting down commercial airliners filled with

passengers over the Atlantic."

6.      As libel *per se*, Risen asserted about the Montgomery that "once the fever broke

and government officials realized that they had been taken in by a grand illusion, they did

absolutely nothing about it …"

7.      **Third, on Page 33 of the Book, Risen writes:**

"A former medical technician, a self-styled computer software
expert with no experience whatsoever in national security affairs,
Dennis Montgomery almost singlehandedly prompted President
Bush to ground a series of international commercial flights based
on what now appears to have been an elaborate hoax. Even after it
appeared that Montgomery had pulled off a scheme of amazing

2

scope, he still had die-hard supporters in the government who
steadfastly refused to believe the evidence suggesting that
Montgomery was a fake, and who rejected the notion that the
super-secret computer software that he foisted on the Pentagon and
CIA was anything other than America's salvation."

8.      As libel *per se*, Risen asserted that Montgomery's work "now appears to have

been an elaborate hoax."

9.      As libel *per se*, Risen asserted that "die-hard supporters in the government who

steadfastly refused to believe the evidence suggesting that Montgomery was a fake."

10.     As libel *per se*, Risen asserted that he "that he foisted on the Pentagon and CIA"

super-secret computer software.

11.     **Fourth, on Page 34 of the Book, the Risen writes:**

"Montgomery was an overweight, middle-aged, incorrigible gambler,
a man who liked to play long odds because he was convinced that he
could out-think the house. He once boasted to a business partner that
he had a system for counting an eight-deck blackjack shoe, quite a
difficult feat for even the best card sharks, and he regularly tested his
theories at the El Dorado and the Peppermill Casino in Reno. He
usually came up short but that didn't stop him from playing blackjack
on a nightly basis, racking up unwieldy debts that eventually led to his
2010 arrest for bouncing more than $ 1 million in bad checks at
Caesar's Palace in Las Vegas."

12.     As libel *per se*, Risen asserted about the Montgomery that he was an "incorrigible

gambler," meaning in effect that Montgomery was a gambling addict who was "playing

blackjack on a nightly basis."  Historically, gambling and in particular an uncontrollable

gambling addict is a loathsome social status.

13.     *Fifth,* **on Page 36 of the Book, Risen writes:**

"Michael Flynn, Montgomery's former lawyer— who later
concluded that Montgomery was a fraud."

14.     As libel *per se*, Risen asserted about the Montgomery that Montgomery's lawyer "concluded that Montgomery was a fraud."

15.     **Sixth,** on Page 37 of the Book, Risen writes:

"By the spring and summer of 2003, eTreppid was awarded contracts by both the air force and U.S. Special Operations Command. Montgomery was able to win over the government in part by offering field tests of his technology —tests that former employees say were fixed to impress visiting officials. Warren Trepp later told the FBI that he eventually learned that Montgomery had no real computer software programming skills, according to court documents that include his statements to the FBI. Trepp also described to federal investigators how eTreppid employees had confided to him that Montgomery had asked them to help him falsify tests of his object recognition software when Pentagon officials came to visit. Trepp said that on one occasion, Montgomery told two eTreppid employees to go into an empty office and push a button on a computer when they heard a beep on a cell phone. Meanwhile, Montgomery carried a toy bazooka into a field outside eTreppid. He was demonstrating to a group of visiting U.S. military officials that his technology could recognize the bazooka from a great distance."

16.     As libel *per se*, Risen asserted about Montgomery that he committed fraud including defrauding the U.S. Government, prohibited under the False Claims Act codified at 31 U.S.C. §§ 3729 – 3733.

17.     **Seventh,** on Page 37 of the Book, Risen writes:

"After he was in place in the field, he used a hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of a bazooka on another screen prominently displayed in front of the military officers standing in another room, according to court documents. The military officers were convinced that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands. (Montgomery insists that the eTreppid employees lied when they claimed that he had asked them to fix the tests, and also says that the air force issued a report showing that it had verified the tests.)"

18.     As libel *per se*, Risen asserted about Montgomery that he committed fraud

including defrauding the U.S. Government, prohibited under the False Claims Act codified at 31

U.S.C. §§ 3729 – 3733.

19.     **Eighth, on Page 40 of the Book, Risen writes:**

> "Montgomery brilliantly played on the CIA's technical insecurities
> as well as the agency's woeful lack of understanding about al
> Qaeda and Islamic terrorism. He was able to convince the CIA that
> he had developed a secret new technology that enabled him to
> decipher al Qaeda codes embedded in the network banner
> displayed on the broadcasts of Al Jazeera, the Qatar-based news
> network. Montgomery sold the CIA on the fantasy that al Qaeda
> was using the broadcasts to digitally transmit its plans for future
> terrorist attacks. And only he had the technology to decode those
> messages, thus saving America from another devastating attack.
> The CIA— more credulous than Hollywood or Las Vegas— fell
> for Montgomery's claims. In short, he convinced CIA officials that
> he could detect terrorist threats by watching television."

20.     As libel *per se*, Risen asserted about Montgomery that "Montgomery sold the

CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for

future terrorist attacks."

21.     As libel *per se*, Risen asserted about Montgomery that he defrauded the CIA.

22.     **Ninth, on Page 42 of the Book, Risen writes:**

> "A CIA official defensively pointed out that the agency did not
> actually have a contract with eTreppid at the time Montgomery was
> providing data from the Al Jazeera videotapes. While they were
> working closely together during the final months of 2003, the CIA
> had not yet started paying Montgomery, the official said. The
> agency never finalized a contract with him because agency staff
> eventually realized they had been conned, according to this official.
> But that does not diminish the fact that for a few crucial months, the
> CIA took Montgomery and his technology very seriously."

