UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 15-cv-20782-MARTINEZ/GOODMAN

DENNIS L. MONTGOMERY,

        Plaintiff,

v.

JAMES RISEN, HOUGHTON MIFFLIN
HARCOURT PUBLISHING CO.,
HOUGHTON MIFFLIN HARCOURT CO.,
and HMH HOLDINGS, INC.,

        Defendants.

_____/

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS OR
TRANSFER FOR LACK OF PERSONAL JURISDICTION OVER RISEN AND
HOUGHTON MIFFLIN HARCOURT COMPANY, DISMISS OR TRANSFER
FOR IMPROPER VENUE, TRANSFER UNDER 28 U.S.C. § 1404(a),
AND DISMISS FOR FAILURE TO STATE A CLAIM**

**HOLLAND & KNIGHT LLP**
Sanford L. Bohrer
  Sandy.Bohrer@hklaw.com
Brian W. Toth
  Brian.Toth@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, Florida  33131
Tel: (305) 374-8500
Fax: (305) 789-7799

**DAVIS WRIGHT TREMAINE LLP**
Laura R. Handman (admitted *pro hac vice*)
  laurahandman@dwt.com
Micah J. Ratner (admitted *pro hac vice*)
  micahratner@dwt.com
1919 Pennsylvania Ave., NW, Suite 800
Washington, D.C.  20006
Tel.: (202) 973-4200
Fax: (202) 973-4499

*Counsel for Defendants*

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ..................................................................... 1

II.     ARGUMENT ................................................................................................. 3

     A.    Montgomery Fails to Meet His Burden to Show Personal Jurisdiction Over Risen and the Holding Company, So the Court Should Dismiss or Transfer......... 3

     B.    Montgomery Fails to Meet His Burden to Show Proper Venue, So the Court Must Dismiss or Transfer........................................................................ 8

     C.    The Court Should Transfer Venue Under 28 U.S.C. § 1404(a)............................. 9

     D.    Montgomery Fails to Plead a Plausible Claim for Defamation or Other Related Torts, So the Court Should Dismiss Under Rule 12(b)(6)...................... 10

          1.    The Fair Report Privilege Immunizes the Statements at Issue from Liability, and the Presence of Other Sources Corroborating the Official Record Does Not Diminish Protections of the Privilege............ 12

          2.    Montgomery Concedes that Certain of the Challenged Statements Are Non-Actionable Opinion and Rhetorical Hyperbole ................................. 14

          3.    The Court Should Dismiss the Amended Complaint for Failure to Plausibly Plead Actual Malice or Any Other Applicable Fault ................. 15

               a.    Montgomery Is a Limited-Purpose Public Figure ........................ 15

               b.    Montgomery Does Not Plausibly Plead Actual Malice or Any Other Applicable Standard of Fault ............................................. 17

III.    CONCLUSION............................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
   134 S. Ct. 568 (2013) ...................................................................................................9

*Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*,
   223 F.3d 1082 (9th Cir. 2000) .....................................................................................6

*Beckley Newspapers Corp. v. Hanks*,
   389 U.S. 81 (1967) .....................................................................................................19

*Bonner v. City of Prichard*,
   661 F.2d 1206 (11th Cir. 1981) ...................................................................................5

*Bose Corp. v. Consumers Union of U.S., Inc.*,
   466 U.S. 485 (1984) ...................................................................................................18

*Bryant v. Avado Brands Inc.*,
   187 F.3d 1271 (11th Cir. 1999) .................................................................................11

*Buckley v. N.Y. Times Co.*,
   338 F.2d 470 (5th Cir. 1964) .......................................................................................5

*CACI Premier Tech., Inc. v. Rhodes*,
   536 F.3d 28, 295 (4th Cir. 2008) ...............................................................................17

*Calder v. Jones*,
   465 U.S. 783 (1984) .................................................................................................5, 6

*Cellularvision Tech. & Telecomms., L.P. v. Alltel Corp.*,
   508 F. Supp. 2d 1186 (S.D. Fla. 2007) ........................................................................9

*Doe v. Celebrity Cruises*,
   145 F. Supp. 2d 1337 (S.D. Fla. 2001) ........................................................................9

*Dorsey v. National Enquirer, Inc.*,
   973 F.2d 1431 (9th Cir. 1992) ................................................................................6, 13

*Edwards v. National Audubon Soc'y, Inc.*,
   556 F.2d 113 (2d Cir. 1977) .......................................................................................18

*Farah v. Esquire Magazine*,
   736 F.3d 528 (D.C. Cir. 2013) ...............................................................................3, 11

*Flowers v. Carville*,
  310 F. Supp. 2d 1157 (D. Nev. 2004), *aff'd*, 161 F. App'x 697 (9th Cir. 2006) ....................18

*Hakky v. Wash. Post Co.*,
  2010 WL 2573902 (M.D. Fla. June 24, 2010) ........................................................................15

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657 (1989) ................................................................................................................19

*Hemispherx Biopharma, Inc. v. MidSouth Capital, Inc.*,
  669 F. Supp. 2d 1353 (S.D. Fla. 2009) .....................................................................................9

*Jaisinghani v. Capital Cities/ABC, Inc.*,
  973 F. Supp. 1450 (S.D. Fla. 1997) ...........................................................................................9

*Keeton v. Hustler Magazine*,
  465 U.S. 770 (1984) ..................................................................................................................4

*Klayman v. City Pages*,
  2015 WL 1546173 (M.D. Fla. Apr. 3, 2015) ...........................................................................19

*Licciardello v. Lovelady*,
  544 F.3d 1280 (11th Cir. 2008) ................................................................................................6

*Madara v. Hall*,
  916 F.2d 1510 (11th Cir. 1990) ...........................................................................................3, 5

*McFarlane v. Esquire Magazine*,
  74 F.3d 1296 (D.C. Cir. 1996) ..................................................................................................4

*McFarlane v. Sheridan Square Press, Inc.*,
  91 F.3d 1501 (D.C. Cir. 1996) ................................................................................................18

*Milkovich v. Lorain Journal Co.*,
  497 U.S. 1 (1990) ....................................................................................................................14

*Moldea v. N.Y. Times Co.*,
  22 F.3d 310 (D.C. Cir. 1994) ............................................................................................14, 19

*N. Atl. Marine, Ltd. v. Sealine Int'l, Ltd.*,
  2007 WL 5298433 (S.D. Fla. Mar. 29, 2007) .........................................................................11

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ................................................................................................................19

*Reeves v. ABC*,
  719 F.2d 602 (2d Cir. 1983) ...................................................................................................12

