Exhibit 1

Naveed Mahboobian
CA Bar No. 279464
1217 Wilshire Blvd., # 3043
Santa Monica, CA 90403
Tel:(424) 272-1005
Email: nmahboobian@gmail.com

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

DENNIS MONTGOMERY,

                Plaintiff,

     v.

MICHAEL FLYNN,

          Defendant.

Misc. Case No. :

[Pending in the Southern District of
Florida, Case 15-20782-CIV]

NOTICE OF MOTION AND EXPEDITED
MOTION TO COMPEL COMPLIANCE
WITH SUBPOENA TO MICHAEL FLYNN
AND FOR AWARD OF ATTORNEYS
FEES AND COSTS

Hearing Date: TBD
Time: TBD
Judge: TBD
Courtroom: TBD

      NOTICE is hereby given of the filing of this motion by Plaintiff Dennis Montgomery ("Plaintiff"), pursuant to Rule 45, Fed.R.Civ.P. This motion seeks to compel third party Michael Flynn ("Flynn") to appear for deposition and produce documents requested in the Subpoena to Testify at a Deposition In a Civil Action issued on August 26, 2015. **Plaintiff requests expedited treatment as discovery is set to close on November 19, 2015, in the underlying action in the U.S. District Court for the Southern District of Florida (Civil No. 15-20782).**

      Plaintiff further respectfully requests that Flynn be ordered to sit for a deposition and to

produce the requested documents within three (3) days from the Court's order. Plaintiff also requests that he be awarded his reasonable attorneys' fees and costs incurred in connection with this matter.

This motion is made following the conference of counsel pursuant to Local Rule 7-3. Plaintiff's counsel sought to contact deponent Flynn and telephoned him multiple times, however Plaintiff's counsel has not received any responses from Mr. Flynn. Plaintiff's counsel further sought consent for the filing of this motion from Defendants James Risen, Houghton Mifflin Harcourt, and Houghton Mifflin Harcourt Publishing Company, however Plaintiff did not receive any response from their counsel as they continue to collude with Mr. Flynn to avoid the deposition.

**Plaintiff respectfully requests expedited handling of this motion.**

Dated: November 12, 2015

Respectfully submitted,

Naveed Mahboobian

Attorney for Plaintiff

MOTION TO COMPEL COMPLIANCE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM IN SUPPORT OF EXPEDITED MOTION TO COMPEL

This is a case brought on because of defamatory statements made by Defendants against Plaintiff Dennis Montgomery. *See* Exhibit 1 – Amended Complaint. Defendants published a physical book "Pay Any Price: Greed, Power and Endless War" (referred to as "the Book" or "Book") by author Defendant James Risen, Copyright (c) 2014 by Defendant James Risen, designated by the Library of Congress by its index system as ISBN 978-0-544-34141-8 (hardback edition).

The Book blames U.S. Government leaders and officials for mishandling the "war on terror" and over-reacting. Defendant Risen portrays the global threats as far smaller, less real, and less imminent than national leaders during the Bush Administration.

Yet in Chapter 2, Defendants abruptly shift the blame to a private individual, Dennis Montgomery. Defendant Risen swerves out of his lane to sideswipe Montgomery, so to speak, much too far to be accidental or a result of fair reporting.

At the heart of the case, the main (though not the only) defamation by the Defendants destructive of the Plaintiff's reputation and business prospects is their nationwide announcement of the Plaintiff as a fraud whose work, including software and technology, is a hoax.

Since the defamation has been widely published, the Plaintiff has not been able to get work, contracts, or business opportunities. The harm to the Plaintiff involves his loss of current and future employment, contract, and business opportunities. The relevant test is not where the Plaintiff has earned income in the past, as the Defendants mistakenly assume, but whether the defamation prevents him from earning income currently and in the future.

Defendants reported nationwide that Plaintiff Dennis Montgomery is a con-artist, a fraud,

a hoax, and dishonest.  Among other accusations, Defendants state that Plaintiff Montgomery

defrauded CIA Director George Tenet and the U.S. Government generally with regard to

contracts with the Government, which published and accused Plaintiff Montgomery of having

committed crimes under the False Claims Act, 31 U.S.C. §§ 3729 – 3733, and also common law

and statutory fraud. The Defendants further accuse Dennis Montgomery of lying to the

government which is a criminal violation of 18 U.S.C. § 1001.  This is defamation *Per Se.*

Plaintiff filed suit against Defendants within the U.S. District Court for the Southern

District of Florida.  *Montgomery v. Risen*, No. 15-cv-20782 (S.D. Fla.).

Plaintiff's counsel issued a Subpoena to Testify at a Deposition In a Civil Action

("Subpoena") to Mr. Michael Flynn on August 26, 2015.  Exhibit 2.

 "A subpoena must issue from the court where the action is pending." Fed. R. Civ. P.

45(a)(2). Here, the relevant subpoena issued in connection with a civil action that is pending in

the United States District Court for the Southern District of Florida. (ECF No. 6-2 at 2.) Thus, in

compliance with Federal Rule of Civil Procedure 45, the subpoena issued out of the United

States District Court for the Southern District of Florida. (*Id.*); Fed. R. Civ. P. 45(a)(2). Exhibit

2.

 This Subpoena was served on Mr. Flynn on August 27, 2015.  Correctly, Plaintiff chose

to serve a subpoena with a place of compliance within 100 miles of the address listed for Mr.

Flynn.  The served subpoena  commanded Mr. Flynn's attendance at a deposition located at the

following address: La Mirada Executive Suites, 14241 E. Firestone Blvd., Suite 400, La Mirada,

CA 90638, which is within this district; the Central District of California. Exhibit 4 – Sworn

Affidavit of Plaintiff's Counsel.

"Challenges to compliance are to be made to the court where compliance is required."

Federal Rules of Civil Procedure, Rules and Commentary Rule 45. "The court for the district where compliance is required . . . . may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena . . . ." Fed. R. Civ. P. 45(g).

La Mirada is a city in southeast Los Angeles County and falls under the jurisdiction of the U.S. District Court for the Central District of California, this Court. *See, e.g., AngioScore, Inc. v. TriReme Med., Inc.*, No. 12cv3393, 2014 WL 6706873, at *1 (N.D. Cal. Nov. 25, 2014) ("'[u]nder the current version of the Rule [45], when a motion to quash a subpoena is filed in a court other than the court where compliance is required, that court lacks jurisdiction to resolve the motion.'"); *Sandifer v. Hoyt Archery, Inc.*, No. 12cv322, 2014 WL 3540812, at *4 (M.D. La. July 17, 2014) ("Any motion . . . to compel Mr. Ragsdale's compliance with a Rule 45 subpoena should have first been filed in the district where the discovery is or will be taken or where compliance is required.").

Undersigned Plaintiff's counsel and his colleagues were privy to a telephone conversation on September 4, 2015, which constituted a meet and confer conference on trying to find deposition dates and were told by opposing counsel for Defendants James Risen, Houghton Mifflin Harcourt, and Houghton Mifflin Harcourt Publishing Company, that Mr. Flynn has told opposing counsel that he had not been served with the Subpoena. This is false, as set forth in the attached sworn affidavit of service. Exhibit 3.

Undersigned Plaintiff's counsel has attempted to call Mr. Flynn at his office telephone and has not received any return call even after leaving voicemail messages for Mr. Flynn. Undersigned Plaintiff's counsel had called to arrange convenient deposition times.

The same is not true for Defendants' counsel, with whom Mr. Flynn communicated with. Exhibit 5. Plaintiff's counsel only recently obtained an email which suggests collusion in trying

to evade compliance with the subpoena. Thus, given Defendants' counsel's correspondence with Mr. Flynn, it is thus clear that Mr. Flynn was aware of the subpoena and appears to be colluding with Defendants counsel in order to avoid compliance with the subpoena. This is why he said he was not available for over two months, conveniently until after discovery is scheduled to close on November 19, 2015. To the contrary, Flynn, while corresponding with Defendants' counsel, wouldn't even return Plaintiff's counsel's telephone calls. It is therefore clear that Defendants' counsel and Mr. Flynn acted in concert to thwart the deposition and are not acting appropriately and are collectively evading compliance with the subpoena. (Note that Mr. Flynn and counsel for Defendants refer to each other by their first names, suggesting this "cozy" relationship.) *Id.*

Further, on September 10, 2015, during a telephonic conference between the parties, Defendants' counsel advised Plaintiff's counsel that when they spoke with Mr. Flynn he told Defendants' counsel that he would be traveling **until after discovery is set to close in this case; November 19, 2015**. It is therefore clear that Mr. Flynn is seeking to avoid having to testify at the deposition and is going to great lengths to avoid it.

Not coincidentally, Mr. Flynn was an attorney for Plaintiff Montgomery, and was the one who released 20,000 pages of documents which included attorney-client privileged documents and attorney work product documents to Defendant Risen. It is therefore not surprising that Mr. Flynn does not have the propensity to act ethically and truthfully, and thus wants to avoid testimony as he has violated attorney-client confidences and work-product privilege.

WHEREFORE, Plaintiff respectfully requests that Deponent Michael Flynn be ordered to appear at the deposition as set forth in the attached Subpoena, and that attorneys fees and costs be awarded to Plaintiff.

Dated: November 12, 2015

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,

Naveed Mahboobian
CA Bar No. 279464
1217 Wilshire Blvd., # 3043
Santa Monica, CA 90403
Tel:(424) 272-1005
Email: nmahboobian@gmail.com

Attorney for Plaintiff

MOTION TO COMPEL COMPLIANCE

1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of November, 2015, a true and correct copy of the foregoing was served via U.S. Mail upon the following:

**Michael Flynn**
6125 El Tordo
Rancho Sante Fe, CA 92067

**Sanford Lewis Bohrer** (Also by e-mail)
**Brian Toth** (Also by e-mail)
Holland & Knight, LLP
Suite 3000
701 Brickell Ave
Miami, FL 33131
Email: sbohrer@hklaw.com
Email: brian.toth@hklaw.com

**Laura R. Handman** (Also by e-mail)
**Micah Ratner** (Also by e-mail)
Davis Wright Tremaine LLP
1919 Pennsylvania Ave., N.W., Suite 800
Washington D.C. 20006-3401
Email: laurahandman@dwt.com
Email: MicahRatner@dwt.com

*Attorneys for Defendants*

Naveed Mahboobian

MOTION TO COMPEL COMPLIANCE

# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

DENNIS L. MONTGOMERY



                          Plaintiff,

    v.

JAMES RISEN, an individual,
c/o  The New York Times
1627 "I" Street N.W., Suite 700
Washington, D.C. 20006-4007                          Civil Action No.  15-cv-20782

              and

HOUGHTON MIFFLIN HARCOURT PUBLISHING
COMPANY
222 Berkeley Street
Boston, Massachusetts 02116

              and

HMH HOLDINGS, INC.
222 Berkeley Street
Boston, Massachusetts 02116

              and

HOUGHTON MIFFLIN HARCOURT COMPANY
222 Berkeley Street
Boston, Massachusetts 02116

              Defendants.

## AMENDED COMPLAINT (REDACTED)[1]

    Plaintiff Dennis L. Montgomery, by counsel, sues the Defendants, acting in concert,

jointly and severally, in this civil action for Common Law Defamation *Per Se* (libel and slander),

---

[1] Address and Miami-Dade phone number of Plaintiff have been redacted for security reasons.
The address and phone number are being filed by motion in a Sealed Amended Complaint.

General Defamation (libel and slander), Defamation by Implication (libel and slander), Intentional Infliction of Emotional Distress, Tortious Interference with Prospective Advantage, and Assault, as a result of Defendants causing actual damages, compensatory damages, and giving rise to punitive damages as well, including continuing and aggravated harm to the Plaintiff's professional, business and personal reputation and livelihood.  As grounds therefore, Plaintiff alleges as follows:

I.     **<u>JURISDICTION AND VENUE</u>**

1.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 under diversity of citizenship. The parties are citizens of different states and the amount in controversy exceeds $75,000. Also, the Causes of Action arose in this judicial district.

2.     Venue is proper for Defendants pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(e).

3.     The Causes of Action and the injuries were caused to the Plaintiff by the Defendants' defamation and other tortious conduct in this district, Florida in general, nationwide, and internationally.

4.     In addition, some of the most recent commercial opportunities for the Plaintiff's work were contracts and projects made available through military bases and Government facilities in Florida.

5.     The State of Florida is the third (3rd) largest state by population within the entire United States such that a huge and substantial portion of the nationwide harm has occurred in Florida.

6.     The United States Central Command ("CENTCOM") is located at MacDill Air Force Base, in Tampa, Florida. Central Command, then under the leadership of General Tommy

Ray Franks, led the attack on the Taliban in Afghanistan in response to the September 11 attacks

on the World Trade Center and The Pentagon in 2001. CENTCOM also led the 2003 invasion of

Iraq and the overthrow of Saddam Hussein.  CENTCOM has been the center of the United

States' war on terror and related intelligence gathering during the past fifteen years.

      7.     United States Southern Command ("SOCOM"), responsible for all U.S. military

and intelligence gathering activities in South America and Central America, is located in located

in Doral, Florida.  The U.S. Southern Command works with CENTCOM. Al Qaeda, ISIS, and

other groups and interests, including the Islamic Republic of Iran are active and engaged in

South America and in Central America and in 1994 Iran blew up a synagogue in Buenos Aires,

Argentina.

      8.     In addition, the U.S. Air Force maintains six (6) active military bases in Florida,

the U.S. Navy maintains ten (10) active military bases and two (2) hospital bases in Florida, the

U.S. Coast Guard maintains three (3) active military bases, and the U.S. Marines and the U.S.

Army each maintain one active military base in Florida.

      9.     Many of the drones used for the wars in Iraq and Afghanistan have been operated

out of Florida.  For example, the 2d Special Operations Squadron ("2 SOS") is an Air Force

Reserve Command unit Stationed at Hurlburt Field, Florida. The 2 SOS unit operates MQ-9

Reaper Remotely Piloted Vehicles.

      10.     Defendants knew or should have known of the large counter-terrorism, military,

and intelligence presence within the state of Florida. Defendant Risen is a "national security

expert" who has intimate knowledge of the U.S. Military.

