# Exhibit 2
# (part 1)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

DENNIS L. MONTGOMERY

        Plaintiff,

   v.

SIMON & SCHUSTER,

and

PRISCILLA PAINTON,

and

TINA BENNETT,

        Defendants.

**15 MISC 0363**

Miscellaneous Case No.

## PLAINTIFF'S EMERGENCY MOTION TO COMPEL NON-PARTIES TINA BENNETT, PRISCILLA PAINTON AND SIMON & SCHUSTER TO COMPLY WITH PROPERLY-SERVED SUBPOENAS AND MOTION TO TAKE THE DEPOSITIONS BY VIDEOCONFERENCE AND REQUEST FOR EMERGENCY TELEPHONIC HEARING

Plaintiff, Dennis Montgomery, hereby moves this Honorable Court on an expedited basis

to compel the depositions of Simon & Schuster, Priscilla Painton and Tina Bennett pursuant to

duly served subpoenas *ducus tecum*. **This motion is currently set for December 1, 2015, heard**

**in Part I at 11:00 am**. Depositions were scheduled to occur on November 9, 2015 and

November 10, 2015.[1] The underlying factual and legal bases in this motion are set forth in the

accompanying Memorandum Of Law In Support Of Plaintiff's Motion To Compel Non-Parties

Tina Bennett, Priscilla Painton And Simon & Schuster To Comply With Properly-Served

---

[1] The underlying case is styled *Montgomery v. Risen, et al.* Civil Action No. 15-cv-20782 (S.D. Fla).

Subpoenas And Motion To Take The Depositions By Videoconference And Request For

Emergency Telephonic Hearing.

Dated: November 12, 2015

Respectfully submitted,

Klayman Law Firm
2020 Pennsylvania Ave. Ste. 800
Washington, D.C. 20006
By Raymond Negron, Esq.
New York Bar No.: 4013660
Admitted to S.D.N.Y on March 22, 2002
*Of Counsel*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**



DENNIS L. MONTGOMERY

                    Plaintiff,

      v.

SIMON & SCHUSTER,

and

PRISCILLA PAINTON,

and

TINA BENNETT,

                  Defendants.

# 15 MISC 0363

Miscellaneous Case No.

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION TO COMPEL NON-PARTIES TINA BENNETT, PRISCILLA PAINTON AND SIMON & SCHUSTER TO COMPLY WITH PROPERLY-SERVED SUBPOENAS AND MOTION TO TAKE THE DEPOSITIONS BY VIDEOCONFERENCE AND REQUEST FOR EMERGENCY TELEPHONIC HEARING

## I.    PRELIMINARY STATEMENT

Plaintiff Dennis Montgomery respectfully submits this memorandum of law in support of

his emergency motion, pursuant to Fed. R. Civ. P. 45, to compel compliance by Tina Bennett,

Priscilla Painton and Simon & Schuster with the subpoenas *duces tecum* ("The Subpoenas")

issued in connection with the above-referenced action, which is pending in the United States

District Court for the Southern District of Florida.  Defendants and in house counsel for Simon &

Schuster and Priscilla Painton have objected to these Subpoenas *duces tecum* (*see* Exhibit 1 and

Exhibit 2, respectively) and only Defendants James Risen, Houghton Mifflin Harcourt

Publishing Company and Houghton Mifflin Harcourt Company have objected to the Subpoena

1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of November 2015, a true and correct copy of the foregoing Plaintiff's Emergency Motion To Compel Non-Parties Tina Bennett, Priscilla Painton And Simon & Schuster To Comply With Properly-Served Subpoenas And Motion To Take The Depositions By Videoconference And Request For Emergency Telephonic Hearing was served via e-mail and U.S. mail upon the following:

**Sanford Lewis Bohrer**
**Brian Toth**
Holland & Knight, LLP
Suite 3000
701 Brickell Ave
Miami, FL 33131
Email: sbohrer@hklaw.com
Email: brian.toth@hklaw.com

**Laura R. Handman**
**Micah Ratner**
Davis Wright Tremaine LLP
1919 Pennsylvania Ave., N.W., Suite 800
Washington D.C. 20006-3401
Email: laurahandman@dwt.com
Email: MicahRatner@dwt.com

*Attorneys for James Risen Defendant*
*Attorneys for Houghton Mifflin Harcourt Publishing Company Defendant*
*Attorneys for Houghton Mifflin Harcourt Company Defendant*

**Andrew Nieh**
Assistant General Counsel, Litigation and Compliance
CBS Corporation
51 W. 52nd Street
New York, New York 10019
Tel: (212) 975-4239
Fax: (212) 975-3930
Email: andrew.nieh@cbs.com

*Attorney for Simon & Schuster Defendant*
*Attorney for Priscilla Painton Defendant*

**Kevin Marino**
Marino, Tortorella & Boyle, P.C.
437 Southern Blvd.
Chatham Township, New Jersey 07928
kmarino@kmarino.com

*Attorney for Tina Bennett Defendant*

Raymond Negron, Esq.

*duces tecum* served on Tina Bennett. (Exhibit 3). Tina Bennett has not objected, and in fact her time to object has passed. Ms. Bennett has waived objections to the production of the Subpoena documents, her testimony or the taking of her deposition by videoconference.

The Subpoenas direct Simon & Schuster, Priscilla Painton and Tina Bennett to produce a narrowly defined set of documents that are highly relevant to the underlying action, and for all three (3) to appear at depositions to provide testimony on the same subjects currently scheduled for November 9, 2015 and November 10, 2015. Plaintiff Montgomery also moves this Court, pursuant to Fed. R. Civ. P. 30(b)(4), to issue an order allowing for the depositions to be taken by videoconference. ("The parties may stipulate – or the court may on motion order – that a deposition be taken by telephone or other remote means.). Fed. R. Civ. P. 30(b)(4). Time is short as discovery is set to close on November 19, 2015. This explains the frivolous objections of counsel for deponents Simon & Schuster and Priscilla Painton, as they are attempting to in effect run out the clock on discovery.

## II.   BACKGROUND

### A.   The Complaint

The facts that gave rise to Plaintiff's underlying action are set forth in detail in his Amended Complaint. *See* Exhibit 4. Briefly, on February 24, 2015, Plaintiff Dennis Montgomery filed suit against James Risen, Houghton Mifflin Harcourt Publishing Company and Houghton Mifflin Harcourt Company for the defamatory and severely damaging false statements in Defendant James Risen's recent book, Pay Any Price: Greed, Power and Endless War, (referred to as "The Book" or "Pay Any Price") published by Defendants Houghton Mifflin Harcourt Publishing Company and Houghton Mifflin Harcourt Company.

The Book blames government leaders and officials for mishandling the War on Terror and overreacting. Defendant Risen portrays the global threats regarding the War on Terror as far smaller, less real, and less imminent than national leaders during the Bush Administration. In doing so, Defendant Risen shifts to a private individual who is not a public figure, Plaintiff Dennis Montgomery, and claims that Plaintiff Montgomery defrauded government officials into believing that he had software capable of decrypting Al Jazeera messages and plainly called Plaintiff Montgomery a fraud whose work, including his software and technology, was tantamount to the biggest hoax in American history.

Since the defamatory statements were published, Plaintiff Montgomery has lost substantial work, contracts and business opportunities, and has endured severe emotional distress. In fact, since Plaintiff Montgomery has a potentially fatal brain aneurism, and has repeatedly been hospitalized and operated upon, the emotional distress of this defamation is life threatening. Defendants and their counsel, and those supportive of them, have thus sought to complicate this case and delay its adjudication, obviously hoping that Plaintiff would not be around – that is alive – by the time of trial.

**B.    The Discovery Process to Date Has Uncovered Evidence Pertinent to Plaintiff's Case and Directly Involves Tina Bennett, Priscilla Painton and Simon & Schuster**

During the discovery process of this case, Houghton Mifflin Harcourt Publishing Company's and Houghton Mifflin Harcourt Company's 30(b)(6) representative, Bruce Nichols, admitted in his deposition of October 15, 2015, that The Book originally was to be published by Defendant Risen's longtime publisher, Simon & Schuster, and edited and reviewed by the Vice President and Defendant Risen's editor with Simon & Schuster, Priscilla Painton. Tina Bennett is the literary agent of Defendant Risen who had contact with Simon & Schuster, Priscilla Painton

3

and the actual publisher Houghton Mifflin over the publication of Defendant James Risen's <u>Pay Any Price</u> and thus has intimate knowledge of the reasons why Simon & Schuster decided not to publish <u>Pay Any Price</u>. Yet, at the last minute, Simon & Schuster refused to publish The Book and relinquished its rights to it. Bruce Nichols, a FRCP 30(b) (6) representative of Houghton Mifflin testified that Tina Bennett was Defendant Risen's literary agent who facilitated the move from Priscilla Painton and Simon & Schuster to Houghton Mifflin Harcourt Publishing Company. *See* Exhibit 8.

The reasons why Simon & Schuster ultimately did not publish The Book are critical and relevant as the testimony and documents will likely show that Priscilla Painton and Simon & Schuster rejected publication because it saw and determined that The Book was defamatory toward Mr. Montgomery and/or contained classified government information that could subject them to civil and criminal liability, if not prosecution. In this regard, Defendant Risen almost went to prison over the use of classified information concerning Jeffrey Sterling, in a prior book published by none other than Simon & Schuster. Indeed, Sterling himself is currently serving time for illegally disclosing to Defendant Risen classified, government information.

As explained in the below cases under Florida law, which governs as the lawsuit was filed in the Southern District of Florida, and Florida is where the libel severely primarily harmed Plaintiff Montgomery, who is a citizen of Florida and has done substantial business there, this testimony and document production is not subject to a reporter's or other privileges, and is highly probative since it would go to show actual malice or bad faith. Defendants have claimed, however incorrectly, that Plaintiff Montgomery is a public figure and as such he needs to prove actual malice to defame to recover on his claims. Moreover, as Plaintiff Montgomery has asked in the Amended Complaint for punitive damages, the issue of bad faith is also implicated.

4

In sum, the testimony and documents sought go to a core issue of the case; whether Simon & Schuster refused to publish Pay any Price because it found the manuscript to be written with actual malice and defamation, and whether the author, Defendant Risen herein, did not in fact rely on confidential or other sources, but instead made up the published claim that Plaintiff Montgomery had committed what in effect was the biggest hoax in American history. Here are just a few passages from Pay Any Price, which underscores the false and sensational, defamatory charges against Plaintiff Montgomery designed to sell books, and lots of them.

> . . . Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money. Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, **a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it. The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in public, a series of civil lawsuits involving Montgomery. It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes.**

*See* Exhibit 4 at ¶¶ 106.

> Consider the example of Dennis Montgomery. He provides a perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist was able to create a rogue intelligence operation with little or no adult supervision. Crazy became the new normal in the war on terror, and the original objectives of the war got lost in the process.

See Exhibit 4 at ¶¶ 109.

> A former medical technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international

commercial flights based on what now appears to have been an elaborate hoax. **Even after it appeared that Montgomery had pulled off a scheme of amazing scope, he still had die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Montgomery was a fake, and who rejected the notion that the super-secret computer software that he foisted on the Pentagon and CIA was anything other than America's salvation.**

*See* Exhibit 4 at ¶¶ 111.

**Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks. And only he had the technology to decode those messages, thus saving America from another devastating attack.** The CIA— more credulous than Hollywood or Las Vegas— fell for Montgomery's claims. In short, he convinced CIA officials that he could detect terrorist threats by watching television.

*See* Exhibit 4 at ¶¶ 125.

### C.    The Subpoenas[1]

#### 1.    *Priscilla Painton and Simon & Schuster*

On October 20, 2015, a process server served Priscilla Painton and Simon & Schuster with Subpoenas at 11:58 a.m. In the Affidavit of the Process Server, Raymond Hollingsworth states under oath that he served Priscilla Painton "by personally delivering copies to the person being served." Mr. Hollingsworth notes the age range, sex, race, height, and weight of the witness and states that the "documents were left on desk as defendant refused to accept." Priscilla Painton was served personally, pursuant to CPLR §308, and just because she held her hands back and refused the *physical* Subpoenas does not mean that she was not personally served, having been present. In addition, in accordance with proper service procedure, Mr. Hollingsworth also mailed the papers by first class mail to the address indicated on the Subpoena. Moreover, Mr. Hollingsworth signed an *additional* and *supplemental* affidavit stating that he personally served Simon & Schuster and Priscilla Painton. *See* Exhibit 6.

---

[1] *See* Exhibit 5 for the Affidavit of the Process Server for all three (3) Defendants.

6

2.    Tina Bennett

On October 20, 2015, a process server served Tina Bennett with a Subpoena at 1:13 p.m.

In the Affidavit of the Process Server, Raymond Hollingsworth states under oath that he served

Svetlana Katz, the administrative assistance to Tina Bennett at the place of business, pursuant to

CPLR §308:

> Substituted Service: This type of service is considered a form of personal service
> and has a two-step process. First, delivering the papers within the state to a person
> of suitable age and discretion at the actual place of business, dwelling place or
> usual place of abode (residence) of the person to be served. Second, by mailing
> the papers by first class mail to the person to be served at his or her last known
> residence or mailing them to his or her actual place of business.

Svetlana Katz is a person of suitable age and discretion at the actual place of business of Tina

Bennett's and therefore Tina Bennett was served by substituted service. Mr. Hollingsworth also

swears under oath that he sent the Subpoena by first class mail to the person being served at the

actual place of business.

### D.    The Witnesses Simon & Schuster and Priscilla Painton, Through Counsel, Have Stonewalled Substantive Compliance With the Subpoenas

On November 2, 2015, Andrew K. Nieh, counsel for Simon & Schuster and Priscilla

Painton, sent a letter to Plaintiff Montgomery's counsel outlining objections to each and every

request Plaintiff Montgomery sought in the attachment to the Subpoenas. *See* Exhibit 9. Each is

meritless as discussed below.  In the undersigned counsel's professional history of litigation,

thirty-eight (38) years, he has never seen such overly broad, vague and nonsensical objections, as

in this case, only designed to throw a monkey-wrench into the taking of these crucial

depositions, especially since this case has a discovery cut-off of November 19, 2015.[2]

---

[2] Mr. Nieh, to further obstruct and delay his clients' depositions, as they clearly are working with
Defendant Risen's counsel, even refused to accept witness checks when he claimed they had not
been provided. The obstructionist tactics are sanctionable. *See* Exhibit 10.

### E. The Witnesses Simon & Schuster and Priscilla Painton, Through Counsel, Provide Blanket Objections That Are Meritless

The objections asserted by the Witnesses to justify their wholesale refusal to produce any responsive documents are meritless to start. The Witnesses inability to substantiate its privilege assertions is no surprise. To begin with, they have not even collected responsive documents and thus could not possibly know whether any privilege applies to them. More fundamentally, the notion that the Witnesses' activities with Defendant James Risen – a non-lawyer – can be cloaked in privilege is untenable. Priscilla Painton and Simon & Schuster worked hand-in-hand with Defendant James Risen with whom it had no attorney-client relationship and therefore no work product privilege or attorney-client privilege applies. But, even if this kind of relationship existed – which it did not – the mere alleged involvement of lawyers does not cloak the entire enterprise in the attorney-client privilege. For instance, documents and testimony in which lawyers discuss contributions, materials for government officials, media campaigns, and devise strategies to influence public policy are not communications made for the purpose of obtaining legal advice, and are not privileged. *See In re Grand Jury Subpoenas Dated March 9, 2001*, 179 F. Supp. 2d 270, 289-91 (S.D.N.Y. 2001) ("Communications about non-legal issues such as public relations . . . are not privileged.").

One of the principal issues in this case is the question of whether Simon & Schuster and Priscilla Painton intentionally decided not to publish Defendant James Risen's Book because they perceived it to be a potential liability – if not criminal prosecution – because of defamatory statements or the illegal use of confidential and/or government classified sources. Based on information that has come to light during discovery and through the deposition of Bruce Nichols, there is little doubt that Simon & Schuster and Priscilla Painton decided to reject Defendant James Risen's Book for a good reason, particularly because they had been Defendant Risen's

longtime publishers. This reason is fundamental to Plaintiff Montgomery's case. For instance,

Mr. Nichols testified:

> Q: When was the first time that you became aware that an author by the name of James Risen wanted to publish a book Pay Any Price with your company? [Houghton Mifflin Harcourt Publishing Company]
> A: Shortly before we signed the contract in 2013. However, I had known Jim Risen for quite a while and edited and published his previous book at Simon & Schuster. So I was well aware from conversations with him of the progress of that book and issues he was having. And it was only in 2013 that Simon & Schuster agreed to let the contract go. That's the point at which Houghton Mifflin got involved.

***

> Q: Let's move to the current book, Pay Any Price. Was it Mr. Risen who approached you or did you approach him about writing this book?
> A: He approached me through his literary agent [Tina Bennett] when his relationship with Simon & Schuster was beginning to break down.
> Q: What did he tell you the reasons his relationship with Simon & Schuster was breaking down?
> A: It had very much to do with his relationship with his editor there [Priscilla Painton].
> Q: What did he tell you about that relationship?
> A: They didn't see eye to eye on how the book should be edited and published.

*See* Exhibit 7.

Where a party objects to a discovery request the "objecting party bears the burden of

demonstrating 'specifically how, despite the broad and liberal construction afforded the federal

discovery rules, each [request] is not relevant or how each question is overly broad, burdensome

or oppressive by submitting affidavits or offering evidence revealing the nature of the burden."

*Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105

F.R.D. 16, 42 (S.D.N.Y 1984). "General and conclusory objections as to relevance, overbreadth,

or burden are insufficient to exclude discovery of requested information." *Melendez v. Greiner*,

2003 WL 22434101, at *1 (S.D.N.Y. Oct. 23, 2003).

### 1. The Reporter's Privilege Does Not Apply

In virtually every absurd blanket objection the Witnesses put forth, they disingenuously claim a reporter's privilege. It simply does not apply in this case. In *News-Journal Corp. v. Carson*, petitioners sought certiorari review of an order from the Florida Circuit Court which held that the qualified journalist's privilege under Fla. Stat. § 90.5015(2) did not bar the discovery and production of two documents. The statute provides:

> A professional journalist has a qualified privilege not to be a witness concerning, and not to disclose the information, including the identity of any source, that the professional journalist has obtained while actively gathering news . . . A party seeking to overcome this privilege must make a clear and specific showing that: (a) the information is relevant and material to unresolved issues that have been raised in the proceedings for which the information is sought; (b) the information cannot be obtained from alternative sources; and (c) a compelling interest exists for requiring disclosure of the information.

Fla. Stat. § 90.5015(2). (There is a strong presumption that Florida law applies to this discovery dispute,[3] as the case was filed and is being litigated in the Southern District of Florida, the defamation largely occurred there since Florida is the nation's third largest state in population and has a huge readership in the intelligence and military communities, as well as retirees with much time on their hands, Plaintiff Montgomery is a citizen of Florida and has done substantial business there, and this is his community for purposes of the defamation laws.).

Even if the so-called reporter's privilege were to apply, which it largely does not given the documents and testimony sought, the court in *News-Journal Corp. v. Carson* ruled that the qualified journalist's privilege as to one document had been waived and the other document, although within the scope of the privilege, could theoretically show liability on the part of the petitioner and therefore the journalist was not in any way shielded by the journalist's qualified privilege. *News-Journal Corp. v. Carson*, 741 So. 2d 572 (Fla. Dist. Ct. App. 5th Dist. 1999).

---

[3] In torts cases, such as this case, the law of the place of the wrong governs. *See* Restatement of Conflict of Laws § 377. The primary wrong here occurred in Florida.

Specifically, the appeals court, which serves Miami-Dade County where Plaintiff Montgomery resides and where this suit was filed, held:

> the common law has long recognized and upheld the right of persons damaged by libel and slander to bring a tort suit to redress their injuries caused by a defamatory publication. This is strong public policy which carries great weight. In many such cases, upholding the privilege has the effect of making proof of actual malice impossible because establishing what the publisher knew or did not know at the time of the publication depends on the kind and quality of the information and identity of the sources at hand when the publication was made.

*Id.* at 576.

First, the documents Plaintiff Montgomery seeks are relevant and material to unresolved issues and core pending in this case.

Second, the information Plaintiff Montgomery seeks cannot be obtained through alternative means as the decision not to publish was made by Simon & Schuster and Priscilla Painton.

Third, a compelling interest exists for requiring disclosure of the information sought, as the issue of the refusal to publish Defendant Risen's manuscript goes to the core of whether the subject book is defamatory and thus invokes constitutional protections.

### 2. The Requests Are Not Unduly Burdensome or Vague and Ambiguous

For each and every document request Plaintiff Montgomery provided to Priscilla Painton and Simon & Schuster, their counsel objected to on the basis that the requests were unduly burdensome and vague and ambiguous. This is standard tactic used by defense counsel and as such boilerplate, meritless objections are overruled in other cases, so too should it be overruled here.

The witnesses here cannot carry their burden of showing that the requests are unduly burdensome or vague and ambiguous and in fact do not even attempt to meet this burden. "A

11

party resisting discovery must show specifically how each interrogatory or document request is overly broad, unduly burdensome, or oppressive . . . by submitting affidavits or offering evidence revealing the nature of the burden. Failing to do so, as a general matter, makes such an unsupported objection nothing more than unsustainable boilerplate." *Heller v. City of Dallas*, 303 F.R.D. 466, 490 (N.D. Tex. 2014); *In re ATM Fee Antitrust Litig.*, 233 F.R.D. 542, 545 (N.D. Cal. 2005) (party failed to substantiate its claim of undue burden where it offered only "a blanket objection without specifics sufficient to justify denying discovery.") (citations omitted). The deponents herein, Simon and Schuster and Priscilla Painton failed miserably to meet this burden.

Plaintiff Montgomery's requests are quite narrow and targeted. They seek only (1) documents that specifically relate to Plaintiff Dennis Montgomery; (2) documents that relate to communications to and from Defendant James Risen concerning Dennis Montgomery; (3) documents that relate to the decision of Priscilla Painton and Simon & Schuster not to publish The Book; (4) communications between Simon & Schuster, Priscilla Painton and Houghton Mifflin Harcourt Publishing Company; and (5) any documents that refer to contacts between Simon & Schuster and Defendant James Risen. These categories of documents are specific, directly focused on issues relevant to this case, and lend themselves to targeted keyword searches.

## III.  ARGUMENT

### A.  The Depositions

Rule 26(b) of the Federal Rules of Civil Procedure allows parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense[.]" Fed. R. Civ. P. 26. The allowable scope of discovery "has been construed broadly to encompass any

matter that bears on, or that reasonably cold lead to other matter that cold bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26(b)(1). The Federal Rules of Civil Procedure also provide federal courts with the power to compel compliance with subpoenas and disclosure requests that seek relevant information. *See* Fed. R. Civ. P. 45(c)(2)(B)(i); Fed. R. Civ. P. 37(a)(1). Indeed, this Court has recognized that "discovery[] is an extremely broad concept." *Condit v. Dunne*, 225 F.R.D. 100, 105 (S.D.N.Y. 2004). Thus, the Rule 26(b)(1) standard presents a "relatively low threshold" for a party to show that the material sought is relevant to any claim or defense in the litigation. *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 421 (E.D.N.Y. 2007).

Simon & Schuster, Priscilla Painton and Tina Bennett were properly and duly served with the Subpoenas. As set forth above, Plaintiff Montgomery has reason to believe that Simon & Schuster, Priscilla Painton and Tina Bennett have valuable and critical information regarding the reasons why Simon & Schuster refused – at the last minute – not to publish Defendant James Risen's Book. As none of the Witnesses' specious objections apply, this Court should order the production of documents and appearance for deposition.

### B.    Videoconference

Under the Federal Rules of Civil Procedure, this Court may order that the depositions of Priscilla Painton, Simon & Schuster and Tina Bennett be taken by videoconference. Fed. R. Civ. P. 30(b)(4). "[P]arties routinely conduct depositions via videoconference, and courts encourage the same, because doing so minimizes travel costs." *Forauer v. Vermont Country Store, Inc.*, No. 5:12-cv-276, 2014 WL 2612044, at * 7 (D. Vt. June 11, 2014) (quoting *Gee v. Suntrust Morg.*,

*Inc.*, 2011 WL 5597124, at * (N.D. Cal. Nov. 15, 2011). Videoconference depositions are a "presumptively valid means of discovery." *Normande v. Grippo*, No. 01 Civ. 7441, 2002 WL 59427, at *2 (S.D.N.Y. Jan. 16, 2002). Moreover, "[a]uthorization to take telephonic [videoconference] depositions does not depend upon a showing of hardship by the applicant." *Advani Enterprises, Inc. v. Underwriters at Lloyds*, No. 95 Civ. 4864, 2000 WL 1568255, at * 2 (S.D.N.Y. Oct. 19, 2000). Indeed, here, it would be hardship for Plaintiff and his counsel to travel to the distant city of New York to conduct the depositions. By contrast, there is little prejudice to the Witnesses, who would also save expenses by being deposed by videoconference.

Additionally, courts encourage parties to use technology to save costs when feasible, *see, e.g., Guillen v. Bank of America Corp.*, No. 10-05825, 201` WL 3939690 (N.D. Calif. August 31, 2011, and courts have stated that experimentation in new methods of recording depositions should be encouraged. *Rice's Toyota World, Inc. v. Southeast Toyota Distributors, Inc.*, 114 F.R.D. 647 (M.D.N.C. 1987). Leave to take depositions by telephone or videoconference is granted liberally and a desire to save money, such as here, constitutes good cause to depose out-of-state witnesses by telephone videoconference. *Brown v. Carr*, 253 F.R.D. 410, 412 (S.D. TX 2008).

In this case, the defamed Plaintiff Montgomery is an individual who is destitute, has been repeatedly hospitalized and has a life threatening brain aneurism. He is up against Defendants, including Houghton Mifflin Harcourt Company and Publishing Company, which have a net worth in the billions and thus their refusal to consent to videoconference depositions is tactical, heavy-handed and grossly unjust. Importantly, Plaintiff has offered to streamline the videoconference depositions by obtaining and making documents as exhibits beforehand and

providing them to opposing counsel. Of course, not wanting to take "yes" for an answer, counsel for Defendant Risen does not find this acceptable for tactical reasons. *See* Exhibit 11.

## IV.    CONCLUSION

For all the foregoing reasons, Plaintiff Montgomery respectfully requests that this Court compel Simon & Schuster, Priscilla Painton and Tina Bennett to comply with the Subpoenas *duces tecum* by (1) producing all responsive documentation; (2) providing a privilege log, as required by Federal Rule of Civil Procedure 45, identifying each document withheld on the basis of attorney-client privilege or any other claim of privilege; and (3) appear on November 9, 2015 and November 10, 2015 for their scheduled depositions. Plaintiff Montgomery also requests an Order allowing for the depositions to be taken by videoconference, and an award of attorneys fees and costs for having to prepare and file this motion. Time is of the essence, as discovery is set to close on November 19, 2015.

Plaintiff, Dennis Montgomery, hereby certifies that the parties, as well as counsel for the subject deponents, have met and conferred and are unable to resolve the matters set forth in Plaintiff's Emergency Motion to Compel Non-Parties Tina Bennett, Priscilla Painton and Simon & Schuster to Comply With Properly-Served Subpoenas and Motion to Take Depositions By Videoconference and Request for Emergency Telephonic Hearing.

Dated: November 12, 2015

Respectfully submitted,

Klayman Law Firm
2020 Pennsylvania Ave. Ste. 800
Washington, D.C. 20006

15

By Raymond Negron, Esq.
New York Bar No.: 4013660
Admitted to S.D.N.Y on March 22, 2002
*Of Counsel*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of November 2015, a true and correct copy of the foregoing Memorandum Of Law In Support Of Plaintiff's Emergency Motion To Compel Non-Parties Tina Bennett, Priscilla Painton And Simon & Schuster To Comply With Properly-Served Subpoenas And Motion To Take The Depositions By Videoconference And Request For Emergency Telephonic Hearing was served via e-mail and U.S. mail upon the following:

**Sanford Lewis Bohrer**
**Brian Toth**
Holland & Knight, LLP
Suite 3000
701 Brickell Ave
Miami, FL 33131
Email: sbohrer@hklaw.com
Email: brian.toth@hklaw.com

**Laura R. Handman**
**Micah Ratner**
Davis Wright Tremaine LLP
1919 Pennsylvania Ave., N.W., Suite 800
Washington D.C. 20006-3401
Email: laurahandman@dwt.com
Email: MicahRatner@dwt.com

*Attorneys for James Risen Defendant*
*Attorneys for Houghton Mifflin Harcourt Publishing Company Defendant*
*Attorneys for Houghton Mifflin Harcourt Company Defendant*

**Andrew Nieh**
Assistant General Counsel, Litigation and Compliance
CBS Corporation
51 W. 52nd Street
New York, New York 10019
Tel: (212) 975-4239
Fax: (212) 975-3930
Email: andrew.nieh@cbs.com

*Attorney for Simon & Schuster Defendant*
*Attorney for Priscilla Painton Defendant*

**Kevin Marino**
Marino, Tortorella & Boyle, P.C.
437 Southern Blvd.
Chatham Township, New Jersey 07928
kmarino@kmarino.com

*Attorney for Tina Bennett Defendant*

Raymond Negron, Esq.

17

Exhibit 1

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

| | | |
|---|---|---|
| Montgomery | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   15-cv-20782 |
| | ) | |
| Risen, et al. | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:

Custodian of Records of Simon & Schuster, Inc.

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: 1345 Avenue of the Americas 17th floor – Room B New York, NY 10105 | Date and Time: 11/09/2015 10:00 am |
|---|---|

The deposition will be recorded by this method:   Stenographer and/or audio/visual recording.

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

See "Attachment A" which is hereby incorporated by reference.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  10/19/15

CLERK OF COURT

OR

_____   _____
*Signature of Clerk or Deputy Clerk*   *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  Dennis Montgomery
_____ , who issues or requests this subpoena, are:

Larry Klayman, 7050 W Palmetto Park Rd., Suite 15-287, Boca Raton, FL, 33433. leklayman@gmail.com, 310-595-0800

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 15-cv-20782

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## ATTACHMENT A TO PLAINTIFF'S
## SUBPOENA FOR TESTIMONY AT A DEPOSITION FOR THE RECORDS
## CUSTODIAN OF SIMON & SCHUSTER

For the purpose of this Subpoena –

The term "document" is hereby defined expansively to include any or all of the following, whether existing as electronic, digital, or computer data, in electronic or digital form, or in paper form: correspondence, letters, memoranda, recommendations, records, orders, plans, proposals, meeting agendas, minutes of meetings, briefing materials, notes of phone messages or visits, routing slips, buck slips, standard government forms containing information filled in on lines or blank spaces, slide presentations, "card decks" (for presentations at meetings), power-point presentations, facsimiles (faxes), notes, handwritten notes, notes to the file, requests for decision, requests for authorization, tape recordings, video recordings, electronic mail (email) messages, summaries, briefs, orders, written decisions, applications, , and/or other documents and things. In addition, with regard to payments to persons or vendors, documents also include all invoices, bills, contracting records, commitment of funds, obligation of funds, or disbursement records.

