UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 15-cv-20782-MARTINEZ/GOODMAN

DENNIS MONTGOMERY,

      Plaintiff,

v.

JAMES RISEN et al.,

      Defendants.

_____/


**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM IN SUPPORT**

**HOLLAND & KNIGHT LLP**
Sanford L. Bohrer
  Sandy.Bohrer@hklaw.com
Brian W. Toth
  Brian.Toth@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, Florida  33131
Tel: (305) 374-8500
Fax: (305) 789-7799

**DAVIS WRIGHT TREMAINE LLP**
Laura R. Handman (admitted *pro hac vice*)
  laurahandman@dwt.com
Micah J. Ratner (admitted *pro hac vice*)
  micahratner@dwt.com
1919 Pennsylvania Ave., NW, Suite 800
Washington, D.C.  20006
Tel.: (202) 973-4200
Fax: (202) 973-4499

*Counsel for Defendants*

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................................. 1

II.   STATEMENT OF FACTS ...................................................................................... 3

    A.    Media Coverage of Montgomery Before the Book and Risen's Reliance on It ..... 3

    B.    Reliance on FBI Reports, Court Documents, and Congressional Records for
          Allegations of Fake Software.................................................................... 6

    C.    Reliance on FBI Reports and Court Documents for Allegations of Rigged
          Demonstrations of Software to U.S. Government Officials .................................. 9

    D.    Reliance on Interviews with Sources and Documents........................................... 9

    E.    Complaint Allegations ...................................................................... 11

    F.    Montgomery's Failure to Produce the Critical Software and Defendants'
          Pending Motion for Sanctions for Spoliation and Violation of Court Orders ...... 11

III.  ARGUMENT ................................................................................................... 14

    A.    The Court Should Grant Summary Judgment Because No Dispute as to Any
          Material Fact Exists and Defendants Are Entitled to Judgment as a Matter of
          Law on Plaintiff's Libel and Related Torts Claims ............................................. 14

    B.    The Fair Report Privilege Bars Plaintiff's Claims................................................ 17

    C.    Many of the Challenged Statements Are Non-Actionable Opinion and
          Rhetorical Hyperbole Protected by the First Amendment.................................... 19

    D.    As a Matter of Law, Plaintiff Does Not, and Cannot, Meet His Burden to
          Prove Substantial Falsity........................................................................ 22

    E.    As a Matter of Law, Plaintiff Does Not, and Cannot, Prove By Clear and
          Convincing Evidence, that Defendants Acted With Actual Malice or Any
          Other Applicable Fault.......................................................................... 25

          1.    Montgomery Is a Limited-Purpose Public Figure ..................................... 25

          2.    Montgomery Cannot Prove Actual Malice by Clear and Convincing
               Evidence, or Any Other Applicable Standard of Fault............................... 28

    F.    Montgomery's Other Tort Claims Fail ................................................................. 35

IV.   CONCLUSION................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Acosta Orellana v. CropLife Int'l*,
    711 F. Supp. 2d 81 (D.D.C. 2010) ..................................................................35

*Adventure Outdoors, Inc. v. Bloomberg*,
    519 F. Supp. 2d 1258 (N.D. Ga. 2007), *rev'd on other grounds*,
    552 F.3d 1290 (11th Cir 2008) ......................................................................21

*Air Wisconsin Airlines Corp. v. Hoeper*,
    134 S. Ct. 852 (2014)......................................................................................22

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)......................................................................14, 29, 35

*Baxter v. Palmigiano*,
    425 U.S. 308 (1976)........................................................................................32

*Beckley Newspapers Corp. v. Hanks*,
    389 U.S. 81 (1967)..........................................................................................33

*Bell v. Associated Press*,
    584 F. Supp. 128 (D.D.C. 1984) ..................................................................32

*Biro v. Condé Nast*,
    2015 WL 8103736 (2d Cir. Dec. 8, 2015) ................................................30

*Biro v. Condé Nast*,
    963 F. Supp. 2d 255 (S.D.N.Y. 2013), *aff'd*,
    2015 WL 8103736 (2d Cir. Dec. 8, 2015) ..............................29, 30, 31

*Bose Corp. v. Consumers Union of U.S., Inc.*,
    466 U.S. 485 (1984)..............................................................................29, 33

*Brueggenmeyer v. ABC*,
    684 F. Supp. 452 (N.D. Tex. 1988) ..............................................................26

*Bryant v. Avado Brands Inc.*,
    187 F.3d 1271 (11th Cir. 1999) ......................................................................3

*Bustos v. A&E Television Networks*,
    646 F.3d 762 (10th Cir. 2011) ......................................................................23

*CACI Premier Tech., Inc. v. Rhodes*,
   536 F.3d 280 (4th Cir. 2008) ...................................................................27, 28, 32

*Castellanos v. Pfizer, Inc.*,
   2008 WL 2323876 (S.D. Fla. May 29, 2008) ........................................................16

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..............................................................................................15

*Chaiken v. VV Publ'g Corp.*,
   119 F.3d 1018 (2d Cir. 1997)...............................................................................34

*Chapin v. Knight-Ridder, Inc.*,
   993 F.2d 1087 (4th Cir. 1993) .............................................................................18

*Church of Scientology Int'l v. Behar*,
   238 F.3d 168 (2d Cir. 2001)................................................................................32

*Clyburn v. News World Commc'ns, Inc.*,
   903 F.2d 29 (D.C. Cir. 1990) .........................................................................26, 30

*Cohen v. Cowles Media Co.*,
   501 U.S. 663 (1991)............................................................................................35

*Coles v. Washington Free Weekly, Inc.*,
   881 F. Supp. 26 (D.D.C. 1995), *aff'd*,
   88 F.3d 1278 (D.C. Cir. 1996) ......................................................................17, 19

*Colodny v. Iverson, Yoakum, Papiano & Hatch*,
   936 F. Supp. 917 (M.D. Fla. 1996).....................................................................22

*Cook-Benjamin v. MHM Corr. Servs., Inc.*,
   571 F. App'x 944 (11th Cir. 2014) .................................................................15, 20

*Coquina Invs. v. TD Bank, N.A.*,
   760 F.3d 1300 (11th Cir. 2014) ...........................................................................32

*Crane v. Ariz. Republic*,
   972 F.2d 1511 (9th Cir. 1992) .............................................................................18

*Dameron v. Wash. Magazine, Inc.*,
   779 F.2d 736 (D.C. Cir. 1985) ............................................................................19

*Ditton v. Legal Times*,
   947 F. Supp. 227 (E.D. Va. 1996), *aff'd*, 129 F.3d 116 (4th Cir. 1997)................19

*Dorsey v. Nat'l Enquirer, Inc.*,
   973 F.2d 1431 (9th Cir. 1992) .............................................................................19

*Dowd v. Calabrese,*
    589 F. Supp. 1206 (D.D.C. 1984) ........................................................................18

*Dubai World Corp. v. Jaubert,*
    2011 WL 579213 (S.D. Fla. Feb. 9, 2011) ...........................................................16

*Dunn v. Air Line Pilots Ass'n,*
    193 F.3d 1185 (11th Cir. 1999) ...............................................................16, 22, 33

*Edwards v. Nat'l Audubon Soc'y, Inc.,*
    556 F.2d 113 (2d Cir. 1977).................................................................................30

*Farah v. Esquire Magazine,*
    736 F.3d 528 (D.C. Cir. 2013) ...................................................................3, 15, 35

*Fetter v. N. Am. Alcohols, Inc.,*
    2007 WL 551512 (E.D. Pa. Feb. 15, 2007) ..........................................................20

*Fitzgerald v. Penthouse Int'l, Ltd.,*
    776 F.2d 1236 (4th Cir. 1985) ..............................................................................24

*Flowers v. Carville,*
    310 F. Supp. 2d 1157 (D. Nev. 2004) ...................................................................33

*Foretich v. Chung,*
    1995 WL 224558 (D.D.C. Jan. 25, 1995) .............................................................17

*Forras v. Rauf,*
    39 F. Supp. 3d 45, 56 (D.D.C. 2014), *appeal pending,*
    No. 14-7070 (D.C. Cir. May 21, 2014).................................................................35

*Friendship Empowerment & Economic Development CDC v. WALB-TV,*
    2006 WL 1285037 (M.D. Ga. May 10, 2006) ................................................22, 23

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323 (1984).........................................................................................28, 29

*Global Relief Found. Inc. v. N.Y. Times Co.,*
    390 F.3d 973 (7th Cir. 2004) ................................................................................18

*Hakky v. Wash. Post Co.,*
    2010 WL 2573902 (M.D. Fla. June 24, 2010).................................................28, 30

*Harper v. Walters,*
    822 F. Supp. 817 (D.D.C. 1993), *aff'd,* 40 F.3d 474 (D.C. Cir. 1994) ...................17

*Harte-Hanks Commc'ns, Inc. v. Connaughton,*
    491 U.S. 657 (1989).........................................................................................29, 33

iv

*Haynes v. Alfred A. Knopf, Inc.*,
  8 F.3d 1222 (7th Cir. 1993) .................................................................................23, 24

*Hustler Magazine v. Falwell*,
  485 U.S. 46 (1988)...........................................................................................................35

*Info. Sys. & Networks Corp. v. City of Atlanta*,
  281 F.3d 1220 (11th Cir. 2002) ....................................................................................15

*Jankovic v. Int'l Crisis Grp.*,
  494 F.3d 1080 (D.C. Cir. 2007)....................................................................................17

*Klayman v. City Pages*,
  2015 WL 1546173 (M.D. Fla. Apr. 3, 2015),
  *appeal pending*, No. 15-12731-GG (11th Cir. June 18, 2015) ............................16, 31, 33, 34

*Krohngold v. Nat'l Health Ins. Co.*,
  825 F. Supp. 996 (M.D. Fla. 1993)..............................................................................16

*Lavin v. N.Y. News, Inc.*,
  757 F.2d 1416 (3d Cir. 1985)........................................................................................18

*Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*,
  844 F.2d 955 (2d Cir. 1988)..........................................................................................18

*Levan v. Capital Cities/ABC, Inc.*,
  190 F.3d 1230 (11th Cir. 1999) ..........................................................................22, 29, 32, 33

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
  838 F.2d 1287 (D.C. Cir. 1988)..........................................................................22, 24, 30, 31

*Liberty Lobby, Inc. v. Rees*,
  852 F.2d 595 (D.C. Cir. 1988)......................................................................................30

*Lieberman v. Fieger*,
  338 F.3d 1076 (9th Cir. 2003) ......................................................................................20

*Loeb v. New Times Commc'ns Corp.*,
  497 F. Supp. 85 (S.D.N.Y. 1980).................................................................................30

*Lohrenz v. Donnelly*,
  350 F.3d 1272 (D.C. Cir. 2003)....................................................................................30

*Lyondell-Citgo Ref., LP v. Petroleos de Venezuela, S.A.*,
  2005 WL 1026461 (S.D.N.Y. May 2, 2005) ..............................................................24

*Masson v. New Yorker Magazine, Inc.*,
  501 U.S. 496 (1991).............................................................................................22, 29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)......................................................................................15

*Mayfield v. NASCAR, Inc.*,
    674 F.3d 369 (4th Cir. 2012) .....................................................................30

*McBride v. Merrell Dow & Pharms, Inc.*,
    717 F.2d 1460 (D.C. Cir. 1983) .................................................................15

*McBride v. Merrell Dow & Pharms., Inc.*,
    800 F.2d 1208 (D.C. Cir. 1986) .................................................................30

*McDowell v. Paiewonsky*,
    769 F.2d 942 (3d Cir. 1985).......................................................................27

*McFarlane v. Esquire Magazine*,
    74 F.3d 1296 (D.C. Cir. 1996) .......................................................29, 30, 34

*McFarlane v. Sheridan Square Press, Inc.*,
    91 F.3d 1501 (D.C. Cir. 1996) ...................................................................30

*McManus v. Doubleday & Co.*,
    513 F. Supp. 1383 (S.D.N.Y. 1981)...........................................................34

*Medico v. Time, Inc.*,
    643 F.2d 134 (3d Cir. 1981).......................................................................18

*Metcalf v. KFOR-TV*,
    828 F. Supp. 1515 (W.D. Okla. 1992) .......................................................20

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990)..................................................................................19, 20

*Mirafuentes v. Estevez*,
    2015 WL 8177935 (E.D. Va. Nov. 30, 2015).............................................21

*Moldea v. N.Y. Times Co.*,
    15 F.3d 1137 (D.C. Cir. 1994) ...................................................................20

*Moldea v. N.Y. Times Co.*,
    22 F.3d 310 (D.C. Cir. 1994) .......................................................... *passim*

*Morgan v. Tice*,
    862 F.2d 1495 (11th Cir. 1989) .................................................................22

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964)..............................................................................29, 34

*Obsidian Fin. Grp., LLC v. Cox*,
   812 F. Supp. 2d 1220 (D. Or. 2011), *aff'd*, 740 F.3d 1284 (9th Cir. 2014)............................20

*Parisi v. Sinclair*,
   845 F. Supp. 2d 215 (D.D.C. 2012) ...........................................................................................30

