UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 15-cv-20782-MARTINEZ/GOODMAN

DENNIS MONTGOMERY,

      Plaintiff,

v.

JAMES RISEN et al.,

      Defendants.

_____/


**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**


**HOLLAND & KNIGHT LLP**
Sanford L. Bohrer
  Sandy.Bohrer@hklaw.com
Brian W. Toth
  Brian.Toth@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, Florida  33131
Tel: (305) 374-8500
Fax: (305) 789-7799

**DAVIS WRIGHT TREMAINE LLP**
Laura R. Handman (admitted *pro hac vice*)
  laurahandman@dwt.com
Micah J. Ratner (admitted *pro hac vice*)
  micahratner@dwt.com
1919 Pennsylvania Ave., NW, Suite 800
Washington, D.C.  20006
Tel.: (202) 973-4200
Fax: (202) 973-4499


*Counsel for Defendants*

Defendants respectfully submit this Statement of Undisputed Material Facts under S.D. Fla. L. R. 56.1(a).

### A.      The Parties

1.      Defendant James Risen is the author of *Pay Any Price: Greed, Power, and Endless War* (the "Book").  (Declaration of James Risen ("Risen Decl.") ¶ 2.)  Montgomery alleges Risen "is a Pulitzer Prize-winning journalist," and a "national security expert" (Am. Compl. ¶¶ 10, 14, ECF No. 44.)

2.      Among other things, Chapter 2 (the "Chapter") of the Book is about Plaintiff Dennis L. Montgomery.  (*Id.*)

3.      Defendant Houghton Mifflin Harcourt Publishing Company ("HMH") published the Book on October 14, 2014.  (*Id.*)  HMH and Risen entered into a publishing agreement to write the Book on November 7, 2013.  (*Id.*) (Risen Decl. Ex. 1.) In the publishing agreement, HMH and Risen agreed that Risen was an independent contractor.  (*Id.*)  (Risen Decl. Ex. 1, at 13) ("The Author is in no respect the Publisher's agent or employee.")  Montgomery has not uncovered evidence that that HMH's was at fault for any statement publishing in the Chapter. (Handman Decl. Ex. 3, HMH Dep. Tr. 26:11-18; 33:5-8; 53:10-55:4; 57:12-13; 58:9-11; 64:15-66:14; 68:21-69:2; 70:17-71:10; 72:18-83:18; 90:10-92:18; 94:2-95:10; 115:16-116:17; 117:15-25; Handman Decl. Ex. 4, HMHC Dep. Tr. 84:21-85:3.)

4.      Defendant Houghton Mifflin Harcourt Company ("HMHC") is the holding company of HMH.  (HMHC Dep. Tr. 8:12-14:16.)  HMHC had no role in publishing the Book and no involvement in the Chapter.  (HMHC Dep. Tr. 35:21-25; 38:15-24; 39:13-18; 61:16-24; 70:24-71:11; 73:12-25; 82:13-18; 83:13-85:3.)

### B.      The Book and Chapter

5.      *Pay Any Price* is a nine-chapter book that describes how the war on terror led to waste, fraud, and abuse by U.S. government officials and the contractors who stood to gain from it.  (Chapter at 31, 33.)  The Chapter in suit focuses on how, after the terrorist attacks of September 11, 2001, government officials accepted even questionable intelligence that might

1

prevent the next terrorist attack.  (*Id.* at 31-33.)  Risen recounts Montgomery's story expressly retreading ground covered by previous media reports, most notably a 2010 *Playboy Magazine* feature titled *The Man Who Conned the Pentagon* ("Playboy Article"), which revealed the central allegations Montgomery now challenges, and a 2011 *New York Times* article titled *Hiding Details of Dubious Deal, U.S. Invokes National Security*, which Risen co-authored ("New York Times Article").  (Risen Decl. ¶ 5; Handman Decl. Ex. 1, Risen Dep. Tr. 74:20-75:1; 76:25-78-8; 101:7-23; 162:4-164:19; 206:16-208:13; 215:20-217:21; 218:15-220:13; 277:2-279:22; 297:2-20; Chapter at 53.)

6.     Risen conducted much of the newsgathering for the Chapter in Washington, D.C. for the February 19, 2011 New York Times Article which he co-authored with Eric Lichtblau. (Risen Decl. ¶ 5; Risen Dep. Tr. 38:25-39:13.)  For the article, Lichtblau and Risen interviewed sources for the story by phone, email, or in person; gathered court, official, and congressional records; gathered correspondence involving Montgomery; and reviewed and found support in previously published news articles about Montgomery.  (Risen Decl. ¶ 5; Risen Dep. Tr. 39:17-40:11.)  In February 2011, Lichtblau and Risen sent a *New York Times* stringer to attempt to obtain comment from Montgomery at his home in California.  (Risen Decl. ¶ 5; Risen Dep. Tr. 72:18-73:17.)  The stringer identified herself to Montgomery while he stood in his garage. (Risen Decl. ¶ 5)  Montgomery did not speak to the stringer and closed the garage door.  (*Id.*) The New York Times Article has not been retracted or the subject of any defamation lawsuit. (*Id.*)  Risen did not receive or became aware of any demand for a retraction of the *New York Times* Article.  (*Id.*)  Montgomery has not produced any document demanding a retraction directed to the New York Times Article.

7.     The Chapter added Montgomery's denials and point of view to the narrative, obtained after Risen interviewed him for the Book.  (Chapter at 33-34, 37, 51, 53; Risen Dep. Tr. 77:8-78-22; 79:13-81:13; 113:19-114:15; 206:16-208:13; 304:25-312:2; 337:7-338:19; 339:8-341:18.)

8.     Risen had Lichtblau and reporter Aram Roston review the Chapter for accuracy.

(Risen Dep. Tr. 39:6-7; 180:17-21.)

