UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 15-cv-20782-MARTINEZ/GOODMAN

DENNIS MONTGOMERY,

       Plaintiff,

v.

JAMES RISEN et al.,

       Defendants.
_____/

**DECLARATION OF JAMES RISEN**

I, James Risen, declare:

    1.    I am a defendant in the above-captioned action. I make this declaration in support of Defendants' Motion for Summary Judgment and Memorandum in Support. I make the following statements based on my own personal knowledge and, if called as a witness, I could and would testify competently to these facts under oath.

    2.    I am the author of *Pay Any Price: Greed, Power, and Endless War* (the "Book"). Defendant Houghton Mifflin Harcourt Publishing Company ("HMH") published the Book on October 14, 2014. HMH and I entered into a publishing agreement to write the Book on November 7, 2013, in which HMH and I agreed that I was an independent contractor. A true and correct copy of the publishing agreement, redacted for highly sensitive and proprietary information, is attached hereto as Exhibit 1. Among other things, Chapter 2 (the "Chapter") of the Book is about Plaintiff Dennis L. Montgomery. A true and correct copy of relevant excerpts of the Book is attached hereto as Exhibit 2.

    3.    I have reviewed Montgomery's Amended Complaint in this action.

    4.    I have worked as a journalist for the *New York Times* in its Washington, D.C. bureau since 1998, where I have won two Pulitzer prizes, the first in 2002, for explanatory reporting as a member of the *New York Times* reporting team, and the second for National

Reporting in 2006, and received seven *New York Times* Publisher's Awards. Among other honors, I have received awards from the Overseas Press Club (1990, 2003), the National Press Club (2012), the Newspaper Guild (2014), the Goldsmith Prize for Investigative Reporting from the Shorensten Center on Media, Politics and Public Policy at Harvard University (2006), the Payne Award for Ethics in Journalism from the School of Journalism and Communication at the University of Oregon (2007), and been elected to the American Academy of Arts and Sciences (2007). I received in 2015 the Ridenhour Courage Prize, the Constitutional Champion Award from the Constitution Project, and the Hugh M. Hefner First Amendment Award.

5.  I conducted much of the newsgathering for the Chapter in Washington, D.C. for a February 19, 2011 *New York Times* article titled *Hiding Details of Dubious Deal, U.S. Invokes National Security* (the "New York Times Article"), which I co-authored with Eric Lichtblau. A true and correct copy of the New York Times Article is attached hereto as Exhibit 3. Lichtblau also worked and continues to work in the Washington, D.C. bureau of the *New York Times*. For the article, Lichtblau and I interviewed sources for the story by phone, email, or in person; gathered court, official, and congressional records; gathered correspondence involving Montgomery; and reviewed and found support in previously published news articles about Montgomery. In February 2011, Lichtblau and I sent a *New York Times* stringer to attempt to obtain comment from Montgomery at his home in California. The stringer identified herself to Montgomery while he stood in his garage. Montgomery did not speak to the stringer and closed the garage door. The New York Times Article has not been retracted or the subject of any defamation lawsuit. I did not receive any demand for a correction and, to my knowledge, no one at the *New York Times* received a demand for a correction.

6.  During the course of gathering information for and writing the New York Times Article and the Chapter and up to the time HMH published the Book, I did not have any doubts about the truth of the statements I wrote about Montgomery. I still do not have any doubts about the truth of the statements I wrote about Montgomery.

## I. RELIANCE ON PRIOR MEDIA COVERAGE OF MONTGOMERY

7. For the Chapter and New York Times Article, I reviewed and relied in previous news reports, including but not limited to those outlined below. To my knowledge, up to the time of publication and today, none of the articles I reviewed and relied were subject to a correction, retraction, or lawsuit.

8. For the New York Times Article and the Chapter, I reviewed and found support in a June 27, 2005 *NBC News* article by Lisa Meyers, Aram Roston, and the NBC News Investigative Unit titled *Bogus Analysis Led to Terror Alert in Dec. 2003: CIA Experts Saw Secret Code on Al-Jazeera that Wasn't There*, at true and correct copy of which is attached hereto as Exhibit 4. I found support in the article, which stated that, around Christmas 2003, the U.S. government wrongly raised the terror alert level and canceled international flights based on bogus CIA intelligence derived from non-existent Al Qaeda codes purportedly embedded in Al Jazeera broadcasts. I found support in the article's exclusive interview with Tom Ridge, former Secretary of the Department of Homeland Security at the time. I found support in Ridge's statement that the intelligence was "bizarre, unique, unorthodox, unprecedented"; that he "wonder[ed] whether or not it was credible," and that "we weren't certain" about this intelligence at the time. I also found support in Ridge's statements that "the CIA analysis certainly turned out to be wrong," that he "confirmed there were no secret terror messages" on Al Jazeera, and that there was "no evidence that terrorist were actively plotting against aviation at that time."

