# EXHIBIT 1

CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT

               SOUTHERN DISTRICT OF FLORIDA

2              CASE NO. 15-cv-20782-MARTINEZ/GOODMAN

3

4    DENNIS MONTGOMERY,

5           Plaintiff,

6    -vs-

7    JAMES RISEN, ET AL.,

8           Defendants.

9

     _____/

10

11

12              Thursday, August 20, 2015

                Holland & Knight, LLP

13              701 Brickell Avenue, Suite 3300

                Miami, Florida 33131

14              9:13 a.m. - 6:36 p.m.

15

16      VIDEOTAPE DEPOSITION OF DENNIS MONTGOMERY

17         (VOLUME I - PAGES 1 THROUGH 185)

18

19   Videotape deposition taken before TAMMY WALKER ZIVITZ,

20   Registered Professional Reporter and Notary Public in and

21   for the State of Florida at Large, in the above cause.

22

23

24

25

CONFIDENTIAL

Page 2

1  APPEARANCES:
2    On behalf of the Plaintiff:
3      Larry Klayman, Esq.
        LARRY KLAYMAN, P.A.
4      **REDACTED**

5
6    On behalf of the Defendants:
7      Laura R. Handman, Esq. and Micah J. Ratner, Esq.
        DAVIS WRIGHT TREMAINE, LLP
8      1919 Pennsylvania Avenue, NW
        Suite 800
9      Washington, D.C.  20006
10   On behalf of the Defendants:
11     Brian Toth, Esq.
        HOLLAND & KNIGHT, LLP
12     701 Brickell Avenue
        Suite 3300
13     Miami, Florida  33131
14     ALSO PRESENT:  Dina James, Paralegal and
        Videographer, Christopher Hernandez
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              - - -
2          I N D E X
3              - - -
4  WITNESS:    DIRECT  CROSS  REDIRECT  RECROSS
5  DENNIS MONTGOMERY
6  BY MS. HANDMAN   10        292
7  BY MR. KLAYMAN      282
8              - - -
             E X H I B I T S
9              - - -
10
DEFENDANTS'                          PAGE
11
   Exhibit 1-Emails                  12
12 Exhibit 2-Motion/emails           30
   Exhibit 3-Transcript              30
13 Exhibit 4-Amended Complaint       40
   Exhibit 5-Voter registration     40
14 Exhibit 6-Complaint               43
   Exhibit 7-Plaintiff's responses   56
15 Exhibit 8-Medical records         61
   Exhibit 9-Declaration; Cecelia Wang   82
16 Exhibit 10-Articles               118
   Exhibit 11-Twitter                176
17 Exhibit 12-John Brennan questions      207
   Exhibit 13-Contract               216
18 Exhibit 14-Emails                 216
   Exhibit 15-Declaration of Montgomery   223
19 Exhibit 16-Declaration of Cecelia Wang   273
   Exhibit 17-Swedish hospital notes   292
20
21
22
23
24
25

Page 4

1       THE VIDEOGRAPHER:  We're on the record.
2  The date is August 20, 2015.  The time is
3  9:13 a.m.  This is Media Unit 1.  This is the
4  video deposition of Dennis Montgomery in the
5  matter of Dennis Montgomery versus James Risen,
6  et al.
7       This deposition is being held at 701
8  Brickell Avenue, Miami, Florida 33131.  The
9  court reporter is Tammy Zivitz.  The
10 videographer is Christopher Hernandez.
11      MS. HANDMAN:  Laura Handman; Davis Wright
12 Tremaine, counsel for the defendants.
13      MR. RATNER:  Michael Ratner; Davis Wright
14 Tremaine, counsel for defendants.
15      MR. KLAYMAN:  Larry Klayman,
16 K-L-A-Y-M-A-N, counsel for plaintiff.  Sitting
17 with me is Miss Dina James, paralegal.
18      (DENNIS MONTGOMERY)
19 Having been first duly sworn or affirmed, was
20 examined and testified as follows:  I do.
21      MR. KLAYMAN:  I want to put on the record
22 that Mr. Montgomery is handicapped.  He's
23 severely debilitated as a result of a brain
24 aneurysm and several strokes so there needs to
25 be an opportunity for him to be able to

Page 5

1  respond, and there needs to be a pause to see
2  whether or not I need to make an objection
3  because communication is more difficult as a
4  result.
5       In addition, Mr. Montgomery is someone who
6  has worked inside of the intelligence community
7  as we know from this lawsuit, and he has had
8  access to classified and/or sensitive
9  information, so, therefore, before a response
10 is made, I need to know whether or not to
11 elicit an objection to this, and I need time to
12 do that.
13      In addition, that's to the benefit of
14 defense counsel too because should defense
15 counsel inadvertently or by design elicit
16 classified information, that could subject
17 defense counsel to potential liability.  So we
18 need to be very, very careful here today, and
19 go slowly and deliberately and try to cooperate
20 with each other in that regard.
21      MS. HANDMAN:  And I too wish to put
22 something on the record.  We are here pursuant
23 to a Notice of Deposition.  We offered to do
24 the deposition in Seattle, our district, DC or
25 Miami, and the plaintiff chose Miami.

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

1    We sought an adjournment of the deposition
2  to postpone it because there are outstanding
3  discovery disputes, including over what is or
4  is not classified, and Mr. Klayman on
5  Mr. Montgomery's behalf rejected the request to
6  adjourn.  We will leave the deposition open at
7  the end of today to allow for further
8  questioning in the event there is further
9  discovery.
10    Also, I wish to put on the record that we
11  have notified the Department of Justice,
12  Carlotta Wells.
13    THE WITNESS:  Could you slow down, please?
14    MS. HANDMAN:  Sure.  We have notified the
15  Department of Justice, Carlotta Wells, with
16  whom I think you're familiar, and Rafael Gomez
17  about both the deposition today, and the
18  impending discovery dispute and the hearing
19  tomorrow.  As you can see, they have chosen not
20  to be present at this deposition or to put in
21  any papers with regard to the classified or not
22  classified status of any of the documents and
23  information that we are seeking.
24    I would ask the court reporter and the
25  videographer to keep track of the time.  We are

Page 7

1  entitled to seven hours, and that excludes all
2  breaks, and I appreciate that very much.
3    Mr. Brian Toth has just joined us.  Would
4  you put your appearance on the record?
5    MR. TOTH:  Yes.  Brian Toth, T-O-T-H, for
6  the defendants.
7    MR. KLAYMAN:  In response to what Ms.
8  Handman has just said, this deposition was
9  scheduled initially by mutual agreement.  In
10  fact, it was plaintiff who proposed a slightly
11  later date, and it was Ms. Handman and company
12  that were insistent on this date of the 21st of
13  August -- 20th of August.  We do need to meet a
14  discovery deadline here.  The deposition could
15  have been taken even sooner than that, but for
16  whatever reason the defendants chose to choose
17  August 21st.
18    With regard to this deposition, will all
19  be taken confidentiality, and then we'll have
20  the opportunity pursuant to a protective order,
21  which the defendants wanted in this case to be
22  able to look at that deposition and find out
23  or, at least, determine what is not
24  confidential and what is claimed to be
25  confidential, so, therefore, all of this

Page 8

1  transcript is under confidential seal right
2  now.
3    With regard to notifying people at the
4  Department of Justice, that apparently was
5  done, for whatever reason that is not
6  transparent in your statement, Ms. Handman, and
7  I suggest, and we have no problems with the
8  government here, we're on the side of the
9  government, but I don't want you to intimidate
10  my client throughout this deposition.  He has a
11  brain aneurysm that can have severe
12  consequences so I want you to be careful, to be
13  very courteous towards him, and to give him an
14  opportunity to respond, and not to harass him
15  in any way.
16    THE WITNESS:  I want to say something.
17  I'm wearing the glasses because of the
18  brightness and everything.  I'm not doing it to
19  be clever or any other reason.
20    MS. HANDMAN:  Well, would you like us to
21  pull down the shades, that might help?  The
22  room is -- has shades, and that might help him
23  to --
24    THE WITNESS:  You can try that, but
25  there's so much reflection off the glass and

Page 9

1  everything.
2    MS. HANDMAN:  Well, why don't we try to
3  pull down the shades.
4    MR. KLAYMAN:  Well, he's entitled to wear
5  sunglasses, if he wishes too.  This is what I'm
6  talking about, Ms. Handman.  I don't want you
7  to dictate to my client what his health
8  concerns are.
9    You've already shown in the first status
10  conference an insensitivity to his health, and
11  that's been shown throughout the pleadings as
12  well.  So if he wants to wear his glasses, he
13  can wear his classes.
14    MS. HANDMAN:  He can, but I'm trying to
15  help him to try to adjust the light in the room
16  to see if that makes it easier for you,
17  Mr. Montgomery.
18    THE WITNESS:  Okay.  Maybe turning the
19  lights -- can you turn half of them off above
20  us or -- yeah, turn it down where the
21  videographer can --
22    MS. HANDMAN:  Well, the lawyers have to be
23  able to see.
24    THE WITNESS:  I'm not going anywhere.  I'm
25  at the end of this table.

3 (Pages 6 - 9)

CONFIDENTIAL

Page 10

1    MS. HANDMAN:  If you do need a break,
2 Mr. Montgomery, please let us know, and we'll
3 attempt to accommodate that.
4    THE WITNESS:  I will try to make it quick
5 so if I have to use the restroom or whatever,
6 no one has to get up.  I can just go to the
7 restroom and return as quick as possible.
8    DIRECT EXAMINATION
9 BY MS. HANDMAN:
10    Q   Mr. Montgomery, are you aware that we did
11 a request for documents and request for answers to
12 interrogatories in this case?
13    A   Yes.
14    Q   And what search did you perform for
15 documents to respond to the document request?
16    MR. KLAYMAN:  You can answer that question
17 without getting into classified material or
18 anything that is arguably classified.
19    MS. HANDMAN:  I just asked:  What search
20 you did.
21    THE WITNESS:  I looked on the electronic
22 media that I had, and looked for stuff that was
23 responsive.
24 BY MS. HANDMAN:
25    Q   Did you use any search terms to look for

Page 11

1 responsive material?
2    MR. KLAYMAN:  Objection, vague.
3    THE WITNESS:  I don't know what you mean,
4 "search terms."  I know what it means like an
5 Outlook or something like that.
6 BY MS. HANDMAN:
7    Q   Well, how did you search through your
8 electronic files for responsive material?
9    A   I looked for emails and stuff that you had
10 requested, and I don't remember the list of
11 everything you gave so --
12    Q   Did you put in names of, for example, Edra
13 Blixseth, or her email address?
14    MR. KLAYMAN:  Objection.  It assumes facts
15 not in evidence.
16 BY MS. HANDMAN:
17    Q   Is Edra Blixseth, were you in business
18 with Edra Blixseth?
19    A   I worked for her.
20    Q   And for what years did you work for her?
21    A   2006 to 2009, '10.
22    Q   Did you look for emails with Edra
23 Blixseth?
24    A   Yes, I did.
25    Q   And did you find any?

Page 12

1    A   Yes, I did.
2    Q   Did you frequently correspond with her by
3 email?
4    A   What do you mean?
5    Q   Where was she over the course -- well,
6 strike that.
7    Is her email address LearG2@aol.com?
8    A   It was at some point.
9    Q   And did you look for emails at that
10 address?
11    A   Yes, I did.
12    MS. HANDMAN:  And I'm going to mark as
13 exhibit -- first, let's mark the document
14 request.  Well, why don't we mark this as an
15 exhibit.  Let's mark as Exhibit 1 from your
16 document production, it bears a Bates stamp
17 DLM23215 to 23217, and 22819 to 23217.
18    MR. KLAYMAN:  It will be helpful if you
19 could read to him because his reading is
20 impaired.
21    (Exhibit 1 was marked for identification.)
22 BY MS. HANDMAN:
23    Q   Well, what I'm trying to get at this point
24 before I ask questions about the substance of this
25 later is, is this the full -- all the emails that

Page 13

1 you had with Edra Blixseth in the four or so years
2 that you were associated with her?
3    THE WITNESS:  Can you turn the lights down
4 a little bit more in here?  Would that be
5 possible or is that going to ruin your -- it's
6 just a reflection off the paper and everything.
7 Yeah, that's better.  Thank you.  What is your
8 question again?
9 BY MS. HANDMAN:
10    Q   These were the emails that you produced
11 that involved Edra Blixseth or where Edra Blixseth
12 is --
13    MR. KLAYMAN:  Let me put an objection on
14 the record here because Mr. Montgomery is, in
15 fact, handicapped because he is suffering from
16 several strokes, and because you're just
17 putting a limited number of documents in front
18 of him, and because his short term memory is
19 effected, this question will need to be flushed
20 out in a more precise way because just showing
21 him some documents and asking him whether or
22 not those are all the documents that had been
23 produced may not result in an answer that he's
24 capable of answering at this time because of
25 his medical condition.

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

1 BY MS. HANDMAN:
2    Q   Let me ask you, Mr. Montgomery: Do you
3 think over the course of those four years, you had
4 more than five emails with Edra Blixseth?
5    A   Yes.
6    Q   And did you delete emails with Edra
7 Blixseth?
8    A   Over that period of time, possibly.
9    Q   Have you deleted any emails with Edra
10 Blixseth since you commenced this lawsuit?
11    A   No, I haven't.
12    Q   And what did you do to search for emails
13 with Edra Blixseth?
14    A   I looked on the stuff I had to see if
15 there was that stuff.
16    Q   And were you -- did you perform the search
17 yourself?
18    A   Yes.
19    Q   And are you able to read a computer?
20    A   You mean, look at a computer?
21    Q   Mm-hmm.
22    A   Yes, when I enlarge the, you know, fonts
23 and all of that.
24    Q   Mm-hmm.  And when you say, you looked for
25 these emails, how did you go about doing that, do

Page 15

1 you have an archive that is related to Ms. Blixseth?
2    A   Well, I had some disc drives that I looked
3 on.
4    Q   And you came up with only five emails?
5    MR. KLAYMAN:  Objection.  Same objection.
6    THE WITNESS:  I don't recall if that's all
7 I came up with.
8 BY MS. HANDMAN:
9    Q   Do you have a video showing your work?
10    MR. KLAYMAN:  Objection, vague.
11 BY MS. HANDMAN:
12    Q   Showing your work with the software
13 technology?
14    MR. KLAYMAN:  Same objection.
15    MS. HANDMAN:  We'll mark as an exhibit --
16 let's move on for now and we'll do it later.
17 BY MS. HANDMAN:
18    Q   Mr. Montgomery, where do you live?
19    MR. KLAYMAN:  I'm going to stop this
20 deposition at this point.
21    What I want to know, Ms. Handman, I want
22 to proffer from you, whether you're
23 coordinating this deposition with Rafael Gomez
24 and the Justice Department, and whether you
25 have communicated with them concerning

Page 16

1 Mr. Montgomery in anything dealing with
2 substance, I want a proffer from you on that
3 basis.
4    MS. HANDMAN:  I'm not required to give you
5 such a proffer, and I have notified them
6 because you raised that the documents were
7 classified, and, therefore, couldn't be
8 produced, and, therefore, I notified them.
9    MR. KLAYMAN:  But what I want to know is,
10 whether or not you have had access to
11 classified information, and whether they leaked
12 it to you?
13    MS. HANDMAN:  I'm not even going to bother
14 to answer such a foolish question.
15    MR. KLAYMAN:  It's not foolish, Ms.
16 Handman.
17    MS. HANDMAN:  Yes, it is.  Let's move on,
18 Mr. Klayman.
19    THE WITNESS:  Don't raise your voice.
20 It's hard for me to understand.
21    MS. HANDMAN:  I apologize.  Mr. Klayman,
22 this is my deposition.  I do not want to waste
23 it with this kind of discussion.  If you want
24 to raise it with magistrate at some point in
25 time, be my guest, and the answer is that, it

Page 17

1 is not relevant to this discussion, and you
2 have no basis for suggesting it.
3    MR. KLAYMAN:  Well, it is because of the
4 ground rules that I've set was we're wanting to
5 obey all laws and all procedures as
6 appropriate, and that's why I wanted to know
7 whether, in fact, Mr. Gomez has leaked
8 information to you that would be improper.
9 BY MS. HANDMAN:
10    Q   Mr. Montgomery, where do you live?
11    A   In Miami.
12    Q   What's your address in Miami?
13    A   675 85th Northwest, Number 103.
14    Q   And how big of a place is that?
15    A   It's a condominium.
16    Q   And how many bedrooms?
17    A   I don't recall.
18    Q   You don't recall how many bedrooms?  Who
19 lives there with you?
20    A   Hector Mendez.
21    Q   And who is Hector Mendez?
22    A   A friend of somebody that I knew that I
23 worked with in Florida.
24    Q   And does he own the condo?
25    A   I believe so, yes.

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

1    Q    And do you pay him rent?
2    A    I haven't yet, but I committed to.
3    Q    And how much did you commit to pay?
4    A    200 a month.
5    Q    And did you commit -- does that permit you
6 to be there all month long or is that on a per week
7 or per day basis?
8    A    When I need to be there.
9    Q    When you need to be?
10    A    I live there.  I mean, that's the gist.
11    Q    Well, when did you move there, what day
12 and month?
13    A    Well, it would have been -- I don't know
14 the date.  It would have been in, I believe, March.
15    Q    And you say that -- have you signed a
16 lease with Mr. Mendez?
17    A    No, no, I have not.
18    Q    So this is just an oral agreement?
19    A    Yes.
20    Q    And you just have one room in his condo?
21    A    Yes.
22    Q    And did you move any furniture to that
23 room?
24    A    No.  I physically hadn't moved in there
25 yet with furniture and everything because I had

Page 19

1 fallen and injured myself in Seattle.
2    Q    And when did you fall and injure yourself
3 in Seattle?
4    A    September of 2014, January, March and
5 recently.  I mean, there's been a few other times.
6    Q    That you've fallen?
7    A    And hurt myself, yes.
8    Q    Have you had to go to the hospital for
9 those falls?
10    A    Yes, I have.
11    Q    And have you had to stay in the hospital?
12    A    Well, I've -- from the falls or ever?
13    Q    From the falls?
14    A    I wasn't hospitalized overnight, if that's
15 the question.
16    Q    That's what I mean; inpatient?
17    A    No.
18    Q    How do you spell Mr -- the person you
19 shared the condo with?
20    A    Hector Mendez, M-E-D -- M-E-N-D-E-Z.
21    Q    And you said you're there when you need to
22 be.  Were you there yesterday?
23    A    No, I want to make sure I'm saying
24 something correctly.
25         I had not gotten to move in yet because of

Page 20

1 my injuries and so forth, and my doctor has advised
2 that I need to be in some kind of semi-independent
3 living arrangement, you know, where there's nurses
4 and stuff, and that's what I'm actively pursuing to
5 get now.
6    Q    So when did you come to Miami for this
7 deposition?
8    A    What is today?
9    Q    Today is Thursday.
10    A    Monday.
11    Q    Monday.  And you came from where?
12    A    I'm sorry?
13    Q    Where did you come from?
14    A    Seattle, Washington.
15    Q    And is that where you have been up until
16 Monday?
17    A    You mean --
18    Q    Right.  Have you been in Miami prior to
19 Monday, say, in August of this year?
20    A    Before Monday, is that what you're --
21    Q    Yes, yes.
22    A    No.
23    Q    And in July, were you in Miami?
24    A    No.
25    Q    And in June, were you in Miami?

Page 21

1    A    No.
2    Q    And in May, were you in Miami?
3    A    You mean this year, right?
4    Q    Yes, yes.
5         MR. KLAYMAN:  Objection -- line of
6    questioning, relevancy -- the entire line of
7    questioning.
8 BY MS. HANDMAN:
9    Q    Were you in Miami in May of this year?
10    A    No.
11    Q    And were you in Miami in April of this
12 year?
13    A    I was evicted from my home in April.
14    Q    Your home was where?
15    A    My residence where I was staying, in
16 Yarrow Point, Washington, and I was in the process
17 of moving my stuff out of the home and moving into
18 here.
19    Q    And where is your stuff now that you moved
20 out of the home in Yarrow Point?
21    A    In a storage facility, or most of it I've
22 now sold.
23    Q    Who are you living with in Seattle?
24    A    My son-in-law when I'm there.
25    Q    And your daughter?

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

1    A   Yes.
2    Q   Where do they live?
3        MR. KLAYMAN:   Objection, relevancy. I
4    don't think this is necessary. Why are you
5    getting into that?
6        MS. HANDMAN:   I'm wanting to know where
7    he's living.
8        MR. KLAYMAN:   He said "Seattle." Why are
9    you probing?
10   BY MS. HANDMAN:
11   Q   I wish to know the address of where you
12   are living.
13   A   I don't know the exact address, I'm sorry,
14   I'm not being --
15       MR. KLAYMAN:   I don't understand the
16   relevancy of that, other than you're trying to
17   harass him. He said he was staying in Seattle.
18   What's the point, Ms. Handman?
19       MS. HANDMAN:   I'm trying to establish
20   domicile.
21       MR. KLAYMAN:   It has nothing to do with
22   that.
23       MS. HANDMAN:   Yes, it does.
24       MR. KLAYMAN:   If he said he was in Seattle
25   during that period, how does it matter where

Page 23

1    the address of his -- he said -- let me put
2    this on the record, okay, and I'm not going to
3    tolerate your harassing this man. Already
4    you've done it, and I'm not going to get into
5    the record too much on that. But the reality
6    is, he said he was in Seattle during that
7    period, and he told you why, and to put the
8    address of his daughter and his son-in-law on
9    the record, given the fact that he has been
10   working for intelligence agencies, given the
11   fact that he has, as you know, been assisting
12   in the fight against terrorism, given, as you
13   know, our concerns about his safety, why would
14   you want to jeopardize the safety of his
15   daughter and his son-in-law?
16       MS. HANDMAN:   You can designate it as
17   confidential subject to the protective order.
18   BY MS. HANDMAN:
19   Q   Please answer the question. What is the
20   address where you live with your daughter and
21   son-in-law? And I presume your wife as well, do you
22   live with your wife there too?
23       MR. KLAYMAN:   Same objection.
24       THE WITNESS:   Yes. What month are you
25   referring to?

Page 24

1    BY MS. HANDMAN:
2    Q   Well, you said in April you were evicted
3    from your home in Yarrow Point?
4    A   I was homeless at that time.
5    Q   When did you start living with your
6    son-in-law and your daughter?
7    A   Sometime in -- that was 2004, right?
8    Q   No. You were evicted in April of this
9    year.
10   A   Excuse me. Dates are difficult.
11   Q   2015.
12   A   I think it was late May, early June.
13   Q   Do you remember telling your doctors that
14   you were living with your wife and daughter, I
15   think, in March of this year?
16   A   Which doctor are you referring to?
17   Q   I'll have to get the record. You said
18   that you're looking for some assisted living space?
19   A   That's the word, "assisted."
20   Q   And what steps have you taken to secure
21   assisted living in Florida?
22   A   I contacted multiple -- I contacted the
23   places, and they give you an agent or something, and
24   then I've contacted them and they've began the
25   process for doing that for me.

Page 25

1    Q   Who's the agent that you've contacted?
2    A   I don't have their names off the top of my
3    head. It was involved with the facilities.
4    Q   Why don't we leave a blank for you to fill
5    in, in the deposition who the agent is who is
6    looking for assisted living space.
7    A   I'm also here now to do it myself with my
8    son-in-law also.
9    Q   And your son-in-law's name is?
10   A   I thought I just gave you that.
11   Q   Ishtvan --
12   A   You want his name?
13   Q   Yes.
14   A   Ishtvan Borgyan.
15   Q   I think we'll be able to fill in the
16   spelling. Is he known as "Ish," is that his
17   nickname?
18   A   I call him that. Other people have, yes.
19   Q   We'll call him that for purposes of
20   simplicity in the deposition.
21   A   All right.
22   Q   Is he here now with you, then?
23   A   Yes.
24   Q   And you were in business with him; is that
25   correct?

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

1    A    Yes.
2    Q    What was the name of the company?
3    A    When we were working with Edra, you mean?
4    Q    Yes.
5    A    Well, he worked at Blxware, like I did
6  originally.  In fact -- and the company was actually
7  called Opspring, and then it became Blxware.
8    Q    Have you visited any assisted living
9  places since you've been here?
10    A    Not yet.
11    Q    And prior to -- do you have any doctors in
12  Florida that you see?
13    A    No, but I have -- I still have quite a
14  severe problem, and they are -- I've asked for names
15  of neurosurgeons and neuro people for the Miami
16  area.
17    Q    And did you ask your doctors whether you
18  should travel to Miami for this deposition?
19    A    They've discouraged me from traveling when
20  I'm injured, and, obviously, I have an ongoing brain
21  aneurysm, but I knew it was important for me to come
22  here and I came.
23    Q    Are you aware that there are criminal
24  proceedings pending against you in Clark County,
25  Nevada?

Page 27

1        MR. KLAYMAN:  Objection, relevancy.
2  BY MS. HANDMAN:
3    Q    Can answer.
4        THE WITNESS:  Am I to answer that?
5        MR. KLAYMAN:  You can answer.
6        THE WITNESS:  Yes.
7  BY MS. HANDMAN:
8    Q    And are you aware that you were supposed
9  to appear in those proceedings last week on
10  August 12th?
11        MR. KLAYMAN:  It assumes facts not in
12    evidence.  Objection.
13        THE WITNESS:  I don't remember when the
14    date was.
15  BY MS. HANDMAN:
16    Q    Was there an appearance that was due
17  sometime this month?
18    A    I believe there was.
19    Q    And did you appear?
20        MR. KLAYMAN:  Objection.  Relevancy to all
21    this line of questioning.  Move to strike.
22  BY MS. HANDMAN:
23    Q    Did you appear --
24        THE WITNESS:  Am I to answer?
25        MR. KLAYMAN:  You can answer.

Page 28

1  BY MS. HANDMAN:
2    Q    Yes.
3    A    No, I did not.
4    Q    And do you know what your lawyer told the
5  judge as to why you were not appearing?
6        MR. KLAYMAN:  Objection.  Assumes facts
7    not in evidence.
8  BY MS. HANDMAN:
9    Q    Did a lawyer appear on your behalf?
10    A    Well, I'm using a public defender.
11    Q    And did the public defender appear on your
12  behalf?
13        MR. KLAYMAN:  Objection.  Relevancy to all
14    this line of questioning.  Continuing
15    objection.
16        THE WITNESS:  I don't recall.
17        MS. HANDMAN:  Let's mark as an exhibit the
18    transcript of August 12th.
19        MR. KLAYMAN:  Objection, relevancy.  Lacks
20    foundation.
21  BY MS. HANDMAN:
22    Q    Were you too ill to travel to Nevada?
23    A    I don't remember the date that it was on.
24  If you know, you can tell me.
25    Q    It was August 12th, last Wednesday.

Page 29

1    A    I believe because of the severity of my
2  headaches and my condition, I saw my
3  neuro-ophthalmologist because they were concerned.
4    Q    Who was that?
5    A    Who was what?
6    Q    Who's the neuro-ophthalmologist that you
7  saw?
8    A    Dr. Eugene May.
9    Q    And is Dr. Eugene May in the Seattle area?
10    A    Yes, he is, yes.
11    Q    And did he provide a report to give to the
12  judge that said that you were too ill to travel?
13    A    Well, what do you mean "ill"?  My vision
14  was very bad.
15    Q    Did he say -- well, your lawyer
16  represented to the judge in Nevada that you were
17  still in Washington and too ill to travel.
18        MR. KLAYMAN:  Objection.  Move to strike.
19    You're not testifying, Ms. Handman.  This is
20    inappropriate.  If you want to show him
21    something, fine.  It's irrelevant.
22        Objection, move to strike.  But for you to
23    tell him what his lawyer said --
24        MS. HANDMAN:  I will read from the
25    transcript, which was attached to our papers

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

1   that we've submitted.
2      MR. KLAYMAN: Fine. Go ahead, read. It's
3   still irrelevant.
4      THE WITNESS: Will you just read slowly,
5   please?
6      (Exhibit 2 and 3 were marked for identification.)
7   BY MS. HANDMAN:
8      Q   Sure. I will. It was attached -- let's
9   mark as an Exhibit 2 what was our Exhibit 6 to our
10  prehearing memorandum; is that right? No. It's our
11  Motion to Modify the Deadlines. It's Exhibit 6
12  through 11, 12 -- 11, and this is Exhibit 11 that
13  was filed in this case. The caption is District
14  Court, Clark County, Nevada, State of Nevada versus
15  Dennis L. Montgomery, and the date is -- Exhibit 3
16  is a transcript of August 12, 2015 in the State of
17  Nevada versus Dennis Montgomery.
18     A   This was filed in this action on
19  August 17th with -- what is today?
20     Q   This is -- the date of the transcript is
21  August, Tuesday, August 12, 2015, and it's the State
22  of Nevada versus Dennis Montgomery, District Court,
23  Clark County, Nevada, and your lawyer says I would
24  ask that you waive --
25     MR. KLAYMAN: Wait. The fact that you're

Page 31

1   reading something doesn't mean that his lawyer
2   said that, okay, so, objection.
3      MS. HANDMAN: Well, it's a transcript.
4      MR. KLAYMAN: I don't care what it is. It
5   could be the Holy Grail. It doesn't mean that
6   his lawyer said that. They could be
7   mistranscribed or whatever. So just say you're
8   reading from a transcript, and don't play games
9   with my client.
10  BY MS. HANDMAN:
11     Q   I'm reading from a transcript, Shana
12  Bachman on behalf of Mr. Montgomery.
13     A   I don't know who that is.
14     Q   She's a deputy public defender.
15     A   I've never met her.
16     Q   She is -- in this transcript, it says, "I
17  would ask that you waive his client's appearance.
18  Mr. Montgomery is still in Washington State and is
19  unable to travel because he is suffering from the
20  effects of his stroke. He is working on getting a
21  letter from his doctor, but he needs to get an
22  appointment."
23     A   What day of the week was that?
24     Q   It says it's August 12, which --
25     A   I meant the day.

Page 32

1      Q   August 12th, I believe, was Wednesday,
2   last Wednesday.
3      A   I believe the day before I saw the -- I
4   have severe shoulder pain and injury from the
5   stroke, and I saw a Dr. Porhco also the day before.
6      Q   How do you spell his name?
7      A   Really?
8      Q   Well, we'll leave a blank, and you can
9   fill it in.
10     A   I think it's P-O-R-H-C-O.
11     Q   Thank you. We leave blanks, and then you
12  and your counsel can fill in the names.
13     A   Okay.
14     Q   And you saw him the day before for a
15  shoulder injury?
16     A   My entire left side is injured from my
17  toes to the top of my head. So I have paralysis,
18  and I'm not a doctor. I'm just trying to explain
19  to you in layman's terms. Everything on my left
20  side is in extreme pain and problem.
21     Q   And did he provide a letter for your
22  counsel saying that you were too ill to travel to
23  Nevada?
24     A   The primary --
25     MR. KLAYMAN: Objection, relevance. Go

Page 33

1   ahead. You can answer.
2      THE WITNESS: You've seen, because I gave
3   you the list of all the doctors that take care
4   of me.
5   BY MS. HANDMAN:
6      Q   Yes, and you saw him the day before this
7   hearing?
8      A   You mean today?
9      Q   No, the day before the hearing in Nevada.
10     A   And I also saw Dr. Lim -- my -- Dr. Lim is
11  kind of -- Dr. Lim is kind of the -- I think he's
12  called a physiatrist, which deals with people with
13  my conditions, you know.
14     Q   And how often do you see him?
15     A   Well, I saw him obviously in the hospital
16  every day.
17     Q   But I'm talking in the last three months,
18  how often have you seen him?
19     A   I believe, three times. He's the director
20  of rehab at Swedish. So there are days in which I'm
21  required to -- I see him, but because of
22  emergencies, you know how that goes? Am I making
23  sense to you? What I'm saying, I'm trying to -- I
24  might have an appointment to go see him and I get
25  there and there's an emergency because the hospital

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

1 that I stayed in at Cherry Hill is a neuro hospital
2 for strokes, and those types of things, brain
3 injuries.  So I think I've seen him three times in
4 three months.
5      Q    And did you produce the records of those
6 visits to us?
7      A    Well, I just got them because you don't --
8 let me -- I don't communicate a lot with the public
9 defender obviously because of his schedule.  I mean,
10 I'm not his only client I guess if that makes sense.
11      Q    Well, was the statement truthful that you
12 were still in Washington State and unable to travel
13 because you were suffering from the effects of a
14 stroke, is that a truthful statement?
15      A    Yeah, the injuries that I sustained.
16      Q    And did you ask any of these doctors
17 whether you could come travel across the country to
18 Miami for this deposition in the case that you have
19 brought against Mr. Risen and Houghton Mifflin?
20      A    Have I ever asked?  I think there are
21 times they have written.
22      Q    Well, you saw them last week, and you were
23 planning to travel across the country for this
24 deposition.  Would that be contrary to medical
25 advice?

Page 35

1      MR. KLAYMAN:  Objection, compound
2 question.
3      THE WITNESS:  I don't remember if I did or
4 not.
5 BY MS. HANDMAN:
6      Q    Did they advise you not to travel?
7      A    When I'm injured, yes.
8      Q    Are you injured now?
9      A    Yes.  Well, when you fall down a set of
10 stairs, it takes -- you don't just recover from that
11 immediately, and they know that I -- the sooner I
12 get into some kind of assisted living, I think it's
13 called, obviously, that would be better for me.
14      Q    Do you have any caregivers with you here
15 in Miami while you're here?
16      A    My son-in-law's here with me.
17      Q    Mr. Montgomery, do you remember --
18      A    Are you saying something?  I didn't hear
19 you.
20      Q    No, I'm talking to my colleague here.  Do
21 you recall -- strike that.  Are your taxes being
22 audited currently?
23      MR. KLAYMAN:  Objection, relevancy.
24      THE WITNESS:  Yes.
25

Page 36

1 BY MS. HANDMAN:
2      Q    And did you appear by phone on -- at a
3 hearing in tax court on February 23rd?
4      A    Can somebody turn that off?  That hurts
5 me.  Well, I've only appeared telephonically.
6      Q    And did you represent yourself in that
7 hearing?
8      A    Yes.
9      Q    Did you indicate to the judge that you
10 were appearing from Washington State?
11      A    I don't remember if that was even asked.
12      Q    Is that where you were at the time on
13 February 23rd?
14      A    As far as I know.
15      Q    And on February 23rd, did you register to
16 vote in Florida?
17      A    I don't remember the exact date.
18      Q    Where were you when you registered to
19 vote?
20      A    Well, I was there, but I registered to
21 vote.
22      Q    What do you mean "there"?
23      A    I was in the State of Washington when I
24 registered to vote in Florida.
25      Q    You registered by mail?

Page 37

1      A    Yes.
2      Q    And at that point in time when you
3 registered to vote in Florida, did you have a
4 Residence in Florida?
5      A    Well, yes, I had established -- I don't
6 remember the first address.  Yes, I had made
7 arrangements to live there.
8      Q    And had you spent any time in that
9 facility?
10      A    No.
11      Q    And what was the nature of the place that
12 you found?
13      A    Well, it was -- I believe it was an
14 Extended Stay that I had made arrangements to live
15 for two months.
16      Q    And did you spend any of those two months
17 in that home?
18      A    No.
19      Q    And did you pay any rent?
20      MR. KLAYMAN:  Objection.
21      THE WITNESS:  I don't recall if I did or
22 not.
23 BY MS. HANDMAN:
24      Q    Do you have any records showing that you
25 had leased that Extended Stay property?

