**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

DENNIS L. MONTGOMERY

                    Plaintiff,

      v.

JAMES RISEN, ET AL.,

                  Defendants.

Civil Action No. 1:15-cv-20782-JEM

**PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

      Plaintiff Montgomery respectfully submits this Statement of Disputed Material Facts under

S.D. Fla L.R. 56.1(a). As set forth in the local rule, Plaintiff's Statement herein corresponds

precisely with the order and paragraph number of Defendants' Statement of Undisputed Facts. At

the outset, Plaintiff incorporates by reference the sworn statements, Montgomery's 1st Declaration,

Montgomery's 2nd Declaration, and Montgomery's Opposition of Summary Judgment

Declaration, Exhibits 11, 4, and 6, respectively.

      **A.**      **Parties**

      1.      Undisputed.

      2.      Undisputed.

      3.      Disputed. **A)** The Plaintiff provided information and evidence warning Defendant

Risen before publication that Defendants' intended defamation is false. Exhibit 1. **B)** Houghton

Mifflin Harcourt Publishing Company ("HMH") and Defendant Risen knowingly published the

chapter dedicated to Plaintiff by singling out a private individual with extraordinary accusations of

fraud, illegal activity, criminal conduct, perpetuating the biggest hoax in American history in order

to sell books and for character assassination. *See* Chapter 2 of <u>Pay Any Price</u>; Am. Compl. ¶¶ 100-

1

239 [Dkt # 44]. HMH knew that such accusations about a private individual required strong evidence. Instead HMH admits to conducting absolutely no fact-checking or review of the accuracy of its unusual and damaging accusations. Deposition of 30(b)(6) Witness Bruce Nichols ("Nichols Depo.") 53:10 – 84:25 (esp. 53:10- 60:23; 64:15 – 66:14, 74:11-23; 75:19 - 21), Exhibit 2.  "As I said, we do not fact check. We rely on our authors."  Nichols Depo. 89:20 – 91:2.  "Sir, as I said before, we rely on our authors, Jim made the judgment and reported both sides. So we had no problem with how he presented this." Nichols Depo. 94:1-11 much less issuing corrections or retractions when Plaintiff's counsel, pursuant to Florida Statute § 770.01, demanded them.

4.      Disputed under same analysis as ¶ 3, above.

**B.      The Book and Chapter**

5.      Disputed. Chapter 2 does not merely recount prior publications. The Defendants go far beyond past reporting, stating as true in the Book, in Risen's own voice, what past articles raise only as questions and doubts. Defendant HMH admitted that Defendant Risen originated the claim that the Plaintiff committed one of the most dangerous and elaborate hoaxes in American history and no prior publication or public document ever stated. Nichols Depo. 80:14 – 84:8; Deposition of James Risen ("Risen Depo.") 291:9 – 292:14, Exhibit 3.

6.      Disputed. Montgomery personally informed Defendant Risen as early as 2011 that every substantive assertion about Montgomery in the New York Times reporting and other reporting is and was then false. Exhibit 1.  Moreover the sources that the Defendants relied upon do not support their defamation as detailed below.

7.      Disputed, but broad conclusions here summarize detailed discussions that follow. Defendants included very little of Montgomery's point of view and the material facts he conveyed to Risen. Risen and misrepresented his denials.

8.      Undisputed.

9.      Risen admits to having doubts, that the Plaintiff could be telling the truth.  Risen was asked "Q Now, Mr. Montgomery could be telling the truth.  Correct?"  Risen answered:  "A Yes.  That's why I wanted his side of the story in the chapter--" And: "Q  -- So therefore if he could be telling the truth you cannot say unequivocally that he committed the biggest hoax in American history?" Risen Depo. 337:18-24, Exhibit 3. He does not know if the Plaintiff created one of the largest, most dangerous, and most elaborate hoaxes in American history. This contradicts Risen's Declaration where he stated: "I do not have any doubts about the truth of the statements I wrote about Montgomery. Risen Decl. at ¶ 6.

### C.      Media Coverage of Montgomery Before the Book and Risen's Reliance On It (DISPUTED)

10.      Disputed. Summarizing the detailed responses below, Montgomery informed the Defendants of the falsehood of the Defendants reports and other false reporting.  Chapter 2 of the Book goes far beyond past reporting by transforming false allegations about the Plaintiff as absolute truth, in Risen's own voice, different from past reports about Montgomery. *See* Chapter 2, Exhibit 1.

11.      Disputed. The June 27, 2005, report by NBC, attached to Risen's Decl. Ex. 4 in support of summary judgment, never identifies or mentions Dennis Montgomery or his work as the reason why President Bush and his national security team ordered airplanes blocked from overseas. None of the sources address the Plaintiff's dis-encryption technology that he provided as opposed to analyses, summaries, and reports created by government intelligence agency analysts up the chain of command. The Defendants knew from the news article they rely upon in Ex. 4 that: "Ridge added that the faulty CIA analysis was a significant factor in raising the alert level, ***but not the only factor***."  Thus, the Defendants knew that government officials combined intelligence from many sources.  Montgomery's OMSJ Decl. at ¶ 33. Furthermore, the

Defendants knew from the news article they relied upon at Ex. 4 that Plaintiff's technique was a

valid technology for CIA analysis:

> As discredited as the CIA's interpretation now is, experts say steganography is a valid subject for CIA analysis, and could be used by terrorists to hide data in files on the Web, in still photographs or in broadcast television images.
>
> "Steganography," says professor Nasir Memon of Polytechnic University in Brooklyn, N.Y., "is the art, if you will, of secret writing. And when two parties want to talk to each other and not let anybody know they are indeed communicating, they would use steganography."

The Defendants rely upon Ex. 4 that: 'The article quoted Tom Ridge, former Secretary of the

Department of Homeland Security, who stated that ... he 'wonder[ed] whether or not it was

credible' and 'we weren't certain' about the intelligence at the time.'"  And 'Ridge said that "the

CIA analysis certainly did turn out to be wrong."' Neither uncertainty nor analysis that turned out

to be wrong supports the defamation that the Plaintiff knowingly deceived the government as a

con man, motivated by greed, and perpetrated one of the greatest hoax in American history.

