# Exhibit 2

```
1

2   IN THE UNITED STATES DISTRICT COURT
    FOR THE SOUTHERN DISTRICT OF FLORIDA
3   ----------------------------------x
    DENNIS L. MONTGOMERY,
4                      Plaintiff,

5      -against-              Action No.
                        15-cv-20782
6
    JAMES RISEN, an individual,
7   c/o The New York Times
    1627 "I" Street N.W., Suite 700
8   Washington, D.C. 20006-4007 and
    HOUGHTON MIFFLIN HARCOURT PUBLISHING
9   COMPANY, 222 Berkeley Street
    Boston, Massachusetts 02116
10  and HMH HOLDINGS, INC.
    222 Berkeley Street
11  Boston, Massachusetts 02116
    and HOUGHTON MIFFLIN HARCOURT COMPANY
12  222 Berkeley Street
    Boston, Massachusetts 02116,
13
                    Defendants.
14  ----------------------------------x
                  October 14, 2015
15                 11:41 a.m.

16

17       Videotaped 30(b)(6) Deposition of

18  HOUGHTON MIFFLIN HARCOURT PUBLISHING COMPANY by

19  BRUCE NICHOLS, taken by Plaintiff, pursuant to

20  Notice, at the offices of Merrill Corporation,

21  1345 Avenue of the Americas, New York, New York,

22  before TAMMEY M. PASTOR, a Registered

23  Professional Reporter, Certified LiveNote

24  Reporter and Notary Public within and for the

25  State of New York.
```

11:46:05

11:46:05

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 2

1

2  A P P E A R A N C E S:

3      KLAYMAN LAW FIRM
       Attorneys for Plaintiff
4          7050 W Palmetto Park Road
           Suite 15-287
5          Boca Raton, FL 33433

6      BY:  LARRY KLAYMAN, ESQ.
           (leklayman@gmail.com)
7          (Via Videoconference)

8      DAVIS WRIGHT TREMAINE LLP
       Attorneys for Defendants
9          1919 Pennsylvania Ave., N.W.,
           Suite 800
10         Washington D.C. 20006-3401

11     BY:  LAURA R. HANDMAN, ESQ.
           (laurahandman@dwt.com)
12

13
   ALSO PRESENT:
14
   SHARON R. BURGER, Sr. Vice President, Associate
15  General Counsel, Houghton Mifflin Harcourt

16  DAVID EBER, vice President, Associate General
   Counsel, Houghton Mifflin Harcourt
17
   DINA JAMES, Paralegal
18  (Via Videoconference)

19  NAVEED MAHBOOBIAN, Paralegal
   (Via Videoconference)
20
   RODOLFO DURAN, Videographer
21  DTI Global

22

23

24

25

10:02:59

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 3

1       BRUCE NICHOLS

2                                                              11:31:56

3       THE VIDEOGRAPHER:   This is the DVD                    11:37:24

4    number 1 of the 30(b)(6) video recorded                  11:42:17

5    deposition of Bruce Nichols in the matter                11:42:19

6    of Dennis L. Montgomery against James                    11:42:21

7    Risen, an individual, et al., In the                     11:42:28

8    United States District Court for the                     11:42:28

9    Southern District of Florida.                            11:42:33

10       This deposition is being held at DTI                 11:42:33

11   Global, located at 1345 Avenue of the                    11:42:36

12   Americas, New York, New York on October                  11:42:39

13   14, 2014 at approximately 11:41 a.m.                     11:42:42

14       My name is Rodolfo Duran, I am the                   11:42:47

15   legal video specialist. The court reporter               11:42:49

16   today is Tammey Pastor.  And we are both                 11:42:51

17   in association with DTI Global.                           11:42:54

18       Will counsel please introduce                        11:42:56

19   themselves.                                               11:42:58

20       MR. KLAYMAN:   Larry Klayman for                     11:43:01

21   Plaintiff.  Sitting with me is Naveed                    11:43:06

22   Bahboobian, we previously spelled that for               11:43:08

23   the court reporter.  He is appearing in a                11:43:10

24   paralegal capacity.  And also Dina James,                11:43:14

25   D-I-N-A, James, also a paralegal appearing               11:43:18

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 4

1

2   here with me. I am the counsel.                    11:43:21

3        MS. HANDMAN:   Laura Handman,                 11:43:24

4   Davis Wright Tremaine, counsel for HMH             11:43:30

5   Publishing Company and the other                   11:43:36

6   defendants, James Risen and Houghton               11:43:37

7   Mifflin Publishing Company and Houghton            11:43:43

8   Mifflin Harcourt Company -- Houghton               11:43:47

9   Mifflin Publishing Company and Houghton            11:43:48

10  Mifflin Harcourt Company. And we're here           11:43:52

11  on a 30(b)(6) deposition of Houghton               11:43:54

12  Mifflin Harcourt Publishing Company and            11:44:01

13  Mr. Nichols is here in his capacity as a           11:44:01

14  representative of the company.                     11:44:04

15       We are here on a re-noticed                   11:44:07

16  deposition for 30(b)(6) deposition                 11:44:10

17  scheduled to begin at eleven o'clock.              11:44:14

18  The deposition is beginning late, we               11:44:18

19  were here at eleven o'clock.                       11:44:20

20       We had offered to do this at our              11:44:22

21  office and there are seven topics that             11:44:24

22  were listed in the re-noticed deposition           11:44:28

23  and we are prepared to respond to those.           11:44:32

24       I would add for the record that we            11:44:33

25  received pdfs of exhibits starting at              11:44:36

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 5

1

2  8:27 last night Eastern time. And we                11:44:41

3  have made copies of those even though               11:44:46

4  counsel should have furnished those                 11:44:49

5  copies for the court reporter as                    11:44:51

6  exhibits here. But as a courtesy we've              11:44:54

7  made copies.                                         11:44:56

8      MR. KLAYMAN:   Let the record                   11:44:59

9  reflect that 90 percent of those                    11:44:59

10  exhibits were previously marked at the             11:45:01

11  Risen deposition. So you already had               11:45:07

12  them, Laura, you don't have to make a              11:45:09

13  point of that, Ms. Handman. So we don't            11:45:11

14  need to be posturing here, we just need            11:45:13

15  to move this along.                                11:45:14

16      The few documents that you got                 11:45:16

17  after that were hardly burdensome.  We             11:45:17

18  made a special point to resend them to             11:45:21

19  you and your associates.                           11:45:23

20      Secondly, with regard to there                 11:45:24

21  were technical difficulties this morning           11:45:25

22  that were not of our doing. So to try to           11:45:27

23  blame that on Plaintiff is inappropriate           11:45:30

24  and transparent.                                   11:45:32

25      Thirdly, I want to ask whether or              11:45:34

1

2  not you are producing anyone else today                11:45:39

3  at this deposition other than Mr.                       11:45:40

4  Nichols in response to our 30(b)(6)                     11:45:45

5  deposition and who will be produced                     11:45:46

6  tomorrow for the deposition of the other                11:45:48

7  company which is Houghton Mifflin                       11:45:51

8  Harcourt Company?                                       11:45:56

9      MS. HANDMAN:   We are producing                     11:45:56

10  Mr. Nichols today, as we advised                       11:45:57

11  yesterday on behalf of Houghton Mifflin                 11:46:00

12  Harcourt Publishing Company the 30(b)(6)                11:46:06

13  deposition today. And Mr. Nichols will                  11:46:06

14  also be prepared to respond to the                      11:46:09

15  deposition notice for Houghton Mifflin                  11:46:12

16  Harcourt Company scheduled for tomorrow                 11:46:17

17  at eleven o'clock.                                      11:46:19

18      MR. KLAYMAN:   There are no other                   11:46:20

19  individuals who are being produced                      11:46:22

20  pursuant to these two notices of                        11:46:23

21  deposition?                                             11:46:25

22      MS. HANDMAN:   That's correct. I                    11:46:25

23  will say here at counsel table is also                  11:46:26

24  Sharon Burger and David Eber from                       11:46:31

25  Houghton Mifflin Harcourt Publishing                    11:46:36

| | | |
|---|---|---|
| 1 | | |
| 2 | Company, in-house counsel. | 11:46:37 |
| 3 | MR. KLAYMAN:  Okay. Swear the | 11:46:37 |
| 4 | witness. | 11:46:39 |
| 5 | THE VIDEOGRAPHER:    Will the | 11:46:42 |
| 6 | court reporter please swear in the | 11:46:43 |
| 7 | witness. | |
| 8 | BRUCE NICHOLS, | |
| 9 | having been first duly sworn by the | |
| 10 | Notary Public (Tammey M. Pastor), was | |
| 11 | examined and testified as follows: | |
| 12 | EXAMINATION CONDUCTED BY Witness sworn. | 11:46:53 |
| 13 | MR. KLAYMAN: | 11:46:53 |
| 14 | Q.    Please state your name. | 11:46:53 |
| 15 | A.    Bruce Nichols. | 11:46:55 |
| 16 | Q.    When were you born, Mr. | 11:46:57 |
| 17 | Nichols? | 11:46:59 |
| 18 | A.    March 23rd, 1964. | 11:46:59 |
| 19 | Q.    Run us through briefly your | 11:47:04 |
| 20 | educational background. | 11:47:05 |
| 21 | A.    I went to schooling through | 11:47:06 |
| 22 | high school in public schools in Winchester, | 11:47:09 |
| 23 | Massachusetts. I went to Yale University, | 11:47:11 |
| 24 | graduated 1986 and I went into the | 11:47:14 |
| 25 | publishing industry immediately upon | 11:47:16 |

| | | |
|---|---|---|
| 1 | | |
| 2 | graduating. | 11:47:18 |
| 3 | Q.    What kind of degree do you have | 11:47:21 |
| 4 | from Yale? | 11:47:23 |
| 5 | A.    A BA. | 11:47:23 |
| 6 | Q.    What was your major? | 11:47:24 |
| 7 | A.    Music. | 11:47:26 |
| 8 | Q.    Music? | 11:47:28 |
| 9 | A.    Yes. | 11:47:28 |
| 10 | Q.    Did you take any courses in | 11:47:31 |
| 11 | journalism at Yale? | 11:47:32 |
| 12 | A.    I did not. | 11:47:34 |
| 13 | Q.    Have you ever taken any | 11:47:35 |
| 14 | training in the ethics of journalism? | 11:47:36 |
| 15 | A.    I have not. | 11:47:40 |
| 16 | Q.    Has anyone inside of Houghton | 11:47:41 |
| 17 | Mifflin, when I will talk about Houghton | 11:47:44 |
| 18 | Mifflin, when I am talking about Houghton | 11:47:46 |
| 19 | Mifflin, I am talking about Houghton Mifflin | 11:47:48 |
| 20 | Harcourt Publishing Company offered to have | 11:47:50 |
| 21 | you sent to a school with regard to | 11:47:51 |
| 22 | ethics -- | 11:47:53 |
| 23 | A.    No. | 11:47:53 |
| 24 | Q.    -- in journalism? | 11:47:54 |
| 25 | A.    No. | 11:47:55 |

30(b)(6)
BRUCE NICHOLS - 10/14/2015                          Page 9

| | | |
|---|---|---|
| 1 | | |
| 2 | Q.    Has there been any in-house | 11:47:56 |
| 3 | seminars or programs with regard to | 11:47:57 |
| 4 | journalistic ethics that you know of at | 11:47:59 |
| 5 | Houghton Mifflin since you have been there? | 11:48:02 |
| 6 | A.    Not that I'm aware. | 11:48:03 |
| 7 | Q.    Anyone given you training | 11:48:08 |
| 8 | outside of any formal programs on the ethics | 11:48:09 |
| 9 | of journalism? | 11:48:14 |
| 10 | A.    No, sir. | 11:48:15 |
| 11 | Q.    What was your first job outside | 11:48:16 |
| 12 | of Yale? | 11:48:18 |
| 13 | A.    I was an editorial assistant | 11:48:18 |
| 14 | for Little Brown Company in Boston for six | 11:48:20 |
| 15 | months. And then I was a sales | 11:48:25 |
| 16 | representative for their college division, | 11:48:27 |
| 17 | also based in Boston, for a little less than | 11:48:31 |
| 18 | two years. | 11:48:34 |
| 19 | Then I moved to Chicago, they | 11:48:38 |
| 20 | were merging with a company called Scott | 11:48:40 |
| 21 | Foresman.  I edited textbooks in political | 11:48:43 |
| 22 | science for one year before moving to New | 11:48:46 |
| 23 | York as a textbook editor for MacMillan | 11:48:50 |
| 24 | Company for three years. | 11:48:53 |
| 25 | Then in 1989 -- sorry, 1992 I | 11:48:56 |

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 10

| | | |
|---|---|---|
| 1 | | |
| 2 | joined the Free Press which was a trade | 11:49:01 |
| 3 | division of MacMillan and was at the Free | 11:49:04 |
| 4 | Press for 16 years, of which the larger | 11:49:09 |
| 5 | company changed due to merger, so it became | 11:49:11 |
| 6 | part of Simon & Shuster. | 11:49:14 |
| 7 | So I worked as an editor of | 11:49:17 |
| 8 | trade non-fiction and executive editor for | 11:49:20 |
| 9 | 16 years there. | 11:49:25 |
| 10 | Then I moved to Harper Collins | 11:49:26 |
| 11 | in 2007 to launch an imprint, general | 11:49:32 |
| 12 | non-fiction in print at the Collins, of the | 11:49:39 |
| 13 | Collins division of Harper Collins. | 11:49:42 |
| 14 | I joined Houghton Mifflin, my | 11:49:45 |
| 15 | present position, which is Senior Vice | 11:49:47 |
| 16 | President, Publisher six years ago. | 11:49:51 |
| 17 | Q.   And have you been in that | 11:49:54 |
| 18 | position ever since? | 11:49:56 |
| 19 | A.   Yes. | 11:49:57 |
| 20 | Q.   How is it someone that majored | 11:50:01 |
| 21 | in music got into the publishing industry? | 11:50:02 |
| 22 | A.   There is no major in publishing | 11:50:05 |
| 23 | in most universities, so people come from | 11:50:06 |
| 24 | all kinds of background. Sometimes they are | 11:50:09 |
| 25 | English majors, but that is no more of a | 11:50:12 |

1

2  qualification than any other major.                    11:50:15

3      Q.    Have you ever been fired from a              11:50:17

4  job?                                                   11:50:18

5      A.    No, sir.                                     11:50:18

6      Q.    Let me just clarify the earlier             11:50:23

7  question, during the time that you have been          11:50:25

8  with Houghton Mifflin, are you aware of any           11:50:27

9  seminars or courses on the ethics of                  11:50:30

10  journalism?                                          11:50:33

11     A.    Not that I'm aware of.                       11:50:34

12     Q.    Inside of the company?                       11:50:35

13     A.    Not that I'm aware of.                       11:50:36

14     Q.    Are you aware of any, is there               11:50:38

15  an ombudsman inside of Houghton Mifflin?             11:50:40

16     A.    Not by that title, no.                       11:50:43

17     Q.    What title, if any?                          11:50:45

18     A.    Well if you're asking about                  11:50:48

19  legal reviews of our publications, is that           11:50:50

20  what you're asking?                                  11:50:54

21     Q.    I am asking if there is                      11:50:56

22  somebody that will entertain complaints             11:50:57

23  about your publishing practices from                11:51:01

24  individuals who claimed they were defamed or        11:51:04

25  otherwise.                                           11:51:06

1

2      A.    Well any such complaints would                    11:51:06

3   come into our Legal Department.                            11:51:08

4      Q.    Only the lawyers would look at                    11:51:12

5   those complaints?                                          11:51:13

6      A.    In consultation with the                          11:51:17

7   publishers.                                                11:51:18

8      Q.    Who are the publishers?                           11:51:19

9      A.    I am the publisher for the                        11:51:20

10  adult trade publishing program. The trade                 11:51:23

11  division is a small part of the larger                    11:51:26

12  corporation, it is roughly equally split                  11:51:29

13  between adult and young readers.  So there                 11:51:35

14  is a publisher for young readers trade                    11:51:37

15  books.                                                     11:51:40

16          Collectively the trade division                   11:51:40

17  is about 10 percent of the overall                        11:51:42

18  corporation.                                               11:51:45

19     Q.    Based on your personal                            11:51:48

20  knowledge why were you selected as the                    11:51:49

21  30(b)(6) representative today?                             11:51:51

22       ** DIRECTION NOT TO ANSWER **                        11:51:52

23        MS. HANDMAN:  Objection, involves                   11:51:52

24      attorney-client privileged information.               11:51:55

25      You are instructed not to answer.                     11:52:02

| | | |
|---|---|---|
| 1 | | |
| 2 | MR. KLAYMAN:   What is the | 11:52:03 |
| 3 | attorney-client privilege? | 11:52:04 |
| 4 | Q.    How were you selected as the | 11:52:05 |
| 5 | 30(b)(6) representative today? | 11:52:07 |
| 6 | MS. HANDMAN:   Again, | 11:52:08 |
| 7 | attorney-client privilege information. | 11:52:09 |
| 8 | We have presented him as the 30(b)(6) | 11:52:10 |
| 9 | witness for the publishing company. | 11:52:13 |
| 10 | CERTIFIED FOR COURT RULINGS: | 11:52:13 |
| 11 | ------------------------------- | 11:52:16 |
| 12 | MR. KLAYMAN:   Certify these two | 11:52:16 |
| 13 | questions and the court reporter, please | 11:52:17 |
| 14 | mark them, the certifications. | 11:52:19 |
| 15 | With regard to -- are you | 11:52:23 |
| 16 | instructing him not to answer, | 11:52:25 |
| 17 | Ms. Handman? | 11:52:26 |
| 18 | MS. HANDMAN:   Correct. | 11:52:29 |
| 19 | MR. KLAYMAN:   On both questions? | 11:52:30 |
| 20 | MS. HANDMAN:   Correct. | 11:52:31 |
| 21 | BY MR. KLAYMAN: | 11:52:32 |
| 22 | Q.    What is it about your position, | 11:52:32 |
| 23 | I am asking you not any lawyers that makes | 11:52:34 |
| 24 | you suitable to testify to the matters set | 11:52:36 |
| 25 | forth in the 30(b)(6) deposition today, | 11:52:39 |

1

2  notice of deposition?                                    11:52:44

3        MS. HANDMAN:   That asks for a                     11:52:47

4  legal conclusion, but I'll allow him to                  11:52:47

5  answer. I object but I will allow him to                 11:52:50

6  answer.                                                  11:52:52

7  A.    I am not only the publisher of                     11:52:55

8  the adult book, including Mr. Risen's, but I             11:52:57

9  was also Mr. Risen's editor. So I worked                 11:53:01

10  closely with him in the editorial process.              11:53:03

11        MR. KLAYMAN:   I am going to ask                   11:53:07

12   the court reporter mark as Exhibit 20,                 11:53:09

13   you should have a copy of that the                     11:53:11

14   Notice of Deposition upon which Mr.                    11:53:12

15   Nichols is appearing here today.                       11:53:14

16        MS. HANDMAN:   I don't have a copy                11:53:16

17  of that Exhibit 20. I don't believe that                11:53:17

18  was provided. I do have a copy of the                   11:53:20

19  Notice of Deposition, however, with me.                 11:53:22

20        MR. KLAYMAN:   Well, if we can                    11:53:28

21   mark that as Exhibit 20.                               11:53:29

22        (Plaintiff's Deposition                           11:53:29

23  Exhibit 20 for identification, Re-notice                11:53:29

24  of Rule 30(b)(6) Deposition, no                         11:53:29

25  production numbers.)                                    11:53:55

BRUCE NICHOLS - 10/14/2015                    Page 15

| | | |
|---|---|---|
| 1 | | |
| 2 | BY MR. KLAYMAN: | 11:53:55 |
| 3 | Q.   Have you ever seen this before, | 11:53:55 |
| 4 | Mr. Nichols? | 11:53:56 |
| 5 | A.   Yes, I have. | 11:53:58 |
| 6 | Q.   When did you first see it? | 11:53:59 |
| 7 | A.   When my counsel provided it in | 11:54:02 |
| 8 | preparation for this. | 11:54:04 |
| 9 | Q.   When was that? | 11:54:05 |
| 10 | A.   Initially before the first | 11:54:06 |
| 11 | scheduled deposition, so in September. | 11:54:11 |
| 12 | Q.   Did you understand what was | 11:54:18 |
| 13 | being requested in terms of your testimony | 11:54:19 |
| 14 | today? | 11:54:21 |
| 15 | A.   Yes, I do. | 11:54:21 |
| 16 | Q.   Who did you consult with of in | 11:54:22 |
| 17 | preparing that testimony? | 11:54:25 |
| 18 | A.   With counsel. | 11:54:26 |
| 19 | Q.   Which counsel? | 11:54:29 |
| 20 | A.   Counsel at this table, so | 11:54:32 |
| 21 | Ms. Handman, Ms. Handman as well as Sharon | 11:54:34 |
| 22 | Burger and David Eber. | 11:54:37 |
| 23 | Q.   Who are those two later two | 11:54:40 |
| 24 | people, what are their names? | 11:54:42 |
| 25 | A.   Sharon Burger and David Eber | 11:54:44 |

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 16

| | | |
|---|---|---|
| 1 | | |
| 2 | are in-house Houghton Mifflin counsel. | 11:54:46 |
| 3 | Q.   They are in-house lawyers? | 11:54:52 |
| 4 | A.   Yes. | 11:54:53 |
| 5 | Q.   Did you consult with anybody | 11:54:54 |
| 6 | else? | 11:54:55 |
| 7 | A.   No. | 11:54:57 |
| 8 | Q.   Did you consult with Mr. | 11:54:58 |
| 9 | Bayers, William Bayers, General Counsel? | 11:54:59 |
| 10 | A.   Not regarding the Houghton | 11:55:01 |
| 11 | Mifflin Publishing Company today's | 11:55:06 |
| 12 | deposition, no. | 11:55:08 |
| 13 | Q.   After this lawsuit was filed | 11:55:08 |
| 14 | have you ever talked to Mr. Bayers about | 11:55:10 |
| 15 | this lawsuit that you're here on today? | 11:55:11 |
| 16 | MS. HANDMAN:   You can answer but, | 11:55:21 |
| 17 | don't discuss the content. | 11:55:21 |
| 18 | A.   We've consulted about the | 11:55:26 |
| 19 | lawsuit, yes. | 11:55:28 |
| 20 | Q.   When did that first happen? | 11:55:28 |
| 21 | A.   There was a phone conference a | 11:55:37 |
| 22 | week ago and then there is a follow-up phone | 11:55:39 |
| 23 | call or two. | 11:55:41 |
| 24 | Q.   Who was present on the phone | 11:55:46 |
| 25 | conference a week ago? | 11:55:47 |

1

2     A.    I believe the people in this          11:55:48

3  room, again. So Laura Handman, Sharon          11:55:50

4  Burger, I'm not sure David Eber was on that    11:55:55

5  call. So I think it was the three of us,       11:55:59

6  plus Bill Bayers.                              11:56:01

7     Q.    You said there was a follow-up        11:56:06

8  discussion?                                    11:56:07

9     A.    There was a brief follow-up           11:56:07

10  phone call with Laura Handman and Sharon      11:56:09

11  Burger yesterday and, again, this morning.    11:56:14

12     Q.    How long was the first               11:56:22

13  conversation, about?                          11:56:23

14     A.    No more than an hour.                11:56:24

15     Q.    How long was the one this            11:56:25

16  morning?                                      11:56:26

17     A.    Very brief, ten minutes or           11:56:29

18  less.                                         11:56:30

19     Q.    Prior to the filing of this          11:56:31

20  lawsuit have you ever spoken to Mr. Bayers    11:56:32

21  about any issues concerning potential legal   11:56:36

22  liability over this book, the subject of      11:56:39

23  this case, Pay Any Price?                     11:56:44

24     A.    No, I have not had                   11:56:49

25  conversations with Bill Bayers directly       11:56:51

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 18

| | | |
|---|---|---|
| 1 | | |
| 2 | before this about this book. | 11:56:52 |
| 3 | Q.    But have you had conversations | 11:56:53 |
| 4 | with him indirectly? | 11:56:54 |
| 5 | MS. HANDMAN:   Objection. You are | 11:56:56 |
| 6 | really treading close to attorney-client | 11:56:57 |
| 7 | privileged information. And I don't see | 11:56:59 |
| 8 | any of this on the topic here. | 11:57:02 |
| 9 | We've allowed you to ask some | 11:57:05 |
| 10 | preliminary questions to establish who | 11:57:06 |
| 11 | Mr. Nichols is and how he prepared for | 11:57:09 |
| 12 | this. But, honestly, those topics are | 11:57:11 |
| 13 | not within the seven that are listed | 11:57:16 |
| 14 | here. | 11:57:18 |
| 15 | MR. KLAYMAN:   Well we are not | 11:57:21 |
| 16 | limited, the seven are very broad, | 11:57:22 |
| 17 | Ms. Handman.  We are entitled to ask | 11:57:24 |
| 18 | questions, foundation questions | 11:57:26 |
| 19 | regarding that. | 11:57:27 |
| 20 | So consequently I am allowed to | 11:57:28 |
| 21 | ask these questions.  Also discovery is | 11:57:30 |
| 22 | that which is relevant or may lead to | 11:57:32 |
| 23 | relevant evidence. So I take it you are | 11:57:34 |
| 24 | not instructing him not to answer. | 11:57:36 |
| 25 | MS. HANDMAN:   Not yet, but you | 11:57:38 |

| 1 | | |
|---|---|---|
| 2 | are going right to the edge of these | 11:57:39 |
| 3 | topics. No, it is not a broad -- the | 11:57:41 |
| 4 | 30(b)(6) is limited to these topics that | 11:57:42 |
| 5 | are the seven topics listed in your | 11:57:48 |
| 6 | deposition. | 11:57:51 |
| 7 | MR. KLAYMAN:  If you obstruct | 11:57:51 |
| 8 | this deposition we will obviously take | 11:57:53 |
| 9 | it up with the Magistrate and move for | 11:57:54 |
| 10 | sanctions. | 11:57:56 |
| 11 | BY MR. KLAYMAN: | 11:57:57 |
| 12 | Q.  Mr. Bayers -- I ask the | 11:57:57 |
| 13 | question again -- excuse me.  Mr. Nichols, I | 11:57:59 |
| 14 | ask the question again. Did you discuss with | 11:58:02 |
| 15 | Mr. Bayers or anyone else in the Legal | 11:58:04 |
| 16 | Department or any other person at Houghton | 11:58:08 |
| 17 | Mifflin, the potential for liability before | 11:58:11 |
| 18 | of this lawsuit was filed concerning the | 11:58:14 |
| 19 | book Pay Any Price? | 11:58:16 |
| 20 | ** DIRECTION NOT TO ANSWER ** | 11:58:19 |
| 21 | MS. HANDMAN:  Objection. You're | 11:58:19 |
| 22 | asking for attorney-client privilege | 11:58:20 |
| 23 | communications and I am going to | 11:58:20 |
| 24 | instruct him not to answer. | 11:58:22 |
| 25 | MR. KLAYMAN:  I am not asking | 11:58:27 |

1

2      what was discussed. I am asking if there                 11:58:28

3      was a discussion about it, about the                    11:58:30

4      book.                                                   11:58:32

5          MS. HANDMAN:   About liability you                  11:58:32

6      said. So you did ask what was discussed                 11:58:33

7      and I'm instructing him not to answer.                  11:58:35

8          MR. KLAYMAN:   I am not asking him                  11:58:38

9      what specifically was discussed.  I'm                   11:58:39

10      just trying to identify. We'll come back                11:58:41

11      to that. Certify the question, however.                11:58:43

12   CERTIFIED FOR COURT RULINGS:                              11:58:43

13   -------------------------------                           11:58:47

14   BY MR. KLAYMAN:                                           11:58:47

15      Q.    Prior to this book being                         11:58:47

16   published, was there any discussion -- let                11:58:52

17   me backup.                                                11:58:56

18          When was the first time that                       11:58:56

19   you became aware that an author by the name               11:58:58

20   of James Risen wanted to publish a book Pay               11:59:02

21   Any Price with your company?                              11:59:07

22      A.    Shortly before we signed the                     11:59:08

23   contract in 2013. However, I had known Jim                11:59:09

24   Risen for quite a while and edited and                    11:59:15

25   published his previous book at Simon &                    11:59:17

| | | |
|---|---|---|
| 1 | | |
| 2 | Schuster. | 11:59:17 |
| 3 | So I was well aware from | 11:59:20 |
| 4 | conversations with him of the progress of | 11:59:22 |
| 5 | that book and issues he was having. And it | 11:59:26 |
| 6 | was only in 2013 that Simon & Schuster | 11:59:28 |
| 7 | agreed to let the contract go. That's the | 11:59:31 |
| 8 | point at which Houghton Mifflin got | 11:59:34 |
| 9 | involved. | 11:59:36 |
| 10 | Q.    What is the name of his | 11:59:40 |
| 11 | previous book? | 11:59:42 |
| 12 | A.    His previous book is called | 11:59:42 |
| 13 | State of War. | 11:59:44 |
| 14 | Q.    What did you discuss with Mr. | 11:59:45 |
| 15 | Risen specifically about State of War, in | 11:59:47 |
| 16 | other words, what issues concerning it? | 11:59:49 |
| 17 | MS. HANDMAN:  Objection. That is | 11:59:52 |
| 18 | beyond the limits of the seven topics | 11:59:53 |
| 19 | and not also relevant to this inquiry. | 11:59:56 |
| 20 | MR. KLAYMAN:   I am entitled to | 12:00:01 |
| 21 | some leeway, Ms. Handman.  If you want | 12:00:02 |
| 22 | to instruct we will certainly move for | 12:00:05 |
| 23 | sanctions.  I am not shy about that. So | 12:00:07 |
| 24 | you can decide whether you want a motion | 12:00:09 |
| 25 | on this or not. Are you letting him | 12:00:11 |

1

2      answer?                                          12:00:13

3          MS. HANDMAN:   You're asking him            12:00:14

4      about questions about State of War? I am         12:00:14

5      not letting him answer. First of all, it         12:00:20

6      is too broad. Second of all, I don't            12:00:22

7      know what the relevance is to this.             12:00:26

8          MR. KLAYMAN:   Let me see if I can          12:00:27

9      narrow it.                                       12:00:28

10   BY MR. KLAYMAN:                                    12:00:29

11      Q.    With regard to State of War was          12:00:33

12   there any discussion as to whether or not at       12:00:36

13   any time there were factual inaccuracies in        12:00:39

14   that book with Mr. Risen?                          12:00:42

15      A.    There was a legal review at             12:00:49

16   Simon & Schuster.  I am not here to speak on       12:00:51

17   behalf of Simon & Schuster.  I can only           12:00:52

18   speak as his editor my own experience.            12:00:58

19   There was a legal review of that book, as         12:01:00

20   there was this book.                               12:01:03

21      Q.    Was Simon & Schuster sued over           12:01:04

22   that book, State of War?                           12:01:06

23      A.    No, sir.                                  12:01:07

24      Q.    Ever?                                     12:01:09

25      A.    Not to my knowledge.                      12:01:10

| | | |
|---|---|---|
| 1 | | |
| 2 | Q.    To the best of your knowledge | 12:01:11 |
| 3 | did anyone ever complain about factual | 12:01:12 |
| 4 | inaccuracies in that book? | 12:01:14 |
| 5 | A.    No, not to my knowledge. | 12:01:16 |
| 6 | Q.    Let's move to the current book, | 12:01:20 |
| 7 | Pay Any Price.  Was it Mr. Risen who | 12:01:22 |
| 8 | approached you or did you approach him about | 12:01:26 |
| 9 | writing this book? | 12:01:28 |
| 10 | A.    He approached me through his | 12:01:29 |
| 11 | literary agent when his relationship with | 12:01:31 |
| 12 | Simon & Schuster was beginning to break | 12:01:34 |
| 13 | down. | 12:01:41 |
| 14 | Q.    What did he tell you the | 12:01:41 |
| 15 | reasons his relationship with Simon & | 12:01:42 |
| 16 | Schuster was breaking down? | 12:01:44 |
| 17 | A.    It had very much to do with his | 12:01:44 |
| 18 | relationship with his editor there. | 12:01:46 |
| 19 | Q.    What did he tell you about that | 12:01:51 |
| 20 | relationship? | 12:01:52 |
| 21 | A.    They didn't see eye to eye on | 12:01:53 |
| 22 | how the book should be edited and published. | 12:01:56 |
| 23 | Q.    So the editor had difficulty | 12:02:02 |
| 24 | with some of the things Mr. Risen was | 12:02:03 |
| 25 | writing in that book? | 12:02:05 |

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 24

| | | |
|---|---|---|
| 1 | | |
| 2 | A.    No, I wouldn't say that. They | 12:02:06 |
| 3 | did not see eye to eye on how to structure | 12:02:07 |
| 4 | and publish the book. | 12:02:10 |
| 5 | Q.    What was the problem? | 12:02:11 |
| 6 | A.    I don't know. You'd have to ask | 12:02:13 |
| 7 | Simon & Schuster. | 12:02:15 |
| 8 | Q.    He didn't discuss that with | 12:02:18 |
| 9 | you? Surely he must have. | 12:02:20 |
| 10 | A.    He reached an impasse with them | 12:02:21 |
| 11 | about when and how they were going to | 12:02:23 |
| 12 | publish the book. That's all I needed to | 12:02:26 |
| 13 | know. | 12:02:28 |
| 14 | Q.    And he told you that they | 12:02:30 |
| 15 | objected to certain content in that book? | 12:02:31 |
| 16 | A.    No, he did not. That was not | 12:02:33 |
| 17 | the issue. | 12:02:34 |
| 18 | Q.    Who at Simon & Schuster was he | 12:02:36 |
| 19 | dealing with? | 12:02:37 |
| 20 | A.    I only know through him that | 12:02:40 |
| 21 | his editor at the time was a woman named | 12:02:42 |
| 22 | Priscilla Painton. | 12:02:44 |
| 23 | Q.    How is that spelled? | 12:02:46 |
| 24 | A.    Painton I believe is | 12:02:47 |
| 25 | P-A-I-N-T-O-N, I believe. | 12:02:51 |

