Exhibit 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

DENNIS L. MONTGOMERY

                      Plaintiff,

    v.

HOUGHTON MIFFLIN HARCOURT
PUBLISHING COMPANY

            and                              Civil Action No. 1:15-cv-20782-JEM

HMH HOLDINGS, INC.

            and

JAMES RISEN, an individual, Author

                   Defendants.

---

<u>**SECOND DECLARATION OF PLAINTIFF DENNIS MONTGOMERY IN SUPPORT
OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION CHALLENGING
FLORIDA JURISDICTION AND VENUE**</u>

Pursuant to 28 U.S.C. §1746, I, Dennis Montgomery, hereby declare under penalty of perjury

that the following is true and correct:

1) I am over the age of 18 years old and mentally and legally competent to make this

   affidavit sworn under oath[1], despite having suffered a brain aneurism and serious

   related health issues. *See* Exhibits 1, 2, and 3, attached to this affidavit.

2) Reporter James Risen of <u>The New York Times</u>, publisher Houghton Mifflin Harcourt

   Publishing Company, and HMH Holdings, Inc., published a book <u>Pay Any Price:</u>

   <u>Greed, Power and Endless War</u> in October 2014 (hereinafter "the Book"). *See*

---

[1]     My prior declaration is attached and incorporated substantially into the Amended
Complaint. The prior declaration should be read in conjunction with this Second Declaration.

Amended Complaint ¶¶ 14-15, 30.

3) In Chapter 2 of the Defendants' Book, James Risen, Houghton Mifflin Harcourt Publishing Company, and HMH Holdings, Inc. lie about me and libel and slander me maliciously and extensively.

4) Chapter 2 involves me, and James Risen focuses almost exclusively on defaming me alone to sell copies of the Book in marketing interviews.  Having read the Book, I find that I am used by Risen as the centerpiece, that is the Defendants' defamatory "punching boy," to sell books. Risen conspicuously and intentionally downplays the many other events and incidents in the Book and focuses almost exclusively on defaming me when promoting his Book for sales in Florida and elsewhere. *See* Amended Complaint ¶ 41-42.

5) Whereas, the Defendants, especially Houghton Mifflin Harcourt Publishing Company, have great resources and no doubt have "errors and omissions" insurance to finance their legal defense, I have no money or resources at all.  I lost my house in foreclosure.  The Defendants will be more than able to afford to litigate the claim in Florida, particularly since two mega-law firms represent them.

6) My finances, employment, career and business opportunities have been severely devastated and destroyed by the knowingly, and at a minimum recklessly, false and misleading statements made by the Defendants, contributing to the loss of my previous house in foreclosure and driving me into poverty just at the time I have also been diagnosed with serious medical problems.

7) The Defendants knowingly and at a minimum recklessly published defamatory and false and misleading statements which are not opinion or hyperbole and are not fair

reporting of their sources or public records.  The Defendants have not engaged in fair reporting, but published extremely lopsided and unbalanced, falsified and defamatory statements in which they knowingly and/or recklessly distorted and falsified the information available to them.  Importantly. the defamation is specifically false and misleading in factually verifiable terms, including in that:

8) Defendants published defamatory material and statements from alleged confidential U.S. Government sources in the intelligence and military communities.  The false and misleading statements obviously did not result from fair reporting of previously published material, as they falsely and conveniently claim in their motions to dismiss and related pleadings. They admit that on page ix of the Book by stating: **"Many people have criticized the use of anonymous sources.  Yet all reporters know that the very best stories – the most important, the most sensitive –rely on them.  *This book would not be possible without the cooperation of many current and former government officials and other individuals who were willing to discuss sensitive matters only on the condition of anonymity*.**" *See* Amended Complaint ¶¶ 59-64. Already, counsel for Defendants have misled this Court and stated on the record that I am not a registered voter in Florida. Incredibly, this false statement was made under oath by defense counsel Laura Handman of a large District of Columbia national law firm that had the resources to check this out with Miami-Dade County Elections – Miami-Dade Portal.

Therefore, Risen's Book is not a fair report of prior reports or public information. Indeed, quite the contrary.  It is a big selling point of Defendant's Book that it publishes new information that had never been accessible or published before,

specifically revealing inside information, however falsified, from U.S. Government sources. That appeal of revealing inside information previously unknown from U.S. Government sources is exactly why the Book is a bestseller in Florida and elsewhere, particularly given that Florida is at the center of U.S. counterterrorism military and intelligence operations, as I testify to below.

