# Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

DENNIS L. MONTGOMERY

    Plaintiff,

v.

HOUGHTON MIFFLIN HARCOURT
PUBLISHING COMPANY

    and

HMH HOLDINGS, INC.

    and

JAMES RISEN, an individual, Author

    Defendants.

Civil Action No. 1:15-cv-20782-JEM

### THIRD DECLARATION OF PLAINTIFF DENNIS MONTGOMERY, IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to 28 U.S.C. §1746, I, Dennis Montgomery, hereby declare under penalty of perjury that the following is true and correct:

1) I am over the age of 18 years old and mentally and legally competent to make this affidavit sworn under oath.

2) I have reviewed the Defendants' motion for summary judgment and associated Defendants' Statement of Undisputed Facts filed in this case as well as the affidavit of James Risen submitted with Defendants' summary judgment motion.

3) I hereby submit this additional sworn declaration and affidavit to address additional facts not previously addressed by my prior sworn declarations in this case, all of

which are part of the record. (Please cite where they can be found).

4) I dispute as untrue a great many of the assertions in the Defendants' Statement of Undisputed Material Facts, because many of them are not true. The Plaintiff's Statement of Disputed Material Facts includes identification of the assertions that are false within the Defendants' Statement of Undisputed Material Facts.

5) I warned Defendant James Risen by email and in telephone calls as early as 2011 that disparaging assertions about me and my work were and are false, including the defamatory assertions that the Defendants proposed to publish in the Book and had previously published and the defamatory assertions published by others.

6) The Defendants did not publish material facts which I provided concerning my side of the story but published many assertions that I warned them were untrue and did not follow up on or report on the other side of various issues, which I drew to their attention.

7) The Defendants only published in Chapter 2, Page 33, of the Book:

> Montgomery strongly denies that the peddled fraudulent technology. He insists that the charges have been leveled by critics with axes to grind, including his former lawyer and former employees. He claims that he was following direct orders from both the NSA and the CIA, and says that the CIA, NSA, and U.S. military took his technology so seriously that it was used to help in the targeting of Predator strikes and other data. Montgomery adds that he is limited in what he can say about his software and business dealings with the CIA and he can say about this software and business dealings with the CIA and Pentagon without the approval of the Justice Department. The fact that the government is blocking public disclosure of the details of its relationship with him, he adds, shows that his work was considered serious and important. "Do you really think," he asked, "the government invoked the state secrets privilege just from being embarrassed or conned?"

8) And the Defendants merely published on Page 41 of the Book:

> Montgomery insists that he did not come up with the idea of analyzing Al Jazeera videotapes – he says that the CIA came to him in late 2003 and asked him to do it. CIA officials brought Montgomery two different versions of al Qaeada videotapes, he claims. They gave him original al Qaeda videotapes obtained independently by the ICA, and then also gave him recordings of the same videotapes recorded as they had been broadcast on Al Jazeera. The CIA wanted him to compare the two, he claims.

9) And the Defendants also merely published on Page 41 of the Book:

> Montgomery let the CIA draw its own conclusions based on the information he gave them. After he reported to the CIA that he had detected a series of hidden letters and numbers, he left it up to the CIA to conclude that those numbers and letters and numbers, he left it up to the CIA to conclude that those numbers and letters referred to specific airline flights. He insists that he did not offer the CIA his own conclusions about what the data meant.

10) However, the Defendants did not provide a fair report of both sides of the story, and excluded material facts I provided to them, and did not report the details that I communicated to Defendant Risen between 2011 and early 2014 in phone calls and emails, as to how and why his proposed account in his planned Book was inaccurate and defamatory. The following perspectives, facts, or details are not reported in the Book by the Defendants, or were severely altered:

   a) That Aram Roston's article in Playboy Magazine was false and inaccurate.

   b) That in my November 2010 bankruptcy proceeding deposition, I asserted my Fifth Amendment rights to avoid breaking the law by revealing classified information. Risen transformed me taking the Fifth into supposed proof that I had committed a fraud.