23.     As libel *per se*, Risen asserted about Montgomery that "agency staff eventually

realized they had been conned, according to this official."

24.     ***Tenth,*** **on Page 46 of the Book, the Risen writes:**

"It did not take long for the French firm to conclude that the whole thing was a hoax.  The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers.  The firm reported back to the French government that the supposed intelligence was a fabrication."

25.     As libel *per se*, Risen asserted about Montgomery that "the whole thing"

(Montgomery's work) "was a hoax" and a "fabrication."

26.     ***Eleventh,*** **on Page 46 of the Book, the Risen writes:**

"The CIA never investigated the apparent hoax nor examined how it had been handled inside the agency. No one involved in promoting Montgomery, in vouching for his information to the president, or in proposing to shoot down planes based on his claims ever faced any consequences."

27.     As libel *per se*, Risen asserted about Montgomery that his work was a hoax.

28.     ***Twelfth,*** **on Page 47 of the Book, the Risen writes:**

"At the time of the Christmas 2003 scare, John Brennan was head of the newly created Terrorist Threat Integration Center and in charge of distributing terrorism-related intelligence throughout the government. That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration. But Brennan was never admonished for his role in the affair. After Barack Obama became president, Brennan was named to be his top counterterrorism advisor in the White House. He later became CIA director."

29.     As libel *per se*, Risen asserted about Montgomery that "That meant that

Brennan's office was responsible for circulating Montgomery's fabricated intelligence to

officials in the highest reaches of the Bush administration."

30.     ***Thirteenth,*** **on Page 50 of the Book, Risen writes:**

"Edra Blixseth was Dennis Montgomery's latest mark. After being introduced to him by a former Microsoft executive and then hearing Montgomery explain his software, she agreed in 2006 to bankroll Montgomery to launch a new company, to be called Blxware.

> Montgomery needed new government contracts for Blxware, and Edra Blixseth had the money and contacts to try to make it happen."

31.     As libel *per se*, Risen asserted about Montgomery that "Edra Blixseth was Dennis Montgomery's latest mark," clearly asserting Montgomery to be a con man.

32.     The libel is false, including because Montgomery owed no stock or ownership in BLIXWARE so as to be able to make a "mark" of Edra Blixseth.

33.     **Fourteenth,** on November 6, 2014, James Risen appeared as an interview guest on "The Daily Show with Jon Stewart," by Comedy Central, interviewed by Jon Stewart. Exhibit A, attached. The television interview was taped at The Daily Show's studio 11th Avenue between 51st and 52nd Street, New York (Manhattan), New York, and broadcast for the first time nationwide across the United States of America through cable television and satellite television on "The Comedy Central" channel.

34.     James Risen stated in said television interview for his statements to be broadcast on TV that his favorite story is the story of –

> Dennis Montgomery who is this guy was as a computer software expert, supposed expert. Who convinced the CIA in 2003 that he had the super-secret technology to read Al Jazeera news broadcasts and decipher Al Qaeda codes inside the [interrupted by Jon Stewart]
>
> [Jon Stewart]  An Enigma machine for Al Qaeda...?
>
> [Dennis Montgomery] Right.  And he convinced the CIA in 2003 that he could read numbers and letters hidden in the Al Jazeera broadcasts that corresponded with flights that Al Qaeda was going to shoot down, knock--- or blow up….
>
> President Bush was so convinced of this that they grounded flights all over the world at Christmas 2003 based on this guy's intelligence or supposed intelligence.  It took the French intelligence service, who had gotten very mad because they grounded flights from Paris to Los Angeles.  And they demanded that the CIA tell them where they were getting this information.   And so they finally [non-verbal

interruption].  They finally got the information.   The French told them this is a hoax.  This is a fabrication.

And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it.  And Montgomery kept getting more contracts after that.

[Other, extended discussion with Jon Stewart on other topics]

There is lots of raw intelligence every day that says there is an attack about to happen.   You really have to be a pretty sophisticated consumer of intelligence after several years to begin to realize what's real and what's not really a credible threat.

35.     As libel *per se*, Risen asserted about Montgomery that "he convinced the CIA in 2003 that he could read numbers and letters hidden in the Al Jazeera broadcasts that corresponded with flights that Al Qaeda was going to shoot down, knock--- or blow up….

36.     As libel *per se*, Risen asserted about Montgomery that "The French told them this is a hoax.  This is a fabrication.  And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it.  And Montgomery kept getting more contracts after that."  The statement that "the CIA agreed with them" is Risen's assertion about Montgomery's work that "this is a hoax.  This is a fabrication."

37.     As libel *per se*, Risen asserted about Montgomery that "they covered the whole thing up, and refused to ever talk about it,"  as a way of saying that the CIA had been conned.

38.     *Fifteenth,* on October 13, 2014, James Risen gave a television interview [3] with Judy Woodruff which was broadcast nationwide by the Public Broadcasting System (PBS).   In that interview, James Risen made the following statements for broadcast on television, and Judy Woodruff repeated many points from James Risen's book which Risen agreed with and endorsed.  Much of the interview involved other chapters not relevant here.

---

[3]       http://www.pbs.org/newshour/bb/costs-security-price-high/

JUDY WOODRUFF:  In the next chapter, JAMES RISEN, you write about millions of dollars spent on programs that were completely fraudulent.  One was run by a man named Dennis Montgomery.  He was a, He was a .... I guess he had worked in computer software... but he was a GAMBLER! [4]

JAMES RISEN:  Right.