*Rexam Airspray, Inc. v. Arminak*,
    471 F. Supp. 2d 1292 (S.D. Fla. 2007) ................................................................4

*Rosanova v. Playboy Enters., Inc.*,
    580 F.2d 859 (5th Cir. 1978) ...............................................................................16

*Sculptchair, Inc. v. Century Arts, Ltd.*,
    94 F.3d 623 (11th Cir. 1996) ................................................................................4

*Silvester v. ABC*,
    839 F.2d 1491 (11th Cir. 1988) .....................................................................15, 16

*Stern v. News Corp.*,
    2008 WL 10712037 (S.D. Fla. Aug. 26, 2008)....................................................10

*Time, Inc. v. McLaney*,
    406 F.2d 565 (5th Cir. 1969) .................................................................................3

*Time, Inc. v. Pape*,
    401 U.S. 279 (1971)......................................................................................18, 19

*U.S. ex rel. Osheroff v. Humana Inc.*,
    776 F.3d 805 (11th Cir. 2015) .............................................................................11

*Waldbaum v. Fairchild Publ'ns, Inc.*,
    627 F.2d 1287 (D.C. Cir. 1980) .....................................................................15, 16

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014).......................................................................................7, 8

*White v. Fraternal Order of Police*,
    909 F.2d 512 (D.C. Cir. 1990) .............................................................................13

**State Cases**

*Beck v. Lipkind*,
    681 So. 2d 794 (Fla. 3d DCA 1996) ....................................................................14

*Immuno v. Moor-Jankowski*,
    74 N.Y.2d 548, 560 (1989), *vacated*, 497 U.S. 1021 (1990),
    *adhered to on remand*, 77 N.Y.2d 235 (1991)....................................................14

*Internet Solutions Corp. v. Marshall*,
    39 So. 3d 1201 (Fla. 2010).....................................................................................5

*Palm Beach Newspapers, Inc. v. Early*,
    334 So. 2d 50 (Fla. 4th DCA 1976) .....................................................................19

*Renaissance Health Publ'g v. Resveratrol Partners*,
   982 So. 2d 739 (Fla. 4th DCA 2008) ........................................................................6

*Rety v. Green*,
   546 So. 2d 410 (Fla. 3d DCA 1989) .......................................................................16

*Stewart v. Sun Sentinel Co.*,
   695 So. 2d 360 (Fla. 4th DCA 1997) ......................................................................13

**Federal Statutes**

28 U.S.C. § 1391(b) ........................................................................................................8

28 U.S.C. § 1404(a) ............................................................................................1, 8, 9, 10

28 U.S.C. § 1406(a) ........................................................................................................9

**Rules**

Fed. R. Civ. P. 12(b) ........................................................................................... *passim*

S.D. Fla. L.R. 7.1(c) ........................................................................................................9

Defendants James Risen ("Risen"), Houghton Mifflin Harcourt Publishing Company ("HMH"), and Houghton Mifflin Harcourt Company ("HMHC"), improperly sued as HMH Holdings, Inc., (together "HMH Companies"), respectfully file this reply in support of their motions: (1) to dismiss or transfer for lack of personal jurisdiction over Risen and HMHC; (2) to dismiss or transfer for improper venue; (3) to transfer under 28 U.S.C. § 1404(a); and (4) to dismiss the Amended Complaint with prejudice for failure to state a claim.

## I.    PRELIMINARY STATEMENT

Plaintiff Dennis Montgomery's ("Montgomery") Opposition – long on rhetoric but short on specifics – cannot rescue his meritless claims designed to chill speech by an author and publisher (and its holding company) on matters of the highest public import: an alleged fraud in national security that put lives at risk.  This Court should dismiss or transfer for the following reasons.

*First*, Montgomery fails to meet his burden to prove that Risen and HMHC, the publisher's holding company, have contacts with Florida that give rise to personal jurisdiction.  Montgomery cannot impute the contacts of the publisher, HMH (which does not challenge jurisdiction), to Risen and HMHC.  To subject Risen to jurisdiction, Montgomery must rewrite Supreme Court and Eleventh Circuit precedent to require merely a "reasonable foreseeable" injury here, when, in fact, Risen's conduct must be "calculated to" cause injury to Montgomery in Florida.  It is undisputed that Montgomery was *not* living in Florida at the time of publication of Chapter 2 ("Chapter") of *Pay Any Price: Greed, Power, and the Endless War* (the "Book"), Risen had only one possible contact with Florida when working on the Chapter, and the Chapter does not mention Florida.  So Risen did not expressly aim his conduct at Montgomery in Florida sufficient to satisfy due process.

*Second*, Montgomery's Opposition does not address, much less meet his burden to demonstrate, that venue is proper here.  Thus, the Court should dismiss or transfer.

1

**Third**, the Court should transfer for the convenience of witnesses and parties.  While claiming to have moved to Florida, all the while continuing to withhold his current address, Montgomery failed to establish that he is domiciled here.  Moreover, although he now conveniently claims his important witnesses are located in Florida, his own 2006 declaration attached to the Opposition states that his important witnesses are outside this jurisdiction.  Risen and most of the key witnesses are in or near D.C., so the Court should transfer there.

**Fourth**, the Amended Complaint comes patently short of stating a plausible claim for defamation or other related torts.  Montgomery argues that the Court cannot review court records, FBI reports filed in court, congressional records, or news articles on a Rule 12(b)(6) motion, but these documents are subject to judicial notice under Eleventh Circuit precedent.

a)      Montgomery fails to cite any inaccuracies, much less a material one, in the Chapter's report of allegations in official records that Montgomery was a fraud.  Contrary to Montgomery's argument, Defendants do not forfeit the fair report privilege merely because confidential sources may also corroborate statements Risen cites in official records.  The Chapter included Plaintiff's denials and the fair report privilege bars Montgomery's claims as matter of law.

b)      Montgomery concedes in his Opposition, as he must, that certain statements in the Amended Complaint are opinion and hyperbole, and thus, non-actionable.

c)      Montgomery – the subject of extensive worldwide news coverage since 2008 about the very claims in the Chapter – cannot escape his status as a limited-purpose public figure.  Montgomery's non-specific denials, confusion of bad motive and constitutional actual malice, and post-publication retraction demand – the only grounds Montgomery cites – cannot plausibly show actual malice, or any other applicable level of fault, as a matter of law.  Given that he chooses not to defend invocation of his Fifth Amendment right when confronted with his fraud in a previous lawsuit (which Risen relied upon), and the Chapter expressly relies on prior reputable publications

and official records alleging that Montgomery's work was a fraud, Montgomery cannot plausibly

show that Defendants knew what they published was false or had serious doubts as to the truth.