      11.     Given the large counter-terrorism, military, and intelligence presence in Florida,

Defendants marketed the Book <u>Pay Any Price</u> into the state for Florida, as there is a large

readership there from military and intelligence personnel and retirees in these services, as well as the general population at large. Pay Any Price specifically deals with the United States' efforts in the war on terrorism and related intelligence gathering activities, and as such there would be substantial interest from those living within Florida, which has the largest military and intelligence presence in the nation.

12.     Defendants knew or should have known of Plaintiff's substantial ties to counter-terrorism, military, and intelligence contracts and intended on harming Plaintiff in Florida, which continues to be center of the war on terror. Defendants knew that if Plaintiff's reputation was harmed in Florida, the large military presence in Florida would ensure that Plaintiff would lose jobs and contracts and not be hired for any more jobs and contracts.

## II.     **THE PARTIES**

13.     Dennis L. Montgomery is a natural person, an individual, and a citizen of the United States. He is a citizen of Florida, which as set forth above, is where much of this work has taken place and will continue to take place. He resides at ███████████ Miami, FL ████ and has a Miami-Dade telephone number of ████████. Mr. Montgomery is also registered to vote in Florida and has had multiple and ongoing business dealings within the state of Florida. Plaintiff is in poor health. He suffered a brain aneurysm and a related multi-infarct stroke on May 12, 2014. He suffered both a hemorrhagic stroke (caused by ruptured blood vessels that cause brain bleeding) and an ischemic stroke (loss of blood flow). He was in the hospital for two months, through July 2014. He has been left permanently disabled and partially paralyzed. Plaintiff could suffer a similar or repeated event causing him to die at any time. He is currently in outpatient physical therapy to work on ongoing left-sided weakness and speech therapy for stroke related cognitive and memory impairments along with swallowing difficulties.

14.     James Risen is a natural person who is a Pulitzer Prize-winning journalist for <u>The New York Times</u>, previously for <u>The Los Angeles Times</u>. He has written or co-written many articles concerning U.S. Government ("Government") activities and is the author or co-author of two books about the National Security Agency ("NSA") and the Central Intelligence Agency ("CIA").

15.     Defendant Houghton Mifflin Harcourt Publishing Company is the publisher of Risen's Book, "<u>Pay Any Price: Greed, Power and Endless War</u>" and is located in Boston, Massachusetts.

16.     Defendant HMH Holdings, Inc. is the parent company and owner of the Houghton Mifflin Harcourt Publishing Company and is incorporated in the State of Delaware.

17.     Defendant Houghton Mifflin Harcourt Company is the parent company and owner of the Houghton Mifflin Harcourt Publishing Company and is incorporated in the State of Delaware.

18.      Houghton Mifflin Harcourt Company and/or Houghton Mifflin Harcourt Publishing Company maintains offices throughout the United States, including an office in Orlando, Florida.

19.     With regard to each of the allegations in this complaint, all of the Defendants have acted in concert, jointly and severally, thus giving rise to joint and several liability for each of them. Thus, when a tortious act is attributed (and pled as) to Defendant Risen, it also applies to the other defendants, Houghton Mifflin Harcourt Publishing Company, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company.

20.     All of the allegations of this Complaint refer or relate to the tortious, illegal conduct of each and every named Defendant, who acted individually and in concert, jointly and severally, to severely damage Plaintiff Montgomery.

III.     **FACTS COMMON TO ALL COUNTS**

21.     Plaintiff Montgomery sues for harm and thus damages in this district, Florida in general, nationwide and internationally to himself as an individual, which damages include financial harm to his business reputation as an individual and his business and professional opportunities as an individual, intentional infliction of emotional distress, and assault for placing Plaintiff Montgomery in immediate fear of bodily harm, injury, and death, by terrorists who have sworn to attack those assisting the U.S. military and Government.

22.     Plaintiff Montgomery sues for harm to his financial interests as an individual owner, investor, partner, shareholder and/or employee of companies impacted by these events, which has resulted in financial harm to Plaintiff Montgomery as an individual through the loss of value of his ownership interests in those companies as a result of Defendants' defamation and other tortious conduct.

23.     Plaintiff Montgomery sues for harm to his financial interests as an individual in the intellectual property of computer software, computer software techniques and encoding and decryption technologies which he developed and which have been harmed by Defendants' defamation and other tortious conduct, as well as other harm and thus damages to be uncovered during discovery.

**Dennis Montgomery Not a Public Figure**

24.     Plaintiff Montgomery is a private citizen and at all material times acted individually and in business.

6

25.    Plaintiff Montgomery has not sought any form of publicity, public note or prominence outside of implementing his own business affairs in private transactions.

26.    Plaintiff Montgomery has not sought or held any public office or Government position within the Government.

27.    Plaintiff Montgomery thus is not a public figure based on facts, including his work for the Government, which was secret, while he in effect worked undercover for the Government outside of the public eye.

28.    Plaintiff Montgomery has not sought or acquired any position of public power or influence which would give him the ability to protect himself apart from the courts within the meaning of *New York Times v. Sullivan*, 376 U.S. 254 (1964).

29.    Plaintiff Montgomery is not a public figure within the meaning of *New York Times v. Sullivan,* 376 U.S. 254 (1964) or its progeny.


### <u>Defamation of Plaintiff Dennis Montgomery by Defendant James Risen in Recent Bestselling Book</u>

30.    On October 14, 2014,[2] the publishing 'house' of Defendant Houghton Mifflin Harcourt Publishing Company at 215 Park Avenue South, New York, New York 10003, whose parent is Defendant HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company, published a book titled "<u>Pay Any Price:  Greed, Power and Endless War</u>" (referred to as "the Book" or "Book" below) by author Defendant James Risen, Copyright (c) 2014 by Defendant James Risen, designated by the Library of Congress by its index system as ISBN 978-0-544-

---

[2]    A book's official publication date is somewhat artificial for marketing, and books are often available and being promoted a week or two ahead of the official publication date.  In part, this is due to the task of distributing books to bookstores and on the Internet all across the nation by the official date of publication.

34141-8 (hardback edition).  This publication dated October 14, 2014, was the first publication of the Book in this district, Florida in general, domestically, and worldwide, in any language and the first printing run of the Book.  The Book was physically printed in the United States.

31.     On information and belief, the Book <u>Pay Any Price</u> was sold starting in October 2014, in mainstream bookstores throughout this district, Florida in general, the United States as a whole, internationally, and on the Internet.

32.     Defendants advertised the sale of the Book <u>Pay Any Price</u> throughout this district, Florida in general, the United States as a whole, internationally, and on the Internet.

33.     The Book <u>Pay Any Price</u> was available for sale and was and is sold throughout book stores such as Barnes and Noble, Books-A-Million bookstores, and throughout the state of Florida and the United States.

34.     The Book <u>Pay Any Price</u> was and is similarly sold throughout the internet on websites such as Amazon.com and barnesandnoble.com, where it was purchased by citizens and residents of Florida. As of April 27, 2015, <u>Pay Any Price</u> is still ranked by Amazon.com as the fourteenth (14th) highest bestseller in books on national and international security.[3]

35.     A complete copy of Chapter 2 of <u>Pay Any Price</u> is attached for the Court as Exhibit A.

36.     Chapter 2 of the Book <u>Pay Any Price</u> is devoted to the Plaintiff Montgomery – though curiously not to Warren Trepp, Montgomery's much more politically connected business partner, after whom their company eTreppid was named.

37.     The Book could have been written and still be complete by omitting Plaintiff Montgomery entirely from the Book.  Plaintiff Montgomery is not necessary to the theme or

---

[3] *See* http://www.amazon.com/gp/bestsellers/books/3049231/ref=pd_zg_hrsr_b_1_5_last

message of the Book, but indeed the reports about Plaintiff Montgomery actually conflict with the Book overall.

38.     The Book was rated as #18 in the greatest quantity of sales nationwide on The New York Times' list rating the nation's bestselling books for the week of November 9 to 16, 2014, and #20 in quantity of sales nationwide for the week of October 26 to November 9, 2014.

39.     The Book was rated as #11 in the greatest quantity of sales nationwide on The Los Angeles Times' list rating the nation's bestselling books as of November 2, 2014, and #17 in quantity of sales nationwide as of November 16, 2014.

40.     The Book is listed on The New York Times' list of the 100 most notable books published in the year 2014.

41.     Apart from the Book itself, Defendant Risen also engaged in a flurry of radio and television news interviews and talk show interviews in and around September 2014 and October 2014, associated with the "roll out" of his Book in which Defendant Risen made further defamatory factual publications of and concerning Plaintiff Montgomery, in addition to the words and content of the Book itself.  In these interviews, Defendant Risen and the other Defendants repeated the false and misleading statements from the Book itself, and also added to those claims and even at times falsely and misleadingly contradicted the defamatory claims of his own Book.

42.     Many of Defendant Risen's and the other Defendants' libelous and slanderous statements were made during written news and talk show interviews during September 2014, October 2014, and November, 2014, some spoken, some in print and elsewhere, surrounding the publication of his Book rather than in the Book itself.  Defendants were purposely and intentionally marketing the book through the sensational defamatory statements made about

Plaintiff. In fact, Plaintiff is the focal point of the Book and that explains why he has been defamed and thus trashed not just in the Book but Defendant's published interviews about the Book, intended to get readers to buy the Book in Florida and elsewhere.

43.     Counsel for Plaintiff Montgomery served a demand for a retraction upon Jon Stewart and "The Daily Show" airing on November 6, 2014 on the Comedy Central nationwide television network after Defendant Risen's television interview on "The Daily Show."  Stewart and the "The Daily Show" production did not air a correction or retraction, but later removed the interview from its website. However, the publication is still out on - and being published on - the Internet and other media sites.

44.     Plaintiff Montgomery also sent two demand letters to the Defendant publishers pursuant to Florida Statute § 770.02. One was served on January 14, 2015 and the other was served on February 13, 2015. Defendants responded on January 20, 2014, refusing to retract the false information and pay damages. (Composite Exhibit B). To date, Defendants' have not responded to Plaintiff Montgomery's letter of February 13, 2015. These are incorporated herein by reference.

45.     Defendants' defamation that Plaintiff Montgomery convinced the Government of false terror threats is false and misleading including but not limited to the fact that Plaintiff Montgomery never offered any interpretation of the hidden data he uncovered, even when pressured to give his conjecture about what the hidden data was, meant, or referred to.  Plaintiff Montgomery left it up to intelligence experts of the Government to analyze and determine what the hidden data and clues that he found actually meant.

46.     Defendants' defamation of Plaintiff Montgomery is false and misleading, including but not limited to the fact that Plaintiff Montgomery and his partners turned down

other contracts of equal or greater profitability with private companies, but were urged by Government officials to help the Government for national defense instead.

47.     Defendants' defamation of Plaintiff Montgomery publishing that he defrauded the Government to make money out of greed is false and misleading, including but not limited to the fact that Plaintiff Montgomery was only a minority stockholder who did not receive any distribution of company profits.  Warren Trepp was the President and CEO and controlled all shareholder activities and financial decisions in the company, eTreppid.  Plaintiff Montgomery owned no stock in Edra Blixseth's later company BLIXWARE.

48.     Defendants' defamation of Plaintiff Montgomery publishing that he defrauded the Government is false and misleading including but not limited to the fact that the Government conducted its own independent tests of Plaintiff Montgomery's software and confirmed its effectiveness and reliability.

49.     Defendants' publications that Plaintiff Montgomery defrauded the Government are false and misleading including but not limited to the fact that the Government has continued to use Plaintiff Montgomery's software and technology.

50.     Defendant Risen and the other Defendants have misrepresented the truthful story of these events by faulting the wrong parties and thus defaming Plaintiff Montgomery.

51.     Defendants' defamation of Plaintiff Montgomery is false and malicious, including but not limited to the fact that Defendant Risen's Government sources would bear the blame and legal consequences if they did not portray Plaintiff Montgomery as at fault.

52.     In the alternative, Defendants, all of them, jointly and severally, manufactured the alleged facts pled in this Complaint and did not have confidential sources in Government.

53.     Defendants' defamation of Plaintiff Montgomery was made with actual malice. Defendants had knowledge of the falsity of the defamatory statements, and/or made the defamatory statements with reckless disregard to the truth. *See* Plaintiff's Affidavit, Exhibit C, incorporated herein by reference.

54.     Despite being a Pulitzer Prize-winning author, Defendant Risen has previously been alleged to engage in a pattern and practice of defaming individuals for profit. As one example revealed on Defendant Risen's Wikipedia page, specifically, Wen Ho Lee co-wrote a book called My Country Versus Me in which he described Defendant Risen as a "hatchet job on me, and a sloppy one at that." The New York Times and The Los Angeles Times jointly decided to settle the case brought by Wen Ho Lee on behalf of Defendant Risen and agreed to pay damages to settle the lawsuit.

### Use of False And Misleading Classified Information by Defendants or Failure to Fact Check

55.     Thus, either the Defendants, all of them, had in their possession classified national security and intelligence information from the Government and details of confidential private conversations and events within the Government (and falsified that information) or Defendants made up the entire defamatory story about Plaintiff Montgomery for sensationalism and thus just to sell more books and reap huge profits.

56.     Defendants Houghton Mifflin Harcourt Publishing Company ("Houghton Mifflin") and its parent, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company, were required to fulfill their legal and ethical responsibilities before publishing a book of this nature and especially a book containing Chapter 2 and related passages which singles out a private citizen for intense defamation, to "fact check" and review the evidence for defamatory factual recitations made in the Book concerning Plaintiff Montgomery before publication.

57.     Houghton Mifflin and HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company, were required to ensure that the author, Defendant Risen, had sufficient factual basis for the Book's statements and claims about Plaintiff Montgomery.

58.     Here, however, even if true, the substance of the Book's published criticisms and descriptions of Plaintiff Montgomery would have required Defendant Risen to admittedly base his Book on information from the Government which is classified or secret or otherwise legally restricted on the grounds of national security or intelligence sources and methods.

59.     In the Book's preliminary pages, Defendant Risen writes and Defendants Houghton Mifflin, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company published and admitted the following:

### A NOTE ON SOURCES

> "Many people have criticized the use of anonymous sources.  Yet all reporters know that the very best stories – the most important, the most sensitive – rely on them.  This book would not be possible without the cooperation of many current and former government officials and other individuals who were willing to discuss sensitive matters only on the condition of anonymity."