1. Any and all documents that refer or relate in any way to Dennis Montgomery.

2. Any and all documents that refer or relate in any way to communications to and from James Risen concerning Dennis Montgomery.

3. Any and all documents that refer or relate in any way to communications with Houghton Mifflin Harcourt Company concerning Dennis Montgomery.

4. Any and all documents that refer or relate in any way to communications with Houghton Mifflin Harcourt Publishing Company concerning Dennis Montgomery.

5. Any and all documents that refer or relate in any way to the decision not to publish Pay Any Price, by James Risen.

6. Any and all documents that refer or relate in any way to contracts and the actual contracts by and between Simon & Schuster and James Risen.

7. Any and all documents that refer or relate in any way to why Priscilla Painton and Simon & Schuster decided not to publish James Risen's book Pay Any Price.

8. Any and all documents that refer or relate in any way to the communications between Priscilla Painton and Tina Bennett.

9. Any and all documents that refer or relate in any way to the communications between Priscilla Painton and James Risen.

10. Any and all documents that refer or relate in any way to the communications between James Risen and Priscilla Painton regarding confidential sources.

11. Any and all documents that refer or relate in any way to the communications between James Risen and Priscilla Painton regarding classified material and/or sources.

12. Any and all documents that refer or relate in any way to payments made by Harcourt Mifflin Harcourt Company to Simon & Schuster.

13. Any and all documents that refer or relate in any way to the preliminary measures Simon & Schuster took in order to publish Pay Any Price.

14. Any and all documents that refer or relate in any way to any contracts by and between Tina Bennett and Simon & Schuster.

15. Any and all document that refer or relate in any way to any contracts by and between Tina Bennett and Houghton Mifflin Harcourt Company.

16. Any and all documents that refer or relate in any way to any contracts by and between Tina Bennett and Houghton Mifflin Harcourt Publishing Company.

17. Any and all documents that refer or relate to communications by and between Tina Bennett and James Risen regarding Simon & Schuster.

18. Any and all documents that refer or relate to the communications between you and James Risen regarding Houghton Mifflin Harcourt Company.

19. Any and all documents that refer or relate to the communications between you and James Risen regarding Houghton Mifflin Harcourt Publishing Company.

20. Any and all documents that refer or relate in any way to Tina Bennett deciding to contact Houghton Mifflin Harcourt Company and/or Houghton Mifflin Harcourt Publishing Company for James Risen and his book Pay Any Price.

21. Any and all documents that refer or relate to Tina Bennett deciding to leave negotiations at Simon & Schuster in furtherance of a contract with either Houghton Mifflin Harcourt Company or Houghton Mifflin Harcourt Publishing Company.

22. Any and all documents that refer or relate in any way to Bruce Nichols concerning Pay Any Price.

23. Any and all documents that refer or relate to copyrights or other intellectual property rights concerning Pay Any Price.

Exhibit 2

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | | |
|---|---|---|
| Montgomery | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 15-cv-20782 |
| | ) | |
| Risen, et al. | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:
Priscilla Painton

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: 1345 Avenue of the Americas 17th floor – Room B New York, NY 10105 | Date and Time: 11/09/2015 2:00 pm |
|---|---|

The deposition will be recorded by this method: Stenographer and/or audio/visual recording.

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:
See "Attachment A" which is hereby incorporated by reference.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 10/10/15

CLERK OF COURT

OR

_____          _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Dennis Montgomery
_____ , who issues or requests this subpoena, are:
Larry Klayman, 7050 W Palmetto Park Rd., Suite 15-287, Boca Raton, FL, 33433. leklayman@gmail.com, 310-595-0800

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   15-cv-20782

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person

  **(i)** is a party or a party's officer; or

  **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:

  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

  **(i)** fails to allow a reasonable time to comply;

  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);

  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

  **(iv)** subjects a person to undue burden.

  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

  **(i)** expressly make the claim; and

  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**

The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**ATTACHMENT A TO PLAINTIFF'S
SUBPOENA FOR TESTIMONY AT A DEPOSITION FOR PRISCILLA PAINTON**

For the purpose of this Subpoena –

The term "document" is hereby defined expansively to include any or all of the following, whether existing as electronic, digital, or computer data, in electronic or digital form, or in paper form:  correspondence, letters, memoranda, recommendations, records, orders, plans, proposals, meeting agendas, minutes of meetings, briefing materials, notes of phone messages or visits, routing slips, buck slips, standard government forms containing information filled in on lines or blank spaces, slide presentations, "card decks" (for presentations at meetings), power-point presentations, facsimiles (faxes), notes, handwritten notes, notes to the file, requests for decision, requests for authorization, tape recordings, video recordings, electronic mail (email) messages, summaries, briefs, orders, written decisions, applications, , and/or other documents and things. In addition, with regard to payments to persons or vendors, documents also include all invoices, bills, contracting records, commitment of funds, obligation of funds, or disbursement records.

1. Any and all documents that refer or relate in any way to Dennis Montgomery.

2. Any and all documents that refer or relate in any way to communications to and from James Risen concerning Dennis Montgomery.

3. Any and all documents that refer or relate in any way to communications with Houghton Mifflin Harcourt Company concerning Dennis Montgomery.

4. Any and all documents that refer or relate in any way to communications with Houghton Mifflin Harcourt Publishing Company concerning Dennis Montgomery.

5. Any and all documents that refer or relate in any way to the decision not to publish Pay Any Price, by James Risen.

6. Any and all documents that refer or relate in any way to contracts and the actual contracts by and between Simon & Schuster and James Risen.

7. Any and all documents that refer or relate in any way to why Priscilla Painton and Simon & Schuster decided not to publish James Risen's book Pay Any Price.

8. Any and all documents that refer or relate in any way to the communications between Priscilla Painton and Tina Bennett.

9. Any and all documents that refer or relate in any way to the communications between Priscilla Painton and James Risen.

10. Any and all documents that refer or relate in any way to the communications between James Risen and Priscilla Painton regarding confidential sources.

11. Any and all documents that refer or relate in any way to the communications between James Risen and Priscilla Painton regarding classified material and/or sources.

12. Any and all documents that refer or relate in any way to payments made by Harcourt Mifflin Harcourt Company to Simon & Schuster.

13. Any and all documents that refer or relate in any way to the preliminary measures Simon & Schuster took in order to publish Pay Any Price.

14. Any and all documents that refer or relate in any way to any contracts by and between Tina Bennett and Simon & Schuster.

15. Any and all document that refer or relate in any way to any contracts by and between Tina Bennett and Houghton Mifflin Harcourt Company.

16. Any and all documents that refer or relate in any way to any contracts by and between Tina Bennett and Houghton Mifflin Harcourt Publishing Company.

17. Any and all documents that refer or relate to communications by and between Tina Bennett and James Risen regarding Simon & Schuster.

18. Any and all documents that refer or relate to the communications between you and James Risen regarding Houghton Mifflin Harcourt Company.

19. Any and all documents that refer or relate to the communications between you and James Risen regarding Houghton Mifflin Harcourt Publishing Company.

20. Any and all documents that refer or relate in any way to Tina Bennett deciding to contact Houghton Mifflin Harcourt Company and/or Houghton Mifflin Harcourt Publishing Company for James Risen and his book Pay Any Price.

21. Any and all documents that refer or relate to Tina Bennett deciding to leave negotiations at Simon & Schuster in furtherance of a contract with either Houghton Mifflin Harcourt Company or Houghton Mifflin Harcourt Publishing Company.

22. Any and all documents that refer or relate in any way to Bruce Nichols concerning Pay Any Price.

23. Any and all documents that refer or relate to copyrights or other intellectual property rights concerning Pay Any Price.

Exhibit 3

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | | |
|---|---|---|
| Montgomery | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   15-cv-20782 |
| | ) | |
| Risen, et al. | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:
Tina Bennett

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: 1345 Avenue of the Americas 17th floor – Room B New York, NY 10105 | Date and Time: 11/10/2015 10:00 am |
|---|---|

The deposition will be recorded by this method:   Stenographer and/or audio/visual recording.

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:
See "Attachment A" which is hereby incorporated by reference.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  10/19/15

CLERK OF COURT

OR

_____          _____
*Signature of Clerk or Deputy Clerk*                              *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Dennis Montgomery
, who issues or requests this subpoena, are:

Larry Klayman, 7050 W Palmetto Park Rd., Suite 15-287, Boca Raton, FL, 33433. leklayman@gmail.com, 310-595-0800

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  15-cv-20782

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

    ❐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

    ❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

    $ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:

(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## ATTACHMENT A TO PLAINTIFF'S
## SUBPOENA FOR TESTIMONY AT A DEPOSITION FOR TINA BENNETT

For the purpose of this Subpoena –

The term "document" is hereby defined expansively to include any or all of the following, whether existing as electronic, digital, or computer data, in electronic or digital form, or in paper form: correspondence, letters, memoranda, recommendations, records, orders, plans, proposals, meeting agendas, minutes of meetings, briefing materials, notes of phone messages or visits, routing slips, buck slips, standard government forms containing information filled in on lines or blank spaces, slide presentations, "card decks" (for presentations at meetings), power-point presentations, facsimiles (faxes), notes, handwritten notes, notes to the file, requests for decision, requests for authorization, tape recordings, video recordings, electronic mail (email) messages, summaries, briefs, orders, written decisions, applications, , and/or other documents and things. In addition, with regard to payments to persons or vendors, documents also include all invoices, bills, contracting records, commitment of funds, obligation of funds, or disbursement records.

1. Any and all documents that refer or relate in any way to Dennis Montgomery.

2. Any and all documents that refer or relate in any way to communications to and from James Risen concerning Dennis Montgomery.

3. Any and all documents that refer or relate in any way to communications with Houghton Mifflin Harcourt Company concerning Dennis Montgomery.

4. Any and all documents that refer or relate in any way to communications with Houghton Mifflin Harcourt Publishing Company concerning Dennis Montgomery.

5. Any and all documents that refer or relate in any way to the decision not to publish Pay Any Price, by James Risen.

6. Any and all documents that refer or relate in any way to contracts and the actual contracts by and between Simon & Schuster and James Risen.

7. Any and all documents that refer or relate in any way to why Priscilla Painton and Simon & Schuster decided not to publish James Risen's book Pay Any Price.

8. Any and all documents that refer or relate in any way to the communications between Priscilla Painton and Tina Bennett.

9. Any and all documents that refer or relate in any way to the communications between Priscilla Painton and James Risen.

10. Any and all documents that refer or relate in any way to the communications between James Risen and Priscilla Painton regarding confidential sources.

11. Any and all documents that refer or relate in any way to the communications between James Risen and Priscilla Painton regarding classified material and/or sources.

12. Any and all documents that refer or relate in any way to payments made by Harcourt Mifflin Harcourt Company to Simon & Schuster.

13. Any and all documents that refer or relate in any way to the preliminary measures Simon & Schuster took in order to publish Pay Any Price.

14. Any and all documents that refer or relate in any way to any contracts by and between Tina Bennett and Simon & Schuster.

15. Any and all document that refer or relate in any way to any contracts by and between Tina Bennett and Houghton Mifflin Harcourt Company.

16. Any and all documents that refer or relate in any way to any contracts by and between Tina Bennett and Houghton Mifflin Harcourt Publishing Company.

17. Any and all documents that refer or relate to communications by and between Tina Bennett and James Risen regarding Simon & Schuster.

18. Any and all documents that refer or relate to the communications between you and James Risen regarding Houghton Mifflin Harcourt Company.

19. Any and all documents that refer or relate to the communications between you and James Risen regarding Houghton Mifflin Harcourt Publishing Company.

20. Any and all documents that refer or relate in any way to Tina Bennett deciding to contact Houghton Mifflin Harcourt Company and/or Houghton Mifflin Harcourt Publishing Company for James Risen and his book Pay Any Price.

21. Any and all documents that refer or relate to Tina Bennett deciding to leave negotiations at Simon & Schuster in furtherance of a contract with either Houghton Mifflin Harcourt Company or Houghton Mifflin Harcourt Publishing Company.

22. Any and all documents that refer or relate in any way to Bruce Nichols concerning Pay Any Price.

23. Any and all documents that refer or relate to copyrights or other intellectual property rights concerning Pay Any Price.

Exhibit 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

DENNIS L. MONTGOMERY

███████████████

████████████

                    Plaintiff,

     v.

JAMES RISEN, an individual,
c/o  The New York Times
1627 "I" Street N.W., Suite 700
Washington, D.C. 20006-4007

         and

HOUGHTON MIFFLIN HARCOURT PUBLISHING
COMPANY
222 Berkeley Street
Boston, Massachusetts 02116

         and

HMH HOLDINGS, INC.
222 Berkeley Street
Boston, Massachusetts 02116

         and

HOUGHTON MIFFLIN HARCOURT COMPANY
222 Berkeley Street
Boston, Massachusetts 02116

         Defendants.

Civil Action No.  15-cv-20782

## AMENDED COMPLAINT (REDACTED)[1]

    Plaintiff Dennis L. Montgomery, by counsel, sues the Defendants, acting in concert,

jointly and severally, in this civil action for Common Law Defamation *Per Se* (libel and slander),

---

[1] Address and Miami-Dade phone number of Plaintiff have been redacted for security reasons.
The address and phone number are being filed by motion in a Sealed Amended Complaint.

General Defamation (libel and slander), Defamation by Implication (libel and slander), Intentional Infliction of Emotional Distress, Tortious Interference with Prospective Advantage, and Assault, as a result of Defendants causing actual damages, compensatory damages, and giving rise to punitive damages as well, including continuing and aggravated harm to the Plaintiff's professional, business and personal reputation and livelihood.  As grounds therefore, Plaintiff alleges as follows:

I.   **JURISDICTION AND VENUE**

1.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 under diversity of citizenship. The parties are citizens of different states and the amount in controversy exceeds $75,000. Also, the Causes of Action arose in this judicial district.

2.     Venue is proper for Defendants pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(e).

3.     The Causes of Action and the injuries were caused to the Plaintiff by the Defendants' defamation and other tortious conduct in this district, Florida in general, nationwide, and internationally.

4.     In addition, some of the most recent commercial opportunities for the Plaintiff's work were contracts and projects made available through military bases and Government facilities in Florida.

5.     The State of Florida is the third (3rd) largest state by population within the entire United States such that a huge and substantial portion of the nationwide harm has occurred in Florida.

6.     The United States Central Command ("CENTCOM") is located at MacDill Air Force Base, in Tampa, Florida. Central Command, then under the leadership of General Tommy

Ray Franks, led the attack on the Taliban in Afghanistan in response to the September 11 attacks

on the World Trade Center and The Pentagon in 2001. CENTCOM also led the 2003 invasion of

Iraq and the overthrow of Saddam Hussein.  CENTCOM has been the center of the United

States' war on terror and related intelligence gathering during the past fifteen years.

  7.  United States Southern Command ("SOCOM"), responsible for all U.S. military

and intelligence gathering activities in South America and Central America, is located in located

in Doral, Florida.  The U.S. Southern Command works with CENTCOM. Al Qaeda, ISIS, and

other groups and interests, including the Islamic Republic of Iran are active and engaged in

South America and in Central America and in 1994 Iran blew up a synagogue in Buenos Aires,

Argentina.

  8.  In addition, the U.S. Air Force maintains six (6) active military bases in Florida,

the U.S. Navy maintains ten (10) active military bases and two (2) hospital bases in Florida, the

U.S. Coast Guard maintains three (3) active military bases, and the U.S. Marines and the U.S.

Army each maintain one active military base in Florida.

  9.  Many of the drones used for the wars in Iraq and Afghanistan have been operated

out of Florida.  For example, the 2d Special Operations Squadron ("2 SOS") is an Air Force

Reserve Command unit Stationed at Hurlburt Field, Florida. The 2 SOS unit operates MQ-9

Reaper Remotely Piloted Vehicles.

  10.  Defendants knew or should have known of the large counter-terrorism, military,

and intelligence presence within the state of Florida. Defendant Risen is a "national security

expert" who has intimate knowledge of the U.S. Military.

  11.  Given the large counter-terrorism, military, and intelligence presence in Florida,

Defendants marketed the Book <u>Pay Any Price</u> into the state for Florida, as there is a large

3

readership there from military and intelligence personnel and retirees in these services, as well as the general population at large. Pay Any Price specifically deals with the United States' efforts in the war on terrorism and related intelligence gathering activities, and as such there would be substantial interest from those living within Florida, which has the largest military and intelligence presence in the nation.

12.     Defendants knew or should have known of Plaintiff's substantial ties to counter-terrorism, military, and intelligence contracts and intended on harming Plaintiff in Florida, which continues to be center of the war on terror. Defendants knew that if Plaintiff's reputation was harmed in Florida, the large military presence in Florida would ensure that Plaintiff would lose jobs and contracts and not be hired for any more jobs and contracts.

II.     **THE PARTIES**

13.     Dennis L. Montgomery is a natural person, an individual, and a citizen of the United States. He is a citizen of Florida, which as set forth above, is where much of this work has taken place and will continue to take place. He resides at ███████████ Miami, FL ███ and has a Miami-Dade telephone number of ████████. Mr. Montgomery is also registered to vote in Florida and has had multiple and ongoing business dealings within the state of Florida. Plaintiff is in poor health. He suffered a brain aneurysm and a related multi-infarct stroke on May 12, 2014. He suffered both a hemorrhagic stroke (caused by ruptured blood vessels that cause brain bleeding) and an ischemic stroke (loss of blood flow). He was in the hospital for two months, through July 2014. He has been left permanently disabled and partially paralyzed. Plaintiff could suffer a similar or repeated event causing him to die at any time. He is currently in outpatient physical therapy to work on ongoing left-sided weakness and speech therapy for stroke related cognitive and memory impairments along with swallowing difficulties.

14.     James Risen is a natural person who is a Pulitzer Prize-winning journalist for The New York Times, previously for The Los Angeles Times. He has written or co-written many articles concerning U.S. Government ("Government") activities and is the author or co-author of two books about the National Security Agency ("NSA") and the Central Intelligence Agency ("CIA").

15.     Defendant Houghton Mifflin Harcourt Publishing Company is the publisher of Risen's Book, "Pay Any Price: Greed, Power and Endless War" and is located in Boston, Massachusetts.

16.     Defendant HMH Holdings, Inc. is the parent company and owner of the Houghton Mifflin Harcourt Publishing Company and is incorporated in the State of Delaware.

17.     Defendant Houghton Mifflin Harcourt Company is the parent company and owner of the Houghton Mifflin Harcourt Publishing Company and is incorporated in the State of Delaware.

18.      Houghton Mifflin Harcourt Company and/or Houghton Mifflin Harcourt Publishing Company maintains offices throughout the United States, including an office in Orlando, Florida.

19.     With regard to each of the allegations in this complaint, all of the Defendants have acted in concert, jointly and severally, thus giving rise to joint and several liability for each of them. Thus, when a tortious act is attributed (and pled as) to Defendant Risen, it also applies to the other defendants, Houghton Mifflin Harcourt Publishing Company, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company.

20.     All of the allegations of this Complaint refer or relate to the tortious, illegal conduct of each and every named Defendant, who acted individually and in concert, jointly and severally, to severely damage Plaintiff Montgomery.

III.     **FACTS COMMON TO ALL COUNTS**

21.     Plaintiff Montgomery sues for harm and thus damages in this district, Florida in general, nationwide and internationally to himself as an individual, which damages include financial harm to his business reputation as an individual and his business and professional opportunities as an individual, intentional infliction of emotional distress, and assault for placing Plaintiff Montgomery in immediate fear of bodily harm, injury, and death, by terrorists who have sworn to attack those assisting the U.S. military and Government.

22.     Plaintiff Montgomery sues for harm to his financial interests as an individual owner, investor, partner, shareholder and/or employee of companies impacted by these events, which has resulted in financial harm to Plaintiff Montgomery as an individual through the loss of value of his ownership interests in those companies as a result of Defendants' defamation and other tortious conduct.

23.     Plaintiff Montgomery sues for harm to his financial interests as an individual in the intellectual property of computer software, computer software techniques and encoding and decryption technologies which he developed and which have been harmed by Defendants' defamation and other tortious conduct, as well as other harm and thus damages to be uncovered during discovery.

### Dennis Montgomery Not a Public Figure

24.     Plaintiff Montgomery is a private citizen and at all material times acted individually and in business.

6

25.     Plaintiff Montgomery has not sought any form of publicity, public note or prominence outside of implementing his own business affairs in private transactions.

26.     Plaintiff Montgomery has not sought or held any public office or Government position within the Government.

27.     Plaintiff Montgomery thus is not a public figure based on facts, including his work for the Government, which was secret, while he in effect worked undercover for the Government outside of the public eye.

28.     Plaintiff Montgomery has not sought or acquired any position of public power or influence which would give him the ability to protect himself apart from the courts within the meaning of *New York Times v. Sullivan*, 376 U.S. 254 (1964).

29.     Plaintiff Montgomery is not a public figure within the meaning of *New York Times v. Sullivan,* 376 U.S. 254 (1964) or its progeny.

## Defamation of Plaintiff Dennis Montgomery by Defendant James Risen in Recent Bestselling Book

30.     On October 14, 2014,[2] the publishing 'house' of Defendant Houghton Mifflin Harcourt Publishing Company at 215 Park Avenue South, New York, New York 10003, whose parent is Defendant HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company, published a book titled "Pay Any Price:  Greed, Power and Endless War" (referred to as "the Book" or "Book" below) by author Defendant James Risen, Copyright (c) 2014 by Defendant James Risen, designated by the Library of Congress by its index system as ISBN 978-0-544-

---

[2]     A book's official publication date is somewhat artificial for marketing, and books are often available and being promoted a week or two ahead of the official publication date.  In part, this is due to the task of distributing books to bookstores and on the Internet all across the nation by the official date of publication.

34141-8 (hardback edition). This publication dated October 14, 2014, was the first publication of the Book in this district, Florida in general, domestically, and worldwide, in any language and the first printing run of the Book. The Book was physically printed in the United States.

31.     On information and belief, the Book <u>Pay Any Price</u> was sold starting in October 2014, in mainstream bookstores throughout this district, Florida in general, the United States as a whole, internationally, and on the Internet.

32.     Defendants advertised the sale of the Book <u>Pay Any Price</u> throughout this district, Florida in general, the United States as a whole, internationally, and on the Internet.

33.     The Book <u>Pay Any Price</u> was available for sale and was and is sold throughout book stores such as Barnes and Noble, Books-A-Million bookstores, and throughout the state of Florida and the United States.

34.     The Book <u>Pay Any Price</u> was and is similarly sold throughout the internet on websites such as Amazon.com and barnesandnoble.com, where it was purchased by citizens and residents of Florida. As of April 27, 2015, <u>Pay Any Price</u> is still ranked by Amazon.com as the fourteenth (14th) highest bestseller in books on national and international security.[3]

35.     A complete copy of Chapter 2 of <u>Pay Any Price</u> is attached for the Court as Exhibit A.

36.     Chapter 2 of the Book <u>Pay Any Price</u> is devoted to the Plaintiff Montgomery – though curiously not to Warren Trepp, Montgomery's much more politically connected business partner, after whom their company eTreppid was named.

37.     The Book could have been written and still be complete by omitting Plaintiff Montgomery entirely from the Book. Plaintiff Montgomery is not necessary to the theme or

---

[3] *See* http://www.amazon.com/gp/bestsellers/books/3049231/ref=pd_zg_hrsr_b_1_5_last

message of the Book, but indeed the reports about Plaintiff Montgomery actually conflict with the Book overall.

38.     The Book was rated as #18 in the greatest quantity of sales nationwide on <u>The New York Times'</u> list rating the nation's bestselling books for the week of November 9 to 16, 2014, and #20 in quantity of sales nationwide for the week of October 26 to November 9, 2014.

39.     The Book was rated as #11 in the greatest quantity of sales nationwide on <u>The Los Angeles Times'</u> list rating the nation's bestselling books as of November 2, 2014, and #17 in quantity of sales nationwide as of November 16, 2014.

40.     The Book is listed on <u>The New York Times</u>' list of the 100 most notable books published in the year 2014.

41.     Apart from the Book itself, Defendant Risen also engaged in a flurry of radio and television news interviews and talk show interviews in and around September 2014 and October 2014, associated with the "roll out" of his Book in which Defendant Risen made further defamatory factual publications of and concerning Plaintiff Montgomery, in addition to the words and content of the Book itself.  In these interviews, Defendant Risen and the other Defendants repeated the false and misleading statements from the Book itself, and also added to those claims and even at times falsely and misleadingly contradicted the defamatory claims of his own Book.

42.     Many of Defendant Risen's and the other Defendants' libelous and slanderous statements were made during written news and talk show interviews during September 2014, October 2014, and November, 2014, some spoken, some in print and elsewhere, surrounding the publication of his Book rather than in the Book itself.  Defendants were purposely and intentionally marketing the book through the sensational defamatory statements made about

Plaintiff. In fact, Plaintiff is the focal point of the Book and that explains why he has been defamed and thus trashed not just in the Book but Defendant's published interviews about the Book, intended to get readers to buy the Book in Florida and elsewhere.

43.     Counsel for Plaintiff Montgomery served a demand for a retraction upon Jon Stewart and "The Daily Show" airing on November 6, 2014 on the Comedy Central nationwide television network after Defendant Risen's television interview on "The Daily Show."  Stewart and the "The Daily Show" production did not air a correction or retraction, but later removed the interview from its website. However, the publication is still out on - and being published on - the Internet and other media sites.

44.     Plaintiff Montgomery also sent two demand letters to the Defendant publishers pursuant to Florida Statute § 770.02. One was served on January 14, 2015 and the other was served on February 13, 2015. Defendants responded on January 20, 2014, refusing to retract the false information and pay damages. (Composite Exhibit B). To date, Defendants' have not responded to Plaintiff Montgomery's letter of February 13, 2015. These are incorporated herein by reference.

45.     Defendants' defamation that Plaintiff Montgomery convinced the Government of false terror threats is false and misleading including but not limited to the fact that Plaintiff Montgomery never offered any interpretation of the hidden data he uncovered, even when pressured to give his conjecture about what the hidden data was, meant, or referred to.  Plaintiff Montgomery left it up to intelligence experts of the Government to analyze and determine what the hidden data and clues that he found actually meant.

46.     Defendants' defamation of Plaintiff Montgomery is false and misleading, including but not limited to the fact that Plaintiff Montgomery and his partners turned down

other contracts of equal or greater profitability with private companies, but were urged by Government officials to help the Government for national defense instead.

47.    Defendants' defamation of Plaintiff Montgomery publishing that he defrauded the Government to make money out of greed is false and misleading, including but not limited to the fact that Plaintiff Montgomery was only a minority stockholder who did not receive any distribution of company profits.  Warren Trepp was the President and CEO and controlled all shareholder activities and financial decisions in the company, eTreppid.  Plaintiff Montgomery owned no stock in Edra Blixseth's later company BLIXWARE.

48.    Defendants' defamation of Plaintiff Montgomery publishing that he defrauded the Government is false and misleading including but not limited to the fact that the Government conducted its own independent tests of Plaintiff Montgomery's software and confirmed its effectiveness and reliability.

49.    Defendants' publications that Plaintiff Montgomery defrauded the Government are false and misleading including but not limited to the fact that the Government has continued to use Plaintiff Montgomery's software and technology.

50.    Defendant Risen and the other Defendants have misrepresented the truthful story of these events by faulting the wrong parties and thus defaming Plaintiff Montgomery.

51.    Defendants' defamation of Plaintiff Montgomery is false and malicious, including but not limited to the fact that Defendant Risen's Government sources would bear the blame and legal consequences if they did not portray Plaintiff Montgomery as at fault.

52.    In the alternative, Defendants, all of them, jointly and severally, manufactured the alleged facts pled in this Complaint and did not have confidential sources in Government.

53.     Defendants' defamation of Plaintiff Montgomery was made with actual malice. Defendants had knowledge of the falsity of the defamatory statements, and/or made the defamatory statements with reckless disregard to the truth. *See* Plaintiff's Affidavit, Exhibit C, incorporated herein by reference.

54.     Despite being a Pulitzer Prize-winning author, Defendant Risen has previously been alleged to engage in a pattern and practice of defaming individuals for profit. As one example revealed on Defendant Risen's Wikipedia page, specifically, Wen Ho Lee co-wrote a book called My Country Versus Me in which he described Defendant Risen as a "hatchet job on me, and a sloppy one at that." The New York Times and The Los Angeles Times jointly decided to settle the case brought by Wen Ho Lee on behalf of Defendant Risen and agreed to pay damages to settle the lawsuit.

## Use of False And Misleading Classified Information by Defendants or Failure to Fact Check

55.     Thus, either the Defendants, all of them, had in their possession classified national security and intelligence information from the Government and details of confidential private conversations and events within the Government (and falsified that information) or Defendants made up the entire defamatory story about Plaintiff Montgomery for sensationalism and thus just to sell more books and reap huge profits.

56.     Defendants Houghton Mifflin Harcourt Publishing Company ("Houghton Mifflin") and its parent, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company, were required to fulfill their legal and ethical responsibilities before publishing a book of this nature and especially a book containing Chapter 2 and related passages which singles out a private citizen for intense defamation, to "fact check" and review the evidence for defamatory factual recitations made in the Book concerning Plaintiff Montgomery before publication.

57.     Houghton Mifflin and HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company, were required to ensure that the author, Defendant Risen, had sufficient factual basis for the Book's statements and claims about Plaintiff Montgomery.

58.     Here, however, even if true, the substance of the Book's published criticisms and descriptions of Plaintiff Montgomery would have required Defendant Risen to admittedly base his Book on information from the Government which is classified or secret or otherwise legally restricted on the grounds of national security or intelligence sources and methods.

59.     In the Book's preliminary pages, Defendant Risen writes and Defendants Houghton Mifflin, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company published and admitted the following:

### A NOTE ON SOURCES

> "Many people have criticized the use of anonymous sources.  Yet all reporters know that the very best stories – the most important, the most sensitive – rely on them.  This book would not be possible without the cooperation of many current and former government officials and other individuals who were willing to discuss sensitive matters only on the condition of anonymity."