*Paterson v. Little, Brown & Co.*,
   502 F. Supp. 2d 1124 (W.D. Wash. 2007)..................................................................................26

*Peter Scalamandre & Sons, Inc. v. Kaufman*,
   113 F.3d 556 (5th Cir. 1997) .....................................................................................................32

*Peterson v. Atlanta Hous. Auth.*,
   998 F.2d 904 (11th Cir. 1993) ...................................................................................................25

*Philadelphia Newspapers, Inc. v. Hepps*,
   475 U.S. 767 (1986).............................................................................................................22, 24

*Pippen v. NBCUniversal Media, LLC*,
   734 F.3d 610 (7th Cir.), *cert. denied*, 134 S. Ct. 2829 (2014) .................................................30

*Price v. Viking Penguin, Inc.*,
   881 F.2d 1426 (8th Cir. 1989) ...................................................................................................22

*Q Int'l Courier, Inc. v. Seagraves*,
   1999 WL 1027034 (D.D.C. Feb. 26, 1999) ..........................................................................17, 18

*Restis v. Am. Coal. Against Nuclear Iran, Inc.*,
   2015 WL 1344479 (S.D.N.Y. Mar. 23, 2015) ............................................................................24

*Rhodes v. Placer Cnty.*,
   2011 WL 1302240 (E.D. Cal. Mar. 31, 2011) ...........................................................................20

*Rosanova v. Playboy Enters., Inc.*,
   580 F.2d 859 (5th Cir. 1978) .....................................................................................................27

*Schatz v. Republican State Leadership Comm.*,
   669 F.3d 50 (1st Cir. 2012)........................................................................................................30

*Seaton v. TripAdvisor LLC*,
   728 F.3d 592 (6th Cir. 2013) .....................................................................................................21

*Serian v. Penguin Grp. (USA), Inc.*,
   2009 WL 2225412 (N.D. W. Va. July 23, 2009).........................................................................20

*Silvester v. ABC*,
   839 F.2d 1491 (11th Cir. 1988) ...................................................................................... passim

*Sirpal v. Univ. of Miami*,
  509 F. App'x 924 (11th Cir. 2013) ......................................................................15

*Spelson v. CBS, Inc.*,
  581 F. Supp. 1195, 1203 (N.D. Ill. 1984), *aff'd*, 757 F.2d 1291 (7th Cir. 1985) ...................21

*St. Amant v. Thompson*,
  390 U.S. 727 (1968)........................................................................................29

*Straw v. Chase Revel, Inc.*,
  813 F.2d 356 (11th Cir. 1987) .........................................................................28

*Stroud v. Bank of Am.*,
  886 F. Supp. 2d 1308 (S.D. Fla. 2012) .............................................................16

*Tavoulareas v. Piro*,
  817 F.2d 762 (D.C. Cir. 1987) (en banc)........................................24, 25, 29, 30

*Time, Inc. v. McLaney*,
  406 F.2d 565 (5th Cir. 1969) ..................................................................*passim*

*Time, Inc. v. Pape*,
  401 U.S. 279 (1971)........................................................................................33

*Trulock v. Lee*,
  66 F. App'x 472 (4th Cir. 2003) (per curiam) ....................................................24

*U.S. ex rel. Osheroff v. Humana Inc.*,
  776 F.3d 805 (11th Cir. 2015) ...........................................................................3

*Waldbaum v. Fairchild Publ'ns, Inc.*,
  627 F.2d 1287 (D.C. Cir. 1980).................................................................25, 26

*Washington Post Co. v. Keogh*,
  365 F.2d 965 (D.C. Cir. 1966)..................................................................15, 30

*Washington v. Smith*,
  80 F.3d 555 (D.C. Cir. 1996)..........................................................................20

*Weyrich v. New Republic, Inc.*,
  235 F.3d 617 (D.C. Cir. 2001)........................................................................20

*White v. Fraternal Order of Police*,
  909 F.2d 512 (D.C. Cir. 1990).........................................................17, 18, 19, 30

*Winn v. United Press Int'l*,
  938 F. Supp. 39 (D.D.C. 1996), *aff'd*, 1997 WL 404959 (D.C. Cir. 1997)............................28

*Wolf v. Ramsey*,
    253 F. Supp. 2d 1323 (N.D. Ga. 2003) ..........................................................................16, 22

*Yohe v. Nugent*,
    321 F.3d 35 (1st Cir. 2003) ..........................................................................................18, 19

**State Cases**

*Alpine Indus. Computers v. Cowles Publ'g Co.*,
    57 P.3d 1178 (Wash. Ct. App. 2002) ...................................................................................19

*Beck v. Lipkind*,
    681 So. 2d 794 (Fla. 3d DCA 1996) (per curiam) ...............................................................20

*Bishop v. Fla. Specialty Paint Co.*,
    389 So. 2d 999 (Fla. 1980) ....................................................................................................16

*Don King Prods., Inc. v. Walt Disney Co.*,
    40 So. 3d 40 (Fla. 4th DCA 2010) ..................................................................................16, 17

*Fikes v. Furst*,
    61 P.3d 855 (N.M. Ct. App. 2002) .......................................................................................21

*Gleichenhaus v. Carlyle*,
    591 P.2d 635 (Kan. Ct. App.), *aff'd in relevant part*,
    597 P.2d 611 (Kan. 1979) ......................................................................................................27

*Immuno v. Moor-Jankowski*,
    74 N.Y.2d 548, 560 (1989), *vacated*, 497 U.S. 1021 (1990),
    *adhered to on remand*, 77 N.Y.2d 235 (1991) ....................................................................20

*Jackson v. District of Columbia*,
    412 A.2d 948 (D.C. 1980) .....................................................................................................35

*Jung v. Jung*,
    791 A.2d 46 (D.C. 2002) .......................................................................................................35

*Mile Marker, Inc. v. Petersen Publ'g, L.L.C.*,
    811 So. 2d 841 (Fla. 4th DCA 2002) ...................................................................................34

*Mosesian v. McClatchy Newspapers*,
    285 Cal. Rptr. 430 (Cal. Ct. App. 1991) ..............................................................................27

*Pegasus v. Reno Newspapers, Inc.*,
    57 P.3d 82 (Nev. 2002) ..........................................................................................................34

*Phillips v. Evening Star Newspaper Co.*,
    424 A.2d 78, 87 (D.C. 1980) .................................................................................................28

*Quinn v. Jewel Food Stores, Inc.*,
   276 Ill. App. 3d 861 (1995) ................................................................21

*Shiver v. Apalachee Publ'g Co.*,
   425 So. 2d 1173 (Fla. 1st DCA 1983) ...................................................22

*Sipple v. Found. for Nat'l Progress*,
   83 Cal. Rptr. 2d 677 (Cal. Ct. App. 1999) ...........................................18

*Solers, Inc. v. Doe*,
   977 A.2d 941 (D.C. 2009) ....................................................................35

*Stewart v. Sun Sentinel Co.*,
   695 So. 2d 360 (Fla. 4th DCA 1997) .............................15, 16, 17, 18

*Thomas v. Patton*,
   2005 WL 3048033 (Fla. 4th Cir. Ct. Oct. 21, 2005), *aff'd*,
   939 So. 2d 139 (Fla. 1st DCA 2006) ..............................................16, 32

*Yauncey v. Hamilton*,
   786 S.W.2d 854 (Ky. 1989) ..................................................................21

**Rules**

Fed. R. Civ. P. 56(a) ..........................................................1, 14, 15, 25

Fed. R. Civ. P. 56(c)(1)..............................................................................15

Fed. R. Civ. P. 12(b)(6)......................................................................15, 30

**Other Authorities**

*Restatement (Second) of Conflict of Laws* § 150(2).....................................16

*Restatement (Second) of Torts* § 581A cmt. h (1977)..................................23

## MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR HEARING

Defendants James Risen, Houghton Mifflin Harcourt Publishing Company ("HMH"), and Houghton Mifflin Harcourt Company ("HMHC"), improperly sued as HMH Holdings, Inc., (together "Defendants"), respectfully move this Court for an Order granting Defendants' motion for summary judgment under Fed. R. Civ. P. 56(a) and dismissing the Amended Complaint with prejudice.[1]  Defendants request a 30-minute hearing due to the number of dispositive grounds advanced in this motion and the importance of deciding this motion well before trial to avoid the continued chilling effects of this action on free speech.

### I.      PRELIMINARY STATEMENT

Plaintiff Dennis Montgomery brings this libel action against Pulitzer Prize-winning author James Risen, his publisher HMH, and HMH's holding company HMHC, arising from statements in Chapter 2 ("Chapter") of his book, *Pay Any Price: Greed, Power, and Endless War* (the "Book"), that report allegations that Montgomery defrauded the federal government – allegations widely published in articles since 2008, that were never the subject of a libel claim until now.  The Court should grant Defendants summary judgment for the following reasons:

*First*, Montgomery's Amended Complaint is barred by the fair report privilege.  The privilege protects the Chapter, which accurately summarized official documents, including FBI reports, court records, and statements in congressional records – all of which alleged that Montgomery rigged demonstrations and provided bogus software to the federal government.

*Second*, other statements Montgomery challenges are non-actionable expressions of opinion and rhetorical hyperbole, not verifiable statements of fact.  That the hoax Montgomery allegedly perpetuated was "one of the most elaborate and dangerous hoaxes in American history" and "crazy," that he was motivated by "greed" and accused of being a "con artist," are all subjective opinions protected by the First Amendment, based on disclosed facts.

---

[1] Pending before this Court are Defendants' motion to dismiss or transfer for lack of personal jurisdiction over Risen and HMHC, to dismiss or transfer for improper forum, to transfer for inconvenient forum, and to dismiss for failure to state a claim.  (ECF Nos. 25 and 52.)  If the Court grants that motion on any ground, it need not reach summary judgment.

**Third**, his deliberate failure to produce what Magistrate Judge Goodman has said is the "critical" evidence in the case – the software at the heart of his claim – compels the conclusion that he cannot meet his burden to prove falsity as a matter of law.  He claims his software works and that the Book was false when it reported allegations that his software was a fraud.  Without his software, he cannot prove – and Defendants cannot test – that it works.

**Fourth**, even if Montgomery could carry his burden to prove falsity, as a limited-purpose public figure, he has not and cannot put forth "concrete," "affirmative evidence" that would allow a reasonable jury to find, by clear and convincing evidence, that Defendants published with actual malice, or indeed, any other applicable standard of fault.  Risen interviewed Montgomery and published his denials; interviewed high-level government officials involved, as well as those close to Montgomery; relied on reputable news articles; and relied on official records, including testimony of his former business partner, his former lawyer, and Montgomery's own repeated invocation of the Fifth Amendment privilege against self-incrimination when asked in deposition whether his software was a fraud, and the 2013 Congressional testimony of John Brennan, now Director of the CIA, who testified that Montgomery's software "was determined not to be an accurate source of information."  Given this undisputed record, Plaintiff cannot carry his burden of showing that Risen or his publisher knew what they were publishing was false or had serious doubts as to the truth.

**Fifth**, Montgomery's other tort claims are barred for the same reasons as the libel claims and because he cannot prove the elements of those claims.

Libel cases such as this that "impinge[] upon" fundamental free speech and press rights under First Amendment, lie in a "different category" where granting summary judgment to defendants is the rule, not the exception.  *Time, Inc. v. McLaney*, 406 F.2d 565, 566 (5th Cir. 1969) (reversing denial of summary judgment on interlocutory appeal in libel action requiring actual malice against magazine publisher).  This is a classic example of where "the failure to dismiss a libel suit might necessitate long and expensive trial proceedings, which, if not really warranted, would themselves offend … [First Amendment principles] because of the chilling

2

effect of such litigation." *Id.* The Court should thus enter summary judgment for Defendants and dismiss this fatally flawed Amended Complaint with prejudice.

## II.      STATEMENT OF FACTS

*Pay Any Price* is a nine-chapter book that describes how the war on terror led to waste, fraud, and abuse by U.S. government officials and the contractors who stood to gain from it. (SUMF ¶ 5.)  Chapter 2 of the Book, titled *The Emperor of the War on Terror*, focuses on how, after the terrorist attacks of September 11, 2001, government officials were willing to accept any intelligence – no matter how suspect – that might prevent the next terrorist attack.  (*Id.*)  In that context, Risen recounts Montgomery's story retreading ground covered by previous media reports, most notably a 2010 *Playboy Magazine* feature titled *The Man Who Conned the Pentagon* ("Playboy Article"), which revealed the central allegations Montgomery now challenges, and a 2011 *New York Times* article titled *Hiding Details of Dubious Deal, U.S. Invokes National Security*, which Risen co-authored ("New York Times Article").  (*Id.*)

### A.      Media Coverage of Montgomery Before the Book and Risen's Reliance on It

It is undisputed that Montgomery was subject to extensive media coverage years before the Chapter, and Risen relied on that coverage.  (SUMF ¶ 10.)[2]  In June 27, 2005, Lisa Meyers and Aram Roston at NBC News published an article, titled *Bogus Analysis Led to Terror Alert in Dec. 2003: CIA Experts Saw Secret Code on Al-Jazeera that Wasn't There*, which revealed that, around Christmas 2003, the U.S. government wrongly raised the terror alert level and canceled flights based on non-existent Al Qaeda codes allegedly embedded in Al Jazeera broadcasts.  (*Id.* 11.)  The article quoted Tom Ridge, former Secretary of the Department of Homeland Security, who admitted that:  the intelligence was "bizarre, unique, unorthodox, unprecedented"; he

---

[2] The news articles and court and congressional records are admissible under judicial notice. *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 n.4 (11th Cir. 2015) ("[C]ourts may take judicial notice of documents such as the newspaper articles at issue here for the limited purpose of determining which statements the documents contain (but not for determining the truth of those statements)."); *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) ("Judicial notice is properly taken of publicly available historical articles."); *Bryant v. Avado Brands Inc.*, 187 F.3d 1271, 1279-80 (11th Cir. 1999) (judicial notice of public records).