9.      Risen states that, during the course of gathering information for and writing the
New York Times Article and the Chapter and up to the time HMH published the Book, he did
not have any doubts about the truth of the statements he wrote about Montgomery.  (Risen Decl.
¶ 6.)  Risen also states that he still does not have any doubts about the truth of the statements he
wrote about Montgomery.  (*Id.*)

    C.    **Media Coverage of Montgomery Before the Book and Risen's Reliance on It**

10.      Montgomery was subject to extensive media coverage years before publication of
the Chapter.  (Risen Decl. ¶¶ 7-18; Risen Dep. Tr. 74:20-75:1; 76:25-78-8; 101:7-23; 162:4-
164:19; 215:20-217:21; 218:15-220:13; 277:2-279:22; 351:4-13.)  Risen reviewed, found
support in, and relied upon the prior news articles, including but not limited to those outlined
below.  (*Id.*)  Up to the time of publication and today, none of the articles Risen reviewed and
relied upon for the Chapter were subject to a correction, retraction, or lawsuit.  (*Id.*)

11.      On June 27, 2005, Lisa Meyers, Aram Roston, and the NBC News Investigative
Unit published an *NBC News* article titled *Bogus Analysis Led to Terror Alert in Dec. 2003: CIA
Experts Saw Secret Code on Al-Jazeera that Wasn't There*, which reported that, around
Christmas 2003, the U.S. government wrongly raised the terror alert level and canceled flights
based on non-existent Al Qaeda codes purportedly embedded in Al Jazeera broadcasts.  (Risen
Decl. Ex. 4, at 1-2.)  The article quoted Tom Ridge, former Secretary of the Department of
Homeland Security, who stated that:  the intelligence was "bizarre, unique, unorthodox,
unprecedented"; he "wonder[ed] whether or not it was credible"; and "we weren't certain" about
this intelligence at the time.  (*Id.* at 1.)  Ridge said "the CIA analysis certainly did turn out to be
wrong," he "confirm[ed] there were no secret terror messages" and "no evidence that terrorists
were actively plotting against aviation at that time."  (*Id.* at 2.)  Risen reviewed and found
support in this article for the Chapter.  (Risen Decl. ¶ 8.)

12.      On November 1, 2006, the *Wall Street Journal* ran a front-page story titled
*Congressman's Favors for Friend Include Help in Secret Budget*.  The article stated that, in court

3

records, Montgomery had accused then-Congressman, subsequently Nevada Governor, Jim Gibbons of taking bribes from Warren Trepp, Montgomery's former business partner at eTreppid Technologies ("eTreppid").  (Risen Decl. Ex. 5, at 3-9.)  Risen reviewed and found support in this article for the Chapter.  (Risen Decl. ¶ 9.)

13.     In a follow-up *Wall Street Journal* article, titled *Nevada Governor Faces FBI Probe Into Contracts*, Trepp accused Montgomery of giving "false testimony" in their litigation over Montgomery's software.  (Risen Decl. Ex. 6 at 4.)  Risen reviewed and found support in this article for the Chapter.  (Risen Decl. ¶ 10.)

14.     Montgomery gave an exclusive interview to Lisa Meyers of NBC News, the journalist who wrote the 2005 story on the bogus Al Jazeera codes, on May 11, 2007, in which he repeated the "explosive charge" against Trepp and Gibbons.  (Risen Decl. Ex. 7, at 1.)  Risen reviewed and found support in this article for the Chapter.  (Risen Decl. ¶ 11.)

15.     Gibbons was ultimately cleared in 2008, with the Associated Press quoting his lawyer as saying, "It should be crystal clear that the only persons who should be investigated or charged are those who made false allegations of wrongdoing and who tried to fuel this investigation for their own private purposes."  (Risen Decl. Ex. 9, at 1; Chapter at 50.)  Risen reviewed and found support in this article for the Chapter.  (Risen Decl. ¶ 13.)

16.     An August 4, 2007 article published in the *Reno Gazette-Journal* titled *eTreppid Court Documents Unsealed*, publicized Montgomery's statements in his newly unsealed declaration in which he claimed that his technology warned of and thwarted terrorist attacks around the world.  (Risen Decl. Ex. 8 at 36-38.)  Risen reviewed and found support in this article for his Chapter.  (Risen Decl. ¶ 12.)

17.     The media publicly identified Montgomery as the contractor who allegedly provided the bogus intelligence from Al Jazeera to the government in an August 29, 2008 *Bloomberg News* article titled *Yellowstone Club Divorcee Entangled in Terrorist Software Suits*.  (Risen Decl. Ex. 10, at 10, 12-18.)  The article summarized Trepp's allegations in court records that Montgomery stole eTreppid's "computer code that purportedly could sift through broadcasts

4

from Qatar-based news network Al-Jazeera and find embedded messages from terrorists," and quoted Montgomery's former attorney's charge that the "software was a sham." (*Id.* at 10.) The *Bloomberg News* article also revealed, based on FBI reports unsealed in Montgomery's cases, that former fellow employees at eTreppid told the FBI that Montgomery made them rig demonstrations of his software to sell his it to visiting government officials. (*Id.* at 17.) Risen reviewed and found support in this article for the Chapter. (Risen Decl. ¶ 14; Risen Dep. Tr. 206:19-20.)