9. For the New York Times Article and the Chapter, I reviewed and found support in a November 1, 2006 front-page story in the *Wall Street Journal* titled *Congressman's Favors for Friend Include Help in Secret Budget* by John R. Wilke, a true and correct copy of which is attached hereto as Exhibit 5. I found support in the article, which stated that Montgomery had accused then-Congressman, later Nevada Governor, Jim Gibbons of taking bribes from Warren Trepp, Montgomery's former business partner at eTreppid Technologies ("eTreppid").

10. For the New York Times Article and the Chapter, I reviewed and found support in a February 15, 2007 follow-up article in the *Wall Street Journal* titled *Nevada Governor Faces FBI Probe into Contracts* by John R. Wilke, a true and correct copy of which is attached hereto as Exhibit 6. I found support in the article, which stated that Trepp accused Montgomery of giving "false testimony" in their litigation over Montgomery's software.

11. For the New York Times Article and the Chapter, I reviewed and found support in a May 11, 2007 *NBC News* article by Lisa Meyers, Jim Popkin, and the NBC News Investigative Unit titled *FBI Probes Nevada Governor for Corruption*, a true and correct copy of which is attached hereto as Exhibit 7. I found support in the article, which included Montgomery's exclusive interview with Lisa Meyers of NBC News in which he repeated the "explosive charge" against Trepp and Gibbons.

12. For the New York Times Article and the Chapter, I reviewed and found support in an August 4, 2007 article published in the *Reno Gazette-Journal* by Martha Bellisle titled *eTreppid Court Documents Unsealed*, a true and correct copy of which is attached hereto as Exhibit 8. I found support in the article, which stated that, in Montgomery's then unsealed declaration, he claimed that his technology warned of and thwarted terrorist attacks around the world.

13. For the New York Times Article and the Chapter, I reviewed and found support in a November 3, 2008 article published in the *USA Today* by Associated Press writer Matt Apuzzo entitled *Attorney: Nevada Gov. Gibbons Cleared in FBI Probe*, a true and correct copy of which is attached hereto as Exhibit 9. I found support in the article, which stated that Gibbons was ultimately cleared in 2008 and the quote of Gibbons' lawyer saying: "It should be crystal clear that the only persons who should be investigated or charged are those who made false allegations of wrongdoing and who tried to fuel this investigation for their own private purposes." (Chapter at 50.)

14. For the New York Times Article and the Chapter, I reviewed and found support in an August 29, 2008 *Bloomberg News* article by Anthony Effinger titled *Yellowstone Club*

*Divorcee Entangled in Terrorist Software Suits*, a true and correct copy of which is attached hereto as Exhibit 10.  I found support in the article, which publicly identified Montgomery as the contractor who allegedly provided the bogus intelligence from Al Jazeera to the government. (Ex. 10, at 10, 12-18.)  I found support in the article, which summarized Trepp's allegations in court records that Montgomery stole eTreppid's "computer code that purportedly could sift through broadcasts from Qatar-based news network Al-Jazeera and find embedded messages from terrorists." (*Id.*)  I found support in the article, which quoted from Montgomery's former attorney saying that the "software was a sham." (*Id.*)  I also found support in the article, which stated, based on FBI reports unsealed in Montgomery's cases, that former fellow employees at eTreppid told the FBI that Montgomery had them rig demonstrations of his software to sell his technology to visiting government officials. (*Id.* at 17.)