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

1       MR. KLAYMAN: Objection. Assumes facts
2    not in evidence.
3       THE WITNESS: I don't recall.
4       MR. KLAYMAN: We're going to take a break
5    shortly because of his health. He needs a
6    break. We've been going about an hour.
7       THE WITNESS: I develop these outrageous
8    muscle spasms, you know. It's part of the
9    injuries.
10      MR. KLAYMAN: Let's take a break now,
11   then.
12      THE WITNESS: I can't control.
13      MS. HANDMAN: Do you wish to take a break
14   now?
15      THE WITNESS: Yes, I have to go to the
16   bathroom real quick, and then I can return if
17   that's all right.
18      MS. HANDMAN: Sure.
19      THE WITNESS: Everyone doesn't have to
20   leave and all that. I'm just going to do that.
21      MR. KLAYMAN: I'll help you to the
22   bathroom.
23      THE VIDEOGRAPHER: We're off the record.
24   The time is 10:03 a.m.
25      (A recess was taken after

Page 39

1    which the following proceedings were had:)
2       THE VIDEOGRAPHER: Back on the record.
3    The time is 10:08 a.m.
4    BY MS. HANDMAN:
5       Q   Mr. Montgomery, when did you begin your
6    arrangements with Mr. Mendez at your current
7    residence, condo residence?
8       A   January or February, I believe.
9       Q   January or February is when you began it?
10      A   I believe so.
11      Q   Well, you testified just now that you had
12   made an arrangement with the Extended Stay facility
13   when you registered to vote in February?
14      A   Yes, and it was after that point.
15      Q   When?
16      A   I don't know the exact date. I
17   registered -- I don't know what day I registered to
18   vote. You must.
19      Q   I do, I do, February 23rd, 2015.
20      MR. KLAYMAN: Wait a second. We don't
21   know that you do, Ms. Handman. You already
22   submitted an affidavit under oath under your
23   name that was false so I'm not taking a
24   reference what you say you know. You've
25   already been proved not to be truthful to this

Page 40

1    court.
2       THE WITNESS: Are you waiting for me to
3    say something?
4    BY MS. HANDMAN:
5       Q   Was it before or after you registered to
6    vote that you made the arrangement with Mr. Mendez?
7       A   I believe after.
8       MS. HANDMAN: Let's mark as Exhibit 4, the
9    Amended Complaint, and Exhibit 5 the -- your
10   voters registration.
11      THE WITNESS: Okay.
12      (Exhibits 4 and 5 were marked for identification.)
13   BY MS. HANDMAN:
14      Q   Take a look at Exhibit 5.
15      MR. KLAYMAN: I object to Exhibit 5. Is
16   this your Exhibit 5 or our Exhibit 5? How are
17   you labeling this?
18      MS. HANDMAN: This is my Exhibit 5. It's
19   part of your plaintiff's initial disclosure
20   with an added attachment related to the
21   Extended Stay.
22      THE WITNESS: I'm just covering the things
23   because that yellow is --
24      MS. HANDMAN: Okay.
25      MR. KLAYMAN: Well, I want you to

Page 41

1    represent -- was this Extended Stay of America
2    part of an exhibit in our complaint, is that
3    what you're saying? Where did you get this?
4       MS. HANDMAN: We got that by looking on
5    the Internet at the address that is listed in
6    the registration, and I'm about to ask --
7       MR. KLAYMAN: Well, just be careful how
8    you're representing things because you already
9    misrepresented his voter registration once
10   before, so you're implying that this was part
11   of his voter registration by stapling this
12   together, is that what you're doing, another
13   slick technique?
14   BY MS. HANDMAN:
15      Q   Mr. Montgomery --
16      MR. KLAYMAN: I object to your
17   characterization of this being part of his
18   voter registration.
19   BY MS. HANDMAN:
20      Q   The first page and the second page of
21   exhibit -- the first page is marked as plaintiff's
22   initial disclosures, 057, and you will see the date
23   of registration there is 2/23/15?
24      MR. KLAYMAN: So which --
25

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

BY MS. HANDMAN:

1 BY MS. HANDMAN:
2     Q   Does that refresh your recollection as to
3 when you registered to vote?
4         MR. KLAYMAN:  Objection to this exhibit,
5     insofar as you have appeared to piece together
6     different documents from different sources that
7     are not part of the voter registration.  So I
8     just want you to be clear on the record where
9     this stuff came from.
10 BY MS. HANDMAN:
11    Q   The second page is also from plaintiff's
12 initial disclosure, 61?
13    A   The second document I'm looking at?
14    Q   It's actually on the back of the -- to
15 save trees we two-sided it, and you will see on the
16 back there.
17        MR. KLAYMAN:  Yeah, certainly your large
18    law firm, which has hundreds of people needs to
19    save trees.
20        THE WITNESS:  There's stuff coming through
21    it.  What's the small print stuff?
22 BY MS. HANDMAN:
23    Q   It's a FedEx, and it's from -- was
24 produced by your -- by you.
25    A   No, but there's all these little, tiny

Page 43

1 letters.  I don't know what those say.
2     Q   All right.  Let's move on.
3     A   Do you mind if I turn these over because
4 the yellow is -- does bizarre things to my eyes?
5         MS. HANDMAN:  Let's mark as Defendants'
6     Exhibit 6, the complaint that was filed by you
7     in this case on February 24th, 2015.
8         (Exhibit 6 was marked for identification.)
9 BY MS. HANDMAN:
10    Q   If you would look, Mr. Montgomery, at
11 paragraph 6 -- let me ask you first, did you review
12 the complaint before it was filed on your behalf in
13 this lawsuit?
14    A   I'm sure I did or somebody sent it to me
15 or read it to me.
16    Q   And it is an accurate, you agree that
17 everything in here is accurate?
18        MR. KLAYMAN:  Can you show him the
19    complaint?
20        MS. HANDMAN:  I will.
21 BY MS. HANDMAN:
22    Q   I'm going to refer you particularly to
23 paragraph 6 of the complaint.  You want me to read
24 it to you?
25    A   Yes.  Can I give it back to you?

Page 44

1     Q   Sure.  "Dennis L. Montgomery is a natural
2 person, an individual, and a citizen of the United
3 States.  He is a citizen of Florida, which has set
4 forth above is where much of this work has taken
5 place and will continue to take place."
6         Were you on February 24th when you filed
7 this complaint a citizen of Florida?
8     A   Yes, I believe so.
9     Q   And what's the basis for that belief?
10    A   Well, I changed my voter registration in
11 Washington implied here, and I was in the process of
12 moving until I injured myself.
13    Q   And in what steps had you taken to move to
14 Florida?
15        MR. KLAYMAN:  Objection, asked and
16    answered, but you can go over.
17        THE WITNESS:  Well, I located the housing
18    and I was selling my furniture, obviously,
19    because I didn't have the money to move all of
20    that across the country.
21 BY MS. HANDMAN:
22    Q   And you were being evicted from your
23 Yarrow Point home?
24        MR. KLAYMAN:  Objection, asked and
25    answered.

Page 45

1         THE WITNESS:  I don't know what date that
2     exactly took place.
3 BY MS. HANDMAN:
4     Q   April 1st, I believe?
5     A   That sounds right.
6     Q   Did you set up a bank account in Florida?
7     A   No, I didn't.
8     Q   Do you receive Social Security Disability?
9     A   Yes, I do.
10    Q   And do those checks come by mail?
11    A   No.
12    Q   They deposit it in a bank?
13    A   Yes.
14    Q   And where is that bank?
15    A   Well, it's in the United States.
16    Q   Well, what bank is it?
17    A   I think at first it was Citibank, and then
18 it was Bank of America or reverse, I don't remember.
19    Q   And what address does your bank account
20 there have for you?
21    A   I don't recall.
22    Q   Does it have your Florida address?
23    A   It might.
24    Q   Do you remember changing -- notifying them
25 that you were now in Florida?

12 (Pages 42 - 45)

CONFIDENTIAL

Page 46

1    A   I don't recall.
2    Q   Where is your wife registered to vote?
3        MR. KLAYMAN: Objection. Assumes facts
4    not in evidence.
5  BY MS. HANDMAN:
6    Q   Is your wife registered to vote?
7    A   I don't know.
8    Q   Do you know whether she registered to vote
9  in Florida when you did?
10   A   I don't know.
11   Q   You have said you have longstanding plans
12 to move to Florida.
13       Had you taken any steps to -- prior to
14 registering to vote to move to Florida?
15   A   I was hoping to get work here again before
16 my stroke, obviously, and I had made contact with
17 some people, I don't remember, yes.
18   Q   Who did you make contact with?
19   A   I don't remember their names exactly.
20   Q   Do you remember what companies or entities
21 they were associated with?
22   A   Well, my son -- I can say "Ish," is that
23 right?
24   Q   Yes.
25   A   He had a contract, and I was helping him

Page 47

1  at the time with a company in Florida developing a
2  cardiac monitoring device.
3    Q   And what was the name of that company?
4    A   Cardiac Networks.
5    Q   And when was that?
6    A   2010.
7    Q   And have you had any contacts with
8  companies in Florida since then?
9    A   Yes, Mr. -- yes.
10   Q   Who?
11   A   Anthony Fisher has another company here,
12 and I had contacted him to try to do business also
13 here.
14   Q   And what company is he with?
15   A   I can't remember the name of the company,
16 I apologize. He was a member of Cardiac Networks
17 and then had moved on.
18   Q   Do you have any documents or records of
19 any sort reflecting your contacts with him?
20   A   I believe so.
21   Q   Have you produced those?
22   A   I don't recall if I did or not.
23   Q   And when did -- when was your contact with
24 him?
25   A   Well, I mean, I had contact with him in

Page 48

1  2010 and '11 and so forth.
2    Q   And when was your last contact with him?
3    A   Four days ago.
4    Q   And what was that regarding?
5    A   Trying to possibly see if I could do some
6  work here.
7    Q   Are you able to work?
8    A   Well, that's a good question. I don't
9  know.
10   Q   When was the last time you worked?
11   A   Before my first brain surgery.
12   Q   Which was in 2013; is that the coiling
13 procedure?
14   A   Yes, I had a brain coiling, is that what
15 you're asking me?
16   Q   Mm-hmm. Is that what you're referring to?
17   A   I don't understand.
18   Q   I asked: When was the last time you
19 worked, and you said: It was before your first
20 brain procedure?
21   A   Yes, that's correct.
22   Q   Have you had any contact with anyone at
23 MacDill Air Force Base in the last -- since your --
24 when was the last contact you've had with anyone at
25 MacDill Air Force Base?

Page 49

1    A   2012.
2    Q   Who was that with?
3    A   SOCOM.
4    Q   And who at SOCOM?
5        MR. KLAYMAN: Objection, only to the
6    extent that you can identify someone publicly.
7    It wasn't some intelligence officer whose
8    identity is undercover.
9        THE WITNESS: I think you know who they
10   are, don't you? Are you trying to ask me who
11   SOCOM is?
12 BY MS. HANDMAN:
13   Q   No, I'm asking you, who you had contact
14 with at SOCOM in 2012?
15   A   His first name is Chris.
16   Q   Would that be Chris Pipes?
17   A   That sounds like the individual, yes.
18   Q   And did he come to your facility in
19 California in 2012?
20   A   Yes.
21   Q   And that's where you met him -- that's
22 where you met with him?
23   A   I don't understand what you mean: "I met
24 with him."
25   Q   Did he come to your facility in 2012?

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

1    A    Yes.
2    Q    That facility was in California?
3    A    Yes.
4    Q    And that was the last contact you've had
5  with anyone at SOCOM?
6    A    I don't know if that is or not, but it
7  might be.
8    Q    And have you had any contact -- when was
9  your last contact with someone at Eglin Air Force
10  Base?
11   A    The same time period.
12   Q    2012?
13   A    I think Mr -- can I just say "Chris"?
14   Q    Yes.
15   A    I think he worked at both MacDill and
16  Eglin.
17   Q    To get Social Security, do you have to be
18  unable to work?
19        MR. KLAYMAN:  Objection, calls for a legal
20     conclusion.
21        THE WITNESS:  What do you mean "Social
22     Security"?
23  BY MS. HANDMAN:
24   Q    Social Security Disability.
25        MR. KLAYMAN:  Objection, it's a legal

Page 51

1     conclusion.  He's not a lawyer.
2  BY MS. HANDMAN:
3    Q    Did you have to indicate to the government
4  that you were unable to work?
5        MR. KLAYMAN:  Objection.  Assumes facts
6     not in evidence, and vague and ambiguous.
7        THE WITNESS:  What do you mean, "the
8     government"?
9  BY MS. HANDMAN:
10   Q    Well, the Social Security Administration
11  that decides whether you're eligible for Social
12  Security Disability benefits.
13   A    Well, I filled out whatever, and the
14  doctors had filled out.
15   Q    And did you have to attest -- say that you
16  were unable to work?
17   A    I don't recall, but it's quite an
18  extensive group of papers, you know.
19        MS. HANDMAN:  We'd ask for that to be
20     produced.
21        MR. KLAYMAN:  What are you asking for?
22        MS. HANDMAN:  The application and
23     representations he made to the government about
24     his ability to work.
25        MR. KLAYMAN:  Back up.  You want to do a

Page 52

1     request to produce, go ahead and do it.
2        MS. HANDMAN:  We will.
3        MR. KLAYMAN:  Okay, that's fine.  I'll
4     object, if necessary.
5        THE WITNESS:  I don't know what the
6     doctors wrote.  I mean --
7  BY MS. HANDMAN:
8    Q    You know what you wrote?
9    A    Well, my wife had to write it for me.
10   Q    And have you earned any income other than
11  Social Security -- when did you start -- strike
12  that -- when did you start receiving Social
13  Security?
14   A    About six or eight months after I applied,
15  and --
16   Q    And when was that?
17   A    I believe I applied here at -- the
18  hospital applied for me when I was in the hospital.
19   Q    Was that before your stroke or after your
20  stroke?
21   A    During I guess, sir.
22   Q    You weren't on Social Security prior to
23  your stroke?
24   A    When you say "Social Security" --
25   Q    Social Security Disability benefits, I

Page 53

1  apologize.  You're correct for the --
2    A    No.
3    Q    Have you earned any income besides what
4  benefits you receive as Social Security Disability
5  benefits, have you earned any income since your
6  stroke?
7    A    I can't remember the date.  I told you my
8  stroke date.
9    Q    May of 2014?
10   A    Right, but I didn't get out of the
11  hospital in May.
12   Q    But have you received any, earned any
13  income?
14   A    I believe the answer is "yes."
15   Q    From who?
16   A    The Arizona people.
17   Q    Well, let's --
18        THE WITNESS:  Can I have some more water,
19     please?  Just tap water.  Nothing with cold in
20     it, please.  Nothing clever.
21        MR. KLAYMAN:  I'm going to object to this
22     line of questioning, particularly in light of
23     the fact -- well, I'll just withhold it right
24     now and see what you're going to ask.
25        THE WITNESS:  I'm not sure.

14 (Pages 50 - 53)

Case 1:15-cv-20782-JEM   Document 227-1   Entered on FLSD Docket 01/11/2016   Page 16 of 77

CONFIDENTIAL

Page 54

1          MR. KLAYMAN:  There is no question
2     pending.
3          THE WITNESS:  There was a last one.  I
4     can't remember.
5          MR. KLAYMAN:  It's fine, wait for the next
6     question.
7          THE WITNESS:  Okay.  Go ahead.
8  BY MS. HANDMAN:
9     Q    Do you have a Florida telephone number?
10    A    Yes.
11    Q    When did you obtain that?
12    A    I think in March of 2000 -- this year.
13    Q    '15?
14    A    This year, '15, yes.
15    Q    Is that for a cell phone or a hardline
16 phone?
17    A    Both.  I believe I had a fax phone and
18 cell phone.
19    Q    Where is that fax?
20    A    Well, it's an electronic fax.  You know
21 how you send something, you get a PDF, does that
22 make sense?
23    Q    Yes.  Have you started to receive bills?
24    A    Just a second.  Go ahead, I'm sorry.
25    Q    Have you started to receive bills for that

Page 55

1  telephone?
2     A    Yes.
3     Q    Do you have those bills?
4     A    Well, I must.  I have to pay the bill.
5     Q    Who's the carrier?
6     A    Character carrier?
7     Q    The carrier, the telephone company.
8     A    Well, one of them is AT&T, and the other
9  one is Grasshopper, this kind of virtual, you know,
10 they issue you numbers and so forth.
11    Q    What's the number for your Florida --
12    A    I don't know it.
13    Q    What's the carrier?
14    A    I thought I provided it to you.
15    Q    But I'm not asking for the telephone
16 number, but the service that is providing it?
17    A    It's a company called Grasshopper, which
18 you rent the number -- you know -- the carrier is
19 Grasshopper.
20    Q    You talk about a company you formed:  Alex
21 James.  Do you recall forming a company in
22 Florida --
23         MR. KLAYMAN:  Wait a minute.  I don't
24    recall talking about that during this
25    deposition.

Page 56

1          MS. HANDMAN:  Sorry, no, not in this
2     deposition, in his second declaration.
3          THE WITNESS:  I don't understand what
4     you're saying.
5          MR. KLAYMAN:  Just wait.  Let her ask a
6     question.
7          MS. HANDMAN:  I'll get back to that.
8     Let's mark as Defendants' 7.  It's Plaintiff's
9     Responses to Defendants' First Set of
10    Interrogatories to Plaintiff.
11         (Exhibit 7 was marked for identification.)
12 BY MS. HANDMAN:
13    Q    I will read to you -- you were asked, what
14 damages you were seeking from the defendants here,
15 and you say that you have $1.5 million in medical
16 expenses?
17         MR. KLAYMAN:  Wait, wait, wait.  Show him
18    the document.  I don't recollect that at all.
19    You're not testifying.
20         THE WITNESS:  Can you point to me where so
21    it's easier for me to find it?
22 BY MS. HANDMAN:
23    Q    Right there in answer to Number 5, and you
24 will see a list of --
25    A    Can you just read them to me, and -- sure.

Page 57

1     Q    Sure.  I'll read the one that I was
2  mentioning.  It says, "Lost $1.5 million in medical
3  expenses."  Have you incurred 1.5 --
4          MR. KLAYMAN:  Can I see that?  Am I
5     entitled to see that?
6          MS. HANDMAN:  Yes, absolutely.
7          MR. KLAYMAN:  Thank you.
8          THE WITNESS:  Can you just point to me
9     which line it is, that's all I'm asking you to
10    do.
11 BY MS. HANDMAN:
12    Q    Right there.  It just says, "$1.5 million
13 in medical expenses."  Have you incurred $1.5
14 million in medical expenses to date?
15    A    I believe my -- Overlake was my first
16 surgery, was 200-something-thousand plus.  I think
17 it was $300,000.
18    Q    And did you pay that out-of-pocket?
19    A    I was turned over -- no, I couldn't pay
20 it.  I was turned over to collection agencies.
21    Q    Do you have insurance, did you have
22 insurance at that time?
23    A    For a portion of the time, and then I
24 didn't.
25    Q    And are your medical expenses now covered

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

1 by Medicare?
2    A   No.
3    Q   Who's paying your medical expenses now?
4    A   Well, at some point during 2015, this
5 year, right?
6    Q   Mm-hmm.
7    A   I was able to, I don't remember which date
8 it was, apply for Obamacare, and they covered some
9 portion of them.
10    Q   And what portion did they cover?
11    A   I don't remember. I didn't have Obamacare
12 at the time of my stroke in 2014.
13    Q   And you mentioned 200,000, I think, for
14 your care from Overlake?
15    A   Well, the surgery.
16    Q   For the surgery?
17    A   Yeah.
18    Q   Is that where the coiling failed, the
19 failed --
20    A   Well, the first brain coiling.
21    Q   Mm-hmm. Was that --
22    A   Yes, that was the first brain coiling.
23    Q   And did the coil break off?
24    A   I don't remember.
25       MR. KLAYMAN: Objection. Lacks

Page 59

1    foundation. Don't guess.
2       THE WITNESS: I don't know the exact
3    details of it. I imagine it must have been on
4    my medical records.
5 BY MS. HANDMAN:
6    Q   Did you bring any lawsuits against any of
7 the medical facilities that treated you?
8    A   No.
9    Q   You mentioned the 200,000. What other
10 expenses make up the $1.5 million?
11    A   How much would that be left? I can't --
12 one point something.
13    Q   And where do you get that number, 1.5?
14       MR. KLAYMAN: Look at your document there,
15    Mr. Montgomery.
16       THE WITNESS: Well, it would be 1.5 less
17    the Overlake expenses and all of that. And
18    then all of my Swedish bills, and my bills that
19    are associated with the strokes and everything.
20 BY MS. HANDMAN:
21    Q   And this line underneath that says, "Lost
22 $10 million in future medical costs."
23       Do you know how you estimated that?
24    A   What the doctors feel it's going to take
25 to take care of me for the rest of my life.

Page 60

1    Q   And how much of that will Obamacare cover?
2       MR. KLAYMAN: Objection. No one knows,
3    including the president what Obamacare covers.
4 BY MS. HANDMAN:
5    Q   How much currently are they covering of
6 your medical expenses?
7    A   Well, they just cover a portion, you know.
8    Q   So what are you paying, how much -- what
9 did you pay last month for your medical expenses?
10    A   I assume around 1,200.
11    Q   Do you have a bill, anything to show?
12    A   I don't have anything with me.
13    Q   You have, though, documents in Seattle?
14    A   Well, I kind of only go to the same group
15 of people that I gave you on the list so all of
16 those people.
17    Q   Will have those records?
18    A   Yes.
19    Q   When was your aneurysm first diagnosed?
20    A   You don't mean operated, you mean
21 discovered?
22    Q   Diagnosed, yes.
23    A   2011.
24    Q   Where were you at the time?
25    A   Well, I was in the emergency room.

Page 61

1    Q   In what state?
2    A   California.
3    Q   And what hospital was that?
4    A   You mean, where I was treated at, right?
5    Q   Yes, where it was diagnosed and treated.
6    A   I believe it was Eisenhower Medical
7 Center.
8    Q   In California?
9    A   In Palm Springs.
10       MS. HANDMAN: Let's mark as Defendants'
11    Exhibit 8 some of the medical records that you
12    have produced in this action.
13       THE WITNESS: Well, they were just
14    obtained from the hospital.
15       (Exhibit 8 was marked for identification.)
16 BY MS. HANDMAN:
17    Q   Including Overlake medical records as DLM,
18 Bates stamped DLM 24187. Well, there's number of
19 Bates stamps here, and there's also a record from
20 the Swedish medical facility that you were
21 mentioning.
22       MR. KLAYMAN: Allow him to review that
23    first so he can confirm what you just said.
24 BY MS. HANDMAN:
25    Q   If I might direct you, you see Overlake

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

1 Medical Center, is that --
2     A   Yeah, I see where you're pointing, sure.
3     Q   And that's a facility that you have been
4 treated at?
5     A   Well, that says "emergency," and -- yeah,
6 I guess -- I think I did go to the emergency before
7 I had the coiling, the brain coiling.
8     Q   And it says in this report, "Patient
9 reports in 2010, he was evaluated for possible
10 stroke.  That is when he was first diagnosed with
11 aneurysm, and it was found on MRI and CT imaging."
12         Does that refresh your recollection that
13 you were first diagnosed in 2010?
14         MR. KLAYMAN:  Please show it to him and
15     see if it refreshes his recollection.
16         THE WITNESS:  Just point to the line,
17     and I'll try to --
18         MR. KLAYMAN:  Yeah, take your time,
19     Mr. Montgomery.
20 BY MS. HANDMAN:
21     Q   It's right there (indicating).
22     A   Okay.  I see it, okay.
23     Q   Does that refresh your recollection that
24 you were first diagnosed with an aneurysm in 2010?
25     A   Well, that is signed by Dr. Mannem.

Page 63

1     Q   Isn't that the name on there?
2     A   Yes.  She's my GP.  So I'm not sure that
3 date would necessarily be accurate because that --
4 well, I don't know if she went and looked it up or I
5 had said, so I don't know.
6     Q   It's important to be truthful with your
7 doctors about your medical history, is that not
8 true?
9     A   Yeah, I would have told her whatever I
10 knew at the time.
11     Q   And just for the record, I'm looking at
12 DLM, Bates stamped DLM 24187.  And let's turn to the
13 record of Dr. Lim at the Swedish Medical facility.
14 He's your treating physician; is that correct?
15     A   He was one of them.
16     Q   And point out to you on Bates stamp DLM
17 26375.
18         MR. KLAYMAN:  Please show it to him.
19         MS. HANDMAN:  I will.
20 BY MS. HANDMAN:
21     Q   And I'll read it to you first.  "History
22 of present illness.  This is a pleasant 60-year old
23 man, right hand dominant gentleman who was first
24 diagnosed with a right ophthalmic artery aneurysm
25 back in 2010 while living in California."  And I'll

Page 64

1 show you right under this first sentence.
2     A   My concern is that he got this from me,
3 and by the time I saw him, I was massively
4 medicated.  I'm not saying that's not right, and it
5 might be that date, but I'm not certain for sure.
6 It's that time frame.
7     Q   And you have not produced any records from
8 that time frame; is that correct?
9     A   I thought I produced the Eisenhower ER
10 visit that detected that aneurysm.
11     Q   We'll check.  We'll leave it open.  Do you
12 remember what date, day or month it was?  It must
13 have been a pretty important moment when that
14 happened.
15         MR. KLAYMAN:  Objection.  Compound
16     question.  Let him answer.
17 BY MS. HANDMAN:
18     Q   When in 2010 were you diagnosed with an
19 aneurysm?
20     A   I don't know the exact day.  I didn't go
21 in because I had an aneurysm.  I went in because I
22 had a severe headache.
23     Q   Had you had headaches before?
24     A   Yeah, but that one was the most intense I
25 think I had ever had.

Page 65

1     Q   Had you gone to see a doctor about the
2 headaches before?
3     A   I don't recall if I did or not, but it
4 would have been a doctor down in -- obviously, at
5 that area at the time I was living.
6     Q   Do you recall who were the doctors you saw
7 when you were living in California?
8     A   No, I don't.
9     Q   You have their records?
10     A   No, I had a GP.
11     Q   And who was that?
12     A   His first name was Daniel.  I don't
13 remember the rest of his name.
14     Q   Did you have headaches when you were
15 living in Nevada?
16     A   I don't think so.
17     Q   Have you had any more strokes since May of
18 2014?
19     A   I don't believe so.
20     Q   And has any doctor told you that you are
21 at any risk of death?
22     A   Well, as far as I know, I still have the
23 brain aneurysm.  The repair was unsuccessful.
24     Q   And has any doctor said to you:  You could
25 die at any moment?

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

```
1    A   Yes.
2    Q   Who?
3    A   The neurosurgeons, both Dr. Chowdhry and
4 Dr. Eskridge.
5    Q   And they put that in writing?
6    A   Well, they told me the reason I -- the
7 first doctor, I told you his name.  Dr. Chowdhry
8 told me, "That the brain aneurysm is not
9 successfully repaired, that if it ruptures, I will
10 have minutes to get to a hospital, and I will likely
11 die."
12   Q   And you've had this aneurysm since 2010,
13 and it hadn't progressed beyond that?
14   A   Yes, it's grown.
15   Q   Are you getting treated -- are you
16 planning any surgery for the aneurysm?
17   A   They're evaluating whether they're going
18 to do surgery again.  There's nothing to say that I
19 don't have the aneurysm still.  I see a neurosurgeon
20 who deals with that.
21       Am I supposed to hear?  I don't know what
22 he's saying.
23   Q   No, he's advising me of something.  Did
24 they put in writing that you could die at any time?
25   A   Well, I don't know if they put it in
```

Page 67

```
1 writing, but they made it clear that I'm in a very
2 fragile situation.  They have a finger in the dyke
3 of the damn that could leak, and they're just
4 holding it back.
5    Q   And you didn't tell them you were
6 traveling here for this deposition?  Have you told
7 them you commenced --
8        MR. KLAYMAN:  Wait, wait, wait.
9        MS. HANDMAN:  I think he said.
10       MR. KLAYMAN:  Please don't testify for
11    him, and I think that's a compound question,
12    anyway.
13 BY MS. HANDMAN:
14   Q   Do you recall going to DC four weeks after
15 your stroke with the officers from the Maricopa
16 County Sheriff's Office?
17   A   I went with my attorney, yes.  I mean, I
18 went.
19   Q   That was four weeks after your stroke?
20   A   No, it would have been eight weeks.
21   Q   Eight weeks.  Did the doctors advise
22 whether that was proper or not?
23   A   They didn't want me traveling then.
24   Q   Could that have aggravated your condition?
25   A   No.
```

Page 68

```
1        MR. KLAYMAN:  Objection.  Calls for
2    speculation.  Move to strike.
3        THE WITNESS:  What time is it?
4        MR. KLAYMAN:  We'll take a break again.
5    Finish this line of questioning, and we'll
6    break in about ten minutes, ten or 15 minutes
7    to break.
8 BY MS. HANDMAN:
9    Q   Do you drink?
10       MR. KLAYMAN:  Objection.  Vague and
11    ambiguous.
12       THE WITNESS:  You mean water?
13 BY MS. HANDMAN:
14   Q   Alcohol, alcohol, sorry.
15   A   I have occasionally.
16   Q   When was the last time that you drank
17 alcohol?
18   A   A couple of weeks ago.
19   Q   Do the doctors advise against drinking
20 alcohol?
21   A   No.
22   Q   They say that's okay?
23   A   Well, they -- you're asking me if I have
24 ever had a sip of alcohol, and I've had some small
25 amount of alcohol.  I believe it was a Margarita.  I
```

Page 69

```
1 drank maybe a third of it.
2    Q   Did you drink when you were in DC with the
3 officers?
4    A   Yes.
5    Q   Did you become intoxicated?
6    A   I don't know if I did or not, but --
7    Q   Do you recall one officer telling the
8 waitress or waiter not to put alcohol in your
9 cocktails?
10   A   No.
11   Q   How often would you say you drink alcohol?
12   A   I would say in the last ten years, eight
13 to ten times.  I don't care for alcohol.  I don't
14 drink it very -- I mean, I think before the date
15 that I think you're referring to that visit, I
16 hadn't drank in two to three years.  I don't drink
17 very often, to the best of my recall.
18   Q   You mentioned that earlier you, the income
19 that you've received since your stroke has been from
20 the Maricopa County Sheriff's Office; is that
21 correct?
22   A   I got some disability.
23   Q   But besides the disability, I asked for
24 what work income that you received.
25   A   I believe that's correct.
```

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

1    Q   And how much have you received from the
2  Maricopa County Sheriff's Office?
3    A   I don't recall exactly.
4    Q   Well, is it more than 15,000?
5    A   You mean ever?
6    Q   Yes.
7    A   Yes.
8    Q   Is it more than 50,000?
9        MR. KLAYMAN:  Objection.  I'm going to get
10  into this line of -- object to this line of
11  testimony, particularly since you've had
12  contact with Mr. Gomez and others out there.
13  It's clear that you're doing his bidding for
14  him, and that's improper to use a civil
15  proceeding for any other purpose on behalf of
16  Mr. Gomez.  This is objectionable so I'm going
17  to limit the questioning here.
18       MS. HANDMAN:  This relates to his income,
19  and he claims that he's not been able to work
20  because of -- I think I'm allowed to ask him
21  what he's received from the Maricopa County
22  Sheriff's Office.
23       MR. KLAYMAN:  I'm making an objection.
24  You can respond.
25       THE WITNESS:  I think I answered it.

Page 71

1        MR. KLAYMAN:  I think it shows an improper
2  communication.  I'm very glad that you revealed
3  that at the outset, it's not exactly the most
4  intelligent thing to do, but --
5        MS. HANDMAN:  You said it in our papers to
6  Magistrate Goodman so it shouldn't have come as
7  a surprise to you, Mr. Klayman.
8        MR. KLAYMAN:  I didn't say it was coming
9  as a surprise.  I'm just objecting to --
10       THE WITNESS:  Are you saying "Mr. Gomez"?
11  BY MS. HANDMAN:
12   Q   No, I'm saying from the sheriff's office
13  in Maricopa County.
14   A   Yes.
15   Q   Did you receive $1.2 million?
16   A   No.
17   Q   Did you receive any money from a
18  charitable organization?
19   A   I don't know what you're referring to.  I
20  don't know.
21   Q   Did you receive $10,000 from a charitable
22  organization in connection with your work for the
23  Maricopa County Sheriff's Office?
24   A   I don't know if it came from a charitable
25  or not.

Page 72

1    Q   What work did you do for the Maricopa
2  County Sheriff's Office?
3        MR. KLAYMAN:  Objection.  That's
4  irrelevant, and instruct him not to answer.  He
5  can testify as to his income.  I instruct you
6  not to answer.  It's being obtained for an
7  improper purpose.
8        MS. HANDMAN:  Let's mark as Exhibit 9,
9  Declaration of Cecelia Wang.
10       MR. KLAYMAN:  We're going to take a break
11  right now.
12       THE WITNESS:  My muscle spasms, I have to
13  stand up every so often or it will just start
14  hurting me badly.
15       MS. HANDMAN:  No problem.
16       THE WITNESS:  I'll try to hurry and
17  accommodate you.
18       MS. HANDMAN:  I appreciate that.
19       THE VIDEOGRAPHER:  We're off the record.
20  The time is 10:58 a.m.
21       MR. KLAYMAN:  We're going to take a
22  15-minute break.
23       (A recess was taken after
24  which the following proceedings were had:)
25       THE VIDEOGRAPHER:  Back on the record.

Page 73

1  The time is 11:14 a.m.
2        MR. KLAYMAN:  Let's just be clear on the
3  record so we don't waste time and you can move
4  it along, in that I instruct him not to answer
5  with regard to the subject matter of his work
6  on behalf of the Maricopa County Sheriff's
7  Office and related entities.
8  BY MS. HANDMAN:
9    Q   You had talked about the risk of an
10  aneurysm rupturing.  Did the doctors tell you how
11  likely that was?
12   A   You mean ever?  I mean, they've told me at
13  different times so at stages.
14   Q   Well, currently, how likely is it that
15  your aneurysm would rupture or you would get another
16  aneurysm?
17   A   Another aneurysm or another stroke?
18   Q   Well, let's start with another aneurysm.
19   A   I don't know if they've told me the risk
20  of another aneurysm.
21   Q   Have they told you the risk of an aneurysm
22  that you've had rupturing?
23   A   Yes, but at various times, such as
24  Dr. Chowdhry telling it to me, and then
25  Dr. Eskridge.  It's very -- just depending on the

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

1 size of the aneurysm.
2     Q    And how about right now when you've last
3 seen those doctors?
4     A    They don't know.  They don't know since
5 they were doing the second coiling on me, and it was
6 interrupted because of the strokes and everything.
7 They have no idea if what they did to prevent the
8 aneurysm breaking or not was successful.
9     Q    But it hasn't broken since the -- since
10 you had the stroke; is that correct?
11    A    You mean since I was in the hospital?
12    Q    Right, May of 2014.
13    A    I thought it was 2015 -- no, 2014, that's
14 right.
15    Q    2014, right.  And did you ask their advice
16 as to whether you should bring this lawsuit in terms
17 of the stress that bringing a lawsuit would entail?
18    A    No.
19    Q    And did you ask -- did they tell you
20 whether travel could affect your condition?
21    A    Their concern is more not my condition,
22 but my walking and those, you know, dressing, you
23 know, the basic non-aneurysm related stuff.
24    Q    But they did advise not to travel to
25 Nevada.  So would traveling increase the risks or

Page 75

1 not?
2     A    Well, I don't know that -- you read to me
3 something -- I have to have somebody travel with me.
4 I can't do it alone.
5        So part of traveling also requires having
6 somebody to travel with me, and I did not have
7 anybody during -- what was the period?  When was the
8 hearing down in Nevada, I'm sorry?
9     Q    Last week.
10    A    I didn't have anybody available to help
11 me -- even if I could have went, I couldn't go.  I
12 didn't have anybody available.
13    Q    Does your wife live with you in Miami?
14    A    No.
15    Q    Where is she living?
16    A    In Washington.
17    Q    Does she live with you in Washington?
18    A    When I'm there, yes.
19    Q    And your son-in-law is here with you now?
20    A    Yes.
21    Q    Does he work?
22        MR. KLAYMAN:  Objection, relevancy.
23 BY MS. HANDMAN:
24    Q    Well, you said you had no one to come with
25 you last week to Nevada?

Page 76

1     A    My daughter has seizures, and when she has
2 a seizure, bad seizure, she can't go anywhere.
3     Q    Did she have a seizure last week?
4     A    No, but she had one last night.
5     Q    What condition does she suffer?
6        MR. KLAYMAN:  Objection, relevancy.
7        THE WITNESS:  I just know she's had
8     seizures for the last -- seizures.
9 BY MS. HANDMAN:
10    Q    Are you claiming that the book Pay Any
11 Price published by the defendant and written by
12 Mr. Risen has caused any of your medical problems?
13    A    Yes.
14    Q    And what is the basis for that?
15    A    Undue stress put on me.
16    Q    And is that -- are you saying that the
17 book which -- are you aware the book came out in
18 2014, and your stroke was in May of 2014?  Are you
19 saying that the book caused your stroke?
20        MR. KLAYMAN:  Objection.  That's three
21    questions, and it assumes facts not in
22    evidence.
23 BY MS. HANDMAN:
24    Q    You plead that the book was published, I
25 believe, in October of 2014, and your stroke was in

Page 77

1 May of 2014.  Are you claiming that the book
2 caused --
3     A    Is that right?  Okay.
4        MR. KLAYMAN:  You want to show him?  I'm
5    not accepting what you say is right, Ms.
6    Handman.  You have a tendency not to tell the
7    truth.  More than a tendency.
8        THE WITNESS:  Ask it again, maybe, in
9    smaller pieces.
10 BY MS. HANDMAN:
11    Q    All right.  Was the book published after
12 your stroke?
13    A    I don't know.  You would have to tell me.
14 I don't recall when it was published.  I don't know
15 the exact date.
16        MR. KLAYMAN:  You want to show him the
17    book?  That's your book.
18        THE WITNESS:  Why don't you just tell me
19    when it was physically available and published.
20 BY MS. HANDMAN:
21    Q    In October of 2014.
22        MR. KLAYMAN:  I assume that to be the
23    case, and then he can answer.  It doesn't mean
24    that, that is when it was published.
25

20 (Pages 74 - 77)

CONFIDENTIAL

Page 78

1 BY MS. HANDMAN:
2     Q    Assuming that to be the case, that was
3 after your stroke; is that correct?
4     A    Yes, yes, yes.
5     Q    Your stroke occurred in the course of
6 surgery; is that correct?
7     A    Well, I don't know the technical details
8 of that.
9     Q    For repair of your aneurysm, your stroke
10 occurred during that process?  Go ahead, finish your
11 answer.
12     A    I'm sorry, ask it again for me.
13         MS. HANDMAN:  For the record, if you turn
14     to Exhibit 4, the Amended Complaint, paragraph
15     30, this is your Amended Complaint, and it
16     says, "On October 13, 2014, the Publishing
17     House of defendant, Houghton Mifflin Publishing
18     Company, at 215 Park Avenue" -- blah, blah,
19     blah -- "published a book titled:  Pay Any
20     Price, Greed, Power, and Endless War."
21     A    Okay, I believe you.
22     Q    Okay, good.  And your stroke was in May;
23 is that correct, of 2014?
24     A    I had, had -- some of them occurred then.
25     Q    Did you have any occur -- and your

Page 79

1 aneurysm we established was first diagnosed in 2010;
2 is that correct?
3     A    I still think it's '11, but I believe what
4 is written.
5     Q    By your doctors?
6     A    Right, but I thought I produced the
7 Eisenhower Medical report, and it would be whatever
8 date that was.
9     Q    I'm not sure that was the first diagnosis
10 but --
11     A    It was.
12         MR. KLAYMAN:  Wait, wait, wait.  You know
13     what, I've been very courteous to you.  And if
14     I had been you and the way you behaved at the
15     Risen deposition, I would be injecting
16     testimony like you did the speaking objections.
17     So please at least since you're now taking a
18     deposition, don't come up with your own
19     testimony.  Let my client testify, and let's do
20     this honestly and truthfully.
21         MS. HANDMAN:  While we're talking about
22     speaking objections, you have been doing it
23     quite a bit on this record, and I'm not going
24     to bother to clutter it with that, but --
25

Page 80

1 BY MS. HANDMAN:
2     Q    Mr. Montgomery, do you have any other
3 stress in your life besides this lawsuit?
4     A    The stroke.
5     Q    The stroke.  Did you blame anyone else for
6 your medical condition?
7     A    There was a Bank of America lawsuit.
8     Q    And you claimed that the bank was
9 responsible for your medical condition?
10     A    Mr. Flynn claimed that.
11     Q    He was representing you at that time?
12     A    No, he was representing himself.  I don't
13 know -- can you ask me that question again?
14     Q    Sure.  Did you claim that the variety of
15 banks, Bank of America, Countrywide, NV Mortgage,
16 Inc., do you recall saying in connection with that
17 in your lawsuit, and it was you and Mr. Flynn and
18 your wife who were the plaintiffs in a lawsuit
19 against these banks in the Western District of
20 Washington, and you contended, "In connection with
21 plaintiff's intentional infliction outrageous
22 conduct claim, there have been significant
23 developments involving, quote, 'physical
24 manifestation,' closed quote, of Mr. Montgomery's
25 emotional distress, which distinguishes this case

Page 81

1 from the consolidated cases?"
2     A    What day --
3         MR. KLAYMAN:  Objection.  That is not even
4     a question.  That is one of the longest
5     soliloquies I have ever heard in a deposition.
6         THE WITNESS:  I don't remember the date of
7     that.  Can you give me the date of it?
8 BY MS. HANDMAN:
9     Q    Sure.  This date was June 26, 2014.
10     A    I believe I was still in the hospital.
11     Q    Are you claiming that you never made a
12 claim, and didn't intend to make a claim, that the
13 bank had caused -- worsened during the period of
14 your loan modification?
15     A    Is my signature and name at the bottom of
16 it?
17     Q    Your lawyer's is.
18     A    Who was the lawyer?
19         MR. KLAYMAN:  Wait.  Can you show it to
20     him, please?  I cannot accept your testimony,
21     Ms. Handman.  That's what I'm asking you not to
22     do.
23         Ask a proper question, and show him the
24     document, and you will get an answer.
25         MS. HANDMAN:  Well, I don't know if -- you

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

1  know what, let me ask you.
2      MR. KLAYMAN:  Your last question wasn't
3  even a question, and it went on for about three
4  minutes.
5  BY MS. HANDMAN:
6      Q    Are you claiming that the banks were --
7  had aggravated your condition, your
8  medical condition?
9      A    I don't remember, I don't recall that.
10  I'm not saying it didn't, but I just don't recall --
11  Mr. Flynn was driving that particular lawsuit.
12      Q    Was your lawyer, Paul E. Brain?
13      A    Yes, at one time, but I thought there
14  was -- I don't know how that originally worked.  I
15  don't know if Michael Flynn was the attorney of
16  record, I don't know.
17      MS. HANDMAN:  Well, let's mark as Exhibit
18  9, a document that was filed in the case that I
19  mentioned filed on June 26, 2014, and it is
20  signed by Paul E. Brain, counsel for
21  plaintiffs, Dennis Lee Montgomery and Brenda
22  Kathleen Montgomery, and Michael Flynn.
23      (Exhibit 9 was marked for identification.)
24  BY MS. HANDMAN:
25      Q    And I refer you to pages 3 and 4, the

Page 83

1  bottom of three over to four to refresh your
2  recollection as to whether you claim that the
3  banks -- the banks had worsened your condition.
4      A    It's too tough to read this.  Would you
5  mind reading it to me?
6      Q    I would be happy to do that.  I was in the
7  process when Mr. Klayman --
8      MR. KLAYMAN:  Let me make sure it's read
9  accurately.
10      MS. HANDMAN:  -- when Mr. Klayman
11  interrupted me.  "In connection with
12  plaintiff's intentional infliction, outrageous
13  conduct claim, there have been significant
14  developments involving, quote, 'physical
15  manifestation of Mr. Montgomery's emotional
16  distress, which distinguishes this case from
17  the consolidated cases.'  Mr. Montgomery's
18  brain aneurysm as pled in paragraph 1.3 of the
19  Second Amended Complaint was first diagnosed in
20  2011, and after and/or contemporaneous with the
21  Defendants' alleged fraudulent conduct, i.e.,
22  quote, 'dual tracking,' end quote, 'robo
23  signing' as recited in paragraph 5.13 of the
24  Second Amended Complaint while seeking
25  foreclosure in bankruptcy."