Defendants admit from their Ex. 4 that they rely on that it was not Plaintiff's role to make

decisions for the government such as blocking air travel, but senior government officials.

      12.    Disputed. The article that the Defendants relied on as Risen Decl. Ex. 5 informed

the Defendants that the reports are from court records, not from him seeking publicity.

      13.    Disputed. Defendants knew they could not rely on Trepp or his employees as

reliable sources in light of on-going litigation and acrimonious disputes between Trepp and

Montgomery. Risen Depo at  278:19 - 283:22, Exhibit 3. Trepp was working, at great effort and

expense, to get control and ownership of the software created by Plaintiff.  Montgomery 2nd Decl.

26-29, 64, Exhibit 4.

      14.    Disputed.  Defendants offer no relationship or relevance between the 2005

interview on an unrelated topic with the 2007 story about Plaintiff's work.  Montgomery testified

that he did not talk to the media about his work because his work was secret.  Dennis Montgomery

Deposition, August 20, 2015 ("Montgomery Depo.") 283:4-11, Exhibit 5.  He did not seek

publicity because he was working under cover.  Montgomery Depo. 283:9-14

  15. Disputed. As the advocacy of Gibbons' attorneys in the press in Risen Decl. 9 is

not a reliable source for fair reporting, as a Pulitzer Prize winning journalist Risen knows.

  16. Undisputed.

  17. Disputed.  **A)** The Defendants knew then and know now that the FBI reports only

note what Warren Trepp and his employees claimed.  The Defendants had actual knowledge that

there are no reports from the FBI other than just taking notes of Trepp's and his employees'

accusations.  Risen Depo. 345:5-20; 354:8 - 358:15, Exhibit 3.  **B)** Risen never interviewed Trepp

or his employees.  *Id.*  **C)** Risen Decl. Ex. 10 in Bloomberg News on August 29, 2008, actually

states:

> She's dueling in court with Warren Trepp, once a top trader for Michael Milken,
> who alleges that Edra and a former partner of Trepp's in a software company stole
> computer code that purportedly could sift through broadcasts from Qatar-based
> news network Al-Jazeera and find embedded messages from terrorists. Edra tried to
> use connections to the Republican party to sell the software to the government for
> $100 million, according to Michael Flynn, a lawyer who was once on Edra's
> payroll.

  The Bloomberg article stated that "Edra tried to ... sell the software to the government for

$100 million, according to Michael Flynn, a lawyer who was once on Edra's payroll."  Therefore,

Defendants admit to knowing that the Plaintiff's software was valued at $100 million.  Defendants

knew that Trepp's allegations were made to gain leverage in litigation.

  18. Disputed.  **A)** The Defendants admit actual knowledge from Risen Decl. Ex. 11 that

the Air Force publicly stated only that tests of the Plaintiff's work were "inconclusive." The

Defendants had actual knowledge that the government did not find Plaintiff's work to be

fraudulent, a con, or a the biggest hoax in American history. Risen Depo. 298:21 - 299:25; 340:8 -

342:10, Exhibit 3.  **B)** Defendants claim to have relied upon a 2010 article in <u>Playboy</u> in Risen

Decl. 11 which also reports: "Trepp obviously believed Montgomery's technology was real because he [Trepp] pursued the lawsuit with a vengeance." *See* Ex. 4 to Risen Deposition, 6/19/15, Exhibit 7.  Therefore, the Defendants actually knew that the court records they relied upon revealed that Trepp's actions of furiously seeking to get ownership and control of the software contradicted his disparaging words.  **C)** The Playboy article also stated:  "But if it's all bogus, why is it still classified?"  *Id.*  **D)** The Playboy article also stated:  "One former counterterrorism official remembers the briefing: 'They found encoded location data for previous and *future threat locations* on these Al Jazeera tapes,' he says." (Emphasis added.)  So the Defendants knew that the Plaintiff's work was identifying terrorist threats *before* they happened, which would quickly be confirmed not.  *Id.*; Montgomery 2nd Decl. ¶ 21-23, Exhibit 4. **E)** The Playboy article also stated of Montgomery's team working with the CIA at eTreppid:  "We called them Sid's guys, ***and no one knew what the hell they did***."  Thus, the Defendants admit that they could not rely upon eTreppid employees who did not know "what the hell they did."  **F)** Defendants admit knowing from the article that as late as 2009, Joseph Liberatore, a former Air Force official who was one of Montgomery's chief liasions, officially thanked Montgomery for his intelligence work.

19.     Disputed. **A)** the Defendant is quoting his own article, not a source.  **B)** In the November 2010 deposition referred to, the Plaintiff asserted his Fifth Amendment rights to only avoid disclosing classified information. Montgomery Depo. 236:-238:3, Exhibit 5.  Montgomery warned Risen of this before publication.  Montgomery OMSJ Decl. at ¶ 5, Exhibit 6. Yet the Defendants falsely published that asserting the Fifth Amendment confirms that Plaintiff's work was a fraud.  **C)** The email the Defendants attached as an exhibit to the motion for summary judgment ("MSJ Ex.") 12; Bates No. DEFS00S2809 informed the Defendants before publication that Joseph Liberatore of the U.S. Air Force as late as December 2008 strongly believed that the

Plaintiff's work was legitimate. Ex. 12 reveals that Liberatore was working to arrange a multi-million dollar contract between the Air Force and BLXWARE for Plaintiff's services. **D)** MSJ Ex. 12 also reveals that Liberatore was fully aware of past controversies and Trepp's accusations.  The Defendants published that the Plaintiff kept getting new contracts with the government because secrecy prevented different government agencies from learning he was a fraud.  Yet in MSJ Ex. 12, Liberatore expresses that he was fully aware of past criticisms. **E)** Defendants relied on Steve Crisman's mere *belief*, which does not support their defamation of Plaintiff.