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 25

1

2      Q.    Do you know whether she is at                12:02:55

3  Simon & Schuster?                                       12:02:57

4      A.    I believe she is still there.                 12:02:57

5      Q.    You said that you were very                   12:03:06

6  familiar with Mr. Risen before. You                     12:03:07

7  considered him a friend?                                12:03:09

8      A.    A friend, but he was an author                12:03:10

9  that I published that I admired greatly.                12:03:12

10     Q.    So he would have confided in                  12:03:16

11  you the reasons why Ms. Painton had                     12:03:18

12  difficulty with his book, State of War?                 12:03:20

13        MS. HANDMAN:  Objection,                         12:03:24

14        mischaracterization of the testimony.            12:03:27

15     Q.    You can respond.                              12:03:29

16     A.    As I said, he discussed in                    12:03:30

17  general terms that they could not see eye to            12:03:34

18  eye on how to structure and when to publish.            12:03:36

19     Q.    Now, correct me if I'm wrong,                 12:03:39

20  you said Mr. Risen approached you with                  12:03:43

21  regard to his book Pay Any Price?                       12:03:45

22     A.    Through his literary agent,                   12:03:48

23  correct.                                               12:03:50

24     Q.    Who was his literary agent at                 12:03:50

25  the time?                                              12:03:52

| | | | |
|---|---|---|---|
| 1 | | | |
| 2 | A. | Tina Bennett. | 12:03:52 |
| 3 | Q. | Where is she located? | 12:03:54 |
| 4 | A. | She is now at William Morris | 12:03:56 |
| 5 | Endeavor. When she originally negotiated his | | 12:04:00 |
| 6 | contract for State of War and with Simon & | | 12:04:04 |
| 7 | Schuster for Pay Any Price she was with | | 12:04:08 |
| 8 | Janklow & Nesbit. | | 12:04:11 |
| 9 | Q. | Where are they located? | 12:04:14 |
| 10 | A. | They are both in Manhattan. | 12:04:15 |
| 11 | Q. | When Mr. Risen approached you, | 12:04:20 |
| 12 | what did he tell you he wanted to write | | 12:04:21 |
| 13 | about? Did he already have a manuscript or | | 12:04:23 |
| 14 | he was just giving you a concept at the | | 12:04:25 |
| 15 | time? | | 12:04:28 |
| 16 | A. | No. He had a complete draft. | 12:04:28 |
| 17 | Q. | Did you review the draft? | 12:04:30 |
| 18 | A. | I did. | 12:04:31 |
| 19 | Q. | You did? After he approached | 12:04:34 |
| 20 | you was it in person or was it by phone? | | 12:04:38 |
| 21 | A. | Initially it was Tina Bennett | 12:04:41 |
| 22 | calling me on the phone. | | 12:04:45 |
| 23 | Q. | He had presented that book | 12:04:46 |
| 24 | first to Simon & Schuster. Then when they | | 12:04:48 |
| 25 | wouldn't publish it they contacted you; | | 12:04:53 |

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 27

| | | |
|---|---|---|
| 1 | | |
| 2 | correct? | 12:04:56 |
| 3 | MS. HANDMAN:  Objection, | 12:04:56 |
| 4 | mischaracterizing the witness. | 12:04:56 |
| 5 | MR. KLAYMAN:   I am entitled to | 12:04:57 |
| 6 | ask leading questions, he is an adverse | 12:04:59 |
| 7 | witness. Go on. | 12:05:01 |
| 8 | A.    They did not say they wouldn't | 12:05:01 |
| 9 | publish it.  They couldn't agree on how to | 12:05:03 |
| 10 | structure it and when to publish it. | 12:05:05 |
| 11 | Q.    Simon & Schuster had problem | 12:05:07 |
| 12 | with both State of War and Pay Any Price | 12:05:09 |
| 13 | based on your knowledge? | 12:05:10 |
| 14 | MS. HANDMAN:  Objection. | 12:05:11 |
| 15 | A.    Not to my knowledge. | 12:05:12 |
| 16 | Q.    What you're saying they did | 12:05:15 |
| 17 | have a problem with State of War? | 12:05:16 |
| 18 | MS. HANDMAN:  Objection. | 12:05:18 |
| 19 | Q.    You can respond. | 12:05:20 |
| 20 | A.    What I said was they could not | 12:05:21 |
| 21 | agree on how to structure it or when to | 12:05:22 |
| 22 | publish it. | 12:05:25 |
| 23 | Q.    They had the same -- | 12:05:26 |
| 24 | MS. HANDMAN:   You are mixing up | 12:05:27 |
| 25 | the books. Are you asking about State of | 12:05:30 |

1

2      War or Pay Any Price?                                    12:05:33

3          MR. KLAYMAN:  I just asked about                    12:05:34

4      State of War. I didn't mix anything up.                 12:05:35

5      State of War.                                           12:05:38

6      A.     They had no --                                   12:05:40

7      Q.     There were issues about State                    12:05:41

8  of War that caused in Simon & Schuster not                 12:05:44

9  to want to publish it?                                     12:05:47

10     A.     No, sir. They published State                    12:05:48

11  of War.                                                    12:05:54

12     Q.     I thought you testified                          12:05:54

13  previously they had issues over State of                   12:05:55

14  War?                                                       12:05:57

15     A.     No, sir.  Maybe we were                          12:05:57

16  confusing. Pay Any Price is the book they                  12:05:58

17  had under contract that they could not agree               12:06:00

18  with Jim on how to structure it or when to                 12:06:03

19  publish it. That's why Pay Any Price became                12:06:05

20  available to Houghton Mifflin.                             12:06:08

21     Q.     Okay. So consequently when Mr.                   12:06:09

22  Risen and his agent approached you, you must               12:06:15

23  have asked what issues did they have with                  12:06:17

24  the book that you're not publishing it with                12:06:20

25  them, now you want to publish it with us,                  12:06:23

1

2  Harcourt,  you must have asked that;          12:06:25

3  correct?                                       12:06:29

4      A.    Yes. And as I said it was,           12:06:29

5  they could not agree on a structure and they  12:06:31

6  could not agree on the timing of when to       12:06:35

7  publish it.                                     12:06:35

8      Q.    What did Mr. Risen tell you           12:06:36

9  about why they could not agree on the          12:06:38

10  structure and time to publish it?             12:06:39

11      A.    They wanted to make changes in      12:06:44

12  structure he did not agree with and they did  12:06:45

13  not want to commit to publication date in     12:06:48

14  2014.                                          12:06:50

15      Q.    About what time did Mr. Risen        12:06:55

16  approach you and his agent in this regard?    12:06:57

17      A.    Shortly before we signed our        12:07:00

18  contract.                                      12:07:01

19      Q.    When was that?                       12:07:03

20      A.    Which was in I believe November     12:07:04

21  of 2013.                                        12:07:14

22      Q.    The problems -- I will use          12:07:14

23  issues so we don't run into problems.  I       12:07:16

24  will use issues as a way to identify it.       12:07:18

25  The issues you understood that Simon &         12:07:22

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 30

| | | |
|---|---|---|
| 1 | | |
| 2 | Schuster had with Pay Any Price started with | 12:07:24 |
| 3 | Mr. Risen's claim he had confidential | 12:07:31 |
| 4 | sources inside the government he was using | 12:07:34 |
| 5 | to publish this book; correct? | 12:07:36 |
| 6 | A.   No. That was never ever | 12:07:37 |
| 7 | suggested. | 12:07:40 |
| 8 | Q.   In fact you understood that the | 12:07:46 |
| 9 | concerns involved the use of classified | 12:07:50 |
| 10 | government information? | 12:07:53 |
| 11 | MS. HANDMAN:  Objection. | 12:07:56 |
| 12 | A.   Sir, no. No. There was never | 12:07:56 |
| 13 | any discussion about Simon & Schuster or | 12:07:57 |
| 14 | with -- to my knowledge, or with Houghton | 12:08:01 |
| 15 | Mifflin about an issue with classified | 12:08:03 |
| 16 | sources. | 12:08:05 |
| 17 | As I said, the issue for Simon | 12:08:07 |
| 18 | & Schuster with Pay Any Price was how to | 12:08:09 |
| 19 | structure and when to publish the book. | 12:08:10 |
| 20 | Q.   Let's talk about issues with | 12:08:13 |
| 21 | Harcourt, let's call it Harcourt. | 12:08:17 |
| 22 | A.   What's your question? | 12:08:24 |
| 23 | Q.   Did you ever ask Mr. Risen | 12:08:25 |
| 24 | whether there was anything in his book Pay | 12:08:26 |
| 25 | Any Price in the manuscript he presented | 12:08:29 |

| | |
|---|---|
| 1 | |
| 2   that was gleaned from classified government | 12:08:33 |
| 3   information? | 12:08:35 |
| 4       A.    I did not ask that question of | 12:08:37 |
| 5   him, no. | 12:08:39 |
| 6       Q.    Are you aware of anyone ever | 12:08:41 |
| 7   asking that question at Harcourt of Mr. | 12:08:43 |
| 8   Risen? | 12:08:45 |
| 9           MS. HANDMAN:  Objection, | 12:08:46 |
| 10      attorney-client privilege. | 12:08:46 |
| 11      Q.    Except for lawyers. | 12:08:49 |
| 12      A.    No. Not outside of the legal | 12:08:53 |
| 13   review. | 12:08:54 |
| 14          MR. KLAYMAN:   Ms. Handman, my | 12:09:05 |
| 15      asking the question whether that was | 12:09:07 |
| 16      inquired upon by anyone, I am not asking | 12:09:09 |
| 17      for the conclusion of such inquiry. This | 12:09:11 |
| 18      is a fact and it is not subject to | 12:09:13 |
| 19      attorney-client privilege. Also would be | 12:09:15 |
| 20      covered by the crime fraud exception if | 12:09:16 |
| 21      I have to push that, because of the use | 12:09:18 |
| 22      of classified information without | 12:09:20 |
| 23      authorization from the government is a | 12:09:25 |
| 24      crime. As you might know that is quite | 12:09:26 |
| 25      much in the news these days, | 12:09:27 |

1

2      particularly in regard to Hillary                    12:09:29

3      Clinton and company.                                 12:09:31

4           So I am entitled to ask this                    12:09:32

5      question whether or not anyone at                    12:09:33

6      Harcourt ever asked Risen if his book                12:09:37

7      contained or was gleaned from classified             12:09:41

8      government information.                               12:09:43

9           MS. HANDMAN:   And he answered                  12:09:43

10       that excluding conversations with                  12:09:44

11       counsel.                                            12:09:47

12           MR. KLAYMAN:   We will certify                  12:09:50

13       this.                                               12:09:51

14   CERTIFIED FOR COURT RULINGS:                            12:09:51

15   -------------------------------                         12:09:55

16   BY MR. KLAYMAN:                                         12:09:55

17       Q.    With regard to the manuscript                12:09:55

18    itself, has that manuscript been produced to          12:09:58

19    Defendant -- excuse me, has the manuscript            12:10:03

20    presented to you by Mr. Risen and his                 12:10:06

21    literary agent been produced to Plaintiffs            12:10:08

22    in this case?                                          12:10:10

23       A.    Yes.                                          12:10:13

24       Q.    Was that manuscript presented                12:10:27

25    before the contract was signed?                       12:10:29

| | | |
|---|---|---|
| 1 | | |
| 2 | A.    I believe so. I'm not a hundred | 12:10:36 |
| 3 | percent certain exactly, but right around | 12:10:38 |
| 4 | that time. | 12:10:40 |
| 5 | Q.    Who if anyone initially | 12:10:46 |
| 6 | reviewed that manuscript for Houghton | 12:10:49 |
| 7 | Mifflin? | 12:10:51 |
| 8 | A.    I did. | 12:10:51 |
| 9 | Q.    In going through that | 12:10:55 |
| 10 | manuscript.  Did you ever ask Mr. Risen | 12:10:56 |
| 11 | whether there was anything contained in it | 12:10:59 |
| 12 | that the government would object to? | 12:11:03 |
| 13 | MS. HANDMAN:  Objection, overbroad | 12:11:06 |
| 14 | question. | 12:11:08 |
| 15 | MR. KLAYMAN:  I think it is quite | 12:11:09 |
| 16 | a good question. Answer it, please. | 12:11:10 |
| 17 | MS. HANDMAN:  Object because they | 12:11:14 |
| 18 | don't like what's said? What do you mean | 12:11:14 |
| 19 | by object? | 12:11:16 |
| 20 | MR. KLAYMAN:  Please don't | 12:11:17 |
| 21 | testify, Ms. Handman.  This is | 12:11:18 |
| 22 | inappropriate, okay. I'm asking the | 12:11:19 |
| 23 | questions, you're not. | 12:11:21 |
| 24 | Q.    Answer the question, Mr. | 12:11:23 |
| 25 | Nichols. | 12:11:23 |

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 34

1

2      A.    Well it does depend on what you          12:11:25

3   mean by government object to. This entire       12:11:27

4   book was revealing stories of things that       12:11:30

5   the government had done that included abuse      12:11:32

6   of power and corruption. So in that sense       12:11:35

7   I'm sure the government would not be happy       12:11:39

8   about it.                                        12:11:41

9      Q.    Did you ask whether there was           12:11:43

10   anything in the book that it published,         12:11:44

11   talking about Risen and his agent, talking      12:11:48

12   with lawyers Harcourt had the liability from    12:11:52

13   the government?                                 12:11:57

14        MS. HANDMAN:  Mr. Klayman, I am            12:11:59

15      going to instruct the witness to answer      12:12:00

16      only with regard to the chapter that is      12:12:01

17      in issue in this book.  You're asking        12:12:03

18      questions that apply to the whole book.      12:12:05

19      The only thing that is relevant in this      12:12:08

20      case is the chapter and that's what has      12:12:10

21      been our position throughout. The rest       12:12:16

22      is covered by the reporter's privilege       12:12:17

23      and is not relevant and just as we           12:12:19

24      produced documents only related to this      12:12:22

25      chapter.                                     12:12:24

BRUCE NICHOLS - 10/14/2015                    Page 35

| | | |
|---|---|---|
| 1 | | |
| 2 | So in response to your request for | 12:12:24 |
| 3 | manuscripts, that will be his | 12:12:29 |
| 4 | instruction on this when you're asking | 12:12:30 |
| 5 | about substantive questions about the | 12:12:32 |
| 6 | book. | 12:12:36 |
| 7 | So he is permitted to answer with | 12:12:36 |
| 8 | regard to the chapter in issue in this | 12:12:38 |
| 9 | suit. | 12:12:44 |
| 10 | MR. KLAYMAN:  Well there is more | 12:12:45 |
| 11 | than one chapter at issue, Ms. Handman, | 12:12:46 |
| 12 | I am sure you've read it several times | 12:12:49 |
| 13 | at least. | 12:12:50 |
| 14 | MS. HANDMAN:  No. There is only | 12:12:50 |
| 15 | one chapter at issue. | 12:12:51 |
| 16 | MR. KLAYMAN:  Well, let me tell | 12:12:53 |
| 17 | you there is because at chapter 3 there | 12:12:54 |
| 18 | is a reference to Dennis Montgomery. | 12:12:57 |
| 19 | The lead sentence called New Oligarchs. | 12:12:59 |
| 20 | I am also going to ask questions about | 12:13:04 |
| 21 | the first part of this book which | 12:13:05 |
| 22 | relates to both chapters. | 12:13:07 |
| 23 | MS. HANDMAN:  You can ask about | 12:13:09 |
| 24 | that lead sentence if you want to. | 12:13:10 |
| 25 | MR. KLAYMAN:  Chapter 2 and | 12:13:12 |

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 36

| 1 | | |
|---|---|---|
| 2 | chapter 3. Okay. | 12:13:13 |
| 3 | MS. HANDMAN:   No. Chapter 3 lead | 12:13:15 |
| 4 | sentence, yes.  That you certainly can | 12:13:16 |
| 5 | ask about. | 12:13:18 |
| 6 | A.    Could you repeat the question. | 12:13:20 |
| 7 | Q.    Yes. Could the court reporter | 12:13:21 |
| 8 | please read it back. | 12:13:21 |
| 9 | (The pending question was read as | 12:13:21 |
| 10 | follows: | 12:13:21 |
| 11 | "Question:    Did you ask whether | 12:11:43 |
| 12 | there was anything in the book that it | 12:11:44 |
| 13 | published, talking about Risen and his | 12:11:47 |
| 14 | agent, talking with lawyers Harcourt had | 12:11:49 |
| 15 | the liability from the government?") | 12:11:56 |
| 16 | A.    I am not sure what you mean by | 12:13:50 |
| 17 | liability from the government. | 12:13:52 |
| 18 | Q.    The government could take legal | 12:13:53 |
| 19 | action against Harcourt for publishing the | 12:13:54 |
| 20 | book, Pay Any Price? | 12:13:58 |
| 21 | MS. HANDMAN:   Again, excluding | 12:14:00 |
| 22 | conversations with counsel. | 12:14:02 |
| 23 | MR. KLAYMAN:   Correct. | 12:14:03 |
| 24 | A.    I spoke to Jim to ask if he had | 12:14:07 |
| 25 | any concerns about leak investigations and | 12:14:09 |

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 37

1

2  he did not.                                      12:14:12

3      Q.    What do you mean by leak               12:14:15

4  investigations?                                  12:14:17

5      A.    Which is what happened with his        12:14:18

6  first book when the government went after        12:14:21

7  somebody that they believed might have been      12:14:25

8  the source of his.                               12:14:27

9      Q.    With regard to that first book         12:14:31

10  you're saying State of War?                     12:14:33

11     A.    Yes.                                    12:14:34

12     Q.    That was published by Simon &          12:14:37

13  Schuster?                                        12:14:38

14     A.    Correct.                                12:14:38

15     Q.    And a major issue as far as you        12:14:40

16  know with State of War was writings             12:14:43

17  concerning Jeffrey Sterling?                     12:14:45

18         MS. HANDMAN:  Objection. I am            12:14:50

19     instructing the witness not to answer        12:14:52

20     anything that would reveal any               12:14:54

21     information protected by the Shield Law.     12:14:56

22     The reporter's privilege with regard to     12:14:59

23     the source.                                   12:15:03

24     A.    What I can say is their                12:15:07

25  investigation of Jeffrey Sterling was what      12:15:09

BRUCE NICHOLS - 10/14/2015                    Page 38

1

2  caused Jim Risen to be at one point in legal                     12:15:14

3  jeopardy.                                                        12:15:18

4      Q.   And Mr. Risen told you what                            12:15:23

5  kind of legal jeopardy he was in at the time                    12:15:24

6  he was trying to get Pay Any Price published                    12:15:27

7  by you; is that right?                                          12:15:29

8      A.   It was very well known, very                           12:15:30

9  public case.                                                    12:15:32

10     Q.   What jeopardy was well known?                          12:15:35

11     A.   That he was under subpoena to                          12:15:36

12  answer questions about his reporting that                      12:15:43

13  might have forced him to reveal a source he                    12:15:46

14  was not going to reveal.                                       12:15:48

15     Q.   And it was also well known that                        12:15:49

16  the government was threatening Mr. Risen                       12:15:51

17  with asking the court to jail him if he did                    12:15:54

18  not provide that information, that source?                     12:15:58

19        MS. HANDMAN:  Objection.                                 12:16:02

20     A.   Jim Risen was not threatening                         12:16:03

21  anyone.                                                        12:16:05

22     Q.   I didn't say that. It was also                        12:16:05

23  well known in the publishing industry and                     12:16:08

24  elsewhere that the government, the Justice                     12:16:12

25  Department was threatening Mr. Risen with an                   12:16:14

1

2  indictment and/or jail time if he didn't                  12:16:19

3  provide the information with regard to Mr.               12:16:23

4  Sterling?                                                 12:16:26

5         MS. HANDMAN:  Objection. You can               12:16:26

6     answer.                                                12:16:30

7     A.    I have no knowledge he was ever              12:16:30

8  threatened with indictment no. He was under             12:16:32

9  subpoena and he was fighting the subpoena.              12:16:34

10     Q.    You did read in the newspaper,              12:16:36

11  however, the was seeking to have him put in           12:16:38

12  prison until he revealed the source;                     12:16:40

13  correct?                                                  12:16:42

14         MS. HANDMAN:  Objection.                      12:16:42

15     A.    No, sir. It never reached that             12:16:45

16  point. He was under subpoena. He was                    12:16:46

17  fighting the subpoena. And then it was                  12:16:48

18  hypothetical that if he was forced to                   12:16:51

19  testify and if he refused to testify, what             12:16:53

20  would happen. But that never came to pass.             12:16:56

21     Q.    What did you understand would              12:16:58

22  happen to him if he refused to testify based           12:16:59

23  on what was generally known as he testified            12:17:02

24  to?                                                      12:17:04

25         MS. HANDMAN:  Objection,                       12:17:05

1

2    hypothetical, speculation.                          12:17:06

3        MR. KLAYMAN:   It is not                        12:17:07

4    hypothetical.                                       12:17:08

5    Q.    Answer the question.                          12:17:09

6        MR. KLAYMAN:   Please don't                     12:17:10

7    interrupt my question.                              12:17:10

8    A.    It is speculation in terms of                 12:17:11

9  it was, my understanding was it would have            12:17:13

10  been up to the Judge in that case to decide          12:17:15

11  what kind of sanctions to impose.                    12:17:18

12    Q.    One of those sanctions based on              12:17:22

13  what was generally known in the publishing           12:17:24

14  industry was to have Mr. Risen imprisoned            12:17:26

15  until he revealed that information?                  12:17:29

16    A.    I can't speculate on what kind               12:17:31

17  of a sentence if he had been given a                 12:17:33

18  sentence he would have been given, I don't           12:17:35

19  know.                                                12:17:39

20    Q.    You read that in the newspaper               12:17:39

21  didn't you at the time?                              12:17:41

22    A.    I knew in the worst case                     12:17:41

23  scenario he was under -- in danger of going          12:17:42

24  to jail, of course.                                  12:17:45

25    Q.    That was widely known based on               12:17:47

1

2  newspaper reports, media reports; correct?          12:17:50

3      A.    Yes, again, but it was                    12:17:55

4  speculation about a case in fact when the          12:17:56

5  case played out the government chose not to        12:17:58

6  ask him to testify. So it did not come to          12:18:01

7  pass.                                              12:18:06

8      Q.    You're aware the government              12:18:06

9  chose not to have him testify based on            12:18:07

10  published reports because to testify would       12:18:09

11  have revealed classified information?             12:18:11

12          MS. HANDMAN:  Objection.                  12:18:14

13      Q.    You're aware of that based on           12:18:16

14  published reports; correct?                       12:18:18

15          MS. HANDMAN:  Objection.                  12:18:20

16      A.    If he had -- the question was           12:18:20

17  would he have revealed a source. That's what      12:18:24

18  he would have been asked. And that's what         12:18:27

19  never, he was never forced to.                    12:18:29

20      Q.    You're aware based on published         12:18:31

21  reports the government decided not to             12:18:33

22  proceed with prosecuting him because they         12:18:35

23  didn't want to have classified information        12:18:38

24  come out into the public domain?                  12:18:40

25          MS. HANDMAN:  Objection.                  12:18:42

30(b)(6)

BRUCE NICHOLS - 10/14/2015                    Page 42

1

2     A.    No. That's not my understanding          12:18:43

3  at all. There was a hearing about whether he      12:18:45

4  would be asked to testify. That question was      12:18:48

5  heard in court prior to the Sterling trial.       12:18:52

6  When he made clear what he would testify to       12:18:57

7  or not, the government decided not to call        12:18:59

8  him as a witness.                                 12:19:01

9     Q.    At the time Mr. Risen and his            12:19:02

10  literary agent approached you to publish Pay     12:19:05

11  Any Price when Simon & Schuster had refused,     12:19:09

12  you're aware that Mr. Risen was in               12:19:10

13  significant legal difficulty or jeopardy         12:19:15

14  with the government?                             12:19:17

15        MS. HANDMAN:  Objection.                   12:19:18

16     A.    I need to clarify your question         12:19:19

17  because Simon & Schuster did not refuse to       12:19:21

18  publish Pay Any Price. As I said, they had a     12:19:23

19  disagreement on how to structure it and when    12:19:25

20  to publish it. It was never rejected as a        12:19:28

21  manuscript at Simon & Schuster.                  12:19:31

22     Q.    How do you know that? Did you           12:19:32

23  talk to anybody at Simon & Schuster about        12:19:35

24  that?                                            12:19:36

25     A.    No. I know that from Jim                12:19:36

BRUCE NICHOLS - 10/14/2015                    Page 43

| | | |
|---|---|---|
| 1 | | |
| 2 | Risen's literary agent. | 12:19:38 |
| 3 | Q.    You didn't bother to follow-up | 12:19:39 |
| 4 | to find out what the difficulties were if | 12:19:41 |
| 5 | any at Simon & Schuster? | 12:19:43 |
| 6 | A.    It would not be proper for one | 12:19:44 |
| 7 | publisher to call another and have a | 12:19:46 |
| 8 | conversation like that. | 12:19:48 |
| 9 | Q.    Why is that not proper? | 12:19:50 |
| 10 | A.    It essentially borders on | 12:19:52 |
| 11 | collusion. It is up to us to make our own | 12:19:54 |
| 12 | judgment what we think of a manuscript and | 12:19:56 |
| 13 | whether and when we think it should be | 12:19:58 |
| 14 | published. | 12:20:01 |
| 15 | Q.    How would that border on | 12:20:02 |
| 16 | collusion just to find out what difficulties | 12:20:03 |
| 17 | there were in the book? How is that | 12:20:05 |
| 18 | collusion? | 12:20:08 |
| 19 | A.    We are now talking entirely | 12:20:08 |
| 20 | speculation, but if I were a literary agent | 12:20:10 |
| 21 | and one of my clients had an issue with one | 12:20:12 |
| 22 | publish and the publishers said if you find | 12:20:15 |
| 23 | somebody else we will let this go and all | 12:20:18 |
| 24 | the other publishers called and talked, I | 12:20:20 |
| 25 | would not be happy about that. | 12:20:23 |

30(b)(6)

BRUCE NICHOLS - 10/14/2015                    Page 44

| | | |
|---|---|---|
| 1 | | |
| 2 | Q.    Well at the time Mr. Risen | 12:20:24 |
| 3 | approached you Simon & Schuster had the | 12:20:25 |
| 4 | rights to Pay Any Price; correct? | 12:20:27 |
| 5 | A.    Correct. | 12:20:29 |
| 6 | Q.    Right. So it would have been | 12:20:30 |
| 7 | normal in the ordinary course to consult | 12:20:33 |
| 8 | with Simon & Schuster to determine whether | 12:20:35 |
| 9 | or not you would be buying a manuscript or | 12:20:38 |
| 10 | book, Pay Any Price that someone else had | 12:20:41 |
| 11 | already purchased; correct? | 12:20:43 |
| 12 | A.    No, sir. Publishers do not call | 12:20:45 |
| 13 | each other and compare notes on the quality | 12:20:50 |
| 14 | of the manuscript. That is a decision and | 12:20:53 |
| 15 | strategy and publishing plan. That is a | 12:20:56 |
| 16 | decision we keep very much to ourselves for | 12:20:59 |
| 17 | our own list. | 12:21:01 |
| 18 | What we have to be careful | 12:21:04 |
| 19 | about in a situation where an agent contacts | 12:21:06 |
| 20 | and says the relationship is going sour, is | 12:21:08 |
| 21 | we don't want to interfere with that | 12:21:11 |
| 22 | contract. | 12:21:15 |
| 23 | So we have to say if you are | 12:21:15 |
| 24 | free, if Simon & Schuster in this case says | 12:21:18 |
| 25 | to you we will let this go if you find | 12:21:22 |

1

2  someone who wants it, then we can have a                    12:21:24

3  conversation. But we don't call the other                    12:21:27

4  publisher, no.                    12:21:29

5      Q.    At a minimum did you confirm                    12:21:30

6  from Simon & Schuster that Harcourt was free                    12:21:32

7  to publish the book Pay Any Price?                    12:21:36

8      A.    Yes, in fact our contract                    12:21:38

9  specifies some of the advance payments that                    12:21:39

10  we were paying would be paid to them as part                    12:21:43

11  of --                    12:21:46

12      Q.    Who did you talk to at Simon &                    12:21:47

13  Schuster about that? You or anybody else at                    12:21:49

14  Harcourt.                    12:21:53

15      A.    That wasn't our job, that was                    12:21:54

16  the literary agent's job.                    12:21:56

17      Q.    Did you get any proof from the                    12:22:00

18  literary agent that Simon & Schuster was                    12:22:02

19  relinquishing its rights to Pay Any Price?                    12:22:04

20      A.    The literary agent who is a top                    12:22:07

21  agent I trust implicitly, when she tells me                    12:22:11

22  they have agreed, I believe her.                    12:22:13

23      Q.    They didn't agree, based on                    12:22:18

24  your experience and you published a book                    12:22:20

25  that Simon & Schuster owned you would be                    12:22:22

1

2   subjected, Harcourt would be subjected to                12:22:24

3   significant potential liability from Simon &             12:22:27

4   Schuster?                                                12:22:30

5         MS. HANDMAN:  Objection,                           12:22:30

6      hypothetical question.                                12:22:31

7      A.    When we drew up our contract it                 12:22:31

8   was with Simon & Schuster and Jim all                    12:22:33

9   agreeing to the terms.                                   12:22:37

10      Q.    Who is it at Simon & Schuster                  12:22:47

11   that engaged in negotiations in                         12:22:48

12   relinquishing rights to the book to your                12:22:50

13   company Harcourt?                                       12:22:53

14      A.    As I said this was done through                12:22:53

15   the literary agent, so I don't know exactly             12:22:55

16   who she was talking to, but she brokered the            12:22:58

17   deal that said if you do this, they will                12:23:00

18   agree to that. That's what happened.                    12:23:05

19      Q.    Have you ever reviewed? Based                  12:23:10

20   on your personal knowledge why would Simon &            12:23:17

21   Schuster have given up its rights, its legal            12:23:19

22   rights on the book?                                     12:23:22

23         MS. HANDMAN:   Asked and answered.                12:23:23

24      You can answer.                                      12:23:24

25      Q.    From what you know?                            12:23:24

1

2     A.    As I said, they could not agree                12:23:27

3  with Jim on how the book should be                      12:23:29

4  structured and when to publish. When another            12:23:31

5  publisher says we see eye to eye and we are             12:23:34

6  willing to do it and we can agree on how to             12:23:37

7  reimburse their advance payments it is up to            12:23:39

8  them. They can say no, but they were willing            12:23:41

9  to do it.                                               12:23:43

10    Q.    To the best of your knowledge                  12:23:49

11  was the decision by Simon & Schuster not to            12:23:51

12  publish it have anything to do as well with            12:23:52

13  anything concerning State of War?                      12:23:56

14    A.    No, sir.                                       12:23:57

15    Q.    Let's back up a little bit. You                12:24:03

16  say you saw the manuscript before Harcourt             12:24:04

17  decided to publish Risen's book?                       12:24:08

18    A.    Right around the time of the                   12:24:13

19  contract it was all once the literary agent            12:24:14

20  had gotten preliminary approval from Simon &           12:24:17

21  Schuster to explore it.                                12:24:20

22    Q.    The answer is yes?                             12:24:26

23    A.    That I saw the manuscript?                     12:24:27

24    Q.    Before Harcourt proceeded with                 12:24:28

25  a contract, signed a contract with Mr. Risen           12:24:31

1

2  you reviewed the manuscript of State of War?          12:24:35

3     A.   Yes.                                           12:24:37

4     Q.   I will turn your attention to                 12:24:41

5  what is marked as Risen Exhibit 3. It is the          12:24:42

6  ultimate book that was published Pay Any              12:24:44

7  Price: Greed, Power and Endless War by James          12:24:51

8  Risen.                                                 12:24:52

9        MS. HANDMAN:   Excuse me,                        12:24:52

10       Exhibit 3 is the book itself you're              12:24:53

11       saying?                                          12:24:56

12       MR. KLAYMAN:   Risen Exhibit 3.                  12:24:57

13       MS. HANDMAN:   All that was sent                 12:24:59

14       to us was the cover.                             12:25:00

15       MR. KLAYMAN:   We put you on                     12:25:06

16       notice we are talking about the book.            12:25:07

17       MS. HANDMAN:   Well Exhibit 3 that               12:25:09

18       was sent to us was the cover. If you             12:25:12

19       want to ask him questions about the              12:25:14

20       chapter and you want this marked as              12:25:16

21       Exhibit 3 in this case, I guess it would         12:25:22

22       be Exhibit 2.                                    12:25:24

23       MR. KLAYMAN:   You obviously have                12:25:28

24       the book Pay Any Price with you. Can you         12:25:30

25       put that in front of him, please.                12:25:32

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 49

| | | |
|---|---|---|
| 1 | | |
| 2 | (Plaintiff's Deposition | 12:25:32 |
| 3 | Exhibit 21 for identification, Xeroxed | 12:25:32 |
| 4 | Cover Page Pay Any Price by James Risen, | 12:25:32 |
| 5 | no production numbers.) | 12:25:32 |
| 6 | BY MR. KLAYMAN: | 12:26:07 |
| 7 | Q.    Turn to the beginning that says | 12:26:07 |
| 8 | Note on Sources. | 12:26:11 |
| 9 | A.    Yes. | 12:26:14 |
| 10 | Q.    It is written here in | 12:26:16 |
| 11 | Exhibit 21, which is also Exhibit 3 to Mr. | 12:26:18 |
| 12 | Risen's deposition "Many people have | 12:26:21 |
| 13 | criticized the use of anonymous sources, yet | 12:26:25 |
| 14 | all reporters know that the very best | 12:26:27 |
| 15 | stories, the most important, most sensitive | 12:26:29 |
| 16 | rely on, this book would not be possible | 12:26:32 |
| 17 | without the cooperation of many current and | 12:26:36 |
| 18 | former government officials and other | 12:26:38 |
| 19 | individuals who are willing to discuss | 12:26:40 |
| 20 | sensitive matters on the condition of | 12:26:41 |
| 21 | anonymity." | 12:26:44 |
| 22 | Do you see that? | 12:26:46 |
| 23 | A.    Yes, sir. | 12:26:46 |
| 24 | Q.    I take it that was in the | 12:26:47 |
| 25 | manuscript you reviewed and Mr. Risen had | 12:26:49 |

30(b)(6)