9) Defendants are simply flat-out lying concerning what many of their sources in the U.S. Government tell them. As presented in my affidavit to then U.S. District Judge Brian Sandoval (now Governor of Nevada) on October 30, 2006, attached as Exhibit 4, especially on pages 11 to 15, the U.S. Government always independently tested and verified my results, including that my software and technology frequently predicted ahead-of-time terrorist attacks that did in fact later occur at the place and on the date my data predicted. For example, as I stated in October 2006 in the affidavit on pages 14-15, "In early 2005, the Air Force contracted with an independent consulting contractor who verified that there was, in fact, embedded patterns inside the Al Jazeera signals, but that the consultant was unable to decode the encryptions." Exhibit 4. The U.S. Government independently tested and confirmed my work. Real-world events accurately predicted by my software and technology ahead of time confirmed my work. Therefore, based on all of my personal interaction with U.S. Government officials and personnel who have any knowledge of my work, Defendant Risen is knowingly and intentionally lying about, twisting, and distorting what his claimed sources say about me and my work. *See* Amended Complaint ¶¶ 48-49.

10) The substance of the Defendants' defamation is to blame me as a private citizen for the actions and failures of U.S. Government officials. Defendants could not

reasonably trust any sources of negative information about me from sources that Defendants know are shifting the blame for their own actions to me as a scapegoat. *See* Amended Complaint ¶¶ 50-51; 80-81.

11) Defendants defamed me with knowledge of their false statements or at a minimum a reckless disregard to the truth and biased reporting because the Defendants actually know that Warren Trepp has never been required to pay back any of the $30 million that eTreppid received from the U.S. Government nor offered to pay any of it back nor has the U.S. Government asked for any of the money back.

12) James Risen and the other Defendants actually know that their defamation of me is false and misleading.  If eTreppid received $30 million from the U.S. Government for the use of my software and technology that was a fraud or a hoax, eTreppid would have had to pay the money back to the U.S. Government. *See* Amended Complaint ¶ 106, 130.

13) Risen and the other Defendants know that if Trepp actually believed that eTreppid had received $30 million as payment for my work that was fraudulent, a con, or a hoax, Trepp's lawyers would be offering to return the $30 million and to cut a deal to keep Trepp out of jail.

14) Risen and the other Defendants know that my software and technology actually works from their alleged sources – if they are genuine – and is valuable, which is why eTreppid has not been required to pay any of the $30 million back. *See* Amended Complaint ¶ 146, 151.

15) Defendants defamed me with knowledge of their falsity or at a minimum a reckless indifference to the truth and biased and dishonest reporting because they knew that

Warren Trepp controlled the company eTreppid and kept the money, yet accuse me defrauding and conning the U.S. Government.

16) Defendants defamed me with knowledge of their false, published statements or at a minimum demonstrated a reckless indifference to the truth and biased and dishonest reporting because they knew that Trepp negotiated with the U.S. Government and entered into the contracts, yet they accuse me of defrauding and conning the U.S. Government. *See* Amended Complaint ¶ 12, 46.

17) Defendants defamed me with knowledge of their false published statements or at a minimum a reckless indifference to the truth and biased and dishonest reporting by claiming that I fabricated intelligence to make money.  In fact, eTreppid was paid for software work and analysis to fulfill the CIA's concerns, not paid contingent upon results or conditional upon finding any terrorist threats.  Defendants had no reason to recklessly presume that eTreppid made money contingent upon results. *See* Amended Complaint ¶ 192.

18) Defendants defamed me with knowledge of their false published statements or at a minimum demonstrated a reckless indifference to the truth and biased and dishonest reporting because my software and technology did work, does work, and is still being used today successfully by the U.S. Government.[2] *See* Amended Complaint ¶ 99.

19) In fact, the Defendants ignore and intentionally omit my ten (10) patent applications, which attest to and show my expertise. *See* Amended Complaint ¶ 62.

20) Defendants defamed me with knowledge of their false published statements or at a minimum demonstrated a reckless indifference to the truth and biased and dishonest

---

[2]     Obviously, software goes through various versions of improvements.

reporting because the U.S. Government independently tested and verified the results of my software and technology.  The U.S. Government did not rely upon my word alone. *See* Amended Complaint ¶ 135.

21) The data detected by my software and technology did predict in advance actual terrorist incidents and/or meetings, confirming that my work was legitimate. *See* Amended Complaint ¶ 206.

22) Defendants defamed me with knowledge of their false, published statements or at a minimum demonstrated a reckless indifference to the truth and biased and dishonest reporting by simply assuming without any reason that the U.S. Government did not independently confirm the results of my work. *See* Amended Complaint ¶ 48.