c) That the government approached eTreppid for help. Yet Risen transformed that into falsely claiming that I admitted to fabricating data. Risen states, mainly in interviews promoting the Book, that I was saying that the CIA told him to fabricate the data. Where I warned Risen that the reports were false and I did not fabricate data and then separately informed Risen that the CIA approached eTreppid for data processing the CIA wanted done, the Defendants changed that into meaning that the CIA told me to fabricate data, which is false.

d) That the government negotiated with Trepp, not me. I did not sell anyone or persuade anyone, did not con anyone, perpetrate a hoax or any fraud.

e) That the government contracted with and paid the money to Trepp. The Defendants falsely reported that the government paid me $30 million, when the government paid me $0.00. In fact, the Defendants mentioned the CIA's clarification that they never had a contract with me as evidence that the Plaintiff was suspicious.

f) That the FBI statements were inaccurate and Magistrate Judge Cooke wrote that she would hold the government in contempt if they tried to reintroduce the FBI statements because they are uncorroborated hearsay.

g) That I warned Risen that Trepp employees who did not have security clearances "read in" to the program (for security clearance) did not know what work I was doing. One had to be "read in" to the compartmentalized program for security purposes. Trepp's employees and even government personnel could not give any opinion about my work because they did not have security clearances to be informed about what work we were doing.

h) That Tim Blixseth had no knowledge of my work, yet the Defendants rely upon Blixseth's defaming me during Tim Blixseth's bitter divorce from his wife Edra.

i) Tim Blixseth did not have a security clearance and was not "read in" to the program. Neither was Mike Flynn.

j) That I never offered his own interpretation of the data we uncovered, and refused to offer an opinion when asked about what the embedded data might mean.

k) That the government kept issuing new contracts for my services because the government – those actually "read into" the program – was pleased with the work. Defendant Risen transformed this information that the government kept issuing new contracts for my work into a new accusation that I conned the government.

l) That the government tested my work, including giving tapes to analyze purely for the purpose of testing the legitimacy of my work, and continued to use my services because the data was valuable and predicted attacks *in advance.*

m) I sent Defendant Risen a copy of an email from Capt Robert P Lyons ASC/RAB, dated April 9, 2004, to the Plaintiff which stated: "You both and your families are in my thoughts. You are heroes and I've deeply enjoyed knowing you and working with you. We are at a crease in history--you have helped the Nation be better against our foes."

n) That I had a security clearance which I would have lost if the government actually believed I had committed any fraud, con, or hoax against it.

o) That I was subject to regular, unannounced lie detector rests every six months, which I never refused.

p) That the data I found embedded in television broadcasts and other videos was not

in the "crawl" but in the "banner" and main body of the video. The Defendants defamed him with claims that others could not find data embedded in the "crawl" and therefore I am a fraud. However, I never claimed the data was embedded only in those very small areas, nor would that make any sense. Thus, the criticism is a straw man argument of sleight-of-word trick.

q) That the government never purchased the Al Jazeera decoding software. Neither the Plaintiff nor the companies he worked for ever sold any Al Jazeera decoding software. It was licensed. As a result, the government had to continue to be satisfied with the results over time to continue the licensing arrangement over time.

r) That Obama's Director of National Intelligence, James Clapper, continued the program.

s) That the Bush Administration only invoked State Secrets privilege only twice that year, one of which involved my work.

11) In support of their defamation and character assassination, Defendant James Risen has cited to records from court cases and other government records involving me.

12) I am familiar with those particular court cases and the other records which the Defendants rely upon in spreading their false claims published about me.

13) The Defendants' Book does not fairly report the contents of those court records, but takes ideas out of context and misrepresents the facts, circumstances, and content of records that they claim to rely upon to support their defamation of me.

14) The court records that the Defendants refer to and rely upon also clearly informed the Defendants that Warren Trepp was the majority owner and executive head of eTreppid and that Trepp negotiated with government officials and sold eTreppid's

6

services to customers including government agencies.

15) The court records that the Defendants refer to and rely upon also clearly informed the Defendants that I did not sell eTreppid's services to government agencies or negotiate with the government to sell the services of my work. That was Trepp's job and role and later Edra Blixseth's job and role under BLXWARE.