JUDY WOODRUFF:  And he sold the CIA and the Pentagon on technology that turned out to be not at all what he said it was.

JAMES RISEN:   It is difficult to tell in some of these cases who is scamming who.  If you talk to Montgomery, he argues that the CIA wanted him to do what he was doing.  And so its a fascinating dynamic that's developed in the war on terror, between people who recognize the opportunities for this gold rush and the agencies which are... who have so much money to spend now, they're getting so much more money than they ever had before, that in some cases they don't know what to do with.

In this case, they began to believe, in this sort of war fever, that you could find Al Qaeda messages hidden in Al Jazeera broadcasts.  And so that.. that program, that highly secret program, was used to ground planes all over Europe and the United States

JUDY WOODRUFF:  When actually there was nothing to it.

JAMES RISEN:  Right

JUDY WOODRUFF:  It was a hoax.

JAMES RISEN:  Right.  Right.

JUDY WOODRUFF:  And then there was another part of it where he was saying he had special facial recognition software....

JAMES RISEN:  Right.  Right

JUDY WOODRUFF:  ... used on drones?

JAMES RISEN:   Yeah.  There were cases in which people said that he was fooling the military and the CIA about his operations and how... what kind of techniques and technologies he had.  He would argue that the CIA actually wanted him and or the army believed him

---

[4]      Emphasis, by exclamation in tone of voice, the in original conversation.

and tested it.  So it's this very complicated story about a man
recognizing an opportunity who had never been involved in national
security before and the CIA and the military all just hungry for
whoever could come with the latest idea.

39.     As libel *per se*, Risen asserted about Montgomery that "you write about millions of dollars spent on programs that were completely fraudulent.  One was run by a man named Dennis Montgomery," which Risen confirms by saying "Right." (Actually where the discussion is about "the next chapter" that chapter is exclusively about Dennis Montgomery alone.)

40.     As libel *per se*, Risen asserted about Montgomery that "When actually there was nothing to it," which Risen confirms by saying "Right." And also "It was a hoax," which Risen confirms by saying "Right.  Right."

41.     As libel *per se*, Risen asserted about Montgomery that "There were cases in which people said that he was fooling the military and the CIA about his operations and how... what kind of techniques and technologies he had."

42.     **Sixteenth,** on October 24, 2014, James Risen gave an audio interview with Lucy Worsley published on the <u>New York Times</u> website, titled **"Inside The New York Times Book Review: James Risen's 'Pay Any Price'"** which is accessible at that website address. [5]  In this interview  "**Inside <u>The New York Times</u> Book Review**," with Pamela Paul, October 24, 2014, James Risen stated for national broadcast:

> PAMELA PAUL:   How do we count and account for the costs of the
> government's war on terror.  We'll talk to  James Risen, author of Pay
> Any Price:  Greed, Power, and Endless War.

---

[5]     See:  ArtsBeat: Book Review Podcast: James Risen's 'Pay Any Price', by John Williams, <u>New York Times</u>, October 24, 2014, http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/ , based upon Louise Richardson's book review of Risen's book.

JAMES RISEN ("tease" audio clip):   It seems to me that what the war on terror had become in thirteen years was a search for cash and a search for power and status.

PAMELA PAUL:   What is the British fascination with murder? Lucy Worsley will explain all joining us to talk with us about her new book:  The Art of the English Murder.

LUCY WORSLEY ("tease" audio clip):  The public used to consume murder in a way that you can still see the modern media doing it today.  Just look at the Pistorius trial.

PAMELA PAUL:   Alexander Alter will be here with Notes from the Publishing world.  And Greg Cole has bestseller news.  This is "Inside the New York Times Book Review."  I am Pamela Paul.

James Risen joins me now.  His new book is Pay Any Price:  Greed, Power, and Endless War.  Hi James.

JAMES RISEN:   Hi, thanks for having me.

PAMELA PAUL:  Thanks for being here. Now this is a book that covers a lot of territory.  Tell us briefly about what it is you set out to write about in the book.

JAMES RISEN:   What I wanted to do was, I'd written one book before about the war on terror, and I wanted to follow up with a new book that kind of looked at where we were 13 years after 9/11 and how we had what started out in the immediate aftermath of 9/11 as kind of a search for justice or a search for retribution or whatever you want to think, say we were doing right after 9/11 as a country.  It seemed to me that what the war had become in 13 years was a search for cash and a search for power and status and that it was becoming an endless war in which we had a new mercenary class of people who were taking advantage of the war on terror.  And that enormous unintended consequences had happened.  And I began to hear about just some really crazy things that were going on.  And so I thought it would make a good story.

[The discussion then covers the Chapter "Rosetta" not relevant here, concerning a lawsuit for 9/11 families against Saudi Arabia, except the ending]

JAMES RISEN [winds up the Chapter on "Rosetta" by saying]:   .... in the war on terror became so complicated and so difficult to tell what was really going on, to me it was like a case study in how the

war on terror had been turned for other uses, and become a.... something that you could never tell what was the truth and what was not the truth.  And that to me was at the heart of the problems with the war on terror, that you could never tell what's real and what was concoction today.

[The discussion then covers how Risen went about researching the book, not relevant here]

PAMELA PAUL:   Did a lot of it arise out of stories that, reporting that you'd originally done for the Times?