Montgomery's attempt to cure the defects in his original Complaint fail.  This is a classic

example of where "the failure to dismiss a libel suit might necessitate long and expensive trial

proceedings, which, if not really warranted, would themselves offend . . . [First Amendment

principles] because of the chilling effect of such litigation." *Time, Inc. v. McLaney*, 406 F.2d

565, 566 (5th Cir. 1969); *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) (same,

affirming dismissal of libel suit under Rule 12(b)(6)).  The Court should dismiss this fatally

flawed Amended Complaint with prejudice.

## II.   ARGUMENT

### A.   Montgomery Fails to Meet His Burden to Show Personal Jurisdiction Over Risen and the Holding Company, So the Court Should Dismiss or Transfer

Montgomery wrongly cites the standard for determining motions to dismiss for lack of

*subject-matter jurisdiction* under "FRCP12(b)(1)," to argue the Court must assume all factual

allegations in the Amended Complaint to be true.  (Opp. at 12-13.)  But that is not applicable on

this motion to dismiss for lack of *personal jurisdiction* under Rule 12(b)(2).  Rather, Montgomery

bears the burden of making out a prima facie case of personal jurisdiction by presenting sufficient

evidence to withstand a motion for directed verdict, which he failed to do.  (Am. Compl. ¶¶ 3-12);

(Mot. at 14-15); *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990).

Montgomery's main argument on personal jurisdiction is that, because HMH – the

publishing company – is registered to do business in Florida, has an office in Florida, and marketed

and sold the Book in Florida, Risen and the holding company, HMHC (improperly sued as HMH

Holdings, Inc.), are subject to personal jurisdiction in Florida.  (Opp. at 1, 4-6, 15, 17.)  This is a red

herring.  As Montgomery acknowledges, HMH, the publishing company, is *not* contesting personal

jurisdiction.  (*Id.* at 13.)  Moreover, Montgomery cannot impute HMH's contacts to Risen and

HMHC because "[e]ach defendant's contacts with the forum State must be assessed individually."

*Keeton v. Hustler Magazine*, 465 U.S. 770, 781 n.13 (1984).  Thus, contrary to Montgomery's

argument, the Court must assess Risen's and the holding company's contacts with Florida

separately from the publisher's.[1]  When the Court views each defendant's contacts separately, as it

must, it becomes obvious that Risen and HMHC[2] are not subject to personal jurisdiction in Florida.

 *First*, Montgomery argues for jurisdiction over Risen because: (1) Risen contracted with

the publisher to sell the Book and derives royalties from copies sold in Florida and elsewhere; and

(2) Risen spoke on radio and television to "stimulate the sale of books inside Florida and elsewhere"

(Opp. at 17-19, 21.)  Because Risen and HMHC met their burden to "raise[] through affidavits

[and] documents . . . a meritorious challenge to personal jurisdiction, the burden shifts to the

plaintiff to prove jurisdiction by *affidavits, testimony or documents*."  *See Sculptchair, Inc. v.

Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996) (emphasis added).  But Montgomery fails to

provide any evidence – just bald assertions in his Opposition, the conclusory allegations in his

Amended Complaint and declarations replete with argument, speculation, and opinion – that

Risen's contract with HMH to sell the Book nationwide and his appearances on national news

programs to promote the Book were expressly aimed and calculated to cause injury to

Montgomery in Florida.  *Rexam Airspray, Inc. v. Arminak*, 471 F. Supp. 2d 1292, 1298 (S.D. Fla.

2007) (plaintiff "may not merely rely upon the factual allegations set forth in the complaint").

---

[1] *See id.* (noting that "[i]t does not of course follow from the fact that jurisdiction may be
asserted over [the publisher], that jurisdiction may also be asserted over" the holding company);
*McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1300 (D.C. Cir. 1996) ("The writer is not the
publisher; [the writer's] contacts must be assessed separately.").

[2] Montgomery's only argument is that HMHC, the holding company, is the parent company and
owner of the publisher, which does not subject HMHC to personal jurisdiction in Florida as a
matter of law.  (*See* Mot. at 16 n.17.)  HMHC is merely a Delaware holding company that is not
registered to do business in Florida.  (*Id.* at 4); (Handman Decl. Ex. 4).  Montgomery does not –
and could not – try to pierce the corporate veil to impute HMH's contacts in Florida to HMHC.

Montgomery fails to distinguish binding Eleventh and Fifth Circuit precedent[3] and persuasive authority establishing that distributing and selling the Book in Florida and promoting it nationally are not sufficient to subject Risen to personal jurisdiction in Florida.  *E.g.*, *Madara*, 916 F.2d at 1513 (affirming dismissal of libel action brought in Florida against singer for comments quoted in nationally-distributed publication); *Buckley*, 338 F.2d at 474; (Mot. at 16 & nn.18, 18-19).[4]

Montgomery argues that Risen did more than participate in circulating the Book in Florida.  He argues it was reasonably foreseeable that Montgomery would experience harm in Florida because: (1) he knew or should have known that Montgomery worked in the past with people in Florida; (2) Risen should have reasonably foreseen harm to Montgomery's reputation in Florida because Risen is national security expert, and Montgomery claims Florida (not the D.C. area) is the center of U.S. military and intelligence activities; and (3) Montgomery moved to Florida after publication.  (Opp. at 17-19, 21-22.)  To make these allegations stick, Montgomery must dramatically lower the due process bar explicitly set by the Supreme Court and Eleventh Circuit.

Montgomery "disputes" that *Calder v. Jones*, 465 U.S. 783, 790 (1984), requires "that Defendants' actions must be 'calculated to' cause injury inside Florida."  (Opp. at 22.)  Montgomery argues instead that "[t]he actual rule of *Calder v. Jones* is whether it was reasonably _foreseeable_ that harm would result in Florida."  (Opp. at 22.)  But Montgomery's interpretation directly contradicts the

---

[3] Montgomery asserts that *Buckley v. N.Y. Times Co.*, 338 F.2d 470, 474 (5th Cir. 1964) is not binding authority, but he is wrong.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (Fifth Circuit decisions before September 30, 1981 "shall be binding").