60.     Thus, Defendants admit that the Book is based upon inside, Governmental classified information, however false and misleading, from "many current and former government officials…"

61.     Among other occasions, Defendant Risen described in The New York Times telephone[4] interview posted on October 24, 2014, titled **"Inside The New York Times Book Review: James Risen's 'Pay Any Price'"**, that he was alerted about Plaintiff Montgomery by sources within the CIA.

---

[4]     Accessible at: http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/

62.     Thus, the substance of the Book's false and misleading publications about Plaintiff Montgomery, if true or otherwise, would have required Defendants Houghton Mifflin, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company to review information from the Government which is classified or secret or otherwise legally restricted on the grounds of national security or intelligence sources and methods. Since this would be illegal, one can only conclude that Defendants fabricated the defamatory publications as alleged herein.

63.     Defendant Risen and the other Defendants' defamatory and false and misleading factual assertions, descriptions, and reports in Chapter 2 of the Book Pay Any Price concerning Plaintiff Montgomery relate in specific detail conversations, incidents, events, decisions, etc., that Defendant Risen could not possibly know without receiving information from the Government that is classified, secret, or legally restricted.

64.     For example, the Book related and published conversations within the Oval Office of The White House with President George W. Bush and his foreign policy team and the national command authority of the United States, communications between the intelligence services of France and the United States, deliberations within the CIA and NSA, and so on and so forth.

65.     Plaintiff Montgomery developed various software including software that successfully decoded hidden messages from broadcast video.[5]

66.     However, as to why the Bush Administration cancelled flights from Europe and ordered potential shoot-downs (see below), including the full range of their information, only the

---

[5]     Plaintiff Montgomery's company began originally developing software to colorize black-and-white movies, which requires an extraordinarily sophisticated ability to recognize specific objects and shapes – such as faces, individual parts of clothing, etc., as they are moving in three dimensional perspective and changing distances (affecting size in relation to other objects in the view) and to follow and track every object requiring a slightly different shade of color, brightness, including as impacted by shadows, etc.

14

Government intelligence officials themselves and the President of the United States at the time know why they did what they did.

67.     Defendants Risen, Houghton Mifflin, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company, were used as tools by the CIA, NSA, and other Government agencies and their affiliates to maliciously destroy Plaintiff Montgomery because he came forward as a whistleblower in an attempt to reveal their unconstitutional and illegal actions in spying on all American citizens, regardless of whether there was probable cause that they were communicating with and/or aiding and abetting terrorists and/or committing crimes.

### Actual Malice and Punitive Damages:  Defendant James Risen is an Expert in Journalism

68.     Actual malice can be found if Defendants published defamatory statements with a reckless disregard of the truth or used slipshod or sketchy investigative techniques.

69.     Reckless disregard of the truth can be shown when there is little investigative effort expended initially or signals of the falsehood of reporting are ignored, or no additional inquires were made after the editors knew or should have known that the published accounts were untrue.

70.     Actual malice can also be proved by circumstantial evidence. Evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity. *Reader's Digest Assn. v. Superior Court* 37 Cal.3d 244, 257 (1984).

71.     In his interview posted on October 24, 2014, called  "titled **"Inside The New York Times Book Review: James Risen's 'Pay Any Price:**  This week, James Risen and Lucy Worsley," **Defendant Risen admits that ….**

"  . . . it is very difficult to tell what is actually true."[6]

72.    Defendant Risen is a Pulitzer Prize-winning investigative reporter for The New York Times, and accordingly trained, experienced, and disciplined in journalistic standards and ethics.

73.    Regarding Defendant Risen's status as an expert in accurate and reliable reporting as a journalist, Newsweek praises Defendant Risen on October 20, 2014, by claiming

> "At long last we can retire Bob Woodward and Carl Bernstein as the icons of investigative reporting. With his second book probing the dark tunnels of the so-called war on terror, James Risen has established himself as the finest national security reporter of this generation, a field crowded with first-rank talent at The Washington Post, Wall Street Journal, Associated Press, Reuters, McClatchy Newspapers and the New York Times, his employer and sometimes bane."[7]

74.    As "the finest national security reporter of this generation" according to Newsweek, Defendant Risen should have understood what Dan Aykroyd's character (Naval Intelligence Captain Raymond Thurman)  in the movie Pearl Harbor explains to Admiral Chester Nimitz:

> **Admiral Chester W. Nimitz**:   So, sir, you would have us mobilize the entire fleet, at the cost of millions of dollars, based on this 'spine-tingling' feeling of yours?
>
> **Captain Raymond Thurman**:   No, sir. I understand my job is to gather and interpret material. Making difficult

---

[6]     ArtsBeat: Book Review Podcast: James Risen's 'Pay Any Price', by John Williams, New York Times, October 24, 2014,  http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/ , based upon Louise Richardson's book review of Risen's book and publishing a podcast interview of James Risen with Lousia Worsley **"Inside The New York Times Book Review: James Risen's 'Pay Any Price'"** accessible at that website address.

[7]     "**Hustlers, Con Men & Dupes Cashing in on the War on Terror,"by Jeff Stein**, Time Magazine, October 20, 2014, http://www.newsweek.com/hustlers-con-men-dupes-cashing-war-terror-278503.   Risen did not make any new statements in the Newsweek article and apparently was not interviewed for the article.  However, Newsweek did republish the libel from Risen's Book.

> decisions based on incomplete information from my
> limited decoding ability is your job, sir.[8]

75.     Yet, Defendant Risen and the other Defendants defame a private citizen, Plaintiff

Montgomery, as responsible for the alleged decision of President George W. Bush's to ban many

incoming international flights around Christmas 2003 from entering U.S. airspace and to

(allegedly) nearly order the U.S. Air Force to shoot down around ten civilian aircraft over the

Atlantic Ocean as a result of Plaintiff Montgomery's claimed fraud and hoax.  Defendant Risen

portrays this as Plaintiff Montgomery's fault, not Bush's, assuming there is any truth at all to this

false and misleading account.

76.     At a time when the Government was encouraging people to: " . . . If you see

something, say something,"[9] Plaintiff Montgomery said something about what he saw,

innocently, diligently, legally and appropriately.

77.     The thesis of Defendant Risen's and the other Defendants' Book is that the war on

terror is illegitimate and unnecessary, motivated by personal greed, irrational paranoia, or

politics, and that the French government is wise and smart while our Government is stupid,

foolish, greedy, incompetent and criminally-minded.

78.     That is, Defendant Risen and the other Defendants' Book is not a neutral report,

in which errors could be classified as simply inadvertent.  The Book is an intentional, politically-

driven, falsified, and misleading attack on U.S. foreign, military, and intelligence policies in the

"war on terror" against Islamic terrorism, meant to mock and ridicule a strong national defense.

---

[8]     "Pearl Harbor" (2001) (Touchstone Pictures and Jerry Bruckheimer Films)
[9]     http://www.dhs.gov/if-you-see-something-say-something%E2%84%A2 .  In fact, the
DHS encourages partners, announcing "If you are interested in establishing a partnership with
DHS and the "If You See Something, Say Something™" Campaign, please email
seesay@hq.dhs.gov."  DHS has set up a special email address seesay@hq.dhs.gov to promote
this concept of vigilance.

Plaintiff Montgomery is illegally used as a whipping boy by Defendants in this regard to sensationalize and sell more books for a great profit.

79.     Defendant Risen sets out to discredit what he calls "The Endless War" as being motivated by corruption, greed, personal profit, and irrational paranoia.

80.     Yet curiously Defendant Risen goes very far out of his way to gratuitously and irrelevantly defame Plaintiff Montgomery as the villain and Government officials as Plaintiff Montgomery's unsuspecting victims, in conflict with the theme of his Book.  Defendant Risen also deliberately looks past Warren Trepp, the owner of eTreppid, to oddly single out and blame only Plaintiff Montgomery.

81.     That is, Defendant Risen and the other Defendants' defamation of Plaintiff Montgomery contradicts and undermines his own thesis in the Book Pay Any Price, curiously shifting the blame from Government officials to a lone private citizen, whom he falsely and misleadingly portrays as having no intelligence or defense background.

82.     Defendant Risen ignores evidence that should have warned him and the other Defendants that their false and misleading publications are wrong into yet another example that Plaintiff Montgomery kept defrauding the Government.

83.     The Government repeatedly rehiring Plaintiff Montgomery should have warned Defendant Risen that there is more than meets the eye to this falsified and misleading story, yet instead Risen portrays this as Plaintiff Montgomery defrauding it, the Government.

84.     More than the average lay person, Defendant Risen knows or should know the unreliability of some sources and the information they provide and the motivations of sources.

85.     A central claim of Defendant Risen's and the Defendants' defamation of Plaintiff Montgomery is that the stupid, foolish, Government was defrauded by Plaintiff Montgomery's

hoax until a private French firm opened its eyes and Government officials were tutored by the French to discover enlightenment.

86.     But in fact, Defendant Risen actually knew or should have known in advance of the Book's publication that France was an opponent of the Bush Administration's foreign policies in the relevant time period after Christmas 2003 and would neither have been trusted by the Government with such secrets nor believed.  Certainly, a private French firm would not have been so trusted.

87.     France at the time was actively involved in opposing the Bush Administration's foreign policy.[10]

88.     In particular, France's animosity toward U.S. foreign, military, and intelligence policies were driven by France's extensive commercial interests with the Middle East, such that a private French high-tech firm would be the least likely source to be believed by U.S. Government officials.

89.     In fact, so disgusted with France's opposition to U.S. foreign, military, and intelligence policies was President Bush's political party that the name of "French fries" was

---

[10]     *See* "**France raises terror war concerns**," <u>CNN</u>, February 7, 2002, ("A senior French government minister has attacked the U.S. approach to fighting terrorism as "simplistic.") http://www.cnn.com/2002/WORLD/europe/02/07/france.bush/  and "**France and allies rally against war,**" <u>BBC News,</u>  March 5, 2003, http://news.bbc.co.uk/2/hi/middle_east/2821145.stm and "**Israeli Analysts: France Ignored Islamic Terror Directed at Jewish Targets:  'Didn't want to deal with Islamic terror for political reasons,'**" <u>Washington Free Beacon</u>, January 12, 2015 ("Columnist Alex Fishman, who writes on security issues for the Tel Aviv daily, Yediot Achronot, said that French intelligence agencies "just didn't want to deal with Islamic terror for political reasons, both because of France's involvement in the Arab world and because 10 percent of its residents are Moslem. The French security services insisted on not touching Islamic terror professionally") http://freebeacon.com/national-security/israeli-analysts-france-ignored-islamic-terror-directed-at-jewish-targets/   With France as an outspoken opponent to President Bush's war on terror policies, perceived as driven by France's lucrative business opportunities in the Middle East, it is highly improbable that the CIA would share sensitive, classified information with France at that period in time.

changed to "Freedom Fries" in the cafeterias and restaurants in the Republican-controlled U.S. House of Representatives, as CNN reported on March 12, 2003.[11] CNN reported: "But House Majority Leader Tom DeLay, R-Texas, said he didn't think Congress needed to take any formal steps to signal its disapproval of France. 'I don't think we have to retaliate against France,' he said. '***They have isolated themselves. They have resigned from any responsibility for the war on terror.***'" (Emphasis added.)

90. Thus Defendant Risen actually knew or should have known, as a Pulitzer Prize-winning expert reporter on national security, the war on terror, and foreign, military, and intelligence policies, that it was nearly impossible for the claim to be true that Plaintiff Montgomery pulled off a hoax against the Government until a private French high-tech firm blew the whistle on Plaintiff Montgomery's fraud using highly-classified intelligence.

91. With regard to Defendant Risen's reporting about a Christmas 2003 alert concerning possible terrorism involving airliners, Defendant Risen actually knows and should have known that the French government does not have the authority to demand an explanation from the CIA.[12]

92. Defendant Risen also knows and should have known that the Bush Administration would never have believed France's analysis as being unbiased and trustworthy, rather than politicized manipulation.

---

[11] "**House cafeterias change names for 'french' fries and 'french' toast**," By Sean Loughlin, CNN, March 12, 2003. http://www.cnn.com/2003/ALLPOLITICS/03/11/sprj.irq.fries/

[12] Defendant Risen himself is under a court order in another case to divulge his sources as a journalist, which Risen has refused to comply with. Risen knows that even journalists often do not reveal their sources. See http://dissenter.firedoglake.com/2014/10/30/in-leak-prosecution-attorneys-demand-to-know-if-government-has-agreement-with-reporter-james-risen/

93.     Moreover, Defendant Risen repeatedly complains and admits in his Book and in interviews that The New York Times refused to publish many of his articles written on these topics.

94.     Thus, Risen has actual knowledge that experienced and well-established news sources such as The New York Times had serious doubts about the truthfulness of Defendant Risen's reporting on these and related topics, such that The New York Times refused to run many of Risen's filed reports, despite his Pulitzer Prize background. If anyone or entity was motivated by greed, it was not Plaintiff Montgomery but Defendants Risen, Houghton Mifflin, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company, who fabricated false and misleading information and then published it for financial gain.

95.     Defendants' acts were willful malicious, deliberate, or were done with reckless indifference to the likelihood that such behavior would cause severe emotional distress and with utter disregard for the consequences of such actions, as well as encourage terrorists and others to threaten Plaintiff Montgomery with severe bodily injury or death; in effect causing a Fatwah to be placed on Plaintiff Montgomery's head and on his family.

IV.     **CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
*Common Law Defamation "Per Se"*

96.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

97.     The Defendants – all of the Defendants – together and each of them acting in concert, jointly and severally, and individually, have defamed the Plaintiff by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff which they knew or should have known to be false.

98.     Defendants' defamation of Plaintiff Montgomery was made with actual malice. Defendants had knowledge of the falsity of the defamatory statements, or made the defamatory statements with reckless disregard to the truth.

99.     Defendants together and each of them acting in concert, jointly and severally, and individually, made false statements that are Defamation *Per Se*, accusing Plaintiff of fraud, crime, scams, and being a con-artist.

100.    Among other accusations, Defendants state that Plaintiff Montgomery defrauded CIA Director George Tenet with regard to contracts with the Government, which published and accused Plaintiff Montgomery of having committed crimes under the False Claims Act, 31 U.S.C. §§ 3729 – 3733, and also common law and statutory fraud.  This is Libel *Per Se*.

101.    Defendants, together and each of them acting in concert, jointly and severally, and individually, knew that their public statements about the Plaintiff would cause severe damage to the reputation, business opportunities, social relationships, and the career of Plaintiff Montgomery.