60.     Thus, Defendants admit that the Book is based upon inside, Governmental classified information, however false and misleading, from "many current and former government officials…"

61.     Among other occasions, Defendant Risen described in The New York Times telephone[4] interview posted on October 24, 2014, titled **"Inside The New York Times Book Review: James Risen's 'Pay Any Price'"**, that he was alerted about Plaintiff Montgomery by sources within the CIA.

---

[4]     Accessible at: http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/

62.     Thus, the substance of the Book's false and misleading publications about Plaintiff Montgomery, if true or otherwise, would have required Defendants Houghton Mifflin, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company to review information from the Government which is classified or secret or otherwise legally restricted on the grounds of national security or intelligence sources and methods. Since this would be illegal, one can only conclude that Defendants fabricated the defamatory publications as alleged herein.

63.     Defendant Risen and the other Defendants' defamatory and false and misleading factual assertions, descriptions, and reports in Chapter 2 of the Book Pay Any Price concerning Plaintiff Montgomery relate in specific detail conversations, incidents, events, decisions, etc., that Defendant Risen could not possibly know without receiving information from the Government that is classified, secret, or legally restricted.

64.     For example, the Book related and published conversations within the Oval Office of The White House with President George W. Bush and his foreign policy team and the national command authority of the United States, communications between the intelligence services of France and the United States, deliberations within the CIA and NSA, and so on and so forth.

65.     Plaintiff Montgomery developed various software including software that successfully decoded hidden messages from broadcast video.[5]

66.     However, as to why the Bush Administration cancelled flights from Europe and ordered potential shoot-downs (see below), including the full range of their information, only the

---

[5]     Plaintiff Montgomery's company began originally developing software to colorize black-and-white movies, which requires an extraordinarily sophisticated ability to recognize specific objects and shapes – such as faces, individual parts of clothing, etc., as they are moving in three dimensional perspective and changing distances (affecting size in relation to other objects in the view) and to follow and track every object requiring a slightly different shade of color, brightness, including as impacted by shadows, etc.

Government intelligence officials themselves and the President of the United States at the time know why they did what they did.

67.    Defendants Risen, Houghton Mifflin, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company, were used as tools by the CIA, NSA, and other Government agencies and their affiliates to maliciously destroy Plaintiff Montgomery because he came forward as a whistleblower in an attempt to reveal their unconstitutional and illegal actions in spying on all American citizens, regardless of whether there was probable cause that they were communicating with and/or aiding and abetting terrorists and/or committing crimes.

**Actual Malice and Punitive Damages:  Defendant James Risen is an Expert in Journalism**

68.    Actual malice can be found if Defendants published defamatory statements with a reckless disregard of the truth or used slipshod or sketchy investigative techniques.

69.    Reckless disregard of the truth can be shown when there is little investigative effort expended initially or signals of the falsehood of reporting are ignored, or no additional inquires were made after the editors knew or should have known that the published accounts were untrue.

70.    Actual malice can also be proved by circumstantial evidence. Evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity. *Reader's Digest Assn. v. Superior Court* 37 Cal.3d 244, 257 (1984).

71.    In his interview posted on October 24, 2014, called  "titled **"Inside The New York Times Book Review: James Risen's 'Pay Any Price:**  This week, James Risen and Lucy Worsley," **Defendant Risen admits that ….**

" . . . it is very difficult to tell what is actually true."[6]

72.     Defendant Risen is a Pulitzer Prize-winning investigative reporter for <u>The New York Times</u>, and accordingly trained, experienced, and disciplined in journalistic standards and ethics.

73.     Regarding Defendant Risen's status as an expert in accurate and reliable reporting as a journalist, <u>Newsweek</u> praises Defendant Risen on October 20, 2014, by claiming

> "At long last we can retire Bob Woodward and Carl Bernstein as the icons of investigative reporting. With his second book probing the dark tunnels of the so-called war on terror, James Risen has established himself as the finest national security reporter of this generation, a field crowded with first-rank talent at *The Washington Post*, *Wall Street Journal*, Associated Press, Reuters, McClatchy Newspapers and the *New York Times*, his employer and sometimes bane."[7]

74.     As "the finest national security reporter of this generation" according to <u>Newsweek</u>, Defendant Risen should have understood what Dan Aykroyd's character (Naval Intelligence Captain Raymond Thurman)  in the movie <u>Pearl Harbor</u> explains to Admiral Chester Nimitz:

> **Admiral Chester W. Nimitz**:   So, sir, you would have us mobilize the entire fleet, at the cost of millions of dollars, based on this 'spine-tingling' feeling of yours?
>
> **Captain Raymond Thurman**:   No, sir. I understand my job is to gather and interpret material. Making difficult

---

[6]     ArtsBeat: Book Review Podcast: James Risen's 'Pay Any Price', by John Williams, <u>New York Times</u>, October 24, 2014,  http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/ , based upon Louise Richardson's book review of Risen's book and publishing a podcast interview of James Risen with Lousia Worsley **"Inside The New York Times Book Review: James Risen's 'Pay Any Price'"** accessible at that website address.

[7]     **"Hustlers, Con Men & Dupes Cashing in on the War on Terror,"by Jeff Stein**, <u>Time Magazine</u>, October 20, 2014, http://www.newsweek.com/hustlers-con-men-dupes-cashing-war-terror-278503.   Risen did not make any new statements in the <u>Newsweek</u> article and apparently was not interviewed for the article.  However, <u>Newsweek</u> did republish the libel from Risen's Book.

decisions based on incomplete information from my
limited decoding ability is your job, sir.[8]

75.     Yet, Defendant Risen and the other Defendants defame a private citizen, Plaintiff

Montgomery, as responsible for the alleged decision of President George W. Bush's to ban many

incoming international flights around Christmas 2003 from entering U.S. airspace and to

(allegedly) nearly order the U.S. Air Force to shoot down around ten civilian aircraft over the

Atlantic Ocean as a result of Plaintiff Montgomery's claimed fraud and hoax.  Defendant Risen

portrays this as Plaintiff Montgomery's fault, not Bush's, assuming there is any truth at all to this

false and misleading account.

76.     At a time when the Government was encouraging people to: " . . . If you see

something, say something,"[9] Plaintiff Montgomery said something about what he saw,

innocently, diligently, legally and appropriately.

77.     The thesis of Defendant Risen's and the other Defendants' Book is that the war on

terror is illegitimate and unnecessary, motivated by personal greed, irrational paranoia, or

politics, and that the French government is wise and smart while our Government is stupid,

foolish, greedy, incompetent and criminally-minded.

78.     That is, Defendant Risen and the other Defendants' Book is not a neutral report,

in which errors could be classified as simply inadvertent.  The Book is an intentional, politically-

driven, falsified, and misleading attack on U.S. foreign, military, and intelligence policies in the

"war on terror" against Islamic terrorism, meant to mock and ridicule a strong national defense.

---

[8]     "Pearl Harbor" (2001) (Touchstone Pictures and Jerry Bruckheimer Films)
[9]     http://www.dhs.gov/if-you-see-something-say-something%E2%84%A2 .  In fact, the
DHS encourages partners, announcing "If you are interested in establishing a partnership with
DHS and the "If You See Something, Say Something™" Campaign, please email
seesay@hq.dhs.gov."  DHS has set up a special email address seesay@hq.dhs.gov to promote
this concept of vigilance.

Plaintiff Montgomery is illegally used as a whipping boy by Defendants in this regard to sensationalize and sell more books for a great profit.

79.     Defendant Risen sets out to discredit what he calls "The Endless War" as being motivated by corruption, greed, personal profit, and irrational paranoia.

80.     Yet curiously Defendant Risen goes very far out of his way to gratuitously and irrelevantly defame Plaintiff Montgomery as the villain and Government officials as Plaintiff Montgomery's unsuspecting victims, in conflict with the theme of his Book.  Defendant Risen also deliberately looks past Warren Trepp, the owner of eTreppid, to oddly single out and blame only Plaintiff Montgomery.

81.     That is, Defendant Risen and the other Defendants' defamation of Plaintiff Montgomery contradicts and undermines his own thesis in the Book Pay Any Price, curiously shifting the blame from Government officials to a lone private citizen, whom he falsely and misleadingly portrays as having no intelligence or defense background.

82.     Defendant Risen ignores evidence that should have warned him and the other Defendants that their false and misleading publications are wrong into yet another example that Plaintiff Montgomery kept defrauding the Government.

83.     The Government repeatedly rehiring Plaintiff Montgomery should have warned Defendant Risen that there is more than meets the eye to this falsified and misleading story, yet instead Risen portrays this as Plaintiff Montgomery defrauding it, the Government.

84.     More than the average lay person, Defendant Risen knows or should know the unreliability of some sources and the information they provide and the motivations of sources.

85.     A central claim of Defendant Risen's and the Defendants' defamation of Plaintiff Montgomery is that the stupid, foolish, Government was defrauded by Plaintiff Montgomery's

hoax until a private French firm opened its eyes and Government officials were tutored by the French to discover enlightenment.

86.     But in fact, Defendant Risen actually knew or should have known in advance of the Book's publication that France was an opponent of the Bush Administration's foreign policies in the relevant time period after Christmas 2003 and would neither have been trusted by the Government with such secrets nor believed.  Certainly, a private French firm would not have been so trusted.

87.     France at the time was actively involved in opposing the Bush Administration's foreign policy.[10]

88.     In particular, France's animosity toward U.S. foreign, military, and intelligence policies were driven by France's extensive commercial interests with the Middle East, such that a private French high-tech firm would be the least likely source to be believed by U.S. Government officials.

89.     In fact, so disgusted with France's opposition to U.S. foreign, military, and intelligence policies was President Bush's political party that the name of "French fries" was

---

[10]     *See* "**France raises terror war concerns**," <u>CNN</u>, February 7, 2002, ("A senior French government minister has attacked the U.S. approach to fighting terrorism as "simplistic.") http://www.cnn.com/2002/WORLD/europe/02/07/france.bush/  and "**France and allies rally against war,**" <u>BBC News,</u>  March 5, 2003, http://news.bbc.co.uk/2/hi/middle_east/2821145.stm and "**Israeli Analysts: France Ignored Islamic Terror Directed at Jewish Targets:  'Didn't want to deal with Islamic terror for political reasons,**'" <u>Washington Free Beacon</u>, January 12, 2015 ("Columnist Alex Fishman, who writes on security issues for the Tel Aviv daily, Yediot Achronot, said that French intelligence agencies "just didn't want to deal with Islamic terror for political reasons, both because of France's involvement in the Arab world and because 10 percent of its residents are Moslem. The French security services insisted on not touching Islamic terror professionally") http://freebeacon.com/national-security/israeli-analysts-france-ignored-islamic-terror-directed-at-jewish-targets/   With France as an outspoken opponent to President Bush's war on terror policies, perceived as driven by France's lucrative business opportunities in the Middle East, it is highly improbable that the CIA would share sensitive, classified information with France at that period in time.

changed to "Freedom Fries" in the cafeterias and restaurants in the Republican-controlled U.S. House of Representatives, as CNN reported on March 12, 2003.[11]  CNN reported:  "But House Majority Leader Tom DeLay, R-Texas, said he didn't think Congress needed to take any formal steps to signal its disapproval of France. 'I don't think we have to retaliate against France,' he said. '***They have isolated themselves. They have resigned from any responsibility for the war on terror.***'" (Emphasis added.)

90.     Thus Defendant Risen actually knew or should have known, as a Pulitzer Prize-winning expert reporter on national security, the war on terror, and foreign, military, and intelligence policies, that it was nearly impossible for the claim to be true that Plaintiff Montgomery pulled off a hoax against the Government until a private French high-tech firm blew the whistle on Plaintiff Montgomery's fraud using highly-classified intelligence.

91.     With regard to Defendant Risen's reporting about a Christmas 2003 alert concerning possible terrorism involving airliners, Defendant Risen actually knows and should have known that the French government does not have the authority to demand an explanation from the CIA.[12]

92.     Defendant Risen also knows and should have known that the Bush Administration would never have believed France's analysis as being unbiased and trustworthy, rather than politicized manipulation.

---

[11]     "**House cafeterias change names for 'french' fries and 'french' toast**," By Sean Loughlin, CNN, March 12, 2003.  http://www.cnn.com/2003/ALLPOLITICS/03/11/sprj.irq.fries/
[12]     Defendant Risen himself is under a court order in another case to divulge his sources as a journalist, which Risen has refused to comply with.  Risen knows that even journalists often do not reveal their sources.  See http://dissenter.firedoglake.com/2014/10/30/in-leak-prosecution-attorneys-demand-to-know-if-government-has-agreement-with-reporter-james-risen/

93.     Moreover, Defendant Risen repeatedly complains and admits in his Book and in interviews that <u>The New York Times</u> refused to publish many of his articles written on these topics.

94.     Thus, Risen has actual knowledge that experienced and well-established news sources such as <u>The New York Times</u> had serious doubts about the truthfulness of Defendant Risen's reporting on these and related topics, such that <u>The New York Times</u> refused to run many of Risen's filed reports, despite his Pulitzer Prize background. If anyone or entity was motivated by greed, it was not Plaintiff Montgomery but Defendants Risen, Houghton Mifflin, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company, who fabricated false and misleading information and then published it for financial gain.

95.     Defendants' acts were willful malicious, deliberate, or were done with reckless indifference to the likelihood that such behavior would cause severe emotional distress and with utter disregard for the consequences of such actions, as well as encourage terrorists and others to threaten Plaintiff Montgomery with severe bodily injury or death; in effect causing a Fatwah to be placed on Plaintiff Montgomery's head and on his family.

IV.     **<u>CAUSES OF ACTION</u>**

**<u>FIRST CAUSE OF ACTION</u>**
***Common Law Defamation "Per Se"***

96.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

97.     The Defendants – all of the Defendants – together and each of them acting in concert, jointly and severally, and individually, have defamed the Plaintiff by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff which they knew or should have known to be false.

98.     Defendants' defamation of Plaintiff Montgomery was made with actual malice. Defendants had knowledge of the falsity of the defamatory statements, or made the defamatory statements with reckless disregard to the truth.

99.     Defendants together and each of them acting in concert, jointly and severally, and individually, made false statements that are Defamation *Per Se*, accusing Plaintiff of fraud, crime, scams, and being a con-artist.

100.     Among other accusations, Defendants state that Plaintiff Montgomery defrauded CIA Director George Tenet with regard to contracts with the Government, which published and accused Plaintiff Montgomery of having committed crimes under the False Claims Act, 31 U.S.C. §§ 3729 – 3733, and also common law and statutory fraud.  This is Libel *Per Se.*

101.     Defendants, together and each of them acting in concert, jointly and severally, and individually, knew that their public statements about the Plaintiff would cause severe damage to the reputation, business opportunities, social relationships, and the career of Plaintiff Montgomery.

102.     A statement is per se defamatory if it falsely imputes to another conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession or office; in other words, or if it tended to injure Plaintiff in his trade or profession.

103.     A statement is also per se defamatory if "it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession, or office, or (d) the other being a woman, acts of unchastity." *Campbell v. Jacksonville Kennel Club, Inc*., 66 So. 2d 495, 497 (Fla. 1953) citing Restatement, Torts, Section 570.

104.    For Defamation Per Se, actual malice need not be shown because damages are presumed. *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So. 2d 495, 497 (Fla. 1953); *Wolfson v. Kirk*, 273 So. 2d 774 (Fla. Dist. Ct. App. 4th Dist. 1973).

105.    Statements are "*defamatory per se,*" recognized under Florida law when statements are so powerful in their ability to hurt someone that Florida law presumes harmful as a matter of law. *Montgomery v. Knox,* 23 Fla. 595, 3 So. 211, 217 (1887), such that a court will allow damages to be awarded in these cases even if no evidence of harm has been presented. "[T]he law presumes malice in their utterance," *Abraham v. Baldwin*, 52 Fla. 151, 42 So. 591, 592 (1906), where the words are "… of such common notoriety established by the general consent of men, that the courts must of necessity take judicial notice of its harmful effect." *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 236 (1933).

106.    **First**, on Page 32 of the Book, the Defendants published:[13]

> "Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money. Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it**.** The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in public, a series of civil lawsuits involving Montgomery.  It was as if everyone in

---

[13]    Note that several statements may qualify under different theories, but are presented in full for proper context.  Some statements are repeated for that portion of the statement that qualifies under different theories of defamation under Florida law.

Washington was afraid to admit that the Emperor of the War on Terror
had no clothes."

107.     As Libel *Per Se*, Defendants published about Plaintiff's actions and work that

"many current and former U.S. officials and others familiar with the case now believe was one of

the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that

it nearly convinced the Bush administration to order fighter jets to start shooting down

commercial airliners filled with passengers over the Atlantic."

108.     As Libel *Per Se*, Defendants published about the Plaintiff that "once the fever

broke and government officials realized that they had been taken in by a grand illusion, they did

absolutely nothing about it …"

109.     **Second, on Page 32 of the Book, the Defendants published:**

> "Consider the example of Dennis Montgomery.  He provides a perfect
> case study to explain how during the war on terror greed and ambition
> have been married to unlimited rivers of cash to create a climate in
> which someone who has been accused of being a con artist was able to
> create a rogue intelligence operation with little or no adult supervision.
> Crazy became the new normal in the war on terror, and the original
> objectives of the war got lost in the process."

110.     As Libel *Per Se*, Defendants published that out of "greed" Plaintiff Montgomery

"create[d] a rogue intelligence operation with little or no adult supervision" which was "crazy"

and that he was "someone who has been accused of being a con artist."

111.     **Third, on Page 33 of the Book, the Defendants published:**

> "A former medical technician, a self-styled computer software
> expert with no experience whatsoever in national security affairs,
> Dennis Montgomery almost singlehandedly prompted President
> Bush to ground a series of international commercial flights based
> on what now appears to have been an elaborate hoax. Even after it
> appeared that Montgomery had pulled off a scheme of amazing
> scope, he still had die-hard supporters in the government who
> steadfastly refused to believe the evidence suggesting that
> Montgomery was a fake, and who rejected the notion that the

super-secret computer software that he foisted on the Pentagon and CIA was anything other than America's salvation."

112.     As Libel *Per Se*, Defendants published that Plaintiff's work "now appears to have been an elaborate hoax."

113.     As Libel *Per Se*, Defendants published that "die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Plaintiff Montgomery was a fake."

114.     As Libel *Per Se*, Defendants published "that he foisted on the Pentagon and CIA" super-secret computer software.

115.     As Libel *Per Se*, Defendants published with reckless disregard for the lives of thousands of airplane passengers on approximately ten civilian aircraft, that Plaintiff Montgomery nearly caused Government policy to shoot down those airplanes causing certain death, despite being a private citizen, rather than looking to Government officials as responsible for the decisions.

116.     **Fourth, on Page 34 of the Book, the Defendants published:**

> "Montgomery was an overweight, middle-aged, incorrigible gambler, a man who liked to play long odds because he was convinced that he could out-think the house. He once boasted to a business partner that he had a system for counting an eight-deck blackjack shoe, quite a difficult feat for even the best card sharks, and he regularly tested his theories at the El Dorado and the Peppermill Casino in Reno. He usually came up short but that didn't stop him from playing blackjack on a nightly basis, racking up unwieldy debts that eventually led to his 2010 arrest for bouncing more than $1 million in bad checks at Caesar's Palace in Las Vegas."

117.     As Libel *Per Se*, Defendants published about the Plaintiff that he was an "incorrigible gambler," meaning in effect that Plaintiff Montgomery was a gambling addict who

was "playing blackjack on a nightly basis." Historically, gambling, and in particular an uncontrollable gambling addiction, is a loathsome social status.

118.  As Libel *Per Se*, Defendants published about the Plaintiff that he bounced more than $1 million in bad checks.

119.  **Fifth, on Page 36 of the Book, the Defendants published:**

> "Michael Flynn, Montgomery's former lawyer— who later
> concluded that Montgomery was a fraud."

120.  As Libel *Per Se*, Defendants published about the Plaintiff that the Plaintiff's lawyer "concluded that Montgomery was a fraud."

121.  **Sixth, on Page 37 of the Book, the Defendants published:**

> "By the spring and summer of 2003, eTreppid was awarded contracts
> by both the air force and U.S. Special Operations Command.
> Montgomery was able to win over the government in part by offering
> field tests of his technology — tests that former employees say were
> fixed to impress visiting officials. Warren Trepp later told the FBI
> that he eventually learned that Montgomery had no real computer
> software programming skills, according to court documents that
> include his statements to the FBI. Trepp also described to federal
> investigators how eTreppid employees had confided to him that
> Montgomery had asked them to help him falsify tests of his object
> recognition software when Pentagon officials came to visit. Trepp
> said that on one occasion, Montgomery told two eTreppid employees
> to go into an empty office and push a button on a computer when they
> heard a beep on a cell phone. Meanwhile, Montgomery carried a toy
> bazooka into a field outside eTreppid. He was demonstrating to a
> group of visiting U.S. military officials that his technology could
> recognize the bazooka from a great distance."

122.  As Libel *Per Se*, Defendants published about the Plaintiff that he committed fraud including defrauding the Government, prohibited under the False Claims Act codified at 31 U.S.C. §§ 3729 – 3733.

123.  **Seventh, on Page 37 of the Book, the Defendants published:**

"After he was in place in the field, he used a hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of a bazooka on another screen prominently displayed in front of the military officers standing in another room, according to court documents. The military officers were convinced that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands. (Montgomery insists that the eTreppid employees lied when they claimed that he had asked them to fix the tests, and also says that the air force issued a report showing that it had verified the tests.)"

124. As Libel *Per Se*, Defendants published about the Plaintiff that he committed fraud including defrauding the Government, prohibited under the False Claims Act codified at 31 U.S.C. §§ 3729 – 3733.

125. **_Eighth,_ on Page 40 of the Book, the Defendants published:**

"Montgomery brilliantly played on the CIA's technical insecurities as well as the agency's woeful lack of understanding about al Qaeda and Islamic terrorism. He was able to convince the CIA that he had developed a secret new technology that enabled him to decipher al Qaeda codes embedded in the network banner displayed on the broadcasts of Al Jazeera, the Qatar-based news network. Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks. And only he had the technology to decode those messages, thus saving America from another devastating attack. The CIA— more credulous than Hollywood or Las Vegas— fell for Montgomery's claims. In short, he convinced CIA officials that he could detect terrorist threats by watching television."

126. As Libel *Per Se*, Defendants published about the Plaintiff that "Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks."

127. As Libel *Per Se*, Defendants published about the Plaintiff that he defrauded the CIA.

128. **_Ninth,_ on Page 42 of the Book, the Defendants published:**

"A CIA official defensively pointed out that the agency did not actually have a contract with eTreppid at the time Montgomery was providing data from the Al Jazeera videotapes. While they were working closely together during the final months of 2003, the CIA had not yet started paying Montgomery, the official said. The agency never finalized a contract with him because agency staff eventually realized they had been conned, according to this official. But that does not diminish the fact that for a few crucial months, the CIA took Montgomery and his technology very seriously."

129. As Libel *Per Se*, Defendants published about the Plaintiff that "agency staff eventually realized they had been conned, according to this official."

130. **Tenth, on Page 46 of the Book, the Defendants published:**

"It did not take long for the French firm to conclude that the whole thing was a hoax. The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers. The firm reported back to the French government that the supposed intelligence was a fabrication."

131. As Libel *Per Se*, Defendants published about the Plaintiff that "the whole thing" (Plaintiff Montgomery's work) "was a hoax" and a "fabrication."

132. **Eleventh, on Page 46 of the Book, the Defendants published:**

"The CIA never investigated the apparent hoax nor examined how it had been handled inside the agency. No one involved in promoting Montgomery, in vouching for his information to the president, or in proposing to shoot down planes based on his claims ever faced any consequences."

133. As Libel *Per Se*, Defendants published about the Plaintiff that his work was a hoax.

134. **Twelfth, on Page 47 of the Book, the Defendants published:**

"At the time of the Christmas 2003 scare, John Brennan was head of the newly created Terrorist Threat Integration Center and in charge of distributing terrorism-related intelligence throughout the government. That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration. But Brennan was never

admonished for his role in the affair. After Barack Obama became president, Brennan was named to be his top counterterrorism advisor in the White House. He later became CIA director."

135.    As Libel *Per Se*, Defendants published about the Plaintiff that "That meant that Brennan's office was responsible for circulating Plaintiff Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration."

136.    As Libel *Per Se*, Defendants published about the Plaintiff that "Brennan was never admonished for his role in the affair," to suggest that Brennan should have been admonished for his involvement with Plaintiff Montgomery's work with the Government.

137.    **Thirteenth, on Page 50 of the Book, the Defendants published:**

"Edra Blixseth was Dennis Montgomery's latest mark. After being introduced to him by a former Microsoft executive and then hearing Montgomery explain his software, she agreed in 2006 to bankroll Montgomery to launch a new company, to be called Blxware. Montgomery needed new government contracts for Blxware, and Edra Blixseth had the money and contacts to try to make it happen."

138.    As Libel *Per Se*, Defendants published about the Plaintiff that "Edra Blixseth was Dennis Montgomery's latest mark," clearly publishing that Plaintiff Montgomery is a con man.

139.    **Fourteenth,** on November 6, 2014, Defendant Risen appeared as an interview guest on "The Daily Show with Jon Stewart," by Comedy Central, and was interviewed by Jon Stewart. The television interview was taped at The Daily Show's studio 11th Avenue between 51st and 52nd Street, New York (Manhattan), New York, and broadcast for the first time in this district, Florida in general, nationwide across the United States, internationally, and through cable television, satellite television, and on YouTube and other Internet sites, on "The Comedy Central" channel.

140. On November 13, 2014, Plaintiff Montgomery's undersigned counsel sent a letter to Mr. Stewart requesting that he allow Mr. Montgomery to appear on his show to correct the false and misleading publications of Defendants. Mr. Stewart declined to extend this courtesy.

141. Defendant Risen stated in said television interview for his statements to be broadcast on television and widely broadcast elsewhere that his favorite story is the story of –

> Dennis Montgomery who is this guy was as a computer software expert, supposed expert. Who convinced the CIA in 2003 that he had the super-secret technology to read Al Jazeera news broadcasts and decipher Al Qaeda codes inside the [interrupted by Jon Stewart]
>
> [Jon Stewart] An Enigma machine for Al Qaeda...?
>
> [Defendant Risen] Right. And he convinced the CIA in 2003 that he could read numbers and letters hidden in the Al Jazeera broadcasts that corresponded with flights that Al Qaeda was going to shoot down, knock--- or blow up….
>
> President Bush was so convinced of this that they grounded flights all over the world at Christmas 2003 based on this guy's intelligence or supposed intelligence. It took the French intelligence service, which had gotten very mad because they grounded flights from Paris to Los Angeles. And they demanded that the CIA tell them where they were getting this information. And so they finally [non-verbal interruption]. They finally got the information. The French told them this is a hoax. This is a fabrication.
>
> And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it. And Montgomery kept getting more contracts after that.
>
> [Other, extended discussion with Jon Stewart on other topics]
>
> There is lots of raw intelligence every day that says there is an attack about to happen. You really have to be a pretty sophisticated consumer of intelligence after several years to begin to realize what's real and what's not really a credible threat.

142. As Libel *Per Se*, Defendant Risen published about the Plaintiff that "he convinced the CIA in 2003 that he could read numbers and letters hidden in the Al Jazeera broadcasts that

corresponded with flights that Al Qaeda was going to shoot down, knock -- or blow up [something] …."

143.    As Libel *Per Se*, Defendant Risen published about the Plaintiff that "The French told them this is a hoax.  This is a fabrication.  And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it.  And Montgomery kept getting more contracts after that."  The statement that "the CIA agreed with them" is Risen's assertion about Plaintiff Montgomery's work that "this is a hoax.  This is a fabrication."

144.    As Libel *Per Se*, Defendant Risen published about the Plaintiff that "they covered the whole thing up, and refused to ever talk about it," as a way of saying that the CIA had been conned because the CIA was not openly discussing in public national security activities.

145.    **Fifteenth,** on October 13, 2014, Defendant James Risen gave a television interview[14] with Judy Woodruff which was broadcast nationwide by the Public Broadcasting System (PBS).   In that interview, Defendant James Risen made the following statements for broadcast on television, and Judy Woodruff repeated many points from James Risen's Book which Risen agreed with and endorsed.  Much of the interview involved other chapters not relevant here.

> JUDY WOODRUFF:  In the next chapter, JAMES RISEN, you write about millions of dollars spent on programs that were completely fraudulent.  One was run by a man named Dennis Montgomery.  He was a, He was a .... I guess he had worked in computer software... but he was a GAMBLER![15]
>
> JAMES RISEN:  Right.
>
> JUDY WOODRUFF:  And he sold the CIA and the Pentagon on technology that turned out to be not at all what he said it was.

---

14      http://www.pbs.org/newshour/bb/costs-security-price-high/
15      Emphasis, by exclamation in tone of voice, the in original conversation.

JAMES RISEN:   It is difficult to tell in some of these cases who is scamming who.  If you talk to Montgomery, he argues that the CIA wanted him to do what he was doing.  And so its a fascinating dynamic that's developed in the war on terror, between people who recognize the opportunities for this gold rush and the agencies which are... who have so much money to spend now, they're getting so much more money than they ever had before, that in some cases they don't know what to do with.

In this case, they began to believe, in this sort of war fever, that you could find Al Qaeda messages hidden in Al Jazeera broadcasts.  And so that.. that program, that highly secret program, was used to ground planes all over Europe and the United States

JUDY WOODRUFF:  When actually there was nothing to it.

JAMES RISEN:   Right

JUDY WOODRUFF:  It was a hoax.

JAMES RISEN:   Right.  Right.

JUDY WOODRUFF:  And then there was another part of it where he was saying he had special facial recognition software....

JAMES RISEN:   Right.  Right

JUDY WOODRUFF: ... used on drones?

JAMES RISEN:   Yeah.  There were cases in which people said that he was fooling the military and the CIA about his operations and how... what kind of techniques and technologies he had.  He would argue that the CIA actually wanted him and or the army believed him and tested it.  So it's this very complicated story about a man recognizing an opportunity who had never been involved in national security before and the CIA and the military all just hungry for whoever could come with the latest idea.

146.   As Libel *Per Se*, Defendant Risen published about the Plaintiff that "you write about millions of dollars spent on programs that were completely fraudulent.  One was run by a man named Dennis Montgomery," which Defendant Risen confirms by saying, "Right." (Where

the discussion is about "the next chapter," that chapter is exclusively about Plaintiff Montgomery alone.).