"wonder[ed] whether or not it was credible"; and "we weren't certain" about this intelligence at the time.  (*Id.*)  Ridge "confirmed there were no secret terror messages" and "no evidence that terrorist were actively plotting against aviation at that time."  (*Id.*)

On November 1, 2006, Montgomery became the subject of extensive media coverage when the *Wall Street Journal* ran a front-page story titled *Congressman's Favors for Friend Include Help in Secret Budget*, revealing that Montgomery had accused then-Congressman, later Nevada Governor, Jim Gibbons of taking bribes from Warren Trepp, Montgomery's former business partner at eTreppid Technologies ("eTreppid").  (SUMF ¶ 12.)  In a follow-up *Wall Street Journal* article titled *Nevada Governor Faces FBI Probe Into Contracts*, Trepp accused Montgomery of giving "false testimony" in their litigation over Montgomery's software.  (*Id.* ¶ 13.)  Montgomery exploited the media spotlight, giving an interview to Lisa Meyers of NBC News, the journalist who wrote the 2005 story on bogus Al Jazeera codes, on May 11, 2007, in which he repeated the "explosive charge" against Trepp and Gibbons.  (*Id.* ¶ 14.)  Gibbons was ultimately cleared in 2008, with his lawyer saying to the press:  "It should be crystal clear that the only persons who should be investigated or charged are those who made false allegations of wrongdoing and who tried to fuel this investigation for their own private purposes."  (*Id.* ¶ 15.)

By creating the controversy over whether Trepp bribed a public official to steer government contracts to eTreppid, Montgomery invited media scrutiny of his litigation with eTreppid, in which public records disclosed his once secret work for the U.S. government.  For instance, an August 4, 2007 article published in the *Reno Gazette-Journal* titled *eTreppid Court Documents Unsealed*, publicized Montgomery's statements in his newly unsealed declaration in which he claimed that his technology warned of and thwarted terrorist attacks around the world.  (SUMF ¶ 16.)  Montgomery was identified as a contractor who allegedly provided the bogus intelligence from Al Jazeera to the government in an August 2008 *Bloomberg News* article titled *Yellowstone Club Divorcee Entangled in Terrorist Software Suits*.  (SUMF ¶ 17.)  The article summarized Trepp's allegations in court records that Montgomery stole eTreppid's "computer code that purportedly could sift through broadcasts from Qatar-based news network Al-Jazeera

4

and find embedded messages to terrorists," and quoted Montgomery's former attorney's charge that the "software was a sham." (*Id.*)  The Bloomberg Article also revealed, based on public FBI reports in Montgomery's cases, that fellow employees at eTreppid told the FBI that Montgomery made them rig demonstrations of his software to sell it to visiting government officials.  (*Id.*)

Then again in 2010, the Playboy Article, written by Aram Roston, who worked on the 2005 NBC article, revealed the central allegations Montgomery now challenges.  Its investigation claimed that Montgomery rigged software demonstrations and sold the U.S. government sham "noise filtering" software to decode purported Al Qaeda messages hidden in Al Jazeera broadcasts – bogus intelligence that led the White House to ground international flights around Christmas in 2003.  (SUMF ¶ 18.)  Soon after, the Playboy Article explained, a French contractor determined that not enough pixels existed in Al Jazeera broadcasts to include the hidden messages and the CIA and the White House soon concluded that they had been hoodwinked.  The article quoted Sloan Venables, Montgomery's co-worker, who stated that he doubted Montgomery's software existed.  (*Id.*)  The article noted that, because of the secrecy surrounding the project, other government agencies continued to contract with Montgomery until 2009.  The article quoted Joseph Liberatore, a former Air Force official who worked with Montgomery on the 2009 contract, who said the Air Force was just looking at Montgomery's software "to see if there was anything there," and an Air Force spokesman who said the Air Force's evaluation of Montgomery's software was "inconclusive" so it ended discussions.

Risen and Eric Lichtblau's 2011 New York Times Article covered much of the same material, but, based on government sources, added that the White House had considered shooting down transatlantic flights based on Montgomery's intelligence and focused on the U.S. government's use of the state-secrets privilege to cover up Montgomery's misdeeds and the government's gullibility. (SUMF ¶ 19.)  The article quoted Liberatore, who said in 2008 that he supported Montgomery but he realized that others in the government did not think Montgomery was credible.  (*Id.*)  The article also quoted Steve Crisman, Montgomery's co-worker at Blxware (the company where Montgomery worked after eTreppid), who said he believed Montgomery's

5

technology was not real.  (*Id.*)  Notably, the New York Times Article said that, in Montgomery's deposition in November 2010, "when asked if his software was a 'complete fraud', he answered, 'I'm going to assert my right under the Fifth Amendment."  (*Id.*)

In a 2012 article by Aram Roston in *Defense News*, "*Obama's Counterterrorism Czar Gave Bogus Intel to Bush White House*," the then-head of the CIA's Counterterrorism Center, Jose A. Rodriguez, Jr., said the Counterterrorism Center was "very skeptical" of Montgomery's intelligence and viewed it as "crazy."  (SUMF ¶ 21.).  Tommy Vietor, former spokesman for the National Security Council ("NSC"), echoed these views, stating that, although John Brennan passed along the information to the White House, "[i]t is absolutely wrong to say Mr. Brennan believed in the veracity of the information" from Montgomery.  (*Id.*)

Montgomery's actions and this media coverage made him notorious before the Book.  A Wikipedia page about him describes the allegations that he defrauded the federal government, and the image of the title page of the Playboy Article, *The Man Who Conned the Pentagon*, was posted on his Twitter page.  (SUMF ¶ 22.)  He continued to seek media attention into 2014, even while he was in the hospital, when he sought to publicize his whistleblower allegation – which Risen addressed in the Chapter – to Fox News.  (*Id.* ¶ 23.)  Fox News, however, rejected his further efforts to obtain publicity because the reporter said Montgomery lied to him.  (*Id.*)

Risen expressly acknowledges in the Book that he relied on the Playboy Article and New York Times Article.  (SUMF ¶ 24.)  Risen relied on these and other reputable media outlets that published numerous news stories about Montgomery before release of the Book in October 2014.  (*Id.* ¶ 22.)  These articles – never retracted, much less the subject of a lawsuit – all track what Risen wrote in the Chapter.  The Book added Montgomery's denials to the narrative, obtained after Risen interviewed him.  (*Id.* ¶ 45.)  Montgomery sued here to challenge publication of these facts after nearly ten years in circulation.

### B.     Reliance on FBI Reports, Court Documents, and Congressional Records for Allegations of Fake Software

As with his New York Times Article and prior media accounts, Risen primarily based the

Chapter on court records and other official documents.  The Chapter refers to FBI interviews of Trepp and eTreppid employees.  The Book expressly states that, "*according to court documents that include his statements to the FBI*," Montgomery's software was fake because "Trepp later told the FBI that he eventually learned that Montgomery had no real computer software programming skills."  (SUMF ¶ 25) (emphasis added). Similarly, the Chapter accurately quotes statements in FBI reports in which eTreppid employee Sloan Venables began to suspect Montgomery's software was fake.  Venables "*told the FBI* that another employee, Patty Gray, began to suspect that Montgomery 'was doing something other than what he was actually telling people he was doing'" and "added *in his statement to the FBI* that he knew that 'Montgomery promised products to customers that he had not been completed or even assigned to programmers.'"  (*Id.* ¶ 26) (emphasis added).

Then, citing court documents, the Chapter states:  "Over the Christmas holidays [of 2005], Montgomery allegedly went into eTreppid's offices and deleted all of the computer files containing his source code and software development data, *according to court documents*."  (SUMF ¶ 28) (emphasis added).  Later, "[a]*ccording to court documents*, [Trepp] *told the FBI* that Montgomery had stolen the software eTreppid had used on secret Pentagon contracts" but "[a]s federal investigators moved in to investigate the alleged theft of the technology, they heard from Trepp and others that Montgomery's alleged technology wasn't real."  (*Id.*) (emphasis added).  The Chapter correctly summarizes FBI reports contained in court records showing that the technology "wasn't real."  (*Id.*)

The Chapter also recounts how Montgomery's later benefactor and business partner at Blxware, Edra Blixseth, was "going through an extremely bitter divorce, and Montgomery became caught up in their legal battles."  (SUMF ¶ 29.)  "Mysteriously, government lawyers sometimes sought to intervene in their court cases ... to keep classified information stemming from Montgomery's work with the intelligence community out of the public records."  (*Id.*)  In those public court records, Edra's ex-husband, Tim Blixseth, alleged the fraud in an affidavit: "Montgomery and Edra Blixseth have engaged in an extensive scheme to defraud the U.S. Government," a "fraud [that] involves Mr. Montgomery's purported 'noise filtering software

technology,' which "does not exist, yet has been used repeatedly by Edra Blixseth and Montgomery to commit financial frauds ...." (SUMF ¶ 29.) Michael Flynn, Montgomery's former attorney, stated there in an affidavit: "Blxware possesses no marketable technology, the technology as represented does not exist[.]" (*Id.*)

The Book recounts that Montgomery's gambling and other debts led to bankruptcy and his arrest for passing $1 million in bad checks. (SUMF ¶ 30.) In that bankruptcy proceeding, Flynn told Montgomery in a deposition: "I know you conned me and you conned the U.S. Government. . . . You're a computer hacker and you're a fraud, Mr. Montgomery." (*Id.*)

The Book also expressly relies on congressional records to confirm that Montgomery's software was fake. The Book explains that, "[a]t the time of the Christmas 2003 scare, John Brennan was the head of the Terrorist Threat Integration Center," which "meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration." (SUMF ¶ 30.) The Book states that, "[i]n 2013, while the Senate was considering whether to confirm Brennan to run the CIA, Senator Saxby Chambliss, a Georgia Republican who was vice chairman of the Senate Intelligence Committee, submitted a written question to Brennan about his role in the intelligence community's dealings with Montgomery." (*Id.*) Indeed, Senator Chambliss' written question titled "Bogus Intelligence," states that "[m]edia reports indicate that when you led the Terrorist Threat Integration Center (TTIC), you championed a program involving IT contractors in Nevada who claimed to intercept al-Qaida targeting information encrypted in the broadcasts of TV news network Al Jazeera." (*Id.*) The written questions confirm in congressional records that not only "[t]he media" but *documents we have reviewed show*, that CIA officials derided the contractor's information, but nonetheless, you passed it to the White House and alert levels ended up being raised unnecessarily." (*Id.*) (emphasis added). Accurately quoting Brennan's response, the Book states that, "[i]n response": (1) "Brennan denied that he had been an advocate for Montgomery and his technology"; (2) "insisted that the Terrorism Threat Integration Center was merely a recipient of the information and data, which had been passed on by the CIA"; (3) he "included Montgomery's data 'in analytic

8

products'"; and (4) confirmed that Montgomery's purported software "'was determined *not to be a source of accurate information*.'"  (*Id.*) (emphasis added).

### C.  Reliance on FBI Reports and Court Documents for Allegations of Rigged Demonstrations of Software to U.S. Government Officials

The Book also explicitly relies on court records and FBI reports, in which "Trepp also described to federal investigators how eTreppid employees had confided to him that Montgomery had asked them to help him falsify tests of his object recognition software when Pentagon officials came to visit."  (SUMF ¶ 31.)  Indeed, "Trepp said that on one occasion, Montgomery told two eTreppid employees to go into an empty office and push a button on a computer when they heard a beep on a cell phone."  (*Id.*)  Then "[a]fter he was in place in the field, he used a hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of a bazooka on another screen prominently displayed in front of the military officers standing in another room, *according to court documents*."  (*Id.*) (emphasis added).  Thus, "[t]he military officers were convinced that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands."  (*Id.*)  The Book again includes Montgomery's denials.  (*Id.*)  Once again, the Book accurately describes the FBI report contained in court documents.  (*Id.*)

### D.  Reliance on Interviews with Sources and Documents

The undisputed facts show that Risen relied on extensive interviews with sources and documentation to support the statements he wrote in the Chapter.  Risen had numerous well-placed government sources.  Risen interviewed and relied on William D. Murray, CIA Paris Station Chief in 2003 when Montgomery perpetrated his hoax on the CIA.  Murray told Risen that:  some high-level CIA officials did not believe Montgomery's intelligence at the time; Frances Townsend, a former White House counterterrorism official on the NSC, discussed with an NSC lawyer that the president had authority to shoot down airplanes believed to be terrorist threats; Townsend considered whether it might have been time to exercise that authority to shoot down passenger jets over the Atlantic in late 2003 based on Montgomery's intelligence; French

intelligence and a technology company conducted a study showing there were not enough pixels in the Al Jazeera broadcasts to include hidden Al Qaeda messages; and the CIA concluded that Montgomery's intelligence based on his purported software was fake.  (SUMF ¶ 34.)  Murray was described as a "former senior CIA official" in the Chapter.  (*Id*.)  Risen also interviewed another "former senior CIA official," the now late Tyler Drumheller, the CIA European Division Chief in late 2003, who corroborated Murray's statements to Risen.  (*Id.* ¶ 35.)