18.     Then again in 2010, the Playboy Article, written by Aram Roston, who worked on the 2005 NBC article, revealed the central allegations Montgomery now challenges. (Risen Decl. Ex. 11.) Its investigation claimed that Montgomery rigged software demonstrations and sold the U.S. government sham "noise filtering" software to decode purported Al Qaeda messages hidden in Al Jazeera broadcasts – bogus intelligence that led the U.S. government to raise the terror alert level and ground international flights around Christmas in 2003. (*Id.* at 1-3, 5.) Soon after, the Playboy Article explained, a French contractor determined that not enough pixels existed in Al Jazeera broadcasts to include the hidden messages and the CIA and the White House soon concluded that they had been hoodwinked. (*Id.* at 4.) The article quoted Sloan Venables, Montgomery's co-worker, who stated that he doubted Montgomery's software existed. (*Id.* at 5.) According to the Playboy Article, because of the secrecy surrounding the project, other government agencies continued to contract with Montgomery until 2009. (*Id.* at 8-9.) The article quoted Joseph Liberatore, a former Air Force official who worked with Montgomery on the 2009 contract, who said the Air Force was just looking at Montgomery's software "to see if there was anything there," and an Air Force spokesman who said that the results of the Air Force's evaluation of Montgomery's software were "inconclusive" so the Air Force ended discussions. (*Id.* at 9.) Risen reviewed and found support in this article for the Chapter. (Risen Decl. ¶ 15; Risen Dep. Tr. 124:11-25.)

19.     Risen and Eric Lichtblau's 2011 New York Times Article covered much of the same material, but, based on government sources, added that the White House had considered

5

shooting down transatlantic flights based on Montgomery's intelligence and focused on the U.S. government's invocation of the state-secrets privilege to cover up Montgomery's misdeeds and the government's gullibility.  (Risen Decl. Ex. 3 at 6.)  The article quoted Liberatore, the former Air Force official who later realized Montgomery's software was bogus, who said in 2008 that he supported Montgomery but he realized that others in the government did not think Montgomery was credible.  (*Id.*; Risen Decl. Ex. 12.)  The article referenced Liberatore thanking Montgomery for his support during the Obama 2009 inauguration for a threat that intelligence officials later publicly stated had never existed.  (*See also* Chapter at 52.)  The article also quoted Steve Crisman, who oversaw business operations for Montgomery at Blxware, who said he believed that Montgomery's technology was not real.  Notably, the New York Times Article said that, in Montgomery's deposition in November 2010, "when asked if his software was a 'complete fraud', he answered, 'I'm going to assert my right under the Fifth Amendment."  (*Id.* at 6.)

20.     In a 2012 article by Aram Roston in *Defense News*, "*Obama's Counterterrorism Czar Gave Bogus Intel to Bush White House*," the then-head of the CIA's Counterterrorism Center, Jose A. Rodriguez, Jr., said the Counterterrorism Center was "very skeptical" of Montgomery's intelligence and viewed it as "crazy."  (Risen Decl. Ex. 13, at 2.)  Tommy Vietor, former spokesman for the National Security Council, echoed these views, stating that, although John Brennan passed along the information to the White House, "[i]t is absolutely wrong to say Mr. Brennan believed in the veracity of the information" from Montgomery.  (*Id.* at 3.)  Risen reviewed and found support in this article for the Chapter.  (Risen Decl. ¶ 17.)

21.     Risen reviewed and found support in a number of other articles that repeated the same claims about Montgomery.  (Risen Decl. ¶ 18 & Ex. 14.)

22.     A Wikipedia page about Montgomery describes the allegations that he defrauded the federal government.  (Handman Decl. Ex. 6.)  The image of the title page of the 2010 Playboy article, *The Man Who Conned the Pentagon*, was posted on a Twitter page bearing Montgomery's name, his picture, and the Twitter handle, "ncoder-Dennis," similar to his email.

6

The image of the title page was taken down after marked as an exhibit in Defendants' Motion to Dismiss.  (Handman Decl. Ex. 5.)

23.      In 2014, when Montgomery was in the hospital, he sought to publicize his whistleblower allegation – which Risen addressed in the Chapter – to Fox News.  (Handman Decl. Ex. 7; Chapter at 53.)  On May 27, 2014, medical staff was informed of Montgomery's desires to be on a news show on Fox while hospitalized.  (*Id.* at DLM-026462.)  On May 28, 2014, Montgomery stated that he also wanted to complete his previous interview with Fox news about his past CIA activities.  (*Id.* at DLM-026482.)  On May 29, 2014, Montgomery spoke to a hospital media representative about the Fox News story.  (*Id.* at DLM-028997.)  On July 17, 2014, Fox News reporter Carl Cameron, however, rejected Montgomery's further efforts to obtain publicity because the reporter said Montgomery was "not being honest" and "lying about lots of things."  (Handman Decl. Ex. 8, at MELC1982445.)

**D.      Reliance on FBI Reports, Court Documents, and Congressional Records for Allegations of Fake Software**

24.      Risen relied on court, official, and congressional records for the Chapter.  (Risen Decl. ¶ 19; Risen Dep. Tr. 109:13-111:3; 277:2-279:22.)  Risen accurately described the contents of these records as a basis for the statements Risen wrote about Montgomery, including but not limited to those outlined below.  (*Id.*)

25.      The Chapter refers to FBI interviews of Warren Trepp, Montgomery's partner in the software venture, eTreppid, and its employees.  The Book expressly states that, "according to court documents that include his statements to the FBI," Montgomery's software was fake because "Trepp later told the FBI that he eventually learned that Montgomery had no real computer software programming skills."  (Chapter at 37.)  Risen relied on FBI and U.S. Air Force Office of Special Investigations ("OSI") reports filed in court records for allegations of fake software.  (Risen Decl. ¶ 20; Chapter at 37, 48-49).  Risen relied on, cited, and accurately quoted in the Chapter FBI and OSI reports contained in court records that state, "recently Trepp has found out that Montgomery's skills may not be what he has purported them to be.  Trepp

cited a recent Air Force Office of Special Investigation Inquiry, which determined that Montgomery's programming skills were not what he alleged."  (Risen Decl. Ex. 15, at DEFS002219).