15. For the New York Times Article and the Chapter, I reviewed and found support in a January/February 2010 *Playboy Magazine* feature by Aram Roston titled *The Man Who Conned the Pentagon* (the "Playboy Article"), a true and correct copy of which is attached hereto as Exhibit 11.  I found support in the Playboy Article, which revealed the central allegations Montgomery now challenges.  I found support in its investigation that claimed Montgomery rigged software demonstrations and sold the U.S. government sham "noise filtering" software to decode purported Al Qaeda messages hidden in Al Jazeera broadcasts – bogus intelligence that led the White House to ground international flights around Christmas in 2003.  I found support in the article's explanation that, soon after, a French contractor determined that not enough pixels existed in Al Jazeera broadcasts to include the hidden messages and the CIA and White House soon concluded that they had been hoodwinked.  I found support in the article's quote of Sloan Venables, Montgomery's co-worker, who stated that he doubted Montgomery's software existed. I found support in the article's statements that, because of the secrecy surrounding the project, other government agencies continued to contract with Montgomery until 2009.  I found support in the quote of Joseph Liberatore, a former Air Force official who worked with Montgomery on the 2009 contract, who said the Air Force was just looking at Montgomery's software "to see if

5

there was anything there." I found support in a quote of an Air Force spokesman who said that the results of the Air Force's evaluation of Montgomery's software were "inconclusive," so Air Force ended discussions. The Playboy Article has not been retracted or the subject of any defamation lawsuit.

16. For the Chapter, I relied on our 2011 New York Times Article, which covered much of the same material as previous news articles about Montgomery, but, based on highly-placed government sources, added that the White House had considered shooting down transatlantic flights based on Montgomery's intelligence and focused on the U.S. government's invocation of the state-secrets privilege to cover up Montgomery's misdeeds and the government's gullibility. For the Chapter, I relied on our quote of Liberatore, the former Air Force official who later realized Montgomery's software was bogus, who said in 2008 that he supported Montgomery but he realized that others in the government did not think Montgomery was credible. (*See* Chapter at 52.) A true and correct copy of the email containing Liberatore's statements that I relied upon is attached hereto as Exhibit 12. I also relied on our quote of Steve Crisman, who oversaw business operations for Montgomery at Blxware, and who said he believed that Montgomery's technology was not real.

17. For the Chapter, I reviewed and found support in an October 1, 2012 article in *Defense News* by Aram Roston titled *Obama's Counterterrorism Czar Gave Bogus Intel to Bush White House*, a true and correct copy of which is attached hereto as Exhibit 13. I found support in statements by Jose A. Rodriguez, Jr., who headed the CIA's Counterterrorism Center when Montgomery was providing the Al Jazeera intelligence, who said the Counterterrorism Center was "very skeptical" of Montgomery's intelligence and viewed it as "crazy." (Ex. 13, at 2). I also found support in statements by Tommy Vietor, former spokesman for the National Security Council, who echoed these views. Vietor stated that, although John Brennan passed along the information to the White House, "[i]t is absolutely wrong to say Mr. Brennan believed in the veracity of the information" from Montgomery. (*Id.* at 3.)

18.     For the New York Times Article and the Chapter, I reviewed and relied on a number of other articles that repeated the same claims about Montgomery, true and correct copies of which are attached hereto as Exhibit 14.

## II.     RELIANCE ON PUBLIC RECORDS

19.     For the New York Times Article and Chapter, I also relied on court, official, and congressional records and accurately described the contents of these records as a basis for the statements I wrote about Montgomery, including but not limited to those outlined below.

20.     For the New York Times Article and the Chapter, I relied on FBI and U.S. Air Force Office of Special Investigations ("OSI") reports filed in court records for allegations of fake software.  (Chapter at 37, 48-49).  True and correct copies of the FBI and OSI reports contained in Government's Compliance with Court Order of August 17, 2006, in *In re Search Warrant*, No. 3:06-cv-00263, ECF Nos. 70-5, 70-8 (D. Nev. Sept. 11, 2006 ) are attached hereto as Exhibit 15.  I relied on, cited, and accurately quoted in the Chapter FBI and OSI reports contained in court records that state, "recently Trepp has found out that Montgomery's skills may not be what he has purported them to be.  Trepp cited a recent Air Force Office of Special Investigation Inquiry, which determined that Montgomery's programming skills were not what he alleged."  (Ex. 15 at DEFS002219).  I relied on these reports for statements that "Venables advised that in the fall of 2005, Patty Gray suspected Montgomery was doing something other than what he was actually telling people he was doing" and "Venables knew Montgomery promised products to customers that had not been completed or even assigned to programmers." (*Id.* at DEFS002223.)  I relied on these reports for statements by an eTreppid employee in which "Gray said that on 21 Dec 2005 ... she told Trepp that she had reason to believe [Montgomery] had not written significant software for the company."  (*Id.* at DEFS002338.)  I also relied on statements by another employee in which "Anderson also informed Trepp that [Montgomery] was using open source to develop eTreppid Source Code, [Montgomery] was dishonest," and that "he had suspicions that [Montgomery] was less technically competent than he led people to believe."  (*Id.* at DEFS002340.)