Page 84

1      THE WITNESS:  You need to slow down.
2  BY MS. HANDMAN:
3      Q    Okay.  "His aneurysm worsened throughout
4  the period that Mr. Montgomery's loan modification
5  application under the Home Affordable Modification
6  Program was being delayed and/or ignored by the
7  defendants while they sought foreclosure in his
8  bankruptcy dual tracking."
9      Does that refresh your recollection as to
10  whether -- then it goes on to say, "Moreover, Mrs.
11  Montgomery has suffered from serious depression
12  throughout this period, also exhibiting physical
13  manifestations of distress caused by the defendants'
14  misconduct."
15      Does that refresh your recollection as to
16  whether you were blaming some of your medical
17  condition on the banks?
18      A    No, but that's why I do remember something
19  like this, and that's why I remember the 2011 you
20  just read me.
21      Q    Mm-hmm.
22      A    That's kind of the date I remembered of
23  the aneurysm.
24      Q    Well, when we get the records, we'll check
25  whether it's 2011 or whether Dr. Lim, and the other

Page 85

1  admitting doctor at the emergency room got it wrong.
2      MR. KLAYMAN:  Objection to that colloquy.
3  Move to strike.
4  BY MS. HANDMAN:
5      Q    Let's turn to the Amended Complaint that
6  you have in front of you.
7      A    This is what I have.  Can somebody show me
8  what they want me --
9      Q    Sure, I will do that.
10      MR. KLAYMAN:  Can you give him an extra
11  copy, please?  Thank you.
12  BY MS. HANDMAN:
13      Q    Do you recall reviewing the Amended
14  Complaint before it was filed, Mr. Montgomery?
15      A    I must have, I guess.  I don't recall it,
16  but --
17      Q    It was filed on April 28th of this year.
18      A    Okay.
19      Q    Where were you on April 28th or at that
20  time?
21      MR. KLAYMAN:  Asked and answered.
22  BY MS. HANDMAN:
23      Q    You were in the state of Washington at
24  that time?
25      MR. KLAYMAN:  And relevancy.

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

1        THE WITNESS:  Am I supposed to answer it?
2 BY MS. HANDMAN:
3    Q   Yes.  Were you in the state of Washington,
4 correct?
5    A   Yes.
6    Q   And if you go to paragraph 13, it says
7 that you resided at, and doesn't give the address,
8 in Miami, Florida.
9        By April 28th, had you secured another
10 residence, the residence with Mr. Mendez?
11       MR. KLAYMAN:  Asked and answered.  You
12    know, if you're just trying to play games with
13    my client who is debilitated, I asked you not
14    to do that.  You should know better, Ms.
15    Handman.
16       You already mocked his illness at the
17    first status conference.  He went over that
18    testimony with you.
19 BY MS. HANDMAN:
20    Q   Mr. Montgomery, can you please answer the
21 question?
22    A   Can you tell me what the question was?
23    Q   Were you residing in Florida as alleged in
24 paragraph 13 of your Amended Complaint at the time
25 of its filing on April 28th?

Page 87

1        MR. KLAYMAN:  Objection, asked and
2    answered.
3 BY MS. HANDMAN:
4    Q   You can answer.
5    A   Yes, I had already gotten residence here
6 in -- yes.
7    Q   Were you living with Mr. Mendez at that
8 point?
9    A   I had made arrangements to stay there,
10 yes, as my residence.
11    Q   And you have no records reflecting that,
12 however?
13    A   I don't recall.
14    Q   You didn't have a written agreement of any
15 sort?
16       MR. KLAYMAN:  Asked and answered.  Are you
17    just trying to badger the guy?  Do you want to
18    give him another stroke, is that what you're
19    trying to do?
20       MS. HANDMAN:  I'm going to move on.
21 BY MS. HANDMAN:
22    Q   Your Amended Complaint alleges 43 portions
23 of the book, Pay Any Price that you claim are false
24 and defamatory.
25       Are those all the portions of the book

Page 88

1 that you are contending are false and defamatory?
2        MR. KLAYMAN:  That's your testimony.
3    You're going to have to show him that.
4 BY MS. HANDMAN:
5    Q   I'm asking him:  You read the Amended
6 Complaint.  Are there any other portions of the
7 book, besides what's listed in the amended -- 43
8 sections that are listed in the Amended Complaint,
9 are there any other sections -- and we'll go over
10 them -- are there any other sections of the book
11 that you contend are false and defamatory?
12    A   You're aware of my injury, and the
13 significant part of my injury is memory -- short
14 term memory recall.  So you're asking me about
15 something that falls within that period of time
16 where I'm injured.  I don't recall.
17    Q   Well, this was almost a year after your
18 stroke.
19       MR. KLAYMAN:  Wait a second, wait a
20    second.  Please don't put testimony in for him,
21    please.  This is not TV, legal show.  This is
22    actually a court of law.  So I would ask that
23    you show him what you want to talk to him
24    about, given the fact that he does have a
25    debilitating aneurysm and related illnesses.

Page 89

1    Just walk him through it.
2 BY MS. HANDMAN:
3    Q   I will ask you one question first, which
4 is:  Was it your intention that the Amended
5 Complaint include everything that you were claiming
6 was false and defamatory about the book?
7    A   I don't recall if that was the case or
8 not.
9       MR. KLAYMAN:  I don't want to give a
10    speaking objection.  Please let him look at the
11    complaint because the complaint speaks for
12    itself.
13       THE WITNESS:  It's very lengthy.
14       MS. HANDMAN:  It is very lengthy.  That's
15    exactly right.
16       MR. KLAYMAN:  I'm not testifying for him.
17    So it's clear, we're talking about more than
18    just the book.  There were interviews by
19    Mr. Risen on TV and radio so walk him through
20    it.
21 BY MS. HANDMAN:
22    Q   The complaint is a complete statement of
23 all the things that you are claiming the defendants
24 published in one form or another is false and
25 defamatory?

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

1     A   I don't know that without reviewing this
2   entire document, which would take me a significant
3   amount of time, if I could do it at all.
4     Q   Okay. Let's go to paragraph 45 in the
5   Amended Complaint.
6     A   Would you mind turning it to me and
7   whatever?
8         MR. KLAYMAN: Sure. Paragraph 45.
9         THE WITNESS: Okay. I see the Number 45.
10  BY MS. HANDMAN:
11    Q   Right. It says, "That defendants'
12  defamation that plaintiff, Montgomery, convinced the
13  government of false terror threats is false and
14  misleading, including but not limited to, the fact
15  that plaintiff, Montgomery, never offered any
16  interpretation of the hidden data he uncovered, even
17  when pressured to give his conjecture about what the
18  hidden data was meant or referred to. Plaintiff,
19  Montgomery, left it up to intelligence experts of
20  the government to analyze and determine what the
21  hidden data and clues that he found actually meant?"
22    A   Includes or --
23    Q   "And clues -- clues that he found actually
24  meant."
25        So you are not contending that it's false

Page 91

1   that you gave information to the government about
2   hidden data and clues; is that correct?
3     A   Well, when you say "gave," I don't
4   understand what that meant.
5     Q   Did you have a software technology that
6   you were offering to the government that purported
7   to analyze information that you said was appearing
8   on Al Jazeera Broadcast?
9     A   You mean, gave to them to run a news?
10    Q   Yes.
11    A   So what is your question?
12    Q   Did you do an output of the data using
13  your software technology and give that to the
14  government there?
15    A   There was technology that was built and
16  used and it generated output.
17    Q   And the output was hidden data and clues?
18    A   It was data.
19    Q   And what was the data?
20        MR. KLAYMAN: To the extent you can answer
21  without identifying classified or sensitive
22  information.
23        THE WITNESS: Numbers and letters.
24  BY MS. HANDMAN:
25    Q   And how were you finding those numbers and

Page 92

1   letters?
2     A   Well, initially there were a few --
3         MR. KLAYMAN: Only to the extent it's not
4   classified. It's a continuing objection. Not
5   classified and not sensitive, such that it
6   doesn't impede upon --
7         THE WITNESS: When you say, "How" --
8         MR. KLAYMAN: Wait, wait, wait, slow down.
9   That it doesn't impede upon any confidential or
10  classified information of the government, you
11  can answer.
12        THE WITNESS: So can you ask your question
13  maybe again or simpler, whatever?
14  BY MS. HANDMAN:
15    Q   I'm going to quote from the book.
16        MR. KLAYMAN: Tell us where in the book
17  you're reading.
18        MS. HANDMAN: Yes, page 40 of the book.
19        MR. KLAYMAN: Do you have another copy of
20  that?
21        MS. HANDMAN: It's part of the Amended
22  Complaint.
23        THE WITNESS: So what number?
24        MS. HANDMAN: It's an exhibit in the
25  Amended Complaint.

Page 93

1         MS. JAMES: What page of the book?
2         MS. HANDMAN: Exhibit A of the Amended
3   Complaint, page 40.
4         THE WITNESS: I thought she was talking
5   about paragraph 45.
6         MS. HANDMAN: I was, but I'm relating it
7   to something in the book.
8   BY MS. HANDMAN:
9     Q   In that book, in the book it says on page
10  40 in the second paragraph, second sentence, it
11  says: "He was able to convince" --
12    A   Wait. I don't see the second sentence.
13  The second paragraph, right?
14    Q   Right, it says, "That he was able to
15  convince" --
16    A   Wait, just let me find that first.
17    Q   Sure.
18    A   I don't see it. Can you just point to it
19  here where -- because this is the second paragraph
20  and I don't see it?
21        MS. JAMES: It's here (indicating).
22        THE WITNESS: Just point. That's the
23  third paragraph, isn't it?
24        MS. HANDMAN: The second full paragraph.
25  "He was able," okay.

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

BY MS. HANDMAN:

2   Q  "He was able to convince the CIA that he

3 had developed a new technology that enabled him to

4 decipher Al Qaeda codes embedded in the network

5 banner displayed on the broadcast of Al Jazeera, the

6 guitar-based news network," is that statement true?

7   A  No.

8   Q  Why not?

9   A  I didn't convince them of anything.

10   Q  Did you talk with Mr. Risen in connection

11 with the book?

12   A  I believe in 2012.

13   Q  And do you recall Mr. Risen including --

14 let me turn to page 41 of the book.

15   A  Do I just turn to the next page?

16   Q  Yes. It says --

17   A  On the backside of it?

18   Q  Page 41.

19   A  Well, that's the backside. That makes it

20 very difficult for me to see.

21   Q  To save trees.

22   A  Okay.

23     MR. KLAYMAN: Go ahead. Do you know where

24 we're reading or where she's reading?

25     THE WITNESS: On 41. Go ahead.

Page 95

BY MS. HANDMAN:

2   Q  So just to go back to page 40, you did

3 not -- you said you didn't convince the CIA, but you

4 did give them a new technology that you said

5 "enabled them" -- enabled you to decipher Al Qaeda

6 codes embedded in the network banner displayed on

7 the broadcast of Al Jazeera; is that correct?

8   A  There was technology that was developed

9 that found data that they would have not normally

10 have seen, I guess.

11   Q  And you recall you said, talking to

12 Mr. Risen in connection with the book?

13   A  Yes.

14   Q  You were already aware of an article that

15 he had co-authored in the New York Times with

16 respect to you and this subject; is that correct?

17   A  I don't remember the dates, but, yes.

18   Q  That was February of 2011?

19   A  Okay.

20     MR. KLAYMAN: Wait, wait, wait. The fact

21 that she said it, doesn't mean it's okay.

22     THE WITNESS: Well, I don't know. I don't

23 know when it was written.

24     MR. KLAYMAN: Please, lay a foundation.

25

Page 96

BY MS. HANDMAN:

2   Q  And you will see, Mr. Risen on page 41

3 says --

4     MR. KLAYMAN: Give him some time to find

5 it.

6 BY MS. HANDMAN:

7   Q  First full paragraph.

8   A  Well, it's bent over. I can't even see

9 the other words. It's not a fun disability to have,

10 trust me. Okay, go ahead.

11 BY MS. HANDMAN:

12   Q  Well, let me start with an overall

13 question first. You've read the chapter in Pay Any

14 Price that you are suing on; is that correct?

15   A  Yeah.

16   Q  And you know that Mr. Risen -- do you

17 agree that Mr. Risen included a number of your

18 points of view about the subject he was writing on?

19     MR. KLAYMAN: Objection. The document

20     speaks for itself.

21 BY MS. HANDMAN:

22   Q  Did he accurately summarize your point of

23 view in the chapter?

24     MR. KLAYMAN: Objection. Allow him to

25     review the document because of his disability.

Page 97

1 Also even if he was not disabled, for him to

2 recollect whether it was absolutely portrayed

3 or not, you have to show him specific portions.

4     MS. HANDMAN: I will do that.

5     MR. KLAYMAN: Thank you.

6     THE WITNESS: Are we still on page 40?

7 BY MS. HANDMAN:

8   Q  41, in that first full paragraph,

9 "Montgomery insists that he did not come up with the

10 idea of analyzing Al Jazeera videotape. He says

11 that the CIA came to him in late 2003 and asked him

12 to do it. CIA officials brought Montgomery two

13 different versions of Al Qaeda videotapes he claims.

14 They gave them original Al Qaeda videotapes obtained

15 independently by the CIA, and then also gave him

16 recordings of the same videotapes recorded as they

17 had been broadcasts on Al Jazeera. The CIA wanted

18 him to compare the two."

19     MR. KLAYMAN: So what's your question?

20 BY MS. HANDMAN:

21   Q  Then, two paragraphs down, "Montgomery let

22 the CIA draw its own conclusions based on the

23 information he gave them. After he recorded to the

24 CIA that he had detected a series of hidden letters

25 and numbers, he left it up to the CIA to conclude

25 (Pages 94 - 97)

Page 98

1 that those numbers and letters referred to specific
2 airline flights. He insisted he did not offer the
3 CIA his own conclusions about what the data meant."
4 Then there's one more.
5     A   Are you asking me a question?
6     Q   I'm about to ask you a question. "The
7 CIA" -- this is the last full paragraph, "made the
8 inevitable connections, quote, 'they would jump at
9 my conclusions said Montgomery,' quote, 'there would
10 be things, like, C4, C4, and they would say, that's
11 explosive. They jumped to conclusions,' closed
12 quotes. He added that it was, quote, 'never
13 suggested it was airplanes or a threat.'"
14         Was that an accurate summary and quote
15 from you of your position with regard to the Al
16 Jazeera analysis?
17     MR. KLAYMAN: Objection. You read more
18     than any alleged quotes for Mr. Montgomery.
19     You have mixed apples and oranges in your
20     reading portions of his book.
21 BY MS. HANDMAN:
22     Q   I said: Was it an accurate summary of
23 your point of view, and what you told Mr. Risen, and
24 was it an accurate quote to the extent it was in
25 quotation marks as I indicated in my reading?

Page 99

1     A   I can't even understand what quotation
2 marks are. The very first part of it was
3 inaccurate.
4     Q   Which first part? You insist --
5 "Montgomery insists that he did not come up with the
6 idea of analyzing Al Jazeera videotapes. He said
7 that the CIA came to him in late 2003 and asked him
8 to do it?"
9     A   That's inaccurate.
10     Q   That is inaccurate. How so?
11     A   Well, we were doing -- the company was
12 doing work with both the Air Force, and -- I don't
13 know if it was one agency or both, on facial
14 recognition and Drone technology in 2000 -- I think
15 it was late 2002 or early 2003. And they had
16 brought us a number of videotapes early on and
17 Predator or other drone videotapes of the
18 individuals they were interested in using the
19 technology to recognize.
20         As a result of that, we had built them a
21 number of laptops that was to achieve that goal. I
22 believe that was given to them in March and April of
23 2003. So did I answer your question?
24     Q   No.
25     MR. KLAYMAN: Wait, wait, wait. That's

Page 100

1 not --
2     MS. HANDMAN: That was a nonresponsive
3 answer.
4     MR. KLAYMAN: That's not for you to
5 decide, Ms. Handman. It was responsive, and
6 you're not sitting here as the magistrate judge
7 or the judge.
8 BY MS. HANDMAN:
9     Q   Back on page 41, that first sentence I
10 read to you.
11     A   That would be in the second -- third full
12 paragraph?
13     Q   No, I'm talking about the first full
14 paragraph, and you said, it was inaccurate when I
15 read you, "Montgomery insists he did not come up
16 with the idea of videotaping Al Jazeera videotape.
17 He says that the CIA came to him in late 2003 and
18 asked them to do it?"
19     A   Well, you just said: I videotaped Al
20 Jazeera.
21     Q   No, no, no, I didn't. I said "the idea of
22 analyzing Al Jazeera videotape."
23     A   Excuse me, would you mind her reading back
24 what you said because you're confusing me?
25     Q   Well, I'm reading from the book and that's

Page 101

1 what it says.
2     A   But you said something different, I think.
3     Q   Is that false? What is false about that
4 statement?
5     MR. KLAYMAN: Well, wait a minute. We
6     have a difference of opinion as to what you
7     read.
8 BY MS. HANDMAN:
9     Q   You mean before when you said, it was
10 false?
11     MR. KLAYMAN: This is all confusing.
12     THE WITNESS: I'm being confused. You
13     said we videotaped Al Jazeera.
14 BY MS. HANDMAN:
15     Q   No.
16     A   Yeah, you did say it.
17     Q   I'll read it again. "Montgomery insists
18 that he did not come up with the idea of analyzing
19 Al Jazeera videotapes. He says that the CIA came to
20 him in late 2003, and asked him to do it."
21         Is that an accurate summary of your
22 position with regard to what happened?
23     A   That is inaccurate.
24     Q   How is that inaccurate?
25     A   Because that's not how it happened.

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

1    Q   Is that what you told Mr. Risen?
2    A   I don't believe so.
3    Q   Did you come up with the idea of analyzing
4 Al Jazeera videotapes?
5    A   Did I, no.
6    Q   Who came up with that?
7    A   We were in the process I believe I told
8 you that in the first instance, we were provided a
9 number of images that, of individuals they were
10 looking to see if they could recognize on drones,
11 and they had given us ten or 12, maybe 15 images and
12 we gave them ten laptops in which we hard code the
13 imagery into the technology and gave them the
14 laptops in mid 2003 and left.
15    Q   And did there, and the images they gave
16 you were not from Al Jazeera Broadcast, they were
17 from drones?
18    A   Drones or videotapes that they had made of
19 the individuals on the ground that were not Al
20 Jazeera tapes.
21    Q   And were --
22        MR. KLAYMAN:  As we get into this area,
23    pause, nothing which is classified or sensitive
24    under government regulations or laws.
25        THE WITNESS:  I understand that.

Page 103

1        MR. KLAYMAN:  Okay.
2 BY MS. HANDMAN:
3    Q   Is this -- the book reports that you told
4 Mr. Flynn that Montgomery had went over the visiting
5 Air Force officials who became convinced that
6 Montgomery's object recognition and video
7 compression technology can help the Air Force's
8 Predator drone program.  Is that what you're
9 referring to?
10    A   You're quoting him directly on something
11 that Mr. Flynn told Mr. Risen?
12    Q   This is page 36, the bottom of page 36.
13    A   This is 36, I believe.  Where were you?
14    Q   I'm reading that paragraph.  The last
15 paragraph, it says, "Michael Flynn's, Montgomery's
16 former lawyer" -- he was your former lawyer; is that
17 correct?
18    A   Yes.
19        MR. KLAYMAN:  No, he is his former lawyer.
20    Q   -- "who later concluded that Montgomery
21 was a fraud," is that an accurate statement?
22    A   Well, that's his statement?
23    Q   Yes.
24        MR. KLAYMAN:  Wait, wait, wait.  That's
25    vague and ambiguous.

Page 104

1 BY MS. HANDMAN:
2    Q   That's Mr. Flynn's statement, correct,
3 "that you were a fraud," he concluded that you were
4 a fraud?
5    A   Well, I don't know -- he had made
6 statements, if that's his conclusion, I don't know.
7    Q   He had made statements to the effect that:
8 You were a fraud and a con man; is that correct?
9    A   After I fired him in 2007.  I'm not a
10 fraud is my position, obviously.
11    Q   And he said that you told him that you had
12 won over the visiting Air Force officer who had
13 become convinced that Montgomery's object
14 recognition and video compression technology could
15 help the Air Force's Predator drone program; is that
16 correct?
17    A   No.
18    Q   What's wrong about that?
19    A   That was their conclusions, not mine.
20    Q   Did you get a contract from the Air Force?
21    A   Over what period of time?
22        MR. KLAYMAN:  Wait, wait.  Vague and
23    ambiguous to the use of the word "you."
24 BY MS. HANDMAN:
25    Q   Did you get a contract with the Air Force

Page 105

1 and SOCOM in connection with the Predator drone
2 project?
3    A   Well, I don't believe it was limited to
4 that drone.
5    Q   Did you get information -- images from the
6 Nellis Air Force Base?
7    A   You mean ever?
8    Q   No, in this time period, 2003.
9    A   2003, I'm not sure that's accurate because
10 our work was done at Eglin and at MacDill.
11    Q   The officer -- were you visited in Nevada
12 by Air Force officials?
13    A   You mean, at the very beginning?
14    Q   Yes.
15    A   Yes.
16    Q   And was the information -- the paragraph
17 at 37 says, "By the spring and summer of 2003, each
18 was awarded contracts by both the Air Force and U.S.
19 Special Operations Command?"
20    A   Where is that at, what page?
21    Q   37, the first full paragraph.
22    A   Would you mind reading it?
23    Q   "By the spring and summer of 2003,
24 eTreppid, E, capital, T-R-E-P-P-I-D, was awarded
25 contracts by both the Air Force and U.S. Special

27 (Pages 102 - 105)

CONFIDENTIAL

Page 106

1 Operations Command. Montgomery was able to win over
2 the government in part by offering field tests of
3 his technology, tests that former employees say were
4 fixed to impress visiting officials."
5    A   Can you break your question up?
6    Q   Sure. Were you awarded -- was eTreppid
7 awarded contracts by both the Air Force and SOCOM
8 based on, in part, field tests of your technology?
9    A   Well, we had done field tests out at
10 MacDill and Eglin.
11    Q   Were the field tests done at MacDill and
12 Eglin or were they done in Nevada?
13    A   All the field -- well, the only field
14 that -- that eTreppid was behind our building. The field
15 tests that we did were at MacDill and Eglin.
16    Q   You don't recall being in the field with a
17 bazooka, and your demonstration of your visual
18 technology was conducted for Air Force officials and
19 others?
20    A   I don't recall that. There were Air Force
21 officials that came to our building.
22    Q   And were field tests conducted when they
23 came?
24    A   I don't recall if we were or not. I don't
25 remember.

Page 107

1    Q   And do you recall that eTreppid and
2 employees complained to the FBI or told the FBI that
3 you would go into an empty office and push a button,
4 and it would tell eTreppid employees to go into an
5 empty office and push a button on a computer when
6 they heard a beep on the cell phone?
7    MR. KLAYMAN: Objection. Are you reading
8    from something?
9    MS. HANDMAN: I am reading from the book.
10    MR. KLAYMAN: It doesn't sound to me like
11    you're reading from the book. Read exactly the
12    portion of the book, please.
13 BY MS. HANDMAN:
14    Q   "Trepp also described to federal
15 investigators how eTreppid employees had confided to
16 him that Montgomery had asked him to help him
17 falsify tests of his object recognition software
18 when Pentagon officials came to visit?"
19    A   In what period of time was that? First, I
20 never did that. So this is back to the spring and
21 summer of 2003?
22    Q   Yes, and what I'm reading is that Trepp
23 had told federal investigators of that. Do you
24 recall that?
25    A   When would he have told him that? I don't

Page 108

1 know.
2    MR. KLAYMAN: You're mixing the book with
3    testimony that you, yourself are giving. I
4    don't understand how you link it up the way
5    you're asking the question. Could you please
6    rephrase it?
7 BY MS. HANDMAN:
8    Q   Do you recall there was a federal
9 investigation of your technology, and whether you
10 had taken it from eTreppid in 2006?
11    A   I believe you're referring to the FBI raid
12 on my home.
13    Q   Among other things, yes.
14    A   Well, I don't know what "the among other
15 things" are.
16    Q   Well, do you recall that Trepp had told
17 the FBI that your employee said that you had asked
18 them to rig the tests?
19    A   I believe Mr. Trepp notified with Mr. Jim
20 Gibbons, and Mr. Jim Gibbons how they communicated
21 to the U.S. Attorneys and so forth. I don't, to
22 this day, know.
23    Q   You haven't read the investigative reports
24 that were unsealed in connection with your challenge
25 to the search?

Page 109

1    MR. KLAYMAN: Objection. Don't speculate.
2    You can answer the question, but don't
3    speculate.
4 BY MS. HANDMAN:
5    Q   Do you recall reading -- do you recall
6 challenging the search that was done by the FBI?
7    A   Yes.
8    Q   And do you recall at some point that all
9 the -- that the documents in connection with that
10 search were unsealed?
11    A   I don't know that, but --
12    Q   Do you have any reason to believe that it
13 was -- strike that.
14    Is the book wrong to say that Mr. Trepp
15 described to federal investigators how eTreppid
16 employees had confided to him that Montgomery had
17 asked him to falsify tests of his object recognition
18 software when Pentagon officials came to them? I'm
19 not saying that you agreed to falsify, but that Mr.
20 Trepp told federal investigators?
21    MR. KLAYMAN: Objection, calls for
22    hearsay.
23    THE WITNESS: Well, all I know is you're
24    referring to some statements that might have
25    been given to the, I believe, FBI, I think

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

1     that's --
2  BY MS. HANDMAN:
3     Q   And you will see that, again, Mr. Risen
4  puts in your point of view at the bottom of page 37.
5  He says, "Montgomery insists that the eTreppid
6  employees lied when they claimed that he had asked
7  them to fix the test?"
8     A   What page is that?
9     Q   Page 37, the same page we were on.  It's
10 at the bottom of the last full paragraph in
11 parentheses.
12       MR. KLAYMAN:  Let him find it first.
13       THE WITNESS:  I don't see the word
14   "employee."  I see --
15 BY MS. HANDMAN:
16    Q   In the paragraph, you see --
17    A   I see "insist something, the eTreppid M."
18    Q   "Employees."
19    A   Okay.
20    Q   "Lied when they claimed that he had asked
21 them to fix the test, and also says that the Air
22 Force issued a report showing it had verified the
23 test."
24       So the first question is:  Is the
25 statement that you insist that they -- the eTreppid

Page 111

1  employees lied when they claim that you had asked
2  them to fix the test, is that an accurate
3  representation of your view with regard to whether
4  the employees were telling the truth or not?
5        MR. KLAYMAN:  Do you see that portion that
6    she's referring to?
7        THE WITNESS:  I see the word "fixed the
8    test," so I think she's reading from there.
9        Yeah, that is.
10 BY MS. HANDMAN:
11    Q   An accurate summary of your position with
12 regard to the test?
13    A   Well, it wasn't just my -- yes, I believe
14 that, that is -- I believe the information, I
15 believe they lied.
16    Q   And you said also, "And Mr. Risen puts in
17 the book, also says that the Air Force issued a
18 report showing that it had verified the test."
19       What test did the Air Force -- is that an
20 accurate summary of what you told Mr. Risen?
21    A   Over what period of time?  That's just a
22 blanket statement.
23    Q   Well, it verified the tests with regard to
24 your object recognition software.
25    A   And he said what, what did it say?

Page 112

1     Q   He says that your position, you're
2  insisting, that the Air Force issued a report
3  showing that it had verified the test.
4        Is that an accurate summary of your
5  position, that the Air Force had verified the test?
6     A   They had issued an independent report
7  stating that the technology was validated.
8     Q   And who issued that report?
9     A   Secretary of Defense's Office.
10    Q   Do you have a copy of that report?
11    A   I don't know if I do or not.  I know one
12 exists.
13    Q   Do you have it in -- it was not produced.
14 Do you have it?
15    A   Well, I think it was produced.
16    Q   I don't believe so.
17    A   Okay.  But I think it was because I think
18 that letter appeared in one of the many pleadings in
19 my matter.
20    Q   In which matter?
21    A   Let's just call it:  The eTreppid matter.
22    Q   Okay, I agree.  The collective eTreppid
23 many matters.
24       MR. KLAYMAN:  Ms. Handman, wherever you
25    can break on this, let's break for lunch now

Page 113

1    because we're coming up on another hour.  I'll
2    let you finish your line of questioning here.
3  BY MS. HANDMAN:
4     Q   What tests were performed by the Air Force
5  in order to validate this?
6     A   Well, there were field tests done at Eglin
7  and --
8     Q   And who performed those?
9     A   I wasn't done speaking.  I was thinking.
10    Q   I'm sorry.
11    A   -- Eggland, MacDill and overseas.
12    Q   And who performed these tests at Eglin?
13    A   The Air Force.
14    Q   Who in the Air Force?
15    A   Well, you're confusing me because it's one
16 thing to say "who performed the test."  It's another
17 one to say "who verified the test."  Those were, I
18 think, two separate situations.
19    Q   Who verified the tests?
20    A   Officials from the Secretary of Defense or
21 the Secretary of the Air Force.  I don't recall
22 which one.
23    Q   And did you get -- was that a development
24 contract or did you get a further contract?
25       MR. KLAYMAN:  Object to the use of the

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

1    word "you."
2 BY MS. HANDMAN:
3    Q   ETreppid, I apologize?
4    A   Well, I thought you were talking about --
5 earlier about -- we went from the bazooka test,
6 which obviously -- I've already stated the
7 information was inaccurate.
8    Q   Well, the information that Mr. Trepp
9 reported that employees had said that you had rigged
10 it was not inaccurate -- had told Federal that.
11    A   Well, I don't remember seeing a report,
12 but if you're telling me it said that -- do you have
13 the report?
14    Q   We do.
15    A   Well, without reading it, I wouldn't know.
16    Q   Before we end, I just want to close one
17 loop.  I read you on page 41, getting back to the Al
18 Jazeera technology.
19    A   Yes.
20    Q   A quote from you.
21    A   What paragraph?
22    Q   That was the last paragraph on 41.  Was
23 that an accurate quote?
24    A   Which was?
25    Q   "They would jump at conclusions, says

Page 115

1 Montgomery.  There would be things like C4, C4, and
2 they would say that's explosives.  They jumped to
3 conclusions.  He added that he never suggested that
4 it was airplanes or a threat," is that an accurate
5 quote from you?
6       MR. KLAYMAN:  You want to read that and
7    make sure she's got it right?
8       THE WITNESS:  Well, the first part of the
9    sentence, what they had jumped to that
10    conclusion, that part was correct.
11       I don't know if they said they were
12    explosives, but I do remember the incident of
13    the C4, and I remember -- I remember that
14    incident.
15 BY MS. HANDMAN:
16    Q   You remember your technology producing C4
17 reference, is that --
18    A   That letter.
19       MR. KLAYMAN:  Objection to the extent you
20    can respond given --
21       THE WITNESS:  That letter came up with a
22    lot of other ones.
23 BY MS. HANDMAN:
24    Q   And were those tests ever validated?
25       MR. KLAYMAN:  Objection.  Vague and

Page 116

1 ambiguous.
2       MS. HANDMAN:  Let's break now.
3       THE VIDEOGRAPHER:  Off the record.  The
4    time is 12:13 p.m.
5       MS. HANDMAN:  What time do you want to
6    resume?
7       MR. KLAYMAN:  In an hour.  Make it an hour
8    and a quarter; 1:30.
9       Can you please tell us, Madam Court
10    Reporter, Tammy, the time when we come back how
11    much we've used?
12       MADAM REPORTER:  Sure.  He's got that on
13    the video too.
14       MR. KLAYMAN:  How much time have we used?
15       THE VIDEOGRAPHER:  Two hours and 51
16    minutes.
17       MR. KLAYMAN:  Okay.  Thank you.
18       THE WITNESS:  It seems like an eternity.
19       (A recess was taken after
20    which the following proceedings were had:)
21       THE VIDEOGRAPHER:  Back on the record.
22       The time is 1:38.
23 BY MS. HANDMAN:
24    Q   Mr. Montgomery, would you agree that prior
25 to the book coming out in October of 2014, that

Page 117

1 there were a number of articles that mentioned you?
2       MR. KLAYMAN:  Objection, without
3    identifying articles.
4       MS. HANDMAN:  We're going to do that.
5 BY MS. HANDMAN:
6    Q   I'm asking you in general:  Would you
7 agree that there were a number of articles that
8 mentioned you?
9       MR. KLAYMAN:  Objection, vague and
10    ambiguous as to mention the number of articles.
11 BY MS. HANDMAN:
12    Q   Well, let's begin in 2000 -- let's mark
13 as -- was there more than one article about you
14 prior to the publication of the book?
15       MR. KLAYMAN:  Objection to the use of the
16    phrase "about you."
17 BY MS. HANDMAN:
18    Q   But, your software, your allegations about
19 Governor Gibbons?
20       MR. KLAYMAN:  Don't speculate.
21 BY MS. HANDMAN:
22    Q   Articles that mentioned you.  Were
23 there --
24       MR. KLAYMAN:  What question are you
25    asking?  You have 25 questions there.  Every

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

1    one is phrased differently. Can you please ask
2    a question the right way?
3        MS. HANDMAN: Let's just go through the
4    articles, and you stop with your speaking
5    objections. Thank you.
6        MR. KLAYMAN: They're not speaking
7    objections.
8        THE WITNESS: Are you saying that to me?
9        MS. HANDMAN: No, no, Mr. Klayman. Let's
10   mark as Defendants' Exhibit 10.
11       THE WITNESS: Okay.
12       (Exhibit 10 was marked for identification.)
13   BY MS. HANDMAN:
14       Q   What's been marked as Defendants' Exhibit
15   10 are a series of articles, the first one --
16       MR. KLAYMAN: Can I get a copy of them?
17       MS. JAMES: Here.
18   BY MS. HANDMAN:
19       Q   The first one is NBC news investigative
20   unit, Lisa Myers, Aram Roston, and it's dated
21   June 27, 2005.
22       A   I can't see the print it's so small, but I
23   guess -- is that under -- I can't see that, but is
24   that what that says there? I'm pointing to it.
25   You're not looking to where I'm pointing. It says

Page 119

1    "updated" something.
2        Q   It says, "Updated 6/27/2005, and the title
3    is: "Bogus analysis led to terror alert in
4    December 2003." You see that title? It's in big
5    letters at the top?
6        A   Yes, I see that.
7        Q   Do you recall that article being published
8    and broadcasted?
9        MR. KLAYMAN: You can have an opportunity
10   to look at the whole article, Mr. Montgomery.
11   I'll take the clip off for you.
12       THE WITNESS: Well, the print is so small,
13   I can't see it so you're either going to have
14   to read it to me or whatever you'd like to do.
15   BY MS. HANDMAN:
16       Q   Well, it says, "Christmas 2003 became a
17   season of terror after the federal government" --
18   well, let me say, in the title, after the title:
19   "Bogus analysis led to terror alert in
20   December 2003," there's a subhead that is in small
21   print that says, "CIA experts saw a secret code on
22   Al Jazeera that wasn't there?"
23       A   I'm listening to you. Okay.
24       Q   Okay. Do you recall now this article in
25   2005?