20.     Disputed. **A)** The <u>Defense News</u> article does not name Montgomery or identify him as related to the intelligence which was criticized.  MSJ Ex. 13. **B)** The article portrays sharp disagreements about whether John Brennan wholeheartedly supported the intelligence source or doubted it.  *Id. (*"Another former CIA official, who asked that his name not be revealed, agreed that without Brennan, the intelligence wouldn't have had wide distribution.  'It was Brennan who decided to take this to the White House," he said. "We heard that Brennan took it upon himself to bring it to the White House.'") In short, Defendants could not rely upon criticisms from some officials while ignoring the strong support for Plaintiff's work from others.

21.     Disputed.  But the paragraph lacks specific details to respond to it.

22.     Disputed, because Wikipedia is a blog written by users. "We agree with those courts that have found Wikipedia to be an unreliable source of information." *See* e.g., <u>*Badasa v. Mukasey*</u>, 540 F.3d 909, 910-11 (8th Cir. 2008). *Bing Shun Li v. Holder* (5th. Cir. 2010).

23.     Disputed. **A)** Defendants describe events while the Plaintiff was heavily medicated and probably delirious while recovering from surgery from a brain aneurysm.  The Plaintiff has no recollection of these events except that he had a television in his hospital room sometimes playing Fox News. Montgomery Depo. 292:10 - 296:21, Exhibit 5. **B)** Cameron's email at Handman Decl.

Ex. 8 is hearsay that is vague as to what it is referring to or why. Montgomery's OMSJ Decl. at ¶ 38, 39.

### D.  Reliance on FBI Reports, Court Documents, and Congressional Records for Allegations of Fake Software (DISPUTED)

24.     Disputed. As set forth in detail below, Defendants misrepresented and distorted court, official and congressional records in a lopsided, unfair, inaccurate and malicious manner.

25.     Disputed, for the same reasons set forth in ¶ 17.  Defendants knew the U.S. Air Force Office of Special Investigations ("OSI") reports and FBI reports only note the accusations by Trepp and his employees, who had strong motivations to disparage Montgomery. The reports only state suspicions of Trepp's employees "that Montgomery's skills may not be what he has purported them to be."  What Plaintiff's skills "may not be" cannot substantiate claims that the Plaintiff is a fraud, a con man, or perpetrating the biggest hoax in American history. Trepp and Risen are knowingly operating an echo chamber.  Montgomery MSJ Decl. ¶ 40, Exhibit 6.

26.     Disputed. Defendants claim in ¶ 26 to have relied on mere doubts such as "Patty Gray, began to suspect that Montgomery 'was doing something other than what he was actually telling people he was doing.'"  The Book, 48-49.  The Defendants claim to rely on Sloan Venables' statement to the FBI that 'Montgomery promised products to customers that had not been completed or even assigned to programmers.'" *Id.*  What Patty "began to suspect" or Venables' concern that promised work was not yet complete does not substantiate published defamation that the Plaintiff was a fraud, a con-man, and perpetrator one of the largest, most dangerous and elaborate hoaxes in American history.

27.     Disputed. **A)** The FBI reports and records reveal that they only note what Trepp and Trepp's employees allege while Trepp fought to get control of the Plaintiff's technology in court. **B)** Defendants did not report from the court records they relied upon that the court in Nevada ruled that the FBI reports were fraudulent and deceitful and exhibited "callous disregard"

8

for Plaintiff's rights.  Order, *In the Matter of the Search of:  The Residence Located at 12720 Buckthorne Lane, Reno, Nevada, and Storage Units 136, 140, 141, 142 and 143, Double R Storage, 888 Madestro Drive, Reno, Nevada,* Case Nos. 3:06-CV-0263-PMP-VPC & 3:06-MJ-00023-VPC, Order, Magistrate Judge Valerie Cooke, Nov. 28, 2006; Montgomery 2nd Decl. ¶ 7, Exhibit 4. **C)** The Plaintiff informed Defendant Risen before publication that Magistrate Judge Cooke warned that if the government tried to cite to the FBI reports again they would be sanctioned because they are uncorroborated hearsay.

28.     Disputed. **A)** The only source identified throughout Defendants' Statement of Undisputed Facts for publishing that the Plaintiff committed fraud and the biggest hoax in American history was Tim Blixseth in the middle of his divorce from Edra Blixseth, Plaintiff's employer. **B)** Defendants cite to no reason to believe that Tim Blixseth would have any understanding of the Plaintiff's work. **C)** The court records Defendants relied upon show Michael Flynn litigating to obtain rights to the software while claiming in the quote in ¶ 28 it does not exist. Risen Depo. 253:18 - 261:4; 267:16–274:14, Exhibit 3.  The Defendants knew that Flynn's statements were not credible. Risen Depo. 252:18 – 270:17, *id.*

29.     Disputed. The November 2010 deposition transcript in Risen Decl. Ex. 16 which the Defendants cite to reveals that it is about Flynn's bankruptcy adversary proceeding fighting to get custody, ownership, and control of the software.  The Defendants could not report on the November 2010 deposition without also reporting that Flynn was fighting  – furiously – to get his hands on the software, even losing his temper in the deposition, Flynn clearly believed the software to be of immense value.

30.     Disputed. Paragraph 30 misrepresents John Brennan's actual statement for his Senate confirmation hearing for CIA Director.  Brennan was asked in writing, "What was the eventual outcome of the program?" to which Brennan answered, "**I don't know the outcome of**

9

the program, other than it was determined not to be a source of accurate information."
Brennan also answered: "**I would refer you to the CIA, as it collected the data from the
contractors.**"  Risen Decl. Ex. 19; Bates No. DEFS003660.  Thus the records that the Defendants
claim to have relied upon do not support their defamation of the Plaintiff and Brennan did not
testify that this was the biggest hoax in American history.

###### E.    Reliance on FBI Reports and Court Documents for Allegations of Rigged Demonstrations of Software to U.S. Government Officials (DISPUTED)

31.    Disputed. The accusations all come from Trepp and his employees whom the
Defendants knew from the court records they relied upon that Trepp valued the software at $100
million in court records in federal litigation and was at the very time feverishly working to obtain
control and ownership of the software. Risen Depo. 354:8 - 358:15, Exhibit 3.