BRUCE NICHOLS - 10/14/2015                    Page 50

1

2  given to you which previously had been                12:26:52

3  presented to Simon & Schuster before the             12:26:56

4  contract was signed with Mr. Risen?                  12:26:58

5       A.    Actually no, sir, this was                12:27:00

6  added very late in the game. So it was not           12:27:02

7  part of the original manuscript.                     12:27:04

8       Q.    When was it added?                        12:27:06

9       A.    When we were in the copy                  12:27:07

10  editing and early stages of the production          12:27:09

11  process.                                            12:27:12

12      Q.    Who decided to add it?                    12:27:16

13      A.    It was a discussion raised               12:27:18

14  between Jim and myself.  And Jim decided he          12:27:20

15  wanted to do this because the issue of              12:27:25

16  confidential sources had become                     12:27:28

17  controversial.                                      12:27:30

18      Q.    In fact around what time did             12:27:35

19  Mr. Risen suggest this Note on Sources              12:27:36

20  should be put in the book?                          12:27:40

21      A.    I don't know exactly when the            12:27:43

22  conversation began. We were in the                  12:27:45

23  production process throughout the late              12:27:46

24  winter and early spring. It was -- of 2014,         12:27:48

25  somewhere in there.                                 12:27:51

1

2      Q.    Mr. Risen told you the reason            12:27:58

3   he wanted this in the book was because it        12:28:00

4   would actually help you sell books, meaning      12:28:02

5   Harcourt; correct?                               12:28:04

6           MS. HANDMAN:  Objection.                 12:28:04

7      A.    Yeah, I would disagree with             12:28:05

8   that. No, it was because the issue of            12:28:10

9   confidential sources had become                  12:28:12

10   controversial and he wanted to defend the       12:28:13

11   use of them.                                     12:28:16

12      Q.    So you're telling me he wanted          12:28:19

13   to defend the use of confidential sources       12:28:20

14   during the time period that he was under        12:28:23

15   potential criminal prosecution for the          12:28:25

16   Jeffrey Sterling matter, he wants to            12:28:29

17   broadcast that in fact he has confidential      12:28:31

18   sources which of course the government is       12:28:33

19   seeking to hold him accountable for?            12:28:35

20           MS. HANDMAN:  Objection.                12:28:37

21      Q.    Does that make sense to you,            12:28:37

22   Mr. Nichols?                                     12:28:39

23           MS. HANDMAN:  Objection.                12:28:40

24      A.    I need to clarify your                  12:28:40

25   question. He was never under criminal           12:28:41

1

2  investigation. He was, as we discussed he          12:28:44

3  was under subpoena. But the book makes clear      12:28:46

4  in the text, the reason why we had a              12:28:50

5  discussion about whether we even needed this      12:28:51

6  is because the book makes clear in each           12:28:54

7  chapter what kind of sources he is relying        12:28:56

8  on.  So it is quite clear when he is uses         12:28:59

9  confidential sources.                             12:29:01

10       Q.    Why did you need to put this          12:29:04

11  special note up front if that was already in     12:29:05

12  the chapter?                                      12:29:07

13       A.    It was a judgment call, but he        12:29:08

14  thought because the issue was controversial.     12:29:10

15  By that I don't mean in his one case it's a      12:29:12

16  controversial decision at newspapers about       12:29:15

17  all of their coverage.                           12:29:18

18       Q.    Because in fact just to tell          12:29:20

19  the reader you published stuff that is also      12:29:26

20  public that is not very sexy, is it, that is     12:29:31

21  not very compelling, is it?  It is much more     12:29:32

22  compelling in terms of sales of books, based    12:29:35

23  on your experience, that we've got              12:29:37

24  confidential sources inside the government       12:29:40

25  that no one else has; correct?                   12:29:42

| | | |
|---|---|---|
| 1 | | |
| 2 | A.    No, sir.  What would be the | 12:29:44 |
| 3 | most compelling is the actual news, whether | 12:29:45 |
| 4 | it is from confidential or on the record | 12:29:47 |
| 5 | sources. That's what gets the attention. | 12:29:49 |
| 6 | The coverage of this book in | 12:29:52 |
| 7 | print or in interviews was not all about the | 12:29:55 |
| 8 | use of confidential sources. It was about | 12:29:59 |
| 9 | the news in the book. | 12:30:00 |
| 10 | Q.    I take it you did have concerns | 12:30:01 |
| 11 | about what sources Mr. Risen had in writing | 12:30:05 |
| 12 | Pay Any Price; correct? | 12:30:11 |
| 13 | MS. HANDMAN:  Objection. Exclude | 12:30:12 |
| 14 | any conversations with counsel. | 12:30:15 |
| 15 | Q.    Please respond. | 12:30:19 |
| 16 | A.    I would respond in this general | 12:30:20 |
| 17 | way, we put our trust in our authors.  They | 12:30:22 |
| 18 | warrant to us what they are presenting to us | 12:30:29 |
| 19 | is true. And we do not then, I might have | 12:30:31 |
| 20 | discussions with him when I can't tell what | 12:30:37 |
| 21 | a source is to ask him to say make a little | 12:30:40 |
| 22 | clearer what something is based on.  But I | 12:30:43 |
| 23 | do not ask him anything about who his | 12:30:44 |
| 24 | sources are. I don't want to know. | 12:30:46 |
| 25 | Q.    You don't want to know because | 12:30:52 |

1

2  it could subject you, Mr. Nichols, to                    12:30:53

3  personal liability; correct?                             12:30:55

4        MS. HANDMAN:  Objection.                          12:30:56

5    Q.    That's your understanding?                       12:30:59

6        MS. HANDMAN:  Objection.                           12:31:00

7    A.    Again, our legal review --                       12:31:05

8    Q.    I am asking about you, Mr.                        12:31:07

9  Nichols.                                                 12:31:10

10        MS. HANDMAN:   Exclude any                        12:31:11

11     conversations with counsel.                          12:31:12

12    A.    Yeah, I mean Jim does not                        12:31:16

13  initiate those conversations with me. And I             12:31:18

14  don't ask him.                                          12:31:20

15    Q.    That is kind of like the three                   12:31:23

16  monkeys, hear no evil, see no evil, do no               12:31:25

17  evil that is the approach at Harcourt;                  12:31:29

18  correct?                                                12:31:31

19        MS. HANDMAN:  Objection.                          12:31:31

20    A.    No, sir.  We take our                            12:31:32

21  reputation very seriously and we have to                12:31:33

22  make a decision who to publish and who do we            12:31:35

23  trust.  And when Jim Risen who is one of the            12:31:38

24  best investigative reporters in the country,            12:31:41

25  reports a story and has multiple sources and            12:31:44

1

2    makes a decision on what that story should              12:31:46

3    be, we tend to trust him. But we do of                 12:31:48

4    course do a legal review.                              12:31:50

5        Q.    The reason I use that analogy                12:31:52

6    is because you, the literary agent and Risen           12:31:53

7    didn't want to address this issue?                     12:31:57

8            MS. HANDMAN:  Objection.                       12:31:59

9        Q.    Correct?                                     12:32:00

10           MS. HANDMAN:   Mischaracterizing               12:32:01

11       the testimony.                                     12:32:02

12       A.    What issue is that?                          12:32:03

13       Q.    Whether or not he is publishing              12:32:05

14    classified information that can subject               12:32:07

15    everyone to going to prison?                          12:32:09

16           MS. HANDMAN:  Objection. Excluding             12:32:11

17       any conversations with counsel.                    12:32:12

18       A.    This Note on Sources has                     12:32:14

19    nothing to do with classified information.            12:32:15

20    It is just about whether the sources are on           12:32:17

21    or off the record.                                    12:32:19

22       Q.    Would Harcourt ever knowingly                12:32:23

23    publish classified information from the               12:32:25

24    government?                                            12:32:27

25           MS. HANDMAN:  Objection, beyond                12:32:27

1

2      the scope of this 30(b)(6) deposition.                    12:32:28

3           MR. KLAYMAN:   Not beyond the                        12:32:32

4      scope. No.  It deals directly with it.                    12:32:33

5      And I just gave you the foundation for                    12:32:34

6      that.                                                     12:32:36

7           MS. HANDMAN:   No, you didn't.                       12:32:36

8  BY MR. KLAYMAN:                                               12:32:38

9      Q.    You can respond, Mr. Nichols. I                     12:32:38

10     am not asking about what your lawyer said to              12:32:40

11     you or anything else. I want to know based                12:32:41

12     on your own personal knowledge would                      12:32:44

13     Harcourt have ever published information                  12:32:45

14     that was classified in nature from the U.S.               12:32:47

15     government, would it ever knowingly do that?              12:32:51

16          MS. HANDMAN:  Objection. The                         12:32:53

17          question is with regard to this chapter.             12:32:54

18     A.    I can't respond to a                                12:32:57

19     hypothetical, about a different publishing                12:32:59

20     decision. I can tell you in this case we had              12:33:02

21     no knowledge or understanding that he was                 12:33:04

22     relying on anything classified.                           12:33:05

23     Q.    Because you never asked;                            12:33:09

24     correct?                                                  12:33:11

25          MS. HANDMAN:  Objection, exclude                     12:33:11

1

2      conversations with counsel.                                12:33:14

3      A.    I can't speak about the legal                        12:33:15

4  review.                                                        12:33:16

5      Q.    You, Mr. Nichols, never asked?                       12:33:17

6      A.    You have changed the topic from                      12:33:21

7  confidential sources to classified                            12:33:23

8  information. I did not ask him for the names                   12:33:24

9  of sources. I was pretty certain from what I                  12:33:29

10  was reading that he was not using classified                 12:33:34

11  information.  I don't recall if I asked him                   12:33:40

12  that outright but that is what the legal                     12:33:42

13  review is for in part.                                       12:33:44

14         MS. HANDMAN:   Again just to be                       12:33:47

15      clear, we are talking about this                         12:33:48

16      chapter.                                                 12:33:50

17      Q.    My question was you, Mr.                           12:33:54

18  Nichols, ever ask Mr. Risen if classified                   12:33:56

19  information was contained in Pay Any Price                   12:34:02

20  with regard to Dennis Montgomery or any                     12:34:05

21  other topic?                                                 12:34:10

22         MS. HANDMAN:   I will allow him to                    12:34:11

23      answer with regard to Dennis Montgomery.                 12:34:12

24         MR. KLAYMAN: Certify it for the                       12:34:14

25      record.                                                  12:34:16

1

2      A.    It was not discussed outside of          12:34:16

3   the legal review.                                  12:34:18

4      Q.    Because it was your view what             12:34:23

5   you don't know you can't be held accountable       12:34:24

6   for?                                               12:34:27

7            MS. HANDMAN:  Objection.                  12:34:27

8      Q.    You.                                      12:34:27

9      A.    It was a process we go through            12:34:33

10   in the legal review, that is the right place      12:34:34

11   to do it.                                         12:34:36

12     Q.    The bottom line is this, you              12:34:40

13   had no reason to believe that in fact Mr.         12:34:41

14   Risen did have access to either confidential      12:34:43

15   sources or classified information from the        12:34:46

16   government because he never identified any        12:34:48

17   such information to you before the contract       12:34:54

18   was signed?                                       12:34:57

19           MS. HANDMAN:   I am going to              12:34:58

20       instruct him to answer with regard to         12:34:59

21       chapter 2 and anything related to Dennis      12:35:01

22       Montgomery.                                   12:35:03

23     A.    But, again, you've conflated             12:35:04

24   confidential sources and classified               12:35:06

25   information. I know very well he had              12:35:07

1

2  confidential sources, he made that clear in            12:35:14

3  his chapter.                                           12:35:15

4      Q.    But you also testified you                   12:35:15

5  don't know what those confidential sources             12:35:16

6  were; correct?                                         12:35:17

7      A.    The names of those sources; is               12:35:18

8  that correct.                                          12:35:20

9      Q.    Right. So you don't know with                12:35:20

10  one way or the other, correct, who his                12:35:23

11  confidential sources were?                            12:35:27

12          MS. HANDMAN:   Objection.                     12:35:27

13      A.    Who they were, that is a                    12:35:30

14  separate question from confidential                   12:35:31

15  information.                                           12:35:32

16      Q.    You never asked; correct?                   12:35:32

17      A.    Who the sources were, correct.              12:35:33

18      Q.    Right. Don't you have a duty to             12:35:34

19  find out what Mr. Risen, don't you have a             12:35:38

20  duty as a publisher to determine whether Mr.          12:35:41

21  Risen's claims in the early pages of this             12:35:44

22  book that he had confidential sources were            12:35:46

23  correct?                                               12:35:50

24      A.    Are you asking if we had a duty             12:35:54

25  to confirm he had confidential sources?               12:35:56

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 60

1

2      Q.    Before the claim is made in the          12:36:05

3   early stages of the book don't you have a        12:36:06

4   duty to determine whether in fact that's         12:36:10

5   true?                                            12:36:11

6      A.    Mr. Risen is one of the                 12:36:13

7   country's best investigative reporters, he       12:36:15

8   published many, many stories and one             12:36:18

9   previous book that I worked on that relied       12:36:19

10   on confidential sources. When he tells me he    12:36:22

11   has confidential sources, I believe him.        12:36:25

12      Q.    Let's say he doesn't have              12:36:30

13   confidential sources. That would be a false     12:36:31

14   statement made to the people who are going      12:36:33

15   to buy this book; correct?                      12:36:35

16          MS. HANDMAN:  Objection.                 12:36:38

17      A.    We rely on our authors'                12:36:40

18   warranty, we make judgments about whether       12:36:43

19   the authors are overall trustworthy. Of         12:36:45

20   course if it turns out that one of our books    12:36:47

21   was presented to us under fraudulent            12:36:51

22   circumstances, we'd take action. But we make    12:36:53

23   those reliances every day.                      12:36:57

24      Q.    Well you're aware that Mr.             12:37:00

25   Montgomery has made that allegation against     12:37:03

1

2  Harcourt that there were matters in this                    12:37:05

3  book Pay Any Price that relate to him that                  12:37:06

4  are false and fraudulent; you're aware of                   12:37:11

5  that, are you not?                                          12:37:13

6       A.    Well, of course, because it was                 12:37:14

7  part of the book. Jim interviewed Mr.                       12:37:15

8  Montgomery and included his side of the                     12:37:17

9  story in this chapter.                                      12:37:19

10      Q.    You just said you would                         12:37:23

11  undertake a review if in fact those claims                 12:37:25

12  were made. What review was undertaken --                   12:37:27

13          MS. HANDMAN:  Objection                           12:37:29

14      mischaracterization of testimony.                     12:37:31

15      Q.    -- of Mr. Montgomery?                           12:37:32

16      A.    I can't speak to the legal                      12:37:36

17  review. Obviously it is privileged. When Jim               12:37:37

18  Risen has a whole number of sources on one                 12:37:40

19  side and one person on the other he makes                  12:37:41

20  the call as to which story he thinks is                    12:37:44

21  right.                                                     12:37:46

22      Q.    How do you know it is                           12:37:50

23  privileged what the legal review is, how do                12:37:51

24  you know that?                                             12:37:54

25          MS. HANDMAN:  Objection. He is not                12:37:54

30(b)(6)

BRUCE NICHOLS - 10/14/2015                    Page 62

| | | |
|---|---|---|
| 1 | | |
| 2 | here as to give testimony as a lawyer. | 12:37:56 |
| 3 | Conversations with legal counsel, his | 12:38:02 |
| 4 | lawyer is instructing him not to answer | 12:38:04 |
| 5 | with regard to conversations with | 12:38:06 |
| 6 | counsel. | 12:38:08 |
| 7 | Q.    Right. I am asking him what do | 12:38:10 |
| 8 | you know as a publisher who has been in the | 12:38:13 |
| 9 | industry a very long time that with regard | 12:38:16 |
| 10 | to any such legal review being privileged, | 12:38:20 |
| 11 | where do you come up with that conclusion, | 12:38:25 |
| 12 | where does it come from? | 12:38:28 |
| 13 | ** DIRECTION NOT TO ANSWER ** | 12:38:29 |
| 14 | MS. HANDMAN:   Again, objection. | 12:38:29 |
| 15 | It involves communications with counsel. | 12:38:30 |
| 16 | I am going to instruct him not to | 12:38:33 |
| 17 | answer.  I can't believe you are | 12:38:37 |
| 18 | actually challenging that issue. | 12:38:38 |
| 19 | MR. KLAYMAN:   You can believe a | 12:38:39 |
| 20 | lot, Ms. Handman, because it is not | 12:38:40 |
| 21 | privileged to begin with.  That is the | 12:38:43 |
| 22 | subject of this book. In fact under | 12:38:45 |
| 23 | Florida law -- I will get to that, it's | 12:38:47 |
| 24 | required a review be undertaken. | 12:38:49 |
| 25 | You're presenting him as someone | 12:38:52 |

BRUCE NICHOLS - 10/14/2015                    Page 63

| | |
|---|---|
| 1 | |
| 2 | who's speaking for the company. If I | 12:38:53 |
| 3 | have to subpoena the lawyers inside the | 12:38:55 |
| 4 | company, which I've already done, this | 12:38:56 |
| 5 | gives me an opening to go back and get | 12:38:58 |
| 6 | William Bayers to testify, and others. | 12:39:00 |
| 7 | So if you want to block it now, | 12:39:03 |
| 8 | you are weakening your own position when | 12:39:05 |
| 9 | I come back and ask for that testimony | 12:39:07 |
| 10 | because this is a core issue under | 12:39:13 |
| 11 | Florida law, particularly with regard to | 12:39:15 |
| 12 | punitive damages and other things in | 12:39:17 |
| 13 | this case. | 12:39:19 |
| 14 | So are you instructing him not to | 12:39:21 |
| 15 | answer under those circumstances? | 12:39:23 |
| 16 | MS. HANDMAN:  Let's hear what the | 12:39:24 |
| 17 | question is again. | 12:39:25 |
| 18 | BY MR. KLAYMAN: | 12:39:29 |
| 19 | Q.    How is it you come to the | 12:39:29 |
| 20 | conclusion that a review as to false, | 12:39:31 |
| 21 | potentially false information in a book from | 12:39:35 |
| 22 | an author is privileged -- | 12:39:37 |
| 23 | MS. HANDMAN: It involves | 12:39:46 |
| 24 | communication -- | 12:39:43 |
| 25 | Q.    -- and not subject to any | 12:39:44 |

| | | |
|---|---|---|
| 1 | | |
| 2 | discovery? | 12:39:46 |
| 3 | ** DIRECTION NOT TO ANSWER ** | 12:39:46 |
| 4 | MS. HANDMAN:   It involves | 12:39:46 |
| 5 | communications with counsel, a legal | 12:39:47 |
| 6 | opinion and I am instructing him not to | 12:39:49 |
| 7 | answer. | 12:39:52 |
| 8 | BY MR. KLAYMAN: | 12:39:53 |
| 9 | Q.    Did you base that opinion it is | 12:39:53 |
| 10 | all privileged based upon communications | 12:39:55 |
| 11 | with counsel? | 12:39:57 |
| 12 | A.    I was told by counsel not to | 12:40:02 |
| 13 | talk about the legal review, that it was | 12:40:03 |
| 14 | confidential. | 12:40:05 |
| 15 | Q.    Are you saying the only review | 12:40:10 |
| 16 | that occurred here was done by the lawyers? | 12:40:11 |
| 17 | A.    There is an editorial review | 12:40:15 |
| 18 | that I do. And there is additional copy | 12:40:17 |
| 19 | editing etc., there is normal editorial | 12:40:22 |
| 20 | process. The legal review is something we do | 12:40:26 |
| 21 | not do with every book, we do with any book | 12:40:29 |
| 22 | for which there might be legal issues. | 12:40:31 |
| 23 | Q.    In the course of reviewing a | 12:40:38 |
| 24 | book from the editorial standpoint, it is | 12:40:40 |
| 25 | the ordinary course in the industry to do | 12:40:44 |

1

2  fact checking; correct?                                 12:40:46

3      A.    No, sir. Book publishers as a                 12:40:47

4  rule do not fact check.                                 12:40:49

5      Q.    Lawyers don't do fact checking;               12:40:53

6  do they?                                                12:40:55

7          MS. HANDMAN:  Objection.  Again,                12:40:56

8      involves what lawyers, the legal                    12:40:58

9      process, the legal review.                          12:41:00

10     Q.    I am not talking about this                   12:41:01

11  book, I am talking about a general rule                12:41:02

12  ordinary course in the industry lawyers do             12:41:05

13  not do fact checking with regard to books              12:41:07

14  being published; correct?                             12:41:09

15         MS. HANDMAN:  Overbroad,                        12:41:10

16     hypothetical.                                       12:41:11

17     Q.    You can respond.                              12:41:12

18     A.    As a general rule book                        12:41:13

19  publishers in any part of their process do             12:41:15

20  not fact check unless there is any                     12:41:17

21  particulars cause to doubt their authors. We           12:41:21

22  rely on our authors who warrant to us the              12:41:23

23  information they are presenting is true.               12:41:27

24     Q.    Any time an author presents                   12:41:33

25  something to Harcourt there is no fact                 12:41:36

1

2  checking  and you'll publish it and not seek                    12:41:38

3  to find out whether it is accurate or not?                      12:41:41

4         MS. HANDMAN:  Objection.                                 12:41:44

5    A.    If we have any doubts we will                           12:41:44

6  explore, but in the case like this one we                       12:41:45

7  make initial judgment of which author we                        12:41:50

8  think we can trust on complicated                               12:41:53

9  investigative journalism.  Jim Risen is the                     12:41:55

10  most trustworthy author I've ever worked                        12:41:59

11  with. And if his decision based on his                          12:42:00

12  reporting is that he has a story right, we                      12:42:03

13  do a legal review, but we do not go back and                    12:42:06

14  check his source. That's not our job.                           12:42:10

15    Q.    What was the other book that                            12:42:13

16  you worked on with Mr. Risen?                                   12:42:14

17    A.    State of War.                                           12:42:16

18    Q.    Are there any others other than                         12:42:21

19  that?                                                           12:42:23

20    A.    With Jim, no.                                           12:42:23

21    Q.    With State of War of course he                          12:42:24

22  got into trouble over references to Jeffrey                     12:42:27

23  Sterling; correct?                                              12:42:29

24         MS. HANDMAN:  Objection. First of                        12:42:29

25    all, mischaracterization of testimony.                        12:42:31

1

2      No foundation. And to the extent that it          12:42:34

3      involves reporter's privilege and                 12:42:37

4      revelation of sources, I instruct the             12:42:39

5      witness not to answer. He can answer              12:42:41

6      other than that.                                   12:42:43

7         Q.    Answer.                                   12:42:46

8         A.    Jeffrey Sterling's name was not          12:42:46

9   in that book.                                         12:42:48

10        Q.    But information gleaned from             12:42:49

11   Jeffrey Sterling was allegedly in that book?        12:42:51

12            MS. HANDMAN:  Objection.                    12:42:53

13        A.    Not allegedly. There was a leak          12:42:55

14   investigation of a story in that book. And          12:42:59

15   the government focused on Jeffrey Sterling,          12:43:01

16   and eventually the government found Jeffrey          12:43:03

17   Sterling guilty. But not because of any             12:43:05

18   testimony of Jim's or any revelation of any         12:43:09

19   sourcing by Jim.                                     12:43:13

20        Q.    You were aware at the time you           12:43:17

21   reviewed the manuscript of Mr. Risen and            12:43:19

22   entered into a contract with him that               12:43:21

23   Jeffrey Sterling had been found guilty --           12:43:28

24        A.    No that --                                12:43:31

25        Q.    Let me finish -- divulging               12:43:32

1

2   classified information to Mr. Risen?                    12:43:35

3       A.   He was not found guilty until                 12:43:36

4   much later.                                            12:43:37

5       Q.   You knew that he was under                    12:43:38

6   indictment for revealing classified                    12:43:40

7   information to Mr. Risen, Mr. Sterling was              12:43:43

8   under indictment for revealing classified              12:43:45

9   information alleged by Mr. Risen?                       12:43:50

10      A.   I knew that was a question the                 12:43:51

11  government was pursuing, yes.                           12:43:53

12      Q.   You knew that before you signed               12:43:54

13  a contract, you meaning Harcourt, with Mr.             12:43:56

14  Risen over Pay Any Price?                               12:43:59

15      A.   Correct.                                       12:44:00

16      Q.   You're telling me that you had                12:44:05

17  no concerns about what was contained in the            12:44:06

18  book with regard to confidential sources or            12:44:08

19  classified information coming from Mr.                  12:44:11

20  Risen?                                                  12:44:13

21      A.   Well in fact we were confident                12:44:15

22  coming out of the legal review that we were            12:44:17

23  in a strong position to publish this book.             12:44:20

24  In fact there has been no many discussion of           12:44:22

25  any leak investigation that I'm aware of of            12:44:24

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 69

1

2  anything in this book. So there has been no          12:44:26

3  parallel to State of War.                             12:44:28

4      Q.    Not yet; correct?                           12:44:29

5      A.    Of course, not yet. It's been a             12:44:30

6  year.                                                 12:44:32

7      Q.    To the best of your knowledge               12:44:37

8  has anyone contacted you from the Justice             12:44:38

9  Department over this book?                            12:44:40

10     A.    No, sir.                                     12:44:41

11     Q.    You mean Harcourt or you?                    12:44:44

12     A.    Neither one.                                 12:44:46

13         MS. HANDMAN:   He is answering on              12:44:46

14      behalf of the company in this                     12:44:47

15      deposition.                                       12:44:54

16     Q.    Now it is a fact based on your               12:44:55

17  experience in the industry that a book               12:44:56

18  published from confidential sources would be          12:44:58

19  much more interesting to a reader than a              12:45:02

20  book published just from information already          12:45:05

21  out in the public domain?                             12:45:07

22         MS. HANDMAN:   Asked and answered.            12:45:09

23      He can answer again.                              12:45:10

24     A.    Well you conflated two                       12:45:11

25  questions. Confidential versus on the                 12:45:13

1

2  record, new information versus old. It's the                     12:45:15

3  information, it is the newness of                                12:45:17

4  information that matters. The sourcing is a                      12:45:19

5  secondary issue.                                                 12:45:23

6      Q.    So the addition of this                               12:45:26

7  confidential source, the little statement at                     12:45:28

8  the front of the book, you concluded based                       12:45:30

9  on your experience that this would help sell                     12:45:36

10  more books; correct?                                            12:45:38

11      A.    You've asked that before. I                          12:45:39

12  repeat my answer. What we believed would                        12:45:40

13  sell this book was the news in the book.                         12:45:44

14      Q.    It would be new information in                       12:45:48

15  the book; correct?                                               12:45:50

16      A.    Correct.                                             12:45:50

17      Q.    Not republished rehashed stuff                      12:45:52

18  that was already out there in the public                         12:45:54

19  domain?                                                          12:46:02

20      A.    Correct.  There were stories                        12:46:02

21  that had been partially reported and there                       12:46:04

22  were stories that had not been reported at                       12:46:05

23  all. It was combination of Jim's additional                      12:46:07

24  reporting and how the stories fit together                       12:46:10

25  that made this book what we believed we                          12:46:12

1

2  should publish.                                    12:46:14

3      Q.    With regard to Mr. Montgomery         12:46:15

4  that is true what you just testified to,          12:46:16

5  this is new information he was publishing?         12:46:18

6      A.    Well Mr. Montgomery's side of         12:46:20

7  the story Jim was very proud to have gotten        12:46:21

8  him to talk to him.                                12:46:24

9      Q.    So the answer is yes?               12:46:26

10     A.    Yes.                                12:46:28

11     Q.    Turn to the chapter Exhibit 21     12:46:30

12  or Exhibit 3 of Risen's deposition, page 32.      12:46:37

13     A.    Yes, sir.                           12:46:44

14     Q.    See the little asterisk there?     12:46:47

15     A.    The first one?                      12:46:48

16     Q.    I will read below that             12:46:49

17  asterisk. Page 32. "Whatever else he was,        12:46:52

18  Dennis Montgomery was a man who understood        12:46:56

19  how best to profit from American's decades        12:46:57

20  of fear. He saw the Post 9/11 age for what        12:47:00

21  it was, a time to make money.                     12:47:03

22          "Montgomery was the maestro            12:47:09

23  behind what many current and former U.S.          12:47:11

24  officials and others familiar with the case       12:47:14

25  now believe was one of the most elaborate         12:47:16

1

2   and dangerous hoaxes in American history, a          12:47:19

3   ruse that was so successful it nearly                12:47:23

4   convinced the Bush administration to order           12:47:25

5   fighter jets to start shooting down                  12:47:28

6   commercial airliners filled with passengers          12:47:31

7   over the Atlantic."                                  12:47:34

8           What I just read to you was in              12:47:35

9   the original manuscript you reviewed before          12:47:37

10   the contract was signed with Mr. Risen;             12:47:39

11   correct?                                            12:47:41

12       A.   I don't remember if every word            12:47:41

13   was.  The gist certainly was, yes.                  12:47:42

14       Q.   Now that is a very strong                 12:47:46

15   statement I just read to you, is it not, to         12:47:47

16   put it mildly?                                      12:47:49

17       A.   Which one?                                12:47:50

18       Q.   The ones that states Mr.                  12:47:52

19   Montgomery was, that the "U.S. government           12:47:54

20   officials and others familiar with the case        12:47:59

21   now believe Mr. Montgomery perpetrated the         12:48:01

22   most elaborate and dangerous hoaxes in             12:48:05

23   American history."                                 12:48:07

24       A.   Well it says "one of the most            12:48:09

25   elaborate and dangerous hoaxes" yes.               12:48:11

1

2      Q.    Very strong statement; is it                12:48:14

3   not?                                                 12:48:16

4      A.    It is a relative statement.                 12:48:16

5   Depends upon how you rank all the other              12:48:17

6   hoaxes in American history.                          12:48:21

7      Q.    What he did almost caused the               12:48:22

8   Bush administration to shoot down civilian           12:48:24

9   airliners; correct?                                  12:48:27

10     A.    That is what Mr. Risen's                     12:48:28

11  reporting.                                           12:48:30

12     Q.    And that the Bush                            12:48:32

13  administration or at least the President had         12:48:33

14  given an order to shoot them down?                   12:48:35

15     A.    No, sir, it does not say that.              12:48:36

16     Q.    Let's stay with what it says, I             12:48:41

17  ask you given that strong statement and the          12:48:43

18  fact references are being made, many current         12:48:45

19  and former U.S. officials and others                 12:48:48

20  familiar with the case, wouldn't in the              12:48:50

21  ordinary course, those statements have               12:48:52

22  caused you, Mr. Nichols, or Harcourt to ask          12:48:56

23  the question who are those officials?                12:49:00

24     A.    No, sir. We do not ask the                  12:49:03

25  identity of sources. We may ask about the            12:49:06

1

2   nature and number. But we do not ask the          12:49:09

3   identity.                                          12:49:13

4       Q.    Didn't want to know?                     12:49:14

5            MS. HANDMAN:  Objection.                  12:49:15

6       Q.    You don't want to know?                  12:49:19

7       A.    Again, as I said, we put our             12:49:23

8   confidence in Mr. Risen's reporting. When he       12:49:24

9   says he has a number of sources that are           12:49:27

10  highly placed, we believe him.                     12:49:28

11      Q.    Based on your experience when a          12:49:31

12  publisher accuses an individual like Mr.           12:49:35

13  Montgomery of participating in one of the          12:49:38

14  most elaborate hoaxes in American history,         12:49:40

15  that's not true that can cause severe damage       12:49:44

16  to that person; correct?  Based on your            12:49:50

17  experience.                                        12:49:51

18          MS. HANDMAN:  Objection, the               12:49:51

19     question is confusing.                          12:49:53

20      A.    I have actually not yet ever             12:49:55

21  published a book where a libel claim was           12:49:56

22  successfully brought. So I don't have any          12:49:59

23  experience to answer your question.                12:50:01

24      Q.    What other cases have you                12:50:05

25  participated in where libel actions were           12:50:06

1

2   brought?                                                12:50:09

3      A.    In my 26 years as an editor and                12:50:10

4   publisher this is the first.                            12:50:12

5      Q.    Then you just lied; correct?                   12:50:13

6      A.    I'm sorry?                                      12:50:15

7      Q.    Then you just lied. You lied                   12:50:16

8   under oath, didn't you, just now?                       12:50:21

9          MS. HANDMAN:  Objection.                         12:50:22

10     A.    About a libel case? What are                   12:50:22

11  you talking about?                                      12:50:25

12     Q.    Based on your experience you                   12:50:26

13  never had seen this happen before because of            12:50:27

14  prior litigation. That's not correct; is it?            12:50:29

15     A.    Sir, you asked about libel                     12:50:31

16  cases in my experience. I testified this is             12:50:33

17  the first book I've edited or published in              12:50:36

18  which a libel claim was brought.                        12:50:39

19     Q.    I am asking you based upon your                12:50:41

20  understanding of what was being said here a             12:50:46

21  statement like this can be severely damaging            12:50:49

22  to someone like Mr. Montgomery.                         12:50:52

23     A.    I am telling you I don't have                  12:50:54

24  experience of a parallel situation to base              12:50:55

25  an answer on.                                           12:50:58

1

2    Q.    So you don't have your own                    12:51:02

3  independent judgment what is being said               12:51:03

4  about an individual that could be harmful to          12:51:05

5  them. That is not a fact you have taken into          12:51:07

6  consideration?                                         12:51:09

7    A.    When an author makes a strong                 12:51:09

8  statement about someone, in this case that            12:51:12

9  what he did was fraudulent, or words to that          12:51:14

10  effect, we take a hard look at those claims.         12:51:18

11  But when an author has a lot of sources to           12:51:21

12  back it up, then we often just make the              12:51:23

13  judgment we believe the author.                      12:51:27

14    Q.    So never having asked for the                12:51:31

15  sources you were flying in effect blind              12:51:32

16  here; right?                                          12:51:35

17        MS. HANDMAN:  Objection.                        12:51:36

18    A.    Some of the sources are on the               12:51:36

19  record, including John Brennan in this               12:51:38

20  chapter and others. And others are off the          12:51:40

21  record.                                               12:51:44

22    Q.    Where in this chapter does it                12:51:44

23  say Mr. Montgomery committed one of the most         12:51:45

24  elaborate hoaxes in American history, such           12:51:48

25  that it nearly convinced the Bush                    12:51:50

30(b)(6)
BRUCE NICHOLS - 10/14/2015          Page 77

1

2  administration to order fighter jets to          12:51:56

3  start shooting down commercial airliners?         12:51:58

4          MS. HANDMAN:  Objection as to             12:52:00

5     form.                                          12:52:01

6     Q.    Take your time, go through the           12:52:02

7  book, show me.  Otherwise you just testified      12:52:03

8  falsely again. Show me.                           12:52:07

9     A.    The entire --                            12:52:11

10          MS. HANDMAN:  Objection.                 12:52:11

11    A.    The entire chapter tells the             12:52:12

12  story of Mr. Montgomery and his firm making      12:52:14

13  contracts with the government, including a       12:52:20

14  contract for software that purported to          12:52:22

15  decrypted terrorist messages in Al Jazeera       12:52:26

16  broadcasts, that caused the government to        12:52:31

17  ground flights.  And, even according to          12:52:33

18  Jim's reporting, to discuss whether the          12:52:35

19  government had authority to shoot down           12:52:37

20  flights.  That is told over many pages in        12:52:39

21  this chapter.                                    12:52:41

22    Q.    You just made a statement Mr.            12:52:42

23  Brennan is a source for that. Show me where      12:52:43

24  it says he was a source for that.                12:52:45

25    A.    Mr. Brennan's public testimony           12:52:46

30(b)(6)
BRUCE NICHOLS - 10/14/2015                        Page 78

1

2   when he was up for nomination as CIA                   12:52:48

3   director is cited by Jim, which I will find            12:52:51

4   in a minute.  Yes, page 47.  The paragraph             12:53:00

5   that begins "In 2013." The second full                 12:53:12

6   paragraph.                                             12:53:15

7           "While the Senate was                          12:53:19

8   considering whether to confirm --" I'm                 12:53:20

9   sorry, "In 2013, while the Senate was                  12:53:22

10   considering whether to confirm Brennan to            12:53:24

11   run the CIA, Senator Saxby Chambliss, a              12:53:26

12   Georgia Republic who was Vice Chairman of            12:53:31

13   the Senate Intelligence Committee submitted          12:53:33

14   a written question to Brennan about his role         12:53:35

15   in the intelligence community's dealing with         12:53:38

16   Montgomery.                                           12:53:41

17           "In response, Brennan denied                  12:53:43

18   that he had been an advocate for Montgomery          12:53:44

19   and his technology and insisted that the             12:53:47

20   Terrorism Threat Integration Center was              12:53:51

21   merely a recipient of Montgomery's                    12:53:53

22   information and data which had been passed            12:53:56

23   on by the CIA. He said that the Center                12:53:58

24   included Montgomery's concluded --" sorry,           12:54:01

25   "He said the center included Montgomery's            12:54:04

1

2  data 'in analytic products, as appropriate.'                    12:54:06

3  He claimed not to know what had become of                       12:54:11

4  the CIA's program with eTREPPID, 'other than                    12:54:14

5  it was determined not to be a source of                         12:54:17

6  accurate information.'"                                          12:54:19

7      Q.    That's it?                                            12:54:24

8      A.    That is Brennan's testimony,                          12:54:25

9  yes.                                                            12:54:28

10     Q.    Consequently Brennan never                           12:54:28

11  testified, even if that recitation of his                      12:54:29

12  testimony is true, Mr. Montgomery had                          12:54:31

13  participated in one of the most dangerous                      12:54:41

14  hoaxes in American history, a ruse that was                    12:54:44

15  so successful it nearly convinced the Bush                     12:54:45

16  administration to start shooting down                          12:54:49

17  commercial airliners full with passengers                      12:54:50

18  over the Atlantic, Mr. Brennan, even based                     12:54:51

19  on Mr. Risen's recitation, never testified                     12:54:54

20  to that effect?                                                12:54:56

21     A.    I did not say Mr. Brennan was a                       12:54:58

22  source of conversations about possibly                         12:55:00

23  shooting down jets, if that is the piece of                    12:55:04

24  the story you're asking about. That is                         12:55:07

25  referred to earlier where Jim Risen has a                      12:55:07

| | | |
|---|---|---|
| 1 | | |
| 2 | member at one of those meetings and seeing | 12:55:12 |
| 3 | that discussion was brought up. | 12:55:14 |
| 4 | Q. Mr. Brennan never testified | 12:55:19 |
| 5 | based on what Mr. Risen had written that Mr. | 12:55:20 |
| 6 | Montgomery had perpetrated one of the most | 12:55:23 |
| 7 | elaborate and dangerous hoaxes in American | 12:55:25 |
| 8 | history; correct? | 12:55:28 |
| 9 | MS. HANDMAN: Objection. | 12:55:29 |
| 10 | A. Mr. Brennan was not asked to | 12:55:32 |
| 11 | characterize it. He was asked if the | 12:55:34 |
| 12 | intelligence had any value. And his | 12:55:36 |
| 13 | testimony here was no. | 12:55:38 |
| 14 | Q. From what confidential sources, | 12:55:40 |
| 15 | if any, based on your knowledge did Mr. | 12:55:41 |
| 16 | Risen rely on to make that kind of a | 12:55:46 |
| 17 | statement that Mr. Montgomery had | 12:55:48 |
| 18 | perpetrated one of the elaborate and | 12:55:49 |
| 19 | dangerous hoaxes in American history? | 12:55:51 |
| 20 | A. He makes clear over the course | 12:55:56 |
| 21 | of several pages he has many sources, | 12:55:58 |
| 22 | including some from eTREPPID, the company, | 12:56:00 |
| 23 | and including others within the government | 12:56:05 |
| 24 | that the software did not work, and that yet | 12:56:11 |
| 25 | flights were grounded. And there was a | 12:56:13 |