23) Defendants defamed me with knowledge of their false published statements or at a minimum demonstrated a reckless indifference to the truth and biased and dishonest reporting by manufacturing, without any reason, that I could fake results without me believing that the CIA, Defense Intelligence Agency ("DIA"), NSA, and/or U.S. military would check if my data accurately predicted events in the real world.  The Defendants' story presupposes that I could know that no one would check the validity of my work. *Id.*

24) Defendants defamed me with knowledge of their false published statements or at a minimum demonstrated a reckless indifference to the truth and biased and dishonest reporting because I and the companies I worked with had equal or better opportunities to provide my services to private sector companies, and had no need to work for the U.S. Government to make the same amount of money or more.  Defendants had no reason to publish false statements, with knowledge or at a minimum recklessly, that

the U.S. Government contracts were any more profitable than my other, private sector opportunities. Defendants purposefully and falsely publish that my work for the U.S. Government was more profitable than my other options. *See* Amended Complaint ¶ 46.

25) Defendants defamed me with reckless indifference to the truth and biased and dishonest reporting by claiming that I persuaded the President, George W. Bush, to ban international passenger aircraft from entering U.S. airspace and nearly shoot down passenger aircraft rather than the President of the United States making his own decisions. The Defendants could not rationally believe that an unknown private civilian caused the President of the United States to ground international flights. Such decisions are the responsibility of the President and his national security team, not my role. *See* Amended Complaint ¶¶ 66; 75.

26) Defendants defamed me with knowledge of their false published statements or at a minimum demonstrated a reckless indifference to the truth and biased reporting because the records and documents that the Defendants purport to be reporting from demonstrate that Michael Flynn, Tim Blixseth, and Warren Trepp all went to extraordinary and expensive efforts to obtain ownership of my work as being extremely valuable, while simultaneously claiming that my work had no value.

27) The documents that the Defendants claim to be reporting on make unmistakably clear that Trepp, Flynn and Blixseth by their various actions believed my software and technology actually worked and had enormous value. The Defendants knew from the documents that Trepp's, Flynn's and Blixseth's actions contradicted their words. Defendants knew that by talking down the value of the technology and software and

attacking me, Trepp, Flynn, and Blixseth were seeking to gain leverage so as to obtain ownership of my intellectual property at a lower price. *See* Amended Complaint ¶ 245.

28) Defendants actually knew from the documents and information they claim to be reporting on that the Defendants could not believe the words of Trepp, Flynn or Blixseth, or their employees, because their words are sharply contradicted by their actions.

29) Furthermore, Michael Flynn, Tim Blixseth, and Warren Trepp were attempting to invoke the fraud exception to bankruptcy laws to invalidate my bankruptcy, and therefore the Defendants knew that they had motives to fabricate or embellish their accusations against me.

30) The public records that the Defendants claim to be relying upon – though voluminous – overwhelmingly contradict the Defendants' defamation of me.

31) Defendants defamed me with knowledge of their false published statements or at a minimum demonstrated a reckless indifference to the truth and biased and dishonest reporting with the technically absurd and obviously false statement that "The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers." *See* Amended Complaint ¶ 130. This French private company is never identified, of course. *Id.*

32) The Defendants' Chapter 2 of the Book which smears me depends centrally on the proposition that there is not enough data space within a video signal to contain hidden codes, and therefore my work was a fraud and a hoax and I conned the U.S. Government by claiming that video signals contained hidden data.

33) Defendants defamed me with reckless indifference to the truth and biased and dishonest reporting by falsely claiming that I claimed the data was contained only in the "crawl" at the bottom of the screen.  By diverting attention to only the "crawl" Defendants intentionally and knowingly engage in biased and misleading defamation.

34) Defendants defamed me with reckless indifference to the truth and biased and dishonest reporting by saying that I claimed the data was a bar code.  By diverting attention to a bar code Defendants intentionally and knowingly engage in biased and misleading defamation.

35) Defendants defamed me with reckless indifference to the truth and biased reporting by claiming a television signal could not contain such simple data as latitude and longitude coordinates, consisting of only six numbers and two letters (East or West longitude, North or South latitude), plus a date, hidden within the signal.

36) A video signal contains an enormous amount of data. The reason my data compression technology was valuable is because a video signal consumes a tremendous amount of transmission band with and storage space.

37) No reputable or honest person could claim or believe, much more falsify information, that a television video signal cannot contain the hidden data that I uncovered and reported to the U.S. Government.

38) Either the Defendants actually know that their defamation of me is false, because codes can be hidden within video signals, or the Defendants based their entire Chapter 2 on a total failure to research or investigate one of the most central lynchpins of their entire reporting.  Defendants either know that a video signal can in fact contain the hidden data I found or made no attempt to investigate if it can, before

they simply intended to defame me. *See* Amended Complaint ¶ 65, 177, 223.

39) Meanwhile, the Defendants claim that I sought publicity in the news media with regard to then Congressman and later Governor Jim Gibbons.

40) That is false. In fact, I filed a False Claims Act lawsuit on the advice of counsel, which was filed under seal in court.