16) The court records that the Defendants refer to and rely upon also clearly informed the Defendants that Warren Trepp was engaged in bitter, intense litigation with me over ownership and control of my technology, software, and intellectual property.

17) The court records that the Defendants refer to and rely upon also clearly informed the Defendants that Warren Trepp valued my technology, software, and intellectual property at $100 million in the litigation.

18) The court records that the Defendants refer to and rely upon also clearly informed the Defendants that Trepp spent years and large legal fees seeking to get ownership and control of my technology, software, and intellectual property, demonstrating that – no matter what he said – Trepp actually believed that they were worth 100 million.

19) The court records that the Defendants refer to and rely upon also clearly informed the Defendants that disparaging remarks by Trepp and eTreppid's employees about the Plaintiff were made to gain leverage in the litigation then ongoing. The Defendants could not be rely upon them to support the Defendants' defamation of the Plaintiff.

20) The court records that the Defendants refer to and rely upon also clearly informed the Defendants that Michael Flynn was engaged in bitter, intense litigation with me over ownership and control of my technology, software, and intellectual property to sell it for payment of the balance of his exorbitant legal bills of over $1.5 million.

21) The court records reflect that the Defendants refer to and rely upon also clearly informed the Defendants that they could not reasonably rely upon Flynn as a source about me or my work because Flynn has been involved in adverse litigation against me.

22) Furthermore, Mr. Flynn has been sanctioned recently by the U.S. Court of Appeals for the Ninth Circuit for making false statements in court documents.

23) The court records that the Defendants refer to and rely upon also clearly informed the Defendants that Tim Blixseth had no first-hand knowledge of my work and cannot offer reliable comments about the legitimacy of my work.

24) I see that the Defendants cite to my November 18, 2010, deposition in the United States Bankruptcy Court for the Central District of California, in an adversary proceeding between Michael Flynn and myself. Attorney Carlotta Wells from the U.S. Department of Justice attended my bankruptcy proceeding, see 14:21-23, along with four mysterious "men in black," two of whom had no last names. As my then attorney explained in that deposition on page 15-16 of the deposition transcript:

```
17 MR. CONANT: Okay. Thank you.
18 Before we start examining the witness, I
19 want to state for the record that there are present
20 in the room four representatives from the U.S.
21 Government, two of which apparently have no last
22 name.
23 We'll ask on the record of Ms. Wells to
24 provide their last names and the government agency
25 that they purportedly work for.

1 MS. WELLS: And I cannot, because to do so
2 would violate the terms of the United States
3 protective order.
4 MR. CONANT: Ms. Wells, do you have a copy
5 of the protective order in front of you?
6 MS. WELLS: I do. Do you have one?
```

8

```
 7 MR. CONANT: I have a copy in front of me.
 8 I'd like to actually get it admitted as an exhibit
 9 in this deposition.
10 Let me -- while I work on getting extra
11 copies to admit as an exhibit, Ms. Wells, can you
12 review the protective order and identify which
13 specific portion of the protective order you're --
14 MS. WELLS: Am I a witness now? All I can
15 tell you is it's pretty self-evident from the face
16 of the United States protective order what's
17 protected, what isn't.
18 The information that's protected is set
19 forth in paragraphs 2 and paragraphs 3.
20 MR. CONANT: How does those pertain
21 specifically to the identities of these gentlemen
22 and why they're here today?
23 MS. WELLS: I think it's self-evident and
24 if you want to read those paragraphs
```

25) As a result of having an attorney from the US Department of Justice plus four "men in black" mystery government agents in my bankruptcy deposition, I asserted my rights against self-incrimination under the Fifth Amendment out of fear that I would be prosecuted for releasing any classified or secret national security information.

26) The Defendants seek to imply that I took the Fifth Amendment in my deposition because I had committed a fraud in my work for the government as support for their defamation of me. On the contrary, as a fair reading or fair reporting of the deposition transcript revealed to the Defendants, I asserted the Fifth Amendment repeatedly to avoid breaking the law by revealing classified information.

27) Between 2011 and 2014 I had several discussions by email and phone with James Risen making it clear that I feared being prosecuted for revealing classified material.