JAMES RISEN:   Some of it. For instance, I did a chapter The Emperor of the War on Terror, about Dennis Montgomery who [laughs] who's a strange character, who I'd done a story about him for the New York Times along with Eric Lichtbau my colleague there at the Times.  He's one of the most fascinating characters in the war on terror.  He... He was a computer software expert who convinced the CIA that he could decipher secret codes from Al Qaeda in the Al Jazeera news broadcasts.  And that he could tell the CIA numbers and letters that corresponded with flights that Al Qaeda wanted to attack.  And the CIA took this so seriously that they grounded, that the Bush Administration grounded a bunch of international flights in Christmas 2003 based on what this guy was telling them.  And when they realized it was a hoax, they covered the whole thing up and never did anything about it.  So I had done a story for the Times with....  about that and then expanded on that and got a lot more information for the book.

PAMELA PAUL:   How did you find out about him?

JAMES RISEN:   Well he had been written about a little bit before we wrote about it.  But I had also, even before he was written about by other people, I had heard from people in the CIA that there was this crazy operation that nobody wanted to talk about, that they were all embarrassed by.  To me that, it was like a case study in just how crazy the war on terror has become. And the only thing that makes sense about why it's gotten so crazy, is I think we kind of have deregulated national security and we took all, you know, Cheney said we're going to take the gloves off.  And that means we deregulated national security at the same time we poured hundreds of billions of dollars into counter-terrorism.  And so it's had enormous unintended consequences from what is essentially a national security crisis that is kind of like the banking crisis.

12

[The interview discussion then turns to the alleged deregulation of national security on other topics not relevant here.]

43.     As libel *per se*, Risen asserted about Montgomery that "And when they [the CIA] realized it was a hoax, they covered the whole thing up and never did anything about it."

44.     The libel is false, for the reasons identified above, and including that Montgomery never purported to be an expert in intelligence but left interpretation of the data he uncovered to intelligence experts of the U.S. Government.

45.     ***Seventeenth,*** James Risen sat for a nationwide television news interview on the television show ***DEMOCRACY NOW!*** A Daily Independent Global News Hour, with Amy Goodman & Juan González, at 207 W. 25th St., Floor 11, New York, NY 10001 on October 14, 2014. On this nationwide television news broadcast, the conversation turned to:

> **AMY GOODMAN:** Dennis Montgomery?
>
> **JAMES RISEN:** Dennis Montgomery is a fascinating character, who—he was a computer software person, self-styled expert, who developed what he said was special technology that would allow him to do things with computers that other people couldn't do. One of the things that he developed was this imaging technology that he said he could find images on broadcast network news tapes from Al Jazeera. He said that he could read special secret al-Qaeda codes in the banners on the broadcasts of Al Jazeera. And the CIA believed this. And he was giving them information based on watching hours and hours of Al Jazeera tapes, saying that "I know where the next al-Qaeda attack is going to be based—is going to happen." And the Bush administration and the CIA fell for this.
>
> **AMY GOODMAN:** And it was in the news zipper at the bottom of the Al Jazeera broadcasts?
>
> **JAMES RISEN:** Well, he says it was in the banner. But anyway. And so, it was this great—if you talk to him, he argues, well, they—that's what they were looking for. You know, they convinced him to look for this. You know, it depends on who you talk to. But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they

13

were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts.

And then there's a whole number of other things, like Alarbus, which was this covert program at the Pentagon where a Palestinian involved in that was actually trying to use the bank account set up by the secret program, Pentagon program, to launder hundreds of millions of dollars. And the FBI investigated this, but then tried to keep the whole thing quiet.

**AMY GOODMAN:** How much did the U.S. government give to Dennis Montgomery?

**JAMES RISEN:** Millions of dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that. So, it's a strange—to me, the Dennis Montgomery story is one of the strangest, because what it shows is, early on in the war on terror, as I said, the CIA and all these other agencies had so much money to spend on counterterrorism that they were willing to throw it at everything. They were so afraid of the next terrorist attack that they were willing to believe anybody who came up with some idea. And I called that chapter about Montgomery, you know, "The Emperor of the War on Terror," because nobody wanted to say that the emperor had no clothes.

**AMY GOODMAN:** I mean, it had very real effects, aside from spending all that money.

**JAMES RISEN:** Yeah.

**AMY GOODMAN:** For example, planes being sent back.

**JAMES RISEN:** Yes, yes. There were planes grounded. International flights between the United States and Europe and Mexico were grounded. There was talk at the White House even of shooting down planes based on this information.

**AMY GOODMAN:** Because they could be used, as with September 11th, as weapons?

**JAMES RISEN:** Yeah, as missiles or whatever. And so, it was crazy. It was absolutely insane.

**AMY GOODMAN:** And it was only the French government who then did a study?

14

**JAMES RISEN:** Yes, yes. Yeah, the French government finally— you know, the U.S.—the CIA and the Bush administration didn't want to tell anybody what was really happening, where they were getting this information. You know, "This supersecret information about Al Jazeera, we can't tell you." And finally, the French intelligence service and the French government said, "You know, you're grounding our planes. You've got to tell us where you're getting this information." And they got—they finally shared the information with them, and the French got a French tech firm to look at this, and they said, "This is nuts. This is fabrication." And after a while, the CIA was finally convinced maybe the French were right, and they stopped talking about it. They didn't do anything else. They just like shut it down eventually, but never wanted to talk about what had really happened.

**AMY GOODMAN:** Then Dennis Montgomery, revealed as a con man—

**JAMES RISEN:** Yeah, yeah.

**AMY GOODMAN:** —in jail for that?

**JAMES RISEN:** Well, no, he's not in jail. But it was a—he actually got more contracts after that, with the Pentagon and other agencies. And he continued to operate for a long time. You know, he kind of went from one agency to the other.