[4] Montgomery argues that "nationwide radio and television interviews [ ] qualify for Florida's long-arm jurisdiction and minimum contacts for constitutional due process." (Opp. at 20.)  But in doing so, Montgomery impermissibly collapses the two prongs of personal jurisdiction: (1) the long-arm statute and (2) due process.  In fact, "the federal due process analysis is *not* built into Florida's long-arm statute" and *Internet Solutions*, which Montgomery cites, only interprets the long-arm statute.  *Internet Solutions Corp. v. Marshall*, 39 So. 3d 1201, 1207 (Fla. 2010).  Risen does not contest whether the long-arm statute applies, so *Internet Solutions* is inapplicable.  Risen contests "[t]he second prong-i.e., the constitutional prong" which "imposes a more restrictive requirement."  *Id.*

Eleventh Circuit and Supreme Court's binding holdings requiring that a defendant's "intentional conduct in his state of residence was *calculated to* cause injury to [plaintiff] in Florida." *Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008) (citing *Calder*, 465 U.S. at 791 ("We hold that jurisdiction over petitioners in California is proper because of their intentional conduct in Florida *calculated to* cause injury to respondent in California.") (emphasis added)). Montgomery admits that "'[c]alculated to' implies a knowing intention to cause injury inside Florida" (Opp. at 22), which Montgomery fails to prove.

Thus, contrary to Montgomery's arguments, the Eleventh Circuit explained that "'something more" is required under *Calder* than the mere 'foreseeability' that an act may have effects in the forum"; among other things, "*Calder* requires that the defendant 'expressly aim' his wrongful conduct, individually targeting *a known forum resident*." *Licciardello*, 544 F.3d at 1287 (citing *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1088 (9th Cir. 2000)). Montgomery relies on cases finding personal jurisdiction over non-resident defendants where plaintiffs themselves resided in the forum state at the time of publication and defendants were well-aware of that residency.[5] Here, in contrast, Defendants cited facts indicating that Montgomery was a Washington resident – not a Florida resident – at the time of publication (Mot. at 7, 22-23), and Montgomery failed to dispute this in his Opposition or declarations. Thus, it is undisputed that Montgomery was *not* a Florida resident when HMH published in October 2014. It is undisputed that Montgomery resided in Washington then, and Risen interviewed Montgomery while

---

[5] *See Calder*, 465 U.S. at 789 (finding personal jurisdiction because, in part, when the article was written and edited, defendants were well aware that plaintiff resided in California and her career was centered in Hollywood, and the *National Enquirer* had substantial circulation there); *Licciardello*, 544 F.3d at 1283-84, 1287-89 (finding personal jurisdiction over Tennessee-based former personal manager of plaintiff who knew plaintiff resided in Florida at publication); *Renaissance Health Publ'g v. Resveratrol Partners*, 982 So. 2d 739, 742 (Fla. 4th DCA 2008) (finding personal jurisdiction "where a defendant disparages a competitor's products to enhance its own commercial sales in a state where the competitor has its corporate headquarters").

Montgomery lived there and/or in California.  (Mot. at 7.)  Montgomery does not dispute in the Opposition or declarations that Risen did not know – and could not divine – that Montgomery had any intention of moving to Florida when Risen researched and wrote the Book or when HMH published.  (Mot. at 4-6, 18.)[6]  Indeed, even Montgomery only alleges he moved to Florida after publication – claiming a hotel as his address when he registered to vote, by mail from Washington, the day before filing this lawsuit – and even now continues to withhold his address.  This is exactly why the "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."  *See Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014) (holding that DEA agent who seized money in Georgia from plaintiffs who resided in Nevada was not subject to personal jurisdiction in Nevada even though agent knew plaintiffs would feel the injury in Nevada).  These are "random, fortuitous, or attenuated contacts" with "persons affiliated with the State" that "cannot be decisive."  *Id.* at 1121-23.

Montgomery further argues that jurisdiction is proper here because the Chapter mentions Montgomery's contract with the U.S. Special Operations Command ("SOCOM").  (Opp. at 2, 12, 16, 26.)  But SOCOM is headquartered near Tampa, Florida, which is not in this District.  Merely mentioning SOCOM, which the Chapter states gave Montgomery "access to video feeds from Predator drones controlled from Nellis Air Force Base *in Nevada*" (Book at 48), does not come close to showing that Risen's actions were calculated to cause harm to Montgomery in Florida, that he expressly aimed the Chapter at Montgomery in Florida, or that Florida was the "focal point" of the Chapter.  *Walden*, 134 S. Ct. at 1123 (it is "insufficient to rely on a defendant's 'random, fortuitous,

---

[6] Even if knowledge that Montgomery had organized a limited liability company in Florida were enough to confer jurisdiction over Risen, which it is not, Risen could not reasonably have known that Montgomery was allegedly going to use it for Florida business.  The company was not under Montgomery's name (Alex James LLC), he is not the managing member listed for the company, the personal address he lists on the organizing documents was in California, and the company ceased being in good standing two years *before* publication.  (*See* Mot. at 8 n.7.)

or attenuated contacts'").  It is undisputed that Risen made just one possible newsgathering contact with Florida while researching the Chapter and that the Chapter does not mention Florida, but rather describes Montgomery's actions in Nevada, California, Washington, and the D.C. area. Montgomery provided no evidence that the "focal point" of the Chapter is Florida.

While Montgomery says he worked with people stationed on military bases in Florida in the past (even though they came to Nevada and California to see his software (Book at 40; Opp. Ex. A, Montgomery Decl. ¶ 62); claims his most recent work is in Florida (even though it appears his most recent work was in Arizona[7]); and claims his greatest prospects for future work are in Florida (even though he says he is so sick he may die at any moment), reliance on Montgomery's connections would "impermissibly allow[] a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Walden*, 134 S. Ct. at 1125.  Trying once again to lower the bar of jurisdiction to mere circulation of the Book in Florida and promotional appearances that aired nationwide, Montgomery argues that "an intentional tort is analyzed differently" (Opp. at 22), but the opposite is true: "These same principles apply when intentional torts are involved."  *Id.* at 1123.  Instead, "the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State," which here are non-existent, or at most, negligible.  *Id.* at 1122.

Thus, this Court should dismiss as to Risen and HMHC for lack of personal jurisdiction in Florida, or alternatively, transfer the action to D.C. under 28 U.S.C. § 1404(a).

**B.      Montgomery Fails to Meet His Burden to Show Proper Venue, So the Court Must Dismiss or Transfer**

Even though a discrete section of the Motion asserts that the Court should dismiss or transfer because venue in this District is improper under 28 U.S.C. § 1391(b)(1)-(3), nowhere in

---

[7] Montgomery's most recent work opportunities, based on his own filings, were apparently with Sheriff Arpaio in Arizona, until the Arizona officials reached the same conclusion as the federal officials – his intelligence was "junk."  (Handman Decl. Ex. 23.)

Montgomery's 50-page Opposition does he respond or specifically argue that venue is proper.