102.    A statement is per se defamatory if it falsely imputes to another conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession or office; in other words, or if it tended to injure Plaintiff in his trade or profession.

103.    A statement is also per se defamatory if "it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession, or office, or (d) the other being a woman, acts of unchastity." *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So. 2d 495, 497 (Fla. 1953) citing Restatement, Torts, Section 570.

104.   For Defamation Per Se, actual malice need not be shown because damages are presumed. *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So. 2d 495, 497 (Fla. 1953); *Wolfson v. Kirk*, 273 So. 2d 774 (Fla. Dist. Ct. App. 4th Dist. 1973).

105.   Statements are "*defamatory per se,*" recognized under Florida law when statements are so powerful in their ability to hurt someone that Florida law presumes harmful as a matter of law. *Montgomery v. Knox,* 23 Fla. 595, 3 So. 211, 217 (1887), such that a court will allow damages to be awarded in these cases even if no evidence of harm has been presented. "[T]he law presumes malice in their utterance," *Abraham v. Baldwin*, 52 Fla. 151, 42 So. 591, 592 (1906), where the words are "… of such common notoriety established by the general consent of men, that the courts must of necessity take judicial notice of its harmful effect." *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 236 (1933).

106.   ***First***, **on Page 32 of the Book, the Defendants published:**[13]

> "Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money. Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it**.** The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in public, a series of civil lawsuits involving Montgomery.  It was as if everyone in

---

[13]    Note that several statements may qualify under different theories, but are presented in full for proper context.  Some statements are repeated for that portion of the statement that qualifies under different theories of defamation under Florida law.

Washington was afraid to admit that the Emperor of the War on Terror had no clothes."

107.     As Libel *Per Se*, Defendants published about Plaintiff's actions and work that "many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic."

108.     As Libel *Per Se*, Defendants published about the Plaintiff that "once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it …"

109.     **Second, on Page 32 of the Book, the Defendants published:**

> "Consider the example of Dennis Montgomery.  He provides a perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist was able to create a rogue intelligence operation with little or no adult supervision. Crazy became the new normal in the war on terror, and the original objectives of the war got lost in the process."

110.     As Libel *Per Se*, Defendants published that out of "greed" Plaintiff Montgomery "create[d] a rogue intelligence operation with little or no adult supervision" which was "crazy" and that he was "someone who has been accused of being a con artist."

111.     **Third, on Page 33 of the Book, the Defendants published:**

> "A former medical technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing scope, he still had die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Montgomery was a fake, and who rejected the notion that the

super-secret computer software that he foisted on the Pentagon and
CIA was anything other than America's salvation."

112.    As Libel *Per Se*, Defendants published that Plaintiff's work "now appears to have

been an elaborate hoax."

113.    As Libel *Per Se*, Defendants published that "die-hard supporters in the

government who steadfastly refused to believe the evidence suggesting that Plaintiff

Montgomery was a fake."

114.    As Libel *Per Se*, Defendants published "that he foisted on the Pentagon and CIA"

super-secret computer software.

115.    As Libel *Per Se*, Defendants published with reckless disregard for the lives of

thousands of airplane passengers on approximately ten civilian aircraft, that Plaintiff

Montgomery nearly caused Government policy to shoot down those airplanes causing certain

death, despite being a private citizen, rather than looking to Government officials as responsible

for the decisions.

116.    ***Fourth*, on Page 34 of the Book, the Defendants published:**

> "Montgomery was an overweight, middle-aged, incorrigible gambler,
> a man who liked to play long odds because he was convinced that he
> could out-think the house. He once boasted to a business partner that
> he had a system for counting an eight-deck blackjack shoe, quite a
> difficult feat for even the best card sharks, and he regularly tested his
> theories at the El Dorado and the Peppermill Casino in Reno. He
> usually came up short but that didn't stop him from playing blackjack
> on a nightly basis, racking up unwieldy debts that eventually led to his
> 2010 arrest for bouncing more than $1 million in bad checks at
> Caesar's Palace in Las Vegas."

117.    As Libel *Per Se*, Defendants published about the Plaintiff that he was an

"incorrigible gambler," meaning in effect that Plaintiff Montgomery was a gambling addict who

was "playing blackjack on a nightly basis." Historically, gambling, and in particular an

uncontrollable gambling addiction, is a loathsome social status.

118. As Libel *Per Se*, Defendants published about the Plaintiff that he bounced more

than $1 million in bad checks.

119. **Fifth, on Page 36 of the Book, the Defendants published:**

> "Michael Flynn, Montgomery's former lawyer— who later
> concluded that Montgomery was a fraud."

120. As Libel *Per Se*, Defendants published about the Plaintiff that the Plaintiff's

lawyer "concluded that Montgomery was a fraud."

121. **Sixth, on Page 37 of the Book, the Defendants published:**

> "By the spring and summer of 2003, eTreppid was awarded contracts
> by both the air force and U.S. Special Operations Command.
> Montgomery was able to win over the government in part by offering
> field tests of his technology — tests that former employees say were
> fixed to impress visiting officials. Warren Trepp later told the FBI
> that he eventually learned that Montgomery had no real computer
> software programming skills, according to court documents that
> include his statements to the FBI. Trepp also described to federal
> investigators how eTreppid employees had confided to him that
> Montgomery had asked them to help him falsify tests of his object
> recognition software when Pentagon officials came to visit. Trepp
> said that on one occasion, Montgomery told two eTreppid employees
> to go into an empty office and push a button on a computer when they
> heard a beep on a cell phone. Meanwhile, Montgomery carried a toy
> bazooka into a field outside eTreppid. He was demonstrating to a
> group of visiting U.S. military officials that his technology could
> recognize the bazooka from a great distance."

122. As Libel *Per Se*, Defendants published about the Plaintiff that he committed fraud

including defrauding the Government, prohibited under the False Claims Act codified at 31

U.S.C. §§ 3729 – 3733.

123. **Seventh, on Page 37 of the Book, the Defendants published:**

"After he was in place in the field, he used a hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of a bazooka on another screen prominently displayed in front of the military officers standing in another room, according to court documents. The military officers were convinced that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands. (Montgomery insists that the eTreppid employees lied when they claimed that he had asked them to fix the tests, and also says that the air force issued a report showing that it had verified the tests.)"

124. As Libel *Per Se*, Defendants published about the Plaintiff that he committed fraud including defrauding the Government, prohibited under the False Claims Act codified at 31 U.S.C. §§ 3729 – 3733.

125. **Eighth,** on Page 40 of the Book, the Defendants published:

"Montgomery brilliantly played on the CIA's technical insecurities as well as the agency's woeful lack of understanding about al Qaeda and Islamic terrorism. He was able to convince the CIA that he had developed a secret new technology that enabled him to decipher al Qaeda codes embedded in the network banner displayed on the broadcasts of Al Jazeera, the Qatar-based news network. Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks. And only he had the technology to decode those messages, thus saving America from another devastating attack. The CIA— more credulous than Hollywood or Las Vegas— fell for Montgomery's claims. In short, he convinced CIA officials that he could detect terrorist threats by watching television."

126. As Libel *Per Se*, Defendants published about the Plaintiff that "Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks."

127. As Libel *Per Se*, Defendants published about the Plaintiff that he defrauded the CIA.

128. **Ninth,** on Page 42 of the Book, the Defendants published:

"A CIA official defensively pointed out that the agency did not actually have a contract with eTreppid at the time Montgomery was providing data from the Al Jazeera videotapes. While they were working closely together during the final months of 2003, the CIA had not yet started paying Montgomery, the official said. The agency never finalized a contract with him because agency staff eventually realized they had been conned, according to this official. But that does not diminish the fact that for a few crucial months, the CIA took Montgomery and his technology very seriously."

129. As Libel *Per Se*, Defendants published about the Plaintiff that "agency staff eventually realized they had been conned, according to this official."

130. *Tenth,* **on Page 46 of the Book, the Defendants published:**

"It did not take long for the French firm to conclude that the whole thing was a hoax. The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers. The firm reported back to the French government that the supposed intelligence was a fabrication."

131. As Libel *Per Se*, Defendants published about the Plaintiff that "the whole thing" (Plaintiff Montgomery's work) "was a hoax" and a "fabrication."

132. *Eleventh,* **on Page 46 of the Book, the Defendants published:**

"The CIA never investigated the apparent hoax nor examined how it had been handled inside the agency. No one involved in promoting Montgomery, in vouching for his information to the president, or in proposing to shoot down planes based on his claims ever faced any consequences."

133. As Libel *Per Se*, Defendants published about the Plaintiff that his work was a hoax.

134. *Twelfth,* **on Page 47 of the Book, the Defendants published:**

"At the time of the Christmas 2003 scare, John Brennan was head of the newly created Terrorist Threat Integration Center and in charge of distributing terrorism-related intelligence throughout the government. That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration. But Brennan was never

28

admonished for his role in the affair. After Barack Obama became
president, Brennan was named to be his top counterterrorism advisor
in the White House. He later became CIA director."

135.    As Libel *Per Se*, Defendants published about the Plaintiff that "That meant that

Brennan's office was responsible for circulating Plaintiff Montgomery's fabricated intelligence

to officials in the highest reaches of the Bush administration."

136.    As Libel *Per Se*, Defendants published about the Plaintiff that "Brennan was

never admonished for his role in the affair," to suggest that Brennan should have been

admonished for his involvement with Plaintiff Montgomery's work with the Government.

137.    ***Thirteenth,*** **on Page 50 of the Book, the Defendants published:**

"Edra Blixseth was Dennis Montgomery's latest mark. After being
introduced to him by a former Microsoft executive and then hearing
Montgomery explain his software, she agreed in 2006 to bankroll
Montgomery to launch a new company, to be called Blxware.
Montgomery needed new government contracts for Blxware, and
Edra Blixseth had the money and contacts to try to make it happen."

138.    As Libel *Per Se*, Defendants published about the Plaintiff that "Edra Blixseth was

Dennis Montgomery's latest mark," clearly publishing that Plaintiff Montgomery is a con man.

139.    ***Fourteenth,*** on November 6, 2014, Defendant Risen appeared as an interview

guest on "The Daily Show with Jon Stewart," by Comedy Central, and was interviewed by Jon

Stewart. The television interview was taped at The Daily Show's studio 11th Avenue between

51st and 52nd Street, New York (Manhattan), New York, and broadcast for the first time in this

district, Florida in general, nationwide across the United States, internationally, and through

cable television, satellite television, and on YouTube and other Internet sites, on "The Comedy

Central" channel.

140. On November 13, 2014, Plaintiff Montgomery's undersigned counsel sent a letter to Mr. Stewart requesting that he allow Mr. Montgomery to appear on his show to correct the false and misleading publications of Defendants. Mr. Stewart declined to extend this courtesy.

141. Defendant Risen stated in said television interview for his statements to be broadcast on television and widely broadcast elsewhere that his favorite story is the story of –

> Dennis Montgomery who is this guy was as a computer software expert, supposed expert. Who convinced the CIA in 2003 that he had the super-secret technology to read Al Jazeera news broadcasts and decipher Al Qaeda codes inside the [interrupted by Jon Stewart]
>
> [Jon Stewart] An Enigma machine for Al Qaeda...?
>
> [Defendant Risen] Right. And he convinced the CIA in 2003 that he could read numbers and letters hidden in the Al Jazeera broadcasts that corresponded with flights that Al Qaeda was going to shoot down, knock--- or blow up….
>
> President Bush was so convinced of this that they grounded flights all over the world at Christmas 2003 based on this guy's intelligence or supposed intelligence. It took the French intelligence service, which had gotten very mad because they grounded flights from Paris to Los Angeles. And they demanded that the CIA tell them where they were getting this information. And so they finally [non-verbal interruption]. They finally got the information. The French told them this is a hoax. This is a fabrication.
>
> And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it. And Montgomery kept getting more contracts after that.
>
> [Other, extended discussion with Jon Stewart on other topics]
>
> There is lots of raw intelligence every day that says there is an attack about to happen. You really have to be a pretty sophisticated consumer of intelligence after several years to begin to realize what's real and what's not really a credible threat.

142. As Libel *Per Se*, Defendant Risen published about the Plaintiff that "he convinced the CIA in 2003 that he could read numbers and letters hidden in the Al Jazeera broadcasts that

corresponded with flights that Al Qaeda was going to shoot down, knock -- or blow up [something] …."

143. As Libel *Per Se*, Defendant Risen published about the Plaintiff that "The French told them this is a hoax. This is a fabrication. And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it. And Montgomery kept getting more contracts after that." The statement that "the CIA agreed with them" is Risen's assertion about Plaintiff Montgomery's work that "this is a hoax. This is a fabrication."

144. As Libel *Per Se*, Defendant Risen published about the Plaintiff that "they covered the whole thing up, and refused to ever talk about it," as a way of saying that the CIA had been conned because the CIA was not openly discussing in public national security activities.

145. **Fifteenth,** on October 13, 2014, Defendant James Risen gave a television interview[14] with Judy Woodruff which was broadcast nationwide by the Public Broadcasting System (PBS). In that interview, Defendant James Risen made the following statements for broadcast on television, and Judy Woodruff repeated many points from James Risen's Book which Risen agreed with and endorsed. Much of the interview involved other chapters not relevant here.

> JUDY WOODRUFF: In the next chapter, JAMES RISEN, you write about millions of dollars spent on programs that were completely fraudulent. One was run by a man named Dennis Montgomery. He was a, He was a .... I guess he had worked in computer software... but he was a GAMBLER![15]

> JAMES RISEN: Right.

> JUDY WOODRUFF: And he sold the CIA and the Pentagon on technology that turned out to be not at all what he said it was.

---

[14]    http://www.pbs.org/newshour/bb/costs-security-price-high/
[15]    Emphasis, by exclamation in tone of voice, the in original conversation.

JAMES RISEN:   It is difficult to tell in some of these cases who is scamming who.  If you talk to Montgomery, he argues that the CIA wanted him to do what he was doing.  And so its a fascinating dynamic that's developed in the war on terror, between people who recognize the opportunities for this gold rush and the agencies which are... who have so much money to spend now, they're getting so much more money than they ever had before, that in some cases they don't know what to do with.