147.     As Libel *Per Se*, Defendant Risen published about the Plaintiff that "When actually there was nothing to it," which Risen confirms by saying "Right." And also "It was a hoax," which Risen confirms by saying "Right.  Right."

148.     As Libel *Per Se*, Defendant Risen published about the Plaintiff that "There were cases in which people said that he was fooling the military and the CIA about his operations and how . . . what kind of techniques and technologies he had."

149.     **Sixteenth,** on October 24, 2014, Defendant Risen gave an audio interview with Lucy Worsley published on The New York Times website, titled **"Inside The New York Times Book Review: James Risen's 'Pay Any Price'"** which is accessible at that website address.  [16] In this interview  "**Inside The New York Times Book Review**," with Pamela Paul, October 24, 2014, Defendant Risen stated for national broadcast:

> PAMELA PAUL:  How do we count and account for the costs of the government's war on terror.  We'll talk to  James Risen, author of Pay Any Price:  Greed, Power, and Endless War.
>
> JAMES RISEN ("tease" audio clip):   It seems to me that what the war on terror had become in thirteen years was a search for cash and a search for power and status.
>
> PAMELA PAUL:   What is the British fascination with murder?  Lucy Worsley will explain all joining us to talk with us about her new book:  The Art of the English Murder.
>
> LUCY WORSLEY ("tease" audio clip):  The public used to consume murder in a way that you can still see the modern media doing it today.  Just look at the Pistorius trial.

---

[16]     *See* ArtsBeat: Book Review Podcast: James Risen's 'Pay Any Price', by John Williams, New York Times, October 24, 2014,  http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/ , based upon Louise Richardson's book review of Risen's book.

PAMELA PAUL:   Alexander Alter will be here with Notes from the Publishing world.  And Greg Cole has bestseller news.  This is "Inside the New York Times Book Review."  I am Pamela Paul.

James Risen joins me now.  His new book is Pay Any Price:  Greed, Power, and Endless War.  Hi James.

JAMES RISEN:   Hi, thanks for having me.

PAMELA PAUL:  Thanks for being here. Now this is a book that covers a lot of territory.  Tell us briefly about what it is you set out to write about in the book.

JAMES RISEN:   What I wanted to do was, I'd written one book before about the war on terror, and I wanted to follow up with a new book that kind of looked at where we were 13 years after 9/11 and how we had what started out in the immediate aftermath of 9/11 as kind of a search for justice or a search for retribution or whatever you want to think, say we were doing right after 9/11 as a country.  It seemed to me that what the war had become in 13 years was a search for cash and a search for power and status and that it was becoming an endless war in which we had a new mercenary class of people who were taking advantage of the war on terror.  And that enormous unintended consequences had happened.  And I began to hear about just some really crazy things that were going on.  And so I thought it would make a good story.

[The discussion then covers the Chapter "Rosetta" not relevant here, concerning a lawsuit for 9/11 families against Saudi Arabia, except the ending]

JAMES RISEN [winds up the Chapter on "Rosetta" by saying]:   ....in the war on terror became so complicated and so difficult to tell what was really going on, to me it was like a case study in how the war on terror had been turned for other uses, and become a.... something that you could never tell what was the truth and what was not the truth.  And that to me was at the heart of the problems with the war on terror, that you could never tell what's real and what was concoction today.

[The discussion then covers how Risen went about researching the book, not relevant here]

PAMELA PAUL:   Did a lot of it arise out of stories that, reporting that you'd originally done for the Times?

JAMES RISEN:   Some of it. For instance, I did a chapter The Emperor of the War on Terror, about Dennis Montgomery who [laughs] who's a strange character, who I'd done a story about him for the New York Times along with Eric Lichtbau my colleague there at the Times.  He's one of the most fascinating characters in the war on terror.  He...  He was a computer software expert who convinced the CIA that he could decipher secret codes from Al Qaeda in the Al Jazeera news broadcasts.  And that he could tell the CIA numbers and letters that corresponded with flights that Al Qaeda wanted to attack. And the CIA took this so seriously that they grounded, that the Bush Administration grounded a bunch of international flights in Christmas 2003 based on what this guy was telling them.  And when they realized it was a hoax, they covered the whole thing up and never did anything about it.  So I had done a story for the Times with....  about that and then expanded on that and got a lot more information for the book.

PAMELA PAUL:   How did you find out about him?

JAMES RISEN:   Well he had been written about a little bit before we wrote about it.  But I had also, even before he was written about by other people, I had heard from people in the CIA that there was this crazy operation that nobody wanted to talk about, that they were all embarrassed by.  To me that, it was like a case study in just how crazy the war on terror has become. And the only thing that makes sense about why it's gotten so crazy, is I think we kind of have deregulated national security and we took all, you know, Cheney said we're going to take the gloves off.  And that means we deregulated national security at the same time we poured hundreds of billions of dollars into counter-terrorism.  And so it's had enormous unintended consequences from what is essentially a national security crisis that is kind of like the banking crisis.

[The interview discussion then turns to the alleged deregulation of national security on other topics not relevant here.]

150.    As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that "And when they [the CIA] realized it was a hoax, they covered the whole thing up and never did anything about it."

151.    **Seventeenth,** Defendant Risen sat for a nationwide television news interview on the television show **DEMOCRACY NOW!** A Daily Independent Global News Hour, with Amy

35

Goodman & Juan González, at 207 W. 25th Street, Floor 11, New York, NY 10001 on October

14, 2014.  On this nationwide television news broadcast, the conversation turned to:

> AMY GOODMAN**:** Dennis Montgomery?

> JAMES RISEN**:** Dennis Montgomery is a fascinating character, who—he was a computer software person, self-styled expert, who developed what he said was special technology that would allow him to do things with computers that other people couldn't do. One of the things that he developed was this imaging technology that he said he could find images on broadcast network news tapes from Al Jazeera. He said that he could read special secret al-Qaeda codes in the banners on the broadcasts of Al Jazeera. And the CIA believed this. And he was giving them information based on watching hours and hours of Al Jazeera tapes, saying that "I know where the next al-Qaeda attack is going to be based—is going to happen." And the Bush administration and the CIA fell for this.

> AMY GOODMAN**:** And it was in the news zipper at the bottom of the Al Jazeera broadcasts?

> JAMES RISEN: Well, he says it was in the banner. But anyway. And so, it was this great—if you talk to him, he argues, well, they—that's what they were looking for. You know, they convinced him to look for this. You know, it depends on who you talk to. But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts.

> And then there's a whole number of other things, like Alarbus, which was this covert program at the Pentagon where a Palestinian involved in that was actually trying to use the bank account set up by the secret program, Pentagon program, to launder hundreds of millions of dollars. And the FBI investigated this, but then tried to keep the whole thing quiet.

> AMY GOODMAN: How much did the Government give to Dennis Montgomery?

> JAMES RISEN: Millions of dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that. So, it's a strange—to me, the Dennis Montgomery story is one of the strangest, because what it shows is, early on in the war on terror, as I said, the CIA and all these other agencies had so

much money to spend on counterterrorism that they were willing to throw it at everything. They were so afraid of the next terrorist attack that they were willing to believe anybody who came up with some idea. And I called that chapter about Montgomery, you know, "The Emperor of the War on Terror," because nobody wanted to say that the emperor had no clothes.

AMY GOODMAN: I mean, it had very real effects, aside from spending all that money.

JAMES RISEN: Yeah.

AMY GOODMAN: For example, planes being sent back.

JAMES RISEN: Yes, yes. There were planes grounded. International flights between the United States and Europe and Mexico were grounded. There was talk at the White House even of shooting down planes based on this information.

AMY GOODMAN: Because they could be used, as with September 11th, as weapons?

JAMES RISEN: Yeah, as missiles or whatever. And so, it was crazy. It was absolutely insane.

AMY GOODMAN: And it was only the French government who then did a study?

JAMES RISEN: Yes, yes. Yeah, the French government finally—you know, the U.S.—the CIA and the Bush administration didn't want to tell anybody what was really happening, where they were getting this information. You know, "This supersecret information about Al Jazeera, we can't tell you." And finally, the French intelligence service and the French government said, "You know, you're grounding our planes. You've got to tell us where you're getting this information." And they got—they finally shared the information with them, and the French got a French tech firm to look at this, and they said, "This is nuts. This is fabrication." And after a while, the CIA was finally convinced maybe the French were right, and they stopped talking about it. They didn't do anything else. They just like shut it down eventually, but never wanted to talk about what had really happened.

AMY GOODMAN: Then Dennis Montgomery, revealed as a con man—

JAMES RISEN: Yeah, yeah.

AMY GOODMAN: —in jail for that?

JAMES RISEN: Well, no, he's not in jail. But it was a—he actually got more contracts after that, with the Pentagon and other agencies. And he continued to operate for a long time. You know, he kind of went from one agency to the other.

AMY GOODMAN: We're talking to James Risen, Pulitzer Prize-winning investigative journalist for *The New York Times*. His new book, just out today, *Pay Any Price: Greed, Power, and Endless War*. When we come back, war corrupts, endless war corrupts absolutely. Stay with us.

[break]

152. As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that "But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts."

153. As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff when asked "How much did the Government give to Dennis Montgomery?" Risen answered in reply: "Millions of dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that."

154. As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that "the French got a French tech firm to look at this, and they said, 'This is nuts. This is fabrication.'"

155. As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff when asked "Then Dennis Montgomery, revealed as a con man—" Risen confirmed in reply: "Yeah, yeah."

156.     As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that he should be in jail, publishing that Plaintiff Montgomery committed a crime.

157.     **Eighteenth**, Defendant James Risen gave an interview with "**Conversations with Great Minds**" of "The Big Picture RT with talk show host Thom Hartmann on October 24, 2014.[17]

>    THOM HARTMAN:   ...  [Abrupt change of topic starting at about time 5:27]  ...  There's just this enormous amount of government money.  Let's throw it at the private sector.  They'll make things well.  One of the members of the private sector who came forward and said I've got a secret, I can figure this stuff out, was a guy by the name of Dennis Montgomery.
>
>    JAMES RISEN:   Right.  Uh, Dennis Montgomery is one of the best stories in the war on terror.  I think somebody should make a movie about him.  Dennis Montgomery was a computer software expert who said that he had developed technology that basically could find objects hidden in the video on television.  And so he convinced, through a whole series of contacts and meetings that I detail in the book, he was able to get to the CIA  and convince the CIA that he had the technology to decipher Al Qaeda codes that were he said were hidden in Al Jazeera news broadcasts.
>
>    THOM HARTMAN:   They were hidden in the Chiron or the --
>
>    JAMES RISEN:   In the banner.  In the banner, actually.  He said that he could find numbers and letters that were constantly showing up, or not showing up but were being hidden, embedded deeply in the video.  And he would then give these  numbers and letters to the CIA.  And the CIA, either he told them or they convinced themselves that these numbers and letters corresponded to flights, international airline flights, that Al Qaeda was going to attack.  And so in December, in Christmas 2003, the Bush Administration and the CIA took this so seriously that they actually grounded a whole series of international flights coming into and out of the United States, and the White House even considered shooting down some of these flights over the Atlantic.
>
>    THOM HARTMAN:   Whoa.

---

[17]     https://www.youtube.com/watch?v=jc_8f4Pp9Zc

JAMES RISEN:   And once the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist and that these supposed Al Qaeda codes weren't really in the Al Jazeera newscasts, the CIA covered the whole thing up and never went public with it and just tried to act like it never happened.

THOM HARTMAN:   Well we know how aggressively this and particularly the Obama Administration right now has gone after whistleblowers and reporters.  You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison.

JAMES RISEN:   Well, no, he ended up getting more contracts from the military... and the Pentagon.  And he was continuing, he continued to operate for several years.  It's really a remarkable story.

THOM HARTMAN:   Yeah, it really and truly is.

[Topic changes abruptly to discussions of torture in the war on terror]

158.     As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that "the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist."

159.     As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that he belongs in prison, responding to the question "You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison," by Risen answering in reply:  "Well, no, he ended up getting more contracts from the military... and the Pentagon.  And he was continuing, he continued to operate for several years.  It's really a remarkable story."

## SECOND CAUSE OF ACTION
### Common Law General Defamation

160.   Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

161.   The Defendants – all of the Defendants – together and each of them acting in concert, jointly and severally, and individually, have defamed Plaintiff by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff which they knew or should have known to be false or misleading.

162.   Defendants' defamation of Plaintiff Montgomery was made with actual malice. Defendants had knowledge of the falsity of the defamatory statements, or made the defamatory statements with reckless disregard to the truth. *See* Plaintiff's Affidavit, Exhibit C, incorporated herein by reference.

163.   To establish General Defamation, a plaintiff need only show: (1) publication; (2) falsity; (3) that the defendant acted with knowledge or reckless disregard as to the falsity on a matter concerning a public figure; (4) actual damages; and (5) the statement must be defamatory.

164.   Pleading in the alternative to the First Cause of Action, Plaintiff re-alleges each of the statements alleged under the First Cause of Action, *supra*, as Defamation *Per Se*, and here alleges that each of those statements are also General Defamation under Florida law.

165.   Plaintiff Montgomery thus claims here that if the Court finds that any of the statements labeled "First" through "Eighteenth" under the First Cause of Action above do not constitute as Defamation *Per Se*, than in the alternative the Plaintiff claims here that any and all such statements not qualifying as Defamation *Per Se* constitute General Defamation against the Plaintiff.

41

166.    Plaintiff therefore re-alleges and incorporates by reference as if set forth fully herein each and all of the statements labeled "First" through "Eighteenth" above.

167.    In addition, Defendants also made other defamatory statements that are also General Defamation.

168.    ***Nineteenth,*** **on Page 49 of the Book, the Defendants published:**

> "Trepp was furious. According to court documents, he told the FBI
> that Montgomery had stolen the software eTreppid had used on secret
> Pentagon contracts. As federal investigators moved in to investigate
> the alleged theft of the technology, they heard from Trepp and others
> that Montgomery's alleged technology wasn't real."

169.    As General Defamation, Defendants published about the Plaintiff that Montgomery had stolen valuable software – yet Defendants also assert that the software "wasn't real."  That is, Defendants simultaneously accuse Plaintiff Montgomery of profiting from defrauding the Government with Plaintiff Montgomery's software, yet allege that the software actually belonged to Warren Trepp and never belonged to Plaintiff Montgomery (that Montgomery later stole it), but also allege that the software was worthless, yet the FBI energetically investigated the alleged theft of software that was worth nothing.  The Defendants randomly construct every possible way to defame the Plaintiff, no matter how inconsistent, including with the FBI investigating the theft of a worthless item.

### THIRD CAUSE OF ACTION
#### Common Law Defamation By Implication

170.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

171.    The Defendants – all of the Defendants – together and each of them individually, have defamed Plaintiff by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff which they knew or should have known to be false or misleading.

172.     Defendants' defamation of Plaintiff Montgomery was made with actual malice. Defendants had knowledge of the falsity of the defamatory statements, or made the defamatory statements with reckless disregard to the truth. *See* Plaintiff's Affidavit, Exhibit C, incorporated herein by reference.

173.     For Defamation by Implication: " . . . [L]iterally true statements can be defamatory where they create a false impression. This variation is known as Defamation by Implication and has a longstanding history in defamation law." *See Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008). Defamation by Implication occurs when a publication states facts that are literally true, but produces a defamatory meaning apparent from a plain reading of the publication in its entirety. *See Chapin v. Knight-Ridder, Inc.* 993 F.3d 1087 (4th Cir. 1993).

174.     Pleading in the alternative, Plaintiff re-alleges that each of the statements alleged under the First and Second Causes of Action, *supra*, are in the alternative also Defamation by Implication under Florida law.

175.     Plaintiff thus alleges here that if the Court finds that any of the statements labeled "First" through "Nineteenth" above do not constitute Defamation *Per Se* or General Defamation, then in the alternative the Plaintiff re-alleges here that any and all such statements not constituting as Defamation *Per Se* or General Defamation are Defamation by Implication against the Plaintiff.

176.     Plaintiff therefore re-alleges and incorporates by reference as if set forth fully herein each and all of the statements labeled "First" through "Nineteenth" above.

177.     Across the many examples of libelous statements from the Book or slanderous interviews, Defendants published that the Plaintiff deceived the Government as to the meaning,

purpose, or interpretation of hidden data and clues that Plaintiff Montgomery uncovered, publishing that Plaintiff Montgomery defrauded and conned the Government.

178.     Thus, Defendants libel and slander Plaintiff Montgomery by implication that he defrauded and scammed the Government concerning the meaning of the information Plaintiff Montgomery uncovered, publishing that Plaintiff Montgomery obtained millions of dollars by frightening and fooling child-like and gullible CIA officials.

179.     Across the many examples of defamatory statements from the Book or slanderous interviews, Defendants published that President George W. Bush's alleged decisions to ground and almost shoot down passenger aircraft around Christmas 2003 (which Defendants would have no way of knowing about) were a result of Plaintiff Montgomery's fraud and scams, deceptively manipulating the President of the United States and the U.S. national command authority.

180.     Across the many examples of defamatory statements from the Book or interviews, Defendants published that Plaintiff Montgomery should be indicted and convicted of crimes and sentenced to prison for his actions.

181.     Among the other statements, in particular, the *Second* example of libel**, on Page 32 of the Book,** states that:

> "Consider the example of Dennis Montgomery.  He provides a perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist was able to create a rogue intelligence operation with little or no adult supervision. Crazy became the new normal in the war on terror, and the original objectives of the war got lost in the process."

182.     Thus, as Defamation by Implication, Defendants published that Plaintiff Montgomery committed fraud and went to any lengths motivated by greed, to obtain money at any cost.

183.    Among the other statements, in particular, in the ***Eleventh*** example of defamation**,**

**on Page 46 of the Book,** states that:

> "The CIA never investigated the apparent hoax nor examined how
> it had been handled inside the agency."

184.    Here, as Defamation by Implication, even if it is true (which it is not) that "The

CIA never investigated" what Defendants describe as an "apparent hoax," the implication is that

Plaintiff Montgomery perpetrated a hoax upon the CIA, and in return for money, which would be

both a fraud and a crime.

185.    Similarly, in the ***Sixteenth*** example of slander from an interview, Defendant

Risen publishes that:

> "It seemed to me that what the war had become in 13 years was a
> search for cash and a search for power and status and that it was
> becoming an endless war in which we had a new mercenary class of
> people who were taking advantage of the war on terror,"

publishing that Plaintiff Montgomery's work is fraudulent in being merely an effort to get cash.

186.    Among the other statements, in particular, the ***Nineteenth*** example of defamation**,**

**on Page 49 of the Book,** states that:

> "Trepp was furious. According to court documents, he told the FBI
> that Montgomery had stolen the software eTreppid had used on secret
> Pentagon contracts. As federal investigators moved in to investigate
> the alleged theft of the technology, they heard from Trepp and others
> that Montgomery's alleged technology wasn't real."

187.    As Defamation by Implication, Defendants published that the Plaintiff stole

valuable software yet at the same time the software that the Plaintiff used to provide services to

the Government was in fact worthless.

188.    In addition, Defendants also made and published other defamatory statements that

are also Defamation by Implication under Florida law.

189. **Twentieth,** on the Preface Page of the Book, the Defendants publish:

"I've come back," he repeated. "I was the King of Kafiristan – me and Dravot – crowned Kings we was! In this office we settled it – you setting there and giving us the books. I am Peachey – Peachey Taliaferro Carnehan – and you've been setting here ever since – Oh, Lord!"

I was more than a little astonished and expressed my feelings accordingly.

"It's true," said Carnehan, with a dry cackle, nursing his fee, which were wrapped in rags. "True as gospel. Kings we were, with crowns upon our head – me and Dravot – poor Dan – oh, poor, poor Dan, that would never take advice, not though I begged of him!"

-- Rudyard Kipling, *The Man Who Would be King.*

190. As Defamation by Implication, Defendants published that Plaintiff Montgomery (along with others addressed in the Book) is a fraud and/or con man as in *The Man Who Would be King.*

191. **Twenty-first,** in the Prologue on Page xiv of the Book, the Defendants publish:

"The new homeland security-industrial complex operates differently. It is largely made up of a web of intelligence agencies and their contractors, companies that mostly provide secret services rather than large weapons systems and equipment. These contractors are hired to help Washington determine the scale and scope of the terrorist threat; they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end."

192. As Defamation by Implication, Defendants state "they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end," suggesting that Plaintiff Montgomery's profits were _contingent_ upon results, such that Plaintiff Montgomery would make greater profits by providing false results at that.

193. **Twenty-second,** in the Prologue on Page xv of the Book, the Defendants published:

"Thus, the creation of a homeland security complex at a time of endless war has bequeathed us with the central narrative of the war on terror – modern tales of greed joined hand in hand with stories of abuse of power.  It was inevitable that those wise in the ways of the world would flock to Washington to try to cash in on the war on terror gold rush – and they have.  This book offers just a few of those stories. But those trying to monetize America's obsession with terrorism are not the only ones who have sought to exploit 9/11."

"Opportunism comes in many forms and is driven by more than just greed.  Ambition and a hunger for power, status, and glory have become great engines of post-9/11 opportunism as well.  The more troubling stories here concern abuses of power that have extended across two presidencies for well over a decade.  After 9/11, the United States deregulated national security, stripping away the post-Watergate intelligence reforms of the 1970's that had constrained executive power for thirty years.  The results are morally challenging – and continue to this day."

194.     Thus, as Defamation by Implication, Defendants published that Plaintiff Montgomery committed fraud and went to any lengths motivated by greed, to obtain money at any cost.

195.     ***Twenty-third,*** **in the Prologue on Page xvii of the Book, the Defendants published:**

"Washington's global war on terror is now in its second decade, thanks to the bipartisan veneer it has gained under Bush and Obama. It shows no signs of slowing down, hustlers and freebooters continue to take full advantage, and the war's unintended consequences continue to pile up.  All too often, things are not what they seem."

196.     As Defamation by Implication, Defendants published that Plaintiff Montgomery – one of the key objects of the Book – is a "hustler" and a "freebooter."

197.     ***Twenty-fourth,*** **Part 1 of the Book,** including but not limited to Chapter 2 which is focused entirely on Plaintiff Montgomery, the Defendants have labeled "Part 1: Greed."

198.     Thus, by placing the chapter focused on Plaintiff Montgomery under a label for the section of the Book of "Greed," Defendants defame the Plaintiff by implication as being

motivated by greed to commit fraud and carry out the alleged hoaxes identified in the rest of the Chapter 2.

199.    **Twenty-fifth,** the Defendants have labeled Chapter 2 of the Book which is focused entirely on Plaintiff Montgomery:  "Chapter 2: The Emperor of the War on Terror."

200.    By naming the chapter focused on Plaintiff Montgomery "The Emperor of the War on Terror," Defendants defame the Plaintiff by implication as being the mastermind of the fraud that Risen seeks to portray the war on terror to be.

201.    **Twenty-Sixth, on Page 40 of the Book, the Defendants published:**

> "The CIA's Science and Technology Directorate, which had largely been stuck on the sidelines of the war on terror, saw in Dennis Montgomery an opportunity to get in the game.  The directorate had played an important role in the Cold War, but in the first few years of the war on terror, it was struggling to determine how technology could be leveraged against groups of terrorists who were trying to stay off the grid."

202.    As Defamation by Implication, again, Defendant Risen falsely and misleadingly published statements which blamed Plaintiff Montgomery for the decisions of government officials and published that Plaintiff Montgomery defrauded the Government.

203.    **Twenty-Seventh, on Page 42 of the Book, the Defendants published:**

> "Montgomery was telling the CIA exactly what it wanted to hear.  At the time, the Bush Administration was obsessed with Al Jazeera, not only because of the networks' unrelenting criticism of the invasion of Iraq, but also because it had become Osama Bin Laden's favorite outlet for broadcasting his videotaped messages to the world."

204.    As Defamation by Implication, Defendants published that Plaintiff Montgomery defrauded and conned the CIA by "telling the CIA exactly what it wanted to hear."

205.    **Twenty-Eighth, on Page 42 of the Book, the Defendants published:**

> "What remains unclear is how Montgomery was able to convince all of them that he had developed secret software that could decode Al

Qaeda's invisible messages. While he had gotten by a few credulous military officers who came to view his demonstrations, he apparently found it just as easy to persuade the CIA as well."

206.    As Defamation by Implication, Defendants published that Plaintiff Montgomery conned the Government with a hoax. That is, it would be clear "how Montgomery was able to convince all of them" if Plaintiff Montgomery's work and technology are legitimate.

207.    ***Twenty-Ninth,*** **on Page 46 of the Book, the Defendants published:**

> "Finally the French brought an end to it. Since Air France flights to the United States were among those that had been grounded, French officials had taken a dim view of the entire episode. They began demanding answers from the Americans. The French applied so much pressure on Washington that the CIA was finally forced to reveal to French intelligence the source of the threat information. Once they heard the story of Dennis Montgomery and eTreppid, French officials arranged for a French high-tech firm to reverse-engineer Montgomery's purported technology. The French wanted to see for themselves whether the claims of hidden messages in Al Jazeera broadcasts made any sense."

208.    As Defamation by Implication, if not explicit, the passage published that Plaintiff Montgomery is a fraud and that his work is a scam and a hoax.

209.    ***Thirtieth,*** **on Page 52 of the Book, the Defendants publish:**

> "Montgomery continued to get defense contracts even during the Obama administration. In 2009, Montgomery was awarded another air force contract, and later claimed that he had provided the government with warning of a threatened Somali terrorist attack against President Obama's inauguration. Joseph Liberatore, an air force official who described himself as one of "the believers" in Montgomery and said he had heard from 'various federal agencies thanking us' for the support Montgomery and his company provided during Obama's inauguration. The threat, however, later proved to be a hoax."

210.    As Defamation by Implication, Defendants published that Plaintiff Montgomery's ability to continue to receive contracts is due to Plaintiff Montgomery's ability to defraud the

Government (and stupidity of government officials) rather than an endorsement of the legitimacy

of Plaintiff Montgomery's work.

211. ***Thirty-First,*** **on Page 31 of the Book, the Defendants published:**

> "and a new breed of entrepreneur learned that one of the surest and
> easiest paths to riches could be found not in Silicon Valley building
> computers or New York designing clothes but rather in Tysons
> Corner, Virginia, coming up with new ways to predict, analyze, and
> prevent terrorist attacks— or, short of that, at least in convincing a
> few government bureaucrats that you had some magic formula for
> doing so."

212. As Defamation by Implication, Defendants published that the Plaintiff engaged in

fraud to convince a few government bureaucrats that he had a magic formula as an easy path to

riches.

213. ***Thirty-Second,*** **on Page 33 of the Book, the Defendants published:**

> "Montgomery's story demonstrates how hundreds of billions of
> dollars poured into the war on terror went to waste. With all rules
> discarded and no one watching the bottom line, government officials
> simply threw money at contractors who claimed to offer an edge
> against the new enemies. And the officials almost never checked back
> to make sure that what they were buying from contractors actually did
> any good— or that the contractors themselves weren't crooks. A 2011
> study by the Pentagon found that during the ten years after 9/ 11, the
> Defense Department had given more than $ 400 billion to contractors
> who had previously been sanctioned in cases involving $ 1 million or
> more in fraud."

214. As Defamation by Implication, Defendants published that the money provided to

Plaintiff Montgomery (among others) went to "waste."

215. ***Thirty-Third,*** **on Page 33 of the Book, the Defendants published:**

> "The Montgomery episode teaches one other lesson, too: the chance
> to gain promotions and greater bureaucratic power through access to
> and control over secret information can mean that there is no
> incentive for government officials to question the validity of that
> secret information. Being part of a charmed inner circle holds a
> seductive power that is difficult to resist."

50

216.     As Defamation by Implication, Defendants published that Plaintiff Montgomery's

work was fraudulent.

217.     **Thirty-Fourth, on Page 33 of the Book, the Defendants published:**

> "How his technology worked was a secret. Dennis Montgomery's
> computer code became the great treasure behind eTreppid
> Technologies, the company he and Trepp founded. Later, many of
> those around Montgomery began to suspect the reason why
> Montgomery had to guard his technological innovations so
> carefully. They came to believe that at least some of the
> technology didn't really exist."

218.     As Defamation by Implication, Defendants published that Plaintiff Montgomery

committed fraud.

219.     **Thirty-Fifth, on Page 35 of the Book, the Defendants published:**

> "Montgomery was on the lookout for somebody to bankroll him,
> and had put out the word to his friends at the casinos that he
> frequented the most. A year later, Montgomery and Trepp were in
> business together. Trepp was one of the first, but hardly the last, to
> be beguiled by Montgomery's claims that he had achieved
> breakthroughs in computer technology of historic significance."

220.     As Defamation by Implication, Defendants published that Plaintiff Montgomery

"beguiled" Warren Trepp by committing fraud.

221.     **Thirty-Sixth, on Page 39 of the Book, the Defendants published:**

> "For a few months in late 2003, the technology from Dennis
> Montgomery and eTreppid so enraptured certain key government
> officials that it was considered the most important and most sensitive
> counterterrorism intelligence that the Central Intelligence Agency had
> to offer President Bush. Senior officials at the CIA's Directorate of
> Science and Technology began to accept and vouch for Montgomery
> to officials at the highest levels of the government. Montgomery's
> claims grew ever more expansive, but that only solidified his position
> inside the national security arena. His technology became too
> impossible to disbelieve."

222.      As Defamation by Implication, the Defendants published that Plaintiff

Montgomery committed fraud and is a con man.

223.      ***Thirty-Seventh,* on Page 40 of the Book, the Defendants published:**

> "Montgomery persuaded the spy agency that his special computer
> technology could detect hidden bar codes broadcast on Al Jazeera,
> which had been embedded into the video feed by al Qaeda. Allegedly,
> al Qaeda was using that secret method to send messages to its terrorist
> operatives around the world about plans for new attacks. Montgomery
> convinced the CIA that his technology had uncovered a series of
> hidden letters and numbers that appeared to be coded messages about
> specific airline flights that the terrorists were targeting.

224.      As Defamation by Implication, the Defendants published that Plaintiff convinced

the CIA of claims that are not (were not) true.

225.      ***Thirty-Eighth,* on Page 42 of the Book, the Defendants published:**

> "Based on Montgomery's information, President Bush ordered the
> grounding of a series of international flights scheduled to fly into the
> United States. This step caused disruptions for thousands of
> travelers."