Risen obtained comment from CIA Office of Public Affairs officials, who said the CIA did not have a contract with Montgomery when he was providing data from Al Jazeera videotapes and that his "threat detection tools were not exactly as billed."  (SUMF ¶ 36.)  Risen interviewed Melvin Dubee, a former staff member on the U.S. Senate Select Committee on Intelligence, who said that committee staff contacted the CIA about Montgomery's technology and the CIA was "very skeptical of it at the time."  (*Id.* ¶ 37.)

Risen interviewed former White House officials.  Risen interviewed Townsend, and as the Chapter reflects, she denied considering shooting down planes, but Murray reaffirmed his statements when Risen told him Townsend's denial.  (SUMF ¶ 38.)  Townsend told Risen she believed Montgomery's was probably the biggest hoax that reached the president.  (*Id.*)  Risen interviewed Samantha Ravich, former advisor to Vice President Dick Cheney, who confirmed she met with Montgomery in the White House, but refused the technology absent proof that the software worked, which she said was never forthcoming.  (*Id.* ¶ 39.)

Risen obtained comment from current and former officials from other agencies with which Montgomery worked.  That includes U.S. Special Operations Command ("SOCOM") officials, who said that Montgomery's technology did not meet SOCOM's requirements, and an Air Force spokesman, who provided a statement stating that the Air Force awarded a contract to Montgomery's company in 2009 but that "the contractor did not perform in accordance with the terms of the contract."  (SUMF ¶ 40, 41.)

Risen also interviewed individuals close to Montgomery.  The ex-husband of Edra Blxware, Tim Blixseth, described a demonstration of the Al Jazeera software Montgomery gave

to him in California.  (SUMF ¶ 43.)  In interviews, Montgomery's former lawyer, Michael Flynn, repeated his statements made in court records accusing Montgomery of being a "fraud" and having "conned" him and others.  (*Id.* ¶ 42.)

### E.  Complaint Allegations

Montgomery's 271-page, 268-paragraph Amended Complaint boils down to one central allegation:  that Risen and HMH defamed him by publishing allegations that he defrauded the federal government by peddling bogus software.  (SUMF ¶ 46.)  He claims falsity alleging that the software worked and existed.  *Id.*  In particular, Montgomery takes issue with statements that his software, which supposedly decoded hidden Al Qaeda messages in Al Jazeera broadcasts, was a sham, and that the intelligence he passed on to federal agencies led the White House to raise the terrorist threat level in late 2003, ground international flights, and consider shooting down transatlantic flights, "what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history."  (*Id.*)

Montgomery also challenges allegations former eTreppid employees made in FBI investigative reports that Montgomery rigged demonstrations of his object recognition software.  (SUMF ¶ 47.)  He takes issue with the statements in the Chapter from Montgomery's "lawyer [who] 'concluded that Montgomery was a fraud,'" and "that out of 'greed' Plaintiff Montgomery 'create[d] a rogue intelligence operation with little or no adult supervision' which was 'crazy' and that he was 'someone who has been accused of being a con artist.'"  (*Id.*)

### F.  Montgomery's Failure to Produce the Critical Software and Defendants' Pending Motion for Sanctions for Spoliation and Violation of Court Orders

To defend against Montgomery's claim that statements in the Book are false because the software allegedly works, on June 1, Defendants requested a copy and the locations of the software referred to in the Amended Complaint.  (SUMF ¶ 48.)  On July 1, Montgomery objected to the request to produce the software as, *e.g.*, "burdensome," and the request to disclose the locations as "largely irrelevant."  (*Id.*)  On July 15, Montgomery's revised objections again refused to disclose "the location of the relevant software."  (*Id.*)  He also refused "to

produce a copy of any software," asserting it is "secret" classified information.  (*Id.*)  He did *not* state the software was outside his possession, custody, or control.

On August 4, 2015, Defendants cited to Judge Goodman orders in Montgomery's prior cases show that his software is *not* classified, yet he has repeatedly refused to produce it.  (ECF No. 94.)  In a case in which Montgomery's former employer, eTreppid, sued Montgomery for allegedly misappropriating the subject software, the U.S. government moved for and obtained a protective order under the state secrets privilege to protect certain classified information from discovery ("U.S. Protective Order").  (SUMF ¶ 49.)  But the U.S. Protective Order specifically *excluded* Montgomery's software from its scope.  (*Id.*)  Thus, the judge in Nevada found that "[t]he clear understanding in drafting and issuing th[e] [U.S.] protective order was that the parties would be discussing the nature and capabilities of the technology."  (*Id.*)

Still, Montgomery refused to produce the software in both the Nevada litigation and in his bankruptcy proceedings in which the U.S. Protective Order was also entered.  In the Nevada action, the magistrate and district judges repeatedly ordered him to produce the software, but he refused.  (SUMF ¶ 50.)  Thus, the district judge held him in contempt, imposing a penalty of $2,500 per day until he produced the software.  (*Id.*)  Instead of producing it, he settled the action and signed confessions of judgment for over $25 million.  (*Id.*)  Then, he declared bankruptcy, refused to produce or describe the software in bankruptcy, and was thus denied discharge.  (*Id.*)

Montgomery repeated this pattern here.  In his August 20, 2015 deposition, he testified that he searched for the software in response to Defendants' discovery requests and gave his ***only*** copy of the software to the FBI on August 19, 2015.  (SUMF ¶ 51.)  At the August 21 hearing on Montgomery's refusal to produce the software, Montgomery's counsel confirmed Montgomery's deposition testimony.  *Id.*  Judge Goodman found "the software is highly relevant" (*id.*) and credited the Nevada court's finding that the software was not classified.  (*Id.*)[3]

---

[3] In a November 13, 2015 letter responding to Defendants' subpoena, the CIA said it "conducted a search of its records and did not locate 'a copy of Montgomery's software, including but not limited to video compression software or noise filtering software Montgomery allegedly used to detect hidden Al Qaeda messages in Al Jazeera broadcasts.'"  (SUMF ¶ 59.)  The CIA declined

On August 22, 2015, Judge Goodman entered an order requiring Montgomery to "use his self-described right of continued access to non-classified information" from the FBI "and produce the software to Defendants." (SUMF ¶ 52.) The order also required him to produce, by August 31, "all" communications with persons who know about the software and its location, including with the FBI, and produce the software by September 4. (*Id.*)

On September 3, 2015, Judge Goodman denied Montgomery's motion for a stay pending his objection. (SUMF ¶ 53.) Judge Goodman "agreed with Defendants' position that the software is 'highly relevant.'" (*Id.*) He found that "Plaintiff's burden to prove falsity does not hinge on whether he [Risen] ever had a copy of the software" but rather "the critical fact issue is whether in fact the software worked." (*Id.*) Thus, "Defendants have the right to inspect and test the software." (*Id.*) He concluded the software is "highly relevant" and "critical" evidence Montgomery must produce. (*Id.*) The judge also found Montgomery intended "to sequester what could be the most important evidence in the entire case." (*Id.*)

On September 4, 2015, Montgomery failed to produce the software; he filed his objection. (SUMF ¶ 54.) On September 8, the FBI General Counsel explained that Montgomery gave the FBI the software in "hard drives contain[ing] **51.6 million files amounting to 600 million pages.**" (*Id.*) He concluded "there is no reasonable way for the Government to locate and provide the alleged software, absent specific instructions from" Montgomery. (*Id.*)

On October 19, 2015, Judge Goodman again ordered Montgomery: to produce his communications with the FBI, now by October 20; to give the FBI comprehensive instructions to locate the software or state that he cannot by October 21; and to produce the software by October 26, 2015. (SUMF ¶ 55.) The order permitted Defendants to file a motion for dismissal or adverse inference sanctions if Montgomery failed to comply. (*Id.*) Judge Goodman again held "that **this particular software is, in fact, critical evidence in the case**, because this is a defamation case, and one of your main burdens as the Plaintiff is to prove … to prove the falsity

---

to look for any other requests, saying some of it might be classified, thus suggesting the software for which the CIA searched was not classified – consistent with its position in prior litigations.

of the allegation." (*Id.*) (emphasis added).

On October 21, 2015, in an about-face, Montgomery filed a declaration directly contradicting his prior deposition testimony, and his counsel's August 21 representations to Judge Goodman. His declaration states: "Based on my personal knowledge and belief, upon searching my memory, I do not believe that I have had access to any of the subject software, nor did I provide it to the Federal Bureau of Investigation ("FBI") when I turned over the drives ...." (SUMF ¶ 56.) He does not explain how he does not have access to his own software, where it is now located, or his about-face after he knew he could face severe sanctions.

On October 23, 2015, the FBI Assistant General Counsel, Ted Schwartz, emailed Montgomery's counsel that, given Montgomery's declaration "***the FBI will not search the drives to locate software*** requested in the *Risen* litigation." (SUMF ¶ 57) (emphasis added). On October 26, 2015, Montgomery did not produce the software. He filed an objection and request for a stay. (*Id.*) On October 28, 2015, Defendants filed their motion for dismissal sanctions on grounds that Montgomery spoliated the software and violated multiple court orders to produce it (*id.*), which is pending before Judge Goodman. On December 11, 2015, Schwartz emailed Plaintiff's counsel stating that Montgomery had not given the FBI the necessary information and the FBI's position was unchanged from his October 23 email that the FBI was not searching for Montgomery's software. (SUMF ¶ 60.)

## III.   ARGUMENT

### A.   The Court Should Grant Summary Judgment Because No Dispute as to Any Material Fact Exists and Defendants Are Entitled to Judgment as a Matter of Law on Plaintiff's Libel and Related Torts Claims

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Although the Court views the evidence in a light favorable to the non-moving party, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment"; there must "be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 245, 247-48 (1986); *see also*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). Here, Montgomery carries the burden of proof at trial, so Defendants may obtain summary judgment simply by establishing that no genuine issue of material fact exists as to an essential element of Montgomery's claim or an affirmative defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Defendants do not need to "support [their] motion with affidavits or other similar material *negating* the opponent's claim." *Id.* at 323. Defendants may meet this burden by demonstrating "an absence of evidence to support [Montgomery's] case." *Id.* at 325. Once Defendants meet this initial burden, Montgomery must cite "to particular parts of materials in the record" or show "that the materials cited do not establish the absence … of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

Modern litigation, and particularly trial, is cripplingly expensive regardless of the outcome, so Rule 56(a) helps weed out meritless claims. Such concerns are especially present in defamation cases, where forcing defendants to incur unnecessary costs defending ultimately meritless suits can chill speech.[4] Thus, in libel cases particularly because of their potential chilling effect on speech about important issues to our democracy (such as the conduct of our counter-terrorism defenses raised in the Book), courts routinely grant motions for summary judgment on libel and related claims on the grounds set forth in this motion and appellate courts routinely affirm and even reverse for failure to grant summary judgment.[5] Under D.C. law, or

---

[4] *Time*, 406 F.2d at 566; *Farah*, 736 F.3d at 534 (recognizing in affirming Rule 12(b)(6) dismissal that "summary proceedings are essential in the First Amendment area because if a suit entails 'long and expensive litigation,' then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails") (quoting *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966); *McBride v. Merrell Dow & Pharms, Inc.*, 717 F.2d 1460, 1467 (D.C. Cir. 1983) ("District of Columbia law … endorses the use, where possible, of summary procedures in handling libel actions."); *Stewart v. Sun Sentinel Co.*, 695 So. 2d 360, 363 (Fla. 4th DCA 1997) (citing, *inter alia*, *Keogh*, 365 F.2d at 968) ("Where the facts are not in dispute in defamation cases, however, pretrial dispositions are 'especially appropriate' because of the chilling effect these cases have on freedom of speech.").