26.     Similarly, the Chapter accurately quotes statements in FBI reports in which eTreppid employee Sloan Venables began to suspect Montgomery's software was fake. Venables "*told the FBI* that another employee, Patty Gray, began to suspect that Montgomery 'was doing something other than what he was actually telling people he was doing'" and "added *in his statement to the FBI* that he knew that 'Montgomery promised products to customers that had not been completed or even assigned to programmers.'"  (Chapter at 48-49) (emphasis added).  Risen relied on, and accurately summarized, the FBI and OSI reports for statements that "Venables advised that in the fall of 2005, Patty Gray suspected Montgomery was doing something other than what he was actually telling people he was doing" and "Venables knew Montgomery promised products to customers that had not been completed or even assigned to programmers."  (Risen Decl. ¶ 20 & Ex. 15, at DEFS002223.)

27.     Then, citing court documents, the Chapter states:  "Over the Christmas holidays [of 2005], Montgomery allegedly went into eTreppid's offices and deleted all of the computer files containing his source code and software development data, *according to court documents*." (Chapter at 49) (emphasis added).  Later, "[a]*ccording to court documents*, [Trepp] *told the FBI* that Montgomery had stolen the software eTreppid had used on secret Pentagon contracts" but "[a]s federal investigators moved in to investigate the alleged theft of the technology, they heard from Trepp and others that Montgomery's alleged technology wasn't real."  (*Id.*) (emphasis added).  The Chapter correctly summarizes FBI reports contained in court records showing that the technology "wasn't real."  (*Id.*)  Risen relied on the FBI and OSI reports for statements by an eTreppid employee in which "Gray said that on 21 Dec 2005 ... she told Trepp that she had reason to believe [Montgomery] had not written significant software for the company."  (Risen Decl. ¶ 20 & Ex. 15 at DEFS002338.)  Risen also relied on statements by another employee in which "Anderson also informed Trepp that [Montgomery] was using open source to develop

8

eTreppid Source Code, [Montgomery] was dishonest," and that "he had suspicions that [Montgomery] was less technically competent than he led people to believe."  (*Id.* & Ex. 15 at DEFS002340.)

28.     The Chapter also recounts how Montgomery's later benefactor and business partner at Blxware, Edra Blixseth, was "going through an extremely bitter divorce, and Montgomery became caught up in their legal battles."  (Chapter at 52.)  "Mysteriously, government lawyers sometimes sought to intervene in their court cases ... to keep classified information stemming from Montgomery's work with the intelligence community out of the public record."  (*Id.*)  In those public court records, Edra's ex-husband, Tim Blixseth, alleged the fraud in an affidavit, stating: "Montgomery and Edra Blixseth have engaged in an extensive scheme to defraud the U.S. Government," a "fraud [that] involves Mr. Montgomery's purported 'noise filtering software technology,' which "does not exist, yet has been used repeatedly by Edra Blixseth and Montgomery to commit financial frauds ...."  (Risen Decl. Ex. 18.)  Michael Flynn, Montgomery's former attorney, stated in an affidavit that, "Based upon personal knowledge, and information and belief, Blxware possesses no marketable technology, the technology as represented does not exist[.]"  (Risen Decl. Ex. 17.)

29.     The Chapter recounts that Montgomery's gambling and other debts led to bankruptcy and his arrest for passing $1 million in bad checks.  (Chapter at 34.)  The prosecution for passing bad checks is still pending, delayed by Montgomery's repeated claims that he is too ill to travel from Washington State to Nevada.  (ECF No. 118.)  Risen relied on the statement by Michael Flynn, Montgomery's former lawyer, to Montgomery in Montgomery's bankruptcy proceeding deposition:  "I know you conned me and you conned the U.S. Government....  You're a computer hacker and you're a fraud, Mr. Montgomery."  (Risen Decl. ¶ 22 & Ex. 16, at 230.)  Risen relied on Montgomery's testimony in his deposition in which the attorney asked if his software was a "complete fraud" and he answered, "I'm going to assert my right under the Fifth Amendment," (Ex. 16 at 194:8-11), along with a number of other instances in which Montgomery invoke the Fifth Amendment in his deposition when asked about his software and

whether it was fraudulent.  (Risen Decl. ¶ 22 & Ex. 16, at 57:16-58:3; 60:14-17; 80:20-81:14,
188:15-191:7; 193:10-194:1-7, 12-24; 199:10-201, 273.)

      30.     The Chapter also expressly relies on congressional records containing statements
from John Brennan's confirmation hearing for CIA Director to confirm that Montgomery's
software was fake.  (Risen Dep. Tr. 101:7-23; 104:4-18; 284:8-285:4; 334:5-17.)  The Chapter
explains that, "[a]t the time of the Christmas 2003 scare, John Brennan was the head of the
newly created Terrorist Threat Integration Center," which "meant that Brennan's office was
responsible for circulating Montgomery's fabricated intelligence to officials in the highest
reaches of the Bush administration."  (Chapter at 47.)  The Chapter states that, "[i]n 2013, while
the Senate was considering whether to confirm Brennan to run the CIA, Sen. Saxby Chambliss, a
Georgia Republican who was vice chairman of the Senate Intelligence Committee, submitted a
written question to Brennan about his role in the intelligence community's dealings with
Montgomery."  (*Id.*)  Indeed, Senator Chambliss' written question titled "Bogus Intelligence,"
states that "[m]edia reports indicate that when you led the Terrorist Threat Integration Center
(TTIC), you championed a program involving IT contractors in Nevada who claimed to intercept
al-Qaida targeting information encrypted in the broadcasts of TV news network Al Jazeera."
(Risen Ex. 19.)  The written questions confirm in congressional records that not only "[t]he
media" but *documents we have reviewed show*, that CIA officials derided the contractor's
information, but nonetheless, you passed it to the White House and alert levels ended up being
raised unnecessarily."  (*Id.*) (emphasis added).  Accurately quoting Brennan's response, the
Chapter states that, "[i]n response": (1) "Brennan denied that he had been an advocate for
Montgomery and his technology"; (2) "insisted that the Terrorism Threat Integration Center was
merely a recipient of the information and data, which had been passed on by the CIA"; (3) he
"included Montgomery's data 'in analytic products'"; and (4) confirmed that Montgomery's
purported software "'was determined not to be a source of accurate information.'"  (Chapter at
47) (quoting Brennan Response, Risen Decl. Ex. 19, at 9).