7

21. Further, I relied on, cited, and accurately quoted in the Chapter statements in the FBI reports that:

> Trepp recently learned that Montgomery would require eTreppid employees to falsify the results of live demonstrations for it's [sic] customers. Jesse Anderson, a programmer for eTreppid, told Trepp that Montgomery would require Anderson and Jim Bauder, another eTreppid employee, to go into an office at eTreppid while Montgomery was out in a nearby field with a toy bazooka to demonstrate eTreppid's recognition software capabilities. Montgomery instructed Anderson and Bauder to go into a room and wait to hear a noise on their cell phone and then instructed them to press a button on a computer keyboard that would display an image of a bazooka on the computer screen viewed by the customers, including Department of Defense employees. Trepp advised that the Department of Defense employees were at the demonstration to make a judgment regarding the purchase of this technology.

(Ex. 15 at DEFS002219.) I relied on statements by other employees who confirmed these accounts in their interviews with the FBI. (*Id.* at DEFS002342, DEFS002343.)

22. For the New York Times Article and the Chapter, I relied on the November 18, 2010 deposition of Dennis L. Montgomery in *In re Dennis & Kathleen Montgomery*, No. 10-bk-18510 (Bankr. C.D. Cal.), a true and correct copy of excerpts of which is attached hereto as Exhibit 16. I relied on the statement by Michael Flynn, Montgomery's former lawyer, to Montgomery: "I know you conned me and you conned the U.S. Government.... You're a computer hacker and you're a fraud, Mr. Montgomery." (Ex. 16, Tr. 230:2-11.) I relied on Montgomery's testimony in his deposition in which the attorney asked if his software was a "complete fraud" and he answered, "I'm going to assert my right under the Fifth Amendment." (*Id.* Tr. 194:8-11.) I also relied on a number of other instances in which Montgomery took the Fifth in the deposition. (*Id.* Tr. 57:12-58:3, 60:14-17, 80:16-81:7, 188:15-191:7, 193:20-194:20, 199:24-201:9, 273:19-21).

23. For the New York Times Article and the Chapter, I relied on Flynn's affidavit stating that, "Based upon personal knowledge, and information and belief, Blxware possesses no marketable technology, the technology as represented does not exist[.]" A true and correct copy

of the Affidavit of Michael J. Flynn in *In re Yellowstone Mountain Club, LLC*, No. 09-00014, ECF No. 473-1 (Bankr. Mont. Mar. 1, 2006) is attached hereto as Exhibit 17, at 10.

24. For the New York Times Article and the Chapter, I relied on public court records, in which the ex-husband of Montgomery's benefactor Edra Blixseth, Tim Blixseth, alleged the fraud in an affidavit, stating: "Montgomery and Edra Blixseth have engaged in an extensive scheme to defraud the U.S. Government," a "fraud [that] involves Mr. Montgomery's purported 'noise filtering software technology,' which "does not exist, yet has been used repeatedly by Edra Blixseth and Montgomery to commit financial frauds ...." A true and correct copy of the Supplemental Affidavit of Timothy L. Blixseth in *In re Yellowstone Mountain Club, LLC*, No. 08-61570, ECF No. 2117 (Bankr. Mont. Jan. 17, 2011) is attached hereto as Exhibit 18, at 1, 4.

25. For the Chapter, I cited, expressly relied on, and accurately described excerpts of the Vice-Chairman Saxby Chambliss' post-confirmation hearing Questions for the Record submitted by the U.S. Senate Select Committee on Intelligence to Mr. John Brennan that confirmed that Montgomery's software was fake (Chapter at 47), a true and correct copy of which is attached hereto as Exhibit 19. I relied on Senator Chambliss' written question to Mr. Brennan titled "Bogus Intelligence," which states that "[m]edia reports indicate that when you led the Terrorist Threat Integration Center (TTIC), you championed a program involving IT contractors in Nevada who claimed to intercept al-Qaida targeting information encrypted in the broadcasts of TV news network Al Jazeera." The written questions confirm in congressional records that not only "[t]he media" but "documents we have reviewed show, that CIA officials derided the contractor's information, but nonetheless, you passed it to the White House and alert levels ended up being raised unnecessarily." I relied on Brennan's response that confirmed that Montgomery's purported software "'was determined not to be a source of accurate information.'" (Chapter at 47) (quoting Ex. 19 at 9).