Page 120

1    A   No.
2    Q   No? Do you recall -- would that have been
3    about your technology?
4        MR. KLAYMAN: Calls for speculation.
5    Objection.
6    BY MS. HANDMAN:
7    Q   Do you understand that you were -- did
8    anyone else --
9    A   Well, let me talk because --
10       MR. KLAYMAN: The document speaks for
11   itself, but give him a chance to review the
12   document.
13       THE WITNESS: What was the date again?
14   BY MS. HANDMAN:
15   Q   It was June of 2005.
16   A   Okay. Go ahead. What was your question?
17   Q   My question is: Was the reference to a
18   secret code on Al Jazeera, would that be your secret
19   code?
20   A   I wouldn't know. I mean --
21   Q   Do you know anyone else that had a secret
22   code that read, "Al Jazeera broadcast?"
23       MR. KLAYMAN: Objection in terms of
24   classified or sensitive information. You're
25   not to reveal names of any undercover people or

Page 121

1    anything else at the CIA, NSA or anyplace else.
2    BY MS. HANDMAN:
3    Q   It refers to, "For weeks, America was on
4    edge" --
5    A   So you're reading the top part, the top
6    paragraphs?
7    Q   I'm now reading the third paragraph. "For
8    weeks America was on edge as security operations
9    went into high gear. Almost 30 international
10   flights were canceled inconveniencing passengers
11   flying Air France, British Air, Continental and Aero
12   Mexico, but senior U.S. officials now tell NBC News
13   that the key piece of information that triggered the
14   holiday alert was a bizarre CIA analysis, which
15   turned out to be all wrong." It talks about --
16   A   You better not just keep reading to me
17   because I can't remember much. If you want to ask
18   me something, try to --
19   Q   You don't remember this article? Do you
20   remember Tom Ridge saying in the -- giving an
21   interview? In an exclusive interview with NBC News,
22   Ridge defended the government's actions, although he
23   called the intelligence analysis, quote, 'bizarre,
24   unique, unorthodoxed, unprecedented?'"
25   A   Like I said, ask me a question before you

31 (Pages 118 - 121)

CONFIDENTIAL

Page 122

1 just keep reading.
2    Q    Okay.  Was this article about your
3 technology?
4    A    I wouldn't know that.
5    Q    Do you know whether Tom Ridge believed
6 that the technology was bizarre, unique,
7 unorthodoxed, unprecedented?
8        MR. KLAYMAN:  Objection.  Lacks
9    foundation, calls for speculation.
10       THE WITNESS:  Well, in the preceding
11   paragraph, you said "for weeks," but it doesn't
12   say for which weeks.
13 BY MS. HANDMAN:
14   Q    Well, it says in December of 2003, is that
15 when your technology was being used, and that
16 ultimately President Bush did cancel flights from
17 Europe?
18   A    Like I said, don't ask me so much at once
19 because --
20       MR. KLAYMAN:  That's a compound question.
21   Objection.
22 BY MS. HANDMAN:
23   Q    Was your technology being used in December
24 of 2003?
25   A    Yes.

Page 123

1    Q    Was that technology involving reading
2 coded messages on Al Jazeera Broadcast?
3    A    Ask me that one more time.
4    Q    Was your technology that was being used in
5 December of 2003 reading secret code on Al Jazeera
6 Broadcast?
7    A    It was analyzing Al Jazeera Broadcast
8 among others and outputting data.
9    Q    U.S. officials tell NBC News, "That CIA
10 experts thought they had found embedded in the crawl
11 signalling upcoming attacks, dates and flight
12 numbers."  Would that be your technology again that
13 they were using?
14       MR. KLAYMAN:  Objection.  Do not
15   speculate.
16       THE WITNESS:  Am I to answer?
17       MR. KLAYMAN:  Yeah, you can answer.  I'm
18   just putting an objection on the record.
19       THE WITNESS:  I don't believe there was
20   ever any intelligence that was ever found in
21   the crawler.
22 BY MS. HANDMAN:
23   Q    Where was the intelligence found?
24       MR. KLAYMAN:  To the extent, you can
25   answer given your constraints.

Page 124

1        THE WITNESS:  Everywhere above that.
2 BY MS. HANDMAN:
3    Q    Above the crawler?
4    A    Assuming we're talking about what a
5 crawler is.  What do you think -- tell me what you
6 think the crawler is.  I want to make sure I'm
7 saying the right thing.
8    Q    Well, you tell me where the technology was
9 found --
10   A    I just told you what I thought.
11   Q    -- above it, and what type of software did
12 you use for the Al Jazeera work for the CIA?
13       MR. KLAYMAN:  Objection.  It needs to be
14   made more specific.
15       Are you talking about the article or just
16   in general?
17       MS. HANDMAN:  In general for the Al
18   Jazeera work.
19       MR. KLAYMAN:  Subject to your requirements
20   as someone who has a security clearance.
21       THE WITNESS:  We had developed certain
22   technology, and there were other individuals
23   that worked at the facility that were also
24   working on stuff.
25

Page 125

1 BY MS. HANDMAN:
2    Q    At what facility?
3    A    In 2003, it would be eTreppid.
4    Q    Was the type of software you had developed
5 video compression software?
6    A    Well, video compression is an attribute of
7 the software, yes.
8    Q    Object detection software, is that an
9 object detection and attribute of the software?
10   A    No, that would be separate.
11   Q    That was not what you were using for the
12 Al Jazeera work?
13   A    Well, maybe you better describe what the
14 Al Jazeera work was because it's more broad than
15 what you were describing.
16   Q    You tell me, then.
17   A    No, you tell me.  I don't understand.
18   Q    When you say "more broadly," what else did
19 it involve?
20   A    Facial recognition.
21   Q    And that was which agency?
22   A    Intelligence.
23   Q    Did the software involve automatic target
24 recognition software?
25   A    You're speaking of the Al Jazeera

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

1 software?
2    Q    Yes.
3    A    No.
4    Q    Did it involve noise filtering software?
5    A    Yes.
6    Q    Any others?
7    A    It's such a broad statement, what do you
8 mean, "what others?"
9    Q    Well, in the Al Jazeera project.
10    A    So far you've named compression, I think,
11 and noise filtering, and what was the other one?
12    Q    Object detection and automatic target
13 recognition you said were not involved.
14    A    Well, that target recognition, we just
15 outputted data, what it ultimately was used for.
16 That's a different matter, I guess.
17    Q    What software did you use in your work on
18 the Big Safari contract?
19         MR. KLAYMAN:  Objection.  Lacks
20    foundation.  Have we talked about the Big
21    Safari yet?
22         THE WITNESS:  No, and that's --
23 BY MS. HANDMAN:
24    Q    What is the Big Safari contract?
25    A    They bought the air conditioners for the

Page 127

1 computers in the warehouse.
2    Q    Did you have a contract for software for
3 that?
4         MR. KLAYMAN:  Objection to the use of the
5    word "you."
6 BY MS. HANDMAN:
7    Q    Sorry, eTreppid?
8    A    Well, Big Safari came in to get the
9 computers up, and they were bringing in air
10 conditioner units and so forth to get the, you know,
11 as part of the system coming up.
12    Q    Do you have the software that you used for
13 the Al Jazeera work?
14    A    No.
15    Q    Where is it?
16    A    I gave it to the government.
17    Q    Which part of the government?
18    A    Well, literally all parts.  I mean, all
19 the parts I was involved with.
20    Q    You didn't keep any copy of your own
21 software?
22    A    There were -- well, first is, you're
23 talking about software that's 12 years old.  I don't
24 recall specifically which modules I kept and didn't
25 keep.

Page 128

1    Q    Did you do any search for them when you
2 were responding to the discovery in our case?
3    A    Yes.
4    Q    And did you find any modules that contain
5 the software that the video compression software and
6 noise filtering software that you had been using on
7 the Al Jazeera Broadcast?
8    A    Once again, you're confusing Al Jazeera
9 work with other work.  You're interchanging the
10 terms, which is confusing me.
11    Q    All right.  Well, I'll be simple.  The
12 software that you used to do the Al Jazeera work, do
13 you still -- you said you looked for it.  Did you
14 find it?
15    A    I believe, I believe I have parts of it.
16    Q    And you have that where?
17    A    Well, I've turned it over to the
18 government, I just told you that.
19    Q    But you maintained a copy of that?
20    A    I turned over what I had.
21    Q    And you didn't maintain any copies?
22    A    I believe, I produced everything I had to
23 them.
24    Q    Without maintaining a copy of -- this is
25 your intellectual property, right?

Page 129

1    A    It was, it was, yeah.  I mean, it was.
2    Q    You didn't keep any copies so that you
3 can't replicate that in any way?
4    A    You asked me -- well, how --
5         MR. KLAYMAN:  Just answer the question.
6         THE WITNESS:  No.
7 BY MS. HANDMAN:
8    Q    In what context did you give it over to
9 the government?
10         MR. KLAYMAN:  Objection, vague and
11    ambiguous.
12         THE WITNESS:  What time period are you
13    referring to?
14         MR. KLAYMAN:  No.  She just asked about
15    context.  What do you mean by "context"?  Can
16    you define that?
17 BY MS. HANDMAN:
18    Q    You say, you gave it over to the
19 government.  Was it in a lawsuit that you gave it
20 over to the government?
21    A    No, I was required to turn stuff over that
22 I thought may contain classified material.
23    Q    What's the basis for thinking it contained
24 classified material?
25    A    Because of what I've been told the

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

1 definition of that was by the individuals.
2    Q   Do you recall being sanctioned by Judge
3 Probe for not producing software in the Nevada, what
4 we've called:  The eTreppid litigation?
5    A   I don't remember the details, but I do
6 know there was that situation, something like that
7 arose.  I don't know if it was sanctioning or not.
8    Q   Were you going to be paying $42,500 a day
9 for failure to produce software?
10    A   Well, that's what -- if that's what you
11 told me he said.
12    Q   Do you recall it?
13    A   I don't remember that, but --
14    Q   But you were -- you do recall you were
15 ordered to produce the software?
16    A   Well, the judge, I believe, made some
17 point of that.  I can't give you the exact detail.
18 I have to trust what you've told me.
19    Q   And do you --
20    A   Can't he speak?
21    Q   No.
22    A   Oh, okay.  I'm just asking a question.
23    Q   Only one lawyer is allowed to speak in
24 deposition.
25    A   That would be a first.

Page 131

1    Q   Only one lawyer is supposed to ask the
2 questions.
3        What software did you give to the
4 government?
5    A   During what period of time?
6    Q   Well, when you say that you gave the Al
7 Jazeera software, when did you give that?
8    A   2003.  I mean, that's --
9    Q   And you haven't had any -- you haven't had
10 a copy of it since 2003?
11    A   No, I have.
12    Q   Mm-hmm.  So when did you stop having a
13 copy of it?
14    A   When I turned it all over to the
15 government.
16    Q   And when was that?
17    A   What is today?
18    Q   Today is August 20, 2015.
19    A   Let me just think, please.  Today is
20 Thursday?
21    Q   Right.
22    A   Wednesday.
23    Q   Wednesday you gave your Al Jazeera
24 software to the government?
25    A   I gave them the disc drives that I believe

Page 132

1 contain classified material.
2    Q   And is this in connection with the
3 litigation involving Sheriff Arpaio?
4        MR. KLAYMAN:  Objection.  I ask you not to
5    respond with regard to Sheriff Arpaio.  It's
6    inappropriate to use this litigation because
7    since you have been in touch with Mr. Gomez for
8    his purposes, that's inappropriate so I ask --
9    he should not respond to that question.
10 BY MS. HANDMAN:
11    Q   You turned over it yesterday pursuant to a
12 court order?
13    A   Is that Wednesday?
14    Q   Yes.  Pursuant to a court order?
15    A   No, I had come forward a year ago to turn
16 over the media that I had, that I believed contained
17 sensitive information, and it finally came together
18 on Wednesday.  Is that yesterday?
19    Q   Yes.
20    A   Wednesday, yes.
21    Q   And to which department in government did
22 you turn it over?
23    A   The FBI.
24    Q   And are they investigating you, the FBI,
25 is that part of a current investigation?

Page 133

1        MR. KLAYMAN:  Objection, objection.  He's
2    not going to testify on behalf of the FBI.
3        THE WITNESS:  Well, I don't know the
4    differentiation between the FBI and the
5    Department of Justice, you know.
6 BY MS. HANDMAN:
7    Q   Why were you required -- strike that.  So
8 until yesterday, you had a copy of your -- the
9 software that you used in the Al Jazeera project?
10    A   I'm not certain.  I told you that I
11 believe I had some information that I think you just
12 asked me about on drives that had other sensitive
13 information on them.
14    Q   Did you ever hand over that software to
15 Blxware, the Al Jazeera?
16    A   Yeah, I'm going to assume from this point
17 when you say "software," you mean that Al Jazeera?
18    Q   Yes.
19    A   I don't know if I did or not.
20    Q   Do you recall after the sanctions were
21 imposed entering into a settlement of the eTreppid
22 litigations?
23    A   Yes.
24    Q   And do you recall agreeing to a confession
25 of judgment in the amount of about $25 million?

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

1    A   I think you're referring to Mr -- call it
2 the eTreppid settlement?
3    Q   Yes.
4    A   I don't remember that, but I know there
5 were legal things happening.  I can't tell you what
6 happened.
7    Q   You don't remember agreeing to a
8 confession of judgment in an amount of approximately
9 $25 million?
10    A   I don't know all the legal things that
11 were happening at the time, I'm sorry.
12    Q   And was that -- it was in settlement of
13 the litigation between you and eTreppid; is that
14 correct?
15    A   That's not correct.
16    Q   What was it a settlement of?
17    A   Between Blxware, Blixseth, the owners of
18 Opspring and Blxware, I mean.
19    Q   Is that Mr. Sandoval?
20    A   What?
21    Q   Sandoval; no?
22    A   Yeah, I think he was brought in as a party
23 to it.  I don't remember the specifics.
24    Q   And was part of the settlement that your
25 software that you had developed for eTreppid would

Page 135

1 now belong to Blxware and offspring -- Opspring?
2    A   Well, those are two different entities so
3 that situation was at two different time frames.  So
4 I would suggest you speak about them individually if
5 that's the best thing.
6    Q   Well, with regard to the claims between
7 Blxware and eTreppid, was the settlement the
8 result -- was that requiring the software that you
9 had developed for eTreppid, which included the Al
10 Jazeera software was supposed to now belong to
11 Blxware; is that correct?
12    A   That's not correct, I don't believe.
13    Q   What is correct?
14    A   You're talking a lot of years ago, but
15 I'll try my best.  The software as part of that
16 agreement returned back to me, I believe.
17    Q   And did you ever turn it over to Blxware?
18    A   Blxware was in two different -- I don't
19 know how to answer that.
20    Q   Well, did you ever turn over your software
21 to -- well, you say it was in two different what,
22 please finish?
23    A   Locations.
24    Q   Locations.  And --
25        MR. KLAYMAN:  Objection, vague.  Move to

Page 136

1 strike.
2 BY MS. HANDMAN:
3    Q   Did you turn it over to either location?
4    A   Oh, by definition, I was at one of them
5 and I had it -- I don't remember turning it over.
6    Q   So as an employee, it was now Blxware?
7    A   No, Opspring ended and Blxware started.
8 That in and of itself is its own, I don't know the
9 right word, ordeal, whatever.
10    Q   Did you write the software, the Al Jazeera
11 software?
12    A   I wrote software.  Are you referring to
13 eTreppid?
14    Q   Yes.  When you were at eTreppid, did you
15 write the software that was used for the Al Jazeera
16 program?
17    A   I and some others.
18    Q   Other employees of eTreppid?
19    A   No.
20    Q   Who?
21        MR. KLAYMAN:  Objection, in terms of
22 naming names.  If any of the individuals are
23 intelligence officials who are undercover or
24 otherwise to remain enormous.
25        THE WITNESS:  Government officials,

Page 137

1 government employees.  I don't know if that's a
2 better word.
3 BY MS. HANDMAN:
4    Q   They wrote the software too?
5    A   They worked on it at times.
6    Q   I'm asking:  Who wrote the software?
7    A   Software is an evolutionary thing.  What
8 point in time are you asking me this?
9    Q   Well, when was the software last revised?
10        MR. KLAYMAN:  Objection, relevance.
11        THE WITNESS:  I don't remember.
12 BY MS. HANDMAN:
13    Q   In which languages is the software
14 written?
15    A   Computer.
16    Q   More specific than that?
17    A   No, but I mean, I think we just started
18 out by -- I made it clear over what period of time
19 since the software was an evolved process.
20    Q   Well, in late 2003, in which language was
21 the software written?
22    A   Parts were in basic, parts were in C or C
23 plus plus, I can't remember.
24    Q   And what was it in the last version?
25        MR. KLAYMAN:  I'm going to instruct you

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

1    don't reveal anything that may be classified
2    sensitive or otherwise under government
3    protection. With that instruction, answer the
4    questions.
5        THE WITNESS: I don't know.
6  BY MS. HANDMAN:
7        Q   On what type of computer systems or work
8    stations must the software be installed to run?
9        MR. KLAYMAN: The same continuing
10   instruction throughout this entire line of
11   testimony.
12       THE WITNESS: During what period of time?
13  BY MS. HANDMAN:
14       Q   In 2003.
15       A   There were multiple types.
16       Q   What were they?
17       MR. KLAYMAN: Let me just stop you here.
18   There's no relevance to this, and it seems to
19   me that you're trying to extract information.
20   I'll let Mr. Montgomery make that determination
21   because I'm not an expert, I'm a lawyer, but it
22   seems to me you're trying to extract
23   information which could potentially be
24   classified or sensitive. And that's something
25   that we're -- that Mr. Montgomery cannot do. I

Page 139

1    don't understand why you're trying to induce
2    him to potentially violate any law.
3        MS. HANDMAN: First of all, the judge held
4    in Nevada that it wasn't classified, and you
5    said as much in your filings in the ninth
6    circuit last week so --
7        MR. KLAYMAN: That's not what I said.
8        MS. HANDMAN: -- putting that aside, I'm
9    not, I'm not asking those questions. I'm
10   asking --
11       THE WITNESS: The judge didn't say that.
12       MR. KLAYMAN: Wait, wait, wait. Be quiet.
13       MS. HANDMAN: Let Mr. Montgomery answer.
14       MR. KLAYMAN: No, we're not letting
15   Mr. Montgomery say anything.
16       THE WITNESS: I don't understand what
17   you're saying. You're both talking back and
18   forth and making noise to me.
19       MR. KLAYMAN: Just slow down here, and let
20   me finish what I'm saying. I don't think it's
21   to your advantage, Ms. Handman, to induce him
22   to violate any federal law, policy or
23   regulation. It seems like that's what you're
24   trying to do, and it's hard for me to
25   understand the relevancy of this.

Page 140

1        Can you make a proffer of what the
2    relevancy is?
3        MS. HANDMAN: He claims to be a computer
4    expert. He's claiming that this stuff worked.
5    We're entitled to find that out. You have not
6    produced the software. Now he claims he
7    doesn't have it as of yesterday. We're going
8    to court tomorrow to try and get it so that our
9    expert can look at it.
10       These are questions that experts, I agree
11   I'm not a software expert either, but that's
12   what the expert can look at. Mr. Montgomery
13   claims to be a software expert. These are
14   software questions. It does not reveal a
15   single classified thing to talk about what
16   algorithms or what hardware it ran on.
17       MR. KLAYMAN: You know what it sounds
18   like?
19       MS. HANDMAN: I don't want to waste our
20   time in this colloquy. We'll be able to
21   address it tomorrow to Judge Goodman.
22       MR. KLAYMAN: That's my point.
23       MS. HANDMAN: Let's save it for Judge
24   Goodman. That's exactly why it should have
25   been adjourned.

Page 141

1        THE WITNESS: Don't talk down to me.
2        MS. HANDMAN: I'm not talking down to you.
3    I'm referring to you as a computer expert, and
4    that's why I'm trying to find out these
5    questions.
6        MR. KLAYMAN: Wait a sec, I want to put
7    something on the record. Number one, if you're
8    not an expert and you don't really know what
9    you're talking about, why are you asking him to
10   induce information about how software
11   functions, okay? It's kind of like methods and
12   sources with regard to the CIA is that you're
13   trying to induce him, and Ms. Handman, you
14   should know better. We're not in a situation
15   like Hillary Clinton, okay? You see the
16   trouble she's gotten into with this, okay? And
17   I know that you know her and your husband knows
18   her.
19       The reality is here, that you have to be
20   careful with this stuff. So we're trying to be
21   careful here, and you shouldn't just go in like
22   a bowl in a China shop.
23  BY MS. HANDMAN:
24       Q   All right. Let's move on to the Wall
25   Street Journal Article in 2006.

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

1  A   Is that in this stack somewhere?
2  Q   It is.
3  A   Is it chronological?
4  Q   It is.  It's November 1, 2006.
5  A   This says something "2007."
6  Q   There are two Wall Street Journal
7 articles?
8  A   Okay, I see it.
9  Q   And this one, November 1, 2006 is titled:
10 Congressman's Favors for Friend Include Help in
11 Secret Budget.
12      Do you recall this article, and the
13 subhead is:  "With Representative Gibbons' backing,
14 an ex-trader for Milken wins millions in contracts."
15 Do you recall this article?
16  A   I know there was something happening, but
17 I don't remember this exact article.
18  Q   And that something happening included your
19 allegations that Mr. Trepp had offered cash and
20 casino chips to Mr. Gibbons in exchange for getting
21 help and contracts with eTreppid; is that correct?
22      MR. KLAYMAN:  Please allow him to review
23    it before you ask the questions, and it is a
24    good suggestion that you read him the portions
25    of it that you're talking about rather than

Page 143

1 characterizing it yourself.
2      MS. HANDMAN:  I'm just trying to move this
3    process along.
4      MR. KLAYMAN:  Unfortunately, the process
5    has to be done the right way according to
6    normal and ordinary procedures of deposing a
7    normal individual.
8      You just don't characterize stuff on your
9    own.  Let him refer to specific portions of it
10    and respond, if it's not otherwise
11    objectionable.
12      THE WITNESS:  Ask your question again and
13    I'll answer.
14      I want to say something first.  You're
15    pushing me too hard.  My blood pressure is way
16    up, and the last thing that I need is higher
17    blood pressure with a brain aneurysm.  So I'm
18    trying to respond to what you're asking me, but
19    pushing and pounding on me won't benefit either
20    one of us.  Okay.  Ask your question.
21 BY MS. HANDMAN:
22  Q   If you go to the third page, and it's
23 under, "Suit's Outrageous Claims is the headline --
24 the heading.
25  A   Oh, at the bottom?

Page 144

1  Q   Yes, mm-hmm.  It says, "Mr. Gibbons also
2 got other unreported gifts of cash and casino chips
3 from Mr. Trepp according to sworn testimony in a
4 civil lawsuit brought by a former executive at
5 eTreppid, Dennis Montgomery."
6      Do you remember giving sworn testimony in
7 a civil lawsuit that you brought against eTreppid
8 accusing Mr. Trepp of giving Mr. Gibbons unreported
9 gifts of cash and casino chips?
10  A   I don't know if it's deemed a gift.
11  Q   Giving it, and whether it was deemed a
12 gift or not?
13  A   Yes.
14  Q   Yes; you do recall making that allegation?
15  A   Yes.
16  Q   And did that lead to an investigation of
17 Mr. Gibbons?
18  A   I believe so.
19  Q   And was he ever charged?
20  A   I don't know if he was charged.
21  Q   Do you know if the government ultimately
22 found that he was not guilty of any wrongdoing and
23 never indicted him?
24  A   Well, that's two different things that you
25 just said.

Page 145

1  Q   Did they ever indict him?
2  A   I don't believe so.
3  Q   Let's move on to the next Wall Street
4 Journal article.  This one is titled:  "Nevada
5 Governor Faces FBI Probe into Contracts.  Subhead,
6 "Focus is gifts Gibbons got while in Congress,
7 quote, 'Black Budget' end quote, Missions?"
8      MR. KLAYMAN:  Take your time and review
9    it.
10 BY MS. HANDMAN:
11  Q   And it's dated February 15, 2007.
12  A   Okay.  Go ahead.
13  Q   You will see on the fourth page just above
14 where it says, "Defamation suit" --
15  A   Down at the bottom?
16  Q   No, it's, "The new federal probe," above
17 where it says "defamation suit."
18  A   Okay.  Go ahead.
19  Q   "The new federal probe follows a Nevada
20 investigation of the dispute over ownership of
21 eTreppid software used in secret government
22 programs.  This investigation was initially focused
23 on Dennis Montgomery, the former partner of Mr.
24 Trepp, who designed the software on which eTreppid
25 was founded in 1998.  The men have accused each

37 (Pages 142 - 145)

CONFIDENTIAL

Page 146

1 other of trade-secret theft, among other claims, and
2 have been battling in court for more than a year."
3        Do you recall this article describing
4 these charges and your involvement?
5    A   No.
6    Q   Do you read the Wall Street Journal?
7    A   Actually, I don't think so.
8    Q   Do people in the business community read
9 the Wall Street Journal?
10    A   I don't know.
11    Q   "The new emails and internal documents
12 would appear to support some of the claims made and
13 legal proceedings filed by Mr. Montgomery who in
14 court papers has alleged that Mr. Trepp gave, at
15 least, $100,000 in cash and casino chips to
16 Mr. Gibbons."
17        Do you recall making those allegations in
18 court records?
19    A   I don't remember if it was in court
20 records.  I remember saying it.
21    Q   Did you also produce emails, allegedly
22 involved in supporting evidence of this attempt to
23 bribe Mr. Gibbons?
24        MR. KLAYMAN:  Objection, vague and
25    ambiguous.  Statements call for legal

Page 147

1        conclusions.  You can answer.
2        THE WITNESS:  I don't know what the
3    bribe -- you asked me -- what was it that you
4    asked me again?
5 BY MS. HANDMAN:
6    Q   Emails, did you have emails?
7    A   I produced disc drives to my attorney.  My
8 attorney at the time was Robert Bennett.
9    Q   And were some of those emails ultimately
10 found to have been altered?
11    A   No.
12    Q   Emails that you had given over; no?
13    A   I gave them the disc drives.
14    Q   Was there a lot of press about this
15 investigation in Nevada, do you know?
16        MR. KLAYMAN:  Objection, vague and
17    ambiguous.  Two questions.
18        THE WITNESS:  I don't know.
19 BY MS. HANDMAN:
20    Q   Were you living in Nevada at the time?
21    A   What period of time?
22    Q   2007.
23    A   No.
24    Q   Where were you living by then?
25    A   Seattle, Washington.  Yes, Seattle

Page 148

1 Washington.
2    Q   Did you follow at all the coverage of this
3 investigation?
4    A   No.
5    Q   Let's turn to the next document, which is
6 again NBC News, and this is again Lisa Myers?
7    A   Okay.
8    Q   And it's May of 2007, and it's titled:
9 "Probes Nevada Governor for Corruption," subhead;
10 Did Jim Gibbons accept cash and gifts in exchange
11 for defense contracts?
12        MR. KLAYMAN:  Object to the form of the
13    question.  You're asking a question that --
14        MS. HANDMAN:  I'm about to get to.
15 BY MS. HANDMAN:
16    Q   Did you give an interview to Lisa Myers in
17 connection with this story?
18    A   At some point, I gave something, you know.
19 I don't remember exactly, but at some point, I gave
20 something.
21    Q   She says in this article, "In an exclusive
22 interview with NBC, Montgomery who is now at war
23 with his former partner, makes an explosive charge.
24 He says that near the end of the cruise, he saw
25 Trepp pass money to the Congressman."  Then it has

Page 149

1 an interview with you.  It goes on throughout this
2 article.
3        MR. KLAYMAN:  Just give him an opportunity
4    please to review the article.
5        THE WITNESS:  Are you asking me about the
6    article, is that what you're asking?
7 BY MS. HANDMAN:
8    Q   I'm asking you if you gave an interview.
9 You claim that you're not a public figure, and have
10 not sought public attention.
11        I'm asking you:  Did you give an exclusive
12 interview to NBC News regarding this matter?
13        MR. KLAYMAN:  Wait a second.  Your
14    colloquy at the beginning of that question has
15    nothing to do with your question.  That's a
16    legal conclusion that the court some day will
17    have to reach or a jury will have to reach so
18    please rephrase the question.  That's an
19    inappropriate question.  If you want to give a
20    speech, you can go outside, but not here in
21    this deposition room.
22 BY MS. HANDMAN:
23    Q   Did you give an exclusive interview to NBC
24 News regarding this?
25    A   I don't know about exclusive, but I gave

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

1 an interview, I believe.
2    Q    And did you appear on television?
3    A    I don't remember when, a year later or
4 something there was some blurb, that was it.
5    Q    A year later, what, from when you gave
6 your interview?
7    A    Whenever I think it happened -- you asked
8 me if I gave an interview, and I think it was a year
9 later or something there was a blurb, a short blurb,
10 that's all I know.
11    Q    She said, "This is explosive charges."  Do
12 you think they didn't -- when you gave the
13 interview, they didn't broadcast it?
14        MR. KLAYMAN:  Wait, wait, wait.  That's
15    two questions.  What Ms. Myers thinks is
16    irrelevant and --
17        MS. HANDMAN:  I'm reading the quote.
18        MR. KLAYMAN:  Your form is incorrect
19    because you're tying her alleged reporting to a
20    question.  You're asking him independently.  So
21    can you please break it up?  The question is
22    not properly formed.
23        MS. HANDMAN:  Just say "objection as to
24    form," Mr. Klayman.
25        MR. KLAYMAN:  No, I'm not giving him

Page 151

1    testimony, I just want you to break it up.
2        THE WITNESS:  You can't give me long
3    things to remember.
4 BY MS. HANDMAN:
5    Q    Why did you agree to give this interview?
6    A    I believe it was my legal advice from my
7 attorney at the time.
8    Q    Why would it help your legal case?
9    A    I think it was concerned about the death
10 threats I had, had.
11    Q    What death threats?
12    A    I've had a number of death threats over
13 the years.
14    Q    Well, back in 2007, what death threats
15 were you concerned about?
16    A    People threaten to kill me.
17    Q    And who threatened to kill you?
18    A    Well, people either contacted me or I
19 think in one case, they left a note that they would
20 kill me and my family.
21    Q    And who do you believe was behind that?
22        MR. KLAYMAN:  Calls for speculation.
23        THE WITNESS:  I don't know.  I just hired
24    the necessary security people to protect my
25    family.

Page 152

1 BY MS. HANDMAN:
2    Q    What security did you hire?
3    A    A private security firm that had ex-Navy
4 SEALS and so forth in it.
5    Q    What's the name of the security firm?
6        MR. KLAYMAN:  Objection, relevance.
7        THE WITNESS:  It was something Global, I
8    can't tell you.
9 BY MS. HANDMAN:
10    Q    Did you report it to the police?
11    A    I reported it -- not to the FBI if that's
12 your -- the police, no.  I don't know if I reported
13 it to the police.  I reported it to the government.
14    Q    And who in the government did you report
15 it to?
16    A    What is the time frame of this again?
17    Q    2007.  This is May of 2007.
18    A    There may have been somebody that was
19 involved with the government that I had in the past,
20 security people that I dealt with.
21    Q    Did they take any measures in response?
22    A    I took measures.
23    Q    Did they -- did the government?
24    A    I don't know, I don't know.
25    Q    You've alleged in some of your papers that

Page 153

1 you believed that Mr. Trepp was connected to the
2 Bonanno family, the Mafia family?
3        MR. KLAYMAN:  Objection, vague and
4    ambiguous.  What do you mean, "the papers"?
5 BY MS. HANDMAN:
6    Q    The papers in this case, is that a belief
7 that you had?
8    A    You're obviously trying to get me killed
9 now.
10    Q    What's that?
11    A    I said, you're obviously trying to get me
12 killed now.
13    Q    This is -- you can mark this section
14 confidential, if you wish.
15        MR. KLAYMAN:  Well, the entire deposition
16    currently is confidential.
17        THE WITNESS:  Yes.
18 BY MS. HANDMAN:
19    Q    "Yes," you believe Mr. Trepp was --
20    A    Yes.
21    Q    Let's turn to the next article, which is
22 an article that appeared in Bloomberg News.
23    A    Is that this two-page one?
24    Q    No, we have finished with that.
25    A    Okay.

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

1    Q   And it's a longer article, dated
2 August 29, 2008.
3    A   The one with Ms. Blixseth.  That's Ms.
4 Blixseth's picture.
5    Q   The headline is:  "Yellowstone Club
6 Divorcee Entangled in Terrorist Software Suits."  Do
7 you remember this article?
8    A   Not specifically.
9    Q   Do you remember discussing it with Ms.
10 Blixseth?
11    A   No.
12    Q   Were you upset by this article at all?
13       MR. KLAYMAN:  He just testified --
14       THE WITNESS:  I haven't even read it.  I
15    don't remember it.  Yellowstone Club Divorcee,
16    that I surely knew.
17 BY MS. HANDMAN:
18    Q   Well, you're mentioned here as well.
19    A   So you tell me where you would like me to
20 read.
21       MR. KLAYMAN:  Finish this questioning
22    because we're an hour, and he needs to take a
23    break right now.
24 BY MS. HANDMAN:
25    Q   It's after code warrior, which is the --

Page 155

1    A   Just give me the page.
2    Q   Yeah, I believe it's the fourth page.
3    A   And it's got the heading:  "Code Warrior"?
4 I see it at the bottom, yeah.
5    Q   And it says that -- if you look below, it
6 says, "The computer code in question compresses
7 digital video so it can be transmitted more
8 efficiently.  It also purportedly picks out
9 patterns, such as targets for missiles or secret
10 messages embedded in broadcasts.  Its inventor,
11 Dennis Montgomery, 55, says in court papers of the
12 U.S. Air Force, used the software on the Predator, a
13 drone aircraft used to track terrorists in
14 Afghanistan and Iraq, and sometimes fire missiles at
15 them."
16       Then it talks about Mr. Trepp, and it
17 says, "That you had worked at 3Net Systems, a
18 Sacramento, California-based firm that made software
19 to help hospitals run their laboratories."
20    A   On the same page --
21       MR. KLAYMAN:  Wait.  No question pending
22    Mr. Montgomery.  Let her finish.
23 BY MS. HANDMAN:
24    Q   I'm just reading you the parts that
25 reference you.

Page 156

1       It says, "Montgomery ran into trouble" --
2 this is on the next page -- "while working at 3Net,
3 where a woman he supervised named Penne Page alleged
4 in a suit against the company that Montgomery twice
5 masturbated in front of her, and asked if it, quote,
6 'turned her on to watch him,' according to a summary
7 of her complaint in California Superior Court in
8 Sacramento.  The case was resolved without any
9 admission of wrongdoing, according to Page's
10 attorney, Chris Whelan."
11       Then, it refers to, it says, "No comment.
12 Montgomery declined to comment for this article,
13 quote, 'talk to my attorneys' he said in a telephone
14 call, and then hung up."
15       MR. KLAYMAN:  There is no question
16    pending.
17 BY MS. HANDMAN:
18    Q   The article goes into the Gibbons'
19 allegations, and it talks about the raid on your
20 house, and that you countersued with Mr. Flynn, and
21 then talks about you meeting Edra Blixseth?
22    A   Are you asking me something?
23       MR. KLAYMAN:  Just let her go, okay?  It's
24    her characterization of what's in there.  The
25    document speaks for itself, so there's an

Page 157

1    objection on that basis.  So just let her do
2    whatever she wants to do right now, and then
3    we'll deal with it when she finally asks you a
4    question.
5       THE WITNESS:  I thought she did ask me a
6    question.
7       MR. KLAYMAN:  No, she didn't ask you any
8    question.
9 BY MS. HANDMAN:
10    Q   The article also references the allegation
11 that -- well, it says, "She" -- Ms. Blixseth --
12 "dueling in court with Warren Trepp, once a top
13 trader for Michael Milken, who alleges that Edra and
14 a former partner of Trepp, in a software company,
15 stole computer code that purportedly could sift
16 through broadcasts from cutter-based news network,
17 Al Jazeera, and find embedded messages from
18 terrorists.  Edra tried to use connections to the
19 Republican party to sell the software to the
20 government for a hundred million, according to
21 Michael Flynn, a lawyer who was once on Edra's
22 payroll."
23       MR. KLAYMAN:  No question pending.
24       THE WITNESS:  I give up.  I don't know
25    what the point was she was trying to make.