###### F.    Reliance on Interviews with Sources and Documents (DISPUTED)

32.    Disputed. Defendants knew that his sources were motivated to evade responsibility
for their controversial decisions by shifting the blame to a scapegoat, Montgomery.  Risen Depo.
299:20-300:13; 307:22 - 308:17; 309:8–311:12, Exhibit 3.  Montgomery 2nd Decl. ¶ 10, Exhibit 4.

33.    Disputed. **A)** CIA Paris Station Chief Murray is not a "well-placed" source because
he was in France and had no involvement in events in the White House or knowledge of
Montgomery's work in Reno, Nevada. Risen Depo. 331:23–335:4, Exhibit 3.  **B)** In Risen's
interview, Murray never tied his comments to the Plaintiff:  "we never talked about Mr.
Montgomery by name because he was looking at this from the point of view of what happened at
the CIA, the White House, and in France." Risen Depo.  331:22-25, Exhibit 3.  **C)** The Defendants
admit in ¶ 33 that Murray told them that "*some*" high-level CIA officials did not believe
Montgomery's intelligence, clearly signaling that *other* high-level CIA officials *did* believe it,
such as Donald Kerr, head of the CIA's Science and Technology Directorate.  The Book, pages
42, 46. **D)** The Defendants admit in ¶ 33 knowing that the decision to block or shoot down aircraft

was the responsibility of government officials, not a private citizen.  Risen Depo. 305:24 – 307:10;

Montgomery 2nd Decl. 25-26, Exhibits 3, 4, respectively.  **E)** Distilled to the root, the Defendants

are using as their only source on this topic the opinions of an *unnamed* private French technology

firm, whom the Defendants never talked to, and know nothing about it. Risen Depo. 333:5 –

334:4, Exhibit 3.

34.     Disputed. **A)** The Defendants admit in ¶34 that George Tenet was the cheerleader,

yet blame a private citizen for high-level government decisions. **B)** Defendant Risen did not

identify Tyler Drumheller as one of his sources when asked in his deposition and should be barred

from citing him now. **C)** Whether anyone was skeptical does not substantiate that the Plaintiff

committed fraud, perpetrated the biggest hoax in American history, and was a con man.

35.     Disputed. **A)** ¶ 35 shows that the Defendants knew the CIA's contract was not with

Montgomery, but with Trepp.  **B)** Whether "tools weren't exactly as billed" does not support

Defendants' defamation that the Plaintiff's work was a fraud, and he perpetrated one of the

greatest hoaxes in American history.

36.     Disputed. **A)** Defendant Risen did not identify Melvin Dubee as one of his sources

when asked in his deposition and should be barred from citing him now. **B)** Defendant Risen

claims in ¶ 36 he was told "the CIA was 'very skeptical of it at the time.'"  Thus, the CIA

carefully scrutinized the Plaintiff's services, with eyes wide open, so that Plaintiff did not defraud

or con them. **C)** The skepticism stated in ¶ 36 does not substantiate a fraud, con, or hoax.

37.     Disputed. **A)** The Defendants claim in ¶ 37 to rely on Frances Townsend, but

Townsend's interview, from Risen's interview notes, Risen Depo. Exhibit 13 Bates NO.

DEFS002528 to 2530, does not support the Defendants' defamation that the Plaintiff was the

"maestro" behind one of the largest, most dangerous, and elaborate hoaxes in American history.

Exhibit 8. **B)** Risen admitted that Townsend blamed the CIA, not the Plaintiff.  Risen Depo.

321:20 – 324:7, Exhibit 3. Yet the Defendants did not publish this side of the story. **B)** Townsend allegedly said in ¶37 "we _may have been played_" but the mere possibility ("**may have been**") does not support the Defendants' defamation.  **C)** According to Risen's notes that he cited in ¶ 37, Townsend described the intelligence from Montgomery as routine, something that happened every day, _not_ one of the most elaborate hoaxes in American history Risen Depo. 321:10 – 322:21, Exhibit 3.

38.     Disputed. Defendants admit in ¶ 38 that they actually knew that Vice President Dick Cheney "refused the software absent proof that it worked," so that the government would scrutinize and check Plaintiff's services before licensing it.  The government was not defrauded or conned but considered Plaintiff's services with eyes wide open.

39.     Disputed. That "the technology did not meet our requirements" does not mean that the Plaintiff perpetrated a fraud or the biggest hoax in American history, or is a con.

40.     Disputed. **A)** Defendant Risen did not identify Todd Spitler as one of his sources when asked in his deposition and should be barred from citing him now. **B)** The actual "spokesman's statement" from the Air Force in 2011 that Defendants rely upon in ¶ 40 actually reports that BLXWARE chose not to undertake one segment of the contract and never invoiced the government for that segment.  Defendants misrepresent the source that BLXWARE did not perform in accordance with the terms of the contract, knowing that BLXWARE voluntarily chose not to undertake that segment of the contract.  MSJ Ex. 26; Bates No. DEFS003874.

41.     Disputed. The court documents that the Defendants relied upon in ¶ 41 reveal that Flynn made (relevant) claims in his declaration only "_on information and belief_" _See_ ¶¶ 12 and 13, MSJ Ex. 17.  Flynn's accusations that the Plaintiff's software did not exist or did not work are made only "on information and belief."  The court records that the Defendants cited to also shows that Flynn was actively seeking to get ownership and control of the software in court.

12

42.     Disputed. **A)** Defendants show no reason why Blixseth knows anything about the Plaintiff's work but **B)** shows that Blixseth was motivated by his bitter divorce from his wife Edra,. Defendants knew that Blixseth has no technical expertise.  Risen Depo. 265:11–268:24, Exhibit 3.

43.     Disputed. A decision by Israel referred to in ¶ 43 not to purchase technology does not substantiate the Defendants' defamatory claims that the technology is a fraud.