1

2  discussion about should the President have          12:56:14

3  authority to shoot down flights.                    12:56:16

4      Q.    So the bottom line is neither             12:56:18

5  you nor Harcourt know where that statement          12:56:19

6  comes from?                                          12:56:21

7          MS. HANDMAN:  Objection.                     12:56:23

8      A.    That statement is Jim's                    12:56:24

9  statement characterizing the entire account.        12:56:25

10  It is not a quote.                                  12:56:29

11      Q.    What in the entire account can            12:56:33

12  cause Mr. Risen, based on your experience,          12:56:35

13  to make that statement, that super strong           12:56:37

14  statement?                                          12:56:41

15      A.    It is his judgment.                       12:56:41

16      Q.    Where is it? Show it to me in             12:56:42

17  that chapter. Show me where you glean that.         12:56:45

18  You are the publisher, you should know.             12:56:47

19      A.    Sir, it is not a quote from a             12:56:49

20  source. It is Jim Risen's depiction of the          12:56:51

21  story as one of the most elaborate and              12:56:54

22  dangerous frauds. The whole story, if               12:56:59

23  another reader wants to read it and say it          12:57:02

24  is not the most elaborate or one of the             12:57:03

25  most, this is a judgment call. That is his          12:57:05

| | | |
|---|---|---|
| 1 | | |
| 2 | judgment and we standby it. | 12:57:07 |
| 3 | Q.   What you don't know doesn't | 12:57:10 |
| 4 | hurt you? | 12:57:12 |
| 5 | MS. HANDMAN:  Objection. | 12:57:12 |
| 6 | A.   No, sir, this is not a question | 12:57:12 |
| 7 | of sourcing.  This is Jim Risen's | 12:57:14 |
| 8 | characterization. | 12:57:15 |
| 9 | Q.   You don't care who you destroy | 12:57:16 |
| 10 | in your publications, do you, as long as you | 12:57:19 |
| 11 | sell books? | 12:57:20 |
| 12 | MS. HANDMAN:  Objection. | 12:57:21 |
| 13 | A.   Sir, our reputation is the | 12:57:21 |
| 14 | single most important thing we have. We | 12:57:23 |
| 15 | would not publish a book knowingly to | 12:57:25 |
| 16 | destroy someone unless -- if we thought | 12:57:27 |
| 17 | there was anything false about that book. | 12:57:29 |
| 18 | Q.   So if you are making a | 12:57:31 |
| 19 | statement -- it is your experience if you | 12:57:33 |
| 20 | make a strong statement like that in a book | 12:57:36 |
| 21 | that can severely harm someone, it is not | 12:57:38 |
| 22 | true; right? | 12:57:40 |
| 23 | MS. HANDMAN:  Objection. | 12:57:42 |
| 24 | A.   What's not true, sir? | 12:57:42 |
| 25 | Q.   That Mr. Montgomery had | 12:57:45 |

30(b)(6)

BRUCE NICHOLS - 10/14/2015                    Page 83

1

2   perpetrated one of the most elaborate and                    12:57:46

3   dangerous hoaxes in American history.                        12:57:48

4         MS. HANDMAN:   Could you repeat                        12:57:52

5     the question.                                              12:57:53

6     Q.    It is your experience as a                           12:57:54

7   publisher that to make such a statement and                  12:57:56

8   publish it to the world that can be                          12:57:58

9   extremely harmful if it is not true?                         12:58:03

10     A.    As I said, I have not faced a                        12:58:05

11   case with a statement proven to be untrue                    12:58:07

12   that caused damage to someone. So I can't                    12:58:10

13   draw on experience.                                          12:58:12

14         I can tell you that Jim's                              12:58:13

15   judgment was this story was an elaborate and                 12:58:15

16   dangerous hoax. He had lots of sources to                    12:58:18

17   back up the story. So we believed the story                  12:58:21

18   is true. We believed he's right.                             12:58:24

19     Q.    He didn't say just an elaborate                      12:58:26

20   dangerous hoax, he said one of the most                      12:58:29

21   elaborate and dangerous hoaxes in American                   12:58:32

22   history, that is stronger than just                          12:58:34

23   elaborate hoax; correct?                                     12:58:36

24     A.    That's true --                                       12:58:37

25     Q.    In 239 years of American                             12:58:39

1

2  history, that is a long time?                          12:58:42

3     A.    That's true, but it is his                    12:58:44

4  judgment this is one of the most.                      12:58:46

5     Q.    Show me any source that says                  12:58:54

6  the Bush administration nearly shot down               12:58:55

7  civilian airliners.                                    12:58:57

8     A.    Give me a minute.                             12:59:00

9     Q.    Where did that source come                    12:59:01

10  from?                                                 12:59:02

11       MS. HANDMAN:  Mr. Klayman, it is                 12:59:22

12    just about one o'clock Eastern time. We             12:59:23

13    would like to break for lunch. So after             12:59:28

14    Mr. Nichols answers this question, we               12:59:32

15    would like to take a lunch break.                   12:59:35

16       MR. KLAYMAN:  I am proposing off                 12:59:36

17    the record -- can we go off the record.             12:59:38

18       MS. HANDMAN:  No. We are on the                  12:59:40

19    record.                                             12:59:41

20       MR. KLAYMAN:  I am asking to go                  12:59:43

21    off the record. Go off the record, you             12:59:44

22    don't get to decide, it is my                       12:59:47

23    deposition.  I want to talk to you.                 12:59:48

24       THE VIDEOGRAPHER:    The time is                 12:59:50

25    12:58 p.m. We are going off the record.             12:59:51

| | | |
|---|---|---|
| 1 | | |
| 2 | (Luncheon Recess: 12:58 p.m.) | 12:59:51 |
| 3 | A F T E R N O O N   S E S S I O N | 12:59:51 |
| 4 | 1:50 p.m. | 12:59:51 |
| 5 | | 12:59:51 |
| 6 | | 13:57:29 |
| 7 | THE VIDEOGRAPHER:    The time is | 13:57:29 |
| 8 | 1:56 p.m. We are back on the record. | 13:57:40 |
| 9 | This also begins DVD number 2. | 13:57:43 |
| 10 | BRUCE NICHOLS, | 13:57:43 |
| 11 | resumed, having been previously duly | 13:57:43 |
| 12 | sworn, was examined and testified | 13:57:43 |
| 13 | further as follows: | 13:57:49 |
| 14 | EXAMINATION CONDUCTED BY | 13:57:49 |
| 15 | MR. KLAYMAN: | 13:57:50 |
| 16 | Q.    Going back on the record at | 13:57:50 |
| 17 | 1:56. So 10:56 Pacific time. | 13:57:52 |
| 18 | Mr. Nichols, you realize you're | 13:58:02 |
| 19 | still under oath? | 13:58:03 |
| 20 | A.    I do. | 13:58:04 |
| 21 | Q.    How much did Simon & | 13:58:05 |
| 22 | Schuster -- did Harcourt have to pay Simon & | 13:58:12 |
| 23 | Schuster to get the rights to this book? | 13:58:14 |
| 24 | A.    We negotiated, as I said | 13:58:17 |
| 25 | earlier, directly with Jim's agent. And some | 13:58:19 |

BRUCE NICHOLS - 10/14/2015                    Page 86

1

2   of the advances we paid we paid to Simon and          13:58:24

3   some we paid to Jim.                                   13:58:31

4        Q.    How much was paid to Simon, as             13:58:32

5   you put it?                                            13:58:34

6        A.    I believe it was 375,000 of the            13:58:34

7   450 total.                                             13:58:36

8        Q.    Did Simon & Schuster share in              13:58:39

9   any of the royalties in the book?                      13:58:42

10       A.    No.                                         13:58:43

11       Q.    That was a one time flat                   13:58:44

12  payment?                                               13:58:45

13       A.    Correct. Well, not one time. It            13:58:46

14  was in installments. The advance was                  13:58:49

15  partially paid upon signing the contract,             13:58:52

16  partially paid upon delivery and acceptance,          13:58:54

17  partially paid on publication.                         13:58:57

18            And those first three payments             13:58:59

19  added up to the 375 paid to Simon. Then                13:59:02

20  there is an additional 375 paid upon                   13:59:06

21  paperback publication that goes to Jim.                13:59:09

22       Q.    But with the payments 375                  13:59:16

23  Harcourt obtained the rights from Simon?               13:59:19

24       A.    No. Our contract is directly               13:59:23

25  with Jim through his agent. So she                      13:59:25

1

2    negotiated a separate agreement with Simon.                 13:59:29

3    But Simon got 375,000 in the end, from us,                  13:59:34

4    that's as much as I know, yes.                              13:59:38

5        Q.    Passing through the agent?                        13:59:39

6        A.    No. Payments were made directly                   13:59:41

7    to them.                                                    13:59:43

8        Q.    That's a lot of money; isn't                      13:59:45

9    it?                                                         13:59:47

10       A.    It depends.                                       13:59:49

11       Q.    Have you ever paid that much                      13:59:53

12   before to acquire a book, rights to a book?                 13:59:55

13       A.    Absolutely, as an advance we've                   13:59:58

14   paid much higher.                                           14:00:01

15       Q.    This was a centerpiece this                       14:00:06

16   book for Harcourt, was it not, you                          14:00:07

17   anticipated excellent sales; correct?                       14:00:08

18       A.    You'd have to define                              14:00:11

19   centerpiece and excellent. It was on our                    14:00:13

20   front list for the fall of 2014, it was one                 14:00:16

21   of a number of lead titles.                                 14:00:19

22       Q.    What do you mean by front list?                   14:00:24

23       A.    Books published for the first                     14:00:25

24   time as opposed to back list, books                         14:00:27

25   published a year ago and are in paperback or                14:00:30

| | | |
|---|---|---|
| 1 | | |
| 2 | more than a year ago. | 14:00:33 |
| 3 | Q.    Harcourt comes up with a | 14:00:34 |
| 4 | brochure they send out to booksellers | 14:00:35 |
| 5 | touting their book; correct? | 14:00:38 |
| 6 | A.    Well we have a catalogue, it's | 14:00:40 |
| 7 | mostly on-line, we print a small number of | 14:00:42 |
| 8 | them. We have a catalogue for an entire | 14:00:45 |
| 9 | season, we have two seasons per year. | 14:00:47 |
| 10 | Q.    Has that catalogue been | 14:00:49 |
| 11 | produced to the Plaintiffs in this case? | 14:00:51 |
| 12 | A.    I don't know. | 14:00:55 |
| 13 | MR. KLAYMAN:   We are going to | 14:00:56 |
| 14 | request that by tomorrow, Laura, if you | 14:00:56 |
| 15 | can get that for us. | 14:01:00 |
| 16 | MS. HANDMAN:   No. You have to | 14:01:00 |
| 17 | make the document request. | 14:01:01 |
| 18 | MR. KLAYMAN:   Well it's part of | 14:01:03 |
| 19 | our document request. | 14:01:04 |
| 20 | MS. HANDMAN:   No, it's not. | 14:01:05 |
| 21 | MR. KLAYMAN:   It was withheld. | 14:01:06 |
| 22 | MS. HANDMAN:   No, it wasn't. You | 14:01:07 |
| 23 | did not request marketing material. You | 14:01:08 |
| 24 | asked for documents related to the | 14:01:14 |
| 25 | manuscript, which we did and we produced | 14:01:16 |

1

2        it, all the documents in that regard.                    14:01:18

3              MR. KLAYMAN:   We will take a look               14:01:22

4        at that what we requested.                              14:01:23

5  BY MR. KLAYMAN:                                               14:01:23

6        Q.    Is that still on-line, that                      14:01:26

7  catalogue?                                                    14:01:27

8        A.    Yes, I believe so. It should                     14:01:28

9  be.                                                           14:01:29

10        Q.    Don't take it down or copy it                   14:01:31

11  off. And when was that catalogue put up                     14:01:33

12  on-line?                                                     14:01:41

13        A.    I don't remember exactly, but                   14:01:41

14  generally speaking a fall season which for                  14:01:46

15  us we define as books being published from                  14:01:48

16  September through the following February                    14:01:52

17  would be released sometime in the previous                  14:01:55

18  spring. So possibly March, April, somewhere                 14:01:58

19  in that neighborhood.                                       14:02:00

20        Q.    Turning back to the book, go to                 14:02:04

21  page 33.                                                    14:02:05

22        A.    Okay.                                           14:02:17

23        Q.    In the second paragraph                        14:02:17

24  "Montgomery's story demonstrates how                        14:02:19

25  hundreds of billions of dollars poured into                 14:02:22

1

2   the war on terror went to waste."          14:02:23

3         Do you see that?                     14:02:25

4   A.   I do.                                 14:02:25

5   Q.   What fact checking, if ever           14:02:26

6   took place to determine whether hundreds of   14:02:31

7   billions of dollars poured into the war on   14:02:33

8   terror and Montgomery's story demonstrated   14:02:37

9   that?                                      14:02:39

10   A.   As I said, we do not fact            14:02:39

11   check. We rely on our authors.            14:02:42

12         That particular statement is        14:02:44

13   awfully vague. There had been plenty of    14:02:47

14   published reports about amounts of spending   14:02:50

15   on the war on terror.                     14:02:52

16   Q.   Not with regard to Mr.               14:02:54

17   Montgomery?                               14:02:55

18   A.   This statement does not              14:02:56

19   attribute hundreds of billions of dollars to   14:02:58

20   Montgomery. It says it demonstrates how that   14:03:00

21   amount could have gone to waste. It doesn't   14:03:04

22   mean he is responsible for hundreds of     14:03:07

23   billions.                                 14:03:08

24   Q.   But you never fact checked it        14:03:08

25   in any event?                             14:03:10

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 91

1

2       A.     There is nothing to fact check          14:03:11

3    there.                                             14:03:13

4       Q.     Turn to page 45 where it stays           14:03:15

5    "One senior -- one former --" excuse me.           14:03:31

6            "One former senior CIA official            14:03:36

7    recalled attending a White House meeting in        14:03:38

8    the week following Christmas to discuss what       14:03:41

9    to do next about the information coming from        14:03:43

10   Montgomery. The official claims there was a        14:03:44

11   brief but serious discussion about whether         14:03:47

12   to shoot down commercial airliners over the        14:03:50

13   Atlantic based on the intelligence.                14:03:53

14           "The former CIA official said              14:03:55

15   during the meeting Frances Townsend, then a        14:03:58

16   counterterrorism official on the National          14:04:01

17   Security Council discussed with an NSC             14:04:05

18   lawyer the fact the President had legal            14:04:07

19   authority to shoot down planes believed to         14:04:09

20   be terrorist threats and it might be time to       14:04:12

21   exercise that authority.  'I couldn't              14:04:14

22   believe they were talking about it' the           14:04:17

23   former CIA official said 'I thought this was       14:04:19

24   crazy.'"                                           14:04:23

25           The it says "Townsend denied               14:04:27

30(b)(6)
BRUCE NICHOLS - 10/14/2015                          Page 92

1

2  ever having such a discussion."                          14:04:28

3         What effort did the publisher                     14:04:31

4  make, meaning you and Harcourt to see who               14:04:34

5  was right, whether Townsend was right or                14:04:37

6  whether this unnamed CIA official was                   14:04:39

7  correct?                                                14:04:41

8     A.   We did not fact check.  Jim                     14:04:41

9  reported both of his sources and he                     14:04:45

10  reported, if you continue that passage, that           14:04:47

11  the former CIA official repeated his version           14:04:50

12  of events after being told of her denial. So           14:04:53

13  Jim reported both of what his sources told             14:04:56

14  him.                                                   14:04:58

15     Q.   Did you or anyone else at                      14:04:59

16  Harcourt ask him who that former CIA                   14:05:00

17  official is?                                           14:05:02

18     A.   No, we did not.                                14:05:03

19         MS. HANDMAN:  Excluding counsel.               14:05:06

20     Something has gone wrong on the video              14:05:12

21     here. I guess you're on this screen here           14:05:14

22     but not that screen. You are on this               14:05:16

23     one, but not the big one.                          14:05:19

24         MR. KLAYMAN:  If you want I can                14:05:27

25     send you an 8 by 10 glossy when this is           14:05:28

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 93

1

2  over, Laura, sign it best regards.                    14:05:31

3      MS. HANDMAN:  Well, I think --                    14:05:35

4      MR. KLAYMAN:  I don't understand,                 14:05:36

5  to do that to break up my testimony                   14:05:37

6  is --                                                 14:05:39

7      MS. HANDMAN:  No, I didn't break                  14:05:39

8  it. We are looking at a screen that only              14:05:41

9  has Bruce on it. I can look at you                     14:05:43

10  drinker water right now on the laptop                14:05:47

11  here. So we can go forward because the               14:05:49

12  witness can see.                                     14:05:54

13      MR. KLAYMAN:  Please don't                       14:05:55

14  interrupt my testimony with these kind               14:05:56

15  of inanities.                                        14:05:57

16      MS. HANDMAN:  If you want we will                14:05:59

17  take a picture of the screen so you can              14:06:00

18  see what I'm talking about.                          14:06:01

19      MR. KLAYMAN:  Feel free.  My                     14:05:55

20  drinking water is hardly a confidential              14:06:08

21  sources privilege or classified                      14:06:12

22  information.  If you want to see me                   14:06:13

23  drinking water or anything else, that's              14:06:15

24  fine with me, but can you please not                 14:06:15

25  interrupt my testimony.                              14:06:16

| | | |
|---|---|---|
| 1 | | |
| 2 | Q.    Given the severity of what Mr. | 14:06:24 |
| 3 | Risen was writing, did you as the publisher | 14:06:26 |
| 4 | not feel it incumbent to determine which | 14:06:30 |
| 5 | story was true or not and to determine who | 14:06:33 |
| 6 | that former CIA official was so the matter | 14:06:34 |
| 7 | could be confirmed? | 14:06:38 |
| 8 | A.    Sir, as I said before, we rely | 14:06:40 |
| 9 | on our authors, Jim made the judgment and | 14:06:43 |
| 10 | reported both sides. So we had no problem | 14:06:46 |
| 11 | with how he presented this. | 14:06:49 |
| 12 | Q.    Basically you are blaming Risen | 14:06:52 |
| 13 | when you say we are not responsible at all? | 14:06:54 |
| 14 | MS. HANDMAN:  Objection. | 14:06:57 |
| 15 | A.    We are not blaming of him of | 14:06:58 |
| 16 | anything. We are not saying he's at fault. | 14:07:01 |
| 17 | Q.    You don't want to know whether | 14:07:05 |
| 18 | he is at fault or not? | 14:07:06 |
| 19 | MS. HANDMAN:  Objection. | 14:07:07 |
| 20 | A.    We don't think there is any | 14:07:07 |
| 21 | fault here. | 14:07:08 |
| 22 | Q.    Do you always take somebody's | 14:07:11 |
| 23 | word for it, is that your experience in life | 14:07:12 |
| 24 | that everybody tells the truth? | 14:07:14 |
| 25 | A.    Of course not. We choose our | 14:07:15 |

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 95

1

2  authors very carefully. There are many, many                    14:07:18

3  authors who want to publish with us that we                     14:07:20

4  do not choose to publish.                                       14:07:22

5      Q.    You are saying an author, based                       14:07:23

6  on your experience would never say something                    14:07:25

7  which was incorrect?                                            14:07:26

8          MS. HANDMAN:  Objection.                                14:07:27

9      A.    Are you asking me to say all my                       14:07:32

10  authors are perfect?  Of course not.                           14:07:34

11      Q.    When did you leave Harper                            14:07:39

12  Collins?                                                       14:07:41

13      A.    2009.                                                14:07:42

14      Q.    Are you aware that Harper                            14:07:43

15  Collins was going to published a book of                       14:07:48

16  mine called Whores, Why and How I Came to                      14:07:51

17  Fight the Establishment?                                       14:07:55

18      A.    I was not aware of that, sir.                        14:07:55

19      Q.    It is initially under the                            14:07:57

20  Judith Regan imprint, are you aware of that?                   14:08:00

21  Does that refresh your recollection?                           14:08:02

22      A.    I was not aware of that. That                        14:08:03

23  imprint was no longer functioning when I                       14:08:04

24  arrived at Harper Collins, but I was working                   14:08:07

25  in the Collins division which would not have                   14:08:10

| | | |
|---|---|---|
| 1 | | |
| 2 | heard much about any other imprint. | 14:08:11 |
| 3 | Q.   Turn your attention to a letter | 14:08:19 |
| 4 | dated January 14, 2015 to Linda K. Zecher | 14:08:21 |
| 5 | and William Bayers of  Houghton Mifflin | 14:08:27 |
| 6 | Harcourt. | 14:08:32 |
| 7 | MS. HANDMAN:   Are we marking this | 14:08:32 |
| 8 | as an exhibit,  Mr. Klayman? | 14:08:34 |
| 9 | MR. KLAYMAN:   Yes. Next exhibit | 14:08:34 |
| 10 | which is 22. | 14:08:35 |
| 11 | MS. HANDMAN:   This is | 14:08:40 |
| 12 | unfortunately a composite of all the | 14:08:40 |
| 13 | letters so we will mark it as 22. It | 14:08:43 |
| 14 | includes the January 14 letter, Mr. | 14:08:45 |
| 15 | Eber's letter of January 20 in response | 14:08:51 |
| 16 | and your letter again of February 13. | 14:08:54 |
| 17 | MR. KLAYMAN:   Let's mark them | 14:09:00 |
| 18 | separately, Exhibit 22 will be the | 14:09:01 |
| 19 | January 14th. | 14:09:04 |
| 20 | (Plaintiff's Deposition | 14:09:04 |
| 21 | Exhibit 22 for identification, Letter | 14:09:04 |
| 22 | dated 1/14/15, no production numbers.) | 14:09:04 |
| 23 | BY MR. KLAYMAN: | 14:09:32 |
| 24 | Q.    Mr. Nichols, have you ever seen | 14:09:32 |
| 25 | this document before? | 14:09:34 |

1

2     A.    Yes, I have.                                  14:09:35

3     Q.    When did you first see it?                    14:09:36

4     A.    It was shared by counsel                      14:09:39

5   shortly after it was sent to us.                      14:09:43

6     Q.    Which counsel shared it?                      14:09:45

7     A.    I believe it was Sharon Burger                14:09:47

8   and David Eber.                                       14:09:49

9     Q.    Have you ever discussed this                  14:09:59

10   letter with anyone other than legal counsel          14:10:01

11   at Harcourt?                                         14:10:03

12     A.    No, sir.                                     14:10:03

13     Q.    I am going to ask you about                  14:10:06

14   your own impression. Turn to page 2.                 14:10:07

15          MS. HANDMAN:   He is here on                  14:10:16

16     behalf of the company.                             14:10:17

17     Q.    Having read this letter, you                 14:10:18

18   did read the letter at the time you saw it;          14:10:19

19   correct?                                             14:10:22

20     A.    I did.                                       14:10:22

21     Q.    It was on or about January 14,               14:10:22

22   2015; correct?                                       14:10:25

23     A.    On or about, yes.                            14:10:25

24     Q.    You are aware this letter is                 14:10:29

25   asking for a retraction or correction of             14:10:30

30(b)(6)

BRUCE NICHOLS - 10/14/2015                    Page 98

1

2  certain material in certain published                    14:10:35

3  statements in Mr. Risen's book Pay Any                    14:10:39

4  Price?                                                     14:10:42

5        MS. HANDMAN:  Objection. Let him                    14:10:42

6    read the letter.                                         14:10:45

7    Q.    That was your understanding?                      14:10:46

8    A.    That it is asking for a                            14:10:53

9  retraction.                                                14:10:55

10      Q.    Retraction and/or correction,                  14:10:55

11  that the gist of this letter asks for                     14:10:59

12  retraction and/or correction of certain                   14:11:01

13  published statements in Mr. Risen's book?                 14:11:03

14    A.    It asks how we fact checked.                      14:11:06

15  Then it says "If you'd like to discuss this                14:11:10

16  please contact me."                                       14:11:12

17        So it does not actually ask for                     14:11:16

18  retraction or correction.                                 14:11:17

19    Q.    You took it to mean that we                       14:11:23

20  were asking, or Mr. Montgomery was asking                 14:11:25

21  for retraction or correction as part of any               14:11:25

22  discussion; correct?                                      14:11:29

23        MS. HANDMAN:  Objection.                            14:11:30

24    A.    I don't interpret beyond what                     14:11:32

25  in the letter, sir.                                       14:11:34

1

2     Q.    I asked what you took it to                    14:11:35

3  mean, not anybody else.                                 14:11:38

4     A.    And I'm giving you my own                      14:11:39

5  answer. I could not tell. All it says is I              14:11:41

6  want to understand how you fact checked                 14:11:46

7  Risen. Then it says "We'd like to discuss               14:11:48

8  this before we take other avenues of                    14:11:50

9  redress, contact me." I don't know what that            14:11:52

10  means.                                                 14:11:56

11     Q.    Now with regard on the second                 14:11:56

12  page I write, right after the quotations, of           14:12:00

13  two, what we claim is defamatory                        14:12:04

14  statements -- three, "Therefore is clear               14:12:07

15  that Houghton Mifflin Harcourt Publishing              14:12:09

16  Company in order to fact check Risen's                  14:12:12

17  statement to responsibly exercise due                  14:12:14

18  diligence, even assuming that Risen's                  14:12:16

19  statements are not defamatory, would have              14:12:18

20  had to have access to top secret highly                14:12:20

21  classified information. However, for you the           14:12:22

22  publisher to have this organization without            14:12:27

23  the authorization of the government would              14:12:31

24  constitute crimes."                                    14:12:33

25        Do you see that?                                 14:12:34

1

2     A.    I do.                                         14:12:34

3     Q.    Having read that that caused                 14:12:35

4  you concern at the time; correct?                     14:12:36

5           MS. HANDMAN:  Objection.                     14:12:37

6     A.    No, sir, it did not.                         14:12:38

7     Q.    Whether or not classified                    14:12:39

8  information was in Pay Any Price absolutely           14:12:42

9  caused you no concern at all?                         14:12:45

10    A.    No, sir.  You are asserting                  14:12:47

11  that we must have had access to classified           14:12:49

12  information.                                          14:12:53

13    Q.    My question is whether or not                14:12:55

14  classified information was contained in the          14:12:57

15  published book by Harcourt Pay Any Price             14:13:01

16  caused you no concern at the time you saw            14:13:03

17  this letter and read it?                             14:13:05

18    A.    We've already discussed                      14:13:08

19  classified information in the chapter and            14:13:10

20  materials on Mr. Montgomery. To the best of          14:13:13

21  our knowledge we do not think that Mr. Risen         14:13:15

22  or we have had access to any classified              14:13:18

23  information.                                          14:13:21

24    Q.    Since you never asked him that,              14:13:21

25  how is it that you know that?                         14:13:23

30(b)(6)
BRUCE NICHOLS - 10/14/2015                Page 101

| | | |
|---|---|---|
| 1 | | |
| 2 | MS. HANDMAN: Objection. Excluding | 14:13:24 |
| 3 | information in conversations with | 14:13:27 |
| 4 | counsel. And this has been asked and | 14:13:30 |
| 5 | answered several, several times. | 14:13:34 |
| 6 | MR. KLAYMAN: This is in the | 14:13:35 |
| 7 | context of this letter. So I'm asking | 14:13:36 |
| 8 | the question, Laura. | 14:13:37 |
| 9 | A. I have answered it before, sir. | 14:13:38 |
| 10 | MS. HANDMAN: You can answer it | 14:13:41 |
| 11 | again. | 14:13:42 |
| 12 | Q. You don't get to decide, I do. | 14:13:43 |
| 13 | So answer the question. | 14:13:44 |
| 14 | A. Outside of the legal review, we | 14:13:45 |
| 15 | did not discuss with Mr. Risen whether he | 14:13:49 |
| 16 | had access to classified information. | 14:13:51 |
| 17 | Q. Even after seeing this letter? | 14:13:54 |
| 18 | A. Correct. | 14:13:56 |
| 19 | MS. HANDMAN: Objection, outside | 14:13:57 |
| 20 | of the legal review. | 14:13:58 |
| 21 | Q. Answer, that's fine. Next | 14:13:59 |
| 22 | paragraph, "I want to understand how you | 14:14:00 |
| 23 | fact checked Risen before you both decided | 14:14:05 |
| 24 | to defame my client and how after the | 14:14:07 |
| 25 | publication of his book you furthered | 14:14:09 |

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 102

1

2   Risen's continuing defamatory statements in        14:14:11

3   the print, television and radio media.  In         14:14:14

4   short, you not only have corporate and             14:14:16

5   personal significant civil liability to my         14:14:18

6   client, but have you also collectively             14:14:21

7   engaged in what is a criminal enterprise for       14:14:24

8   profit."                                           14:14:28

9         Do you remember reading that at             14:14:29

10  the time?                                          14:14:30

11     A.   I do.                                      14:14:30

12     Q.   That caused you concern when              14:14:31

13  you read it; did it not?                           14:14:32

14        MS. HANDMAN:  Objection.                    14:14:34

15     A.   It did not.                                14:14:34

16     Q.   Did you make any inquiry to               14:14:35

17  determine whether or not there was a FBI           14:14:40

18  investigation or Federal investigation of          14:14:42

19  any kind underway with regard to Houghton          14:14:43

20  Mifflin when you read this letter?                 14:14:50

21        MS. HANDMAN:   Excluding                    14:14:51

22     conversations with legal counsel.              14:14:52

23     A.   We had no knowledge of any FBI            14:14:55

24  investigations of Houghton Mifflin, as far         14:14:57

25  as I'm aware.                                      14:15:00

30(b)(6)

BRUCE NICHOLS - 10/14/2015                Page 103

1

2    Q.    Subsequent to that did you                          14:15:00

3  learn there is an FBI investigation underway               14:15:02

4  with regard to Mr. Montgomery?                             14:15:04

5    A.    I am not aware of that.                            14:15:07

6    Q.    No one's ever told you that?                       14:15:09

7    A.    No, sir.                                           14:15:10

8        MS. HANDMAN:  Objection.  You're                     14:15:10

9  saying an FBI investigation into Mr.                       14:15:15

10    Montgomery, is that what you're asking?                 14:15:17

11        MR. KLAYMAN:  I'm asking the                        14:15:19

12  questions, Laura.                                         14:15:19

13        MS. HANDMAN:   Well I am just                       14:15:20

14  wanting clarification.                                    14:15:21

15    A.    Are you asking --                                 14:15:22

16        MR. KLAYMAN:   I am not giving                      14:15:22

17  clarification. I will ask the questions                   14:15:23

18  the way I want to.                                        14:15:24

19        MS. HANDMAN:   Well you're                          14:15:25

20  confusing the witness.                                    14:15:26

21        MR. KLAYMAN:   There is nothing                     14:15:27

22  objectionable about that question.                        14:15:29

23  Please read it back, Ms. Court Reporter.                  14:15:49

24  Stop interrupting my questioning.                         14:15:49

25        (The pending question was read as                   14:15:49

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 104

| | | |
|---|---|---|
| 1 | | |
| 2 | follows: | 14:15:49 |
| 3 | "Question:  Subsequent to that | 14:15:01 |
| 4 | did you learn there is an FBI | 14:15:02 |
| 5 | investigation underway with regard to | 14:15:04 |
| 6 | Mr. Montgomery? | 14:15:05 |
| 7 | "Answer:  I am not aware of | 14:15:08 |
| 8 | that.") | 14:15:09 |
| 9 | Q.    Have you ever inquired as to | 14:15:50 |
| 10 | whether there is? | 14:15:51 |
| 11 | A.    Whether there is an | 14:15:52 |
| 12 | investigation by the FBI of Dennis | 14:15:53 |
| 13 | Montgomery? | 14:15:56 |
| 14 | Q.    Yes. | 14:15:56 |
| 15 | A.    No. | 14:15:57 |
| 16 | MS. HANDMAN:  Excluding | 14:15:58 |
| 17 | conversations with counsel. | 14:15:59 |
| 18 | A.    I have not inquired. | 14:15:59 |
| 19 | Q.    Then it says next paragraph "If | 14:16:15 |
| 20 | you'd like to discuss this matter before Mr. | 14:16:16 |
| 21 | Montgomery takes other avenues of redress, | 14:16:18 |
| 22 | please contact me immediately. I am | 14:16:20 |
| 23 | available to meet with you at the end of the | 14:16:23 |
| 24 | month if such a meeting could prove | 14:16:24 |
| 25 | productive to try to resolve this serious | 14:16:26 |