41) Eventually, the court unsealed the lawsuit documents.

42) When the documents were unsealed in court, the news media began to report on what was said in those court documents.

43) I did not seek news coverage or publicity about the Gibbons issue. *See* Amended Complaint ¶¶ 25-28.

44) Eventually, when news interest grew strong, on the advice of counsel at the time, and the business owner Edra Blixseth, I finally relented and was forced to succumb to requests for comment and granted only one (1) interview with NBC News, which I recall lasting about 45 seconds to one minute on the air.

45) On page 8, the Defendants rely upon an article in <u>The Wall Street Journal</u> titled "Congressman's Favors for Friend Include Help in Secret Budget." However, I did not seek that news coverage or play any role in causing that news coverage.

46) On page 8, the Defendants rely upon an article in <u>The Wall Street Journal</u> titled "Nevada Governor Faces FBI Probe Into Contracts." However, I did not seek that news coverage or play any role in causing that news coverage.

47) On page 9, the Defendants refer to an article in <u>Bloomberg News</u> titled "Yellowstone Club Divorcee Entangled in Terrorist Software Suits." However, I did not seek that news coverage or play any role in causing that news coverage.

48) On page 9, the Defendants refer to an article in <u>Playboy</u> in 2010.  However, I did not seek that news coverage or play any role in causing that news coverage.

49) On page 10, the Defendants refer to an article in <u>The New York Times</u> in 2011. However, I did not seek that news coverage or play any role in causing that news coverage.

50) On page 9, the Defendants refer to an article in <u>Defense News</u> "Obama's Counterterrorism Czar Gave Bogus Intel to Bush white House" in 2012.  However, I did not seek that news coverage or play any role in causing that news coverage.

51) Nevertheless, the <u>Defense News</u> article does alert the Defendants to the fact that U.S. Government officials sought to falsely and misleadingly shift blame to a scapegoat, me.

52) On September 28, 1998, Warren Trepp and I co-founded  eTreppid Technologies ('eTreppid') based on  a "Contribution Agreement" of that date in which we agreed to own the LLC in equal 50% shares. Trepp put up money and Montgomery conveyed his "software compression technology contained on CD No. 1" to eTreppid. The business plan of eTreppid and the application of the "compression technology" was to compress VHS video tapes used for surveillance in casinos for archiving and more efficient storage.  Over the preceding 20 years I developed and copyrighted other types of software technology, including but not limited to "Object Detection" software" which is a crucial component of, among other things, colorizing black and white movies.  In order for the computer to add color, it must be able to recognize individual objects in the movie which are moving in three dimensions,  (that is moving toward or away from the camera and changing in apparent size), aspect angle,

orientation, etc.  This was not conveyed to eTreppid and which, per the terms of the "Contribution Agreement", was expressly excluded. Shortly after the formation  of eTreppid, Montgomery offered to sell one part of his "Object Detection System" ("ODS") software  to Trepp for the sum of ten million dollars, which Trepp rejected. *See* Amended Complaint ¶¶ 80-81.

53) As reflected in a form SF-95 Attachment A prepared by me with my then attorney Michael Flynn for presentation to the U.S. Government, "Beginning on or about November 2002, on behalf of the US Air Force, Montgomery began work on military applications of his technology at Eglin Air Force base to demonstrate the application of his technologies in the war on terror."

54) I am a citizen of the State of Florida, with a residence in an apartment community in Miami, Florida.  I have reported my address under seal for security reasons.

55) I am registered to vote in Florida. *See* Exhibit 9. I previously had a temporary address while settling on the permanent address that I have now.  I have updated my voter registration to reflect my current Miami address.

56) I have reviewed the affidavit of defense counsel Laura Handman attached to the Defendants' initial motion stating that I had not registered to vote in Florida.  The Defendants' affidavit is false.  I am registered to vote in the State of Florida, and have now updated my voter registration with my new address.

57) I found on the website of the publisher Houghton Mifflin Harcourt, that the publisher "Houghton Mifflin Harcourt Publishing Company" maintains permanent and general offices in Orlando, Florida at 9400 Southpark Center Loop, Orlando, Florida 32819. *See* Exhibit C, attached to the Opposition, which I downloaded from the Defendant

publisher's website at  http://www.hmhco.com/about-hmh/our-offices.  These are statements made by the Defendants about themselves.

58) On the website of the Florida Department of State Division of Corporations I found that Defendant Houghton Mifflin Publishing Company is registered to do business in Florida through the Florida Department of State Division of Corporations.  *See* Exhibit D, attached to my Opposition to the Defendants' motion concerning Florida jurisdiction and venue, which I downloaded from the Florida Department of State's website.