28) Therefore, the Defendants had actual knowledge from my conversations with Risen and from the entirety of the record they say they relied upon that I asserted the Fifth Amendment to avoid the fate of Jeffrey Sterling, who was prosecuted for revealing

national security secrets to Risen for Risen's previous book.

29) Thus the Defendants published their defamation of me with reckless disregard of the truth by misrepresenting the deposition transcript.

30) The court records that the Defendants refer to and rely upon, including that November 2010 deposition transcript, also clearly informed the Defendants that the government had never asked for nor received any refund or reimbursement of money paid for my services nor brought any official charge or claim that the government was defrauded.

31) However, our company (first eTreppid, later BLIXWARE) never promised that my work would uncover terrorist communications or terrorist attacks. Our job was simply to search for hidden communications and report whatever we found or did not find in particular source material assigned to us for examination.

32) It was never my role or job to offer an interpretation, analysis, or conclusion about what output data meant and I refused to offer any opinion as to what the data we found might mean, even when asked. It was up to the NSA/CIA analysts on site and at Langley to determine the meaning of the decrypted data.

33) I reported to my government contacts the hidden data that we found, so that national security experts in the government could consider it alongside other sources of intelligence information and come to their own conclusions about what the data was, what it meant, whether it was meaningful, and what to do about it.

34) I never made any recommendation to the government about any proposed course of action to act upon any communications, information or data that we uncovered and reported to the government, except perhaps in discussing how my government contacts could independently test and independently confirm my work.

35) I never recommended that any airplane flights be canceled or blocked from entering the United States or shot down nor was I part of any such discussion.

36) I always understood and believed that the national security apparatus of the U.S. government would never act upon my intelligence information results alone, but would consider all sources of information available to the U.S. government.

37) I always understood and believed that the national security agencies of the U.S. government would independently test and confirm the accuracy and meaning of any data that I uncovered and reported to them.

38) I also note that in the Defendants' Statement of Undisputed Material Facts ¶ 23, the Defendants report three entries in my medical charts on May 27, 28, and 29, 2014, about wanting to have an interview with Fox News. I have no recollection of those conversations, but I do know from the surrounding events that I was heavily medicated and not coherent. I was told by my neurosurgeon that I had suffered severe brain injuries (multi infarct strokes) and I might not survive the injuries.

39) It would appear from the context that I was delirious and simply reacting to Fox News playing on the hospital room television. I have no memory or information about asking to have an interview from the hospital with Fox News. I had suffered a brain aneurysm which I understand typically causes significant brain function disruption beyond the point of injury at first but then swelling subsides. I am especially surprised that any such comment would be written on a hospital medical chart. Even if a hospital patient did make a personal request, I would not expect to see it written on a medical chart, as a doctor consulted agrees now. I never sought out publicity for my work with the NSA/CIA or any other US Government agency.

40) Meanwhile, the Defendants falsely claim that there were FBI reports and/or reports of the U.S. Air Force Office of Special Investigations ("OSI") about my software and technology. That is deceitful. I have personally reviewed all such reports. The so-called "reports" are nothing more than unsubstantiated interview notes with Warren Trepp and Trepp's employees during Trepp's dispute and litigation with you. Risen is in an "echo chamber" in which Trepp sought to disparage me. There are no FBI reports about my software or technology, only Trepp's disparaging comments pressed upon the FBI regardless of the FBI's views. In fact, Nevada Magistrate Judge Cooke warned that if the government tried to cite to the FBI reports again in her courtroom they would be sanctioned because those reports are uncorroborated hearsay

41) In fact, the government independently tested the results of my software and technology, including by providing test videos without telling me which videos contained embedded codes, as I testified in my deposition on August 20, 2015, at 219:17 - 220: ; 289:21 - 290:3.

42) All of the sources relied upon by the Defendants had their own axe to grind. Trepp and Flynn's disparaging that my software didn't work were made at the same time that they were fighting furiously in court to get ownership of it and valued it in court filings at $100 million. Their comments were made to gain leverage in litigation.