**AMY GOODMAN:** We're talking to James Risen, Pulitzer Prize-winning investigative journalist for *The New York Times*. His new book, just out today, *Pay Any Price: Greed, Power, and Endless War*. When we come back, war corrupts, endless war corrupts absolutely. Stay with us.

[break]

46.     As libel *per se*, Risen asserted about Montgomery that "But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts."

47.     As libel *per se*, Risen asserted about Montgomery when asked "How much did the U.S. government give to Dennis Montgomery?" Risen answered in reply: "Millions of

dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that."

48.     As libel *per se*, Risen asserted about Montgomery that "the French got a French tech firm to look at this, and they said, 'This is nuts. This is fabrication.'"

49.     As libel *per se*, Risen asserted about Montgomery when asked "Then Dennis Montgomery, revealed as a con man—" Risen confirmed in reply: "Yeah, yeah."

50.     As libel *per se*, Risen asserted about Montgomery that he should be in jail.

51.     ***Eighteenth***, James Risen gave an interview with "Conversations with Great Minds" of "The Big Picture RT with talk show host Thom Hartmann on October 24, 2014. [6]

> THOM HARTMAN:   ...  [Abrupt change of topic starting at about time 5:27]  ...  There's just this enormous amount of government money.  Let's throw it at the private sector.  They'll make things well. One of the members of the private sector who came forward and said I've got a secret, I can figure this stuff out, was a guy by the name of Dennis Montgomery.
>
> JAMES RISEN:   Right.  Uh, Dennis Montgomery is one of the best stories in the war on terror.  I think somebody should make a movie about him.  Dennis Montgomery was a computer software expert who said that he had developed technology that basically could find objects hidden in the video on television.  And so he convinced, through a whole series of contacts and meetings that I detail in the book, he was able to get to the CIA  and convince the CIA that he had the technology to decipher Al Qaeda codes that were he said were hidden in Al Jazeera news broadcasts.
>
> THOM HARTMAN:   They were hidden in the Chiron or the --
>
> JAMES RISEN:   In the banner.  In the banner, actually.  He said that he could find numbers and letters that were constantly showing up, or not showing up but were being hidden, embedded deeply in the video. And he would then give these  numbers and letters to the CIA.  And the CIA, either he told them or they convinced themselves that these numbers and letters corresponded to flights, international airline flights, that Al Qaeda was going to attack.  And so in December, in Christmas

---

[6]       https://www.youtube.com/watch?v=jc_8f4Pp9Zc

16

2003, the Bush Administration and the CIA took this so seriously that they actually grounded a whole series of international flights coming into and out of the United States, and the White House even considered shooting down some of these flights over the Atlantic.

THOM HARTMAN:   Whoa.

JAMES RISEN:    And once the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist and that these supposed Al Qaeda codes weren't really in the Al Jazeera newscasts, the CIA covered the whole thing up and never went public with it  and just tried to act like it never happened.

THOM HARTMAN:   Well we know how aggressively this and particularly the Obama Administration right now has gone after whistleblowers and reporters.  You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison.

JAMES RISEN:   Well, no, he ended up getting more contracts from the military... and the Pentagon.  And he was continuing, he continued to operate for several years.  It's really a remarkable story.

THOM HARTMAN:   Yeah, it really and truly is.

[Topic changes abruptly to discussions of torture in the war on terror]

52.    As libel *per se*, Risen asserted about Montgomery that "the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist."

53.    As libel *per se*, Risen asserted about Montgomery that he belongs in prison, responding to the question "You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison," by Risen answering in reply:  "Well, no,

he ended up getting more contracts from the military... and the Pentagon.  And he was continuing, he continued to operate for several years.  It's really a remarkable story."

## GENERAL DEFAMATION

54.     In addition, Risen also made additional defamatory statements that are explicit defamation under Florida law.

55.     ***Nineteenth,*** **on Page 49 of the Book, Risen writes:**

> "Trepp was furious. According to court documents, he told the FBI that Montgomery had stolen the software eTreppid had used on secret Pentagon contracts. As federal investigators moved in to investigate the alleged theft of the technology, they heard from Trepp and others that Montgomery's alleged technology wasn't real."

56.     As explicit libel, Risen asserted about Montgomery that Montgomery had stolen valuable software – yet also asserted that the software "wasn't real."

## DEFAMATION BY IMPLICATION UNDER FLORIDA LAW

### Analogous to False Light

57.     For defamation by implication: " . . . [L]iterally true statements can be defamatory where they create a false impression. This variation is known as defamation by implication and has a longstanding history in defamation law." *See Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008). Defamation by implication occurs when a publication states facts that are literally true, but produces a defamatory meaning apparent from a plain reading of the publication in its entirety. See *Chapin v. Knight-Ridder, Inc.* 993 F.3d 1087 (4th Cir. 1993).

58.     Montgomery thus claims here that if the Court finds that any of the statements labeled "First" through "Nineteenth" do not qualify as defamation *per se* or general defamation,

then in the alternative Montgomery claims here that any and all such statements not qualifying as defamation *per se* or general defamation are defamation by implication against Montgomery.

59.     Across the many examples of libelous statements from the Book or slanderous interviews, Risen implies that Montgomery deceived the U.S. Government as to the meaning, purpose, or interpretation of hidden data and clues that Montgomery uncovered, implying that Montgomery defrauded and conned the U.S. Government.