"The plaintiff has failed to respond to this argument, and [his] failure to file an opposing

memorandum 'may be deemed sufficient cause for granting the motion by default.'" *Doe v.

Celebrity Cruises*, 145 F. Supp. 2d 1337, 1346 (S.D. Fla. 2001) (quoting S.D. Fla. L.R. 7.1(c)).

Thus, if the Court does not dismiss or transfer for lack of personal jurisdiction, the Court should

dismiss or transfer this action by default.  Even if the Court did not do that, however,

Montgomery has failed to meet his "burden of showing that the venue selected is proper."

*Hemispherx Biopharma, Inc. v. MidSouth Capital, Inc.*, 669 F. Supp. 2d 1353, 1356 (S.D. Fla.

2009).  (*See* Mot. at 22.)  Venue in this District is "wrong" (28 U.S.C. § 1406(a)) and "improper"

(Fed. R. Civ. P. 12(b)(3)), so the "case must be dismissed or transferred."  *Atl. Marine Constr.

Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 134 S. Ct. 568, 577 (2013).

### C.        The Court Should Transfer Venue Under 28 U.S.C. § 1404(a)

Montgomery argues that the Court should not transfer for the convenience of witnesses

and parties because he claims he now lives in Florida and now claims his potential witnesses are

in Florida.  Montgomery's choice of venue is entitled to "minimal deference" when, as here, it is

presumed that he remained domiciled in Washington.  *Cellularvision Tech. & Telecomms., L.P.

v. Alltel Corp.*, 508 F. Supp. 2d 1186, 1189 (S.D. Fla. 2007); *Jaisinghani v. Capital Cities/ABC,

Inc.*, 973 F. Supp. 1450, 1454 (S.D. Fla. 1997).  Montgomery has failed to meet his "burden . . .

to demonstrate that he changed his domicile to Florida" because all he has cited is his voter

registration – filed by mail from Washington the day before he filed suit – and a recent rental at

an unidentified location, without addressing the other indicia of domicile: "home ownership,

driver's license, . . . location of family, location of business and where taxes are paid."

*Jaisinghani*, 973 F. Supp. at 1454.  This tactic – a recent move to Florida by another of

Montgomery's counsel's clients – did not stave off transfer to the jurisdiction where defendants

worked and did their newsgathering.  *Stern v. News Corp.*, 2008 WL 10712037, at *1 (S.D. Fla. Aug. 26, 2008) (transferring venue to New York when plaintiff, a former New York resident, moved to Florida only two-and-a-half months before filing suit here).

Montgomery lists a number of "important witnesses" at MacDill and Eglin Air Force Bases in Florida he claims he must rely upon to prove that his software is not a fraud.  (Opp. at 2.) But in Montgomery's own 2006 declaration attached to his Opposition, Montgomery states that he worked with the CIA through, not only Eglin, but Nellis Air Force Base in Nevada and Fort Bragg in North Carolina.  (Opp. Ex. A, Ex. 4, Montgomery Decl. ¶ 20.)  His declaration states that he "will require . . . depositions of at least twenty individuals associated with this project" (*id.* ¶ 20) and will need to "depose all of the involved individuals from the CIA, the Air Force, USSOCOM, and the Navy relating to the use and application of my technology" (*id.* 26), but most of Montgomery's witnesses then were not in Florida, and not within 100 miles of this District.

Most of Defendants' witnesses, and many of Montgomery's, are located in the subpoena range of D.C.  (Mot. at 25-26.)  Thus, if the Court does not dismiss or transfer for lack of personal jurisdiction or improper venue, it should transfer to D.C. under 28 U.S.C. § 1404(a).

**D.**     **Montgomery Fails to Plead a Plausible Claim for Defamation or Other Related Torts, So the Court Should Dismiss Under Rule 12(b)(6)**

Once again, Montgomery asks this Court to deny Defendants' motion based on the wrong standard; this time the no "set of facts" standard for considering a Rule 12(b)(6) motion that was overruled by the Supreme Court in *Twombly* and *Iqbal*.  (Opp. at 29.)  In fact, the Court must evaluate the Motion under the *Twombly/Iqbal* heightened "plausibly" standard, which has particular force in ultimately meritless libel actions such as this against a publisher and author where expensive litigation may chill speech even if Defendants eventually prevail.  (Mot. at 26-27.)  Contrary to Montgomery's repeated claims that the fair report privilege, opinion, and actual malice are issues

of fact (Opp. at 37-38), these are undoubtedly issues of law under which courts routinely dismiss at the pleading stage.  (*See* cases cited at Mot. nn.32, 41, and 48.)[8]

Montgomery also argues that the Court may only consider the "pleadings and attached exhibits" on a Rule 12(b)(6) motion, and that it may not review the court and congressional records and newspaper articles Defendants attach to their Motion.  (Opp. at 29-30.)  But "[t]he Eleventh Circuit has held that, when considering a 12(b)(6) motion to dismiss, a court may take judicial notice of the public record," such as the court and congressional records Defendants attach, "without converting the motion to one for summary judgment."  *N. Atl. Marine, Ltd. v. Sealine Int'l, Ltd.*, 2007 WL 5298433, at *4 (S.D. Fla. Mar. 29, 2007) (Martinez, J.) (reviewing court document attached to defendant's Rule 12(b)(6) motion) (citing *Bryant v. Avado Brands Inc.*, 187 F.3d 1271, 1279-80 (11th Cir. 1999)).  Also, the Eleventh Circuit recently found that "courts may take judicial notice of documents such as the newspaper articles at issue here for the limited purpose of determining which statements the documents contain (but not for determining the truth of those statements)."  *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 812 n.4 (11th Cir. 2015).  (*See also* Mot. at 8 n.8.)

Here, the Court may take judicial notice of these documents – not for the truth of matters they contain – but to compare the statements to the Chapter and to see that Montgomery was the subject of prior news coverage.  Doing so does not convert the Motion into one for summary judgment.  Based on the Amended Complaint, exhibits, and judicially noticeable facts, the Court should dismiss under Rule 12(b)(6) because the libel and other claims fail as a matter of law.

---

[8] Because Montgomery's "defamation claim fails, so do [his] other tort claims based upon the same allegedly defamatory speech."  *Farah*, 736 F.3d at 540.  Even so, Montgomery fails to state facts to plausibly plead the elements of these claims.  (Mot. at 39-40 & n.58.)