In this case, they began to believe, in this sort of war fever, that you could find Al Qaeda messages hidden in Al Jazeera broadcasts.  And so that.. that program, that highly secret program, was used to ground planes all over Europe and the United States

JUDY WOODRUFF:  When actually there was nothing to it.

JAMES RISEN:   Right

JUDY WOODRUFF:  It was a hoax.

JAMES RISEN:   Right.  Right.

JUDY WOODRUFF:  And then there was another part of it where he was saying he had special facial recognition software....

JAMES RISEN:   Right.  Right

JUDY WOODRUFF: ... used on drones?

JAMES RISEN:   Yeah.  There were cases in which people said that he was fooling the military and the CIA about his operations and how... what kind of techniques and technologies he had.  He would argue that the CIA actually wanted him and or the army believed him and tested it.  So it's this very complicated story about a man recognizing an opportunity who had never been involved in national security before and the CIA and the military all just hungry for whoever could come with the latest idea.

146.    As Libel *Per Se*, Defendant Risen published about the Plaintiff that "you write about millions of dollars spent on programs that were completely fraudulent.  One was run by a man named Dennis Montgomery," which Defendant Risen confirms by saying, "Right." (Where

the discussion is about "the next chapter," that chapter is exclusively about Plaintiff Montgomery alone.).

147.    As Libel *Per Se*, Defendant Risen published about the Plaintiff that "When actually there was nothing to it," which Risen confirms by saying "Right." And also "It was a hoax," which Risen confirms by saying "Right.  Right."

148.    As Libel *Per Se*, Defendant Risen published about the Plaintiff that "There were cases in which people said that he was fooling the military and the CIA about his operations and how . . . what kind of techniques and technologies he had."

149.    **Sixteenth,** on October 24, 2014, Defendant Risen gave an audio interview with Lucy Worsley published on The New York Times website, titled **"Inside The New York Times Book Review: James Risen's 'Pay Any Price'"** which is accessible at that website address. [16] In this interview  "**Inside The New York Times Book Review**," with Pamela Paul, October 24, 2014, Defendant Risen stated for national broadcast:

> PAMELA PAUL:   How do we count and account for the costs of the government's war on terror.  We'll talk to  James Risen, author of Pay Any Price:  Greed, Power, and Endless War.
>
> JAMES RISEN ("tease" audio clip):   It seems to me that what the war on terror had become in thirteen years was a search for cash and a search for power and status.
>
> PAMELA PAUL:   What is the British fascination with murder?  Lucy Worsley will explain all joining us to talk with us about her new book:  The Art of the English Murder.
>
> LUCY WORSLEY ("tease" audio clip):  The public used to consume murder in a way that you can still see the modern media doing it today.  Just look at the Pistorius trial.

---

[16]    *See* ArtsBeat: Book Review Podcast: James Risen's 'Pay Any Price', by John Williams, New York Times, October 24, 2014,  http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/ , based upon Louise Richardson's book review of Risen's book.

PAMELA PAUL: Alexander Alter will be here with Notes from the Publishing world. And Greg Cole has bestseller news. This is "Inside the New York Times Book Review." I am Pamela Paul.

James Risen joins me now. His new book is Pay Any Price: Greed, Power, and Endless War. Hi James.

JAMES RISEN: Hi, thanks for having me.

PAMELA PAUL: Thanks for being here. Now this is a book that covers a lot of territory. Tell us briefly about what it is you set out to write about in the book.

JAMES RISEN: What I wanted to do was, I'd written one book before about the war on terror, and I wanted to follow up with a new book that kind of looked at where we were 13 years after 9/11 and how we had what started out in the immediate aftermath of 9/11 as kind of a search for justice or a search for retribution or whatever you want to think, say we were doing right after 9/11 as a country. It seemed to me that what the war had become in 13 years was a search for cash and a search for power and status and that it was becoming an endless war in which we had a new mercenary class of people who were taking advantage of the war on terror. And that enormous unintended consequences had happened. And I began to hear about just some really crazy things that were going on. And so I thought it would make a good story.

[The discussion then covers the Chapter "Rosetta" not relevant here, concerning a lawsuit for 9/11 families against Saudi Arabia, except the ending]

JAMES RISEN [winds up the Chapter on "Rosetta" by saying]: .... in the war on terror became so complicated and so difficult to tell what was really going on, to me it was like a case study in how the war on terror had been turned for other uses, and become a.... something that you could never tell what was the truth and what was not the truth. And that to me was at the heart of the problems with the war on terror, that you could never tell what's real and what was concoction today.

[The discussion then covers how Risen went about researching the book, not relevant here]

PAMELA PAUL: Did a lot of it arise out of stories that, reporting that you'd originally done for the Times?

JAMES RISEN: Some of it. For instance, I did a chapter The Emperor of the War on Terror, about Dennis Montgomery who [laughs] who's a strange character, who I'd done a story about him for the New York Times along with Eric Lichtbau my colleague there at the Times. He's one of the most fascinating characters in the war on terror. He... He was a computer software expert who convinced the CIA that he could decipher secret codes from Al Qaeda in the Al Jazeera news broadcasts. And that he could tell the CIA numbers and letters that corresponded with flights that Al Qaeda wanted to attack. And the CIA took this so seriously that they grounded, that the Bush Administration grounded a bunch of international flights in Christmas 2003 based on what this guy was telling them. And when they realized it was a hoax, they covered the whole thing up and never did anything about it. So I had done a story for the Times with.... about that and then expanded on that and got a lot more information for the book.

PAMELA PAUL: How did you find out about him?

JAMES RISEN: Well he had been written about a little bit before we wrote about it. But I had also, even before he was written about by other people, I had heard from people in the CIA that there was this crazy operation that nobody wanted to talk about, that they were all embarrassed by. To me that, it was like a case study in just how crazy the war on terror has become. And the only thing that makes sense about why it's gotten so crazy, is I think we kind of have deregulated national security and we took all, you know, Cheney said we're going to take the gloves off. And that means we deregulated national security at the same time we poured hundreds of billions of dollars into counter-terrorism. And so it's had enormous unintended consequences from what is essentially a national security crisis that is kind of like the banking crisis.

[The interview discussion then turns to the alleged deregulation of national security on other topics not relevant here.]

150. As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that "And when they [the CIA] realized it was a hoax, they covered the whole thing up and never did anything about it."

151. **Seventeenth,** Defendant Risen sat for a nationwide television news interview on the television show **DEMOCRACY NOW!** A Daily Independent Global News Hour, with Amy

Goodman & Juan González, at 207 W. 25th Street, Floor 11, New York, NY 10001 on October

14, 2014.  On this nationwide television news broadcast, the conversation turned to:

> AMY GOODMAN**:** Dennis Montgomery?

> JAMES RISEN**:** Dennis Montgomery is a fascinating character, who—he was a computer software person, self-styled expert, who developed what he said was special technology that would allow him to do things with computers that other people couldn't do. One of the things that he developed was this imaging technology that he said he could find images on broadcast network news tapes from Al Jazeera. He said that he could read special secret al-Qaeda codes in the banners on the broadcasts of Al Jazeera. And the CIA believed this. And he was giving them information based on watching hours and hours of Al Jazeera tapes, saying that "I know where the next al-Qaeda attack is going to be based—is going to happen." And the Bush administration and the CIA fell for this.

> AMY GOODMAN**:** And it was in the news zipper at the bottom of the Al Jazeera broadcasts?

> JAMES RISEN: Well, he says it was in the banner. But anyway. And so, it was this great—if you talk to him, he argues, well, they—that's what they were looking for. You know, they convinced him to look for this. You know, it depends on who you talk to. But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts.

> And then there's a whole number of other things, like Alarbus, which was this covert program at the Pentagon where a Palestinian involved in that was actually trying to use the bank account set up by the secret program, Pentagon program, to launder hundreds of millions of dollars. And the FBI investigated this, but then tried to keep the whole thing quiet.

> AMY GOODMAN: How much did the Government give to Dennis Montgomery?

> JAMES RISEN: Millions of dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that. So, it's a strange—to me, the Dennis Montgomery story is one of the strangest, because what it shows is, early on in the war on terror, as I said, the CIA and all these other agencies had so

much money to spend on counterterrorism that they were willing to throw it at everything. They were so afraid of the next terrorist attack that they were willing to believe anybody who came up with some idea. And I called that chapter about Montgomery, you know, "The Emperor of the War on Terror," because nobody wanted to say that the emperor had no clothes.

AMY GOODMAN: I mean, it had very real effects, aside from spending all that money.

JAMES RISEN: Yeah.

AMY GOODMAN: For example, planes being sent back.

JAMES RISEN: Yes, yes. There were planes grounded. International flights between the United States and Europe and Mexico were grounded. There was talk at the White House even of shooting down planes based on this information.

AMY GOODMAN: Because they could be used, as with September 11th, as weapons?

JAMES RISEN: Yeah, as missiles or whatever. And so, it was crazy. It was absolutely insane.

AMY GOODMAN: And it was only the French government who then did a study?

JAMES RISEN: Yes, yes. Yeah, the French government finally—you know, the U.S.—the CIA and the Bush administration didn't want to tell anybody what was really happening, where they were getting this information. You know, "This supersecret information about Al Jazeera, we can't tell you." And finally, the French intelligence service and the French government said, "You know, you're grounding our planes. You've got to tell us where you're getting this information." And they got—they finally shared the information with them, and the French got a French tech firm to look at this, and they said, "This is nuts. This is fabrication." And after a while, the CIA was finally convinced maybe the French were right, and they stopped talking about it. They didn't do anything else. They just like shut it down eventually, but never wanted to talk about what had really happened.

AMY GOODMAN: Then Dennis Montgomery, revealed as a con man—

JAMES RISEN: Yeah, yeah.

AMY GOODMAN: —in jail for that?

JAMES RISEN: Well, no, he's not in jail. But it was a—he actually got more contracts after that, with the Pentagon and other agencies. And he continued to operate for a long time. You know, he kind of went from one agency to the other.

AMY GOODMAN: We're talking to James Risen, Pulitzer Prize-winning investigative journalist for *The New York Times*. His new book, just out today, *Pay Any Price: Greed, Power, and Endless War*. When we come back, war corrupts, endless war corrupts absolutely. Stay with us.

[break]

152.     As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that "But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts."

153.     As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff when asked "How much did the Government give to Dennis Montgomery?" Risen answered in reply: "Millions of dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that."

154.     As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that "the French got a French tech firm to look at this, and they said, 'This is nuts. This is fabrication.'"

155.     As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff when asked "Then Dennis Montgomery, revealed as a con man—" Risen confirmed in reply: "Yeah, yeah."

156.     As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other

Defendants, published about the Plaintiff that he should be in jail, publishing that Plaintiff

Montgomery committed a crime.

157.     **Eighteenth**, Defendant James Risen gave an interview with "**Conversations with**

**Great Minds**" of "The Big Picture RT with talk show host Thom Hartmann on October 24,

2014.[17]

> THOM HARTMAN:   ...  [Abrupt change of topic starting at about
> time 5:27]  ...  There's just this enormous amount of government
> money.  Let's throw it at the private sector.  They'll make things well.
> One of the members of the private sector who came forward and said
> I've got a secret, I can figure this stuff out, was a guy by the name of
> Dennis Montgomery.
>
> JAMES RISEN:   Right.  Uh, Dennis Montgomery is one of the best
> stories in the war on terror.  I think somebody should make a movie
> about him.  Dennis Montgomery was a computer software expert who
> said that he had developed technology that basically could find objects
> hidden in the video on television.  And so he convinced, through a
> whole series of contacts and meetings that I detail in the book, he was
> able to get to the CIA  and convince the CIA that he had the technology
> to decipher Al Qaeda codes that were he said were hidden in Al Jazeera
> news broadcasts.
>
> THOM HARTMAN:   They were hidden in the Chiron or the --
>
> JAMES RISEN:   In the banner.  In the banner, actually.  He said that
> he could find numbers and letters that were constantly showing up, or
> not showing up but were being hidden, embedded deeply in the video.
> And he would then give these  numbers and letters to the CIA.  And the
> CIA, either he told them or they convinced themselves that these
> numbers and letters corresponded to flights, international airline flights,
> that Al Qaeda was going to attack.  And so in December, in Christmas
> 2003, the Bush Administration and the CIA took this so seriously that
> they actually grounded a whole series of international flights coming
> into and out of the United States, and the White House even considered
> shooting down some of these flights over the Atlantic.
>
> THOM HARTMAN:   Whoa.

---

[17]     https://www.youtube.com/watch?v=jc_8f4Pp9Zc

JAMES RISEN:   And once the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist and that these supposed Al Qaeda codes weren't really in the Al Jazeera newscasts, the CIA covered the whole thing up and never went public with it and just tried to act like it never happened.

THOM HARTMAN:   Well we know how aggressively this and particularly the Obama Administration right now has gone after whistleblowers and reporters.  You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison.

JAMES RISEN:   Well, no, he ended up getting more contracts from the military... and the Pentagon.  And he was continuing, he continued to operate for several years.  It's really a remarkable story.

THOM HARTMAN:   Yeah, it really and truly is.

[Topic changes abruptly to discussions of torture in the war on terror]

158.    As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that "the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist."

159.    As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that he belongs in prison, responding to the question "You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison," by Risen answering in reply:  "Well, no, he ended up getting more contracts from the military... and the Pentagon.  And he was continuing, he continued to operate for several years.  It's really a remarkable story."

40

## SECOND CAUSE OF ACTION
### *Common Law General Defamation*

160.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

161.    The Defendants – all of the Defendants – together and each of them acting in concert, jointly and severally, and individually, have defamed Plaintiff by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff which they knew or should have known to be false or misleading.

162.    Defendants' defamation of Plaintiff Montgomery was made with actual malice. Defendants had knowledge of the falsity of the defamatory statements, or made the defamatory statements with reckless disregard to the truth. *See* Plaintiff's Affidavit, Exhibit C, incorporated herein by reference.

163.    To establish General Defamation, a plaintiff need only show: (1) publication; (2) falsity; (3) that the defendant acted with knowledge or reckless disregard as to the falsity on a matter concerning a public figure; (4) actual damages; and (5) the statement must be defamatory.

164.    Pleading in the alternative to the First Cause of Action, Plaintiff re-alleges each of the statements alleged under the First Cause of Action, *supra*, as Defamation *Per Se*, and here alleges that each of those statements are also General Defamation under Florida law.