226.      As Defamation by Implication, the Defendants published that Plaintiff convinced

President Bush and the national command authority of conclusions drawn from Plaintiff

Montgomery's work.

227.      ***Thirty-Ninth,* on Page 42 of the Book, the Defendants published:**

> "One former senior CIA official recalled attending a White House
> meeting in the week following Christmas to discuss what to do next
> about the information coming from Montgomery. The official claims that
> there was a brief but serious discussion about whether to shoot down
> commercial airliners over the Atlantic based on the intelligence."

228.      As Defamation by Implication, the Defendants published that Plaintiff convinced

President Bush and the national command authority of conclusions drawn from Plaintiff

Montgomery's work.

229.        **_Fortieth,_ on Page 47 of the Book, the Defendants published:**

> "Even more stunning, after the debacle over the bogus Christmas
> 2003 terrorist threats, Montgomery kept getting classified government
> contracts awarded through several different corporate entities.
> Montgomery's problems with the CIA did not stop him from peddling
> variations of his technology to one government agency after another.
> The secrecy that surrounded his work once again worked in his favor.
> CIA officials were reluctant to tell their Pentagon counterparts much
> about their experiences with Montgomery, so Defense Department
> officials apparently did not realize that his technology was considered
> suspect at CIA headquarters."

230.        As Defamation by Implication, Defendants published that Plaintiff continued to

defraud, con, and scam the government, rather than concluding that the Government recognized

the legitimacy of Plaintiff Montgomery's work.

231.        **_Forty-First,_ on Page 48 of the Book, the Defendants published:**

> "He successfully infused a sense of mystery around himself. He was
> like the Wizard of Oz, but now people were beginning to try to
> examine the man behind the curtain."

232.        As Defamation by Implication, Defendants published that the Plaintiff engaged in

fraud and a hoax by keeping details mysterious, including the mystery was caused by Plaintiff

Montgomery rather than by Warren Trepp or the Government.

233.        **_Forty-Second,_ on Page 48 of the Book, the Defendants published:**

> "The technology didn't meet the requirements for us," said a Special
> Operations Command spokesman drily. Still, there is no evidence that
> officials at Special Operations Command ever talked with their
> counterparts at the CIA to check up on Montgomery before awarding
> him a contract. Special Operations Command paid a total of $ 9.6
> million to eTreppid under its contract with the firm."

234.        As Defamation by Implication, the Defendants published that Plaintiff

Montgomery again repeated his fraud and hoax against a new government agency.

235.     *Forty-Third,* **on Page 54 of the Book, in the Chapter "The New Oligarchs,"**

**the Defendants published:**

> CHAPTER 3:  The New Oligarchs
> Page 54:  "Dennis Montgomery is, of course, an extreme example of
> the new kind of counterterrorism entrepreneur who prospered in the
> shadows of 9/11.  But he was hardly alone in recognizing the lucrative
> business opportunities that the war on terror has presented.  In fact, as
> trillions of dollars have poured into the nation's new homeland
> security-industrial complex, the corporate leaders at its vanguard can
> rightly be considered the true winners of the war on terror."

236.     As Defamation by Implication, Defendants published that Plaintiff engaged in

fraud and a hoax motivated by greed.

237.     **As additional instances of Defendants' defamation of Plaintiff Montgomery,**

on information and belief, Plaintiff alleges that Defendant Risen has spoken on these topics on

radio and on television in additional interviews about the Book and Plaintiff Montgomery since

the publication of the Book in October 2014, which the Plaintiff is continuing to investigate.

238.     **As additional instances of Defendants' defamation of Plaintiff Montgomery,**

on information and belief, discovery during this litigation will disclose additional instances of

Defendants having defamed Plaintiff Montgomery since October 2014.

239.     **As additional instances of Defendants' defamation of Plaintiff Montgomery,**

Defendants' defamation of Plaintiff Montgomery has been and is being republished through

book reviews and commentary since October 2014, and such republication of the defamation is

widespread and continuing on radio, television, written publications, and proliferating daily on

the Internet in this district, Florida in general, nationally, and internationally.

## FOURTH CAUSE OF ACTION
### *Common Law Intentional Infliction of Emotional Distress*

240.   Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

241.   Defendants' knowing and intentional publication of the harmful statements against the Plaintiff has foreseeably and proximately caused the Plaintiff emotional distress.

242.   Defendants' intentional actions were committed with the knowledge that they would cause extreme physical pain and suffering and cause severe emotional distress to the Plaintiff.

243.   Defendants' actions were willful malicious, deliberate, and were done with reckless or negligent indifference to the likelihood that such behavior would cause severe emotional distress and with utter disregard for the consequences of such actions.

## FIFTH CAUSE OF ACTION
### Common Law Tortious Interference with Prospective Advantage

244.   Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

245.   Defendants understood that Plaintiff was pursuing the future full value of his software, intellectual property and software technology and techniques and was over time negotiating to make further licenses and sales of the intellectual property.

246.   Defendants were aware that their publication of false and misleading statements about Plaintiff Montgomery harmed Plaintiff Montgomery's career and livelihood and his ability to earn a living, including the opportunity to sell his professional services and software.

247.   Defendants' defamation disparaged Plaintiff's intellectual property and software so as to render it commercially worthless, by claiming that it did not work.

248.   Defendants acted knowingly, willfully and with reckless and negligent disregard of the harm that their publication of their false statements would cause to Plaintiff Montgomery's

livelihood, career, and ability to earn a living, including his opportunity to enter into contracts for the sale of his services and/or intellectual property.

249.     Defendants acted with the intentional malicious purpose of defaming Plaintiff Montgomery as a way to smear aspects of U.S. foreign, military, and intelligence polices with which they disagree in pursuit of their ideological and political agenda.

### SIXTH CAUSE OF ACTION
#### *Common Law Assault (Apprehension)*

250.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

251.     Plaintiff Montgomery was in-effect working undercover and in secret for the CIA, NSA, and other agencies of the Government on classified programs of counter-terrorism and national security.

252.     Defendants' especially high profile publications of the defamatory factual statements have placed Plaintiff Montgomery's life at risk by revealing and disclosing him to public notice by Al Qaeda and its successors such as the Islamic State (I.S.I.S.), as well as other terrorists and terrorist groups, in Florida, domestically and internationally.

253.     ISIS has openly pledged to kill members of the U.S. military and persons who are associated with the U.S. military and their families and those assisting the U.S. military and Government, particularly in counter-terrorism efforts against Islamic Jihad organizations and terrorists.

254.     Defendants have subjected Plaintiff Montgomery to what is in effect a Fatwah, which is an open call that any and all militant Jihadi Muslims should kill Plaintiff Montgomery.

255.     Defendants have placed Plaintiff Montgomery in immediate fear of bodily harm, injury, and death to him and his family members.

256.     Defendants' tortious actions alleged herein were furthered and aided and abetted by the CIA and the NSA, who want to destroy Plaintiff Montgomery to prevent him from disclosing as a whistleblower the full extent of their unconstitutional and illegal Government surveillance on American citizens to the Congress, the Inspector General, and to the courts, specifically in cases styled *Klayman v. Obama*, No. 13-851, 13-881, 14-92 (D.D.C.); *Klayman v. Obama*, No. 14-5004, 14-5005, 14-5016, 14-5017 (D.C. Cir.).

## DAMAGES WITH REGARD TO ALL COUNTS

257.     As a direct and proximate result of the intentional, willful, malicious or negligent actions of Defendants, Plaintiff Montgomery demands judgment be entered against Defendants each and every one of them, jointly and severally, including an award of compensatory and actual damages in an amount to be determined at trial, as pled below, punitive damages, reasonable attorneys fees, pre-judgment interest, post-interest and costs, and such other relief as the Court may deem just and proper.

258.     As a result of Defendants' actions, Plaintiff Montgomery suffered significant personal harm, including to his business and professional endeavors and prospects, career, and finances.

259.     As just one example, Plaintiff Montgomery negotiated for the sale of his technology to the Government for the price of $100 million.

260.     Plaintiff Montgomery was able to obtain a Top Secret clearance in less than a year in 2003.  He passed all of the security issues that were involved in obtaining that level of clearance. His clearance allowed him to courier top-secret material worldwide.  In 2007, the Plaintiff entered The White House and the Pentagon with full access to Top Secret material. As of 2010, the Plaintiff still held that clearance level, and to the best of his knowledge still does.

261.    As a result of his security clearances, the Plaintiff would be employable in high-paying jobs but for the defamation of his character and other tortious actions by the Defendants.

262.    Plaintiff Montgomery has been harmed by the loss of the economic value of his intellectual property, and the value of licensing the intellectual property and/or providing services based upon or incorporating his intellectual property.

263.    Defendants' conduct was unreasonable and outrageous and exceeds the bounds tolerated by decent society, and was done willfully, maliciously and deliberately, or with reckless indifference or negligence, to cause Plaintiff severe mental and emotional pain, distress, and anguish and loss of enjoyment of life, so as to also justify the award of punitive and exemplary damages.

264.    On information and belief, at least the Defendant Houghton Mifflin Harcourt Co., as a publicly traded corporation, was required to publicly disclose the Plaintiff's threatened lawsuit on reports filed with the Securities and Exchange Commission.  A liability or contingent liability, including threatened litigation must be reported under Item 103 "Legal Proceedings," in Management's Discussion and Analysis (MD&A) -- Item 303, and/or in Item 503(c) "Risk Factors."

265.    This information was required on Defendant's regularly scheduled SEC Form 10-Q (quarterly report) and/or SEC Form 10-K (annual report) but also on SEC Form 8-K triggered (within four days) by certain events, because "Form 8-K is the 'current 'report' companies must file with the SEC to announce major events that shareholders should know about."  http://www.sec.gov/answers/form8k.htm.

266.    Defendant's SEC Form 10-Q for the fourth quarter of 2014 was due on February 10, 2015, but is not publicly on file.  Defendant's quarterly SEC Form 10-Q filed on November

6, 2014, covered the period ended September 30, 2014.

267.     In the most recent exchange of correspondence, on January 20, 2015, Houghton Mifflin's Associate General Counsel David Eber replied to Larry Klayman's January 14, 2015, litigation demand concerning Defendants' defamation of Plaintiff Montgomery, copied by Ebers to General Counsel William Bayers, and refused to take any corrective action.

268.     In addition, on information and belief, the Defendant was required to disclose the litigation as non-public information prior to engaging in trades.  On January 31, 2015, and February 17, 2015, General Counsel William Frederick Bayers reported the sales of HMHC stock on SEC Form 4.

## PRAYER FOR RELIEF

With regard to all counts, Plaintiff demands that judgment be entered against Defendants, each and every one of them, acting in concert, jointly and severally, for compensatory and actual damages in excess of $120 million U.S. Dollars resulting from their financial, reputational, emotional and professional injury to Plaintiff, as well as equitable relief as may be appropriate, and such other relief the Court may deem just and proper.  Plaintiff further prays for an award of punitive damages in an amount in excess of $350,000,000.00 U.S. Dollars, to punish Defendants for their outrageous, deceitful, unprecedented, vicious and malicious conduct toward Plaintiff Montgomery designed so Defendants can reap huge profits for their defamatory works. Defendants' actions have left Plaintiff in ruins. According to Bloomberg Business, the market capitalization of Houghton Mifflin Harcourt is $2.8 Billion U.S Dollars. Large punitive damages will deter Defendants from committing such egregious acts in the future against Plaintiff Montgomery and others similarly situated.

## JURY DEMAND

**Plaintiff respectfully demands a jury trial on all issues so triable.**

Dated: April 27, 2015

                               Respectfully submitted,

                               */s/ Larry Klayman*
                               Larry Klayman, Esq.
                               Klayman Law Firm
                               FL Bar No. 246220
                               7050 W Palmetto Park Rd.
                               Suite 15-287
                               Boca Raton, FL 33433
                               (310) 595-0800
                               leklayman@gmail.com
                               Attorney for Plaintiff

# Exhibit A

# PAY ANY PRICE

## GREED, POWER, AND ENDLESS WAR

# JAMES RISEN

Author of *STATE OF WAR*

much Iraqi
the Ameri-

matter, the
cash in Leb-
use no one
ed with the

ker is one
rules and
likely that
Most of the
d to still be
itting to be

as a fitting
it certainly
venture in
Hussein in
2003 when

2



# THE EMPEROR OF THE
# WAR ON TERROR

Greed and power, when combined, can be devastating. In the case of the missing cash of Baghdad, greed tempted Americans and Iraqis alike, while the power of the Coalition Provisional Authority to make fast, sweeping decisions with little oversight allowed that greed to grow unchecked. Billions of dollars disappeared as a result.

Throughout the war on terror, greed and power have flourished just as readily back home in the United States, where the government's surging counterterrorism spending created a new national security gold rush. The post-9/11 panic led Congress to throw cash at the FBI, CIA, and Pentagon faster than they were able to spend it. Soon, a counterterrorism bubble, like a financial bubble, grew in Washington, and a new breed of entrepreneur learned that one of the surest and easiest paths to riches could be found not in Silicon Valley building computers or New York designing clothes but rather in Tysons Corner, Virginia, coming up with new ways to predict, analyze, and prevent terrorist attacks — or, short of that, at least in convincing a few government bureaucrats that you had some magic formula for doing so.

Consider the example of Dennis Montgomery. He provides the

31

Case 1:55-cv-20082-JEM Document 188-2 Entered on FLSD Docket 04/29/2015 Page 104 of 270

perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist was able to create a rogue intelligence operation with little or no adult supervision. Crazy became the new normal in the war on terror, and the original objectives of the war got lost in the process.

\*

Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money.

Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it. The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in a series of civil lawsuits involving Montgomery.

It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes.

\*

A former medical technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what

now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing scope, he still had die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Montgomery was a fake, and who rejected the notion that the super-secret computer software that he foisted on the Pentagon and CIA was anything other than America's salvation.

Montgomery's story demonstrates how hundreds of billions of dollars poured into the war on terror went to waste. With all rules discarded and no one watching the bottom line, government officials simply threw money at contractors who claimed to offer an edge against the new enemies. And the officials almost never checked back to make sure that what they were buying from contractors actually did any good—or that the contractors themselves weren't crooks. A 2011 study by the Pentagon found that during the ten years after 9/11, the Defense Department had given more than $400 billion to contractors who had previously been sanctioned in cases involving $1 million or more in fraud.

The Montgomery episode teaches one other lesson, too: the chance to gain promotions and greater bureaucratic power through access to and control over secret information can mean that there is no incentive for government officials to question the validity of that secret information. Being part of a charmed inner circle holds a seductive power that is difficult to resist.

Montgomery strongly denies that he peddled fraudulent technology. He insists that the charges have been leveled by critics with axes to grind, including his former lawyer and former employees. He claims that he was following direct orders from both the NSA and the CIA, and says that the CIA, NSA, and U.S. military took his technology so seriously that it was used to help in the targeting of Predator strikes and other raids. Montgomery adds that he is limited in what he can say about his software and business dealings with the CIA and Pentagon without the approval of the Justice Department. The fact that the government is blocking public disclosure of the details of its relationship with him, he adds, shows that his work was considered

## GREED

serious and important. "Do you really think," he asked, "the government invoked the state secrets privilege just from being embarrassed or conned?"



The strange tale of Dennis Montgomery and his self-proclaimed plan to win the war on terror begins, appropriately enough, inside the El Dorado Casino in downtown Reno.

Montgomery was an overweight, middle-aged, incorrigible gambler, a man who liked to play long odds because he was convinced that he could out-think the house. He once boasted to a business partner that he had a system for counting an eight-deck blackjack shoe, quite a difficult feat for even the best card sharks, and he regularly tested his theories at the El Dorado and the Peppermill Casino in Reno. He usually came up short but that didn't stop him from playing blackjack on a nightly basis, racking up unwieldy debts that eventually led to his 2010 arrest for bouncing more than $1 million in bad checks at Caesar's Palace in Las Vegas.

Gambling is how he met his first backer, Warren Trepp. Trepp got rich in the biggest casino of them all, Wall Street. He had been Michael Milken's right-hand man in the heyday of Milken's famous Beverly Hills trading desk during the "greed is good" era of insider trading in the 1980s. When a hungry federal prosecutor named Rudolph Giuliani went after Milken for insider trading, he tried to get Trepp to roll over on his boss. Trepp refused, even in the face of a threat that he would be charged himself if he failed to cooperate. Milken went to jail, but Giuliani never could nail Trepp. Instead of facing criminal charges, Trepp became the subject of a marathon investigation by the Securities and Exchange Commission (SEC), which tried to impose civil sanctions for Trepp's alleged part in Milken's insider-trading bonanza. It took nearly a decade, but Trepp finally beat the feds. In 1997, the SEC's case against him was dismissed. He walked away from the Milken years with a fortune.

Warren Trepp may have been able to defeat Rudy Giuliani and a

the govern-
g embarrassed

claimed plan
inside the El

rigible gam-
convinced that
iness partner
Tahoe, quite
ularly tested
in Reno. He
ing blackjack
ally led to his
tacks at Cae-

p. Trepp got
ad been Mi-
famous Bev-
sider trading
Rudolph Gi-
get Trepp to
threat that
Milken went
king crimi-
vestigation
tried to im-
sider-trad-
at the feds.
alked away

Ilani and a

whole legion of federal investigators, but he couldn't outwit Dennis
Montgomery.

By the late 1990s, Trepp was living in Incline Village, a wealthy
enclave on the Nevada side of Lake Tahoe, where he was shaking off
his past and trying to remake himself into a respected philanthropist,
theater angel, and canny private investor. And then he met Mont-
gomery.

Trepp was introduced to Montgomery by a casino host at the El
Dorado in 1997. Montgomery was on the lookout for somebody to
bankroll him, and had put out the word to his friends at the casinos
that he frequented the most. A year later, Montgomery and Trepp
were in business together. Trepp was one of the first, but hardly the
last, to be beguiled by Montgomery's claims that he had achieved
breakthroughs in computer technology of historic significance. The
two founded a company together and tried to find buyers for Mont-
gomery's alleged miracle software.

Montgomery convinced Trepp that he had achieved a series of ma-
jor technological advances in computer software that could be worth
millions. One was the development of software that he argued pro-
vided a new method of video compression, allowing for greater video
storage and transmission than was ever available before. Another in-
novation was stunningly detailed video facial recognition. But the
most dazzling claim of all involved software that Montgomery said
could identify objects and anomalies embedded in video with unprec-
edented detail. He claimed that his technology could even find and
identify objects hidden inside videotape that were not visible to the
naked eye.

How his technology worked was a secret. Dennis Montgomery's
computer code became the great treasure behind eTreppid Technolo-
gies, the company he and Trepp founded. Later, many of those around
Montgomery began to suspect the reason why Montgomery had to
guard his technological innovations so carefully. They came to believe
that at least some of the technology didn't really exist.

\*

GREED

To commercialize his technology, Montgomery first tried to convince Hollywood that he had developed a new and efficient means of colorizing old movies. His object identification software, he claimed, could speed the process of deciding where and how to colorize each frame of film. Warren Trepp later told a court that Montgomery had given him a demonstration of his software's ability to identify patterns and images in a video of the 1939 black-and-white classic *Gunga Din.*

But after failing to strike it big in Hollywood, Montgomery and Trepp shifted their focus to the casino industry in Reno and Las Vegas. Montgomery later bragged that he had developed pattern recognition software specifically for casinos that could help identify cheaters. He even claimed he had technology that could identify high-value chips inside piles of chips on gaming tables, to detect when dealers tried to steal from the casinos by slipping valuable chips to friends. Montgomery also said he had developed video compression software that would allow casinos to more easily store thousands of hours of surveillance tapes, rather than erase all of their old footage.

But his technology was never a big hit with the casino industry, either. So Montgomery turned to Washington. There, Montgomery finally succeeded in his new search for clients through a series of coincidences and chance encounters, along with strong political and financial connections that helped to smooth the way. And it all started, like so many other things in his life, in a casino.

In 2002, Warren Trepp arranged for the MGM Grand Casino to take a look at Montgomery's technology. An air force colonel who had heard about Montgomery's work decided to come and see it as well. Impressed, he helped Montgomery and eTreppid land a contract with the air force.

Michael Flynn, Montgomery's former lawyer—who later concluded that Montgomery was a fraud—said that Montgomery had told him that Montgomery had won over the visiting air force officer, who became convinced that Montgomery's object recognition and video compression technologies could help the air force's Predator drone program. The CIA and air force were flying Predator drones over Afghanistan at the time, and they were sending back thousands of hours of video that needed to be analyzed and stored. Just like

36

Las Vegas casinos, the air force needed a way to maintain the massive piles of video generated by its own version of the eye in the sky. Montgomery's object recognition technology could provide new ways for the air force to track suspected terrorists with the Predator. Montgomery claimed that his facial recognition software was so good that he could identify individual faces from the video camera flying on a Predator high above the mountains of southern Afghanistan.

By the spring and summer of 2003, eTreppid was awarded contracts by both the air force and U.S. Special Operations Command. Montgomery was able to win over the government in part by offering field tests of his technology—tests that former employees say were fixed to impress visiting officials. Warren Trepp later told the FBI that he eventually learned that Montgomery had no real computer software programming skills, according to court documents that include his statements to the FBI. Trepp also described to federal investigators how eTreppid employees had confided to him that Montgomery had asked them to help him falsify tests of his object recognition software when Pentagon officials came to visit. Trepp said that on one occasion, Montgomery told two eTreppid employees to go into an empty office and push a button on a computer when they heard a beep on a cell phone. Meanwhile, Montgomery carried a toy bazooka into a field outside eTreppid. He was demonstrating to a group of visiting U.S. military officials that his technology could recognize the bazooka from a great distance.

After he was in place in the field, he used a hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of the bazooka on another screen prominently displayed in front of the military officers standing in another room, according to court documents. The military officers were convinced that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands. (Montgomery insists that the eTreppid employees lied when they claimed that he had asked them to fix the tests, and also says that the air force issued a report showing that it had verified the tests.)

Montgomery had a lot of support when it came to dealing with the

government. Through Warren Trepp, he had excellent political connections, and in Washington that can take you a very long way.

To help eTreppid get more government business, Trepp brought in Letitia White, a Washington lobbyist with ties to congressional Republicans. She was particularly close with her former boss, California congressman Jerry Lewis. He, in turn, was chairman of the powerful House Defense Appropriations Subcommittee (he later became chairman of the full appropriations committee) and so was able to steer billions of dollars in spending to programs he favored throughout the Pentagon. Letitia White, who had been one of Lewis's closest aides, had left to go to work with the Washington lobbying firm of Copeland Lowery, where she specialized in arranging custom-built earmarks in the defense and intelligence budgets for her clients.

The connections among Lewis, White, and Copeland Lowery later became the subject of a long-running criminal investigation by the Justice Department. The U.S. attorney in Los Angeles probed whether Lewis had steered huge amounts of money to Copeland Lowery's clients in return for large campaign donations from the lobbying firm and from the defense contractors that were its clients. The investigation of Jerry Lewis was ongoing when the U.S. attorney handling the case, Carol Lam, was fired by the Bush administration in 2007, making her one of eight U.S. attorneys pushed aside by the Bush White House in a famously controversial, possibly political decision. The investigation into Lewis and his ties to Copeland Lowery was eventually dropped, but the lobbying firm broke up under the pressure, and Letitia White moved to a new firm. In 2009, Citizens for Responsibility and Ethics in Washington (CREW) named Lewis one of the fifteen most corrupt members of Congress.

But Trepp wasn't finished after hiring White. He convinced another heavyweight Nevada investor, Wayne Prim, to put money into eTreppid. In September 2003, Prim hosted a dinner that brought together Trepp, Montgomery, and Rep. Jim Gibbons of Nevada, a former airline pilot and rising star among congressional Republicans. Gibbons, an influential member of the House Intelligence Committee, almost certainly played a critical role in helping Montgomery to gain access to the Central Intelligence Agency.

ellent political con-
ery long way.

s. Trepp brought in
r congressional Re-
ser boss, California
ian of the powerful
ister became chair-
o was able to steer
red throughout the
wis's closest aides,
g firm of Copeland
r-built earmarks in

eland Lowery later
vestigation by the
es probed whether
eland Lowery's cli-
the lobbying firm
ses. The investiga-
rney handling the
son in 2007, mak-
y the Bush White
l decision. The in-
wery was eventu-
the pressure, and
is for Responsibil-
one of the fifteen

He convinced an-
o put money into
r that brought to-
of Nevada, a for-
mal Republicans.
ligence Commit-
g Montgomery to

Gibbons did not need much coaxing to try to assist eTreppid. Not only was the company based in his home state, but both Prim and Warren Trepp were longtime campaign contributors. After the dinner at Prim's house, Gibbons went to work immediately opening doors in Washington for eTreppid. Flynn said that Montgomery later told him that Gibbons quickly arranged to meet with Porter Goss, then the chairman of the House Intelligence Committee, to discuss eTreppid and Montgomery's technology.

By the fall of 2003, Dennis Montgomery had made a series of impressive moves to gain access to the black budget of the government's national security apparatus. He had the backing of two wealthy investors, had one of the nation's most influential lobbyists scouring the federal budget for earmarks on his behalf, and had the support of a key member of the CIA's oversight committee. After obtaining a series of small contracts with the air force and the Special Operations Command, Montgomery was ready for the big time.

\*

For a few months in late 2003, the technology from Dennis Montgomery and eTreppid so enraptured certain key government officials that it was considered the most important and most sensitive counterterrorism intelligence that the Central Intelligence Agency had to offer President Bush. Senior officials at the CIA's Directorate of Science and Technology began to accept and vouch for Montgomery to officials at the highest levels of the government. Montgomery's claims grew ever more expansive, but that only solidified his position inside the national security arena. His technology became too impossible to disbelieve.

Montgomery's big moment came at Christmas 2003, a strange time of angst in the American national security apparatus. It was two years after the 9/11 attacks, and the war in Iraq was getting worse. Iraq was turning into a new breeding ground for terrorism, and Osama bin Laden was still on the loose, regularly thumbing his nose at the Americans by issuing videotaped threats of further terrorist strikes. The CIA, still stumbling in the aftermath of the two greatest

intelligence failures in its history—missing 9/11 and getting it wrong on Iraq's supposed weapons of mass destruction—was desperate for success, a quick win with which to answer its critics.

The CIA's Science and Technology Directorate, which had largely been stuck on the sidelines of the war on terror, saw in Dennis Montgomery an opportunity to get in the game. The directorate had played an important role in the Cold War, but in the first few years of the war on terror, it was still struggling to determine how technology could be leveraged against small groups of terrorists who were trying to stay off the grid.

Montgomery brilliantly played on the CIA's technical insecurities as well as the agency's woeful lack of understanding about al Qaeda and Islamic terrorism. He was able to convince the CIA that he had developed a secret new technology that enabled him to decipher al Qaeda codes embedded in the network banner displayed on the broadcasts of Al Jazeera, the Qatar-based news network. Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks. And only he had the technology to decode those messages, thus saving America from another devastating attack. The CIA—more credulous than Hollywood or Las Vegas—fell for Montgomery's claims. In short, he convinced CIA officials that he could detect terrorist threats by watching television.

By late 2003, CIA officials began to flock to eTreppid's offices in Reno to see Montgomery's amazing software. Michael Flynn, Montgomery's former lawyer, said that Montgomery had dealings with or knew the identities of at least sixteen different CIA officials. These people now joined the senior military officers who had frequented the company since the previous spring, when it first began to work on the Predator program.

Montgomery persuaded the spy agency that his special computer technology could detect hidden bar codes broadcast on Al Jazeera, which had been embedded into the video feed by al Qaeda. Allegedly, al Qaeda was using that secret method to send messages to its terrorist operatives around the world about plans for new attacks. Montgomery convinced the CIA that his technology had uncovered a series

*The Emperor of the War on Terror*

of hidden letters and numbers that appeared to be coded messages about specific airline flights that the terrorists were targeting.

Montgomery insists that he did not come up with the idea of analyzing Al Jazeera videotapes—he says that the CIA came to him in late 2003 and asked him to do it. CIA officials brought Montgomery two different versions of al Qaeda videotapes, he claims. They gave him original al Qaeda videotapes obtained independently by the CIA, and then also gave him recordings of the same videotapes recorded as they had been broadcast on Al Jazeera. The CIA wanted him to compare the two, he claims.

But even if it wasn't Montgomery's idea, he ran with it as fast as he could. He told the CIA that he had found that the versions of the tapes broadcast on Al Jazeera had hidden letters and numbers embedded in them. He says that he found that each bin Laden video broadcast on al Jazeera had patterns and objects embedded in the network's own banner displayed with the video recordings.

Montgomery let the CIA draw its own conclusions based on the information he gave them. After he reported to the CIA that he had detected a series of hidden letters and numbers, he left it up to the CIA to conclude that those numbers and letters referred to specific airline flights. He insists that he did not offer the CIA his own conclusions about what the data meant.

By the middle of December 2003, Montgomery reported to the CIA that he had discovered certain combinations of letters and numbers. For example, coded messages that included the letters "AF" followed by a series of numbers, or the letters "AA" and "UA" and two or three digits, kept repeating. In other instances, he told the agency that he had found a series of numbers that looked like coordinates for the longitude and latitude of specific locations.

The CIA made the inevitable connections. "They would jump at conclusions," says Montgomery. "There would be things like C4, C4, and they would say that's explosives. They jumped to conclusions." He added that he "never suggested it was airplanes or a threat."

Montgomery's data triggered panic at the CIA and the White House—and urgent demands that Montgomery produce more. On Christmas Eve, CIA officials showed up at Montgomery's house in

41

## GREED

Reno and told him that he had to go back to his office to keep digging through incoming videotapes and Al Jazeera broadcasts throughout the holidays, Montgomery recalled.

Montgomery was telling the CIA exactly what it wanted to hear. At the time, the Bush administration was obsessed with Al Jazeera, not only because of the network's unrelenting criticism of the invasion of Iraq, but also because it had become Osama bin Laden's favorite outlet for broadcasting his videotaped messages to the world. Each time bin Laden released a new video, the American media immediately turned to the CIA for a quick response and analysis of whether the recording was genuine and where and when it had been taped. Each new broadcast on Al Jazeera forced the CIA to scramble to stay one step ahead of Western reporters baying for answers. At first, when bin Laden released videotapes filmed outdoors in what appeared to be the mountainous terrain of northwestern Pakistan, the CIA even tried to conduct a geological analysis of the rocky outcroppings that served as the backdrop for the video, to try to figure out where bin Laden was. His broadcast statements prompted the CIA to look for new methods of analyzing the news network, and also led some American officials to suspect that there was a covert relationship between Al Jazeera and al Qaeda.