[5] *See*, *e.g.*, *Cook-Benjamin v. MHM Corr. Servs., Inc.*, 571 F. App'x 944, 947 (11th Cir. 2014) (affirming grant of summary judgment for lack of falsity and grounds of opinion); *Sirpal v. Univ. of Miami*, 509 F. App'x 924, 930-31 (11th Cir. 2013) (affirming grant of defendants' summary judgment motion on libel claim for failure to prove falsity); *Info. Sys. & Networks Corp. v. City*

any other applicable law,[6] Plaintiff fails to meet his burden to demonstrate critical elements of his claim as a matter of law:  (1) that the statements are non-privileged; (2) that the statements are facts, rather than protected opinions; (3) that the statements at issue are substantially false, and (4) that the Defendants acted with fault, here knowledge of falsity or serious doubt as to

*of Atlanta*, 281 F.3d 1220, 1228 (11th Cir. 2002) (affirming summary judgment for defendant on libel claim arising out of statement of opinion); *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1188 (11th Cir. 1999) (affirming summary judgment to defendants when plaintiff could not prove falsity or actual malice); *Silvester v. ABC*, 839 F.2d 1491, 1498 (11th Cir. 1988) (affirming summary judgment to media defendants for lack of actual malice); *Time*, 406 F.2d at 566 (reversing denial of motion for summary judgment and remanding with directions enter summary judgment for media defendant for lack of actual malice); *Klayman v. City Pages*, 2015 WL 1546172, at *7, *12-13 (M.D. Fla. Apr. 3, 2015) (granting summary judgment to media defendant in libel action for lack of actual malice), *appeal pending*, No. 15-12731-GG (11th Cir. June 18, 2015); *Stroud v. Bank of Am.*, 886 F. Supp. 2d 1308, 1316 (S.D. Fla. 2012) (granting defendant summary judgment on libel claims because plaintiff failed to adduce evidence of falsity, malice, or willful intent); *Dubai World Corp. v. Jaubert*, 2011 WL 579213, at *14 (S.D. Fla. Feb. 9, 2011) (granting counterclaim-defendant summary judgment on libel claim for insufficient evidence of actual malice); *Krohngold v. Nat'l Health Ins. Co.*, 825 F. Supp. 996 (M.D. Fla. 1993) (granting summary judgment for defendant in libel action where no genuine issue of material fact whether the statement was false); *Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 1353 (N.D. Ga. 2003) (granting author defendants summary judgment for lack of actual malice); *Stewart*, 695 So. 2d at 361-62 (granting summary judgment to media defendants under the fair report privilege and for lack of actual malice); *Don King Prods., Inc. v. Walt Disney Co.*, 40 So. 3d 40, 46 (Fla. 4th DCA 2010) (granting summary judgment to media defendant for lack of actual malice); *Thomas v. Patton*, 2005 WL 3048033 (Fla. 4th Cir. Ct. Oct. 21, 2005) (same), *aff'd*, 939 So. 2d 139 (Fla. 1st DCA 2006).

[6] "A federal district court sitting in diversity applies the choice-of-law rules of the forum state." *Castellanos v. Pfizer, Inc.*, 2008 WL 2323876, at *3 (S.D. Fla. May 29, 2008).  In tort cases, Florida courts apply the "significant relationship" test, which provides that "[t]he rights and liabilities of the parties ... are determined by the local law of the state which ... has the most significant relationship to the occurrence and the parties[.]"  *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980).  Where, as here, the claim involves allegedly defamatory statements circulated nationwide, the state with the most significant relationship "will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state."  *Restatement (Second) of Conflict of Laws* § 150(2).  Other considerations include: "(a) the state or states where the defendant did his act or acts of communication, such as assembling, printing and distributing a magazine or book and (b) the state or states of the defendant's domicil[e] ...."  *Id.* § 150(2) cmt. e.  Although Montgomery claims to be a Florida citizen, discovery has shown that he was a citizen of Washington State at the time of publication, and even now.  (ECF Nos. 52, 118.)  D.C. bears the most significant relationship to this lawsuit because that is where Risen conducted the primary newsgathering and wrote much of the Chapter.  (*Id.*; SUMF ¶ 6.)  The Court need not decide which law applies because, on the issue here, the law of the relevant jurisdictions is the same.  Defendants cite D.C. and Florida law here.

truth, as required by Montgomery's status as a public figure.[7]

**B.      The Fair Report Privilege Bars Plaintiff's Claims**

Montgomery's claim should be dismissed because the challenged statements in the Chapter are privileged under the fair report privilege.  The privilege protects against defamation and related claims where – as here – a publication accurately summarizes statements in court records, congressional records, and government investigative reports.  It applies, even if the underlying information ultimately proves to be false, if "the reports were substantially accurate" and fair, the reports attribute statements to the official records, and they "concern a governmental proceeding."  *White v. Fraternal Order of Police*, 909 F.2d 512, 527 (D.C. Cir. 1990); *Stewart*, 695 So. 2d at 362-63 ("This privilege includes the broadcast of the contents of an official document, as long as their account is reasonably accurate and fair, even if the official documents contain erroneous information.") (citation and quotation marks omitted).  Here, the Book serves the critical function that the fair report privilege is designed to protect:  providing "both a fair and accurate accounting of public proceedings as well as informed commentary"[8] and thus advancing "[t]he purpose of the privilege" by "promot[ing] public scrutiny of governmental affairs."[9]  Whether the fair report privilege applies is a question of law courts routinely decide by comparing official records subject to judicial notice with the publication in suit.[10]

---

[7] *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1088 (D.C. Cir. 2007) (stating elements of libel under D.C. law as: "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm"); *Don King Prods.*, 40 So. 3d at 43 (stating, under Florida law, "A common law claim for defamation requires [1] the unprivileged publication (to a third party) of a [2] false and defamatory statement [3] concerning another, [4] with fault amounting to at least negligence on behalf of the publisher, [5] with damage ensuing").
[8] *Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 34 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996).
[9] *Harper v. Walters*, 822 F. Supp. 817, 823 (D.D.C. 1993), *aff'd*, 40 F.3d 474 (D.C. Cir. 1994).
[10] *See Q Int'l Courier, Inc. v. Seagraves*, 1999 WL 1027034, at *4-5 (D.D.C. Feb. 26, 1999) (dismissing libel claim on motion for summary judgment under fair report privilege); *Foretich v. Chung*, 1995 WL 224558, at *1-2 (D.D.C. Jan. 25, 1995) (dismissing on summary judgment motion libel claim against news anchor for reporting allegations in judicial proceedings);

*First*, the Chapter relies upon witness statements made in FBI investigative reports filed in court proceedings, quotes affidavits and deposition transcripts and other filed court documents, and discusses the contents of congressional records.  Each of these plainly falls within the scope of fair report privilege.  *See White*, 909 F.2d at 527 (explaining that privilege "extends broadly to the report 'of any official proceeding, or any action taken by any officer or agency of the government,'" including not only government proceedings themselves, but also allegations or findings that prompt such proceedings) (citation omitted).  Courts routinely hold that reporting on court records, judicial proceedings, and discovery documents, including affidavits and depositions,[11] law enforcement investigations and reports,[12] and congressional records and statements,[13] is protected.  Montgomery cannot dispute that these official records contain the heart of the allegedly defamatory statements:  allegations that Montgomery rigged demonstrations of his software to government officials and that his software did not exist or did not work.  (SUMF ¶ 24-31.)

*Second*, the Chapter *expressly* reports on and refers to the government investigations, congressional records, and court proceedings.  The privilege applies here, where it is "apparent

---

*Stewart*, 695 So. 2d at 361-62 (affirming motion to dismiss libel claim or summary judgment where newspaper's statements protected by fair report privilege).

[11] *See Q Int'l Courier*, 1999 WL 1027034, at *4 (privilege applies to report on civil complaint); *Lavin v. N.Y. News, Inc.*, 757 F.2d 1416, 1419 (3d Cir. 1985) (reports of affidavits privileged); *Sipple v. Found. for Nat'l Progress*, 83 Cal. Rptr. 2d 677, 687-88 (Cal. Ct. App. 1999) (report on deposition testimony privileged).

[12] *See Medico v. Time, Inc.*, 643 F.2d 134, 139 (3d Cir. 1981) (fair report privilege applies to report on FBI documents that "express only tentative and preliminary conclusions that the FBI has never adopted as accurate"); *White*, 909 F.2d at 527-28 (privilege applies to report of D.C. administrative committee); *Global Relief Found. Inc. v. N.Y. Times Co.*, 390 F.3d 973 (7th Cir. 2004) (privilege applies to report of federal investigation into Islamic charity for possible link to terrorism); *Yohe v. Nugent*, 321 F.3d 35, 44 (1st Cir. 2003) (articles giving "rough-and-ready summary" of official statement by police protected by fair report privilege); *Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*, 844 F.2d 955, 960 (2d Cir. 1988) (statement by FBI official about execution of search warrant protected); *Dowd v. Calabrese*, 589 F. Supp. 1206, 1217 (D.D.C. 1984) (report of DOJ investigation protected).

[13] *Crane v. Ariz. Republic*, 972 F.2d 1511, 1517 (9th Cir. 1992) (secret investigation of House Select Committee on Narcotics Abuse and Control was official proceeding under the privilege); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1097 (4th Cir. 1993) ("[A] fair and accurate report of the public remarks of a member of Congress fits within the 'fair report' privilege[.]").

either from specific attribution or from the overall context that the article is quoting, paraphrasing or otherwise drawing upon official documents or proceedings." *Dameron v. Wash. Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985); *Ditton v. Legal Times*, 947 F. Supp. 227, 230 (E.D. Va. 1996) ("A publisher properly attributes a report if the average reader is likely to understand that the report summarizes or paraphrases from the judicial proceedings."), *aff'd*, 129 F.3d 116 (4th Cir. 1997).

*Third*, Montgomery does not have any evidence that the Chapter is anything but a fair and "substantially accurate," *White*, 909 F.2d at 527, account of the findings and allegations in the investigative reports, congressional records, and court proceedings. *See Yohe*, 321 F.3d at 44 ("'[A]ccuracy' for fair report purposes refers only to the factual correctness of the events reported and not to the truth about the events that actually transpired."); *Coles*, 881 F. Supp. at 31 n.3; *Alpine Indus. Computers v. Cowles Publ'g Co.*, 57 P.3d 1178, 1187 (Wash. Ct. App. 2002) ("It is not necessary that it be exact in every immaterial detail[.]") (citation omitted). A comparison of the statements in the Chapter and facts and allegations in the official records shows Risen's reporting was more than accurate and fair.

Indeed, it is undisputed that Risen repeatedly included Montgomery's denials (SUMF ¶¶ 7, 31, 44), making the report more than "fair" for purposes of the privilege. *See, e.g.*, *Dorsey v. Nat'l Enquirer, Inc.*, 973 F.2d 1431, 1437, 1440 (9th Cir. 1992) (tabloid "did not exceed the degree of flexibility and literary license accorded newspapers in making a 'fair report'" by reporting that petition filed against entertainer said entertainer had AIDS; last paragraph of report included entertainer's statement that charge was an "utter fabrication"). Thus, Montgomery's claims are barred by the fair report privilege.

### C.  Many of the Challenged Statements Are Non-Actionable Opinion and Rhetorical Hyperbole Protected by the First Amendment

Statements of opinion that do "not contain a provably false factual connotation" are protected under the First Amendment. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990); *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 313 (D.C. Cir. 1994) ("*Moldea II*"). In addition, an opinion is also not actionable if it cannot be objectively verified as false or cannot "reasonably

[be] interpreted as stating actual facts" about the plaintiff.  *Milkovich*, 497 U.S. at 18-20; *Washington v. Smith*, 80 F.3d 555, 556-57 (D.C. Cir. 1996).  Rhetorical language that is "loose, figurative [and] hyperbolic" is not actionable.  *Milkovich*, 497 U.S. at 21.  Moreover, opinions based on disclosed facts are non-actionable.[14]

Whether the allegedly defamatory statements are non-actionable opinion is a question of law.  *Moldea v. N.Y. Times Co.*, 15 F.3d 1137, 1144 (D.C. Cir. 1994) ("*Moldea I*").  The court must analyze the challenged statements in their entirety, taking into account both the immediate context and the larger social context in which they appeared.  *See Moldea II*, 22 F.3d at 314; *see also Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001).

Here, Montgomery's allegation that Defendants said that Montgomery created a "rogue" intelligence operation, that he and other government contractors may have been motivated by "greed"[15] and that "crazy became the new normal in the war on terror"[16] are non-verifiable

---

[14] *E.g.*, *Moldea II*, 22 F.3d at 317 (where "the reader understands that [ ] supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation"); *Beck v. Lipkind*, 681 So. 2d 794, 795 (Fla. 3d DCA 1996) (non-actionable "[p]ure opinion … when the defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener ….").

[15] Speculation as to another's motivation, such as greed, is non-actionable opinion.  *See Immuno v. Moor-Jankowski*, 74 N.Y.2d 548, 560 (1989) ("Speculations as to the motivations … generally are not readily verifiable, and are therefore intrinsically unsuited as a foundation for libel."), *vacated*, 497 U.S. 1021 (1990), *adhered to on remand*, 77 N.Y.2d 235 (1991); *Obsidian Fin. Grp., LLC v. Cox*, 812 F. Supp. 2d 1220, 1233 (D. Or. 2011) (blogger's statement plaintiff was "greedy," was "figurative, hyperbolic, imaginative, or suggestive"), *aff'd*, 740 F.3d 1284 (9th Cir. 2014); *Fetter v. N. Am. Alcohols, Inc.*, 2007 WL 551512, at *12 (E.D. Pa. Feb. 15, 2007) (statement "that the plaintiff was greedy … reflect[s] personal opinion" is non-actionable); *Metcalf v. KFOR-TV*, 828 F. Supp. 1515, 1530 (W.D. Okla. 1992) (statement that organizations were "shams perpetrated on the public by greedy doctors" was opinion).