E.    **Reliance on FBI Reports and Court Documents for Allegations of Rigged Demonstrations of Software to U.S. Government Officials**

31.    The Chapter also explicitly relies on court records and FBI reports, in which "Trepp also described to federal investigators how eTreppid employees had confided to him that Montgomery had asked them to help him falsify tests of his object recognition software when Pentagon officials came to visit." (Chapter at 37.)  Indeed, "Trepp said that on one occasion, Montgomery told two eTreppid employees to go into an empty office and push a button on a computer when they heard a beep on a cell phone." (*Id.*)  Then "[a]fter he was in place in the field, he used a hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of a bazooka on another screen prominently displayed in front of the military officers standing in another room, *according to court documents*." (*Id.*) (emphasis added).  Thus, "[t]he military officers were convinced that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands." (*Id.*)  The Book again includes Montgomery's denials. (*Id.* at 37.)  Risen relied on, cited, and accurately quoted in the Chapter statements in the FBI reports that:

> Trepp recently learned that Montgomery would require eTreppid employees to falsify the results of live demonstrations for its customers.  Jesse Anderson, a programmer for eTreppid, told Trepp that Montgomery would require Anderson and Jim Bauder, another eTreppid employee, to go into an office at eTreppid while Montgomery was out in a nearby field with a toy bazooka to demonstrate eTreppid's recognition software capabilities.  Montgomery instructed Anderson and Bauder to go into a room and wait to hear a noise on their cell phone and then instructed them to press a button on a computer keyboard that would display an image of a bazooka on the computer screen viewed by the customers, including Department of Defense employees.  Trepp advised that the Department of Defense employees were at the demonstration to make a judgment regarding the purchase of this technology.

(Risen Decl. Ex. 15 at DEFS00229.)  Risen relied on statements by other employees who confirmed these accounts in their interviews with the FBI.  (*Id.* at DEFS002342-43.)

F.    **Reliance on Interviews with Sources and Documents**

32.    Risen relied on interviews he and Lichtblau conducted and documents obtained

11

from numerous high-placed government sources and other sources close to Montgomery or familiar with his work, including but not limited to those outlined below. For the Chapter, Risen also relied on interviews he conducted with Montgomery. (Risen Decl. ¶ 26.)

33. Risen had numerous well-placed government sources. (Risen Dep. Tr. 101:7-23.) Risen interviewed and relied on William D. Murray, CIA Paris Station Chief in 2003 when Montgomery was offering the CIA software that purported to read coded messages on Al-Jazeera broadcasts. Murray told Risen that: some high-level CIA officials did not believe Montgomery's intelligence at the time; Frances Townsend, a former White House counterterrorism official on the National Security Council ("NSC"), discussed with an NSC lawyer that the president had authority to shoot down airplanes believed to be terrorist threats; Townsend considered whether it might have been time to exercise that authority to shoot down passenger jets over the Atlantic in late 2003 based on Montgomery's intelligence; French intelligence and a technology company conducted a study showing there were not enough pixels in the Al Jazeera broadcasts to include hidden Al Qaeda messages; and the CIA concluded that Montgomery's intelligence based on his purported software was fake. (Risen Decl. ¶ 27; Risen Dep. Tr. 288:2-297:1; 330:23-334:4; Chapter at 32-33, 39-47.) Murray was described as a "former senior CIA official" in the Chapter. (*Id*.)

34. Risen also interviewed another "former senior CIA official," the now late Tyler Drumheller, the CIA European Division Chief in late 2003. (Risen Decl. ¶ 28; Chapter at 32-33, 39-47.) Risen's notes from the interview state:

> Tyler Drumheller -- sent word to Europe, that there would be bombs on board Air France and British Air planes in Paris and London. I kept getting calls from the French, saying are you sure this is true. And I kept getting told this is so sensitive that we can't tell you where you get it.
>
> It got seized by the DST director, and that became their super issue. Its witchcraft-if you were read in to this it was like are you read into witchcraft.

12

The French warned us, through Bill Murray.  Said that if this is what you are looking at then we've looked at it and its nothing.

It would be latitude and longtitude, and it would show latitu[]des and long[]itudes and they would look at these towns in Virginia or Georgia, and they would say what the hell is this?  Bangor Maine, or Big Sprins Tex.  The only thing is I said why would they do this?  Why not send it by courier?  Are these guys are such brilliant computer guys who could do this?

Some of the guys in CTC questioned it ....  DDST said it[']s so super secret.  They were putting out daily threat matrices on this, every day, and then suddenly it stopped.  Every day there would be reports at five o[']clock.  It was like after Ames, when they said there are 30 moles.  It[']s very symptomatic of the agency.  It was a big big deal, it was the biggest thing[] in the agency for a couple months.  They shut down all air traffic on this.

The French were engaged and skeptical on this.

They briefed the president on this.  It was his baby.  Tenet pushed everything, Tenet's whole thing was management by cheerleading, and it didn't sound totally crazy to him, and the experts were telling him to do it.

***

Why would they do it this way?  To bring it through al Jazeera, and that would mean Qatar would know about it.

(Risen Decl. Ex. 20.)  Drumheller corroborated Murray's statements to Risen.

35.     Risen obtained comment from CIA Office of Public Affairs officials, George Little and Jennifer Youngblood.  (Risen Dep. Tr. 248:16-250:12; 380:2-384:13; Risen Decl. ¶ 29 & Ex. 21; Chapter at 44.)  Risen relied on the CIA's statement "[o]n the record, from [Youngblood] as CIA spokesperson," that "'[t]he agency never had a contract with this individual,'" referring to Montgomery.   (*Id.*)  Risen also relied on the CIA's statement that "'[a]s you'd expect, the CIA looked at what Montgomery claimed he could do but determined that his threat detection tools weren't exactly as billed.'"  (*Id.*)

36.     Risen interviewed Melvin Dubee, a former staff member on the U.S. Senate Select Committee on Intelligence.  (Risen Decl. ¶ 32.)  Risen relied on Dubee's statement that committee staff contacted the CIA about Montgomery's technology and the CIA was "very skeptical of it at the time."  (*Id.* & Ex. 24.)