### III.   RELIANCE ON SOURCES

26. For the New York Times Article and the Chapter, I also found support in interviews Lichtblau and I conducted and documents obtained from numerous high-placed

9

government sources and other sources close to Montgomery or familiar with his work, including but not limited to those outlined below. For the Chapter, I also relied on interviews I conducted with Montgomery.

27. For the New York Times Article and the Chapter, in or around January or February 2011, October 4, 2011, and February 2014, I interviewed William D. Murray, who was CIA Paris Station Chief in late 2003 when Montgomery gave purported intelligence gleaned from Al Jazeera broadcasts to the CIA. I referred to Murray in the Chapter as a "former senior CIA official" or one of the "former CIA officials." (*Id*.) (Chapter at 32-33, 39-47.) Murray told me, and I relied on him, for the following facts, which accurately reflect what Murray told me when I interviewed him:

   a. Murray was the CIA Paris station chief at the time. Murray was talking to Tyler Drumheller, the CIA European Division Chief at the time, about the purported threat information coming from a technology company that said it detected and decrypted hidden Al Qaeda codes on Al Jazeera television. Drumheller believed it was crazy, but that it was becoming the most important and sensitive intelligence at CIA headquarters. The problem was that this threat information from this supposed technology company was coming in so fast, the CIA was not vetting it. So the intelligence would come in to the CIA, then CIA personnel would take it to George Tenet, then CIA Director, and then Tenet would take it right to President George W. Bush. The U.S. government grounded flights based on this threat information. The French authorities wanted to know the source of the information, because their Air France flights were being affected.

   b. Murray was talking to French intelligence, and French intelligence hired a high technology company of their own to look at the Al Jazeera broadcasts. Murray visited the company in France, and the head of the company said the company would conduct the analysis. Then the French technology company came back a few days later, and said they could not find anything in the Al Jazeera broadcasts. They said there are a couple kinds of bar codes, and there are not enough pixels there for either one. The French technology company said there is just nothing there. There was no way there were hidden messages in the Al Jazeera broadcast. It was not real.

   c. The CIA officials who were pushing this, from the CIA Directorate of Science and Technology, were Donald Kerr and Edward Charbonneau. Murray did not think they were doing it because they were in on it or anything like that. Murray believed they were caught up in trying to get this intelligence. And Tenet was letting it go straight to President Bush

10

       without being vetted.  Nobody was ever held accountable for the bogus Al Jazeera intelligence.  Later, officials all acted like it never happened.

d.    Fran Townsend had a meeting at the White House that Murray attended, where they talked about shooting down airplanes over the Atlantic.  Townsend had a National Security Council lawyer there who said the President now has this authority.  A general there nodded and said yes, we could do that.  Murray said, "I couldn't believe they were talking about it" and "I thought this was crazy."  Murray believed whole thing was insane.

e.    Murray repeated his version of events at the White House meeting after I told him Townsend denied the discussion about shooting down airplanes.

28.    For the New York Times Article and the Chapter, in or around January or February 2011, I interviewed Tyler Drumheller, the CIA European Division Chief in late 2003, when Montgomery gave purported intelligence gleaned from Al Jazeera broadcasts to the CIA.  I referred to Drumheller in the Chapter as a "former senior CIA official" or one of the "former CIA officials."  (*Id.*) (Chapter at 32-33, 39-47.)  Drumheller passed away on August 2, 2015.  A true and correct copy of the notes I took while interviewing Drumheller are attached hereto as Exhibit 20.  The notes I took contemporaneously were taken in the normal course of my practice as a professional journalist and accurately reflect what Drumheller told me.  I relied on Drumheller for the statements reflected in the interview notes I took.