40 (Pages 154 - 157)

CONFIDENTIAL

Page 158

BY MS. HANDMAN:

1  BY MS. HANDMAN:
2      Q   I'm about to make it.  Mr. Montgomery, did
3  you ever ask for a correction of anything in this
4  article?
5          MR. KLAYMAN:  Well, first of all, I object
6      because the article speaks for itself.  We have
7      no way of knowing whether you read it
8      accurately or not.
9          MS. HANDMAN:  I'm not asking that.  I'm
10     asking if he ever asked Bloomberg for a
11     correction.
12         MR. KLAYMAN:  And he previously testified
13     that he didn't recollect the article.
14         MS. HANDMAN:  Well, he may recollect
15     whether he asked for a correction.
16         MR. KLAYMAN:  You haven't asked him a
17     foundation question, which you haven't done.
18         THE WITNESS:  You're trying to confuse me
19     because of my stroke.  You're asking me -- when
20     I say I didn't see the article, you're asking
21     me questions about something that I don't
22     believe I even saw.
23  BY MS. HANDMAN:
24     Q   And you never heard about it?
25     A   Not Bloomberg, no.  I got to get up.  My

Page 159

1  muscles are causing enormous havoc right now.
2          MR. KLAYMAN:  Get up.  Let's take a break.
3      We're an hour and five minutes.  We'll take a
4      break.
5          THE VIDEOGRAPHER:  We're off the record.
6      The time is 2:33 p.m.
7          MR. KLAYMAN:  How much time has been
8      expended?
9          THE VIDEOGRAPHER:  We're now at three
10     hours and 57.
11         (A recess was taken after
12     which the following proceedings were had:)
13         THE VIDEOGRAPHER:  We're back on the
14     record.  The time is 2:42 p.m.
15  BY MS. HANDMAN:
16     Q   Mr. Montgomery, I don't know if you had a
17  chance to read the article at all during the break,
18  but it talks about that the demonstration of the
19  bazooka was faked, and it quotes Mr. Flynn as saying
20  his clients have been lying to him.  Montgomery's
21  software couldn't pick out the bazooka or anything
22  else in a stream of the video.  Did you ever ask for
23  a correction?
24         MR. KLAYMAN:  Objection.  Totally improper
25     question.  Again, you're characterizing the

Page 160

1      article.  You're not even letting him respond,
2      and then you're asking him, you're jumping
3      ahead as to whether he asks for a correction,
4      and you never laid the foundation.
5  BY MS. HANDMAN:
6      Q   Did you ask for --
7      A   I thought I said, I didn't even see it or
8  remember it.
9      Q   Do you remember receiving an email from
10 Edra Blixseth on August 27, 2008, which would be
11 the, I guess, the night before this article?
12         It says, "Dennis, you did not deserve the
13 Bloomberg article.  You have not deserved a Mike
14 Flynn turning on you."
15     A   I don't know what she's saying.  You have
16 to somehow turn yourself to look at me.  If you read
17 down, I don't hear much.
18     Q   I'm sorry.  I'm reading an email from
19 Edra Blixseth to you.  Is your email
20 Dennis@ncoder.net?
21     A   Yes.
22     Q   Her email is LearG2@aol.com?
23     A   It was at one point.  I don't know when it
24 changed.
25     Q   And she writes in this email, "Dennis, you

Page 161

1  do not deserve -- you did not deserve the Bloomberg
2  article."
3          Does that refresh your recollection as to
4  whether you saw the Bloomberg article?
5      A   No, but is it referring to this article?
6      Q   Well, it's around the same date.
7          MR. KLAYMAN:  She can't testify to that so
8      let her ask the question properly.
9  BY MS. HANDMAN:
10     Q   She goes on to say, "You have not deserved
11 a Mike Flynn turning on you?"
12         MR. KLAYMAN:  So what's the question?
13     Stop, stop, stop.
14         What is the question because you're just
15     jumping all over the place?
16 BY MS. HANDMAN:
17     Q   The question is:  Whether that refreshes
18 your recollection as to whether you saw the
19 Bloomberg article?
20     A   No, that does not reflect.
21     Q   It's fair to say then you did not ask for
22 a correction?
23     A   You just asked me if I didn't remember the
24 article.
25     Q   Did you ask for a correction?

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

1        MR. KLAYMAN: Wait. It assumes facts not
2    in evidence. It's totally improper.
3  BY MS. HANDMAN:
4     Q   Did you ask for a correction?
5     A   I don't know.
6     Q   You don't remember asking for a
7  correction; is that correct?
8        MR. KLAYMAN: Same objection.
9        THE WITNESS: Are you aware of what a
10    stroke involves? Cognitive memory defects.
11    I'm trying my best. You're firing at me at
12    light speed, and I think at the speed of a
13    snail. You're looking for spontaneous, quick
14    answers that I don't have the ability to give
15    you.
16  BY MS. HANDMAN:
17    Q   Did you look through your documents to see
18  if you had sought any correction of this Bloomberg
19  article or any article regarding you?
20       MR. KLAYMAN: That's three questions.
21    Objection as to form.
22  BY MS. HANDMAN:
23    Q   Did you look through your -- in response
24  to our document request?
25    A   I don't recall.

Page 163

1     Q   Let's move onto a New York Times article,
2  "Governor of Nevada is Cleared in an Inquiry on
3  Gifts, his Lawyer Says." That's dated November 3rd,
4  2008.
5        It references you in the second page here,
6  "Blxware, LLC, the company where Mr. Montgomery now
7  works, said the terms of the settlement" -- this was
8  the settlement of the civil lawsuit between you and
9  eTreppid -- "were confidential, but the company
10  based in Bellevue, Washington disclosed that the
11  agreement included a payment to Mr. Trepp as, quote,
12  'compensation for certain allegations' made against
13  him in the news media. Blxware was a party to the
14  lawsuit."
15       Does that -- was the settlement in the --
16  what we've called the eTreppid litigation include a
17  compensation for certain allegations made against
18  Mr. Trepp in the news media?
19    A   I don't believe it did.
20    Q   Did you seek a correction of this article?
21       MR. KLAYMAN: Objection. You haven't laid
22    the foundation.
23  BY MS. HANDMAN:
24    Q   Do you recall seeing this article?
25    A   No.

Page 164

1     Q   Did you seek a correction of it?
2     A   A correction of what?
3        MR. KLAYMAN: Wait. That's a nonsecular.
4  BY MS. HANDMAN:
5     Q   You just said that this was wrong, that it
6  was not a compensation for certain allegations.
7        MR. KLAYMAN: Objection. The second
8    question is totally inappropriate because you
9    couldn't lay the foundation.
10       MS. HANDMAN: I've laid the foundation
11    that I've asked him: Did he ever seek a
12    correction.
13       MR. KLAYMAN: Look, I'm trying to do
14    what -- I'm not trying to do what you did
15    during the deposition of Risen. I'm just
16    trying to make an objection, but the problem is
17    if you want Mr. Montgomery to go out of the
18    room, I'll clear it up because you're just
19    muddying up the record -- let me finish --
20    you're muddying up the record to a degree, and
21    I think you're doing it intentionally.
22       You have obviously been a lawyer for a
23    long time. You know how to put two questions
24    together to assume that the first one is
25    correct or that you got a response that you

Page 165

1  want by tying the second one to it, and that is
2  what is wrong with this because he testified
3  that he didn't recollect the article at all.
4  So how do you ask him if he asked for a
5  correction, unless you're somehow trying to ask
6  him a loaded trick question.
7        MS. HANDMAN: I've asked him two separate
8    things. He may remember asking for a
9    correction, and he may not remember the
10    article.
11  BY MS. HANDMAN:
12    Q   I'm trying to find out what articles he
13  ever asked for corrections. This goes to actual
14  malice. I'm allowed to do this. Let me move on. I
15  don't want to waste anymore time discussing it.
16       MR. KLAYMAN: That's fine.
17       MS. HANDMAN: No, I don't want to waste
18    anymore time.
19       MR. KLAYMAN: I'm putting it on the
20    record. This is the way you take depositions,
21    and defend them, and it's abusive and it's
22    improper because you cannot assume and try to
23    tie two questions together when he said he
24    never saw the article, he doesn't remember, and
25    then you're asking him if he made a correction,

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

1    this is slick, it's inappropriate.
2  BY MS. HANDMAN:
3    Q   Mr. Montgomery, if you go to the next
4  article, "Nevada Governor May Sue Accuser over
5  Federal Probe, USA Today?"
6    A   I can't read it.  The print is so small I
7  can't read it.  So somebody is going to have to read
8  it for me and verify that that is what is being
9  read.
10   Q   That's the headline, which is fairly
11 large, I think you can see that:  Nevada Governor
12 May Sue Accuser Over Federal Probe?
13   A   If you looked up my medical records, you
14 will see my problem is that certain types of things
15 become double.  So what I see are wide characters
16 overlapping other characters.  I can't -- I have
17 very little sight on my left side, and my brain
18 injury affects all of my ability to read and
19 everything.  So you can't just say, "Well, that font
20 is bigger so you should be able to see it," it
21 doesn't work that way.
22   Q   So that presumably -- would that affect
23 your ability to engage in software work now?
24   A   You mean, being a computer programmer now?
25   Q   Yes.

Page 167

1    A   Well, that's a different thing because I
2  can talk into a computer and give it instructions or
3  I can have the information read to me through the
4  computer, so there's other avenues for handicap
5  people to try to do their best to adjust to the
6  traumatic injury that they suffer.
7    Q   Well, I'm trying to read this to you.  I'm
8  sure Mr. Klayman would object if I misread the
9  headline.
10       Then, I want to read to you a paragraph
11 below where it says, "Montgomery's credibility was
12 put in doubt after a computer expert questioned the
13 authenticity of emails, Montgomery claimed proved
14 Gibbons was accepting gifts."
15       Do you remember this USA Today article
16 discussing that the question of your credibility
17 being put in doubt because of emails?
18       THE WITNESS:  Well, not this thing in
19       particular, but you've made a reference in this
20       to a computer expert somewhere in the document.
21       I believe that was reference to their computer
22       expert, and our computer expert testified to
23       the exact opposite of that, and it was not
24       tampered with.
25

Page 168

1  BY MS. HANDMAN:
2    Q   But ultimately you agree that charges were
3  not brought against the governor; is that correct?
4    A   Well, as far as I know they didn't, but
5  that doesn't mean the information I provided wasn't
6  accurate.
7    Q   Did you ever ask for a correction of the
8  USA Today article?
9        MR. KLAYMAN:  Objection, lacks foundation.
10       THE WITNESS:  I don't remember seeing it.
11 BY MS. HANDMAN:
12   Q   Do you remember -- you didn't become aware
13 that the governor may sue the accuser, that would be
14 you, over federal probe?
15       MR. KLAYMAN:  Is that a separate question?
16 BY MS. HANDMAN:
17   Q   Do you remember that the governor was
18 thinking of suing you over the federal probe?
19   A   I didn't -- no, I didn't remember him
20 saying he was going to sue me.
21   Q   So you never asked for a correction of
22 this USA Today article?
23       MR. KLAYMAN:  Objection, asked and
24       answered.
25       THE WITNESS:  I don't even remember it.

Page 169

1  BY MS. HANDMAN:
2    Q   But you didn't ask for a correction; is
3  that correct?
4        MR. KLAYMAN:  This is the same slick,
5        dishonest approach that you've been using.
6        Stop, please.
7  BY MS. HANDMAN:
8    Q   No, please answer my question.
9        MR. KLAYMAN:  No, he's not going to answer
10       your question unless you phrase it properly.
11       You can't tie something that way.  Why can't
12       you do it the right way?
13       MS. HANDMAN:  I've asked him if he's seen
14       it, and then I'm asking him if he's made a
15       correction.
16       MR. KLAYMAN:  He said he doesn't remember
17       anything about it.
18       MS. HANDMAN:  You can argue that in
19       response to the credibility of the answer.  I'm
20       allowed to ask him if he ever asked for a
21       correction.
22       MR. KLAYMAN:  What you're trying to do, is
23       you're trying to use the answer to a second
24       question to infer that he knew the answer to
25       the first.

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

1      MS. HANDMAN:  Tell it to the jury.  He's
2   allowed to answer these questions.
3      MR. KLAYMAN:  I'm going to keep objecting.
4   Go ahead.
5 BY MS. HANDMAN:
6      Q   Do you remember an article in Playboy
7   Magazine that appeared in January, February 2010
8   issue called: The Man Who Conned the Pentagon, by
9   Aram Roston.
10     A   I didn't know that's where it appeared.  I
11  thought it was -- there was an article, I don't
12  remember that date.
13     Q   Well, if you would skip a few of these
14  articles, and you will see the article of, The Man
15  Who Conned the Pentagon.
16     A   Okay, I have it.
17     MR. KLAYMAN:  If you want time to review
18  it, go ahead.
19     THE WITNESS:  Well, she hasn't asked me a
20  question.
21 BY MS. HANDMAN:
22     Q   Well, do you recall it?
23     A   I know there was an article in Playboy.
24     Q   Was it about you?
25     A   I thought it was about Tara Reid.

Page 171

1      Q   About what?
2      A   I was trying to be clever.  That was about
3   the playmate that was in it.  Yes, there was an
4   article.
5      Q   And are you the -- in the title:  The Man
6   Who Conned the Pentagon, is that referring to you?
7      A   Since I didn't con the Pentagon, I would
8   have to assume it's not me.
9      Q   Well, in the fourth paragraph, it says,
10  "The man's name is Dennis Montgomery, a
11  self-proclaimed scientist who said he could predict
12  terrorists attack, operating with a small software
13  development company, apparently convinced the Bush
14  White House, the CIA, the Air Force and other
15  agencies that Al Jazeera, the Qatari-owned TV
16  network, was unwittingly transmitting target data to
17  Al Qaeda sleepers."
18     A   Does that indicate to you that you are
19  indeed the subject of this article?
20     MR. KLAYMAN:  Take your time and review
21  it.
22     THE WITNESS:  Well, how can I review
23  something I can barely read?  I can look at the
24  larger pieces of --
25     MR. KLAYMAN:  Take your time, whatever

Page 172

1   time it takes.
2      THE WITNESS:  This is quite a lengthy
3   article.
4 BY MS. HANDMAN:
5      Q   I'm only going to ask you one other
6   question, a few other questions about it.
7      MR. KLAYMAN:  Let him review it, please.
8      THE WITNESS:  I can't obviously read the
9   whole thing.  It would take me a while.
10     MR. KLAYMAN:  Well, take whatever time it
11  takes.
12 BY MS. HANDMAN:
13     Q   Well, let me direct you to a couple of
14  things.
15     MR. KLAYMAN:  Have you had a chance to
16  review it?
17     THE WITNESS:  I've only gotten to the
18  first few pages.
19     MR. KLAYMAN:  Well, read the whole thing,
20  as best you can.
21 BY MS. HANDMAN:
22     Q   Okay.
23     A   I can only look at some of the words.
24     Q   Well, let me ask you:  Did you ask Playboy
25  for a correction of this article at the time it was

Page 173

1 published?
2      A   Yes.
3      Q   When did you make that request?
4      A   Over a number of years.
5      Q   Did you make it in writing?
6      A   Yes.
7      Q   Have you produced that document?
8      A   I don't know if I did or not, but I did --
9   I did make a request of them to correct the articles
10  that were incorrect.
11     Q   And were those requests made before or
12  after this lawsuit?
13     A   Before.
14     Q   And they were in writing before?
15     A   To the best of my knowledge, yes.
16     Q   And were they an email?
17     A   Maybe they were faxed.
18     Q   And did you retain a copy of that?
19     A   I think so, yes.
20     Q   I call for that production.
21     MR. KLAYMAN:  We'll check to see if he has
22  it.
23 BY MS. HANDMAN:
24     Q   What was the date of that -- those?
25     MR. KLAYMAN:  I need to also say this:  We

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

1     think that it was produced, but we'll go back
2     and check.
3   BY MS. HANDMAN:
4       Q   What was the date that you demanded the
5   correction, you said, "It was over a number of
6   years."
7           When was the first time you demanded a
8   correction?
9       A   I don't remember when, but it was over
10  quite a number of years.
11      Q   Did you ever speak to Mr. Roston?
12      A   Once.
13      Q   When was that?
14      A   He called my cell phone I think about a
15  month or two ago.
16      Q   And what was the purpose of the call?
17      A   He called me.
18          MR. KLAYMAN:  Excuse me, he can't testify
19  for Mr. Roston.
20      Q   What did you discuss?
21      A   Did you say Roston or Risen?
22      Q   Roston.
23      A   He introduced himself, and I hung the
24  phone up.
25      Q   And did Playboy make any corrections to

Page 175

1   this article?
2       A   I don't know.  I don't subscribe to the
3   magazine.
4       Q   Are you aware of any correction?
5       A   I don't know.
6       Q   Did you sue Playboy over this article?
7       A   No.
8       Q   Did anyone talk to you about this article?
9           MR. KLAYMAN:  Objection, vague and
10  ambiguous.
11  BY MS. HANDMAN:
12      Q   Did anyone mention having read this
13  article to you?
14      A   Like who?
15      Q   Like, people you would be doing business
16  with?
17      A   I don't recall.  That's five years ago or
18  so, you know, I don't recall.
19      Q   Do you recall whether it was before you
20  were diagnosed with your aneurysm?
21      A   Well, this article is in 2010, and I think
22  I told you my aneurysm was discovered in 2011.
23      Q   Although, your doctors say 2010?
24          MR. KLAYMAN:  Objection, move to strike.
25  You can't testify for him.

Page 176

1           MS. HANDMAN:  Well, we've shown documents
2   to that effect.
3           MR. KLAYMAN:  You still can't testify to
4   that, but I'll be happy to take your
5   deposition.
6           THE WITNESS:  They are taking my
7   deposition.
8           MR. KLAYMAN:  I'm talking about hers.  She
9   wants to testify.
10          MS. HANDMAN:  Let's mark it as Exhibit 11.
11          (Exhibit 11 was marked for identification.)
12  BY MS. HANDMAN:
13      Q   Mr. Montgomery, what has been marked as
14  Exhibit 11, your Twitter page?
15      A   I don't believe I ever had a Twitter page.
16      Q   Is that a picture of you that appears on
17  this page?
18      A   Yes.
19      Q   And is @Ncoder_ Dennis a Twitter handler
20  that you used?
21      A   I believe I found somebody using Twitter
22  on me, and I reported it to whoever the authorities
23  were.  If I did, I don't remember.  If I did, it had
24  to be one time.  I don't remember.
25      Q   Well, if you look on the right column,

Page 177

1   there is a number of retweets by you of various and
2   postings tweets by you or purporting to be by you
3   about Blixseth and other matters related to your
4   business.
5       A   Is that a question?
6       Q   Yes, these refresh your recollection as to
7   whether you used Twitter?
8       A   I didn't use Twitter.  If I did it, I did
9   it one time and turned it off.  I don't ever
10  remember even being on Twitter.
11      Q   Do you know whether the Twitter page still
12  is posted?
13      A   I have no idea.
14      Q   Did you take any steps to take it down?
15      A   I didn't put it up.
16      Q   Well, once it was up, did you take any
17  steps to take it down?
18      A   I contacted the authorities that are
19  involved in it, and, I believe, I sent an email
20  saying, "This is not me" or something.
21      Q   It says, "Yarrow Point, Washington joined
22  February 2013?"
23      A   Okay, I got it.
24      Q   When did you ask that it be taken down?
25      A   I don't remember when.

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

1    Q    Did you contact authorities?
2    A    On Twitter, I think.
3    Q    When?
4    A    I don't remember when, but I've never
5  Twittered people. I don't even know how to Twitter.
6    Q    You see at the banner there, The Man Who
7  Conned -- it's a partial image of the cover or the
8  title page of the Playboy article, The Man Who
9  Conned the Pentagon. Did you post that?
10    A    No.
11    Q    Did you take that down after we attached
12  this to our papers?
13    A    No.
14       MR. KLAYMAN: Same objection. He didn't
15  post the Twitter page. He can't take something
16  down. It's another one of these slick
17  questions.
18  BY MS. HANDMAN:
19    Q    Did you ask any of your family to take it
20  down?
21       MR. KLAYMAN: Same objection.
22  BY MS. HANDMAN:
23    Q    Were you aware that we had submitted this
24  Twitter page as part of our papers in this case?
25    A    I don't know what that means.

Page 179

1    Q    We submitted this as an exhibit in our
2  papers where we moved to dismiss your Complaint?
3    A    No. If you're saying that, okay, but I
4  didn't take it down nor did I put it up.
5    Q    And you didn't tell any family members to
6  take it down?
7    A    I don't remember seeing it.
8    Q    Do you remember any of your family members
9  taking it down?
10       MR. KLAYMAN: Objection, same objection.
11  BY MS. HANDMAN:
12    Q    Are your family members, younger family
13  members on Twitter?
14    A    Not that I know of.
15    Q    Turn if you would in the package to the
16  New York Times article of February 19, 2011.
17    A    Do I just keep going until I run across
18  it?
19    Q    Yeah, keep going and you will see it.
20  "Hiding Details of Dubious Deal, U.S. Invokes
21  National Security," you see that?
22    A    Yeah, I see the title of that one.
23    Q    And it's by Eric Lichtblau and James
24  Risen. Do you remember this article being
25  published?

Page 180

1       MR. KLAYMAN: Take your time and review
2  the whole thing, Mr. Montgomery. Take your
3  time.
4       MS. HANDMAN: Why don't we take a break
5  while Mr. Montgomery reads this.
6       THE VIDEOGRAPHER: We're off the record.
7  The time is 3:13 p.m.
8       (A recess was taken after
9  which the following proceedings were had:)
10       MR. KLAYMAN: What is that?
11       THE VIDEOGRAPHER: It's four hours and 27
12  minutes as of now.
13       (A recess was taken after
14  which the following proceedings were had:)
15       THE VIDEOGRAPHER: Back on the record.
16  The time is 3:18 p.m.
17  BY MS. HANDMAN:
18    Q    Mr. Montgomery, do you recall this
19  article: Hiding Details of Dubious Deal, US Invokes
20  National Security?
21       MR. KLAYMAN: He had to go to the bathroom
22  so he still needs to review it.
23       THE WITNESS: I want to go on the record:
24  It's hard to sit here when you're sitting in
25  your own excrement when you're giving

Page 181

1  depositions. I don't have my family around to
2  take care of me and realize what's going on
3  when I can't control my bladder or my bowels.
4  I'm doing the best I can under what I consider
5  some pretty tough conditions.
6       MS. HANDMAN: Well, you chose to bring
7  this lawsuit, Mr. Montgomery.
8       MR. KLAYMAN: I think that's an offensive
9  remark, and it shows your attitude toward my
10  client, your heartless approach, and, frankly,
11  it's uncalled for, and I suggest you apologize
12  to him.
13       MS. HANDMAN: I've been -- this should be
14  off the record while you read. Please read the
15  article.
16       THE WITNESS: Why is it off the record?
17       MS. HANDMAN: Because we went off the
18  record so you could read the article, and I
19  will say, that I have been as courteous as
20  possible.
21       THE VIDEOGRAPHER: We're off the record.
22  The time is 3:19 p.m.
23       (An off-the-record discussion was had.)
24       MS. HANDMAN: I've tried to accommodate
25  you in every way. We were even willing to do

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

1  this in Seattle where you would have your
2  family by you, and I wouldn't have had to
3  travel many, many hours on a plane, and so I
4  have -- I think I have been as courteous and
5  careful as I could possibly be recognizing your
6  limitations and --
7      THE WITNESS:  I think you're trying to
8  capitalize on it.
9      MS. HANDMAN:  Well, I don't believe so.
10     THE WITNESS:  Well, you're not the one
11 sitting here in your own excrement and you're
12 not the one sitting here being asked
13 double-negative questions of a person who has a
14 cognitive defect, and doesn't even understand a
15 lot of what you're asking.  I'm just trying to
16 do the best I can.
17     You have my neurological reports by the
18 neuropsychiatrist.
19     MR. KLAYMAN:  Are we on the record?
20     MS. JAMES:  No.
21     MR. KLAYMAN:  Okay, fine.  That's fine.
22     THE WITNESS:  Am I supposed to be doing
23 something?
24     MS. HANDMAN:  Your counsel wants you to
25 read this article.

Page 183

1      MR. KLAYMAN:  Yeah.  Let's go back on the
2  record.
3      MS. HANDMAN:  Not while he's reading the
4  article, no.
5      MR. KLAYMAN:  It's part of the deposition.
6  We're back on the record.
7      THE VIDEOGRAPHER:  Both parties have to
8  agree to go back on the record.
9      MR. KLAYMAN:  All right.  Let me go back
10 on the record to make an objection.
11     MS. HANDMAN:  Please read the article.
12     THE VIDEOGRAPHER:  We're back on the
13 record.  The time is 4:20 p.m.
14     MR. KLAYMAN:  I'm going to make an
15 objection as to Ms. Handman's approach here.
16 She's saying that, in effect, that any time my
17 client has to review an article, and he is
18 sufficiently impaired, and he's been testifying
19 quite a while here today, four hours, five
20 hours, four-and-a-half hours approximately,
21 that she's going to go off the record and not
22 count that time.  That's not inappropriate,
23 that's not the way depositions are taken.  This
24 is part of the deposition process.  He's
25 entitled to review it in a reasonable amount of

Page 184

1  time.  And it would appear that the reason for
2  this is to physically paint him into a
3  condition, which is detrimental for him in
4  terms of this deposition.  And to string it out
5  as long as possible is a type of retaliation
6  for bringing the lawsuit.
7      She just made a comment when he told her
8  that he had a physical problem here, "That's
9  too bad, you brought the lawsuit," and that's
10 similar to a comment that was made about his
11 condition at the first status conference, which
12 showed a complete disrespect for Mr. Montgomery
13 and his medical condition, and I would ask that
14 you not do that because he has a brain
15 aneurysm.  It's quite upsetting, and let him
16 review the article as part of his deposition.
17 He's not taking an unreasonable amount of time
18 given his state of affairs.  So let him do it.
19     MS. HANDMAN:  Mr. Klayman, would you
20 please stop using up our time with your long
21 speaking soliloquies.  Tell the judge if you
22 feel I'm behaving inappropriately.  As I said,
23 I tried to accommodate him.  I said, we would
24 even do it in Seattle, but -- and we would
25 adjourn it if he wasn't well, and to allow him

Page 185

1  not to have to come back again, but you will
2  have to if we get the disclosure.
3      MR. KLAYMAN:  The only question is, just
4  let him review it.
5      MS. HANDMAN:  I'm letting him review it.
6      MR. KLAYMAN:  Without making wisecracks.
7      THE WITNESS:  I made it clear to you that
8  the average person doesn't sit for five to
9  seven hours in their own excrement when they're
10 doing this, and I'm trying my best under those
11 conditions, but I can't control my cognitive
12 defects.  I gave you my medical report showing
13 you from the neuropsychologist that I've lost a
14 lot of my cognitive defects.
15     So you're asking me complex questions that
16 I may not understand, and I'm just telling you
17 that, that is the truth.
18     MR. KLAYMAN:  Okay.  That's enough.  Let's
19 move on.
20     THE WITNESS:  Let's go on.
21     MR. KLAYMAN:  Let's move on.  Put it on
22 the record because this is an effort in my view
23 to try to harass him, so let's go forward.
24     THE WITNESS:  Okay.  Got to the end.
25     (PLEASE SEE VOLUME II)

47 (Pages 182 - 185)

CONFIDENTIAL

**[& - 7050]**

| & |
| --- |
| **&**  1:12 2:11 |

| 0 |
| --- |
| **057**  41:22 |

| 1 |
| --- |
| **1**  1:17 3:11 4:3 12:15 12:21 142:4,9 |
| **1,200**  60:10 |
| **1.2**  71:15 |
| **1.3**  83:18 |
| **1.5**  56:15 57:2,3,12 57:13 59:10,13,16 |
| **10**  3:6,16 11:21 59:22 118:10,12,15 |
| **10,000**  71:21 |
| **100,000**  146:15 |
| **103**  17:13 |
| **10:03**  38:24 |
| **10:08**  39:3 |
| **10:58**  72:20 |
| **11**  3:16 30:12,12,12 48:1 79:3 176:10,11 176:14 |
| **118**  3:16 |
| **11:14**  73:1 |
| **12**  3:11,17 30:12,16 30:21 31:24 102:11 127:23 |
| **12:13**  116:4 |
| **12th**  27:10 28:18,25 32:1 |
| **13**  3:17 78:16 86:6,24 |
| **14**  3:18 |
| **15**  1:2 3:18 54:13,14 68:6 72:22 102:11 145:11 |
| **15,000**  70:4 |
| **15-287**  2:4 |
| **16**  3:19 |
| **17**  3:19 |
| **176**  3:16 |
| **17th**  30:19 |

| 185 |
| --- |
| **185**  1:17 |
| **19**  179:16 |
| **1919**  2:8 |
| **1998**  145:25 |
| **1:30**  116:8 |
| **1:38**  116:22 |
| **1st**  45:4 |

| 2 |
| --- |
| **2**  3:12 30:6,9 |
| **2/23/15**  41:23 |
| **20**  1:12 4:2 131:18 |
| **200**  18:4 57:16 |
| **200,000**  58:13 59:9 |
| **2000**  54:12 99:14 117:12 |
| **20006**  2:9 |
| **2002**  99:15 |
| **2003**  97:11 99:7,15 99:23 100:17 101:20 102:14 105:8,9,17,23 107:21 119:4,16,20 122:14,24 123:5 125:3 131:8,10 137:20 138:14 |
| **2004**  24:7 |
| **2005**  118:21 119:25 120:15 |
| **2006**  11:21 108:10 141:25 142:4,9 |
| **2007**  104:9 142:5 145:11 147:22 148:8 151:14 152:17,17 |
| **2008**  154:2 160:10 163:4 |
| **2009**  11:21 |
| **2010**  47:6 48:1 62:9 62:13,24 63:25 64:18 66:12 79:1 170:7 175:21,23 |
| **2011**  60:23 83:20 84:19,25 95:18 175:22 179:16 |
| **2012**  49:1,14,19,25 50:12 94:12 |

| 2013 |
| --- |
| **2013**  48:12 177:22 |
| **2014**  19:4 53:9 58:12 65:18 74:12,13,15 76:18,18,25 77:1,21 78:16,23 81:9 82:19 116:25 |
| **2015**  1:12 4:2 24:11 30:16,21 39:19 43:7 58:4 74:13 131:18 |
| **207**  3:17 |
| **20782**  1:2 |
| **20th**  7:13 |
| **215**  78:18 |
| **216**  3:17,18 |
| **21st**  7:12,17 |
| **223**  3:18 |
| **22819**  12:17 |
| **23217**  12:17,17 |
| **23rd**  36:3,13,15 39:19 |
| **24187**  61:18 63:12 |
| **24th**  43:7 44:6 |
| **25**  117:25 133:25 134:9 |
| **26**  81:9 82:19 |
| **26375**  63:17 |
| **27**  118:21 160:10 180:11 |
| **273**  3:19 |
| **282**  3:7 |
| **28th**  85:17,19 86:9 86:25 |
| **29**  154:2 |
| **292**  3:6,19 |
| **2:33**  159:6 |
| **2:42**  159:14 |

| 3 |
| --- |
| **3**  3:12 30:6,15 82:25 |
| **30**  3:12,12 78:15 121:9 |
| **300,000**  57:17 |
| **3300**  1:13 2:12 |
| **33131**  1:13 2:13 4:8 |

| 33433 |
| --- |
| **33433**  2:4 |
| **36**  103:12,12,13 |
| **37**  105:17,21 110:4,9 |
| **3:13**  180:7 |
| **3:18**  180:16 |
| **3:19**  181:22 |
| **3net**  155:17 156:2 |
| **3rd**  163:3 |

| 4 |
| --- |
| **4**  3:13 40:8,12 78:14 82:25 |
| **40**  3:13,13 92:18 93:3 93:10 95:2 97:6 |
| **41**  94:14,18,25 96:2 97:8 100:9 114:17,22 |
| **42,500**  130:8 |
| **43**  3:14 87:22 88:7 |
| **45**  90:4,8,9 93:5 |
| **4:20**  183:13 |

| 5 |
| --- |
| **5**  3:13 40:9,12,14,15 40:16,16,18 56:23 |
| **5.13**  83:23 |
| **50,000**  70:8 |
| **51**  116:15 |
| **55**  155:11 |
| **56**  3:14 |
| **57**  159:10 |

| 6 |
| --- |
| **6**  3:14 30:9,11 43:6,8 43:11,23 |
| **6/27/2005**  119:2 |
| **60**  63:22 |
| **61**  3:15 42:12 |
| **675**  17:13 |
| **6:36**  1:14 |

| 7 |
| --- |
| **7**  3:14 56:8,11 |
| **701**  1:13 2:12 4:7 |
| **7050**  2:4 |

**[8 - answer]**

**8**

**8**  3:15 61:11,15
**800**  2:8
**82**  3:15
**85th**  17:13

**9**

**9**  3:15 72:8 82:18,23
**9:13**  1:14 4:3

**a**

**a.m.**  1:14 4:3 38:24
  39:3 72:20 73:1
**ability**  51:24 162:14
  166:18,23
**able**  4:25 7:22 9:23
  14:19 25:15 48:7
  58:7 70:19 93:11,14
  93:25 94:2 106:1
  140:20 166:20
**absolutely**  57:6 97:2
**abusive**  165:21
**accept**  81:20 148:10
**accepting**  77:5
  167:14
**access**  5:8 16:10
**accommodate**  10:3
  72:17 181:24 184:23
**account**  45:6,19
**accurate**  43:16,17
  63:3 98:14,22,24
  101:21 103:21 105:9
  111:2,11,20 112:4
  114:23 115:4 168:6
**accurately**  83:9
  96:22 158:8
**accused**  145:25
**accuser**  166:4,12
  168:13
**accusing**  144:8
**achieve**  99:21
**action**  30:18 61:12
**actions**  121:22
**actively**  20:4

**actual**  165:13
**added**  40:20 98:12
  115:3
**addition**  5:5,13
**address**  11:13 12:7
  12:10 17:12 22:11,13
  23:1,8,20 37:6 41:5
  45:19,22 86:7 140:21
**adjourn**  6:6 184:25
**adjourned**  140:25
**adjournment**  6:1
**adjust**  9:15 167:5
**administration**  51:10
**admission**  156:9
**admitting**  85:1
**advantage**  139:21
**advice**  34:25 74:15
  151:6
**advise**  35:6 67:21
  68:19 74:24
**advised**  20:1
**advising**  66:23
**aero**  121:11
**affairs**  184:18
**affect**  74:20 166:22
**affidavit**  39:22
**affirmed**  4:19
**affordable**  84:5
**afghanistan**  155:14
**agencies**  23:10 57:20
  171:15
**agency**  99:13 125:21
**agent**  24:23 25:1,5
**aggravated**  67:24
  82:7
**ago**  48:3 68:18
  132:15 135:14
  174:15 175:17
**agree**  43:16 96:17
  112:22 116:24 117:7
  140:10 151:5 168:2
  183:8
**agreed**  109:19
**agreeing**  133:24
  134:7

**agreement**  7:9 18:18
  87:14 135:16 163:11
**ahead**  30:2 33:1 52:1
  54:7,24 78:10 94:23
  94:25 96:10 120:16
  145:12,18 160:3
  170:4,18
**air**  48:23,25 50:9
  99:12 103:5,7 104:12
  104:15,20,25 105:6
  105:12,18,25 106:7
  106:18,20 110:21
  111:17,19 112:2,5
  113:4,13,14,21
  121:11,11 126:25
  127:9 155:12 171:14
**aircraft**  155:13
**airline**  98:2
**airplanes**  98:13
  115:4
**al**  1:7 4:6 91:8 94:4,5
  95:5,7 97:10,13,14
  97:17 98:15 99:6
  100:16,19,22 101:13
  101:19 102:4,16,19
  114:17 119:22
  120:18,22 123:2,5,7
  124:12,17 125:12,14
  125:25 126:9 127:13
  128:7,8,12 131:6,23
  133:9,15,17 135:9
  136:10,15 157:11
  171:15,17
**alcohol**  68:14,14,17
  68:20,24,25 69:8,11
  69:13
**alert**  119:3,19 121:14
**alex**  55:20
**algorithms**  140:16
**allegation**  144:14
  157:10
**allegations**  117:18
  142:19 146:17
  156:19 163:12,17
  164:6

**alleged**  83:21 86:23
  98:18 146:14 150:19
  152:25 156:3
**allegedly**  146:21
**alleges**  87:22 157:13
**allow**  6:7 61:22 96:24
  142:22 184:25
**allowed**  70:20 130:23
  165:14 169:20 170:2
**altered**  147:10
**ambiguous**  51:6
  68:11 103:25 104:23
  116:1 117:10 129:11
  146:25 147:17 153:4
  175:10
**amended**  3:13 40:9
  78:14,15 83:19,24
  85:5,13 86:24 87:22
  88:5,7,8 89:4 90:5
  92:21,25 93:2
**america**  41:1 45:18
  80:7,15 121:3,8
**amount**  68:25 90:3
  133:25 134:8 183:25
  184:17
**analysis**  98:16 119:3
  119:19 121:14,23
**analyze**  90:20 91:7
**analyzing**  97:10 99:6
  100:22 101:18 102:3
  123:7
**aneurysm**  4:24 8:11
  26:21 60:19 62:11,24
  63:24 64:10,19,21
  65:23 66:8,12,16,19
  73:10,15,16,17,18,20
  73:21 74:1,8,23 78:9
  79:1 83:18 84:3,23
  88:25 143:17 175:20
  175:22 184:15
**answer**  10:16 13:23
  16:14,25 23:19 27:3
  27:4,5,24,25 33:1
  53:14 56:23 64:16
  72:4,6 73:4 77:23

CONFIDENTIAL

**[answer - back]**                                                      Page 188

78:11 81:24 86:1,20
87:4 91:20 92:11
99:23 100:3 109:2
123:16,17,25 129:5
135:19 138:3 139:13
143:13 147:1 169:8,9
169:19,23,24 170:2
**answered** 44:16,25
70:25 85:21 86:11
87:2,16 168:24
**answering** 13:24
**answers** 10:11
162:14
**anthony** 47:11
**anybody** 75:7,10,12
**anymore** 165:15,18
**anyplace** 121:1
**anyway** 67:12
**aol.com** 12:7 160:22
**apologize** 16:21
47:16 53:1 114:3
181:11
**apparently** 8:4
171:13
**appear** 27:9,19,23
28:9,11 36:2 146:12
150:2 184:1
**appearance** 7:4
27:16 31:17
**appearances** 2:1
**appeared** 36:5 42:5
112:18 153:22 170:7
170:10
**appearing** 28:5 36:10
91:7
**appears** 176:16
**apples** 98:19
**application** 51:22
84:5
**applied** 52:14,17,18
**apply** 58:8
**appointment** 31:22
33:24
**appreciate** 7:2 72:18

**approach** 169:5
181:10 183:15
**appropriate** 17:6
**approximately** 134:8
183:20
**april** 21:11,13 24:2,8
45:4 85:17,19 86:9
86:25 99:22
**aram** 118:20 170:9
**archive** 15:1
**area** 26:16 29:9 65:5
102:22
**arguably** 10:18
**argue** 169:18
**arizona** 53:16
**arose** 130:7
**arpaio** 132:3,5
**arrangement** 20:3
39:12 40:6
**arrangements** 37:7
37:14 39:6 87:9
**artery** 63:24
**article** 95:14 117:13
119:7,10,24 121:19
122:2 124:15 141:25
142:12,15,17 145:4
146:3 148:21 149:2,4
149:6 153:21,22
154:1,7,12 156:12,18
157:10 158:4,6,13,20
159:17 160:1,11,13
161:2,4,5,19,24
162:19,19 163:1,20
163:24 165:3,10,24
166:4 167:15 168:8
168:22 170:6,11,14
170:23 171:4,19
172:3,25 175:1,6,8
175:13,21 178:8
179:16,24 180:19
181:15,18 182:25
183:4,11,17 184:16
**articles** 3:16 117:1,3
117:7,10,22 118:4,15
142:7 165:12 170:14