44.     Disputed. The Defendants did not include the Plaintiff's point of view or denials, more than a few anemic statements.  As set forth in Montgomery MSJ Declaration ¶ 5, 10, Exhibit 6, between 2011 and early 2014, Montgomery actually informed Defendant Risen that the defamation in the planned Book was inaccurate.  _None_ of these perspectives, facts, or details were reported:

   a)     That Aram Roston's article in Playboy Magazine was false and inaccurate.

   b)     That in his November 2010 bankruptcy proceeding deposition, Montgomery asserted his Fifth Amendment rights to avoid breaking the law by revealing classified information, not because he had committed a fraud.

   c)     That the government approached eTreppid and later BLXWARE for help. Montgomery Depo. 215:6-11; 287:6-8; 211:9-13;270:22-25; 297:20 - 299:3, Exhibit 5. Yet Risen transformed that into Montgomery claiming that the CIA told the Plaintiff to fabricate the data.

   d)     That the government negotiated with Warren Trepp, not Montgomery. Montgomery Depo. 204:3 - 205:3; 214:21-24, Exhibit 5.

   e)     That the government contracted with and paid the money to Trepp. The Defendants falsely reported that the government paid Montgomery $30 million, when the government paid him $0.00.

f)      That the FBI statements were inaccurate and Magistrate Judge Cooke wrote that she would hold the government in contempt if they tried to reintroduce the FBI statements because they are uncorroborated hearsay.

g)      That Trepp employees not "read in" did not know what work he was doing.

h)      That Tim Blixseth had no knowledge of the Plaintiff's work.

i)      That the Plaintiff never offered his own interpretation of the data he uncovered.

j)      That the government kept issuing new contracts for the Plaintiff's services because government officials – those actually "read into" the program – were pleased with the work.  Defendant Risen transformed this into a new accusation that Plaintiff conned the government.

k)      The Plaintiff sent Defendant Risen a copy of an email from Capt Robert P Lyons ASC/RAB, dated April 9, 2004, to the Plaintiff which stated:  "You both and your families are in my thoughts. You are heroes and I've deeply enjoyed knowing you and working with you. We are at a crease in history--you have helped the Nation be better against our foes."

l)      That Montgomery had a security clearance which he would have lost if the government actually believed Montgomery had committed any fraud or con.

m)     That Montgomery was subject to regular, unannounced lie detector tests.

n)      That the data the Plaintiff found embedded in television broadcasts and other videos was not in the "crawl".

**G.      Amended Complaint Allegations**

45.      Undisputed.

46.      Undisputed.

47.      Undisputed.

14

H.     **Montgomery's Failure to Produce the Critical Software and Defendants' Pending Motion for Sanctions for Spoliation and Violation of Court Orders (DISPUTED)**

48.     Disputed. The Defendants note that the Plaintiff timely objected in detail.

49.     Disputed**. A)** The past litigation shows several disputes about what is classified, with the government repeatedly threatening the Plaintiff with criminal prosecution, even for treason. *See* Montgomery Depo. 190:17-25; 236:9 – 238:3, Exhibit 5.  Plaintiff was intimidated in his 2010 deposition by four government agents who refused to give their last names or agency affiliations.  *Id.* **B)** Thus, the Defendants are confusing the government's own decision whether to prosecute the Plaintiff, as they did Jeffrey Sterling, with the Plaintiff's personal opinion.  Whether the Plaintiff personally believes something is classified is a different question from being at risk of criminal prosecution.  William Jacobson, *"Will James Risen of NY Times go to Jail to Protect Source?"* Legal Insurrection, June 2, 2014; Bill Chappell, *"Jeffrey Sterling, Former CIA Officer, is Convicted of Espionage,"* National Public Radio, January 26, 2015.Disputed.

50.     Disputed. *See* Objection to Limited Portions of Magistrate Judge's Order [Dkt. # 143], Supplement to Objection [Dkt. # 144], Objection of Magistrate Judge's Order to District Court and Request to Stay [Dkt. # 164], Supplement to Objection of Magistrate Judge's Order to District Court and Request to Stay [Dkt. # 188].

51.     Disputed. In August 2015, the Plaintiff delivered all of his computer storage media to the FBI, in order to assure the FBI that no information had been deleted or withheld from the storage media, asking for the ability to retrieve information from the computer hard drives later.

52.     Disputed. Magistrate Goodman's Order speaks for itself without being characterized.

53.     Disputed. Magistrate Goodman's Order speaks for itself without being characterized.

54.     Disputed. The letters and pleadings speak for themselves.

55.     Disputed. Magistrate Goodman's Order speaks for itself without being characterized.

56.     Disputed. Plaintiff has explained fully.

57.     Disputed. The correspondence speaks for itself.

58.     Disputed. The pleadings speak for themselves.

59.     *See* Objection to Limited Portions of Magistrate Judge's Order [Dkt. # 143], Supplement to Objection [Dkt. # 144], Objection of Magistrate Judge's Order to District Court and Request to Stay [Dkt. # 164], Supplement to Objection of Magistrate Judge's Order to District Court and Request to Stay [Dkt. # 188], Plaintiff's Memorandum of Law re Order [Dkt. # 212], and Transcript of Magistrate Judge Goodman of Jan. 5, 2015, Exhibit 18.

60.     *See* Objection to Limited Portions of Magistrate Judge's Order [Dkt. # 143], Supplement to Objection [Dkt. # 144], Objection of Magistrate Judge's Order to District Court and Request to Stay [Dkt. # 164], Supplement to Objection of Magistrate Judge's Order to District Court and Request to Stay [Dkt. # 188], Plaintiff's Memorandum of Law re Order [Dkt. # 212], and Transcript of Magistrate Judge Goodman of Jan. 5, 2015, Exhibit 18.

61.     *See* Objection to Limited Portions of Magistrate Judge's Order [Dkt. # 143], Supplement to Objection [Dkt. # 144], Objection of Magistrate Judge's Order to District Court and Request to Stay [Dkt. # 164], Supplement to Objection of Magistrate Judge's Order to District Court and Request to Stay [Dkt. # 188], Plaintiff's Memorandum of Law re Order [Dkt. # 212], and Transcript of Magistrate Judge Goodman of Jan. 5, 2015, Exhibit 18.