1

2   matter.                                              14:16:29

3          "Let me know if there is an                   14:16:29

4   interest by January 20, 2015 to discuss how          14:16:31

5   you fact checked Risen's statements,                 14:16:34

6   otherwise we will contact the Federal Bureau         14:16:36

7   of Investigation and seek other suitable             14:16:39

8   redress."                                            14:16:40

9          Do you see that?                              14:16:41

10     A.   I did.                                        14:16:41

11     Q.   Now, from that you can discern               14:16:42

12  that Mr. Montgomery was prepared to contact          14:16:46

13  the Federal Bureau of Investigation over the         14:16:48

14  alleged use of classified information in Mr.         14:16:51

15  Risen's book Pay Any Price?                          14:16:53

16     A.   I have no evidence that he did               14:16:56

17  so.                                                  14:16:57

18     Q.   But you took that to mean that;              14:16:59

19  did you not?                                         14:17:01

20     A.   No. I don't take this to mean                14:17:01

21  he is going to do it.                                14:17:03

22     Q.   Did you make any effort to find             14:17:05

23  out whether he did it or not?                        14:17:07

24         MS. HANDMAN:  Excluding                       14:17:08

25     conversations with counsel.                       14:17:09

1

2    A.    No, sir.                                    14:17:09

3    Q.    You didn't really care?                     14:17:11

4          MS. HANDMAN:  Objection.                    14:17:13

5    A.    We discussed this letter and we             14:17:14

6  responded to you. So of course we took the          14:17:16

7  letter seriously.                                    14:17:20

8    Q.    If you were to learn there is               14:17:21

9  ongoing criminal investigation with regard          14:17:23

10  to Mr. Montgomery, would that cause you             14:17:25

11  concern?                                            14:17:27

12    A.    It depends on the facts of the             14:17:27

13  investigation.                                      14:17:30

14    Q.    So if I told you there is an               14:17:34

15  ongoing criminal investigation with regard         14:17:36

16  to Mr. Montgomery coming forward, would that        14:17:37

17  cause you concern?                                  14:17:39

18    A.    Without knowing any more than              14:17:41

19  that, it wouldn't change my opinion about           14:17:43

20  the book we published.                              14:17:45

21    Q.    About what?                                14:17:48

22    A.    About the book we published,               14:17:49

23  Pay Any Price.                                      14:17:51

24    Q.    An FBI investigation is pretty             14:17:55

25  serious; isn't it?                                  14:17:57

1

2     A.    Of Dennis Montgomery?                          14:17:58

3     Q.    Concerning matters in and                      14:18:00

4  around Dennis Montgomery.                               14:18:02

5            MS. HANDMAN:  Objection, vague,               14:18:06

6      overbroad, speculative.                             14:18:07

7     A.    Depending upon the facts of an                 14:18:10

8  investigation of Mr. Montgomery it could               14:18:11

9  easily support our publishing the book.                14:18:13

10    Q.    If Mr. Montgomery initiated the                14:18:19

11  criminal investigation as said here, would            14:18:20

12  that cause concern to you?                             14:18:25

13            MS. HANDMAN:  Objection, no                  14:18:26

14      foundation.  Vague and overbroad.                  14:18:27

15    Q.    You can respond.                               14:18:33

16    A.    Are you talking about an                       14:18:34

17  investigation he initiated of himself?                 14:18:35

18    Q.    I am asking you to answer the                  14:18:39

19  question. You're a bright gentleman, Yale             14:18:40

20  University, doesn't get better than that.             14:18:47

21    A.    I don't understand. Can you                    14:18:49

22  describe the investigation you're talking             14:18:50

23  about?                                                 14:19:04

24            MR. KLAYMAN:   Please read the               14:19:04

25      question back.                                     14:19:04

30(b)(6)
BRUCE NICHOLS - 10/14/2015          Page 108

1

2          (The pending question was read as          14:19:05

3     follows:                                         14:19:05

4          "Question:   If Mr. Montgomery             14:18:19

5     initiated the criminal investigation as         14:18:19

6     said here, would that cause concern to          14:18:24

7     you?")                                           14:18:24

8     A.    I had impression we were                  14:19:05

9  talking about investigation of Mr.                 14:19:07

10  Montgomery. I am not sure why he would            14:19:08

11  initiate an investigation of himself.             14:19:09

12     Q.    Hypothetical, suppose Mr.                14:19:12

13  Montgomery came forward to the FBI with           14:19:13

14  regard to what Risen had published in whole       14:19:14

15  or in part.                                        14:19:19

16          MS. HANDMAN:  Objection.               14:19:20

17     Q.    Would that cause you any                14:19:20

18  concern?                                           14:19:21

19          MS. HANDMAN:  Objection,               14:19:22

20     hypothetical.  Speculative, no                 14:19:23

21     foundation.                                     14:19:24

22          MR. KLAYMAN:   It is not               14:19:25

23     hypothetical. It is stated in the             14:19:26

24     letter.                                         14:19:27

25     A.    The letter does not say he's           14:19:28

BRUCE NICHOLS - 10/14/2015                    Page 109

| | | |
|---|---|---|
| 1 | | |
| 2 | done it. There is no proof he's done it. It | 14:19:30 |
| 3 | is a hypothetical. | 14:19:32 |
| 4 | Q.    Did you take any effort to see | 14:19:33 |
| 5 | whether he had done it? | 14:19:35 |
| 6 | MS. HANDMAN:   Asked and answered. | 14:19:36 |
| 7 | A.    No, sir. | 14:19:37 |
| 8 | MS. HANDMAN:   Asked and answered. | 14:19:38 |
| 9 | Excluding conversations with counsel. | 14:19:38 |
| 10 | Q.    You are aware that the FBI | 14:19:44 |
| 11 | investigates only criminal allegations; | 14:19:46 |
| 12 | correct? | 14:19:50 |
| 13 | A.    I actually don't know the FBI's | 14:19:50 |
| 14 | brief. So I don't know the answer to that | 14:19:53 |
| 15 | question. | 14:19:56 |
| 16 | Q.    Have you been following the | 14:19:56 |
| 17 | Hilary Clinton email scandal?  It has been | 14:19:58 |
| 18 | all over the news. Have you become aware of | 14:20:01 |
| 19 | it? | 14:20:02 |
| 20 | A.    I certainly read newspaper | 14:20:02 |
| 21 | accounts of it. | 14:20:04 |
| 22 | Q.    Those newspaper accounts say | 14:20:04 |
| 23 | the FBI only investigates criminal matters; | 14:20:05 |
| 24 | right? | 14:20:08 |
| 25 | MS. HANDMAN:  Objection. | 14:20:08 |

1

2    A.    I don't know, sir.                          14:20:09

3    Q.    They are investigating whether              14:20:10

4  or not she misused classified information,          14:20:11

5  you're aware of that; right?                        14:20:13

6    A.    I am aware of that.  I don't                14:20:14

7  understand what that has to do with this            14:20:16

8  case.                                               14:20:17

9    Q.    But you have to ask counsel,                14:20:24

10  whether she knows Hilary.                           14:20:26

11    A.    Do you have a question?                     14:20:27

12    Q.    Would that cause you concern?               14:20:28

13    A.    If the FBI was investigating                14:20:29

14  Hillary Clinton's emails?                           14:20:32

15    Q.    No.  I am asking you,  you are              14:20:34

16  now aware the FBI when they investigate             14:20:35

17  matters involving classified information,           14:20:38

18  that it is criminal; right?                         14:20:40

19        MS. HANDMAN:  Objection, no                   14:20:42

20      foundation.                                     14:20:44

21    Q.    You learned that by reading the             14:20:44

22  newspapers lately with regard Hillary               14:20:46

23  Clinton's email scandal?                            14:20:48

24        MS. HANDMAN:  No foundation,                  14:20:49

25      mischaracterizing the record.                   14:20:51

30(b)(6)
BRUCE NICHOLS - 10/14/2015          Page 111

1

2      A.    I cannot say I know everything                        14:20:53

3  the FBI does in investigating, in  a                            14:20:55

4  criminal investigation. I don't know that.                      14:20:56

5      Q.    You do read the newspapers, do                        14:20:58

6  you not?                                                         14:20:59

7      A.    I do.                                                  14:20:59

8      Q.    You watch TV; right?                                  14:21:00

9      A.    Sometimes.                                            14:21:02

10      Q.    And you watch, among other                           14:21:03

11  stations, Fox News from time to time?                          14:21:05

12      A.    Sometimes.                                           14:21:06

13      Q.    There is much that has been                          14:21:11

14  said on Fox News, in particular about FBI                      14:21:13

15  only investigating criminal matters.  And                      14:21:16

16  this was with regard to allegations that                       14:21:19

17  Hillary Clinton breached government secrecy                    14:21:21

18  on classified information.                                     14:21:26

19          MS. HANDMAN:  Objection. No                            14:21:28

20      relevance. I don't know how much longer                    14:21:29

21      you want to waste your time on this                        14:21:30

22      subject.                                                   14:21:32

23          MR. KLAYMAN:   Thank you, Laura.                       14:21:35

24      But the next time I actually have to                       14:21:36

25      rely on you on what to say I'll rip up                     14:21:38

30(b)(6)
BRUCE NICHOLS - 10/14/2015                 Page 112

| | |
|---|---|
| 1 | |
| 2    my bar card. | 14:21:41 |
| 3      Q.    Please respond. | 14:21:42 |
| 4      A.    I am aware from news accounts | 14:21:43 |
| 5  that there are multiple investigations of | 14:21:45 |
| 6  Hillary Clinton, some in Congress, I | 14:21:46 |
| 7  believe. So I don't know the details of what | 14:21:48 |
| 8  the FBI is investigating. I know it has been | 14:21:51 |
| 9  a huge political issue argued about for | 14:21:54 |
| 10  quite a while. | 14:21:58 |
| 11      Q.    You are aware the FBI -- you | 14:21:59 |
| 12  are aware of commentary out there by legal | 14:22:01 |
| 13  experts on Fox and CNN and others that the | 14:22:03 |
| 14  FBI -- excuse me, that Federal laws can hold | 14:22:08 |
| 15  people accountable for mishandling | 14:22:11 |
| 16  classified information or possessing it, | 14:22:14 |
| 17  even if there was no intent to do so; you're | 14:22:16 |
| 18  aware of that? | 14:22:19 |
| 19        MS. HANDMAN:  Objection. You're | 14:22:20 |
| 20      talking about people who work in | 14:22:20 |
| 21      government or people who write books? | 14:22:22 |
| 22        MR. KLAYMAN:   Now you're | 14:22:27 |
| 23      testifying.  I ask you stop that, | 14:22:28 |
| 24      please.  Certify this. I asked my | 14:22:30 |
| 25      question. It is not for you to correct | 14:22:32 |

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 113

1
2    my question.                                          14:22:33
3         Can you read back the question,                 14:22:33
4    Madam court reporter.                                 14:22:33
5         (The pending question was read as               14:22:33
6    follows:                                              14:22:33
7         "Question:   You are aware the                   14:21:59
8    FBI -- you are aware of commentary out                14:22:00
9    there by legal experts on Fox and CNN                 14:22:02
10    and others that the FBI -- excuse me,                14:22:05
11    that Federal laws can hold people                    14:22:09
12    accountable for mishandling classified              14:22:11
13    information or possessing it, even if                14:22:14
14    there was no intent to do so; you're                 14:22:17
15    aware of that?")                                     14:22:19
16    A.   Sir, I am aware just as a                       14:22:57
17 consumer of the news that there have been              14:22:59
18 government officials who've gotten in                  14:23:00
19 trouble for mishandling classified                     14:23:02
20 information. I can't tell you I am aware of            14:23:05
21 reporters getting in trouble for possessing           14:23:07
22 classified information.                                14:23:11
23    Q.   Are you saying Mr. Risen didn't                14:23:14
24 get in trouble over Jeffrey Sterling?                  14:23:16
25    A.   As we discussed that case,                     14:23:20

30(b)(6)
BRUCE NICHOLS - 10/14/2015                Page 114

| | | |
|---|---|---|
| 1 | | |
| 2 | there was nothing about classified | 14:23:21 |
| 3 | information.  That was a subpoena for a | 14:23:23 |
| 4 | source leak investigation. | 14:23:24 |
| 5 |     Q.   This is with regard to leaking | 14:23:29 |
| 6 | classified information; correct? | 14:23:31 |
| 7 |     A.   That was Mr. Sterling's peril, | 14:23:31 |
| 8 | not Mr. Risen's. | 14:23:33 |
| 9 |     Q.   And Mr. Risen had received that | 14:23:34 |
| 10 | information; correct? | 14:23:36 |
| 11 |     A.   I do not know that. | 14:23:40 |
| 12 |     ** DIRECTION NOT TO ANSWER ** | 14:23:36 |
| 13 |     MS. HANDMAN:  Objection. | 14:23:36 |
| 14 | Reporter's privilege. Direct the witness | 14:23:37 |
| 15 | not to answer. | 14:23:39 |
| 16 |     MR. KLAYMAN:  I don't see how | 14:23:43 |
| 17 | that reporter's privilege. But we'll | 14:23:44 |
| 18 | move on. | 14:23:46 |
| 19 | BY MR. KLAYMAN: | 14:23:46 |
| 20 |     Q.   The next paragraph "Although I | 14:23:54 |
| 21 | am representing Mr. Montgomery in my private | 14:23:56 |
| 22 | capacity, as also a public interest advocate | 14:23:57 |
| 23 | there is a duty and responsibility on my | 14:24:01 |
| 24 | part not to accede to top secret classified | 14:24:02 |
| 25 | information being strewn all over the public | 14:24:06 |

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 115

| | |
|---|---|
| 1 | |
| 2  record, particularly given the rise of | 14:24:08 |
| 3  Islamic terrorism in recent months and then | 14:24:10 |
| 4  even heightening risk this presents the | 14:24:13 |
| 5  nation and the free world." | 14:24:16 |
| 6          You remember reading that; do | 14:24:18 |
| 7  you not? | 14:24:19 |
| 8      A.    I do. | 14:24:19 |
| 9      Q.    Are you aware -- that caused | 14:24:24 |
| 10  you concern, did it not, that drawing top | 14:24:27 |
| 11  secret information on the public record can | 14:24:30 |
| 12  be damaging to the nation and to people and | 14:24:32 |
| 13  the nation's security? | 14:24:37 |
| 14          MS. HANDMAN:  Objection. | 14:24:39 |
| 15      A.    You are asking me a very broad | 14:24:39 |
| 16  question. The facts and the basic story in | 14:24:41 |
| 17  this chapter of Dennis Montgomery's software | 14:24:47 |
| 18  and accusations that it was fraudulent had | 14:24:49 |
| 19  been published prior to our book, in | 14:24:51 |
| 20  Playboy, in New York Times and Bloomberg, | 14:24:56 |
| 21  among other places. | 14:24:58 |
| 22          We were not concerned that | 14:24:59 |
| 23  revealing those facts was causing any new | 14:25:01 |
| 24  National security risk. | 14:25:06 |
| 25          What Jim contributed to the | 14:25:09 |

1

2  story is getting your client's side of it                      14:25:11

3  and including that in the chapter.                             14:25:13

4      Q.    Therefore, as you just                              14:25:16

5  testified that the content of the book as                     14:25:18

6  relates to Mr. Montgomery all came from                       14:25:21

7  previously published reports --                               14:25:23

8      A.    No.                                                 14:25:26

9      Q.    Let me finish -- that your Note                     14:25:27

10  on Sources early on in the book was entirely                 14:25:32

11  false?                                                       14:25:34

12      A.    Sir, that is not what I said.                      14:25:34

13  The basic facts had been covered, reported                   14:25:36

14  elsewhere. Jim has his own sources and he                    14:25:40

15  fleshed out a much longer story than had                     14:25:43

16  been published in any other previous                         14:25:45

17  location.                                                    14:25:47

18      Q.    So this Note on Sources we got                     14:25:47

19  into in the beginning of your deposition was                 14:25:50

20  not correct in whole or in part; correct?                    14:25:53

21          MS. HANDMAN:  Objection.                             14:25:57

22      Q.    Please respond.                                    14:26:02

23      A.    In what way is it not correct                      14:26:03

24  that --                                                      14:26:04

25      Q.    I ask the questions, Mr.                           14:26:05

1

2  Nichols.                                        14:26:06

3      A.    I don't understand your              14:26:06

4  question.                                       14:26:07

5      Q.    The question was given the fact       14:26:07

6  you just testified that the information         14:26:09

7  concerning Montgomery came from already         14:26:12

8  published articles and other publications       14:26:15

9  you set forth to the reader in a page called    14:26:22

10  Note on Sources where Harcourt and Risen are   14:26:25

11  claiming -- no need to read it again -- that   14:26:30

12  the information in the book comes from          14:26:34

13  confidential sources, that isn't true or in    14:26:36

14  whole or in part; correct?                     14:26:38

15      A.    No, sir. My testimony was the        14:26:41

16  basic facts of this particular chapter had     14:26:45

17  been covered elsewhere, but Jim had his own    14:26:48

18  sources and had a lot of detail. The Note on   14:26:50

19  Sources talks about the use of anonymous       14:26:53

20  sources. And this book would not have been     14:26:57

21  possible without the cooperation of many       14:27:00

22  current and former officials, etc.  That use   14:27:02

23  of anonymous sources and current and former    14:27:05

24  government officials is evident even in this   14:27:08

25  chapter.                                       14:27:11

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 118

1

2       Q.    Where is it evident on this              14:27:11

3   page on sources?                                   14:27:14

4       A.    This Note on Sources is a                14:27:16

5   general comment about using confidential           14:27:18

6   sources for the entire --                          14:27:20

7       Q.    The reason you put it in there           14:27:22

8   was to sell books?                                 14:27:23

9           MS. HANDMAN:  Objection. Asked and         14:27:24

10      answered already.                              14:27:25

11      Q.    You can respond.                         14:27:28

12          MS. HANDMAN:   You can answer.             14:27:29

13      A.    Sir, as I said last time, what           14:27:29

14   we believed would sell this book would be         14:27:31

15   the news, not how he got the news. We put         14:27:33

16   this in because the issue of confidential         14:27:38

17   sources has become controversial.                 14:27:40

18      Q.    Have you, Mr. Nichols, been              14:27:42

19   contacted yet by the FBI?                         14:27:45

20      A.    No, sir.                                 14:27:46

21      Q.    Turn to what I will ask the              14:27:47

22   court reporter -- this letter you just read       14:27:56

23   was kept in the ordinary course of                14:27:59

24   Harcourt's business; was it not?                  14:28:01

25   Exhibit 22.                                       14:28:03

30(b)(6)

BRUCE NICHOLS - 10/14/2015                    Page 119

| | | |
|---|---|---|
| 1 | | |
| 2 | A.   Yes, sir. | 14:28:03 |
| 3 | Q.   Turning to what I will ask to | 14:28:05 |
| 4 | be marked Exhibit 23, this is the response | 14:28:06 |
| 5 | of David Eber, January 20, 2015. | 14:28:10 |
| 6 | (Plaintiff's Deposition | 14:28:10 |
| 7 | Exhibit 23 for identification, Letter | 14:28:10 |
| 8 | dated 1/20/15, no duction numbers.) | 14:28:40 |
| 9 | BY MR. KLAYMAN: | 14:28:40 |
| 10 | Q.   Do you see that? | 14:28:40 |
| 11 | A.   Yes, sir, I have it. | 14:28:41 |
| 12 | Q.   Did you see this letter written | 14:28:45 |
| 13 | back to me on January 20, 2015 around that | 14:28:47 |
| 14 | date? | 14:28:49 |
| 15 | A.   Yes, sir. | 14:28:50 |
| 16 | Q.   And you participated in helping | 14:28:50 |
| 17 | draft it? | 14:28:53 |
| 18 | MS. HANDMAN:  Objection. It is | 14:28:53 |
| 19 | communication with counsel. | 14:28:56 |
| 20 | MR. KLAYMAN:   That does not | 14:28:58 |
| 21 | require communication with counsel. You | 14:28:59 |
| 22 | can respond. | 14:29:01 |
| 23 | MS. HANDMAN:   Excluding any | 14:29:01 |
| 24 | communication with counsel. | 14:29:02 |
| 25 | MR. KLAYMAN:   Participated in | 14:29:04 |

30(b)(6)
BRUCE NICHOLS - 10/14/2015          Page 120

| | | |
|---|---|---|
| 1 | | |
| 2 | helping draft it. That's all I asked. | 14:29:05 |
| 3 | A.    I did not.  I did not, sir. | 14:29:06 |
| 4 | Q.    Were you aware of the response | 14:29:08 |
| 5 | when it was made? | 14:29:10 |
| 6 | A.    Yes, sir. | 14:29:11 |
| 7 | Q.    Who drafted it? | 14:29:11 |
| 8 | A.    I don't know. I received it | 14:29:14 |
| 9 | from, a copy from David Eber. | 14:29:15 |
| 10 | Q.    When you received that from | 14:29:20 |
| 11 | David Eber did you contact Mr. Eber? | 14:29:21 |
| 12 | ** DIRECTION NOT TO ANSWER ** | 14:29:27 |
| 13 | MS. HANDMAN:  Objection, asks for | 14:29:27 |
| 14 | communications with counsel. Instruct | 14:29:29 |
| 15 | the witness not to answer. | 14:29:34 |
| 16 | MR. KLAYMAN:   That is totally not | 14:29:35 |
| 17 | right. I just asked if he contacted Mr. | 14:29:36 |
| 18 | Eber. I'm not asking for what was said. | 14:29:38 |
| 19 | MS. HANDMAN:   It's about this | 14:29:40 |
| 20 | letter is what you're asking. | 14:29:41 |
| 21 | MR. KLAYMAN:   Yes. Did he contact | 14:29:43 |
| 22 | him when he saw a copy of it, that's | 14:29:45 |
| 23 | all. | 14:29:46 |
| 24 | A.    Did I reach out to discuss it? | 14:29:48 |
| 25 | No, I don't believe I did, I don't recall | 14:29:50 |

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 121

1

2  that.                                                    14:29:51

3      Q.    Did you discuss this letter                    14:29:52

4  with anyone at Harcourt?                                 14:29:53

5           MS. HANDMAN:  Excluding counsel.                14:29:56

6      A.    No, sir.                                        14:29:57

7      Q.    So really it didn't concern you                14:29:59

8  at all?                                                  14:30:02

9           MS. HANDMAN:  Objection.                        14:30:02

10     A.    No, sir. We had a legal review                 14:30:05

11  of this book. We felt we were confident in              14:30:08

12  what we published and so I concurred with               14:30:12

13  the response that we do not think we need to            14:30:16

14  make any changes.                                       14:30:18

15     Q.    And you didn't find out any                    14:30:22

16  more information from me or Mr. Montgomery;             14:30:24

17  did you?                                                14:30:26

18          MS. HANDMAN:  Objection.                        14:30:27

19     Q.    Meeting with us.                               14:30:28

20     A.    Sir, we'd already done a pretty                14:30:30

21  thorough review.                                        14:30:33

22     Q.    Without ever fact checking?                    14:30:34

23          MS. HANDMAN:  Objection, excluding              14:30:36

24     legal review.                                        14:30:40

25     A.    Excluding legal review, without                14:30:41

BRUCE NICHOLS - 10/14/2015                    Page 122

1

2    fact checking.                                        14:30:43

3        Q.    Was this letter kept in the                14:30:46

4    ordinary course of Harcourt's business?              14:30:47

5        A.    Yes, sir.                                   14:30:48

6        Q.    I will turn now to what I will             14:30:49

7    ask be marked as Exhibit 24, a letter dated          14:30:56

8    February 13, 2015 sent via fax and mail to           14:31:06

9    William Bayers,  General Counsel of Houghton         14:31:13

10   Mifflin Harcourt Publishing Company Mr.              14:31:19

11   James Risen at the Houghton Mifflin Harcourt         14:31:20

12   Publishing Company.

13              (Plaintiff's Deposition

14       Exhibit 24 marked for identification,

15       Letter dated 2/13/15, no production

16       numbers.)

17   BY MR. KLAYMAN:                                       14:31:30

18       Q.    Did you see this letter around            14:31:30

19   this date?                                            14:31:32

20       A.    Just a minute. Yes, I did.                 14:31:32

21       Q.    Was this letter kept in the                14:31:40

22   ordinary course of Houghton Mifflin's                14:31:41

23   business?                                             14:31:43

24       A.    Yes, sir, it was.                           14:31:43

25       Q.    Did you read the letter in and            14:31:47

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 123

1

2   around February 13, 2015, did you read it          14:31:48

3   then?                                              14:31:50

4       A.    Yes, sir.                                14:31:50

5           MS. HANDMAN:   Just clarify the            14:31:51

6       record, I think that attachment is part       14:31:54

7       of this letter.                               14:31:56

8           MR. KLAYMAN:   Yes, we set forth          14:32:05

9       in the attachment, the alleged                14:32:08

10       defamatory statements.                        14:32:09

11      Q.    You saw that at the time, too           14:32:10

12   correct, sir?                                     14:32:12

13      A.    Yes, sir.                                14:32:13

14      Q.    What action, if any did                 14:32:13

15   Harcourt take after receiving this letter to      14:32:16

16   determine whether or not they were false and      14:32:18

17   misleading statements published Pay Any           14:32:23

18   Price?                                            14:32:26

19           MS. HANDMAN:   Excluding any             14:32:26

20       communications or actions by counsel.        14:32:27

21      Q.    Respond.                                 14:32:30

22      A.    We discussed with counsel.              14:32:30

23      Q.    What actions were taken after           14:32:34

24   any such discussions?  I am not asking about      14:32:36

25   the discussions, what actions were taken          14:32:39

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 124

1

2  whether or not these statements were                    14:32:41

3  misleading or false?                                     14:32:42

4        MS. HANDMAN:   Excluding any                       14:32:43

5     actions taken in response or on advice                14:32:45

6     of counsel.                                           14:32:48

7     A.    Excluding those, no actions.                    14:32:52

8     Q.    In fact even after receiving                    14:32:53

9  this letter no fact checking was undertaken              14:32:55

10  by Harcourt; correct?                                   14:32:58

11        MS. HANDMAN:   Excluding any                      14:32:59

12     actions or communications with counsel.              14:32:59

13     A.    Outside of work with counsel,                  14:33:03

14  that is correct.                                         14:33:05

15     Q.    In the letter wherein I write                  14:33:05

16  "We demand you issue a retraction                        14:33:26

17  immediately.  Your previous letter of                   14:33:29

18  January 20, 2015 denies any defamatory                  14:33:30

19  statements were made.  We strongly suggest              14:33:34

20  that you reconsider, please govern yourself              14:33:36

21  accordingly."                                           14:33:38

22        Were any efforts made to                          14:33:43

23  determine whether retraction were necessary?            14:33:45

24        MS. HANDMAN:   Again, excluding                   14:33:47

25     any communications by counsel.                       14:33:48

| | |
|---|---|
| 1 | |
| 2   A.   We remained confident in the | 14:33:50 |
| 3  book we published. We did not believe | 14:33:51 |
| 4  retraction was necessary. | 14:33:53 |
| 5   Q.   Do you know whether or not your | 14:33:54 |
| 6  legal counsel are going to testify at trial | 14:33:55 |
| 7  in this matter? | 14:33:58 |
| 8       MS. HANDMAN:  Objection, | 14:33:59 |
| 9    speculative. Asks for future speculation | 14:34:01 |
| 10    and asks for legal judgments. Beyond the | 14:34:06 |
| 11    capacity of this witness. | 14:34:09 |
| 12       MR. KLAYMAN:   That is one of the | 14:34:10 |
| 13    most bizarre objections I have heard in | 14:34:11 |
| 14    my 38 years of being a lawyer. | 14:34:14 |
| 15       MS. HANDMAN:   Well, asking him | 14:34:16 |
| 16    whether legal counsel is going to | 14:34:17 |
| 17    testify at trial I think -- | 14:34:20 |
| 18       MR. KLAYMAN:   If he knows, that | 14:34:21 |
| 19    is a simple question, Laura. It is not a | 14:34:22 |
| 20    big deal. | 14:34:24 |
| 21   Q.   Please answer. | 14:34:25 |
| 22   A.   I do not know, sir. | 14:34:26 |
| 23   Q.   Has anyone told you they are | 14:34:29 |
| 24  going to testify? | 14:34:30 |
| 25       MS. HANDMAN:  Objection.  It is | 14:34:31 |

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 126

1

2      also beyond the seven topics listed for                 14:34:31

3      this 30(b)(6) witness.                                   14:34:34

4      Q.    You can respond.                                   14:34:39

5         ** DIRECTION NOT TO ANSWER **                         14:34:40

6         MS. HANDMAN:   No, he can't                           14:34:40

7      respond. It is beyond the topics.                        14:34:41

8         MR. KLAYMAN:   Certify it.                            14:34:43

9   CERTIFIED FOR COURT RULINGS:                                14:34:49

10  -------------------------------                             14:34:49

11  BY MR. KLAYMAN:                                             14:34:55

12     Q.    I am going to show you what I                      14:34:55

13   will ask the court reporter to mark or it                  14:34:56

14   has been marked as Risen Exhibit 8. It is                  14:34:59

15   the contract.                                              14:35:02

16        MS. HANDMAN:   Which Exhibit is                       14:35:04

17     this?                                                    14:35:05

18        MR. KLAYMAN:   Risen Exhibit 8.  I                    14:35:05

19     am just going off of Risen Exhibit 8.                    14:35:12

20     If you want to remark it as Exhibit 25,                  14:35:17

21     that's fine, but it is also Risen                        14:35:19

22     Exhibit 8.                                               14:35:21

23            (Plaintiff's Deposition                           14:35:21

24     Exhibit 25 for identification, Trade                     14:35:21

25     Publishing Adult Editorial Department                    14:35:21

| 1 | | |
|---|---|---|
| 2 | Publishing Agreement, production numbers | 14:35:21 |
| 3 | DEFS 004322 through DEFS 004337.) | 14:35:48 |
| 4 | BY MR. KLAYMAN: | 14:35:48 |
| 5 | Q.   Do you see that document? | 14:35:48 |
| 6 | A.   Yes, sir. | 14:35:49 |
| 7 | Q.   Was this kept and maintained in | 14:35:50 |
| 8 | the ordinary course of Harcourt's business? | 14:35:55 |
| 9 | A.   Yes, sir. | 14:35:56 |
| 10 | Q.   This is the contract that was | 14:35:58 |
| 11 | signed with Risen by the publisher Houghton | 14:35:59 |
| 12 | Mifflin Harcourt Publishing Company? | 14:36:04 |
| 13 | A.   Yes, sir. | 14:36:04 |
| 14 | Q.   You previously testified you | 14:36:09 |
| 15 | got Simon & Schuster to sign a contract, | 14:36:11 |
| 16 | too. I don't see that. Where is that? | 14:36:13 |
| 17 | MS. HANDMAN:  Objection, | 14:36:16 |
| 18 | mischaracterization. | 14:36:17 |
| 19 | A.   No, sir, I did not say that. I | 14:36:17 |
| 20 | said the literary agent negotiated with both | 14:36:19 |
| 21 | sides. Our contract was with Jim and some of | 14:36:21 |
| 22 | our payments were to them. | 14:36:24 |
| 23 | Q.   Are there any other documents | 14:36:28 |
| 24 | by and between Harcourt and Simon & Schuster | 14:36:29 |
| 25 | concerning the book Pay Any Price? | 14:36:31 |

BRUCE NICHOLS - 10/14/2015                Page 128

1

2     A.    No, sir. No, sir.                          14:36:34

3     Q.    For all you know you may have              14:36:35

4  ripped Simon off of its right because you          14:36:39

5  never confirmed it with Simon itself?              14:36:42

6          MS. HANDMAN:  Objection.                    14:36:44

7     A.    We worked with a literary agent            14:36:44

8  who is one of the best in the business. And        14:36:45

9  when she assures us he is in the clear to          14:36:47

10  sign this contract, we rely on her.               14:36:50

11    Q.    Did you ask for proof of that?            14:36:52

12    A.    No, sir.                                   14:36:54

13         MS. HANDMAN:   Asked and answered.          14:36:55

14    Q.    Your general line of business             14:36:56

15  based upon all this discussion about              14:36:59

16  confidential and classified information           14:37:02

17  sources and who owns property rights in the       14:37:03

18  book you just really don't want to know           14:37:08

19  these things because Harper wants to do what      14:37:11

20  it pleases; right?                                14:37:13

21         MS. HANDMAN:   Objection to the            14:37:14

22     form.  Badgering the witness.                  14:37:15

23    A.    Sir, we rely on literary agents           14:37:16

24  to represent their clients just the way           14:37:19

25  people rely on lawyers to represent their         14:37:20

1

2   clients. And this particular literary agent          14:37:23

3   is one of the best. There was absolutely no          14:37:25

4   reason to doubt her word.                            14:37:27

5        Q.   I now asked be marked as                   14:37:41

6   Exhibit 25 -- we didn't --                           14:37:42

7             MS. HANDMAN:   We did. We marked           14:37:47

8        it as Exhibit 25.                               14:37:49

9             MR. KLAYMAN:   Okay. I ask an              14:37:50

10       Annual Report 2014 be marked as many            14:37:55

11       Exhibit 26.                                     14:37:57

12             (Plaintiff's Deposition                   14:37:57

13       Exhibit 26 for identification, Annual           14:37:57

14       Report 2014, production numbers.)               14:38:34

15  BY MR. KLAYMAN:                                      14:38:34

16       Q.   Take a look at this document,              14:38:35

17   Mr. Nichols, is this a complete copy of the         14:38:36

18   2014 Annual Report of Houghton Mifflin?             14:38:38

19       A.   It appears to be complete, yes.            14:38:42

20       Q.   Turn to the narrative in the               14:38:47

21   front.  It appears to be an SEC filing;             14:38:49

22   correct?                                            14:38:56

23       A.   Which piece are you referring              14:38:56

24   to?                                                 14:38:58

25       Q.   I'll find it.  Attached to the             14:39:00

1

2   Annual Report if you can look into this                14:39:12

3   report which is Exhibit 26 one, two, three,            14:39:14

4   four, five, six, seven, eight, nine, ten --            14:39:18

5   the eleventh page in the Form 10-K filed               14:39:26

6   with the United States Securities and                  14:39:30

7   Exchange Commission.  Correct?                         14:39:32

8        A.    Okay. Yes.                                  14:39:40

9        Q.    That's part of the Annual                   14:39:40

10  Report; correct?                                       14:39:51

11       A.    Was that a question? Yes.                   14:39:52

12       Q.    Based on your experience                   14:39:53

13  Harcourt wouldn't put anything forward in an           14:39:59

14  Annual Report which it didn't believe was              14:40:01

15  true and correct?                                      14:40:03

16          MS. HANDMAN:   Mr. Klayman, you               14:40:04

17       know that the Magistrate has ruled that           14:40:06

18       testimony in the subject of SEC filings           14:40:10

19       are not within the scope of this                  14:40:13

20       deposition.                                       14:40:15

21          And the fact that this one page is            14:40:19

22       in the Annual Report does not give you            14:40:22

23       the opportunity to now go contrary to             14:40:24

24       the Magistrate's order and inquire about          14:40:27

25       SEC filings.                                      14:40:33

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 131

| | | |
|---|---|---|
| 1 | | |
| 2 | MR. KLAYMAN:   I am not inquiring | 14:40:33 |
| 3 | about that. I am inquiring about the | 14:40:34 |
| 4 | Annual Report. It is not just one page. | 14:40:36 |
| 5 | That is another false statement, | 14:40:38 |
| 6 | Ms. Handman, among many, many in this | 14:40:39 |
| 7 | case. Several pages. | 14:40:41 |
| 8 | Q.    They incorporate -- I just got | 14:40:45 |
| 9 | the testimony -- the 10-K filing in the | 14:40:47 |
| 10 | Annual Report which is put forward to the | 14:40:50 |
| 11 | public.  Correct, Mr. Nichols? | 14:40:51 |
| 12 | A.    The Annual Report is put | 14:40:55 |
| 13 | forward to the public, yes. | 14:40:56 |
| 14 | Q.    And my question was is that the | 14:40:58 |
| 15 | best of your knowledge testifying on behalf | 14:41:02 |
| 16 | of Houghton Mifflin Harcourt everything that | 14:41:05 |
| 17 | is contained in here is true and correct in | 14:41:07 |
| 18 | your Annual Report? | 14:41:09 |
| 19 | ** DIRECTION NOT TO ANSWER ** | 14:41:09 |
| 20 | MS. HANDMAN:   I am going to | 14:41:09 |
| 21 | instruct the witness not to answer if | 14:41:10 |
| 22 | you're asking about the SEC filings that | 14:41:13 |
| 23 | are in the Annual Report. If you want to | 14:41:18 |
| 24 | ask specific questions about some of the | 14:41:19 |
| 25 | text here, you know, that is | 14:41:22 |