59) As shown in those Florida government documents, in 2008 Defendant changed its name from "Houghton Mifflin Harcourt" to "Houghton Mifflin Publishing Company."  *Id.*  These are statements made by Defendants about themselves.

60) My research of the publisher also uncovered that Defendants rely significantly upon sales in the Southeast of the United States through a company "Amazon" for very substantial sales over the internet.  Not coincidentally, Amazon's regional distribution centers or "fulfillment centers" are located in Ruskin, Florida in Hillsborough County and Lakeland, Florida, in Polk County. Florida is the largest state in the South East and the third largest in the nation. *See* Exhibit E, attached to my Opposition.

61) Much of the defamation which my lawsuit contests is contained within the physical product physically shipped into Florida for sale, the Book written by James Risen and published by Houghton Mifflin Harcourt Publishing Company.

62) In 2012, Edra Blixseth brought Chris Pipes, from the U.S. Special Operations Command (SOCOM) from MacDill Air Force Base in Florida to our Palm Desert offices. SOCOM was interested in pursuing object tracking, mass surveillance, and

research on cloaking technologies. Chris Pipes met at our facility, with a representative of the CIA.  While he was in our building, Chris Pipes then received a telephone call from SOCOM in Florida, and then told us that SOCOM could not pursue the technology because of what was written about me in the news media. *See* Exhibit 8.

63) The Defendant author James Risen actually knew or should have known that most of my work was with U.S. Government entities in Florida and the contracting offices for my work are in Florida.  A competent Pulitzer Price winning New York Times reporter who wrote the Book over a four-year period from 2011 through 2014 would have reviewed the Wall Street Journal article from November 1, 2006, attached, which includes the explanation:

### Source of Secret Funds

One source of secret funds for eTreppid and other companies is the Special Operations Command. Based in Tampa, Fla., the command fields special-operations military and intelligence forces around the globe and is at the forefront of the fight in Iraq and Afghanistan. It has also been rocked by a criminal investigation of a former contracting officer. The investigation is continuing, according to a spokesman for the U.S. attorney in Tampa.

In a separate inquiry, Pentagon investigators last year found evidence that the command kept special accounts for "unrequested congressional plus-ups," or earmarks. The plus-ups were used to reward lawmakers with projects in their districts, according to declassified investigators' notes reviewed by The Wall Street Journal. The Pentagon's inspector general closed the inquiry after finding that the accounts weren't illegal.

Mr. Trepp said eTreppid won classified work on its merits and already had a number of government contracts before Mr. Gibbons starting making introductions on the company's behalf. Mr. Gibbons's campaign manager, Robert Uithoven, said the congressman has been a strong supporter of new defense technology, particularly after 9/11. But he said there was "no quid

pro quo whatsoever" for contributions from contractors. And while some funding was secret, "it was because of the sensitive nature of the work," Mr. Uithoven said, not to avoid public scrutiny.

For Mr. Trepp, eTreppid's success at winning multimillion-dollar federal contracts marks a comeback from his Drexel days. He sat at Mr. Milken's right arm on the firm's famous X-shaped trading desk in Beverly Hills, sometimes trading as much as $2 billion in securities a day. Federal regulators filed a civil securities-fraud claim against him in 1995, and a Securities and Exchange Commission administrative judge found that his violations had been "egregious, recurring and intentional." But she dismissed the proceeding against him, noting that the allegations were old and he had left the securities business years earlier.

64) This article and dozens of others, as well as court documents, caused Risen to know

or he should have known upon reasonable inquiry over four years that Warren Trepp

was furiously trying to take ownership of my software and technology, which directly

calls into question his self-serving claims that the software and technology he was

trying to acquire rights to was worthless.  The same article also reports:

Mr. Gibbons also got other, unreported gifts of cash and casino chips from Mr. Trepp, according to sworn testimony in a civil lawsuit brought by a former executive at eTreppid, Dennis Montgomery. The suit, filed in February in federal court in Reno, involves a dispute between Messrs. Trepp and Montgomery over the rights to certain software code. ….

The suit has raised alarms in Washington because of concern that national secrets will be revealed if it goes to trial. For example, one of the entities that funded eTreppid is code-named Big Safari and is a classified program, documents in the case show. The nation's top intelligence official, John D. Negroponte, recently filed a statement with the court seeking to seal the case. He wrote that after personally reviewing the matter, he has concluded that disclosure of some information connected with the case could do "exceptionally grave damage" to national security.

65) My greatest opportunities for employment, business, and/or an income are at either

Macdill Air Base near Tampa, Florida and Eglin Air Force Base near Fort Walton

Beach, Florida.

66) As a result, I had had longstanding plans from years past to settle in Florida, in part because of my failing health and desire to enjoy Florida at this stage in my life. Florida also has no personal income tax, making it a great place to boost and save income for eventual retirement. This is also why most military personnel choose Florida as their home state and residence, which they have the unbridled right to do under military regulations. This military readership is why Florida is one of the most important markets for Defendants to sell books.