43) Tim Blixseth had no knowledge of whether my software and technology worked. Blixseth was not "read in" to the program as classified material. He had no technical expertise with which to evaluate my technology or software.

44) On Page 43 of the Book, the Defendants admit that: "Officially the CIA refuses to discuss any details of the episode." Yet the Defendants confidently assert that my

work was a fraud despite knowing that the CIA will not comment on it.

45) On Page 47 of the Book, the Defendants wrote: "'Nobody was blamed,' complains one former CIA official. 'Instead they got promoted."' However, there was no reason for anyone to be blamed. The Defendants recklessly ignored the possibility that no one was blamed because there was nothing to blame them for.

46) As early as 1940 and especially in the days leading up to the Normandy invasion on June 6, 1944, broadcasts from London on BBC radio contained curious phrases such as "John has a long mustache" and "The chair is against the wall" and "Wounds my heart with a monotonous languor." These codes broadcast in open radio broadcasts told the French underground to activate plans for sabotage. These codes told the resistance fighters that the Normandy invasion and D-Day were imminent.

47) Nearly 60 years later, after the September 11, 2001, terrorists attacks by surprisingly-organized Al Qaeda, the CIA approached the company I worked for, eTreppid, to explore the possibility that television broadcasts over Al Jazeera and other sources might be sending encoded signals to activate terrorist sleeper cells.

48) But now, somehow, a tactic that is at least 60 years old, that was actually used with great success by the Allies including the United States was one, is considered so ridiculous and outrageous that I have been falsely defamed as the maestro and emperor behind one of the most dangerous and elaborate hoaxes in American history.

49) Various agencies of the government approached us and asked us to use our data analysis technology to check for hidden signals in various videos and television broadcasts. We applied software meant to filter out noise to clean up a video signal instead to focus on the noise itself.

50) We found anomalies (apparent noise) embedded within the main video signal – not the crawl, and set about decoding the anomalies in the video signals.

51) Compared to the enormous complexity of a video, requiring tremendous "bandwith," the embedded codes were very simple data, just a small set of repeating numbers.

52) When I reported the data I decoded to the government, it was determined that the small set of numbers might be a date and time combined with latitude and longitude.

53) In many cases, the dates were in the future and terrorist attacks later (after I reported the data uncovered to the CIA) occurred at those locations on the dates indicated.

54) It was because terrorist attacks actually occurred at the date and place my data decoding predicted – after I reported the data to the government – that the government rushed to enter into contracts with eTreppid and pay Warren Trepp.

55) Our government contacts gave us test videos from the past without telling us when the videos had been recorded or broadcast or what the videos were at times. My technology and methods decoded the data embedded in the video (when it was present). Our contacts later informed us that the data accurately corresponded to known terrorist attacks at the correct date and place that occurred after the date when the government had captured the video recording.

56) However, I have been defamed and falsely attacked even though the government approached us and asked for our services, the government routinely tested and confirmed the accuracy of our work, the national security apparatus of the United States relies upon multiple sources of information, not only one, and I never offered any interpretation or national security analysis of the data my processing found.

57) My technology found embedded codes in some – but obviously not all – of the

television broadcasts and other videos I was given to broadcast. Therefore, it would be impossible for the unidentified, unnamed French firm that the Defendants rely to test my software without knowing in which Al Jazeera broadcasts (the exact date and hour of the day) my software detected embedded data. Since there were not always embedded codes in the videos broadcast throughout the entire day, the supposed test that the Defendants rely upon by an unknown French firm would be impossible. I explained this in my August 20, 2015, deposition at 231:13 - 232:9.

58) No French firm never had access to my software 230:4 - 231:12.

59) The idea that some unidentified French firm decided there were not enough pixels in the video is ludicrous, as I explained at 232:1-16. Video signals are enormously complex and contain tremendous amounts of data "bandwidth" each second. The suggestion that there is not enough data space to embed relatively simple information such as a date, longitude, and latitude betrays complete ignorance of video by the person expressing such an idea.

I hereby swear under oath and penalty of perjury that the foregoing facts are true and correct to the best of my knowledge and belief:

_____
Mr. Dennis Montgomery
Dated: 11-13-16