60.     In fact, Montgomery refused to speculate as to the interpretation or meaning of the data and analyses he uncovered, even when pressed to state what he thought the data might mean, but Montgomery left the role of interpretation to U.S. Government intelligence experts.

61.     Thus, throughout the statements presented herein, Risen libels and slanders Montgomery by implication that Montgomery defrauded and scammed the U.S. Government concerning the meaning of the information Montgomery uncovered, implying that Montgomery obtained millions of dollars by frightening and fooling child-like and gullible CIA officials.

62.     Across the many examples of libelous statements from the Book or slanderous interviews, Risen implies that President George W. Bush's alleged decisions to ground and almost shoot down passenger aircraft around Christmas 2003 (which Risen would have no way of knowing about) were a result of Montgomery's fraud and scams, deceptively manipulating the President of the United States and the U.S. national command authority.

63.     Across the many examples of libelous statements from the Book or slanderous interviews, Risen implies that Montgomery should be in jail.

64.     Among the other statements, in particular, the ***First*** example of libel**, on Page 32 of the Book,** states that:

> "Consider the example of Dennis Montgomery.  He provides a perfect case study to explain how during the war on terror greed and ambition

> have been married to unlimited rivers of cash to create a climate in
> which who has been accused of being a con artist was able to
> create a rogue intelligence operation with little or no adult supervision.
> Crazy became the new normal in the war on terror, and the original
> objectives of the war got lost in the process."

65. Thus, as libel by implication, Risen implies that Montgomery committed fraud

and went to any lengths motivated by greed, to obtain money at any cost.

66. Among the other statements, in particular, in the ***Eleventh*** example of libel***, on***

**Page 46 of the Book,** states that:

> "The CIA never investigated the apparent hoax nor examined how it
> had been handled inside the agency."

67. Here, as libel by implication, even if it is true that "The CIA never investigated"

what Risen describes as an "apparent hoax," the implication is that Montgomery perpetrated a

hoax upon the CIA, and in return for money, which would be both a fraud and a crime.

68. Similarly, in the ***Sixteenth*** example of slander from an interview, Risen states that

"It seemed to me that what the war had become in 13 years was a search for cash and a search

for power and status and that it was becoming an endless war in which we had a new mercenary

class of people who were taking advantage of the war on terror," implying that Montgomery's

work is fraudulent in being merely an effort to get cash.

69. Among the other statements, in particular, the ***Nineteenth*** example of libel***, on***

**Page 49 of the Book,** states that:

> "Trepp was furious. According to court documents, he told the FBI
> that Montgomery had stolen the software eTreppid had used on secret
> Pentagon contracts. As federal investigators moved in to investigate
> the alleged theft of the technology, they heard from Trepp and others
> that Montgomery's alleged technology wasn't real."

70. As libel by implication, Risen implies that Montgomery stole valuable software

yet at the same time the software was in fact worthless.

71.     In addition, Risen also made additional defamatory statements that are defamation by implication under Florida law.

72.     **Twentieth,** on the Preface Page of the Book, Risen writes:

> "I've come back," he repeated.  "I was the King of Kafiristan – me and Dravot – crowned Kings we was!  In this office we settled it – you setting there and giving us the books.  I am Peachey – Peachey Taliaferro Carnehan – and you've been setting here ever since – Oh, Lord!"
>
> I was more than a little astonished and expressed my feelings accordingly.
>
> "It's true," said Carnehan, with a dry cackle, nursing his fee, which were wrapped in rags.  "True as gospel.  Kings we were, with crowns upon our head – me and Dravot – poor Dan – oh, poor, poor Dan, that would never take advice, not though I begged of him!"
>
> -- Rudyard Kipling, *The Man Who Would be King*.

73. As libel by implication, Risen implies that Montgomery (along with others addressed in the book) is a fraud and/or con man as in *The Man Who Would be King*.

74. **Twenty-first,** in the Prologue on Page xiv of the Book, Risen writes:

> "The new homeland security-industrial complex operates differently. It is largely made up of a web of intelligence agencies and their contractors, companies that mostly provide secret services rather than large weapons systems and equipment.  These contractors are hired to help Washington determine the scale and scope of the terrorist threat; they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end."

75.     As libel by implication, Risen states "they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end," suggesting that Montgomery's and eTreppid's profits were *contingent* upon results, and false results at that.

76.     **Twenty-second,** in the Prologue on Page xv of the Book, Risen writes:

"Thus, the creation of a homeland security complex at a time of endless war has bequeathed us with the central narrative of the war on terror – modern tales of greed joined hand in hand with stories of abuse of power.  It was inevitable that those wise in the ways of the world would flock to Washington to try to cash in on the war on terror gold rush – and they have.  This book offers just a few of those stories. But those trying to monetize America's obsession with terrorism are not the only ones who have sought to exploit 9/11."

"Opportunism comes in many forms and is driven by more than just greed.  Ambition and a hunger for power, status, and glory have become great engines of post-9/11 opportunism as well.  The more troubling stories here concern abuses of power that have extended across two presidencies for well over a decade.  After 9/11, the United States deregulated national security, stripping away the post-Watergate intelligence reforms of the 1970's that had constrained executive power for thirty years.  The results are morally challenging – and continue to this day."

77.     Thus, as libel by implication, Risen implies that Montgomery committed fraud and went to any lengths motivated by greed, to obtain money at any cost.

78.     **_Twenty-third,_ in the Prologue on Page xvii of the Book, Risen writes:**

"Washington's global war on terror is now in its second decade, thanks to the bipartisan veneer it has gained under Bush and Obama. It shows no signs of slowing down, hustlers and freebooters continue to take full advantage, and the war's unintended consequences continue to pile up.  All too often, things are not what they seem."