**1.**    **The Fair Report Privilege Immunizes the Statements at Issue from Liability, and the Presence of Other Sources Corroborating the Official Record Does Not Diminish Protections of the Privilege**

Montgomery argues that fair report privilege does not apply because the preamble to the Book states that Risen relied on some sources who spoke to Risen on condition of anonymity. (Opp. at 34.)  Montgomery incorrectly infers that the preamble means that Risen relied *only* on confidential sources for the Chapter and that the information in the Chapter was never published before.  (*Id.*)  But the preamble to the entire Book does not say that or mention the Chapter about Montgomery.  (*Id.* at 3) (quoting Book at ix.)  And the Chapter, on its face, shows that Risen relied upon and attributed the central claims that Montgomery challenges to official records. (*See* Mot. at 10-16.)  To the extent the Chapter relies on any confidential source, he or she merely corroborated statements in official records.  *See Reeves v. ABC*, 719 F.2d 602, 607 n.3 (2d Cir. 1983) (upholding defendant's exercise of fair report privilege where, although the "story was based partly on undisclosed sources, they were only used to corroborate information obtained from published reports and District Attorney press statements").[9]

---

[9] Plaintiff uses this and other occasions to unfairly accuse defense counsel of being "highly unethical and misleading," here for making "the Fair Reporting Privilege argument, in light of her own clients' touting of the new confidential source information contained in the Book, which has never been published before."  (Opp. at 34.)  But Plaintiff's assertion is based on his own incorrect and illogical assumptions about the preamble.  (*Id.*)  He goes on, "[t]his is the same Washington, D.C. defense counsel that misinformed this Court, even after Plaintiff's counsel told counsel to correct it, that Plaintiff is not a registered voter in Florida."  (*Id.*)  In fact, Ms. Handman's declaration accurately stated that a March 9, 2015 Lexis/Nexis Accurint Comprehensive Report did not contain a record of any voter registration for Plaintiff in Florida. (ECF No. 25-1, ¶ 6.)  After Plaintiff's counsel informed defense counsel on April 14, 2015, that Montgomery had registered to vote in Florida on February 23, 2015, the day before he filed suit, the investigator at Holland & Knight who had obtained the report filed a declaration in this action stating that, when he went back to Lexis/Nexis, he learned for the first time that the Lexis/Nexis Accurint report only updates voter registration information every six months and was last updated in December 2014.  (ECF No. 35-1, ¶¶ 1-7.)  Plaintiff nowhere mentions the investigator's explanation on the numerous occasions he chooses to launch *ad hominem* attacks against opposing counsel. (ECF Nos. 129, Ex C, ¶ 10; 63-1 ¶ 56; Hearing Before Magistrate Judge Goodman, Tr. 9:13-16, May 27, 2015.)

Indeed, Montgomery does not dispute that the court records, congressional records, and government investigative reports cited in the Chapter fall within the scope of the privilege under any potentially applicable law. *E.g.*, *Stewart v. Sun Sentinel Co.*, 695 So. 2d 360, 362 (Fla. 4th DCA 1997) ("This privilege includes the broadcast of the contents of an official document, as long as their account is reasonably accurate and fair, even if the official documents contain erroneous information.") (quotation marks omitted); *White v. Fraternal Order of Police*, 909 F.2d 512, 527 (D.C. Cir. 1990) (same).  (*See also* cases cited Mot. at 27 n.31.)  Nor does Montgomery dispute that these official records contain the heart of the allegedly defamatory statements: allegations that Montgomery rigged demonstrations of his software to government officials and that his software was a hoax.  (Mot. at 10-14) (quoting Book at 34, 37, 47-49, 52). Montgomery cannot dispute that the Director of the CIA himself, in Congressional testimony, said that Montgomery's software "was determined not to be a source of accurate information" and Senator Chambliss described Montgomery's so-called intelligence as "bogus."  (Book at 47); (Brennan Response at 9).  These official views echoed what Montgomery's former business partner in eTreppid and numerous employees there told the FBI and said in court records: Montgomery rigged demonstrations and his software did not exist.  (Book at 48-49.)

Montgomery asserts that "Defendants' published statements do not fairly present the record" (Opp. at 35), but he does not cite any part of Risen's summary that was less than "substantially accurate," *White*, 909 F.2d at 527, or unfair.  A comparison of the statements in the Chapter and facts and allegations in the official records shows Risen's reporting was more than accurate and fair.  (Mot. at 10-14.)  Particularly because it is undisputed that Risen repeatedly included Montgomery's denials (Book at 33-34, 37, 51, 53), the report was "fair" as a matter of law.  *E.g.*, *Dorsey v. National Enquirer, Inc.*, 973 F.2d 1431, 1437, 1440 (9th Cir.

1992).  Because the challenged statements in the Chapter are protected under the fair report

privilege, Montgomery's claims should be dismissed under Rule 12(b)(6).

### 2.   Montgomery Concedes that Certain of the Challenged Statements Are Non-Actionable Opinion and Rhetorical Hyperbole

Montgomery agrees (Opp. at 35 n.3) that an opinion is also not actionable if it cannot

"reasonably [be] interpreted as stating actual facts" about the plaintiff or does "not contain a prov-

ably false factual connotation."  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-20 (1990).  He

also agrees that rhetorical language that is "loose, figurative [and] hyperbolic" is not actionable.

*Id.* at 21.  Thus, without specifying which statements in the Amended Complaint he refers to, he

concedes that the "few statements that might qualify as opinion or hyperbole . . . are not the

statements that Plaintiff is suing upon."  (Opp. at 35 n.3.)  Montgomery appears to concede that,

when the Book refers to government contractors, including Montgomery, who were motivated by

"greed," and that "crazy became the new normal in the war on terror," these non-verifiable

statements are non-actionable.  (Am. Compl. ¶¶ 110, 181.)[10]

Montgomery ignores that, under any applicable law, opinions based on disclosed facts are

non-actionable.[11]  Statements that Montgomery "has been accused of being a con artist" (Am.

Compl. ¶ 110) (quoting Book at 32) are just such non-actionable opinions when read in the

---

[10] Montgomery responds to the characterization that he (and others) were motivated by "greed," simply by saying that his partner Trepp got more money than he did.  (Opp. at 36.)  In any event, speculation as to motivation is non-actionable opinion.  *E.g.*, *Immuno v. Moor-Jankowski*, 74 N.Y.2d 548, 560 (1989) ("Speculations as to the motivations . . . generally are not readily verifiable, and are therefore intrinsically unsuited as a foundation for libel."), *vacated*, 497 U.S. 1021 (1990), *adhered to on remand*, 77 N.Y.2d 235 (1991).