165.    Plaintiff Montgomery thus claims here that if the Court finds that any of the statements labeled "First" through "Eighteenth" under the First Cause of Action above do not constitute as Defamation *Per Se*, than in the alternative the Plaintiff claims here that any and all such statements not qualifying as Defamation *Per Se* constitute General Defamation against the Plaintiff.

166.     Plaintiff therefore re-alleges and incorporates by reference as if set forth fully herein each and all of the statements labeled "First" through "Eighteenth" above.

167.     In addition, Defendants also made other defamatory statements that are also General Defamation.

168.     ***Nineteenth,*** **on Page 49 of the Book, the Defendants published:**

> "Trepp was furious. According to court documents, he told the FBI that Montgomery had stolen the software eTreppid had used on secret Pentagon contracts. As federal investigators moved in to investigate the alleged theft of the technology, they heard from Trepp and others that Montgomery's alleged technology wasn't real."

169.     As General Defamation, Defendants published about the Plaintiff that Montgomery had stolen valuable software – yet Defendants also assert that the software "wasn't real."  That is, Defendants simultaneously accuse Plaintiff Montgomery of profiting from defrauding the Government with Plaintiff Montgomery's software, yet allege that the software actually belonged to Warren Trepp and never belonged to Plaintiff Montgomery (that Montgomery later stole it), but also allege that the software was worthless, yet the FBI energetically investigated the alleged theft of software that was worth nothing.  The Defendants randomly construct every possible way to defame the Plaintiff, no matter how inconsistent, including with the FBI investigating the theft of a worthless item.

### THIRD CAUSE OF ACTION
*Common Law Defamation By Implication*

170.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

171.     The Defendants – all of the Defendants – together and each of them individually, have defamed Plaintiff by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff which they knew or should have known to be false or misleading.

172.     Defendants' defamation of Plaintiff Montgomery was made with actual malice. Defendants had knowledge of the falsity of the defamatory statements, or made the defamatory statements with reckless disregard to the truth. *See* Plaintiff's Affidavit, Exhibit C, incorporated herein by reference.

173.     For Defamation by Implication: " . . . [L]iterally true statements can be defamatory where they create a false impression. This variation is known as Defamation by Implication and has a longstanding history in defamation law." *See Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008). Defamation by Implication occurs when a publication states facts that are literally true, but produces a defamatory meaning apparent from a plain reading of the publication in its entirety. *See Chapin v. Knight-Ridder, Inc.* 993 F.3d 1087 (4th Cir. 1993).

174.     Pleading in the alternative, Plaintiff re-alleges that each of the statements alleged under the First and Second Causes of Action, *supra*, are in the alternative also Defamation by Implication under Florida law.

175.     Plaintiff thus alleges here that if the Court finds that any of the statements labeled "First" through "Nineteenth" above do not constitute Defamation *Per Se* or General Defamation, then in the alternative the Plaintiff re-alleges here that any and all such statements not constituting as Defamation *Per Se* or General Defamation are Defamation by Implication against the Plaintiff.

176.     Plaintiff therefore re-alleges and incorporates by reference as if set forth fully herein each and all of the statements labeled "First" through "Nineteenth" above.

177.     Across the many examples of libelous statements from the Book or slanderous interviews, Defendants published that the Plaintiff deceived the Government as to the meaning,

purpose, or interpretation of hidden data and clues that Plaintiff Montgomery uncovered, publishing that Plaintiff Montgomery defrauded and conned the Government.

178.    Thus, Defendants libel and slander Plaintiff Montgomery by implication that he defrauded and scammed the Government concerning the meaning of the information Plaintiff Montgomery uncovered, publishing that Plaintiff Montgomery obtained millions of dollars by frightening and fooling child-like and gullible CIA officials.

179.    Across the many examples of defamatory statements from the Book or slanderous interviews, Defendants published that President George W. Bush's alleged decisions to ground and almost shoot down passenger aircraft around Christmas 2003 (which Defendants would have no way of knowing about) were a result of Plaintiff Montgomery's fraud and scams, deceptively manipulating the President of the United States and the U.S. national command authority.

180.    Across the many examples of defamatory statements from the Book or interviews, Defendants published that Plaintiff Montgomery should be indicted and convicted of crimes and sentenced to prison for his actions.

181.    Among the other statements, in particular, the *Second* example of libel**, on Page 32 of the Book,** states that:

> "Consider the example of Dennis Montgomery.  He provides a perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist was able to create a rogue intelligence operation with little or no adult supervision. Crazy became the new normal in the war on terror, and the original objectives of the war got lost in the process."

182.    Thus, as Defamation by Implication, Defendants published that Plaintiff Montgomery committed fraud and went to any lengths motivated by greed, to obtain money at any cost.

183.    Among the other statements, in particular, in the ***Eleventh*** example of defamation**,
on Page 46 of the Book,** states that:

> "The CIA never investigated the apparent hoax nor examined how
> it had been handled inside the agency."

184.    Here, as Defamation by Implication, even if it is true (which it is not) that "The
CIA never investigated" what Defendants describe as an "apparent hoax," the implication is that
Plaintiff Montgomery perpetrated a hoax upon the CIA, and in return for money, which would be
both a fraud and a crime.

185.    Similarly, in the ***Sixteenth*** example of slander from an interview, Defendant
Risen publishes that:

> "It seemed to me that what the war had become in 13 years was a
> search for cash and a search for power and status and that it was
> becoming an endless war in which we had a new mercenary class of
> people who were taking advantage of the war on terror,"

publishing that Plaintiff Montgomery's work is fraudulent in being merely an effort to get cash.

186.    Among the other statements, in particular, the ***Nineteenth*** example of defamation**,
on Page 49 of the Book,** states that:

> "Trepp was furious. According to court documents, he told the FBI
> that Montgomery had stolen the software eTreppid had used on secret
> Pentagon contracts. As federal investigators moved in to investigate
> the alleged theft of the technology, they heard from Trepp and others
> that Montgomery's alleged technology wasn't real."

187.    As Defamation by Implication, Defendants published that the Plaintiff stole
valuable software yet at the same time the software that the Plaintiff used to provide services to
the Government was in fact worthless.

188.    In addition, Defendants also made and published other defamatory statements that
are also Defamation by Implication under Florida law.

45

189. **Twentieth,** on the Preface Page of the Book, the Defendants publish:

"I've come back," he repeated. "I was the King of Kafiristan – me and Dravot – crowned Kings we was! In this office we settled it – you setting there and giving us the books. I am Peachey – Peachey Taliaferro Carnehan – and you've been setting here ever since – Oh, Lord!"

I was more than a little astonished and expressed my feelings accordingly.

"It's true," said Carnehan, with a dry cackle, nursing his fee, which were wrapped in rags. "True as gospel. Kings we were, with crowns upon our head – me and Dravot – poor Dan – oh, poor, poor Dan, that would never take advice, not though I begged of him!"

-- Rudyard Kipling, *The Man Who Would be King.*

190. As Defamation by Implication, Defendants published that Plaintiff Montgomery (along with others addressed in the Book) is a fraud and/or con man as in *The Man Who Would be King.*

191. **Twenty-first,** in the Prologue on Page xiv of the Book, the Defendants publish:

"The new homeland security-industrial complex operates differently. It is largely made up of a web of intelligence agencies and their contractors, companies that mostly provide secret services rather than large weapons systems and equipment. These contractors are hired to help Washington determine the scale and scope of the terrorist threat; they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end."

192. As Defamation by Implication, Defendants state "they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end," suggesting that Plaintiff Montgomery's profits were _contingent_ upon results, such that Plaintiff Montgomery would make greater profits by providing false results at that.

193. **Twenty-second,** in the Prologue on Page xv of the Book, the Defendants published:

46

"Thus, the creation of a homeland security complex at a time of endless war has bequeathed us with the central narrative of the war on terror – modern tales of greed joined hand in hand with stories of abuse of power.  It was inevitable that those wise in the ways of the world would flock to Washington to try to cash in on the war on terror gold rush – and they have.  This book offers just a few of those stories. But those trying to monetize America's obsession with terrorism are not the only ones who have sought to exploit 9/11."

"Opportunism comes in many forms and is driven by more than just greed.  Ambition and a hunger for power, status, and glory have become great engines of post-9/11 opportunism as well.  The more troubling stories here concern abuses of power that have extended across two presidencies for well over a decade.  After 9/11, the United States deregulated national security, stripping away the post-Watergate intelligence reforms of the 1970's that had constrained executive power for thirty years.  The results are morally challenging – and continue to this day."

194.     Thus, as Defamation by Implication, Defendants published that Plaintiff Montgomery committed fraud and went to any lengths motivated by greed, to obtain money at any cost.

195.     **Twenty-third,** **in the Prologue on Page xvii of the Book, the Defendants published:**

"Washington's global war on terror is now in its second decade, thanks to the bipartisan veneer it has gained under Bush and Obama. It shows no signs of slowing down, hustlers and freebooters continue to take full advantage, and the war's unintended consequences continue to pile up.  All too often, things are not what they seem."

196.     As Defamation by Implication, Defendants published that Plaintiff Montgomery – one of the key objects of the Book – is a "hustler" and a "freebooter."

197.     **Twenty-fourth,** **Part 1 of the Book,** including but not limited to Chapter 2 which is focused entirely on Plaintiff Montgomery, the Defendants have labeled "Part 1: Greed."

198.     Thus, by placing the chapter focused on Plaintiff Montgomery under a label for the section of the Book of "Greed," Defendants defame the Plaintiff by implication as being

motivated by greed to commit fraud and carry out the alleged hoaxes identified in the rest of the Chapter 2.

199.    ***Twenty-fifth,*** the Defendants have labeled Chapter 2 of the Book which is focused entirely on Plaintiff Montgomery:  "Chapter 2: The Emperor of the War on Terror."

200.    By naming the chapter focused on Plaintiff Montgomery "The Emperor of the War on Terror," Defendants defame the Plaintiff by implication as being the mastermind of the fraud that Risen seeks to portray the war on terror to be.

201.    ***Twenty-Sixth,*** **on Page 40 of the Book, the Defendants published:**

> "The CIA's Science and Technology Directorate, which had largely been stuck on the sidelines of the war on terror, saw in Dennis Montgomery an opportunity to get in the game.  The directorate had played an important role in the Cold War, but in the first few years of the war on terror, it was struggling to determine how technology could be leveraged against groups of terrorists who were trying to stay off the grid."

202.    As Defamation by Implication, again, Defendant Risen falsely and misleadingly published statements which blamed Plaintiff Montgomery for the decisions of government officials and published that Plaintiff Montgomery defrauded the Government.

203.    ***Twenty-Seventh,*** **on Page 42 of the Book, the Defendants published:**

> "Montgomery was telling the CIA exactly what it wanted to hear.  At the time, the Bush Administration was obsessed with Al Jazeera, not only because of the networks' unrelenting criticism of the invasion of Iraq, but also because it had become Osama Bin Laden's favorite outlet for broadcasting his videotaped messages to the world."

204.    As Defamation by Implication, Defendants published that Plaintiff Montgomery defrauded and conned the CIA by "telling the CIA exactly what it wanted to hear."

205.    ***Twenty-Eighth,*** **on Page 42 of the Book, the Defendants published:**

> "What remains unclear is how Montgomery was able to convince all of them that he had developed secret software that could decode Al

48

Qaeda's invisible messages. While he had gotten by a few credulous military officers who came to view his demonstrations, he apparently found it just as easy to persuade the CIA as well."

206.     As Defamation by Implication, Defendants published that Plaintiff Montgomery conned the Government with a hoax. That is, it would be clear "how Montgomery was able to convince all of them" if Plaintiff Montgomery's work and technology are legitimate.

207.     ***Twenty-Ninth,*** **on Page 46 of the Book, the Defendants published:**

> "Finally the French brought an end to it. Since Air France flights to the United States were among those that had been grounded, French officials had taken a dim view of the entire episode. They began demanding answers from the Americans. The French applied so much pressure on Washington that the CIA was finally forced to reveal to French intelligence the source of the threat information. Once they heard the story of Dennis Montgomery and eTreppid, French officials arranged for a French high-tech firm to reverse-engineer Montgomery's purported technology. The French wanted to see for themselves whether the claims of hidden messages in Al Jazeera broadcasts made any sense."

208.     As Defamation by Implication, if not explicit, the passage published that Plaintiff Montgomery is a fraud and that his work is a scam and a hoax.

209.     ***Thirtieth,*** **on Page 52 of the Book, the Defendants publish:**

> "Montgomery continued to get defense contracts even during the Obama administration. In 2009, Montgomery was awarded another air force contract, and later claimed that he had provided the government with warning of a threatened Somali terrorist attack against President Obama's inauguration. Joseph Liberatore, an air force official who described himself as one of "the believers" in Montgomery and said he had heard from 'various federal agencies thanking us' for the support Montgomery and his company provided during Obama's inauguration. The threat, however, later proved to be a hoax."

210.     As Defamation by Implication, Defendants published that Plaintiff Montgomery's ability to continue to receive contracts is due to Plaintiff Montgomery's ability to defraud the

Government (and stupidity of government officials) rather than an endorsement of the legitimacy of Plaintiff Montgomery's work.

211.     ***Thirty-First,*** **on Page 31 of the Book, the Defendants published:**

> "and a new breed of entrepreneur learned that one of the surest and easiest paths to riches could be found not in Silicon Valley building computers or New York designing clothes but rather in Tysons Corner, Virginia, coming up with new ways to predict, analyze, and prevent terrorist attacks— or, short of that, at least in convincing a few government bureaucrats that you had some magic formula for doing so."

212.     As Defamation by Implication, Defendants published that the Plaintiff engaged in fraud to convince a few government bureaucrats that he had a magic formula as an easy path to riches.

213.     ***Thirty-Second,*** **on Page 33 of the Book, the Defendants published:**

> "Montgomery's story demonstrates how hundreds of billions of dollars poured into the war on terror went to waste. With all rules discarded and no one watching the bottom line, government officials simply threw money at contractors who claimed to offer an edge against the new enemies. And the officials almost never checked back to make sure that what they were buying from contractors actually did any good— or that the contractors themselves weren't crooks. A 2011 study by the Pentagon found that during the ten years after 9/ 11, the Defense Department had given more than $ 400 billion to contractors who had previously been sanctioned in cases involving $ 1 million or more in fraud."