Former senior CIA officials say that officials from the CIA's Science and Technology Directorate, including the directorate's chief, Donald Kerr, believed Montgomery's claims about al Qaeda codes. They also convinced CIA director George Tenet to take the technology and intelligence flowing from Montgomery's software seriously. As a result, in December 2003, Tenet rushed directly to President Bush when information provided by Montgomery and his software purported to show that a series of flights from France, Britain, and Mexico to the United States around Christmas were being targeted by al Qaeda. The data strongly suggested that the terrorist group was planning to crash the planes at specific coordinates.

Based on Montgomery's information, President Bush ordered the grounding of a series of international flights scheduled to fly into the United States. This step caused disruptions for thousands of travelers on both sides of the Atlantic, while further stoking public fears of an-

to his office to keep digging
were broadcasts throughout

it what it wanted to hear. At
sessed with Al Jazeera, not
criticism of the invasion of
the bin Laden's favorite out-
ges to the world. Each time
erican media immediately
and analysis of whether the
an it had been taped. Each
IA to scramble to stay one
answers. At first, when bin
in what appeared to be the
areas, the CIA even tried to
outcroppings that served as
out where bin Laden was.
A to look for new methods
of some American officials
nship between Al Jazeera

als from the CIA's Science
directorate's chief, Donald
al Qaeda codes. They also
the technology and intel-
a seriously. As a result, in
esident Bush when infor-
ware purported to show
and Mexico to the United
ted by al Qaeda. The data
was planning to crash the

esident Bush ordered the
scheduled to fly into the
by thousands of travelers
asking public fears of an-

other spectacular al Qaeda attack just two years after the 9/11 attacks on New York and Washington.

✳

Years later, several former CIA officials who eventually pieced together what had happened in those frenzied days became highly critical of how Montgomery's information was handled by Tenet and other senior CIA managers. The critics came to believe that top officials in the CIA's Science and Technology Directorate became fierce advocates for Montgomery's information because they were eager to play a more prominent role in the Bush administration's war on terror. The scientists were tired of being shunted aside, and Montgomery gave them what they wanted: technology that could prove their worth. "They wanted in," said one former senior CIA official, "they wanted to be part of the game."

But former CIA officials blame Tenet even more; the CIA director enabled the overeager scientists. He allowed them to circumvent the CIA's normal reporting and vetting channels, and rushed the raw material fed to the agency by Montgomery directly to the president. Bush himself had no way of vetting the material he was being handed by the CIA. "Tenet made George Bush the case officer on this," said one former senior CIA official. "The president was deciding how this was being handled."

One former senior CIA official said that for two or three months in late 2003 and early 2004, the intelligence from Montgomery was treated like it was the most valuable counterterrorism material at the CIA. Special briefings were given almost daily on the intelligence, but only a handful of CIA officials were told where the intelligence was coming from. "They treated this like the most important, most sensitive compartmented material they had on terrorism," said one former CIA official.

Officially, the CIA still refuses to discuss any details of the episode. One CIA official offered a qualified defense of Tenet's handling of Montgomery's information, saying that the decision to share the threat information with President Bush was debated and approved by

43

GREED

the administration's so-called principals committee, made up of Vice President Dick Cheney, the secretaries of state and defense, and other members of the cabinet. Only after the principals agreed did Tenet take the intelligence in to Bush. In other words, Tenet wasn't the only one who appears to have been hoodwinked. Dennis Montgomery's information received the stamp of approval by the entire upper echelon of the Bush administration.

\*

What remains unclear is how Montgomery was able to convince all of them that he had developed secret software that could decode al Qaeda's invisible messages. While he had gotten by a few credulous military officers who came to view his demonstrations, he apparently found it just as easy to persuade the CIA as well.

A CIA official defensively pointed out that the agency did not actually have a contract with eTreppid at the time Montgomery was providing data from the Al Jazeera videotapes. While they were working closely together during the final months of 2003, the CIA had not yet started paying Montgomery, the official said. The agency never finalized a contract with him because agency staff eventually realized they had been conned, according to this official. But that does not diminish the fact that for a few crucial months, the CIA took Montgomery and his technology very seriously.

Montgomery was able to succeed with the CIA in part because senior agency officials considered his technology so important that they turned the knowledge of its existence into a highly compartmented secret. Few at the CIA knew any more than that there was a new intelligence source providing highly sensitive information about al Qaeda's plans for its future terrorist strikes. In other words, the CIA officials working with Montgomery—people who had already bought into Montgomery—controlled who else was told about the man and his technology. By limiting access to the information, they enhanced their own standing within the CIA; they were the high priests in on the agency's biggest secret. There would be no second-guessing.

The fact that Montgomery and eTreppid had such powerful con-

44

, made up of Vice
defense, and other
agreed did Tenet
it wasn't the only
Montgomery's in-
the upper echelon

is to convince all
could decode al
a few credulous
is, he apparently

ncy did not actu-
gomery was pro-
ey were working
CIA had not yet
ency never final-
lly realized they
as not diminish
ontgomery and

irt because sen-
tant that they
ompartmented
was a new in-
ation about al
words, the CIA
already bought
it the man and
they enhanced
h priests in on
guessing.
powerful con-

## The Emperor of the War on Terror

nections in Washington also reduced the incentives for anyone at the CIA to speak up. Raising questions about Dennis Montgomery would almost certainly lead to a grilling in front of the House Intelligence Committee and Jim Gibbons. It might also incur the wrath of Jerry Lewis and the Defense Appropriations Subcommittee, which, along with the House intelligence panel, controlled the intelligence budget.

✳

For those few allowed into the CIA's charmed circle of secret knowledge, Montgomery seemed to be providing powerful and frightening information.

The string of numbers flowing inexorably from Dennis Montgomery's computers prompted President Bush to act. One set of flights he ordered grounded were Air France flights from Paris to Los Angeles. French security detained seven men at Charles de Gaulle Airport in Paris for questioning, but then released them after no further evidence of a pending attack was uncovered. Christmas 2003 came and went with no attacks. But that did not make the White House any more skeptical of Dennis Montgomery.

One former senior CIA official recalled attending a White House meeting in the week following Christmas to discuss what to do next about the information coming from Montgomery. The official claims that there was a brief but serious discussion about whether to shoot down commercial airliners over the Atlantic based on the intelligence. The former CIA official said that during the meeting, Frances Townsend—then a counterterrorism official on the National Security Council—discussed with an NSC lawyer the fact that the president had the legal authority to shoot down planes believed to be terrorist threats, and that it might be time to exercise that authority. "I couldn't believe they were talking about it," the former senior CIA official said. "I thought this was crazy."

Townsend denied ever having such a discussion. The former CIA official repeated his version of events after being told of her denial.

✳

45

GREED

Finally, the French brought an end to it. Since Air France flights to the United States were among those that had been grounded, French officials had taken a dim view of the entire episode. They began demanding answers from the Americans. The French applied so much pressure on Washington that the CIA was finally forced to reveal to French intelligence the source of the threat information. Once they heard the story of Dennis Montgomery and eTreppid, French officials arranged for a French high-tech firm to reverse-engineer Montgomery's purported technology. The French wanted to see for themselves whether the claims of hidden messages in Al Jazeera broadcasts made any sense.

It did not take long for the French firm to conclude that the whole thing was a hoax. The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers. The firm reported back to the French government that the supposed intelligence was a fabrication.

At first, CIA officials were taken aback by the French company's findings and did not want to believe that they had been fooled. Montgomery says that CIA officials continued to work with him for months after Christmas 2003, and that CIA personnel were still showing up at his offices in Nevada until late 2004.

Once the CIA officials finally accepted the truth, however, and agreed with the French findings, George Tenet and others at the CIA who had been Montgomery's advocates tried to forget all about him. They never talked about the operation again. Within the CIA, it was as if Dennis Montgomery had never existed.

The CIA never investigated the apparent hoax nor examined how it had been handled inside the agency. No one involved in promoting Montgomery, in vouching for his information to the president, or in proposing to shoot down planes based on his claims ever faced any consequences. Donald Kerr, the head of the CIA's Science and Technology Directorate at the time, was never held to account for the role the CIA's technical experts played in advocating for Montgomery. Instead, Kerr kept getting promoted. He received several other senior assignments in the intelligence community, and was eventually

named deputy dire...
to requests for com...

At the time of th...
of the newly created...
of distributing term...
ment. That meant...
ing Montgomery's...
reaches of the Bus...
ished for his role in...
Brennan was name...
White House. He la...

In 2013, while...
Brennan to run th...
can who was vice...
submitted a writte...
gence community s...
denied that he had...
nology, and insist...
was merely a recip...
had been passed...
Montgomery's dat...
not to know wha...
pid, "other than n...
information."

There was no F...
body was blamed...
got promoted."

Even more stu...
2003 terrorist th...
ment contracts aw...
Montgomery's pro...
variations of his te...
The secrecy that s...
CIA officials were...
about their exper...

*The Emperor of the War on Terror*

Air France flights to
in grounded, French
code. They began de-
which applied so much
it forced to reveal to
formation. Once they
could, French officials
engineer Montgom-
to see for themselves
zera broadcasts made

decide that the whole
that there were simply
hidden bar codes or
French government

the French company's
had been fooled. Mont-
with him for months
are still showing up at

truth, however, and
and others at the CIA
forget all about him.
Within the CIA, it was

ask nor examined how
involved in promoting
to the president, or in
claims ever faced any
IA's Science and Tech-
to account for the role
ting for Montgomery.
and several other sen-
and was eventually

named deputy director of national intelligence. Kerr did not respond to requests for comment.

At the time of the Christmas 2003 scare, John Brennan was head of the newly created Terrorist Threat Integration Center and in charge of distributing terrorism-related intelligence throughout the government. That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration. But Brennan was never admonished for his role in the affair. After Barack Obama became president, Brennan was named to be his top counterterrorism advisor in the White House. He later became CIA director.

In 2013, while the Senate was considering whether to confirm Brennan to run the CIA, Sen. Saxby Chambliss, a Georgia Republican who was vice chairman of the Senate Intelligence Committee, submitted a written question to Brennan about his role in the intelligence community's dealings with Montgomery. In response, Brennan denied that he had been an advocate for Montgomery and his technology, and insisted that the Terrorism Threat Integration Center was merely a recipient of Montgomery's information and data, which had been passed on by the CIA. He said that the center included Montgomery's data "in analytic products as appropriate." He claimed not to know what had become of the CIA's program with eTreppid, "other than it was determined not to be a source of accurate information."

There was no further inquiry on the matter from Congress. "Nobody was blamed," complains one former CIA official. "Instead, they got promoted."

Even more stunning, after the debacle over the bogus Christmas 2003 terrorist threats, Montgomery kept getting classified government contracts awarded through several different corporate entities. Montgomery's problems with the CIA did not stop him from peddling variations of his technology to one government agency after another. The secrecy that surrounded his work once again worked in his favor. CIA officials were reluctant to tell their Pentagon counterparts much about their experiences with Montgomery, so Defense Department

47

officials apparently did not realize that his technology was considered suspect at CIA headquarters.

In February 2004, just two months after the Christmas 2003 airplane scare, eTreppid was awarded a new contract with Special Operations Command. The contract was for both data compression and "automatic target recognition software," Montgomery's purported technology to recognize the faces of people on the ground filmed in videos on Predator drones. Special Operations Command gave eTreppid access to video feeds from Predator drones controlled from Nellis Air Force Base in Nevada. It is not certain how long officials there tested Montgomery's facial recognition technology before realizing that eTreppid had no secret formula for identifying terrorists from Predator drone video feeds. But eventually, Special Operations Command also began to see through Montgomery.

"The technology didn't meet the requirements for us," said a Special Operations Command spokesman drily. Still, there is no evidence that officials at Special Operations Command ever talked with their counterparts at the CIA to check up on Montgomery before awarding him a contract. Special Operations Command paid a total of $9.6 million to eTreppid under its contract with the firm.

*

By late 2005, Dennis Montgomery was in trouble. Employees at eTreppid were becoming more openly skeptical of Montgomery and trying to get access to his secret technology to see if it really existed. For years, Montgomery had somehow managed to hide the truth about his secret work for the government from the small number of employees he had hired. He successfully infused a sense of mystery around himself. He was like the Wizard of Oz, but now people were beginning to try to examine the man behind the curtain.

Sloan Venables, hired by Montgomery to be eTreppid's director of research and development, later told the FBI that another employee, Patty Gray, began to suspect that Montgomery "was doing something other than what he was actually telling people he was doing." Venables added in his statement to the FBI that he knew that "Montgom-

ery promised products to customers that had not been completed or even assigned to programmers."

At the same time, Montgomery was arguing with Warren Trepp over money; Montgomery needed cash and claimed that Trepp had shortchanged him on his share of the revenue from eTreppid's contracts. In December 2005, Montgomery asked Trepp for a personal loan of $275,000, on top of the $1.375 million Trepp had already loaned him since 1999, according to court documents. This was too much for Trepp, who finally became fed up with Montgomery.

But Montgomery moved first. Over the Christmas holidays, Montgomery allegedly went into eTreppid's offices and deleted all of the computer files containing his source code and software development data, according to court documents. He broke with Trepp, left eTreppid, and began looking for new backers. Trepp soon discovered that Montgomery had asked yet another casino host at the El Dorado if he knew of any wealthy gamblers who would be willing to invest $5 to $10 million in a new business he was about to launch. Trepp later told the FBI that on his way out the door at eTreppid, Montgomery screamed at one employee, "You're an asshole and I will see you again!"

Trepp was furious. According to court documents, he told the FBI that Montgomery had stolen the software eTreppid had used on secret Pentagon contracts. As federal investigators moved in to investigate the alleged theft of the technology, they heard from Trepp and others that Montgomery's alleged technology wasn't real. Yet they doggedly kept probing Montgomery's theft of secret technology, and even raided Montgomery's home searching for the computer codes, all the while largely ignoring the evidence that he had perpetrated a hoax.

After their partnership broke up, Montgomery and Trepp remained locked in a series of nasty and lingering legal battles. The worst involved Montgomery's allegations that Jim Gibbons, the Nevada Republican congressman whom he had met at Wayne Prim's house, had received bribes from Warren Trepp in return for helping eTreppid to obtain defense contracts. Montgomery's accusations were explosive because they became public just as Gibbons was be-

49

GREED

ing elected governor of Nevada. They helped to trigger a federal corruption investigation, but the inquiry was eventually shelved amid questions about whether e-mails that Montgomery claimed showed that Gibbons had accepted money and a Caribbean cruise in exchange for help in winning contracts for eTreppid—and thus supposedly provided evidence of bribery—may have been forgeries. Dennis Montgomery was widely suspected of having fabricated the e-mails in an effort to damage both Trepp and Gibbons.

In 2008, Abbe Lowell, the Washington attorney representing Gibbons, announced that Gibbons had been cleared of wrongdoing and that prosecutors had told him that he would not be charged in the corruption investigation. Lowell said, "It should be crystal clear that the only persons who should be investigated or charged are those who made false allegations of wrongdoing and who tried to fuel this investigation for their own private purposes," according to an account of his statement in the Associated Press. Gibbons added that "today, I am exceedingly pleased that the FBI and the Justice Department have vindicated me from the allegations and claims of Mr. Montgomery."

\*

Montgomery was able to recover from his battle with Trepp once he landed another wealthy patron, Edra Blixseth, the wife of billionaire Tim Blixseth. Tim Blixseth had made his fortune in timber land swaps in the Pacific Northwest, and then turned his focus to developing a mountain resort for the uber-rich in Montana called the Yellowstone Club. Set in the Rocky Mountains not far north of Yellowstone National Park, the 13,600-acre club was said to be the only private ski resort in the world. It attracted jet-setters who were willing to pay to avoid mixing with the rabble at public ski resorts.

Developing the Yellowstone Club helped to secure for Tim Blixseth the ultimate status symbol—a spot on the Forbes 400. Tim and Edra enjoyed all of the perks of the super-rich—among many other things, they owned a private jet, a yacht, and a massive estate in Rancho Mirage, California, called Porcupine Creek, which came with its own private golf course. Their wealth and ownership of the Yellow-

gger a federal cor-
ally shelved amid
claimed showed
cruise in exchange
is supposedly pro-
ers. Dennis Mont-
the e-mails in an

representing Gib-
wrongdoing and
be charged in the
crystal clear that
ged are those who
to fuel this inves-
to an account of
that "today, I
Department have
Montgomery."

Trepp once he
wife of billionaire
timber land swaps
to developing a
the Yellowstone
Yellowstone Na-
only private ski
willing to pay to

cure for Tim Blix-
rbes 400. Tim and
among many other
ve estate in Ran-
came with its
of the Yellow-

stone Club also meant that the Blixseths were networking with some
of the most famous and powerful people in the world, from Bill Gates
to Jack Kemp to Benjamin Netanyahu.

Edra Blixseth was Dennis Montgomery's latest mark. After being
introduced to him by a former Microsoft executive and then hear-
ing Montgomery explain his software, she agreed in 2006 to bankroll
Montgomery to launch a new company, to be called Blxware. Mont-
gomery needed new government contracts for Blxware, and Edra
Blixseth had the money and contacts to try to make it happen. Jack
Kemp, the former congressman and onetime Republican vice presi-
dential candidate, was a member of the Yellowstone Club, and in 2006
he helped to arrange a White House meeting for Montgomery to push
his technology. Thanks to Kemp, Montgomery met with Samantha
Ravich, a national security aide to Vice President Dick Cheney, who
was an old friend of Kemp. Montgomery explained his technology to
Ravich and then tried to convince her that Cheney should support
his bid for more government funding. But unlike other officials who
had dealt with Montgomery in the past, Ravich demanded proof. She
told Montgomery that she could not do anything for him unless some
technical experts in the government vouched for his technology. He
was never able to get anyone from the Pentagon to call Ravich on his
behalf, and so she dropped the matter. She said in an interview that
she never tried to help him obtain any new government business.

Montgomery also sought to convince Israeli officials to use his
technology, but, like Samantha Ravich, the Israelis were unimpressed
and rejected his offer. Still, Montgomery continued to find ways to
get Pentagon contracts. He says that his technology was often used to
provide targeting information in raids in Iraq and Afghanistan, and
that he was given access to the Predator Operations Center at Nel-
lis Air Force Base—a sign that his work was playing a role in Preda-
tor strikes. "Months of testing and validation at Nellis," as well as at
other bases, "confirmed the value of the technology," insists Mont-
gomery.

Edra Blixseth refused a request for an interview.

★

GREED

Montgomery continued to get defense contracts even during the Obama administration. In 2009, Montgomery was awarded another air force contract, and later claimed that he had provided the government with warning of a threatened Somali terrorist attack against President Obama's inauguration. Joseph Liberatore, an air force official who described himself as one of "the believers" in Montgomery and his technology, e-mailed Montgomery and said he had heard from "various federal agencies thanking us" for the support Montgomery and his company provided during Obama's inauguration. The threat, however, later proved to be a hoax.

\*

Inevitably, Montgomery had a falling out with Edra Blixseth. He then turned to Tim Blixseth to invest and back his operation. By then, Tim and Edra Blixseth were going through an extremely bitter divorce, and Montgomery became caught up in their legal battles. Mysteriously, government lawyers sometimes sought to intervene in their court cases, with vague references to the need to keep classified information stemming from Montgomery's work with the intelligence community out of the public record.

When Montgomery approached him, Tim Blixseth had no intention of giving money to Montgomery, his ex-wife's erstwhile partner. Blixseth was interested in finding out what Montgomery was really doing, however, and so he played along when Montgomery called desperate for money. At one point, Montgomery's wife even called Blixseth to plead for help with bail after Montgomery was arrested for passing bad checks at Caesar's Palace in Las Vegas. (Eventually, Montgomery was forced into personal bankruptcy proceedings.) Blixseth refused to help but kept talking to Montgomery.

In 2010, Blixseth finally went to see Montgomery's latest computer software operation, hidden away in a nondescript warehouse near Palm Springs. Blixseth says that throughout the darkened office, Montgomery had mounted at least eight large-screen televisions, all tuned to Al Jazeera and all tied in to a computer in the middle of the room.

Dennis Mont
ing technology to
given up on his se
Blixseth took in t
his Al Jazeera da

In fact, Mon
wavering. He cla
network broadca
Olympics in the s

Today, Dennis M
that his technolo
tive and valuable
NSA contractor T
domestic surveil
me that he could
that he had been
top U.S. intellige
erations.

But Montgo
his assertions."

* Eric Lichtblau and
Aram Roston also wr

52

os even during the
as awarded another
provided the govern-
orist attack against
ers, an air force of-
ers" in Montgom-
i said he had heard
the support Mont-
s inauguration. The

a Blixseth. He then
ation. By then, Tim
ely bitter divorce,
al battles. Mysteri-
intervene in their
keep classified in-
th the intelligence

seth had no inten-
erstwhile partner.
gomery was really
gomery called des-
i even called Blix-
* was arrested for
Eventually, Mont-
eedings.) Blixseth

ery's latest com-
script warehouse
a darkened office,
en televisions, all
the middle of the

Dennis Montgomery was once again using his top-secret decoding technology to scour Al Jazeera broadcasts. Montgomery had not given up on his secret project, despite being abandoned by the CIA. As Blixseth took in the bizarre scene, Montgomery proudly told him that his Al Jazeera data was all being fed "straight to the Pentagon."

In fact, Montgomery says that his focus on Al Jazeera was unwavering. He claims that he recorded every minute of Al Jazeera's network broadcast nonstop from February 2004 until the London Olympics in the summer of 2012. "That's over 8 billion frames."

★

Today, Dennis Montgomery continues to argue that he is not a fraud, that his technology is genuine, and that he performed highly sensitive and valuable work for the CIA and the Pentagon. After former NSA contractor Edward Snowden leaked documents about the NSA's domestic surveillance operations in 2013, Montgomery suggested to me that he could provide the documents that would prove not only that he had been telling the truth, but that he had also been used by top U.S. intelligence officials in highly questionable intelligence operations.

But Montgomery has never provided the documents to back up his assertions.[*]

---

[*] Eric Lichtblau and James Risen reported about Montgomery for the *New York Times*. Aram Roston also wrote an excellent story about Montgomery for *Playboy* magazine.

# Exhibit B

# Klayman Law Firm

2020 Pennsylvania Avenue, N.W., Suite 800, Washington, DC 20006-1811 ❖ Telephone: (310) 595-0800 ❖ leklayman@gmail.com

VIA FEDERAL EXPRESS AND CERTIFIED MAIL

January 14, 2015

 **① URGENT**

Linda K. Zecher
President, Chief Executive Officer and Director

William Bayers
Executive Vice President and General Counsel

Houghton Mifflin Harcourt
222 Berkeley Street
Boston, MA 02116

## Re: Defamation of Dennis Montgomery in "Pay Any Price" by James Risen.

Dear Ms. Zecher and Mr. Bayers:

I am counsel for Dennis Montgomery.

My client has brought it my attention that the recent publication of "Pay Any Price," written by James Risen, is defamatory. In a later correspondence, I will outline in detail all of the defamatory statements, which are actionable as libel per se. And because Mr. Montgomery is not a public figure, in fact having worked with various intelligence agencies and The White House, he was "undercover" given his duties and responsibilities in gathering intelligence concerning various matters related to terrorism. Thus, to prove a case for defamation, which we will file in Florida if this matter cannot be resolved, one need not even show malice, although it arises in any event from libel per se.

In Risen's book, as just one example of the defamatory conduct, he writes at pages 32-33:

> Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money.

Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it. The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in a series of civil lawsuits involving Montgomery.

It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes.

A former medial technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing scope, he still had die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Montgomery was a fake, and who rejected the notion that the super-secret computer software that he foisted on the Pentagon and CIA was anything other than America's salvation.

It is therefore clear that Houghton Mifflin Harcourt, in order to fact-check Risen's statements to responsibly exercise due diligence, even assuming that Risen's statements are not defamatory, would have had to have had access to top secret highly classified information. However, for you the publisher, to have access to this information, without the authorization of the government, would constitute crimes.

Thus, I want to understand how you fact checked Risen before you both decided to defame my client and how, after publication of his book, you furthered Risen's continuing defamatory statements in the print, television and radio media. In short, you not only have corporate and personal significant civil liability to my client, but have you also collectively engaged what is in effect a criminal enterprise for profit.

If you would like to discuss this matter before Mr. Montgomery takes other avenues of redress, please contact me immediately. I am available to meet with you at the end of this month if such a meeting could prove productive to try to resolve this serious matter. Let me know if there is an interest by January 20, 2015 to discuss how you fact-checked Risen's statements; otherwise we will contact the Federal Bureau of Investigation and seek other suitable redress.

Although I am representing Mr. Montgomery in my private capacity, as also a public interest advocate, there is a duty and responsibility on my part not to accede to top secret classified

information being strewn all over the public record, particularly given the rise of Islamic
terrorism in recent months and the even heightening risks this presents to the this nation and the
free world.

Please govern yourselves accordingly.

Sincerely,

Larry Klayman

cc:      Dennis Montgomery
         James Risen

3



**Houghton**
**Mifflin**
**Harcourt**

David Eber
Vice President:
Associate General Counsel

January 20, 2015

VIA U.S. MAIL AND ELECTRONIC MAIL

Larry Klayman
Klayman Law Firm
2020 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC  20006-1811
leklayman@gmail.com

Re: *Pay any Price*, by James Risen

Dear Mr. Klayman:

We have received your letter dated January 14, 2015, to Linda Zecher and William Bayers at Houghton Mifflin Harcourt Publishing Company ("HMH").

We deny your allegations that *Pay any Price* contains defamatory statements concerning your client Dennis Montgomery, or that HMH or Mr. Risen engaged in any criminal conduct in preparing and vetting the book. We also decline your invitation to meet to discuss HMH's manuscript review processes.

Sincerely,

David Eber

cc:     William Bayers
         James Risen

# Klayman Law Firm

2020 Pennsylvania Avenue, N.W., Suite 800, Washington, DC 20006-1811 ⊗   Telephone: (310) 595-0800 ⊗   leklayman@gmail.com

Via Fax and Mail

February 13, 2015

Mr. William Bayers, Esq.
General Counsel
Houghton Mifflin Harcourt Publishing Company
222 Berkeley Street, FL 1-11
Boston, Massachusetts 02116

Mr. James Risen
c/o The New York Times
1627 "I" Street N.W., Suite 700
Washington, D.C. 20006-4007

Mr. James Risen
c/o Houghton Mifflin Harcourt Publishing Company
222 Berkeley Street, FL 1-11
Boston, Massachusetts 02116

Re:   **Demand for Retraction of Defamation Pursuant to § 770.02 Florida Statutes (2012)**

Dear Mr. Bayers and Mr. Risen:

I am writing as legal counsel for Mr. Dennis Montgomery, who is the subject of Chapter 2 and other portions of a book published by Houghton Mifflin Harcourt Publishing Company titled "Pay Any Price: Greed, Power and Endless War" authored by James Risen.

This letter is to place you on notice pursuant to § 770.02 Florida Statutes (2012) "Notice condition precedent to action or prosecution for libel or slander" that you have published statements concerning our client Dennis Montgomery which constitute defamation *per se*, general defamation and defamation by inference (hereafter "defamatory statements").

You are now on notice that these materials have resulted in severe damage to Dennis Montgomery personally and in his trade and profession, for which you may be held to account for legally.

Your defamatory statements were first and continue to be published in a book with publication date October 14, 2014, by Houghton Mifflin Harcourt Publishing Company at 215 Park Avenue South, New York, New York 10003, under the title "Pay Any Price: Greed, Power and Endless War" (referred to as "the Book) by author James Risen, Copyright (c) 2014 by James Risen, designated by the Library of Congress by its index system as ISBN 978-0-544-34141-8 (hardback edition).

The publication dated October 14, 2014, was the first publication of the book worldwide in any language and the first printing run of the book. The book was physically printed in the United States of America. We understand that copies of the Book were distributed to bookstores and/or the public up to a week or two earlier than the designated date of publication (a book's designated publication date being primarily of marketing significance, not necessarily the earliest date of a book's release).

Apart from the book itself, James Risen on behalf of himself and the publisher also engaged in a flurry of news interviews and talk show interviews starting in September, and continuing until the present time, associated with the publication "roll out" of his book in which Risen made further statements in addition to the words of the book itself and repeated claims from the book itself.

Many of Risen's libelous and slanderous statements were made during written news and talk show interviews in September 2014, October 2014, and November, 2014, and since then, some spoken, some in print, surrounding the publication of his book rather than in the book itself.

Your defamatory statements against Dennis Montgomery are exceedingly numerous, extensive, detailed, and often each defamatory in numerous respects. Many statements each include multiple and overlapping topics of defamation against Dennis Montgomery.

As a result, we have attached as "Attachment A" to this letter a 28-page restatement, summary, and analysis of at least 43 examples of defamatory statements. We expect that James Risen also made other statements during additional radio, television, and print interviews about the Book.

You are now on notice that this article resulted in severe damage to Mr. Montgomery personally and in his trade and profession, for which you all will be held to legally account for.

We demand that you issue a retraction immediately. In your previous letter of January 20, 2015, you denied that any defamatory statements were made. We strongly suggest that you reconsider. Please govern yourselves accordingly.

Sincerely,

Larry Klayman

cc: Dennis Montgomery

# ATTACHMENT A

## LIST OF EXAMPLES OF DEFAMATORY STATEMENTS, COMMENTS

### DEFAMATION *PER SE*

1.    The following statements are "*defamatory per se,*" recognized under Florida law when statements are so powerful in their ability to hurt someone that Florida law presumes harmful as a matter of law. *Montgomery v. Knox*, 23 Fla. 595, 3 So. 211, 217 (1887), such that a judge will allow damages to be awarded in these cases even if no evidence of harm has been presented. "[T]he law presumes malice in their utterance," *Abraham v. Baldwin*, 52 Fla. 151, 42 So. 591, 592 (1906), where the words are "… of such common notoriety established by the general consent of men, that the courts must of necessity take judicial notice of its harmful effect." *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 236 (1933). [1]

2.    **First, on Page 32 of the Book, Risen writes:** [2]

    "Consider the example of Dennis Montgomery. He provides a perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist was able to create a rogue intelligence operation with little or no adult supervision. Crazy became the new normal in the war on terror, and the original objectives of the war got lost in the process."

3.    As libel *per se*, Risen asserted that out of "greed" Montgomery "create[d] a rogue intelligence operation with little or no adult supervision and that he was "someone who has been accused of being a con artist."