[16] *See Cook-Benjamin*, 571 F. App'x at 947 ("[S]tatement[] that [plaintiff] was … 'crazy' constitute[s] [defendant's] opinion and thus cannot be proven false."); *Weyrich*, 235 F.3d at 624 (statement that plaintiff experienced bouts of "paranoia" was protected opinion); *Lieberman v. Fieger*, 338 F.3d 1076, 1080 (9th Cir. 2003) (statement in interview that plaintiff, a psychiatric expert, is "crazy," was protected opinion); *Serian v. Penguin Grp. (USA), Inc.*, 2009 WL 2225412, at *9 (N.D. W. Va. July 23, 2009) (statement in national security book that plaintiff was "very crazy" was non-actionable "subjective opinion[]"); *Rhodes v. Placer Cnty.*, 2011 WL 1302240 (E.D. Cal. Mar. 31, 2011) (calling plaintiff "a 'crazy flute player'" was "hyperbole").

statements of subjective opinion and rhetorical hyperbole that are non-actionable.  (SUMF ¶ 46.)[17]  Moreover, read in its proper context, statements that Montgomery "has been accused of being a con artist" (*id.* (quoting Chapter at 32)) are non-actionable opinion based on disclosed facts, including that Montgomery's own former business partner, employees, and lawyer all accused him in court records of being a con artist and a fraud – an allegation to which his response was to take the Fifth.[18]  Finally, the statement that "many current and former U.S. officials and others familiar with the case believe" Montgomery's software was "one of the most elaborate and dangerous hoaxes in American history" is a non-verifiable, subjective ranking that depends on the author's viewpoint and viewpoints of the officials he describes later in the Chapter, rather than a statement of objective fact.[19]  This characterization is also opinion based on facts disclosed later in the Chapter that the White House seriously considered shooting down passenger jets over the Atlantic based on Montgomery's intelligence.  (SUMF ¶ 38.)  Thus, these challenged statements are non-actionable opinion.

---

[17] That Plaintiff is an "incorrigible gambler" (SUMF ¶ 46) is also non-actionable opinion where he was arrested for passing a million dollars in bad checks to a casino in Nevada and had to declare bankruptcy.  The FBI Report shows that he was a gambler and "incorrigible" is a subjective assessment of his motivation, and, thus, protected opinion.  (Handman Decl. Ex. 18 at Bates Nos. 00002, 00021-22); *Fikes v. Furst*, 61 P.3d 855, 864-65 (N.M. Ct. App. 2002) (statement that plaintiff was "pursuing a bizarre obsession" was protected opinion).  The criminal charges are still pending, delayed by his claimed inability to travel to Nevada.  (SUMF ¶ 29.)

[18] *See Spelson v. CBS, Inc.*, 581 F. Supp. 1195, 1203 (N.D. Ill. 1984) (statement that "individuals are 'cancer con-artists' and 'practitioners of fraud,'" were opinion)), *aff'd*, 757 F.2d 1291 (7th Cir. 1985); *Yauncey v. Hamilton*, 786 S.W.2d 854 (Ky. 1989) (acquaintance of suspected murder's statement to newspaper that suspect was a "con artist" was protected opinion); *Quinn v. Jewel Food Stores, Inc.*, 276 Ill. App. 3d 861, 866-67 (1995) (employer's evaluation stating that plaintiff was a "con artist" was protected opinion).

[19] *See Adventure Outdoors, Inc. v. Bloomberg*, 519 F. Supp. 2d 1258 (N.D. Ga. 2007) (granting in part motion to dismiss on grounds that describing plaintiff and other gun dealers as "the worst of the worst," "a scourge on our society," "rogue," and "immoral and corrupt" were statements of non-actionable opinion), *rev'd on other grounds*, 552 F.3d 1290 (11th Cir 2008) (holding district court lacked subject-matter jurisdiction); *Mirafuentes v. Estevez*, 2015 WL 8177935, at *3 (E.D. Va. Nov. 30, 2015) (dismissing libel claim under Rule 12(b)(6) because "[t]he assertion that Sota was perceived to be among the most corrupt Mexicans in 2013 is not actionable because it is not objectively verifiable and instead amounts to a subjective assertion"); *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 600 (6th Cir. 2013) (affirming dismissal because TripAdvisor's placement of Grand Resort on "2011 Dirtiest Hotels list" was statement of opinion).

**D.    As a Matter of Law, Plaintiff Does Not, and Cannot, Meet His Burden to Prove Substantial Falsity**

The First Amendment requires a plaintiff such as Montgomery to bear the burden of proving that the speech at issue, which indisputably addresses a matter of public concern, was indeed false. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776-77 (1986); *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1239 (11th Cir. 1999).  The Court must enter summary judgment when the plaintiff fails to come forward with evidence sufficient for a reasonable jury to conclude that the defamatory sting of the publication is untrue. *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1294 (D.C. Cir. 1988).  Montgomery cannot meet his burden of demonstrating material falsity,[20] whether by a preponderance or clear and convincing evidence.[21]

Given this constitutional requirement, courts in this Circuit and others have not hesitated to enter summary judgment for defamation defendants where, as here, the undisputed record evidence corroborates the gist of the alleged defamation.[22]  For instance, in *Friendship*

---

[20] "[T]he falsity must be 'material,'" *Air Wisconsin Airlines Corp. v. Hoeper*, 134 S. Ct. 852, 861 (2014), meaning that errors "effect[ing] no material change in meaning" cannot give rise to liability, *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991).  Thus, "so long as the substance, the gist, the sting, of the libelous charge [was] justified," the publication must be deemed substantially true, even if the defendant "cannot justify every word of the alleged defamatory matter." *Masson*, 501 U.S. at 516-17 (citations and internal quotation marks omitted).  *See also Hoeper*, 134 S. Ct. at 861.  An alleged defamatory statement is thus "not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Id.*; *Dunn*, 193 F.3d at 1193.

[21] Although in *Levan v. Capital Cities/ABC*, the Eleventh Circuit expressly declined to reach whether a plaintiff must demonstrate falsity by a preponderance of the evidence or, alternatively, by the more demanding "clear and convincing" standard, 190 F.3d at 1239 n.26, the weight of authority holds that the clear and convincing evidence standard applies.  The Eleventh Circuit has previously stated in *dicta* that "The First Amendment ... requires that [plaintiff] prove by clear and convincing evidence that the statements were *false* ...." *Morgan v. Tice*, 862 F.2d 1495, 1500 (11th Cir. 1989) (emphasis added).  *See also Colodny v. Iverson, Yoakum, Papiano & Hatch*, 936 F. Supp. 917, 922 (M.D. Fla. 1996) ("When the plaintiff is deemed to be a limited public figure, he or she 'has the burden of showing by clear and convincing evidence that the defamatory statement … was false.'") (quoting *Shiver v. Apalachee Publ'g Co.*, 425 So. 2d 1173, 1175 (Fla. 1st DCA 1983)); *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1445 (8th Cir. 1989); *Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 1353 (N.D. Ga. 2003).

[22] *See, e.g.*, *Dow Jones & Co.*, 838 F.2d at 1295-96 (entering summary for media defendants because Liberty Lobby could not establish statements that its "publishing arm" disseminated the book or that it had "published" the magazine were materially false, despite that no corporate relationship existed between Liberty Lobby and the publisher); *See also supra* note 5.

*Empowerment & Economic Development, CDC, Inc. v. WALB-TV*, the plaintiff alleged that the news broadcast was defamatory because it allegedly contained false allegations of child abuse. 2006 WL 1285037, at *4, *6 (M.D. Ga. May 10, 2006).  Rejecting plaintiff's argument that the report was false, the court found that the news broadcasts reported only the parent's accusations and opinions and "included the exact video that [the parent] relied upon in support of her allegations."  *Id.*  The court granted summary judgment to defendant television station because the news broadcast, as here, was "substantially and materially truthful" and "[n]o reasonable juror could reach any other conclusion."  *Id.* at *6.

Here, the heart of Montgomery claim is that the Chapter made false statements that Montgomery's software did not work or did not exist.  (SUMF ¶ 46.)  But no reasonable juror could conclude the software worked or even existed, because Montgomery has not produced the software itself in discovery.  On August 21, Judge Goodman found the software is "highly relevant" to the element of "substantial falsity of the claim in the book that the software did not work."  (SUMF ¶ 51)  On October 16, Judge Goodman reiterated that the "software is, in fact, critical evidence in the case, because this is a defamation case, and one of the main burdens as the Plaintiff is to prove … the falsity of the allegation."  (*Id.* ¶ 55) (emphasis added).

Contrary to Montgomery's arguments Judge Goodman has repeatedly rejected that the software is irrelevant because Risen did not have a copy of the software at the time of publication, falsity depends only on whether the software works or not.  (SUMF ¶¶ 51, 55.)  It is well-established that "it makes no difference [if] the true facts were unknown" at the time of publication, because "truth – not just known truth – is a complete defense to defamation." *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir. 1993) (Posner, J.) (internal citations omitted); *Bustos v. A&E Television Networks*, 646 F.3d 762, 764 (10th Cir. 2011) (stating defendant need not "know the truth … when he makes the defamatory statement" because if it "turns out to be true, he is free from liability; the truth, whenever discovered, serves as a complete defense."); *Restatement (Second) of Torts* § 581A cmt. h (1977) ("[I]f the defamatory matter is true ... it is enough that it turns out to be true.").  Montgomery would have this Court

bless his attempts "to sequester what could be the most important evidence" of truth.  (SUMF ¶ 53.)  But he "does not have a legally protected right to a reputation based on the concealment of the truth."  *Haynes*, 8 F.3d at 1228.  Rather, as Judge Goodman stated, the software is "highly relevant," and indeed, "critical" to falsity.  (SUMF ¶¶ 51, 53, 55.)

Given that Montgomery has not produced the software, contends that the software is unobtainable because it is classified[23] or he belatedly claims he lacks access to his own software, yet never says where it is if he does not have it, the consequences of this lack of verifiability must fall entirely on Montgomery as the party carrying the burden to establish falsity.  Indeed, in *Hepps*, the Supreme Court emphasized that the allocation of the burden of proof will be dispositive in those cases in which the truth or falsity of a statement is, at bottom, unknowable.  The Court recognized that this rule will "insulate from liability some speech that is false, but unprovably so."  475 U.S. at 778.  *Accord Dow Jones & Co.*, 838 F.2d at 1292 ("Where the question of truth or falsity is a close one, a court should err on the side of nonactionability.").

In any event, the record in this case, "precludes any reasonable inference that the central allegation of the challenged [publication] was false."  *Tavoulareas v. Piro*, 817 F.2d 762, 783-84 (D.C. Cir. 1987) (en banc).  Far from placing Montgomery in "a worse light than a bare recitation of the uncontested facts" would have, *Haynes*, 8 F.3d at 1228, it is now clear that the software either does not work, is unobtainable, or does not exist.  Thus, Montgomery cannot meet his burden to prove material falsity, compelling summary judgment for Defendants.

---

[23] Even if the software were classified – and there is no basis for that assertion, as Judge Goodman and other courts have found – the remedy would be dismissal or an adverse inference that the software did not work or did not exist, supporting summary judgment.  *See, e.g.*, *Fitzgerald v. Penthouse Int'l, Ltd.*, 776 F.2d 1236, 1243-44 & n.11 (4th Cir. 1985) (dismissing libel action where classified material subject to state secrets privilege was central to plaintiff's burden to prove falsity); *Trulock v. Lee*, 66 F. App'x 472, 476-77 (4th Cir. 2003) (per curiam) (same as to claim brought by former official Montgomery's counsel represented); *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 2015 WL 1344479, at *5-8 (S.D.N.Y. Mar. 23, 2015) (dismissing libel action based on statements accusing plaintiff of violating Iran sanctions because claims would disclose states secrets); *Lyondell-Citgo Ref., LP v. Petroleos de Venezuela, S.A.*, 2005 WL 1026461, at *4 (S.D.N.Y. May 2, 2005) (entering adverse inference against party refusing to produce allegedly classified information under court order).

### E. As a Matter of Law, Plaintiff Does Not, and Cannot, Prove By Clear and Convincing Evidence, that Defendants Acted With Actual Malice or Any Other Applicable Fault

Plaintiff's claim fails for another, independent reason under Rule 56(a): Montgomery – a limited-purpose public figure – does not and cannot put forth sufficient evidence with convincing clarity, as a matter of law, for a reasonable jury to find that Defendants acted with actual malice (or, indeed, any other applicable standard of fault).

#### 1. Montgomery Is a Limited-Purpose Public Figure

Montgomery's naked allegation that he is a private figure (SUMF ¶¶ 46) carries no weight. "Whether the plaintiff is a public figure is a question of law for the court to resolve." *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1294 n.12 (D.C. Cir. 1980). To determine whether Montgomery is a limited-purpose public figure, "the court must (1) isolate the public controversy, (2) examine the plaintiffs' involvement in the controversy, and (3) determine whether 'the alleged defamation [was] germane to the plaintiffs' participation in the controversy.'" *Silvester*, 839 F.2d at 1494 (quoting *Waldbaum*, 627 F.2d at 1297). Montgomery is a "limited purpose public figure," having "inject[ed]" himself into and been "drawn into a particular public controversy" centered on widely-publicized allegations that he committed fraud in contracting work he performed for the U.S. government. *Tavoulareas*, 817 F.2d at 772.