37.     Risen interviewed Frances Townsend, a former White House counterterrorism

official on the National Security Council ("NSC") who dealt with Montgomery's intelligence at the White House.  (Risen Decl. ¶ 30; Risen Dep. Tr. 282:23-284:7; 313:12-326:25.)  Risen interviewed Townsend and, as the Chapter reflects, she denied considering shooting down planes, but Murray reaffirmed his statements when Risen told him Townsend's denial.  (*Id.* & Ex. 22; Chapter at 45.)  Risen relied on Townsend's statements that "[w]e understood we may have been played" and "[t]here was stupid sh[**] reported to the [CIA] for variety of reasons" but "it[']s fair to say it's the biggest one that makes it all the way through the system."  (Risen Decl. ¶ 30 & Ex. 22; Risen Dep. Tr. 282:23-284:7; 313:12-326:25; Chapter at 32.)

38.     Risen interviewed Samantha Ravich, former advisor to Vice President Dick Cheney, who confirmed she met with Montgomery in the White House but refused the software absent proof that it worked, which she said was never forthcoming.  (Risen Decl. ¶ 31 & Ex. 23; Risen Dep. Tr. 93:19-21; 282:23-284:7; 328:2-330:22; Chapter at 51.)

39.     Risen obtained comment from a spokesman for United States Special Operations Command.  (Risen Decl. ¶ 34.)  Risen relied on the spokesman's statement that "The technology did not meet our requirements," referring to Montgomery's software.  (*Id.*; Chapter at 48.)

40.     Risen and Lichtblau reached out to and obtained comment from an Air Force spokesman, Todd Spitler.  (Risen Decl. ¶ 34 & Ex. 25.)  Risen relied on the spokesman's statement that the Air Force awarded a contract to Montgomery's company in 2009 but that "the contractor did not perform in accordance with the terms of the contract."  (Risen Decl. ¶ 34 & Ex. 26 at 1.)

41.     Risen interviewed Montgomery's former lawyer, Michael Flynn.  (Risen Decl. ¶ 36; Risen Dep. Tr. 58:7-12.)  Flynn provided public court records and confirmed his previous statements made in court records to Risen accusing Montgomery of being a "fraud" and having "conned" him and others.  (Risen ¶ 36 & Ex. 16, at 230; Risen Dep. Tr. 254:5-10; 267:19-24; Chapter at 36.)

42.     Risen interviewed Tim Blixseth, the ex-husband of Montgomery's boss at Blxware, Edra Blixseth.  (Risen Decl. ¶ 37; Risen Dep. Tr. 254:11-14.)  Tim Blixseth provided

information about Montgomery's interactions with Edra Blixseth and his observation of a demonstration of Montgomery's Al Jazeera software in Palm Springs, California.  (*Id.*; Chapter at 50-52.)

43.     Lichtblau interviewed George Birnbaum, a former chief of staff to Prime Minister Benjamin Netanyahu who confirmed that Montgomery tried to sell his technology to the Israeli government but the Israeli government was unimpressed and the Israeli government did not enter into a contract with Montgomery. (Risen Decl. ¶ 35.)  Montgomery admitted that the Israelis did not end up signing a contract with him.  (Pl.'s Dep. Tr. 214:2-18; Chapter at 51.)

44.     Risen interviewed Montgomery by phone and email for the Chapter starting in 2011 or 2012.  (Risen Decl. ¶ 38; Risen Dep. Tr. 72:2-6; 364:1-25; Risen Decl. Ex. 27.)  Risen included Montgomery's point of view and denials in the Chapter.  (Chapter at 33-34, 37, 51, 53; Risen Dep. Tr. 77:8-78:22; 79:13-81:13; 113:19-114:15; 206:16-208:13; 304:25-312:2; 337:7-338:19; 339:8-341:18.)

### G.     Amended Complaint Allegations

45.     The Amended Complaint claims that Risen and HMH defamed him by publishing allegations that he defrauded the federal government by peddling bogus software.  (Am. Compl. ¶¶ 23, 48, 49, 65, 120-27, 181-84, 202-21, 230-36, 245-48, 259, 262, ECF No. 44.)  The Amended Complaint claims falsity alleging that the software worked and existed.  *Id.* Montgomery primarily challenges statements that his software, which he claims decoded hidden Al Qaeda messages in Al Jazeera broadcasts, was a sham, and that the intelligence he passed on to federal agencies led the White House to raise the terrorist threat level in late 2003, ground international flights, and consider shooting down transatlantic flights, "what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history."  (*Id.* ¶¶ 107, 112, 114, 126, 129, 131, 133.)

46.     Montgomery also challenges recitation of allegations former eTreppid employees made in FBI investigative reports that Montgomery rigged demonstrations of his object recognition software.  (*Id.* ¶¶ 122, 124.)  He takes issue with the statements by Montgomery's

15

"lawyer [who] 'concluded that Montgomery was a fraud,'" that he was an "incorrigible gambler," and "that out of 'greed' Plaintiff Montgomery 'create[d] a rogue intelligence operation with little or no adult supervision' which was 'crazy' and that he was 'someone who has been accused of being a con artist.'" (*Id.* ¶¶ 110, 117-18, 120, 181; *see id.* ¶ 194.)