29.    For the New York Times Article and the Chapter, in or around late 2010 or January 2011, I reached out to and obtained comment from CIA spokespeople, George Little and Jennifer Youngblood.  A true and correct copy of the email I received from Youngblood is attached hereto as Exhibit 21.  I relied on the CIA's statement "[o]n the record, from [Youngblood] as CIA spokesperson," that "'[t]he agency never had a contract with this individual,'" referring to Montgomery.  (Chapter at 44.)  I also relied on her as a US intelligence official for the CIA's statement that "'[a]s you'd expect, the CIA looked at what Montgomery claimed he could do but determined that his threat detection tools weren't exactly as billed.'" (*Id.*)

30.    For the New York Times Article and the Chapter, in or around January or February 2011, I interviewed Frances Townsend, a former White House counterterrorism official

11

on the National Security Council ("NSC") who dealt with Montgomery's intelligence at the White House. The Chapter states that I interviewed Townsend. (Chapter at 45.) A true and correct copy of the notes I took while interviewing Townsend is attached hereto as Exhibit 22. The notes I took contemporaneously accurately reflect what Townsend told me. I relied on Townsend's statements that "[w]e understood we may have been played" and"[t]here was stupid sh[**] reported to the [CIA] for variety of reasons" but "it[']s fair to say it's the biggest one that makes it all the way through the system." (Chapter at 32.)

31. For the New York Times Article and the Chapter, on or about February 1, 2011, I interviewed Samantha Ravich, former advisor to Vice President Dick Cheney. A true and correct copy of the notes I took while interviewing Ravich are attached hereto as Exhibit 23. The notes I took contemporaneously accurately reflect what Ravich told me. I relied on her confirmation that she met with Montgomery but refused the technology absent proof that the software worked, which she said was never forthcoming. (Chapter at 51.)

32. For the New York Times Article and the Chapter, on or about January 11, 2011, I interviewed Melvin Dubee, a former staff member on the U.S. Senate Select Committee on Intelligence. A true and correct copy of the notes I took while interviewing Dubee are attached hereto as Exhibit 24. The notes I took contemporaneously accurately reflect what Dubee told me. I relied on Dubee for his statements that the committee staff contacted the CIA about Montgomery's technology and the CIA was "very skeptical of it at the time."

33. For the New York Times Article and the Chapter, Lichtblau and I reached out to and obtained comment from an Air Force spokesman, Todd Spitler. A true and correct copy of Lichtblau's January 21, 2011 email to Spitler is attached hereto as Exhibit 25. A true and correct copy of Spitler's return email to me containing a statement from the Air Force is attached hereto as Exhibit 26. I relied on the Air Force's statement that the Air Force awarded a contract to Montgomery's company in 2009 but that "the contractor did not perform in accordance with the terms of the contract." (Ex. 26 at 1.)

34.     For the New York Times Article and the Chapter, in or around January or February 2011, I reached out to a spokesman for United States Special Operations Command. I relied on the spokesman's statement that "The technology did not meet our requirements," referring to Montgomery's software.  (Chapter at 48.)

35.     For the New York Times Article and the Chapter, on or about January 13, 2011, Lichtblau interviewed George Birnbaum, a former chief of staff to Prime Minister Benjamin Netanyahu.  Birnbaum confirmed that Montgomery tried to sell his technology to the Israeli government but the Israeli government was unimpressed and chose not to enter into a contract with Montgomery.

36.     For the New York Times Article and the Chapter, I interviewed Michael Flynn, Montgomery's former lawyer, by email and phone from late 2010 to 2014.  Flynn gave Lichtblau and then me public court records and confirmed his previous statements in articles and court records that he believed Montgomery was a "fraud" and had "conned" him and others.  (Ex. 16, at 230; Chapter at 36.)

37.     For the New York Times Article and the Chapter, I interviewed Tim Blixseth in person and by email from 2011 to 2014, the ex-husband of Montgomery's former business partner.  Blixseth gave me and Lichtblau information about Montgomery's interactions with Edra Blixseth and his observation of a demonstration of Montgomery's software in Palm Springs, California.  (Chapter at 50-52.)

I interviewed Montgomery by phone and email for the Chapter starting in 2011 or 2012. A true and correct copy of the notes I took while interviewing Montgomery is attached hereto as Exhibit 27.  The notes I took contemporaneously accurately reflect what Montgomery told me and included Montgomery's point of view and denials in the Chapter.  (Chapter at 33-34, 37, 51, 53.)

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 11, 2015 in Washington, D.C.

_____
James Risen