173:9
**aside** 139:8
**asked** 10:19 26:14
34:20 36:11 44:15,24
48:18 56:13 69:23
85:21 86:11,13 87:1
87:16 97:11 99:7
100:18 101:20
107:16 108:17
109:17 110:6,20
111:1 129:4,14
133:12 147:3,4 150:7
156:5 158:10,15,16
161:23 164:11 165:4
165:7,13 168:21,23
169:13,20 170:19
182:12
**asking** 13:21 48:15
49:13 51:21 55:15
57:9 68:23 81:21
88:5,14 98:5 108:5
117:6,25 130:22
137:6,8 139:9,10
141:9 143:18 148:13
149:5,6,8,11 150:20
156:22 158:9,10,19
158:20 160:2 162:6
165:8,25 169:14
182:15 185:15
**asks** 157:3 160:3
**assisted** 24:18,19,21
25:6 26:8 35:12
**assisting** 23:11
**associated** 13:2 46:21
59:19
**assume** 60:10 77:22
133:16 164:24
165:22 171:8
**assumes** 11:14 27:11
28:6 38:1 46:3 51:5
76:21 162:1
**assuming** 78:2 124:4
**at&t** 55:8
**attached** 29:25 30:8
178:11

**attachment** 40:20
**attack** 171:12
**attacks** 123:11
**attempt** 10:3 146:22
**attention** 149:10
**attest** 51:15
**attitude** 181:9
**attorney** 67:17 82:15
147:7,8 151:7 156:10
**attorneys** 108:21
156:13
**attribute** 125:6,9
**audited** 35:22
**august** 1:12 4:2 7:13
7:13,17 20:19 27:10
28:18,25 30:16,19,21
30:21 31:24 32:1
131:18 154:2 160:10
**authenticity** 167:13
**authored** 95:15
**authorities** 176:22
177:18 178:1
**automatic** 125:23
126:12
**available** 75:10,12
77:19
**avenue** 1:13 2:8,12
4:8 78:18
**avenues** 167:4
**average** 185:8
**awarded** 105:18,24
106:6,7
**aware** 10:10 26:23
27:8 76:17 88:12
95:14 162:9 168:12
175:4 178:23

**b**

**b** 3:8
**bachman** 31:12
**back** 39:2 42:14,16
43:25 51:25 56:7
63:25 67:4 72:25
95:2 100:9,23 107:20
114:17 116:10,21

Veritext Legal Solutions

CONFIDENTIAL

**[back - brought]**                                                                                              Page 189

135:16 139:17
151:14 159:13 174:1
180:15 183:1,6,8,9
183:12 185:1
**backing** 142:13
**backside** 94:17,19
**bad** 29:14 76:2 184:9
**badger** 87:17
**badly** 72:14
**bank** 45:6,12,14,16
45:18,19 80:7,8,15
81:13
**bankruptcy** 83:25
84:8
**banks** 80:15,19 82:6
83:3,3 84:17
**banner** 94:5 95:6
178:6
**barely** 171:23
**base** 48:23,25 50:10
105:6
**based** 94:6 97:22
106:8 155:18 157:16
163:10
**basic** 74:23 137:22
**basis** 16:3 17:2 18:7
44:9 76:14 129:23
157:1
**bates** 12:16 61:18,19
63:12,16
**bathroom** 38:16,22
180:21
**battling** 146:2
**bazooka** 106:17
114:5 159:19,21
**bears** 12:16
**bedrooms** 17:16,18
**beep** 107:6
**began** 24:24 39:9
**beginning** 105:13
149:14
**behalf** 2:2,6,10 6:5
28:9,12 31:12 43:12
70:15 73:6 133:2

**behaved** 79:14
**behaving** 184:22
**belief** 44:9 153:6
**believe** 17:25 18:14
27:18 29:1 32:1,3
33:19 37:13 39:8,10
40:7 44:8 45:4 47:20
52:17 53:14 54:17
57:15 61:6 65:19
68:25 69:25 76:25
78:21 79:3 81:10
94:12 99:22 102:2,7
103:13 105:3 108:11
108:19 109:12,25
111:13,14,15 112:16
123:19 128:15,15,22
130:16 131:25
133:11 135:12,16
144:18 145:2 150:1
151:6,21 153:19
155:2 158:22 163:19
167:21 176:15,21
177:19 182:9
**believed** 122:5
132:16 153:1
**bellevue** 163:10
**belong** 135:1,10
**benefit** 5:13 143:19
**benefits** 51:12 52:25
53:4,5
**bennett** 147:8
**bent** 96:8
**best** 69:17 135:5,15
162:11 167:5 172:20
173:15 181:4 182:16
185:10
**better** 13:7 35:13
86:14 121:16 125:13
137:2 141:14
**beyond** 66:13
**bidding** 70:13
**big** 17:14 119:4
126:18,20,24 127:8
**bigger** 166:20

**bill** 55:4 60:11
**bills** 54:23,25 55:3
59:18,18
**bit** 13:4 79:23
**bizarre** 43:4 121:14
121:23 122:6
**black** 145:7
**bladder** 181:3
**blah** 78:18,18,19
**blame** 80:5
**blaming** 84:16
**blank** 25:4 32:8
**blanket** 111:22
**blanks** 32:11
**blixseth** 11:13,17,18
11:23 13:1,11,11
14:4,7,10,13 15:1
134:17 154:3,10
156:21 157:11
160:10,19 177:3
**blixseth's** 154:4
**blood** 143:15,17
**bloomberg** 153:22
158:10,25 160:13
161:1,4,19 162:18
**blurb** 150:4,9,9
**blxware** 26:5,7
133:15 134:17,18
135:1,7,11,17,18
136:6,7 163:6,13
**boca** 2:4
**bogus** 119:3,19
**bonanno** 153:2
**book** 76:10,17,17,19
76:24 77:1,11,17,17
78:19 87:23,25 88:7
88:10 89:6,18 92:15
92:16,18 93:1,7,9,9
94:11,14 95:12 98:20
100:25 103:3 107:9
107:11,12 108:2
109:14 111:17
116:25 117:14
**borgyan** 25:14

**bother** 16:13 79:24
**bottom** 81:15 83:1
103:12 110:4,10
143:25 145:15 155:4
**bought** 126:25
**bowels** 181:3
**bowl** 141:22
**brain** 4:23 8:11
26:20 34:2 48:11,14
48:20 58:20,22 62:7
65:23 66:8 82:12,20
83:18 143:17 166:17
184:14
**break** 10:1 38:4,6,10
38:13 58:23 68:4,6,7
72:10,22 106:5
112:25,25 116:2
150:21 151:1 154:23
159:2,4,17 180:4
**breaking** 74:8
**breaks** 7:2
**brenda** 82:21
**brennan** 3:17
**brian** 2:11 7:3,5
**bribe** 146:23 147:3
**brickell** 1:13 2:12 4:8
**brightness** 8:18
**bring** 59:6 74:16
181:6
**bringing** 74:17 127:9
184:6
**british** 121:11
**broad** 125:14 126:7
**broadcast** 91:8 94:5
95:7 102:16 120:22
123:2,6,7 128:7
150:13
**broadcasted** 119:8
**broadcasts** 97:17
155:10 157:16
**broadly** 125:18
**broken** 74:9
**brought** 34:19 97:12
99:16 134:22 144:4,7
168:3 184:9

CONFIDENTIAL

**budget** 142:11 145:7
**building** 106:14,21
**built** 91:15 99:20
**bush** 122:16 171:13
**business** 11:17 25:24
  47:12 146:8 175:15
  177:4
**button** 107:3,5

**c**

**c** 32:10 137:22,22
**c4** 98:10,10 115:1,1
  115:13,16
**california** 49:19 50:2
  61:2,8 63:25 65:7
  155:18 156:7
**call** 25:18,19 112:21
  134:1 146:25 156:14
  173:20 174:16
**called** 26:7 33:12
  35:13 55:17 121:23
  130:4 163:16 170:8
  174:14,17
**calls** 50:19 68:1
  109:21 120:4 122:9
  151:22
**cancel** 122:16
**canceled** 121:10
**capable** 13:24
**capital** 105:24
**capitalize** 182:8
**caption** 30:13
**cardiac** 47:2,4,16
**care** 31:4 33:3 58:14
  59:25 69:13 181:2
**careful** 5:18 8:12
  41:7 141:20,21 182:5
**caregivers** 35:14
**carlotta** 6:12,15
**carrier** 55:5,6,7,13
  55:18
**case** 1:2 7:21 10:12
  30:13 34:18 43:7
  77:23 78:2 80:25
  82:18 83:16 89:7

**128:2 151:8,19 153:6**
  156:8 178:24
**cases** 81:1 83:17
**cash** 142:19 144:2,9
  146:15 148:10
**casino** 142:20 144:2
  144:9 146:15
**cause** 1:21
**caused** 76:12,19 77:2
  81:13 84:13
**causing** 159:1
**cecelia** 3:15,19 72:9
**cell** 54:15,18 107:6
  174:14
**center** 61:7 62:1
**certain** 64:5 124:21
  133:10 163:12,17
  164:6 166:14
**certainly** 42:17
**challenge** 108:24
**challenging** 109:6
**chance** 120:11
  159:17 172:15
**changed** 44:10
  160:24
**changing** 45:24
**chapter** 96:13,23
**character** 55:6
**characterization**
  41:17 156:24
**characterize** 143:8
**characterizing** 143:1
  159:25
**characters** 166:15,16
**charge** 148:23
**charged** 144:19,20
**charges** 146:4 150:11
  168:2
**charitable** 71:18,21
  71:24
**check** 64:11 84:24
  173:21 174:2
**checks** 45:10
**cherry** 34:1

**china** 141:22
**chips** 142:20 144:2,9
  146:15
**choose** 7:16
**chose** 5:25 7:16
  181:6
**chosen** 6:19
**chowdhry** 66:3,7
  73:24
**chris** 49:15,16 50:13
  156:10
**christmas** 119:16
**christopher** 2:14
  4:10
**chronological** 142:3
**cia** 94:2 95:3 97:11
  97:12,15,17,22,24,25
  98:3,7 99:7 100:17
  101:19 119:21 121:1
  121:14 123:9 124:12
  141:12 171:14
**circuit** 139:6
**citibank** 45:17
**citizen** 44:2,3,7
**civil** 70:14 144:4,7
  163:8
**claim** 80:14,22 81:12
  81:12 83:2,13 87:23
  111:1 149:9
**claimed** 7:24 80:8,10
  110:6,20 167:13
**claiming** 76:10 77:1
  81:11 82:6 89:5,23
  140:4
**claims** 70:19 97:13
  135:6 140:3,6,13
  143:23 146:1,12
**clark** 26:24 30:14,23
**classes** 9:13
**classified** 5:8,16 6:4
  6:21,22 10:17,18
  16:7,11 91:21 92:4,5
  92:10 102:23 120:24
  129:22,24 132:1
  138:1,24 139:4

**140:15**
**clear** 42:8 67:1 70:13
  73:2 89:17 137:18
  164:18 185:7
**clearance** 124:20
**cleared** 163:2
**clever** 8:19 53:20
  171:2
**client** 8:10 9:7 31:9
  34:10 79:19 86:13
  181:10 183:17
**client's** 31:17
**clients** 159:20
**clinton** 141:15
**clip** 119:11
**close** 114:16
**closed** 80:24 98:11
**club** 154:5,15
**clues** 90:21,23,23
  91:2,17
**clutter** 79:24
**cocktails** 69:9
**code** 102:12 119:21
  120:18,19,22 123:5
  154:25 155:3,6
  157:15
**coded** 123:2
**codes** 94:4 95:6
**cognitive** 162:10
  182:14 185:11,14
**coil** 58:23
**coiling** 48:12,14
  58:18,20,22 62:7,7
  74:5
**cold** 53:19
**colleague** 35:20
**collection** 57:20
**collective** 112:22
**colloquy** 85:2 140:20
  149:14
**column** 176:25
**come** 20:6,13 26:21
  34:17 45:10 49:18,25
  71:6 75:24 79:18
  97:9 99:5 100:15

CONFIDENTIAL

**[come - corrections]**

101:18 102:3 116:10
132:15 185:1
**coming**  42:20 71:8
113:1 116:25 127:11
**command**  105:19
106:1
**commenced**  14:10
67:7
**comment**  156:11,12
184:7,10
**commit**  18:3,5
**committed**  18:2
**communicate**  34:8
**communicated**  15:25
108:20
**communication**  5:3
71:2
**community**  5:6 146:8
**companies**  46:20
47:8
**company**  7:11 26:2,6
47:1,3,11,14,15 55:7
55:17,20,21 78:18
99:11 156:4 157:14
163:6,9 171:13
**compare**  97:18
**compensation**  163:12
163:17 164:6
**complained**  107:2
**complaint**  3:13,14
40:9 41:2 43:6,12,19
43:23 44:7 78:14,15
83:19,24 85:5,14
86:24 87:22 88:6,8
89:5,11,11,22 90:5
92:22,25 93:3 156:7
179:2
**complete**  89:22
184:12
**complex**  185:15
**compound**  35:1
64:15 67:11 122:20
**compresses**  155:6
**compression**  103:7
104:14 125:5,6

126:10 128:5
**computer**  14:19,20
107:5 137:15 138:7
140:3 141:3 155:6
157:15 166:24 167:2
167:4,12,20,21,22
**computers**  127:1,9
**con**  104:8 171:7
**concern**  64:2 74:21
**concerned**  29:3
151:9,15
**concerning**  15:25
**concerns**  9:8 23:13
**conclude**  97:25
**concluded**  103:20
104:3
**conclusion**  50:20
51:1 104:6 115:10
149:16
**conclusions**  97:22
98:3,9,11 104:19
114:25 115:3 147:1
**condition**  13:25 29:2
67:24 74:20,21 76:5
80:6,9 82:7,8 83:3
84:17 184:3,11,13
**conditioner**  127:10
**conditioners**  126:25
**conditions**  33:13
181:5 185:11
**condo**  17:24 18:20
19:19 39:7
**condominium**  17:15
**conduct**  80:22 83:13
83:21
**conducted**  106:18,22
**conference**  9:10
86:17 184:11
**confession**  133:24
134:8
**confided**  107:15
109:16
**confidential**  7:24,25
8:1 23:17 92:9
153:14,16 163:9

**confidentiality**  7:19
**confirm**  61:23
**confuse**  158:18
**confused**  101:12
**confusing**  100:24
101:11 113:15 128:8
128:10
**congress**  145:6
**congressman**  148:25
**congressman's**
142:10
**conjecture**  90:17
**connected**  153:1
**connection**  71:22
80:16,20 83:11 94:10
95:12 105:1 108:24
109:9 132:2 148:17
**connections**  98:8
157:18
**conned**  170:8,15
171:6 178:7,9
**consequences**  8:12
**consider**  181:4
**consolidated**  81:1
83:17
**constraints**  123:25
**contact**  46:16,18
47:23,25 48:2,22,24
49:13 50:4,8,9 70:12
178:1
**contacted**  24:22,22
24:24 25:1 47:12
151:18 177:18
**contacts**  47:7,19
**contain**  128:4 129:22
132:1
**contained**  129:23
132:16
**contemporaneous**
83:20
**contend**  88:11
**contended**  80:20
**contending**  88:1
90:25

**context**  129:8,15,15
**continental**  121:11
**continue**  44:5
**continuing**  28:14
92:4 138:9
**contract**  3:17 46:25
104:20,25 113:24,24
126:18,24 127:2
**contracts**  105:18,25
106:7 142:14,21
145:5 148:11
**contrary**  34:24
**control**  38:12 181:3
185:11
**convince**  93:11,15
94:2,9 95:3
**convinced**  90:12
103:5 104:13 171:13
**cooperate**  5:19
**coordinating**  15:23
**copies**  128:21 129:2
**copy**  85:11 92:19
112:10 118:16
127:20 128:19,24
131:10,13 133:8
173:18
**correct**  25:25 48:21
53:1 63:14 64:8
69:21,25 74:10 78:3
78:6,23 79:2 86:4
91:2 95:7,16 96:14
103:17 104:2,8,16
115:10 134:14,15
135:11,12,13 142:21
162:7 164:25 168:3
169:3 173:9
**correction**  158:3,11
158:15 159:23 160:3
161:22,25 162:4,7,18
163:20 164:1,2,12
165:5,9,25 168:7,21
169:2,15,21 172:25
174:5,8 175:4
**corrections**  165:13
174:25

**[correctly - detection]**

**correctly** 19:24
**correspond** 12:2
**corruption** 148:9
**costs** 59:22
**counsel** 4:12,14,16
  5:14,15,17 32:12,22
  82:20 182:24
**count** 183:22
**countersued** 156:20
**country** 34:17,23
  44:20
**countrywide** 80:15
**county** 26:24 30:14
  30:23 67:16 69:20
  70:2,21 71:13,23
  72:2 73:6
**couple** 68:18 172:13
**course** 12:5 14:3 78:5
**court** 1:1 4:9 6:24
  30:14,22 36:3 40:1
  88:22 116:9 132:12
  132:14 140:8 146:2
  146:14,18,19 149:16
  155:11 156:7 157:12
**courteous** 8:13 79:13
  181:19 182:4
**cover** 58:10 60:1,7
  178:7
**coverage** 148:2
**covered** 57:25 58:8
**covering** 40:22 60:5
**covers** 60:3
**crawl** 123:10
**crawler** 123:21 124:3
  124:5,6
**credibility** 167:11,16
  169:19
**criminal** 26:23
**cross** 3:4
**cruise** 148:24
**ct** 62:11
**current** 39:6 132:25
**currently** 35:22 60:5
  73:14 153:16

**cutter** 157:16
**cv** 1:2

**d**

**d** 3:2 19:20,20 105:24
**d.c.** 2:9
**damages** 56:14
**damn** 67:3
**daniel** 65:12
**data** 90:16,18,21
  91:2,12,17,18,19
  95:9 98:3 123:8
  126:15 171:16
**date** 4:2 7:11,12
  18:14 27:14 28:23
  30:15,20 36:17 39:16
  41:22 45:1 53:7,8
  57:14 58:7 63:3 64:5
  64:12 69:14 77:15
  79:8 81:6,7,9 84:22
  120:13 161:6 170:12
  173:24 174:4
**dated** 118:20 145:11
  154:1 163:3
**dates** 24:10 95:17
  123:11
**daughter** 21:25 23:8
  23:15,20 24:6,14
  76:1
**davis** 2:7 4:11,13
**day** 18:7,11 31:23,25
  32:3,5,14 33:6,9,16
  39:17 64:12,20 81:2
  108:22 130:8 149:16
**days** 33:20 48:3
**dc** 5:24 67:14 69:2
**deadline** 7:14
**deadlines** 30:11
**deal** 157:3 179:20
  180:19
**dealing** 16:1
**deals** 33:12 66:20
**dealt** 152:20
**death** 65:21 151:9,11
  151:12,14

**debilitated** 4:23
  86:13
**debilitating** 88:25
**december** 119:4,20
  122:14,23 123:5
**decide** 100:5
**decides** 51:11
**decipher** 94:4 95:5
**declaration** 3:15,18
  3:19 56:2 72:9
**declined** 156:12
**deemed** 144:10,11
**defamation** 90:12
  145:14,17
**defamatory** 87:24
  88:1,11 89:6,25
**defect** 182:14
**defects** 162:10
  185:12,14
**defend** 165:21
**defendant** 76:11
  78:17
**defendants** 1:8 2:6
  2:10 3:10 4:12,14 7:6
  7:16,21 43:5 56:8,9
  56:14 61:10 83:21
  84:7,13 89:23 90:11
  118:10,14
**defended** 121:22
**defender** 28:10,11
  31:14 34:9
**defense** 5:14,14,17
  113:20 148:11
**defense's** 112:9
**define** 129:16
**definition** 130:1
  136:4
**degree** 164:20
**delayed** 84:6
**delete** 14:6
**deleted** 14:9
**deliberately** 5:19
**demanded** 174:4,7
**demonstration**
  106:17 159:18

**dennis** 1:4,16 3:5 4:4
  4:5,18 30:15,17,22
  44:1 82:21 144:5
  145:23 155:11
  160:12,20,25 171:10
  176:19
**department** 6:11,15
  8:4 15:24 132:21
  133:5
**depending** 73:25
**deposing** 143:6
**deposit** 45:12
**deposition** 1:16,19
  4:4,7 5:23,24 6:1,6
  6:17,20 7:8,14,18,22
  8:10 15:20,23 16:22
  20:7 25:5,20 26:18
  34:18,24 55:25 56:2
  67:6 79:15,18 81:5
  130:24 149:21
  153:15 164:15 176:5
  176:7 183:5,24 184:4
  184:16
**depositions** 165:20
  181:1 183:23
**depression** 84:11
**deputy** 31:14
**describe** 125:13
**described** 107:14
  109:15
**describing** 125:15
  146:3
**deserve** 160:12 161:1
  161:1
**deserved** 160:13
  161:10
**design** 5:15
**designate** 23:16
**designed** 145:24
**detail** 130:17
**details** 59:3 78:7
  130:5 179:20 180:19
**detected** 64:10 97:24
**detection** 125:8,9
  126:12

CONFIDENTIAL

**[determination - emotional]** Page 193

determination 138:20
determine 7:23 90:20
detrimental 184:3
develop 38:7
developed 94:3 95:8 124:21 125:4 134:25 135:9
developing 47:1
development 113:23 171:13
developments 80:23 83:14
device 47:2
diagnosed 60:19,22 61:5 62:10,13,24 63:24 64:18 79:1 83:19 175:20
diagnosis 79:9
dictate 9:7
die 65:25 66:11,24
difference 101:6
different 42:6,6 73:13 97:13 101:2 126:16 135:2,3,18,21 144:24 167:1
differentiation 133:4
differently 118:1
difficult 5:3 24:10 94:20
digital 155:7
dina 2:14 4:17
direct 3:4 10:8 61:25 172:13
directly 103:10
director 33:19
disability 45:8 50:24 51:12 52:25 53:4 69:22,23 96:9,25
disabled 97:1
disc 15:2 131:25 147:7,13
disclosed 163:10
disclosure 40:19 42:12 185:2

disclosures 41:22
discouraged 26:19
discovered 60:21 175:22
discovery 6:3,9,18 7:14 128:2
discuss 174:20
discussing 154:9 165:15 167:16
discussion 16:23 17:1 181:23
dishonest 169:5
dismiss 179:2
displayed 94:5 95:6
dispute 6:18 145:20
disputes 6:3
disrespect 184:12
distinguishes 80:25 83:16
distress 80:25 83:16 84:13
district 1:1,1 5:24 30:13,22 80:19
divorcee 154:6,15
dlm 61:17,18 63:12 63:12,16
dlm23215 12:17
doctor 20:1 24:16 31:21 32:18 65:1,4 65:20,24 66:7 85:1
doctors 24:13 26:11 26:17 33:3 34:16 51:14 52:6 59:24 63:7 65:6 67:21 68:19 73:10 74:3 79:5 175:23
document 10:15 12:13,16 42:13 56:18 59:14 81:24 82:18 90:2 96:19,25 120:10 120:12 148:5 156:25 162:24 167:20 173:7
documents 6:22 10:11,15 13:17,21,22 16:6 42:6 47:18

60:13 109:9 146:11 162:17 176:1
doing 8:18 14:25 24:25 41:12 70:13 74:5 79:22 99:11,12 164:21 175:15 181:4 182:22 185:10
domicile 22:20
dominant 63:23
double 166:15 182:13
doubt 167:12,17
dr 29:8,9 32:5 33:10 33:10,11 62:25 63:13 66:3,4,7 73:24,25 84:25
drank 68:16 69:1,16
draw 97:22
dressing 74:22
drink 68:9 69:2,11 69:14,16
drinking 68:19
drives 15:2 131:25 133:12 147:7,13
driving 82:11
drone 99:14,17 103:8 104:15 105:1,4 155:13
drones 102:10,17,18
dual 83:22 84:8
dubious 179:20 180:19
due 27:16
dueling 157:12
duly 4:19
dyke 67:2

**e**

e 3:2,8 19:20,20,20 82:12,20 105:24,24
earlier 69:18 114:5
early 24:12 99:15,16
earned 52:10 53:3,5 53:12

easier 9:16 56:21
edge 121:4,8
edra 11:12,17,18,22 13:1,11,11 14:4,6,9 14:13 26:3 156:21 157:13,18 160:10,19
edra's 157:21
effect 104:7 176:2 183:16
effected 13:19
effects 31:20 34:13
efficiently 155:8
effort 185:22
eggland 113:11
eglin 50:9,16 105:10 106:10,12,15 113:6 113:12
eight 52:14 67:20,21 69:12
eisenhower 61:6 64:9 79:7
either 119:13 136:3 140:11 143:19 151:18
electronic 10:21 11:8 54:20
elicit 5:11,15
eligible 51:11
email 11:13 12:3,7 160:9,18,19,22,25 173:16 177:19
emails 3:11,12,18 11:9,22 12:9,25 13:10 14:4,6,9,12,25 15:4 146:11,21 147:6 147:6,9,12 167:13,17
embedded 94:4 95:6 123:10 155:10 157:17
emergencies 33:22
emergency 33:25 60:25 62:5,6 85:1
emotional 80:25 83:15

CONFIDENTIAL

**employee** 108:17
110:14 136:6
**employees** 106:3
107:2,4,15 109:16
110:6,18 111:1,4
114:9 136:18 137:1
**empty** 107:3,5
**enabled** 94:3 95:5,5
**ended** 136:7
**endless** 78:20
**engage** 166:23
**enlarge** 14:22
**enormous** 136:24
159:1
**entail** 74:17
**entangled** 154:6
**entering** 133:21
**entire** 21:6 32:16
90:2 138:10 153:15
**entities** 46:20 73:7
135:2
**entitled** 7:1 9:4 57:5
140:5 183:25
**er** 64:9
**eric** 179:23
**eskridge** 66:4 73:25
**esq** 2:3,7,7,11
**establish** 22:19
**established** 37:5 79:1
**estimated** 59:23
**et** 1:7 4:6
**eternity** 116:18
**etreppid** 105:24
106:6,14 107:1,4,15
108:10 109:15 110:5
110:17,25 112:21,22
114:3 125:3 127:7
130:4 133:21 134:2
134:13,25 135:7,9
136:13,14,18 142:21
144:5,7 145:21,24
163:9,16
**eugene** 29:8,9
**europe** 122:17

**evaluated** 62:9
**evaluating** 66:17
**event** 6:8
**evicted** 21:13 24:2,8
44:22
**evidence** 11:15 27:12
28:7 38:2 46:4 51:6
76:22 146:22 162:2
**evolutionary** 137:7
**evolved** 137:19
**ex** 142:14 152:3
**exact** 22:13 36:17
39:16 59:2 64:20
77:15 130:17 142:17
167:23
**exactly** 45:2 46:19
70:3 71:3 89:15
107:11 140:24
148:19
**examination** 10:8
**examined** 4:20
**example** 11:12
**exchange** 142:20
148:10
**excludes** 7:1
**exclusive** 121:21
148:21 149:11,23,25
**excrement** 180:25
182:11 185:9
**excuse** 24:10 100:23
174:18
**executive** 144:4
**exhibit** 3:11,12,12,13
3:13,14,14,15,15,16
3:16,17,17,18,18,19
3:19 12:13,15,15,21
15:15 28:17 30:6,9,9
30:11,12,15 40:8,9
40:14,15,16,16,18
41:2,21 42:4 43:6,8
56:11 61:11,15 72:8
78:14 82:17,23 92:24
93:2 118:10,12,14
176:10,11,14 179:1

**exhibiting** 84:12
**exhibits** 40:12
**exists** 112:12
**expended** 159:8
**expenses** 56:16 57:3
57:13,14,25 58:3
59:10,17 60:6,9
**expert** 138:21 140:4
140:9,11,12,13 141:3
141:8 167:12,20,22
167:22
**experts** 90:19 119:21
123:10 140:10
**explain** 32:18
**explosive** 98:11
148:23 150:11
**explosives** 115:2,12
**extended** 37:14,25
39:12 40:21 41:1
**extensive** 51:18
**extent** 49:6 91:20
92:3 98:24 115:19
123:24
**extra** 85:10
**extract** 138:19,22
**extreme** 32:20
**eyes** 43:4

**f**

**faces** 145:5
**facial** 99:13 125:20
**facilities** 25:3 59:7
**facility** 21:21 37:9
39:12 49:18,25 50:2
61:20 62:3 63:13
124:23 125:2
**fact** 7:10 13:15 17:7
23:9,11 26:6 30:25
53:23 88:24 90:14
95:20
**facts** 11:14 27:11
28:6 38:1 46:3 51:5
76:21 162:1
**failed** 58:18,19

**failure** 130:9
**fair** 161:21
**fairly** 166:10
**faked** 159:19
**fall** 19:2 35:9
**fallen** 19:1,6
**falls** 19:9,12,13 88:15
**false** 39:23 87:23
88:1,11 89:6,24
90:13,13,25 101:3,3
101:10
**falsify** 107:17 109:17
109:19
**familiar** 6:16
**family** 151:20,25
153:2,2 178:19 179:5
179:8,12,12 181:1
182:2
**far** 36:14 65:22
126:10 168:4
**favors** 142:10
**fax** 54:17,19,20
**faxed** 173:17
**fbi** 107:2,2 108:11,17
109:6,25 132:23,24
133:2,4 145:5 152:11
**february** 36:3,13,15
39:8,9,13,19 43:7
44:6 95:18 145:11
170:7 177:22 179:16
**federal** 107:14,23
108:8 109:15,20
114:10 119:17
139:22 145:16,19
166:5,12 168:14,18
**fedex** 42:23
**feel** 59:24 184:22
**field** 106:2,8,9,11,13
106:13,14,16,22
113:6
**fight** 23:12
**figure** 149:9
**filed** 30:13,18 43:6
43:12 44:6 82:18,19
85:14,17 146:13

Veritext Legal Solutions

CONFIDENTIAL

**files**  11:8
**filing**  86:25
**filings**  139:5
**fill**  25:4,15 32:9,12
**filled**  51:13,14
**filtering**  126:4,11
  128:6
**finally**  132:17 157:3
**find**  7:22 11:25 56:21
  93:16 96:4 110:12
  128:4,14 140:5 141:4
  157:17 165:12
**finding**  91:25
**fine**  29:21 30:2 52:3
  54:5 165:16 182:21
  182:21
**finger**  67:2
**finish**  68:5 78:10
  113:2 135:22 139:20
  154:21 155:22
  164:19
**finished**  153:24
**fire**  155:14
**fired**  104:9
**firing**  162:11
**firm**  42:18 152:3,5
  155:18
**first**  4:19 9:9 12:13
  37:6 41:20,21 43:11
  45:17 48:11,19 49:15
  56:9 57:15 58:20,22
  60:19 61:23 62:10,13
  62:24 63:21,23 64:1
  65:12 66:7 79:1,9
  83:19 86:17 89:3
  93:16 96:7,13 97:8
  99:2,4 100:9,13
  102:8 105:21 107:19
  110:12,24 115:8
  118:15,19 127:22
  130:25 139:3 143:14
  158:5 164:24 169:25
  172:18 174:7 184:11
**fisher**  47:11

**five**  14:4 15:4 159:3
  175:17 183:19 185:8
**fix**  110:7,21 111:2
**fixed**  106:4 111:7
**flight**  123:11
**flights**  98:2 121:10
  122:16
**florida**  1:1,13,21 2:4
  2:13 4:8 17:23 24:21
  26:12 36:16,24 37:3
  37:4 44:3,7,14 45:6
  45:22,25 46:9,12,14
  47:1,8 54:9 55:11,22
  86:8,23
**flushed**  13:19
**flying**  121:11
**flynn**  80:10,17 82:11
  82:15,22 103:4,11
  156:20 157:21
  159:19 160:14
  161:11
**flynn's**  103:15 104:2
**focus**  145:6
**focused**  145:22
**follow**  148:2
**following**  39:1 72:24
  116:20 159:12 180:9
  180:14
**follows**  4:20 145:19
**font**  166:19
**fonts**  14:22
**foolish**  16:14,15
**force**  48:23,25 50:9
  99:12 103:5 104:12
  104:20,25 105:6,12
  105:18,25 106:7,18
  106:20 110:22
  111:17,19 112:2,5
  113:4,13,14,21
  155:12 171:14
**force's**  103:7 104:15
**foreclosure**  83:25
  84:7
**form**  89:24 148:12
  150:18,24 162:21

**formed**  55:20 150:22
**former**  103:16,16,19
  106:3 144:4 145:23
  148:23 157:14
**forming**  55:21
**forth**  20:1 44:4 48:1
  55:10 108:21 127:10
  139:18 152:4
**forward**  132:15
  185:23
**found**  37:12 62:11
  90:21,23 95:9 123:10
  123:20,23 124:9
  144:22 147:10
  176:21
**foundation**  28:20
  59:1 95:24 122:9
  126:20 158:17 160:4
  163:22 164:9,10
  168:9
**founded**  145:25
**four**  13:1 14:3 48:3
  67:14,19 83:1 180:11
  183:19,20
**fourth**  145:13 155:2
  171:9
**fragile**  67:2
**frame**  64:6,8 152:16
**frames**  135:3
**france**  121:11
**frankly**  181:10
**fraud**  103:21 104:3,4
  104:8,10
**fraudulent**  83:21
**frequently**  12:2
**friend**  17:22 142:10
**front**  13:17 85:6
  156:5
**full**  12:25 93:24 96:7
  97:8 98:7 100:11,13
  105:21 110:10
**fun**  96:9
**functions**  141:11
**furniture**  18:22,25
  44:18

**further**  6:7,8 113:24
**future**  59:22

**g**

**games**  31:8 86:12
**gear**  121:9
**general**  117:6 124:16
  124:17
**generated**  91:16
**gentleman**  63:23
**getting**  10:17 22:5
  31:20 66:15 114:17
  142:20
**gibbons**  108:20,20
  117:19 142:13,20
  144:1,8,17 145:6
  146:16,23 148:10
  156:18 167:14
**gift**  144:10,12
**gifts**  144:2,9 145:6
  148:10 163:3 167:14
**gist**  18:10
**give**  8:13 16:4 24:23
  29:11 43:25 81:7
  85:10 86:7 87:18
  89:9 90:17 91:13
  95:4 96:4 120:11
  129:8 130:17 131:3,7
  148:16 149:3,11,19
  149:23 151:2,5 155:1
  157:24 162:14 167:2
**given**  23:9,10,12
  88:24 99:22 102:11
  109:25 115:20
  123:25 147:12
  184:18
**giving**  108:3 121:20
  144:6,8,11 150:25
  180:25
**glad**  71:2
**glass**  8:25
**glasses**  8:17 9:12
**global**  152:7
**go**  5:19 10:6 14:25
  19:8 30:2 32:25

CONFIDENTIAL

33:24 38:15 44:16
52:1 54:7,24 60:14
62:6 64:20 75:11
76:2 78:10 86:6 88:9
90:4 94:23,25 95:2
96:10 107:3,4 118:3
120:16 141:21
143:22 145:12,18
149:20 156:23
164:17 166:3 170:4
170:18 174:1 180:21
180:23 183:1,8,9,21
185:20,23
**goal** 99:21
**goes** 33:22 84:10
149:1 156:18 161:10
165:13
**going** 9:24 12:12
13:5 15:19 16:13
23:2,4 38:4,6,20
43:22 53:21,24 59:24
66:17 67:14 70:9,16
72:10,21 79:23 87:20
88:3 92:15 117:4
119:13 130:8 133:2
133:16 137:25 140:7
166:7 168:20 169:9
170:3 172:5 179:17
179:19 181:2 183:14
183:21
**gomez** 6:16 15:23
17:7 70:12,16 71:10
132:7
**good** 48:8 78:22
142:24
**goodman** 1:2 71:6
140:21,24
**gotten** 19:25 87:5
141:16 172:17
**government** 8:8,9
51:3,8,23 90:13,20
91:1,6,14 92:10
102:24 106:2 119:17
127:16,17 128:18
129:9,19,20 131:4,15

131:24 132:21
136:25 137:1 138:2
144:21 145:21
152:13,14,19,23
157:20
**government's** 121:22
**governor** 117:19
145:5 148:9 163:2
166:4,11 168:3,13,17
**gp** 63:2 65:10
**grail** 31:5
**grasshopper** 55:9,17
55:19
**greed** 78:20
**ground** 17:4 102:19
**group** 51:18 60:14
**grown** 66:14
**guess** 34:10 52:21
59:1 62:6 85:15
95:10 118:23 126:16
160:11
**guest** 16:25
**guilty** 144:22
**guitar** 94:6
**guy** 87:17

**h**

**h** 3:8 7:5 32:10
**half** 9:19 183:20
**hand** 63:23 133:14
**handicap** 167:4
**handicapped** 4:22
13:15
**handler** 176:19
**handman** 2:7 3:6
4:11,11 5:21 6:14 7:8
7:11 8:6,20 9:2,6,14
9:22 10:1,9,19,24
11:6,16 12:12,22
13:9 14:1 15:8,11,15
15:17,21 16:4,13,16
16:17,21 17:9 21:8
22:6,10,18,19,23
23:16,18 24:1 27:2,7
27:15,22 28:1,8,17

28:21 29:19,24 30:7
31:3,10 33:5 35:5
36:1 37:23 38:13,18
39:4,21 40:4,8,13,18
40:24 41:4,14,19
42:1,10,22 43:5,9,20
43:21 44:21 45:3
46:5 49:12 50:23
51:2,9,19,22 52:2,7
54:8 56:1,7,12,22
57:6,11 59:5,20 60:4
61:10,16,24 62:20
63:19,20 64:17 67:9
67:13 68:8,13 70:18
71:5,11 72:8,15,18
73:8 75:23 76:9,23
77:6,10,20 78:1,13
79:21 80:1 81:8,21
81:25 82:5,17,24
83:10 84:2 85:4,12
85:22 86:2,15,19
87:3,20,21 88:4 89:2
89:14,21 90:10 91:24
92:14,18,21,24 93:2
93:6,8,24 94:1 95:1
96:1,6,11,21 97:4,7
97:20 98:21 100:2,5
100:8 101:8,14 103:2
104:1,24 107:9,13
108:7 109:4 110:2,15
111:10 112:24 113:3
114:2 115:15,23
116:2,5,23 117:4,5
117:11,17,21 118:3,9
118:13,18 119:15
120:6,14 121:2
122:13,22 123:22
124:2,17 125:1
126:23 127:6 129:7
129:17 132:10 133:6
136:2 137:3,12 138:6
138:13 139:3,8,13,21
140:3,19,23 141:2,13
141:23 143:2,21
145:10 147:5,19