**I.      Additional, Material, Disputed Facts Submitted By Plaintiff**

62.     Defendant Risen admits he did not have any reliable source that the Plaintiff committed fraud:  "no one wanted to admit publicly that they had been the victim of a hoax or had

been fooled." Risen Depo.304:14 – 305:23, Exhibit 3.

63.     Defendant Risen admits that the Plaintiff could be telling the truth and therefore the Defendants cannot say that he created one of the largest, most dangerous, and most elaborate hoaxes in American history: Risen was asked "Q: Now, Mr. Montgomery could be telling the truth.  Correct?" Risen answered:  "A: Yes. That's why I wanted his side of the story in the chapter"  "Q: So therefore if he could be telling the truth you cannot say unequivocally that he committed the biggest hoax in American history?" Risen Depo. 337:18-24, Exhibit 3.

64.     Defendant Risen admits that the CIA merely made a mistake: "No.  I think they made a mistake in this case.  And I think they then afterwards wanted to move on and not talk about it."  Risen Depo. 307:15-17, Exhibit 3.  Defendants knew it was not a fraud or hoax by the Plaintiff. Defendants knowingly transformed comments that Plaintiff's work may have produced information unhelpful to decision-makers or inaccurate into false accusations that the Plaintiff committed fraud, a crime against the government, a con and/or a hoax.  Risen Depo. at 102:7 – 107:12; 215:1 – 217:10. Defendants knew that Plaintiff's work was to search for whatever data or communications might be hidden, with no warranty or promise that decision-makers would necessarily find that the data uncovered useful. Montgomery 2nd Aff. At ¶ 17, Exhibit 4.

65.     The Defendants produced email communications between Montgomery and Eric Lichtblau and James Risen as early as 2011 demanding retraction.  *See* Exhibit 9.

66.     The Defendants' accusation that the Plaintiff committed one of the most dangerous and elaborate hoaxes in American history was Defendant Risen's own independent assertion, not the statement of any source or record.  Risen Depo. 291:5 - 293:14, Exhibit 3.  Although Risen claims that many people "believe" that, no source or record said that other than him.  Risen Depo. 316:12-18 (Frances Townsend never said Plaintiff committed fraud or the biggest hoax), *id*.

67.     The Defendant Houghton Mifflin Harcourt Publishing Company also admits that it

is Defendant Risen's own statement that the Plaintiff committed one of the most elaborate hoaxes in American history. Nichols Depo. 80:14–84:8, Exhibit 2.

68.     The Book was rejected for publication by its first publisher.  In an email from Priscilla Painton, Vice President and Executive Editor, Simon & Schuster, to Defendant Risen's literary agent Tina Bennett of William Morris Endeavor Entertainment, January 1, 2013: Concerning Defendant Risen's earlier manuscript "in too many instances, it does not answer the questions it raises nor does it offer evidence for the claims it makes." Simon & Schuster document production, Bates No. S&S-001, Exhibit 10.

69.     Simon & Schuster determined and communicated that Chapter 2 about the Plaintiff was the primary new material in Defendant Risen's Book and the primary appeal of the Book for publication and sales. *Id.*

70.     A major appeal for sensationalizing and selling the Book was the claim that it was based upon confidential and classified sources. Nichols Depo. 48:23 – 53:9, Exhibit 2.

71.     Ultimately, the Book was rejected by the first publisher Simon & Schuster because Defendant Risen could not answer the questions raised and provide supporting information and documentation. *See* Exhibit 10.

72.     As a result, the Defendants here sensationalized the accusations against the Plaintiff and made up accusations at the Plaintiff's expense to sell books in Florida. Montgomery 2nd Decl. ¶ 4, Exhibit 4.

73.     None of the Defendants' sources, documents, or interview notes substantiate or relate to the accusations that the Plaintiff committed any hoax, fraud, or con, much less that he was the "maestro" of "one of the most dangerous and elaborate hoaxes in American history."

74.     Acting with reckless disregard for the truth, Defendant HMH by Bruce Nichols testified in his deposition that the publisher conducted absolutely no fact check or review of the

author's sources or the facts and chose not to investigate if the Book's Chapter 2 about the
Plaintiff were accurate. Nichols Depo. 53:10–84:25 (esp. 53:10- 60:23; 64:15 – 66:14, 74:11-23;
75:19 - 21), Exhibit 2.  "As I said, we do not fact check. We rely on our authors." Nichols Depo.
89:20 – 91:2, *id*.  "Sir, as I said before, we rely on our authors, Jim made the judgment and
reported both sides. So we had no problem with how he presented this." Nichols Depo. 94:1-11,
*id.*

    75.    The Defendants fabricated accusations against the Plaintiff because they believed
they can say whatever they wish.  HMH's Rule 30(b)(6) representative Bruce Nichols testified in
his deposition on October 14, 2015, Nichols Depo. 74:20 – 75:4:

    A.    I have actually not yet ever published a book where a libel claim was
    successfully brought. So I don't have any experience to answer your question.
    Q.    What other cases have you participated in where libel actions were brought?
    A.    In my 26 years as an editor and publisher this is the first.

    76.    Defendants knew that the government tested the Plaintiff's technology to confirm
that it worked.  Risen Depo. 298:21 - 299:25; Montgomery 2nd Decl. ¶ 9, 20, Exhibis 3, 4,
respectively.  As but one example, MSJ Ex. 25, DEFS003836 states "Early reports from the Air
Force about ... BLXWARE indicated ... was performing well in the early testing of its product."

    77.    Defendants knowingly transformed comments that Plaintiff's work may have
produced information unhelpful to decision-makers or inaccurate into false accusations that the
Plaintiff committed fraud, a crime against the government, a con and/or a hoax.  Risen Depo.
102:7–107:12; 215:1–217:10, Exhibit 3. Compare with 339:5-19; 340:16 - 342:10, *id*.

    78.    The Defendants knew that if information from Montgomery's work was merely
wrong or unhelpful to decision-makers, that does not mean that he perpetrated a hoax, committed
fraud, or was a con man. Risen Depo. 101:14-22; 285:8 - 288:14; 314:1 – 328:24 (esp. 317:12 –
320:13); 335:2 - 337:25; 338:6 – 339:19; 340:8 – 342:10; 346:5–20; 383:3 – 385:13, Exhibit 3.