30(b)(6)
BRUCE NICHOLS - 10/14/2015                     Page 132

| | | |
|---|---|---|
| 1 | | |
| 2 | permissible. | 14:41:26 |
| 3 | MR. KLAYMAN:  I am asking about | 14:41:27 |
| 4 | the Annual Report. This is part of the | 14:41:28 |
| 5 | Annual Report, so I am asking -- | 14:41:29 |
| 6 | MS. HANDMAN:  No, it is a back | 14:41:32 |
| 7 | door way of asking about SEC filings | 14:41:33 |
| 8 | which the Judge said you could not do. | 14:41:35 |
| 9 | MR. KLAYMAN:  That's not my | 14:41:36 |
| 10 | problem, okay. It's your Annual Report. | 14:41:37 |
| 11 | You put it in there. | 14:41:40 |
| 12 | Q.   Correct, Mr. Nichols? | 14:41:44 |
| 13 | MS. HANDMAN:  Can we go off the | 14:41:45 |
| 14 | record, please. | 14:41:47 |
| 15 | MR. KLAYMAN:  No, we are not | 14:41:47 |
| 16 | going off the record. | 14:41:48 |
| 17 | BY MR. KLAYMAN: | 14:41:50 |
| 18 | Q.   I am going to ask the you | 14:41:50 |
| 19 | question again. The Annual Report of 2014 | 14:41:52 |
| 20 | for Houghton Mifflin Harcourt contains an | 14:41:54 |
| 21 | entire version of the Form 10-K filed in and | 14:41:58 |
| 22 | around that time period as part of your | 14:42:03 |
| 23 | Annual Report; is it not? | 14:42:06 |
| 24 | A.   I'd like to discuss with | 14:42:14 |
| 25 | counsel. | 14:42:15 |

1

2        MS. HANDMAN:  I am going to read,                    14:42:16

3    put on the record the portion of                         14:42:18

4    Magistrate Judge's post discovery                        14:42:22

5    hearing order dated 9/15/2015. In it he                  14:42:25

6    says topic --                                            14:42:34

7        MR. KLAYMAN:  I don't want you to                    14:42:43

8    take, you know, the order speaks for                     14:42:44

9    itself. I don't want you to go off                       14:42:46

10   record and coach this witness as you've                 14:42:47

11   done before and manipulating testimony                  14:42:50

12   because then you're going to be                          14:42:54

13   potentially subject to perjury here                     14:42:55

14   yourself.                                                14:42:57

15       I just want to get, I think it                      14:42:57

16   will be well advised on your part to let                14:42:59

17   him answer. Because all I'm asking is                   14:43:01

18   whether or not what's put forward in the               14:43:04

19   Annual Report, this is part of the                      14:43:07

20   Annual Report is true and correct to the               14:43:08

21   best of his knowledge. That's all.                      14:43:10

22       MS. HANDMAN:  I believe that that                   14:43:14

23   goes beyond the scope of what Magistrate               14:43:15

24   Goodman permitted as testimony.                         14:43:17

25       MR. KLAYMAN:  It is not. I am                       14:43:25

BRUCE NICHOLS - 10/14/2015                Page 134

1

2   asking about the Annual Report.                    14:43:26

3        MS. HANDMAN:   You pointed him to            14:43:28

4   this SEC 10-K. He specifically said that          14:43:30

5   this kind of collateral information is            14:43:38

6   exactly what you're not allowed to                14:43:41

7   inquire into.                                     14:43:43

8        MR. KLAYMAN:   I am asking about             14:43:44

9   the Annual Report.                                14:43:45

10        MS. HANDMAN:   If you have                    14:43:45

11  specific questions about anything in the          14:43:46

12  Annual Report that pertains to the book,          14:43:47

13  you're free to ask it.                            14:43:53

14        MR. KLAYMAN:   The reason you               14:43:55

15  don't want him to go into it is because           14:43:55

16  you don't want him to say this Annual             14:43:58

17  Report is true and correct because it             14:43:59

18  would subject him to potential perjury.           14:44:03

19        MS. HANDMAN:   No.  I am following           14:44:05

20  the Magistrate Judge's order.                     14:44:06

21        MR. KLAYMAN:   I think it will be           14:44:07

22  helpful, why don't you have him take the          14:44:08

23  Fifth Amendment.                                  14:44:11

24        MS. HANDMAN:   I am having him               14:44:11

25  following the Magistrate Judge's order.           14:44:13

30(b)(6)

BRUCE NICHOLS - 10/14/2015                    Page 135

| | | |
|---|---|---|
| 1 | | |
| 2 | MR. KLAYMAN:  That is not the | 14:44:14 |
| 3 | order. I am asking about the Annual | 14:44:15 |
| 4 | Report. This is held out to the public. | 14:44:16 |
| 5 | I asked no questions about stock | 14:44:18 |
| 6 | acquisition or divestitures or anything | 14:44:20 |
| 7 | like that. I just want to know if | 14:44:22 |
| 8 | Harcourt subscribes to the accuracy of | 14:44:26 |
| 9 | its 2014 Annual Report. | 14:44:28 |
| 10 | MS. HANDMAN:  We are going to | 14:44:30 |
| 11 | take a break now and we'll resume in a | 14:44:30 |
| 12 | few minutes. | 14:44:34 |
| 13 | MR. KLAYMAN:  I ask you not coach | 14:44:36 |
| 14 | him on this, Ms. Handman.  You are going | 14:44:37 |
| 15 | to implicate yourself. | 14:44:39 |
| 16 | THE VIDEOGRAPHER:    The time is | 14:44:41 |
| 17 | 2:43 p.m. We are going off the record. | 14:44:42 |
| 18 | (Recess taken .) | 14:54:41 |
| 19 | THE VIDEOGRAPHER:    The time is | 14:54:46 |
| 20 | 2:53 p.m. We are back on the record. | 14:54:47 |
| 21 | This also begins DVD number 3. | 14:54:49 |
| 22 | EXAMINATION CONDUCTED BY | 14:54:52 |
| 23 | MR. KLAYMAN: | 14:54:52 |
| 24 | Q.    How long was this break? | 14:54:52 |
| 25 | THE VIDEOGRAPHER:    10 minutes. | 14:54:55 |

1

2     MR. KLAYMAN:   Counsel only                    14:54:57

3  represented a few minutes, I think it             14:54:58

4  was longer than that.                             14:54:59

5  A.    I didn't time it myself.                     14:55:01

6     MR. KLAYMAN:   The court reporter               14:55:08

7  or videographer has it.                            14:55:09

8     MS. HANDMAN:   I have something to              14:55:11

9  put on the record right now. Topic 9               14:55:12

10  that was listed in the original 30(b)(6)          14:55:16

11  notice for deposition was "Manipulation           14:55:18

12  of corporate stock and failure to                 14:55:22

13  disclose potential liability in this              14:55:24

14  lawsuit and filings with and to the               14:55:26

15  Securities and Exchange Commission and            14:55:29

16  related communications with, to and from          14:55:30

17  the SEC."                                          14:55:34

18     I will now read from the Judge,                14:55:36

19  Magistrate Judge's order of 9/15/2015.            14:55:40

20  Item number 3, "Topic number 9 for               14:55:43

21  Plaintiff's 30(b)(6) depositions of the          14:55:47

22  corporate Defendants is stricken without         14:55:49

23  prejudice as an improper subject for             14:55:52

24  deposition at this time."                         14:55:55

25     Accordingly, I am going to                     14:55:58

1

2  instruct the witness not to answer,                    14:55:59

3  consistent with the Magistrate Judge's                 14:56:01

4  ruling.                                                 14:56:07

5       MR. KLAYMAN:  I am not asking him                 14:56:08

6  about stock manipulation. I have that up               14:56:09

7  on appeal. I am waiting for the Judge to               14:56:12

8  rule on that. I will respect the                       14:56:14

9  Magistrate Judge's ruling and the                      14:56:17

10  Judge's ultimate ruling. I am not asking              14:56:19

11  about that.                                            14:56:21

12       He told me this is part of the                   14:56:22

13  Annual Report held out to the public.                 14:56:23

14       The question I am going to ask him               14:56:24

15  right now, would Houghton Mifflin                      14:56:26

16  publish an Annual Report which it                      14:56:30

17  believed contained false or misleading                14:56:31

18  information?                                           14:56:34

19    ** DIRECTION NOT TO ANSWER **                       14:56:34

20       MS. HANDMAN:  I am instructing                   14:56:34

21  him not to answer based on the                         14:56:39

22  Magistrate Judge's ruling.                             14:56:40

23       MR. KLAYMAN:  Is he taking the                   14:56:42

24  fifth on this, too?                                    14:56:43

25       MS. HANDMAN:  Excuse me?                         14:56:44

BRUCE NICHOLS - 10/14/2015                    Page 138

1

2      MR. KLAYMAN:   Is he taking the                    14:56:45

3  Fifth?                                                 14:56:46

4      MS. HANDMAN:   He is being                         14:56:47

5  instructed not to answer because it is                14:56:48

6  outside the scope of the 30(b)(6)                      14:56:49

7  deposition, as per the Magistrate's                   14:56:50

8  order.                                                14:56:54

9      MR. KLAYMAN:   I am going to                       14:56:55

10  adjourn this deposition at this time, so             14:56:56

11  I will seek, I have questions to ask                 14:56:58

12  about the Annual Report. Now that you're             14:57:02

13  considering this to deal with what you               14:57:06

14  just read into the record I will adjourn             14:57:08

15  the deposition at this time.                         14:57:10

16      MS. HANDMAN:   You do so at your                  14:57:13

17  own peril.                                           14:57:14

18      MR. KLAYMAN:   We will have an                    14:57:15

19  emergency hearing.                                   14:57:17

20      MS. HANDMAN:   We consider this                   14:57:17

21  deposition over. The deposition of                   14:57:18

22  Houghton Mifflin Harcourt Publishing                 14:57:23

23  Company we consider concluded if you                 14:57:26

24  wish to adjourn it now,  we will object              14:57:28

25  to any return.                                       14:57:34

30(b)(6)

BRUCE NICHOLS - 10/14/2015                    Page 139

1

2        MR. KLAYMAN:  I will seek a          14:57:34

3   ruling from the Magistrate on this. I am   14:57:35

4   not getting into SEC matters. You know     14:57:37

5   that Ms. Handman.                          14:57:39

6        MS. HANDMAN:  Well, I suggest you     14:57:40

7   move on and finish your questions on       14:57:41

8   other subjects. If this was your last      14:57:43

9   question, then, you know, it is fine to    14:57:44

10  adjourn.                                   14:57:47

11       MR. KLAYMAN:  I have questions        14:57:47

12  regarding the Annual Reports. So I am      14:57:48

13  therefore adjourning the deposition at     14:57:50

14  this time.                                 14:57:51

15       MS. HANDMAN:  I said if you have      14:57:51

16  some specific questions about the Annual   14:57:52

17  Report.                                    14:57:57

18       MR. KLAYMAN:  That is my              14:57:57

19  position,  okay. You are not going to      14:57:58

20  convince me otherwise.                     14:58:00

21       MS. HANDMAN:  You do so at the        14:58:01

22  risk of not having return on this          14:58:02

23  subject because we consider the            14:58:03

24  deposition complete.                       14:58:05

25       MR. KLAYMAN:  You are not having      14:58:07

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 140

| 1 | | |
|---|---|---|
| 2 | your client answer a simple question | 14:58:09 |
| 3 | about an Annual Report. The deposition | 14:58:10 |
| 4 | is adjourned subject to the court's | 14:58:12 |
| 5 | ruling. Thank you. | 14:58:14 |
| 6 | MS. HANDMAN:  Mr. Klayman, one | 14:58:17 |
| 7 | moment, please. | 14:58:20 |
| 8 | We will go off the record for a | 14:58:27 |
| 9 | moment.  Mr. Klayman, we are not | 14:58:29 |
| 10 | adjourned. Mr. Klayman? | 14:58:30 |
| 11 | THE VIDEOGRAPHER:    The time is | 14:58:38 |
| 12 | 2:57 p.m. We are going off the record. | 14:58:39 |
| 13 | (Recess taken.) | 15:14:03 |
| 14 | THE VIDEOGRAPHER:    The time is | 15:14:04 |
| 15 | 3:12 p.m. And we are back on the record. | 15:14:08 |
| 16 | MS. HANDMAN:  Mr. Klayman has | 15:14:10 |
| 17 | exited the deposition. We were saying | 15:14:14 |
| 18 | without going off the record, he spoke | 15:14:22 |
| 19 | over the statement I was trying to say, | 15:14:24 |
| 20 | which was if he had other questions | 15:14:26 |
| 21 | about the Annual Report, excluding | 15:14:27 |
| 22 | topics stricken by the Magistrate, we | 15:14:31 |
| 23 | are and remain happy to have Mr. Nichols | 15:14:33 |
| 24 | answer those questions and complete the | 15:14:37 |
| 25 | deposition. | 15:14:39 |

1

2      We sent an email to Mr. Klayman          15:14:40

3   and his colleagues to that effect and       15:14:45

4   said we are still here. We asked the        15:14:47

5   court reporter and videographer to stay     15:14:48

6   and the witness to stay to see if Mr.       15:14:51

7   Klayman would come back to finish the       15:14:53

8   questioning of this witness, this           15:14:56

9   30(b)(6) witness for the Houghton           15:14:58

10   Mifflin Harcourt Publishing Company        15:15:01

11   30(b)(6) deposition.                       15:15:04

12      We even tried calling the phone         15:15:06

13   number listed on the court papers and      15:15:08

14   under the Klayman Law Firm letterhead.     15:15:12

15   And there was no ability to leave a        15:15:17

16   message.                                   15:15:18

17      We remained here to answer              15:15:20

18   questions to finish the deposition. Mr.    15:15:26

19   Klayman walked out. We consider this       15:15:28

20   deposition now concluded. We have no       15:15:29

21   further statements at this time.           15:15:38

22

23

24

25

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 142

1

2

3          THE VIDEOGRAPHER:    The time is          15:15:41

4     3:14 p.m. And we are going off the            15:15:42

5     record.

6          (Time Noted: 3:14 p.m.)

7

8          _____

9          BRUCE NICHOLS

10

11   Subscribed and sworn to before me

12   this _____ day of _____, 2015.

13

14   _____

15

16

17

18

19

20

21

22

23

24

25

1

2  STATE OF NEW YORK     )    Pg__of__Pgs

3              ss:

4  COUNTY OF NEW YORK    )

5      I wish to make the following changes, for

6  the following reasons:

7  PAGE LINE

8  ____ ____   CHANGE: _____

9          REASON: _____

10  ____ ____   CHANGE: _____

11          REASON: _____

12  ____ ____   CHANGE: _____

13          REASON: _____

14  ____ ____   CHANGE: _____

15          REASON: _____

16  ____ ____   CHANGE: _____

17          REASON: _____

18  ____ ____   CHANGE: _____

19          REASON: _____

20  ____ ____   CHANGE: _____

21          REASON: _____

22  ____ ____   CHANGE: _____

23          REASON: _____

24  ____ ____   CHANGE: _____

25          REASON: _____

30(b)(6)
BRUCE NICHOLS - 10/14/2015                    Page 144

1

2

3          C E R T I F I C A T E

4  STATE OF NEW YORK  )
                      : ss.
5  COUNTY OF NEW YORK )

6          I, TAMMEY M. PASTOR, a Registered

7  Professional Reporter, Certified LiveNote

8  Reporter and Notary Public within and for the

9  State of New York, do hereby certify:

10          That BRUCE NICHOLS, the witness

11  whose deposition is hereinbefore set forth,

12  was duly sworn by me and that such deposition

13  is a true record of the testimony given by the

14  witness.

15          I further certify that I am not

16  related to any of the parties to this action

17  by blood or marriage, and that I am in no way

18  interested in the outcome of this matter.

19          IN WITNESS WHEREOF, I have hereunto

20  set my hand this _____ day of _____,2015.

21

22

23

24  _____

25  TAMMEY M. PASTOR, RPR, CLR

BRUCE NICHOLS - 10/14/2015                    Page 145

1

2

3  ** DIRECTION NOT TO ANSWER **       12

4  CERTIFIED FOR COURT RULINGS:        13

5  -------------------------------

6  (Plaintiff's Deposition Exhibit 20   14

7  for identification, Re-notice of

8  Rule 30(b)(6) Deposition, no

9  production numbers.)

10  ** DIRECTION NOT TO ANSWER **       19

11  CERTIFIED FOR COURT RULINGS:        20

12  -------------------------------

13  CERTIFIED FOR COURT RULINGS:        32

14  -------------------------------

15  (Plaintiff's Deposition Exhibit 21   49

16  for identification, Xeroxed Cover

17  Page Pay Any Price by James Risen,

18  no production numbers.)

19  ** DIRECTION NOT TO ANSWER **       62

20  ** DIRECTION NOT TO ANSWER **       64

21  (Plaintiff's Deposition Exhibit 22   96

22  for identification, Letter dated

23  1/14/15, no production numbers.)

24  ** DIRECTION NOT TO ANSWER **       114

25

1

2  (Plaintiff's Deposition Exhibit 23    119

3  for identification, Letter dated

4  1/20/15, no duction numbers.)

5  ** DIRECTION NOT TO ANSWER **        120

6  (Plaintiff's Deposition Exhibit 24    122

7  marked for identification, Letter

8  dated 2/13/15, no production

9  numbers.)

10  ** DIRECTION NOT TO ANSWER **        126

11  CERTIFIED FOR COURT RULINGS:         126

12  -------------------------------

13  (Plaintiff's Deposition Exhibit 25    126

14  for identification, Trade Publishing

15  Adult Editorial Department

16  Publishing Agreement, production

17  numbers DEFS 004322 through DEFS

18  004337.)

19  (Plaintiff's Deposition Exhibit 26    129

20  for identification, Annual Report

21  2014, production numbers.)

22  ** DIRECTION NOT TO ANSWER **        131

23  ** DIRECTION NOT TO ANSWER **        137

24

25

30(b)(6)
BRUCE NICHOLS - 10/14/2015                                i1

---

**0**

---

**004322**
127:3

**004337**
127:3

---

**1**

---

**1**
3:4

**1/14/15**
96:22

**1/20/15**
119:8

**10**
12:17 92:25 135:25

**10-K**
130:5 131:9 132:21
134:4

**10:56**
85:17

**11:41**
3:13

**12:58**
84:25 85:2

**13**
96:16 122:18 123:2

**1345**
3:11

**14**
3:13 96:4,14 97:21

**14th**
96:19

**16**
10:4,9

**1964**
7:18

**1986**
7:24

**1989**
9:25

**1992**
9:25

**1:50**
85:4

**1:56**
85:8,17

---

**2**

---

**2**
35:25 48:22 58:21 85:9
97:14

**2/13/15**
122:15

**20**
14:12,17,21,23 96:15
105:4 119:5,13 124:18

**2007**
10:11

**2009**
95:13

**2013**
20:23 21:6 29:21 78:5,9

**2014**
3:13 29:14 50:24 87:20
129:10,14,18 132:19
135:9

**2015**
96:4 97:22 105:4 119:5,
13 122:8 123:2 124:18

**21**
49:3,11 71:11

**22**
96:10,13,18,21 118:25

**23**
119:4,7

**239**
83:25

**23rd**
7:18

**24**
122:7,14

**25**
126:20,24 129:6,8

**26**
75:3 129:11,13 130:3

**2:43**
135:17

**2:53**
135:20

**2:57**
140:12

---

**3**

---

**3**
35:17 36:2,3 48:5,10,
12,17,21 49:11 71:12
135:21 136:20

**30(b)(6)**
3:4 4:11,16 6:4,12
12:21 13:5,8,25 14:24
19:4 56:2 126:3 136:10,
21 138:6

**32**
71:12,17

**33**
89:21

**375**
86:19,20,22

**375,000**
86:6 87:3

**38**
125:14

**3:12**
140:15

---

**4**

---

**45**
91:4

**450**
86:7

**47**
78:4

---

**8**

---

**8**
92:25 126:14,18,19,22

**8:27**
5:2

---

**9**

---

**9**
136:9,20

**9/11**
71:20

**9/15/2015**
133:5 136:19

**90**
5:9

---

**A**

---

**a.m.**
3:13

**absolutely**
87:13 100:8 129:3

**abuse**
34:5

**accede**
114:24

**acceptance**
86:16

**access**
58:14 99:20 100:11,22
101:16

**account**
81:9,11

**accountable**
51:19 58:5 112:15
113:12

**accounts**
109:21,22 112:4

**accuracy**
135:8

**accurate**
66:3 79:6

**accusations**
115:18

**accuses**
74:12

**acquire**
87:12

**acquisition**

---

BRUCE NICHOLS - 10/14/2015                                  i2

135:6

**action**
36:19 60:22 123:14

**actions**
74:25 123:20,23,25
124:5,7,12

**actual**
53:3

**add**
4:24 50:12

**added**
50:6,8 86:19

**addition**
70:6

**additional**
64:18 70:23 86:20

**address**
55:7

**adjourn**
138:10,14,24 139:10

**adjourned**
140:4,10

**adjourning**
139:13

**administration**
72:4 73:8,13 77:2 79:16
84:6

**admired**
25:9

**adult**
12:10,13 14:8 126:25

**advance**
45:9 47:7 86:14 87:13

**advances**
86:2

**adverse**
27:6

**advice**
124:5

**advised**
6:10 133:16

**advocate**
78:18 114:22

**age**

71:20

**agent**
23:11 25:22,24 28:22
29:16 32:21 34:11
36:14 42:10 43:2,20
44:19 45:18,20,21
46:15 47:19 55:6 85:25
86:25 87:5 127:20
128:7 129:2

**agent's**
45:16

**agents**
128:23

**ago**
10:16 16:22,25 87:25
88:2

**agree**
27:9,21 28:17 29:5,6,9,
12 45:23 46:18 47:2,6

**agreed**
21:7 45:22

**agreeing**
46:9

**agreement**
87:2 127:2

**airliners**
72:6 73:9 77:3 79:17
84:7 91:12

**AI**
77:15

**allegation**
60:25

**allegations**
109:11 111:16

**alleged**
68:9 105:14 123:9

**allegedly**
67:11,13

**allow**
14:4,5 57:22

**allowed**
18:9,20 134:6

**Amendment**
134:23

**American**
72:2,23 73:6 74:14

76:24 79:14 80:7,19
83:3,21,25

**American's**
71:19

**Americas**
3:12

**amount**
90:21

**amounts**
90:14

**analogy**
55:5

**analytic**
79:2

**and/or**
39:2 98:10,12

**Annual**
129:10,13,18 130:2,9,
14,22 131:4,10,12,18,
23 132:4,5,10,19,23
133:19,20 134:2,9,12,
16 135:3,9 137:13,16
138:12 139:12,16
140:3,21

**anonymity**
49:21

**anonymous**
49:13 117:19,23

**answer**
12:22,25 13:16 14:5,6
16:16 18:24 19:20,24
20:7 22:2,5 33:16,24
34:15 35:7 37:19 38:12
39:6 40:5 46:24 47:22
57:23 58:20 62:4,13,17
63:15 64:3,7 67:5,7
69:23 70:12 71:9 74:23
75:25 99:5 101:10,13,
21 104:7 107:18 109:14
114:12,15 118:12
120:12,15 125:21 126:5
131:19,21 133:17
137:2,19,21 138:5
140:2,24

**answered**
32:9 46:23 69:22 101:5,
9 109:6,8 118:10
128:13

**answering**
69:13

**answers**
84:14

**anticipated**
87:17

**anybody**
16:5 42:23 45:13 99:3

**appeal**
137:7

**appearing**
3:23,25 14:15

**appears**
129:19,21

**apply**
34:18

**approach**
23:8 29:16 54:17

**approached**
23:8,10 25:20 26:11,19
28:22 42:10 44:3

**appropriate**
79:2

**approval**
47:20

**approximately**
3:13

**April**
89:18

**argued**
112:9

**arrived**
95:24

**articles**
117:8

**asked**
28:3,23 29:2 32:6 41:18
42:4 46:23 56:23 57:5,
11 59:16 69:22 70:11
75:15 76:14 80:10,11
88:24 99:2 100:24
101:4 109:6,8 112:24
118:9 120:2,17 128:13
129:5 135:5

**asking**
11:18,20,21 13:23

19:22,25 20:2,8 22:3
27:25 31:7,15,16 33:22
34:17 35:4 38:17 54:8
56:10 59:24 62:7 75:19
79:24 84:20 95:9 97:25
98:8,20 101:7 103:10,
11,15 107:18 110:15
115:15 120:18,20
123:24 125:15 131:22
132:3,5,7 133:17 134:2,
8 135:3 137:5,10

**asks**
14:3 98:11,14 120:13
125:9,10

**asserting**
100:10

**assistant**
9:13

**associates**
5:19

**association**
3:17

**assuming**
99:18

**assures**
128:9

**asterisk**
71:14,17

**Atlantic**
72:7 79:18 91:13

**Attached**
129:25

**attachment**
123:6,9

**attending**
91:7

**attention**
48:4 53:5 96:3

**attorney-client**
12:24 13:3,7 18:6 19:22
31:10,19

**attribute**
90:19

**author**
20:19 25:8 63:22 65:24
66:7,10 76:7,11,13 95:5

**authority**
77:19 81:3 91:19,21

**authorization**
31:23 99:23

**authors**
53:17 60:19 65:21,22
90:11 94:9 95:2,3,10

**authors'**
60:17

**available**
28:20 104:23

**Avenue**
3:11

**avenues**
99:8 104:21

**aware**
9:6 11:8,11,13,14 20:19
21:3 31:6 41:8,13,20
42:12 60:24 61:4 67:20
68:25 95:14,18,20,22
97:24 102:25 103:5
104:7 109:10,18 110:5,
6,16 112:4,11,12,18
113:7,8,15,16,20 115:9
120:4

**awfully**
90:13

___

**B**

___

**BA**
8:5

**back**
20:10 36:8 47:15 63:5,9
66:13 76:12 83:17 85:8,
16 87:24 89:20 103:23
107:25 113:3 119:13
132:6 135:20 140:15

**background**
7:20 10:24

**backup**
20:17

**Badgering**
128:22

**Bahboobian**
3:22

**bar**

112:2

**base**
64:9 75:24

**based**
9:17 12:19 27:13 39:22
40:12,25 41:9,13,20
45:23 46:19 52:22
53:22 56:11 64:10
66:11 69:16 70:8 74:11,
16 75:12,19 79:18 80:5,
15 81:12 91:13 95:5
128:15 130:12 137:21

**basic**
115:16 116:13 117:16

**Basically**
94:12

**Bayers**
16:9,14 17:6,20,25
19:12,15 63:6 96:5
122:9

**began**
50:22

**beginning**
4:18 23:12 49:7 116:19

**begins**
78:5 85:9 135:21

**behalf**
6:11 22:17 69:14 97:16
131:15

**believe**
14:17 17:2 24:24,25
25:4 29:20 33:2 45:22
58:13 60:11 62:17,19
71:25 72:21 74:10
76:13 86:6 89:8 91:22
97:7 112:7 120:25
125:3 130:14 133:22

**believed**
37:7 70:12,25 83:17,18
91:19 118:14 137:17

**Bennett**
26:2,21

**best**
23:2 47:10 49:14 54:24
60:7 69:7 71:19 93:2
100:20 128:8 129:3
131:15 133:21

**better**

107:20

**beyond**
21:18 55:25 56:3 98:24
125:10 126:2,7 133:23

**big**
92:23 125:20

**Bill**
17:6,25

**billions**
89:25 90:7,19,23

**bit**
47:15

**bizarre**
125:13

**blame**
5:23

**blaming**
94:12,15

**blind**
76:15

**block**
63:7

**Bloomberg**
115:20

**book**
14:8 17:22 18:2 19:19
20:4,15,20,25 21:5,11,
12 22:14,19,20,22 23:4,
6,9,22,25 24:4,12,15
25:12,21 26:23 28:16,
24 30:5,19,24 32:6
34:4,10,17,18 35:6,21
36:12,20 37:6,9 43:17
44:10 45:7,24 46:12,22
47:3,17 48:6,10,16,24
49:16 50:20 51:3 52:3,6
53:6,9 59:22 60:3,9,15
61:3,7 62:22 63:21
64:21,24 65:3,11,18
66:15 67:9,11,14 68:18,
23 69:2,9,17,20 70:8,
13,15,25 74:21 75:17
77:7 82:15,17,20 85:23
86:9 87:12,16 88:5
89:20 95:15 98:3,13
100:15 101:25 105:15
106:20,22 107:9 115:19
116:5,10 117:12,20
118:14 121:11 125:3

BRUCE NICHOLS - 10/14/2015                              i4

127:25 128:18 134:12

**books**
12:15 27:25 51:4 52:22
60:20 65:13 70:10
82:11 87:23,24 89:15
112:21 118:8

**booksellers**
88:4

**border**
43:15

**borders**
43:10

**born**
7:16

**Boston**
9:14,17

**bother**
43:3

**bottom**
58:12 81:4

**breached**
111:17

**break**
23:12 84:13,15 93:5,7
135:11,24

**breaking**
23:16

**Brennan**
76:19 77:23 78:10,14,
17 79:10,18,21 80:4,10

**Brennan's**
77:25 79:8

**brief**
17:9,17 91:11 109:14

**briefly**
7:19

**bright**
107:19

**broad**
18:16 19:3 22:6 115:15

**broadcast**
51:17

**broadcasts**
77:16

**brochure**
88:4

**brokered**
46:16

**brought**
74:22 75:2,18 80:3

**Brown**
9:14

**Bruce**
3:1,5 7:8,15 85:10 93:9

**burdensome**
5:17

**Bureau**
105:6,13

**Burger**
6:24 15:22,25 17:4,11
97:7

**Bush**
72:4 73:8,12 76:25
79:15 84:6

**business**
118:24 122:4,23 127:8
128:8,14

**buy**
60:15

**buying**
44:9

─────────────

**C**

**call**
16:23 17:5,10 30:21
42:7 43:7 44:12 45:3
52:13 61:20 81:25

**called**
9:20 21:12 35:19 43:24
95:16 117:9

**calling**
26:22

**can't**
40:16 53:20 56:18 57:3
58:5 61:16 62:17 83:12
113:20 126:6

**capacity**
3:24 4:13 114:22
125:11

**card**
112:2

**care**
82:9 106:3

**careful**
44:18

**carefully**
95:2

**case**
17:23 32:22 34:20 38:9
40:10,22 41:4,5 44:24
48:21 52:15 56:20
63:13 66:6 71:24 72:20
73:20 75:10 76:8 83:11
88:11 110:8 113:25
131:7

**cases**
74:24 75:16

**catalogue**
88:6,8,10 89:7,11

**cause**
65:21 74:15 81:12
106:10,17 107:12
108:6,17 110:12

**caused**
28:8 38:2 73:7,22 77:16
83:12 100:3,9,16
102:12 115:9

**causing**
115:23

**center**
78:20,23,25

**centerpiece**
87:15,19

**certain**
24:15 33:3 57:9 98:2,12

**certainly**
21:22 36:4 72:13
109:20

**certifications**
13:14

**CERTIFIED**
13:10 20:12 32:14
126:9

**certify**
13:12 20:11 32:12
57:24 112:24 126:8

**Chairman**
78:12

**challenging**
62:18

**Chambliss**
78:11

**change**
106:19

**changed**
10:5 57:6

**changes**
29:11 121:14

**chapter**
34:16,20,25 35:8,11,15,
17,25 36:2,3 48:20
52:7,12 56:17 57:16
58:21 59:3 61:9 71:11
76:20,22 77:11,21
81:17 100:19 115:17
116:3 117:16,25

**chapters**
35:22

**characterization**
82:8

**characterize**
80:11

**characterizing**
81:9

**check**
65:4,20 66:14 90:11
91:2 92:8 99:16

**checked**
90:24 98:14 99:6
101:23 105:5

**checking**
65:2,5,13 66:2 90:5
121:22 122:2 124:9

**Chicago**
9:19

**choose**
94:25 95:4

**chose**
41:5,9

**Christmas**
91:8

**CIA**
78:2,11,23 91:6,14,23
92:6,11,16 94:6

**CIA'S**
79:4

**circumstances**
60:22 63:15

**cited**
78:3

**civil**
102:5

**civilian**
73:8 84:7

**claim**
30:3 60:2 74:21 75:18
99:13

**claimed**
11:24 79:3

**claiming**
117:11

**claims**
59:21 61:11 76:10
91:10

**clarification**
103:14,17

**clarify**
11:6 42:16 51:24 123:5

**classified**
30:9,15 31:2,22 32:7
41:11,23 55:14,19,23
56:14,22 57:7,10,18
58:15,24 68:2,6,8,19
93:21 99:21 100:7,11,
14,19,22 101:16 105:14
110:4,17 111:18 112:16
113:12,19,22 114:2,6,
24 128:16

**clear**
42:6 52:3,6,8 57:15
59:2 80:20 99:14 128:9

**clearer**
53:22

**client**
101:24 102:6 140:2

**client's**
116:2

**clients**
43:21 128:24 129:2

**Clinton**
32:3 109:17 111:17
112:6

**Clinton's**
110:14,23

**close**
18:6

**closely**
14:10

**CNN**
112:13 113:9

**coach**
133:10 135:13

**collateral**
134:5

**collectively**
12:16 102:6

**college**
9:16

**Collins**
10:10,12,13 95:12,15,
24,25

**collusion**
43:11,16,18

**combination**
70:23

**come**
10:23 12:3 20:10 41:6,
24 62:11,12 63:9,19
84:9

**comes**
81:6 88:3 117:12

**coming**
68:19,22 91:9 106:16

**comment**
118:5

**commentary**
112:12 113:8

**commercial**
72:6 77:3 79:17 91:12

**Commission**
130:7 136:15

**commit**
29:13

**committed**
76:23

**Committee**
78:13

**communication**
63:24 119:19,21,24

**communications**
19:23 62:15 64:5,10
120:14 123:20 124:12,
25 136:16

**community's**
78:15

**company**
4:5,7,8,9,10,12,14 6:7,
8,12,16 7:2 8:20 9:14,
20,24 10:5 11:12 13:9
16:11 20:21 32:3 46:13
63:2,4 69:14 80:22
97:16 99:16 122:10,12
127:12 138:23

**compare**
44:13

**compelling**
52:21,22 53:3

**complain**
23:3

**complaints**
11:22 12:2,5

**complete**
26:16 129:17,19 139:24
140:24

**complicated**
66:8

**composite**
96:12

**concept**
26:14

**concern**
100:4,9,16 102:12
106:11,17 107:12
108:6,18 110:12 115:10
121:7

**concerned**
115:22

**concerning**
17:21 19:18 21:16
37:17 47:13 107:3
117:7 127:25

**concerns**
30:9 36:25 53:10 68:17

**concluded**
70:8 78:24 138:23

**conclusion**
14:4 31:17 62:11 63:20

**concurred**
121:12

**condition**
49:20

**CONDUCTED**
7:12 85:14 135:22

**conference**
16:21,25

**confided**
25:10

**confidence**
74:8

**confident**
68:21 121:11 125:2

**confidential**
30:3 50:16 51:9,13,17
52:9,24 53:4,8 57:7
58:14,24 59:2,5,11,14,
22,25 60:10,11,13
64:14 68:18 69:18,25
70:7 80:14 93:20
117:13 118:5,16 128:16