67) In 2011, I incorporated a business with a partner in Florida to contract with the military and U.S. Government at bases in Florida to continue the same type of services and software and technological work that I had performed under eTreppid and BLXWARE.  This business was named Alex James LLC, which I incorporated through the "Legal Zoom" service company.

68) Exhibit N attached to my Opposition to the Defendants' motion presents the papers I processed through the "Legal Zoom" company and my payment information paying for the company in Florida in 2011.

69) As an "expert" in national security issues, Defendant James Risen knows that the war in Afghanistan was run largely from Florida electronically and by drone controllers located in Florida.  General Tommy Franks rarely set foot in Afghanistan but fought the war from U.S. Air Force Bases in Florida. *See* Amended Complaint ¶ 73.

70) Defendant James Risen also knows that the U.S. military leadership and personnel are concentrated mainly in Florida, secondarily in California, and thirdly in Texas. Because U.S. military servicemen can easily and by right choose their State of

residence despite being deployed, Florida's lack of an income tax makes Florida a very attractive state for U.S. servicemen, often poorly paid.  As a result, many of the nation's top military leaders, current and former, choose Florida.

71) Defendant Risen knew in publishing the Book that Florida is an enormous market as the nation's now third largest State, including with many retirees with more time to read books than the average American.

72) The team on which I worked had contracts directly with the intelligence agencies at the military bases **in FLORIDA**.  I have video showing the work.  The contracting officers are out of those military bases, many of which are classified. I met and worked with CIA officials in Florida at various military bases.  However, I cannot identify the exact units stationed at those bases, which is classified information.

73) We at eTreppid and later BLXWARE did most of our work with units stationed at MacDill Air Force Base and Eglin Air Force Base, whose identity is secret.  *See* February 14, 2004, "Order for Supplies or Services" attached, with the "Ship To" address of UQ USSOCOM/SOAL-SP (Mohr), 7701 Tampa Point Boulevard, MacDill Air Force Base, Florida 33621.

74) Most of the payments for our work, the work I did for eTreppid and later BLXWARE, came out of the CIA offices in Florida and SOCOM, the U.S. Special Operations Command of the U.S. military at Macdill Air Force Base, Florida.

75) The U.S. Southern Command of the U.S. military is located in Dade County, Florida, at 9301 NW 33rd Street, Doral, Fla. 33172, having telephone switchboard telephone number (305) 437-1000.  *See* Exhibit 5, attached.

76) The U.S. Central Command ("CENTCOM") of the U.S. military is located at MacDill

Air Force Base near Tampa, Florida.  *See* Exhibit 6, attached.

77) Relating to my work conducting surveillance of international communications, major fiber optics cables run from Florida across the ocean, which is partly why my work opportunities for my experience and capabilities are in Florida.

78) I intend to call witnesses who can testify that my defamed software and technology does indeed work and is not a hoax personnel based at Macdill Air Base near Tampa, Florida and at Eglin Air Force Base near Fort Walton Beach, Florida, where I did a lot of his work, as some of my most significant witnesses.  The organizational units housed at Macdill and Eglin used my software, technology, and work extensively during the time period addressed by Defendants' defamation of me.  Those witnesses can prove that the defamatory statements about me are false.

79) Relevant officials at Macdill and Eglin (and all facilities that my work has provided services to anywhere) make their own contracting decisions and do not rely upon contracting offices in Washington, D.C., nor even at the Central Intelligence Agency in Langley, Virginia, the Pentagon in Arlington, Virginia, or the National Security Agency in Fort Meade, Maryland.

80) Potential witnesses in this case, with whom I have worked, are largely in Florida, including:

> Goss, Porter, former Director of CIA, now in Miami, Florida
> Johns, Ken, Macdill AFB, Florida
> Lyons, XXXXX, Macdill AFB, Florida
> Macbeth, W. Rhys, Eglin AFB, Florida
> Nazelrod, Craig, Eglin AFB, Florida
> Pipes, XXXXX, Macdill AFB, Florida
> Roche, James, Macdill, Florida
> Rumsfeld, Donald, now in Florida
> Stillman, Phillip, Attorney for Dennis Montgomery, now in Miami, Florida
> Madden, Tom, Boca Raton, Florida