79.     As libel by implication, Risen implies that Montgomery – one of the key objects of the Book – is a "hustler" and a "freebooter."

80.     **_Twenty-fourth,_ Part 1 of the Book,** including Chapter 2 which is focused entirely on Dennis Montgomery, Risen have labeled "Part 1:  Greed"

81.     Thus, by placing the chapter focused on Dennis Montgomery under a label for the section of the Book of "Greed," Risen libels Montgomery by implication as being motivated by greed to commit fraud and carry out the alleged hoaxes identified in the rest of the Chapter 2.

22

82. ***Twenty-fifth,*** Risen have labeled Chapter 2 of the Book which is focused entirely on Dennis Montgomery: "Chapter 2: The Emperor of the War on Terror."

83. By naming the chapter focused on Dennis Montgomery "The Emperor of the War on Terror," Risen libels Montgomery by implication as being the mastermind of the fraud that Risen seeks to portray the war on terror to be.

84. ***Twenty-Sixth,*** **on Page 40 of the Book, Risen writes:**

> "The CIA's Science and Technology Directorate, which had largely been stuck on the sidelines of the war on terror, saw in Dennis Montgomery an opportunity to get in the game. The directorate had played an important role in the Cold War, but in the first few years of the war on terror, it was struggling to determine how technology could be leveraged against groups of terrorists who were trying to stay off the grid."

85. As libel by implication, again, Risen blames Montgomery for the decisions of government officials.

86. ***Twenty-Seventh,*** **on Page 42 of the Book, Risen writes:**

> "Montgomery was telling the CIA exactly what it wanted to hear. At the time, the Bush Administration was obsessed with Al Jazeera, not only because of the networks' unrelenting criticism of the invasion of Iraq, but also because it had become Osama Bin Laden's favorite outlet for broadcasting his videotaped messages to the world."

87. As libel by implication, Risen implies that Montgomery defrauded and conned the CIA by "telling the CIA exactly what it wanted to hear."

88. ***Twenty-Eighth,*** **on Page 42 of the Book, Risen writes:**

> "What remains unclear is how Montgomery was able to convince all of them that he had developed secret software that could decode Al Qaeda's invisible messages. While he had gotten by a few credulous military officers who came to view his demonstrations, he apparently found it just as easy to persuade the CIA as well."

89. As libel by implication, Risen implies that Montgomery conned the U.S. Government

with a hoax.  It would of course be entirely clear "how Montgomery was able to convince all of

them" if Montgomery's work and technology are legitimate.

90. ***Twenty-Ninth,*** **on Page 46 of the Book, Risen writes:**

> "Finally the French brought an end to it.  Since Air France flights
> to the United States were among those that had been grounded,
> French officials had taken a dim view of the entire episode.  They
> began demanding answers from the Americans.  The French
> applied so much pressure on Washington that the CIA was finally
> forced to reveal to French intelligence the source of the threat
> information. Once they heard the story of Dennis Montgomery and
> eTreppid, French officials arranged for a French high-tech firm to
> reverse-engineer Montgomery's purported technology.  The
> French wanted to see for themselves whether the claims of hidden
> messages in Al Jazeera broadcasts made any sense."

91. As libel by implication, if not explicit, the passage implies that Montgomery is a fraud

and that his work is a scam and a hoax.

92. ***Thirtieth,*** **on Page 52 of the Book, Risen writes:**

> "Montgomery continued to get defense contracts even during the
> Obama administration.  In 2009, Montgomery was awarded another
> air force contract, and later claimed that he had provided the
> government with warning of a threatened Somali terrorist attack
> against President Obama's inauguration.  Joseph Liberatore, an air
> force official who described himself as one of "the believers"  in
> Montgomery and said he had heard from 'various federal agencies
> thanking us' for the support Montgomery and his company provided
> during Obama's inauguration.  The threat, however, later proved to be
> a hoax."

93. As libel by implication, Risen implies that Montgomery's ability to continue to receive

contracts is due to Montgomery's ability to defraud the government (and stupidity of government

officials) rather than an endorsement of the legitimacy of Montgomery's work.

94. ***Thirty-First,*** **on Page 31 of the Book, Risen writes:**

"and a new breed of entrepreneur learned that one of the surest and easiest paths to riches could be found not in Silicon Valley building computers or New York designing clothes but rather in Tysons Corner, Virginia, coming up with new ways to predict, analyze, and prevent terrorist attacks— or, short of that, at least in convincing a few government bureaucrats that you had some magic formula for doing so."

95. As libel by implication, Risen implies that Montgomery engaged in fraud to convince a few government bureaucrats that he had a magic formula as an easy path to riches.

96. ***Thirty-Second,*** **on Page 33 of the Book, Risen writes:**

"Montgomery's story demonstrates how hundreds of billions of dollars poured into the war on terror went to waste. With all rules discarded and no one watching the bottom line, government officials simply threw money at contractors who claimed to offer an edge against the new enemies. And the officials almost never checked back to make sure that what they were buying from contractors actually did any good— or that the contractors themselves weren't crooks. A 2011 study by the Pentagon found that during the ten years after 9/ 11, the Defense Department had given more than $ 400 billion to contractors who had previously been sanctioned in cases involving $ 1 million or more in fraud."

97. As libel by implication, Risen implies that the money provided to Montgomery (among others) went to "waste."

98. ***Thirty-Third,*** **on Page 33 of the Book, Risen writes:**

"The Montgomery episode teaches one other lesson, too: the chance to gain promotions and greater bureaucratic power through access to and control over secret information can mean that there is no incentive for government officials to question the validity of that secret information. Being part of a charmed inner circle holds a seductive power that is difficult to resist."