[11] *E.g.*, *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 317 (D.C. Cir. 1994) (where "the reader understands that [ ] supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation"); *Beck v. Lipkind*, 681 So. 2d 794, 795 (Fla. 3d DCA 1996) ("Opinions cannot be defamatory."  "Pure opinion occurs when the defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public.") (citations omitted).

context that Montgomery's own former business partner, employees, and lawyer all accused him in court records of being a con artist and a fraud – an allegation to which his response was to take the Fifth. Thus, Montgomery fails to state a claim based on these opinions to the extent they are not already protected under the fair report privilege.

### 3. The Court Should Dismiss the Amended Complaint for Failure to Plausibly Plead Actual Malice or Any Other Applicable Fault

Montgomery also fails to state a claim because he is a limited-purpose public figure and does not – and cannot – plausibly plead actual malice or any other applicable level of fault as a matter of law. *E.g.*, *Hakky v. Wash. Post Co.*, 2010 WL 2573902, at *6 (M.D. Fla. June 24, 2010) (dismissing libel claim against media company because "under *Iqbal*, Plaintiff failed to allege sufficient facts demonstrating negligence or actual malice on the part of Defendants").

### a. Montgomery Is a Limited-Purpose Public Figure

Montgomery argues that he is not a limited-purpose public figure. The parties do not dispute that (Opp. at 43), to determine whether Montgomery is a limited-purpose public figure, "the court must (1) isolate the public controversy, (2) examine the plaintiffs' involvement in the controversy, and (3) determine whether 'the alleged defamation [was] germane to the plaintiffs' participation in the controversy.'" *Silvester v. ABC*, 839 F.2d 1491, 1494 (11th Cir. 1988) (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980)).

*First*, Montgomery does not dispute that a public controversy existed over widely-publicized allegations that he committed fraud in government-contracting work he performed for the U.S. government. (Mot. at 32.) Rather, he dismisses the many articles about Montgomery's alleged fraud on the U.S. government stretching back to 2008 as "other defamatory news coverage" that cannot make Montgomery a public figure. (Opp. at 44.) But the cases he cites do not stand for this broad proposition; they merely hold that defendant "cannot by *his* defamation"

make plaintiff a public figure because plaintiff "must be a limited public figure prior to the alleged defamation." (*Id.*) (quoting *Rety v. Green*, 546 So. 2d 410, 424 (Fla. 3d DCA 1989)) (emphasis added). But these articles in *Bloomberg News* (2008), *The Guardian* (2009), *Playboy Magazine* (2010), and *The New York Times* (2011), among many others, about the same controversy as the Chapter, were world news years before publication of the Book in October 2014.

*Second*, Montgomery argues that he did not voluntarily thrust himself into the controversy. (Opp. at 42-43.) But Montgomery "voluntarily put [himself] into a position to influence the outcome of the controversy." *Silvester*, 839 F.2d at 1496. In a declaration he filed in 2006 that he attaches to his Opposition (Opp., Ex. A, Ex. 4, ¶ 32), he accused his business partner in eTreppid of bribing a Congressman to get government contracts for his software and then repeated those allegations in an exclusive interview on a nationally-televised NBC news program. By voluntarily injecting himself into the controversy, he cannot complain that it blew back on him and the media found his own government-contracting fraud contained in FBI documents filed in the same litigation in which he accused his partner of offering bribes. (*See* Mot. at 8-10, 32 and n.44.) He also does not dispute that the image of the title page of the 2010 Playboy article, *The Man Who Conned the Pentagon*, was posted on his Twitter page, thereby voluntarily exploiting his own public figure status and underscoring that this controversy has become part of his public persona. (Handman Decl. Ex. 25.)

*Third*, even if Montgomery had not voluntarily thrust himself into the controversy, at the very least, he became "caught up in the controversy involuntarily and, against his will, assumes a prominent position in its outcome" and thus he "'invited comment' relating to the issue at hand." *Silvester*, 839 F.2d at 1496 (quoting *Waldbaum*, 627 F.2d at 1298). Contrary to Montgomery's argument, "[i]t is no answer to the assertion that one is a public figure to say, truthfully, that one doesn't choose to be. It is sufficient . . . that '[defendant] voluntarily engaged in a course that was bound to invite attention and comment.'" *Id.* (quoting *Rosanova v. Playboy Enters., Inc.*, 580 F.2d

859, 861 (5th Cir. 1978)).  Montgomery cannot dispute – indeed, he brags – that, after his alleged

government contracting fraud on once secret national security projects was exposed to the world,

he continued to work on U.S. government contracts for his software (even though he did not

produce this software (ECF No. 60, at 3, 6-8)) and continues to seek that work allegedly in Florida

today.  Montgomery cannot continue the same course of conduct that invited intense scrutiny in

the past and expect a different outcome.  Thus, he is the same as the government contractor in

*CACI Premier Tech., Inc. v. Rhodes* that "became a public figure because," when the U.S. military

"engaged [the contractor] to provide civilian interrogators at Abu Ghraib," it "surely knew when it

accepted the interrogation work that it was potentially exposing itself to the inhospitable climate of

media criticism."  536 F.3d 280, 295 (4th Cir. 2008).

     Finally, it is beyond dispute that the Chapter is germane to the controversy surrounding

his alleged government-contracting fraud, which is the focus of the Chapter and the claimed

defamation.  Thus, Montgomery is a limited-purpose public figure.[12]

> **b.**    **Montgomery Does Not Plausibly Plead Actual Malice or Any Other Applicable Standard of Fault**

     Montgomery argues in his Opposition that he did more than plead conclusory allegations

of fault because he plausibly pleaded actual malice through Montgomery's denials in interviews

with Risen, Risen's purported ill will toward Montgomery, and Montgomery's post-publication

request for retraction.  (Opp. at 38-41.)  Montgomery is wrong, as a matter of law.

     *First*, Montgomery argues that he establishes knowledge or recklessness as to falsity

through the denials he gave to Risen.  (Opp. at 40-41.)  But it is blackletter law that actual malice

"cannot be predicated on mere denials, however vehement; such denials are so commonplace in

---

[12] Plaintiff does not even attempt to rebut Defendants' argument that, even if Plaintiff were not a public figure (which he is), Plaintiff has not and could not plausibly plead even negligence given the Chapter's reliance on extensive source material.  (*See* cases cited Mot. at 32-33.)  Thus, the Court should dismiss even if Plaintiff were a private figure.

the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Edwards v. National Audubon Soc'y, Inc.*, 556 F.2d 113, 121 (2d Cir. 1977); *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1510-11 (D.C. Cir. 1996) (no actual malice even though plaintiff was not contacted because "[defendant] knew . . . that [plaintiff] had sued . . . for defamation based upon similar allegations; [defendant] could reasonably expect [plaintiff] to deny any involvement regardless of the facts.").