214.     As Defamation by Implication, Defendants published that the money provided to Plaintiff Montgomery (among others) went to "waste."

215.     ***Thirty-Third,*** **on Page 33 of the Book, the Defendants published:**

> "The Montgomery episode teaches one other lesson, too: the chance to gain promotions and greater bureaucratic power through access to and control over secret information can mean that there is no incentive for government officials to question the validity of that secret information. Being part of a charmed inner circle holds a seductive power that is difficult to resist."

216.     As Defamation by Implication, Defendants published that Plaintiff Montgomery's

work was fraudulent.

217.     **Thirty-Fourth, on Page 33 of the Book, the Defendants published:**

> "How his technology worked was a secret. Dennis Montgomery's
> computer code became the great treasure behind eTreppid
> Technologies, the company he and Trepp founded. Later, many of
> those around Montgomery began to suspect the reason why
> Montgomery had to guard his technological innovations so
> carefully. They came to believe that at least some of the
> technology didn't really exist."

218.     As Defamation by Implication, Defendants published that Plaintiff Montgomery

committed fraud.

219.     **Thirty-Fifth, on Page 35 of the Book, the Defendants published:**

> "Montgomery was on the lookout for somebody to bankroll him,
> and had put out the word to his friends at the casinos that he
> frequented the most. A year later, Montgomery and Trepp were in
> business together. Trepp was one of the first, but hardly the last, to
> be beguiled by Montgomery's claims that he had achieved
> breakthroughs in computer technology of historic significance."

220.     As Defamation by Implication, Defendants published that Plaintiff Montgomery

"beguiled" Warren Trepp by committing fraud.

221.     **Thirty-Sixth, on Page 39 of the Book, the Defendants published:**

> "For a few months in late 2003, the technology from Dennis
> Montgomery and eTreppid so enraptured certain key government
> officials that it was considered the most important and most sensitive
> counterterrorism intelligence that the Central Intelligence Agency had
> to offer President Bush. Senior officials at the CIA's Directorate of
> Science and Technology began to accept and vouch for Montgomery
> to officials at the highest levels of the government. Montgomery's
> claims grew ever more expansive, but that only solidified his position
> inside the national security arena. His technology became too
> impossible to disbelieve."

222.      As Defamation by Implication, the Defendants published that Plaintiff Montgomery committed fraud and is a con man.

223.      ***Thirty-Seventh,*** **on Page 40 of the Book, the Defendants published:**

> *"*Montgomery persuaded the spy agency that his special computer technology could detect hidden bar codes broadcast on Al Jazeera, which had been embedded into the video feed by al Qaeda. Allegedly, al Qaeda was using that secret method to send messages to its terrorist operatives around the world about plans for new attacks. Montgomery convinced the CIA that his technology had uncovered a series of hidden letters and numbers that appeared to be coded messages about specific airline flights that the terrorists were targeting.

224.      As Defamation by Implication, the Defendants published that Plaintiff convinced the CIA of claims that are not (were not) true.

225.      ***Thirty-Eighth,*** **on Page 42 of the Book, the Defendants published:**

> "Based on Montgomery's information, President Bush ordered the grounding of a series of international flights scheduled to fly into the United States. This step caused disruptions for thousands of travelers."

226.      As Defamation by Implication, the Defendants published that Plaintiff convinced President Bush and the national command authority of conclusions drawn from Plaintiff Montgomery's work.

227.      ***Thirty-Ninth,*** **on Page 42 of the Book, the Defendants published:**

> "One former senior CIA official recalled attending a White House meeting in the week following Christmas to discuss what to do next about the information coming from Montgomery. The official claims that there was a brief but serious discussion about whether to shoot down commercial airliners over the Atlantic based on the intelligence."

228.      As Defamation by Implication, the Defendants published that Plaintiff convinced President Bush and the national command authority of conclusions drawn from Plaintiff Montgomery's work.

229.    ***Fortieth,*** **on Page 47 of the Book, the Defendants published:**

> "Even more stunning, after the debacle over the bogus Christmas
> 2003 terrorist threats, Montgomery kept getting classified government
> contracts awarded through several different corporate entities.
> Montgomery's problems with the CIA did not stop him from peddling
> variations of his technology to one government agency after another.
> The secrecy that surrounded his work once again worked in his favor.
> CIA officials were reluctant to tell their Pentagon counterparts much
> about their experiences with Montgomery, so Defense Department
> officials apparently did not realize that his technology was considered
> suspect at CIA headquarters."

230.    As Defamation by Implication, Defendants published that Plaintiff continued to

defraud, con, and scam the government, rather than concluding that the Government recognized

the legitimacy of Plaintiff Montgomery's work.

231.    ***Forty-First,*** **on Page 48 of the Book, the Defendants published:**

> "He successfully infused a sense of mystery around himself. He was
> like the Wizard of Oz, but now people were beginning to try to
> examine the man behind the curtain."

232.    As Defamation by Implication, Defendants published that the Plaintiff engaged in

fraud and a hoax by keeping details mysterious, including the mystery was caused by Plaintiff

Montgomery rather than by Warren Trepp or the Government.

233.    ***Forty-Second,*** **on Page 48 of the Book, the Defendants published:**

> "The technology didn't meet the requirements for us," said a Special
> Operations Command spokesman drily. Still, there is no evidence that
> officials at Special Operations Command ever talked with their
> counterparts at the CIA to check up on Montgomery before awarding
> him a contract. Special Operations Command paid a total of $ 9.6
> million to eTreppid under its contract with the firm."

234.    As Defamation by Implication, the Defendants published that Plaintiff

Montgomery again repeated his fraud and hoax against a new government agency.

235.    ***Forty-Third,*** **on Page 54 of the Book, in the Chapter "The New Oligarchs,"**

**the Defendants published:**

> CHAPTER 3:   The New Oligarchs
> Page 54:  "Dennis Montgomery is, of course, an extreme example of
> the new kind of counterterrorism entrepreneur who prospered in the
> shadows of 9/11.  But he was hardly alone in recognizing the lucrative
> business opportunities that the war on terror has presented.  In fact, as
> trillions of dollars have poured into the nation's new homeland
> security-industrial complex, the corporate leaders at its vanguard can
> rightly be considered the true winners of the war on terror."

236.    As Defamation by Implication, Defendants published that Plaintiff engaged in

fraud and a hoax motivated by greed.

237.    **As additional instances of Defendants' defamation of Plaintiff Montgomery,**

on information and belief, Plaintiff alleges that Defendant Risen has spoken on these topics on

radio and on television in additional interviews about the Book and Plaintiff Montgomery since

the publication of the Book in October 2014, which the Plaintiff is continuing to investigate.

238.    **As additional instances of Defendants' defamation of Plaintiff Montgomery,**

on information and belief, discovery during this litigation will disclose additional instances of

Defendants having defamed Plaintiff Montgomery since October 2014.

239.    **As additional instances of Defendants' defamation of Plaintiff Montgomery,**

Defendants' defamation of Plaintiff Montgomery has been and is being republished through

book reviews and commentary since October 2014, and such republication of the defamation is

widespread and continuing on radio, television, written publications, and proliferating daily on

the Internet in this district, Florida in general, nationally, and internationally.

<u>**FOURTH CAUSE OF ACTION**</u>
***Common Law Intentional Infliction of Emotional Distress***

54

240. Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

241. Defendants' knowing and intentional publication of the harmful statements against the Plaintiff has foreseeably and proximately caused the Plaintiff emotional distress.

242. Defendants' intentional actions were committed with the knowledge that they would cause extreme physical pain and suffering and cause severe emotional distress to the Plaintiff.

243. Defendants' actions were willful malicious, deliberate, and were done with reckless or negligent indifference to the likelihood that such behavior would cause severe emotional distress and with utter disregard for the consequences of such actions.

## FIFTH CAUSE OF ACTION
### *Common Law Tortious Interference with Prospective Advantage*

244. Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

245. Defendants understood that Plaintiff was pursuing the future full value of his software, intellectual property and software technology and techniques and was over time negotiating to make further licenses and sales of the intellectual property.

246. Defendants were aware that their publication of false and misleading statements about Plaintiff Montgomery harmed Plaintiff Montgomery's career and livelihood and his ability to earn a living, including the opportunity to sell his professional services and software.

247. Defendants' defamation disparaged Plaintiff's intellectual property and software so as to render it commercially worthless, by claiming that it did not work.

248. Defendants acted knowingly, willfully and with reckless and negligent disregard of the harm that their publication of their false statements would cause to Plaintiff Montgomery's

livelihood, career, and ability to earn a living, including his opportunity to enter into contracts for the sale of his services and/or intellectual property.

249.    Defendants acted with the intentional malicious purpose of defaming Plaintiff Montgomery as a way to smear aspects of U.S. foreign, military, and intelligence polices with which they disagree in pursuit of their ideological and political agenda.

### SIXTH CAUSE OF ACTION
### *Common Law Assault (Apprehension)*

250.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

251.    Plaintiff Montgomery was in-effect working undercover and in secret for the CIA, NSA, and other agencies of the Government on classified programs of counter-terrorism and national security.

252.    Defendants' especially high profile publications of the defamatory factual statements have placed Plaintiff Montgomery's life at risk by revealing and disclosing him to public notice by Al Qaeda and its successors such as the Islamic State (I.S.I.S.), as well as other terrorists and terrorist groups, in Florida, domestically and internationally.

253.    ISIS has openly pledged to kill members of the U.S. military and persons who are associated with the U.S. military and their families and those assisting the U.S. military and Government, particularly in counter-terrorism efforts against Islamic Jihad organizations and terrorists.

254.    Defendants have subjected Plaintiff Montgomery to what is in effect a Fatwah, which is an open call that any and all militant Jihadi Muslims should kill Plaintiff Montgomery.

255.    Defendants have placed Plaintiff Montgomery in immediate fear of bodily harm, injury, and death to him and his family members.

256.    Defendants' tortious actions alleged herein were furthered and aided and abetted by the CIA and the NSA, who want to destroy Plaintiff Montgomery to prevent him from disclosing as a whistleblower the full extent of their unconstitutional and illegal Government surveillance on American citizens to the Congress, the Inspector General, and to the courts, specifically in cases styled *Klayman v. Obama*, No. 13-851, 13-881, 14-92 (D.D.C.); *Klayman v. Obama*, No. 14-5004, 14-5005, 14-5016, 14-5017 (D.C. Cir.).

## DAMAGES WITH REGARD TO ALL COUNTS

257.    As a direct and proximate result of the intentional, willful, malicious or negligent actions of Defendants, Plaintiff Montgomery demands judgment be entered against Defendants each and every one of them, jointly and severally, including an award of compensatory and actual damages in an amount to be determined at trial, as pled below, punitive damages, reasonable attorneys fees, pre-judgment interest, post-interest and costs, and such other relief as the Court may deem just and proper.

258.    As a result of Defendants' actions, Plaintiff Montgomery suffered significant personal harm, including to his business and professional endeavors and prospects, career, and finances.

259.    As just one example, Plaintiff Montgomery negotiated for the sale of his technology to the Government for the price of $100 million.

260.    Plaintiff Montgomery was able to obtain a Top Secret clearance in less than a year in 2003.  He passed all of the security issues that were involved in obtaining that level of clearance. His clearance allowed him to courier top-secret material worldwide.  In 2007, the Plaintiff entered The White House and the Pentagon with full access to Top Secret material. As of 2010, the Plaintiff still held that clearance level, and to the best of his knowledge still does.

261.     As a result of his security clearances, the Plaintiff would be employable in high-paying jobs but for the defamation of his character and other tortious actions by the Defendants.

262.     Plaintiff Montgomery has been harmed by the loss of the economic value of his intellectual property, and the value of licensing the intellectual property and/or providing services based upon or incorporating his intellectual property.

263.     Defendants' conduct was unreasonable and outrageous and exceeds the bounds tolerated by decent society, and was done willfully, maliciously and deliberately, or with reckless indifference or negligence, to cause Plaintiff severe mental and emotional pain, distress, and anguish and loss of enjoyment of life, so as to also justify the award of punitive and exemplary damages.

264.     On information and belief, at least the Defendant Houghton Mifflin Harcourt Co., as a publicly traded corporation, was required to publicly disclose the Plaintiff's threatened lawsuit on reports filed with the Securities and Exchange Commission.  A liability or contingent liability, including threatened litigation must be reported under Item 103 "Legal Proceedings," in Management's Discussion and Analysis (MD&A) -- Item 303, and/or in Item 503(c) "Risk Factors."

265.     This information was required on Defendant's regularly scheduled SEC Form 10-Q (quarterly report) and/or SEC Form 10-K (annual report) but also on SEC Form 8-K triggered (within four days) by certain events, because "Form 8-K is the 'current 'report' companies must file with the SEC to announce major events that shareholders should know about."  http://www.sec.gov/answers/form8k.htm.

266.     Defendant's SEC Form 10-Q for the fourth quarter of 2014 was due on February 10, 2015, but is not publicly on file.  Defendant's quarterly SEC Form 10-Q filed on November

58

6, 2014, covered the period ended September 30, 2014.

267.     In the most recent exchange of correspondence, on January 20, 2015, Houghton Mifflin's Associate General Counsel David Eber replied to Larry Klayman's January 14, 2015, litigation demand concerning Defendants' defamation of Plaintiff Montgomery, copied by Ebers to General Counsel William Bayers, and refused to take any corrective action.

268.     In addition, on information and belief, the Defendant was required to disclose the litigation as non-public information prior to engaging in trades.  On January 31, 2015, and February 17, 2015, General Counsel William Frederick Bayers reported the sales of HMHC stock on SEC Form 4.

## PRAYER FOR RELIEF

With regard to all counts, Plaintiff demands that judgment be entered against Defendants, each and every one of them, acting in concert, jointly and severally, for compensatory and actual damages in excess of $120 million U.S. Dollars resulting from their financial, reputational, emotional and professional injury to Plaintiff, as well as equitable relief as may be appropriate, and such other relief the Court may deem just and proper.  Plaintiff further prays for an award of punitive damages in an amount in excess of $350,000,000.00 U.S. Dollars, to punish Defendants for their outrageous, deceitful, unprecedented, vicious and malicious conduct toward Plaintiff Montgomery designed so Defendants can reap huge profits for their defamatory works. Defendants' actions have left Plaintiff in ruins. According to Bloomberg Business, the market capitalization of Houghton Mifflin Harcourt is $2.8 Billion U.S Dollars. Large punitive damages will deter Defendants from committing such egregious acts in the future against Plaintiff Montgomery and others similarly situated.