---

[1] Examples of defamation *per se* include those that hurt one's profession, business or trade; falsely state that a person has a socially unacceptable illness or disease; or falsely state that a person has been involved in some kind of criminal activity. *Lawnwood Medical Center Inc. v. Sadow*, 43 So. 3d 710, 729 (Fla. 4th DCA 2010).

[2] Note that several statements may qualify under different theories, but are presented in full for proper context. Some statements are repeated for that portion of the statement that qualifies under different theories of defamation under Florida law.

4. **Second, on Page 32 of the Book, the Risen writes:**

"Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money. Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it**.** The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in public, a series of civil lawsuits involving Montgomery.  It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes."

5. As libel *per se*, Risen asserted Montgomery's work "many current and former

U.S. officials and others familiar with the case now believe was one of the most elaborate and

dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the

Bush administration to order fighter jets to start shooting down commercial airliners filled with

passengers over the Atlantic."

6. As libel *per se*, Risen asserted about the Montgomery that "once the fever broke

and government officials realized that they had been taken in by a grand illusion, they did

absolutely nothing about it …"

7. **Third, on Page 33 of the Book, Risen writes:**

"A former medical technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing

2

scope, he still had die-hard supporters in the government who
steadfastly refused to believe the evidence suggesting that
Montgomery was a fake, and who rejected the notion that the
super-secret computer software that he foisted on the Pentagon and
CIA was anything other than America's salvation."

8.      As libel *per se*, Risen asserted that Montgomery's work "now appears to have

been an elaborate hoax."

9.      As libel *per se*, Risen asserted that "die-hard supporters in the government who

steadfastly refused to believe the evidence suggesting that Montgomery was a fake."

10.     As libel *per se*, Risen asserted that he "that he foisted on the Pentagon and CIA"

super-secret computer software.

11.     **Fourth, on Page 34 of the Book, the Risen writes:**

"Montgomery was an overweight, middle-aged, incorrigible gambler,
a man who liked to play long odds because he was convinced that he
could out-think the house. He once boasted to a business partner that
he had a system for counting an eight-deck blackjack shoe, quite a
difficult feat for even the best card sharks, and he regularly tested his
theories at the El Dorado and the Peppermill Casino in Reno. He
usually came up short but that didn't stop him from playing blackjack
on a nightly basis, racking up unwieldy debts that eventually led to his
2010 arrest for bouncing more than $ 1 million in bad checks at
Caesar's Palace in Las Vegas."

12.     As libel *per se*, Risen asserted about the Montgomery that he was an "incorrigible

gambler," meaning in effect that Montgomery was a gambling addict who was "playing

blackjack on a nightly basis."  Historically, gambling and in particular an uncontrollable

gambling addict is a loathsome social status.

13.     *Fifth,* **on Page 36 of the Book, Risen writes:**

"Michael Flynn, Montgomery's former lawyer— who later
concluded that Montgomery was a fraud."

14. As libel *per se*, Risen asserted about the Montgomery that Montgomery's lawyer "concluded that Montgomery was a fraud."

15. **Sixth, on Page 37 of the Book, Risen writes:**

> "By the spring and summer of 2003, eTreppid was awarded contracts by both the air force and U.S. Special Operations Command. Montgomery was able to win over the government in part by offering field tests of his technology —tests that former employees say were fixed to impress visiting officials. Warren Trepp later told the FBI that he eventually learned that Montgomery had no real computer software programming skills, according to court documents that include his statements to the FBI. Trepp also described to federal investigators how eTreppid employees had confided to him that Montgomery had asked them to help him falsify tests of his object recognition software when Pentagon officials came to visit. Trepp said that on one occasion, Montgomery told two eTreppid employees to go into an empty office and push a button on a computer when they heard a beep on a cell phone. Meanwhile, Montgomery carried a toy bazooka into a field outside eTreppid. He was demonstrating to a group of visiting U.S. military officials that his technology could recognize the bazooka from a great distance."

16. As libel *per se*, Risen asserted about Montgomery that he committed fraud including defrauding the U.S. Government, prohibited under the False Claims Act codified at 31 U.S.C. §§ 3729 – 3733.

17. **Seventh, on Page 37 of the Book, Risen writes:**

> "After he was in place in the field, he used a hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of a bazooka on another screen prominently displayed in front of the military officers standing in another room, according to court documents. The military officers were convinced that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands. (Montgomery insists that the eTreppid employees lied when they claimed that he had asked them to fix the tests, and also says that the air force issued a report showing that it had verified the tests.)"

18. As libel *per se*, Risen asserted about Montgomery that he committed fraud including defrauding the U.S. Government, prohibited under the False Claims Act codified at 31 U.S.C. §§ 3729 – 3733.

19. **Eighth, on Page 40 of the Book, Risen writes:**

> "Montgomery brilliantly played on the CIA's technical insecurities as well as the agency's woeful lack of understanding about al Qaeda and Islamic terrorism. He was able to convince the CIA that he had developed a secret new technology that enabled him to decipher al Qaeda codes embedded in the network banner displayed on the broadcasts of Al Jazeera, the Qatar-based news network. Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks. And only he had the technology to decode those messages, thus saving America from another devastating attack. The CIA— more credulous than Hollywood or Las Vegas— fell for Montgomery's claims. In short, he convinced CIA officials that he could detect terrorist threats by watching television."

20. As libel *per se*, Risen asserted about Montgomery that "Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks."

21. As libel *per se*, Risen asserted about Montgomery that he defrauded the CIA.

22. **Ninth, on Page 42 of the Book, Risen writes:**

> "A CIA official defensively pointed out that the agency did not actually have a contract with eTreppid at the time Montgomery was providing data from the Al Jazeera videotapes. While they were working closely together during the final months of 2003, the CIA had not yet started paying Montgomery, the official said. The agency never finalized a contract with him because agency staff eventually realized they had been conned, according to this official. But that does not diminish the fact that for a few crucial months, the CIA took Montgomery and his technology very seriously."

23. As libel *per se*, Risen asserted about Montgomery that "agency staff eventually realized they had been conned, according to this official."

24.   **Tenth,** on Page 46 of the Book, the Risen writes:

"It did not take long for the French firm to conclude that the whole thing was a hoax. The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers. The firm reported back to the French government that the supposed intelligence was a fabrication."

25.   As libel *per se*, Risen asserted about Montgomery that "the whole thing"

(Montgomery's work) "was a hoax" and a "fabrication."

26.   **Eleventh,** on Page 46 of the Book, the Risen writes:

"The CIA never investigated the apparent hoax nor examined how it had been handled inside the agency. No one involved in promoting Montgomery, in vouching for his information to the president, or in proposing to shoot down planes based on his claims ever faced any consequences."

27.   As libel *per se*, Risen asserted about Montgomery that his work was a hoax.

28.   **Twelfth,** on Page 47 of the Book, the Risen writes:

"At the time of the Christmas 2003 scare, John Brennan was head of the newly created Terrorist Threat Integration Center and in charge of distributing terrorism-related intelligence throughout the government. That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration. But Brennan was never admonished for his role in the affair. After Barack Obama became president, Brennan was named to be his top counterterrorism advisor in the White House. He later became CIA director."

29.   As libel *per se*, Risen asserted about Montgomery that "That meant that

Brennan's office was responsible for circulating Montgomery's fabricated intelligence to

officials in the highest reaches of the Bush administration."

30.   **Thirteenth,** on Page 50 of the Book, Risen writes:

"Edra Blixseth was Dennis Montgomery's latest mark. After being introduced to him by a former Microsoft executive and then hearing Montgomery explain his software, she agreed in 2006 to bankroll Montgomery to launch a new company, to be called Blxware.

6

> Montgomery needed new government contracts for Blxware, and
> Edra Blixseth had the money and contacts to try to make it happen."

31.     As libel *per se*, Risen asserted about Montgomery that "Edra Blixseth was Dennis

Montgomery's latest mark," clearly asserting Montgomery to be a con man.

32.     The libel is false, including because Montgomery owed no stock or ownership in

BLIXWARE so as to be able to make a "mark" of Edra Blixseth.

33.     **Fourteenth,** on November 6, 2014, James Risen appeared as an interview guest

on "The Daily Show with Jon Stewart," by Comedy Central, interviewed by Jon Stewart.

Exhibit A, attached. The television interview was taped at The Daily Show's studio 11th Avenue

between 51st and 52nd Street, New York (Manhattan), New York, and broadcast for the first time

nationwide across the United States of America through cable television and satellite television

on "The Comedy Central" channel.

34.     James Risen stated in said television interview for his statements to be broadcast

on TV that his favorite story is the story of –

> Dennis Montgomery who is this guy was as a computer software
> expert, supposed expert. Who convinced the CIA in 2003 that he had
> the super-secret technology to read Al Jazeera news broadcasts and
> decipher Al Qaeda codes inside the [interrupted by Jon Stewart]
>
> [Jon Stewart]  An Enigma machine for Al Qaeda...?
>
> [Dennis Montgomery] Right.  And he convinced the CIA in 2003 that
> he could read numbers and letters hidden in the Al Jazeera broadcasts
> that corresponded with flights that Al Qaeda was going to shoot down,
> knock--- or blow up….
>
> President Bush was so convinced of this that they grounded flights all
> over the world at Christmas 2003 based on this guy's intelligence or
> supposed intelligence.  It took the French intelligence service, who had
> gotten very mad because they grounded flights from Paris to Los
> Angeles.  And they demanded that the CIA tell them where they were
> getting this information.    And so they finally [non-verbal

interruption]. They finally got the information. The French told them this is a hoax. This is a fabrication.

And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it. And Montgomery kept getting more contracts after that.

[Other, extended discussion with Jon Stewart on other topics]

There is lots of raw intelligence every day that says there is an attack about to happen. You really have to be a pretty sophisticated consumer of intelligence after several years to begin to realize what's real and what's not really a credible threat.

35.     As libel *per se*, Risen asserted about Montgomery that "he convinced the CIA in 2003 that he could read numbers and letters hidden in the Al Jazeera broadcasts that corresponded with flights that Al Qaeda was going to shoot down, knock--- or blow up….

36.     As libel *per se*, Risen asserted about Montgomery that "The French told them this is a hoax. This is a fabrication. And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it. And Montgomery kept getting more contracts after that." The statement that "the CIA agreed with them" is Risen's assertion about Montgomery's work that "this is a hoax. This is a fabrication."

37.     As libel *per se*, Risen asserted about Montgomery that "they covered the whole thing up, and refused to ever talk about it," as a way of saying that the CIA had been conned.

38.     **Fifteenth,** on October 13, 2014, James Risen gave a television interview [3] with Judy Woodruff which was broadcast nationwide by the Public Broadcasting System (PBS). In that interview, James Risen made the following statements for broadcast on television, and Judy Woodruff repeated many points from James Risen's book which Risen agreed with and endorsed. Much of the interview involved other chapters not relevant here.

---

[3]     http://www.pbs.org/newshour/bb/costs-security-price-high/

JUDY WOODRUFF:  In the next chapter, JAMES RISEN, you write about millions of dollars spent on programs that were completely fraudulent.  One was run by a man named Dennis Montgomery.  He was a, He was a .... I guess he had worked in computer software... but he was a GAMBLER! [4]

JAMES RISEN:  Right.

JUDY WOODRUFF:  And he sold the CIA and the Pentagon on technology that turned out to be not at all what he said it was.

JAMES RISEN:   It is difficult to tell in some of these cases who is scamming who.  If you talk to Montgomery, he argues that the CIA wanted him to do what he was doing.  And so its a fascinating dynamic that's developed in the war on terror, between people who recognize the opportunities for this gold rush and the agencies which are... who have so much money to spend now, they're getting so much more money than they ever had before, that in some cases they don't know what to do with.

In this case, they began to believe, in this sort of war fever, that you could find Al Qaeda messages hidden in Al Jazeera broadcasts.  And so that.. that program, that highly secret program, was used to ground planes all over Europe and the United States

JUDY WOODRUFF:  When actually there was nothing to it.

JAMES RISEN:  Right

JUDY WOODRUFF:  It was a hoax.

JAMES RISEN:  Right.  Right.

JUDY WOODRUFF:  And then there was another part of it where he was saying he had special facial recognition software....

JAMES RISEN:  Right.  Right

JUDY WOODRUFF:  ... used on drones?

JAMES RISEN:   Yeah.  There were cases in which people said that he was fooling the military and the CIA about his operations and how... what kind of techniques and technologies he had.  He would argue that the CIA actually wanted him and or the army believed him

---

[4]     Emphasis, by exclamation in tone of voice, the in original conversation.

and tested it.  So it's this very complicated story about a man
recognizing an opportunity who had never been involved in national
security before and the CIA and the military all just hungry for
whoever could come with the latest idea.

39.     As libel *per se*, Risen asserted about Montgomery that "you write about millions of dollars spent on programs that were completely fraudulent.  One was run by a man named Dennis Montgomery," which Risen confirms by saying "Right." (Actually where the discussion is about "the next chapter" that chapter is exclusively about Dennis Montgomery alone.)

40.     As libel *per se*, Risen asserted about Montgomery that "When actually there was nothing to it," which Risen confirms by saying "Right." And also "It was a hoax," which Risen confirms by saying "Right.  Right."

41.     As libel *per se*, Risen asserted about Montgomery that "There were cases in which people said that he was fooling the military and the CIA about his operations and how... what kind of techniques and technologies he had."

42.     **Sixteenth,** on October 24, 2014, James Risen gave an audio interview with Lucy Worsley published on the <u>New York Times</u> website, titled **"Inside The New York Times Book Review: James Risen's 'Pay Any Price'"** which is accessible at that website address. [5]  In this interview  "Inside <u>The New York Times</u> Book Review," with Pamela Paul, October 24, 2014, James Risen stated for national broadcast:

> PAMELA PAUL:  How do we count and account for the costs of the
> government's war on terror.  We'll talk to  James Risen, author of Pay
> Any Price:  Greed, Power, and Endless War.

---

[5]     See:  ArtsBeat: Book Review Podcast: James Risen's 'Pay Any Price', by John Williams, <u>New York Times</u>, October 24, 2014, http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/ , based upon Louise Richardson's book review of Risen's book.

JAMES RISEN ("tease" audio clip):  It seems to me that what the war on terror had become in thirteen years was a search for cash and a search for power and status.

PAMELA PAUL:  What is the British fascination with murder?  Lucy Worsley will explain all joining us to talk with us about her new book:  The Art of the English Murder.

LUCY WORSLEY ("tease" audio clip):  The public used to consume murder in a way that you can still see the modern media doing it today.  Just look at the Pistorius trial.

PAMELA PAUL:  Alexander Alter will be here with Notes from the Publishing world.  And Greg Cole has bestseller news.  This is "Inside the New York Times Book Review."  I am Pamela Paul.

James Risen joins me now.  His new book is Pay Any Price:  Greed, Power, and Endless War.  Hi James.

JAMES RISEN:  Hi, thanks for having me.

PAMELA PAUL:  Thanks for being here. Now this is a book that covers a lot of territory.  Tell us briefly about what it is you set out to write about in the book.

JAMES RISEN:  What I wanted to do was, I'd written one book before about the war on terror, and I wanted to follow up with a new book that kind of looked at where we were 13 years after 9/11 and how we had what started out in the immediate aftermath of 9/11 as kind of a search for justice or a search for retribution or whatever you want to think, say we were doing right after 9/11 as a country.  It seemed to me that what the war had become in 13 years was a search for cash and a search for power and status and that it was becoming an endless war in which we had a new mercenary class of people who were taking advantage of the war on terror.  And that enormous unintended consequences had happened.  And I began to hear about just some really crazy things that were going on.  And so I thought it would make a good story.

[The discussion then covers the Chapter "Rosetta" not relevant here, concerning a lawsuit for 9/11 families against Saudi Arabia, except the ending]

JAMES RISEN [winds up the Chapter on "Rosetta" by saying]:   .... in the war on terror became so complicated and so difficult to tell what was really going on, to me it was like a case study in how the

war on terror had been turned for other uses, and become a.... something that you could never tell what was the truth and what was not the truth. And that to me was at the heart of the problems with the war on terror, that you could never tell what's real and what was concoction today.

[The discussion then covers how Risen went about researching the book, not relevant here]

PAMELA PAUL:   Did a lot of it arise out of stories that, reporting that you'd originally done for the Times?

JAMES RISEN:   Some of it. For instance, I did a chapter The Emperor of the War on Terror, about Dennis Montgomery who [laughs] who's a strange character, who I'd done a story about him for the New York Times along with Eric Lichtbau my colleague there at the Times. He's one of the most fascinating characters in the war on terror.  He... He was a computer software expert who convinced the CIA that he could decipher secret codes from Al Qaeda in the Al Jazeera news broadcasts.  And that he could tell the CIA numbers and letters that corresponded with flights that Al Qaeda wanted to attack. And the CIA took this so seriously that they grounded, that the Bush Administration grounded a bunch of international flights in Christmas 2003 based on what this guy was telling them.  And when they realized it was a hoax, they covered the whole thing up and never did anything about it.  So I had done a story for the Times with....  about that and then expanded on that and got a lot more information for the book.

PAMELA PAUL:   How did you find out about him?

JAMES RISEN:   Well he had been written about a little bit before we wrote about it.  But I had also, even before he was written about by other people, I had heard from people in the CIA that there was this crazy operation that nobody wanted to talk about, that they were all embarrassed by.  To me that, it was like a case study in just how crazy the war on terror has become. And the only thing that makes sense about why it's gotten so crazy, is I think we kind of have deregulated national security and we took all, you know, Cheney said we're going to take the gloves off.  And that means we deregulated national security at the same time we poured hundreds of billions of dollars into counter-terrorism.  And so it's had enormous unintended consequences from what is essentially a national security crisis that is kind of like the banking crisis.

[The interview discussion then turns to the alleged deregulation of national security on other topics not relevant here.]

43.    As libel *per se*, Risen asserted about Montgomery that "And when they [the CIA] realized it was a hoax, they covered the whole thing up and never did anything about it."

44.    The libel is false, for the reasons identified above, and including that Montgomery never purported to be an expert in intelligence but left interpretation of the data he uncovered to intelligence experts of the U.S. Government.

45.    ***Seventeenth,*** James Risen sat for a nationwide television news interview on the television show ***DEMOCRACY NOW!*** A Daily Independent Global News Hour, with Amy Goodman & Juan González, at 207 W. 25th St., Floor 11, New York, NY 10001 on October 14, 2014.  On this nationwide television news broadcast, the conversation turned to:

**AMY GOODMAN:** Dennis Montgomery?

**JAMES RISEN:** Dennis Montgomery is a fascinating character, who—he was a computer software person, self-styled expert, who developed what he said was special technology that would allow him to do things with computers that other people couldn't do. One of the things that he developed was this imaging technology that he said he could find images on broadcast network news tapes from Al Jazeera. He said that he could read special secret al-Qaeda codes in the banners on the broadcasts of Al Jazeera. And the CIA believed this. And he was giving them information based on watching hours and hours of Al Jazeera tapes, saying that "I know where the next al-Qaeda attack is going to be based—is going to happen." And the Bush administration and the CIA fell for this.

**AMY GOODMAN:** And it was in the news zipper at the bottom of the Al Jazeera broadcasts?

**JAMES RISEN:** Well, he says it was in the banner. But anyway. And so, it was this great—if you talk to him, he argues, well, they—that's what they were looking for. You know, they convinced him to look for this. You know, it depends on who you talk to. But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they

13

were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts.

And then there's a whole number of other things, like Alarbus, which was this covert program at the Pentagon where a Palestinian involved in that was actually trying to use the bank account set up by the secret program, Pentagon program, to launder hundreds of millions of dollars. And the FBI investigated this, but then tried to keep the whole thing quiet.

**AMY GOODMAN:** How much did the U.S. government give to Dennis Montgomery?

**JAMES RISEN:** Millions of dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that. So, it's a strange—to me, the Dennis Montgomery story is one of the strangest, because what it shows is, early on in the war on terror, as I said, the CIA and all these other agencies had so much money to spend on counterterrorism that they were willing to throw it at everything. They were so afraid of the next terrorist attack that they were willing to believe anybody who came up with some idea. And I called that chapter about Montgomery, you know, "The Emperor of the War on Terror," because nobody wanted to say that the emperor had no clothes.

**AMY GOODMAN:** I mean, it had very real effects, aside from spending all that money.

**JAMES RISEN:** Yeah.

**AMY GOODMAN:** For example, planes being sent back.

**JAMES RISEN:** Yes, yes. There were planes grounded. International flights between the United States and Europe and Mexico were grounded. There was talk at the White House even of shooting down planes based on this information.

**AMY GOODMAN:** Because they could be used, as with September 11th, as weapons?

**JAMES RISEN:** Yeah, as missiles or whatever. And so, it was crazy. It was absolutely insane.

**AMY GOODMAN:** And it was only the French government who then did a study?

14

JAMES RISEN: Yes, yes. Yeah, the French government finally—you know, the U.S.—the CIA and the Bush administration didn't want to tell anybody what was really happening, where they were getting this information. You know, "This supersecret information about Al Jazeera, we can't tell you." And finally, the French intelligence service and the French government said, "You know, you're grounding our planes. You've got to tell us where you're getting this information." And they got—they finally shared the information with them, and the French got a French tech firm to look at this, and they said, "This is nuts. This is fabrication." And after a while, the CIA was finally convinced maybe the French were right, and they stopped talking about it. They didn't do anything else. They just like shut it down eventually, but never wanted to talk about what had really happened.

AMY GOODMAN: Then Dennis Montgomery, revealed as a con man—

JAMES RISEN: Yeah, yeah.

AMY GOODMAN: —in jail for that?

JAMES RISEN: Well, no, he's not in jail. But it was a—he actually got more contracts after that, with the Pentagon and other agencies. And he continued to operate for a long time. You know, he kind of went from one agency to the other.

AMY GOODMAN: We're talking to James Risen, Pulitzer Prize-winning investigative journalist for *The New York Times*. His new book, just out today, *Pay Any Price: Greed, Power, and Endless War*. When we come back, war corrupts, endless war corrupts absolutely. Stay with us.

[break]

46.     As libel *per se*, Risen asserted about Montgomery that "But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts."

47.     As libel *per se*, Risen asserted about Montgomery when asked "How much did the U.S. government give to Dennis Montgomery?" Risen answered in reply: "Millions of

dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that."

48.     As libel *per se*, Risen asserted about Montgomery that "the French got a French tech firm to look at this, and they said, 'This is nuts. This is fabrication.'"

49.     As libel *per se*, Risen asserted about Montgomery when asked "Then Dennis Montgomery, revealed as a con man—" Risen confirmed in reply: "Yeah, yeah."

50.     As libel *per se*, Risen asserted about Montgomery that he should be in jail.

51.     ***Eighteenth***, James Risen gave an interview with "Conversations with Great Minds" of "The Big Picture RT with talk show host Thom Hartmann on October 24, 2014. [6]

> THOM HARTMAN:   ...  [Abrupt change of topic starting at about time 5:27]  ...  There's just this enormous amount of government money.  Let's throw it at the private sector.  They'll make things well. One of the members of the private sector who came forward and said I've got a secret, I can figure this stuff out, was a guy by the name of Dennis Montgomery.
>
> JAMES RISEN:   Right.  Uh, Dennis Montgomery is one of the best stories in the war on terror.  I think somebody should make a movie about him.  Dennis Montgomery was a computer software expert who said that he had developed technology that basically could find objects hidden in the video on television.  And so he convinced, through a whole series of contacts and meetings that I detail in the book, he was able to get to the CIA  and convince the CIA that he had the technology to decipher Al Qaeda codes that were he said were hidden in Al Jazeera news broadcasts.
>
> THOM HARTMAN:   They were hidden in the Chiron or the --
>
> JAMES RISEN:   In the banner.  In the banner, actually.  He said that he could find numbers and letters that were constantly showing up, or not showing up but were being hidden, embedded deeply in the video. And he would then give these  numbers and letters to the CIA.  And the CIA, either he told them or they convinced themselves that these numbers and letters corresponded to flights, international airline flights, that Al Qaeda was going to attack.  And so in December, in Christmas

---

[6]      https://www.youtube.com/watch?v=jc_8f4Pp9Zc

2003, the Bush Administration and the CIA took this so seriously that they actually grounded a whole series of international flights coming into and out of the United States, and the White House even considered shooting down some of these flights over the Atlantic.

THOM HARTMAN:   Whoa.

JAMES RISEN:    And once the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist and that these supposed Al Qaeda codes weren't really in the Al Jazeera newscasts, the CIA covered the whole thing up and never went public with it  and just tried to act like it never happened.

THOM HARTMAN:   Well we know how aggressively this and particularly the Obama Administration right now has gone after whistleblowers and reporters.  You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison.

JAMES RISEN:   Well, no, he ended up getting more contracts from the military... and the Pentagon.  And he was continuing, he continued to operate for several years.  It's really a remarkable story.

THOM HARTMAN:   Yeah, it really and truly is.

[Topic changes abruptly to discussions of torture in the war on terror]

52.     As libel *per se*, Risen asserted about Montgomery that "the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist."

53.     As libel *per se*, Risen asserted about Montgomery that he belongs in prison, responding to the question "You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison," by Risen answering in reply:  "Well, no,

he ended up getting more contracts from the military... and the Pentagon.  And he was

continuing, he continued to operate for several years.  It's really a remarkable story."

## GENERAL DEFAMATION

54.     In addition, Risen also made additional defamatory statements that are explicit

defamation under Florida law.

55.     *Nineteenth,* **on Page 49 of the Book, Risen writes:**

> "Trepp was furious. According to court documents, he told the FBI
> that Montgomery had stolen the software eTreppid had used on secret
> Pentagon contracts. As federal investigators moved in to investigate
> the alleged theft of the technology, they heard from Trepp and others
> that Montgomery's alleged technology wasn't real."

56.     As explicit libel, Risen asserted about Montgomery that Montgomery had stolen

valuable software – yet also asserted that the software "wasn't real."

## DEFAMATION BY IMPLICATION UNDER FLORIDA LAW

### Analogous to False Light

57.     For defamation by implication: " . . . [L]iterally true statements can be defamatory

where they create a false impression. This variation is known as defamation by implication and

has a longstanding history in defamation law." *See Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098,

1106 (Fla. 2008). Defamation by implication occurs when a publication states facts that are

literally true, but produces a defamatory meaning apparent from a plain reading of the

publication in its entirety. See *Chapin v. Knight-Ridder, Inc.* 993 F.3d 1087 (4th Cir. 1993).

58.     Montgomery thus claims here that if the Court finds that any of the statements

labeled "First" through "Nineteenth" do not qualify as defamation *per se* or general defamation,

then in the alternative Montgomery claims here that any and all such statements not qualifying as

defamation *per se* or general defamation are defamation by implication against Montgomery.

59.     Across the many examples of libelous statements from the Book or slanderous

interviews, Risen implies that Montgomery deceived the U.S. Government as to the meaning,

purpose, or interpretation of hidden data and clues that Montgomery uncovered, implying that

Montgomery defrauded and conned the U.S. Government.

60.     In fact, Montgomery refused to speculate as to the interpretation or meaning of

the data and analyses he uncovered, even when pressed to state what he thought the data might

mean, but Montgomery left the role of interpretation to U.S. Government intelligence experts.

61.     Thus, throughout the statements presented herein, Risen libels and slanders

Montgomery by implication that Montgomery defrauded and scammed the U.S. Government

concerning the meaning of the information Montgomery uncovered, implying that Montgomery

obtained millions of dollars by frightening and fooling child-like and gullible CIA officials.

62.     Across the many examples of libelous statements from the Book or slanderous

interviews, Risen implies that President George W. Bush's alleged decisions to ground and

almost shoot down passenger aircraft around Christmas 2003 (which Risen would have no way

of knowing about) were a result of Montgomery's fraud and scams, deceptively manipulating the

President of the United States and the U.S. national command authority.

63.     Across the many examples of libelous statements from the Book or slanderous

interviews, Risen implies that Montgomery should be in jail.

64.     Among the other statements, in particular, the ***First*** example of libel**, on Page 32

of the Book,** states that:

> **"**Consider the example of Dennis Montgomery.  He provides a perfect
> case study to explain how during the war on terror greed and ambition

have been married to unlimited rivers of cash to create a climate in
which someone who has been accused of being a con artist was able to
create a rogue intelligence operation with little or no adult supervision.
Crazy became the new normal in the war on terror, and the original
objectives of the war got lost in the process."

65.     Thus, as libel by implication, Risen implies that Montgomery committed fraud

and went to any lengths motivated by greed, to obtain money at any cost.

66.     Among the other statements, in particular, in the ***Eleventh*** example of libel**, on

Page 46 of the Book,** states that:

"The CIA never investigated the apparent hoax nor examined how it
had been handled inside the agency."

67.     Here, as libel by implication, even if it is true that "The CIA never investigated"

what Risen describes as an "apparent hoax," the implication is that Montgomery perpetrated a

hoax upon the CIA, and in return for money, which would be both a fraud and a crime.

68.     Similarly, in the ***Sixteenth*** example of slander from an interview, Risen states that

"It seemed to me that what the war had become in 13 years was a search for cash and a search

for power and status and that it was becoming an endless war in which we had a new mercenary

class of people who were taking advantage of the war on terror," implying that Montgomery's

work is fraudulent in being merely an effort to get cash.

69.     Among the other statements, in particular, the ***Nineteenth*** example of libel**, on

Page 49 of the Book,** states that:

"Trepp was furious. According to court documents, he told the FBI
that Montgomery had stolen the software eTreppid had used on secret
Pentagon contracts. As federal investigators moved in to investigate
the alleged theft of the technology, they heard from Trepp and others
that Montgomery's alleged technology wasn't real."

70.     As libel by implication, Risen implies that Montgomery stole valuable software

yet at the same time the software was in fact worthless.

71.     In addition, Risen also made additional defamatory statements that are defamation by implication under Florida law.

72.     ***Twentieth,*** **on the Preface Page of the Book, Risen writes:**

> "I've come back," he repeated. "I was the King of Kafiristan – me and Dravot – crowned Kings we was! In this office we settled it – you setting there and giving us the books. I am Peachey – Peachey Taliaferro Carnehan – and you've been setting here ever since – Oh, Lord!"
>
> I was more than a little astonished and expressed my feelings accordingly.
>
> "It's true," said Carnehan, with a dry cackle, nursing his fee, which were wrapped in rags. "True as gospel. Kings we were, with crowns upon our head – me and Dravot – poor Dan – oh, poor, poor Dan, that would never take advice, not though I begged of him!"
>
>       -- Rudyard Kipling, *The Man Who Would be King.*

73. As libel by implication, Risen implies that Montgomery (along with others addressed in the book) is a fraud and/or con man as in *The Man Who Would be King.*

74. ***Twenty-first,*** **in the Prologue on Page xiv of the Book, Risen writes:**

> "The new homeland security-industrial complex operates differently. It is largely made up of a web of intelligence agencies and their contractors, companies that mostly provide secret services rather than large weapons systems and equipment. These contractors are hired to help Washington determine the scale and scope of the terrorist threat; they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end."