*First*, Montgomery cannot dispute that a public controversy existed since at least 2005 over widely-publicized allegations that, around Christmas 2003, the U.S. government wrongly raised the terror alert and grounded international flights based on discredited intelligence gleaned by purportedly decoding Al Qaeda messages broadcast over Al Jazeera television. (SUMF ¶ 12.) *Silvester*, 839 F.2d at 1494-95 (citing *Waldbaum,* 627 F.2d at 1296) ("If it is evident that resolution of the controversy will affect people who do not directly participate in it, the controversy is more than merely newsworthy and is of legitimate public concern."). Montgomery's allegation that his work for the government was secret at one point (SUMF ¶ 24-29) is immaterial to whether he is a public figure. *See Peterson v. Atlanta Hous. Auth.*, 998 F.2d 904, 917 n.25 (11th Cir. 1993) (noting there is no requirement "that there must be general public

awareness of a problem … for it to constitute a matter of public concern"). In any event, he cannot dispute that no later than 2008, *Bloomberg News* (2008), *The Guardian* (2009), *Playboy Magazine* (2010), and *The New York Times* (2011), among many others, reported around the world that Montgomery was the contractor whose software provided the bogus intelligence about Al Qaeda codes on Al Jazeera broadcasts and rigged tests of his software to the government, the same controversy addressed in the Chapter years later in October 2014. (SUMF ¶¶ 10-22.)

*Second*, Montgomery "voluntarily put [himself] into a position to influence the outcome of the controversy." *Silvester*, 839 F.2d at 1496. In a declaration he filed in 2006 that he refiled in this action (SUMF ¶ 47), he publicly accused his business partner in eTreppid of bribing a Congressman to get government contracts for his software and then repeated those allegations in an interview he gave to NBC News in a nationally-televised program. (*Id.*) By voluntarily creating a public controversy about his company's alleged bribes to obtain national security contracts for his software and giving an interview about his accusations on national news, he opened the door to media scrutiny about his own alleged government-contracting fraud contained in FBI documents filed in the same protracted litigation in which he accused his partner of offering bribes. By voluntarily engaging in a course of conduct that was likely to receive widespread media attention, he became a public figure.[24]

*Third*, even if Montgomery had not voluntarily thrust himself into the controversy, at the very least, he became "caught up in the controversy involuntarily and, against his will, assumes a prominent position in its outcome" and thus he "'invited comment' relating to the issue at hand." *Silvester*, 839 F.2d at 1496 (quoting *Waldbaum*, 627 F.2d at 1298). Montgomery became caught up

---

[24] *See Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 32 (D.C. Cir. 1990) (finding public controversy, in which plaintiff became embroiled as public figure, because he associated with the mayor and lied to the press about his involvement in the death of a friend, prompting "the DEA, the U.S. Attorney's office, and the D.C. Police Department investigat[ion]"); *Paterson v. Little, Brown & Co.*, 502 F. Supp. 2d 1124, 1140 (W.D. Wash. 2007) (finding computer scientist who engaged in protracted debate about originality of his invention a limited-purpose public figure); *Brueggenmeyer v. ABC*, 684 F. Supp. 452, 458 (N.D. Tex. 1988) (finding plaintiff a limited-purpose public figure because "the course of conduct in which [plaintiff] engaged generated consumer complaints, government legal actions, BBB investigations, and media attention").

in the public controversy, and central to it, no later than 2008 when Bloomberg, then Playboy, then the New York Times, and other media outlets reported on Montgomery's alleged government-contracting fraud.  (SUMF ¶¶ 12-22.)  Indeed, "[i]t is no answer to the assertion that one is a public figure to say, truthfully, that one doesn't choose to be.  It is sufficient … that '[plaintiff] voluntarily engaged in a course that was bound to invite attention and comment.'"  *Silvester*, 839 F.2d at 1496 (quoting *Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 861 (5th Cir. 1978)).  He cannot dispute that a Wikipedia page exists on the internet describing the allegation that he defrauded the federal government central to the Chapter and the image of the title page of the 2010 Playboy article, *The Man Who Conned the Pentagon*, was posted on his Twitter page, thereby underscoring that this controversy has become part of his public persona.  (SUMF ¶ 22.)

*Fourth*, Montgomery reconfirmed his public figure status by seeking and obtaining U.S. government contracts involving national security even after he was subject to extensive media scrutiny, thus assuming the risk of further public scrutiny about his alleged contracting fraud.  *See CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 295 (4th Cir. 2008); *McDowell v. Paiewonsky*, 769 F.2d 942, 947-51 (3d Cir. 1985) (holding that architect subject to previous media scrutiny about his work on public projects was limited-purpose public figure when he later accepted government contracts).[25]  Montgomery cannot dispute – indeed, he brags – that, after his alleged government contracting work on once secret national security projects was exposed as a fraud to the world, he continued to work on government contracts with his purported software and alleges he still seeks that work in Florida today.  (SUMF ¶ 18-19, 40, 47.)  Montgomery cannot continue the same course of conduct that invited intense scrutiny and expect a different outcome.  Thus, he is like the government contractor in *CACI* that "became a public figure because," when the U.S. military "engaged [the contractor] to provide civilian interrogators at Abu Ghraib," it "surely knew

---

[25] *See also Mosesian v. McClatchy Newspapers*, 285 Cal. Rptr. 430, 439 (Cal. Ct. App. 1991) (president of company who was subject to media attention in public debate about award of a public contract to company to put on horse-racing event a limited-purpose public figure); *Gleichenhaus v. Carlyle*, 591 P.2d 635, 641 (Kan. Ct. App.) (contributor to political campaign who later obtained government contract was a limited-purpose public figure), *aff'd in relevant part*, 597 P.2d 611, 612-13 (Kan. 1979).

when it accepted the interrogation work that it was potentially exposing itself to the inhospitable climate of media criticism."  536 F.3d at 295.  And just as the Eleventh Circuit held that jai alai fronton owners became limited-purpose public figures by "entering a strictly regulated, high-profile industry in which there were few major participants" and "[t]he potential loss of tax revenue because of corruption" was a public controversy, Montgomery continued to seek contracts with government agencies despite the harsh glare of publicity on his previous alleged government-contracting frauds.  *Silvester*, 839 F.2d at 1495-97.  Indeed, he continued to seek media attention into 2014, even while he was in the hospital, when he sought to publicize his alleged whistleblower allegation – which Risen addressed in the Chapter – to Fox News.  (SUMF ¶ 23.)

In sum, it is beyond dispute that the Chapter is germane to the controversy surrounding his alleged government-contracting fraud, which is the focus of the Chapter and the claimed defamation.  Thus, he is unquestionably – as a matter of law – a limited-purpose public figure regarding his alleged fraud on the government.

### 2.    Montgomery Cannot Prove Actual Malice by Clear and Convincing Evidence, or Any Other Applicable Standard of Fault

As a public figure, Montgomery must prove that Defendants acted with actual malice.[26] *Gertz*, 418 U.S. at 331-32; *Straw v. Chase Revel, Inc.*, 813 F.2d 356, 361 (11th Cir. 1987).  He must prove actual malice by clear and convincing evidence; a preponderance will not suffice.

---

[26] Even if Montgomery were not a public figure, which he is, the Amended Complaint must be dismissed because he cannot prove negligence, the lower standard applicable to private-figure plaintiffs.  *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 87 (D.C. 1980) ("[T]he basic standard of care in the District of Columbia for media defamation of private individuals … [is] that of negligence."); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1984) (holding states may not impose "liability without fault" in libel cases private plaintiffs bring).  Montgomery cannot show negligence, based on the undisputed material facts.  As the Chapter and record reflect, Risen relied on articles previously published in reputable publications, relied on official records and included Montgomery's denials in the Chapter, and HMH relied on a reputable author – all factors that show, as a matter of law, not just no actual malice, but no negligence.  *See, e.g.*, *Winn v. United Press Int'l*, 938 F. Supp. 39, 45 (D.D.C. 1996) ("[A] periodical that relies on articles from other reliable publications is not negligent as a matter of law when it does not verify those articles with their original sources."), *aff'd*, 1997 WL 404959 (D.C. Cir. 1997); *Hakky v. Wash. Post Co.*, 2010 WL 2573902, at *6 (M.D. Fla. June 24, 2010) (dismissing libel claim against media company because, in part, "under *Iqbal*, Plaintiff failed to allege sufficient facts demonstrating negligence …").

*Masson*, 501 U.S. at 510; *Levan*, 190 F.3d at 1239.

"The standard of actual malice is a daunting one." *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996), "and quite purposefully so." *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 277 (S.D.N.Y. 2013), *aff'd*, 2015 WL 8103736 (2d Cir. Dec. 8, 2015). *Accord Anderson*, 477 U.S. at 255-57; *Gertz*, 418 U.S. at 342. Actual malice gives "breathing space" to journalists and publishers reporting on matters of public concern where, although not present here, "erroneous statement is inevitable." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 271-72 (1964). Indeed, a plaintiff does not establish actual malice even by proof of "'highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.'" *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 663-64 n.5 (1989) (citation omitted); *Levan*, 190 F.3d at 1239.

The Supreme Court has explained that "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). The actual malice standard thus turns on the subjective state of mind of the author at the time of publication. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 n.30 (1984) (same); *Harte-Hanks*, 491 U.S. at 688.

To defeat summary judgment, Plaintiff must submit "concrete," "affirmative evidence" that would allow a reasonable jury "to find actual malice by clear and convincing evidence." *Anderson*, 477 U.S. at 254-57; *Silvester*, 839 F.2d at 1498. He must show "not merely that the defamatory publication was false, but that the defendant either knew the statement to be false or that the defendant 'in fact entertained serious doubts as to the truth of his publication.'" *Tavoulareas*, 817 F.2d at 775-76 (quoting *St. Amant*, 390 U.S. at 731); *Silvester*, 839 F.2d at 1498. The defendant must be aware that the story was "(1) fabricated; (2) so inherently improbable that only a reckless person would have put [it] in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that [defendant has] obvious

reasons to doubt." *Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003); *Tavoulareas*, 817 F.2d at 776 ("'For [the actual malice] standard to be met, the publisher must come close to willfully blinding itself to the falsity of its utterance.'") (citation omitted).

Here, because the Chapter expressly relies on previously published articles in reputable publications and statements in official court records, FBI reports, and the Congressional Record, and includes Plaintiff's denials, Plaintiff could not even plausibly plead the "daunting" standard of actual malice,[27] much less prove actual malice by clear and convincing evidence.  When assessing actual malice, federal courts in Eleventh and D.C. Circuits routinely grant summary judgment.[28]

Indeed, the undisputed facts here conclusively demonstrate the absence of actual malice, as a matter of law.  The Chapter reflects that Risen extensively interviewed Montgomery – facts showing the absence of actual malice.  *See Parisi v. Sinclair*, 845 F. Supp. 2d 215, 218-19 (D.D.C. 2012) (no actual malice where defendant interviewed plaintiff) (citing *Lohrenz*, 350 F.3d at 1283).[29]  The Chapter includes Montgomery's denials throughout.  (SUMF ¶¶ 7, 31, 44), which further precludes actual malice.  *See Lohrenz*, 350 F.3d at 1286 ("[R]eporting perspectives at odds with the publisher's own 'tend[s] to rebut a claim of malice'") (citation omitted); *Biro*, 963 F. Supp. 2d at 288 (finding no actual malice when defendant printed plaintiff's denials).[30]

---

[27] *See Hakky*, 2010 WL 2573902, at *6-7 (dismissing libel claim under Rule 12(b)(6) where plaintiff failed to plausibly allege facts showing actual malice); *Biro v. Condé Nast*, 2015 WL 8103736 (2d Cir. Dec. 8, 2015) (affirming dismissal of libel claim for failure to plausibly allege actual malice); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir.) (same), *cert. denied*, 134 S. Ct. 2829 (2014); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012) (same); *Mayfield v. NASCAR, Inc.*, 674 F.3d 369, 377-78 (4th Cir. 2012) (same).

[28] *See supra* note 5; *Lohrenz*, 350 F.3d at 1274 (affirming summary judgment); *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501 (D.C. Cir. 1996) (same); *Moldea II*, 22 F.3d at 312 (same); *McFarlane*, 74 F.3d at 1300 (same); *White v. Fraternal Order of Police*, 909 F.2d at 514 (same); *Clyburn*, 903 F.2d at 35 (same); *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 596 (D.C. Cir. 1988) (same); *Dow Jones & Co.*, 838 F.2d at 1291 (same). *Cf. Keogh*, 365 F.2d at 967 (reversing denial of summary judgment).

[29] *See also Biro*, 963 F. Supp. 2d at 288 (no actual malice where defendants had interviewed plaintiff and included denials); *Loeb v. New Times Commc'ns Corp.*, 497 F. Supp. 85, 93 (S.D.N.Y. 1980) (no actual malice when plaintiff "himself was interviewed") (citation omitted); *McBride v. Merrell Dow & Pharms., Inc.*, 800 F.2d 1208 (D.C. Cir. 1986).