47.     Montgomery alleges he is a private figure and that is work was secret at one point. (*Id.* ¶¶ 24-29.)  In a declaration he filed in 2006 that he refiled in this action, he publicly accused Trepp of bribing a Congressman to get government contracts for his software.  (Opp., Ex. A, Ex. 4, ¶ 32, ECF No. 63-1.)  Montgomery alleges that Risen should have focused on Trepp, rather than Montgomery, because Trepp was the head of eTreppid, was allegedly responsible for obtaining contracts from the U.S. government, and did not have to return the money he earned from federal government contracts.  (Am. Compl. ¶¶ 36-37, 47, 50, 80, ECF No. 44.) Montgomery also asserts that his companies would not have continued to obtain contracts from the federal government if the software did not work (*id.* ¶¶ 49, 83).  Risen adopted a theory the CIA had every incentive after 9/11 to find any intelligence to prevent that next attack; when the CIA ultimately found Montgomery's intelligence was bogus, the CIA kept it secret from the public and other government agencies, allowing Montgomery to sell his software to other agencies.  (Chapter at 31-33, 39-40, 43-44, 47-48.)  Montgomery alleges he continues to seek to sell his alleged software to the government today.  (Am. Compl. ¶ 4, ECF No. 44.)

### H.     Montgomery's Failure to Produce the Critical Software and Defendants' Pending Motion for Sanctions for Spoliation and Violation of Court Orders

48.     On June 1, Defendants requested a copy and the locations of the software referred to in the Amended Complaint.  (ECF No. 90-1, Defs.' Interrogs. 9-15 & Reqs. for Produc. 7-15, 26-32, 36-47, 53.)  On July 1, Montgomery objected to the request to produce the software as, *e.g.*, "burdensome," and the request to disclose the locations as "largely irrelevant." (Pl.'s July 1 Resp. & Objections to Interrog. 9 & Reqs. for Produc. 8, Defs.' Mem. in Supp. of Sanctions Ex. 5, ECF No. 166-1.)  On July 15, Montgomery's revised objections again refused to disclose "the location of the relevant software." (ECF No. 90-2, Pl.'s July 15 Resp. & Objections to Interrog.

9.)  He also refused "to produce a copy of any software," asserting it is "secret" classified information. (*Id.* 9-15) (objecting that he "is not legally permitted to disclose … confidential or secret" information); (*Id.*, Pl.'s July 15 Resp. & Objections to Reqs. for Produc. 7-15, 26-32, 36-47, 53) (objecting based on "legal restrictions" or that "he is not legally permitted to disclose").  He did not state the software was outside his possession, custody, or control.  (*Id.*)

49.     On August 4, 2015, Defendants explained to Judge Goodman that orders in Montgomery's previous cases show that his software is *not* classified, yet he has repeatedly refused to produce it.  (ECF No. 94.)  In a case in which Montgomery's former employer, eTreppid, sued Montgomery for allegedly misappropriating the subject software, the U.S. government moved for and obtained a protective order under the state secrets privilege to protect certain classified information from discovery ("U.S. Protective Order").  (*Montgomery v. eTreppid Technologies, Inc.*, 3:06-cv-00056-PMP-VPC ("*eTreppid*"), ECF No. 253 (D. Nev. Aug. 29, 2007), Defs.' Pre-Hearing Mem. Ex. 2, ECF No. 94-2.)  However, the U.S. Protective Order specifically *excluded* Montgomery's software from its scope.  *Id.* at 2-3, ¶ 4(c) (stating that "[t]his Order does not preclude the Parties from serving or taking any discovery ... relating to ... [t]he computer source code, software, programs, or technical specifications relating to any technology owned or claimed by any of the Parties.").  Thus, the judge in Nevada found that "[t]he clear understanding in drafting and issuing th[e] [U.S.] protective order was that the parties would be discussing the nature and capabilities of the technology." (*eTreppid*, ECF No. 645, at 6 n.3, Defs.' Pre-Hearing Mem. Ex. 3, ECF No. 94-3.)

50.     Still, Montgomery refused to produce the software in both the Nevada litigation and in his later bankruptcy proceedings in which the U.S. Protective Order was also entered.  In the Nevada action, the magistrate and district judges repeatedly ordered him to produce the software, but he refused.  (*Id.*, ECF No. 645; *eTreppid*, ECF Nos. 728, 765, 769, Defs.' Pre-Hearing Mem. Ex. 4, ECF No. 94-4.)  Thus, the district judge held him in contempt, imposing a penalty of $2,500 per day until he produced the software.  (*eTreppid*, ECF No. 815, at 3-5, Defs.' Pre-Hearing Mem. Ex. 5, ECF No. 94-5.)  Instead of producing the software, he settled the action

and signed confessions of judgment for over $25 million. (*eTreppid*, ECF Nos. 897, 898, Defs.'
Pre-Hearing Mem. Ex. 6, ECF No. 94-6.)  Then, he declared bankruptcy, continued to refuse to
produce or describe the software in bankruptcy, and was thus denied discharge.  (*eTreppid*, ECF
Nos. 1206, ¶ 22, 1208, ¶ 22, Defs.' Pre-Hearing Mem. Ex. 8, ECF No. 94-8.)

51.     In his August 20, 2015 deposition in Miami, he testified that he searched for the
software in response to Defendants' discovery requests and gave his only copy of the software to
the FBI on August 19, 2015.  (Pl.'s Dep. Tr. 127:12-15; 128:1-25; 129:1-4; 131:12-22; 132:21-
23, ECF No. 166-2.)  At the August 21 hearing on Montgomery's refusal to produce the
software, Montgomery's counsel confirmed Montgomery's deposition testimony.  (Aug. 21 Hr'g
Tr. 6:25; 7:1-10; 8:7-18, ECF No. 111-1.)  Judge Goodman found "the software is highly
relevant" to the element of "substantial falsity of the claim in the book that the software did not
work" (*id*. 32:23-24) and credited the Nevada court's finding that the software was not classified.
(*Id.* 30:18-23; 40:7-47:1.)