148:14,15 149:7,22
150:17,23 151:4
152:1,9 153:5,18
154:17,24 155:23
156:17 157:9 158:1,9
158:14,23 159:15
160:5 161:9,16 162:3
162:16,22 163:23
164:4,10 165:7,11,17
166:2 168:1,11,16
169:1,7,13,18 170:1
170:5,21 172:4,12,21
173:23 174:3 175:11
176:1,10,12 178:18
178:22 179:11 180:4
180:17 181:6,13,17
181:24 182:9,24
183:3,11 184:19
185:5
**handman's** 183:15
**happened** 64:14
101:22,25 134:6
150:7
**happening** 134:5,11
142:16,18
**happy** 83:6 176:4
**harass** 8:14 22:17
185:23
**harassing** 23:3
**hard** 16:20 102:12
139:24 143:15
180:24
**hardline** 54:15
**hardware** 140:16
**havoc** 159:1
**head** 25:3 32:17
**headache** 64:22
**headaches** 29:2
64:23 65:2,14
**heading** 143:24
155:3
**headline** 143:23
154:5 166:10 167:9
**health** 9:7,10 38:5

CONFIDENTIAL

hear  35:18 66:21
  160:17
heard  81:5 107:6
  158:24
hearing  6:18 33:7,9
  36:3,7 75:8
hearsay  109:22
heartless  181:10
hector  17:20,21
  19:20
held  4:7 139:3
help  8:21,22 9:15
  38:21 75:10 103:7
  104:15 107:16
  142:10,21 151:8
  155:19
helpful  12:18
helping  46:25
hernandez  2:14 4:10
hidden  90:16,18,21
  91:2,17 97:24
hiding  179:20 180:19
high  121:9
higher  143:16
hill  34:1
hillary  141:15
hire  152:2
hired  151:23
history  63:7,21
hmm  14:21,24 48:16
  58:6,21 84:21 131:12
  144:1
holding  67:4
holiday  121:14
holland  1:12 2:11
holy  31:5
home  21:13,14,17,20
  24:3 37:17 44:23
  84:5 108:12
homeless  24:4
honestly  79:20
hoping  46:15
hospital  3:19 19:8,11
  33:15,25 34:1 52:18
  52:18 53:11 61:3,14

66:10 74:11 81:10
hospitalized  19:14
hospitals  155:19
houghton  34:19
  78:17
hour  38:6 113:1
  116:7,7 154:22 159:3
hours  7:1 116:15
  159:10 180:11 182:3
  183:19,20,20 185:9
house  78:17 156:20
  171:14
housing  44:17
hundred  157:20
hundreds  42:18
hung  156:14 174:23
hurry  72:16
hurt  19:7
hurting  72:14
hurts  36:4
husband  141:17

**i**

i.e.  83:21
idea  74:7 97:10 99:6
  100:16,21 101:18
  102:3 177:13
identification  12:21
  30:6 40:12 43:8
  56:11 61:15 82:23
  118:12 176:11
identify  49:6
identifying  91:21
  117:3
identity  49:8
ignored  84:6
ii  185:25
illness  63:22 86:16
illnesses  88:25
image  178:7
imagery  102:13
images  102:9,11,15
  105:5
imagine  59:3

imaging  62:11
immediately  35:11
impaired  12:20
  183:18
impede  92:6,9
impending  6:18
implied  44:11
implying  41:10
important  26:21 63:6
  64:13
imposed  133:21
impress  106:4
improper  17:8 70:14
  71:1 72:7 159:24
  162:2 165:22
inaccurate  99:3,9,10
  100:14 101:23,24
  114:7,10
inadvertently  5:15
inappropriate  29:20
  132:6,8 149:19 164:8
  166:1 183:22
inappropriately
  184:22
incident  115:12,14
include  89:5 142:10
  163:16
included  96:17 135:9
  142:18 163:11
includes  90:22
including  6:3 60:3
  61:17 90:14 94:13
income  52:10 53:3,5
  53:13 69:18,24 70:18
  72:5
inconveniencing
  121:10
incorrect  150:18
  173:10
increase  74:25
incurred  57:3,13
independent  20:2
  112:6
independently  97:15
  150:20

indicate  36:9 51:3
  171:18
indicated  98:25
indicating  62:21
  93:21
indict  145:1
indicted  144:23
individual  44:2
  49:17 143:7
individually  135:4
individuals  99:18
  102:9,19 124:22
  130:1 136:22
induce  139:1,21
  141:10,13
inevitable  98:8
infer  169:24
infliction  80:21 83:12
information  5:9,16
  6:23 16:11 17:8 91:1
  91:7,22 92:10 97:23
  105:5,16 111:14
  114:7,8 120:24
  121:13 132:17
  133:11,13 138:19,23
  141:10 167:3 168:5
initial  40:19 41:22
  42:12
initially  7:9 92:2
  145:22
injecting  79:15
injure  19:2
injured  19:1 26:20
  32:16 35:7,8 44:12
  88:16
injuries  20:1 34:3,15
  38:9
injury  32:4,15 88:12
  88:13 166:18 167:6
inpatient  19:16
inquiry  163:2
insensitivity  9:10
inside  5:6
insist  99:4 110:17,25

CONFIDENTIAL

**insisted** 98:2
**insistent** 7:12
**insisting** 112:2
**insists** 97:9 99:5
  100:15 101:17 110:5
**insofar** 42:5
**installed** 138:8
**instance** 102:8
**instruct** 72:4,5 73:4
  137:25
**instruction** 138:3,10
**instructions** 167:2
**insurance** 57:21,22
**intellectual** 128:25
**intelligence** 5:6 23:10
  49:7 90:19 121:23
  123:20,23 125:22
  136:23
**intelligent** 71:4
**intend** 81:12
**intense** 64:24
**intention** 89:4
**intentional** 80:21
  83:12
**intentionally** 164:21
**interchanging** 128:9
**interested** 99:18
**internal** 146:11
**international** 121:9
**internet** 41:5
**interpretation** 90:16
**interrogatories** 10:12
  56:10
**interrupted** 74:6
  83:11
**interview** 121:21,21
  148:16,22 149:1,8,12
  149:23 150:1,6,8,13
  151:5
**interviews** 89:18
**intimidate** 8:9
**intoxicated** 69:5
**introduced** 174:23
**inventor** 155:10

**investigating** 132:24
**investigation** 108:9
  132:25 144:16
  145:20,22 147:15
  148:3
**investigative** 108:23
  118:19
**investigators** 107:15
  107:23 109:15,20
**invokes** 179:20
  180:19
**involve** 125:19,23
  126:4
**involved** 13:11 25:3
  126:13 127:19
  146:22 152:19
  177:19
**involvement** 146:4
**involves** 162:10
**involving** 80:23
  83:14 123:1 132:3
**iraq** 155:14
**irrelevant** 29:21 30:3
  72:4 150:16
**ish** 25:16 46:22
**ishtvan** 25:11,14
**issue** 55:10 170:8
**issued** 110:22 111:17
  112:2,6,8

**j**

**j** 2:7
**james** 1:7 2:14 4:5,17
  55:21 93:1,21 118:17
  179:23 182:20
**january** 19:4 39:8,9
  170:7
**jazeera** 91:8 94:5
  95:7 97:10,17 98:16
  99:6 100:16,20,22
  101:13,19 102:4,16
  102:20 114:18
  119:22 120:18,22
  123:2,5,7 124:12,18
  125:12,14,25 126:9

127:13 128:7,8,12
  131:7,23 133:9,15,17
  135:10 136:10,15
  157:17 171:15
**jeopardize** 23:14
**jim** 108:19,20 148:10
**john** 3:17
**joined** 7:3 177:21
**journal** 141:25 142:6
  145:4 146:6,9
**judge** 28:5 29:12,16
  36:9 100:6,7 130:2
  130:16 139:3,11
  140:21,23 184:21
**judgment** 133:25
  134:8
**july** 20:23
**jump** 98:8 114:25
**jumped** 98:11 115:2
  115:9
**jumping** 160:2
  161:15
**june** 20:25 24:12
  81:9 82:19 118:21
  120:15
**jury** 149:17 170:1
**justice** 6:11,15 8:4
  15:24 133:5

**k**

**k** 4:16
**kathleen** 82:22
**keep** 6:25 121:16
  122:1 127:20,25
  129:2 170:3 179:17
  179:19
**kept** 127:24
**key** 121:13
**kill** 151:16,17,20
**killed** 153:8,12
**kind** 16:23 20:2
  33:11,11 35:12 55:9
  60:14 84:22 141:11
**klayman** 2:3,3 3:7
  4:15,15,21 6:4 7:7

9:4 10:16 11:2,14
  12:18 13:13 15:5,10
  15:14,19 16:9,15,18
  16:21 17:3 21:5 22:3
  22:8,15,21,24 23:23
  27:1,5,11,20,25 28:6
  28:13,19 29:18 30:2
  30:25 31:4 32:25
  35:1,23 37:20 38:1,4
  38:10,21 39:20 40:15
  40:25 41:7,16,24
  42:4,17 43:18 44:15
  44:24 46:3 49:5
  50:19,25 51:5,21,25
  52:3 53:21 54:1,5
  55:23 56:5,17 57:4,7
  58:25 59:14 60:2
  61:22 62:14,18 63:18
  64:15 67:8,10 68:1,4
  68:10 70:9,23 71:1,7
  71:8 72:3,10,21 73:2
  75:22 76:6,20 77:4
  77:16,22 79:12 81:3
  81:19 82:2 83:7,8,10
  85:2,10,21,25 86:11
  87:1,16 88:2,19 89:9
  89:16 90:8 91:20
  92:3,8,16,19 94:23
  95:20,24 96:4,19,24
  97:5,19 98:17 99:25
  100:4 101:5,11
  102:22 103:1,19,24
  104:22 107:7,10
  108:2 109:1,21
  110:12 111:5 112:24
  113:25 115:6,19,25
  116:7,14,17 117:2,9
  117:15,20,24 118:6,9
  118:16 119:9 120:4
  120:10,23 122:8,20
  123:14,17,24 124:13
  124:19 126:19 127:4
  129:5,10,14 132:4
  133:1 135:25 136:21
  137:10,25 138:9,17

CONFIDENTIAL

139:7,12,14,19
140:17,22 141:6
142:22 143:4 145:8
146:24 147:16
148:12 149:3,13
150:14,18,24,25
151:22 152:6 153:3
153:15 154:13,21
155:21 156:15,23
157:7,23 158:5,12,16
159:2,7,24 161:7,12
162:1,8,20 163:21
164:3,7,13 165:16,19
167:8 168:9,15,23
169:4,9,16,22 170:3
170:17 171:20,25
172:7,10,15,19
173:21,25 174:18
175:9,24 176:3,8
178:14,21 179:10
180:1,10,21 181:8
182:19,21 183:1,5,9
183:14 184:19 185:3
185:6,18,21
**knew**  17:22 26:21
63:10 154:16 169:24
**knight**  1:12 2:11
**know**  5:7,10 10:2
11:3,4 14:22 15:21
16:9 17:6 18:13 20:3
22:6,11,13 23:11,13
28:4,24 31:13 33:13
33:22 35:11 36:14
38:8 39:16,17,21,24
43:1 45:1 46:7,8,10
48:9 49:9 50:6 51:18
52:5,8 54:20 55:9,12
55:18 59:2,23 60:7
63:4,5 64:20 65:22
66:21,25 69:6 71:19
71:20,24 73:19 74:4
74:4,22,23 75:2 76:7
77:13,14 78:7 79:12
80:13 81:25 82:1,14
82:15,16 86:12,14

90:1 94:23 95:22,23
96:16 99:13 104:5,6
108:1,14,22 109:11
109:23 112:11,11
114:15 115:11
120:20,21 122:4,5
127:10 130:6,7 133:3
133:5,19 134:4,10
135:19 136:8 137:1
138:5 140:17 141:8
141:14,17,17 142:16
144:10,20,21 146:10
147:2,15,18 148:18
149:25 150:10
151:23 152:12,24,24
157:24 159:16
160:15,23 162:5
164:23 168:4 170:10
170:23 173:8 175:2,5
175:18 177:11 178:5
178:25 179:14
**knowing**  158:7
**knowledge**  173:15
**known**  25:16
**knows**  60:2 141:17

**l**

**l**  4:16 30:15 44:1
**labeling**  40:17
**laboratories**  155:19
**lacks**  28:19 58:25
122:8 126:19 168:9
**laid**  160:4 163:21
164:10
**language**  137:20
**languages**  137:13
**laptops**  99:21 102:12
102:14
**large**  1:21 42:17
166:11
**larger**  171:24
**larry**  2:3,3 4:15
**late**  24:12 97:11 99:7
99:15 100:17 101:20
137:20

**laura**  2:7 4:11
**law**  21:24 23:8,15,21
24:6 25:8 42:18
75:19 88:22 139:2,22
**law's**  25:9 35:16
**laws**  17:5 102:24
**lawsuit**  5:7 14:10
43:13 74:16,17 80:3
80:7,17,18 82:11
129:19 144:4,7 163:8
163:14 173:12 181:7
184:6,9
**lawsuits**  59:6
**lawyer**  28:4,9 29:15
29:23 30:23 31:1,6
51:1 81:18 82:12
103:16,16,19 130:23
131:1 138:21 157:21
163:3 164:22
**lawyer's**  81:17
**lawyers**  9:22
**lay**  95:24 164:9
**layman's**  32:19
**lead**  144:16
**leak**  67:3
**leaked**  16:11 17:7
**learg2**  12:7 160:22
**lease**  18:16
**leased**  37:25
**leave**  6:6 25:4 32:8
32:11 38:20 64:11
**led**  119:3,19
**lee**  82:21
**left**  32:16,19 59:11
90:19 97:25 102:14
151:19 166:17
**legal**  50:19,25 88:21
134:5,10 146:13,25
149:16 151:6,8
**lengthy**  89:13,14
172:2
**letter**  31:21 32:21
112:18 115:18,21
**letters**  43:1 91:23
92:1 97:24 98:1

119:5
**letting**  139:14 160:1
185:5
**liability**  5:17
**lichtblau**  179:23
**lied**  110:6,20 111:1
111:15
**life**  59:25 80:3
**light**  9:15 53:22
162:12
**lights**  9:19 13:3
**lim**  33:10,10,11
63:13 84:25
**limit**  70:17
**limitations**  182:6
**limited**  13:17 90:14
105:3
**line**  21:5,6 27:21
28:14 53:22 57:9
59:21 62:16 68:5
70:10,10 113:2
138:10
**link**  108:4
**lisa**  118:20 148:6,16
**list**  11:10 33:3 56:24
60:15
**listed**  41:5 88:7,8
**listening**  119:23
**literally**  127:18
**litigation**  130:4 132:3
132:6 134:13 163:16
**litigations**  133:22
**little**  13:4 42:25
166:17
**live**  15:18 17:10
18:10 22:2 23:20,22
37:7,14 75:13,17
**lives**  17:19
**living**  20:3 21:23
22:7,12 24:5,14,18
24:21 25:6 26:8
35:12 63:25 65:5,7
65:15 75:15 87:7
147:20,24

CONFIDENTIAL

**[llc - missiles]**

**llc**  163:6
**llp**  1:12 2:7,11
**loaded**  165:6
**loan**  81:14 84:4
**located**  44:17
**location**  136:3
**locations**  135:23,24
**long**  18:6 151:2
  164:23 184:5,20
**longer**  154:1
**longest**  81:4
**longstanding**  46:11
**look**  7:22 10:25
  11:22 12:9 14:20
  40:14 43:10 59:14
  89:10 119:10 140:9
  140:12 155:5 160:16
  162:17,23 164:13
  171:23 172:23
  176:25
**looked**  10:21,22 11:9
  14:14,24 15:2 63:4
  128:13 166:13
**looking**  24:18 25:6
  41:4 42:13 63:11
  102:10 118:25
  162:13
**loop**  114:17
**lost**  57:2 59:21
  185:13
**lot**  34:8 115:22
  135:14 147:14
  182:15 185:14
**lunch**  112:25
**lying**  159:20

**m**

**m**  4:16 19:20,20
  110:17
**macdill**  48:23,25
  50:15 105:10 106:10
  106:11,15 113:11
**madam**  116:9,12
**mafia**  153:2

**magazine**  170:7
  175:3
**magistrate**  16:24
  71:6 100:6
**mail**  36:25 45:10
**maintain**  128:21
**maintained**  128:19
**maintaining**  128:24
**making**  33:22 70:23
  139:18 144:14
  146:17 185:6
**malice**  165:14
**man**  23:3 63:23
  104:8 170:8,14 171:5
  178:6,8
**man's**  171:10
**manifestation**  80:24
  83:15
**manifestations**  84:13
**mannem**  62:25
**march**  18:14 19:4
  24:15 54:12 99:22
**margarita**  68:25
**maricopa**  67:15
  69:20 70:2,21 71:13
  71:23 72:1 73:6
**mark**  12:12,13,14,15
  15:15 28:17 30:9
  40:8 43:5 56:8 61:10
  72:8 82:17 117:12
  118:10 153:13
  176:10
**marked**  12:21 30:6
  40:12 41:21 43:8
  56:11 61:15 82:23
  118:12,14 176:11,13
**marks**  98:25 99:2
**martinez**  1:2
**massively**  64:3
**masturbated**  156:5
**material**  10:17 11:1,8
  129:22,24 132:1
**matter**  4:5 22:25
  73:5 112:19,20,21
  126:16 149:12

**matters**  112:23 177:3
**mean**  11:3 12:4 14:20
  18:10 19:5,16 20:17
  21:3 26:3 29:13 31:1
  31:5 33:8 34:9 36:22
  47:25 49:23 50:21
  51:7 52:6 60:20,20
  61:4 67:17 68:12
  69:14 70:5 73:12,12
  74:11 77:23 91:9
  95:21 101:9 105:7,13
  120:20 126:8 127:18
  129:1,15 131:8
  133:17 134:18
  137:17 153:4 166:24
  168:5
**means**  11:4 178:25
**meant**  31:25 90:18
  90:21,24 91:4 98:3
**measures**  152:21,22
**media**  4:3 10:22
  132:16 163:13,18
**medical**  3:15 13:25
  34:24 56:15 57:2,13
  57:14,25 58:3 59:4,7
  59:22 60:6,9 61:6,11
  61:17,20 62:1 63:7
  63:13 76:12 79:7
  80:6,9 82:8 84:16
  166:13 184:13
  185:12
**medicare**  58:1
**medicated**  64:4
**meet**  7:13
**meeting**  156:21
**member**  47:16
**members**  179:5,8,12
  179:13
**memorandum**  30:10
**memory**  13:18 88:13
  88:14 162:10
**men**  145:25
**mendez**  17:20,21
  18:16 19:20 39:6
  40:6 86:10 87:7

**mention**  117:10
  175:12
**mentioned**  58:13
  59:9 69:18 82:19
  117:1,8,22 154:18
**mentioning**  57:2
  61:21
**messages**  123:2
  155:10 157:17
**met**  31:15 49:21,22
  49:23
**methods**  141:11
**mexico**  121:12
**miami**  1:13 2:13 4:8
  5:25,25 17:11,12
  20:6,18,23,25 21:2,9
  21:11 26:15,18 34:18
  35:15 75:13 86:8
**micah**  2:7
**michael**  4:13 82:15
  82:22 103:15 157:13
  157:21
**mid**  102:14
**mifflin**  34:19 78:17
**mike**  160:13 161:11
**milken**  142:14
  157:13
**million**  56:15 57:2,12
  57:14 59:10,22 71:15
  133:25 134:9 157:20
**millions**  142:14
**mind**  43:3 83:5 90:6
  100:23 105:22
**mine**  104:19
**minute**  55:23 72:22
  101:5
**minutes**  66:10 68:6,6
  82:4 116:16 159:3
  180:12
**misconduct**  84:14
**misleading**  90:14
**misread**  167:8
**misrepresented**  41:9
**missiles**  155:9,14

**missions** 145:7
**mistranscribed** 31:7
**mixed** 98:19
**mixing** 108:2
**mm** 14:21,24 48:16
58:6,21 84:21 131:12
144:1
**mocked** 86:16
**modification** 81:14
84:4,5
**modify** 30:11
**modules** 127:24
128:4
**moment** 64:13 65:25
**monday** 20:10,11,16
20:19,20
**money** 44:19 71:17
148:25
**monitoring** 47:2
**montgomery** 1:4,16
3:5,18 4:4,5,18,22
5:5 9:17 10:2,10
13:14 14:2 15:18
16:1 17:10 30:15,17
30:22 31:12,18 35:17
39:5 41:15 43:10
44:1 59:15 62:19
80:2 82:21,22 84:11
85:14 86:20 90:12,15
90:19 97:9,12,21
98:9,18 99:5 100:15
101:17 103:4,20
106:1 107:16 109:16
110:5 115:1 116:24
119:10 138:20,25
139:13,15 140:12
144:5 145:23 146:13
148:22 155:11,22
156:1,4,12 158:2
159:16 163:6 164:17
166:3 167:13 171:10
176:13 180:2,5,18
181:7 184:12
**montgomery's** 6:5
80:24 83:15,17 84:4

103:6,15 104:13
159:20 167:11
**month** 18:4,6,12
23:24 27:17 60:9
64:12 174:15
**months** 33:17 34:4
37:15,16 52:14
**mortgage** 80:15
**motion** 3:12 30:11
**move** 15:16 16:17
18:11,22 19:25 27:21
29:18,22 43:2 44:13
44:19 46:12,14 68:2
73:3 85:3 87:20
135:25 141:24 143:2
145:3 163:1 165:14
175:24 185:19,21
**moved** 18:24 21:19
47:17 179:2
**moving** 21:17,17
44:12
**mri** 62:11
**muddying** 164:19,20
**multiple** 24:22
138:15
**muscle** 38:8 72:12
**muscles** 159:1
**mutual** 7:9
**myers** 118:20 148:6
148:16 150:15

**n**

**n** 3:2 4:16 19:20
**name** 25:9,12 26:2
32:6 39:23 47:3,15
49:15 63:1 65:12,13
66:7 81:15 152:5
171:10
**named** 126:10 156:3
**names** 11:12 25:2
26:14 32:12 46:19
120:25 136:22
**naming** 136:22
**national** 179:21
180:20

**natural** 44:1
**nature** 37:11
**navy** 152:3
**nbc** 118:19 121:12,21
123:9 148:6,22
149:12,23
**ncoder** 176:19
**ncoder.net** 160:20
**near** 148:24
**necessarily** 63:3
**necessary** 22:4 52:4
151:24
**need** 5:2,10,11,18
7:13 10:1 13:19 18:8
18:9 19:21 20:2 84:1
143:16 173:25
**needs** 4:24 5:1 31:21
38:5 42:18 124:13
154:22 180:22
**negative** 182:13
**nellis** 105:6
**network** 94:4,6 95:6
157:16 171:16
**networks** 47:4,16
**neuro** 26:15 29:3,6
34:1
**neurological** 182:17
**neuropsychiatrist** 182:18
**neuropsychologist** 185:13
**neurosurgeon** 66:19
**neurosurgeons** 26:15
66:3
**nevada** 26:25 28:22
29:16 30:14,14,17,22
30:23 32:23 33:9
65:15 74:25 75:8,25
105:11 106:12 130:3
139:4 145:4,19
147:15,20 148:9
163:2 166:4,11
**never** 31:15 81:11
90:15 98:12 107:20
115:3 144:23 158:24

160:4 165:24 168:21
178:4
**new** 94:3 95:4,15
145:16,19 146:11
163:1 179:16
**news** 91:9 94:6
118:19 121:12,21
123:9 148:6 149:12
149:24 153:22
157:16 163:13,18
**nickname** 25:17
**night** 76:4 160:11
**ninth** 139:5
**noise** 126:4,11 128:6
139:18
**non** 74:23
**nonresponsive** 100:2
**nonsecular** 164:3
**normal** 143:6,7
**normally** 95:9
**northwest** 17:13
**notary** 1:20
**note** 151:19
**notes** 3:19
**notice** 5:23
**notified** 6:11,14 16:5
16:8 108:19
**notifying** 8:3 45:24
**november** 142:4,9
163:3
**nsa** 121:1
**number** 13:17 17:13
54:9 55:11,16,18
56:23 59:13 61:18
90:9 92:23 96:17
99:16,21 102:9 117:1
117:7,10 141:7
151:12 173:4 174:5
174:10 177:1
**numbers** 55:10 91:23
91:25 97:25 98:1
123:12
**nurses** 20:3
**nv** 80:15

CONFIDENTIAL

**[nw - papers]**

| | | | |
|---|---|---|---|
| **nw** 2:8 | **objections** 79:16,22 | 141:11,15,16 142:8 | **outset** 71:3 |
| **o** | 118:5,7 | 143:20 145:12,18 | **outside** 149:20 |
| **o** 7:5 32:10,10 | **obtain** 54:11 | 148:7 153:25 156:23 | **outstanding** 6:2 |
| **oath** 39:22 | **obtained** 61:14 72:6 | 170:16 172:22 | **overall** 96:12 |
| **obamacare** 58:8,11 | 97:14 | 177:23 179:3 182:21 | **overlake** 57:15 58:14 |
| 60:1,3 | **obviously** 26:20 | 185:18,24 | 59:17 61:17,25 |
| **obey** 17:5 | 33:15 34:9 35:13 | **old** 63:22 127:23 | **overlapping** 166:16 |
| **object** 40:15 41:16 | 44:18 46:16 65:4 | **once** 41:9 122:18 | **overnight** 19:14 |
| 52:4 53:21 70:10 | 104:10 114:6 153:8 | 128:8 157:12,21 | **overseas** 113:11 |
| 103:6 104:13 107:17 | 153:11 164:22 172:8 | 174:12 177:16 | **owned** 171:15 |
| 109:17 111:24 | **occasionally** 68:15 | **ones** 115:22 | **owners** 134:17 |
| 113:25 125:8,9 | **occur** 78:25 | **ongoing** 26:20 | **ownership** 145:20 |
| 126:12 148:12 158:5 | **occurred** 78:5,10,24 | **open** 6:6 64:11 | **p** |
| 167:8 | **october** 76:25 77:21 | **operated** 60:20 | **p** 32:10 105:24,24 |
| **objecting** 71:9 170:3 | 78:16 116:25 | **operating** 171:12 | **p.a.** 2:3 |
| **objection** 5:2,11 11:2 | **offensive** 181:8 | **operations** 105:19 | **p.m.** 1:14 116:4 |
| 11:14 13:13 15:5,5 | **offer** 98:2 | 106:1 121:8 | 159:6,14 180:7,16 |
| 15:10,14 21:5 22:3 | **offered** 5:23 90:15 | **ophthalmic** 63:24 | 181:22 183:13 |
| 23:23 27:1,12,20 | 142:19 | **ophthalmologist** | **package** 179:15 |
| 28:6,13,15,19 29:18 | **offering** 91:6 106:2 | 29:3,6 | **page** 3:10 41:20,20 |
| 29:22 31:2 32:25 | **office** 67:16 69:20 | **opinion** 101:6 | 41:21 42:11 92:18 |
| 35:1,23 37:20 38:1 | 70:2,22 71:12,23 | **opportunity** 4:25 | 93:1,3,9 94:14,15,18 |
| 42:4 44:15,24 46:3 | 72:2 73:7 107:3,5 | 7:20 8:14 119:9 | 95:2 96:2 97:6 100:9 |
| 49:5 50:19,25 51:5 | 112:9 | 149:3 | 103:12,12 105:20 |
| 58:25 60:2 64:15 | **officer** 49:7 69:7 | **opposite** 167:23 | 110:4,8,9,9 114:17 |
| 68:1,11 70:9,23 72:3 | 104:12 105:11 | **opspring** 26:7 134:18 | 143:22 145:13 |
| 75:22 76:6,20 81:3 | **officers** 67:15 69:3 | 135:1 136:7 | 153:23 155:1,2,20 |
| 85:2 87:1 89:10 92:4 | **officials** 97:12 103:5 | **oral** 18:18 | 156:2,3 163:5 176:14 |
| 96:19,24 98:17 107:7 | 105:12 106:4,18,21 | **oranges** 98:19 | 176:15,17 177:11 |
| 109:1,21 115:19,25 | 107:18 109:18 | **ordeal** 136:9 | 178:8,15,24 |
| 117:2,9,15 120:5,23 | 113:20 121:12 123:9 | **order** 7:20 23:17 | **page's** 156:9 |
| 122:8,21 123:14,18 | 136:23,25 | 113:5 132:12,14 | **pages** 1:17 82:25 |
| 124:13 126:19 127:4 | **offspring** 135:1 | **ordered** 130:15 | 172:18 |
| 129:10 132:4 133:1,1 | **oh** 130:22 136:4 | **ordinary** 143:6 | **pain** 32:4,20 |
| 135:25 136:21 | 143:25 | **organization** 71:18 | **paint** 184:2 |
| 137:10 146:24 | **okay** 9:18 23:2 31:2 | 71:22 | **palm** 61:9 |
| 147:16 150:23 152:6 | 32:13 40:11,24 52:3 | **original** 97:14 | **palmetto** 2:4 |
| 153:3 157:1 159:24 | 54:7 62:22,22 68:22 | **originally** 26:6 82:14 | **paper** 13:6 |
| 162:8,21 163:21 | 77:3 78:21,22 84:3 | **outlook** 11:5 | **papers** 6:21 29:25 |
| 164:7,16 168:9,23 | 85:18 90:4,9 93:25 | **output** 91:12,16,17 | 51:18 71:5 146:14 |
| 175:9,24 178:14,21 | 94:22 95:19,21 96:10 | **outputted** 126:15 | 152:25 153:4,6 |
| 179:10,10 183:10,15 | 103:1 110:19 112:17 | **outputting** 123:8 | 155:11 178:12,24 |
| **objectionable** 70:16 | 112:22 116:17 | **outrageous** 38:7 | 179:2 |
| 143:11 | 118:11 119:23,24 | 80:21 83:12 143:23 | |
| | 120:16 122:2 130:22 | | |

CONFIDENTIAL

**[paragraph - predator]**                                                    Page 203

**paragraph** 43:11,23
  78:14 83:18,23 86:6
  86:24 90:4,8 93:5,10
  93:13,19,23,24 96:7
  97:8 98:7 100:12,14
  103:14,15 105:16,21
  110:10,16 114:21,22
  121:7 122:11 167:10
  171:9
**paragraphs** 97:21
  121:6
**paralegal** 2:14 4:17
**paralysis** 32:17
**parentheses** 110:11
**park** 2:4 78:18
**part** 38:8 40:19 41:2
  41:10,17 42:7 75:5
  88:13 92:21 99:2,4
  106:2,8 115:8,10
  121:5 127:11,17
  132:25 134:24
  135:15 178:24 183:5
  183:24 184:16
**partial** 178:7
**particular** 82:11
  167:19
**particularly** 43:22
  53:22 70:11
**parties** 183:7
**partner** 145:23
  148:23 157:14
**parts** 127:18,19
  128:15 137:22,22
  155:24
**party** 134:22 157:19
  163:13
**pass** 148:25
**passengers** 121:10
**patient** 62:8
**patterns** 155:9
**paul** 82:12,20
**pause** 5:1 102:23
**pay** 18:1,3 37:19 55:4
  57:18,19 60:9 76:10
  78:19 87:23 96:13

**paying** 58:3 60:8
  130:8
**payment** 163:11
**payroll** 157:22
**pdf** 54:21
**pending** 26:24 54:2
  155:21 156:16
  157:23
**penne** 156:3
**pennsylvania** 2:8
**pentagon** 107:18
  109:18 170:8,15
  171:6,7 178:9
**people** 8:3 25:18
  26:15 33:12 42:18
  46:17 53:16 60:15,16
  120:25 146:8 151:16
  151:18,24 152:20
  167:5 175:15 178:5
**perform** 10:14 14:16
**performed** 113:4,8
  113:12,16
**period** 14:8 22:25
  23:7 50:11 75:7
  81:13 84:4,12 88:15
  104:21 105:8 107:19
  111:21 129:12 131:5
  137:18 138:12
  147:21
**permit** 18:5
**person** 19:18 44:2
  182:13 185:8
**phone** 36:2 54:15,16
  54:17,18 107:6
  174:14,24
**phrase** 117:16
  169:10
**phrased** 118:1
**physiatrist** 33:12
**physical** 80:23 83:14
  84:12 184:8
**physically** 18:24
  77:19 184:2
**physician** 63:14

**pick** 159:21
**picks** 155:8
**picture** 154:4 176:16
**piece** 42:5 121:13
**pieces** 77:9 171:24
**pipes** 49:16
**place** 17:14 37:11
  44:5,5 45:2 161:15
**places** 24:23 26:9
**plaintiff** 1:5 2:2 4:16
  5:25 7:10 56:10
  90:12,15,18
**plaintiff's** 3:14 40:19
  41:21 42:11 56:8
  80:21 83:12
**plaintiffs** 80:18
  82:21
**plane** 182:3
**planning** 34:23 66:16
**plans** 46:11
**play** 31:8 86:12
**playboy** 170:6,23
  172:24 174:25 175:6
  178:8
**playmate** 171:3
**plead** 76:24
**pleadings** 9:11
  112:18
**pleasant** 63:22
**please** 6:13 10:2
  23:19 30:5 53:19,20
  62:14 63:18 67:10
  79:17 81:20 85:11
  86:20 88:20,21 89:10
  95:24 107:12 108:5
  116:9 118:1 131:19
  135:22 142:22 149:4
  149:18 150:21 169:6
  169:8 172:7 181:14
  183:11 184:20
  185:25
**pled** 83:18
**plus** 57:16 137:23,23
**pocket** 57:18

**point** 12:8,23 15:20
  16:24 21:16,20 22:18
  24:3 37:2 39:14
  44:23 56:20 57:8
  58:4 59:12 62:16
  63:16 87:8 93:18,22
  96:22 98:23 109:8
  110:4 130:17 133:16
  137:8 140:22 148:18
  148:19 157:25
  160:23 177:21
**pointing** 62:2 118:24
  118:25
**points** 96:18
**police** 152:10,12,13
**policy** 139:22
**porhco** 32:5
**portion** 57:23 58:9
  58:10 60:7 107:12
  111:5
**portions** 87:22,25
  88:6 97:3 98:20
  142:24 143:9
**portrayed** 97:2
**position** 98:15
  101:22 104:10
  111:11 112:1,5
**possible** 10:7 13:5
  62:9 181:20 184:5
**possibly** 14:8 48:5
  182:5
**post** 178:9,15
**posted** 177:12
**postings** 177:2
**postpone** 6:2
**potential** 5:17
**potentially** 138:23
  139:2
**pounding** 143:19
**power** 78:20
**preceding** 122:10
**precise** 13:20
**predator** 99:17 103:8
  104:15 105:1 155:12

CONFIDENTIAL

**[predict - raised]**

**predict** 171:11
**prehearing** 30:10
**present** 2:14 6:20
  63:22
**president** 60:3
  122:16
**press** 147:14
**pressure** 143:15,17
**pressured** 90:17
**presumably** 166:22
**presume** 23:21
**pretty** 64:13 181:5
**prevent** 74:7
**previously** 158:12
**price** 76:11 78:20
  87:23 96:14
**primary** 32:24
**print** 42:21 118:22
  119:12,21 166:6
**prior** 20:18 26:11
  46:13 52:22 116:24
  117:14
**private** 152:3
**probe** 130:3 145:5,16
  145:19 166:5,12
  168:14,18
**probes** 148:9
**probing** 22:9
**problem** 26:14 32:20
  72:15 164:16 166:14
  184:8
**problems** 8:7 76:12
**procedure** 48:13,20
**procedures** 17:5
  143:6
**proceeding** 70:15
**proceedings** 26:24
  27:9 39:1 72:24
  116:20 146:13
  159:12 180:9,14
**process** 21:16 24:25
  44:11 78:10 83:7
  102:7 137:19 143:3,4
  183:24

**proclaimed** 171:11
**produce** 34:5 52:1
  130:9,15 146:21
**produced** 13:10,23
  16:8 42:24 47:21
  51:20 61:12 64:7,9
  79:6 112:13,15
  128:22 140:6 147:7
  173:7 174:1
**producing** 115:16
  130:3
**production** 12:16
  173:20
**professional** 1:20
**proffer** 15:22 16:2,5
  140:1
**program** 84:6 103:8
  104:15 136:16
**programmer** 166:24
**programs** 145:22
**progressed** 66:13
**project** 105:2 126:9
  133:9
**proper** 67:22 81:23
**properly** 150:22
  161:8 169:10
**property** 37:25
  128:25
**proposed** 7:10
**protect** 151:24
**protection** 138:3
**protective** 7:20 23:17
**proved** 39:25 167:13
**provide** 29:11 32:21
**provided** 55:14 102:8
  168:5
**providing** 55:16
**public** 1:20 28:10,11
  31:14 34:8 149:9,10
**publication** 117:14
**publicly** 49:6
**published** 76:11,24
  77:11,14,19,24 78:19
  89:24 119:7 173:1
  179:25

**publishing** 78:16,17
**pull** 8:21 9:3
**purported** 91:6
**purportedly** 155:8
  157:15
**purporting** 177:2
**purpose** 70:15 72:7
  174:16
**purposes** 25:19 132:8
**pursuant** 5:22 7:20
  132:11,14
**pursuing** 20:4
**push** 107:3,5
**pushing** 143:15,19
**put** 4:21 5:21 6:10,20
  7:4 11:12 13:13 23:1
  23:7 66:5,24,25 69:8
  76:15 88:20 141:6
  164:23 167:12,17
  177:15 179:4 185:21
**puts** 110:4 111:16
**putting** 13:17 123:18
  139:8 165:19

**q**

**qaeda** 94:4 95:5
  97:13,14 171:17
**qatari** 171:15
**quarter** 116:8
**question** 10:16 13:8
  13:19 16:14 19:15
  23:19 35:2 48:8 54:1
  54:6 56:6 64:16
  67:11 80:13 81:4,23
  82:2,3 86:21,22 89:3
  91:11 92:12 96:13
  97:19 98:5,6 99:23
  106:5 108:5 109:2
  110:24 117:24 118:2
  120:16,17 121:25
  122:20 129:5 130:22
  132:9 143:12,20
  148:13,13 149:14,15
  149:18,19 150:20,21
  155:6,21 156:15