    79.    Yet acting out of actual to sell books while trashing a private individual's

reputation, the Defendants fabricated a story accusing Montgomery of selling the CIA on a fantasy, conning the government, and persuading them of various cons and hoaxes.

80.    Defendants knew that Montgomery's work was to search for whatever data or communications might be hidden, with no warranty or promise that decision-makers would necessarily find the data uncovered useful.  Montgomery 2nd Decl. ¶ 17, Exhibit 4.

81.    Defendant Risen knew from the article in <u>Playboy</u> he claims to have relied upon that the Plaintiff had a top secret security clearance, Risen Depo. 127:3–129:14, that he would have lost if he released or disclosed classified national security information or committed the biggest hoax in American history, and that Plaintiff did not lose his security clearance. Montgomery MSJ Decl. ¶ 10g, 26, 27, Exhibit 6.

82.    Defendants had actual knowledge that the U.S. Government has never requested nor received any refund, repayment or return of any funds paid to any company for any work performed by Montgomery. That is logically because it did work and was not a fraud and the biggest hoax in American history. Risen Depo. 282:19 - 284:2; Montgomery 2nd Decl. ¶¶ 11-15, Exhibits 3, 4 respectively.

83.    Further, Defendant Risen testified in his deposition that he relied upon interviews with sources in which he took notes. Risen Depo. 147:4–150:16, Exhibit 3. However, the Defendants produced few notes from his interviews that back up or substantiate the Defendants' defamation of the Plaintiff.  There are no notes from sources asserting that there was any fraud, con, or hoax. *See* Exhibit 17.

84.    Defendants had actual knowledge that the Plaintiff never offered any interpretation, analysis, or recommendation about the hidden that he uncovered.  Risen Depo. 306:16 – 308:17, Exhibit 3.

85.    MSJ Exhibit 3, written by James Risen and Eric Lichtblau clearly states that it was

Warren Trepp who sold the government on eTreppid's services: "With the help of Representative Jim Gibbons, a Republican who would become Nevada's governor and was *a longtime friend of Mr. Trepp's, the company won the attention of intelligence officials in Washington.*" (Emphasis added.) So the Defendants had actual knowledge that Warren Trepp – not Dennis Montgomery – negotiated with and persuaded government agencies for contracts for eTreppid's services. 1st Declaration of Dennis L. Montgomery ¶¶ 7d, e, g; Montgomery 2nd Decl. ¶ 16, Exhibits 11, 4 respectively.

86.     Perversely, the Defendants published in Chapter 2, at the top of page 38, that "Through Warren Trepp, he had excellent political connections, and in Washington that can take you a very long way. To help eTreppid get more government business, Trepp brought in Letitia White, a Washington lobbyist."

87.     The Defendants knowingly alter the reality that Trepp actually received the $30 million (the Plaintiff did not), persuaded the government and "sold" them into a defamation that the Plaintiff "through Warren Trepp" conned the government or perpetrated a fraud or the biggest hoax in American history.

88.     After summarizing actions by Trepp on pages 38-39 of the Book, Chapter 2, the Defendants astonishingly summarize Trepp's efforts by publishing: "By the fall of 2003, Dennis Montgomery had made a series of impressive moves to gain access to the black budget of the government's national security apparatus," after listing the actions by Trepp not Montgomery.

89.     The Defendants had no supporting facts that Montgomery, rather than Trepp, who is adverse to Plaintiff, did any of the things that the Defendants accuse the Plaintiff Montgomery of. *The sources point to Trepp.*

90.     Defendant Risen claimed – falsely – in his Deposition, Risen Depo. 77:8-23:

A    The primary thing that I added was that I  got Mr. Montgomery's voice and I got his side of the  story.  That was what I really wanted to get was his  side of the

21

story.  And so I made it a very aggressive  effort to get him to talk.  And he did.
And he  extensively discussed his side of the story and I included his side of the
story extensively in the chapter.  And that is the primary difference between what I
wrote in the New York Times and what I wrote in  *Pay Any Price* because he
would not talk to us for the  *New York Times*.

Similarly, Defendant Risen testified in Risen Depo. 79:13 – 80:1, Exhibit 3.

A   Well, as I said, I just answered.  I said I wanted to get his side of the story and I
did.  I got his extensive denials, his extensive discussions of his involvement and
interactions with the CIA.  A lot of -- and then his extensive discussions of his role
and his -- and then his claims that he had all of this other material related to what
top government officials had asked him to do.  And I sent him a chapter.  Then he
made assertions about secret things that the government had asked him to do but
that he never provided the evidence that he said he would provide me.  So I gave
him an extensive opportunity throughout the whole chapter to provide his side of
the story on many different points.

91.    In Chapter 2, on page 33, the Defendants wrote

A 2011 study by the Pentagon found that during the ten years after 9/11, the
Defense Department had given more than $400 billion in contractors who had
previously been sanctioned in cases involving $1 million or more in fraud.

Yet, the Defendants did *not* report that neither the Plaintiff nor any of the companies he was

working under were ever sanctioned nor were any sanction or debarment proceedings initiated.

Having gone out of his way to mention in Chapter 2 that problem contractors were sanctioned, the

Defendants do not let the reader know that the Plaintiff was *not* among them. Chapter 2.

Defendants did not publish and withheld material facts that Plaintiff conveyed to Defendant Risen.

Montgomery OMSJ Decl. ¶ 5, Exhibit 6.

92.    On November 1, 2012, at Bates No. DEFS003294, the Plaintiff wrote to Defendant

Risen and asked "Why have you not chased the money, and contacted Warren Trepp who kept all

of the money? I don't get that?"  The Plaintiff then wrote to Defendant Risen "His role? He is the

CEO of eTreppid. He got all of the money. Why was he not in your story?" Exhibit 12.

93.    Two years later, Defendants published Chapter 2 which falsely reports that

Montgomery received $30 million, knowing that the government paid that money to Trepp at

eTreppid.