**confirm**
45:5 59:25 78:8,10

**confirmed**
94:7 128:5

**conflated**
58:23 69:24

**confusing**
28:16 74:19 103:20

**Congress**
112:6

**consequently**
18:20 28:21 79:10

**consider**
138:20,23 139:23

30(b)(6)

BRUCE NICHOLS - 10/14/2015                                         i6

consideration
76:6

considered
25:7

considering
78:8,10 138:13

consistent
137:3

constitute
99:24

consult
15:16 16:5,8 44:7

consultation
12:6

consulted
16:18

consumer
113:17

contact
98:16 99:9 104:22
105:6,12 120:11,21

contacted
26:25 69:8 118:19
120:17

contacts
44:19

contained
32:7 33:11 57:19 68:17
100:14 131:17 137:17

contains
132:20

content
16:17 24:15 116:5

context
101:7

continue
92:10

continuing
102:2

contract
20:23 21:7 26:6 28:17
29:18 32:25 44:22 45:8
46:7 47:19,25 50:4
58:17 67:22 68:13
72:10 77:14 86:15,24
126:15 127:10,15,21

128:10

contracts
77:13

contrary
130:23

contributed
115:25

controversial
50:17 51:10 52:14,16
118:17

conversation
17:13 43:8 45:3 50:22

conversations
17:25 18:3 21:4 32:10
36:22 53:14 54:11,13
55:17 57:2 62:3,5 79:22
101:3 102:22 104:17
105:25 109:9

convince
139:20

convinced
72:4 76:25 79:15

cooperation
49:17 117:21

copies
5:3,5,7

copy
14:13,16,18 50:9 64:18
89:10 120:9,22 129:17

core
63:10

corporate
102:4 136:12,22

corporation
12:12,18

correct
6:22 13:18,20 25:19,23
27:2 29:3 30:5 36:23
37:14 39:13 41:2,14
44:4,5,11 51:5 52:25
53:12 54:3,18 55:9
56:24 59:6,8,10,16,17,
23 60:15 65:2,14 66:23
68:15 69:4 70:10,15,16,
20 72:11 73:9 74:16
75:5,14 80:8 83:23
86:13 87:17 88:5 92:7

97:19,22 98:22 100:4
101:18 109:12 112:25
114:6,10 116:20,23
117:14 123:12 124:10,
14 129:22 130:7,10,15
131:11,17 132:12
133:20 134:17

correction
97:25 98:10,12,18,21

corruption
34:6

couldn't
27:9 91:21

Council
91:17

counsel
3:18 4:2,4 5:4 6:23 7:2
15:7,18,19,20 16:2,9
32:11 36:22 53:14
54:11 55:17 57:2 62:3,
6,15 64:5,11,12 92:19
97:4,6,10 101:4 102:22
104:17 105:25 109:9
110:9 119:19,21,24
120:14 121:5 122:9
123:20,22 124:6,12,13,
25 125:6,16 132:25
136:2

counterterrorism
91:16

country
54:24

country's
60:7

course
40:24 44:7 51:18 55:4
60:20 61:6 64:23,25
65:12 66:21 69:5 73:21
80:20 94:25 95:10
106:6 118:23 122:4,22
127:8

courses
8:10 11:9

court
3:8,15,23 5:5 7:6 13:10,
13 14:12 20:12 32:14
36:7 38:17 42:5 103:23
113:4 118:22 126:9,13
136:6

court's
140:4

courtesy
5:6

cover
48:14,18 49:4

coverage
52:17 53:6

covered
31:20 34:22 116:13
117:17

crazy.'
91:24

crime
31:20,24

crimes
99:24

criminal
51:15,25 102:7 106:9,
15 107:11 108:5
109:11,23 110:18
111:4,15

criticized
49:13

current
23:6 49:17 71:23 73:18
117:22,23


D

D-i-n-a
3:25

damage
74:15 83:12

damages
63:12

damaging
75:21 115:12

danger
40:23

dangerous
72:2,22,25 79:13 80:7,
19 81:22 83:3,16,20,21

data
78:22 79:2

**date**
29:13 119:14 122:19

**dated**
96:4,22 119:8 122:7,15
133:5

**David**
6:24 15:22,25 17:4 97:8
119:5 120:9,11

**Davis**
4:4

**day**
60:23

**days**
31:25

**deal**
46:17 125:20 138:13

**dealing**
24:19 78:15

**deals**
56:4

**decades**
71:19

**decide**
21:24 40:10 84:22
101:12

**decided**
41:21 42:7 47:17 50:12,
14 101:23

**decision**
44:14,16 47:11 52:16
54:22 55:2 56:20 66:11

**decrypted**
77:15

**defamatory**
99:13,19 102:2 123:10
124:18

**defame**
101:24

**defamed**
11:24

**defend**
51:10,13

**Defendant**
32:19

**defendants**

**4:6** 136:22

**define**
87:18 89:15

**DEFS**
127:3

**degree**
8:3

**delivery**
86:16

**demand**
124:16

**demonstrated**
90:8

**demonstrates**
89:24 90:20

**denial**
92:12

**denied**
78:17 91:25

**denies**
124:18

**Dennis**
3:6 35:18 57:20,23
58:21 71:18 104:12
107:2,4 115:17

**Department**
12:3 19:16 38:25 69:9
126:25

**depend**
34:2

**Depending**
107:7

**depends**
73:5 87:10 106:12

**depiction**
81:20

**deposition**
3:5,10 4:11,16,18,22
5:11 6:3,5,6,13,15,21
13:25 14:2,14,19,22,24
15:11 16:12 19:6,8
49:2,12 56:2 69:15
71:12 84:23 96:20
116:19 119:6 122:13
126:23 129:12 130:20
136:11,24 138:7,10,15,

**21** 139:13,24 140:3,17,
25

**depositions**
136:21

**describe**
107:22

**destroy**
82:9,16

**detail**
117:18

**details**
112:7

**determine**
44:8 59:20 60:4 90:6
94:4,5 102:17 123:16
124:23

**determined**
79:5

**didn't**
23:21 24:8 28:4 38:22
39:2 40:21 41:23 43:3
45:23 55:7 56:7 74:4
75:8 83:19 93:7 106:3
113:23 121:7,15 129:6
130:14 136:5

**different**
56:19

**difficulties**
5:21 43:4,16

**difficulty**
23:23 25:12 42:13

**diligence**
99:18

**Dina**
3:24

**Direct**
114:14

**DIRECTION**
12:22 19:20 62:13 64:3
114:12 120:12 126:5
131:19 137:19

**directly**
17:25 56:4 85:25 86:24
87:6

**director**
78:3

**disagree**
51:7

**disagreement**
42:19

**discern**
105:11

**disclose**
136:13

**discovery**
18:21 64:2 133:4

**discuss**
16:17 19:14 21:14 24:8
49:19 77:18 91:8 98:15
99:7 101:15 104:20
105:4 120:24 121:3
132:24

**discussed**
20:2,6,9 25:16 52:2
58:2 91:17 97:9 100:18
106:5 113:25 123:22

**discussion**
17:8 20:3,16 22:12
30:13 50:13 52:5 68:24
80:3 81:2 91:11 92:2
98:22 128:15

**discussions**
53:20 123:24,25

**District**
3:8,9

**divestitures**
135:6

**division**
9:16 10:3,13 12:11,16
95:25

**divulging**
67:25

**document**
88:17,19 96:25 127:5
129:16

**documents**
5:16 34:24 88:24 89:2
127:23

**doesn't**
60:12 82:3 90:21
107:20

**doing**
5:22

30(b)(6)
BRUCE NICHOLS - 10/14/2015                                       i8

**dollars**
89:25 90:7,19

**domain**
41:24 69:21 70:19

**don't**
5:12,13 14:16,17 16:17
18:7 22:6 24:6 29:23
33:18,20 40:6,18 44:21
45:3 46:15 50:21 52:15
53:24,25 54:14 57:11
58:5 59:5,9,18,19 60:3
65:5 72:12 74:6,22
75:23 76:2 82:3,9 84:22
88:12 89:10,13 93:4,13
94:17,20 98:24 99:9
101:12 105:20 107:21
109:13,14 110:2,6
111:4,20 112:7 114:16
117:3 120:8,25 127:16
128:18 133:7,9 134:15,
16,22

**door**
132:7

**doubt**
65:21 129:4

**doubts**
66:5

**draft**
26:16,17 119:17 120:2

**drafted**
120:7

**draw**
83:13

**drawing**
115:10

**drew**
46:7

**drinker**
93:10

**drinking**
93:20,23

**DTI**
3:10,17

**duction**
119:8

**due**
10:5 99:17

**duly**
7:9 85:11

**Duran**
3:14

**duty**
59:18,20,24 60:4
114:23

**DVD**
3:3 85:9 135:21

───────────────

**E**

**earlier**
11:6 79:25 85:25

**early**
50:10,24 59:21 60:3
116:10

**easily**
107:9

**Eastern**
5:2 84:12

**Eber**
6:24 15:22,25 17:4 97:8
119:5 120:9,11,18

**Eber's**
96:15

**edge**
19:2

**edited**
9:21 20:24 23:22 75:17

**editing**
50:10 64:19

**editor**
9:23 10:7,8 14:9 22:18
23:18,23 24:21 75:3

**editorial**
9:13 14:10 64:17,19,24
126:25

**educational**
7:20

**effect**
76:10,15 79:20

**effort**
92:3 105:22 109:4

**efforts**
124:22

**eight**
130:4

**either**
58:14

**elaborate**
71:25 72:22,25 74:14
76:24 80:7,18 81:21,24
83:2,15,19,21,23

**eleven**
4:17,19 6:17

**eleventh**
130:5

**email**
109:17 110:23

**emails**
110:14

**emergency**
138:19

**Endeavor**
26:5

**Endless**
48:7

**engaged**
46:11 102:7

**English**
10:25

**entered**
67:22

**enterprise**
102:7

**entertain**
11:22

**entire**
34:3 77:9,11 81:9,11
88:8 118:6 132:21

**entirely**
43:19 116:10

**entitled**
18:17 21:20 27:5 32:4

**equally**
12:12

**essentially**
43:10

**establish**
18:10

**Establishment**
95:17

**et al**
3:7

**ethics**
8:14,22 9:4,8 11:9

**etreppid**
79:4 80:22

**event**
90:25

**events**
92:12

**eventually**
67:16

**everybody**
94:24

**evidence**
18:23 105:16

**evident**
117:24 118:2

**evil**
54:16,17

**exactly**
33:3 46:15 50:21 89:13
134:6

**EXAMINATION**
7:12 85:14 135:22

**examined**
7:11 85:12

**excellent**
87:17,19

**exception**
31:20

**Exchange**
130:7 136:15

**exclude**
53:13 54:10 56:25

**excluding**
32:10 36:21 55:16
92:19 101:2 102:21
104:16 105:24 109:9
119:23 121:5,23,25
123:19 121:5,23,25
140:21

**excuse**

19:13 32:19 48:9 91:5
112:14 113:10 137:25

**executive**
10:8

**exercise**
91:21 99:17

**exhibit**
14:12,17,21,23 48:5,10,
12,17,21,22 49:3,11
71:11,12 96:8,9,18,21
118:25 119:4,7 122:7,
14 126:14,16,18,19,20,
22,24 129:6,8,11,13
130:3

**exhibits**
4:25 5:6,10

**exited**
140:17

**experience**
22:18 45:24 52:23
69:17 70:9 74:11,17,23
75:12,16,24 81:12
82:19 83:6,13 94:23
95:6 130:12

**experts**
112:13 113:9

**explore**
47:21 66:6

**extent**
67:2

**extremely**
83:9

**eye**
23:21 24:3 25:17,18
47:5

**F**

**faced**
83:10

**fact**
30:8 31:18 41:4 45:8
50:18 51:17 52:18
58:13 60:4 61:11 62:22
65:2,4,5,13,20,25
68:21,24 69:16 73:18
76:5 90:5,10,24 91:2,18
92:8 98:14 99:6,16

101:23 105:5 117:5
121:22 122:2 124:8,9
130:21

**facts**
106:12 107:7 115:16,23
116:13 117:16

**factual**
22:13 23:3

**failure**
136:12

**fall**
87:20 89:14

**false**
60:13 61:4 63:20,21
82:17 116:11 123:16
124:3 131:5 137:17

**falsely**
77:8

**familiar**
25:6 71:24 72:20 73:20

**far**
37:15 102:24

**fault**
94:16,18,21

**fax**
122:8

**FBI**
102:17,23 103:3,9
104:4,12 106:24 108:13
109:10,23 110:13,16
111:3,14 112:8,11,14
113:8,10 118:19

**FBI'S**
109:13

**fear**
71:20

**February**
89:16 96:16 122:8
123:2

**Federal**
102:18 105:6,13 112:14
113:11

**feel**
93:19 94:4

**felt**
121:11

**fifth**
134:23 137:24 138:3

**Fight**
95:17

**fighter**
72:5 77:2

**fighting**
39:9,17

**filed**
16:13 19:18 130:5
132:21

**filing**
17:19 129:21 131:9

**filings**
130:18,25 131:22 132:7
136:14

**filled**
72:6

**find**
43:4,16,22 44:25 59:19
66:3 78:3 105:22
121:15 129:25

**fine**
93:24 101:21 126:21
139:9

**finish**
67:25 116:9 139:7

**fired**
11:3

**firm**
77:12

**first**
7:9 9:11 15:6,10 16:20
17:12 20:18 22:5 26:24
35:21 37:6,9 66:24
71:15 75:4,17 86:18
87:23 97:3

**fit**
70:24

**five**
130:4

**flat**
86:11

**fleshed**
116:15

**flights**
77:17,20 80:25 81:3

**Florida**
3:9 62:23 63:11

**flying**
76:15

**focused**
67:15

**follow-up**
16:22 17:7,9 43:3

**following**
89:16 91:8 109:16
134:19,25

**follows**
7:11 36:10 85:13 104:2
108:3 113:6

**forced**
38:13 39:18 41:19

**Foresman**
9:21

**form**
77:5 128:22 130:5
132:21

**formal**
9:8

**former**
49:18 71:23 73:19 91:5,
6,14,23 92:11,16 94:6
117:22,23

**forth**
13:25 117:9 123:8

**forward**
93:11 106:16 108:13
130:13 131:10,13
133:18

**found**
67:16,23 68:3

**foundation**
18:18 56:5 67:2 107:14
108:21 110:20,24

**four**
130:4

**Fox**
111:11,14 112:13 113:9

**Frances**
91:15

30(b)(6)
BRUCE NICHOLS - 10/14/2015                                           i10

**fraud**
31:20

**frauds**
81:22

**fraudulent**
60:21 61:4 76:9 115:18

**free**
10:2,3 44:24 45:6 93:19
115:5 134:13

**friend**
25:7,8

**front**
48:25 52:11 70:8 87:20,
22 129:21

**full**
78:5 79:17

**functioning**
95:23

**furnished**
5:4

**further**
85:13

**furthered**
101:25

**future**
125:9

_____

**G**

**game**
50:6

**general**
10:11 16:9 25:17 53:16
65:11,18 118:5 122:9
128:14

**generally**
39:23 40:13 89:14

**gentleman**
107:19

**Georgia**
78:12

**getting**
113:21 116:2 139:4

**gist**
72:13 98:11

**give**
62:2 84:8 130:22

**given**
9:7 40:17,18 46:21 50:2
73:14,17 94:2 115:2
117:5

**gives**
63:5

**giving**
26:14 99:4 103:16

**glean**
81:17

**gleaned**
31:2 32:7 67:10

**Global**
3:11,17

**glossy**
92:25

**go**
21:7 27:7 43:23 44:25
58:9 63:5 66:13 77:6
84:17,20,21 89:20
93:11 130:23 132:13
133:9 134:15 140:8

**goes**
86:21 133:23

**going**
14:11 19:2,23 24:11
33:9 34:15 35:20 38:14
40:23 44:20 55:15
58:19 60:14 62:16
84:25 85:16 88:13
95:15 97:13 105:21
125:6,16,24 126:12,19
131:20 132:16,18
133:2,12 135:10,14,17
136:25 137:14 138:9
139:19 140:12,18

**good**
33:16

**Goodman**
133:24

**gotten**
47:20 71:7 113:18

**govern**
124:20

**government**

30:4,10 31:2,23 32:8
33:12 34:3,5,7,13
36:15,17,18 37:6 38:16,
24 41:5,8,21 42:7,14
49:18 51:18 52:24
55:24 56:15 58:16
67:15,16 68:11 72:19
77:13,16,19 80:23
99:23 111:17 112:21
113:18 117:24

**graduated**
7:24

**graduating**
8:2

**greatly**
25:9

**Greed**
48:7

**ground**
77:17

**grounded**
80:25

**guess**
48:21 92:21

**guilty**
67:17,23 68:3

_____

**H**

**Handman**
4:3 5:13 6:9,22 12:23
13:6,17,18,20 14:3,16
15:21 16:16 17:3,10
18:5,17,25 19:21 20:5
21:17,21 22:3 25:13
27:3,14,18,24 30:11
31:9,14 32:9 33:13,17,
21 34:14 35:11,14,23
36:3,21 37:18 38:19
39:5,14,25 41:12,15,25
42:15 46:5,23 48:9,13,
17 51:6,20,23 53:13
54:4,6,10,19 55:8,10,
16,25 56:7,16,25 57:14,
22 58:7,19 59:12 60:16
61:13,25 62:14,20
63:16,23 64:4 65:7,15
66:4,24 67:12 69:13,22
74:5,18 75:9 76:17
77:4,10 80:9 81:7 82:5,

12,23 83:4 84:11,18
88:16,20,22 92:19 93:3,
7,16 94:14,19 95:8
96:7,11 97:15 98:5,23
100:5 101:2,10,19
102:14,21 103:8,13,19
104:16 105:24 106:4
107:5,13 108:16,19
109:6,8,25 110:19,24
111:19 112:19 114:13
115:14 116:21 118:9,12
119:18,23 120:13,19
121:5,9,18,23 123:5,19
124:4,11,24 125:8,15,
25 126:6,16 127:17
128:6,13,21 129:7
130:16 131:6,20 132:6,
13 133:2,22 134:3,10,
19,24 135:10,14 136:8
137:20,25 138:4,16,20
139:5,6,15,21 140:6,16

**happen**
16:20 39:20,22 75:13

**happened**
37:5 46:18

**happy**
34:7 43:25 140:23

**Harcourt**
4:8,10,12 6:8,12,16,25
8:20 29:2 30:21 31:7
32:6 34:12 36:14,19
45:6,14 46:2,13 47:16,
24 51:5 54:17 55:22
56:13 61:2 65:25 68:13
69:11 73:22 81:5 85:22
86:23 87:16 88:3 92:4,
16 96:6 97:11 99:15
100:15 117:10 121:4
122:10,11 123:15
124:10 127:12,24
130:13 131:16 132:20
135:8 138:22

**Harcourt's**
118:24 122:4 127:8

**hard**
76:10

**harm**
82:21

**harmful**
76:4 83:9

**Harper**
10:10,13 95:11,14,24
128:19

**he's**
83:18 94:16 108:25
109:2

**hear**
54:16 63:16

**heard**
42:5 96:2 125:13

**hearing**
42:3 133:5 138:19

**heightening**
115:4

**held**
3:10 58:5 135:4 137:13

**help**
51:4 70:9

**helpful**
134:22

**helping**
119:16 120:2

**high**
7:22

**higher**
87:14

**highly**
74:10 99:20

**Hilary**
109:17 110:10

**Hillary**
32:2 110:14,22 111:17
112:6

**history**
72:2,23 73:6 74:14
76:24 79:14 80:8,19
83:3,22 84:2

**HMH**
4:4

**hoax**
83:16,20,23

**hoaxes**
72:2,22,25 73:6 74:14
76:24 79:14 80:7,19
83:3,21

**hold**
51:19 112:14 113:11

**honestly**
18:12

**Houghton**
4:6,7,8,9,11 6:7,11,15,
25 8:16,17,18,19 9:5
10:14 11:8,15 16:2,10
19:16 21:8 28:20 30:14
33:6 96:5 99:15 102:19,
24 122:9,11,22 127:11
129:18 131:16 132:20
137:15 138:22

**hour**
17:14

**House**
91:7

**huge**
112:9

**hundred**
33:2

**hundreds**
89:25 90:6,19,22

**hurt**
82:4

**hypothetical**
39:18 40:2,4 46:6 56:19
65:16 108:12,20,23
109:3

---

**I**

**I'd**
132:24

**I'll**
14:4 111:25 129:25

**I'm**
9:6 11:11,13 17:4 20:7,
9 25:19 33:2,22 34:7
68:25 75:6 78:8 93:18
99:4 101:7 102:25
103:11 120:18 133:17

**I've**
63:4 66:10 75:17

**identification**
14:23 49:3 96:21 119:7
122:14 126:24 129:13

**identified**
58:16

**identify**
20:10 29:24

**identity**
73:25 74:3

**immediately**
7:25 104:22 124:17

**impasse**
24:10

**implicate**
135:15

**implicitly**
45:21

**important**
49:15 82:14

**impose**
40:11

**impression**
97:14 108:8

**imprint**
10:11 95:20,23 96:2

**imprisoned**
40:14

**improper**
136:23

**in-house**
7:2 9:2 16:2,3

**inaccuracies**
22:13 23:4

**inanities**
93:15

**inappropriate**
5:23 33:22

**included**
34:5 61:8 78:24,25

**includes**
96:14

**including**
14:8 76:19 77:13 80:22,
23 116:3

**incorporate**
131:8

**incorrect**

**identified**
95:7

**incumbent**
94:4

**independent**
76:3

**indictment**
39:2,8 68:6,8

**indirectly**
18:4

**individual**
3:7 74:12 76:4

**individuals**
6:19 11:24 49:19

**industry**
7:25 10:21 38:23 40:14
62:9 64:25 65:12 69:17

**information**
12:24 13:7 18:7 30:10
31:3,22 32:8 37:21
38:18 39:3 40:15 41:11,
23 55:14,19,23 56:13
57:8,11,19 58:15,17,25
59:15 63:21 65:23
67:10 68:2,7,9,19 69:20
70:2,3,4,14 71:5 78:22
91:9 93:22 99:21 100:8,
12,14,19,23 101:3,16
105:14 110:4,17 111:18
112:16 113:13,20,22
114:3,6,10,25 115:11
117:6,12 121:16 128:16
134:5 137:18

**information.'**
79:6

**initial**
66:7

**initially**
15:10 26:21 33:5 95:19

**initiate**
54:13 108:11

**initiated**
107:10,17 108:5

**inquire**
130:24 134:7

**inquired**
31:16 104:9,18

30(b)(6)
BRUCE NICHOLS - 10/14/2015                                     i12

**inquiring**
131:2,3

**inquiry**
21:19 31:17 102:16

**inside**
8:16 11:12,15 30:4
52:24 63:3

**insisted**
78:19

**installments**
86:14

**instruct**
19:24 21:22 34:15
58:20 62:16 67:4
120:14 131:21 137:2

**instructed**
12:25 138:5

**instructing**
13:16 18:24 20:7 37:19
62:4 63:14 64:6 137:20

**instruction**
35:4

**Integration**
78:20

**intelligence**
78:13,15 80:12 91:13

**intent**
112:17 113:14

**interest**
105:4 114:22

**interesting**
69:19

**interfere**
44:21

**interpret**
98:24

**interrupt**
40:7 93:14,25

**interrupting**
103:24

**interviewed**
61:7

**interviews**
53:7

**introduce**
3:18

**investigate**
110:16

**investigates**
109:11,23

**investigating**
110:3,13 111:3,15
112:8

**investigation**
37:25 52:2 67:14 68:25
102:18 103:3,9 104:5,
12 105:7,13 106:9,13,
15,24 107:8,11,17,22
108:5,9,11 111:4 114:4

**investigations**
36:25 37:4 102:24
112:5

**investigative**
54:24 60:7 66:9

**involved**
21:9 30:9

**involves**
12:23 62:15 63:23 64:4
65:8 67:3

**involving**
110:17

**Islamic**
115:3

**isn't**
87:8 106:25 117:13

**issue**
24:17 30:15,17 34:17
35:8,11,15 37:15 43:21
50:15 51:8 52:14 55:7,
12 62:18 63:10 70:5
112:9 118:16 124:16

**issues**
17:21 21:5,16 28:7,13,
23 29:23,24,25 30:20
64:22

**it'**
91:22

**it's**
52:15 62:23 69:5 70:2
88:6,18,20 120:19
132:10

**Item**
136:20

**its**
45:19 46:21 128:4
135:9

---

**J**

**jail**
38:17 39:2 40:24

**James**
3:6,24,25 4:6 20:20
48:7 49:4 122:11

**Janklow**
26:8

**January**
96:4,14,15,19 97:21
105:4 119:5,13 124:18

**Jazeera**
77:15

**Jeffrey**
37:17,25 51:16 66:22
67:8,11,15,16,23
113:24

**jeopardy**
38:3,5,10 42:13

**jets**
72:5 77:2 79:23

**Jim**
20:23 28:18 36:24 38:2,
20 42:25 46:8 47:3
50:14 54:12,23 61:7,17
66:9,20 67:19 71:7 78:3
79:25 81:20 82:7 86:3,
21,25 92:8,13 94:9
115:25 116:14 117:17
127:21

**Jim's**
67:18 70:23 77:18 81:8
83:14 85:25

**job**
9:11 11:4 45:15,16
66:14

**John**
76:19

**joined**
10:2,14

**journalism**
8:11,14,24 9:9 11:10
66:9

**journalistic**
9:4

**Judge**
40:10 132:8 136:18
137:7

**Judge's**
133:4 134:20,25 136:19
137:3,9,10,22

**judgment**
43:12 52:13 66:7 76:3,
13 81:15,25 82:2 83:15
84:4 94:9

**judgments**
60:18 125:10

**Judith**
95:20

**Justice**
38:24 69:8

---

**K**

**keep**
44:16

**kept**
118:23 122:3,21 127:7

**kind**
8:3 38:5 40:11,16 52:7
54:15 80:16 93:14
102:19 134:5

**kinds**
10:24

**Klayman**
3:20 5:8 6:18 7:3,13
13:2,12,19,21 14:11,20
15:2 18:15 19:7,11,25
20:8,14 21:20 22:8,10
27:5 28:3 31:14 32:12,
16 33:15,20 34:14
35:10,16,25 36:23 40:3,
6 48:12,15,23 49:6
56:3,8 57:24 62:19
63:18 64:8 84:11,16,20
85:15 88:13,18,21 89:3,
5 92:24 93:4,13,19
96:8,9,17,23 101:6
103:11,16,21 107:24

108:22 111:23 112:22
114:16,19 119:9,20,25
120:16,21 122:17 123:8
125:12,18 126:8,11,18
127:4 129:9,15 130:16
131:2 132:3,9,15,17
133:7,25 134:8,14,21
135:2,13,23 136:2,6
137:5,23 138:2,9,18
139:2,11,18,25 140:6,9,
10,16

**knew**
40:22 68:5,10,12

**know**
9:4 22:7 24:6,13,20
25:2 31:24 37:16 40:19
42:22,25 46:15,25
49:14 50:21 53:24,25
56:11 58:5,25 59:5,9
61:22,24 62:8 74:4,6
79:3 81:5,18 82:3 87:4
88:12 94:17 99:9
100:25 105:3 109:13,14
110:2 111:2,4,20 112:7,
8 114:11 120:8 125:5,
22 128:3,18 130:17
131:25 133:8 135:7
139:4,9

**knowing**
106:18

**knowingly**
55:22 56:15 82:15

**knowledge**
12:20 22:25 23:2,5
27:13,15 30:14 39:7
46:20 47:10 56:12,21
69:7 80:15 100:21
102:23 131:15 133:21

**known**
20:23 38:8,10,15,23
39:23 40:13,25

**knows**
110:10 125:18

————————
                L
————————

**laptop**
93:10

**larger**
10:4 12:11

**Larry**
3:20

**late**
4:18 50:6,23

**lately**
110:22

**launch**
10:11

**Laura**
4:3 5:12 17:3,10 88:14
93:2 101:8 103:12
111:23 125:19

**law**
37:21 62:23 63:11

**laws**
112:14 113:11

**lawsuit**
16:13,15,19 17:20
19:18 136:14

**lawyer**
56:10 62:2,4 91:18
125:14

**lawyers**
12:4 13:23 16:3 31:11
34:12 36:14 63:3 64:16
65:5,8,12 128:25

**lead**
18:22 35:19,24 36:3
87:21

**leading**
27:6

**leak**
36:25 37:3 67:13 68:25
114:4

**leaking**
114:5

**learn**
103:3 104:4 106:8

**learned**
110:21

**leave**
95:11

**leeway**
21:21

**legal**
3:15 11:19 12:3 14:4

17:21 19:15 22:15,19
31:12 36:18 38:2,5
42:13 46:21 54:7 55:4
57:3,12 58:3,10 61:16,
23 62:3,10 64:5,13,20,
22 65:8,9 66:13 68:22
91:18 97:10 101:14,20
102:22 112:12 113:9
121:10,24,25 125:6,10,
16

**let's**
23:6 30:20,21 47:15
60:12 63:16 73:16
96:17

**letter**
96:3,14,15,16,21 97:10,
17,18,24 98:6,11,25
100:17 101:7,17 102:20
106:5,7 108:24,25
118:22 119:7,12 120:20
121:3 122:3,7,15,18,21,
25 123:7,15 124:9,15,
17

**letters**
96:13

**letting**
21:25 22:5

**liability**
17:22 19:17 20:5 34:12
36:15,17 46:3 54:3
102:5 136:13

**libel**
74:21,25 75:10,15,18

**lied**
75:5,7

**life**
94:23

**limited**
18:16 19:4

**limits**
21:18

**Linda**
96:4

**line**
58:12 81:4 128:14

**list**
44:17 87:20,22,24

**listed**

4:22 18:13 19:5 126:2
136:10

**literary**
23:11 25:22,24 32:21
42:10 43:2,20 45:16,18,
20 46:15 47:19 55:6
127:20 128:7,23 129:2

**litigation**
75:14

**little**
9:14,17 47:15 53:21
70:7 71:14

**located**
3:11 26:3,9

**location**
116:17

**long**
17:12,15 62:9 82:10
84:2 135:24

**longer**
95:23 111:20 116:15
136:4

**look**
12:4 76:10 89:3 93:9
129:16 130:2

**looking**
93:8

**lot**
62:20 76:11 87:8
117:18

**lots**
83:16

**lunch**
84:13,15

**luncheon**
85:2

————————
                M
————————

**Macmillan**
9:23 10:3

**Madam**
113:4

**maestro**
71:22

**Magistrate**

19:9 130:17 133:4,23
134:20,25 136:19
137:3,9,22 139:3
140:22

**Magistrate's**
130:24 138:7

**mail**
122:8

**maintained**
127:7

**major**
8:6 10:22 11:2 37:15

**majored**
10:20

**majors**
10:25

**making**
77:12 82:18

**man**
71:18

**Manhattan**
26:10

**manipulating**
133:11

**manipulation**
136:11 137:6

**manuscript**
26:13 30:25 32:17,18,
19,24 33:6,10 42:21
43:12 44:9,14 47:16,23
48:2 49:25 50:7 67:21
72:9 88:25

**manuscripts**
35:3

**March**
7:18 89:18

**mark**
13:14 14:12,21 96:13,
17 126:13

**marked**
5:10 48:5,20 119:4
122:7,14 126:14 129:5,
7,10

**marketing**
88:23

**marking**
96:7

**Massachusetts**
7:23

**material**
88:23 98:2

**materials**
100:20

**matter**
3:5 51:16 94:6 104:20
105:2 125:7

**matters**
13:24 49:20 61:2 70:4
107:3 109:23 110:17
111:15 139:4

**mean**
33:18 34:3 36:16 37:3
52:15 54:12 69:11
87:22 90:22 98:19 99:3
105:18,20

**meaning**
51:4 68:13 92:4

**means**
99:10

**media**
41:2 102:3

**meet**
104:23

**meeting**
91:7,15 104:24 121:19

**meetings**
80:2

**member**
80:2

**merely**
78:21

**merger**
10:5

**merging**
9:20

**messages**
77:15

**Mifflin**
4:7,8,9,10,12 6:7,11,15,
25 8:17,18,19 9:5 10:14
11:8,15 16:2,11 19:17

21:8 28:20 30:15 33:7
96:5 99:15 102:20,24
122:10,11 127:12
129:18 131:16 132:20
137:15 138:22

**Mifflin's**
122:22

**mildly**
72:16

**mine**
95:16

**minimum**
45:5

**minute**
78:4 84:8 122:20

**minutes**
17:17 135:12,25 136:3

**mischaracterization**
25:14 61:14 66:25
127:18

**mischaracterizing**
27:4 55:10 110:25

**mishandling**
112:15 113:12,19

**misleading**
123:17 124:3 137:17

**misused**
110:4

**mix**
28:4

**mixing**
27:24

**moment**
140:7,9

**money**
71:21 87:8

**monkeys**
54:16

**Montgomery**
3:6 35:18 57:20,23
58:22 60:25 61:8,15
71:3,18,22 72:19,21
74:13 75:22 76:23
77:12 78:16,18 79:12
80:6,17 82:25 90:17,20
91:10 98:20 100:20

103:4,10 104:6,13,21
105:12 106:10,16
107:2,4,8,10 108:4,10,
13 114:21 116:6 117:7
121:16

**Montgomery's**
71:6 78:21,24,25 89:24
90:8 115:17

**month**
104:24

**months**
9:15 115:3

**morning**
5:21 17:11,16

**Morris**
26:4

**motion**
21:24

**move**
5:15 19:9 21:22 23:6
114:18 139:7

**moved**
9:19 10:10

**moving**
9:22

**multiple**
54:25 112:5

**music**
8:7,8 10:21

_____

**N**

**name**
3:14 7:14 20:19 21:10
67:8

**named**
24:21

**names**
15:24 57:8 59:7

**narrative**
129:20

**narrow**
22:9

**nation**
115:5,12

**nation's**
115:13

**National**
91:16 115:24

**nature**
56:14 74:2

**Naveed**
3:21

**nearly**
72:3 76:25 79:15 84:6

**necessary**
124:23 125:4

**need**
5:14 42:16 51:24 52:10
117:11 121:13

**needed**
24:12 52:5

**negotiated**
26:5 85:24 87:2 127:20

**negotiations**
46:11

**neighborhood**
89:19

**neither**
69:12 81:4

**Nesbit**
26:8

**never**
30:6,12 39:15,20 41:19
42:20 51:25 56:23 57:5
58:16 59:16 75:13
76:14 79:10,19 80:4
90:24 95:6 100:24
128:5

**new**
3:12 9:22 35:19 70:2,14
71:5 115:20,23

**newness**
70:3

**news**
31:25 53:3,9 70:13
109:18 111:11,14 112:4
113:17 118:15

**newspaper**
39:10 40:20 41:2
109:20,22

**newspapers**
52:16 110:22 111:5

**Nichols**
3:1,5 4:13 6:4,10,13
7:8,15,17 14:15 15:4
18:11 19:13 33:25
51:22 54:2,9 56:9 57:5,
18 73:22 84:14 85:10,
18 96:24 117:2 118:18
129:17 131:11 132:12
140:23