Olivia, Adrian, Eglin AFB, Florida
Bartholomew, Mary L, Eglin AFB, Florida
Fiamengo, Nicholas A, Eglin AFB, Florida
Freeman, Gregory J, Eglin AFB, Florida
Savage, Cynthia, Eglin AFB, Florida
McCool, John C, Eglin AFB, Florida
Temple, James K, Eglin AFB, Florida
Griffin, Susan M., Macdill AFB, Florida
Russell, Deborah, Macdill AFB, Florida
Nettelhorst, Doug M, Macdill AFB, Florida
Stallworth, Hugh T, Macdill AFB, Florida
Bob McCaskey, Macdill AFB, Florida
Crutchfield, Chris, Macdill AFB, Florida
Melnyk, Michael S., Macdill AFB, Florida
Lopez, Tina M, Macdill AFB, Florida
Cerny, Jeffrey D., Macdill AFB, Florida
Muccio, Anthony B., Eglin AFB, Florida
McKinney, Scott E Lt.Col., Eglin AFB, Florida
Purvis, Brad Civ, Eglin AFB, Florida
'Kirsch, Jim', Eglin AFB, Florida
Hughes, Stacey L, Eglin AFB, Florida

81) Ultimately, I became aware that James Risen had published these false reports in the Book and that Risen was conducting a nationwide publicity campaign, particularly aimed at Florida, to sell the Book.

82) I heard and watched James Risen repeatedly in national television and radio interviews discussing his book but primarily about me, mostly ignoring the rest of his Book in those interviews while attacking me as a private individual.

83) In radio, television, and newspaper interviews, James Risen mainly focused on libeling and slandering me in order to sell the Book.

84) Risen's appearances on radio and television were not just commentary but attempts to stimulate and promote the sale of books inside Florida and elsewhere.

85) Risen was speaking on radio and television to move books off of Florida bookstores and shelves and to the checkout counter in Florida.

86) The defamation by Defendants of me is not a criticism of the U.S. Government in the District of Columbia, but _excuses_ the U.S. Government as an innocent and unsuspecting victim, while blaming and defaming me.  Therefore, the U.S. Government has not suffered harm within Washington, D.C.

87) I had relatively little contact with the U.S. Government in Washington, D.C.  It was the companies that I worked under, eTreppid and later BLXWARE, who contracted with regional offices at various U.S. Government bases or facilities.  I interacted almost entirely with technical people pursuant to the contracts.

88) It was Warren Trepp and later Edra Blixseth who used their contacts with the U.S. Government to seek and arrange contracts for our work.  I did not persuade the U.S. Government to hire me, Trepp and Blixseth did.  My own interaction with offices or officials in the Washington, D.C. area was very limited because I was not the one running the companies nor primarily interacting with the U.S. Government.

89) Starting as early as 2011, I was contacted by James Risen asking about my secret work under contract for the U.S. Government in support of anti-terrorism efforts.

90) I see that in James Risen's Declaration attached to the Defendants' Motion to Dismiss, Risen states that he has been working on the Book since 2011.

91) I continually provided numerous warnings, in writing, to James Risen that the claims he mentioned and later published in October 2014 in the Book are false.

92) However, James Risen attempted to blackmail me by demanding that I provide classified documents and information to him or else he would publish the false claims that he later did publish in the Book.  That is, when I warned him that the reports were false, James Risen responded to me by telling me that he would not publish

those false claims if instead I provided him with classified information and documents. *See* Exhibit 7. That is, James Risen demanded that I commit multiple crimes as the price for Risen not publishing the false reports about me.  Of course, I refused to be blackmailed into breaking the law as the price for being defamed.

93) Writers Aram Roston and James Risen were both after John Brennan's information. They both knew that I had worked for John Brennan. Exhibit 7.

94) Roston and Risen published false and defamatory information about me to try to pressure me into releasing classified information about John Brennan and others in the war on terror to them as the price for them telling the truth.

95) However, Roston and Risen knew that my work was real and legitimate, because they sought to obtain secret and classified information from Brennan from me.

96) Roston and Risen published defamatory statements about me to punish and to pressure – that is, coerce – me for not illegally disclosing classified information and material to them.

97) In both cases, I told Risen and Roston I would have to turn over classified information, a road I wasn't willing to go down.  I was never what they were after. They were writing these stories to hurt me so that I would provide classified information about the various administrations.  I was just their pawn.

98) Attached as Exhibit 7 are a few of my communications to James Risen, which I have produced to Defendants as "initial disclosures," informing him in advance of the publication of the Book that his claims were not only false but preposterous and that his sources were clearly unreliable.

99) In fact, on November 1, 2012, discussing the Book that he was then writing, I warned

James Risen under the email address "TheAgencyInsider@Hotmail.com" that his reporting was false including because Warren Trepp was the CEO of eTreppid and kept all the money.

100)   Risen also promised in that same email thread:  "If you give us the Brennan emails, we will write a story."

101)   However, this response was in the context of a long back-and-forth discussion concerning the falsehood of Risen's accusations against me.