99. As libel by implication, Risen implies that Montgomery's work was fraudulent.

100. ***Thirty-Fourth,*** **on Page 33 of the Book, Risen writes:**

"How his technology worked was a secret. Dennis Montgomery's computer code became the great treasure behind eTreppid Technologies, the company he and Trepp founded. Later, many of

those around Montgomery began to suspect the reason why Montgomery had to guard his technological innovations so carefully. They came to believe that at least some of the technology didn't really exist."

101.     As libel by implication, Risen implies that Montgomery committed fraud.

102.     **_Thirty-Fifth_, on Page 35 of the Book, Risen writes:**

"Montgomery was on the lookout for somebody to bankroll him, and had put out the word to his friends at the casinos that he frequented the most. A year later, Montgomery and Trepp were in business together. Trepp was one of the first, but hardly the last, to be beguiled by Montgomery's claims that he had achieved breakthroughs in computer technology of historic significance."

103.     As libel by implication, Risen implies that Montgomery "beguiled" Warren Trepp by committing fraud.

104.     **_Thirty-Sixth_, on Page 39 of the Book, Risen writes:**

"For a few months in late 2003, the technology from Dennis Montgomery and eTreppid so enraptured certain key government officials that it was considered the most important and most sensitive counterterrorism intelligence that the Central Intelligence Agency had to offer President Bush. Senior officials at the CIA's Directorate of Science and Technology began to accept and vouch for Montgomery to officials at the highest levels of the government. Montgomery's claims grew ever more expansive, but that only solidified his position inside the national security arena. His technology became too impossible to disbelieve."

105.     As libel by implication, Risen imply that Montgomery committed fraud and is a con man.

106.     **_Thirty-Seventh_, on Page 40 of the Book, Risen writes:**

"Montgomery persuaded the spy agency that his special computer technology could detect hidden bar codes broadcast on Al Jazeera, which had been embedded into the video feed by al Qaeda. Allegedly, al Qaeda was using that secret method to send messages to its terrorist operatives around the world about plans for new attacks. Montgomery convinced the CIA that his technology had uncovered a series of

hidden letters and numbers that appeared to be coded messages about specific airline flights that the terrorists were targeting.

107.     As libel by implication, Risen imply that Montgomery convinced the CIA of claims that are not (were not) true.

108.     **_Thirty-Eighth,_** **on Page 42 of the Book, Risen writes:**

> "Based on Montgomery's information, President Bush ordered the grounding of a series of international flights scheduled to fly into the United States. This step caused disruptions for thousands of travelers."

109.     As libel by implication, Risen imply that Montgomery convinced President Bush and the national command authority of conclusions drawn from Montgomery's work.

110.     **_Thirty-Ninth,_** **on Page 42 of the Book, Risen writes:**

> "One former senior CIA official recalled attending a White House meeting in the week following Christmas to discuss what to do next about the information coming from Montgomery. The official claims that there was a brief but serious discussion about whether to shoot down commercial airliners over the Atlantic based on the intelligence."

111.     As libel by implication, Risen imply that Montgomery convinced President Bush and the national command authority of conclusions drawn from Montgomery's work.

112.     **_Fortieth,_** **on Page 47 of the Book, Risen writes:**

> "Even more stunning, after the debacle over the bogus Christmas 2003 terrorist threats, Montgomery kept getting classified government contracts awarded through several different corporate entities. Montgomery's problems with the CIA did not stop him from peddling variations of his technology to one government agency after another. The secrecy that surrounded his work once again worked in his favor. CIA officials were reluctant to tell their Pentagon counterparts much about their experiences with Montgomery, so Defense Department officials apparently did not realize that his technology was considered suspect at CIA headquarters."

113.     As libel by implication, Risen implies that Montgomery continued to defraud, con, and scam the government, rather than concluding that the U.S. Government recognized the legitimacy of Montgomery's work.

114.     ***Forty-First,*** **on Page 48 of the Book, Risen writes:**

> "He successfully infused a sense of mystery around himself. He was like the Wizard of Oz, but now people were beginning to try to examine the man behind the curtain."

115.     As libel by implication, Risen implies that the Montgomery engaged in fraud and a hoax by keeping details mysterious.

116.     ***Forty-Second,*** **on Page 48 of the Book, Risen writes:**

> "The technology didn't meet the requirements for us," said a Special Operations Command spokesman drily. Still, there is no evidence that officials at Special Operations Command ever talked with their counterparts at the CIA to check up on Montgomery before awarding him a contract. Special Operations Command paid a total of $ 9.6 million to eTreppid under its contract with the firm."

117.     As libel by implication, Risen imply that Montgomery again repeated his fraud and hoax against a new government agency.

118.     ***Forty-Third,*** **on Page 54 of the Book, in the Chapter "The New Oligarchs,"**

**Risen writes:**

> CHAPTER 3:   The New Oligarchs
> Page 54:  "Dennis Montgomery is, of course, an extreme example of the new kind of counterterrorism entrepreneur who prospered in the shadows of 9/11.  But he was hardly alone in recognizing the lucrative business opportunities that the war on terror has presented.  In fact, as trillions of dollars have poured into the nation's new homeland security-industrial complex, the corporate leaders at its vanguard can rightly be considered the true winners of the war on terror."

119.     As libel by implication, Risen implies that Montgomery engaged in fraud and a hoax motivated by greed.