Here, Montgomery argues that denials should have prompted Risen to focus on Trepp, rather than Montgomery, because Trepp was the head of eTreppid, was allegedly responsible for obtaining contracts from the U.S. government, and did not have to return the money he earned from federal government contracts. (Opp. at 46-47.) Montgomery also argues that his companies would not have continued to obtain contracts from the federal government if the software did not work. (*Id.*) But Risen adopted an equally or more plausible theory given the extensive evidence that Montgomery's software was a fraud: national security officials after 9/11 had an incentive to find any intelligence to prevent that next attack; when the intelligence ultimately proved to be a fraud, the secrecy surrounding national security insulated the debacle from scrutiny by the public and other military and intelligence agencies in silos, so Montgomery could hop from one agency to another. (Book at 31-33, 39-40, 43-44, 47-48.) In any event, after the CIA found Montgomery's software wanting, SOCOM reached the same conclusion. (*Id.* at 48.) As a matter of law, Risen's rational interpretation of complex and ambiguous events does not establish actual malice. *See Time, Inc. v. Pape*, 401 U.S. 279, 289-90 (1971) (where an event lends itself to "a number of possible rational interpretations," an author's "deliberate choice of [one] such . . . interpretation, though arguably reflecting a misconception, [does] not" show actual malice).[13]

---

[13] *See also Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512-13 (1984) (same); *Flowers v. Carville*, 310 F. Supp. 2d 1157, 1166 (D. Nev. 2004) ("[A] defendant who publishes a

*Second*, Montgomery argues that Risen acted with actual malice by asserting that Risen acted with common law malice. (Opp. at 38-40.) As the Middle District of Florida recently explained to Montgomery's counsel who was acting *pro se*, "[d]espite its name, the actual malice standard does *not measure malice in the sense of ill will or animosity,* but instead the speaker's subjective doubts about the truth of the publication." *Klayman v. City Pages*, 2015 WL 1546173, at *13 (M.D. Fla. Apr. 3, 2015). As in *Klayman*, "Plaintiff's filings in this case make clear that he does not fully cognize the difference between constitutional actual malice and 'ill will' or 'hatred,' often referred to as common law malice." *Id.* "In this context, ill will is different than actual malice." *Id.* (citing *Palm Beach Newspapers, Inc. v. Early*, 334 So. 2d 50, 52 (Fla. 4th DCA 1976); *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 82 (1967) (holding that it was an error of law to instruct a jury that ill will can establish actual malice)). Although ill will or motive, combined with other evidence Montgomery cannot muster, may provide some circumstantial support for actual malice, the case Montgomery relies upon makes clear that ill will alone cannot establish actual malice. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989). "Subjective ill-will does not establish actual malice, nor does a malevolent motive for publication," which is all Montgomery argues here. *Klayman*, 2015 WL 1546173, at *13 (citing *id.* at 665).

*Third*, as in *Klayman*, "Plaintiff argues there is evidence of actual malice because Defendants ignored Plaintiff's letter demanding a correction to the articles." *Id.* at *15. (*See also* Opp. at 40.) But "the Supreme Court has explicitly rejected Plaintiff's argument and stated that actual malice cannot be inferred from a publisher's failure to retract a statement once it learns it to be false." *Id.* (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 286 (1964) ("[F]ailure to

---

rational interpretation of an ambiguous report has not acted with actual malice . . ., even though his interpretation 'arguably reflect[s] a misconception'") (quoting *Pape*, 401 U.S. at 290), *aff'd*, 161 F. App'x 697 (9th Cir. 2006); *Moldea*, 22 F.3d at 315 ("[W]hen a writer is evaluating or giving an account of inherently ambiguous materials or subject matter, the First Amendment requires that the courts allow latitude for interpretation.").

retract upon respondent's demand . . . [is] not adequate evidence of malice for constitutional purposes.")).  (*See also* cases cited Mot. at 39.)  "Thus, the fact that Plaintiff alerted Defendants after publication that he believed the statements were false and that he wanted some kind of correction or retraction does not help Plaintiff to establish actual malice."  *Id.*

Not only does Montgomery not point to facts showing actual malice, but the undisputed facts properly before the Court on this Rule 12(b)(6) motion demonstrate the *absence* of actual malice.  Tellingly, Montgomery does not rebut Defendants' argument that Risen was entitled to draw an adverse inference that Montgomery's software was a fraud based on Montgomery's re-peated invocation of his Fifth Amendment right against self-incrimination "when asked if his software was a 'complete fraud.'"  (Mot. at 37.)  In addition: (1) the Chapter expressly relied on previously-published articles in reputable publications; (2) the Chapter includes Montgomery's denials; and (3) the Chapter relied on statements in official court records, FBI reports, and congressional records stating that Montgomery's work was a fraud.  (Mot. at 34-39.)  Montgomery does not even address that he cannot show actual malice as to HMH because it relied on an admittedly highly-reputable author (Am. Compl. ¶¶ 10, 14) and cannot show actual malice as to the holding company, HMHC, because the Amended Complaint does not allege – nor could it allege – that the holding company had anything to do with publication of the Book or is at fault in any way.  (Mot. at 38 n.56.)  Thus, Montgomery cannot plausibly meet, as a matter of law, the "daunting" standard of actual malice, or any other applicable level of fault.  The Court should dismiss his Amended Complaint with prejudice.

## III.   CONCLUSION

For the foregoing reasons, and for those articulated in the Motion, defendants HMH Companies and Risen respectfully request that the Court grant their motions to dismiss or transfer.

Dated:  June 11, 2015

Respectfully submitted,

HOLLAND & KNIGHT LLP

By: <u>s/ Sanford L. Bohrer</u>
    Sanford L. Bohrer
    Brian W. Toth
    701 Brickell Avenue, Suite 3300
    Miami, Florida  33131
    Tel.: (305) 374-8500
    Fax: (305) 789-7799


DAVIS WRIGHT TREMAINE LLP

By: <u>s/ Laura R. Handman</u>
    Laura R. Handman (admitted *pro hac vice*)
    Micah J. Ratner (admitted p*ro hac vice*)
    1919 Pennsylvania Ave., NW, Suite 800
    Washington, D.C.  20006
    Tel.: (202) 973-4200
    Fax: (202) 973-4499

    *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on June 11, 2015, I filed this document with the Clerk of Court using

CM/ECF, which will serve this document on all counsel of record.


s/Sanford L. Bohrer