## <u>JURY DEMAND</u>

**Plaintiff respectfully demands a jury trial on all issues so triable.**

Dated: April 27, 2015

Respectfully submitted,

*/s/ Larry Klayman*
Larry Klayman, Esq.
Klayman Law Firm
FL Bar No. 246220
7050 W Palmetto Park Rd.
Suite 15-287
Boca Raton, FL 33433
(310) 595-0800
leklayman@gmail.com
Attorney for Plaintiff

# Exhibit 2

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| Dennis L. Montgomery | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 1:15-cv-20782-JEM |
| James Risen, Houghton Mifflin Harcourt Publishing Company, and HMH Holdings, Inc. | ) ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                    Michael J. Flynn

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: La Mirada Exexcutive Suites 14241 E. Firestone Blvd., Suite 400 La Mirada, CA 90638 | Date and Time: 09/14/2015 10:00 am |
|---|---|

The deposition will be recorded by this method:     Stenographic and/or by video/audio recording.

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

See "Attachment A" which is hereby incorporated by reference.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     08/26/2015

*CLERK OF COURT*

OR

_____          _____
*Signature of Clerk or Deputy Clerk*                                  *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*     Dennis L. Montgomery                                                                    , who issues or requests this subpoena, are:

Larry Klayman, Klayman Law Firm, 7050 W Palmetto Park Rd., Suite 15-287, Boca Raton, FL 33433 (310) 595-0800

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  1:15-cv-20782-JEM

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**

(A) When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**ATTACHMENT A TO PLAINTIFF'S SUBPOENA DUCES TECUM**

For the purpose of this Subpoena –

The term "document" is hereby defined expansively to include any or all of the following, whether existing as electronic, digital, or computer data, in electronic or digital form, or in paper form: correspondence, letters, memoranda, recommendations, records, orders, plans, proposals, meeting agendas, minutes of meetings, briefing materials, notes of phone messages or visits, routing slips, buck slips, standard government forms containing information filled in on lines or blank spaces, slide presentations, "card decks" (for presentations at meetings), power-point presentations, facsimiles (faxes), notes, handwritten notes, notes to the file, requests for decision, requests for authorization, tape recordings, video recordings, electronic mail (email) messages, summaries, briefs, orders, written decisions, applications, , and/or other documents and things. In addition, with regard to payments to persons or vendors, documents also include all invoices, bills, contracting records, commitment of funds, obligation of funds, or disbursement records.

1. Any and all documents that refer or relate in any way to Dennis Montgomery.

2. Any and all documents concerning Dennis Montgomery provided to Eric Lichtblau including but not limited to documents contained on a "thumb drive" as referred to in the email of Eric Lichtblau to James Risen which is attached as Exhibit 1.

3. Any and all documents concerning Dennis Montgomery provided to James Risen including but not limited to documents contained on a "thumb drive" as referred to in the email of Eric Lichtblau to James Risen which is attached as Exhibit 1.

4. Any and all documents that refer or relate in any way to communications to and from James Risen concerning Dennis Montgomery.

5. Any and all documents that refer or relate in any way to communications to and from Eric Lichtblau concerning Dennis Montgomery.

6. Any and all "thumb drives" or other forms of electronic storage devices which contain or once contained documents that refer or relate to Dennis Montgomery as referred to in the email of Eric Lichtblau to James Risen which is attached as Exhibit 1.

7. Any and all documents concerning Dennis Montgomery and/or the attached email (Exhibit 1) from Eric Lichtblau to James Risen.

8. Any and all documents that refer or relate in any way to documents Mr. Flynn gave to the U.S. Government or any of its agencies concerning Dennis Montgomery.

9. Any and all documents that refer or relate in any way to documents Mr. Flynn received from the U.S. Government or any of its agencies concerning Dennis Montgomery.

10. Any and all documents that refer or relate in any way to communications with Playboy writer Aram Roston concerning Dennis Montgomery.

11. Any and all documents that refer or relate in any way to communications with Houghton Mifflin Harcourt concerning Dennis Montgomery.

12. Any and all documents that refer or relate in any way to communications with Houghton Mifflin Harcourt Publishing Company concerning Dennis Montgomery.

# Exhibit 1

# Redacted-A/C-work product

From: **james risen** <jrisen31@gmail.com>
Date: Fri, Jan 7, 2011 at 7:06 AM
Subject: Re: Con man
To: Eric Lichtblau <ericlichtblau@gmail.com>

excellent! great work.
jim

On Fri, Jan 7, 2011 at 2:54 AM, Eric Lichtblau <ericlichtblau@gmail.com> wrote:
I got some terrific stuff today. Spent 8+ hours with the source and
left with a thumb drive with 20,000 pages of documents. Have a much
better grasp of the whole storyline and characters. Hayden and
negroponte were directly involved, in addition to cheney aides, plus
major involvement by kemp, clinton wingman burkle, navy sec, Conrad
burns and others.

Flying back tomorrow

--
Eric Lichtblau
(202) 468-9254

DEFS003843

# Exhibit 3

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 1:15-cv-20782-JEM

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*    Michael Flynn

on *(date)* Aug 26th 2015

☒ I served the subpoena by delivering a copy to the named individual as follows: Delivered
by Personal Service to individual at 6175 El Fordo
Rancho Santa Fe, CA 92067 on *(date)* Aug 29th ; or

☐ I returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____

My fees are $ $50.00 for travel and $ 100.00 for services, for a total of $ 15/80.00 .

I declare under penalty of perjury that this information is true.

Date: Aug 27th 2015          _____
                                                    *Server's signature*

                             Brandon Berg, 25 uc
                                          *Printed name and title*


                             9054 Mira Mesa Blvd CA 126. San Diego, CA
                                          *Server's address*          92126

Additional information regarding attempted service, etc.:

# Exhibit 4

Naveed Mahboobian
CA Bar No. 279464
1217 Wilshire Blvd., # 3043
Santa Monica, CA 90403
Tel:(424) 272-1005
Email: nmahboobian@gmail.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

DENNIS MONTGOMERY,

        Plaintiff,

    v.

JAMES RISEN, ET. AL.

        Defendant.

Case No. :

[Pending in the Southern District of Florida, Case 15-20782-CIV]

DECLARATION OF NAVEED MAHBOOBIAN

## <u>DECLARATION OF NAVEED MAHBOOBIAN</u>

    I, Naveed Mahboobian, being over eighteen years of age, and duly competent to testify, hereby swear and affirm on my personal information and belief as follows:

1. I have personal knowledge of the following facts and, if called upon as a witness, could testify competently thereto.

2. I am an attorney licensed within the State of California.

3. I am an associate who works for Larry Klayman on behalf of the Plaintiff in this lawsuit,

4. Dennis Montgomery.

5. Mr. Klayman asked me to make arrangements to personally serve Michael Flynn with a

6. Subpoena to Testify at a Deposition In a Civil Action ("Subpoena"). A copy of the

1

MOTION TO COMPEL COMPLIANCE

7. Subpoena is attached to this Motion to Compel as Exhibit 2.

8. The Subpoena was issued by Mr. Klayman on August 26, 2015 and I made arrangements to have Mr. Flynn personally served.

9. In arranging service upon Mr. Flynn, I contacted Brandon Berg of Signature Legal Services, LLC, a process server located at 9450 Mira Mesa Blvd, Ste C-126 San Diego, CA 92126, on August 26, 2015. Mr. Berg advised me that they would be attempting service on Mr. Flynn that same evening.

10. The Subpoena demanded Mr. Flynn's attendance at a deposition at the following address: La Mirada Executive Suites, 14241 E. Firestone Blvd., Suite 400, La Mirada, CA 90638("La Mirada Address").

11. This La Mirada Address is located approximately 82.9 miles from the deponent's residential address.  Exhibit A.

12. The La Mirada Address is located within Los Angeles County, California, and falls under the jurisdiction of the U.S. District Court for the Central District of California.   The La Mirada Address is located approximately 18.5 miles from the Central District's Western Division Courthouse.  Exhibit B.

13. Mr. Berg advised me that Mr. Flynn was personally served with the Subpoena on August 27, 2015, at his residential address of 6125 El Tordo Rancho Sante Fe, California 92067.

14. Mr. Berg also sent a copy of the subpoena to Mr. Flynn by U.S. Mail.

Sworn to under penalty of perjury.

_____

Naveed Mahboobian

MOTION TO COMPEL COMPLIANCE

# Exhibit A



La Mirada Executive Suites - ESDI to 6125 El Tordo, Rancho Santa Fe, CA 92067    Drive 82.9 miles, 1 h 27 min

Map data ©2015 Google, INEGI    10 mi

# La Mirada Executive Suites - ESDI

14241 Firestone Boulevard #400, La Mirada, CA 90638

**Get on I-5 S from Valley View Ave**

2 min (0.5 mi)

↑  1.  Head northwest on Firestone Blvd toward Valley View Ave

361 ft

↰  2.  Turn left at the 1st cross street onto Valley View Ave

0.2 mi

↰  3.  Turn left onto Firestone Blvd

420 ft

🚶  4.  Use the left lane to take the Interstate 5 S ramp

0.1 mi



Follow I-5 S to Encinitas. Take exit 42 from I-5 S

1 h 11 min (76.2 mi)



| | 5. | Merge onto I-5 S |
|---|---|---|
| | | 21.4 mi |
| | 6. | Keep right to stay on I-5 S |
| | | 54.5 mi |
| | 7. | Take exit 42 for Encinitas Blvd toward Encinitas |
| | | 0.3 mi |

**Continue on Encinitas Blvd. Take La Granada to El Tordo in Rancho Santa Fe**

14 min (6.2 mi)



| | 8. | Turn left onto Encinitas Blvd |
|---|---|---|
| | | 3.3 mi |
| | 9. | Continue onto S Rancho Santa Fe Rd |
| | | 0.4 mi |
| | 10. | Turn right onto La Bajada |
| | | 0.5 mi |
| | 11. | Slight right onto Los Morros |
| | | 0.3 mi |
| | 12. | Continue onto La Granada |
| | | 1.6 mi |
| | 13. | Turn left onto El Tordo |
| | | Destination will be on the right |
| | | 240 ft |

# 6125 El Tordo

Rancho Santa Fe, CA 92067

These directions are for planning purposes only. You may find that construction projects, traffic, weather, or other events may cause conditions to differ from the map results, and you should plan your route accordingly. You must obey all signs or notices regarding your route.

| Live traffic | *Fast* ▬▬▬▬ *Slow* |
| --- | --- |

# Exhibit B

Case 2:15-cv-08830-JD Document 31-4 Filed 11/17/15 Page 89 of 93


Maps

312 N Spring St, Los Angeles, CA 90012 to La Mirada Executive Suites - ESDI

Drive 18.5 miles, 27 min



Map data ©2015 Google     2 mi

## 312 N Spring St
Los Angeles, CA 90012

**Get on US-101 S**

49 s (0.3 mi)

⬆ 1. Head northeast on N Main St toward W Aliso St

236 ft

⬏ 2. Turn right at the 1st cross street onto W Aliso St

266 ft

↖ 3. Use the left 2 lanes to turn slightly left to stay on W Aliso St

72 ft

🚶 4. Use any lane to merge onto US-101 S via the ramp to Interstate 10 Fwy E/Interstate 5 Fwy S

0.1 mi

**Take I-5 S to Firestone Blvd in La Mirada. Take exit 118 from I-5 S**



———————————— 22 min (17.9 mi)

🚶 5. Merge onto US-101 S

———————————— 0.7 mi

🛈 6. Keep right at the fork to stay on US-101 S, follow signs for California 60 E/Interstate 5 S

———————————— 2.3 mi

🚶 7. Merge onto I-5 S

———————————— 14.8 mi

🛈 8. Take exit 118 for Valley View Ave

———————————— 397 ft

**Take Valley View Ave to Firestone Blvd**



———————————— 2 min (0.4 mi)

↱ 9. Turn right onto Firestone Blvd

———————————— 449 ft

↱ 10. Turn right onto Valley View Ave

———————————— 0.2 mi

↱ 11. Turn right onto Firestone Blvd

———————————— 358 ft

↰ 12. Make a U-turn
    🛈 Destination will be on the left

———————————— 49 ft

## La Mirada Executive Suites - ESDI

14241 Firestone Boulevard #400, La Mirada, CA 90638

These directions are for planning purposes only. You may find that construction projects, traffic, weather, or other events may cause conditions to differ from the map results, and you should plan your route accordingly. You must obey all signs or notices regarding your route.

| Live traffic | Fast ▮▮▮▮ Slow |
|---|---|

# Exhibit 5

**Handman, Laura**

| | |
|---|---|
| **From:** | Michael Flynn <mike@mjfesq.com> |
| **Sent:** | Thursday, September 03, 2015 1:03 PM |
| **To:** | Handman, Laura |
| **Subject:** | Re: Montgomery v. Risen |

Laura.

1. I have not been served with sny subpoena. And have no notice.

2. I am traveling Stptember 4 thru 12.

3. I am out of the country from Sept 12 thru 30.

4. First available dates are in Dec.

Mike.

On Sep 3, 2015 7:44 AM, "Handman, Laura" <laurahandman@dwt.com> wrote:

Dear Mr. Flynn:

   As you know, I am representing the defendants, author Jim Risen and his book publisher, in the libel action brought by Dennis Montgomery. Could you or your lawyer, if you have a lawyer acting for you in this matter, please call me in my D.C. office 202 973 4224 about the subpoena for your deposition served by Plaintiff Montgomery that had been scheduled for September 14.

   We have advised Plaintiff's counsel that the 14th and 15th are Rosh Hashanah and therefore we cannot attend. We have suggested to Plaintiff's counsel alternative dates of Sept. 9, 10 or 11 subject, of course, to your availability.

   Laura Handman

**Laura R. Handman** | Davis Wright Tremaine LLP
1919 Pennsylvania Avenue NW, Suite 800 | Washington, DC 20006-3401
Tel: (202) 973-4224 | Fax: (202) 973-4499
and
1251 Avenue of the Americas, 21st Floor | New York, NY 10020-1104
Tel: (212) 489-8230 | Fax: (212) 489-8340
Email: laurahandman@dwt.com | Website: www.dwt.com
Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

1