75.     As libel by implication, Risen states "they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end," suggesting that Montgomery's and eTreppid's profits were *contingent* upon results, and false results at that.

76.     ***Twenty-second,*** **in the Prologue on Page xv of the Book, Risen writes:**

"Thus, the creation of a homeland security complex at a time of endless war has bequeathed us with the central narrative of the war on terror – modern tales of greed joined hand in hand with stories of abuse of power. It was inevitable that those wise in the ways of the world would flock to Washington to try to cash in on the war on terror gold rush – and they have. This book offers just a few of those stories. But those trying to monetize America's obsession with terrorism are not the only ones who have sought to exploit 9/11."

"Opportunism comes in many forms and is driven by more than just greed. Ambition and a hunger for power, status, and glory have become great engines of post-9/11 opportunism as well. The more troubling stories here concern abuses of power that have extended across two presidencies for well over a decade. After 9/11, the United States deregulated national security, stripping away the post-Watergate intelligence reforms of the 1970's that had constrained executive power for thirty years. The results are morally challenging – and continue to this day."

77.     Thus, as libel by implication, Risen implies that Montgomery committed fraud and went to any lengths motivated by greed, to obtain money at any cost.

78.     ***Twenty-third,*** **in the Prologue on Page xvii of the Book, Risen writes:**

"Washington's global war on terror is now in its second decade, thanks to the bipartisan veneer it has gained under Bush and Obama. It shows no signs of slowing down, hustlers and freebooters continue to take full advantage, and the war's unintended consequences continue to pile up. All too often, things are not what they seem."

79.     As libel by implication, Risen implies that Montgomery – one of the key objects of the Book – is a "hustler" and a "freebooter."

80.     ***Twenty-fourth,*** **Part 1 of the Book,** including Chapter 2 which is focused entirely on Dennis Montgomery, Risen have labeled "Part 1:  Greed"

81.     Thus, by placing the chapter focused on Dennis Montgomery under a label for the section of the Book of "Greed," Risen libels Montgomery by implication as being motivated by greed to commit fraud and carry out the alleged hoaxes identified in the rest of the Chapter 2.

82. **_Twenty-fifth,_** Risen have labeled Chapter 2 of the Book which is focused entirely on Dennis Montgomery: "Chapter 2: The Emperor of the War on Terror."

83. By naming the chapter focused on Dennis Montgomery "The Emperor of the War on Terror," Risen libels Montgomery by implication as being the mastermind of the fraud that Risen seeks to portray the war on terror to be.

84. **_Twenty-Sixth,_** on Page 40 of the Book, Risen writes:

> "The CIA's Science and Technology Directorate, which had largely been stuck on the sidelines of the war on terror, saw in Dennis Montgomery an opportunity to get in the game. The directorate had played an important role in the Cold War, but in the first few years of the war on terror, it was struggling to determine how technology could be leveraged against groups of terrorists who were trying to stay off the grid."

85. As libel by implication, again, Risen blames Montgomery for the decisions of government officials.

86. **_Twenty-Seventh,_** on Page 42 of the Book, Risen writes:

> "Montgomery was telling the CIA exactly what it wanted to hear. At the time, the Bush Administration was obsessed with Al Jazeera, not only because of the networks' unrelenting criticism of the invasion of Iraq, but also because it had become Osama Bin Laden's favorite outlet for broadcasting his videotaped messages to the world."

87. As libel by implication, Risen implies that Montgomery defrauded and conned the CIA by "telling the CIA exactly what it wanted to hear."

88. **_Twenty-Eighth,_** on Page 42 of the Book, Risen writes:

> "What remains unclear is how Montgomery was able to convince all of them that he had developed secret software that could decode Al Qaeda's invisible messages. While he had gotten by a few credulous military officers who came to view his demonstrations, he apparently found it just as easy to persuade the CIA as well."

23

89. As libel by implication, Risen implies that Montgomery conned the U.S. Government

with a hoax.  It would of course be entirely clear "how Montgomery was able to convince all of

them" if Montgomery's work and technology are legitimate.

90. ***Twenty-Ninth,*** **on Page 46 of the Book, Risen writes:**

> "Finally the French brought an end to it.  Since Air France flights
> to the United States were among those that had been grounded,
> French officials had taken a dim view of the entire episode.  They
> began demanding answers from the Americans.  The French
> applied so much pressure on Washington that the CIA was finally
> forced to reveal to French intelligence the source of the threat
> information. Once they heard the story of Dennis Montgomery and
> eTreppid, French officials arranged for a French high-tech firm to
> reverse-engineer Montgomery's purported technology.  The
> French wanted to see for themselves whether the claims of hidden
> messages in Al Jazeera broadcasts made any sense."

91. As libel by implication, if not explicit, the passage implies that Montgomery is a fraud

and that his work is a scam and a hoax.

92. ***Thirtieth,*** **on Page 52 of the Book, Risen writes:**

> "Montgomery continued to get defense contracts even during the
> Obama administration.  In 2009, Montgomery was awarded another
> air force contract, and later claimed that he had provided the
> government with warning of a threatened Somali terrorist attack
> against President Obama's inauguration.  Joseph Liberatore, an air
> force official who described himself as one of "the believers"  in
> Montgomery and said he had heard from 'various federal agencies
> thanking us' for the support Montgomery and his company provided
> during Obama's inauguration.  The threat, however, later proved to be
> a hoax."

93. As libel by implication, Risen implies that Montgomery's ability to continue to receive

contracts is due to Montgomery's ability to defraud the government (and stupidity of government

officials) rather than an endorsement of the legitimacy of Montgomery's work.

94. ***Thirty-First,*** **on Page 31 of the Book, Risen writes:**

"and a new breed of entrepreneur learned that one of the surest and easiest paths to riches could be found not in Silicon Valley building computers or New York designing clothes but rather in Tysons Corner, Virginia, coming up with new ways to predict, analyze, and prevent terrorist attacks— or, short of that, at least in convincing a few government bureaucrats that you had some magic formula for doing so."

95. As libel by implication, Risen implies that Montgomery engaged in fraud to convince a few government bureaucrats that he had a magic formula as an easy path to riches.

96. *Thirty-Second,* on Page 33 of the Book, Risen writes:

"Montgomery's story demonstrates how hundreds of billions of dollars poured into the war on terror went to waste. With all rules discarded and no one watching the bottom line, government officials simply threw money at contractors who claimed to offer an edge against the new enemies. And the officials almost never checked back to make sure that what they were buying from contractors actually did any good— or that the contractors themselves weren't crooks. A 2011 study by the Pentagon found that during the ten years after 9/ 11, the Defense Department had given more than $ 400 billion to contractors who had previously been sanctioned in cases involving $ 1 million or more in fraud."

97. As libel by implication, Risen implies that the money provided to Montgomery (among others) went to "waste."

98. *Thirty-Third,* on Page 33 of the Book, Risen writes:

"The Montgomery episode teaches one other lesson, too: the chance to gain promotions and greater bureaucratic power through access to and control over secret information can mean that there is no incentive for government officials to question the validity of that secret information. Being part of a charmed inner circle holds a seductive power that is difficult to resist."

99. As libel by implication, Risen implies that Montgomery's work was fraudulent.

100. *Thirty-Fourth,* on Page 33 of the Book, Risen writes:

"How his technology worked was a secret. Dennis Montgomery's computer code became the great treasure behind eTreppid Technologies, the company he and Trepp founded. Later, many of

those around Montgomery began to suspect the reason why Montgomery had to guard his technological innovations so carefully. They came to believe that at least some of the technology didn't really exist."

101.      As libel by implication, Risen implies that Montgomery committed fraud.

102.      ***Thirty-Fifth,*** **on Page 35 of the Book, Risen writes:**

"Montgomery was on the lookout for somebody to bankroll him, and had put out the word to his friends at the casinos that he frequented the most. A year later, Montgomery and Trepp were in business together. Trepp was one of the first, but hardly the last, to be beguiled by Montgomery's claims that he had achieved breakthroughs in computer technology of historic significance."

103.      As libel by implication, Risen implies that Montgomery "beguiled" Warren Trepp by committing fraud.

104.      ***Thirty-Sixth,*** **on Page 39 of the Book, Risen writes:**

"For a few months in late 2003, the technology from Dennis Montgomery and eTreppid so enraptured certain key government officials that it was considered the most important and most sensitive counterterrorism intelligence that the Central Intelligence Agency had to offer President Bush. Senior officials at the CIA's Directorate of Science and Technology began to accept and vouch for Montgomery to officials at the highest levels of the government. Montgomery's claims grew ever more expansive, but that only solidified his position inside the national security arena. His technology became too impossible to disbelieve."

105.      As libel by implication, Risen imply that Montgomery committed fraud and is a con man.

106.      ***Thirty-Seventh,*** **on Page 40 of the Book, Risen writes:**

"Montgomery persuaded the spy agency that his special computer technology could detect hidden bar codes broadcast on Al Jazeera, which had been embedded into the video feed by al Qaeda. Allegedly, al Qaeda was using that secret method to send messages to its terrorist operatives around the world about plans for new attacks. Montgomery convinced the CIA that his technology had uncovered a series of

hidden letters and numbers that appeared to be coded messages about specific airline flights that the terrorists were targeting.

107.     As libel by implication, Risen imply that Montgomery convinced the CIA of

claims that are not (were not) true.

108.     ***Thirty-Eighth,*** **on Page 42 of the Book, Risen writes:**

"Based on Montgomery's information, President Bush ordered the grounding of a series of international flights scheduled to fly into the United States. This step caused disruptions for thousands of travelers."

109.     As libel by implication, Risen imply that Montgomery convinced President Bush

and the national command authority of conclusions drawn from Montgomery's work.

110.     ***Thirty-Ninth,*** **on Page 42 of the Book, Risen writes:**

"One former senior CIA official recalled attending a White House meeting in the week following Christmas to discuss what to do next about the information coming from Montgomery. The official claims that there was a brief but serious discussion about whether to shoot down commercial airliners over the Atlantic based on the intelligence."

111.     As libel by implication, Risen imply that Montgomery convinced President Bush

and the national command authority of conclusions drawn from Montgomery's work.

112.     ***Fortieth,*** **on Page 47 of the Book, Risen writes:**

"Even more stunning, after the debacle over the bogus Christmas 2003 terrorist threats, Montgomery kept getting classified government contracts awarded through several different corporate entities. Montgomery's problems with the CIA did not stop him from peddling variations of his technology to one government agency after another. The secrecy that surrounded his work once again worked in his favor. CIA officials were reluctant to tell their Pentagon counterparts much about their experiences with Montgomery, so Defense Department officials apparently did not realize that his technology was considered suspect at CIA headquarters."

113.    As libel by implication, Risen implies that Montgomery continued to defraud,

con, and scam the government, rather than concluding that the U.S. Government recognized the

legitimacy of Montgomery's work.

114.    ***Forty-First,*** **on Page 48 of the Book, Risen writes:**

> "He successfully infused a sense of mystery around himself. He was like the Wizard of Oz, but now people were beginning to try to examine the man behind the curtain."

115.    As libel by implication, Risen implies that the Montgomery engaged in fraud and

a hoax by keeping details mysterious.

116.    ***Forty-Second,*** **on Page 48 of the Book, Risen writes:**

> "The technology didn't meet the requirements for us," said a Special Operations Command spokesman drily. Still, there is no evidence that officials at Special Operations Command ever talked with their counterparts at the CIA to check up on Montgomery before awarding him a contract. Special Operations Command paid a total of $ 9.6 million to eTreppid under its contract with the firm."

117.    As libel by implication, Risen imply that Montgomery again repeated his fraud

and hoax against a new government agency.

118.    ***Forty-Third,*** **on Page 54 of the Book, in the Chapter "The New Oligarchs,"**

**Risen writes:**

> CHAPTER 3:   The New Oligarchs
> Page 54:  "Dennis Montgomery is, of course, an extreme example of the new kind of counterterrorism entrepreneur who prospered in the shadows of 9/11.  But he was hardly alone in recognizing the lucrative business opportunities that the war on terror has presented.  In fact, as trillions of dollars have poured into the nation's new homeland security-industrial complex, the corporate leaders at its vanguard can rightly be considered the true winners of the war on terror."

119.    As libel by implication, Risen implies that Montgomery engaged in fraud and a

hoax motivated by greed.

Exhibit C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

DENNIS L. MONTGOMERY

                    Plaintiff,

        v.                                             Civil Action No. 1:15-cv-20782-JEM

JAMES RISEN, ET AL.,

                    Defendants.

_____

## DECLARATION OF PLAINTIFF DENNIS MONTGOMERY, IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION CHALLENGING FLORIDA JURISDICTION AND VENUE

Pursuant to 28 U.S.C. §1746, I, Dennis Montgomery, hereby declare under penalty of perjury that the following is true and correct:

1) I am over the age of 18 years old and I make this affidavit on personal knowledge and belief. I am mentally and legally competent to make this affidavit sworn under oath, despite having suffered a brain aneurism and serious related health issues. *See* Exhibits 9, 10, 11, attached to this affidavit.

2) Reporter James Risen of The New York Times and publisher Houghton Mifflin Harcourt Publishing Company published a book Pay Any Price: Greed, Power and Endless War in October 2014 (hereafter "the Book").

3) In Chapter 2 of the Defendants' Book, James Risen and Houghton Mifflin Harcourt Publishing Company lie about me and my work and libel me extensively.

4) Chapter 2 involves me and James Risen focuses almost exclusively on defaming me alone to sell copies of the Book in marketing interviews. Having read the book, I am

its centerpiece, that is, Defendants "punching boy" to sell books. Risen conspicuously ignores the many other events and incidents in the Book and focuses almost exclusively on me when promoting his book for sales in Florida and elsewhere.

5) Whereas, the Defendants, especially Houghton Mifflin Harcourt Publishing Company, have great resources and no doubt have "errors and omissions" insurance to finance their legal defense, I have no money or resources at all. I lost my house in foreclosure. The Defendants will be able to afford to litigate the claims in Florida.

6) My finances, employment, career and business opportunities have been severely devastated and destroyed by the false and misleading statements made by the Defendants, contributing to the loss of my previous house in foreclosure and driving me into poverty just at the time I have also been diagnosed with serious medical problems.

7) The Defendants' published defamatory and false and misleading statements which are not opinion or hyperbole and are not fair reporting of their sources or public records. The defamation is specifically false and misleading in factually verifiable terms, including in that:

    a.  Defendants published defamatory material and statements from confidential government sources in the intelligence and military communities. The false and misleading statements did not result from fair reporting of previously published material. They admit this on page ix of the Book stating, "Many people have criticized the use of anonymous sources. Yet all reporters know that the very best stories – the most important, the most sensitive – rely on them. This book would not be possible without the cooperation of may current

and former government officials and other individuals who were willing to discuss sensitive matters only on the condition of anonymity." Indeed, this is a big selling point of Defendants' book. It publishes new information, however defamatory, that had not been accessible or published before. This is why the Book is a bestseller in Florida and elsewhere, particularly given that Florida is at the center of U.S. Government counterterrorism military and intelligence operations, as I testify to below.

b.  The Defendants actually know that their U.S. Government sources are the ones who will bear the public blame for their own poor decisions if they do not shift the blame implausibly to me with the Defendants' concerted help.

c.  Defendant James Risen intentionally omitted several important facts while fabricating defamatory statements and stories about me.

d.  The Defendants actually knew that Warren Trepp received most of the money, yet accuse me of fraud to obtain money while excusing politically-connected Warren Trepp who took and kept the money and controlled the company.

e.  The Defendants' falsely and misleadingly state that I fabricated intelligence to make money. In fact, eTreppid was paid for software work and analysis, not contingent upon results or conditional upon finding any terrorist threats. Our work was complete and payment due merely for doing the analysis the CIA and other Government officials asked us to do.

f.  My software and technology did work, does work, and is still being used successfully by the U.S. Government today.

g.  The Defendants actually know that Warren Trepp has never paid back any of

the $30 million that eTreppid received from the U.S. Government nor offered

to pay any of it back nor has the U.S. Government asked for any of the money

back.  Therefore, James Risen actually knows that his defamation of me is

false and misleading.  If eTreppid received $30 million from the U.S.

Government for the use of my software and technology that was a purported

fraud or a hoax, eTreppid would have to pay the money back to the U.S.

Government.  But the U.S. Government knows that my software and

technology actually worked and works and is valuable, which is why eTreppid

does not have to pay any of the $30 million back.

h.  In fact, the Defendants ignore and intentionally omit my ten (10) patent

applications, which attest to and show my expertise.

i.  The U.S. Government independently tested and verified the results of my

software and technology and did not rely upon my word alone. The U.S.

Government officials sought me and my technology out.

j.  The data detected by my software and technology did predict actual terrorist

incidents and/or meetings in advance.

k.  I could not have fabricated intelligence from my work, as Defendants defame

me, without being certain that no one else would independently verify my

work in any number of other ways available to the CIA, NSA, and military.

l.  I and the companies I worked with had equal or better opportunities to provide

my services to private sector companies, and had no need to work for the U.S.

Government to make the same amount of money or less.

m.  I was motivated by patriotism, not greed, in turning down equivalent

opportunities to provide services to the private sector to answer requests for help in the war on terror by the U.S. Government.

n.  The Central Intelligence Agency ("CIA") wanted experts to analyze Al Qaeda videos.

o.  It was the CIA who proposed to eTreppid that we would analyze Al Qaeda videos.  The defamation of me states that I fraudulently sold the CIA and U.S. Government on a fantasy using fabricated intelligence.  In fact, the CIA and the U.S. Government approached us with what they wanted analyzed.

p.  The Defendants actually knew that Warren Trepp closed the "sales" of contracts by persuading the U.S. Government, yet falsely accuse me of selling a fantasy of fabricated intelligence to the U.S. Government, while excusing Trepp, as a fraudulent scheme to obtain money.

q.  Defendants' falsely state that I persuaded the President George W. Bush to ban international passenger aircraft from entering U.S. airspace and nearly shoot down passenger aircraft. However, I never provided any interpretation of what the hidden data we uncovered meant.  We merely provided the uncovered data to the U.S. Government experts for their interpretation.  Even when pressed, I refused to offer any national security interpretation of the data.

r.  As obvious from the records and documents that the Defendants rely upon, the Defendants' so-called sources Michael Flynn, Tim Blixseth, and Warren Trepp went to extraordinary and expensive legal and extra-legal (self help) efforts to furiously get ownership of my work as being extremely valuable,

while simultaneously stating that my work had no value.

s.   Michael Flynn, Tim Blixseth, and Warren Trepp were attempting to invoke the fraud exception to bankruptcy laws to invalidate my bankruptcy, and therefore the Defendants knew that they had motives to fabricate or embellish their false statements against me.

t.   The public records that the Defendants claim to be relying upon – though voluminous – overwhelmingly contradict the Defendants defamation of me.

u.   On September  28, 1998, I and Warren Trepp co-founded eTreppid Technologies ("eTreppid") based on  a "Contribution Agreement" of that date in which we agreed to own the LLC in equal 50% shares. Trepp put up money and I conveyed his "software compression technology contained on CD No. 1" to eTreppid. The business plan of eTreppid and the application of the "compression technology" were to compress VHS videotapes used for surveillance in casinos for archiving and more efficient storage.  Over the preceding 20 years I developed and copyrighted other types of software technology, including but not limited to "Object Detection Software" which is a crucial component of, among other things, colorizing black and white movies.  In order for the computer to add color, it must be able to recognize individual objects in the movie which are moving in three dimensions, (that is moving toward or away from the camera and changing in apparent size), aspect angle, orientation, etc.  This was not conveyed to eTreppid and which, per the terms of the "Contribution Agreement", was expressly excluded. Shortly after the formation of eTreppid, I offered to sell one part of his

6

"Object Detection System" ("ODS") software to Warren Trepp for the sum of $10 million dollars, which Trepp rejected.

    v.    As reflected in a form SF-95 Attachment A prepared by me with my then attorney Michael Flynn for presentation to the Government, "Beginning on or about November 2002, on behalf of the US Air Force, Montgomery began work on military applications of his technology at Eglin Air Force base [in Florida] to demonstrate the application of his technologies in the war on terror."

    w.    Defendants make the technically absurd and false statement that "The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers," only by falsely misrepresenting that the data was contained only in the "crawl" at the bottom of the screen. This falsified and misleading misdirection and deception to focus only on the crawl is deceptive.  It is patently unbelievable, which Defendant Risen should have known as an expert in national security, that a television signal could not contain such simple data as latitude and longitude coordinates, consisting of only six numbers and two letters (East or West longitude, North or South latitude).

8) I am a citizen of the State of Florida, with a residence in an apartment community in Miami, Florida. I have a Florida telephone number in this district. I am reporting my address and Miami-Dade, Florida phone number under seal.

9) I am registered to vote in Florida, as shown in Exhibit 1, attached to this affidavit. I previously had a temporary address while settling on the permanent address that I

have now.  I have updated my voter registration to reflect my current Miami address.

10) I have reviewed the affidavit of defense counsel Laura Handman attached to the
Defendants' motion stating that I had not registered to vote in Florida.  The
Defendants' affidavit is false.  I am registered to vote in the State of Florida, and am
now updating my voter registration with my new address. I was registered to vote in
Florida when Ms. Handman signed her affidavit. She misled this Court.

11) I found on the website of the publisher Houghton Mifflin Harcourt, that Houghton
Mifflin Harcourt Publishing Company maintains permanent and general offices in
Orlando, Florida at 9400 Southpark Center Loop, Orlando, Florida 32819. Exhibit 2,
attached to this affidavit, which I downloaded from the Defendant publisher's website
at  http://www.hmhco.com/about-hmh/our-offices.  These are statements made by the
Defendants about themselves.

12) On the website of the Florida Department of State Division of Corporations, I found
that Defendant Houghton Mifflin Publishing Company is registered to do business in
Florida through the Florida Department of State Division of Corporations. Exhibit 3,
attached to this affidavit, which I downloaded from the Florida Department of State's
website.

13) As shown in those Florida Government documents, in 2008 Defendant changed its
name from "Houghton Mifflin Harcourt" to "Houghton Mifflin Publishing
Company." *Id.*  These are statements made by Defendants about themselves.

14) My research of the publisher also uncovered that Defendants rely significantly upon
sales in the Southeast of the United States through a company "Amazon" for very
substantial sales over the internet.  Amazon's regional distribution centers or

"fulfillment centers" are located in Ruskin, Florida in Hillsborough County and Lakeland, Florida, in Polk County.  *See* Exhibit 4, attached to this affidavit.

15) Much of the defamation which my lawsuit contests is contained within the physical product physically shipped into Florida for sale, the Book written by James Risen and published by Houghton Mifflin Harcourt Publishing Company.

16) In 2012, Edra Blixseth brought Chris Pipes, from the U.S. Special Operations Command ("SOCOM") from MacDill Air Force Base in Florida to our Palm Desert offices. SOCOM was interested in pursuing object tracking, mass surveillance, and research on cloaking technologies. Chris Pipes met at our facility, with a representative of the CIA. While he was in our building, Chris Pipes then received a telephone call from SOCOM in Florida, and then told us that SOCOM could not pursue the technology because of what was written about me in the news media. Exhibit 18, attached to this affidavit.

17) SOCOM is the Unified Combatant Command charged with overseeing the various Special Operations Component Commands of the Army, Air Force, Navy and Marine Corps of the United States Armed Forces. The command is part of the Department of Defense and is the only Unified Combatant Command legislated into being by the U.S. Congress. SOCOM is headquartered at MacDill Air Force Base in Tampa, Florida. *See*, Exhibit 12, attached to this affidavit.

18) U.S. Central Command ("CENTCOM") is a theatre-level Unified Combatant Command of the U.S. Department of Defense, established in 1983. CENTCOM Area of Responsibility includes countries in the Middle East, North Africa, and Central Asia, most notably Afghanistan and Iraq. CENTCOM has been the main American

presence in many military and intelligence operations. It is headquartered in Tampa,

Florida. *See*, Exhibit 12, attached to this affidavit.

19) The Defendant author James Risen actually knew or should have known that most of

my work was with U.S. Government organizations in Florida and the contracting

offices for my work are in Florida.  A competent Pulitzer Price winning <u>New York</u>

<u>Times</u> reporter who wrote the Book over a four-year period from 2011 through 2014

would have reviewed the <u>Wall Street Journal</u> article from November 1, 2006,

attached, which includes the explanation:

### Source of Secret Funds

**One source of secret funds for eTreppid and other companies is the Special Operations Command. Based in Tampa, Fla., the command fields special-operations military and intelligence forces around the globe and is at the forefront of the fight in Iraq and Afghanistan. It has also been rocked by a criminal investigation of a former contracting officer. The investigation is continuing, according to a spokesman for the U.S. attorney in Tampa.**

In a separate inquiry, Pentagon investigators last year found evidence that the command kept special accounts for "unrequested congressional plus-ups," or earmarks. The plus-ups were used to reward lawmakers with projects in their districts, according to declassified investigators' notes reviewed by <u>The Wall Street Journal</u>. The Pentagon's inspector general closed the inquiry after finding that the accounts weren't illegal.

Mr. Trepp said eTreppid won classified work on its merits and already had a number of government contracts before Mr. Gibbons starting making introductions on the company's behalf. Mr. Gibbons's campaign manager, Robert Uithoven, said the congressman has been a strong supporter of new defense technology, particularly after 9/11. But he said there was "no quid pro quo whatsoever" for contributions from contractors. And while some funding was secret, "it was because of the sensitive nature of the work," Mr. Uithoven said, not to avoid public scrutiny.

> For Mr. Trepp, eTreppid's success at winning multimillion-dollar
> federal contracts marks a comeback from his Drexel days. He sat at
> Mr. Milken's right arm on the firm's famous X-shaped trading desk
> in Beverly Hills, sometimes trading as much as $2 billion in
> securities a day. Federal regulators filed a civil securities-fraud
> claim against him in 1995, and a Securities and Exchange
> Commission administrative judge found that his violations had
> been "egregious, recurring and intentional." But she dismissed the
> proceeding against him, noting that the allegations were old and he
> had left the securities business years earlier. (Emphasis added).

20) This article and dozens of others, as well as court documents, caused Risen to know

or he should have known upon reasonable inquiry over four years that Warren Trepp

was furiously trying to take ownership of my software and technology, which directly

calls into question his self-serving false statements that the software and technology

he was trying to acquire rights to was worthless.  The same article also reports:

> Mr. Gibbons also got other, unreported gifts of cash and casino
> chips from Mr. Trepp, according to sworn testimony in a civil
> lawsuit brought by a former executive at eTreppid, Dennis
> Montgomery. The suit, filed in February in federal court in Reno,
> involves a dispute between Messrs. Trepp and Montgomery over
> the rights to certain software code . . .

> The suit has raised alarms in Washington because of concern that
> national secrets will be revealed if it goes to trial. For example, one
> of the entities that funded eTreppid is code-named Big Safari and
> is a classified program, documents in the case show. The nation's
> top intelligence official, John D. Negroponte, recently filed a
> statement with the court seeking to seal the case. He wrote that
> after personally reviewing the matter, he has concluded that
> disclosure of some information connected with the case could do
> "exceptionally grave damage" to national security.

21) My greatest opportunities for employment, business, and/or an income are at either

Macdill Air Base near Tampa, Florida and Eglin Air Force Base near Fort Walton

Beach, Florida, which is at the center of U.S. Government intelligence and

counterterrorism operations. *See* Exhibit 12, attached to this affidavit.

22) As a result, I have settled in Florida not just for professional reasons but also because of my failing health and desire to enjoy Florida at this stage in my life. Florida has no personal income tax as well as a Homestead exception should I buy a home. Florida is a great place to live.

23) In 2011, I incorporated a business with a partner in Florida to contract with the military and U.S. Government at bases in Florida to continue the same type of services and software and technological work that I had performed under eTreppid and BLXWARE. This business was named Alex James LLC, which I incorporated through the "Legal Zoom" service company. I set up the articles of incorporation, paid for and set up this company. Judy Crowhurst is the woman I chose to run it. Exhibit 17, attached to this affidavit.

24) Exhibit 5, attached to this affidavit, presents the papers I processed through the "Legal Zoom" company and my payment information paying for the company in Florida in 2011.

25) As an expert in national security issues, Defendant James Risen knows that the war in Afghanistan was and is run largely from Florida electronically and by drone controllers located in Florida. For instance, following September 11, 2001, General Tommy Franks rarely set foot in Afghanistan and fought the war from U.S. Air Force Bases in Florida, including from SOCOM and CENTCOM. This explains my work with SOCOM and CENTOM in large part and why it continued there.

26) Defendant James Risen also knows that the U.S. military leadership and personnel are concentrated mainly in Florida. Because U.S. military servicemen can choose their state of residence despite being deployed elsewhere, Florida's lack of an income tax

makes Florida a very attractive State for U.S. servicemen, often poorly paid. As a result, most of the nation's top military leaders, current and former servicemen, chose Florida as their residency.

27) Defendant Risen knew in publishing the Book that Florida is an enormous market as the nation's now third largest State, including Florida's significant military and intelligence and counterterrorism personnel, with many retirees (including retired U.S. Government employees in the military and intelligence fields) with more time to read books than the average American. For instance, former Secretary of Defense Donald Rumsfield now lives in Florida, as well as former Chairman of the U.S. Senate Intelligence Committee and CIA Director Porter Goss, who lives in Miami.

28) The team on which I worked had contracts directly with the intelligence agencies at the military bases **in Florida**. I have video showing the work. The contracting officers are out of those military bases, many of which are classified. I met and worked with CIA officials in Florida at various military bases. However, I cannot identify here the exact units stationed at those bases, which is classified information. Exhibit 19, attached to this affidavit.

29) We at eTreppid and later BLXWARE did most of our work with units stationed at MacDill Air Force Base and Eglin Air Force Base, whose identity is secret. *See* February 14, 2004, "Order for Supplies or Services" attached, with the "Ship To" address of UQ USSOCOM/SOAL-SP (Mohr), 7701 Tampa Point Boulevard, MacDill Air Force Base, Florida 33621.

30) Most of the payments for our work, the work I did for eTreppid and later BLXWARE, came out of the CIA offices in Florida and SOCOM, the U.S. Special