[30] Montgomery's general denials do not establish knowledge or serious doubts as to falsity.  *See, e.g.*, *Edwards v. Nat'l Audubon Soc'y, Inc.*, 556 F.2d 113, 121 (2d Cir. 1977) (actual malice

Next, the Chapter, Risen's declaration, his deposition, his notes, and his correspondence with sources also show that Montgomery cannot prove actual malice because Risen had numerous high-level government officials and individuals close to Montgomery familiar with intelligence generated by Montgomery's software on which he based his statements about Montgomery – sources he had no reason to doubt at the time of publication and whose information was corroborated by official records.  (SUMF ¶¶ 33-44.)  This is just like in *Silvester v. ABC*, where the Eleventh Circuit affirmed summary judgment because plaintiff could not prove actual malice, given that the publisher and author relied on some sources, albeit with an axe to grind, but independently verified information by interviewing law enforcement officials, a journalist, and plaintiff's attorney who were all familiar with the controversy or with plaintiff.  839 F.2d at 1494.  Thus, with discovery now closed, Montgomery has failed to find *any* evidence that Risen had subjective doubts as to falsity.

Reliance on previously published material from reputable publications also precludes Montgomery from proving actual malice, as a matter of law.  *See, e.g.*, *Dow Jones & Co.*, 838 F.2d at 1297 ("[G]ood faith reliance on previously published materials in reputable sources … precludes a finding of actual malice as a matter of law."); *Biro*, 963 F. Supp. 2d at 279 (plaintiff could not plausibly plead actual malice because defendants republished an article from *The New Yorker*, a reputable publication).  Here, the Book expressly cites the comprehensive Playboy Article and New York Times Article, which contain all the facts Plaintiff now challenges, facts first published in the 2008 article in *Bloomberg News*, also a reputable publication.  Plaintiff has not – and could not – prove that he had obtained retractions or challenged any of these publications in a lawsuit.  Reliance on these reputable sources defeats actual malice.

Moreover, reliance on official reports or official sources, as Risen did here, cannot constitute actual malice.[31]  No less a prominent official than the CIA Director, in Congressional

---

"cannot be predicated on mere denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error").

[31] *Klayman*, 2015 WL 1546173, at *16-17 (granting defendants summary judgment, because, in

testimony, supported the claim that Montgomery's information was not accurate or, as Senator Chambliss described it "bogus."  In a 2012 article in *Defense News*, Jose Rodriguez, the man who had been in charge of the CIA's Counterterrorism Center, said the Center had been "skeptical," viewed the software as "crazy" and passing it along to the White House "ridiculous." (SUMF ¶ 21.)  These official views echoed what Plaintiff's ` former business partner in eTreppid told the FBI and said in court records:  the demonstrations were rigged and the software non-existent.  The court records include what Plaintiff's former lawyer said:  "Blxware possesses no marketable technology, the technology as represented does not exist[.]"  (*Id.* ¶ 29.)  Montgomery repeatedly invoked his Fifth Amendment right against self-incrimination in his deposition in response to questions about his software, most notably "when asked if his software was a 'complete fraud,'" (*id.* ¶¶ 20, 30).  In a civil case, an adverse inference that the software was a fraud may be drawn from Montgomery's invocation.[32]  In the face of this adverse inference and "[i]n view of the vast number of objective sources who condemned" Montgomery as a fake, this Court should "conclude as a matter of law" that Defendants "did not entertain serious doubts that the gist" of the Chapter "was true."  *Levan*, 190 F.3d at 1244 (Eleventh Circuit reverses plaintiff's jury verdict on actual malice and enters judgment for defendant).

Montgomery alleges that Risen should have focused on Trepp, rather than Montgomery, because Trepp led eTreppid, was allegedly responsible for obtaining contracts from the U.S.

---

part, no actual malice when newspapers and authors relied on judicial opinions and public filings in Florida Bar disciplinary proceedings); *Thomas*, 2005 WL 3048033, at *3 (granting media defendant summary judgment, no actual malice where author relied on report of official proceedings); *Bell v. Associated Press*, 584 F. Supp. 128, 129, 132 (D.D.C. 1984) (no actual malice where reporter relied on arrest report); *CACI.*, 536 F.3d at 292 (affirming summary judgment, no actual malice where radio commentator relied on official reports about the conditions set by government contractor that led to torture, rape, and murder at Abu Ghraib prison); *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 175 (2d Cir. 2001) (affirming summary judgment, no actual malice where author relied on police report); *Peter Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556, 562-63 (5th Cir. 1997) (reversing jury verdict, finding no actual malice where arson allegations were based on police report).

[32] *See, e.g.*, *Coquina Invs. v. TD Bank, N.A.*, 760 F.3d 1300, 1310 (11th Cir. 2014) ("In civil cases, ... 'the Fifth Amendment does not forbid adverse inferences against parties ... when they refuse to testify ....'") (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)).

government, and did not have to return the money he earned from federal contracts. (SUMF ¶ 47.) Montgomery also asserts that his companies would not have continued to obtain contracts from the federal government if the software did not work (*id.*), but that is pure speculation. Risen adopted an equally or more plausible theory given the extensive evidence that Montgomery's software was a fraud: the CIA had every incentive after 9/11 to find any intelligence to prevent that next attack; when the CIA ultimately found Montgomery's intelligence was bogus, the CIA kept it secret from the public and other government agencies, allowing Montgomery to peddle his software to other agencies. (*Id.*) In any event, after the CIA found Montgomery's software wanting, SOCOM reached the same conclusion. (*Id.* ¶ 39.) And the Air Force similarly found his technology "inconclusive" and did not proceed in 2009. (*Id.* ¶ 18-19, 40.) As a matter of law, Risen's rational interpretation of complex and ambiguous events cannot establish actual malice. *See Time, Inc. v. Pape*, 401 U.S. 279, 289-90 (1971) (where an event lends itself to "a number of possible rational interpretations," an author's "deliberate choice of [one] such … interpretation, though arguably reflecting a misconception, [does] not" show actual malice); *Bose*, 466 U.S. at 512-13 (same).[33]

In addition, Montgomery's claim that Risen acted with common law malice, cannot, as a matter of law, demonstrate actual malice. "Ill-will, improper motive or personal animosity plays no role in determining whether a defendant acted with 'actual malice.'" *Dunn*, 193 F.3d at 1198 n.17; *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 82 (1967) (holding it was error to instruct jury that ill will can establish actual malice). "[D]espite its name, the actual malice standard does *not measure malice in the sense of ill will or animosity*, but instead the speaker's subjective doubts about the truth of the publication." *Klayman*, 2015 WL 1546173, at *13. Although ill will or motive, combined with other evidence Montgomery cannot muster, may provide some circumstantial support for actual malice, ill will alone cannot establish actual malice. *Harte-Hanks*, 491 U.S. at 668. "Subjective ill-will does not establish actual malice, nor

---

[33] *Moldea II*, 22 F.3d at 315 ("[W]hen a writer is evaluating or giving an account of inherently ambiguous materials or subject matter, the First Amendment requires that the courts allow latitude for interpretation."); *Flowers v. Carville*, 310 F. Supp. 2d 1157, 1166 (D. Nev. 2004) ("[one] who publishes a rational interpretation of an ambiguous report has not acted with actual malice[.]").

does a malevolent motive for publication," which is all Montgomery asserts here. *Klayman*, 2015 WL 1546173, at *13 (citing *id.* at 665). Here, Montgomery cannot point to *any* evidence of ill will – Risen went out of his way to include Montgomery's point of view in the Chapter.

And given that the Book was the work of a highly reputable author – Montgomery admits Risen "is a Pulitzer Prize-winning journalist," and a "national security expert" (SUMF ¶ 1) who had published the same allegations in the *New York Times* in 2011 without legal challenge – Montgomery cannot prove that HMH was even negligent, much less acted with actual malice, in relying on and publishing Risen's work. *See Mile Marker, Inc. v. Petersen Publ'g, L.L.C.*, 811 So. 2d 841, 847 (Fla. 4th DCA 2002) (granting summary judgment for lack of actual malice where the publisher reasonably relied on product reviewer); *Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1032 (2d Cir. 1997) (publisher is not liable "if it relies upon the integrity of a reputable author and has no serious reason to question the accuracy of the information provided by that author").[34] HMH would have no reason to doubt Risen since other reputable publications had also published the same allegations for years without legal challenge.[35]

Montgomery deposed both Risen and HMH and had over 6,000 pages of documents, yet cannot point to any evidence that Risen or HMH had doubts, much less serious doubts, as to the truth of what Risen wrote and HMH published. In sum, Montgomery cannot defeat summary

---

[34] *See McManus v. Doubleday & Co.*, 513 F. Supp. 1383, 1390 (S.D.N.Y. 1981) (publisher was "entitled as a matter of law to rely on [author's] proven reportorial ability"); *Pegasus v. Reno Newspapers, Inc.*, 57 P.3d 82, 93 (Nev. 2002) (no actual malice where "there is no evidence that ... anyone … at [the newspaper] had any reason to believe [the freelance reporter] would lie ....").

[35] Plaintiff cannot put forth any evidence to prove that the publisher HMH acted with any degree of fault, and HMH's deposition testimony shows it acted with no fault (SUMF ¶ 3.) *See Mile Marker*, 811 So. 2d at 847 (granting summary judgment because "[w]here the defendant in a defamation action is a publishing organization, this 'actual malice' must be 'brought home to the persons in the [publishing] organization having responsibility for the publication'") (quoting *N.Y. Times*, 376 U.S. at 287); *McFarlane*, 74 F.3d at 1303 (explaining that, because actual malice is a question of each defendant's subjective state of mind, absent respondeat superior, actual malice will not be imputed from the author to the publisher). Risen was an independent contractor, not an employee, of HMH. (SUMF ¶ 3.) Nor can Montgomery provide evidence that HMHC was at fault in any way, and the undisputed facts show it is merely a holding company of the publisher and had nothing to do with publication of the Book (*id.* ¶ 4). This is an additional basis to dismiss the Amended Complaint as to HMH and HMHC.

judgment since he cannot come forward with the requisite "concrete" "affirmative evidence" that would allow a reasonable jury to find with "convincing clarity" actual malice or, indeed, any other applicable level of fault.  *Anderson*, 477 U.S. at 255-57.

**F.    Montgomery's Other Tort Claims Fail**

Because Montgomery's "defamation claim fails, so do [his] other tort claims based upon the same allegedly defamatory speech."  *Farah*, 736 F.3d at 540.  "[A] plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim."  *Moldea II*, 22 F.3d at 319-20 (citing *Cohen v. Cowles Media Co.*, 501 U.S. 663, 670 (1991)).  "The First Amendment considerations that apply to defamation therefore apply also to" Montgomery's claims for tortious interference, intentional infliction of emotional distress, and assault.  *Farah*, 736 F.3d at 540 (dismissing tortious interference claim); *Hustler Magazine v. Falwell*, 485 U.S. 46, 50 (1988) (dismissing intentional infliction of emotional distress claims); *Forras v. Rauf*, 39 F. Supp. 3d 45, 56 (D.D.C. 2014) (dismissing assault claim Montgomery's counsel brought for failure to show intent to harm or that statements were threats), *appeal pending*, No. 14-7070 (D.C. Cir. May 21, 2014).  Montgomery also cannot submit evidence to prove these claims.[36]

**IV.    CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for summary judgment and dismiss the Amended Complaint with prejudice.

---

[36] Plaintiff cannot show intent or that statements were threats of civil assault, and cannot show "extreme and outrageous" conduct, intent, or severe distress as to IIED.  *See Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 92 (D.D.C. 2010) (assault if "(a) they act intending to cause a harmful or offensive contact ... or an imminent apprehension of such a contact, and (b) the other party is thereby put in such imminent apprehension") (alterations omitted); *Jackson v. District of Columbia*, 412 A.2d 948, 955 n.15 (D.C. 1980) (no liability for assault for negligent or reckless behavior lacking the intent to commit an assault); *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009) (dismissing for failure to state a claim because "plaintiff must show that the interference was intentional and that there was resulting damage" to state a tortious interference claim); *Jung v. Jung*, 791 A.2d 46, 50 (D.C. 2002) (elements of IIED:  "(1) extreme and outrageous conduct that (2) intentionally or recklessly caused (3) severe emotional distress to another.").

Dated:  December 14, 2015                    Respectfully submitted,

s/Brian W. Toth

Sanford L. Bohrer
Florida Bar No. 160643
sbohrer@hklaw.com
Brian W. Toth
Florida Bar No. 57708
brian.toth@hklaw.com
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Telephone: (305) 374-8500
Fax: (305) 789-7799

– and –

Laura R. Handman (admitted *pro hac vice*)
laurahandman@dwt.com
Micah J. Ratner (admitted *pro hac vice*)
micahratner@dwt.com
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave., NW, Suite 800
Washington, D.C.  20006
Tel.: (202) 973-4200
Fax: (202) 973-4499

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on December 14, 2015, I filed this document with the Clerk of Court using

CM/ECF, which will serve this document on all counsel of record.

s/Brian W. Toth