52.     On August 22, Judge Goodman entered an order requiring Montgomery to "use
his self-described right of continued access to non-classified information" from the FBI "and
produce the software to Defendants."  (Aug. 22 Order ¶ 6, ECF No. 107.)  The order also
required him to produce "all" communications with persons who know about the software and of
its location, including with the FBI by August 31 and the software by September 4.  (*Id.* ¶¶ 5-6.)

53.     On September 3, 2015, Judge Goodman denied Montgomery's motion for a stay
pending his objection.  (Stay Order, ECF No. 122.)  Judge Goodman "agreed with Defendants'
position that the software is 'highly relevant.'"  (*Id.* at 5.)  He found that "Plaintiff's burden to
prove falsity does not hinge on whether he [Risen] ever had a copy of the software" but rather
"the critical fact issue is whether in fact the software worked."  (*Id.*)  Thus, "Defendants have the
right to inspect and test the software."  (*Id.*)  He concluded the software is "highly relevant" and
"critical" evidence Montgomery must produce.  (*Id.* at 6.)  The judge also found Montgomery
intended "to sequester what could be the most important evidence in the entire case."  (*Id.*)

54.     On September 4, Montgomery did not produce the software; he filed his

objection.  (ECF No. 125.)  On September 8, the FBI General Counsel explained in a letter to Montgomery counsel that Montgomery gave the FBI the software in "hard drives contain[ing] 51.6 million files amounting to 600 million pages."  (ECF No. 126, at 3.)  He concluded "there is no reasonable way for the Government to locate and provide the alleged software, absent specific instructions from" Montgomery.  (*Id.* at 3-4.)

55.     On October 19 Judge Goodman again ordered Montgomery:  to produce his communications with the FBI, now by October 20; to give the FBI comprehensive instructions to locate the software or state that he cannot by October 21; and to produce the software by October 26, 2015.  (ECF No. 164, ¶¶ 2-4.)  The order permitted Defendants to file a motion for dismissal or adverse inference sanctions if Montgomery failed to comply.  (*Id.*)  Judge Goodman again held "that this particular software is, in fact, critical evidence in the case, because this is a defamation case, and one of your main burdens as the Plaintiff is to prove … to prove the falsity of the allegation."  (Oct. 16 Hr'g Tr. 18:5-10, ECF No. 166-3.)

56.     On October 21, 2015, Montgomery filed a declaration that states:  "Based on my personal knowledge and belief, upon searching my memory, I do not believe that I have had access to any of the subject software, nor did I provide it to the Federal Bureau of Investigation ("FBI") when I turned over the drives ...."  (Pl.'s Decl., ECF No. 158-1.)  He has not explained how he does not have access to his own software or where it is now located or how he testified at his deposition on August 20 that he gave his software to the FBI on August 19, and his lawyer confirmed the same to Judge Goodman on August 21, but now says he does not have it.

57.     On October 23, 2015, the FBI Assistant General Counsel, Ted Schwartz, emailed Montgomery's counsel that, given Montgomery's declaration "the FBI will not search the drives to locate software requested in the *Risen* litigation."  (Email from Ted Schwartz, Defs.' Mem. in Supp. of Sanctions Ex. 4, ECF No. 166-4) (emphasis added).

58.     On October 26, 2015, Montgomery did not produce the software.  He filed an objection and request for a stay.  (ECF No. 164.)  On October 28, 2015, Defendants filed their motion for dismissal sanctions on grounds that Montgomery spoliated the software and violated

19

multiple court orders to produce it (ECF No. 182), which is pending before Judge Goodman.

59.     In a letter dated November 13, 2015, in response to Defendants' subpoena, the CIA stated it had "conducted a search of its records and did not locate 'a copy of Montgomery's software, including but not limited to video compression software or noise filtering software Montgomery allegedly used to detect hidden Al Qaeda messages in Al Jazeera broadcasts.'"

60.     On December 11, 2015, Schwartz emailed Montgomery's counsel to respond to his November 16, 2015 email.  (ECF No. 196-1, at 2.)  Schwartz stated that "I am advised that the Dropbox link which you forwarded from Mr. Montgomery is to a file filtering program which is not of any use in locating the alleged software in the absence of the specific information which the FBI had requested in its September 8 letter, namely, the number or designator of the drive on which the software is present and the file name of the software."  (*Id.*)  Thus, "[a]s a result, and given the fact that Mr. Montgomery does not believe that the FBI is in possession of the software, the FBI's position as stated in my October 23 email remains unchanged."  (*Id.*)

61.     Defendants retained a software expert to examine and test Montgomery's claim that the software worked, but no software was ever produced by Montgomery for Defendants' expert to test.  (Handman Decl. ¶ 10.)  Montgomery has not identified or provided documents identifying any other location where his software can be found.  (*Id.*)

Dated:  December 14, 2015                         Respectfully submitted,

                                                  s/Brian W. Toth
                                                  Sanford L. Bohrer
                                                  Florida Bar No. 160643
                                                  sbohrer@hklaw.com
                                                  Brian W. Toth
                                                  Florida Bar No. 57708
                                                  brian.toth@hklaw.com
                                                  HOLLAND & KNIGHT LLP
                                                  701 Brickell Avenue, Suite 3300
                                                  Miami, Florida 33131
                                                  Telephone: (305) 374-8500
                                                  Fax: (305) 789-7799

                                                  – and –

                                                  Laura R. Handman (admitted *pro hac vice*)
                                                  laurahandman@dwt.com
                                                  Micah J. Ratner (admitted *pro hac vice*)
                                                  micahratner@dwt.com
                                                  DAVIS WRIGHT TREMAINE LLP
                                                  1919 Pennsylvania Ave., NW, Suite 800
                                                  Washington, D.C.  20006
                                                  Tel.: (202) 973-4200
                                                  Fax: (202) 973-4499

                                                  *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on December 14, 2015, I filed this document with the Clerk of Court using

CM/ECF, which will serve this document on all counsel of record.

                                                  s/Brian W. Toth

21