157:4,6,8,23 158:17
  159:25 161:8,12,14
  161:17 164:8 165:6
  167:16 168:15 169:8
  169:10,24 170:20
  172:6 177:5 185:3
**questioned** 167:12
**questioning** 6:8 21:6
  21:7 27:21 28:14
  53:22 68:5 70:17
  113:2 154:21
**questions** 3:17 12:24
  76:21 117:25 131:2
  138:4 139:9 140:10
  140:14 141:5 142:23
  147:17 150:15
  158:21 162:20
  164:23 165:23 170:2
  172:6 178:17 182:13
  185:15
**quick** 10:4,7 38:16
  162:13
**quiet** 139:12
**quite** 26:13 51:17
  79:23 172:2 174:10
  183:19 184:15
**quotation** 98:25 99:1
**quote** 80:23,24 83:14
  83:22,22 92:15 98:8
  98:9,12,14,24 114:20
  114:23 115:5 121:23
  145:7,7 150:17 156:5
  156:13 163:11
**quotes** 98:12,18
  159:19
**quoting** 103:10

**r**

**r** 2:7 32:10 105:24
**radio** 89:19
**rafael** 6:16 15:23
**raid** 108:11 156:19
**raise** 16:19,24
**raised** 16:6

CONFIDENTIAL

**ran** 140:16 156:1
**ratner** 2:7 4:13,13
**raton** 2:4
**reach** 149:17,17
**read** 12:19 14:19
29:24 30:2,4 43:15
43:23 56:13,25 57:1
63:21 75:2 83:4,8
84:20 88:5 96:13
98:17 100:10,15
101:7,17 107:11
108:23 114:17 115:6
119:14 120:22
142:24 146:6,8
154:14,20 158:7
159:17 160:16 166:6
166:7,7,9,18 167:3,7
167:10 171:23 172:8
172:19 175:12
181:14,14,18 182:25
183:11
**reading** 12:19 31:1,8
31:11 83:5 92:17
94:24,24 98:20,25
100:23,25 103:14
105:22 107:7,9,11,22
109:5 111:8 114:15
121:5,7,16 122:1
123:1,5 150:17
155:24 160:18 183:3
**reads** 180:5
**real** 38:16
**reality** 23:5 141:19
**realize** 181:2
**really** 32:7 141:8
**reason** 7:16 8:5,19
66:6 109:12 184:1
**reasonable** 183:25
**recall** 15:6 17:17,18
28:16 35:21 37:21
38:3 45:21 46:1
47:22 51:17 55:21,24
65:3,6 67:14 69:7,17
70:3 77:14 80:16
82:9,10 85:13,15

87:13 88:14,16 89:7
94:13 95:11 106:16
106:20,24 107:1,24
108:8,16 109:5,5,8
113:21 119:7,24
120:2 127:24 130:2
130:12,14 133:20,24
142:12,15 144:14
146:3,17 162:25
163:24 170:22
175:17,18,19 180:18
**receive** 45:8 53:4
54:23,25 71:15,17,21
**received** 53:12 69:19
69:24 70:1,21
**receiving** 52:12
160:9
**recess** 38:25 72:23
116:19 159:11 180:8
180:13
**recited** 83:23
**recognition** 99:14
103:6 104:14 107:17
109:17 111:24
125:20,24 126:13,14
**recognize** 99:19
102:10
**recognizing** 182:5
**recollect** 56:18 97:2
158:13,14 165:3
**recollection** 42:2
62:12,15,23 83:2
84:9,15 161:3,18
177:6
**record** 4:1,21 5:22
6:10 7:4 13:14 23:2,5
23:9 24:17 38:23
39:2 42:8 61:19
63:11,13 72:19,25
73:3 78:13 79:23
82:16 116:3,21
123:18 141:7 159:5
159:14 164:19,20
165:20 180:6,15,23
181:14,16,18,21,23

182:19 183:2,6,8,10
183:13,21 185:22
**recorded** 97:16,23
**recordings** 97:16
**records** 3:15 34:5
37:24 47:18 59:4
60:17 61:11,17 64:7
65:9 84:24 87:11
146:18,20 166:13
**recover** 35:10
**recross** 3:4
**redirect** 3:4
**refer** 43:22 82:25
143:9
**reference** 39:24
115:17 120:17
155:25 167:19,21
**references** 157:10
163:5
**referred** 90:18 98:1
**referring** 23:25
24:16 48:16 69:15
71:19 103:9 108:11
109:24 111:6 129:13
134:1 136:12 141:3
161:5 171:6
**refers** 121:3 156:11
**reflect** 161:20
**reflecting** 47:19
87:11
**reflection** 8:25 13:6
**refresh** 42:2 62:12,23
83:1 84:9,15 161:3
177:6
**refreshes** 62:15
161:17
**regard** 5:20 6:21
7:18 8:3 73:5 98:15
101:22 111:3,12,23
132:5 135:6 141:12
**regarding** 48:4
149:12,24 162:19
**register** 36:15
**registered** 1:20 36:18
36:20,24,25 37:3

39:13,17,17 40:5
42:3 46:2,6,8
**registering** 46:14
**registration** 3:13
40:10 41:6,9,11,18
41:23 42:7 44:10
**regulation** 139:23
**regulations** 102:24
**rehab** 33:20
**reid** 170:25
**rejected** 6:5
**related** 15:1 40:20
73:7 74:23 88:25
177:3
**relates** 70:18
**relating** 93:6
**relevance** 32:25
137:10 138:18 152:6
**relevancy** 21:6 22:3
22:16 27:1,20 28:13
28:19 35:23 75:22
76:6 85:25 139:25
140:2
**relevant** 17:1
**remain** 136:24
**remark** 181:9
**remember** 11:10
24:13 27:13 28:23
35:3,17 36:11,17
37:6 45:18,24 46:17
46:19,20 47:15 53:7
54:4 58:7,11,24
64:12 65:13 81:6
82:9 84:18,19 95:17
106:25 114:11
115:12,13,13,16
121:17,19,20 130:5
130:13 134:4,7,23
136:5 137:11,23
142:17 144:6 146:19
146:20 148:19 150:3
151:3 154:7,9,15
160:8,9 161:23 162:6
165:8,9,24 167:15
168:10,12,17,19,25

CONFIDENTIAL

169:16 170:6,12
174:9 176:23,24
177:10,25 178:4
179:7,8,24
**remembered** 84:22
**rent** 18:1 37:19 55:18
**repair** 65:23 78:9
**repaired** 66:9
**rephrase** 108:6
149:18
**replicate** 129:3
**report** 29:11 62:8
79:7 110:22 111:18
112:2,6,8,10 114:11
114:13 152:10,14
185:12
**reported** 114:9
152:11,12,13 176:22
**reporter** 1:20 4:9
6:24 116:10,12
**reporting** 150:19
**reports** 62:9 103:3
108:23 182:17
**represent** 36:6 41:1
**representation** 111:3
**representations**
51:23
**representative**
142:13
**represented** 29:16
**representing** 41:8
80:11,12
**republican** 157:19
**request** 6:5 10:11,11
10:15 12:14 52:1
162:24 173:3,9
**requested** 11:10
**requests** 173:11
**required** 16:4 33:21
129:21 133:7
**requirements** 124:19
**requires** 75:5
**requiring** 135:8
**resided** 86:7

**residence** 21:15 37:4
39:7,7 86:10,10 87:5
87:10
**residing** 86:23
**resolved** 156:8
**respect** 95:16
**respond** 5:1 8:14
10:15 70:24 115:20
132:5,9 143:10,18
160:1
**responding** 128:2
**response** 5:9 7:7
152:21 162:23
164:25 169:19
**responses** 3:14 56:9
**responsible** 80:9
**responsive** 10:23
11:1,8 100:5
**rest** 59:25 65:13
**restroom** 10:5,7
**result** 4:23 5:4 13:23
99:20 135:8
**resume** 116:6
**retain** 173:18
**retaliation** 184:5
**return** 10:7 38:16
**returned** 135:16
**retweets** 177:1
**reveal** 120:25 138:1
140:14
**revealed** 71:2
**reverse** 45:18
**review** 43:11 61:22
96:25 120:11 142:22
145:8 149:4 170:17
171:20,22 172:7,16
180:1,22 183:17,25
184:16 185:4,5
**reviewing** 85:13 90:1
**revised** 137:9
**ridge** 121:20,22
122:5
**rig** 108:18
**rigged** 114:9

**right** 8:1 20:18 21:3
24:7 25:21 30:10
38:17 43:2 45:5
46:23 53:10,23 56:23
57:12 58:5 61:4
62:21 63:23,24 64:1
64:4 72:11 74:2,12
74:14,15 77:3,5,11
79:6 89:15 90:11
93:13,14 115:7 118:2
124:7 128:11,25
131:21 136:9 141:24
143:5 154:23 157:2
159:1 169:12 176:25
183:9
**risen** 1:7 4:5 34:19
76:12 79:15 89:19
94:10,13 95:12 96:2
96:16,17 98:23 102:1
103:11 110:3 111:16
111:20 164:15
174:21 179:24
**risk** 65:21 73:9,19,21
**risks** 74:25
**road** 2:4
**robert** 147:8
**robo** 83:22
**room** 8:22 9:15 18:20
18:23 60:25 85:1
149:21 164:18
**roston** 118:20 170:9
174:11,19,21,22
**ruin** 13:5
**rules** 17:4
**run** 91:9 138:8
155:19 179:17
**rupture** 73:15
**ruptures** 66:9
**rupturing** 73:10,22

**s**

**s** 3:8
**sacramento** 155:18
156:8

**safari** 126:18,21,24
127:8
**safety** 23:13,14
**sanctioned** 130:2
**sanctioning** 130:7
**sanctions** 133:20
**sandoval** 134:19,21
**save** 42:15,19 94:21
140:23
**saw** 29:2,7 32:3,5,14
33:6,10,15 34:22
64:3 65:6 119:21
148:24 158:22 161:4
161:18 165:24
**saying** 19:23 32:22
33:23 35:18 41:3
56:4 64:4 66:22
71:10,12 76:16,19
80:16 82:10 109:19
118:8 121:20 124:7
139:17,20 146:20
159:19 160:15
168:20 177:20 179:3
183:16
**says** 30:23 31:16,24
57:2,12 59:21 62:5,8
78:16 86:6 90:11
93:9,11,14 94:16
96:3 97:10 100:17
101:1,19 103:15
105:17 110:5,21
111:17 112:1 114:25
118:24,25 119:2,16
119:21 122:14 142:5
144:1 145:14,17
148:21,24 155:5,6,11
155:17 156:1,11
157:11 160:12 163:3
167:11 171:9 177:21
**schedule** 34:9
**scheduled** 7:9
**scientist** 171:11
**seal** 8:1
**seals** 152:4

CONFIDENTIAL

**search**  10:14,19,25
  11:4,7 14:12,16
  108:25 109:6,10
  128:1
**season**  119:17
**seattle**  5:24 19:1,3
  20:14 21:23 22:8,17
  22:24 23:6 29:9
  60:13 147:25,25
  182:1 184:24
**sec**  141:6
**second**  39:20 41:20
  42:11,13 54:24 56:2
  74:5 83:19,24 88:19
  88:20 93:10,10,12,13
  93:19,24 100:11
  149:13 163:5 164:7
  165:1 169:23
**secret**  119:21 120:18
  120:18,21 123:5
  142:11 145:21 146:1
  155:9
**secretary**  112:9
  113:20,21
**section**  153:13
**sections**  88:8,9,10
**secure**  24:20
**secured**  86:9
**security**  45:8 50:17
  50:22,24 51:10,12
  52:11,13,22,24,25
  53:4 121:8 124:20
  151:24 152:2,3,5,20
  179:21 180:20
**see**  5:1 6:19 9:16,23
  14:14 26:12 33:14,21
  33:24 41:22 42:15
  48:5 53:24 56:24
  57:4,5 61:25 62:2,15
  62:22 65:1 66:19
  90:9 93:12,18,20
  94:20 96:2,8 102:10
  110:3,13,14,16,17
  111:5,7 118:22,23
  119:4,6,13 141:15

142:8 145:13 155:4
  158:20 160:7 162:17
  166:11,14,15,20
  170:14 173:21 178:6
  179:19,21,22 185:25
**seeing**  114:11 163:24
  168:10 179:7
**seek**  163:20 164:1,11
**seeking**  6:23 56:14
  83:24
**seen**  33:2,18 34:3
  74:3 95:10 169:13
**seizure**  76:2,2,3
**seizures**  76:1,8,8
**self**  171:11
**sell**  157:19
**selling**  44:18
**semi**  20:2
**send**  54:21
**senior**  121:12
**sense**  33:23 34:10
  54:22
**sensitive**  5:8 91:21
  92:5 102:23 120:24
  132:17 133:12 138:2
  138:24
**sent**  43:14 177:19
**sentence**  64:1 93:10
  93:12 100:9 115:9
**separate**  113:18
  125:10 165:7 168:15
**september**  19:4
**series**  97:24 118:15
**serious**  84:11
**service**  55:16
**set**  17:4 35:9 44:3
  45:6 56:9
**settlement**  133:21
  134:2,12,16,24 135:7
  163:7,8,15
**seven**  7:1 185:9
**severe**  8:11 26:14
  32:4 64:22
**severely**  4:23

**severity**  29:1
**shades**  8:21,22 9:3
**shana**  31:11
**shared**  19:19
**sheriff**  132:3,5
**sheriff's**  67:16 69:20
  70:2,22 71:12,23
  72:2 73:6
**shop**  141:22
**short**  13:18 88:13
  150:9
**shortly**  38:5
**shoulder**  32:4,15
**show**  29:20 43:18
  56:17 60:11 62:14
  63:18 64:1 77:4,16
  81:19,23 85:7 88:3
  88:21,23 97:3
**showed**  184:12
**showing**  13:20 15:9
  15:12 37:24 110:22
  111:18 112:3 185:12
**shown**  9:9,11 176:1
**shows**  71:1 181:9
**side**  8:8 32:16,20
  166:17
**sided**  42:15
**sift**  157:15
**sight**  166:17
**signalling**  123:11
**signature**  81:15
**signed**  18:15 62:25
  82:20
**significant**  80:22
  83:13 88:13 90:2
**signing**  83:23
**similar**  184:10
**simple**  128:11
**simpler**  92:13
**simplicity**  25:20
**single**  140:15
**sip**  68:24
**sir**  52:21
**sit**  180:24 185:8

**sitting**  4:16 100:6
  180:24 182:11,12
**situation**  67:2 130:6
  135:3 141:14
**situations**  113:18
**six**  52:14
**size**  74:1
**skip**  170:13
**sleepers**  171:17
**slick**  41:13 166:1
  169:4 178:16
**slightly**  7:10
**slow**  6:13 84:1 92:8
  139:19
**slowly**  5:19 30:4
**small**  42:21 68:24
  118:22 119:12,20
  166:6 171:12
**smaller**  77:9
**snail**  162:13
**social**  45:8 50:17,21
  50:24 51:10,11 52:11
  52:12,22,24,25 53:4
**socom**  49:3,4,11,14
  50:5 105:1 106:7
**software**  15:12 91:5
  91:13 107:17 109:18
  111:24 117:18
  124:11 125:4,5,7,8,9
  125:23,24 126:1,4,17
  127:2,12,21,23 128:5
  128:5,6,12 130:3,9
  130:15 131:3,7,24
  133:9,14,17 134:25
  135:8,10,15,20
  136:10,11,12,15
  137:4,6,7,9,13,19,21
  138:8 140:6,11,13,14
  141:10 145:21,24
  154:6 155:12,18
  157:14,19 159:21
  166:23 171:12
**sold**  21:22
**soliloquies**  81:5
  184:21

**somebody** 17:22 36:4
  43:14 75:3,6 85:7
  152:18 166:7 176:21
**son** 21:24 23:8,15,21
  24:6 25:8,9 35:16
  46:22 75:19
**sooner** 7:15 35:11
**sorry** 20:12 22:13
  54:24 56:1 68:14
  75:8 78:12 113:10
  127:7 134:11 160:18
**sort** 47:19 87:15
**sought** 6:1 84:7
  149:10 162:18
**sound** 107:10
**sounds** 45:5 49:17
  140:17
**sources** 42:6 141:12
**southern** 1:1
**space** 24:18 25:6
**spasms** 38:8 72:12
**speak** 130:20,23
  135:4 174:11
**speaking** 79:16,22
  89:10 113:9 118:4,6
  125:25 184:21
**speaks** 89:11 96:20
  120:10 156:25 158:6
**special** 105:19,25
**specific** 97:3 98:1
  124:14 137:16 143:9
**specifically** 127:24
  154:8
**specifics** 134:23
**speculate** 109:1,3
  117:20 123:15
**speculation** 68:2
  120:4 122:9 151:22
**speech** 149:20
**speed** 162:12,12
**spell** 19:18 32:6
**spelling** 25:16
**spend** 37:16
**spent** 37:8

**spontaneous** 162:13
**spring** 105:17,23
  107:20
**springs** 61:9
**stack** 142:1
**stages** 73:13
**stairs** 35:10
**stamp** 12:16 63:16
**stamped** 61:18 63:12
**stamps** 61:19
**stand** 72:13
**stapling** 41:11
**start** 24:5 52:11,12
  72:13 73:18 96:12
**started** 54:23,25
  136:7 137:17
**state** 1:21 30:14,16
  30:21 31:18 34:12
  36:10,23 61:1 85:23
  86:3 184:18
**stated** 114:6
**statement** 8:6 34:11
  34:14 89:22 94:6
  101:4 103:21,22
  104:2 110:25 111:22
  126:7
**statements** 104:6,7
  109:24 146:25
**states** 1:1 44:3 45:15
**stating** 112:7
**stations** 138:8
**status** 6:22 9:9 86:17
  184:11
**stay** 19:11 37:14,25
  39:12 40:21 41:1
  87:9
**stayed** 34:1
**staying** 21:15 22:17
**steps** 34:20 44:13
  46:13 177:14,17
**stole** 157:15
**stop** 15:19 118:4
  131:12 138:17
  161:13,13,13 169:6
  184:20

**storage** 21:21
**story** 148:17
**stream** 159:22
**street** 141:25 142:6
  145:3 146:6,9
**stress** 74:17 76:15
  80:3
**strike** 12:6 27:21
  29:18,22 35:21 52:11
  68:2 85:3 109:13
  133:7 136:1 175:24
**string** 184:4
**stroke** 31:20 32:5
  34:14 46:16 52:19,20
  52:23 53:6,8 58:12
  62:10 67:15,19 69:19
  73:17 74:10 76:18,19
  76:25 77:12 78:3,5,9
  78:22 80:4,5 87:18
  88:18 158:19 162:10
**strokes** 4:24 13:16
  34:2 59:19 65:17
  74:6
**stuff** 10:22 11:9
  14:14,15 20:4 21:17
  21:19 42:9,20,21
  74:23 124:24 129:21
  140:4 141:20 143:8
**subhead** 119:20
  142:13 145:5 148:9
**subject** 5:16 23:17
  73:5 95:16 96:18
  124:19 171:19
**submitted** 30:1 39:22
  178:23 179:1
**subscribe** 175:2
**substance** 12:24 16:2
**successful** 74:8
**successfully** 66:9
**sue** 166:4,12 168:13
  168:20 175:6
**suffer** 76:5 167:6
**suffered** 84:11
**suffering** 13:15 31:19
  34:13

**sufficiently** 183:18
**suggest** 8:7 135:4
  181:11
**suggested** 98:13
  115:3
**suggesting** 17:2
**suggestion** 142:24
**suing** 96:14 168:18
**suit** 145:14,17 156:4
**suit's** 143:23
**suite** 1:13 2:8,12
**suits** 154:6
**summarize** 96:22
**summary** 98:14,22
  101:21 111:11,20
  112:4 156:6
**summer** 105:17,23
  107:21
**sunglasses** 9:5
**superior** 156:7
**supervised** 156:3
**support** 146:12
**supporting** 146:22
**supposed** 27:8 66:21
  86:1 131:1 135:10
  182:22
**sure** 6:14 19:23 30:8
  38:18 43:14 44:1
  53:25 56:25 57:1
  62:2 63:2 64:5 79:9
  80:14 81:9 83:8 85:9
  90:8 93:17 105:9
  106:6 115:7 116:12
  124:6 167:8
**surely** 154:16
**surgery** 48:11 57:16
  58:15,16 66:16,18
  78:6
**surprise** 71:7,9
**sustained** 34:15
**swedish** 3:19 33:20
  59:18 61:20 63:13
**sworn** 4:19 144:3,6
**system** 127:11

| | | | |
|---|---|---|---|
| **systems** 138:7 155:17 | **targets** 155:9 | 113:16,17 114:5 | 133:11 134:1,22 |
| **t** | **tax** 36:3 | **testified** 4:20 39:11 | 137:17 139:20 146:7 |
| **t** 3:8 7:5,5 105:24 | **taxes** 35:21 | 154:13 158:12 165:2 | 150:7,8,12 151:9,19 |
| **table** 9:25 | **technical** 78:7 | 167:22 | 162:12 164:21 |
| **take** 33:3 38:4,10,13 | **technique** 41:13 | **testify** 67:10 72:5 | 166:11 173:19 174:1 |
| 40:14 44:5 59:24,25 | **technology** 15:13 | 79:19 133:2 161:7 | 174:14 175:21 178:2 |
| 62:18 68:4 72:10,21 | 91:5,13,15 94:3 95:4 | 174:18 175:25 176:3 | 181:8 182:4,7 |
| 90:2 119:11 145:8 | 95:8 99:14,19 102:13 | 176:9 | **thinking** 113:9 |
| 152:21 154:22 159:2 | 103:7 104:14 106:3,8 | **testifying** 29:19 | 129:23 168:18 |
| 159:3 165:20 171:20 | 106:18 108:9 112:7 | 56:19 89:16 183:18 | **thinks** 150:15 |
| 171:25 172:9,10 | 114:18 115:16 120:3 | **testimony** 70:11 | **third** 69:1 93:23 |
| 176:4 177:14,14,16 | 122:3,6,15,23 123:1 | 79:16,19 81:20 86:18 | 100:11 121:7 143:22 |
| 177:17 178:11,15,19 | 123:4,12 124:8,22 | 88:2,20 108:3 138:11 | **thought** 25:10 55:14 |
| 179:4,6 180:1,2,4 | **telephone** 54:9 55:1 | 144:3,6 151:1 | 64:9 74:13 79:6 |
| 181:2 | 55:7,15 156:13 | **tests** 106:2,3,8,9,11 | 82:13 93:4 114:4 |
| **taken** 1:19 7:15,19 | **telephonically** 36:5 | 106:15,22 107:17 | 123:10 124:10 |
| 24:20 38:25 44:4,13 | **television** 150:2 | 109:17 111:23 113:4 | 129:22 157:5 160:7 |
| 46:13 72:23 108:10 | **tell** 28:24 29:23 67:5 | 113:6,12,19 115:24 | 170:11,25 |
| 116:19 159:11 | 73:10 74:19 77:6,13 | **thank** 13:7 32:11 | **thousand** 57:16 |
| 177:24 180:8,13 | 77:18 86:22 92:16 | 57:7 85:11 97:5 | **threat** 98:13 115:4 |
| 183:23 | 107:4 116:9 121:12 | 116:17 118:5 | **threaten** 151:16 |
| **takes** 35:10 172:1,11 | 123:9 124:5,8 125:16 | **theft** 146:1 | **threatened** 151:17 |
| **talk** 55:20 88:23 | 125:17 134:5 152:8 | **thing** 71:4 113:16 | **threats** 90:13 151:10 |
| 94:10 120:9 140:15 | 154:19 170:1 179:5 | 124:7 135:5 137:7 | 151:11,12,14 |
| 141:1 156:13 167:2 | 184:21 | 140:15 143:16 167:1 | **three** 33:17,19 34:3,4 |
| 175:8 | **telling** 24:13 69:7 | 167:18 172:9,19 | 69:16 76:20 82:3 |
| **talked** 73:9 126:20 | 73:24 111:4 114:12 | 180:2 | 83:1 159:9 162:20 |
| **talking** 9:6 33:17 | 185:16 | **things** 34:2 40:22 | **thursday** 1:12 20:9 |
| 35:20 55:24 79:21 | **ten** 68:6,6 69:12,13 | 41:8 43:4 89:23 | 131:20 |
| 89:17 93:4 95:11 | 102:11,12 | 98:10 108:13,15 | **tie** 165:23 169:11 |
| 100:13 114:4 124:4 | **tendency** 77:6,7 | 115:1 134:5,10 | **time** 4:2 5:11 6:25 |
| 124:15 127:23 | **term** 13:18 88:14 | 144:24 151:3 165:8 | 13:24 14:8 16:25 |
| 135:14 139:17 141:2 | **terms** 10:25 11:4 | 166:14 172:14 | 24:4 36:12 37:2,8 |
| 141:9 142:25 176:8 | 32:19 74:16 120:23 | **think** 6:16 14:3 22:4 | 38:24 39:3 47:1 |
| **talks** 121:15 155:16 | 128:10 136:21 163:7 | 24:12,15 25:15 32:10 | 48:10,18 50:11 57:22 |
| 156:19,21 159:18 | 184:4 | 33:11 34:3,20 35:12 | 57:23 58:12 60:24 |
| **tammy** 1:19 4:9 | **terror** 90:13 119:3,17 | 45:17 49:9 50:13,15 | 62:18 63:10 64:3,6,8 |
| 116:10 | 119:19 | 54:12 57:16 58:13 | 65:5 66:24 68:3,16 |
| **tampered** 167:24 | **terrorism** 23:12 | 62:6 64:25 65:16 | 72:20 73:1,3 80:11 |
| **tap** 53:19 | **terrorist** 154:6 | 67:9,11 69:14,15 | 82:13 85:20,24 86:24 |
| **tapes** 102:20 | **terrorists** 155:13 | 70:20,25 71:1 79:3 | 88:15 90:3 96:4 |
| **tara** 170:25 | 157:18 171:12 | 99:14 101:2 109:25 | 104:21 105:8 107:19 |
| **target** 125:23 126:12 | **test** 108:18 110:7,21 | 111:8 112:15,17,17 | 111:21 116:4,5,10,14 |
| 126:14 171:16 | 110:23 111:2,8,12,18 | 113:18 124:5,6 | 116:22 123:3 129:12 |
| | 111:19 112:3,5 | 126:10 131:19 | 131:5 134:11 135:3 |

CONFIDENTIAL

137:8,18 138:12
140:20 145:8 147:8
147:20,21 151:7
152:16 159:6,7,14
164:23 165:15,18
170:17 171:20,25
172:1,10,25 174:7
176:24 177:9 180:1,3
180:7,16 181:22
183:13,16,22 184:1
184:17,20
**times** 19:5 33:19 34:3
34:21 69:13 73:13,23
95:15 137:5 163:1
179:16
**tiny** 42:25
**title** 119:2,4,18,18
171:5 178:8 179:22
**titled** 78:19 142:9
145:4 148:8
**today** 5:18 6:7,17
20:8,9 30:19 33:8
131:17,18,19 166:5
167:15 168:8,22
183:19
**toes** 32:17
**told** 23:7 28:4 53:7
63:9 65:20 66:6,7,8
67:6 73:12,19,21
98:23 102:1,7 103:3
103:11 104:11 107:2
107:23,25 108:16
109:20 111:20
114:10 124:10
128:18 129:25
130:11,18 133:10
175:22 184:7
**tolerate** 23:3
**tom** 121:20 122:5
**tomorrow** 6:19 140:8
140:21
**top** 25:2 32:17 119:5
121:5,5 157:12
**totally** 159:24 162:2
164:8

**toth** 2:11 7:3,5,5
**touch** 132:7
**tough** 83:4 181:5
**track** 6:25 151:13
**tracking** 83:22 84:8
**trade** 146:1
**trader** 142:14 157:13
**transcript** 3:12 8:1
28:18 29:25 30:16,20
31:3,8,11,16
**transmitted** 155:7
**transmitting** 171:16
**transparent** 8:6
**traumatic** 167:6
**travel** 26:18 28:22
29:12,17 31:19 32:22
34:12,17,23 35:6
74:20,24 75:3,6
182:3
**traveling** 26:19 67:6
67:23 74:25 75:5
**treated** 59:7 61:4,5
62:4 66:15
**treating** 63:14
**trees** 42:15,19 94:21
**tremaine** 2:7 4:12,14
**trepp** 107:14,22
108:16,19 109:14,20
114:8 142:19 144:3,8
145:24 146:14
148:25 153:1,19
155:16 157:12,14
163:11,18
**trick** 165:6
**tried** 157:18 181:24
184:23
**triggered** 121:13
**trouble** 141:16 156:1
**true** 63:8 94:6
**trust** 96:10 130:18
**truth** 77:7 111:4
185:17
**truthful** 34:11,14
39:25 63:6

**truthfully** 79:20
**try** 5:19 8:24 9:2,15
10:4 47:12 62:17
72:16 121:18 135:15
140:8 165:22 167:5
185:23
**trying** 9:14 12:23
22:16,19 32:18 33:23
48:5 49:10 86:12
87:17,19 138:19,22
139:1,24 141:4,13,20
143:2,18 153:8,11
157:25 158:18
162:11 164:13,14,16
165:5,12 167:7
169:22,23 171:2
182:7,15 185:10
**tuesday** 30:21
**turn** 9:19,20 13:3
36:4 43:3 63:12
78:13 85:5 94:14,15
129:21 132:15,22
135:17,20 136:3
148:5 153:21 160:16
179:15
**turned** 57:19,20
121:15 128:17,20
131:14 132:11 156:6
177:9
**turning** 9:18 90:6
136:5 160:14 161:11
**tv** 88:21 89:19
171:15
**tweets** 177:2
**twice** 156:4
**twitter** 3:16 176:14
176:15,19,21 177:7,8
177:10,11 178:2,5,15
178:24 179:13
**twittered** 178:5
**two** 37:15,16 42:15
69:16 97:12,18,21
113:18 116:15 135:2
135:3,18,21 142:6
144:24 147:17

150:15 153:23
164:23 165:7,23
174:15
**tying** 150:19 165:1
**type** 124:11 125:4
138:7 184:5
**types** 34:2 138:15
166:14

**u**

**u.s.** 105:18,25 108:21
121:12 123:9 155:12
179:20
**ultimately** 122:16
126:15 144:21 147:9
168:2
**unable** 31:19 34:12
50:18 51:4,16
**uncalled** 181:11
**uncovered** 90:16
**undercover** 49:8
120:25 136:23
**underneath** 59:21
**understand** 16:20
22:15 48:17 49:23
56:3 91:4 99:1
102:25 108:4 120:7
125:17 139:1,16,25
182:14 185:16
**undue** 76:15
**unfortunately** 143:4
**unique** 121:24 122:6
**unit** 4:3 118:20
**united** 1:1 44:2 45:15
**units** 127:10
**unorthodoxed**
121:24 122:7
**unprecedented**
121:24 122:7
**unreasonable** 184:17
**unreported** 144:2,8
**unsealed** 108:24
109:10
**unsuccessful** 65:23

CONFIDENTIAL

**unwittingly** 171:16
**upcoming** 123:11
**updated** 119:1,2
**upset** 154:12
**upsetting** 184:15
**usa** 166:5 167:15
168:8,22
**use** 10:5,25 70:14
104:23 113:25
117:15 124:12
126:17 127:4 132:6
157:18 169:23 177:8

**v**

**vague** 11:2 15:10
51:6 68:10 103:25
104:22 115:25 117:9
129:10 135:25
146:24 147:16 153:3
175:9
**validate** 113:5
**validated** 112:7
115:24
**variety** 80:14
**various** 73:23 177:1
**verified** 110:22
111:18,23 112:3,5
113:17,19
**verify** 166:8
**version** 137:24
**versions** 97:13
**versus** 4:5 30:14,17
30:22
**video** 4:4 15:9 103:6
104:14 116:13 125:5
125:6 128:5 155:7
159:22
**videographer** 2:14
4:1,10 6:25 9:21
38:23 39:2 72:19,25
116:3,15,21 159:5,9
159:13 180:6,11,15
181:21 183:7,12
**videotape** 1:16,19
97:10 100:16,22

**videotaped** 100:19
101:13
**videotapes** 97:13,14
97:16 99:6,16,17
101:19 102:4,18
**videotaping** 100:16
**view** 96:18,23 98:23
110:4 111:3 185:22
**violate** 139:2,22
**virtual** 55:9
**vision** 29:13
**visit** 64:10 69:15
107:18
**visited** 26:8 105:11
**visiting** 103:4 104:12
106:4
**visits** 34:6
**visual** 106:17
**voice** 16:19
**volume** 1:17 185:25
**vote** 36:16,19,21,24
37:3 39:13,18 40:6
42:3 46:2,6,8,14
**voter** 3:13 41:9,11,18
42:7 44:10
**voters** 40:10
**vs** 1:6

**w**

**w** 2:4
**wait** 30:25 39:20
54:5 55:23 56:5,17
56:17,17 67:8,8,8
79:12,12,12 81:19
88:19,19 92:8,8,8
93:12,16 95:20,20,20
99:25,25,25 101:5
103:24,24,24 104:22
104:22 139:12,12,12
141:6 149:13 150:14
150:14,14 155:21
162:1 164:3
**waiter** 69:8
**waiting** 40:2

**waitress** 69:8
**waive** 30:24 31:17
**walk** 89:1,19
**walker** 1:19
**walking** 74:22
**wall** 141:24 142:6
145:3 146:6,9
**wang** 3:15,19 72:9
**want** 4:21 8:9,12,16
9:6 15:21,21 16:2,9
16:22,23 19:23 23:14
25:12 29:20 40:25
42:8 43:23 51:25
67:23 77:4,16 85:8
87:17 88:23 89:9
114:16 115:6 116:5
121:17 124:6 140:19
141:6 143:14 149:19
151:1 164:17 165:1
165:15,17 167:10
170:17 180:23
**wanted** 7:21 17:6
97:17
**wanting** 17:4 22:6
**wants** 9:12 157:2
176:9 182:24
**war** 78:20 148:22
**warehouse** 127:1
**warren** 157:12
**warrior** 154:25 155:3
**washington** 2:9
20:14 21:16 29:17
31:18 34:12 36:10,23
44:11 75:16,17 80:20
85:23 86:3 147:25
148:1 163:10 177:21
**waste** 16:22 73:3
140:19 165:15,17
**watch** 156:6
**water** 53:18,19 68:12
**way** 8:15 13:20 79:14
108:4 118:2 129:3
143:5,15 158:7
165:20 166:21
169:11,12 181:25

183:23
**we've** 30:1 38:6
116:11 130:4 163:16
176:1
**wear** 9:4,12,13
**wearing** 8:17
**wednesday** 28:25
32:1,2 131:22,23
132:13,18,20
**week** 18:6 27:9 31:23
34:22 75:9,25 76:3
139:6
**weeks** 67:14,19,20,21
68:18 121:3,8 122:11
122:12
**wells** 6:12,15
**went** 63:4 64:21
67:17,18 75:11 82:3
86:17 103:4 114:5
121:9 181:17
**western** 80:19
**whelan** 156:10
**white** 171:14
**wide** 166:15
**wife** 23:21,22 24:14
46:2,6 52:9 75:13
80:18
**willing** 181:25
**win** 106:1
**wins** 142:14
**wisecracks** 185:6
**wish** 5:21 6:10 22:11
38:13 153:14
**wishes** 9:5
**withhold** 53:23
**witness** 3:4 6:13 8:16
8:24 9:18,24 10:4,21
11:3 13:3 15:6 16:19
23:24 27:4,6,13,24
28:16 30:4 33:2 35:3
35:24 37:21 38:3,7
38:12,15,19 40:2,11
40:22 42:20 44:17
45:1 49:9 50:21 51:7
52:5 53:18,25 54:3,7

CONFIDENTIAL

**[witness - zivitz]** Page 212

56:3,20 57:8 59:2,16
61:13 62:16 68:3,12
70:25 71:10 72:12,16
76:7 77:8,18 81:6
84:1 86:1 89:13 90:9
91:23 92:7,12,23
93:4,22 94:25 95:22
97:6 101:12 102:25
109:23 110:13 111:7
115:8,21 116:18
118:8,11 119:12
120:13 122:10
123:16,19 124:1,21
126:22 129:6,12
133:3 136:25 137:11
138:5,12 139:11,16
141:1 143:12 147:2
147:18 149:5 151:2
151:23 152:7 153:17
154:14 157:5,24
158:18 162:9 167:18
168:10,25 170:19
171:22 172:2,8,17
176:6 180:23 181:16
182:7,10,22 185:7,20
185:24
**woman**  156:3
**won**  104:12
**word**  24:19 104:23
110:13 111:7 114:1
127:5 136:9 137:2
**words**  96:9 172:23
**work**  11:20 15:9,12
44:4 46:15 48:6,7
50:18 51:4,16,24
69:24 70:19 71:22
72:1 73:5 75:21
99:12 105:10 124:12
124:18 125:12,14
126:17 127:13 128:9
128:9,12 138:7
166:21,23
**worked**  5:6 11:19
17:23 26:5 48:10,19
50:15 82:14 124:23

137:5 140:4 155:17
**working**  23:10 26:3
31:20 124:24 156:2
**works**  163:7
**worsened**  81:13 83:3
84:3
**wright**  2:7 4:11,13
**write**  52:9 136:10,15
**writes**  160:25
**writing**  66:5,24 67:1
96:18 173:5,14
**written**  34:21 76:11
79:4 87:14 95:23
137:14,21
**wrong**  85:1 104:18
109:14 121:15 164:5
165:2
**wrongdoing**  144:22
156:9
**wrote**  52:6,8 136:12
137:4,6

| x |
| --- |

**x**  3:2,8

| y |
| --- |

**y**  4:16
**yarrow**  21:16,20
24:3 44:23 177:21
**yeah**  9:20 13:7 34:15
42:17 58:17 62:2,5
62:18 63:9 64:24
96:15 101:16 111:9
123:17 129:1 133:16
134:22 155:2,4
179:19,22 183:1
**year**  20:19 21:3,9,12
24:9,15 54:12,14
58:5 63:22 85:17
88:17 132:15 146:2
150:3,5,8
**years**  11:20 13:1 14:3
69:12,16 127:23
135:14 151:13 173:4
174:6,10 175:17

**yellow**  40:23 43:4
**yellowstone**  154:5,15
**yesterday**  19:22
132:11,18 133:8
140:7
**york**  95:15 163:1
179:16
**younger**  179:12

| z |
| --- |

**z**  19:20
**zivitz**  1:19 4:9

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of


the deposition wholly or partly, on motion under rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.