94.    Similarly, in MSJ Ex. 3 Defendant Risen also wrote in the article:

Hoping to win more government money, Ms. Blixseth turned to some influential friends, like Jack Kemp, the former New York congressman and Republican vice-presidential nominee, and Conrad Burns, then a Republican senator from Montana. They became minority stakeholders in the venture, called Blxware.

Thus, the Defendants knew that after Warren Trepp's involvement, it then became Edra Blixseth

selling the services to the government, based upon Trepp's prior efforts – still not Montgomery.

95.    The Defendants base their claim that the Plaintiff is a public figure solely on

Plaintiff being written about in public stories that they wrote. Risen Depo. 163: –168:2;

Montgomery 2nd Decl. 39-50, Exhibits 3, 4, respectively.

96.    The Plaintiff warned Defendant Risen on November 1, 2012, at Bates No.

DEFS003281, Exhibit 12.

"You reported on FBI documents, as if they were accurate, when that the Judge tossed out all of the claims in their report. The FBI refused to produce any of the people in their report for examination by the court. That include Daniel Bogden, who was reinstated by Obama as the US Attorney for Nevada.

"Why did you not mention in your story Judge Cooke scathing report against the Warren Trepp, FBI, and other government officials? Judge Cooke reported that DM had his 4th amendment constitutional rights violated?

97.    The Plaintiff warned Defendant Risen on November 1, 2012, at Bates No.

DEFS003280, Exhibit 12.

DM made it clear who was at the building, and why they were all there. There is a reason the CIA and NSA were there, you must know that.

Do you really think the government invoked the State Secrets Privilege from being embarrassed or conned? Negroponte in his in camera declaration, if ever released, was spell it all of out.

They government never wanted information to come out regarding the other work. The program started out spying on terrorist, and under Obama quickly moved to spying on Americans!! A program which was started by Brennan in 2003 and continues to this day. This technology is being used today to spy on Americans, including candidate Romney.

I don't see you ever publishing that information?

98.     The Plaintiff warned Defendant Risen on November 1, 2012, at Bates No. DEFS003249: "I must have you assurance that this information will not be leaked to the current administration. Otherwise Mr. Montgomery will be arrested and all information confiscated. Have anyone tried to make contact with John Brennan yet?" Exhibit 13.

99.     Defendant Risen responded to the Plaintiff on November 1, 2012, at Bates No. DEFS003249: "No, I haven't contacted anybody." Exhibit 13.

100.    The Plaintiff warned Defendant Risen on November 12, 2012, at Bates No. DEFS003248: "I can't ever see you correcting the record that you wrote about Mr. Montgomery. Why not just call Brennan or Trepp or the agency and get the details from them? Trepp got 30mil from them, ask him the questions." Exhibit 13.

101.    The Plaintiff warned Defendant Risen on November 14, 2012, at Bates No. DEFS003232, Exhibit 14:

You don't bother to pressure the people that got the money, Trepp.

You don't bother the people that were there from the CIA, NSA, DIA, Big Safari, Fort Washington, Air Force, etc.?

You don't bother Tenet, Brennan, Clapper, Salvatori, Secretary Roche, or any of the other people that were involved in the projects, and were responsible for developing these technologies.

Why DM?

102.    However, none of Plaintiff's responses are reflected in Chapter 2 of the Book.  The Defendants neither heeded the red flags that their planned defamation was probably wrong nor included material facts from the other side of the story from the Plaintiff in their accounts. Montgomery's OMSJ Decl. at ¶ 5.

103.    In these email communications, Risen threatened to publish knowingly defamatory

statements about Montgomery unless Montgomery broke the law by providing emails with John Brennan and others that Montgomery understood to be classified communications. Montgomery informed Risen that his assertions are false but they replied that they might retract those statements if Montgomery violated the law by providing them with classified communications. *See* Exhibit 14.

104.    In February 2011, the Plaintiff tried to get retraction or correction and first asked the Justice Department for approval. Then sent emails to Defendant Risen and his editor at the New York Times demanding a retraction. Montgomery Depo. 190:2-197:10, Exhibit 5.

105.    The Plaintiff, by counsel, served two, very detailed and specific demands for retraction under Florida law upon the Defendants, including Defendant HMH, one in December 2014 and another in January 2015 prior to filing suit. The Defendants explicitly refused a retraction. Exhibits 15, 16; *see also* Nichols Depo. 96:3-98:25; 119:3-125:4, Exhibit 2.

106.    Plaintiff never sought publicity for his work with the intelligence agencies and is not a public figure. Montgomery's OMSJ Decl. at ¶ 39.

107.    Defendant Risen admitted to Lucy Worsley, "it is very difficult to tell what is actually true." Am. Compl. at ¶ 71.

108.    Defendant Risen only admitted to speaking with three sources at his deposition, but claimed there were many others. Risen Depo. at pg. 283, Exhibit 3.

109.    Bill Murray, a so-called source of Risen's, was not in the position to know whether Plaintiff committed one of the biggest hoaxes in American history. Risen Depo. at pg. 331, Exhibit 3.

Dated: January 13, 2016

Respectfully Submitted,

_/s/ Larry Klayman_
Larry Klayman, Esq.
FL Bar No. 246220
The Klayman Law Firm
7050 W Palmetto Park Rd.
Suite 15-287
Boca Raton, Florida 33433

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this January 13, 2016 a true and correct copy of the foregoing Plaintiff's Statement of Disputed Material Facts was filed with the Court through the Court's Electronic Case Filing system, and will be delivered electronically to all counsel for the Defendants who have entered an appearance in this case through the ECF system, including:

**Sanford Lewis Bohrer**
**Brian Toth**
Holland & Knight, LLP Suite 3000
701 Brickell Ave Miami, Florida 33131
Email: sbohrer@hklaw.com
Email: brian.toth@hklaw.com

**Laura R. Handman**
**Micah Ratner**
Davis Wright Tremaine LLP
1919 Pennsylvania Ave., N.W., Suite 800
Washington D.C. 20006-3401
Email: laurahandman@dwt.com
Email: MicahRatner@dwt.com
_Attorneys for Defendants_

_/s/ Larry Klayman_
Larry Klayman, Esq.