**night**
5:2

**nine**
130:4

**nomination**
78:2

**non-fiction**
10:8,12

**normal**
44:7 64:19

**Notary**
7:10

**note**
49:8 50:19 52:11 55:18
116:9,18 117:10,18
118:4

**notes**
44:13

**notice**
6:15 14:2,14,19 48:16
136:11

**notices**
6:20

**November**
29:20

**NSC**
91:17

**number**
3:4 61:18 74:2,9 85:9
87:21 88:7 135:21
136:20

**numbers**
14:25 49:5 96:22 119:8
122:16 127:2 129:14

**O**

**o'clock**
4:17,19 6:17 84:12

**oath**
75:8 85:19

**object**
14:5 33:12,17,19 34:3
138:24

**objected**
24:15

**objection**
12:23 18:5 19:21 21:17
25:13 27:3,14,18 30:11
31:9 33:13 37:18 38:19
39:5,14,25 41:12,15,25
42:15 46:5 51:6,20,23
53:13 54:4,6,19 55:8,
16,25 56:16,25 58:7
59:12 60:16 61:13,25
62:14 65:7 66:4,24
67:12 74:5,18 75:9
76:17 77:4,10 80:9 81:7
82:5,12,23 94:14,19
95:8 98:5,23 100:5
101:2,19 102:14 103:8
106:4 107:5,13 108:16,
19 109:25 110:19
111:19 112:19 114:13
115:14 116:21 118:9
119:18 120:13 121:9,
18,23 125:8,25 127:17
128:6,21

**objectionable**
103:22

**objections**
125:13

**obstruct**
19:7

**obtained**
86:23

**obviously**
19:8 48:23 61:17

**occurred**
64:16

**October**
3:12

**offered**
4:20 8:20

**office**
4:21

**official**
91:6,10,14,16,23 92:6,
11,17 94:6

**officials**
49:18 71:24 72:20
73:19,23 113:18
117:22,24

**okay**
7:3 28:21 33:22 36:2
89:22 129:9 130:8
132:10 139:19

**old**
70:2

**Oligarchs**
35:19

**ombudsman**
11:15

**on-line**
88:7 89:6,12

**once**
47:19

**one's**
103:6

**ones**
72:18

**ongoing**
106:9,15

**opening**
63:5

**opinion**
64:6,9 106:19

**opportunity**
130:23

**opposed**
87:24

**order**
72:4 73:14 77:2 99:16
130:24 133:5,8 134:20,
25 135:3 136:19 138:8

**ordinary**
44:7 64:25 65:12 73:21
118:23 122:4,22 127:8

30(b)(6)
BRUCE NICHOLS - 10/14/2015                                    i16

**organization**
99:22

**original**
50:7 72:9 136:10

**originally**
26:5

**outright**
57:12

**outside**
9:8,11 31:12 58:2
101:14,19 124:13 138:6

**overall**
12:17 60:19

**overbroad**
33:13 65:15 107:6,14

**owned**
45:25

**owns**
128:17

―――――――――
P

**P-a-i-n-t-o-n**
24:25

**p.m.**
84:25 85:2,4,8 135:17,
20 140:12,15

**Pacific**
85:17

**page**
49:4 71:12,17 78:4
89:21 91:4 97:14 99:12
117:9 118:3 130:5,21
131:4

**pages**
59:21 77:20 80:21
131:7

**paid**
45:10 86:2,3,4,15,16,
17,19,20 87:11,14

**Painton**
24:22,24 25:11

**paperback**
86:21 87:25

**paragraph**
78:4,6 89:23 101:22

**104:19 114:20**

**paralegal**
3:24,25

**parallel**
69:3 75:24

**part**
10:6 12:11 35:21 45:10
50:7 57:13 61:7 65:19
88:18 98:21 108:15
114:24 116:20 117:14
123:6 130:9 132:4,22
133:16,19 137:12

**partially**
70:21 86:15,16,17

**participated**
74:25 79:13 119:16,25

**participating**
74:13

**particular**
90:12 111:14 117:16
129:2

**particularly**
32:2 63:11 115:2

**particulars**
65:21

**pass**
39:20 41:7

**passage**
92:10

**passed**
78:22

**passengers**
72:6 79:17

**Passing**
87:5

**Pastor**
3:16 7:10

**pay**
17:23 19:19 20:20 23:7
25:21 26:7 27:12 28:2,
16,19 30:2,18,24 36:20
38:6 42:10,18 44:4,10
45:7,19 48:6,24 49:4
53:12 57:19 61:3 68:14
85:22 98:3 100:8,15
105:15 106:23 123:17
127:25

**paying**
45:10

**payment**
86:12

**payments**
45:9 47:7 86:18,22 87:6
127:22

**pdfs**
4:25

**pending**
36:9 103:25 108:2
113:5

**people**
10:23 15:24 17:2 49:12
60:14 112:15,20,21
113:11 115:12 128:25

**percent**
5:9 12:17 33:3

**perfect**
95:10

**peril**
114:7 138:17

**period**
51:14 132:22

**perjury**
133:13 134:18

**permissible**
132:2

**permitted**
35:7 133:24

**perpetrated**
72:21 80:6,18 83:2

**person**
19:16 26:20 61:19
74:16

**personal**
12:19 46:20 54:3 56:12
102:5

**pertains**
134:12

**phone**
16:21,22,24 17:10
26:20,22

**picture**
93:17

**piece**
79:23 129:23

**place**
58:10 90:6

**placed**
74:10

**places**
115:21

**Plaintiff**
3:21 5:23

**plaintiff's**
14:22 49:2 96:20 119:6
122:13 126:23 129:12
136:21

**Plaintiffs**
32:21 88:11

**plan**
44:15

**planes**
91:19

**Playboy**
115:20

**played**
41:5

**please**
3:18 7:6,14 13:13
33:16,20 36:8 40:6
48:25 53:15 93:13,24
98:16 103:23 104:22
107:24 112:3,24 116:22
124:20 125:21 132:14
140:7

**pleases**
128:20

**plenty**
90:13

**plus**
17:6

**point**
5:13,18 21:8 38:2 39:16

**pointed**
134:3

**political**
9:21 112:9

**portion**
133:3

**position**
  10:15,18 13:22 34:21
  63:8 68:23 139:19

**possessing**
  112:16 113:13,21

**possible**
  49:16 117:21

**possibly**
  79:22 89:18

**post**
  71:20 133:4

**posturing**
  5:14

**potential**
  17:21 19:17 46:3 51:15
  134:18 136:13

**potentially**
  63:21 133:13

**poured**
  89:25 90:7

**power**
  34:6 48:7

**practices**
  11:23

**prejudice**
  136:23

**preliminary**
  18:10 47:20

**preparation**
  15:8

**prepared**
  4:23 6:14 18:11 105:12

**preparing**
  15:17

**present**
  10:15 16:24

**presented**
  13:8 26:23 30:25 32:20,
  24 50:3 60:21 94:11

**presenting**
  53:18 62:25 65:23

**presents**
  65:24 115:4

**President**
  10:16 73:13 81:2 91:18

**Press**
  10:2,4

**pretty**
  57:9 106:24 121:20

**previous**
  20:25 21:11,12 60:9
  89:17 116:16 124:17

**previously**
  3:22 5:10 28:13 50:2
  85:11 116:7 127:14

**Price**
  17:23 19:19 20:21 23:7
  25:21 26:7 27:12 28:2,
  16,19 30:2,18,25 36:20
  38:6 42:11,18 44:4,10
  45:7,19 48:7,24 49:4
  53:12 57:19 61:3 68:14
  98:4 100:8,15 105:15
  106:23 123:18 127:25

**print**
  10:12 53:7 88:7 102:3

**prior**
  17:19 20:15 42:5 75:14
  115:19

**Priscilla**
  24:22

**prison**
  39:12 55:15

**private**
  114:21

**privilege**
  13:3,7 19:22 31:10,19
  34:22 37:22 67:3 93:21
  114:14,17

**privileged**
  12:24 18:7 61:17,23
  62:10,21 63:22 64:10

**problem**
  24:5 27:11,17 94:10
  132:10

**problems**
  29:22,23

**proceed**
  41:22

**proceeded**
  47:24

**process**
  14:10 50:11,23 58:9
  64:20 65:9,19

**produced**
  6:5,19 32:18,21 34:24
  88:11,25

**producing**
  6:2,9

**production**
  14:25 49:5 50:10,23
  96:22 122:15 127:2
  129:14

**productive**
  104:25

**products**
  79:2

**profit**
  71:19 102:8

**program**
  12:10 79:4

**programs**
  9:3,8

**progress**
  21:4

**proof**
  45:17 109:2 128:11

**proper**
  43:6,9

**property**
  128:17

**proposing**
  84:16

**prosecuting**
  41:22

**prosecution**
  51:15

**protected**
  37:21

**proud**
  71:7

**prove**
  104:24

**proven**
  83:11

**provide**
  38:18 39:3

**provided**
  14:18 15:7

**public**
  7:10,22 38:9 41:24
  52:20 69:21 70:18
  77:25 114:22,25 115:11
  131:11,13 135:4 137:13

**publication**
  29:13 86:17,21 101:25

**publications**
  11:19 82:10 117:8

**publish**
  20:20 24:4,12 25:18
  26:25 27:9,10,22 28:9,
  19,25 29:7,10 30:5,19
  42:10,18,20 43:22 45:7
  47:4,12,17 54:22 55:23
  66:2 68:23 71:2 82:15
  83:8 95:3,4 137:16

**published**
  20:16,25 23:22 25:9
  28:10 34:10 36:13
  37:12 38:6 41:10,14,20
  43:14 45:24 48:6 52:19
  56:13 60:8 65:14 69:18,
  20 74:21 75:17 87:23,
  25 89:15 90:14 95:15
  98:2,13 100:15 106:20,
  22 108:14 115:19
  116:7,16 117:8 121:12
  123:17 125:3

**publisher**
  10:16 12:9,14 14:7 43:7
  45:4 47:5 59:20 62:8
  74:12 75:4 81:18 83:7
  92:3 94:3 99:22 127:11

**publishers**
  12:7,8 43:22,24 44:12
  65:3,19

**publishing**
  4:5,7,9,12 6:12,25 7:25
  8:20 10:21,22 11:23
  12:10 13:9 16:11 28:24
  36:19 38:23 40:13
  44:15 55:13 56:19 71:5
  99:15 107:9 122:10,12
  126:25 127:2,12 138:22

**punitive**

63:12

**purchased**
44:11

**purported**
77:14

**pursuant**
6:20

**pursuing**
68:11

**push**
31:21

**put**
39:11 48:15,25 50:20
52:10 53:17 72:16 74:7
86:5 89:11 118:7,15
130:13 131:10,12
132:11 133:3,18 136:9

---

**Q**

**qualification**
11:2

**quality**
44:13

**question**
11:7 19:13,14 20:11
30:22 31:4,7,15 32:5
33:14,16,24 36:6,9,11
40:5,7 41:16 42:4,16
46:6 51:25 56:17 57:17
59:14 63:17 68:10
73:23 74:19,23 78:14
82:6 83:5 84:14 100:13
101:8,13 103:22,25
104:3 107:19,25 108:2,
4 109:15 110:11 112:25
113:2,3,5,7 115:16
117:4,5 125:19 130:11
131:14 132:19 137:14
139:9 140:2

**questioning**
103:24

**questions**
13:13,19 18:10,18,21
22:4 27:6 33:23 34:18
35:5,20 38:12 48:19
69:25 103:12,17 116:25
131:24 134:11 135:5
138:11 139:7,11,16

140:20,24

**quite**
20:24 31:24 33:15 52:8
112:10

**quotations**
99:12

**quote**
81:10,19

---

**R**

**radio**
102:3

**raised**
50:13

**rank**
73:5

**Re-notice**
14:23

**re-noticed**
4:15,22

**reach**
120:24

**reached**
24:10 39:15

**read**
35:12 36:8,9 39:10
40:20 71:16 72:8,15
81:23 97:17,18 98:6
100:3,17 102:13,20
103:23,25 107:24 108:2
109:20 111:5 113:3,5
117:11 118:22 122:25
123:2 133:2 136:18
138:14

**reader**
52:19 69:19 81:23
117:9

**readers**
12:13,14

**reading**
57:10 102:9 110:21
115:6

**realize**
85:18

**really**
18:6 106:3 121:7

128:18

**reason**
51:2 52:4 55:5 58:13
118:7 129:4 134:14

**reasons**
23:15 25:11

**recall**
57:11 120:25

**recalled**
91:7

**received**
4:25 114:9 120:8,10

**receiving**
123:15 124:8

**recess**
85:2 135:18 140:13

**recipient**
78:21

**recitation**
79:11,19

**recollection**
95:21

**reconsider**
124:20

**record**
4:24 5:8 53:4 55:21
57:25 70:2 76:19,21
84:17,19,21,25 85:8,16
110:25 115:2,11 123:6
132:14,16 133:3,10
135:17,20 136:9 138:14
140:8,12,15,18

**recorded**
3:4

**redress**
99:9 104:21 105:8

**reference**
35:18

**references**
66:22 73:18

**referred**
79:25

**referring**
129:23

**reflect**

5:9

**refresh**
95:21

**refuse**
42:17

**refused**
39:19,22 42:11

**Regan**
95:20

**regard**
5:20 8:21 9:3 13:15
22:11 25:21 29:16 32:2,
17 34:16 35:8 37:9,22
39:3 56:17 57:20,23
58:20 62:5,9 63:11
65:13 68:18 71:3 89:2
90:16 99:11 102:19
103:4 104:5 106:9,15
108:14 110:22 111:16
114:5

**regarding**
16:10 18:19 139:12

**regards**
93:2

**rehashed**
70:17

**reimburse**
47:7

**rejected**
42:20

**relate**
61:3

**related**
34:24 58:21 88:24
136:16

**relates**
35:22 116:6

**relationship**
23:11,15,18,20 44:20

**relative**
73:4

**released**
89:17

**relevance**
22:7 111:20

30(b)(6)
BRUCE NICHOLS - 10/14/2015                                    i19

**relevant**
18:22,23 21:19 34:19,
23

**reliances**
60:23

**relied**
60:9

**relinquishing**
45:19 46:12

**rely**
49:16 60:17 65:22
80:16 90:11 94:8
111:25 128:10,23,25

**relying**
52:7 56:22

**remain**
140:23

**remained**
125:2

**remark**
126:20

**remember**
72:12 89:13 102:9
115:6

**repeat**
36:6 70:12 83:4

**repeated**
92:11

**report**
129:10,14,18 130:2,3,
10,14,22 131:4,10,12,
18,23 132:4,5,10,19,23
133:19,20 134:2,9,12,
17 135:4,9 137:13,16
138:12 139:17 140:3,21

**reported**
70:21,22 92:9,10,13
94:10 116:13

**reporter**
3:15,23 5:5 7:6 13:13
14:12 36:7 103:23
113:4 118:22 126:13
136:6

**reporter's**
34:22 37:22 67:3
114:14,17

**reporters**
49:14 54:24 60:7
113:21

**reporting**
38:12 66:12 70:24
73:11 74:8 77:18

**reports**
41:2,10,14,21 54:25
90:14 116:7 139:12

**represent**
128:24,25

**representative**
4:14 9:16 12:21 13:5

**represented**
136:3

**representing**
114:21

**Republic**
78:12

**republished**
70:17

**reputation**
54:21 82:13

**request**
35:2 88:14,17,19,23

**requested**
15:13 89:4

**require**
119:21

**required**
62:24

**resend**
5:18

**resolve**
104:25

**respect**
137:8

**respond**
4:23 6:14 25:15 27:19
53:15,16 56:9,18 65:17
107:15 112:3 116:22
118:11 119:22 123:21
126:4,7

**responded**
106:6

**response**
6:4 35:2 78:17 96:15
119:4 120:4 121:13
124:5

**responsibility**
114:23

**responsible**
90:22 94:13

**responsibly**
99:17

**rest**
34:21

**resume**
135:11

**resumed**
85:11

**retraction**
97:25 98:9,10,12,18,21
124:16,23 125:4

**return**
138:25 139:22

**reveal**
37:20 38:13,14

**revealed**
39:12 40:15 41:11,17

**revealing**
34:4 68:6,8 115:23

**revelation**
67:4,18

**review**
22:15,19 26:17 31:13
54:7 55:4 57:4,13 58:3,
10 61:11,12,17,23
62:10,24 63:20 64:13,
15,17,20 65:9 66:13
68:22 101:14,20
121:10,21,24,25

**reviewed**
33:6 46:19 48:2 49:25
67:21 72:9

**reviewing**
64:23

**reviews**
11:19

**right**
19:2 33:3 38:7 44:6

47:18 58:10 59:9,18
61:21 62:7 66:12 76:16
82:22 83:18 92:5 93:10
99:12 109:24 110:5,18
111:8 120:17 128:4,20
136:9 137:15

**rights**
44:4 45:19 46:12,21,22
85:23 86:23 87:12
128:17

**rip**
111:25

**ripped**
128:4

**rise**
115:2

**Risen**
3:7 4:6 5:11 20:20,24
21:15 22:14 23:7,24
25:6,20 26:11 28:22
29:8,15 30:23 31:8
32:6,20 33:10 34:11
36:13 38:2,4,16,20,25
40:14 42:9,12 44:2
47:25 48:5,8,12 49:4,25
50:4,19 51:2 53:11
54:23 55:6 57:18 58:14
59:19 60:6 61:18 66:9,
16 67:21 68:2,7,9,14,20
72:10 79:25 80:5,16
81:12 94:3,12 99:7
100:21 101:15,23
108:14 113:23 114:9
117:10 122:11 126:14,
18,19,21 127:11

**Risen's**
14:8,9 30:3 43:2 47:17
49:12 59:21 71:12
73:10 74:8 79:19 81:20
82:7 98:3,13 99:16,18
102:2 105:5,15 114:8

**risk**
115:4,24 139:22

**Rodolfo**
3:14

**role**
78:14

**room**
17:3

30(b)(6)
BRUCE NICHOLS - 10/14/2015                                         i20

**roughly**
  12:12

**royalties**
  86:9

**rule**
  14:24 65:4,11,18 137:8

**ruled**
  130:17

**ruling**
  137:4,9,10,22 139:3
  140:5

**RULINGS**
  13:10 20:12 32:14
  126:9

**run**
  7:19 29:23 78:11

**ruse**
  72:3 79:14

                S

**sales**
  9:15 52:22 87:17

**sanctions**
  19:10 21:23 40:11,12

**saw**
  47:16,23 71:20 97:18
  100:16 120:22 123:11

**Saxby**
  78:11

**saying**
  27:16 37:10 48:11
  64:15 94:16 95:5 103:9
  113:23 140:17

**says**
  44:20,24 47:5 49:7
  72:24 73:16 74:9 77:24
  84:5 90:20 91:25 98:15
  99:5,7 104:19 133:6

**scandal**
  109:17 110:23

**scenario**
  40:23

**scheduled**
  4:17 6:16 15:11

**school**

  7:22 8:21

**schooling**
  7:21

**schools**
  7:22

**Schuster**
  21:2,6 22:16,17,21
  23:12,16 24:7,18 25:3
  26:7,24 27:11 28:8
  30:2,13,18 37:13 42:11,
  17,21,23 43:5 44:3,8,24
  45:6,13,18,25 46:4,8,
  10,21 47:11,21 50:3
  85:22,23 86:8 127:15,
  24

**science**
  9:22

**scope**
  56:2,4 130:19 133:23
  138:6

**Scott**
  9:20

**screen**
  92:21,22 93:8,17

**season**
  88:9 89:14

**seasons**
  88:9

**SEC**
  129:21 130:18,25
  131:22 132:7 134:4
  136:17 139:4

**second**
  22:6 78:5 89:23 99:11

**secondary**
  70:5

**Secondly**
  5:20

**secrecy**
  111:17

**secret**
  99:20 114:24 115:11

**Securities**
  130:6 136:15

**security**
  91:17 115:13,24

**see**
  15:6 18:7 22:8 23:21
  24:3 25:17 47:5 49:22
  54:16 71:14 90:3 92:4
  93:12,18,22 97:3 99:25
  105:9 109:4 114:16
  119:10,12 122:18
  127:5,16

**seeing**
  80:2 101:17

**seek**
  66:2 105:7 138:11
  139:2

**seeking**
  39:11 51:19

**seen**
  15:3 75:13 96:24

**selected**
  12:20 13:4

**sell**
  51:4 70:9,13 82:11
  118:8,14

**seminars**
  9:3 11:9

**Senate**
  78:7,9,13

**Senator**
  78:11

**send**
  88:4 92:25

**senior**
  10:15 91:5,6

**sense**
  34:6 51:21

**sensitive**
  49:15,20

**sent**
  8:21 48:13,18 97:5
  122:8

**sentence**
  35:19,24 36:4 40:17,18

**separate**
  59:14 87:2

**separately**
  96:18

**September**
  15:11 89:16

**serious**
  91:11 104:25 106:25

**seriously**
  54:21 106:7

**set**
  13:24 117:9 123:8

**seven**
  4:21 18:13,16 19:5
  21:18 126:2 130:4

**severe**
  74:15

**severely**
  75:21 82:21

**severity**
  94:2

**sexy**
  52:20

**share**
  86:8

**shared**
  97:4,6

**Sharon**
  6:24 15:21,25 17:3,10
  97:7

**Shield**
  37:21

**shoot**
  73:8,14 77:19 81:3
  91:12,19

**shooting**
  72:5 77:3 79:16,23

**short**
  102:4

**shortly**
  20:22 29:17 97:5

**shot**
  84:6

**show**
  77:7,8,23 81:16,17 84:5
  126:12

**Shuster**
  10:6

30(b)(6)
BRUCE NICHOLS - 10/14/2015

i21

shy
21:23

side
61:8,19 71:6 116:2

sides
94:10 127:21

sign
93:2 127:15 128:10

signed
20:22 29:17 32:25
47:25 50:4 58:18 68:12
72:10 127:11

significant
42:13 46:3 102:5

signing
86:15

Simon
10:6 20:25 21:6 22:16,
17,21 23:12,15 24:7,18
25:3 26:6,24 27:11 28:8
29:25 30:13,17 37:12
42:11,17,21,23 43:5
44:3,8,24 45:6,12,18,25
46:3,8,10,20 47:11,20
50:3 85:21,22 86:2,4,8,
19,23 87:2,3 127:15,24
128:4,5

simple
125:19 140:2

single
82:14

sir
9:10 11:5 22:23 28:10,
15 30:12 39:15 44:12
47:14 49:23 50:5 53:2
54:20 65:3 69:10 71:13
73:15,24 75:15 81:19
82:6,13,24 94:8 95:18
97:12 98:25 100:6,10
101:9 103:7 106:2
109:7 110:2 113:16
116:12 117:15 118:13,
20 119:2,11,15 120:3,6
121:6,10,20 122:5,24
123:4,12,13 125:22
127:6,9,13,19 128:2,12,
23

Sitting
3:21

situation
44:19 75:24

six
9:14 10:16 130:4

small
12:11 88:7

software
77:14 80:24 115:17

somebody
11:22 37:7 43:23

somebody's
94:22

sorry
9:25 75:6 78:9,24

sour
44:20

source
37:8,23 38:13,18 39:12
41:17 53:21 66:14 70:7
77:23,24 79:5,22 81:20
84:5,9 114:4

sources
30:4,16 49:8,13 50:16,
19 51:9,13,18 52:7,9,24
53:5,8,11,24 54:25
55:18,20 57:7,9 58:15,
24 59:2,5,7,11,17,22,25
60:10,11,13 61:18 67:4
68:18 69:18 73:25 74:9
76:11,15,18 80:14,21
83:16 92:9,13 93:21
116:10,14,18 117:10,
13,18,19,20,23 118:3,4,
6,17 128:17

sourcing
67:19 70:4 82:7

Southern
3:9

speak
22:16,18 57:3 61:16

speaking
63:2 89:14

speaks
133:8

special
5:18 52:11

specialist
3:15

specific
131:24 134:11 139:16

specifically
20:9 21:15 134:4

specifies
45:9

speculate
40:16

speculation
40:2,8 41:4 43:20 125:9

speculative
107:6 108:20 125:9

spelled
3:22 24:23

spending
90:14

split
12:12

spoke
36:24 140:18

spoken
17:20

spring
50:24 89:18

stages
50:10 60:3

standby
82:2

standpoint
64:24

start
72:5 77:3 79:16

started
30:2

starting
4:25

state
7:14 21:13,15 22:4,11,
22 25:12 26:6 27:12,17,
25 28:4,5,7,10,13
37:10,16 47:13 48:2
66:17,21 69:3

stated
108:23

statement
60:14 70:7 72:15 73:2,
4,17 75:21 76:8 77:22
80:17 81:5,8,9,13,14
82:19,20 83:7,11 90:12,
18 99:17 131:5 140:19

statements
73:21 98:3,13 99:14,19
102:2 105:5 123:10,17
124:2,19

states
3:8 72:18 130:6

stations
111:11

stay
73:16

stays
91:4

Sterling
37:17,25 39:4 42:5
51:16 66:23 67:11,15,
17,23 68:7 113:24

Sterling's
67:8 114:7

stock
135:5 136:12 137:6

stop
103:24 112:23

stories
34:4 49:15 60:8 70:20,
22,24

story
54:25 55:2 61:9,20
66:12 67:14 71:7 77:12
79:24 81:21,22 83:15,
17 89:24 90:8 94:5
115:16 116:2,15

strategy
44:15

strewn
114:25

stricken
136:22 140:22

strong
68:23 72:14 73:2,17

76:7 81:13 82:20

**stronger**
83:22

**strongly**
124:19

**structure**
24:3 25:18 27:10,21
28:18 29:5,10,12 30:19
42:19

**structured**
47:4

**stuff**
52:19 70:17

**subject**
17:22 31:18 54:2 55:14
62:22 63:25 111:22
130:18 133:13 134:18
136:23 139:23 140:4

**subjected**
46:2

**subjects**
139:8

**submitted**
78:13

**subpoena**
38:11 39:9,16,17 52:3
63:3 114:3

**subscribes**
135:8

**Subsequent**
103:2 104:3

**substantive**
35:5

**successful**
72:3 79:15

**successfully**
74:22

**sued**
22:21

**suggest**
50:19 124:19 139:6

**suggested**
30:7

**suit**
35:9

**suitable**
13:24 105:7

**super**
81:13

**support**
107:9

**suppose**
108:12

**sure**
17:4 34:7 35:12 36:16
108:10

**Surely**
24:9

**swear**
7:3,6

**sworn**
7:9,12 85:12

---

**T**

**table**
6:23 15:20

**take**
8:10 18:23 19:8 36:18
49:24 53:10 54:20
60:22 76:10 77:6 84:15
89:3,10 93:17 94:22
99:8 105:20 109:4
123:15 129:16 133:8
134:22 135:11

**taken**
8:13 76:5 123:23,25
124:5 135:18 140:13

**takes**
104:21

**talk**
8:17 30:20 42:23 45:12
64:13 71:8 84:23

**talked**
16:14 43:24

**talking**
8:18,19 34:11 36:13,14
43:19 46:16 48:16
57:15 65:10,11 75:11
91:22 93:18 107:16,22
108:9 112:20

**talks**

**117:19**

**tammey**
3:16 7:10

**technical**
5:21

**technology**
78:19

**television**
102:3

**tell**
23:14,19 26:12 29:8
35:16 52:18 53:20
56:20 83:14 99:5
113:20

**telling**
51:12 68:16 75:23

**tells**
45:21 60:10 77:11
94:24

**ten**
17:17 130:4

**tend**
55:3

**terms**
15:13 25:17 40:8 46:9
52:22

**terror**
90:2,8,15

**terrorism**
78:20 115:3

**terrorist**
77:15 91:20

**testified**
7:11 28:12 39:23 59:4
71:4 75:16 77:7 79:11,
19 80:4 85:12 116:5
117:6 127:14

**testify**
13:24 33:21 39:19,22
41:6,9,10 42:4,6 63:6
125:6,17,24

**testifying**
112:23 131:15

**testimony**
15:13,17 25:14 55:11
61:14 62:2 63:9 66:25

**67:18 77:25 79:8,12**
80:13 93:5,14,25
117:15 130:18 131:9
133:11,24

**text**
52:4 131:25

**textbook**
9:23

**textbooks**
9:21

**Thank**
111:23 140:5

**thing**
34:19 82:14

**things**
23:24 34:4 63:12
128:19

**think**
17:5 33:15 43:12,13
66:8 93:3 94:20 100:21
121:13 123:6 125:17
133:15 134:21 136:3

**thinks**
61:20

**Thirdly**
5:25

**thorough**
121:21

**thought**
28:12 52:14 82:16
91:23

**Threat**
78:20

**threatened**
39:8

**threatening**
38:16,20,25

**threats**
91:20

**three**
9:24 17:5 54:15 86:18
99:14 130:3

**time**
5:2 11:7 20:18 22:13
24:21 25:25 26:15
29:10,15 33:4 38:5 39:2

40:21 42:9 44:2 47:18
50:18 51:14 62:9 65:24
67:20 71:21 77:6 84:2,
12,24 85:7,17 86:11,13
87:24 91:20 97:18
100:4,16 102:10
111:11,21,24 118:13
123:11 132:22 135:16,
19 136:5,24 138:10,15
139:14 140:11,14

**times**
35:12 101:5 115:20

**timing**
29:6

**Tina**
26:2,21

**title**
11:16,17

**titles**
87:21

**today**
3:16 6:2,10,13 12:21
13:5,25 14:15 15:14
16:15

**today's**
16:11

**told**
24:14 38:4 51:2 64:12
77:20 92:12,13 103:6
106:14 125:23 137:12

**tomorrow**
6:6,16 88:14

**top**
45:20 99:20 114:24
115:10

**topic**
18:8 57:6,21 133:6
136:9,20

**topics**
4:21 18:12 19:3,4,5
21:18 126:2,7 140:22

**total**
86:7

**totally**
120:16

**touting**
88:5

**Townsend**
91:15,25 92:5

**trade**
10:2,8 12:10,14,16
126:24

**training**
8:14 9:7

**transparent**
5:24

**treading**
18:6

**Tremaine**
4:4

**trial**
42:5 125:6,17

**trouble**
66:22 113:19,21,24

**true**
53:19 60:5 65:23 71:4
74:15 79:12 82:22,24
83:9,18,24 84:3 94:5
117:13 130:15 131:17
133:20 134:17

**trust**
45:21 53:17 54:23 55:3
66:8

**trustworthy**
60:19 66:10

**truth**
94:24

**try**
5:22 104:25

**trying**
20:10 38:6 140:19

**turn**
48:4 49:7 71:11 91:4
96:3 97:14 118:21
122:6 129:20

**Turning**
89:20 119:3

**turns**
60:20

**TV**
111:8

**two**
6:20 9:18 13:12 15:23

16:23 69:24 88:9 99:13
130:3

---

**U**

**U.S.**
56:14 71:23 72:19
73:19

**ultimate**
48:6 137:10

**understand**
15:12 39:21 93:4 99:6
101:22 107:21 110:7
117:3

**understanding**
40:9 42:2 54:5 56:21
75:20 98:7

**understood**
29:25 30:8 71:18

**undertake**
61:11

**undertaken**
61:12 62:24 124:9

**underway**
102:19 103:3 104:5

**unfortunately**
96:12

**United**
3:8 130:6

**universities**
10:23

**University**
7:23 107:20

**unnamed**
92:6

**untrue**
83:11

**use**
29:22,24 30:9 31:21
49:13 51:11,13 53:8
55:5 105:14 117:19,22

**uses**
52:8

---

**V**

**vague**
90:13 107:5,14

**value**
80:12

**version**
92:11 132:21

**versus**
69:25 70:2

**Vice**
10:15 78:12

**video**
3:4,15 92:20

**videographer**
3:3 7:5 84:24 85:7
135:16,19,25 136:7
140:11,14

**view**
58:4

---

**W**

**waiting**
137:7

**want**
5:25 21:21,24 28:9,25
29:13 35:24 41:23
44:21 48:19,20 53:24,
25 55:7 56:11 63:7
74:4,6 84:23 92:24
93:16,22 94:17 95:3
99:6 101:22 103:18
111:21 126:20 128:18
131:23 133:7,9,15
134:15,16 135:7

**wanted**
20:20 26:12 29:11
50:15 51:3,10,12

**wanting**
103:14

**wants**
45:2 51:16 81:23
128:19

**war**
21:13,15 22:4,11,22
25:12 26:6 27:12,17

28:2,4,5,8,11,14 37:10,
16 47:13 48:2,7 66:17,
21 69:3 90:2,7,15

**warrant**
53:18 65:22

**warranty**
60:18

**wasn't**
45:15 88:22

**waste**
90:2,21 111:21

**watch**
111:8,10

**water**
93:10,20,23

**way**
29:24 53:17 59:10
103:18 116:23 128:24
132:7

**we'd**
60:22 99:7 121:20

**we'll**
20:10 114:17 135:11

**we're**
4:10

**we've**
5:6 16:18 18:9 52:23
87:13 100:18

**weakening**
63:8

**week**
16:22,25 91:8

**went**
7:21,23,24 37:6 90:2

**what's**
30:22 33:18 82:24
133:18

**White**
91:7

**who's**
63:2

**who've**
113:18

**Whores**
95:16

**widely**
40:25

**William**
16:9 26:4 63:6 96:5
122:9

**willing**
47:6,8 49:19

**Winchester**
7:22

**winter**
50:24

**wish**
138:24

**withheld**
88:21

**witness**
7:4,7,12 13:9 27:4,7
34:15 37:19 42:8 67:5
93:12 103:20 114:14
120:15 125:11 126:3
128:22 131:21 133:10
137:2

**woman**
24:21

**word**
72:12 94:23 129:4

**words**
21:16 76:9

**work**
80:24 112:20 124:13

**worked**
10:7 14:9 60:9 66:10,16
128:7

**working**
95:24

**world**
83:8 115:5

**worst**
40:22

**wouldn't**
24:2 26:25 27:8 73:20
106:19 130:13

**Wright**
4:4

**write**
26:12 99:12 112:21

124:15

**writing**
23:9,25 53:11 94:3

**writings**
37:16

**written**
49:10 78:14 80:5
119:12

**wrong**
25:19 92:20

---

**X**

**Xeroxed**
49:3

---

**Y**

**Yale**
7:23 8:4,11 9:12 107:19

**Yeah**
51:7 54:12

**year**
9:22 69:6 87:25 88:2,9

**years**
9:18,24 10:4,9,16 75:3
83:25 125:14

**yesterday**
6:11 17:11

**York**
3:12 9:23 115:20

**you'd**
24:6 87:18 98:15
104:20

**you'll**
66:2

**you're**
11:18,20 16:15 19:21
22:3 27:16 28:24 33:23
34:17 35:4 37:10 41:8,
13,20 42:12 48:10
51:12 60:24 61:4 62:25
68:16 79:24 85:18
92:21 103:8,10,19
107:19,22 110:5
112:17,19,22 113:14
120:20 131:22 133:12
134:6,13 138:12

**you've**
35:12 58:23 70:11
133:10

**young**
12:13,14

---

**Z**

**Zecher**
96:4