102)   In fact, in a November 1, 2012, email thread, attached as Exhibit 7, which I have produced to Defendants as "initial disclosures," discussing the Book that he was then writing, I warned James Risen under the email address "TheAgencyInsider@Hotmail.com" that his reporting was false including because Warren Trepp was the CEO of eTreppid and kept all the money. *See* Amended Complaint ¶ 47.

103)   Risen also promised in the attached email thread, which I have produced to Defendants as "initial disclosures":  "As I said on the phone, I protect my sources.  I will never divulge the identify of my sources in a leak investigation. But I also have to know that the source is telling me the truth. Jim" Exhibit 7.

104)   So Risen admitted that it was his professional responsibility to determine that the sources he used to defame me are telling the truth.  But Risen did not do that.  The sources he relied upon were obviously not telling the truth, as is patently obvious.

105)   I warned James Risen concerning the falsehood of his reporting in that November 1, 2012, email thread, which I have produced to Defendants as "initial disclosures," attached:

23

There is a reason the CIA and NSA were there, you must know that.

Do you really think the government invoked the State Secrets Priviledge from beiing embarrassed or conned? Negroponte in his in camera declaration, if ever released, was spell it all of out.

They governemnt never wanted information to come out regarding the other work. The program started out spying on terrorist, and under Obama quickly moved to spying on Americans!! A program which was started by Brennan in 2003 and continues to this day. This technology is being used today to spy on Americans, including candidate Romney.

I don't see you ever publishing that information? Exhibit 7.

106)   Furthermore, this November 1, 2012, exchange concerning Risen's plans writing

the Book which was eventually published on October 14, 2014, was seven (7) months

before the revelations by Edward Snowden that mass surveillance of Americans was

occurring.  Therefore, Risen actually knew in 2013 that I was telling the truth and was

being lied to by his so-called sources.  My discussions with James Risen on

November 1, 2012, were proven true in mid-2013.  Therefore, Risen had actual

knowledge that I was indeed a whistleblower and that the sources he relied upon were

falsely discrediting me to cover up wrong-doing.  In this, of course, James Risen

distorted and falsified the real story.

107)   I made it clear to James Risen, in the phone call referenced in the email, that the

Obama administration used mass surveillance technology to alter the 2012 election _in_

_FLORIDA_, and that they will use the technology again in 2016!

108)   In June of 2012, in a telephone call, I told James Risen and Eric Lichtblau that

their information about me in their 2011 New York Times story was incorrect, and

they needed to correct it.  I also made it clear that I was under a US Protective Order

24

in Nevada, and a State Secrets Privilege order by the Director of National Intelligence

not allowing me to discuss my work.  In addition, there were sealed documents still in

the Nevada case.  I also made it clear, that the State secrets privilege was also issued,

to protect the work I did on domestic surveillance.  I told them I knew they met with

my ex attorney Mike Flynn, for several days, in regards to their story, and suggested,

he had other motives for his conduct!

109)     I also made it clear in June of 2012 that I had a brain aneurysm that was going to

be repaired soon, and a risky procedure, and wanted my name cleared in case I

became incapacitated or I died.

110)     Therefore, the Defendants believed they could get away with their defamation

because I would probably become incapacitated or die in the meantime.

111)     In 2013, going over Risen's and Lichtblau's heads, I sent emails directly to the

editors of The New York Times telling them their story was wrong and to retract it.

112)     I sent an email to the editors of The New York Times, demanding that they

correct the false reporting about me in 2012.

113)     In 2012-2014, on at least 10 different occasions, I made it clear to Aram Roston

of Playboy, his story was wrong, and told him to retract it.

114)     Carlotta Wells, a U.S. Department of Justice attorney assigned to matters

involving me, told me that if I talk to the press or leak information, I will be charged

with treason for disclosing my work with the NSA and CIA.  She told me when I

signed my Top Secret clearance, I forfeited my right to protect my first amendment

rights.

115)     Carlotta Wells additionally said that "If the US Government wants to leak false

information to the press to hide successful work, and to confuse terrorist groups, they will do it irrespective of my rights. Deal with it!" Defendants obviously must know of this through their so-called confidential sources.

116)   Carlotta Wells also stated to me and Jack Kemp, about my legal matters with the CIA  that "I [Carlotta Wells] am just a foot solder doing what I am told of to do from the White House.  I don't agree with their strategy, but that is the way it is."  Jack Kemp replied, "You are a senior litigation attorney for the DOJ, hard for me to believe that you were listening to them."  Carlotta Wells in turn replied "Take it up with your friend George Bush." Defendants must know of this from their so-called confidential and other sources off information.

I hereby swear under oath and penalty of perjury that the foregoing facts are true and correct to the best of my knowledge and belief:

*/s/ Dennis Montgomery*
Mr. Dennis Montgomery