Exhibit 2

```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                          MIAMI DIVISION
                   CASE NO. 15-20782-CIVIL-MARTINEZ
3

4    DENNIS L. MONTGOMERY,              Miami, Florida

5                    Plaintiff,         January 5, 2016

6            vs.                        2:00 p.m.

7    JAMES RISEN, et al.,

8                    Defendants.        Pages 1 to 215
```
_____
```
9

10                 MISCELLANEOUS MOTION HEARING
             BEFORE THE HONORABLE JONATHAN GOODMAN,
11               UNITED STATES MAGISTRATE JUDGE
           (TRANSCRIBED FROM THE DIGITAL AUDIO RECORDING)
12
     APPEARANCES:
13

14   FOR THE PLAINTIFF:       LARRY KLAYMAN, ESQ.
                              KLAYMAN LAW FIRM
15                            2520 Coral Way, Suite 2027
                              Miami, Florida 33145
16

17   FOR THE DEFENDANTS:      LAURA R. HANDMAN, ESQ.
                              DAVIS, WRIGHT & TREMAINE
18                            1919 Pennsylvania Avenue, NW
                              Suite 800
19                            Washington, DC 20006

20                            SANFORD BOHRER, ESQ.
                              BRIAN W. TOTH, ESQ.
21                            HOLLAND & KNIGHT
                              701 Brickell Avenue
22                            Suite 3000
                              Miami, Florida 33131
23

24

25
```

```
 1   TRANSCRIBED BY:          LISA EDWARDS, RDR, CRR
                              Official Court Reporter
 2                            United States District Court
                              400 North Miami Avenue
 3                            Twelfth Floor
                              Miami, Florida 33128
 4                            (305) 523-5499

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1              THE COURTROOM DEPUTY:  Calling Case

 2      15-20782-Civil-Martinez, Montgomery versus Risen, et al.

 3              THE COURT:  Good afternoon, everyone.  Please be

 4      seated.

 5              MR. KLAYMAN:  Good afternoon, your Honor.

 6              MS. HANDMAN:  Good afternoon, your Honor.

 7              THE COURT:  So Happy New Year to all.

 8              MR. KLAYMAN:  Happy New Year to you.

 9              THE COURT:  And are any of you fans of the -- well,

10      let's do it this way:  Let's have appearances first, starting

11      with the Plaintiff.

12              MR. KLAYMAN:  Larry Klayman for the Plaintiffs, your

13      Honor.  And Ms. Dina James, my paralegal, sitting next to me.

14              THE COURT:  Good afternoon to you.

15              And for the defense?

16              MS. HANDMAN:  Laura Handman, Davis, Wright & Tremaine,

17      for the Defendants.  And here with me, Sandy Bohrer and Brian

18      Toth.

19              THE COURT:  Thank you.  Well, good afternoon to you.

20              So are any of you folks fans of the TV show Curb Your

21      Enthusiasm with Larry David?

22              Mr. Klayman, are you a fan?

23              MR. KLAYMAN:  I am, your Honor.  I am a fan of that.

24              THE COURT:  And so here's what I was thinking:  I came

25      out.  I said, Happy New Year.  And I think I can say that.

1   It's January 5th.

2          But there's got to be some cutoff point where it's no

3   longer appropriate to say Happy New Year.  So surely if you saw

4   someone mid-February, you wouldn't say Happy New Year.  That's

5   beyond the informal statute of limitations.

6          And I was just curious:  When do you stop saying Happy

7   New Year?  February -- I mean, January 5th, perfectly fine.

8   But what do you think?

9          Mr. Klayman, what is your view on that?

10          MR. KLAYMAN:  Chinese New Year's does occur in

11   February.

12          THE COURT:  Aha.

13          MR. KLAYMAN:  So consequently, you would be able to say

14   Happy New Year.

15          THE COURT:  Well, how about --

16          MR. KLAYMAN:  And if you're Jewish, of course, it comes

17   in Rosh Hashana.

18          THE COURT:  All right.

19          MR. KLAYMAN:  So with that caveat, I think I agree.

20   Unless you're somewhat inebriated, under the American system

21   you're probably going to say Happy New Year's in February.

22          THE COURT:  Oh, all right.  That's a little bit of an

23   evasive answer.

24          MR. KLAYMAN:  I'm a lawyer.

25          THE COURT:  Exactly.

1          What about you folks on the defense?  Any thought on

2    that?  Just curious.

3          MS. HANDMAN:  Well, I think it's a pleasant greeting;

4    and we all wish a good year in 2016.  So I would say it through

5    January.

6          THE COURT:  Through the end of January?  My gosh.

7    Okay.  Fair enough.  Interesting.

8          Well, folks, let's talk about how we're going to handle

9    the hearing.  I've read all of your submissions, and I'm going

10   to give you sooner or later an opportunity to argue and make

11   comments.

12         But my general practice when I have hearings, whether

13   it's a motion to dismiss, a summary judgment motion, a

14   sanctions motion like this, is to basically go back and forth

15   and ask each side various questions.  There's no particular

16   logic to the questions, other than I'll tell you a particular

17   document I'm looking at, a motion, a memorandum, a reply.  I'll

18   tell you the page number and I'll say, By the way, here's my

19   question.

20         And we'll go back and forth and back and forth.  And

21   after we're all done, I'm fairly confident that probably most

22   of the points that you wanted to address with me will have been

23   covered.  But maybe not.  And so at the end of this

24   give-and-take, at the end of this conversation, I'm happy to

25   hear from all of you on any additional points.  But this is

1    just the way I do things.

2         And you may not be able to see it from where you are,

3    but every memo that I have here has a whole bunch of Post-It

4    stickers on it.  I'm sort of an old-fashioned, old-school guy.

5    And each Post-It sticker indicates a question or comment that I

6    have.

7         And I had a hearing -- gosh, I guess it was a few

8    months ago on a big antitrust case that I had by consent and it

9    was a summary judgment hearing and it went from 2:00 in the

10   afternoon until 10:00 at night.  I'm not saying that to suggest

11   to any of you that we're staying that late.  But my point was

12   that almost all the hearing was me asking questions.  And then

13   at the end, the lawyers were able to put on a little of their

14   PowerPoint presentations, not because the PowerPoints covered

15   issues that weren't addressed.  I think they were just so

16   enamored with having the PowerPoint presentation and they had

17   spent time that they wanted to put it on.

18        So that's how we're going to do it.  Do your best to

19   answer my questions directly.

20        And let me start off just with a question on status.  I

21   read in the papers that -- meaning in the papers that you filed

22   here, not in the newspapers -- but I read in the papers that

23   there has been some litigation in the New York federal district

24   court having to do with a subpoena and, Mr. Klayman, your

25   effort to take depositions of various individuals and to get

1    certain documents.  And there was a ruling by the district

2    court and I think certain materials, if they existed, were

3    supposed to be turned over by December.

4         So I'm just wondering what the status is of that.  So

5    who's up to speed on that and can fill me in, please?

6         MR. KLAYMAN:  I can answer that, your Honor.

7         THE COURT:  Go ahead.

8         MR. KLAYMAN:  We did get documentation on December

9    15th.  That documentation's very important.  I have copies of

10   it here today, if your Honor should ask a question in that

11   regard.

12        The documentation that we got was from the first

13   publisher -- presumed publisher of Mr. Risen, Simon & Schuster,

14   and his literary agent, Tina Bennett.  And the book was turned

15   down by Simon & Schuster, rejected.

16        That documentation shows as we read the

17   documentation -- and we have stipulated to its authenticity --

18   that Mr. Risen did not have sufficient information about what

19   he wrote concerning Mr. Montgomery.  That was one of the

20   serious concerns I interpret the documents to say in moving

21   forward with publishing at Simon & Schuster.

22        It also -- the documentation also shows -- and I would

23   ask that this be put under protective order for the time being,

24   because we've agreed that it's subject to declassification, my

25   characterization of the documents.  So if the court reporter

1    could keep this off the record -- off the public record for

2    right now.

3            THE COURT:  Well, Mr. Klayman, I have to tell you --

4    and I've indicated this before -- I am not a big proponent of

5    sealing hearings, sealing documents, sealing comments merely

6    because a party or a lawyer prefers that the comment not be

7    available for review by the public.  Quite to the contrary, the

8    general rule is that the courts are open to the public.

9            So there are times, of course, when material should be

10   filed under seal.  Maybe you're talking about a classified

11   document, a trade secret document, somebody's Social Security

12   number, those kinds of things.  But so far, the fact that you

13   happened to engage in some rhetoric describing a particular

14   document that was turned over in discovery, that to me is not a

15   ground to seal the document or to seal this portion of the

16   transcript.

17           And from a practical standpoint, I have to tell you,

18   it's very difficult to do the way you've asked.  Here's why:

19   If an entire hearing is under seal, then it's easy.  We simply

20   let the court reporter know, let the Clerk of the Court know,

21   and the entire transcript is sealed, if appropriate.

22           But right now, from what I understand, based on your

23   comment, you want me to sort of in effect make a comment to the

24   court reporter, send him or her a signal, saying, Oh, this

25   particular comment by Mr. Klayman from 2:08 p.m. to 2:11,

1    that's going to be off the record.  Then we're going to go back

2    on the record.  Then maybe an hour later you'll make a comment

3    that you want to be under seal.  And practically speaking, it's

4    logistically cumbersome to accomplish that.

5         So --

6         MR. KLAYMAN:  I would agree with you, your Honor.  I

7    was trying to just respect what Simon & Schuster's lawyers had

8    designated as confidential.  I don't believe that they are

9    confidential and I don't believe that I'm prohibited from

10   characterizing the documentation.

11        THE COURT:  Listen, if that were worthy of under-seal

12   filing, unless there's some other factual development out there

13   that I'm not aware of, lawyers would be willy-nilly sealing

14   transcripts and documents all the time.  Lawyers engage in

15   rhetoric in almost every single hearing and they describe the

16   other side's position in some fairly strident terms.  So the

17   fact that you choose to describe certain documents the way you

18   did -- you didn't really disclose any specifics; it's just your

19   opinion of what they showed to me -- is not the kind of comment

20   that would generate an under-seal justification.

21        What are the defense's thoughts on that?

22        MS. HANDMAN:  Your Honor, first of all, it was

23   designated as confidential subject to the protective order your

24   Honor entered by Simon & Schuster, Priscilla Peyton and Tina

25   Bennett, the third parties who produced the documents.  And

1    it's in that connection that they are not filed in the public

2    record at this point.

3         I don't know the general characterization such as what

4    Mr. Klayman engaged in would necessarily be sealed, and I would

5    take issue with his characterization.  First of all, Simon &

6    Schuster never turned down the book.  They had suggested

7    changes.  And ultimately, Mr. Risen's editor moved from Simon &

8    Schuster ultimately to Houghton Mifflin, and the book

9    transferred.  That was how it happened.

10        The documents produced are redacted.  What's redacted

11   are information about the eight other chapters in the book

12   pursuant to the Court's order.  The one part that is left in

13   about the chapter on Montgomery, the editor who inherited the

14   book after Mr. Nichols left at Simon & Schuster praised that

15   chapter, said it was -- did -- it fit in with the thesis and

16   did not require significant change.

17        And --

18        MR. KLAYMAN:  If I may finish.  And I'm happy to --

19        THE COURT:  Well, I don't know if --

20        MS. HANDMAN:  And finally, if -- sorry.

21        THE COURT:  I don't know -- everybody, maybe you had

22   too much coffee this afternoon.  Just take a breath.  Everybody

23   relax.  So let me hear the rest of defense counsel's comments.

24        By the way, this was simply almost a question to the

25   side.  I don't want you to necessarily disclose to me all the

1    nuances and specific details about the documents that were

2    turned over in New York.  So far, you've just made some

3    general, generic, somewhat vague comments about your opinions

4    on what these documents show or not.  I don't necessarily need

5    to hear any more specifics about the documents.

6              Are there any depositions that were scheduled?  Because

7    I saw that the judge indicated that there might be depositions

8    that were taken.

9              MR. KLAYMAN:  The reason --

10             MS. HANDMAN:  No.  There are no depositions scheduled.

11             MR. KLAYMAN:  Can I finish?

12             THE COURT:  Folks, listen, this is going to be a very

13   long hearing if people are interrupting.

14             So a general comment:  Please, don't interrupt each

15   other.  Don't interrupt me.

16             Let me hear the rest of what you were going to say.

17             And then, Mr. Klayman, you can finish.

18             MS. HANDMAN:  We had a conference before Judge Coat on

19   Tuesday:  Mr. Klayman, myself and the lawyers for Simon &

20   Schuster and Tina Bennett.  And at that conference, Mr. Klayman

21   withdrew his request for depositions if we would stipulate to

22   the authenticity of the documents, which we have done.

23             MR. KLAYMAN:  And the reason for that, your Honor, is

24   because the documents were so clear that we don't need the

25   testimony.  They're very, very clear.

1          And they show that the book -- and I have documents

2    here, if I may present them to you -- I think you should have

3    them, because they may be relevant to this hearing -- they show

4    that in fact Mr. Risen did not have sufficient information upon

5    which he claims that our client had committed the biggest hoax

6    in American history and had caused the near shoot-down of

7    planes over the Atlantic, among hundreds of other defamatory

8    alleged statements.

9          In addition, it shows that the book itself -- that the

10   primary focus of this book was Mr. Montgomery, that Simon &

11   Schuster did not believe that they could sell this book without

12   a sensational chapter.  And that was the motivation for the

13   defamation with regard to Mr. Montgomery.

14         And last but not least, it also shows that the new

15   publisher didn't really correct anything either.

16         So they are very important documents.  The documents

17   are clear-cut.  And for that reason, we decided not to go ahead

18   with depositions.

19         THE COURT:  I'll tell you, Mr. Klayman, I'm not going

20   to take you up on your offer.  I don't want to see those

21   materials.  I don't want to rely on those materials.  And I'll

22   tell you why.

23         MR. KLAYMAN:  Okay.

24         THE COURT:  Because when I make a substantive ruling or

25   when I make a substantive report and recommendation on a

```
 1   critical part of the case -- and I think a motion for sanctions
 2   where the defense is asking the Court to throw out your
 3   client's claim, that is a critical stage in the case -- and
 4   therefore, if I'm going to be basing a report and
 5   recommendation on that and I'm going to be relying on material
 6   that's under seal, then I'm already feeling ill at ease because
 7   a Court's order or a Court's report and recommendation,
 8   substantive, not just based on a discovery dispute, in my view
 9   should usually be public.  And I don't want to be basing my
10   report and recommendation on any sealed material pursuant to
11   some confidentiality order.
12          So I hear your comments.  And maybe later when this
13   case is all over I'll be able to out of pure curiosity look at
14   these documents.  But I don't really have any need to look at
15   them right now and I don't want to look at them right now.
16          So let's get into the actual nuts and bolts of the
17   hearing.
18          MR. KLAYMAN:  There's an aspect, your Honor, about the
19   status I wanted to add, if I may.
20          We still do have a motion pending in front of the
21   Central District of California with regard to Attorney Michael
22   Flynn.  The magistrate in San Diego initially ruled that the
23   matter should have been heard in the Central District because
24   of the hundred-mile rule.
25          We respectfully disagreed.
```

1          So we took it to the Central District.  A magistrate

2     there, magistrate judge, simply based her decision off of the

3     other magistrate's decision and denied it.  We have an

4     objection pending with the judge in the Central District for

5     Mr. Flynn's testimony and documentation.

6          MS. HANDMAN:  And, your Honor, if we're updating the

7     status, we do have pending in the Western District of

8     Washington a motion to compel the deposition of Estevan

9     Berghian, better known as Ish for the sake of ease, I-S-H, who

10    is the son-in-law of Mr. Montgomery and who was listed on the

11    Plaintiff's trial witness list and who worked with

12    Mr. Montgomery in various businesses and who has said that

13    Mr. Montgomery lives with him under his care.

14         And you'll recall, your Honor, this came up before you

15    about the efforts to evade service.  We were able finally to

16    make service.  And Mr. Ish objected.  And we moved to compel.

17    Mr. Montgomery *pro se* filed a motion saying that the motion to

18    compel was not timely.  Ish has not filed anything in that

19    proceeding.  That's fully briefed and pending in the Western

20    District of Washington.

21         MR. KLAYMAN:  Yes.  The motion was filed, your Honor,

22    after discovery had closed by several weeks.

23         THE COURT:  You know, maybe I was wrong when I said

24    earlier that the hearing wasn't going to last until 10:00,

25    because the way things are unfolding, we're going to be here

1   for a long, long time.

2          So, folks, I know that you're all focused on the case.

3   But you don't need to completely turn over every rock on every

4   little point and subpoint.  It just is not necessary.  And some

5   of these things that we've been talking about now are not what

6   I would call in the critical category.

7          So let me ask a couple of questions, Mr. Klayman, just

8   so I can get a feel for your view and make sure that I don't

9   misinterpret or misunderstand your position.

10         Concerning your view on the relevancy or lack of

11  relevancy of the software, would you agree that in a defamation

12  case like this one that the Plaintiff, which would be your

13  client, Mr. Montgomery, has the burden to prove falsity?  Do

14  you agree with that?

15         MR. KLAYMAN:  We would -- that's one aspect the burden

16  of proof.  But also, recklessness.  And that's where relevancy

17  primarily comes in.

18         THE COURT:  Well, actually, Mr. Klayman, doesn't

19  recklessness come in only after you've established the falsity?

20  In other words, let's assume that a defendant is completely

21  reckless, cavalier, outrageously reckless.  If it turns out

22  that whatever he or she said or published is true, recklessness

23  really wouldn't matter, would it?

24         MR. KLAYMAN:  It does matter in this instance.  The

25  facts of this case are very case specific.  This is why I

```
1    raised those documents with you when you asked the question, is

2    that Mr. Risen had no basis to write what he wrote because he

3    had no access to classified or any other government information

4    and documents.

5         THE COURT:  So what?

6         MR. KLAYMAN:  In fact, he admits that at his deposition

7    at Page 124, Line 11 to Line 16.  We cited this in our

8    pleadings.

9         So consequently, if you go back also and you look at

10   the original motions to dismiss, they're not relying on

11   anything with regard to software and whether it works or not.

12   They're relying on public information.  And it was reckless to

13   publish this when he had no basis to publish this.  We don't

14   have to prove the negative, in other words.

15        THE COURT:  And the --

16        MR. KLAYMAN:  And in this case -- let me just add one

17   other thing.  And I don't want to prolong the hearing longer

18   than is necessary either, your Honor.  I know how hard you work

19   and we work.

20        But in this particular case, this whole issue's a

21   nonstarter, because at the time that you made your initial

22   order, okay, saying to turn over the software, you didn't have

23   the benefit of the CIA weighing in on whether this software, if

24   it exists, could ever be produced.  The software according to

25   the CIA, if it exists, according to the Justice Department, can
```

1    never be turned over because it's classified.  And to do so

2    would be a crime.  Consequently, we're arguing really about

3    nothing.

4           You'll notice in any of the pleadings that the

5    Defendants have filed, they don't want to discuss the

6    classification issue.  The matter could never have been turned

7    over.  So therefore, Mr. Risen made this stuff up out of whole

8    cloth.  He had no basis to do it.  It was reckless.  And I've

9    got the testimony of Mr. Montgomery and others that will say

10   that what he told is the truth.  So we will put forward

11   evidence that what he said was the truth.

12          And in fact -- and I realize, you know, events overtake

13   themselves.  But just in the last few days, we've learned

14   that -- and this will come into trial; it's not in the

15   pleadings yet -- but we learned that intelligence agencies were

16   intercepting communications between Congress and the prime

17   minister of Israel and they were doing that.  And that's

18   exactly what Mr. Montgomery has been telling the FBI has been

19   happening under his immunity agreements.  He's extremely

20   credible.

21          Consequently, we'll let the jury decide on who's

22   telling the truth or not.  That's a jury question.

23          So yes.  We will prove the falsity.  But it's also

24   reckless, because Mr. Montgomery -- excuse me -- Mr. Risen made

25   this story up without having background facts.  That's why the

1   book was never published by Simon & Schuster.  They had already

2   been in a lot of trouble and hot water over a prior book that

3   Mr. Risen had written dealing with an individual named Jeffrey

4   Sterling, who went to prison.  He's in prison today.  Risen

5   almost went to prison over that.  He probably read about it.

6           THE COURT:  Mr. Klayman, do you recall my question,

7   sir?

8           MR. KLAYMAN:  The question is, yes, we will show that

9   it was false and we will prove that it was reckless.

10          THE COURT:  That was not my question.  My question was

11  not whether you will prove it was false.

12          My question is:  Do you agree as a matter of law, not

13  even in this case only, but as a matter of law for defamation

14  lawsuits that a plaintiff has the burden to prove falsity?  I

15  was hoping -- and, gosh, it must have been overly optimistic of

16  me -- I was hoping that I would hear from you either "yes" or

17  "no."  You've been going on for about --

18          MR. KLAYMAN:  I can answer that.

19          THE COURT:  -- ten minutes.

20          MR. KLAYMAN:  I said yes initially.  But I said under

21  the facts of this case, we don't need --

22          THE COURT:  So you --

23          MR. KLAYMAN:  -- the software --

24          THE COURT:  So you agree that a plaintiff needs to

25  prove falsity in general, and in this case Mr. Montgomery as a

```
 1    defamation Plaintiff must prove falsity.  Correct?
 2            MR. KLAYMAN:  Falsity and/or recklessness.
 3            THE COURT:  Well, that's --
 4            MR. KLAYMAN:  That's my position legally.
 5            THE COURT:  So you say that a defamation plaintiff must
 6    prove either falsity or, as a substitute, reckless behavior.
 7    Is that your position?
 8            MR. KLAYMAN:  Correct.  And in this instance --
 9            THE COURT:  What case, sir, says that?  Tell me what
10    case.  Because I'm not familiar with any case that says that.
11    I've read the Defendants' memorandum of law; and they cited
12    several cases for the basic proposition that a defamation
13    plaintiff has the burden of proving falsity.  That simply
14    confirmed my understanding as a lawyer who's been practicing
15    for 35 years.
16            You now have said to me something I can tell you
17    candidly I've never heard before.  I've never heard anybody say
18    in a defamation case that a plaintiff has a choice.  Either the
19    plaintiff can prove falsity or, or, regardless of the falsity,
20    all the plaintiff needs to prove is recklessness.
21            So I'm asking you:  What case, what law, supports that
22    view of defamation law?  Because to me, it's a novel point.
23    Tell me the case.
24            MR. KLAYMAN:  Your Honor, I don't have the cite with me
25    right now.  But I can get it for you.  And I was looking
```

1   through the pleadings yesterday and I thought that I saw we

2   made reference to that in the pleadings.

3         But our position here is -- I just want to be clear --

4   is that, number one, the software deals with only one small

5   aspect of alleged defamation, if at all.

6         THE COURT:  We haven't even gotten into the specific

7   facts, Mr. Klayman.  Right now I'm just talking about the law.

8   And you just uttered what I thought to be a fairly remarkable

9   proposition that I'm not familiar with.  When a lawyer who's

10  been practicing for a long time says something to me that is

11  startling, I say, My gosh.  Either I've been living in a cave

12  for all these years or this is some new area of the law that

13  I'm not familiar with.

14        And you've now told me that you're not aware of a

15  citation.  That strikes me as a rather --

16        MR. KLAYMAN:  I didn't say that.  What I said, your

17  Honor -- I don't have it in front of me right now -- reckless

18  disregard for the truth is the equivalent of falsity.  And

19  there is jurisprudence to that effect.  And I'll be happy to

20  supplement, your Honor.

21        THE COURT:  So then in that case, Mr. Klayman, what I

22  want you to do is by Friday you will be filing a list of

23  authorities, not a memorandum of law.  In fact, I'm

24  specifically prohibiting you from filing a memorandum of law.

25  All I want you to do is file a list of authorities to support

21

1    your view that a defamation plaintiff can either prove falsity

2    or as a substitute for falsity recklessness.  So you'll just

3    list the case citations, and at most you will be permitted to

4    include a one-sentence parenthetical description of the

5    holding.

6         Now, I have a feeling that you're not going to be able

7    to find such a case, Mr. Klayman.  But if you do, if you do

8    find a case or more than one case to that proposition, then

9    I'll give the Defendants the opportunity by Tuesday to submit a

10   reciprocal list of authorities.  They're not going to get to

11   argue either.  They will be permitted at most to include a

12   one-sentence parenthetical describing the case.

13        So let me make sure that I also further understand what

14   you're saying.  You're talking about recklessness.  Let's

15   assume, Mr. Klayman -- Mr. Klayman?

16        MR. KLAYMAN:  Yes.

17        THE COURT:  Listen.  It's fine to have a colleague here

18   in court with you.  But if you're going to be passing notes and

19   consulting with your paralegal and you're not listening to my

20   questions, it's going to make it very problematic for the

21   hearing to proceed smoothly.  If you absolutely need to take a

22   break, say, Excuse me, Judge.  I need 15 seconds to speak to my

23   colleague.

24        But for me to be looking out at you, trying to ask you

25   a question, and you're turning to the side and all I can see is

1    the side of your face and you're whispering to your paralegal

2    and you're passing notes, number one, I consider that rude.

3    And number two, you don't have the ability to respond to my

4    question.

5            But if you feel a need to take a brief break because

6    you need to consult, all you need to do is say, Judge, I need

7    15 seconds to consult.

8            MR. KLAYMAN:  I will, your Honor.  Thank you.

9            THE COURT:  So let's talk about recklessness.

10           Assume for the sake of discussion that one morning

11   Mr. Risen woke up and said, You know what?  I need to sell a

12   book.  I haven't had a successful book in a really long time.

13   I don't have time to do any research.  I don't have time to

14   interview anybody.  I heard about this guy, Dennis Montgomery.

15   He sounds like a perfect victim for me.  I'm just going to

16   write a book.  I'm not going to conduct any due diligence.  I'm

17   not going to do any research.  And I'm going to write a book

18   that says that Mr. Montgomery sold a bunch of bogus software to

19   the United States.

20           Mr. Risen never had the software, never had access to

21   it, never spoke to anybody about the software.  He just said,

22   I'm coming up with this story.  I'm making it up out of whole

23   cloth.  I mean, you couldn't imagine a more wildly reckless

24   scenario.

25           Now, if it turns out fortuitously that what Mr. Risen

1   wrote in my hypothetical scenario with no investigation, no due

2   diligence, and absolute malice and recklessness turns out to be

3   true, do you have a successful defamation claim?

4           MR. KLAYMAN:  Under these circumstances, I believe we

5   do, under these facts.

6           THE COURT:  How?

7           MR. KLAYMAN:  Because, your Honor -- and I was trying

8   to couch my answer in the context of actual malice, which is a

9   factor in proving defamation with a public figure.

10          Assuming that our client is a public figure -- which we

11  submit he's not.  He was undercover.  He was not a public

12  figure and is not a public figure.  But the concept of

13  recklessness fits in with the concept of actual malice, which

14  fits in with the concept of having to prove falsity in a

15  defamation case.

16          And those are the cases that I'll be citing to you,

17  primarily.

18          The -- in this particular --

19          THE COURT:  And just so we're clear, these are cases

20  that are going to say recklessness is a substitute for falsity

21  and a defamation claim can proceed without proof of falsity if

22  there's recklessness?  That's what these cases are going to

23  say?

24          MR. KLAYMAN:  In the context of actual malice, of

25  having to show actual malice, yes.

1      So -- and by the way, I did answer your question

2  initially.  I didn't mean to in any way impugn your question;

3  and I respect what you have to say deeply, honestly.

4      So in this context, and in light of the documentation

5  that we have received and in light of Mr. Risen's own testimony

6  at Page 124 of his deposition, in light of the fact that he

7  made claims that this was the biggest hoax in American history,

8  that it almost results in planes being shot down -- which don't

9  necessarily even hinge on the software; there's a lot of

10  defamatory statements that don't hinge on that software -- yes,

11  we can prove falsity and in the context of actual malice

12  recklessness here.

13      And --

14      THE COURT:  I know.  But my question is not whether you

15  can prove falsity.

16      My question is:  Under this hypothetical, I came out

17  with a set of crazy facts that I assumed would demonstrate no

18  investigation, a complete lack of due diligence, extreme

19  recklessness, pure -- a pure cavalier attitude, someone who

20  just didn't even care if it was true or not.

21      But then I said, fortuitously, notwithstanding this

22  crazy, reckless behavior, fortuitously, it turns out that the

23  story is true.  Do you still have a viable, successful

24  defamation claim?  And you said yes.  Correct?

25      MR. KLAYMAN:  And the way -- yes.

1          THE COURT:  All right.

2          MR. KLAYMAN:  And the way we're going to prove that, if

3    I may --

4          THE COURT:  Yes.

5          MR. KLAYMAN:  -- is to present testimony of

6    Mr. Montgomery and other witnesses that this is false.

7          THE COURT:  That it's false.

8          MR. KLAYMAN:  Now --

9          THE COURT:  So you have to prove falsity?

10         MR. KLAYMAN:  Yeah.  And I said that initially.  But I

11   also said that within the context of proving falsity, with the

12   actual malice standard, that recklessness comes into play.

13   That's what I meant to say.

14         THE COURT:  Well, I think, Mr. Klayman, if you don't

15   mind me saying so, you're talking in circles, because you just

16   told me that you don't need to prove falsity, because instead

17   you can rely on recklessness and malice.

18         Then I came up with this extreme hypothetical and I

19   said, Do you still have a viable defamation claim if it turns

20   out fortuitously that this story, reckless as it may have been,

21   turns out to be true?

22         And you said, Yes.  There's a viable claim.  And then

23   you explained, Because we're going to show falsity.

24         Well, if you say we're going to show falsity, then

25   you're sort of conceding the point that a defamation plaintiff

```
 1   needs to show falsity and you're in effect conceding that you

 2   can't use recklessness as a substitute for proving falsity.

 3         So, Ms. Handman, do you agree that recklessness is a

 4   substitute for proving falsity?

 5         MS. HANDMAN:  No, your Honor.  I agree with your

 6   analysis.

 7         Falsity is its own element of the claim of libel.  And

 8   then if falsity is established along with a defamatory

 9   statement of fact, then the Plaintiff must show in this case

10   because he's a public figure actual malice, that they published

11   the false allegation knowing it was false or with serious

12   doubts as to the truth, sometimes called reckless disregard.

13         But the fault requirement is a wholly separate element

14   of the claim that must be shown as well as falsity and a

15   defamatory statement of fact.

16         THE COURT:  So let's go to the Defendants' memorandum

17   of law in support of the sanctions motion that is the first

18   major memorandum that kicked off this briefing.  It's Docket

19   Entry 166.

20         Mr. Klayman, do you have that handy?  Take your time.

21         MR. KLAYMAN:  Which memorandum, your Honor?  Excuse me.

22         THE COURT:  It's Docket Entry 166.  It's entitled

23   Defendants' memorandum of law in support of their motion for

24   sanctions.  It's probably the first major submission on the

25   very issue that we're here on today:  sanctions.
```

1              Do you have that?

2              MR. KLAYMAN:  Ms. James is finding it.

3              THE COURT:  All right.  Take your time.

4              Ms. Handman, I take it you have that memorandum?

5              MS. HANDMAN:  Yes, your Honor.

6              MR. KLAYMAN:  I've got it, your Honor.

7              THE COURT:  Okay.  So I'm looking at Page 3.  Are you

8    there?

9              MR. KLAYMAN:  I'm there, your Honor.

10             THE COURT:  All right.  So in the middle of Page 3, the

11   Defendants note that on July 1st, Montgomery's counsel objected

12   to the request to produce the software as vague, ambiguous,

13   overly broad, burdensome, and used the phrase "largely

14   irrelevant" concerning the request to disclose the location and

15   then also refusing to produce a copy of the software because

16   it's not -- because your client is not legally permitted to

17   produce secret, classified information.

18             So those were all of your initial objections when

19   Defendants asked for the software because the Defendants wanted

20   their expert to examine it to see if it actually worked or not.

21             So the one objection, Mr. Klayman, that is

22   conspicuously missing from that initial objection is, "I don't

23   have it" or "It doesn't exist" or "I can't produce it because

24   it's not in my possession, custody and control."  That kind of

25   objection was never raised.

1          And my question is:  Why not?

2          MR. KLAYMAN:  The answer is, because Mr. Montgomery

3    didn't know.  He had so much material, he didn't know.

4          Initially -- and I'll let him speak for himself.  And

5    again, your Honor, I've read your very fine ruling.  It was

6    cited, actually, by Defendants, the *Wandner* case *versus*

7    *American Airlines*.  There, you had an evidentiary hearing.  I'm

8    just speaking as a lawyer here.  I'm not speaking for

9    Mr. Montgomery.  Okay?  We don't have an evidentiary hearing

10   here as in *Wandner*.

11         But he didn't know for sure.  He had so much stuff.  He

12   had 47 hard drives, 600 million pages of documentation.  In

13   fact, he didn't know whether or not it was still with the CIA

14   or not.  That's my understanding.

15         So he wasn't clear on that.

16         Now, he thought he might.  Yeah.  And that's why he has

17   made a good-faith effort to try to assist in finding that

18   software.

19         But in the interim, the Defendants served subpoenas on

20   personnel and the CIA itself.  And the CIA came back with the

21   Justice Department and said, "We cannot produce this under any

22   circumstance."  And it's not relevant.

23         THE COURT:  So your answer is, Well, we didn't raise

24   the objection that Mr. Montgomery didn't have the software at

25   the time because he didn't know.

1          So then the next followup question, quite frankly, is:

2     Well, if that's true, then why months later in his deposition

3     did Mr. Montgomery unequivocally say, "I turned over the

4     software the day before or two days before to the FBI"?

5          I read that transcript multiple times in preparation

6     for today's hearing.  And Mr. Montgomery's testimony was not

7     equivocal.  He didn't say, you know, "I'm not sure if I still

8     have the software."  He didn't say, "I can't recall if the CIA

9     has the only copy" or "I don't remember if I still have it in

10    my possession."  He didn't say anything which we -- which would

11    remotely suggest that he no longer had the software.

12         To the contrary, he unequivocally said, "I turned it

13    over to the FBI."

14         And then a day or two later, Mr. Klayman, you appeared

15    in court in this very courtroom and you said to me, "The

16    software was turned over."

17         And I remember I was rather astonished at the time.

18    And I asked you a lot of followup questions, like:  When did

19    this happen?  How were the arrangements made?  Did you let the

20    Defendant s know in advance?

21         And you went into a lengthy explanation about your

22    relationship with a district judge up in Washington, DC -- I

23    think it was Judge Lamberth -- and somehow you were able to

24    contact Judge Lamberth and he was able to pave the road and

25    grease the wheels so that you were able with your client to

1    turn over the software to the FBI.  And you explained to me all

2    about the continuing right of access and you explained to me

3    about how the software was turned over by Mr. Montgomery to the

4    FBI in their office here in South Florida.

5            And nowhere during either Mr. Montgomery's testimony or

6    your very protracted explanation was there ever a hint that

7    Mr. Montgomery no longer had the software or even that he

8    wasn't sure.  Any reasonable person reading that deposition

9    transcript or listening to your arguments in court would come

10   away with the inescapable conclusion that the software existed,

11   that Mr. Montgomery had it, and that he turned it over to the

12   FBI in an arrangement orchestrated by you.

13           So what do you say about that, sir?  How is it that now

14   you're saying that -- or Mr. Montgomery is saying, "Gee, I'm

15   not sure if I have it"?  "Now that I think about it, I probably

16   didn't have it"?  But when questioned at his deposition, he

17   gave every indication that he had it and turned it over.  Now

18   when you appeared in front of me, you gave every indication

19   that your client had it and turned it over.

20           So what am I supposed to make about those

21   circumstances?

22           MR. KLAYMAN:  Well, first of all, your Honor, we've

23   always been in good faith.  Mr. Montgomery has been trying for

24   years to come forward, because whatever he has in his

25   possession is government information, which is classified.

1          Now, he does have a clearance.  He says he still has a

2    top-secret clearance.  It was never revoked.  There was never a

3    hearing to revoke it.  So he could have it in his possession,

4    but he can't turn it over to anybody else.  And consequently,

5    he has been trying for years.  I didn't orchestrate it.  And we

6    went through a federal judge, so it was done properly and with

7    supervision at the highest levels.

8          THE COURT:  Well, let's not use the word "orchestrate,"

9    because perhaps that has some negative connotations.

10         Didn't you in fact arrange it?  Didn't you reach out to

11   Judge Lamberth and didn't you coordinate with the FBI and make

12   those arrangements?

13         MR. KLAYMAN:  Before this case was filed, yes.  We did

14   reach out to Judge Lamberth, who I have a lot of confidence in.

15         THE COURT:  And then didn't you yourself make the

16   arrangements after this lawsuit was filed?  I mean, didn't you

17   make the arrangement with the FBI to make that turnover to

18   their office in Miramar?

19         MR. KLAYMAN:  That was in progress, your Honor.  We

20   tried different ways to get the information in the government

21   hands.  We didn't want to keep the information.  At least

22   Mr. Montgomery -- I don't mean we -- he didn't want to keep the

23   information.

24         I might add, I have never seen anything that is even

25   arguably classified.  Okay?  I'm not like some other people

1    that have been in the newspaper lately.  I don't want to see

2    it.  I never want to see it.  And it's -- so I don't know

3    whether the software was there or not.  I don't know.

4         But Mr. Montgomery thought that it likely was at the

5    time.  However, it was the FBI and the CIA that would have to

6    make that determination on declassification.

7         And in a letter that was written by James Baker,

8    general counsel of the FBI, working in conjunction with FBI

9    Director Comey -- we were working directly with his office

10   through Baker -- that it was determined that they would do a

11   declassification review, even though they didn't want to get

12   involved in the civil proceeding, because they've got serious

13   criminal investigations ongoing.

14        Your Honor knows, because you wear dual hats as a

15   criminally charged magistrate and civilly charged magistrate.

16   You don't want to mix the criminal with the civil.  It can

17   taint the criminal proceeding in particular.

18        And I was a former Justice Department lawyer, so I know

19   that.  I had to go through that.

20        So I didn't know myself.  But Mr. Montgomery did

21   believe that it was likely that it was there.  But when they

22   started to look into it, it appears that it wasn't there,

23   because they have tremendous expertise, the FBI.  This is not

24   some run-of-the-mill computer expert.  This is the top law

25   enforcement agency in the world that I worked with when I was

1    at Justice.  I know what they can do.

2         And consequently, as it progressed, it became clear

3    that it likely was not there; but that if it is there -- and

4    this is a really important point, your Honor, and it kind of

5    surmounts everything -- you didn't have the benefit of this

6    when you issued your initial order.  We don't fault you for

7    that.  I respect you.

8         But you were trying to push us along.  And we did get

9    pushed along.  I mean, we did move.  I'm still trying to have

10   the FBI take more time to look at it.  I requested a month

11   extension of discovery so they'd have more time.  Defendants

12   didn't want that because they liked the strategic angle, trying

13   to get the case dismissed or negative inference or whatever.

14   They didn't want to find it.  They'd never wanted to find it.

15   They want to put us in a box.  They want to paint us in a

16   corner.

17        And the reality here is is that they served subpoenas

18   on the CIA.  The CIA came back and said, We object under their

19   *Touhy* regulations and policy.  We're not producing it.  And

20   it's classified and you'll never get it.

21        Did they come to you and ask you to enforce those

22   subpoenas?  No.  They've waived any claim to this software.  If

23   they really wanted it, they'd be in front of you today on that

24   issue and not this issue.

25        THE COURT:  So talking about waiver, Mr. Klayman, what

```
 1    is your response to the Defendants' argument that you have

 2    waived your objection by not timely asserting the claim that

 3    Mr. Montgomery doesn't have the software?  They say you waived

 4    it by not raising it in your initial objection to the request

 5    for production, that he didn't raise it in his deposition, that

 6    you didn't raise it here in this courtroom when you gave me

 7    that very lengthy explanation about the turnover to the FBI.

 8    They say that's a waiver.

 9              What's your response to that?

10              MR. KLAYMAN:  My response is, I'll incorporate what I

11    just said.  So I don't want to repeat it and take up the

12    Court's time.  But in addition to that, that was not our

13    objection to make.  That was the objection of the CIA.

14              This stuff belongs to the CIA.  It doesn't belong to

15    Mr. Montgomery.

16              THE COURT:  Mr. Klayman, I really don't follow that

17    argument at all.  If I'm a party in a case and somebody serves

18    me with a request for production or a subpoena and I don't have

19    the material, I may have a bunch of other objections, such as

20    privilege or it's classified or the FBI doesn't want me turning

21    it over.

22              But the threshold position would be and would have to

23    be:  I don't have it.  That to me is probably the most

24    important point, because then many of the other points really

25    don't matter, because if Mr. Montgomery doesn't have it and
```

```
 1    never had it or doesn't have it at the time, end of story.

 2              But he never said that at the time.  You never said it

 3    at the time.  Why wouldn't that be a waiver?

 4              MR. KLAYMAN:  It's not because, at the time, as I said,

 5    he thought that he may have had it.  So I didn't want to raise

 6    that.

 7              Your Honor, from my perspective as a lawyer, you know,

 8    not just of the Florida Bar for 38, going on 39 years, but DC,

 9    et cetera, as a government -- former government Justice

10    Department lawyer, and as someone who started two ethics group,

11    Judicial Watch and Freedom Watch, the last thing I ever want to

12    do is say anything to a court or the government that is even

13    arguably untrue.  That's the most sacrosanct aspect of my

14    belief in our justice system.

15              So we didn't say -- we would never say that we didn't

16    have it.  He didn't know.

17              THE COURT:  Well, did you or Mr. Montgomery ever say,

18    "We're not sure"?  "We don't know"?

19              In other words, it's one thing to make an offhand

20    comment.  But once you're under oath in a deposition, it seems

21    to me you need to be very careful about what you say and what

22    you don't say.  And when you're appearing at a hearing in front

23    of a federal magistrate judge in federal district court, you

24    need to be careful about the accuracy of your representations.

25              So if you're telling me now, like you just did, that
```

1    Mr. Montgomery thought he may have had the software, then it

2    seems to me the prudent thing to have done would have been,

3    number one, for Mr. Montgomery to have said in his deposition,

4    "You know, I'm not sure if I have the software.  Maybe I

5    don't."  And it would have been prudent for you to say to me at

6    a hearing, "Judge, I'm not sure if Mr. Montgomery has the

7    software or not."

8           But you didn't say that.  And he didn't say that.  To

9    the contrary, both of you took positions and made statements

10   which represented that the software did exist, that

11   Mr. Montgomery had it, and that, golly gee, so sad, too bad, it

12   was just turned over to the FBI two days ago.

13          Those are the representations, Mr. Klayman, that you

14   made and that Mr. Montgomery made.

15          So why didn't you try to give yourself a safety valve

16   or give Mr. Montgomery a safety valve by accurately saying in

17   all of those circumstances, "We're not sure" or "Maybe" or

18   "Maybe not"?  Why didn't you all do that?

19          MR. KLAYMAN:  At the hearing, your Honor, it was my

20   understanding that I did.  Maybe I did -- didn't do it as

21   artfully as I could have done it.  But coming in front of you

22   and trying to explain to you what we did and why we did it and

23   why this was in progress for years and why the information was

24   likely classified, now confirmed that it was by the CIA, and to

25   say that we've made arrangements with the FBI to get it if it

```
 1    was required to be produced -- your Honor had not ordered yet

 2    that it be produced.  We were here on August 19th.  Your order

 3    came out on August 22nd.  So there was no order that we

 4    violated.  None.

 5          THE COURT:  Here's what I want you to do, Mr. Klayman,

 6    because you just told me that you thought at the hearing that

 7    you made clear to me that Mr. Montgomery wasn't sure if he had

 8    the software.

 9          By the way, Ms. Handman, you were either at that

10    hearing in person or by phone.  Do you recall --

11          MS. HANDMAN:  I was in person, your Honor.

12          MR. KLAYMAN:  I did not say that, your Honor.  You may

13    have misunderstood what I just said.

14          THE COURT:  Excuse me.

15          MR. KLAYMAN:  Okay.

16          THE COURT:  So at that hearing, did Mr. Klayman say to

17    me in words or substance, "We're not sure if Mr. Montgomery has

18    the software"?

19          MS. HANDMAN:  No.  No, your Honor.  My recollection is,

20    as was yours -- and indeed, I also was astonished by both what

21    we learned for the first time in the deposition and then the

22    following day when Mr. Klayman confirmed the details of the

23    handover that he organized.

24          THE COURT:  So what I want you to do, Mr. Klayman, by

25    this Friday, is I want you to file a notice pinpointing to me
```

1    the page numbers in that hearing transcript where you told me

2    that Mr. Montgomery wasn't sure if he had the software or not

3    and that maybe, but not definitely, maybe, the software had

4    been turned over to the FBI.

5         So you'll point those pages out to me, because my

6    recollection is similar to Ms. Handman's --

7         MR. KLAYMAN:  I'm not refuting what you said, your

8    Honor.

9         THE COURT:  The transcript of this hearing, I think,

10   sir, will reflect that you just told me that you thought you

11   told me at the hearing that Mr. Montgomery wasn't sure whether

12   he actually had the software.  You just told me that no less

13   than four minutes ago.

14        MR. KLAYMAN:  That's what I said.  And I'll go back and

15   look at the transcript, get an expedited copy.  That's not what

16   I meant to say.  Okay?

17        What I'm trying to say is that we made provisions if

18   that software was there for the FBI to locate it when it was

19   turned over.  That's what I meant to say.

20        I said to you, I don't know one way or the other

21   what's -- what he turned over because I'm not entitled to see

22   it.  I don't know.  And Mr. Montgomery did believe -- this is

23   what I said -- that it was in the 47 hard drives.  But it

24   appeared that it was not when the FBI made an effort to find

25   it.  And he has communicated with the FBI on a number of

1    occasions and met with them on two occasions.

2         So -- and, you know, we've supplemented the record with

3    our good faith in that regard.

4         So that's what I meant to say, your Honor.  If it came

5    out inarticulately, I apologize.

6         And let me also point one other thing out --

7         THE COURT:  Excuse me.  I'm about to sort of modify

8    your homework assignment there, which is:  To the extent that

9    you now say that Mr. Montgomery -- that I advised you, Judge,

10   at the hearing that Mr. Montgomery merely thought that he had

11   the software as opposed to actually turning it over, you'll

12   pinpoint those pages in the hearing transcript to me as well

13   because, candidly, I don't have that memory at all.  My memory

14   is completely to the contrary.

15        And as I indicated to you, my reaction was to be

16   astonished.  And my jaw was probably hanging half open.

17   Perhaps I did a good job of covering it up.  But I remember

18   saying to myself, Wow.  This is some development.  And then I

19   asked some additional followup questions which caused you to

20   give me that fairly protracted explanation about Judge Lamberth

21   and working with the FBI and going with your client to the FBI

22   offices, and then that led to the discussion about the

23   continuing right of access.  All of those things flow from my

24   impression that you were unequivocally representing that the

25   software had in fact been turned over within the past day or

1    two.

2            I don't recall any sort of mushy statement, any kind of

3    safety valve, any equivocation.  But apparently, you think

4    otherwise.

5            So you'll file by Friday the hearing transcript pages

6    where you told me that Mr. Montgomery merely thought that he

7    had the classified software, but wasn't sure.

8            MR. KLAYMAN:  But that's not what I just said, your

9    Honor, with all due respect.  I'm happy to do that.

10           But what I said was is that he thought he had it.

11   Okay?  So consequently, I thought he had it.  So that's what I

12   told you.

13           THE COURT:  Any kind of equivocation that will be

14   included in your Friday filing, "thought," "maybe," "perhaps,"

15   "not sure," whatever language you believe you said to me short

16   of an unequivocal representation that the software was turned

17   over, you'll point out those pages to me, please.

18           MR. KLAYMAN:  Okay.  And there's one thing I wanted to

19   add here, if I may.

20           Mr. Montgomery has a very serious brain aneurysm.  He's

21   been in the hospital a number of times.  At the deposition, he

22   sat for seven hours.  He was not feeling well.  It's on the

23   record.  I'm sure your Honor's seen it, having read it.  Okay?

24           If he inartfully answered a question and was tired and

25   just wanted to get rid of something -- because, you know, I

1   will maintain that Ms. Handman at some point as she did in the

2   initial status conference showed a lack of respect for him and

3   his medical condition.  She said to him, for instance, "You're

4   tired.  You don't feel well?  Well, it's your problem."  I'm

5   paraphrasing.  "You're the one that brought this case.  So you

6   deal with it."

7         That's not the way you deal with somebody who has a

8   brain aneurysm who could die at any moment.

9         So I think that needs to be taken into account.

10        I can tell you just a little vignette of a story.  When

11  I was on the trial team breaking up AT&T, AT&T brought a

12  witness in who testified inartfully.  And he claimed to the

13  Court -- and the Court accepted it -- that he had taken NyQuil

14  the night before and that it clouded his memory, which it does.

15  It's very powerful stuff.

16        A brain aneurysm is a lot more powerful than NyQuil.

17  And he wasn't thinking clearly throughout that deposition.  And

18  in fact, he thought that he had even defecated on himself in

19  the middle of the deposition.

20        But I think that needs to be taken into account.

21        THE COURT:  So, Ms. Handman, what about that?  Let's

22  assume that Mr. Montgomery was not quite as artful as he could

23  have been in his deposition, and the reason for that in whole

24  or in part is the fact that the man has a brain aneurysm, is

25  sick, doesn't have quite the memory that he used to have.  What

```
1     are your thoughts on that?
2          MS. HANDMAN:  Well, first of all, he was totally clear
3     in his answers with regard to what happened the day before the
4     deposition and what he turned over to the FBI.
5          He was asked, Have you searched for your software?
6          Yes.
7          Do you have it?
8          No.
9          Did you -- when did you stop having it?
10          Yesterday, when I gave it to the FBI.
11          It couldn't have been clearer.  And I -- if you recall,
12     your Honor, I did offer to take the deposition in Seattle,
13     where he lives.  And he chose to come to Florida to sit for his
14     deposition.  We offered him any breaks that he wanted.
15          And I -- in the medical records that they've produced
16     so far, yes, he had a brain aneurysm some years ago.  Yes, he
17     had a stroke in 2014.  But his current medical condition from
18     what I can see from the records is stable and the aneurysm is
19     not worsening.  And he fell, and that's why he went to the
20     hospital.  He didn't stay over in the hospital this year.
21          So I have to take issue with the notion that this
22     testimony was in any way product of his medical condition.
23          MR. KLAYMAN:  This may be helpful, your Honor, because
24     it's nice to have Ms. Handman all of a sudden give herself a
25     medical degree and become an expert in this case.  But it may
```

1   be more helpful to look at the video -- this was videoed -- and

2   see his demeanor at the time and how much pain he was in.

3   There is a video of this.  That's more persuasive than

4   Ms. Handman's self-appointed role as a medical expert.

5          THE COURT:  And if you submitted that to me, would it

6   need to be under seal?

7          MR. KLAYMAN:  Not from our standpoint.

8          MS. HANDMAN:  No, your Honor.

9          THE COURT:  And the portion of the video deposition

10   where Mr. Montgomery was explaining about searching for the

11   software and turning it over to the FBI, more or less, how much

12   time are we talking about?  Is that 10, 15 minutes at the most?

13   Or are we talking about hours?

14          MS. HANDMAN:  I think it was about 10, 15 minutes, if I

15   recall correctly, your Honor.  I haven't looked recently.

16          MR. KLAYMAN:  I might add on that point, your Honor, he

17   was feeling pain throughout the deposition.  We had to leave

18   the room on a number of occasions.

19          THE COURT:  So here's what you're going to do.  You

20   have another homework assignment, Mr. Klayman.  And we'll talk

21   about the timing in just a minute.

22          But I will allow you, because you offered -- I will

23   allow you to submit to me the relevant video excerpts of

24   Mr. Montgomery's deposition concerning the questions and

25   answers on the topic of turning over the software.  It looks as

```
 1    though, according to the Defendants' memo, that part of that

 2    discussion was on Page 127 of the deposition transcript.  But

 3    you'll submit that video to me.

 4          And here's how you're going to have to do it, because

 5    the clerk's office normally receives filings electronically on

 6    CM/ECF.  And this is not going to be a filing; it's going to be

 7    an actual DVD.  So you'll have to make arrangements to do sort

 8    of an old-fashioned filing of that DVD, excerpt to the clerk's

 9    office.  You'll provide a courtesy copy of that videotaped DVD

10    excerpt to defense counsel and also you'll provide a courtesy

11    copy to me, to chambers.

12          The copy that you provide to chambers can either be an

13    actual DVD or you can submit it to me in electronic format.  It

14    doesn't really matter to me, either way.  I have lawyers submit

15    video excerpts to me both ways.

16          How much time do you think you'll need in order to get

17    that done?

18          MR. KLAYMAN:  Well, I was going to ask you at the end

19    of the hearing, your Honor, at the present time we have a

20    response to Defendants' summary judgment motion due on Friday.

21    So we're really jammed.  And we're here today.  I had wanted to

22    push it off.  I know your Honor wanted to have it sooner.  And

23    I respect that.

24          But we're really packed out right now in terms of time.

25    So I would like more time for all of this.  Perhaps, you know,
```

1   a week from Friday to submit everything that you requested.

2        And with regard to the video, for the record, I'd like

3   to submit the entire video, and then I'll pinpoint those

4   sections of the testimony that your Honor wants to see with

5   regard to the software, because it's important that you see the

6   whole -- or at least be on the record for purposes of objection

7   or appeal at least.  I'm not saying you're going to rule

8   against us.  I hope you won't.  But you need to see how much

9   pain he was in throughout this entire process.

10       THE COURT:  Ms. Handman, what's your view on that?

11       MS. HANDMAN:  Your Honor, as you know, we resisted

12   resetting this hearing in part because of various deadlines,

13   including a mediation that's scheduled for next Wednesday.  And

14   our own summary judgment reply that -- because Mr. Klayman

15   asked for an extra week is now due on the 19th.

16       So for us, it is important for the reasons your Honor

17   has articulated about the falsity issues, for example, that if

18   there is to be a ruling on this, you know, before we submit our

19   reply, that would be very helpful.

20       So I'm understanding Mr. Klayman's scheduling problems.

21   And I leave it up to you, your Honor.  But there are reasons

22   why an expeditious handling of this is important.  As you know,

23   we have to start making motions in limine at the beginning of

24   February.  Trial is currently set for the middle of March.

25   There are in addition to this our motion to dismiss and

```
 1    transfer pending.  And our summary judgment will be fully
 2    briefed by the 19th.
 3            So we are on a very fast track here.
 4            THE COURT:  Let me try to sharpen my question,
 5    because -- thank you for all that additional information.  I
 6    was really only asking you about one particular point.  I
 7    probably should have flagged that for you.
 8            I wanted to know your position on Mr. Klayman's
 9    suggestion that the entire video be submitted as opposed to
10    just the 15- or 20-minute excerpt.
11            MS. HANDMAN:  I'm fine with that, your Honor.
12            THE COURT:  All right.  So, Mr. Klayman, it seems to me
13    it's a lot less burdensome to simply file the entire DVD than
14    to have to review it and filter it and pinpoint particular
15    pages and excerpts.
16            But here's a suggestion that I have, because you have
17    advanced to me the argument that your client is not feeling
18    well, he's got medical issues, and that perhaps I need to
19    evaluate his deposition testimony with his medical condition in
20    mind.
21            And I understand that you have certain deadlines and
22    the defense has similar deadlines as well.
23            But since it's the entire DVD that's being submitted
24    and not excerpts, and I don't want to postpone this any
25    further, what about simply arranging for the Defendants to file
```

1      the entire DVD, send a courtesy copy to me?  That way, you

2      folks from the Plaintiff's side don't even need to be burdened

3      with that.  The defense will carry the laboring oar on that.

4              I already know what pages to turn to because the

5      references in the memorandum tell me what pages.  For example,

6      it's approximately around Page 127.  So obviously, starting a

7      few pages before 127 and a few pages after, that's where I'll

8      find the questions and answers from Mr. Montgomery's videotaped

9      deposition concerning the software and his search for it and

10     turning it over to the government.

11             So do you have any problems with that?

12             MR. KLAYMAN:  I don't, as long as I can verify that

13     they have actually turned the whole thing over, your Honor.  We

14     did have some issues at the outset of this case about an

15     affidavit.  You might remember.  I won't belabor it.

16             THE COURT:  That's fine.

17             So why don't we have the Defendants submit that DVD by

18     Friday.  Give Mr. Klayman a courtesy copy and provide a

19     courtesy copy to me as well.  Okay?

20             MS. HANDMAN:  Your Honor, do you have the transcript of

21     the deposition?  That might be helpful as well.

22             THE COURT:  I probably -- I know for sure I have

23     excerpts.  I don't know if I have the entire transcript.  But

24     I'm happy to have you file the entire transcript.

25             My suggestion is, if you have the transcript in what I

48

```
 1    call page-saver format -- do you know what I mean by that?
 2    Four pages per page in quadrants as opposed to one page?  A lot
 3    of court reporters do it that way along with a word index.  So
 4    that'll shorten the amount of -- or minimize the amount of
 5    paper.  So if you want to do that, please try to submit the
 6    page-saver version of the transcript.
 7            And do you think you can get that done by Friday?
 8            MS. HANDMAN:  Yes, your Honor.
 9            THE COURT:  All right.  Fine.
10            So the other point, Mr. Klayman, that I have is, you
11    were talking to me about what representations were made by
12    Mr. Montgomery and what representations were made by you and my
13    comments about my perception that the representations were
14    unequivocal.
15            Take a look, if you would, please, at Pages 5 and 6 of
16    the Defendants' memorandum, the same one that I called your
17    attention to earlier in the hearing, Docket Entry 166.
18            Are you there?
19            MR. KLAYMAN:  Correct.
20            THE COURT:  So this is an excerpt from the hearing
21    transcript.  Comment by you -- or question by me:  The FBI has
22    the software?
23            Answer by you:  They have the software, yes.
24            So I'm going to go through a couple of additional
25    questions and answers here.  But the point here is, your answer
```

1   is, "They have the software, yes," not, "Judge, maybe they have

2   the software"; "Judge, Mr. Montgomery is unclear whether the

3   software was given to the FBI"; or, "Judge, I can't tell you

4   for certain.  I think there's a good possibility that they have

5   the software.  But Mr. Montgomery is not 100 percent sure, so

6   maybe not."  None of those sorts of statements are in there.

7          But to the contrary, the representation from you to me

8   is, "They have the software, yes."

9          I don't think there's any other way to read that, any

10  other way to interpret it, than this being a flat-out,

11  unequivocal representation that the software was turned over to

12  the FBI.

13         Question by me:  How did they get it?

14         Because Mr. Montgomery provided it to them.

15         Question by me:  When?

16         He provided it to them three days ago.

17         Not "He thinks he provided it to them," "He's not

18  sure," "Maybe it's on there."

19         Anyways, you understand my point.  It's an unequivocal

20  representation.

21         Then question by me a little bit lower:  And so when

22  the software was turned over -- not "maybe turned over," "could

23  have been turned over," "possibly turned over" -- but when the

24  software was turned over three days ago, did either you or

25  Mr. Montgomery keep a copy?  Or you just gave the software?

1          Answer by you in court:  We just gave it to them.

2          No copies?

3          It was just the software.  And relative to this case,

4    the software is included.

5          So maybe the Defendants were cherry-picking the

6    transcript when they made this submission in their memorandum.

7    But I've got to tell you that, based on these questions and

8    answers, I am still of the recollection -- I still have the

9    recollection that your comments to me were quite strident,

10   quite unequivocal, quite certain, and the story that you told

11   me -- I don't mean story in a pejorative sense, but the

12   representations that you made to me were that the software had

13   in fact for sure been turned over.

14         So I'll see by Friday when you complete your homework

15   assignment whether there are any statements which might

16   minimize the certainty of those representations.  But so far,

17   what I've seen confirms my recollection that the

18   representations were certain and therefore in my mind

19   astonishing.

20         MR. KLAYMAN:  And what I said to you, your Honor -- let

21   me just add for 30 seconds -- is that based on what

22   Mr. Montgomery told me -- and I did not have access to any

23   software, nor can I; to do so would be to commit a crime, which

24   I won't do -- I believed that the software was given to the

25   FBI.

```
 1              Now, over time, when the FBI could not find it, despite

 2    all the good-faith efforts to help them to find it,

 3    Mr. Montgomery came to believe that it was not there.

 4              So that's the explanation.  It's that simple.

 5              THE COURT:  So let's take a look, please, Mr. Klayman,

 6    at Page 9 of this same memorandum, Docket Entry 166.  And

 7    toward the bottom, under Paragraph K, the Defendants are

 8    quoting your client's declaration.  Quote:  "Based upon my

 9    personal knowledge and belief, upon searching my memory, I do

10    not believe that I have had access to any of the subject

11    software, nor did I provide it to the Federal Bureau of

12    Investigation when I turned over the drives."

13              So is it your client's position that he never had

14    access to the software?  Because that's the way it's phrased:

15    "I do not believe that I have had access to any of the subject

16    software."  Is that what that statement means?

17              MR. KLAYMAN:  Your Honor, we do not have in front of --

18    the statement speaks for itself.  And I will help try to

19    explain it as counsel, as legal counsel, but not as someone

20    who's testifying, because we -- he's not here today.  We don't

21    have an evidentiary hearing, like you did it in other case.

22              THE COURT:  Mr. Klayman --

23              MR. KLAYMAN:  But I --

24              THE COURT:  Mr. Klayman, didn't you or somebody from

25    your office draft this declaration?
```

1          MR. KLAYMAN:  Based upon what he said.

2          THE COURT:  Okay.  So let's not pretend that you don't

3    know what the declaration is about.  Presumably, you or

4    somebody in your firm spoke to Mr. Montgomery in order to

5    obtain the information that you would include in his

6    declaration.  Correct?

7          MR. KLAYMAN:  And the document speaks for itself.  And

8    respecting attorney-client privilege and work product, I will

9    answer the question as counsel.

10          THE COURT:  Yes.

11          MR. KLAYMAN:  Okay?  But I have to respect the

12    attorney-client privilege, too.

13          He came to believe, as I said, when the FBI had not

14    found it thus far that he likely had never turned it over, that

15    he didn't have it.

16          This is stuff that's owned by the CIA.

17          THE COURT:  I'm doing a bad job of asking my question.

18    I'm going to try it again.

19          I'm not asking you whether this declaration means that

20    Mr. Montgomery now believes that he didn't turn it over to the

21    FBI.  That's pretty clear to me that's what this declaration

22    says.  But I'm not asking about that part of the declaration.

23    I'm not asking whether he now believes he didn't recently turn

24    it over to the FBI.

25          I'm asking about the other statement, where he says, "I

1    do not believe that I have had access to any of the subject

2    software."  That sounds to me as though he's saying, "I now

3    believe that I never had access to the subject software."

4         Is that your client's position?  Yes or no.

5         MR. KLAYMAN:  No.  I mean -- and your Honor just made

6    the point by using the word "never," which is not in there.  He

7    never said never.

8         THE COURT:  So what does that mean, "I do not believe

9    that I have had access"?  I mean, isn't "never" sort of a

10   superfluous word?

11        MR. KLAYMAN:  Well, there was a point in time, your

12   Honor -- and in fact, Defendants put this on the record -- when

13   Mr. Montgomery was -- his premises were raided ironically by

14   the FBI.  He was tied to a tree as they searched his house and

15   when they took everything that he had.

16        There was a court in Nevada that ordered that the FBI

17   return the materials to Mr. Montgomery not because the

18   materials were not -- repeat, not -- classified, but because

19   the agent had lied in an affidavit and also had not shown

20   probable cause to seize all of this material.

21        Now, under the circumstances, it's likely that he never

22   got everything back.  May have kept that on behalf of the CIA.

23   So that helps explain why in retrospect he thought he never had

24   this, he didn't have access, because they never gave it back.

25   This is 47 hard drives, 600 million pages of documentation.

```
 1    The FBI is still going through it.  The FBI is taking it

 2    seriously.

 3            You know, your Honor, it's --

 4            THE COURT:  Wait, Mr. Klayman.  I just have to follow

 5    up on that last statement.  And I know that you said this,

 6    because my memory, even though I'm 60 years old, is still

 7    pretty good that I can remember something that you said 30

 8    seconds ago.

 9            You just said to me, "The FBI is still going through

10    this information."  So that's a representation to me that as of

11    today, the FBI is still reviewing the information.

12            Did you mean to say that, sir?

13            MR. KLAYMAN:  Yes.  Let me tell you why I meant to say

14    that:  Because there are two branches of the FBI that's

15    involved here.  Okay?  There's one, the civil side, which was

16    dealing with this.  And then there's the criminal side.

17            I met with two agents of the FBI about a month and a

18    half ago.  And Mr. Montgomery has received immunity.  I can

19    provide that under seal to you, an immunity agreement, to also

20    talk to the FBI.  And they're going through everything, all of

21    the information that he provided.  That's the criminal

22    investigation.

23            The individual who has corresponded with Ms. Handman

24    *ex parte* without my knowing -- I've been trying to talk to this

25    guy, Ted Schwartz.  He's a piece of work.  Okay?  I've been
```

```
1    trying to talk to him to cooperate.  And all he writes back is,

2    you know, "We're not talking.  You put it in writing."

3            But he's not the person we're dealing with.  We're

4    dealing here with two FBI agents and the assistant US

5    Attorney --

6            THE COURT:  What are the name of the two FBI agents?

7            MR. KLAYMAN:  Walter Giardino --

8            THE COURT:  Yes.

9            MR. KLAYMAN:  -- and William Barnett.

10           THE COURT:  William Barnett.  And the name of the

11   assistant US attorney?

12           MR. KLAYMAN:  Deborah Curtis.

13           THE COURT:  All right.  So --

14           MR. KLAYMAN:  They have access to everything.  They're

15   going through everything.

16           THE COURT:  All right.  So I just want to be clear.

17           MR. KLAYMAN:  Okay.

18           THE COURT:  Your representation to me is that still as

19   of now, January 2016, that Special Agent Giordano [sic],

20   Special Agent Barnett and AUSA Deborah Curtis are reviewing the

21   41 files that you turned over in order to locate the software

22   at issue in this case?

23           MR. KLAYMAN:  Well, in order to see what's there.

24   Okay?  And I did raise with them, even at my last meeting, we

25   want to continue looking for this.  I did in good faith on
```

```
 1    behalf of Mr. Montgomery.

 2         THE COURT:  Is it your representation, Mr. Klayman,

 3    that these three people, Giordano, Barnett and Ms. Curtis or

 4    others working with them are still to this day searching for

 5    the software which is at issue in this civil defamation

 6    lawsuit?

 7         MR. KLAYMAN:  Making that specific representation.

 8    What I'm representing is they're searching everything that's on

 9    those drives.  And if --

10         THE COURT:  Because I seem to remember a letter from

11    the FBI attorney saying to you in a letter, Mr. Klayman, the

12    information that your client -- or that you provided in an

13    effort to provide additional help locating the software was of

14    no help whatsoever.

15         Ms. Handman, when was that letter?  Do you remember?

16    Was it back in --

17         MS. HANDMAN:  Well, the first letter was September 8th.

18         Then Mr. Schwartz wrote Mr. Klayman, and he filed it

19    under seal October 1st.

20         Then he wrote October 23rd after this declaration that

21    you referred to was written.  And that was filed.

22         And then on December 11 is his most recent

23    correspondence, all of which went to Mr. Klayman, copied to me.

24         And he's right.  This response to your November 16,

25    2015, e-mail, "I am advised that the Dropbox link which you
```

1    forwarded from Mr. Montgomery is to a file-filtering program

2    which is not of any use in locating the alleged software in the

3    absence of the specific information which the FBI had requested

4    in its September 8 letter, namely the number or designation of

5    the drive on which the software is present and the file name of

6    the software.

7        "As a result and given the fact that Mr. Montgomery

8    does not believe that the FBI is in possession of the software,

9    the FBI's position as stated in my October 23 e-mail remains

10   unchanged."

11       And that position was that the FBI is not looking for

12   Mr. Montgomery's software that's involved in this lawsuit,

13   which is unrelated to the 47 drives, hard drives, the 51

14   million files and 600 million pages that Mr. Montgomery buried

15   his software in when he provided it to the FBI.

16       THE COURT:  What is the date of that communication from

17   Mr. Schwartz?

18       MS. HANDMAN:  It's December 11.  And we filed it as a

19   notice of supplemental hearing on December -- notice of

20   supplemental filing.  It's ECF 196-1.

21       THE COURT:  Right.

22       So, Mr. Klayman, concerning your statement that the FBI

23   is still looking at these materials, based on what Ms. Handman

24   told me, the FBI criminal side, meaning Mr. Giordano,

25   Mr. Barnett and Ms. Curtis, are looking at the files for other

1   purposes, not necessarily searching for the software at issue

2   in this case, the software that was mentioned in Mr. Risen's

3   book, do you have any reason to believe that Mr. Giordano,

4   Mr. Barnett, Ms. Curtis or others working with them are still

5   as of January 2016 actively looking for the software at issue

6   in this case?

7          MR. KLAYMAN:  I asked them to.  I don't know what

8   they're doing in that regard.  I know I asked them to.

9          And it's not just Special Agent Giardino.  It's not

10  just Special Agent Barnett.  It's the FBI.  These were just two

11  who appeared at a meeting that -- two meetings that we've had,

12  one here in Miami and one I've had later than that.  But it's

13  the FBI.  They have a forensics section.  They are the leading

14  law enforcement agency in the world.  It's not just those two

15  people.  And they're going through all of this.

16         If I may put this on the record, because I want your

17  Honor to understand what the criminal investigation is about,

18  is that with regard to what Mr. Montgomery was privy to with

19  regard to software that he was involved with with the CIA and

20  with the NSA and other intelligence agencies, Defense

21  Intelligence Agency as well, he learned that officials of these

22  agencies, including, but not limited to, James Clapper and

23  others, were accessing, harvesting the information, private

24  information about people like you, a magistrate judge.  You

25  might even be on that list, believe it or not.  Judges,

1    congressmen, senators, influential people.  They even harvested

2    my stuff when I was here in Miami, because I'm an advocate.

3    You know I've had my differences with a number of

4    administrations here and trying to enforce the rule of law.

5              And they got my financial records back in 2007 out of

6    Colonial Bank.

7              So this is a serious matter.  And at the highest level,

8    this is being dealt with by the FBI director, the criminal.

9              The civil side of the FBI is, not to coin a phrase, the

10   JV team.

11             MS. HANDMAN:  Your Honor --

12             MR. KLAYMAN:  The other side of the FBI is the criminal

13   side.  And they're looking for everything that's on that that

14   he turned over.

15             MS. HANDMAN:  Your Honor, if I might point out, the

16   e-mail from Mr. Schwartz on December 11 to Mr. Klayman copied

17   also Deborah Curtis, the AUSA who Mr. Klayman has referenced;

18   Rafael Gomez, the DOJ lawyer who has been handling some of our

19   *Touhy* requests; and James Baker, the general counsel of the

20   FBI.

21             I guess that's the B team.

22             And that -- they were copied on his letter -- on his

23   e-mail.

24             MR. KLAYMAN:  To copy someone on a letter is not to

25   sanction it.  I've had direct communications with Mr. Baker --

1      THE COURT:  Mr. Klayman, we're not going to play

2  ping-pong and we're not going to have comments back and forth,

3  east and west.

4      MR. KLAYMAN:  I would agree.

5      THE COURT:  It's almost north and south.  Okay?

6      MR. KLAYMAN:  I would agree.

7      THE COURT:  So we're still here on Page 9 of this

8  memorandum.  And I'm a little bit curious about Footnote 15.

9  Footnote 15 says, "Although previously ordered, Montgomery did

10 not produce the July 28th and August 12th, 2015, letters

11 referenced in Mr. Baker's September 8th letter or any response

12 to Mr. Baker's request for further information to locate the

13 software until October 20th."

14      So actually, now that I think about it, this question

15 might be better phrased or better asked to Ms. Handman, which

16 is:  So are you saying in this footnote that ultimately,

17 perhaps in your view belatedly, Mr. Klayman did turn over these

18 documents; he just didn't do it until October 20th?

19      MS. HANDMAN:  That's correct, your Honor.

20      THE COURT:  All right.

21      MS. HANDMAN:  Your Honor had ordered it for much

22 earlier.

23      MR. KLAYMAN:  Your Honor, I believe, if I may help

24 clarify here -- I'm not sure; I'm going from memory -- that

25 Mr. Montgomery was ill in the hospital during that period.

1        MS. HANDMAN:  He's --

2        THE COURT:  Folks, gosh.  This is such a small little

3  point.  I'm getting reluctant to even raise a point for fear

4  that it will trigger a 15-minute discussion.  We need to keep

5  our eye on the ball, and let's talk about things that are

6  important and move on when we have a minor point.

7        So concerning number -- I mean, Page 9 on this

8  declaration, the declaration that Mr. Montgomery signed, that's

9  actually a very important part of this motion because the

10 defense is claiming that either that declaration is false or

11 it's the equivalent of a sham affidavit or should be ignored or

12 is an after-the-fact justification.  But in any event, it's a

13 major part of the sanctions request.

14       So right after the Defendants quote that declaration,

15 Mr. Klayman, they raise the following points:  "He," meaning

16 Mr. Montgomery, "does not explain how he supposedly does not

17 have access to his own software, where it is now located or

18 explain this change of story after this Court made clear in its

19 October 16th and 19th orders that he could face

20 dismissal/sanctions."

21       So do you have any further clarification to --

22       MR. KLAYMAN:  I believe --

23       THE COURT:  -- provide?

24       MR. KLAYMAN:  I believe that I've been clear on the

25 record.  This was an evolving process, that it appeared to him

1   that he didn't get back the software in all likelihood when the

2   documentation was ordered back by the judge in Nevada, that it

3   was withheld, and he had all this information.  He had been

4   trying for years with regard to inspectors general, with regard

5   to Senate and House committees and the FBI to turn this -- and

6   the Department of Defense to turn this stuff over.  He didn't

7   want it in his possession.

8           Mr. Montgomery's a patriot, your Honor.  He doesn't

9   have to stick his neck out like this.

10          THE COURT:  So let me just make sure --

11          MR. KLAYMAN:  (Inaudible) is in Moscow right now.  My

12   client's here in the United States.

13          THE COURT:  Have you seen the movie by the way,

14   Citizenfour?

15          MR. KLAYMAN:  No.  But I'd like to.  Is it good?

16          THE COURT:  I enjoyed it.  It's available on NetFlix, I

17   think.  That's where I saw it.

18          MR. KLAYMAN:  Okay.  Thanks.

19          THE COURT:  But in any event, I want to make sure that

20   I understand your position.  And please correct me if I'm

21   wrong, because I just heard the explanation for the first time

22   this afternoon, unlike a lot of other arguments which have gone

23   back and forth this afternoon which I've heard before or read

24   before, this particular point I think, if I'm not mistaken, I

25   heard for the first time.  I want to make sure that I'm on

```
 1    board.

 2            Your position -- and I want you to tell me if I'm wrong

 3    or not understanding this correctly -- your position is that

 4    Mr. Montgomery now realizes most likely that he no longer has

 5    the software at issue because the FBI removed it from his house

 6    illegally when he was tied to a tree; and when it was brought

 7    out that the FBI special agent lied in an affidavit, the judge

 8    ordered the seized materials to be returned, and apparently,

 9    although materials were returned, the software was not

10    returned.

11            Do I have that right?

12            MR. KLAYMAN:  That's the only logical explanation,

13    based upon the fact that he now doesn't believe he has it and

14    the FBI can't find it.

15            THE COURT:  When was it that --

16            MR. KLAYMAN:  That's deductive reasoning.

17            THE COURT:  I hear what you're saying.

18            What year was it that the FBI or somebody tied him to a

19    tree and --

20            MR. KLAYMAN:  Well, handcuffed him.

21            THE COURT:  I'm sorry?

22            MR. KLAYMAN:  Handcuffed him.  It wasn't quite like

23    Zorro, you know, when we were kids.  But they handcuffed him to

24    a tree.

25            THE COURT:  All right.  And when --
```

64

1          MR. KLAYMAN:  I don't remember.  I don't remember the

2     date.  I can --

3          THE COURT:  I mean, are we talking a year or two ago?

4     Are we --

5          MR. KLAYMAN:  No.  It was quite a while ago.

6          THE COURT:  Ten years?  15 years?

7          MR. KLAYMAN:  Quite a while ago.  More than three years

8     ago, I think.

9          MS. HANDMAN:  Your Honor, if I might be heard on this.

10         THE COURT:  Yes.

11         MS. HANDMAN:  After the search was found

12    unconstitutional, in part because the Court found it was in

13    service of the civil dispute over ownership of the software

14    between eTreppid and Mr. Montgomery, and also because the

15    probable cause was based allegedly on his possession of

16    classified information and the Court found there was no -- that

17    probable cause was not satisfied, it was returned.  That was

18    the subject of the subsequent proceedings that we have

19    referenced to your Honor --

20         THE COURT:  You mean in Las Vegas?

21         MS. HANDMAN:  In Las Vegas, where Judge Pro, federal

22    district court judge, ordered Mr. Montgomery to produce his

23    software.  And when he failed to, he sanctioned him $2500 a

24    day.

25         I don't believe he ever said, "Oh, by the way, the FBI

```
1    didn't give it back to me.  I can't do it.  Please don't

2    sanction me."  Instead, he entered interest a confession of

3    judgment for $25 million, then declared bankruptcy, didn't

4    produce the software again.  And it was -- the bankruptcy was

5    not discharged.

6               I also want to be clear on another point:  The CIA in

7    response to our Touhy request, it is true they refused to --

8               THE COURT:  I'm sorry.  By the way, for benefit of the

9    court reporter, Touhy is T-O-U-H-Y.

10              Go ahead.

11              MS. HANDMAN:  Sorry.

12               -- our subpoena to the CIA.  There, the CIA responded

13   in two ways.  As to documents other than the software, they

14   said, We're not going to search.  It is too time-consuming and

15   it'll distract us from our mission.  We're not a party to this

16   litigation.  Some of what we would find would be classified.

17   We'd have to go through the segregation process.  We won't

18   confirm if we have it or not because it's classified.

19              But as to the software, they did search for that.  And

20   they concluded they did not have it.

21              And that is what they said as recently as a few months

22   ago.

23              THE COURT:  Right.  I know.  I read that.

24              MR. KLAYMAN:  Your Honor, may I just respond quickly?

25   I think it's important here for the record, is I'm trying --
```

```
 1   which I'm answering your question in the best of my knowledge.

 2   And I've said to you that I've never seen any of this stuff.

 3   Okay?

 4            With all due respect to Ms. Handman, she wants to be a

 5   medical expert and she testifies unequivocally as to what other

 6   judges have done and everything else.  And that's entitled to

 7   no weight.

 8            THE COURT:  I'm not taking her comments as testimony.

 9   This is what lawyers do.  They make arguments.  They make

10   reference to other cases, other rulings, orders.  She hasn't

11   been sworn in, and I'm not construing it as testimony.  It's

12   just --

13            MR. KLAYMAN:  I just wanted to make that clear on the

14   record.

15            THE COURT:  -- it's a lawyer presentation.

16            MR. KLAYMAN:  Right.  There was no -- there was no

17   determination by any judge in Nevada based on my reading the

18   pleadings of whether software was in the documentation or in

19   the materials that were seized or not.  Okay?  The judge made a

20   blanket ruling that there was no probable cause and the FBI

21   agent had lied.  Okay?

22            THE COURT:  So in --

23            MS. HANDMAN:  If I might --

24            THE COURT:  No.  Not yet.  Please.

25            In the Las Vegas case, which I read about and I know
```

```
 1    there was a per-day sanction imposed, I do recall that it was

 2    $2500 per day; and I know that instead of paying that penalty,

 3    there was a different resolution reached.

 4            My question to you, Mr. Klayman, is that when

 5    Mr. Montgomery was ordered by the judge in Nevada to turn over

 6    the software, did he say to the judge at the time, "Judge, I

 7    don't have the software"?  "Judge, the FBI took the software

 8    when I was handcuffed outside my house and never returned it"?

 9    Or "Judge, I'm not even sure that I have the software.  Maybe I

10    do or maybe I don't"?

11            Did Mr. Montgomery in any way advise the Court in

12    Nevada that he did not have the software?  Yes or no.

13            MR. KLAYMAN:  I don't know.  And this is why --

14            THE COURT:  You don't know?

15            MR. KLAYMAN:  I don't -- it's my understanding that

16    Mr. Flynn handled the argumentation.  That's why we'd like to

17    depose him.  Instead, Mr. Flynn is all of a sudden on vacation

18    when we serve him and can't be found.  Okay?

19            THE COURT:  But --

20            MR. KLAYMAN:  He can never be found.  All right?

21            THE COURT:  -- in getting ready for this case, you need

22    to prepare.  And part of the preparation is, you review

23    transcripts from other hearings.  You review depositions from

24    other cases.  You review court orders that are relevant.

25            The issue of the software is a very hotly contested,
```

1    relevant issue in this case.  And it was also the subject of an

2    order entered by a Nevada federal district court judge.

3              I would think, even though you say you personally never

4    saw the software, I would think you would be sufficiently

5    familiar --

6              MR. KLAYMAN:  I wasn't --

7              THE COURT:  -- familiar with that case to be able to

8    say to me, Yes, that representation, that explanation or that

9    possible explanation was made to the Court by Mr. Montgomery or

10   not.  But instead, you're telling me, Gee, I just don't know.

11             MR. KLAYMAN:  From what I read, I didn't see anything

12   that he made any representation to that effect to the Court.

13   This was argued by lawyers, from what I read.

14             THE COURT:  Right.

15             MR. KLAYMAN:  Right.  And I didn't see that.

16             THE COURT:  All right.

17             MR. KLAYMAN:  So I'm trying to be honest with the

18   Court.  I don't make stuff up.  Okay?  I don't testify like I'm

19   a witness here.  You know?  Excuse me if I get a little bit

20   heated here, but I sit here and I listen to stuff that is fed

21   to you, your Honor, as if it's fact.  And it's not.  And if I

22   don't know, I'm going to tell you that.  I'm not going to sit

23   here and play that game.

24             THE COURT:  I wish you'd had that philosophy back when

25   we had the hearing a few months ago and you unequivocally told

```
 1    me, unless your homework assignment on Friday proves to the

 2    contrary -- I wish you had that philosophy when you said to me

 3    that the software had in fact been turned over.

 4         MR. KLAYMAN:  Well, in fact, it was not to my advantage

 5    to say that.  That's what I believed at the time, your Honor.

 6    So I had no motivation to say anything that was untrue to you.

 7    What would -- I could have lied to you.  I didn't.  I didn't

 8    make anything up.  I believed that.  And so did Mr. Montgomery.

 9    And people can reevaluate things over time.

10         And if I may add here, you know, I understand why we're

11    going through this process, and I respect you and I know your

12    reputation.  And, you know, deeply, I respect you.  But the

13    fact here is I think we should be starting whether this

14    software can ever be produced even if it existed, because this

15    is a nonstarter.  This is classified material.

16         THE COURT:  Has any judge declared this particular

17    software, the one being discussed in Mr. Risen's book, to be

18    classified?

19         MR. KLAYMAN:  Well, we're probably going to get a jury

20    to do that if we get to go to the jury.  We have the CIA coming

21    in.

22         The answer is, no, that I know of.  No one's ever ruled

23    on that.  But it will be in front of this jury if you allow

24    it -- if this Court allows it to go to the jury.

25         And the CIA -- they wanted to bring the CIA in as
```

1    witnesses here.  Now, where were they?  It's total hypocrisy,

2    total hypocrisy.  They could have come in front of you and

3    said, Order the CIA to testify.  Instead, they'd rather play

4    this game and they'd rather say, I don't want any extensions.

5    You can't find it because we're going to shut the door on you

6    because we think Magistrate Goodman might give us an order that

7    we like.

8              THE COURT:  So, Ms. Handman, what about that point?

9    Mr. Klayman says that, You know what?  The Defendants really

10   don't want this software, as evidenced by the fact that you

11   objected to a mere one-month extension of time and that one

12   month could have been used by the FBI to track down the

13   software if it existed on the files that Mr. Montgomery turned

14   over, and therefore I should ignore your rhetoric.  Instead, I

15   should focus on your conduct.

16             And according to Mr. Klayman, your conduct demonstrates

17   that you really don't want the software.  Instead, you want a

18   sanction for not -- for the Plaintiff not turning over the

19   software.

20             What do you say to that?

21             MS. HANDMAN:  I am glad you asked, your Honor.

22             First of all, I want to be clear on one point.  Not

23   only has no court ever said the software was classified, but

24   the government was a party in the Nevada proceedings we've been

25   discussing.  They did assert the state secrets privilege as to

1    everything but the software.  They specifically excluded the

2    software from the protective order.  And it was on that basis

3    that Judge Pro ordered that it be produced.

4         So all these claims by Mr. Klayman, "Oh, I can't look

5    at the software," "I can't do my due diligence that I'm

6    required to do as a lawyer because it's classified," there is

7    no basis for that.

8         When Mr. Klayman, who has been pressing for the

9    expedited schedule that we have been living under in this case,

10   asked for an additional month to complete discovery, by that

11   time Mr. Schwartz had already written on October 23rd that the

12   FBI was not looking for the software.

13        So there was -- on that ground, there was no basis for

14   saying that the -- that the deadline should be extended.

15        In addition, Mr. Klayman refused to agree to any

16   postponement of the trial deadline so that we would be forced

17   to make our summary judgment motion later because the discovery

18   would be still open and yet the trial date would be nigh upon

19   us, as it is already with the current schedule that we have,

20   while motions to dismiss and transfer are still pending.

21        And so we said, No, we won't agree to extend the

22   discovery deadline.  We did say, You can complete your Southern

23   District subpoenas that were already served by the prior

24   deadline, just as our subpoena on the son-in-law was also

25   served by the prior deadline.  But we said there's no reason to

```
 1   extend the discovery for another month to allow the FBI to

 2   conduct a search that they're not conducting.

 3            MR. KLAYMAN:  Your Honor, the litmus test here, the

 4   litmus test and the bottom line is this:  The CIA objected to

 5   producing the software.  They said it was classified and in

 6   their view not relevant.  Not just the CIA, but the Justice

 7   Department.  Two letters.

 8            THE COURT:  You know what, Mr. Klayman?  Let's pick up

 9   on that point, because I've read the letter from the CIA

10   counsel.  I've read your memorandum about that letter.

11            I agree with Ms. Handman's description of the letter,

12   which says, number one, We did look for the software.  That

13   they did do.  And according to the letter, the CIA said, We

14   didn't find the software.  That's point one.

15            Now, point two was, the CIA said, And by the way, we're

16   not going to search for anything else because we are a

17   clandestine agency, and most of the things that we have would

18   be classified anyway.

19            So concerning the software at issue here, the one being

20   discussed in Mr. Risen's book, the one that you and

21   Mr. Montgomery previously represented, I believe unequivocally,

22   had been turned over to the FBI, they said they searched for it

23   and it didn't exist.  And my reading of that letter is not that

24   the CIA said the software is classified.  To the contrary, they

25   said, We haven't found the software.
```

1          Can you point to me any place either in that CIA letter

2   or any other location where the CIA has said, in fact, this

3   software, the one we're talking about in this case, is, in

4   fact, classified?

5          MR. KLAYMAN:  I read that letter to say, your Honor,

6   that if it does exist, if it does exist, we would not produce

7   it in any event because it would be classified.  That's how I

8   read it.

9          But here's the litmus test.  I want to get to this

10  point.  Why are we here today trying to paint Mr. Montgomery

11  into a corner and, you know, dealing with these points when in

12  fact they didn't ever file a motion to compel the CIA to

13  produce the information?  They laid back.  They didn't want it

14  from the CIA.

15         THE COURT:  Well, if --

16         MR. KLAYMAN:  Like if I enforce a subpoena with Simon &

17  Schuster, they should have gone in and done that.

18         THE COURT:  Except, Mr. Klayman, if the CIA says, We

19  don't have the software, what's the purpose of filing a motion

20  to compel?

21         MR. KLAYMAN:  They didn't --

22         THE COURT:  (Inaudible) we don't have it.

23         MR. KLAYMAN:  They didn't say they didn't have it.  The

24  letter says clearly that we cannot confirm or deny whether we

25  have it.  But if we did have it, you're not getting it anyway.

1    It's classified.

2          THE COURT:  You know, I don't want to give you another

3    homework assignment, Mr. Klayman.  But I'm very certain that

4    the letter from the CIA lawyer did not say, We cannot confirm

5    or deny that the software does not exist.

6          In fact, Ms. Handman, do you have that letter handy or

7    the quote from the letter?

8          MS. HANDMAN:  I have the quote.

9          THE COURT:  What does it say?

10         MS. HANDMAN:  It said, "The CIA conducted a search of

11   its records and did not locate," quote, "'a copy of

12   Montgomery's software,' including but not limited to

13   video-compression software or noise-filtering software

14   Montgomery allegedly used to detect hidden Al-Qaeda messages in

15   Al Jazeera broadcasts."

16         MR. KLAYMAN:  You only read a section.

17         She conveniently leaves out a section, your Honor.  And

18   this is what I take issue with.

19         THE COURT:  Well, just --

20         MR. KLAYMAN:  Sorry if I get a little bit heated.

21         THE COURT:  Just read the section under what we call

22   the rule --

23         MR. KLAYMAN:  This is the technique.

24         THE COURT:  Just read under what I call the rule of

25   completeness, what else did she leave out?

1              MR. KLAYMAN:  "Second" -- Page 2.

2              THE COURT:  Yes.

3              MR. KLAYMAN:  "Second, the CIA is a clandestine

4   intelligence service, and most of our information is

5   classified.  Even if the CIA were to devote agency resources to

6   searching for records that might pertain to your private

7   lawsuit, responsive records, if there are any, would almost

8   certainly be classified or otherwise privileged from disclosure

9   and hence unavailable to you."

10             So that's what the CIA said.

11             Now, your Honor, if we -- you know, let's do that

12  evidentiary hearing.  Why don't you order the CIA people to

13  come down here and testify on that.  That's something she

14  wouldn't do because she doesn't want to hear it.

15             MS. HANDMAN:  Good luck with that.

16             MR. KLAYMAN:  Your Honor can get them down here.  Get

17  them down here.

18             MS. HANDMAN:  Your Honor, what actually it says

19  after --

20             THE COURT:  Folks, folks, you're doing the east-west,

21  back-and-forth thing.  And let's not do that anymore.

22             Now, let's have you under the cross-hairs a little bit,

23  Ms. Handman, here.

24             So where in the amended complaint do you contend that

25  the Plaintiff alleges that the software exists?  Mr. Klayman in

```
 1    his memorandum says, Wait a minute.  My amended complaint never

 2    says that.

 3              And you take the contrary position.

 4              So show me where in the amended complaint

 5    Mr. Montgomery alleges that the software in fact existed and

 6    that he had access to it, other than -- other than a

 7    declaration attached to the amended complaint.  But in the

 8    amended complaint itself, are there any allegations to that

 9    effect?

10              MS. HANDMAN:  Yes, your Honor.

11              I will start -- there's about ten.  The first one is

12    Paragraph 23:  "Plaintiff Montgomery sues for harm to his

13    financial interests as an individual in the intellectual

14    property of computer software, computer software techniques and

15    encoding and decryption technologies which he developed and

16    which have been harmed by Defendants' defamation and other

17    tortious conduct as well as other harm, and thus damages to be

18    covered during discovery."

19              Then Paragraph 48:  "Defendants' defamation of

20    Plaintiff Montgomery, publishing that he defrauded the

21    government, is false and misleading, including but not limited

22    to the fact that the government conducted its own independent

23    test of Montgomery's software and confirmed its effectiveness

24    and reliability."

25              Paragraph 49:  "Defendants' publications that Plaintiff
```

1    Montgomery defrauded the government are false and misleading,

2    including but not limited to the fact that the government has

3    continued to use Plaintiff Montgomery's software and

4    technology."

5             THE COURT:  What was that paragraph number?

6             MS. HANDMAN:  That was Paragraph 49.

7             Paragraph 65:  "Plaintiff Montgomery developed various

8    software, including software that successfully decoded hidden

9    messages from broadcast video."

10            THE COURT:  That was 45?

11            MS. HANDMAN:  65.

12            THE COURT:  65.  Sorry.

13            Go ahead.

14            MS. HANDMAN:  Then Paragraph 206, starting at 206:  "As

15   defamation by implication, Defendants published that Plaintiff

16   Montgomery conned the government with a hoax; that is, it would

17   be clear, quote, 'how Montgomery was able to convince all of

18   them,' closed quote, if Montgomery's -- Mr. Montgomery's work

19   and technology are legitimate."

20            It then quotes a passage from the book in Paragraph

21   207, talking about the French taking issue with the Al Jazeera

22   technology.

23            And then 208:  "As defamation by implication, if not

24   explicit, the passage published that Plaintiff Montgomery is a

25   fraud and that his work is a scam and a hoax."

1          He then quotes another portion of the book talking

2     about the Somali -- alleged Somali terrorist attack on

3     President Obama, where the threat later proved to be a hoax.

4          And he says in Paragraph 2010 [sic]:  "As defamation by

5     implication, Defendants published that Plaintiff Montgomery's

6     ability to continue to receive contracts is due to Plaintiff

7     Montgomery's ability to defraud the government and stupidity of

8     government officials rather than the endorsement of the

9     legitimacy of Plaintiff's work."

10          It then quotes another passage of the book.

11          And in 212 he says, "As defamation by implication,

12     Defendants published that the Plaintiff engaged in fraud to

13     convince a few government bureaucrats that he had a magic

14     formula as an easy path to riches."

15          And another passage is quoted in 214:  "As defamation

16     by implication, Defendants published that the money provided to

17     Plaintiff Montgomery, among others went to, quote, 'waste.'"

18          Then 216:  "As defamation by implication, Defendants

19     published that Plaintiff Montgomery's work was fraudulent."

20          218:  "As defamation by implication, Defendants

21     published that Plaintiff Montgomery committed fraud."

22          220:  "As defamation by implication, Defendants

23     published that Plaintiff Montgomery, quote, 'beguiled,' closed

24     quote, Warren Trepp by committing fraud."

25          Then Paragraph 230:  "As defamation by implication,

1    Defendants published that Plaintiff continued to defraud, con

2    and scam the government rather than concluding that the

3    government recognized the legitimacy of Plaintiff Montgomery's

4    work."

5         232:  "As defamation by implication, Defendants

6    published that the Plaintiff engaged in fraud and a hoax by

7    keeping details mysterious, including the mystery was caused by

8    Plaintiff Montgomery rather than by Warren Trepp or the

9    government."

10        And -- well, I can keep going.  But I'll just give

11   you -- do you want me to keep going, your Honor?  I'll just

12   give you some other paragraphs.  You can go 234 to 236; 240 --

13   here's a helpful one in 245.  This is in the tortious

14   interference with prospective advantage cause of action:

15   "Defendants understood that Plaintiff was pursuing the future

16   full value of his software, intellectual property and software

17   technology and techniques and was over time negotiating to make

18   further licenses and sales of the intellectual property."

19        246:  "Defendants were aware that their publication of

20   false and misleading statements about Montgomery harmed

21   Plaintiff Montgomery 's career and livelihood and his ability

22   to earn a living, including the opportunity to sell his

23   professional services and software."

24        247:  "Defendants' defamation disparaged Plaintiff's

25   intellectual property and software so as to render it

1    commercially worthless by claiming that it did not work."

2         248:  "Defendants acted knowingly, willfully and with

3    reckless and negligent disregard to harm -- to the harm that

4    their publication of their false statements would cause to

5    Plaintiff Montgomery's livelihood, career and ability to earn a

6    living, including his opportunity to enter into contracts for

7    the sale of his services and/or intellectual property."

8         Then 259.  This is in the damages generally.  As just

9    one example:  "Plaintiff Montgomery negotiated for the sale of

10   his technology to the government for the price of $100

11   million."

12        262:  "Plaintiff Montgomery has been harmed by the loss

13   of the economic value of his intellectual property and the

14   value of licensing the intellectual property and/or providing

15   services based upon or incorporating his intellectual

16   property."

17        THE COURT:  Mr. Klayman, does Mr. Montgomery take the

18   position that part of the defamation is the false statement

19   that the software did not work?

20        MR. KLAYMAN:  Part of it.  But that's a small part of

21   it.

22        THE COURT:  A part of it?

23        MR. KLAYMAN:  A part of it.  Yeah.

24        THE COURT:  Right.

25        MR. KLAYMAN:  And I could go through this for a couple

```
 1   hours, too, and point out all the statements that have nothing
 2   to do with the software; in fact, many --
 3           THE COURT:  I've read the amended complaint and I --
 4           MR. KLAYMAN:  -- that deal with that.
 5           THE COURT:  -- I'm well aware that it is not limited to
 6   simply the software.  I know that it concerns Mr. Risen's
 7   comments on various news shows, interview shows, his efforts to
 8   market the book, et cetera.  I'm aware of all of those
 9   allegations in the complaint that are above and beyond just the
10   software.
11           But my question is:  You'd agree -- I think you'd have
12   to agree -- that at least in part the defamation claim is that
13   Mr. Risen falsely stated in the book that the software did not
14   work.  Correct?
15           MR. KLAYMAN:  That's a very, very small part, because
16   what he stated in the book was this was the biggest hoax in
17   American history.
18           Now, the software -- let's just take a hypothetical.
19   It may work in large part, but maybe there are portions of it
20   that don't do what, you know, was represented.  And that's
21   through no fault of anybody.  When you buy a car, sometimes you
22   take it off the lot and not everything works and it can be
23   corrected.
24           So the fact that you say this was the biggest hoax in
25   American history that almost resulted in the death of people
```

1    flying over the Atlantic, that doesn't mean the software

2    doesn't work.  That means that you're going far beyond that

3    which you have to go to sensationalize this book.  That's why

4    these documents are important, because Simon & Schuster said, I

5    don't think you're going to sell this book.  This is

6    republished pablum.

7              THE COURT:  So is the --

8              MR. KLAYMAN:  (Inaudible) is Montgomery.

9              THE COURT:  Let me rephrase my question to address

10   those stated concerns of yours.

11             Would you agree that in part your lawsuit claims that

12   Mr. Risen defamed Mr. Montgomery by falsely claiming that the

13   software didn't work in the complete way that it was supposed

14   to work?  Would you at least agree with that?

15             MR. KLAYMAN:  I wish that -- I'm not trying to avoid

16   your question.  But Risen never wrote that.  He said this was

17   the biggest fraud in American history.

18             So there may be parts of that software that work or

19   don't work.

20             THE COURT:  But when he said this was the biggest

21   fraud, this refers to at least in part the software.  Correct?

22             MR. KLAYMAN:  No.  I think he was talking about

23   everything that was represented by Warren Trepp and

24   Mr. Montgomery and others who were doing business with the

25   government.

```
 1              And there's an important paragraph that Ms. Handman

 2    glosses over, okay, which, your Honor, I want you to -- I want

 3    to pinpoint that for you.   Paragraph 49.

 4              THE COURT:  Of the amended complaint?

 5              MR. KLAYMAN:  Yeah.

 6              THE COURT:  Yes.

 7              MR. KLAYMAN:  "Defendants' publications that Plaintiff

 8    Montgomery defrauded the government are false and misleading,

 9    including but not limited to the fact that the government has

10    continued to use Plaintiff's software and technology."

11              Mr. Montgomery maintains that the Government's

12    continuing to use his technology.  And so consequently, she's

13    pointing to that.  She's making our point, is that you just

14    can't say the guy committed the biggest fraud in American

15    history without any facts to back it up.  And he had no facts

16    to back it up.  He made this up.

17              And this gets to your first question.  He made it up

18    because the first publisher said, You can't sell this book.

19    You need something sensational.

20              THE COURT:  Mr. Klayman --

21              MR. KLAYMAN:  So let's beat up on Montgomery.

22              THE COURT:  -- would you agree with me, sir, that part

23    of your lawsuit -- part of this defamation lawsuit concerns the

24    issue, the factual issue, of whether or not the software works

25    the way it was supposed to work?
```

1              MR. KLAYMAN:  A small part of it, yes.

2              THE COURT:  All right.

3              MR. KLAYMAN:  Okay.  But the large part does not.

4              THE COURT:  So --

5              MR. KLAYMAN:  It goes way beyond that.

6              THE COURT:  So for that part of the lawsuit, are the

7    Defendants required to accept at face value Mr. Montgomery's

8    position that the software worked and is still being used or do

9    Defendants have the right to factually probe that position?

10             MR. KLAYMAN:  That's a great question, your Honor.  Let

11   me answer it as best I can in all good faith, which we've been

12   throughout.

13             It's heads I win, tails you lose, for Defendants,

14   Ms. Handman, is that at trial, we'll get to present our

15   testimony that it did work with our witnesses.  They can

16   present theirs that it won't.

17             But it's interesting here.  Go through the deposition

18   of Mr. Risen.  You won't identify any confidential sources.  In

19   fact, you come to the conclusion there are none.

20             But even if he had any, he wouldn't identify them

21   because of reporter's privilege.  They claim this privilege.

22   And consequently, they're barred from presenting any evidence

23   with regard to whether software works or not because they

24   wouldn't provide the names of their sources.

25             Now, they painted themselves into a royal corner here.

```
 1    And they can't paint theirselves by playing a tactical game

 2    with you and with me to get you to dismiss this case with heads

 3    I tail -- tails you lose --

 4            THE COURT:  Heads I win.

 5            MR. KLAYMAN:  -- philosophy of litigation.  I hope I

 6    was clear on that.

 7            THE COURT:  Regarding --

 8            MR. KLAYMAN:  It's clever.

 9            THE COURT:  Let's --

10            MR. KLAYMAN:  I'll give her credit for one thing:  This

11    is her -- you know, she represents these very big interests all

12    the time.

13            THE COURT:  By "her," you mean Ms. Handman,

14    Mr. Klayman?

15            MR. KLAYMAN:  Yes.  Ms. Handman.

16            And this is a tactic which is used by defense counsel

17    in every case.  Okay?  Heads I win, tails you lose.  We're not

18    telling who you our sources are.  So you're going to have to

19    prove it in a vacuum.

20            And they're barred under the reporter's privilege if

21    they want to claim it from ever coming up with any testimony to

22    the contrary what Mr. Montgomery's going to testify to and

23    others are going to testify to.

24            They put themselves in a box.  And they're hoping that

25    you'll buy it.
```

```
 1          THE COURT:  Do you recall the specific question that
 2   triggered all those comments?
 3          MR. KLAYMAN:  Yeah.  Whether in part we were relying on
 4   that.
 5          And what I'm saying is, we're entitled to put our
 6   testimony on and they can put their testimony on.
 7          THE COURT:  Not exactly.  Not exactly, sir.
 8          The question is -- try to focus on the question:  Would
 9   you agree that part of this lawsuit involves the issue of
10   whether or not the software works the way it was supposed to
11   work?  You already told me the answer to that is yes in part.
12   Correct?
13          MR. KLAYMAN:  Small part.
14          THE COURT:  And then the followup question is:  Do the
15   Defendants have to accept at face value Mr. Montgomery's
16   position that there was not a hoax and that the government is
17   still using the software today because the software works?  Do
18   Defendants just simply have to live with that?  Or do they have
19   the ability to probe that position factually during discovery?
20          MR. KLAYMAN:  Probe that position both during discovery
21   and in a trial by bringing forward their so-called sources,
22   which they refuse to identify.
23          THE COURT:  But isn't part of the ability of the
24   Defendants to factually evaluate your client's position the
25   ability to inspect and test the software?  Isn't that something
```

1    that Defendants have the right to do in a case like this?

2           MR. KLAYMAN:  I wouldn't -- under the circumstances of

3    this case, no, because it's classified material.

4           Let me tell you something.  If Risen --

5           THE COURT:  Says you.

6           MR. KLAYMAN:  If Risen --

7           THE COURT:  Says you.

8           MR. KLAYMAN:  Let's bring the CIA down here, your

9    Honor.  Order them down here.

10          I was in front of Magistrate Turnoff years ago.  He

11   brought the Attorney General down here to testify.  Issue an

12   order to have the CIA come down here.

13          THE COURT:  Mr. Klayman, as we sit here today this

14   afternoon, do you have any authority, an appellate court, a

15   district judge, a magistrate judge, a state judge, who has

16   reviewed the software at issue or submissions about the

17   software and concluded this software, the software at issue in

18   this case, the software that was sold by Mr. Montgomery's

19   company to the government, is, in fact, classified?  Do you

20   have anybody saying that?

21          MR. KLAYMAN:  No judge can ever reach the issue.  A

22   jury's going to have to make that determination on the basis of

23   the FBI's -- excuse me -- FBI and CIA's -- excuse me -- Justice

24   Department and CIA's representations.  You're going to have to

25   accept that, your Honor.  You'll have no choice.  Otherwise,

1    call them down here and put them on the stand.

2         THE COURT:  So as we sit here today, nobody has -- no

3    judge or official has declared the software to in fact be

4    classified --

5         MR. KLAYMAN:  The --

6         THE COURT:  Let me just finish.

7         The only judge that I know of who has issued a ruling

8    on the software in Nevada has declared to the contrary.  So

9    therefore, as of now, the software has not in fact been deemed

10   classified.  Therefore, don't the Defendants have the right to

11   test and evaluate the efficacy of the software?

12        MR. KLAYMAN:  Your Honor, accepting the representations

13   in all due respect to you -- and I respect you, as I said -- of

14   what Ms. Handman told you, that's not what the judge in Nevada

15   ruled.  I'm sorry.  That's not what he ruled.

16        THE COURT:  Did the --

17        MR. KLAYMAN:  He turned -- he turned the stuff back on

18   the basis --

19        THE COURT:  Did the judge in Nevada say that the

20   software was classified?

21        MR. KLAYMAN:  I don't think he made a ruling either

22   way.  He told them to turn documents back because they had

23   violated the Fourth Amendment.

24        THE COURT:  So for purposes of moving this part of the

25   colloquy conversation this afternoon forward, assume I'm going

1    to just ignore what Ms. Handman said, because after all she's a

2    defense lawyer and you've already made your views known about

3    all defense lawyers in general.  So I'm not going to pay

4    attention at all to Ms. Handman's re-creation and summary of

5    what the judge said.

6        MR. KLAYMAN:  I was a defense lawyer, your Honor, at

7    Blackwell Walker.

8        THE COURT:  I'm well aware of that.  I understand.

9        MR. KLAYMAN:  So I respect defense lawyers.  But I

10   don't -- I don't take their arguments at face value.

11       THE COURT:  Nor would you take every plaintiff's

12   lawyer's representations at face value.  Lawyers don't take the

13   opposing side's representations at face value.  When you're the

14   plaintiff, you probe the defense's positions.  When you're the

15   defense, you probe the plaintiff's positions.  That's what the

16   adversary system is all about.

17       So I'm going to ignore Ms. Handman's description.

18   Nevertheless, as of today, no judge, no government official,

19   has said the software at issue is, in fact, classified.  I know

20   you say, Well, gee, Judge, you can summon the CIA here to your

21   courtroom and get them to say it.  But that hasn't happened yet

22   and I'm not inclined to do that.

23       So would you agree that as of 4:07 p.m. this afternoon,

24   no judge, no government official, has branded this software as

25   classified?  Do you agree with that?

1          MR. KLAYMAN:  No.

2          THE COURT:  Why not?

3          MR. KLAYMAN:  Because the CIA letters are written in an

4   official capacity.  They're official -- they're official

5   letters.  They're official documents of the CIA.

6          THE COURT:  Yes.  I know.  But --

7          MR. KLAYMAN:  They are written only after consultation.

8          THE COURT:  But I've rejected that argument,

9   Mr. Klayman, because I've read that CIA letter --

10         MR. KLAYMAN:  Yes.  I agree with you on the judge, but

11  not on the CIA.  They are government officials.

12         THE COURT:  I've rejected your argument that the CIA

13  letter says that this software is classified.  It does not say

14  that, Mr. Klayman.  And you haven't pointed to me persuasively

15  that it does.

16         What it says is, We've looked for the software and we

17  can't find it.  And we're not going to look for other materials

18  because we're a clandestine agency and most of our materials

19  are, in fact, classified.  That's what it says.

20         There's no definitive description of this specific

21  software.

22         But let's move on, because we're going around in --

23         MR. KLAYMAN:  May I have one more point, your Honor?

24         THE COURT:  -- circles.

25         MR. KLAYMAN:  One point.

```
1              THE COURT:  Only if it's a new point.

2              MR. KLAYMAN:  It's a new point.

3              THE COURT:  What's the new point?

4              MR. KLAYMAN:  Okay.  To show you the bad faith, if you

5    want to use that term -- I'm not using that term -- of the

6    Defendants in this whole exercise is that they went down to the

7    very last day to designate an expert.  They could have

8    designated an expert on software much sooner.  They know what

9    we're dealing with.

10             Risen is allegedly the premier national security

11   reporter in the United States, albeit however dishonest he may

12   be.  But he's considered that by certain elements of our media.

13             THE COURT:  I guess it's a good thing that statements

14   lawyers make in legal proceedings are protected by the

15   litigation privilege, because it sounds like you just made some

16   pretty nasty comments --

17             MR. KLAYMAN:  Well, I've got --

18             THE COURT:  -- about --

19             MR. KLAYMAN:  Well, I've got a long complaint here that

20   says that he falsified information.  That's what I'm basing it

21   on.

22             THE COURT:  Right.  So it's protected under the

23   litigation --

24             MR. KLAYMAN:  And I'm an advocate.

25             THE COURT:  -- privilege.
```

1          MR. KLAYMAN:  And I'm an advocate.

2          THE COURT:  You are.  You certainly are.

3          MR. KLAYMAN:  They just happen to be missing a hard

4     drive with 20,000 documents in the context of this case, your

5     Honor.  We could get into that.

6          But let me get into the issue here.  The expert was not

7     designated till the last time.  We never even got his résumé.

8     We never got anything else that was required under the federal

9     rules and the local rules.  And it was clear that they were

10    just trying to set us up for this kind of a hearing.  And that

11    shows a lack of -- it shows the tactical nature of this whole

12    thing, which is what I've been saying.  And, you know, that

13    needs to be taken into consideration.

14         And I understand why your Honor asked all these

15    questions.  If I was sitting there, I would ask them, too.

16    Okay?  I'd be a pretty tough judge like you.

17         But we've been honest with you.  And the reality here

18    is you have to look at this from a result-oriented position, is

19    that they're not going to get the software.  And most of the

20    case is not based on that.  They don't come forward with their

21    sources.  And they're barred from presenting those sources at

22    trial or at summary judgment.  And it is heads I win, tails you

23    lose.

24         And they're trying to work you in a position, your

25    Honor, to do their bidding.  And as you've pointed out in your

```
 1    order, very well-written order on that other case, where you

 2    did have an evidentiary hearing, Wandner versus American

 3    Airlines, in a case-dispositive sanction, as you pointed out,

 4    that's not in front of this Court right now, a case-dispositive

 5    sanction, in front of you as the magistrate judge.

 6          THE COURT:  Yes, it is.  They've asked me to issue a

 7    report and recommendation --

 8          MR. KLAYMAN:  Right.  It's --

 9          THE COURT:  -- recommending to Judge Martinez that he

10    dismiss the case under the spoliation doctrine.

11          MR. KLAYMAN:  Right.  Right.

12          What I'm saying is the ultimate.  And it shows no lack

13    of respect to you, because I -- as I said, you know, we're here

14    because --

15          THE COURT:  Because I've asked you to be here.

16          MR. KLAYMAN:  -- (inaudible) our argument.

17          But what I'm saying is that this thing needs to be

18    considered in context, okay?  And the extreme Draconian

19    sanctions is what they've always wanted in this case.  Always.

20          THE COURT:  So let's assume for the sake of discussion

21    that the FBI -- the civil side of the FBI finds the software.

22    Maybe you send them a supplemental set of instructions or

23    guidelines or maybe they just luck upon it.  It doesn't matter.

24    They find the software at issue in this case.

25          Would Defendants have the right to inspect and test the
```

```
 1   hardware, assuming that the trial was continued and the

 2   discovery deadline was continued?  Would they have the right to

 3   examine the hardware and test it -- I mean, the software and

 4   test it?

 5         MR. KLAYMAN:  Not under these circumstances.

 6         THE COURT:  Because...?

 7         MR. KLAYMAN:  Because it's classified.

 8         THE COURT:  And then we go around in a circle again.

 9   I'm going to say:  Says who?  And you're going to say:  Says

10   me.

11         MR. KLAYMAN:  Let's get to the heart of the issue, your

12   Honor.

13         THE COURT:  What's that?

14         MR. KLAYMAN:  You can issue an order right now to have

15   the persons who signed that letter down here in front of you.

16   And they should have to testify in front of you and you can ask

17   them these questions, rather than to hypothesize or to divine

18   what they might have meant in the letters.

19         I read it a different way than you.  There's a dispute

20   of fact here.  Let's get them down here.

21         MS. HANDMAN:  Your Honor, if I could add one more

22   point, that if indeed it were classified -- and I agree 100

23   percent with all that you have said -- that would be another

24   grounds for dismissal, because Mr. Klayman says we're not going

25   to get it either way.  And that can be a ground for dismissal
```

1    as well, if indeed what your Honor has called critical evidence

2    is not available to the defense in order to defend the claim.

3            And one final --

4            MR. KLAYMAN:  It's not --

5            THE COURT:  Mr. Klayman.

6            MR. KLAYMAN:  Okay.  I'm sorry.  I thought she was

7    done.

8            MS. HANDMAN:  One final point on the so-called bad

9    faith:  I don't know if he's read Mr. Risen's declaration that

10   was submitted in support of the summary judgment motion.  But

11   there is lengthy discussion about sources there.  We have not

12   asserted any confidential sources in this case.

13           THE COURT:  So, Mr. Klayman, let's assume --

14           MR. KLAYMAN:  That's not true, by the way.  That's

15   false.

16           THE COURT:  Let's assume that the software is found.

17   Let's assume that either the CIA or the FBI or Judge Martinez

18   or another federal judge declares the software to be classified

19   and says, None of you Defendants have a right to inspect or

20   test the software.  None of your experts can test or examine

21   the software because it is classified.

22           So under those circumstances, the Defendants say, We

23   win anyway.  I guess it's your argument:  Heads we win, tails

24   you lose.

25           The defense would say, We win anyway, because we are

```
 1    prevented from adequately defending the case because we're

 2    dealing with state secrets and classified information.  Even if

 3    it's not the Plaintiff's fault, if a critical piece of

 4    information is not available to us because it's classified or a

 5    state secret, then our hands are tied behind our backs.  We

 6    can't adequately defend the case.

 7          And the Defendants have cited case law where the result

 8    was to rule for the Defendants because they were unable to

 9    defend the case under the state secrets or classified

10    information doctrine.

11          What are your views on that possible scenario?

12          MR. KLAYMAN:  We've gone through this before, your

13    Honor.

14          Number one, the CIA made this clear and the Justice

15    Department, because they understood that question.  And they

16    said it's not relevant to your proving your case.

17          They can bring in front of this Court their sources, if

18    they have any.  And they can waive the privilege, which

19    Ms. Handman just falsely stated they hadn't taken.  And I'll

20    show you where she's taken it, on the transcript.  Go read the

21    Risen transcript.  That's a false statement, just like the

22    statement about motor registration.

23          This issue here can be resolved.  Bring the sources in

24    front of the jury and let them determine whether or not

25    Risen -- to refute Mr. Montgomery's testimony in the small part
```

1    of the case --

2         THE COURT:  I'm asking you about apples and you're

3    talking about oranges.

4         MR. KLAYMAN:  I'm getting to it.  But I --

5         THE COURT:  The question --

6         MR. KLAYMAN:  The whole picture here --

7         THE COURT:  Mr. Klayman --

8         MR. KLAYMAN:  The CIA is not --

9         THE COURT:  Mr. Klayman, my question was not about the

10   sources.  My question was if the software exists and it is in

11   fact described by an appropriate authority as confidential, as

12   a state secret, and the Defendants can't examine it.  We're

13   talking about the software, not the sources of Mr. Risen or his

14   lack of sources.  We're talking about the software.

15        Isn't the law, as the Defendants say it is, that

16   they're entitled to win because they're not able to adequately

17   defend the case?  What are your thoughts on that?

18        MR. KLAYMAN:  No, because they don't need the software

19   to defend their case.  They don't need it.  And that's what the

20   CIA was saying.

21        And it's important that neither the CIA, the director

22   of the CIA, have come into this court with an affidavit asking

23   you to shut this case down because it would compromise national

24   security.  They say that they can prove the case without the

25   software.  They have sources.  Come in with their sources and

1    have them testify.

2        THE COURT:  By the way, who in this case decides what

3    the Defendant needs and what the Plaintiff needs to either

4    prove the case or defend the case?  Judge Martinez or perhaps

5    me or some associate CIA attorney?  I'm not talking about

6    whether a document's classified or not.  Maybe the CIA has the

7    ability to review a document and determine whether it's a

8    classified state secret.

9        But as to what a plaintiff or a defendant in this civil

10   case needs to prove its claim or its defense, who decides that?

11   The judges in this case or some young associate CIA lawyer?

12       MR. KLAYMAN:  Well, number one, I don't -- it's not a

13   young associate CIA lawyer.  Letters like that are not written

14   by young associate CIA lawyers.

15       THE COURT:  Who is the CIA lawyer who signed that

16   letter?

17       MR. KLAYMAN:  He signed it on behalf of the officials

18   of the CIA.

19       THE COURT:  What's the person's name, sir?

20       MR. KLAYMAN:  Rafael Gomez.

21       THE COURT:  And who is Rafael Gomez?  Is he the CIA --

22       MR. KLAYMAN:  One of them was Dean Morrow, assistant

23   general counsel.  That's very high up.  Joe Dean Morrow.

24       THE COURT:  Assistant general counsel is the person who

25   signed the letter?

```
 1              MR. KLAYMAN:  Yes.  That's an official.

 2         And the other --

 3              THE COURT:  So you think that Mr. Morrow tells me what

 4    the Plaintiff needs to prove its case or what the defense needs

 5    to prove --

 6              MR. KLAYMAN:  This is what --

 7              THE COURT:  Mr. Klayman --

 8              MR. KLAYMAN:  I'm sorry, your Honor.

 9              THE COURT:  One of the general rules that I explained

10    at the beginning of the hearing, it's basically the same rule

11    you learned when you were a child:  No interrupting.

12              MR. KLAYMAN:  I agree with you.

13              THE COURT:  So please try to refrain from --

14              MR. KLAYMAN:  I'm getting emotional.  So I apologize.

15              THE COURT:  So the issue of what a party in this case

16    needs to prove for its defense or what the Plaintiff needs to

17    prove:  That's an issue for the Court, Mr. Klayman, not the

18    CIA, unless you can provide case law to me to the contrary that

19    somehow the CIA or that particular CIA counsel is an expert on

20    defamation law or defamation defenses, which I don't think they

21    are.

22         But is it up to the CIA to tell Judge Martinez or me

23    how to evaluate the burdens of proof in this case?

24              MR. KLAYMAN:  That's -- that's -- that is your province

25    after you hold an evidentiary hearing to find out what it is
```

```
 1   that letter means.  That letter, according to you, is

 2   ambiguous.  According to me, it's not.

 3            THE COURT:  I didn't say the letter was --

 4            MR. KLAYMAN:  Maybe you say it's unambiguous.  I'm

 5   sorry.

 6            THE COURT:  Rafael --

 7            MR. KLAYMAN:  But you know what?  You cannot divine, in

 8   all due respect, your Honor, what that CIA official meant based

 9   on your interpretation of that letter.

10            What is the harm of bringing the CIA down here,

11   bringing the assistant general counsel down here?  You gave an

12   evidentiary hearing in this case.  Why can't we have one if

13   you're going to make that kind of a ruling?  I don't think you

14   should make that kind of a ruling.  I think this matter should

15   be dealt with summarily and this matter should be given to the

16   jury to decide.

17            You know, that's something that you raised there.  You

18   wrote an excellent opinion.

19            THE COURT:  Have you --

20            MR. KLAYMAN:  Give it to the jury.

21            THE COURT:  Mr. Klayman, have you before this afternoon

22   requested an evidentiary hearing concerning the sanctions

23   motion?

24            MR. KLAYMAN:  It's not our motion.

25            THE COURT:  I'm going to take that as a "no."  Correct?
```

1    MR. KLAYMAN:  No.  It's not our motion.  We don't have

2    the burden here.

3    THE COURT:  So, Ms. Handman, why shouldn't I follow

4    Mr. Klayman's suggestion and unilaterally issue a subpoena and

5    require the CIA assistant counsel to come down here, come under

6    oath and answer my specific questions about, By golly, what did

7    that letter really mean?  Why shouldn't I do that?

8    MS. HANDMAN:  Because first of all, the letter on its

9    face is unambiguous as to the software, which is the only issue

10   that we are talking about today.

11   As to its relevance, I agree with your Honor, and for

12   all the reasons you've already articulated; and I believe

13   Mr. Klayman is supposed to come up with a case that says that

14   falsity is not an element of the libel claim that he has to

15   prove.  But you certainly wouldn't be looking to the CIA

16   assistant general counsel for that purpose.

17   If you were going to go into an evidentiary hearing,

18   you know, should Mr. Montgomery be present here to be quizzed

19   or not?  I mean, is that -- I don't believe it's necessary

20   based on the evidence that we have in front of you.  But if

21   your Honor had serious questions, that's the person that should

22   be here to answer questions.

23   And I don't believe there's any ambiguity in the letter

24   from the CIA.  And it's consistent with the position they took

25   when the government was a party in the Nevada proceeding and

1    said the software was not subject to the state secrets

2    privilege and was specifically excluded from the protective

3    order that the government entered into.  So it is completely

4    consistent within the position that they've taken all along

5    with regard to the software.

6            And I would say, in the Ninth Circuit just in October,

7    Mr. Klayman wrote about how Mr. Montgomery had the software and

8    he gave it to the Maricopa County Sheriff's Office.

9            And so I honestly -- you could go down so many avenues

10   in this case, and I know that no one wants to.  But there are

11   many factual areas that could be explored.  But it's not

12   necessary in this case for your Honor to decide this motion, I

13   don't believe.

14           MR. KLAYMAN:  Again, that's a mischaracterization of

15   pleadings and record here.

16           THE COURT:  How about this, Mr. Klayman?  I'll just

17   give you a standing objection that whatever Ms. Handman says

18   you're objecting to as being false, deceptive, disingenuous or

19   just factually incorrect?

20           MR. KLAYMAN:  Your Honor, I don't mean anything --

21           THE COURT:  Just a standing objection to anything and

22   everything that she says.

23           MR. KLAYMAN:  No.

24           THE COURT:  It'll be simpler that way.  That way you

25   won't have to interrupt every time she speaks with a retort.

1    I'm just accept it as a given.

2        MR. KLAYMAN:  I can't leave it out there, your Honor.

3    That's my duty as a lawyer to correct things.

4        THE COURT:  And I'm giving you a shortcut.  You're on

5    the record --

6        MR. KLAYMAN:  You're being facetious, and that's not

7    fair.

8        THE COURT:  Take a look at Page 18, sir.  Are you

9    familiar -- this is the same -- Defendants' memorandum.  Are

10   you familiar, Mr. Klayman, with the case of *Trulock versus Lee*?

11       MR. KLAYMAN:  I am.

12       THE COURT:  And based on what I read here, you're

13   familiar with it because you were the lawyer representing the

14   Plaintiffs in that lawsuit.  Correct?

15       MR. KLAYMAN:  I alluded to it earlier, that I've had

16   experience, your Honor.

17       THE COURT:  All right.  So in this footnote, Footnote

18   22, the Defendants describe that case, *Trulock versus Lee*, a

19   Fourth Circuit case, as a case involving the affirmance of a

20   dismissal of a libel action brought by a former official

21   Mr. Klayman represented because classified information subject

22   to the state secrets privilege was central to proving falsity.

23       So isn't that a case which stands for the proposition

24   that when the state secrets privilege or classified information

25   is involved in a civil case, if it is not made available to one

```
 1   side or the other, the result could be a dismissal, a default

 2   or termination of the case?  Doesn't that case stand for that

 3   proposition?

 4           MR. KLAYMAN:  Not under the facts of that case compared

 5   to this case.  And let me explain.

 6           THE COURT:  Sure.

 7           MR. KLAYMAN:  I tried to explain it.

 8           In that case, the director of the CIA, George Tenet,

 9   came in with an affidavit to the Eastern District.  Okay?  They

10   were directly in front of the Court.  And that's what I'm

11   asking your Honor to do:  Put them in front of this Court

12   before that determination is made.

13           And that was sent in ex parte.  I never got to see it.

14   I don't know what was given to the judge to this day.

15           So that's the difference in this case.  And that's why

16   you have to bring the CIA in here, if you won't accept the

17   letter that I read to mean that this is classified.

18           THE COURT:  Well, why would I go ahead and require the

19   CIA to come down here for a hearing to give me its position on

20   whether the software is a classified secret when they have

21   specifically said that they don't have the software and can't

22   locate it after a search?

23           MR. KLAYMAN:  And they also said that even if we found

24   it, we wouldn't give it to you.

25           Let's back up a little bit here, your Honor.  If
```

1    Mr. Montgomery and Mr. Trepp made hundreds of millions of

2    dollars on this software and if it was the greatest thing since

3    sliced bread in fighting terrorism and deciphering messages on

4    Al Jazeera from Osama bin Laden and others, wouldn't that

5    software by logic be classified?  Wouldn't you not want that in

6    the hands of the public?  Would you not want that in the hands

7    of a foreign entity that might be adverse to this country?

8            And our client's being accused of the biggest hoax in

9    American history.  You know, in all due respect -- and I don't

10   mean to show any lack of respect to Mr. Risen, either -- but

11   that is false.

12           THE COURT:  What is false?

13           MR. KLAYMAN:  That statement.  It's false.  This was

14   not the biggest hoax in American history.  I can cite several

15   others, including what's going on right now in Washington in a

16   number of areas.  The biggest hoax in American history.  Not

17   Mr. Montgomery.  This was all jacked up to sell books.

18           So, your Honor, I think at a minimum you've got to

19   bring the CIA in here if you're going to reach that issue.  But

20   you don't have to reach it, because this was all a tactical

21   maneuver by the Defendants to try to paint the Plaintiff into a

22   corner.

23           And they can come forward with their sources.  They can

24   withdraw their so-called reporter's privilege, which I don't

25   believe exists here anyway.  And that's going to be subject to

1    motions in limine.

2         THE COURT:  Are you talking about the neutral reporting

3    privilege?

4         MR. KLAYMAN:  Yeah.  When you're a defendant -- and

5    there are cases, and we've cited them to the Court, maybe not

6    in pleadings that we've filed with your Honor -- but when

7    you're a defendant in a defamation action, you really -- it's a

8    very low bar to get over that reporter's so-called privilege

9    because you're a litigant.  It's kind of like a lawyer has to

10   sue for his attorney's fees.  The attorney-client privilege

11   goes out the window as to what he did.

12        THE COURT:  Right.  I'm just asking if the so-called

13   fair reporting privilege, which the Defendants mentioned, is

14   sometimes also known as the neutral reporting privilege.  Is

15   that also what it's known as?

16        MS. HANDMAN:  A (inaudible) privilege, you were.

17        THE COURT:  I'm sorry?

18        MS. HANDMAN:  That's a somewhat different privilege.

19        THE COURT:  A different privilege?

20        MS. HANDMAN:  The fair report privilege is when you are

21   fairly and accurately reporting on judicial or official

22   proceedings, which is what we believe the book did.

23        THE COURT:  And what's the --

24        MS. HANDMAN:  Neutral report would be, for example, if

25   you were reporting on Donald Trump has accused so-and-so of

1  such-and-such, and so-and-so responds with such-and-such.  Then

2  you're neutrally reporting on this public controversy.  You're

3  not taking sides.  And you are protected in certain

4  jurisdictions, not every jurisdiction.

5       But it's not tied to necessarily official proceedings

6  or judicial proceedings.

7       THE COURT:  I understand.  Thank you for that.

8       MR. KLAYMAN:  It doesn't really apply, your Honor, when

9  you're a litigant, when you're a defendant.  Okay?  If you're a

10 third party -- for instance, if Mr. Risen was being required to

11 testify according to the Justice Department in this case

12 against Jeffrey Sterling or Sterling having revealed classified

13 information to Mr. Risen, and Mr. Risen refused to testify, the

14 Justice Department was about ready to -- and the Court -- to

15 throw him in jail until he testified.

16      But this is -- he's not a third party here.  He's the

17 Defendant.  And you can't claim that reporter's privilege in

18 that context.  You have to cough up who you actually talked to.

19      MS. HANDMAN:  And we have, your Honor.  In fact, the

20 only privilege that we asserted --

21      THE COURT:  Ms. Handman, what's sauce for the goose is

22 sauce for the gander.  If Mr. Klayman can't interrupt, neither

23 can you.

24      MS. HANDMAN:  Okay.

25      THE COURT:  So please.

```
 1          MR. KLAYMAN:  And that's the key, your Honor.

 2          THE COURT:  Let's take a look, Mr. Klayman, at your

 3   memorandum, Plaintiff's opposition to Defendants' memorandum of

 4   law in support of their motion for sanctions, which is

 5   euphemistically called Document 178 in my chambers.

 6          Are you there?

 7          MR. KLAYMAN:  I'm going to look for it, your Honor.

 8          THE COURT:  Okay.  It was filed on November 16th.

 9          MR. KLAYMAN:  I'll look for it again, your Honor.  We

10   may have -- we may not have it with us.  Ms. James will go look

11   for it.

12          THE COURT:  All right.  Why don't you take a minute to

13   look at it, because I'd be a little surprised if you don't have

14   it.  It's probably one of the major memoranda --

15          MS. HANDMAN:  We have an extra copy, your Honor.

16   Mr. Toth has a copy.

17          THE COURT:  All right.  Thank you.

18          MR. KLAYMAN:  We'll look for it in the meantime.

19          Thank you.

20          THE COURT:  By the way, Mr. Klayman, just as a brief

21   interlude to just sort of change the dynamic here and take a

22   brief moment, -- not quite of mindfulness, but just to change

23   the topic briefly, I have to tell you that the other day I was

24   reading -- I don't remember if it was a news story or a blog or

25   something.  But it had to do with the fact that on New Year's
```

1    Eve, here in South Florida at the stadium up in

2    Fort Lauderdale, where the Florida panthers play -- what's the

3    name of that stadium?  I always forget the name of it.  What is

4    it?  BBT?

5            THE LAW CLERK:  BB&T Bank.

6            THE COURT:  The one right across from Sawgrass Mills,

7    that stadium, where the Panthers play.

8            Anyway, New Year's Eve.  Billy Joel was playing a

9    concert there.  And the article talked about the fact that

10   Billy Joel was wonderful and he had as his guests, his surprise

11   guests, Howard Stern, the radio personality, and Jimmy Kimmel.

12   And I have to tell you, Mr. Klayman, that ever since we had

13   that hearing a few months ago, whenever I think of Jimmy

14   Kimmel, I think of you on television holding your dog.  I don't

15   know if it was on Sunset Boulevard or whatever.

16           But you have now ruined for me forever the Jimmy Kimmel

17   Show, because I'm always thinking of that mental image of you

18   holding the dog.  And I think you explained to me that they

19   filmed it and apparently held the film for weeks and weeks and

20   weeks and then they didn't even broadcast it until sometime

21   later.

22           Maybe that memory of you and Jimmy Kimmel will go away

23   after some passage of time.  But I'm confessing to you that

24   whenever I hear the name Jimmy Kimmel, the mental image of you

25   and your dog appears in the forefront of my mind.

1          MR. KLAYMAN:  Well, thank you, your Honor.  I wish I

2     could have had my dog here today, because --

3          THE COURT:  Have you been on the Jimmy Kimmel Show

4     since?

5          MR. KLAYMAN:  No, I have not.  But you'll see that

6     there was a reason why I held my dog up, because she's a lot

7     better-looking than I am.

8          THE COURT:  In any event, let's take a look at your

9     memorandum on Page 10.  And in the middle of the page, you say,

10    "Second, even if Plaintiff Montgomery had a duty to preserve

11    the alleged software, which he did not, especially under the

12    circumstances" -- and I want you to explain to me how it is

13    that you think a plaintiff whose libel suit is based in part on

14    the software and whether or not it worked or whether or not it

15    worked to the extent that the government may have thought that

16    it worked -- how it is that you think that Mr. Montgomery

17    wouldn't have a duty to preserve that software once the lawsuit

18    was filed.  That strikes me as a remarkable proposition.  I'm

19    just shocked by it.  So please explain to me how it is that you

20    think once the lawsuit was filed that Mr. Montgomery didn't

21    have a preservation duty.

22         MR. KLAYMAN:  I've already explained it.  But let me

23    put it in the context of this statement, is that what we meant

24    to say by that is that because the software's classified and

25    belongs to the government, that it wasn't his to keep and that

1    in any event, when it was turned over to the FBI here in

2    Miramar, that we did discuss -- and our affidavits are on the

3    record from Ms. James and me -- that we did discuss the ability

4    to obtain it if it wasn't classified for purposes of this civil

5    litigation.  And that's what I was saying that day when I

6    appeared in front of you on August 19th of last year.  So

7    that's what we meant by that.

8         THE COURT:  But isn't that sort of circular reasoning?

9    Because you say to me, Well, there was no duty to preserve

10   because the information is classified and therefore

11   Mr. Montgomery couldn't have possessed it anyway; and I guess

12   you're saying he had a duty to immediately turn it over to the

13   government.  It's sort of like contraband, almost sort of

14   radioactive material.  My gosh, he can't even keep it in his

15   possession for a second.  He's got to immediately turn it over.

16        MR. KLAYMAN:  Without getting into attorney-client

17   privilege, your Honor, and just talking generally, is that, you

18   know, based on my experience as a Justice Department lawyer,

19   based upon my experience in having cases that do involve

20   national security, based on being a lawyer for 38 years, having

21   a lot of different -- luckily -- experiences in litigation, is

22   that this was a work in progress.  And it was something that

23   Mr. Montgomery wanted to get out of his hands.

24        And you had a situation over there in Arizona where

25   this judge, who doesn't have -- Judge Murray Snow doesn't have

```
1     your temperament or --

2            THE COURT:  Oh, Judge Snow --

3            MR. KLAYMAN:  -- objectivity.

4            THE COURT:  -- actually has a good sense of humor?

5            MR. KLAYMAN:  No, he does not.  Okay?

6            And he was trying to -- the ACLU and their lawyers were

7     trying to suggest that Mr. Montgomery had done something wrong,

8     you know?  And consequently, we didn't want to have -- he

9     didn't want to have this in his possession.  Okay?  And so we

10    wanted to put it in the right hands.  And we expected the

11    government to act responsibly on this.

12           I'm a former government person.  Although I try to keep

13    the government more honest, I believe in the government.  To

14    me, the highest calling was when I was a Justice Department

15    lawyer.

16           THE COURT:  But I guess my point is, doesn't this

17    argument come full circle?  I say:  Is there a duty to preserve

18    once the lawsuit is filed?  And you say to me:  No, not under

19    the peculiar circumstances of this case because the software's

20    classified.

21           But then we get to the point of:  Says who?  Who says

22    it's classified?  You say it's classified.  Mr. Montgomery says

23    it's classified.  And although I'm always interested to hear

24    what you and Mr. Montgomery have to say, that's not going to

25    necessarily in and of itself carry the day for me.
```

1        So the defense says it's not classified.  And they

2   point me to evidence which they say supports the notion that

3   another judge has ruled that it's not classified.

4        I know you disagree with that description of what

5   happened.

6        But my point is, just because you say it's classified

7   doesn't mean that it is.  And since you haven't yet pointed me

8   to a judge who has designated the software as classified or any

9   government official who has reviewed the software and declared

10  it to be classified, it's just a circular argument.  And in

11  effect, it seems to me what you're saying is, "Because we said

12  so.  We have no duty to preserve because we say it's classified

13  and needs to be turned over to the government."

14       So how is that a persuasive presentation?

15       MR. KLAYMAN:  What I meant to say -- look, people write

16  things.  We're very small.  Okay?  And I don't have a lot of

17  lawyers like opposing counsel.  There's not two mega law firms.

18  We have, you know, two lawyers, me.

19       So what I meant here, you know, is -- and I think I

20  said it, but maybe I could have said it better -- is that we

21  put it in the hands of the right people that had told us that

22  they would make it available if it was required to be made

23  available in the civil context, if they could find it.  Okay?

24       And that's what we tried to do.  And I didn't mean to

25  say that we're not preserving it.  We preserved it.  We gave it

1    to the people who should have it.

2          THE COURT:  What I mean is, a duty to preserve for

3    purposes of this case, a duty to preserve so that the opposing

4    party can obtain it in discovery.

5          MR. KLAYMAN:  And that software is -- if it exists, if

6    it exists, it's in the hands of people who are not going to

7    destroy it.  It's in the hands of the FBI and presumably its

8    client, the Justice Department -- not its client, but the

9    entity, the Justice Department.

10          Now, if we're going to assume that we're destroying

11    something by giving it to the Justice Department, then we have

12    no government at all.

13          THE COURT:  But that's an interesting comment that you

14    made.  You said "if it exists."  And the "it" refers to the

15    software.  If it exists.

16          Can you tell me either way?

17          MR. KLAYMAN:  We've been through that.  And I myself

18    don't know.

19          THE COURT:  Does the software exist?

20          MR. KLAYMAN:  I myself don't know.  I've never looked

21    at it.  I made a point not to.

22          THE COURT:  Does Mr. Montgomery know if the software

23    exists?

24          MR. KLAYMAN:  He believes now after everything that's

25    happened -- and we went through that in great depth -- that

```
 1    it's likely that it was not on that stuff that he turned over.
 2              THE COURT:  But that's a different point.
 3              It's one thing to say if you're Mr. Montgomery, "I
 4    don't think I turned it over to the FBI."  That's not the same
 5    as saying, "It doesn't exist at all in any place.  It's gone.
 6    It doesn't exist."
 7              Is it Mr. Montgomery's position that the software no
 8    longer exists?
 9              MR. KLAYMAN:  That's not his position.  His position is
10    that he currently does not believe that he had it when he
11    turned it over, based on everything that's happened in the
12    course of things.
13              THE COURT:  So just so I'm clear, Mr. Montgomery now
14    thinks that he didn't have it when he turned material over to
15    the FBI and also doesn't know where it is.
16              MR. KLAYMAN:  And --
17              THE COURT:  Is that correct?
18              MR. KLAYMAN:  If -- if it is anywhere, it's in the
19    hands of the CIA.
20              THE COURT:  Is that correct, that as of now
21    Mr. Montgomery doesn't know where it is?
22              MR. KLAYMAN:  That's essentially correct.  But I was
23    very clear earlier -- I thought I was clear; we went over it
24    several times -- as to what his position was.  So if I've just
25    misspoken, your Honor, I don't want to be hung by my....
```

1          THE COURT:  Own petard.

2          MR. KLAYMAN:  Petard.

3          If you say things enough, you never say things twice

4     the same way.  I mean, that's -- I can tell you, as a trial

5     lawyer, I'll try to get the other side to say it as many times

6     as possible.

7          MS. HANDMAN:  Your Honor, might I be heard?

8          THE COURT:  It depends.  Is it a new point?  I know I

9     didn't ask you a question, so it's got to be some new point.

10    Otherwise, you wouldn't be speaking or seeking to speak.  So

11    what is the new point?

12         MS. HANDMAN:  Well, it is related to what you have been

13    discussing with Mr. Klayman.  I mean, we're talking about

14    software that is supposedly Mr. Montgomery's most valuable

15    property.  And the fact that he doesn't know where it is now is

16    somewhat incredible.

17         What he said in the deposition at 131, which your Honor

18    will see, is I asked, "When you say that you gave the

19    Al Jazeera software to the government, when did you give that?"

20         Answer:  "2003.  I mean, that's" --

21         Question:  "And you haven't had a copy of it since

22    2003?"

23         Answer:  "No.  I have."

24         Question:  "So when did you stop having a copy of it?"

25         Question [sic]:  "When I turned it all over to the

1   government."

2         Question:  "And when was that?"

3         Answer:  "Was it today?"

4         Question:  "Today is August 20th, 2015."

5         Answer:  "Let me just think, please.  Today is

6   Thursday."

7         Question:  "Right."

8         Answer:  "Wednesday."

9         And in his most recent filing of December 28,

10  Mr. Montgomery's position was articulated as follows:  He

11  claims that in (inaudible) claims he searched his memory.

12  Instead, he says, because the FBI has not found the software,

13  he must not have given it to them.

14        And it is the essence of the circular logic you were

15  saying:  Blame the FBI for his own failure to provide the

16  information that could locate the software and unmask whether

17  the software exists and whether it works.

18        And that -- here's exactly what he said.  In arguing

19  why your Honor should not conclude that he lied in his October

20  21 declaration, because, first, Montgomery initially believed

21  that he may have turned the software over in the 47 hard

22  drives.  He then met with the FBI on two occasions and he

23  corresponded by e-mail and also gave the FBI detailed

24  instructions of where to find the software, if it existed on

25  the hard drives.

1          When the FBI did not locate the software, Montgomery

2    provided further information to the FBI in order to help them

3    find the software.

4          Then, when the FBI did not find it, he concluded it was

5    likely the software was not contained on the hard drives.

6    Therefore, Montgomery did not lie.

7          But even this most recent statement is a lie, because

8    it -- Mr. Schwartz has said in several e-mails that he did not

9    provide the requisite information and the FBI is not looking

10   for it.  And if that's the basis for his conclusion that he

11   didn't give it to the FBI, that's a false premise.

12         MR. KLAYMAN:  Well, your Honor, if that's the case,

13   let's bring Mr. Schwartz down here, too, okay?  Because his

14   letter, as I said, is contrary to what the criminal division is

15   doing of the FBI.  They're going through every jot and tittle.

16   We're cooperating with them.  I've asked them on several

17   occasions to keep looking for the software.  And so is

18   Mr. Montgomery.

19         And again, no disrespect for Ms. Handman, but this

20   reminds me of -- I was a French literature major in addition to

21   poli sci, in addition to being a star on Jimmy Kimmel.  But --

22         THE COURT:  I thought you majored in animal husbandry.

23         MR. KLAYMAN:  I don't know how to take that.

24         But --

25         THE COURT:  In the best way possible.

1      MR. KLAYMAN:  Maybe my ex-wife thinks that.  I don't

2  know.

3      But --

4      THE COURT:  I think animal husbandry is like, you know,

5  agriculture, breeding livestock.

6      MR. KLAYMAN:  Could be.  Well, they did have a primate

7  section at Duke, so I think maybe I should have gravitated to

8  that.

9      But in any event, what I'm trying to say is that this

10  is like theater of the absurd.  It's like Ionesco.  We're going

11  round and round and round.  Okay?  We've said what we did.

12  People do over time come to different conclusions.  That's

13  normal.  Your Honor recognized that in this other case, you

14  know, that it was an evolving process to try to figure out what

15  went on with that -- with the *Wandner* case.

16      And to say that someone is lying because they come to

17  certain conclusions based upon events that have occurred is not

18  fair.

19      THE COURT:  So let's take a look at the reply

20  memorandum, the Defendants' reply.  And this is a memorandum

21  that Defendants submitted on November 30th.

22      Do you have that handy?

23      MR. KLAYMAN:  We're finding it.  Thank you.

24      THE COURT:  All right.  Take your time.

25      MS. HANDMAN:  It's 184, if that's helpful.

```
 1              THE COURT:  Do you have it, Mr. Klayman?

 2              MR. KLAYMAN:  Yes.

 3              THE COURT:  All right.  Good.

 4         So let's turn, if we can, please, to -- it's actually

 5    the first numbered page.  And at the top, it says Preliminary

 6    Statement.

 7              Do you see that?

 8              MR. KLAYMAN:  Yes.

 9              THE COURT:  All right.  And basically, in this

10    preliminary statement, the Defendants are challenging the

11    veracity of Mr. Montgomery's declaration that he now believes

12    that he no longer -- let me rephrase it -- that he now believes

13    that he didn't turn the software over to the FBI.  So let's go

14    through each and every one of these points.  Each one has a

15    bullet point next to it.

16         And Defendants say, Well, Mr. Montgomery doesn't

17    explain either in his declaration or his memorandum how it is

18    that he doesn't have access to his own software.  I think you

19    explained that to me with the story about being handcuffed

20    outside of his house and then the software being taken by the

21    FBI and then purportedly returned to him and then him later,

22    only recently, apparently realizing that of all the material

23    returned, the software wasn't there.

24         So do you have anything further to add on this first

25    bullet point beyond what I just summarized?
```

```
 1          MR. KLAYMAN:  No, beyond what you've summarized and
 2    what I've argued prior.
 3          THE COURT:  So the next point is:  How is it that you
 4    or your client could bring a lawsuit turning on whether the
 5    software worked when Mr. Montgomery and you knew from day one
 6    that not having the software could lead to dismissal?  And that
 7    bullet point relates to a prior memorandum the Defendants filed
 8    in which they quoted you from a hearing -- and I remember it,
 9    because I was here -- saying, "We knew from day one that they
10    would be seeking to dismiss the case on the software argument."
11          So what is your response to the second bullet point?
12          MR. KLAYMAN:  What I've said on the record.  And what I
13    meant was, I understand, and no disrespect to defense counsel,
14    which I've been not just at Blackwell, but in my own private
15    practice, in front of this Court as well in a criminal setting
16    sometimes, is that we knew that we would try that:  Heads I
17    win, tails you lose.  They always do that.  Okay?
18          But in this instance, what I pointed to you, as I've
19    said before, is that the software's not necessary for them to
20    prove their case.  Just come forward and come forward with your
21    confidential sources.
22          THE COURT:  But, Mr. Klayman, you as the Plaintiff
23    don't get to dictate how the Defendant defends its case.  Maybe
24    there are five alternative grounds that they want to pursue.
25    And maybe they're able to pursue three of them.  But if the
```

1   other two are blocked by you or your client, you can't say,

2   Well, they can pursue these other three ways of defending the

3   case.

4           MR. KLAYMAN:  But I'm not --

5           THE COURT:  Maybe they can; maybe they can't.  But if

6   you shut down a significant way of defending the case, namely,

7   examining the software, isn't that a problem?

8           MR. KLAYMAN:  I've never shut it down on behalf of

9   Mr. Montgomery, nor has he.

10          What we said was the government has to do a

11  declassification review.  And it has to be in their hands, not

12  in our hands.

13          THE COURT:  Well, that's only assuming that the

14  government has the software.  You're not even sure,

15  Mr. Montgomery isn't even sure, that the government has the

16  software.  Right?

17          MR. KLAYMAN:  That -- that may or may not be the case.

18  But they have a way of proving their case.  And as you pointed

19  out, again, in the *Wandner* case, you don't always have a full

20  deck of cards on either side.  In fact, you let that case go

21  forward --

22          THE COURT:  Well, a lot of --

23          MR. KLAYMAN:  -- and gave it to the jury.

24          THE COURT:  Well, a lot of people have accused me of

25  not playing with a full deck.  So I know what you mean.

```
 1              MR. KLAYMAN:  All right.  You let it go to the jury.

 2   The jury can reach its own conclusions here.

 3              THE COURT:  What about Point 3, sir?  How could

 4   Mr. Montgomery unilaterally give his only copy of the software

 5   to the FBI when he knew it was subject to a discovery request

 6   at a hearing two days later?

 7              Now, I know later on he filed a declaration saying, "I

 8   now believe that I didn't turn the software over to the FBI."

 9   But at the time that he did turn it over, as of the time he

10   turned over all those materials, he obviously thought that the

11   software was there.

12              So if you're going to turn software over to the FBI and

13   you know the software is subject to a discovery request and you

14   know that there's a hearing two days later, how do you turn

15   over your only version and not make a copy?  That's their

16   position.  What --

17              MR. KLAYMAN:  The --

18              THE COURT:  What would possibly possess you to do that

19   unless, unless, your actual goal was to sequester it from the

20   defense and to effectively prevent them from ever examining it?

21              What are your comments about that?

22              MR. KLAYMAN:  First of all, the software's a very small

23   part of the case.  I can go through the complaint, if you'd

24   like, and enumerate every single defamatory statement as

25   alleged, which has nothing to do with the software.  Okay? I
```

```
 1    can do what Ms. Handman did.  Okay?  I could do it in a very
 2    direct way.
 3          Secondly, we are -- we never tried to keep it away from
 4    anybody because we put it in the hands of the people that own
 5    it, that it belongs to.  And they -- it's kind of like -- I've
 6    used this analogy before, so you may have read some of my
 7    stuff.  But it's a little bit like the Wizard of Oz, you know?
 8    Dorothy could have come back from Oz at any time.  But she --
 9    and she did.  And they can come back from Oz.  They subpoenaed
10    the CIA, the people who it belongs to.  Why didn't they pursue
11    getting that information?
12          You can order them and give them an order right now to
13    turn it over and see what happens.  And if we're going to go
14    down this road, which I don't believe we have to, since, A, the
15    software is a very small part of the case, but, B, for all the
16    other reasons that we've talked about today, then order them to
17    be deposed, your Honor.  They never came in.  They waived that.
18    They didn't want to hear the answer.  No one says they're not
19    smart.
20          THE COURT:  I'm not sure you're actually answering my
21    question.
22          MR. KLAYMAN:  And it's a --
23          THE COURT:  So --
24          MR. KLAYMAN:  And it's a --
25          THE COURT:  -- when Mr. Montgomery turned over these
```

```
1    materials to the FBI and you arranged that procedure, why

2    couldn't he simply or why didn't he simply keep a copy of the

3    software so that it could be examined by the Defendant or at

4    least evaluated by a judge or a government agency to see if in

5    fact the Defendants have the ability to examine it?  Why didn't

6    he just make an extra copy?

7          MR. KLAYMAN:  Because it would be illegal and it would

8    be criminal.  Ask Hillary Clinton, who's going through

9    something right now for making copies of stuff and keeping it

10   on an unclassified server.

11         THE COURT:  So when you say he couldn't make a copy

12   because it would be illegal and criminal, isn't that based on

13   the underlying assumption that the software is, in fact,

14   classified?

15         MR. KLAYMAN:  That's correct.

16         THE COURT:  And we've already been through --

17         MR. KLAYMAN:  It's not an assumption --

18         THE COURT:  It's not an assumption?

19         MR. KLAYMAN:  No.

20         THE COURT:  Do you know what?  I'm not going through

21   this again.

22         MR. KLAYMAN:  I know.

23         THE COURT:  We've been through it ten times.

24         MR. KLAYMAN:  I'm not asking you to.  But that's my --

25   that's our position.
```

1          THE COURT:  I understand.

2          MR. KLAYMAN:  In just one of the various criminal

3     statutes involved, we cited in our brief -- I'm looking for the

4     citation.

5          MS. HANDMAN:  Your Honor, Mr. Klayman has often claimed

6     that Mr. Montgomery has a security clearance.  So presumably,

7     he's held it all these years, whether he had a clearance or

8     not, whether it was classified or not.  He has maintained it

9     all these years and has not had an issue that he's raising now,

10    that he couldn't keep it.

11         MR. KLAYMAN:  Well, Hillary Clinton has a security

12    clearance, too.  It's not doing her any good.

13         THE COURT:  So, Mr. --

14         MR. KLAYMAN:  18 USC 798.

15         THE COURT:  Mr. Klayman, let's assume that this

16    material, the software, is, in fact, classified and that

17    suddenly late last year Mr. Montgomery decided, I'd better get

18    this classified material out of my hands and turn it over to

19    the FBI.  Why didn't he turn it over earlier in the year or the

20    year before or two years before or five years before or ten

21    years before?

22         MR. KLAYMAN:  Your Honor, I would love to submit to

23    you, if you'd like to see it, his attempts to come forward as a

24    whistleblower.  Like Edward Snowden, they didn't want to take

25    yes for an answer.  You know why?  Because there are officials,

1    not our entire government, inside of the CIA and inside of the

2    NSA and inside of the Defense Intelligence Agency where the

3    director of DIA lied and perjured himself in front of Congress

4    about mass surveillance of American citizens.

5        And your Honor might see that we got another

6    preliminary injunction last November 9th against the NSA, which

7    the government by the way is giving up on its appeal as of

8    yesterday.  So they're accepting what the judge ruled, because

9    there was a sensitivity there.

10        And no one wanted to hear what Mr. Montgomery had to

11    say, not until Judge Lamberth stepped in, who's very well

12    respected, like yourself, and played a role.

13        THE COURT:  Does Mr. Montgomery have a security

14    clearance that would enable him to keep this software, if in

15    fact it's classified?

16        MR. KLAYMAN:  Not keep it.  But he does have a security

17    clearance.

18        THE COURT:  Does he have a security clearance that

19    would entitle him to possess this software if in fact it's

20    classified?

21        MR. KLAYMAN:  No more -- and I'm not trying to be cute

22    or anything -- no more than Hillary Clinton had the ability to

23    keep classified information on her private server.

24        THE COURT:  Let's eliminate Hillary Clinton from the

25    answer.  So let me ask the question again:

1           Does Mr. Montgomery have a security clearance that

2    would entitle him to possess the software, assuming that it is

3    in fact classified?

4           MR. KLAYMAN:  My understanding is no.

5           THE COURT:  No.  And what about you?  Do you have a

6    security clearance?

7           MR. KLAYMAN:  I do not.  And that's why I never wanted

8    to see any of it or hear about it.

9           THE COURT:  Have you ever applied for a security

10   clearance --

11          MR. KLAYMAN:  I --

12          THE COURT:  Let me finish.

13           -- so that you could review the software in this case?

14          MR. KLAYMAN:  No.  And the reason for that is I'll be

15   long since buried in some cemetery in Tel Aviv or Jerusalem

16   before that ever happens, because I'm an advocate who's fought

17   this government now for most of my career.  And for Larry

18   Klayman to get a security clearance is virtually impossible,

19   and -- nor any private lawyer, including my friend Joseph

20   diGenova in Washington and his wife, Victoria Toensing.  They

21   don't give it to private lawyers anymore.

22          However, I do get preclearance at the airport when I go

23   through.  Sometimes.  I'm not a risk.

24          THE COURT:  Turn to Page 3 of the same reply

25   memorandum.  Do you see the paragraph that starts, "First,

```
 1    Montgomery waived"?

 2              MR. KLAYMAN:  Correct.

 3              THE COURT:  So I'm not asking you about this case or

 4    the facts of this particular case.  I'm just asking, do you

 5    agree as a matter of law that a person can waive an objection

 6    that he lacked possession, custody or control?

 7              MR. KLAYMAN:  Not under the facts as we presented here

 8    today.  No.  I don't believe that you could -- you certainly

 9    can waive objections.  They waived objections to the software.

10    They totally waived it.

11              THE COURT:  You know, it's really interesting to me.  I

12    just said, "Let's not discuss the facts of this particular

13    case.  Just as a matter of law, do you agree with this

14    principle?"  And your answer started off by saying, "Under the

15    facts of this case."

16              So to use your phrase, that's a nonstarter.  Let's try

17    it one more time.

18              I'm only asking if you agree with the legal

19    proposition, not linked to the facts of this case, that a party

20    can waive an objection that he or she lacks possession, custody

21    or control of evidence.

22              MR. KLAYMAN:  Yes.

23              THE COURT:  Now, let's shift to a second argument that

24    the defense raises, the judicial estoppel theory.

25              Do you agree as a matter of law, not connected to the
```

1   facts of this case, but just as a legal principle, that the

2   judicial estoppel doctrine can concern statements, inconsistent

3   positions in the same proceeding as opposed to the more typical

4   scenario where a statement is made in an earlier proceeding and

5   then an inconsistent is made in a later proceeding?  Do you

6   understand my question?

7           MR. KLAYMAN:  I'm not sure I do, your Honor.

8           THE COURT:  All right.  Let me get to it a different

9   way.

10          So -- and please forgive me for sounding like a law

11  professor here.  The judicial estoppel doctrine is usually

12  raised when a party takes a certain position in one case or

13  proceeding and then later in a different case or proceeding

14  takes an inconsistent position.  And then in that second case,

15  the opposing party objects and says, Judge, the party can't

16  successfully raise this argument in this case because in an

17  earlier case they took the exact opposite position.

18          Now, the Defendants have said in their memorandum,

19  Judge, the judicial estoppel doctrine, while typically invoked

20  in a two-proceeding scenario, a prior proceeding and a later

21  proceeding, can also be applied to inconsistent positions in

22  the same case; in other words, in a lawsuit.  In January, a

23  party says A.  And then in July, the party says opposite A.

24  Same proceeding, not prior and later proceeding.  Same

25  proceeding.  They say as a matter of law the judicial estoppel

1    doctrine can be used to prevent the party in the same case from

2    taking an inconsistent position.

3            So now I'm done sounding like a law professor.  And my

4    question is -- hopefully you're not going to ask me if it's on

5    the final.  So my next question is:  Do you agree as a matter

6    of law, not necessarily connected to the facts or circumstances

7    of this case, but just legal principles -- do you agree that

8    the judicial estoppel doctrine can apply in the same case?

9            MR. KLAYMAN:  Under extreme circumstances.  But not in

10   this case, because --

11           THE COURT:  Oh, my gosh.

12           MR. KLAYMAN:  Your Honor, you asked for it.  You got

13   it.

14           THE COURT:  I know.  I know.  But I said "not related

15   to the facts of the case."  And, by golly, you said --

16           MR. KLAYMAN:  Well, and that's because --

17           THE COURT:  -- "the facts of the case."

18           MR. KLAYMAN:  That's because there's no A and opposite

19   of A here.  This was a continuation of an evolution of trying

20   to understand whether the software was in the hands of the FBI.

21   And, you know, we've gone through -- you know, we're now into

22   the third hour here, fourth hour.

23           And I've tried to explain to you -- and I think that

24   you understood what I was saying, and, you know, you're a very

25   intelligent man and a good judge.  But I -- you know, I made it

1    clear what happened here wasn't that anybody was trying to

2    deceive anybody or create inconsistent statements here.  And

3    we're human.

4            THE COURT:  Mr. Klayman --

5            MR. KLAYMAN:  We're not robots.

6            THE COURT:  Mr. Klayman, trust me.  I understand that

7    that is your position.  I know you made that position in your

8    papers and you've made it here today.  I think in retrospect I

9    scored over 1,000 on my SAT.  I think, you know, I'm a fairly

10   bright guy; and I'm with you.  I understand your arguments as

11   to this case.

12           MR. KLAYMAN:  And I might add, I'm not an expert on

13   judicial estoppel doctrine, so I don't want to be held to what

14   I just said.  And I'll let the law speak for itself.  I'm not

15   an expert on it.

16           THE COURT:  All right.  So I assume you agree with the

17   general proposition that a duty to preserve arises in a

18   specific case when that party reasonably anticipates

19   litigation.  That's not a controversial point.  Right?

20           MR. KLAYMAN:  If you have it in your custody or control

21   and if you're entitled to have it.

22           THE COURT:  And if it's not classified?

23           MR. KLAYMAN:  No.  I mean, as a general matter, yes.

24   But this is a very fact-specific case, your Honor.  And you

25   understand we're dealing here with national security, and we

```
 1    have to respect that.  And that comes first, typically in

 2    today's current world.

 3         You know, the thesis of James Risen's book is that the

 4    government is totally corrupt and that the people that ran

 5    these intelligence agencies are totally corrupt.  Even I don't

 6    believe that, even though I got a preliminary injunction

 7    against the NSA.  I don't believe that everybody's corrupt.

 8    And I do want them to protect me.  We've never said, Don't

 9    surveil on probable cause terrorists.  We said, Don't surveil

10    everybody.

11         THE COURT:  Take a look at Page --

12         MR. KLAYMAN:  Including you.

13         THE COURT:  Take a look at Page 8, please, of the

14    Defendants' reply.  So the Defendants are making reference to

15    your argument that, quote, "Mr. Montgomery," quote, "made

16    provisions with the FBI at the time he was required to turn

17    over the 47 hard drives to retrieve what might be requested in

18    discovery in this case."

19         And the Defendants then say, the FBI did not require

20    Montgomery to turn over all 47 drives.  Instead, they say that

21    it was Montgomery who insisted on turning over data irrelevant

22    to the FBI's inquiry.

23         So I think I understand the point.  But let me just

24    make sure.

25         Am I correct in believing that the FBI did not require
```

1   Mr. Montgomery to in fact turn over the 47 drives or any other

2   number of drives or the software?  It was not a directive from

3   the FBI.  Correct?

4           MR. KLAYMAN:  That's a semantical question, your Honor.

5   He was required by law to do that.

6           THE COURT:  That was going to be my next point, which

7   is, as I understand your argument, Mr. Montgomery was required

8   to turn over these files.  As a matter of general law, he was

9   required because the information was classified and therefore

10  he had to turn it over, as opposed to receiving a specific

11  case-precise directive from the FBI.  Right?  That's his view?

12          MR. KLAYMAN:  There's -- and let me explain that in

13  context.

14          I made reference to the Arizona proceeding.  The

15  materials that he had provided allegedly to the sheriff of

16  Maricopa County and its Cold Case Posse came up in the context

17  of that proceeding.  I don't know exactly what was turned over

18  or not to Maricopa County and the Cold Case Posse, which works

19  in conjunction with the Maricopa County Sheriff's Office.  But

20  he was ordered -- they were ordered by Judge Murray Snow to

21  turn that stuff over to the CIA and the Justice Department.

22          THE COURT:  That's the one with no sense of humor?

23          MR. KLAYMAN:  Right.

24          THE COURT:  Uh-huh.

25          MS. HANDMAN:  Do I --

1            THE COURT:  Not yet.

2            MR. KLAYMAN:  Not as good-looking as you, either.

3            THE COURT:  A low barrier.

4            MR. KLAYMAN:  And he doesn't have a beard.

5            THE COURT:  But I guess my point is, this whole

6    discussion about whether he was required or not required is not

7    emanating from a specific FBI directive or requirement in the

8    case; but to the contrary, Mr. Montgomery's position that he

9    was required to turn over these files is based on the notion --

10   well, I mean, that he was required to turn over the software is

11   based on his position that the software is classified, that he

12   didn't have the right to keep it, and therefore he had to turn

13   it over to the government.  That's what you mean by "required."

14   Correct?

15           MR. KLAYMAN:  Correct.

16           THE COURT:  All right.

17           MS. HANDMAN:  Your Honor, do you want a footnote on the

18   Maricopa County or not?

19           THE COURT:  Only if it's a new footnote.

20           MS. HANDMAN:  Well --

21           THE COURT:  By the way, earlier, when I asked you if it

22   was a new point and you said yes, I refrained from saying so.

23   About half of the things you said were new.  The first half

24   were not.

25           So is this a new point?

1          MS. HANDMAN:  Well, it's a point that was raised with

2     you in a hearing a few hearings ago.  And in the Maricopa

3     County case, Mr. Montgomery turned over 45 hard drives, not 47.

4     And this is the case in which Mr. Klayman has sought to

5     intervene in the proceedings on the grounds that

6     Mr. Montgomery's software is involved.  And the sheriff's

7     office retained two former NSA experts to review the 45 hard

8     drives; and their conclusion was it contained, quote, "among

9     other things a high volume of recordings of Al Jazeera

10    Television Network" and was, quote, "evidence of an outright

11    and fraudulent con perpetrated on the government for personal

12    gain and cover."

13         And these are two former NSA experts who Mr. Klayman is

14    representing in a whistleblower suit in DC, making it unlikely

15    that he will be challenging their conclusion.

16         MR. KLAYMAN:  Well, that's -- this is what I'm talking

17    about, your Honor.  That's fiction.  Okay?  This is great.

18    Let's put it on the witness stand.

19         MS. HANDMAN:  It was a report that was introduced in

20    evidence in the Arizona proceedings.  We've attached it in our

21    papers before.

22         MR. KLAYMAN:  No testimony was taken there in that

23    regard.

24         MS. HANDMAN:  There have been many days of testimony --

25         THE COURT:  Folks, folks, is it clear to you from my

1    body language that I'm not listening to anything that you're

2    saying for the past 40 seconds because you're interrupting each

3    other?  So be aware of your surroundings, please.  I've

4    listened to everything else you've said, but not the past 40

5    seconds.

6              So, Ms. Handman, what about Mr. Klayman's position

7    that, Listen, Mr. Montgomery's been trying for years to turn

8    over this information.  Fortunately, I have a relationship with

9    Judge Lamberth in Washington, DC.  And I respect Judge

10   Lamberth, Mr. Klayman says, and fortunately I was able based on

11   that relationship to facilitate the arrangements to turn over

12   the software and the other files.  Mr. Montgomery is a patriot.

13   He's a whistleblower.  He is pursuing noble goals similar to

14   Mr. Snowden, if you're of the belief that Mr. Snowden is a

15   patriot as opposed to a criminal.

16             What about all of those arguments?

17             MS. HANDMAN:  Your Honor, I will not opine on whether

18   he is in fact a whistleblower or, as the NSA expert said, a

19   fraud and a con.

20             What I will say with regard to the NSA surveillance --

21   but it is quite clear from both Mr. Klayman's own statements

22   and the FBI's statements in the September 8th letter that the

23   software at issue in our case is not relevant in any way to his

24   whistle-blowing allegations.

25             So there was absolutely no reason why he could not have

1    segregated his software from the 47 hard drives, 51 million

2    files that he did turn over to the FBI, knowing that this

3    lawsuit was pending, that the demands were pending, that we had

4    a hearing before your Honor.  Absolutely no reason why, as your

5    Honor pointed out, he could not segregate it, let the Court

6    decide whether it's classified, let the Court decide whether

7    we're entitled to it, but not just bury it in a data dump that

8    guaranteed that we would never be able to get it.

9          MR. KLAYMAN:  Your Honor, may I respond briefly to

10   that?

11         THE COURT:  No, not right yet, because I have a quick

12   point and I have a thought; and I don't get thoughts very

13   often.  I need to follow up on it immediately.

14         So what about Mr. Klayman's argument that basically,

15   Ms. Handman, you're exaggerating the relevancy and the

16   importance of the software?

17         Mr. Klayman says, Yeah, it's true.  A small part of the

18   defamation allegations relate to the software.  But only a

19   small portion.  Most of the defamation claims concern other

20   issues.  For example, we have Mr. Risen on the talk-show

21   circuit giving interviews and making statements; and even when

22   he uses the phrase like "This is the greatest hoax," it's not

23   necessarily linked to the software.  And he says in effect,

24   therefore, you're trying to box him in a corner by exaggerating

25   the importance of the software so that when you don't get the

1   software, you make it seem as though your entire defense has

2   been compromised, when according to him and in truth and in

3   fact, it's only a small part of the case.

4         What about that?

5         MS. HANDMAN:  A number of points.

6         First of all, your Honor long ago apprised -- realized

7   that the crux of the whole case was whether the software

8   worked.  And that was the basis for saying it was a hoax

9   perpetrated on the government.  And that is consistent --

10        THE COURT:  Right.  But I'm sorry for interrupting.

11        But here's the thing:  I did say that.  I did make the

12  ruling.  I'm able to revisit my rulings in a case.  Who knows?

13  Maybe I was wrong.  Maybe I need to analyze that issue again.

14  Maybe I didn't review the amended complaint sufficiently.  Why

15  shouldn't I give Mr. Klayman the opportunity to make that

16  argument and convince me that my prior assessment was

17  incorrect?

18        I do sometimes in fact reconsider prior rulings.  I do

19  sometimes change my mind.  In fact, I have written opinions and

20  reports and recommendations where I say, I know I ruled one way

21  earlier in the case; but now that I've thought about it some

22  more, I'm changing my analysis.  I've done that before.

23        So give me a better argument than, Well, Judge, you

24  yourself said so earlier.  I mean, I'm a pretty cocky guy,

25  pretty confident.  But who knows?  I could be wrong.

1           MS. HANDMAN:  Well, your Honor, I think my recitation

2      of various paragraphs of the amended complaint as well as

3      Mr. Montgomery's own declaration in April, which said the

4      software worked, the software works and the government is still

5      using it, that was the thrust of his declaration in April of

6      this year in this case.  It suggests that indeed even the

7      claims that Mr. Klayman has cited as examples of other claims,

8      whether in Mr. -- President Bush considered shooting down

9      planes.  Based on what?  On Mr. Montgomery's software and the

10     intelligence coming from that.  That's the claim.

11          This --

12          THE COURT:  Well, let me ask you that, because that's

13     obviously a fairly colorful allegation, pretty provocative,

14     pretty exciting.  Imagine that.  President Bush and the

15     national government, our leading officials, almost took extreme

16     action like that.

17          But where in the complaint does it say that that

18     decision or that potential decision to shoot down planes or to

19     stop planes in the sky was, in fact, based on the software?

20          MS. HANDMAN:  Well, that's what is the basis for his

21     saying that it's defamatory of him, because he's saying that it

22     was -- based on his intelligence, that that led President Bush

23     to consider shooting it down.  And that's in the book.  We have

24     various people who were in the room who opine on whether

25     President Bush considered it based on the intelligence that was

1    being generated by Mr. Montgomery's software.

2         And so --

3         THE COURT:  Maybe that's where I'm unclear.

4         So software is sold to the government.  The software

5    generates results.  Well, it has to generate something.

6    Otherwise, there'd be nothing for President Bush or other

7    national leaders to act upon.  Correct?

8         I mean, if the software was 100 percent completely

9    inoperative and you put the software in whatever security

10   computers the government has and it generates nothing, because

11   it doesn't work, then there'd be nothing to base a decision on.

12   Right?

13        MS. HANDMAN:  Mr. Montgomery has said -- and this is

14   the crux of the coded messages on the Al Jazeera broadcast --

15   that it generated letters and numbers which the government then

16   interpreted as relating to planes and other targets.

17        That's why President Bush did -- and there's no dispute

18   on this -- that he did stop planes coming from Europe based on

19   what Mr. Montgomery said his software was generating by way of

20   numbers and letters that then were interpreted as targets.  And

21   it was that that also -- and the book goes into a difference of

22   opinion whether the government seriously considered shooting

23   down planes or not with different people in the room, all of

24   which is fleshed out in the chapter.

25        But that's one example.

1          Another that Mr. Klayman has cited --

2          THE COURT:  Wait just a minute.  Let me just make sure

3   that I understand this.

4          Software is sold to the government.  Although

5   Mr. Risen's book contends that the software didn't work and was

6   a hoax, that phrase, "doesn't work," can mean a lot of

7   different things, as Mr. Klayman pointed out.  It can mean it

8   doesn't work at all.

9          I mean, you install the software.  You're hovering over

10  the computer waiting for something to come out, some result,

11  some information, some data, some number, some letter,

12  something.  And nothing happens.  You're just looking at a

13  blank screen.  That's one way of software not working.

14         Another way that it doesn't work is it does generate

15  some information, but it's bad information.  It's wrong

16  information.  Maybe purposely so, maybe it's just made up.  But

17  it's some information.

18         So what I hear you saying is, the software was sold to

19  the government.  The software was implemented.  The software

20  generated some information, numbers and letters.  And then,

21  based on the judgment calls of various security and military

22  leaders who interpreted these numbers and letters, the

23  conclusion was reached that the numbers and letters somehow

24  indicated flight numbers; and based on that interpretation of

25  the numbers and letters, President Bush ordered certain steps

```
1   to be taken concerning flights.  Is that what we're talking

2   about?

3          MS. HANDMAN:  Well, the chapter, if you read it -- and

4   this is consistent with what was published in prior articles

5   before the chapter -- talks about how ultimately the French

6   were disturbed that their planes were not flying.  And so they

7   had technical people take a look at the Al Jazeera broadcasts.

8   And they concluded -- and this is all in the book -- based on

9   sourcing that we have disclosed -- and it's in Mr. Risen's

10  declaration -- they concluded that there weren't enough pixels

11  in the Al Jazeera broadcast to be sending coded numbers or

12  letters to anybody.

13         And so the software that Mr. Montgomery was purporting

14  to read was, in fact, not reading these things off of

15  Al Jazeera broadcasts.  And that's one of the many ways in

16  which this software is meant -- is said to be demonstrably not

17  working.

18         Now, Mr. Klayman has said, Well, here's --

19         THE COURT:  Wait.  So that is an allegation that

20  relates to the software, which would generate support for your

21  desire to examine and test the software.

22         MS. HANDMAN:  Correct.

23         THE COURT:  Okay.  So of all the paragraphs that you

24  cited to me earlier this afternoon, do any of them specifically

25  say the software which led to the purported interpretation of
```

1    the numbers and letters in the Al Jazeera broadcast didn't

2    work?

3            MS. HANDMAN:  Yes.  Sorry.  They quote the section that

4    talks about the French -- in Paragraph 207 of the amended

5    complaint.  And it reads -- it quotes the section of the book

6    that says, "Finally, the French brought an end to it.  Since

7    Air France flights to the United States were among those that

8    had been grounded, French officials had taken a dim view of the

9    entire episode.  They began demanding answer from Americans.

10   The French applied so much pressure on Washington that the CIA

11   was finally forced to reveal to French intelligence the source

12   of the threat information.

13           "Once they heard the story of Dennis Montgomery and

14   eTreppid, French officials arranged for a French high-tech firm

15   to reverse-engineer Montgomery's purported technology.  The

16   French wanted to see for themselves whether the claims of

17   hidden messages in Al Jazeera broadcasts made any sense.

18   That's the quote from the book.

19           And then the paragraph after that is, "As defamation by

20   implication, if not explicit, the passage published that

21   Plaintiff Montgomery is a fraud and that his work is a scam and

22   a hoax."

23           THE COURT:  Please proceed with the answer to the

24   threshold question which, to refresh your recollection is, what

25   about Mr. Klayman's position that you're exaggerating the

```
1    importance of the software and that most of his defamation

2    claim has absolutely nothing to do with the software?  Please

3    continue giving me other illustrations and responses.

4        MS. HANDMAN:  The other claim that he cited was the

5    fact that we report, as was told to the FBI, that various

6    employees of eTreppid had said that Mr. Montgomery had had them

7    rig tests of his software when it was being demonstrated to

8    government officials.

9        THE COURT:  What paragraph of the complaint says that?

10       MS. HANDMAN:  I'm quoting Mr. Klayman saying that that

11   was unrelated to his software.  I'm not -- it'll take me a

12   minute, maybe, if Mr. Toth can look through the amended

13   complaint and see where that is.

14       And, of course, that circles right back again to

15   whether the software worked or whether the tests were rigged.

16       And yes.  We have our sources of information besides

17   the software itself.  But obviously, the software itself.  And

18   I think what the Court should focus on is that Mr. Klayman is

19   repeatedly referring to the fact that, Well, Mr. Montgomery

20   will testify that the software -- about the software and he'll

21   have people that will testify.

22       Well, that would be incredibly prejudicial to us.  He

23   should be precluded from putting in any evidence on whether the

24   software works.  If he thinks that's so unimportant, he

25   probably should not have any objection to that.
```

```
1              If we're not allowed to test the software and have an

2    expert test the software and just take Mr. Montgomery's word

3    for it that it worked, that would be incredibly prejudicial.

4    And the fact is that the software is central to each -- we

5    quote John Brennan when he is being confirmed for CIA director

6    saying that the intelligence that was produced was inadequate.

7              We quote other government agencies who decided not to

8    go forward with the contract because it was inadequate.

9              Yes.  We have other bases.  But it's his burden to

10   prove it's false.  And as your Honor said, we're not limited to

11   just what he wants us to have and doesn't want us to have.

12             THE COURT:  Right.

13             But my point is, let's say Mr. Risen in his book

14   accuses Mr. Montgomery and his company of engaging in many

15   types of activities, all under the general rubric of

16   perpetrating a massive hoax or fraud.  Some of those things,

17   whether true or not, may relate to the efficacy of the

18   software.

19             But Mr. Klayman says, But much more of the claim in the

20   book relates to things other than the software.  And our

21   complaint relates to many things that have nothing at all to do

22   with the software.  Therefore, he says, the defamation claim

23   only in small part relates to the software, and most of our

24   allegations have nothing to do with the software.

25             So try to focus on that position a little more.
```

1          MS. HANDMAN:  I can only think of one item in the book

2     that they have sued on that it genuinely is not related to the

3     software.  We report that he is in -- well, two things:  We

4     report that he's an --

5          THE COURT:  An incorrigible gambler?

6          MS. HANDMAN:  Correct.

7          And the other one is that he made false allegations

8     against Warren Trepp and Governor Gibbons that -- we actually

9     don't say they're false.  We give the whole history there where

10    the government ultimately based on his allegations decided not

11    to prosecute Governor Gibbons.

12         And we quote a lawyer in an Associated Press report

13    saying that they should be looking at the people who make the

14    allegations.

15         That is not directly related to the software.

16    Obviously, Warren Trepp was a partner in eTreppid and Warren

17    Trepp ultimately concluded that the software either didn't

18    exist or didn't work.

19         Mr. Montgomery -- we quote him on that --

20    Mr. Montgomery's own lawyer, Mr. Flynn, we quote as saying he's

21    a con artist, again, revolving around the software and the fact

22    that the software was never produced ultimately to Mr. Trepp in

23    the course of the proceedings with Judge Pro.  And he's the one

24    that has this $25 million confession of judgment.

25         All of this ultimately circles back to the dealings

1    with -- even in Bricks Wear (phonetic), the subsequent

2    business, is all about Montgomery's software and trying to

3    continue to sell it to the government.

4           THE COURT:  So would it be fair for me to say that your

5    position is that virtually all of Mr. Montgomery's allegations

6    in his amended complaint relate either directly and overtly or

7    implicitly to the efficacy of the software?

8           MS. HANDMAN:  I would say that.  But obviously,

9    Mr. Klayman disagrees.  And whether your Honor and Judge

10   Martinez find -- ultimately find it, you know, decisive on the

11   case or not is something that I don't know that you need to

12   decide at this point.  These are issue-related and these are

13   remedial steps, in our view, remedying the wild goose chase

14   that we've been on and that the Court has been on and now the

15   FBI is on, remedying the fact that we have not had access to

16   the software.

17          And I would have to underscore, I am libel lawyer; and

18   in my bookcases there is a unanimous view of the courts that

19   they should be disposed of at the earliest stage, either on

20   dismissal --

21          THE COURT:  It's a little too late for that right now.

22          MS. HANDMAN:  -- or summary judgment.

23          That -- because of the chilling effect.  And it's not

24   like just a car accident or something like that.

25          And I might add, in the *Flurry* case, there, as your

 1    Honor knows, a jury rendered a verdict for the Plaintiff; and

 2    the Eleventh Circuit reversed and said the case should have

 3    been dismissed.  Why?  Because the critical evidence there

 4    again was not available for the Defendants to inspect.

 5              MR. KLAYMAN:  Your Honor, may I respond to that?

 6              THE COURT:  If it's a new point, yes.

 7              MR. KLAYMAN:  Yes.

 8              Well, Ms. Handman says she's been on a wild goose

 9    chase.  In all this time, they've taken one deposition of

10    Mr. Montgomery.  They didn't take the depositions of the

11    French.  That has nothing to do with the software in the hands

12    of the CIA.  The French did not have access to our software, to

13    the CIA's software.

14              They didn't take depositions with regard to gambling.

15    They didn't take depositions with regard to Edra Blixseth or

16    Trepp.  They didn't take depositions of the employee who Risen

17    claims falsely that they cooked some kind of test with

18    government authorities.  They did nothing.

19              They've been resting on this gambit that your Honor is

20    going to recommend throwing this thing out.  That's their whole

21    defense.  And it's just simply not accurate.

22              Secondly, with regard to the expert, the expert they

23    designated does not have a top-secret clearance to even look at

24    this software.  This is another example of the fact that this

25    is a tactical gambit.  He can't see it.

1          THE COURT:  Well, he can't see it perhaps if it's

2     classified.  But then we go around in a circle again.  Who says

3     it's classified?

4          MR. KLAYMAN:  But he --

5          THE COURT:  You say it's classified.  Anybody else?

6     Not that I'm aware of.

7          MR. KLAYMAN:  We've been taking this position.  One

8     would think that if there was sincerity and ingenuousness here

9     that they would come up with a certified expert from the FBI or

10    the CIA or the Defense Intelligence Agency or the National

11    Security Agency that could actually -- and analyze it.

12         So, you know, all they want is for your Honor to

13    recommend a dismissal or an adverse inference.  This is the

14    strategy.

15         And even Ms. Handman just a few minutes ago wouldn't go

16    so far as to say, because she knows that's not true -- and I'll

17    call her on it -- that the allegations of this complaint are

18    only about software.  If your Honor goes through it, it's a

19    very detailed complaint.  And you'll see the overwhelming

20    majority of allegations of defamation have nothing to do with

21    the software.

22         You hit the nail on the head:  the biggest hoax in

23    American history.  This guy has a target on his back as a

24    result of that, from all sources, not just, you know, so-called

25    sources of Mr. Risen, but also he's been threatened from

1    overseas as well.

2         THE COURT:  So --

3         MR. KLAYMAN:  And on that -- let me just add one other

4    thing.  I haven't seen it.  I don't know what's on it.  But on

5    that software, it was not true for her to say -- she just, you

6    know, comes forward with this without any basis that the

7    software has nothing to do with the criminal investigation of

8    the Justice Department.

9         On that software -- excuse me -- as a result of that

10   software, things were uncovered of major crimes committed by

11   CIA operatives.  And for her to say the software is not

12   something they're looking at is totally false if they can find

13   it.

14        So that's just simply not the case.  And I just want

15   to --

16        THE COURT:  Who --

17        MR. KLAYMAN:  -- add one other point.

18        THE COURT:  Who was it who used the software in order

19   to uncover this alleged misconduct by CIA officials?

20        MR. KLAYMAN:  At the time that he was entitled to it,

21   it was Mr. Montgomery.  I don't want to say in court.

22        THE COURT:  Did anybody other than Mr. Montgomery use

23   the software for that purpose?

24        MR. KLAYMAN:  Yes.  You have James Clapper.  He had

25   regular meetings with James Clapper.  And Keith Alexander and

1   even Brennan.  Okay?  But no with Clapper.

2          So this is the kind of information that -- that is --

3   has many different sources.  And the fact that they have not

4   taken one deposition outside of Dennis Montgomery tells the

5   tale, the tale with the tape, where they're going, what the

6   strategy is.  They're swinging for the fences, but

7   unfortunately they've struck out.

8          THE COURT:  So what about that, Ms. Handman?  What

9   about the fact that, apparently, according to Mr. Klayman,

10  you've only taken one deposition in this case and it happens to

11  be of Mr. Montgomery?

12         MS. HANDMAN:  Well, first of all, we did get documents

13  from his former partner, Edra Blixseth, which we've shared with

14  Mr. Montgomery and -- with Mr. Klayman, rather, and have not

15  taken her deposition, but expect that if we need her to come to

16  trial, she would.

17         We have tried to be taking the deposition of

18  Mr. Montgomery's son-in-law, who was in business with him in

19  the Bricks Wear company.  And that -- as your Honor knows, it

20  was a struggle to get service made, but we finally did, and

21  we're in the fight on that.

22         We have subpoenaed government entities.  We're waiting

23  to hear from the Air Force.  We haven't heard back, as they've

24  been doing their *Touhy* review.

25         And we have reached out to various other of the people

1    that Mr. Klayman is referencing; but frankly, on the fault side

2    of things, all we need is to be able to show what Mr. Risen

3    had.  And we feel that it's overwhelming what he had, and it is

4    to satisfy no actual malice.

5          On falsity, it's their burden to prove falsity.  And

6    we're back to the same question on the software.

7          And we did hire an expert who is very sophisticated on

8    software.  He -- I don't know if he has classified status, but

9    honestly, I don't believe he needs to to look at the software.

10         THE COURT:  Well, Mr. Klayman he's been pounding the

11   drum for some time that the software is classified.  And you

12   obviously disagree with him.  But he's been raising that point.

13         So knowing that you were going to confront that

14   argument, why didn't the Defendants make arrangements to retain

15   an expert witness to examine the software who has the necessary

16   security clearance?  Just in case a court order would agree

17   with Mr. Klayman.

18         MS. HANDMAN:  Well, I don't know that he would get -- I

19   don't know that there are this cadre of experts who also have

20   classified clearance.  If it were necessary, if it became

21   necessary, we would do that.  But I -- that's so hypothetical

22   at this point, you know, that it really would not be worth

23   our -- this case has been extraordinarily expensive.  This

24   sanctions process alone in trying to track down the software:

25   extraordinarily expensive.

1          We hope that your Honor will award us attorney's fees

2     in connection with this.  And we hope that your Honor, if you

3     don't dismiss, will at least give us a finding that the

4     software does not work or did not exist and preclude

5     Mr. Klayman's client from testifying or putting in any evidence

6     either on summary judgment or at trial on that subject.

7          THE COURT:  So, Mr. Klayman, when was the last time you

8     or Mr. Montgomery made an effort to try to help the FBI locate

9     the software that may have been turned over to the FBI?

10          MR. KLAYMAN:  A few weeks ago, I communicated with

11     Mr. Baker.  And I said, Jim, I'd like you to take control of

12     this and put somebody on this, even on the civil side, other

13     than Mr. Schwartz, because we have been cooperating.

14          THE COURT:  And have you provided --

15          MR. KLAYMAN:  I can provide that to you, if you'd like

16     to see it.

17          THE COURT:  Have you provided any specific guidance to

18     the FBI such as, "Here's a file name"; "Here's a more

19     particularized description of a file"; "Here's this code";

20     "Here's this particular directory"?  Anything mechanical,

21     logistical, that would from a practical perspective help the

22     FBI track down the software?

23          MR. KLAYMAN:  We did, your Honor.  And that's what we

24     wanted to talk to Mr. Schwartz about.  But, of course, I -- I

25     don't get a return call.  But apparently, Ms. Handman does.

```
 1            THE COURT:  When was the last time that you provided

 2    that type of practical assistance?

 3            MR. KLAYMAN:  We provided a listing, to the best of my

 4    recollection, of the different categories of information that

 5    was on the hard drives, okay, and where to find it.

 6            THE COURT:  When?

 7            MR. KLAYMAN:  I would say probably about a month ago,

 8    somewhere in that range, six weeks.

 9            THE COURT:  Is that before or after Mr. Schwartz wrote

10    the letter saying that this information is of no help?

11            MR. KLAYMAN:  That was after his first letter.  And

12    I've been trying to -- and then I met with the FBI in

13    Washington about a month ago.

14            THE COURT:  Let me do a better job of asking the

15    question.

16            So you know Mr. Schwartz wrote a letter to you that

17    basically said, You have submitted this information to us.  I

18    think he used the phrase "a Dropbox" in that memo, and said,

19    And, frankly, this is of no help to us at all and it is not

20    what we asked for in our prior request.

21            So that particular letter -- let's call it the Dropbox

22    letter -- Ms. Handman, what was the date of that letter?

23            MS. HANDMAN:  Well, the Dropbox e-mail was sent

24    November 16 by --

25            THE COURT:  November 16th.  By Mr. Schwartz?
```

1          MS. HANDMAN:  No.  That was sent by -- forwarded by

2     Mr. Klayman.  He forwarded what Montgomery had sent to him,

3     which was the Dropbox, on November 16th.

4          On December 11, Mr. Schwartz wrote the e-mail that you

5     are describing that we put in the record at 196 that says that

6     that was of no use and that they still had not provided the

7     file identification and --

8          THE COURT:  Right.  That's the e-mail where

9     Mr. Schwartz used the term Dropbox, didn't he?

10          MS. HANDMAN:  Correct.

11          THE COURT:  All right.  And that related back to a

12     November 16 e-mail from -- that Mr. Klayman forwarded.

13          So, Mr. Klayman, we're using that date as a marker,

14     December 11th, 2015, Mr. Schwartz's letter, where he said the

15     information is of no help.

16          So have you provided any additional guidance to

17     Mr. Schwartz or other FBI officials who were searching for the

18     software such as the file name, a directory name, a

19     subdirectory code or things like that since December 11th?

20          MR. KLAYMAN:  What I did was I wrote back to Mr. Baker

21     and I said, We want to come forward and we believe that what

22     we've provided will allow you to find it if in fact it's there,

23     but that we're prepared to do whatever it takes for you to make

24     an effort, a real effort, to find it; that I am disappointed

25     with Mr. Schwartz.  I put it mildly, frankly.

1          You know, Washington, your Honor, is a funny place.

2     I've spent most of my professional life there as well as here.

3     And people sometimes based on your politics or, you know, who

4     you've wound up suing before take a dislike and they don't even

5     know you.  And that's what I believe has happened with

6     Mr. Schwartz.  You know, with all due respect, I don't know

7     what your politics are.  I'm a conservative.  He's probably a

8     liberal democrat.  He probably doesn't like me.

9          And so I've been trying to communicate with the FBI.

10    And I might add, he's communicating with her, but not with me.

11    I've been trying to take a position with the FBI that we're

12    here to help you.  And this shows our good faith, not our bad

13    faith.  We have -- and I'll provide that further documentation

14    to you.

15         THE COURT:  What further documentation?

16         MR. KLAYMAN:  Well, I have e-mails to Mr. Baker saying,

17    Hey, we want to help you with this.  We want to --

18         THE COURT:  So I've been listening to your explanation.

19    And it sound to me that, setting aside the attorney rhetoric,

20    the simple answer to my question is, No, I have not provided

21    such specific advice.  Am I correct or incorrect in that

22    assessment?

23         MR. KLAYMAN:  From the point of when we set forth the

24    different files that would be found, the answer is no, because

25    Mr. Montgomery believes that that will allow the FBI to find

1    it, but that we have reached an impediment with Mr. Schwartz.

2    And that's why I was communicating with Mr. Baker, copying

3    Judge Lamberth on that.  And I did have a subsequent meeting

4    with the FBI, where I said, Look, we are here to help.  And

5    it's an open book here.  There is no bad faith here, your

6    Honor.

7            THE COURT:  So if you say to me, "Well, I wrote a

8    letter to Mr. Baker saying, 'We're trying to cooperate; we have

9    our issues with Mr. Schwartz; please believe us; we really do

10   want to try to help you track down this information,'" how is

11   Mr. Montgomery going to be able to help the FBI to track down

12   the software on that massive amount of information that he

13   turned over if he doesn't even have the software anymore?

14   Where is he going to get the additional information to pass on

15   to help the FBI further its efforts to locate the software?  Is

16   he just going to have a dream and then maybe in the middle of

17   the night he'll come up with the name of a subdirectory file?

18   How --

19           MR. KLAYMAN:  Again, we --

20           THE COURT:  -- from a practical perspective, if he

21   doesn't have the software anymore, is he going to be of any

22   help whatsoever?

23           MR. KLAYMAN:  First of all, as I've said, he's not

24   entitled to be in possession of that software.  He had to turn

25   it over.  It doesn't mean that he can't meet with FBI agents

1    and analysts and help them go through it.  And he's got

2    immunity, both in terms of document production and in terms of

3    testimony.  So he is available for that.

4           And so there's no bad faith here.  And that's a

5    material element of what you have cited with regard to

6    sanctions and spoliation.  We have continuously put our foot

7    forward.

8           And I've said, in Washington, sometimes people take a

9    disliking to you.  You know, I wound up suing the Clintons a

10   lot; I wound up suing George W. Bush a lot.  Who knows why

11   Schwartz won't return my call?  So I went to Baker.  Maybe the

12   guy's just incompetent.  There are incompetent people,

13   regrettably, in these agencies.  I worked with them, believe

14   me, at the Justice Department.

15          So I take issue with the fact that we haven't tried to

16   come forward.

17          And with regard to this issue of the Air Force,

18   discovery's closed.  We asked to -- as I said, to extend it a

19   month.  Ms. Handman on behalf of her client has filed no motion

20   to compel the Air Force.  That's a complete ruse, what she's

21   saying, that she's waiting for the Air Force.  I'm waiting for

22   Godot.

23          So that makes no sense at all.

24          And then last by not least, this concept that it's

25   unanimous that you dispose of cases at the earliest point:

1    That's not the way things are done here in the Southern

2    District, thank God.  That's why this is my favorite district

3    to be.  You actually listen to what the lawyers are saying and

4    make rulings on what's said.  And Mr. Montgomery's not even a

5    public figure.

6           So this whole concept of actual malice, we contend, is

7    not even necessary.  Defamation can result from negligence.

8    He's not a public figure.

9           THE COURT:  So let's turn to your supplemental

10   memorandum of law in response to my questions.  In particular,

11   I'm talking about Docket No. 212, Docket Entry 212.  So I

12   basically came up with a list of questions that I wanted you

13   folks to answer.  And you responded in your supplemental

14   memorandum.

15          And Question No. 2 -- Questions No. 2 and 3 are sort of

16   related.  And the question was:  May a sanctions order be

17   entered if there is a factual dispute on a material factual

18   issue?

19          And you say no.  If there's a factual dispute, the

20   issue must be given to the jury to decide.

21          So let me ask you sort of a hypothetical question so I

22   can understand.  Let's assume for the sake of discussion that

23   500 people are standing in a large room and at the front of the

24   room is a fireplace which is lit.  There's a raging fire in the

25   front.  And 498 of those 500 people say that they saw a

1   particular person throw a flash drive containing electronically

2   stored information into the fire.  498 out of 500 say that.

3   And this person is involved in litigation, the one who tossed

4   the flash drive into the fire.

5         Two of the 500 people, however, say, no.  That's not

6   true.  This particular person did not throw the flash drive

7   into the fire.

8         So according to you, I would not be able to enter a

9   sanctions motion -- not be able to grant sanctions based on a

10  conclusion that the party spoliated evidence by throwing a

11  flash drive into a fire because, my gosh, there's a factual

12  dispute.  Two out of 500 people say he didn't do it.

13        Isn't that a logical outgrowth of your position that no

14  sanctions can be awarded if there's a factual dispute?

15        MR. KLAYMAN:  No.  And the reason for that is, your

16  Honor, is that -- demeanor.  Okay?  One person that has the

17  credibility can carry the day against 500 other people.  You

18  have to assess the demeanor and the credibility.

19        And that's why an evidentiary hearing is so important.

20  That's why you held one in that case, because you can come in

21  and put anything you want in an affidavit.  An affidavit's

22  generally not even worth the paper it's written on unless you

23  assess -- unless you assess the demeanor of the person.  So --

24  or documents that are being, you know, given to you in

25  isolation without bringing someone in to do that.

1          That's why I say, one deposition in a year?  They can

2    go -- they can go around taking depositions here and having

3    people on video, and you would have been able to assess

4    demeanor.

5          And Mr. Montgomery is extremely credible.  And he's

6    extremely sincere.  And he has not revealed anything publicly

7    like Snowden did to compromise our national security.  He's

8    done it all behind closed doors, the proper way, with the FBI.

9          THE COURT:  So it sounds like what you're saying is,

10   actually, Yes, sanctions can be awarded if there is a factual

11   dispute if the Court determines that the credibility of the

12   witnesses to the contrary is low.

13         MR. KLAYMAN:  I didn't get to the second part.

14         In an extreme circumstance, the answer is yes, but not

15   in this circumstance, where there is so much gray.  Not that I

16   believe there's gray, but because the gray has been presented

17   by the other side.

18         The reality here is, is that this issue should be given

19   to the jury to decide.  Let them hear what the issue was with

20   the classification.  Let them hear the issue that there was

21   about coming forward over a number of years and being a

22   whistleblower and having no one listen to you until Judge

23   Lamberth made a contact on behalf of Mr. Montgomery with the --

24   with the director of the FBI through his general counsel, James

25   Baker.  Let them hear that Mr. Montgomery has risked his life

1   and has been threatened for coming forward.

2        You know, it's our contention that this -- what

3   happened here with regard to this chapter may have been an

4   effort by the CIA to discredit Mr. Montgomery before he came

5   forward.  Yet we can't find out who the sources were, if there

6   were any at all.

7        Let them hear that Mr. Montgomery has an aneurysm and

8   his life expectancy is not great, yet he must do the right

9   thing for this country.  Let them hear all that.

10        THE COURT:  So let's --

11        MR. KLAYMAN:  So let the jury decide this.  And she can

12   make her arguments, Ms. Handman.

13        THE COURT:  So let's take a look at Point No. 4, your

14   answer to Question 4, a very succinct statement, five words:

15   "Plaintiff never changed his position."

16        I have to tell you, Mr. Klayman, I have a difficult

17   time accepting that statement because, as we've already

18   reviewed many times earlier today, in his deposition that

19   Mr. Montgomery said unequivocally, I turned over the software.

20   At the hearing, you unequivocally said to me, The software was

21   turned over.  And then in this declaration, he says, Upon

22   further searching of my memory, I now believe I didn't turn

23   over the software.

24        How is that not a change in position?  Would you

25   explain that to me?

1          MR. KLAYMAN:  Because at the time that Mr. Montgomery

2     made the representations, notwithstanding the fact that he

3     wasn't feeling well at a deposition is just one instance

4     because of his severe brain aneurysm --

5          THE COURT:  That may be an explanation --

6          MR. KLAYMAN:  -- he believed them to be true.

7          THE COURT:  Excuse me.

8          That may be an explanation for a change in position,

9     but that's not -- that's much different than saying, There was

10    never a change in a position.  How can you say to me with a

11    straight face he never changed his position?

12         MR. KLAYMAN:  I can say that because he believed it at

13    the time to be true, number one.

14         Number two, the distinct possibilities when the

15    documentation and materials were given back to him after his

16    house was illegally searched and his person was illegally

17    searched, that the software was not given back to him, that he

18    believes that it was there.

19         And --

20         THE COURT:  Again, that would be an explanation,

21    perhaps a justifiable one, for a change in position.  The

22    explanation would be, Yes, Judge.  He changed his position, but

23    that's because he was lied to or that's because the FBI tricked

24    him into thinking that the software had in fact been returned

25    or that's because he was sick and had an aneurysm at the time.

```
 1    Those would all be explanations, perhaps acceptable, for a

 2    change in position.

 3            But you haven't explained to me yet the basis or

 4    persuasively told me the basis for your succinct, unequivocal

 5    statement:  Plaintiff never changed his position.

 6            MR. KLAYMAN:  This is --

 7            THE COURT:  I don't understand that comment.

 8            MR. KLAYMAN:  I understand what your question is, your

 9    Honor.

10            This is a term of art used by lawyers representing the

11    client who is taking the position for that client that what he

12    said was consistent at the time, that he believed it to be

13    true.  And that's what I meant by that, not that my client had

14    lied or acted in bad faith or anything to that effect.  So

15    that's what that means.

16            THE COURT:  So let's take a look at the next page --

17            MR. KLAYMAN:  So I'm glad you asked the question.

18            THE COURT:  -- next page, Page 2, Paragraph -- numbered

19    Paragraph 6.  You say here in the second statement, "Montgomery

20    initially believed that he may have turned the software over in

21    the 47 hard drives."

22            So I read that statement today, earlier today,

23    preparing for the hearing.  And here's what I did:  I circled

24    the word "may," because that to me is the most important word

25    in that statement, in that sentence.
```

1          Now, maybe he did believe at the time initially that he

2     may have turned over the software.  But that's not what he

3     said.  He didn't say, "I may have turned it over"; "I could

4     have turned it over"; "I'm not sure if I turned it over"; "My

5     recollection is not clear."  There are a number of different

6     possibilities.

7          He came right out and said that he did.  And you came

8     right out and said that you did, unless as part of your

9     completion of the homework assignment you point to me to a

10    particular place in the transcript where you made an

11    unequivocal representation about that.

12         So how do you say -- or why does it matter what he

13    secretly internally believed?  Doesn't it really matter what

14    his statements were on the record in a deposition and what you

15    represented to the Court?  Isn't that far more important than

16    what he might have internally believed but never articulated?

17         MR. KLAYMAN:  Well, again, the use of "may" was a term

18    of art.  "May" can -- has a different context, how you use it.

19    Okay?  And in that context, what we meant to say is that he

20    believed that it was there.  Okay?  That's what I meant by

21    that.

22         You know, you have a very good sense of humor, your

23    Honor, if you may indulge me.  The first movie that I ever saw

24    of Woody Allen, Take the Money and Run.

25         THE COURT:  Yes.

1          MR. KLAYMAN:  He goes into a bank.  He gives the teller

2     a note.  And he says, "This is a holdup.  I want all your

3     money.  I've got a gun."

4          The holder -- the teller can't read the word "gun."

5     And she says, "This looks like 'gub' to me."  Remember that?

6          THE COURT:  I do.

7          MR. KLAYMAN:  Right.  And by the time they finish

8     arguing over whether it meant gub or gun, Fielding Mellish, the

9     character, was arrested and taken to prison and locked in

10    solitary confinement with an insurance salesman, which is the

11    worst punishment of all.

12         So that's what I'm talking about.

13         THE COURT:  Well, you have my congratulations for

14    remembering that his character's name was Fielding Mellish.

15    You're absolutely right.

16         MR. KLAYMAN:  I love Woody Allen.

17         So --

18         THE COURT:  Do you know what his actual name is?

19         MR. KLAYMAN:  No.

20         THE COURT:  I believe that his last -- his actual last

21    name is Konigsberg.  Am I right?

22         MR. KLAYMAN:  You probably are.  I never knew that.

23         UNIDENTIFIED SPEAKER:  (Inaudible.)

24         THE COURT:  Yes.  I think it is Konigsberg.  All right.

25    I get a gold star.

```
 1            MR. KLAYMAN:  He's at the Carlisle Hotel in New York
 2   every Monday playing his clarinet.  Very nice person.
 3            THE COURT:  Is it the clarinet or the flute?  Maybe
 4   you're right.  It's the clarinet.
 5            MR. KLAYMAN:  I don't know.
 6            THE COURT:  Okay.
 7            MR. KLAYMAN:  So what I'm saying is is that, you know,
 8   in different contexts, words mean different things.  In the
 9   context of that, we meant that he believed that he had turned
10   it over.
11            THE COURT:  All right.  And so again, maybe it's a
12   question of semantics; but on this same page, you say,
13   "Therefore, Mr. Montgomery did not lie.  Mr. Montgomery at all
14   times acted in good faith, particularly since the software is
15   classified."
16            So again, I'm telling you, you can look here at my
17   notes:  "is."  Because when you say to me something is
18   classified, my way of reading it is, this has got to be
19   something more than an argument from Mr. Klayman, his lawyer.
20   My gosh, maybe there's a judge who has said it.  Maybe, you
21   know, Mr. Schwartz from the FBI said it.  Who knows?
22            But I think that what you're telling me is that nobody
23   has classified it.  This is simply your client's position.
24   Correct?
25            MR. KLAYMAN:  My understanding, as I said before, is
```

```
 1    that the CIA has now confirmed that it's classified.  I know

 2    that your Honor, you know, may see it differently.  But that's

 3    our position.

 4         This -- if indeed what Mr. Risen wrote has any truth to

 5    it at all, and this is the biggest hoax in American history,

 6    then this software basically, to use a movie analogy, was the

 7    reverse equivalent of doomsday machine in Dr. Strangelove.  It

 8    was the greatest thing invented in world history.  And it

 9    proved to be a fraud.

10         So if it is such a great thing and if in fact Mr. Risen

11    dedicated his book to Mr. Montgomery -- and this was the focus,

12    as documents will show that, to sell the book, the

13    sensationalism -- then it had to be classified, if it could do

14    everything that Mr. Montgomery is claimed to have represented

15    that it did.

16         MS. HANDMAN:  That's a big "if."

17         MR. KLAYMAN:  You're darned right it's a big "if."  But

18    it's an "if" that your client --

19         THE COURT:  Folks, folks, you've behaved for the past

20    half-hour.  Let's not stray.  Let's continue to act

21    professionally, please.

22         So by the way, Mr. Klayman, you say you're a big Woody

23    Allen fan.  I have to tell you, although I am, too, my children

24    have now come to hate Woody Allen.  And I'll tell you why.

25    While they were growing up, every single time that we went out
```

1   to a Chinese restaurant, I would always say the same thing.

2   The fortune cookies would come.  I would open up the fortune

3   cookies.  And you know what I would read out loud?  It's a

4   famous Woody Allen line.  In fact, it's the title of one of his

5   books.

6           MR. KLAYMAN:  You stumped me on that one.  But educate

7   me.

8           THE COURT:  Ms. Handman?

9           MS. HANDMAN:  I should know.

10          THE COURT:  Mr. Bohrer?

11          MR. BOHRER:  No, sir.  Not -- I'm not a Woody Allen

12   fan.

13          THE COURT:  Mr. Toth?

14          MR. TOTH:  I don't know.

15          THE COURT:  "Help.  I'm a prisoner in a Chinese

16   bakery."

17          (Laughter.)

18          THE COURT:  So that was the title of one of his books.

19   And I would say that at every Chinese meal, and my children

20   therefore hate Woody Allen.  The epilogue to the story is that

21   now that my children are grown up and my son is 27 and my

22   daughter's almost 25, occasionally it has been told to me they

23   lapse and they use that comment with their friends when they're

24   out to dinner.

25          MR. KLAYMAN:  I have to say, if you'll indulge me, my

1    favorite Woody Allen line is there's nothing like love between

2    a man and a woman.  It just depends which man and which woman

3    you get in between.

4            THE COURT:  He probably stole that from Groucho Marx.

5            MR. KLAYMAN:  Probably.

6            THE COURT:  So we have now spent a significant amount

7    of time, a little more than four hours, going through my

8    questions and your answers to my questions or, no disrespect,

9    non-answers to my questions.

10           But I told you folks that I would give you an

11   opportunity to make further argument on the spoliation motion

12   if we have not covered an issue either factual or legal that

13   you want to bring to my attention.

14           I think you've done a pretty comprehensive job of

15   covering all the issues.  However, I'm going to give each side

16   the opportunity to raise a new argument or to add some gloss to

17   an argument that we have already discussed.  However, do not

18   hesitate to say, "I have nothing further to say."

19           So, Ms. Handman, you're the movant on the spoliation.

20   Do you have any additional arguments to say?  And before

21   deciding, feel free to consult with Mr. Bohrer and Mr. Toth.

22           MS. HANDMAN:  Your Honor, I was only going to close

23   with -- I know you have a penchant for quotes.  And here is one

24   that I've been saving since I was an AUSA.  And it was issued

25   by a brilliant defense counsel in one of the Abscam cases.  I

```
 1    think it's attributable, or a version of it, to Mark Twain:

 2    The thirteenth stroke of the clock is not only false of itself,

 3    but casts grave doubt on the credibility of the preceding

 4    twelve.

 5            THE COURT:  Understood.  Do you know Mark Twain's real

 6    name?

 7            MS. HANDMAN:  Oh.

 8            MR. KLAYMAN:  Samuel Clemens.

 9            THE COURT:  I was asking Ms. Handman.  Okay?

10            MS. HANDMAN:  I'm not good with names.

11            THE COURT:  Plus, you didn't phrase your answer in the

12    form of a question, so it wouldn't constitute a successful

13    Jeopardy response.

14            Mr. Klayman, anything further from you?

15            MR. KLAYMAN:  Yes, your Honor.

16            THE COURT:  Yes?  Okay.

17            MR. KLAYMAN:  You asked something earlier about even if

18    a person threw a flash drive.  Ironically, a flash drive is at

19    issue here.  We could have made the same argument that she's

20    attempting to make.  We never got the 20,000 documents on the

21    flash drive that Mr. Flynn had turned over to Mr. Risen.  And

22    it's a miraculous disappearance of that flash drive or any

23    documents pertaining thereto.

24            But I'm not making that argument.

25            Even if a person threw the flash drive into a
```

 1   fireplace, even if he actually did it, if it wasn't done

 2   intentionally, then it's certainly not bad faith.  And the case

 3   law is such that bad faith is not even grossly negligent

 4   behavior.  If you look at the *Preferred Care Partners* case,

 5   it -- Westlaw 982460, Page 7, and it's not even clearly

 6   egregious conduct --

 7          THE COURT:  That's a Shineman case out of the Southern

 8   District of New York.  Right?

 9          MR. KLAYMAN:  Right.

10          And, your Honor, I'm not trying to flatter you, but you

11   wrote an excellent decision in that *Wandner* case, which, you

12   know, I think is one of the seminal decisions out there right

13   now.

14          THE COURT:  I would hardly call it a seminal decision.

15   But thank you for the comments.

16          Anything new to add?

17          MR. KLAYMAN:  It's ironic, though, that the one case in

18   this district that they cite is yours.  Okay?  Everything else

19   is somewhere else.  And I do have DC Circuit cases as well.

20          THE COURT:  Actually, I think they cited another case

21   called *Boston Boat*, I think, which is a more recent spoliation

22   case in which I found that spoliation had occurred.

23          So in *Wandner*, the result was no spoliation.  In *Boston*

24   *Boat*, there was.

25          MR. KLAYMAN:  The other case, your Honor -- you may

174

```
  1    know it already --
  2              THE COURT:  And they also cited Point Blank, I think,
  3    as a matter of fact, as well, which is a spoliation case.
  4              MS. HANDMAN:  We did.
  5              THE COURT:  The other case we would turn your attention
  6    on -- I won't relive your Wandner case, because you know what
  7    you wrote -- is Michele E. Shepherd and LaRue Graves,
  8    Appellees, versus American Broadcasting Companies, Inc.,
  9    Appellant.  It's Lexis No. 94 -- Cases No. 94-7141 and No.
 10    94-7186, the United States Court of Appeals for the District of
 11    Columbia Circuit.  Ms. Handman loves the DC Circuit.
 12              By the way, this (inaudible) statute has been stricken
 13    down in the federal court there on diversity cases.  So the
 14    idea of dismissing things early no longer exists in DC.
 15              THE COURT:  What's the specific Lexis citation to
 16    this --
 17              MR. KLAYMAN:  Well, you can find it at 62 F.3d 1469.
 18              THE COURT:  62 F.3d --
 19              MR. KLAYMAN:  1469.
 20              THE COURT:  And the other case?
 21              MR. KLAYMAN:  314 US Appeals, DC, 137.  These are
 22    alternative cites.
 23              THE COURT:  Yes.  But that's --
 24              MR. KLAYMAN:  The Lexis cite --
 25              THE COURT:  But I don't need alternative cites for the
```

```
 1    same case.  I thought you cited two cases.  No?  Only one?

 2          MR. KLAYMAN:  Well, they're consolidated cases.

 3          THE COURT:  So 62 F.3d --

 4          MR. KLAYMAN:  I'll give you a copy of this.

 5          THE COURT:  62 F.3d 1469 is a consolidated case?

 6          MR. KLAYMAN:  It appears -- there appears to be two

 7    different cases that were filed.

 8          MS. HANDMAN:  What are they called?

 9          THE COURT:  Shepherd.

10          MR. KLAYMAN:  Shepherd versus American Broadcasting

11    Company.

12          THE COURT:  Shepherd versus ABC, yes.

13          And the other one?

14          MR. KLAYMAN:  There are two numbers listed for that

15    one, 947141 and 947186.

16          THE COURT:  Yes.

17          MS. HANDMAN:  They're cited in our papers, your Honor.

18          MR. KLAYMAN:  Yeah.

19          And this case goes through the law.  Under these

20    circumstances, where you're asking for dismissal or an adverse

21    inference, it would take clear and convincing evidence.  And

22    what the Defendants have alleged is in effect that somehow

23    Mr. Montgomery, which of course we strenuously deny, committed

24    some kind of fraud.  But even if it's not fraud, it's still

25    something that's subterfuge.  And it would take clear and
```

1    convincing evidence for your Honor to impose Draconian

2    sanctions.  Okay?  And this case goes through all the different

3    case law in that, in addition to what you wrote.

4         And then there is the case *Pfizer, Inc., versus*

5    *International Rectifier Corp.*, 538 F.2d 180, 195, Eighth

6    Circuit, 1976 -- cert denied -- and all the progeny cases:

7    *Ford versus Fogarty Van Lines, Inc.*, 780 F.2d 1582 at Page

8    1583, Eleventh Circuit, 1986; *RD versus Stock*, S-T-O-C-K, 712

9    F.2d 1290, at Page 1292, Eighth Circuit, 1983; *Titus versus*

10   *Mercedes-Benz*, 695 F.2d 746 at Page 749, Third Circuit, 1982;

11   *Graves versus Kaiser Aluminum and Chemical Company*, 528 F.2d

12   1360, at Page 1361, Fifth Circuit, 1976.  And of course, the

13   Fifth Circuit became the Eleventh Circuit.

14        And there was also the case that you cited by Judge --

15   Magistrate Judge Simonton with a whole line of authority in

16   that regard which she cited in her opinion.

17        So there's a lot of authority here that the threshold

18   is extremely high to impose spoliation sanctions here with such

19   a Draconian measure as dismissal or an adverse inference.  This

20   matter is -- really, there are disputes of fact here.  It

21   should be provided to the jury to decide.

22        Again, we could have played the same tactical game with

23   regard to the thumb drive.  Ironically, your Honor used that as

24   an analogy.  And that was not produced in this case to

25   Mr. Risen.  It was produced to Mr. Risen by Mr. Flynn,

1    violating the attorney-client and work-product privileges of

2    Mr. Montgomery.  That went absent.  Mr. Flynn went absent.  No

3    one knows where he is.  We do have a motion still pending in

4    the Central District.

5            And it is very telling.  There are certain things here

6    that -- you know, there's a great trial lawyer by the name of

7    Gerry Spence.  You've probably heard of him.

8            THE COURT:  Yes.  Out of Wyoming.

9            MR. KLAYMAN:  Yes.  He used to wear a Buckskin Billy

10   outfit, you know, and a ponytail.  A very bright guy.  One of

11   the great trial lawyers of our time.

12           And Gerry Spence always said -- sometimes I was on TV

13   with him during the Clinton years, and he would say this to me

14   and to the audience.  And he was saying, you know, "Everything

15   has a reason.  There's always a story and the pieces fit."

16           And the pieces fit here, is that an expert that doesn't

17   have even the ability to look at the software, appointed or

18   named on the last day but without complying with the Federal

19   Rules of Civil Procedure and local rules, not moving to compel

20   the testimony of the CIA --

21           THE COURT:  Mr. Klayman, I'm sorry, sir.  But --

22           MR. KLAYMAN:  All right.  I won't repeat.

23           THE COURT:  The most important thing I said to you was:

24   anything new.  And so far, every single point you've made is

25   highlighted in something you told me earlier.

1          Any --

2          MR. KLAYMAN:  At this point, I think you're right, your

3    Honor.  So I'll -- I'll just say one last thing here, your

4    Honor:  What they're trying to do just doesn't smell right.

5    And it's a grasping at straws.  Again, they're swinging for the

6    fences, but they've struck out.

7          THE COURT:  Those are four metaphors in one conclusion.

8    My gosh.

9          One other question for you, which is, I had asked the

10   parties whether or not the appropriate burden of proof on

11   spoliation is preponderance, clear and convincing or something

12   else.

13         The Defendants submitted a memorandum of law, a fairly

14   lengthy, comprehensive discussion that went on for many pages.

15         You were far more succinct and to the point and simply

16   said:  preponderance.  But you didn't cite any case law or make

17   any argument.  You just sort of said, That's what it is.

18         Do you have any case law to support your response that

19   the appropriate burden of proof here in the Eleventh Circuit on

20   a spoliation sanctions issue is clear and convincing evidence?

21         MR. KLAYMAN:  I just cited those cases, your Honor:

22   your case, the *Michele Shepherd* case and all the citations that

23   I then set forth on the court record.

24         THE COURT:  All right.  I understand.

25         MR. KLAYMAN:  And if your Honor would like a copy of

1    the *Shepherd* case, I can give it to you.

2            THE COURT:  I do not.

3            So one final point, which has to do with the

4    Defendants' argument about being unduly prejudiced if sanctions

5    are not imposed, which is, assume for the sake of discussion

6    you get past the summary judgment motion, which hasn't been

7    referred to me.  Judge Martinez will be ruling on that.  And

8    assume you get by the spoliation motion and you're now at

9    trial.

10           So at the trial, would it be Mr. Montgomery's intent to

11   submit evidence that the software existed, number one?  And

12   number two, that it worked?  I think you told me he'd actually

13   testified to that himself.  Correct?

14           MR. KLAYMAN:  He testified himself where, your Honor?

15           THE COURT:  If, hypothetically, the case were to go to

16   trial, you would have Mr. Montgomery appear as a witness.

17   Right?

18           MR. KLAYMAN:  Correct.

19           THE COURT:  I mean, I don't know how you'd prove your

20   case without Mr. Montgomery appearing.  So he'd be a witness

21   for you.  Right?

22           MR. KLAYMAN:  Correct.

23           THE COURT:  All right.  And one of the things that you

24   would have him do at the trial is to testify that, A, the

25   software existed and, B, that it worked.  Correct?

1           MR. KLAYMAN:  He would -- he would testify that what

2    was written by Mr. Risen was not true and that the government

3    is still using the software and that for that limited

4    purpose -- again, it's only a small part of the case -- that he

5    did not defraud the government.

6           Whether it worked or not is for the government to

7    decide, is that he was not ever accused of committing the

8    biggest hoax in American history.  So that's what our testimony

9    would be geared to.  It wouldn't be hinging on the software; it

10   would be hearing [sic] on the fact that no one has ever accused

11   him of committing the biggest hoax in American history.  And

12   there are documents that'll be in our summary judgment

13   opposition where no one has ever said that from the government

14   in terms of what was produced by the Defendants.

15          THE COURT:  Mr. Klayman, I want to be very candid with

16   you right now.  I'm going to tell you my reaction to what you

17   just said.

18          My reaction is, Gee, Mr. Klayman's being evasive.  He's

19   not answering my question.  These are the thoughts that are

20   running through my mind.  Because I asked a fairly simple

21   question --

22          MR. KLAYMAN:  Your Honor --

23          THE COURT:  -- which is:  If the case were to go to

24   trial, at any point in the trial, do you anticipate that

25   Mr. Montgomery would say -- I'm not saying it's the most

1   important thing; I'm not saying he wouldn't testify about other

2   things.  I'm just simply saying, among all the things that you

3   would have him testify to, wouldn't you have him testify, A,

4   that the software existed and, B, that it worked?  Yes or no.

5   Those are the only two permissible responses.

6          MR. KLAYMAN:  I -- my strategy evolves as I go to

7   trial, your Honor.  But as of today, it depends on what

8   happens.  It depends on your rulings and everything else.

9          But as of today, I would not have him testify to that.

10  I would have him testify that no one has ever said that his

11  software didn't work.  No one has ever said that.  No one has

12  ever claimed that.  That's apart from the issue of whether it

13  worked or not.

14         THE COURT:  So just so I'm clear, you're representing

15  to me that right now, at trial, you would not have

16  Mr. Montgomery testify that the software existed and that it

17  worked?  You would not do that?

18         MR. KLAYMAN:  As of today, that's not my strategy.

19  You're asking me to reveal my strategy here.  But as of today,

20  they have nothing -- they have put forward nothing to show that

21  the software didn't work --

22         THE COURT:  So then --

23         MR. KLAYMAN:  -- and nothing to show that someone told

24  Mr. Montgomery or anybody else that it didn't work.

25         And again, your Honor hit the nail on the head earlier.

1    It's not -- it's not a proposition of -- how do I phrase

2    it? -- one or the other, because it may have worked in certain

3    portions and maybe there were some things that needed to be

4    modified or whatever the case may be.  But the bottom line here

5    is -- and the case is very simple from our perspective -- no

6    one has come forward to say it didn't work.

7              THE COURT:  Here's the issue, Mr. Klayman:  It's not

8    necessarily me trying to get you to disclose your trial

9    strategy.  It has to do with me evaluating the merits of the

10   Defendants' argument that we need sanctions because if we don't

11   get them, Mr. Montgomery with his lawyer, Mr. Klayman, doing

12   the questioning at trial, will testify that the software

13   worked.  And if we don't have access to the software and you

14   don't impose sanctions, we're unduly prejudiced.

15             So in order to deal with that argument, I'm asking you

16   the question of what's going to happen at trial.

17             And basically, you didn't answer the question.  But

18   instead, you said, Well, my strategy is evolving.  I don't plan

19   on doing that.

20             So therefore, the next logical step would be that if

21   that's the case, I take it that you would not object to

22   entering into a binding stipulation right now that at trial you

23   agree that Mr. Montgomery will not at all testify whether the

24   software existed or whether it worked.  Are you willing to --

25             MR. KLAYMAN:  I can't do that, your Honor.

1          THE COURT:  Let me --

2          MR. KLAYMAN:  You know --

3          THE COURT:  Let me just finish my question.  You may --

4          MR. KLAYMAN:  I thought you were done.

5          THE COURT:  -- have predicted it.  But we need to have

6    a complete record.

7          So my question is:  Are you willing to enter into a

8    binding stipulation that at trial Mr. Montgomery will not

9    testify, A, that the software existed and, B, that it worked?

10   Are you willing to do that?

11         MR. KLAYMAN:  Your Honor, you know I can't do that.  I

12   don't know what's going to happen in your order.  I don't know

13   what's going to happen in subsequent testimony that may come up

14   at trial.  You know I can't do that.  I'm trying to give you a

15   good-faith response as we've been in good faith all along and

16   not in bad faith.

17         THE COURT:  The thing is --

18         MR. KLAYMAN:  And without going through --

19         THE COURT:  The thing is, Mr. Klayman, I don't know

20   that you can't do that, because parties with the advice of

21   counsel enter into those kinds of stipulations all the time.

22   In order to take an issue off the table, in order to not have

23   to confront an issue, parties will sometimes say, Your Honor, I

24   disagree with the other side's legal position.  But in order to

25   avoid A, B, C and D, I'll agree on the record I will never go

1    into this at trial.  It happens all the time.

2          MR. KLAYMAN:  Your Honor, I can't do that.

3          THE COURT:  Or sometimes in response to a motion in

4    limine, somebody will say, Judge, you don't have to rule on

5    that.  I agree not to enter into that testimony.

6          But you're saying --

7          MR. KLAYMAN:  I can't do that, your Honor.  No trial

8    lawyer that has any degree of experience past Civil Procedure

9    101 could agree to that.

10         And the reason you can't, okay, is because you don't

11   know what's going to come up.  I've had a hard enough time

12   today refuting facts that are set forth as firm facts that are

13   not true.  Okay?  So I don't know where it's going to go.  But

14   I don't want to go back through the last four hours here

15   because, number one, this is a tactic.  It is a ruse.  You made

16   it clear that your Honor doesn't want me to repeat it.

17         They can come forward with their sources at trial.  The

18   jury can make a decision on its own as to whether or not

19   Mr. Montgomery was in good faith or bad faith and withheld this

20   information.  Juries are very smart.  I have a tremendous

21   degree of confidence in the jury system.

22         And that's where you should leave it.  And, you know,

23   for me to do that, I'd be committing malpractice.  I should rip

24   up my Bar card.  I can't do that.

25         THE COURT:  So just to wrap up, Mr. Klayman, are you

```
 1    clear on your homework assignments?
 2            MR. KLAYMAN:  I would -- I'd ask you, your Honor,
 3    because of the summary judgment motion, can we submit it on
 4    Monday?
 5            THE COURT:  Instead of Friday?
 6            MR. KLAYMAN:  Instead of Friday.
 7            THE COURT:  Any objection to that?
 8            MS. HANDMAN:  No, your Honor.
 9            THE COURT:  All right.  And you, Ms. Handman, you're
10    aware --
11            MR. KLAYMAN:  No later than Monday.
12            THE COURT:  You're aware of your homework assignment as
13    well?
14            MS. HANDMAN:  Yes.
15            THE COURT:  So I'm sure that both of you took careful
16    notes of the homework assignment.  But just to make you feel
17    more comfortable, tomorrow I'll be entering a post-hearing
18    administrative order summarizing in writing each of the
19    homework assignments.  So to the extent that you're a little
20    nervous that you had to frantically take notes on the fly,
21    don't worry.  Rest assured I will put them in writing for you
22    so there's no confusion as to the homework assignment.  All
23    right?
24            MR. KLAYMAN:  We appreciate your diligence, your Honor.
25            MS. HANDMAN:  Thank you, your Honor.
```

```
 1            MR. KLAYMAN:  I'm not flattering you.  Few magistrate

 2    judges would spend four hours on any issue.

 3            THE COURT:  Well, it's actually four hours and 24

 4    minutes.

 5            MR. KLAYMAN:  Okay.

 6            THE COURT:  And, see, this is my experience as a

 7    private billable lawyer.  I'm not going to give up 24 minutes

 8    of billable time.  My gosh, that's, like, 300 bucks right

 9    there.

10            All right, folks.  For those of you who are out of

11    town, safe travels.  I'm still able to say Happy New Year.  So

12    again, Happy New Year.  Be well.  And take care.  We'll be in

13    recess.  Bye now.

14            (Proceedings concluded.)

15                      C E R T I F I C A T E

16

17            I hereby certify that the foregoing is an

18    accurate transcription of the proceedings in the

19    above-entitled matter to the best of my ability.

20

21

22    _____        /s/Lisa Edwards
          DATE             LISA EDWARDS, RDR, CRR
                           Official Court Reporter
23                         United States District Court
                           400 North Miami Avenue, Twelfth Floor
24                         Miami, Florida 33128
                           (305) 523-5499

25
```

**$**

**$100** [1] - 80:10
**$25** [2] - 65:3, 147:24
**$2500** [2] - 64:23, 67:2

**'**

**'a** [1] - 74:11
**'beguiled** [1] - 78:23
**'gub'** [1] - 167:5
**'how** [1] - 77:17
**'waste** [1] - 78:17
**'We're** [1] - 158:8

**/**

**/s/Lisa** [1] - 186:21

**1**

**1** [1] - 1:8
**1,000** [1] - 132:9
**10** [3] - 43:12, 43:14, 110:9
**100** [3] - 49:5, 94:22, 141:8
**101** [1] - 184:9
**10:00** [2] - 6:10, 14:24
**11** [5] - 16:7, 56:22, 57:18, 59:16, 156:4
**11th** [2] - 156:14, 156:19
**124** [2] - 16:7, 24:6
**127** [3] - 44:2, 47:6, 47:7
**1290** [1] - 176:9
**1292** [1] - 176:9
**12th** [1] - 60:10
**131** [1] - 116:17
**1360** [1] - 176:12
**1361** [1] - 176:12
**137** [1] - 174:21
**1469** [3] - 174:17, 174:19, 175:5
**15** [8] - 21:22, 22:7, 43:12, 43:14, 46:10, 60:8, 60:9, 64:6
**15-20782-CIVIL-MARTINEZ** [1] - 1:2
**15-20782-Civil-Martinez** [1] - 3:2
**15-minute** [1] - 61:4
**1582** [1] - 176:7
**1583** [1] - 176:8

**15th** [1] - 7:9
**16** [4] - 16:7, 56:24, 155:24, 156:12
**166** [4] - 26:19, 26:22, 48:17, 51:6
**16th** [4] - 61:19, 108:8, 155:25, 156:3
**178** [1] - 108:5
**18** [2] - 103:8, 126:14
**180** [1] - 176:5
**184** [1] - 119:25
**1919** [1] - 1:18
**195** [1] - 176:5
**196** [1] - 156:5
**196-1** [1] - 57:20
**1976** [2] - 176:6, 176:12
**1982** [1] - 176:10
**1983** [1] - 176:9
**1986** [1] - 176:8
**19th** [5] - 37:2, 45:15, 46:2, 61:19, 111:6
**1st** [2] - 27:11, 56:19

**2**

**2** [4] - 75:1, 160:15, 165:18
**20,000** [1] - 92:4, 172:20
**20-minute** [1] - 46:10
**20006** [1] - 1:19
**2003** [2] - 116:20, 116:22
**2007** [1] - 59:5
**2010** [1] - 78:4
**2014** [1] - 42:17
**2015** [4] - 56:25, 60:10, 117:4, 156:14
**2016** [4] - 1:5, 5:4, 55:19, 58:5
**2027** [1] - 1:15
**206** [2] - 77:14
**207** [2] - 77:21, 144:4
**208** [1] - 77:23
**20th** [3] - 60:13, 60:18, 117:4
**21** [1] - 117:20
**212** [3] - 78:11, 160:11
**214** [1] - 78:15
**216** [1] - 78:18
**218** [1] - 78:20
**22** [1] - 103:18
**220** [1] - 78:22
**22nd** [1] - 37:3
**23** [2] - 57:9, 76:12
**230** [1] - 78:25

**232** [1] - 79:5
**234** [1] - 79:12
**236** [1] - 79:12
**23rd** [2] - 56:20, 71:11
**24** [2] - 186:3, 186:7
**240** [1] - 79:12
**245** [1] - 79:13
**246** [1] - 79:19
**247** [1] - 79:24
**248** [1] - 80:2
**25** [1] - 170:22
**2520** [1] - 1:15
**259** [1] - 80:8
**262** [1] - 80:12
**27** [1] - 170:21
**28** [1] - 117:9
**28th** [1] - 60:10
**2:00** [2] - 1:6, 6:9
**2:08** [1] - 8:25
**2:11** [1] - 8:25

**3**

**3** [5] - 27:7, 27:10, 123:3, 128:24, 160:15
**30** [2] - 50:21, 54:7
**300** [1] - 186:8
**3000** [1] - 1:22
**305** [2] - 2:4, 186:24
**30th** [1] - 119:21
**314** [1] - 174:21
**33128** [2] - 2:3, 186:24
**33131** [1] - 1:22
**33145** [1] - 1:15
**35** [1] - 19:15
**38** [2] - 35:8, 111:20
**39** [1] - 35:8

**4**

**4** [2] - 163:13, 163:14
**40** [2] - 137:2, 137:4
**400** [2] - 2:2, 186:23
**41** [1] - 55:21
**45** [3] - 77:10, 136:3, 136:7
**47** [1] - 28:12, 38:23, 53:25, 57:13, 117:21, 133:17, 133:20, 134:1, 136:3, 138:1, 165:21
**48** [1] - 76:19
**49** [3] - 76:25, 77:6, 83:3
**498** [2] - 160:25, 161:2

**4:07** [1] - 89:23

**5**

**5** [2] - 1:5, 48:15
**500** [6] - 160:23, 160:25, 161:2, 161:5, 161:12, 161:17
**51** [2] - 57:13, 138:1
**523-5499** [2] - 2:4, 186:24
**528** [1] - 176:11
**538** [1] - 176:5
**5th** [2] - 4:1, 4:7

**6**

**6** [2] - 48:15, 165:19
**60** [1] - 54:6
**600** [3] - 28:12, 53:25, 57:14
**62** [4] - 174:17, 174:18, 175:3, 175:5
**65** [3] - 77:7, 77:11, 77:12
**695** [1] - 176:10

**7**

**7** [1] - 173:5
**701** [1] - 1:21
**712** [1] - 176:8
**746** [1] - 176:10
**749** [1] - 176:10
**780** [1] - 176:7
**798** [1] - 126:14

**8**

**8** [2] - 57:4, 133:13
**800** [1] - 1:18
**8th** [3] - 56:17, 60:11, 137:22

**9**

**9** [3] - 51:6, 60:7, 61:7
**94** [1] - 174:9
**94-7141** [1] - 174:9
**94-7186** [1] - 174:10
**947141** [1] - 175:15
**947186** [1] - 175:15
**982460** [1] - 173:5
**9th** [1] - 127:6

**A**

**ABC** [1] - 175:12
**ability** [14] - 22:3, 78:6, 78:7, 79:21, 80:5, 86:19, 86:23, 86:25, 98:7, 111:3, 125:5, 127:22, 177:17, 186:19
**able** [20] - 4:13, 6:2, 6:13, 13:13, 14:15, 21:6, 29:23, 29:24, 29:25, 68:7, 77:17, 97:16, 121:25, 137:10, 138:8, 139:12, 153:2, 158:11, 161:8, 161:9, 162:3, 186:11
**above-entitled** [1] - 186:19
**Abscam** [1] - 171:25
**absence** [1] - 57:3
**absent** [2] - 177:2
**absolute** [1] - 23:2
**absolutely** [5] - 21:21, 137:25, 138:4, 145:2, 167:15
**absurd** [1] - 119:10
**accept** [5] - 84:7, 86:15, 87:25, 103:1, 104:16
**acceptable** [1] - 165:1
**accepted** [1] - 41:13
**accepting** [3] - 88:12, 127:8, 163:17
**access** [19] - 16:3, 22:20, 30:2, 39:23, 50:22, 51:10, 51:14, 51:15, 53:1, 53:3, 53:9, 53:24, 55:14, 61:17, 76:6, 120:18, 148:15, 149:12, 182:13
**accessing** [1] - 58:23
**accident** [1] - 148:24
**accomplish** [1] - 9:4
**according** [11] - 16:24, 16:25, 44:1, 70:16, 72:13, 100:1, 100:2, 107:11, 139:2, 152:9, 161:8
**account** [2] - 41:9, 41:20
**accuracy** [1] - 35:24
**accurate** [2] - 149:21, 186:18
**accurately** [2] -

36:16, 106:21
**accused** [5] - 105:8, 106:25, 122:24, 180:7, 180:10
**accuses** [1] - 146:14
**ACLU** [1] - 112:6
**act** [3] - 112:11, 141:7, 169:20
**acted** [3] - 80:2, 165:14, 168:14
**action** [4] - 79:14, 103:20, 106:7, 140:16
**actively** [1] - 58:5
**activities** [1] - 146:15
**actual** [15] - 13:16, 23:8, 23:13, 23:24, 23:25, 24:11, 25:12, 26:10, 44:7, 44:13, 123:19, 153:4, 160:6, 167:18, 167:20
**add** [16] - 13:19, 16:16, 31:24, 40:19, 43:16, 50:21, 69:10, 94:21, 120:24, 132:12, 148:25, 151:3, 151:17, 157:10, 171:16, 173:16
**addition** [7] - 12:9, 34:12, 45:25, 71:15, 118:20, 118:21, 176:3
**additional** [9] - 5:25, 39:19, 46:5, 48:24, 56:13, 71:10, 156:16, 158:14, 171:20
**address** [2] - 5:22, 82:9
**addressed** [1] - 6:15
**adequately** [3] - 96:1, 96:6, 97:16
**administrations** [1] - 59:4
**administrative** [1] - 185:18
**admits** [1] - 16:6
**advance** [1] - 29:20
**advanced** [1] - 46:17
**advantage** [2] - 69:4, 79:14
**adversary** [1] - 89:16
**adverse** [4] - 105:7, 150:13, 175:20, 176:19
**advice** [2] - 157:21, 183:20
**advise** [1] - 67:11
**advised** [2] - 39:9, 56:25
**advocate** [4] - 59:2,

91:24, 92:1, 128:16
**affidavit** [7] - 47:15, 53:19, 61:11, 63:7, 97:22, 104:9, 161:21
**affidavit's** [1] - 161:21
**affidavits** [1] - 111:2
**affirmance** [1] - 103:19
**after-the-fact** [1] - 61:12
**afternoon** [14] - 3:3, 3:5, 3:6, 3:14, 3:19, 6:10, 10:22, 62:22, 62:23, 87:14, 88:25, 89:23, 100:21, 143:24
**agencies** [6] - 17:15, 58:20, 58:22, 133:5, 146:7, 159:13
**agency** [6] - 32:25, 58:14, 72:17, 75:5, 90:18, 125:4
**Agency** [4] - 58:21, 127:2, 150:10, 150:11
**Agent** [4] - 55:19, 55:20, 58:9, 58:10
**agent** [4] - 7:14, 53:19, 63:7, 66:21
**agents** [4] - 54:17, 55:4, 55:6, 158:25
**ago** [22] - 6:8, 36:12, 38:13, 42:16, 49:16, 49:24, 54:8, 54:18, 64:3, 64:5, 64:7, 64:8, 65:22, 68:25, 87:10, 109:13, 136:2, 139:6, 150:15, 154:10, 155:7, 155:13
**agree** [37] - 4:19, 9:6, 15:11, 15:14, 18:12, 18:24, 26:3, 26:5, 60:4, 60:6, 71:15, 71:21, 72:11, 81:11, 81:12, 82:11, 82:14, 83:22, 86:9, 89:23, 89:25, 90:10, 94:22, 99:12, 101:11, 129:5, 129:13, 129:18, 129:25, 131:5, 131:7, 132:16, 153:16, 182:23, 183:25, 184:5, 184:9
**agreed** [1] - 7:24
**agreement** [1] - 54:19
**agreements** [1] - 17:19
**agriculture** [1] - 119:5
**aha** [1] - 4:12

ahead [5] - 7:7, 12:17, 65:10, 77:13, 104:18
**Air** [5] - 144:7, 152:23, 159:17, 159:20, 159:21
**Airlines** [2] - 28:7, 93:3
**airport** [1] - 128:22
**al** [2] - 1:7, 3:2
**Al** [12] - 74:14, 74:15, 77:21, 105:4, 116:19, 136:9, 141:14, 143:7, 143:11, 143:15, 144:1, 144:17
**Al-Qaeda** [5] - 74:14
**albeit** [1] - 91:11
**Alexander** [1] - 151:25
**allegation** [3] - 26:11, 140:13, 143:19
**allegations** [11] - 76:8, 81:9, 137:24, 138:18, 146:24, 147:7, 147:10, 147:14, 148:5, 150:17, 150:20
**alleged** [8] - 12:8, 20:5, 57:2, 78:2, 110:11, 123:25, 151:19, 175:22
**allegedly** [4] - 64:15, 74:14, 91:10, 134:15
**alleges** [2] - 75:25, 76:5
**Allen** [8] - 166:24, 167:16, 169:23, 169:24, 170:4, 170:11, 170:20, 171:1
**allow** [6] - 43:22, 43:23, 69:23, 72:1, 156:22, 157:25
**allowed** [1] - 146:1
**allows** [1] - 69:24
**alluded** [1] - 103:15
**almost** [11] - 6:12, 9:15, 10:24, 18:5, 24:8, 60:5, 75:7, 81:25, 111:13, 140:15, 170:22
**alone** [1] - 153:24
**alternative** [3] - 121:24, 174:22, 174:25
**Aluminum** [1] - 176:11
**ambiguity** [1] - 101:23
**ambiguous** [2] - 27:12, 100:2

amended [12] - 75:24, 76:1, 76:4, 76:7, 76:8, 81:3, 83:4, 139:14, 140:2, 144:4, 145:12, 148:6
**Amendment** [1] - 88:23
**American** [19] - 4:20, 12:6, 24:7, 28:7, 81:17, 81:25, 82:17, 83:14, 93:2, 105:9, 105:14, 105:16, 127:4, 150:23, 169:5, 174:8, 175:10, 180:8, 180:11
**Americans** [1] - 144:9
**amount** [4] - 48:4, 158:12, 171:6
**analogy** [3] - 124:6, 169:6, 176:24
**analysis** [2] - 26:6, 139:22
**analysts** [1] - 159:1
**analyze** [2] - 139:13, 150:11
**aneurysm** [9] - 40:20, 41:8, 41:16, 41:24, 42:16, 42:18, 163:7, 164:4, 164:25
**angle** [1] - 33:12
**animal** [2] - 118:22, 119:4
**answer** [35] - 4:23, 6:19, 7:6, 18:18, 23:8, 24:1, 28:2, 28:23, 48:23, 48:25, 50:1, 52:9, 69:22, 84:11, 86:11, 101:6, 101:22, 116:20, 116:23, 117:3, 117:5, 117:8, 124:18, 126:25, 127:25, 129:14, 144:9, 144:23, 157:20, 157:24, 160:13, 162:14, 163:14, 172:11, 182:17
**answered** [1] - 40:24
**answering** [3] - 66:1, 124:20, 180:19
**answers** [7] - 42:3, 43:25, 47:8, 48:25, 50:8, 171:8, 171:9
**anticipate** [1] - 180:24
**anticipates** [1] - 132:18
**antitrust** [1] - 6:8
**anyway** [7] - 72:18,

73:25, 95:23, 95:25, 105:25, 109:8, 111:11
**anyways** [1] - 49:19
**apart** [1] - 181:12
**apologize** [2] - 39:5, 99:14
**appeal** [2] - 45:7, 127:7
**Appeals** [2] - 174:10, 174:21
**appear** [1] - 179:16
**appearances** [1] - 3:10
**APPEARANCES** [1] - 1:12
**appeared** [6] - 29:14, 30:18, 38:24, 58:11, 61:25, 111:6
**appearing** [2] - 35:22, 179:20
**Appellant** [1] - 174:9
**appellate** [1] - 87:14
**Appellees** [1] - 174:8
**apples** [1] - 97:2
**applied** [3] - 128:9, 130:21, 144:10
**apply** [2] - 107:8, 131:8
**appointed** [2] - 43:4, 177:17
**appreciate** [1] - 185:24
**apprised** [1] - 139:6
**appropriate** [5] - 4:3, 8:21, 97:11, 178:10, 178:19
**April** [2] - 140:3, 140:5
**area** [1] - 20:12
**areas** [2] - 102:11, 105:16
**arguably** [2] - 31:25, 35:13
**argue** [2] - 5:10, 21:11
**argued** [2] - 68:13, 121:2
**arguing** [3] - 17:2, 117:18, 167:8
**argument** [28] - 34:1, 34:17, 46:17, 90:8, 90:12, 93:16, 95:23, 112:17, 113:10, 121:10, 129:23, 130:16, 133:15, 134:7, 138:14, 139:16, 139:23, 153:14, 168:19, 171:11, 171:16, 171:17, 172:19,

172:24, 178:17, 179:4, 182:10, 182:15
**argumentation** [1] - 67:16
**arguments** [8] - 30:9, 62:22, 66:9, 89:10, 132:10, 137:16, 163:12, 171:20
**arises** [1] - 132:17
**Arizona** [3] - 111:24, 134:14, 136:20
**arrange** [1] - 31:10
**arranged** [2] - 125:1, 144:14
**arrangement** [2] - 30:12, 31:17
**arrangements** [7] - 29:19, 31:12, 31:16, 36:25, 44:7, 137:11, 153:14
**arranging** [1] - 46:25
**arrested** [1] - 167:9
**art** [2] - 165:10, 166:18
**artful** [1] - 41:22
**artfully** [1] - 36:21
**article** [1] - 109:9
**articles** [1] - 143:4
**articulated** [4] - 45:17, 101:12, 117:10, 166:16
**artist** [1] - 147:21
**aside** [1] - 157:19
**aspect** [4] - 13:18, 15:15, 20:5, 35:13
**assert** [1] - 70:25
**asserted** [2] - 95:12, 107:20
**asserting** [1] - 34:2
**assess** [4] - 161:18, 161:23, 162:3
**assessment** [2] - 139:16, 157:22
**assignment** [9] - 39:8, 43:20, 50:15, 69:1, 74:3, 166:9, 185:12, 185:16, 185:22
**assignments** [2] - 185:1, 185:19
**assist** [1] - 28:17
**assistance** [1] - 155:2
**assistant** [7] - 55:4, 55:11, 98:22, 98:24, 100:11, 101:5, 101:16
**associate** [4] - 98:5, 98:11, 98:13, 98:14
**Associated** [1] -

147:12
**assume** [15] - 15:20, 21:15, 22:10, 41:22, 88:25, 93:20, 95:13, 95:16, 95:17, 114:10, 126:15, 132:16, 160:22, 179:5, 179:8
**assumed** [1] - 24:17
**assuming** [4] - 23:10, 94:1, 122:13, 128:2
**assumption** [3] - 125:13, 125:17, 125:18
**assured** [1] - 185:21
**astonished** [3] - 29:17, 37:20, 39:16
**astonishing** [1] - 50:19
**AT&T** [2] - 41:11
**Atlantic** [2] - 12:7, 82:1
**attached** [2] - 76:7, 136:20
**attack** [1] - 78:2
**attempting** [1] - 172:20
**attempts** [1] - 126:23
**attention** [4] - 48:17, 89:4, 171:13, 174:5
**attitude** [1] - 24:19
**Attorney** [3] - 13:21, 55:5, 87:11
**attorney** [9] - 52:8, 52:12, 55:11, 56:11, 98:5, 106:10, 111:16, 157:19, 177:1
**attorney's** [2] - 106:10, 154:1
**attorney-client** [5] - 52:8, 52:12, 106:10, 111:16, 177:1
**attributable** [1] - 172:1
**audience** [1] - 177:14
**AUDIO** [1] - 1:11
**August** [5] - 37:2, 37:3, 60:10, 111:6, 117:4
**AUSA** [3] - 55:20, 59:17, 171:24
**authenticity** [2] - 7:17, 11:22
**authorities** [4] - 20:23, 20:25, 21:10, 149:18
**authority** [4] - 87:14, 97:11, 176:15, 176:17
**available** [9] - 8:7,

62:16, 95:2, 96:4, 103:25, 113:22, 113:23, 149:4, 159:3
**Avenue** [4] - 1:18, 1:21, 2:2, 186:23
**avenues** [1] - 102:9
**Aviv** [1] - 128:15
**avoid** [2] - 82:15, 183:25
**award** [1] - 154:1
**awarded** [2] - 161:14, 162:10
**aware** [10] - 9:13, 20:14, 79:19, 81:5, 81:8, 89:8, 137:3, 150:6, 185:10, 185:12

# B

**back-and-forth** [1] - 75:21
**background** [1] - 17:25
**backs** [1] - 96:5
**bad** [13] - 36:11, 52:17, 91:4, 95:8, 142:15, 157:12, 158:5, 159:4, 165:14, 173:2, 173:3, 183:16, 184:19
**Baker** [11] - 32:7, 32:10, 59:19, 59:25, 154:11, 156:20, 157:16, 158:2, 158:8, 159:11, 162:25
**Baker's** [2] - 60:11, 60:12
**bakery** [1] - 170:16
**ball** [1] - 61:5
**bank** [1] - 167:1
**Bank** [2] - 59:6, 109:5
**bankruptcy** [2] - 65:3, 65:4
**bar** [1] - 106:8
**Bar** [2] - 35:8, 184:24
**Barnett** [7] - 55:9, 55:10, 55:20, 56:3, 57:25, 58:4, 58:10
**barred** [3] - 84:22, 85:20, 92:21
**barrier** [1] - 135:3
**base** [1] - 141:11
**based** [37] - 8:22, 13:8, 14:2, 50:7, 50:21, 51:8, 52:1, 57:23, 63:13, 64:15, 66:17, 80:15, 92:20, 100:8, 101:20,

103:12, 110:13, 111:18, 111:19, 111:20, 115:11, 119:17, 125:12, 135:9, 135:11, 137:10, 140:9, 140:19, 140:22, 140:25, 141:18, 142:21, 142:24, 143:8, 147:10, 157:3, 161:9
**bases** [1] - 146:9
**basic** [1] - 19:12
**basing** [3] - 13:4, 13:9, 91:20
**basis** [14] - 16:2, 16:13, 17:8, 71:2, 71:7, 71:13, 87:22, 88:18, 118:10, 139:8, 140:20, 151:6, 165:3, 165:4
**BB&T** [1] - 109:5
**BBT** [1] - 109:4
**beard** [1] - 135:4
**beat** [1] - 83:21
**became** [3] - 33:2, 153:20, 176:13
**because..** [1] - 94:6
**become** [4] - 42:25
**BEFORE** [1] - 1:10
**began** [1] - 144:9
**beginning** [2] - 45:23, 99:10
**behalf** [6] - 53:22, 56:1, 98:17, 122:8, 159:19, 162:23
**behaved** [1] - 169:19
**behavior** [3] - 19:6, 24:22, 173:4
**behind** [2] - 96:5, 162:8
**belabor** [1] - 47:15
**belatedly** [1] - 60:17
**belief** [3] - 35:14, 51:9, 137:14
**believes** [7] - 52:20, 52:23, 114:24, 120:11, 120:12, 157:25, 164:18
**belong** [1] - 34:14
**belongs** [4] - 34:14, 110:25, 124:5, 124:10
**benefit** [3] - 16:23, 33:5, 65:8
**Bennett** [3] - 7:14, 9:25, 11:20
**Benz** [1] - 176:10
**Berghian** [1] - 14:9
**best** [6] - 6:18, 66:1, 84:11, 118:25, 155:3,

186:19
**better** [8] - 14:9, 60:15, 110:7, 113:20, 126:17, 139:23, 155:14
**better-looking** [1] - 110:7
**between** [4] - 17:16, 64:14, 171:1, 171:3
**beyond** [6] - 4:5, 81:9, 82:2, 84:5, 120:25, 121:1
**bidding** [1] - 92:25
**big** [6] - 6:8, 8:4, 85:11, 169:16, 169:17, 169:22
**biggest** [14] - 12:5, 24:7, 81:16, 81:24, 82:17, 82:20, 83:14, 105:8, 105:14, 105:16, 150:22, 169:5, 180:8, 180:11
**billable** [2] - 186:7, 186:8
**Billy** [3] - 109:8, 109:10, 177:9
**bin** [1] - 105:4
**binding** [2] - 182:22, 183:8
**bit** [8] - 4:22, 49:21, 60:8, 68:19, 74:20, 75:22, 104:25, 124:7
**Blackwell** [2] - 89:7, 121:14
**blame** [1] - 117:15
**Blank** [1] - 174:2
**blank** [1] - 142:13
**blanket** [1] - 66:20
**Blixseth** [2] - 149:15, 152:13
**blocked** [1] - 122:1
**blog** [1] - 108:24
**blowing** [1] - 137:24
**board** [1] - 63:1
**Boat** [2] - 173:21, 173:24
**body** [1] - 137:1
**bogus** [1] - 22:18
**BOHRER** [1] - 1:20, 170:11
**Bohrer** [3] - 3:17, 170:10, 171:21
**bolts** [1] - 13:16
**book** [41] - 7:14, 10:6, 10:8, 10:11, 10:14, 12:1, 12:9, 12:10, 12:11, 18:1, 18:2, 22:12, 22:16, 22:17, 58:3, 69:17, 72:20, 77:20, 78:1,

78:10, 81:8, 81:13, 81:16, 82:3, 82:5, 83:18, 106:22, 133:3, 140:23, 141:21, 142:5, 143:8, 144:5, 144:18, 146:13, 146:20, 147:1, 158:5, 169:11, 169:12
**bookcases** [1] - 148:18
**books** [3] - 105:17, 170:5, 170:18
**Boston** [2] - 173:21, 173:23
**bottom** [3] - 51:7, 72:4, 182:4
**Boulevard** [1] - 109:15
**box** [3] - 33:15, 85:24, 138:24
**brain** [6] - 40:20, 41:8, 41:16, 41:24, 42:16, 164:4
**branches** [1] - 54:14
**branded** [1] - 89:24
**bread** [1] - 105:3
**break** [2] - 21:22, 22:5
**breaking** [1] - 41:11
**breaks** [1] - 42:14
**breath** [1] - 10:22
**breeding** [1] - 119:5
**Brennan** [2] - 146:5, 152:1
**BRIAN** [1] - 1:20
**Brian** [1] - 3:17
**Brickell** [1] - 1:21
**Bricks** [2] - 148:1, 152:19
**brief** [4] - 22:5, 108:20, 108:22, 126:3
**briefed** [2] - 14:19, 46:2
**briefing** [1] - 26:18
**briefly** [2] - 108:23, 138:9
**bright** [2] - 132:10, 177:10
**brilliant** [1] - 171:25
**bring** [9] - 69:25, 87:8, 96:17, 96:23, 104:16, 105:19, 118:13, 121:4, 171:13
**bringing** [4] - 86:21, 100:10, 100:11, 161:25
**broad** [1] - 27:13
**broadcast** [5] - 77:9, 109:20, 141:14, 143:11, 144:1

**Broadcasting** [2] - 174:8, 175:10
**broadcasts** [4] - 74:15, 143:7, 143:15, 144:17
**brought** [6] - 41:5, 41:11, 63:6, 87:11, 103:20, 144:6
**bucks** [1] - 186:8
**Buckskin** [1] - 177:9
**bullet** [4] - 120:15, 120:25, 121:7, 121:11
**bunch** [2] - 6:3, 22:18, 34:19
**burden** [9] - 15:13, 15:15, 18:14, 19:13, 101:2, 146:9, 153:5, 178:10, 178:19
**burdened** [1] - 47:2
**burdens** [1] - 99:23
**burdensome** [2] - 27:13, 46:13
**Bureau** [1] - 51:11
**bureaucrats** [1] - 78:13
**buried** [2] - 57:14, 128:15
**bury** [1] - 138:7
**Bush** [8] - 140:8, 140:14, 140:22, 140:25, 141:6, 141:17, 142:25, 159:10
**business** [3] - 82:24, 148:2, 152:18
**businesses** [1] - 14:12
**buy** [2] - 81:21, 85:25
**BY** [1] - 2:1
**bye** [1] - 186:13

## C

**cadre** [1] - 153:19
**California** [1] - 13:21
**candid** [1] - 180:15
**candidly** [2] - 19:17, 39:13
**cannot** [4] - 28:21, 73:24, 74:4, 100:7
**capacity** [1] - 90:4
**car** [2] - 81:21, 148:24
**card** [1] - 184:24
**cards** [1] - 122:20
**Care** [1] - 14:13, 24:20, 186:12
**Care** [1] - 173:4

**career** [3] - 79:21, 80:5, 128:17
**careful** [2] - 35:21, 35:24, 185:15
**Carlisle** [1] - 168:1
**carry** [3] - 47:3, 112:25, 161:17
**case** [184] - 6:8, 13:1, 13:3, 13:13, 15:2, 15:12, 15:25, 16:16, 16:20, 18:13, 18:21, 18:25, 19:9, 19:10, 19:18, 19:21, 19:23, 20:21, 21:3, 21:7, 21:8, 21:12, 23:15, 26:9, 28:6, 31:13, 33:13, 34:17, 41:5, 42:25, 47:14, 50:3, 51:21, 55:22, 58:2, 58:6, 66:25, 67:21, 68:1, 68:7, 71:9, 73:3, 85:2, 85:17, 87:1, 87:3, 87:18, 92:4, 92:20, 93:1, 93:3, 93:4, 93:10, 93:19, 93:24, 95:12, 96:1, 96:6, 96:7, 96:9, 96:16, 97:1, 97:17, 97:19, 97:23, 97:24, 98:2, 98:4, 98:10, 98:11, 99:4, 99:15, 99:18, 99:23, 100:12, 101:13, 102:10, 102:12, 103:10, 103:18, 103:19, 103:23, 103:25, 104:2, 104:4, 104:5, 104:8, 104:15, 107:11, 112:19, 114:3, 118:12, 119:13, 119:15, 121:10, 121:20, 121:23, 122:3, 122:6, 122:17, 122:18, 122:19, 122:20, 123:23, 124:15, 128:13, 129:3, 129:4, 129:13, 129:15, 129:19, 130:1, 130:12, 130:13, 130:14, 130:16, 130:17, 130:22, 131:1, 131:7, 131:8, 131:10, 131:15, 131:17, 132:11, 132:18, 132:24, 133:18, 134:11, 135:8, 136:3, 136:4, 137:23, 139:3, 139:7, 139:12, 139:21,

140:6, 148:11, 148:25, 149:2, 151:14, 152:10, 153:16, 153:23, 161:20, 173:2, 173:4, 173:7, 173:11, 173:17, 173:20, 173:22, 173:25, 174:3, 174:5, 174:6, 174:20, 175:1, 175:5, 175:19, 176:2, 176:3, 176:4, 176:14, 176:24, 178:16, 178:18, 178:22, 179:1, 179:15, 179:20, 180:4, 180:23, 182:4, 182:5, 182:21
**CASE** [1] - 1:2
**Case** [3] - 3:1, 134:16, 134:18
**case-dispositive** [2] - 93:3, 93:4
**case-precise** [1] - 134:11
**Cases** [1] - 174:9
**cases** [17] - 19:12, 23:16, 23:19, 23:22, 66:10, 67:24, 106:5, 111:19, 159:25, 171:25, 173:19, 174:13, 175:1, 175:2, 175:7, 176:6, 178:21
**casts** [1] - 172:3
**categories** [1] - 155:4
**category** [1] - 15:6
**caused** [3] - 12:6, 39:19, 79:7
**cavalier** [2] - 15:21, 24:19
**cave** [1] - 20:11
**caveat** [1] - 4:19
**cemetery** [1] - 128:15
**central** [2] - 103:22, 146:4
**Central** [5] - 13:21, 13:23, 14:1, 14:4, 177:4
**cert** [1] - 176:6
**certain** [15] - 7:1, 7:2, 9:17, 46:21, 49:4, 50:10, 50:18, 74:3, 91:12, 107:3, 119:17, 130:12, 142:25, 177:5, 182:2
**certainly** [5] - 75:8, 92:2, 101:15, 129:8, 173:2

**certainty** [1] - 50:16
**certified** [1] - 150:9
**certify** [1] - 186:17
**cetera** [2] - 35:9, 81:8
**challenging** [2] - 120:10, 136:15
**chambers** [3] - 44:11, 44:12, 108:5
**change** [10] - 10:16, 61:18, 108:21, 108:22, 139:19, 163:24, 164:8, 164:10, 164:21, 165:2
**changed** [4] - 163:15, 164:11, 164:22, 165:5
**changes** [1] - 10:7
**changing** [1] - 139:22
**chapter** [7] - 10:13, 10:15, 12:12, 141:24, 143:3, 143:5, 163:3
**chapters** [1] - 10:11
**character** [1] - 167:9
**character's** [1] - 167:14
**characterization** [3] - 7:25, 10:3, 10:5
**characterizing** [1] - 9:10
**charged** [2] - 32:15
**chase** [2] - 148:13, 149:9
**Chemical** [1] - 176:11
**cherry** [1] - 50:5
**cherry-picking** [1] - 50:5
**child** [1] - 99:11
**children** [3] - 169:23, 170:19, 170:21
**chilling** [1] - 148:23
**Chinese** [4] - 4:10, 170:1, 170:15, 170:19
**choice** [2] - 19:18, 87:25
**choose** [1] - 9:17
**chose** [1] - 42:13
**CIA** [87] - 16:23, 16:25, 28:13, 28:20, 29:8, 32:5, 33:18, 34:13, 34:14, 36:24, 52:16, 53:22, 58:19, 65:6, 65:12, 69:20, 69:25, 70:3, 72:4, 72:6, 72:9, 72:13, 72:15, 72:24, 73:1, 73:2, 73:12, 73:14, 73:18, 74:4, 74:10,

75:3, 75:5, 75:10, 75:12, 87:8, 87:12, 89:20, 90:3, 90:5, 90:9, 90:11, 90:12, 95:17, 96:14, 97:8, 97:20, 97:21, 97:22, 98:5, 98:6, 98:11, 98:13, 98:14, 98:15, 98:18, 98:21, 99:18, 99:19, 99:22, 100:8, 100:10, 101:5, 101:15, 101:24, 104:8, 104:16, 104:19, 105:19, 115:19, 124:10, 127:1, 134:21, 144:10, 146:5, 149:12, 150:10, 151:11, 151:19, 163:4, 169:1, 177:20

**CIA's** [3] - 87:23, 87:24, 149:13

**circle** [3] - 94:8, 112:17, 150:2

**circled** [1] - 165:23

**circles** [4] - 25:15, 90:24, 145:14, 147:25

**circuit** [1] - 138:21

**Circuit** [14] - 102:6, 103:19, 149:2, 173:19, 174:11, 176:6, 176:8, 176:9, 176:10, 176:12, 176:13, 178:19

**circular** [3] - 111:8, 113:10, 117:14

**circumstance** [3] - 28:22, 162:14, 162:15

**circumstances** [12] - 23:4, 30:21, 36:17, 53:21, 87:2, 94:5, 95:22, 110:12, 112:19, 131:6, 131:9, 175:20

**citation** [3] - 20:15, 126:4, 174:15

**citations** [2] - 21:3, 178:22

**cite** [5] - 19:24, 105:14, 173:18, 174:24, 178:16

**cited** [18] - 16:7, 19:11, 28:6, 96:7, 106:5, 126:3, 140:7, 142:1, 143:24, 145:4, 159:5, 173:20, 174:2, 175:1, 175:17, 176:14, 176:16, 178:21

**cites** [2] - 174:22,

174:25

**citing** [1] - 23:16

**Citizenfour** [1] - 62:14

**citizens** [1] - 127:4

**civil** [12] - 32:12, 32:16, 54:15, 56:5, 59:9, 64:13, 93:21, 98:9, 103:25, 111:4, 113:23, 154:12

**Civil** [2] - 177:19, 184:8

**civilly** [1] - 32:15

**claim** [22] - 13:3, 23:3, 23:21, 24:24, 25:19, 25:22, 26:7, 26:14, 33:22, 34:2, 81:12, 84:21, 85:21, 95:2, 98:10, 101:14, 107:17, 140:10, 145:2, 145:4, 146:19, 146:22

**claimed** [4] - 41:12, 126:5, 169:14, 181:12

**claiming** [3] - 61:10, 80:1, 82:12

**claims** [11] - 12:5, 24:7, 71:4, 82:11, 117:11, 138:19, 140:7, 144:16, 149:17

**clandestine** [3] - 72:17, 75:3, 90:18

**Clapper** [4] - 58:22, 151:24, 151:25, 152:1

**clarification** [1] - 61:21

**clarify** [1] - 60:24

**clarinet** [1] - 168:2, 168:3, 168:4

**classification** [2] - 17:6, 162:20

**classified** [86] - 8:10, 16:3, 17:1, 27:17, 30:25, 31:25, 33:20, 34:20, 36:24, 40:7, 53:18, 64:16, 65:16, 65:18, 69:15, 69:18, 70:23, 71:6, 72:5, 72:18, 72:24, 73:4, 73:7, 74:1, 75:5, 75:8, 87:3, 87:19, 88:4, 88:10, 88:20, 89:19, 89:25, 90:13, 90:19, 94:7, 94:22, 95:18, 95:21, 96:2, 96:4, 96:9, 98:6, 98:8, 103:21, 103:24, 104:17, 104:20, 105:5, 107:12, 110:24, 111:4,

111:10, 112:20, 112:22, 112:23, 113:1, 113:3, 113:6, 113:8, 113:10, 113:12, 125:14, 126:8, 126:16, 126:18, 127:15, 127:20, 127:23, 128:3, 132:22, 134:9, 135:11, 138:6, 150:2, 150:3, 150:5, 153:8, 153:11, 153:20, 168:15, 168:18, 168:23, 169:1, 169:13

**clear** [34] - 11:24, 11:25, 12:17, 20:3, 23:19, 28:15, 33:2, 37:7, 42:2, 52:21, 55:16, 61:18, 61:24, 65:6, 66:13, 70:22, 77:17, 85:6, 92:9, 96:14, 115:13, 115:23, 132:1, 136:25, 137:21, 166:5, 175:21, 175:25, 178:11, 178:20, 181:14, 184:16, 185:1

**clear-cut** [1] - 12:17

**clearance** [15] - 31:1, 31:2, 126:6, 126:7, 126:12, 127:14, 127:17, 127:18, 128:1, 128:6, 128:10, 128:18, 149:23, 153:16, 153:20

**clearer** [1] - 42:11

**clearly** [3] - 41:17, 73:24, 173:5

**Clemens** [1] - 172:8

**CLERK** [1] - 109:5

**Clerk** [1] - 8:20

**clerk's** [2] - 44:5, 44:8

**clever** [1] - 85:8

**client** [24] - 12:5, 15:13, 23:10, 27:16, 29:25, 30:19, 39:21, 46:17, 52:8, 52:12, 56:12, 106:10, 111:16, 114:8, 121:4, 122:1, 154:5, 159:19, 165:11, 165:13, 169:18, 177:1

**client's** [8] - 13:3, 51:8, 51:13, 53:4, 62:12, 86:24, 105:8, 168:23

**Clinton** [5] - 125:8, 126:11, 127:22,

127:24, 177:13

**Clintons** [1] - 159:9

**clock** [1] - 172:2

**close** [1] - 171:22

**closed** [5] - 14:22, 77:18, 78:23, 159:18, 162:8

**cloth** [2] - 17:8, 22:23

**clouded** [1] - 41:14

**CM/ECF** [1] - 44:6

**Coat** [1] - 11:18

**cocky** [1] - 139:24

**code** [2] - 154:19, 156:19

**coded** [2] - 141:14, 143:11

**coffee** [1] - 10:22

**coin** [1] - 59:9

**Cold** [2] - 134:16, 134:18

**colleague** [2] - 21:17, 21:23

**colloquy** [1] - 88:25

**Colonial** [1] - 59:6

**colorful** [1] - 140:13

**Columbia** [1] - 174:11

**Comey** [1] - 32:9

**comfortable** [1] - 185:17

**coming** [8] - 22:22, 36:21, 69:20, 85:21, 140:10, 141:18, 162:21, 163:1

**comment** [13] - 6:5, 8:6, 8:23, 8:25, 9:2, 9:19, 11:14, 35:20, 48:21, 114:13, 165:7, 170:23

**comments** [14] - 5:11, 8:5, 10:23, 11:3, 13:12, 48:13, 50:9, 60:2, 66:8, 81:7, 86:2, 91:16, 123:21, 173:15

**commercially** [1] - 80:1

**commit** [1] - 50:23

**committed** [5] - 12:5, 78:21, 83:14, 151:10, 175:23

**committees** [1] - 62:5

**committing** [4] - 78:24, 180:7, 180:11, 184:23

**communicate** [1] - 157:9

**communicated** [2] - 38:25, 154:10

**communicating** [2] - 157:10, 158:2

**communication** [1] - 57:16

**communications** [2] - 17:16, 59:25

**Companies** [1] - 174:8

**company** [3] - 87:19, 146:14, 152:19

**Company** [2] - 175:11, 176:11

**compared** [1] - 104:4

**compel** [7] - 14:8, 14:16, 14:18, 73:12, 73:20, 159:20, 177:19

**complaint** [20] - 75:24, 76:1, 76:4, 76:7, 76:8, 81:3, 81:9, 83:4, 91:19, 123:23, 139:14, 140:2, 140:17, 144:5, 145:9, 145:13, 146:21, 148:6, 150:17, 150:19

**complete** [7] - 24:18, 50:14, 71:10, 71:22, 82:13, 159:20, 183:6

**completely** [5] - 15:3, 15:20, 39:14, 102:3, 141:8

**completeness** [1] - 74:25

**completion** [1] - 166:9

**complying** [1] - 177:18

**comprehensive** [2] - 171:14, 178:14

**compression** [1] - 74:13

**compromise** [2] - 97:23, 162:7

**compromised** [1] - 139:2

**computer** [4] - 32:24, 76:14, 142:10

**computers** [1] - 141:10

**con** [4] - 79:1, 136:11, 137:19, 147:21

**conceding** [2] - 25:25, 26:1

**concept** [5] - 23:12, 23:13, 23:14, 159:24, 160:6

**concern** [2] - 130:2, 138:19

**concerning** [10] - 7:19, 15:10, 27:14,

43:24, 47:9, 57:22, 61:7, 72:19, 100:22, 143:1
**concerns** [4] - 7:20, 81:6, 82:10, 83:23
**concert** [1] - 109:9
**conclude** [1] - 117:19
**concluded** [7] - 65:20, 87:17, 118:4, 143:8, 143:10, 147:17, 186:14
**concluding** [1] - 79:2
**conclusion** [8] - 30:10, 84:19, 118:10, 136:8, 136:15, 142:23, 161:10, 178:7
**conclusions** [3] - 119:12, 119:17, 123:2
**condition** [4] - 41:3, 42:17, 42:22, 46:19
**conduct** [6] - 22:16, 70:15, 70:16, 72:2, 76:17, 173:6
**conducted** [2] - 74:10, 76:22
**conducting** [1] - 72:2
**conference** [3] - 11:18, 11:20, 41:2
**confessing** [1] - 109:23
**confession** [2] - 65:2, 147:24
**confidence** [2] - 31:14, 184:21
**confident** [2] - 5:21, 139:25
**confidential** [7] - 9:8, 9:9, 9:23, 84:18, 95:12, 97:11, 121:21
**confidentiality** [1] - 13:11
**confinement** [1] - 167:10
**confirm** [3] - 65:18, 73:24, 74:4
**confirmed** [6] - 19:14, 36:24, 37:22, 76:23, 146:5, 169:1
**confirms** [1] - 50:17
**confront** [2] - 153:13, 183:23
**confusion** [1] - 185:22
**congratulations** [1] - 167:13
**Congress** [2] - 17:16, 127:3
**congressmen** [1] -

59:1
**conjunction** [2] - 32:8, 134:19
**connected** [2] - 129:25, 131:6
**connection** [2] - 10:1, 154:2
**conned** [1] - 77:16
**connotations** [1] - 31:9
**consent** [1] - 6:8
**consequently** [10] - 4:13, 16:9, 17:2, 17:21, 31:4, 33:2, 40:11, 83:12, 84:22, 112:8
**conservative** [1] - 157:7
**consider** [2] - 22:2, 140:23
**consideration** [1] - 92:13
**considered** [5] - 91:12, 93:18, 140:8, 140:25, 141:22
**consistent** [5] - 101:24, 102:4, 139:9, 143:4, 165:12
**consolidated** [2] - 175:2, 175:5
**conspicuously** [1] - 27:22
**constitute** [1] - 172:12
**construing** [1] - 66:11
**consult** [3] - 22:6, 22:7, 171:21
**consultation** [1] - 90:7
**consulting** [1] - 21:19
**consuming** [1] - 65:14
**contact** [2] - 29:24, 162:23
**contained** [2] - 118:5, 136:8
**containing** [1] - 161:1
**contend** [2] - 75:24, 160:6
**contends** [1] - 142:5
**contention** [1] - 163:2
**contested** [1] - 67:25
**context** [15] - 23:8, 23:24, 24:4, 24:11, 25:11, 92:4, 93:18, 107:18, 110:23,

113:23, 134:13, 134:16, 166:18, 166:19, 168:9
**contexts** [1] - 168:8
**continuation** [1] - 131:19
**continue** [5] - 55:25, 78:6, 145:3, 148:3, 169:20
**continued** [5] - 77:3, 79:1, 83:10, 94:1, 94:2
**continuing** [3] - 30:2, 39:23, 83:12
**continuously** [1] - 159:6
**contraband** [1] - 111:13
**contract** [1] - 146:8
**contracts** [2] - 78:6, 80:6
**contrary** [14] - 8:7, 29:12, 36:9, 39:14, 49:7, 69:2, 72:24, 76:3, 85:22, 88:8, 99:18, 118:14, 135:8, 162:12
**control** [5] - 27:24, 129:6, 129:21, 132:20, 154:11
**controversial** [1] - 132:19
**controversy** [1] - 107:2
**conveniently** [1] - 74:17
**conversation** [1] - 5:24, 88:25
**convince** [3] - 77:17, 78:13, 139:16
**convincing** [4] - 175:21, 176:1, 178:11, 178:20
**cooked** [1] - 149:17
**cookies** [2] - 170:2, 170:3
**cooperate** [2] - 55:1, 158:8
**cooperating** [2] - 118:16, 154:13
**coordinate** [1] - 31:11
**copied** [3] - 56:23, 59:16, 59:22
**copies** [3] - 7:9, 50:2, 125:9
**copy** [23] - 27:15, 29:9, 38:15, 44:9, 44:11, 44:12, 47:1, 47:18, 47:19, 49:25,

59:24, 74:11, 108:15, 108:16, 116:21, 116:24, 123:4, 123:15, 125:2, 125:6, 125:11, 175:4, 178:25
**copying** [1] - 158:2
**Coral** [1] - 1:15
**corner** [5] - 33:16, 73:11, 84:25, 105:22, 138:24
**Corp** [1] - 176:5
**correct** [33] - 12:15, 19:1, 19:8, 24:24, 48:19, 52:6, 60:19, 62:20, 81:14, 82:21, 86:12, 100:25, 103:3, 103:14, 115:17, 115:20, 115:22, 125:15, 129:2, 133:25, 134:3, 134:14, 135:15, 141:7, 143:22, 147:6, 156:10, 157:21, 168:24, 179:13, 179:18, 179:22, 179:25
**corrected** [1] - 81:23
**correctly** [2] - 43:15, 63:3
**corresponded** [2] - 54:23, 117:23
**correspondence** [1] - 56:23
**corrupt** [3] - 133:4, 133:5, 133:7
**couch** [1] - 23:8
**cough** [1] - 107:18
**counsel** [20] - 27:11, 32:8, 44:10, 51:19, 52:9, 59:19, 72:10, 85:16, 98:23, 98:24, 99:19, 100:11, 101:5, 101:16, 113:17, 121:13, 162:24, 171:25, 183:21
**counsel's** [1] - 10:23
**country** [2] - 105:7, 163:9
**County** [6] - 102:8, 134:16, 134:18, 134:19, 135:18, 136:3
**couple** [3] - 15:7, 48:24, 80:25
**course** [8] - 4:16, 8:9, 115:12, 145:14, 147:23, 154:24, 175:23, 176:12
**COURT** [421] - 1:1, 3:3, 3:7, 3:9, 3:14, 3:19, 3:24, 4:12, 4:15,

4:18, 4:22, 4:25, 5:6, 7:7, 8:3, 9:11, 10:19, 10:21, 11:12, 12:19, 12:24, 14:23, 15:18, 16:5, 16:15, 18:6, 18:10, 18:19, 18:22, 18:24, 19:3, 19:5, 19:9, 20:6, 20:21, 21:17, 22:9, 23:6, 23:19, 24:14, 25:1, 25:4, 25:7, 25:9, 25:14, 26:16, 26:22, 27:3, 27:7, 27:10, 28:23, 31:8, 31:15, 33:25, 34:16, 35:17, 37:5, 37:14, 37:16, 37:24, 38:9, 39:7, 40:13, 41:21, 43:5, 43:9, 43:19, 45:10, 46:4, 46:12, 47:16, 47:22, 48:9, 48:20, 51:5, 51:22, 51:24, 52:2, 52:10, 52:17, 53:8, 54:4, 55:6, 55:8, 55:10, 55:13, 55:16, 55:18, 56:2, 56:10, 57:16, 57:21, 60:1, 60:5, 60:7, 60:20, 61:2, 61:23, 62:10, 62:13, 62:16, 62:19, 63:15, 63:17, 63:21, 63:25, 64:3, 64:6, 64:10, 64:20, 65:8, 65:23, 66:8, 66:15, 66:22, 66:24, 67:14, 67:19, 67:21, 68:7, 68:14, 68:16, 68:24, 69:16, 70:8, 72:8, 73:15, 73:18, 73:22, 74:2, 74:9, 74:19, 74:21, 74:24, 75:2, 75:20, 77:5, 77:10, 77:12, 80:17, 80:22, 80:24, 81:3, 81:5, 82:7, 82:9, 82:20, 83:4, 83:6, 83:20, 83:22, 84:2, 84:4, 84:6, 85:4, 85:7, 85:9, 85:13, 86:1, 86:7, 86:14, 86:23, 87:5, 87:7, 87:13, 88:2, 88:6, 88:16, 88:19, 88:24, 89:8, 89:11, 90:2, 90:6, 90:8, 90:12, 90:24, 91:1, 91:3, 91:13, 91:18, 91:22, 91:25, 92:2, 93:6, 93:9, 93:15, 93:20, 94:6, 94:8, 94:13, 95:5, 95:13, 95:16, 97:2, 97:5,

97:7, 97:9, 98:2, 98:15, 98:19, 98:21, 98:24, 99:3, 99:7, 99:9, 99:13, 99:15, 100:3, 100:6, 100:19, 100:21, 100:25, 101:3, 102:16, 102:21, 102:24, 103:4, 103:8, 103:12, 103:17, 104:6, 104:18, 105:12, 106:2, 106:12, 106:17, 106:19, 106:23, 107:7, 107:21, 107:25, 108:2, 108:8, 108:12, 108:17, 108:20, 109:6, 110:3, 110:8, 111:8, 112:2, 112:4, 112:16, 114:2, 114:13, 114:19, 114:22, 115:2, 115:13, 115:17, 115:20, 116:1, 116:8, 118:22, 118:25, 119:4, 119:19, 119:24, 120:1, 120:3, 120:9, 121:3, 121:22, 122:5, 122:13, 122:22, 122:24, 123:3, 123:18, 124:20, 124:23, 124:25, 125:11, 125:16, 125:18, 125:20, 125:23, 126:1, 126:13, 126:15, 127:13, 127:18, 127:24, 128:5, 128:9, 128:12, 128:24, 129:3, 129:11, 129:23, 130:8, 131:11, 131:14, 131:17, 132:4, 132:6, 132:16, 132:22, 133:11, 133:13, 134:6, 134:22, 134:24, 135:1, 135:3, 135:5, 135:16, 135:19, 135:21, 136:25, 138:11, 139:10, 140:12, 141:3, 142:2, 143:19, 143:23, 144:23, 145:9, 146:12, 147:5, 148:4, 148:21, 149:6, 150:1, 150:5, 151:2, 151:16, 151:18, 151:22, 152:8, 153:10, 154:7, 154:14, 154:17, 155:1, 155:6, 155:9,

155:14, 155:25, 156:8, 156:11, 157:15, 157:18, 158:7, 158:20, 160:9, 162:9, 163:10, 163:13, 164:5, 164:7, 164:20, 165:7, 165:16, 165:18, 166:25, 167:6, 167:13, 167:18, 167:20, 167:24, 168:3, 168:6, 168:11, 169:19, 170:8, 170:10, 170:13, 170:15, 170:18, 171:4, 171:6, 172:5, 172:9, 172:11, 172:16, 173:7, 173:14, 173:20, 174:2, 174:5, 174:15, 174:18, 174:20, 174:23, 174:25, 175:3, 175:5, 175:9, 175:12, 175:16, 177:8, 177:21, 177:23, 178:7, 178:24, 179:2, 179:15, 179:19, 179:23, 180:15, 180:23, 181:14, 181:22, 182:7, 183:1, 183:3, 183:5, 183:17, 183:19, 184:3, 184:25, 185:5, 185:7, 185:9, 185:12, 185:15, 186:3, 186:6
  **Court** [31] - 2:1, 2:2, 8:20, 13:2, 41:13, 61:18, 64:12, 64:16, 67:11, 68:9, 68:12, 68:18, 69:24, 93:4, 96:17, 99:17, 104:10, 104:11, 106:5, 107:14, 121:15, 138:5, 138:6, 145:18, 148:14, 162:11, 166:15, 174:10, 186:22, 186:23
  **court** [24] - 6:24, 7:2, 7:25, 8:20, 8:24, 21:18, 29:15, 30:9, 35:25, 35:23, 48:3, 50:1, 53:16, 64:22, 65:9, 67:24, 68:2, 70:23, 87:14, 97:22, 151:21, 153:16, 174:13, 178:23
  **Court's** [4] - 10:12, 13:7, 34:12
  **courtesy** [5] - 44:9, 44:10, 47:1, 47:18,

47:19
  **courtroom** [3] - 29:15, 34:6, 89:21
  **COURTROOM** [1] - 3:1
  **courts** [2] - 8:8, 148:18
  **cover** [1] - 136:12
  **covered** [4] - 5:23, 6:14, 76:18, 171:12
  **covering** [2] - 39:17, 171:15
  **crazy** [2] - 24:17, 24:22
  **create** [1] - 132:2
  **creation** [1] - 89:4
  **credibility** [4] - 161:17, 161:18, 162:11, 172:3
  **credible** [2] - 17:20, 162:5
  **credit** [1] - 85:10
  **crime** [2] - 17:2, 50:23
  **crimes** [1] - 151:10
  **criminal** [16] - 32:13, 32:16, 32:17, 54:16, 54:21, 57:24, 58:17, 59:8, 59:12, 118:14, 121:15, 125:8, 125:12, 126:2, 137:15, 151:7
  **criminally** [1] - 32:15
  **critical** [6] - 13:1, 13:3, 15:6, 95:1, 96:3, 149:3
  **cross** [1] - 75:22
  **cross-hairs** [1] - 75:22
  **CRR** [2] - 2:1, 186:22
  **crux** [2] - 139:7, 141:14
  **cumbersome** [1] - 9:4
  **Curb** [1] - 3:20
  **curiosity** [1] - 13:13
  **curious** [3] - 4:6, 5:2, 60:8
  **current** [3] - 42:17, 71:19, 133:2
  **Curtis** [6] - 55:12, 55:20, 56:3, 57:25, 58:4, 59:17
  **custody** [4] - 27:24, 129:6, 129:20, 130:20
  **cut** [1] - 12:17
  **cute** [1] - 127:21
  **cutoff** [1] - 4:2

# D

  **damages** [2] - 76:17, 80:8
  **darned** [1] - 169:17
  **data** [3] - 133:21, 138:7, 142:11
  **date** [5] - 57:16, 64:2, 71:18, 155:22, 156:13
  **DATE** [1] - 186:22
  **daughter's** [1] - 170:22
  **David** [1] - 3:21
  **DAVIS** [1] - 1:17
  **Davis** [1] - 3:16
  **days** [8] - 17:13, 29:4, 36:12, 49:16, 49:24, 123:6, 123:14, 136:24
  **DC** [9] - 1:19, 29:22, 35:8, 136:14, 137:9, 173:19, 174:11, 174:14, 174:21
  **deadline** [6] - 71:14, 71:16, 71:22, 71:24, 71:25, 94:2
  **deadlines** [3] - 45:12, 46:21, 46:22
  **deal** [4] - 41:6, 41:7, 81:4, 182:15
  **dealing** [8] - 18:3, 54:16, 55:3, 55:4, 73:11, 91:9, 96:2, 132:25
  **dealings** [1] - 147:25
  **deals** [1] - 20:4
  **dealt** [2] - 59:8, 100:15
  **Dean** [2] - 98:22, 98:23
  **death** [1] - 81:25
  **Deborah** [3] - 55:12, 55:20, 59:17
  **deceive** [1] - 132:2
  **December** [10] - 7:3, 7:8, 56:22, 57:18, 57:19, 59:16, 117:9, 156:4, 156:14, 156:19
  **deceptive** [1] - 102:18
  **decide** [11] - 17:21, 100:16, 102:12, 138:6, 148:12, 160:20, 162:19, 163:11, 176:21, 180:7
  **decided** [4] - 12:17, 126:17, 146:7, 147:10
  **decides** [2] - 98:2,

98:10
  **deciding** [1] - 171:21
  **deciphering** [1] - 105:3
  **decision** [8] - 14:2, 14:3, 140:18, 141:11, 173:11, 173:14, 184:18
  **decisions** [1] - 173:12
  **decisive** [1] - 148:10
  **deck** [2] - 122:20, 122:25
  **declaration** [22] - 51:8, 51:25, 52:3, 52:6, 52:19, 52:21, 52:22, 56:20, 61:8, 61:10, 61:14, 76:7, 95:9, 117:20, 120:11, 120:17, 123:7, 140:3, 140:5, 143:10, 163:21
  **declared** [5] - 65:3, 69:16, 88:3, 88:8, 113:9
  **declares** [1] - 95:18
  **declassification** [4] - 7:24, 32:6, 32:11, 122:11
  **decoded** [1] - 77:8
  **decryption** [1] - 76:15
  **dedicated** [1] - 169:11
  **deductive** [1] - 63:16
  **deemed** [1] - 88:9
  **deeply** [2] - 24:3, 69:12
  **defamation** [44] - 12:13, 15:11, 18:13, 19:1, 19:5, 19:12, 19:18, 19:22, 20:5, 21:1, 23:3, 23:9, 23:15, 23:21, 24:24, 25:19, 25:25, 56:5, 76:16, 76:19, 77:15, 77:23, 78:4, 78:11, 78:15, 78:18, 78:20, 78:22, 78:25, 79:5, 79:24, 80:18, 81:12, 83:23, 99:20, 106:7, 138:18, 138:19, 144:19, 145:1, 146:22, 150:20, 160:7
  **defamatory** [6] - 12:7, 24:10, 26:8, 26:15, 123:24, 140:21
  **defamed** [1] - 82:12
  **default** [1] - 104:1
  **defecated** [1] - 41:18
  **defend** [1] - 95:2,

96:6, 96:9, 97:17, 97:19, 98:4

**defendant** [5] - 15:20, 98:9, 106:4, 106:7, 107:9

**Defendant** [5] - 29:20, 98:3, 107:17, 121:23, 125:3

**defendants** [1] - 1:8

**Defendants** [60] - 3:17, 17:5, 21:9, 27:11, 27:19, 28:6, 28:19, 33:11, 46:25, 47:17, 50:5, 51:7, 53:12, 61:14, 70:9, 77:15, 78:5, 78:12, 78:16, 78:18, 78:20, 78:22, 79:1, 79:5, 79:15, 79:19, 80:2, 84:7, 84:9, 84:13, 86:15, 86:18, 86:24, 87:1, 88:10, 91:6, 93:25, 95:19, 95:22, 96:7, 96:8, 97:12, 97:15, 103:18, 105:21, 106:13, 119:21, 120:10, 120:16, 121:7, 125:5, 130:18, 133:14, 133:19, 149:4, 153:14, 175:22, 178:13, 180:14

**DEFENDANTS** [1] - 1:17

**Defendants'** [18] - 19:11, 26:16, 26:23, 34:1, 44:1, 44:20, 48:16, 76:16, 76:19, 76:25, 79:24, 83:7, 103:9, 108:3, 119:20, 133:14, 179:4, 182:10

**defending** [3] - 96:1, 122:2, 122:6

**defends** [1] - 121:23

**Defense** [4] - 58:20, 62:6, 127:2, 150:10

**defense** [26] - 3:15, 5:1, 10:23, 13:2, 44:10, 46:22, 47:3, 61:10, 85:16, 89:2, 89:3, 89:6, 89:9, 89:15, 95:2, 95:25, 98:10, 99:4, 99:16, 113:1, 121:13, 123:20, 129:24, 139:1, 149:21, 171:25

**defense's** [2] - 9:21, 89:14

**defenses** [1] - 99:20

**definitely** [1] - 38:3

**definitive** [1] - 90:20

**defraud** [3] - 78:7, 79:1, 180:5

**defrauded** [3] - 76:20, 77:1, 83:8

**degree** [3] - 42:25, 184:8, 184:21

**demanding** [1] - 144:9

**demands** [1] - 138:3

**demeanor** [5] - 43:2, 161:16, 161:18, 161:23, 162:4

**democrat** [1] - 157:8

**demonstrably** [1] - 143:16

**demonstrate** [1] - 24:17

**demonstrated** [1] - 145:7

**demonstrates** [1] - 70:16

**denied** [2] - 14:3, 176:6

**DENNIS** [1] - 1:4

**Dennis** [3] - 22:14, 144:13, 152:4

**deny** [3] - 73:24, 74:5, 175:23

**Department** [18] - 16:25, 28:21, 32:18, 35:10, 62:6, 72:7, 87:24, 96:15, 107:11, 107:14, 111:18, 112:14, 114:8, 114:9, 114:11, 134:21, 151:8, 159:14

**depose** [1] - 67:17

**deposed** [1] - 124:17

**deposition** [35] - 14:8, 16:6, 24:6, 29:2, 30:8, 30:16, 34:5, 35:20, 36:3, 37:21, 40:21, 41:17, 41:19, 41:23, 42:4, 42:12, 42:14, 43:9, 43:17, 43:24, 44:2, 46:19, 47:9, 47:21, 84:17, 116:17, 149:9, 152:4, 152:10, 152:15, 152:17, 162:1, 163:18, 164:3, 166:14

**depositions** [12] - 6:25, 11:6, 11:7, 11:10, 11:21, 12:18, 67:23, 149:10, 149:14, 149:15, 149:16, 162:2

**depth** [1] - 114:25

**DEPUTY** [1] - 3:1

**describe** [3] - 9:15, 9:17, 103:18

**described** [1] - 97:11

**describing** [3] - 8:13, 21:12, 156:5

**description** [6] - 21:4, 72:11, 89:17, 90:20, 113:4, 154:19

**designate** [1] - 91:7

**designated** [6] - 9:8, 9:23, 91:8, 92:7, 113:8, 149:23

**designation** [1] - 57:4

**desire** [1] - 143:21

**despite** [1] - 51:1

**destroy** [1] - 114:7

**destroying** [1] - 114:10

**detailed** [2] - 117:23, 150:19

**details** [3] - 11:1, 37:22, 79:7

**detect** [1] - 74:14

**determination** [4] - 32:6, 66:17, 87:22, 104:12

**determine** [2] - 96:24, 98:7

**determined** [1] - 32:10

**determines** [1] - 162:11

**developed** [2] - 76:15, 77:7

**development** [2] - 9:12, 39:18

**devote** [1] - 75:5

**DIA** [1] - 127:3

**dictate** [1] - 121:23

**die** [1] - 41:8

**Diego** [1] - 13:22

**difference** [2] - 104:15, 141:21

**differences** [1] - 59:3

**different** [22] - 31:20, 67:3, 94:19, 106:18, 106:19, 111:21, 115:2, 119:12, 130:8, 130:13, 141:23, 142:7, 152:3, 155:4, 157:24, 164:9, 166:5, 166:18, 168:8, 175:7, 176:2

**differently** [1] - 169:2

**difficult** [2] - 8:18, 163:16

**diGenova** [1] - 128:20

**DIGITAL** [1] - 1:11

**diligence** [5] - 22:16, 23:2, 24:18, 71:5, 185:24

**dim** [1] - 144:8

**Dina** [1] - 3:13

**dinner** [1] - 170:24

**direct** [2] - 59:25, 124:2

**directive** [3] - 134:2, 134:11, 135:7

**directly** [5] - 6:19, 32:9, 104:10, 147:15, 148:6

**Director** [1] - 32:9

**director** [6] - 59:8, 97:21, 104:8, 127:3, 146:5, 162:24

**directory** [2] - 154:20, 156:18

**disagree** [3] - 113:4, 153:12, 183:24

**disagreed** [1] - 13:25

**disagrees** [1] - 148:9

**disappearance** [1] - 172:22

**disappointed** [1] - 156:24

**discharged** [1] - 65:5

**disclose** [4] - 9:18, 10:25, 27:14, 182:8

**disclosed** [1] - 143:9

**disclosure** [1] - 75:8

**discovery** [16] - 8:14, 13:8, 14:22, 33:11, 71:10, 71:17, 71:22, 72:1, 76:18, 86:19, 86:20, 94:2, 114:4, 123:5, 123:13, 133:18

**discovery's** [1] - 159:18

**discredit** [1] - 163:4

**discuss** [4] - 17:5, 111:2, 111:3, 129:12

**discussed** [3] - 69:17, 72:20, 171:17

**discussing** [2] - 70:25, 116:13

**discussion** [10] - 22:10, 39:22, 44:2, 61:4, 93:20, 95:11, 135:6, 160:22, 178:14, 179:5

**dishonest** [1] - 91:11

**disingenuous** [1] - 102:18

**dislike** [1] - 157:4

**disliking** [1] - 159:9

**dismiss** [8] - 5:13, 16:10, 45:25, 71:20,

85:2, 93:10, 121:10, 154:3

**dismissal** [9] - 94:24, 94:25, 103:20, 104:1, 121:6, 148:20, 150:13, 175:20, 176:19

**dismissal/ sanctions** [1] - 61:20

**dismissed** [2] - 33:13, 149:3

**dismissing** [1] - 174:14

**disparaged** [1] - 79:24

**dispose** [1] - 159:25

**disposed** [1] - 148:19

**dispositive** [2] - 93:3, 93:4

**dispute** [9] - 13:8, 64:13, 94:19, 141:17, 160:17, 160:19, 161:12, 161:14, 162:11

**disputes** [1] - 176:20

**disregard** [3] - 20:18, 26:12, 80:3

**disrespect** [3] - 118:19, 121:13, 171:8

**distinct** [1] - 164:14

**distract** [1] - 65:15

**DISTRICT** [2] - 1:1, 1:1

**district** [9] - 6:23, 7:1, 29:22, 35:23, 64:22, 68:2, 87:15, 160:2, 173:18

**District** [14] - 2:2, 13:21, 13:23, 14:1, 14:4, 14:7, 14:20, 71:23, 104:9, 160:2, 173:8, 174:10, 177:4, 186:23

**disturbed** [1] - 143:6

**diversity** [1] - 174:13

**divine** [1] - 94:17, 100:7

**DIVISION** [1] - 1:2

**division** [1] - 118:14

**Docket** [6] - 26:18, 26:22, 48:17, 51:6, 160:11

**doctrine** [8] - 93:10, 96:10, 130:2, 130:11, 130:19, 131:1, 131:8, 132:13

**Document** [1] - 108:5

**document** [8] - 5:17,

8:11, 8:14, 8:15, 52:7, 98:7, 159:2
 **document's** [1] - 98:6
 **documentation** [15] - 7:8, 7:12, 7:16, 7:17, 7:22, 9:10, 14:5, 24:4, 28:12, 53:25, 62:2, 66:18, 157:13, 157:15, 164:15
 **documentation's** [1] - 7:9
 **documents** [31] - 7:1, 7:20, 7:25, 8:5, 9:14, 9:17, 9:25, 10:10, 11:1, 11:4, 11:5, 11:22, 11:24, 12:1, 12:16, 13:14, 16:1, 16:4, 60:18, 65:13, 82:4, 88:22, 90:5, 92:4, 152:12, 161:24, 169:12, 172:20, 172:23, 180:12
 **dog** [5] - 109:14, 109:18, 109:25, 110:2, 110:6
 **DOJ** [1] - 59:18
 **dollars** [1] - 105:2
 **Donald** [1] - 106:25
 **done** [18] - 5:21, 11:22, 31:6, 36:2, 36:21, 44:17, 48:7, 66:6, 73:17, 95:7, 112:7, 131:3, 139:22, 160:1, 162:8, 171:14, 173:1, 183:4
 **doomsday** [1] - 169:7
 **door** [1] - 70:5
 **doors** [1] - 162:8
 **Dorothy** [1] - 124:8
 **doubt** [1] - 172:3
 **doubts** [1] - 26:12
 **down** [35] - 7:15, 10:6, 12:6, 24:8, 70:12, 75:13, 75:16, 75:17, 87:8, 87:9, 87:11, 87:12, 88:1, 91:6, 94:15, 94:20, 97:23, 100:10, 100:11, 101:5, 102:9, 104:19, 118:13, 122:6, 122:8, 124:14, 140:8, 140:18, 140:23, 141:23, 153:24, 154:22, 158:10, 158:11, 174:13
 **Dr** [1] - 169:7

**Draconian** [3] - 93:18, 176:1, 176:19
 **draft** [1] - 51:25
 **dream** [1] - 158:16
 **drive** [12] - 57:5, 92:4, 161:1, 161:4, 161:6, 161:11, 172:18, 172:21, 172:22, 172:25, 176:23
 **drives** [19] - 28:12, 38:23, 51:12, 53:25, 56:9, 57:13, 117:22, 117:25, 118:5, 133:17, 133:20, 134:1, 134:2, 136:3, 136:8, 138:1, 155:5, 165:21
 **Dropbox** [6] - 56:25, 155:18, 155:21, 155:23, 156:3, 156:9
 **drum** [1] - 153:11
 **dual** [1] - 32:14
 **due** [13] - 22:16, 23:1, 24:18, 40:9, 44:20, 45:15, 66:4, 71:5, 78:6, 88:13, 100:8, 105:9, 157:6
 **Duke** [1] - 119:7
 **dump** [1] - 138:7
 **during** [6] - 30:5, 60:25, 76:18, 86:19, 86:20, 177:13
 **duty** [11] - 103:3, 110:10, 110:17, 110:21, 111:9, 111:12, 112:17, 113:12, 114:2, 114:3, 132:17
 **DVD** [8] - 44:7, 44:8, 44:9, 44:13, 46:13, 46:23, 47:1, 47:17
 **dynamic** [1] - 108:21

## E

 **e-mail** [9] - 56:25, 57:9, 59:16, 59:23, 117:23, 155:23, 156:4, 156:8, 156:12
 **e-mails** [2] - 118:8, 157:16
 **earliest** [2] - 148:19, 159:25
 **early** [1] - 174:14
 **earn** [2] - 79:22, 80:5
 **ease** [2] - 13:6, 14:9
 **east** [2] - 60:3, 75:20
 **east-west** [1] - 75:20

145:6
 **enable** [1] - 127:14
 **enamored** [1] - 6:16
 **encoding** [1] - 76:15
 **end** [7] - 5:6, 5:23, 5:24, 6:13, 35:1, 44:18, 144:6
 **endorsement** [1] - 78:8
 **enforce** [2] - 33:21, 59:4, 73:16
 **enforcement** [2] - 32:25, 58:14
 **engage** [2] - 8:13, 9:14
 **engaged** [3] - 10:4, 78:12, 79:6
 **engaging** [1] - 146:14
 **engineer** [1] - 144:15
 **enjoyed** [1] - 62:16
 **enter** [5] - 80:6, 161:8, 183:7, 183:21, 184:5
 **entered** [5] - 9:24, 65:2, 68:2, 102:3, 160:17
 **entering** [2] - 182:22, 185:17
 **Enthusiasm** [1] - 3:21
 **entire** [13] - 8:19, 8:21, 45:3, 45:9, 46:9, 46:13, 46:23, 47:1, 47:23, 47:24, 127:1, 139:1, 144:9
 **entities** [1] - 152:22
 **entitle** [2] - 127:19, 128:2
 **entitled** [10] - 26:22, 38:21, 66:6, 86:5, 97:16, 132:21, 138:7, 151:20, 158:24, 186:19
 **entity** [2] - 105:7, 114:9
 **Entry** [5] - 26:19, 26:22, 48:17, 51:6, 160:11
 **enumerate** [1] - 123:24
 **epilogue** [1] - 170:20
 **episode** [1] - 144:9
 **equivalent** [3] - 20:18, 61:11, 169:7
 **equivocal** [1] - 29:7
 **equivocation** [2] - 40:3, 40:13
 **especially** [1] - 110:11

**Eastern** [1] - 104:9
 **easy** [2] - 8:19, 78:14
 **ECF** [1] - 57:20
 **economic** [1] - 80:13
 **editor** [2] - 10:7, 10:13
 **Edra** [2] - 149:15, 152:13
 **educate** [1] - 170:6
 **Edward** [1] - 126:24
 **Edwards** [1] - 186:21
 **EDWARDS** [2] - 2:1, 186:22
 **effect** [10] - 8:23, 20:19, 26:1, 68:12, 76:9, 113:11, 138:23, 148:23, 165:14, 175:22
 **effectively** [1] - 123:20
 **effectiveness** [1] - 76:23
 **efficacy** [3] - 88:11, 146:17, 148:7
 **effort** [8] - 6:25, 28:17, 38:24, 56:13, 154:8, 156:24, 163:4
 **efforts** [4] - 14:15, 51:2, 81:7, 158:15
 **egregious** [1] - 173:6
 **eight** [1] - 10:11
 **Eighth** [2] - 176:5, 176:9
 **either** [29] - 12:15, 16:18, 18:16, 19:6, 19:18, 20:11, 21:1, 21:11, 30:5, 37:9, 44:12, 44:14, 49:24, 61:10, 73:1, 88:21, 94:25, 95:17, 98:3, 105:10, 114:16, 120:17, 122:20, 135:2, 147:17, 148:6, 148:19, 154:6, 171:12
 **electronic** [1] - 44:13
 **electronically** [2] - 44:5, 161:1
 **element** [4] - 26:7, 26:13, 101:14, 159:5
 **elements** [1] - 91:12
 **Eleventh** [4] - 149:2, 176:8, 176:13, 178:19
 **eliminate** [1] - 127:24
 **emanating** [1] - 135:7
 **emotional** [1] - 99:14
 **employee** [1] - 149:16
 **employees** [1] -

**ESQ** [4] - 1:14, 1:17, 1:20, 1:20
 **essence** [1] - 117:14
 **essentially** [1] - 115:22
 **established** [2] - 15:19, 26:8
 **Estevan** [1] - 14:8
 **estoppel** [7] - 129:24, 130:2, 130:11, 130:19, 130:25, 131:8, 132:13
 **et** [4] - 1:7, 3:2, 35:9, 81:8
 **ethics** [1] - 35:10
 **eTreppid** [4] - 64:14, 144:14, 145:6, 147:16
 **euphemistically** [1] - 108:5
 **Europe** [1] - 141:18
 **evade** [1] - 14:15
 **evaluate** [4] - 46:19, 86:24, 88:11, 99:23
 **evaluated** [1] - 125:4
 **evaluating** [1] - 182:9
 **evasive** [2] - 4:23, 180:18
 **Eve** [2] - 109:1, 109:8
 **event** [6] - 61:12, 62:19, 73:7, 110:8, 111:1, 119:9
 **events** [2] - 17:12, 119:17
 **evidence** [16] - 17:11, 84:22, 95:1, 101:20, 113:2, 129:21, 136:10, 136:20, 145:23, 149:3, 154:5, 161:10, 175:21, 176:1, 178:20, 179:11
 **evidenced** [1] - 70:10
 **evidentiary** [10] - 28:7, 28:9, 51:21, 75:12, 93:2, 99:25, 100:12, 100:22, 101:17, 161:19
 **evolution** [1] - 131:19
 **evolves** [1] - 181:6
 **evolving** [3] - 61:25, 119:14, 182:18
 **ex** [3] - 54:24, 104:13, 119:1
 **ex-wife** [1] - 119:1
 **exact** [1] - 130:17
 **exactly** [6] - 4:25,

17:18, 86:7, 117:18, 134:17

**exaggerating** [3] - 138:15, 138:24, 144:25

**examine** [7] - 27:20, 94:3, 95:20, 97:12, 125:5, 143:21, 153:15

**examined** [1] - 125:3

**examining** [2] - 122:7, 123:20

**example** [7] - 45:17, 47:5, 80:9, 106:24, 138:20, 141:25, 149:24

**examples** [1] - 140:7

**excellent** [2] - 100:18, 173:11

**except** [1] - 73:18

**excerpt** [4] - 44:8, 44:10, 46:10, 48:20

**excerpts** [5] - 43:23, 44:15, 46:15, 46:24, 47:23

**exciting** [1] - 140:14

**excluded** [2] - 71:1, 102:2

**excuse** [9] - 17:24, 26:21, 37:14, 39:7, 68:19, 87:23, 151:9, 164:7

**Excuse** [1] - 21:22

**exercise** [1] - 91:6

**exist** [11] - 27:23, 36:10, 72:23, 73:6, 74:5, 114:19, 115:5, 115:6, 147:18, 154:4

**existed** [12] - 7:2, 30:10, 69:14, 70:13, 76:5, 117:24, 179:11, 179:25, 181:4, 181:16, 182:24, 183:9

**exists** [13] - 16:24, 16:25, 75:25, 97:10, 105:25, 114:5, 114:6, 114:14, 114:15, 114:23, 115:8, 117:17, 174:14

**expect** [1] - 152:15

**expectancy** [1] - 163:8

**expected** [1] - 112:10

**expedited** [2] - 38:15, 71:9

**expeditious** [1] - 45:22

**expensive** [2] - 153:23, 153:25

**experience** [5] -

103:16, 111:18, 111:19, 184:8, 186:6

**experiences** [1] - 111:21

**expert** [19] - 27:20, 32:24, 42:25, 43:4, 66:5, 91:7, 91:8, 92:6, 99:19, 132:12, 132:15, 137:18, 146:2, 149:22, 150:9, 153:7, 153:15, 177:16

**expertise** [1] - 32:23

**experts** [4] - 95:20, 136:7, 136:13, 153:19

**explain** [13] - 36:22, 51:19, 53:23, 61:16, 61:18, 104:5, 104:7, 110:12, 110:19, 120:17, 131:23, 134:12, 163:25

**explained** [8] - 25:23, 30:1, 30:2, 99:9, 109:18, 110:22, 120:19, 165:3

**explaining** [1] - 43:10

**explanation** [14] - 29:21, 30:6, 34:7, 39:20, 51:4, 62:21, 63:12, 68:8, 68:9, 157:18, 164:5, 164:8, 164:20, 164:22

**explanations** [1] - 165:1

**explicit** [2] - 77:24, 144:20

**explored** [1] - 102:11

**extend** [3] - 71:21, 72:1, 159:18

**extended** [1] - 71:14

**extension** [2] - 33:11, 70:11

**extensions** [1] - 70:4

**extent** [3] - 39:8, 110:15, 185:19

**extra** [3] - 45:15, 108:15, 125:6

**extraordinarily** [2] - 153:23, 153:25

**extreme** [6] - 24:18, 25:18, 93:18, 131:9, 140:15, 162:14

**extremely** [4] - 17:19, 162:5, 162:6, 176:18

**eye** [1] - 61:5

**F**

**F.2d** [5] - 176:5, 176:7, 176:9, 176:10, 176:11

**F.3d** [4] - 174:17, 174:18, 175:3, 175:5

**face** [9] - 22:1, 61:19, 84:7, 86:15, 89:10, 89:12, 89:13, 101:9, 164:11

**facetious** [1] - 103:6

**facilitate** [1] - 137:11

**fact** [78] - 8:12, 9:17, 12:4, 16:6, 17:12, 20:23, 24:6, 26:9, 26:15, 28:13, 31:10, 39:25, 41:18, 41:24, 50:13, 53:12, 57:7, 61:12, 63:13, 68:21, 69:3, 69:4, 69:13, 70:10, 73:2, 73:4, 73:12, 74:6, 76:5, 76:22, 77:2, 81:2, 81:24, 83:9, 84:19, 87:19, 88:3, 88:9, 89:19, 90:19, 94:20, 97:11, 107:19, 108:25, 109:9, 116:15, 122:20, 125:5, 125:13, 126:16, 127:15, 127:19, 128:3, 132:24, 134:1, 137:18, 139:3, 139:18, 139:19, 140:19, 143:14, 145:5, 145:19, 146:4, 147:21, 148:15, 149:24, 152:3, 152:9, 156:22, 159:15, 164:2, 164:24, 169:10, 170:4, 174:3, 176:20, 180:10

**fact-specific** [1] - 132:24

**factor** [1] - 23:9

**facts** [20] - 15:25, 17:25, 18:21, 20:7, 23:5, 24:17, 83:15, 104:4, 129:4, 129:7, 129:12, 129:15, 129:19, 130:1, 131:6, 131:15, 131:17, 184:12

**factual** [10] - 9:12, 83:24, 102:11, 160:17, 160:19, 161:11, 161:14, 162:10, 171:12

**factually** [4] - 84:9, 86:19, 86:24, 102:19

**failed** [1] - 64:23

**failure** [1] - 117:15

**fair** [6] - 5:7, 103:7, 106:13, 106:20, 119:18, 148:4

**fairly** [9] - 5:21, 9:16, 20:8, 39:20, 106:21, 132:9, 140:13, 178:13, 180:20

**faith** [21] - 28:17, 30:23, 39:3, 51:2, 55:25, 84:11, 91:4, 95:9, 157:12, 157:13, 158:5, 159:4, 165:14, 168:14, 173:2, 173:3, 183:15, 183:16, 184:19

**false** [25] - 18:9, 18:11, 25:6, 25:7, 26:11, 61:10, 76:21, 77:1, 79:20, 80:4, 80:18, 83:8, 95:15, 96:21, 102:18, 105:11, 105:12, 105:13, 118:11, 146:10, 147:7, 147:9, 151:12, 172:2

**falsely** [4] - 81:13, 82:12, 96:19, 149:17

**falsified** [1] - 91:20

**falsity** [35] - 15:13, 15:19, 17:23, 18:14, 18:25, 19:1, 19:2, 19:6, 19:13, 19:19, 20:18, 21:1, 21:2, 23:14, 23:20, 23:21, 24:11, 24:15, 25:9, 25:11, 25:16, 25:23, 25:24, 26:1, 26:2, 26:4, 26:7, 26:8, 26:14, 45:17, 101:14, 103:22, 153:5

**familiar** [8] - 19:10, 20:9, 20:13, 68:5, 68:7, 103:9, 103:10, 103:13

**famous** [1] - 170:4

**fan** [4] - 3:22, 3:23, 169:23, 170:12

**fans** [2] - 3:9, 3:20

**far** [10] - 8:12, 11:2, 42:16, 50:16, 52:14, 82:2, 150:16, 166:15, 177:24, 178:15

**fashioned** [2] - 6:4, 44:8

**fast** [1] - 46:3

**fault** [5] - 26:13,

33:6, 81:21, 96:3, 153:1

**favorite** [2] - 160:2, 171:1

**FBI** [123] - 17:18, 29:4, 29:13, 30:1, 30:4, 30:12, 31:11, 31:17, 32:5, 32:8, 32:23, 33:10, 34:7, 34:20, 36:12, 36:25, 38:4, 38:18, 38:24, 38:25, 39:21, 42:4, 42:10, 43:11, 48:21, 49:3, 49:12, 50:25, 51:1, 52:13, 52:21, 52:24, 53:14, 53:16, 54:1, 54:9, 54:11, 54:14, 54:17, 54:20, 55:4, 55:6, 56:11, 57:3, 57:8, 57:11, 57:15, 57:22, 57:24, 58:10, 58:13, 59:8, 59:9, 59:12, 59:20, 62:5, 63:5, 63:7, 63:14, 63:18, 64:25, 66:20, 67:7, 70:12, 71:12, 72:1, 72:22, 87:23, 93:21, 95:17, 111:1, 114:7, 115:4, 115:15, 117:12, 117:15, 117:22, 117:23, 118:1, 118:2, 118:4, 118:9, 118:11, 118:15, 120:13, 120:21, 123:5, 123:8, 123:12, 125:1, 126:19, 131:20, 133:16, 133:19, 133:25, 134:3, 134:11, 135:7, 138:2, 145:5, 148:15, 150:9, 154:8, 154:9, 154:18, 154:22, 155:12, 156:17, 157:9, 157:11, 157:25, 158:4, 158:11, 158:15, 158:25, 162:8, 162:24, 164:23, 168:21

**FBI's** [4] - 57:9, 87:23, 133:22, 137:22

**fear** [1] - 61:3

**February** [5] - 4:4, 4:7, 4:11, 4:21, 45:24

**fed** [1] - 68:20

**Federal** [2] - 51:11, 177:18

**federal** [9] - 6:23, 31:6, 35:23, 64:21, 68:2, 92:8, 95:18,

174:13
**fees** [2] - 106:10, 154:1
**fell** [1] - 42:19
**fences** [2] - 152:6, 178:6
**few** [12] - 6:7, 17:13, 47:7, 65:21, 68:25, 78:13, 109:13, 136:2, 150:15, 154:10, 186:1
**fiction** [1] - 136:17
**Fielding** [2] - 167:8, 167:14
**Fifth** [2] - 176:12, 176:13
**fight** [1] - 152:21
**fighting** [1] - 105:3
**figure** [8] - 23:9, 23:10, 23:12, 26:10, 119:14, 160:5, 160:8
**file** [14] - 20:25, 37:25, 40:5, 46:13, 46:25, 47:24, 57:1, 57:5, 73:12, 154:18, 154:19, 156:7, 156:18, 158:17
**file-filtering** [1] - 57:1
**filed** [21] - 6:21, 8:10, 10:1, 14:17, 14:18, 14:21, 17:5, 31:13, 31:16, 56:18, 56:21, 57:18, 106:6, 108:8, 110:18, 110:20, 112:18, 121:7, 123:7, 159:19, 175:7
**files** [9] - 55:21, 57:14, 57:25, 70:13, 134:8, 135:9, 137:12, 138:2, 157:24
**filing** [9] - 9:12, 20:22, 20:24, 40:14, 44:6, 44:8, 57:20, 73:19, 117:9
**filings** [1] - 44:5
**fill** [1] - 7:5
**film** [1] - 109:19
**filmed** [1] - 109:19
**filter** [1] - 46:14
**filtering** [2] - 57:1, 74:13
**final** [4] - 95:3, 95:8, 131:5, 179:3
**finally** [5] - 10:20, 14:15, 144:6, 144:11, 152:20
**financial** [2] - 59:5, 76:13
**fine** [6] - 4:7, 21:17, 28:5, 46:11, 47:16,

48:9
**finish** [7] - 10:18, 11:11, 11:17, 88:6, 128:12, 167:7, 183:3
**fire** [5] - 160:24, 161:2, 161:4, 161:7, 161:11
**fireplace** [2] - 160:24, 173:1
**FIRM** [1] - 1:14
**firm** [1] - 52:4, 144:14, 184:12
**firms** [1] - 113:17
**first** [29] - 3:10, 7:12, 9:22, 10:5, 26:17, 26:24, 30:22, 37:21, 42:2, 56:17, 62:21, 62:25, 70:22, 76:11, 83:17, 83:18, 101:8, 117:20, 120:5, 120:24, 123:22, 128:25, 133:1, 135:23, 139:6, 152:12, 155:11, 158:23, 166:23
**fit** [3] - 10:15, 177:15, 177:16
**fits** [2] - 23:13, 23:14
**five** [3] - 121:24, 126:20, 163:14
**flagged** [1] - 46:7
**flash** [9] - 161:1, 161:4, 161:6, 161:11, 172:18, 172:21, 172:22, 172:25
**flat** [1] - 49:10
**flat-out** [1] - 49:10
**flatter** [1] - 173:10
**flattering** [1] - 186:1
**fleshed** [1] - 141:24
**flight** [1] - 142:24
**flights** [2] - 143:1, 144:7
**Floor** [2] - 2:3, 186:23
**FLORIDA** [1] - 1:1
**Florida** [10] - 1:4, 1:15, 1:22, 2:3, 30:4, 35:8, 42:13, 109:1, 109:2, 186:24
**flow** [1] - 39:23
**Flurry** [1] - 148:25
**flute** [1] - 182:14
**fly** [1] - 185:20
**flying** [2] - 82:1, 143:6
**Flynn** [7] - 13:22, 67:16, 67:17, 147:20, 172:21, 176:25, 177:2
**Flynn's** [1] - 14:5

**focus** [6] - 12:10, 70:15, 86:8, 145:18, 146:25, 169:11
**focused** [1] - 15:2
**Fogarty** [1] - 176:7
**folks** [6] - 3:20, 5:1, 5:8, 11:12, 15:2, 47:2, 61:2, 75:20, 136:25, 160:13, 169:19, 171:10, 186:10
**follow** [4] - 34:16, 54:4, 101:3, 138:13
**following** [2] - 37:22, 61:15
**follows** [1] - 117:10
**followup** [4] - 29:1, 29:18, 39:19, 86:14
**foot** [1] - 159:6
**Footnote** [3] - 60:8, 60:9, 103:17
**footnote** [4] - 60:16, 103:17, 135:17, 135:19
**FOR** [2] - 1:14, 1:17
**Force** [4] - 152:23, 159:17, 159:20, 159:21
**forced** [2] - 71:16, 144:11
**Ford** [1] - 176:7
**forefront** [1] - 109:25
**foregoing** [1] - 186:17
**foreign** [1] - 105:7
**forensics** [1] - 58:13
**forever** [1] - 109:16
**forget** [1] - 109:3
**forgive** [1] - 130:10
**form** [1] - 172:12
**format** [2] - 44:13, 48:1
**former** [7] - 32:18, 35:9, 103:20, 112:12, 136:7, 136:13, 152:13
**formula** [1] - 78:14
**Fort** [1] - 109:2
**forth** [9] - 5:14, 5:20, 60:2, 62:23, 75:21, 157:23, 178:23, 184:12
**fortuitously** [4] - 22:25, 24:21, 24:22, 25:20
**fortunately** [2] - 137:8, 137:10
**fortune** [2] - 170:2
**forward** [22] - 7:21, 17:10, 30:24, 86:21, 88:25, 92:20, 105:23, 121:20, 122:21,

126:23, 146:8, 151:6, 156:21, 159:7, 159:16, 162:21, 163:1, 163:5, 181:20, 182:6, 184:17
**forwarded** [4] - 57:1, 156:1, 156:2, 156:12
**fought** [1] - 128:16
**four** [7] - 38:13, 48:2, 171:7, 178:7, 184:14, 186:2, 186:3
**Fourth** [2] - 88:23, 103:19
**fourth** [1] - 131:22
**France** [1] - 144:7
**frankly** [4] - 29:1, 153:1, 155:19, 156:25
**frantically** [1] - 185:20
**fraud** [14] - 77:25, 78:12, 78:21, 78:24, 79:6, 82:17, 82:21, 83:14, 137:19, 144:21, 146:16, 169:9, 175:24
**fraudulent** [2] - 78:19, 136:11
**free** [1] - 171:21
**Freedom** [1] - 35:11
**French** [13] - 77:21, 118:20, 143:5, 144:4, 144:6, 144:8, 144:10, 144:11, 144:14, 144:16, 149:11, 149:12
**Friday** [12] - 20:22, 37:25, 40:5, 40:14, 44:20, 45:1, 47:18, 48:7, 50:14, 69:1, 185:5, 185:6
**friend** [1] - 128:19
**friends** [1] - 170:23
**FROM** [1] - 1:11
**front** [24] - 13:20, 20:17, 30:18, 33:23, 35:22, 36:21, 51:17, 69:23, 70:2, 87:10, 93:4, 93:5, 94:15, 94:16, 96:17, 96:24, 101:20, 104:10, 104:11, 111:6, 121:15, 127:3, 160:23, 160:25
**full** [4] - 79:16, 112:17, 122:19, 122:25
**fully** [2] - 14:19, 46:1
**funny** [1] - 157:1
**future** [1] - 79:15

## G

**gain** [1] - 136:12
**gambit** [2] - 149:19, 149:25
**gambler** [1] - 147:5
**gambling** [1] - 149:14
**game** [4] - 68:23, 70:4, 85:1, 176:22
**gander** [1] - 107:22
**geared** [1] - 180:9
**gee** [2] - 36:11, 89:20
**Gee** [3] - 30:14, 68:10, 180:18
**General** [1] - 87:11
**general** [20] - 5:12, 8:8, 10:3, 11:3, 11:14, 18:25, 32:8, 59:19, 62:4, 89:3, 98:23, 98:24, 99:9, 100:11, 101:16, 132:17, 132:23, 134:8, 146:15, 162:24
**generally** [2] - 80:8, 111:17, 161:22
**generate** [4] - 9:20, 141:5, 142:14, 143:20
**generated** [3] - 141:1, 141:15, 142:20
**generates** [2] - 141:5, 141:10
**generating** [1] - 141:19
**generic** [1] - 11:3
**genuinely** [1] - 147:2
**George** [2] - 104:8, 159:10
**Gerry** [2] - 177:7, 177:12
**Giardino** [2] - 55:7, 58:9
**Gibbons** [2] - 147:8, 147:11
**Giordano** [4] - 55:19, 56:3, 57:24, 58:3
**give-and-take** [1] - 5:24
**given** [12] - 49:3, 50:24, 57:7, 100:15, 103:1, 104:14, 117:13, 160:20, 161:24, 162:18, 164:15, 164:17
**glad** [2] - 70:21, 165:17
**gloss** [1] - 171:16
**glosses** [1] - 83:2
**goal** [1] - 123:19

12

**goals** [1] - 137:13
**God** [1] - 160:2
**Godot** [1] - 159:22
**gold** [1] - 167:25
**golly** [1] - 36:11, 101:6, 131:15
**Gomez** [3] - 59:18, 98:20, 98:21
**good-faith** [3] - 28:17, 51:2, 183:15
**good-looking** [1] - 135:2
**GOODMAN** [1] - 1:10
**Goodman** [1] - 70:6
**goose** [3] - 107:21, 148:13, 149:8
**gosh** [11] - 5:6, 6:7, 18:15, 20:11, 61:2, 111:14, 131:11, 161:11, 168:20, 178:8, 186:8
**government** [71] - 16:3, 30:25, 31:20, 35:9, 35:12, 47:10, 70:24, 76:21, 76:22, 77:1, 77:2, 77:16, 78:7, 78:8, 78:13, 79:2, 79:3, 79:9, 80:10, 82:25, 83:8, 83:9, 86:16, 87:19, 89:18, 89:24, 90:11, 101:25, 102:3, 110:15, 110:25, 111:13, 112:11, 112:12, 112:13, 113:9, 113:13, 114:12, 116:19, 117:1, 122:10, 122:14, 122:15, 125:4, 127:1, 127:7, 128:17, 133:4, 135:13, 136:11, 139:9, 140:4, 140:15, 141:4, 141:10, 141:15, 141:22, 142:4, 142:19, 145:8, 146:7, 147:10, 148:3, 149:18, 152:22, 180:2, 180:5, 180:6, 180:13
**Government's** [1] - 83:11
**Governor** [2] - 147:8, 147:11
**grant** [1] - 161:9
**grasping** [1] - 178:5
**grave** [1] - 172:3
**Graves** [2] - 174:7, 176:11
**gravitated** [1] - 119:7

**gray** [3] - 162:15, 162:16
**grease** [1] - 29:25
**great** [7] - 84:10, 114:25, 136:17, 163:8, 169:10, 177:6, 177:11
**greatest** [3] - 105:2, 138:22, 169:8
**greeting** [1] - 5:3
**grossly** [1] - 173:3
**Groucho** [1] - 171:4
**ground** [3] - 8:15, 71:13, 94:25
**grounded** [1] - 144:8
**grounds** [3] - 94:24, 121:24, 136:5
**group** [1] - 35:10
**growing** [1] - 169:25
**grown** [1] - 170:21
**guaranteed** [1] - 138:8
**gub** [1] - 167:8
**guess** [7] - 6:7, 59:21, 91:13, 95:23, 111:11, 112:16, 135:5
**guests** [2] - 109:10, 109:11
**guidance** [2] - 154:17, 156:16
**guidelines** [1] - 93:23
**gun** [3] - 167:3, 167:4, 167:8
**guy** [8] - 6:4, 22:14, 54:25, 83:14, 132:10, 139:24, 150:23, 177:10

## H

**hairs** [1] - 75:22
**half** [5] - 39:16, 54:18, 135:23, 169:20
**half-hour** [1] - 169:20
**handcuffed** [5] - 63:20, 63:22, 63:23, 67:8, 120:19
**handle** [1] - 5:8
**handled** [1] - 67:16
**handling** [1] - 45:22, 59:18
**HANDMAN** [91] - 1:17, 3:6, 3:16, 5:3, 9:22, 10:20, 11:10, 11:18, 14:6, 26:5, 27:5, 37:11, 37:19, 42:2, 43:8, 43:14,

45:11, 46:11, 47:20, 48:8, 56:17, 57:18, 59:11, 59:15, 60:19, 60:21, 61:1, 64:9, 64:11, 64:21, 65:11, 66:23, 70:21, 74:8, 74:10, 75:15, 75:18, 76:10, 77:6, 77:11, 77:14, 94:21, 95:8, 101:8, 106:16, 106:18, 106:20, 106:24, 107:19, 107:24, 108:15, 116:7, 116:12, 119:25, 126:5, 134:25, 135:17, 135:20, 136:1, 136:19, 136:24, 137:17, 139:5, 140:1, 140:20, 141:13, 143:3, 143:22, 144:3, 145:4, 145:10, 147:1, 147:6, 148:8, 148:22, 152:12, 153:18, 155:23, 156:1, 156:10, 169:16, 170:9, 171:22, 172:7, 172:10, 174:4, 175:8, 175:17, 185:8, 185:14, 185:25
**Handman** [42] - 3:16, 26:3, 27:4, 37:9, 41:1, 41:21, 42:24, 45:10, 54:23, 56:15, 57:23, 60:15, 66:4, 70:8, 74:6, 75:23, 83:1, 84:14, 85:13, 85:15, 88:14, 89:1, 96:19, 101:3, 102:17, 107:21, 118:19, 124:1, 137:6, 138:15, 149:8, 150:15, 152:8, 154:25, 155:22, 159:19, 163:12, 170:8, 171:19, 172:9, 174:11, 185:9
**Handman's** [5] - 38:6, 43:4, 72:11, 89:4, 89:17
**handover** [1] - 37:23
**hands** [16] - 31:21, 96:5, 105:6, 111:23, 112:10, 113:21, 114:6, 114:7, 115:19, 122:11, 122:12, 124:4, 126:18, 131:20, 149:11
**handy** [3] - 26:20, 74:6, 119:22
**hanging** [1] - 39:16

**happy** [5] - 5:24, 10:18, 20:19, 40:9, 47:24
**Happy** [10] - 3:7, 3:8, 3:25, 4:3, 4:4, 4:6, 4:14, 4:21, 186:11, 186:12
**hard** [16] - 16:18, 28:12, 38:23, 53:25, 57:13, 92:3, 117:21, 117:25, 118:5, 133:17, 136:3, 136:7, 138:1, 155:5, 165:21, 184:11
**hardly** [1] - 173:14
**hardware** [2] - 94:1, 94:3
**harm** [5] - 76:12, 76:17, 80:3, 100:10
**harmed** [3] - 76:16, 79:20, 80:12
**harvested** [1] - 59:1
**harvesting** [1] - 58:23
**Hashana** [1] - 4:17
**hate** [2] - 169:24, 170:20
**hats** [1] - 32:14
**head** [2] - 150:22, 181:25
**heads** [7] - 84:13, 85:2, 85:4, 85:17, 92:22, 95:23, 121:16
**hear** [20] - 5:25, 10:23, 11:5, 11:16, 13:12, 18:16, 63:17, 75:14, 109:24, 112:23, 124:18, 127:10, 128:8, 142:18, 152:23, 162:19, 162:20, 162:25, 163:7, 163:9
**heard** [12] - 13:23, 19:17, 22:14, 62:21, 62:23, 62:25, 64:9, 116:7, 144:13, 152:23, 177:7
**hearing** [55] - 5:9, 6:7, 6:9, 6:12, 8:19, 9:15, 11:13, 12:3, 13:17, 14:24, 16:17, 21:21, 28:7, 28:9, 29:6, 31:3, 35:22, 36:6, 36:19, 37:6, 37:10, 37:16, 38:1, 38:9, 38:11, 39:10, 39:12, 40:5, 44:19, 45:12, 48:17, 48:20, 51:21, 57:19, 68:25, 75:12, 92:10, 93:2,

99:10, 99:25, 100:12, 100:22, 101:17, 104:19, 109:13, 121:8, 123:6, 123:14, 136:2, 138:4, 161:19, 163:20, 165:23, 180:10, 185:17
**HEARING** [1] - 1:10
**hearings** [4] - 5:12, 8:5, 67:23, 136:2
**heart** [1] - 94:11
**heated** [2] - 68:20, 74:20
**held** [5] - 109:19, 110:6, 126:7, 132:13, 161:20
**help** [20] - 51:2, 51:18, 56:13, 56:14, 60:23, 118:2, 154:8, 154:21, 155:10, 155:19, 156:15, 157:12, 157:17, 158:4, 158:10, 158:11, 158:15, 158:22, 159:1, 170:15
**helpful** [6] - 42:23, 43:1, 45:19, 47:21, 79:13, 119:25
**helps** [1] - 53:23
**hence** [1] - 75:9
**hereby** [1] - 186:17
**herself** [1] - 42:24
**hesitate** [1] - 171:18
**hidden** [3] - 74:14, 77:8, 144:17
**high** [4] - 98:23, 136:9, 144:14, 176:18
**high-tech** [1] - 144:14
**highest** [3] - 31:7, 59:7, 112:14
**highlighted** [1] - 177:25
**Hillary** [4] - 125:8, 126:11, 127:22, 127:24
**himself** [5] - 28:4, 41:18, 127:3, 179:13, 179:14
**hinge** [2] - 24:9, 24:10
**hinging** [1] - 180:9
**hint** [1] - 30:6
**hire** [1] - 153:7
**history** [15] - 12:6, 24:7, 81:17, 81:25, 82:17, 83:15, 105:9, 105:14, 105:16, 147:9, 150:23, 169:5, 169:8, 180:8, 180:11

**hit** [2] - 150:22, 181:25

**hoax** [21] - 12:5, 24:7, 77:16, 77:25, 78:3, 79:6, 81:16, 81:24, 86:16, 105:8, 105:14, 105:16, 138:22, 139:8, 142:6, 144:22, 146:16, 150:22, 169:5, 180:8, 180:11

**hold** [1] - 99:25

**holder** [1] - 167:4

**holding** [3] - 21:5, 109:14, 109:18

**holdup** [1] - 167:2

**HOLLAND** [1] - 1:21

**homework** [11] - 39:8, 43:20, 50:14, 69:1, 74:3, 166:9, 185:1, 185:12, 185:16, 185:19, 185:22

**honest** [3] - 68:17, 92:17, 112:13

**honestly** [3] - 24:3, 102:9, 153:9

**Honor** [178] - 3:5, 3:6, 3:13, 3:23, 7:6, 7:10, 9:6, 9:22, 9:24, 11:23, 13:18, 14:6, 14:14, 14:21, 16:18, 19:24, 20:17, 20:20, 22:8, 23:7, 26:5, 26:21, 27:5, 27:6, 27:9, 28:5, 30:22, 31:19, 32:14, 33:4, 35:7, 36:19, 37:1, 37:11, 37:12, 37:19, 38:8, 39:4, 40:9, 42:12, 42:23, 43:8, 43:15, 43:16, 44:19, 44:22, 45:4, 45:11, 45:16, 45:21, 46:11, 47:13, 47:20, 48:8, 50:20, 51:17, 53:5, 53:12, 54:3, 58:17, 59:11, 59:15, 60:19, 60:21, 60:23, 62:8, 64:9, 64:19, 65:24, 68:21, 69:5, 70:21, 72:3, 73:5, 74:17, 75:11, 75:16, 75:18, 76:10, 79:11, 83:2, 84:10, 87:9, 87:25, 88:12, 89:6, 90:23, 92:5, 92:14, 92:25, 94:12, 94:21, 95:1, 96:13, 99:8, 100:8, 101:11, 101:21,

102:12, 102:20, 103:2, 103:16, 104:11, 104:25, 105:18, 106:6, 107:8, 107:19, 108:1, 108:7, 108:9, 108:15, 110:1, 111:17, 115:25, 116:7, 116:17, 117:19, 118:12, 119:13, 124:17, 126:5, 126:22, 127:5, 130:7, 131:12, 132:24, 134:4, 135:17, 136:17, 137:17, 138:4, 138:5, 138:9, 139:6, 140:1, 146:10, 148:9, 149:1, 149:5, 149:19, 150:12, 150:18, 152:19, 154:1, 154:2, 154:23, 157:1, 158:6, 161:16, 165:9, 166:23, 169:2, 171:22, 172:15, 173:10, 173:25, 175:17, 176:1, 176:23, 178:3, 178:4, 178:21, 178:25, 179:14, 180:22, 181:7, 181:25, 182:25, 183:11, 183:23, 184:2, 184:7, 184:16, 185:2, 185:8, 185:24, 185:25

**Honor's** [1] - 40:23

**HONORABLE** [1] - 1:10

**hope** [4] - 45:8, 85:5, 154:1, 154:2

**hopefully** [1] - 131:4

**hoping** [3] - 18:15, 18:16, 85:24

**hospital** [4] - 40:21, 42:20, 60:25

**hot** [1] - 18:2

**Hotel** [1] - 168:1

**hotly** [1] - 67:25

**Houghton** [1] - 10:8

**hour** [4] - 9:2, 131:22, 169:20

**hours** [7] - 40:22, 43:13, 81:1, 171:7, 184:14, 186:2, 186:3

**House** [1] - 62:5

**house** [5] - 53:14, 63:5, 67:8, 120:20, 164:16

**hovering** [1] - 142:9

**Howard** [1] - 109:11

**human** [1] - 132:3

**humor** [3] - 112:4, 134:22, 166:22

**hundred** [1] - 13:24

**hundred-mile** [1] - 13:24

**hundreds** [2] - 12:7, 105:1

**hung** [1] - 115:25

**husbandry** [2] - 118:22, 119:4

**hypocrisy** [2] - 70:1, 70:2

**hypothesize** [1] - 94:17

**hypothetical** [6] - 23:1, 24:16, 25:18, 81:18, 153:21, 160:21

**hypothetically** [1] - 179:15

**I**

**idea** [1] - 174:14

**identification** [1] - 156:7

**identify** [3] - 84:18, 84:20, 86:22

**ignore** [3] - 70:14, 89:1, 89:17

**ignored** [1] - 61:11

**ill** [2] - 13:6, 60:25

**illegal** [2] - 125:7, 125:12

**illegally** [3] - 63:6, 164:16

**illustrations** [1] - 145:3

**image** [2] - 109:17, 109:24

**imagine** [2] - 22:23, 140:14

**immediately** [3] - 111:12, 111:15, 138:13

**immunity** [4] - 17:19, 54:18, 54:19, 159:2

**impediment** [1] - 158:1

**implemented** [1] - 142:19

**implication** [11] - 77:15, 77:23, 78:5, 78:11, 78:16, 78:18, 78:20, 78:22, 78:25, 79:5, 144:20

**implicitly** [1] - 148:7

**importance** [2] - 138:16, 138:25, 145:1

**important** [18] - 7:9,

12:16, 33:4, 34:24, 45:5, 45:16, 45:22, 61:6, 61:9, 65:25, 82:4, 83:1, 97:21, 161:19, 165:24, 166:15, 177:23, 181:1

**impose** [3] - 176:1, 176:18, 182:14

**imposed** [2] - 67:1, 179:5

**impossible** [1] - 128:18

**impression** [1] - 39:24

**impugn** [1] - 24:2

**inadequate** [2] - 146:6, 146:8

**inartfully** [2] - 40:24, 41:12

**inarticulately** [1] - 39:5

**inaudible** [8] - 62:11, 73:22, 82:8, 93:16, 106:16, 117:11, 167:23, 174:12

**inc** [2] - 174:8, 176:4, 176:7

**inclined** [1] - 89:22

**include** [3] - 21:4, 21:11, 52:5

**included** [2] - 40:14, 50:4

**including** [13] - 45:13, 58:22, 74:12, 76:21, 77:2, 77:8, 79:7, 79:22, 80:6, 83:9, 105:15, 128:19, 133:12

**incompetent** [2] - 159:12

**inconsistent** [6] - 130:2, 130:5, 130:14, 130:21, 131:2, 132:2

**incorporate** [1] - 34:10

**incorporating** [1] - 80:15

**incorrect** [3] - 102:19, 139:17, 157:21

**incorrigible** [1] - 147:5

**incredible** [1] - 116:16

**incredibly** [2] - 145:22, 146:3

**indeed** [5] - 37:20, 94:22, 95:1, 140:6, 169:4

**independent** [1] -

76:22

**index** [1] - 48:3

**indicated** [4] - 8:4, 11:7, 39:15, 142:24

**indicates** [1] - 6:5

**indication** [2] - 30:17, 30:18

**individual** [3] - 18:3, 54:23, 76:13

**individuals** [1] - 6:25

**indulge** [2] - 166:23, 170:25

**inebriated** [1] - 4:20

**inescapable** [1] - 30:10

**inference** [4] - 33:13, 150:13, 175:21, 176:19

**influential** [1] - 59:1

**informal** [1] - 4:5

**information** [58] - 7:18, 10:11, 12:4, 16:3, 16:12, 27:17, 30:25, 31:20, 31:21, 31:23, 36:23, 46:5, 52:5, 54:10, 54:11, 54:21, 56:12, 57:3, 58:23, 58:24, 60:12, 62:3, 64:16, 73:13, 75:4, 91:20, 96:2, 96:4, 96:10, 103:21, 103:24, 107:13, 111:10, 117:16, 118:2, 118:9, 124:11, 127:23, 134:9, 137:8, 142:11, 142:15, 142:16, 142:17, 142:20, 144:12, 145:16, 152:2, 155:4, 155:10, 155:17, 156:15, 158:10, 158:12, 158:14, 161:2, 184:20

**ingenuousness** [1] - 150:8

**inherited** [1] - 10:13

**initial** [6] - 16:21, 27:18, 27:22, 33:6, 34:4, 41:2

**injunction** [2] - 127:6, 133:6

**inoperative** [1] - 141:9

**inquiry** [1] - 133:22

**inside** [2] - 127:1, 127:2

**insisted** [1] - 133:21

**inspect** [4] - 86:25, 93:25, 95:19, 149:4

**inspectors** [1] - 62:4

**install** [1] - 142:9
**instance** [6] - 15:24, 19:8, 41:3, 107:10, 121:18, 164:3
**instead** [13] - 25:16, 65:2, 67:2, 67:17, 68:10, 70:3, 70:14, 70:17, 117:12, 133:20, 182:18, 185:5, 185:6
**instructions** [2] - 93:22, 117:24
**insurance** [1] - 167:10
**intellectual** [8] - 76:13, 79:16, 79:18, 79:25, 80:7, 80:13, 80:14, 80:15
**Intelligence** [3] - 58:21, 127:2, 150:10
**intelligence** [9] - 17:15, 58:20, 75:4, 133:5, 140:10, 140:22, 140:25, 144:11, 146:6
**intelligent** [1] - 131:25
**intent** [1] - 179:10
**intentionally** [1] - 173:2
**intercepting** [1] - 17:16
**interest** [1] - 65:2
**interested** [1] - 112:23
**interesting** [4] - 5:7, 84:17, 114:13, 129:11
**interests** [2] - 76:13, 85:11
**interference** [1] - 79:14
**interim** [1] - 28:19
**interlude** [1] - 108:21
**internally** [2] - 166:13, 166:16
**International** [1] - 176:5
**interpret** [2] - 7:20, 49:10
**interpretation** [3] - 100:9, 142:24, 143:25
**interpreted** [3] - 141:16, 141:20, 142:22
**interrupt** [4] - 11:14, 11:15, 102:25, 107:22
**interrupting** [4] - 11:13, 99:11, 137:2, 139:10
**intervene** [1] - 136:5

**interview** [2] - 22:14, 81:7
**interviews** [1] - 138:21
**introduced** [1] - 136:19
**invented** [1] - 169:8
**investigation** [5] - 23:1, 24:18, 54:22, 58:17, 151:7
**Investigation** [1] - 51:12
**investigations** [1] - 32:13
**invoked** [1] - 130:19
**involve** [1] - 111:19
**involved** [8] - 32:12, 54:15, 57:12, 58:19, 103:25, 126:3, 136:6, 161:3
**involves** [1] - 86:9
**involving** [1] - 103:19
**Ionesco** [1] - 119:10
**ironic** [1] - 173:17
**ironically** [3] - 53:13, 172:18, 176:23
**irrelevant** [2] - 27:14, 133:21
**Ish** [1] - 14:9
**ISH** [1] - 14:9
**ish** [2] - 14:16, 14:18
**isolation** [1] - 161:25
**Israel** [1] - 17:17
**issue** [54] - 10:5, 17:6, 26:25, 33:24, 42:21, 55:22, 56:5, 58:1, 58:5, 63:5, 67:25, 68:1, 72:19, 74:18, 77:21, 83:24, 86:9, 87:11, 87:16, 87:17, 87:21, 89:19, 92:6, 93:6, 93:24, 94:11, 94:14, 96:23, 99:15, 99:17, 101:4, 101:9, 105:19, 126:9, 137:23, 139:13, 148:12, 159:15, 159:17, 160:18, 160:20, 162:18, 162:19, 162:20, 171:12, 172:19, 178:20, 181:12, 182:7, 183:22, 183:23, 186:2
**issue's** [1] - 16:20
**issue-related** [1] - 148:12
**issued** [3] - 33:6, 88:7, 171:24

**issues** [7] - 6:15, 45:17, 46:18, 47:14, 138:20, 158:9, 171:15
**it'll** [3] - 65:15, 102:24, 145:11
**item** [1] - 147:1
**itself** [10] - 12:9, 28:20, 51:18, 52:7, 76:8, 112:25, 132:14, 145:17, 172:2

**J**

**jacked** [1] - 105:17
**jail** [1] - 107:15
**James** [11] - 3:13, 27:2, 32:7, 58:22, 59:19, 108:10, 111:3, 133:3, 151:24, 151:25, 162:24
**JAMES** [1] - 1:7
**jammed** [1] - 44:21
**January** [8] - 1:5, 4:1, 4:7, 5:5, 5:6, 55:19, 58:5, 130:22
**jaw** [1] - 39:16
**Jazeera** [11] - 74:15, 77:21, 105:4, 116:19, 136:9, 141:14, 143:7, 143:11, 143:15, 144:1, 144:17
**Jeffrey** [2] - 18:3, 107:12
**Jeopardy** [1] - 172:13
**Jerusalem** [1] - 128:15
**Jewish** [1] - 4:16
**Jim** [1] - 154:11
**Jimmy** [7] - 109:11, 109:13, 109:16, 109:22, 109:24, 110:3, 118:21
**job** [4] - 39:17, 52:17, 155:14, 171:14
**Joe** [1] - 98:23
**Joel** [2] - 109:8, 109:10
**John** [1] - 146:5
**JONATHAN** [1] - 1:10
**Joseph** [1] - 128:19
**jot** [1] - 118:15
**judge** [42] - 11:7, 14:2, 14:4, 29:22, 31:6, 35:23, 49:2, 62:2, 63:7, 64:22, 66:17, 66:19, 67:5, 67:6, 67:7, 67:9,

68:2, 69:16, 87:15, 87:21, 88:3, 88:7, 88:14, 88:19, 89:5, 89:18, 89:24, 90:10, 92:16, 93:5, 95:18, 104:14, 111:25, 113:3, 113:8, 125:4, 127:8, 131:25, 168:20
**JUDGE** [1] - 1:11
**Judge** [38] - 11:18, 21:22, 22:6, 29:23, 29:24, 31:11, 31:14, 36:6, 39:9, 39:20, 49:1, 49:3, 64:21, 67:6, 71:3, 89:20, 93:9, 95:17, 98:4, 99:22, 111:25, 112:2, 127:11, 130:15, 130:19, 134:20, 137:9, 139:23, 147:23, 148:9, 158:3, 162:22, 164:22, 176:14, 176:15, 179:7, 184:4
**judges** [4] - 58:25, 66:6, 98:11, 186:2
**judgment** [16] - 5:13, 6:9, 44:20, 45:14, 46:1, 65:3, 71:17, 92:22, 95:10, 142:21, 147:24, 148:22, 154:6, 179:6, 180:12, 185:3
**Judicial** [1] - 35:11
**judicial** [9] - 106:21, 107:6, 129:24, 130:2, 130:11, 130:19, 130:25, 131:8, 132:13
**July** [3] - 27:11, 60:10, 130:23
**juries** [1] - 184:20
**jurisdiction** [1] - 107:4
**jurisdictions** [1] - 107:4
**jurisprudence** [1] - 20:19
**jury** [19] - 17:21, 17:22, 69:19, 69:20, 69:23, 69:24, 96:24, 100:16, 100:20, 122:23, 123:1, 123:2, 149:1, 160:20, 162:19, 163:11, 176:21, 184:18, 184:21
**jury's** [1] - 87:22
**justice** [1] - 35:14
**Justice** [18] - 16:25, 28:21, 32:18, 33:1,

35:9, 72:6, 87:23, 96:14, 107:11, 107:14, 111:18, 112:14, 114:8, 114:9, 114:11, 134:21, 151:8, 159:14
**justifiable** [1] - 164:21
**justification** [2] - 9:20, 61:12
**JV** [1] - 59:10

**K**

**Kaiser** [1] - 176:11
**keep** [18] - 8:1, 31:21, 31:22, 49:25, 61:4, 79:10, 79:11, 110:25, 111:14, 112:12, 118:17, 124:3, 125:2, 126:10, 127:14, 127:16, 127:23, 135:12
**keeping** [2] - 79:7, 125:9
**Keith** [1] - 151:25
**kept** [1] - 53:22
**key** [1] - 108:1
**kicked** [1] - 26:18
**kids** [1] - 63:23
**Kimmel** [7] - 109:11, 109:14, 109:16, 109:22, 109:24, 110:3, 118:21
**kind** [13] - 9:19, 27:24, 33:4, 40:2, 40:13, 92:10, 100:13, 100:14, 106:9, 124:5, 149:17, 152:2, 175:24
**kinds** [2] - 8:12, 183:21
**KLAYMAN** [372] - 1:14, 1:14, 3:5, 3:8, 3:12, 3:23, 4:10, 4:13, 4:16, 4:19, 4:24, 7:6, 7:8, 9:6, 10:18, 11:9, 11:11, 11:23, 12:23, 13:18, 14:21, 15:15, 15:24, 16:6, 16:16, 16:8, 18:18, 18:20, 18:23, 19:2, 19:4, 19:8, 19:24, 20:16, 21:16, 22:8, 23:4, 23:7, 23:24, 24:25, 25:2, 25:5, 25:8, 25:10, 26:21, 27:2, 27:6, 27:9, 28:2, 30:22, 31:13, 31:19, 34:10, 35:4, 36:19, 37:12, 37:15, 38:7,

38:14, 40:8, 40:18, 42:23, 43:7, 43:16, 44:18, 47:12, 48:19, 50:20, 51:17, 51:23, 52:1, 52:7, 52:11, 53:5, 53:11, 54:13, 55:7, 55:9, 55:12, 55:14, 55:17, 55:23, 56:7, 58:7, 59:12, 59:24, 60:4, 60:6, 60:23, 61:22, 61:24, 62:11, 62:15, 62:18, 63:12, 63:16, 63:20, 63:22, 64:1, 64:5, 64:7, 65:24, 66:13, 66:16, 67:13, 67:15, 67:20, 68:6, 68:11, 68:15, 68:17, 69:4, 69:19, 72:3, 73:5, 73:16, 73:21, 73:23, 74:16, 74:20, 74:23, 75:1, 75:3, 75:16, 80:20, 80:23, 80:25, 81:4, 81:15, 82:8, 82:15, 82:22, 83:5, 83:7, 83:21, 84:1, 84:3, 84:5, 84:10, 85:5, 85:8, 85:10, 85:15, 86:3, 86:13, 86:20, 87:2, 87:6, 87:8, 87:21, 88:5, 88:12, 88:17, 88:21, 89:6, 89:9, 90:1, 90:3, 90:7, 90:10, 90:23, 90:25, 91:2, 91:4, 91:17, 91:19, 91:24, 92:1, 92:3, 93:8, 93:11, 93:16, 94:5, 94:7, 94:11, 94:14, 95:4, 95:6, 95:14, 96:12, 97:4, 97:6, 97:8, 97:18, 98:12, 98:17, 98:20, 98:22, 99:1, 99:6, 99:8, 99:12, 99:14, 99:24, 100:4, 100:7, 100:20, 100:24, 101:1, 102:14, 102:20, 102:23, 103:2, 103:6, 103:11, 103:15, 104:4, 104:7, 104:23, 105:13, 106:4, 107:8, 108:1, 108:7, 108:9, 108:18, 110:1, 110:5, 110:22, 111:16, 112:3, 112:5, 113:15, 114:5, 114:17, 114:20, 114:24, 115:9, 115:16, 115:18, 115:22, 116:2, 118:12,

118:23, 119:1, 119:6, 119:23, 120:2, 120:8, 121:1, 121:12, 122:4, 122:8, 122:17, 122:23, 123:1, 123:17, 123:22, 124:22, 124:24, 125:7, 125:15, 125:17, 125:19, 125:22, 125:24, 126:2, 126:11, 126:14, 126:22, 127:16, 127:21, 128:4, 128:7, 128:11, 128:14, 129:2, 129:7, 129:22, 130:7, 131:9, 131:12, 131:16, 131:18, 132:5, 132:12, 132:20, 132:23, 133:12, 134:4, 134:12, 134:23, 135:2, 135:4, 135:15, 136:16, 136:22, 138:9, 149:5, 149:7, 150:4, 150:7, 151:3, 151:17, 151:20, 151:24, 154:10, 154:15, 154:23, 155:3, 155:7, 155:11, 156:20, 157:16, 157:23, 158:19, 158:23, 161:15, 162:13, 163:11, 164:1, 164:6, 165:6, 165:6, 165:8, 165:17, 166:17, 167:1, 167:7, 167:16, 167:19, 167:22, 168:1, 168:5, 168:7, 168:25, 169:17, 170:6, 170:25, 171:5, 172:8, 172:15, 172:17, 173:9, 173:17, 173:25, 174:17, 174:19, 174:21, 174:24, 175:2, 175:4, 175:6, 175:10, 175:14, 175:18, 177:9, 177:22, 178:2, 178:21, 178:25, 179:14, 179:18, 179:22, 180:1, 180:22, 181:6, 181:18, 181:23, 182:25, 183:2, 183:4, 183:11, 183:18, 184:2, 184:7, 185:2, 185:6, 185:11, 185:24, 186:1, 186:5
**Klayman** [122] - 3:12,

3:22, 4:9, 6:24, 8:3, 8:25, 10:4, 11:17, 11:19, 11:20, 12:19, 15:7, 15:18, 18:6, 20:7, 20:21, 21:7, 21:15, 25:14, 26:20, 27:21, 29:14, 33:25, 34:16, 36:13, 37:5, 37:16, 37:22, 37:24, 43:20, 45:14, 46:12, 47:18, 48:10, 51:5, 51:22, 51:24, 54:4, 56:2, 56:11, 56:18, 56:23, 57:22, 59:16, 59:17, 60:1, 60:17, 61:15, 67:4, 70:9, 70:16, 71:4, 71:8, 71:15, 72:8, 73:18, 74:3, 75:25, 80:17, 83:20, 85:14, 87:13, 90:9, 90:14, 94:24, 95:5, 95:13, 97:7, 97:9, 99:7, 99:17, 100:21, 101:13, 102:7, 102:16, 103:10, 103:21, 107:22, 108:2, 108:20, 109:12, 116:13, 120:1, 121:22, 126:5, 126:15, 128:18, 132:4, 132:6, 136:4, 136:13, 137:10, 138:17, 139:15, 140:7, 142:1, 142:7, 143:18, 145:10, 145:18, 146:19, 148:9, 152:9, 152:14, 153:1, 153:10, 153:17, 154:7, 156:2, 156:12, 156:13, 163:16, 168:19, 169:22, 172:14, 177:21, 180:15, 182:7, 182:11, 183:19, 184:25
**Klayman's** [9] - 45:20, 46:8, 101:4, 137:6, 137:21, 138:14, 144:25, 154:5, 180:18
**KNIGHT** [1] - 1:21
**knowing** [4] - 26:11, 54:24, 138:2, 153:13
**knowingly** [1] - 80:2
**knowledge** [2] - 51:9, 66:1
**known** [4] - 14:9, 89:2, 106:14, 106:15
**knows** [9] - 32:14,

139:12, 139:25, 149:1, 150:16, 152:19, 159:10, 168:21, 177:3
**Konigsberg** [2] - 167:21, 167:24

# L

**laboring** [1] - 47:3
**lack** [7] - 15:10, 24:18, 41:2, 92:11, 93:12, 97:14, 105:10
**lacked** [1] - 129:6
**lacks** [1] - 129:20
**Laden** [1] - 105:4
**laid** [1] - 73:13
**Lamberth** [10] - 29:23, 29:24, 31:11, 31:14, 39:20, 127:11, 137:9, 137:10, 158:3, 162:23
**language** [2] - 40:15, 137:1
**lapse** [1] - 170:23
**large** [3] - 81:19, 84:3, 160:23
**largely** [1] - 27:13
**LARRY** [1] - 1:14
**Larry** [3] - 3:12, 3:21, 128:17
**LaRue** [1] - 174:7
**Las** [3] - 64:20, 64:21, 66:25
**last** [19] - 12:14, 14:24, 17:13, 35:11, 54:5, 55:24, 91:7, 92:7, 111:6, 126:17, 127:6, 154:7, 155:1, 159:24, 167:20, 177:18, 178:3, 184:14
**late** [3] - 6:11, 126:17, 148:21
**lately** [1] - 32:1
**Lauderdale** [1] - 109:2
**laughter** [1] - 170:17
**Laura** [1] - 3:16
**LAURA** [1] - 1:17
**law** [40] - 14:10, 18:12, 18:13, 19:11, 19:21, 19:22, 20:7, 20:12, 20:23, 20:24, 26:17, 26:23, 32:24, 58:14, 59:4, 71:24, 96:7, 97:15, 99:18, 99:20, 108:4, 113:17, 129:5, 129:13, 129:25, 130:10,

130:25, 131:3, 131:6, 132:14, 134:5, 134:8, 152:18, 160:10, 173:3, 175:19, 176:3, 178:13, 178:16, 178:18
**LAW** [2] - 1:14, 109:5
**lawsuit** [16] - 31:16, 56:6, 57:12, 75:7, 82:11, 83:23, 84:6, 86:9, 103:14, 110:17, 110:20, 112:18, 121:4, 130:22, 138:3
**lawsuits** [1] - 18:14
**lawyer** [33] - 4:24, 8:6, 19:14, 20:9, 28:8, 32:18, 35:7, 35:10, 59:18, 66:15, 71:6, 74:4, 89:2, 89:6, 98:11, 98:13, 98:15, 103:3, 103:13, 106:9, 111:18, 111:20, 112:15, 116:5, 128:19, 147:12, 147:20, 148:17, 168:19, 177:6, 182:11, 184:8, 186:7
**lawyer's** [1] - 89:12
**lawyers** [20] - 6:13, 9:7, 9:13, 9:14, 11:19, 44:14, 66:9, 68:13, 89:3, 89:9, 89:12, 91:14, 98:14, 112:6, 113:17, 113:18, 128:21, 160:3, 165:10, 177:11
**lead** [1] - 121:6
**leaders** [2] - 141:7, 142:22
**leading** [2] - 58:13, 140:15
**learned** [5] - 17:13, 17:15, 37:21, 58:21, 99:11
**least** [10] - 12:14, 31:21, 45:6, 45:7, 81:12, 82:14, 82:21, 125:4, 154:3, 159:24
**leave** [5] - 43:17, 45:21, 74:25, 103:2, 184:22
**leaves** [1] - 74:17
**led** [3] - 39:22, 140:22, 143:25
**Lee** [2] - 103:10, 103:18
**left** [2] - 10:12, 10:14
**legal** [7] - 51:19, 91:14, 129:18, 130:1, 131:7, 171:12, 183:24

16

**legally** [2] - 19:4, 27:16

**legitimacy** [2] - 78:9, 79:3

**legitimate** [1] - 77:19

**lengthy** [4] - 29:21, 34:7, 95:11, 178:14

**less** [3] - 38:12, 43:11, 46:13

**letter** [44] - 32:7, 56:10, 56:11, 56:15, 56:17, 57:4, 59:22, 59:24, 60:11, 72:9, 72:10, 72:11, 72:13, 72:23, 73:1, 73:5, 73:24, 74:4, 74:6, 74:7, 90:9, 90:13, 94:15, 98:16, 98:25, 100:1, 100:3, 100:9, 101:7, 101:8, 101:23, 104:17, 118:14, 137:22, 142:11, 155:10, 155:11, 155:16, 155:21, 155:22, 156:14, 158:8

**letters** [14] - 60:10, 72:7, 90:3, 90:5, 94:18, 98:13, 141:15, 141:20, 142:20, 142:22, 142:23, 142:25, 143:12, 144:1

**level** [1] - 59:7

**levels** [1] - 31:7

**Lexis** [3] - 174:9, 174:15, 174:24

**libel** [5] - 26:7, 101:14, 103:20, 110:13, 148:17

**liberal** [1] - 157:8

**licenses** [1] - 79:18

**licensing** [1] - 80:14

**lie** [3] - 118:6, 118:7, 168:13

**lied** [8] - 53:19, 63:7, 66:21, 69:7, 117:19, 127:3, 164:23, 165:14

**life** [3] - 157:2, 162:25, 163:8

**light** [3] - 24:4, 24:5, 24:6

**likelihood** [1] - 62:1

**likely** [9] - 32:4, 32:21, 33:3, 36:24, 52:14, 53:21, 63:4, 115:1, 118:5

**limine** [1] - 45:23, 106:1, 184:4

**limitations** [1] - 4:5

**limited** [8] - 58:22, 74:12, 76:21, 77:2,

81:5, 83:9, 146:10, 180:3

**Line** [2] - 16:7

**line** [5] - 72:4, 170:4, 171:1, 176:15, 182:4

**Link** [1] - 176:7

**link** [1] - 56:25

**linked** [2] - 129:19, 138:23

**LISA** [2] - 2:1, 186:22

**list** [7] - 14:11, 20:22, 20:25, 21:3, 21:10, 58:25, 160:12

**listed** [2] - 14:10, 175:14

**Listen** [1] - 137:7

**listen** [6] - 9:11, 11:12, 21:17, 68:20, 160:3, 162:22

**listened** [1] - 137:4

**listening** [4] - 21:19, 30:9, 137:1, 157:18

**listing** [1] - 155:3

**lit** [1] - 160:24

**literary** [1] - 7:14

**literature** [1] - 118:20

**litigant** [2] - 106:9, 107:9

**litigation** [9] - 6:23, 65:16, 85:5, 91:15, 91:23, 111:5, 111:21, 132:19, 161:3

**litmus** [2] - 72:3, 72:4, 73:9

**live** [1] - 86:18

**livelihood** [2] - 79:21, 80:5

**lives** [2] - 14:13, 42:13

**livestock** [1] - 119:5

**living** [4] - 20:11, 71:9, 79:22, 80:6

**local** [2] - 92:9, 177:19

**locate** [9] - 38:18, 55:21, 60:12, 74:11, 104:22, 117:16, 118:1, 154:8, 158:15

**located** [1] - 61:17

**locating** [2] - 56:13, 57:2

**location** [2] - 27:14, 73:2

**locked** [1] - 167:9

**logic** [2] - 5:16, 105:5, 117:14

**logical** [3] - 63:12, 161:13, 182:20

**logistical** [1] -

154:21

**logistically** [1] - 9:4

**look** [35] - 13:13, 13:14, 13:15, 16:9, 32:22, 33:10, 38:15, 43:1, 48:15, 51:5, 71:4, 72:12, 90:17, 92:18, 103:8, 108:2, 108:7, 108:9, 108:10, 108:13, 108:18, 110:8, 113:15, 119:19, 133:11, 133:13, 143:7, 145:12, 149:23, 153:9, 163:13, 165:16, 168:16, 173:4, 177:17

**Look** [1] - 158:4

**looked** [3] - 43:15, 90:16, 114:20

**looking** [20] - 5:17, 19:25, 21:24, 27:7, 55:25, 57:11, 57:23, 57:25, 58:5, 59:13, 71:12, 101:15, 110:7, 118:9, 118:17, 126:3, 135:2, 142:12, 147:13, 151:12

**looks** [2] - 43:25, 167:5

**lose** [6] - 84:13, 85:3, 85:17, 92:23, 95:24, 121:17

**loss** [1] - 80:12

**loud** [1] - 170:3

**love** [3] - 126:22, 167:16, 171:1

**loves** [1] - 174:11

**low** [3] - 106:8, 135:3, 162:12

**lower** [1] - 49:21

**luck** [2] - 75:15, 93:23

**luckily** [1] - 111:21

**lying** [1] - 119:16

## M

**machine** [1] - 169:7

**magic** [1] - 78:13

**MAGISTRATE** [1] - 1:11

**Magistrate** [3] - 70:6, 87:10, 176:15

**magistrate** [10] - 13:22, 14:1, 14:2, 32:15, 35:23, 58:24, 87:15, 93:5, 186:1

**magistrate's** [1] -

14:3

**mail** [9] - 56:25, 57:9, 59:16, 59:23, 117:23, 155:23, 156:4, 156:8, 156:12

**mails** [2] - 118:8, 157:16

**maintain** [1] - 41:1

**maintained** [1] - 126:8

**maintains** [1] - 83:11

**major** [6] - 26:18, 26:24, 61:13, 108:14, 118:20, 151:10

**majored** [1] - 118:22

**majority** [1] - 150:20

**malice** [11] - 23:2, 23:8, 23:13, 23:24, 23:25, 24:11, 25:12, 25:17, 26:10, 153:4, 160:6

**malpractice** [1] - 184:23

**man** [4] - 41:24, 131:25, 171:2

**maneuver** [1] - 105:21

**March** [1] - 45:24

**Maricopa** [6] - 102:8, 134:16, 134:18, 134:19, 135:18, 136:2

**Mark** [2] - 172:1, 172:5

**marker** [1] - 156:13

**market** [1] - 81:8

**Martinez** [6] - 93:9, 95:17, 98:4, 99:22, 148:10, 179:7

**Marx** [1] - 171:4

**mass** [1] - 127:4

**massive** [2] - 146:16, 158:12

**material** [15] - 8:9, 13:5, 13:10, 28:3, 34:19, 53:20, 69:15, 87:3, 111:14, 115:14, 120:22, 126:16, 126:18, 159:5, 160:17

**materials** [15] - 7:2, 12:21, 53:17, 53:18, 57:23, 63:8, 63:9, 66:19, 90:17, 90:18, 123:10, 125:1, 134:15, 164:15

**matter** [24] - 13:23, 15:23, 15:24, 17:6, 18:12, 18:13, 34:25, 44:14, 59:7, 93:23, 100:14, 100:15, 129:5, 129:13,

129:25, 130:25, 131:5, 132:23, 134:8, 166:12, 166:13, 174:3, 176:20, 186:19

**meal** [1] - 170:19

**mean** [41] - 4:7, 22:23, 24:2, 31:16, 31:22, 33:9, 48:1, 50:11, 53:5, 53:8, 53:9, 54:12, 61:7, 64:3, 64:20, 82:1, 85:13, 94:3, 101:7, 101:19, 102:20, 104:17, 105:10, 113:7, 113:24, 114:2, 116:4, 116:13, 116:20, 122:25, 132:23, 135:10, 135:13, 139:24, 141:8, 142:6, 142:7, 142:9, 158:25, 168:8, 179:19

**meaning** [3] - 6:21, 57:24, 61:15

**means** [5] - 51:16, 52:19, 82:2, 100:1, 165:15

**meant** [18] - 25:13, 38:16, 38:19, 39:4, 54:13, 94:18, 100:8, 110:23, 111:7, 113:15, 113:19, 121:13, 143:16, 165:13, 166:19, 166:20, 167:8, 168:9

**meantime** [1] - 108:18

**measure** [1] - 176:19

**mechanical** [1] - 154:20

**media** [1] - 91:12

**mediation** [1] - 45:13

**medical** [9] - 41:3, 42:15, 42:17, 42:22, 42:25, 43:4, 46:18, 46:19, 66:5

**meet** [1] - 158:25

**meeting** [3] - 55:24, 58:11, 158:3

**meetings** [2] - 58:11, 151:25

**mega** [1] - 113:17

**Mellish** [2] - 167:8, 167:14

**memo** [3] - 6:3, 44:1, 155:18

**memoranda** [1] - 108:14

**memorandum** [29] - 5:17, 19:11, 20:23,

20:24, 26:16, 26:18, 26:21, 26:23, 27:4, 47:5, 48:16, 50:6, 51:6, 60:8, 72:10, 76:1, 103:9, 108:3, 110:9, 119:20, 120:17, 121:7, 128:25, 130:18, 160:10, 160:14, 178:13
**memory** [10] - 39:13, 41:14, 41:25, 51:9, 54:6, 60:24, 109:22, 117:11, 163:22
**mental** [2] - 109:17, 109:24
**mentioned** [2] - 58:2, 106:13
**Mercedes** [1] - 176:10
**Mercedes-Benz** [1] - 176:10
**mere** [1] - 70:11
**merely** [3] - 8:5, 39:10, 40:6
**merits** [1] - 182:9
**messages** [5] - 74:14, 77:9, 105:3, 141:14, 144:17
**met** [4] - 39:1, 54:17, 117:22, 155:12
**metaphors** [1] - 178:7
**MIAMI** [1] - 1:2
**Miami** [9] - 1:4, 1:15, 1:22, 2:2, 2:3, 58:12, 59:2, 186:23, 186:24
**Michael** [1] - 13:21
**Michele** [2] - 174:7, 178:22
**mid** [1] - 4:4
**mid-February** [1] - 4:4
**middle** [5] - 27:10, 41:19, 45:24, 110:9, 158:16
**Mifflin** [1] - 10:8
**might** [23] - 11:7, 28:16, 31:24, 43:16, 47:15, 47:21, 50:15, 58:25, 59:15, 60:15, 64:9, 66:23, 70:6, 75:6, 94:18, 105:7, 116:7, 127:5, 132:12, 133:17, 148:25, 157:10, 166:16
**mildly** [1] - 156:25
**mile** [1] - 13:24
**military** [1] - 142:21
**mill** [1] - 32:24

**million** [8] - 28:12, 53:25, 57:14, 65:3, 80:11, 138:1, 147:24
**millions** [1] - 105:1
**Mills** [1] - 109:6
**mind** [6] - 25:15, 46:20, 50:18, 109:25, 139:19, 180:20
**mindfulness** [1] - 108:22
**minimize** [2] - 48:4, 50:16
**minimum** [1] - 105:18
**minister** [1] - 17:17
**minor** [1] - 161:9
**minute** [5] - 43:21, 76:1, 108:12, 142:2, 145:12
**minutes** [7] - 18:19, 38:13, 43:12, 43:14, 150:15, 186:4, 186:7
**miraculous** [1] - 172:22
**Miramar** [1] - 31:18, 111:2
**MISCELLANEOUS** [1] - 1:10
**mischaracterizatio n** [1] - 102:14
**misconduct** [1] - 151:19
**misinterpret** [1] - 15:9
**misleading** [4] - 76:21, 77:1, 79:20, 83:8
**missing** [2] - 27:22, 92:3
**mission** [1] - 65:15
**misspoken** [1] - 115:25
**mistaken** [1] - 62:24
**misunderstand** [1] - 15:9
**misunderstood** [1] - 37:13
**mix** [1] - 32:16
**modified** [1] - 182:4
**modify** [1] - 39:7
**moment** [2] - 41:8, 108:22
**Monday** [3] - 168:2, 185:4, 185:11
**money** [2] - 78:16, 167:3
**Money** [1] - 166:24
**Montgomery** [186] - 3:2, 7:19, 10:13, 12:10, 12:13, 14:10,

14:12, 14:13, 14:17, 15:13, 17:9, 17:18, 17:24, 18:25, 22:14, 22:18, 25:6, 28:2, 28:9, 28:24, 29:3, 30:3, 30:7, 30:11, 30:14, 30:23, 31:22, 32:4, 32:20, 34:3, 34:15, 34:25, 35:17, 36:1, 36:3, 36:6, 36:11, 36:14, 36:16, 37:7, 37:17, 38:2, 38:11, 38:22, 39:9, 39:10, 40:6, 40:20, 41:22, 43:10, 48:12, 49:2, 49:5, 49:14, 49:25, 50:22, 51:3, 52:4, 52:20, 53:13, 53:17, 54:18, 56:1, 57:1, 57:7, 57:14, 58:18, 60:9, 60:25, 61:8, 61:16, 63:4, 64:14, 64:22, 67:5, 67:11, 68:9, 69:8, 70:13, 72:21, 73:10, 74:14, 76:5, 76:12, 76:20, 77:1, 77:7, 77:16, 77:17, 77:24, 78:17, 78:21, 78:23, 79:8, 79:20, 79:21, 80:9, 80:12, 80:17, 82:8, 82:12, 82:24, 83:8, 83:11, 83:21, 101:18, 102:7, 105:1, 105:17, 110:10, 110:16, 110:20, 111:11, 111:23, 112:7, 112:22, 112:24, 114:22, 115:3, 115:13, 115:21, 117:20, 118:1, 118:6, 118:18, 120:16, 121:5, 122:9, 122:15, 123:4, 124:25, 126:6, 126:17, 127:10, 127:13, 128:1, 129:1, 133:15, 133:20, 133:21, 134:1, 134:7, 136:3, 137:12, 141:13, 141:19, 143:13, 144:13, 144:21, 145:6, 145:19, 146:14, 147:19, 149:10, 151:21, 151:22, 152:4, 152:11, 152:14, 154:8, 156:2, 157:25, 158:11, 162:5, 162:23, 162:25, 163:4, 163:7,

163:19, 164:1, 165:19, 168:13, 169:11, 169:14, 175:23, 177:2, 179:16, 179:20, 180:25, 181:16, 181:24, 182:11, 182:23, 183:8, 184:19
**MONTGOMERY** [1] - 1:4
**Montgomery's** [40] - 27:11, 29:6, 30:5, 43:24, 47:8, 57:12, 62:8, 74:12, 76:23, 77:3, 77:18, 78:5, 78:7, 78:19, 79:3, 80:5, 84:7, 85:22, 86:15, 87:18, 96:25, 115:7, 116:14, 117:10, 120:11, 135:8, 136:6, 137:7, 140:3, 140:9, 141:1, 144:15, 146:2, 147:20, 148:2, 148:5, 152:18, 160:4, 179:10
**month** [9] - 33:10, 54:17, 70:11, 70:12, 71:10, 72:1, 155:7, 155:13, 159:19
**months** [5] - 6:8, 29:2, 65:21, 68:25, 109:13
**morning** [1] - 22:10
**Morrow** [3] - 98:22, 98:23, 99:3
**Moscow** [1] - 62:11
**most** [23] - 5:21, 21:3, 21:11, 34:23, 35:13, 43:12, 56:22, 63:4, 72:17, 75:4, 90:18, 92:19, 116:14, 117:9, 118:7, 128:17, 138:19, 145:1, 146:23, 157:2, 165:24, 177:23, 180:25
**MOTION** [1] - 1:10
**motion** [32] - 5:13, 5:14, 5:17, 13:1, 13:20, 14:8, 14:17, 14:21, 26:17, 26:23, 44:20, 45:25, 61:9, 71:17, 73:12, 73:19, 95:10, 100:23, 100:24, 101:1, 102:12, 108:4, 159:19, 161:9, 171:11, 177:3, 179:6, 179:8, 184:3, 185:3
**motions** [4] - 16:10,

45:23, 71:20, 106:1
**motivation** [2] - 12:12, 69:6
**motor** [1] - 96:22
**movant** [1] - 171:19
**move** [2] - 33:9, 61:6, 90:22
**moved** [2] - 10:7, 14:16
**movie** [3] - 62:13, 166:23, 169:6
**moving** [3] - 7:20, 88:24, 177:19
**MR** [372] - 3:5, 3:8, 3:12, 3:23, 4:10, 4:13, 4:16, 4:19, 4:24, 7:6, 7:8, 9:6, 10:18, 11:9, 11:11, 11:23, 12:23, 13:18, 14:21, 15:15, 15:24, 16:6, 16:16, 18:8, 18:18, 18:20, 18:23, 19:2, 19:4, 19:8, 19:24, 20:16, 21:16, 22:8, 23:4, 23:7, 23:24, 24:25, 25:2, 25:5, 25:8, 25:10, 26:21, 27:2, 27:6, 27:9, 28:2, 30:22, 31:13, 31:19, 34:10, 35:4, 36:19, 37:12, 37:15, 38:7, 38:14, 40:8, 40:18, 42:23, 43:7, 43:16, 44:18, 47:12, 48:19, 50:20, 51:17, 51:23, 52:1, 52:7, 52:11, 53:5, 53:11, 54:13, 55:7, 55:9, 55:12, 55:14, 55:17, 55:23, 56:7, 58:7, 59:12, 59:24, 60:4, 60:6, 60:23, 61:22, 61:24, 62:11, 62:15, 62:18, 63:12, 63:16, 63:20, 63:22, 64:1, 64:5, 64:7, 65:24, 66:13, 66:16, 67:13, 67:15, 67:20, 68:6, 68:11, 68:15, 68:17, 69:4, 69:19, 72:3, 73:5, 73:16, 73:21, 73:23, 74:16, 74:20, 74:23, 75:1, 75:3, 75:16, 80:20, 80:23, 80:25, 81:4, 81:15, 82:8, 82:15, 82:22, 83:5, 83:7, 83:21, 84:1, 84:3, 84:5, 84:10, 85:5, 85:8, 85:10, 85:15, 86:3, 86:13,

18

86:20, 87:2, 87:6, 87:8, 87:21, 88:5, 88:12, 88:17, 88:21, 89:6, 89:9, 90:1, 90:3, 90:7, 90:10, 90:23, 90:25, 91:2, 91:4, 91:17, 91:19, 91:24, 92:1, 92:3, 93:8, 93:11, 93:16, 94:5, 94:7, 94:11, 94:14, 95:4, 95:6, 95:14, 96:12, 97:4, 97:6, 97:8, 97:18, 98:12, 98:17, 98:20, 98:22, 99:1, 99:6, 99:8, 99:12, 99:14, 99:24, 100:4, 100:7, 100:20, 100:24, 101:1, 102:14, 102:20, 102:23, 103:2, 103:6, 103:11, 103:15, 104:4, 104:7, 104:23, 105:13, 106:4, 107:8, 108:1, 108:7, 108:9, 108:18, 110:1, 110:5, 110:22, 111:16, 112:3, 112:5, 113:15, 114:5, 114:17, 114:20, 114:24, 115:9, 115:16, 115:18, 115:22, 116:2, 118:12, 118:23, 119:1, 119:6, 119:23, 120:2, 120:8, 121:1, 121:12, 122:4, 122:8, 122:17, 122:23, 123:1, 123:17, 123:22, 124:22, 124:24, 125:7, 125:15, 125:17, 125:19, 125:22, 125:24, 126:2, 126:11, 126:14, 126:22, 127:16, 127:21, 128:4, 128:7, 128:11, 128:14, 129:2, 129:7, 129:22, 130:7, 131:9, 131:12, 131:16, 131:18, 132:5, 132:12, 132:20, 132:23, 133:12, 134:4, 134:12, 134:23, 135:2, 135:4, 135:15, 136:16, 136:22, 138:9, 149:5, 149:7, 150:4, 150:7, 151:3, 151:17, 151:20, 151:24, 154:10, 154:15, 154:23, 155:3, 155:7,

155:11, 156:20, 157:16, 157:23, 158:19, 158:23, 161:15, 162:13, 163:11, 164:1, 164:6, 164:12, 165:6, 165:8, 165:17, 166:17, 167:1, 167:7, 167:16, 167:19, 167:22, 168:1, 168:5, 168:7, 168:25, 169:17, 170:6, 170:11, 170:14, 170:25, 171:5, 172:8, 172:15, 172:17, 173:9, 173:17, 173:25, 174:17, 174:19, 174:21, 174:24, 175:2, 175:4, 175:6, 175:10, 175:14, 175:18, 177:9, 177:22, 178:2, 178:21, 178:25, 179:14, 179:18, 179:22, 180:1, 180:22, 181:6, 181:18, 181:23, 182:25, 183:2, 183:4, 183:11, 183:18, 184:2, 184:7, 185:2, 185:6, 185:11, 185:24, 186:1, 186:5
**MS** [90] - 3:6, 3:16, 5:3, 9:22, 10:20, 11:10, 11:18, 14:6, 26:5, 27:5, 37:11, 37:19, 42:2, 43:8, 43:14, 45:11, 46:11, 47:20, 48:8, 56:17, 57:18, 59:11, 59:15, 60:19, 60:21, 61:1, 64:9, 64:11, 64:21, 65:11, 66:23, 70:21, 74:8, 74:10, 75:15, 75:18, 76:10, 77:6, 77:11, 77:14, 94:21, 95:8, 101:8, 106:16, 106:18, 106:20, 106:24, 107:19, 107:24, 108:15, 116:7, 116:12, 119:25, 126:5, 134:25, 135:17, 135:20, 136:1, 136:19, 136:24, 137:17, 139:5, 140:1, 140:20, 141:13, 143:3, 143:22, 144:3, 145:4, 145:10, 147:1, 147:6, 148:8, 148:22, 152:12, 153:18,

155:23, 156:1, 156:10, 169:16, 170:9, 171:22, 172:7, 172:10, 174:4, 175:8, 175:17, 185:8, 185:14, 185:25
**multiple** [1] - 29:5
**Murray** [2] - 111:25, 134:20
**mushy** [1] - 40:2
**must** [8] - 18:15, 19:1, 19:5, 26:9, 26:14, 117:13, 160:20, 163:8
**my...** [1] - 115:25
**mysterious** [1] - 79:7
**mystery** [1] - 79:7

## N

**nail** [2] - 150:22, 181:25
**name** [16] - 55:6, 55:10, 57:5, 98:19, 109:3, 109:24, 154:18, 156:18, 158:17, 167:14, 167:18, 167:21, 172:6, 177:6
**named** [2] - 18:3, 177:18
**namely** [2] - 57:4, 122:6
**names** [2] - 84:24, 172:10
**nasty** [1] - 91:16
**National** [1] - 150:10
**national** [7] - 91:10, 97:23, 111:20, 132:25, 140:15, 141:7, 162:7
**nature** [1] - 92:11
**near** [1] - 12:6
**necessarily** [10] - 10:4, 10:25, 11:4, 24:9, 58:1, 107:5, 112:25, 131:6, 138:23, 182:8
**necessary** [9] - 15:4, 16:18, 101:19, 102:12, 121:19, 153:15, 153:20, 153:21, 160:7
**neck** [1] - 62:9
**need** [33] - 11:4, 11:24, 13:14, 15:3, 18:21, 21:21, 21:22, 22:5, 22:6, 22:11, 25:16, 35:21, 35:24,

43:6, 44:16, 45:8, 46:18, 47:2, 61:4, 67:21, 83:19, 97:18, 97:19, 138:13, 139:13, 148:11, 152:15, 153:2, 174:25, 182:10, 183:5
**needed** [1] - 182:3
**needs** [16] - 18:24, 19:20, 26:1, 41:9, 41:20, 92:13, 93:17, 98:3, 98:10, 99:4, 99:16, 113:13, 153:9
**negative** [3] - 16:14, 31:9, 33:13
**negligence** [1] - 160:7
**negligent** [2] - 80:3, 173:3
**negotiated** [1] - 80:9
**negotiating** [1] - 79:17
**nervous** [1] - 185:20
**NetFlix** [1] - 62:16
**Network** [1] - 136:10
**neutral** [3] - 106:2, 106:14, 106:24
**neutrally** [1] - 107:2
**Nevada** [11] - 53:16, 62:2, 66:17, 67:5, 67:12, 68:2, 70:24, 88:8, 88:14, 88:19, 101:25
**never** [56] - 10:6, 17:1, 17:6, 18:1, 19:17, 22:20, 22:21, 27:25, 31:2, 31:24, 32:2, 33:14, 33:20, 35:1, 35:2, 35:15, 51:13, 52:14, 53:3, 53:6, 53:7, 53:9, 53:21, 53:23, 53:24, 66:2, 67:8, 67:20, 68:3, 76:1, 82:16, 92:7, 92:8, 104:13, 114:20, 116:3, 122:8, 124:3, 124:17, 128:7, 133:8, 138:8, 147:22, 163:15, 164:10, 164:11, 165:5, 166:16, 167:22, 172:20, 183:25
**nevertheless** [1] - 89:18
**New** [17] - 3:7, 3:8, 3:25, 4:3, 4:4, 4:7, 4:10, 4:14, 4:21, 6:23, 11:2, 108:25, 109:8, 168:1, 173:8, 186:11, 186:12

**new** [16] - 12:14, 20:12, 91:1, 91:2, 91:3, 116:8, 116:9, 116:11, 135:19, 135:22, 135:23, 135:25, 149:6, 171:16, 173:16, 177:24
**news** [2] - 81:7, 108:24
**newspaper** [1] - 32:1
**newspapers** [1] - 6:22
**next** [10] - 3:13, 29:1, 45:13, 120:15, 121:3, 131:5, 134:6, 165:16, 165:18, 182:20
**nice** [2] - 42:24, 168:2
**Nichols** [1] - 10:14
**nigh** [1] - 71:18
**night** [3] - 6:10, 41:14, 158:17
**nilly** [1] - 9:13
**Ninth** [1] - 102:6
**NO** [1] - 1:2
**noble** [1] - 137:13
**nobody** [2] - 88:2, 168:22
**noise** [1] - 74:13
**noise-filtering** [1] - 74:13
**non** [1] - 171:9
**non-answers** [1] - 171:9
**None** [1] - 95:19
**none** [4] - 37:4, 49:6, 84:19, 95:20
**nonstarter** [3] - 16:21, 69:15, 129:16
**normal** [1] - 119:13
**normally** [1] - 44:5
**North** [2] - 2:2, 186:23
**north** [1] - 60:5
**note** [2] - 27:11, 167:2
**notes** [5] - 21:18, 22:2, 168:17, 185:16, 185:20
**nothing** [19] - 17:3, 81:1, 123:25, 141:6, 141:10, 141:11, 142:12, 145:2, 146:21, 146:24, 149:11, 149:18, 150:20, 151:7, 171:1, 171:18, 181:20, 181:23
**notice** [4] - 17:4,

37:25, 57:19
**notion** [3] - 42:21, 113:2, 135:9
**notwithstanding** [2] - 24:21, 164:2
**novel** [1] - 19:22
**November** [8] - 56:24, 108:8, 119:21, 127:6, 155:24, 155:25, 156:3, 156:12
**nowhere** [1] - 30:5
**NSA** [8] - 58:20, 127:2, 127:6, 133:7, 136:7, 136:13, 137:18, 137:20
**nuances** [1] - 11:1
**number** [27] - 5:18, 8:12, 20:4, 22:2, 22:3, 36:3, 38:25, 40:21, 43:18, 57:4, 59:3, 61:7, 72:12, 77:5, 96:14, 98:12, 105:16, 134:2, 139:5, 142:11, 162:21, 164:13, 164:14, 166:5, 179:11, 179:12, 184:15
**numbered** [2] - 120:5, 165:18
**numbers** [11] - 38:1, 141:15, 141:20, 142:20, 142:22, 142:23, 142:24, 142:25, 143:11, 144:1, 175:14
**nuts** [1] - 13:16
**NW** [1] - 1:18
**NyQuil** [2] - 41:13, 41:16

## O

**oar** [1] - 47:3
**oath** [2] - 35:20, 101:6
**Obama** [1] - 78:3
**object** [2] - 33:18, 182:21
**objected** [4] - 14:16, 27:11, 70:11, 72:4
**objecting** [1] - 102:18
**objection** [16] - 14:4, 27:21, 27:22, 27:25, 28:24, 34:2, 34:4, 34:13, 45:6, 102:17, 102:21, 129:5, 129:20, 145:25, 185:7
**objections** [4] -

27:18, 34:19, 129:9
**objectivity** [1] - 112:3
**objects** [1] - 130:15
**obtain** [3] - 52:5, 111:4, 114:4
**obviously** [7] - 47:6, 123:10, 140:13, 145:17, 147:16, 148:8, 153:12
**occasionally** [1] - 170:22
**occasions** [5] - 39:1, 43:18, 117:22, 118:17
**occur** [1] - 4:10
**occurred** [2] - 119:17, 173:22
**October** [9] - 56:19, 56:20, 57:9, 60:13, 60:18, 61:19, 71:11, 102:6, 117:19
**OF** [1] - 1:1
**offer** [2] - 12:20, 42:12
**offered** [2] - 42:14, 43:22
**offhand** [1] - 35:19
**office** [7] - 30:4, 31:18, 32:9, 44:5, 44:9, 51:25, 136:7
**Office** [2] - 102:8, 134:19
**offices** [1] - 39:22
**official** [14] - 2:1, 88:3, 89:18, 89:24, 90:4, 90:5, 99:1, 100:8, 103:20, 106:21, 107:5, 113:9
**Official** [1] - 186:22
**officials** [11] - 58:21, 78:8, 90:11, 98:17, 126:25, 140:15, 144:8, 144:14, 145:8, 151:19, 156:17
**often** [2] - 126:5, 138:13
**old** [4] - 6:4, 44:8, 54:6
**old-fashioned** [2] - 6:4, 44:8
**old-school** [1] - 6:4
**once** [5] - 35:20, 110:17, 110:20, 112:18, 144:13
**one** [10] - 7:19, 10:12, 15:12, 15:15, 16:16, 20:4, 21:4, 21:8, 21:12, 22:2, 22:10, 27:21, 35:19, 36:3, 38:20, 39:6,

40:18, 41:5, 46:6, 48:2, 48:16, 54:15, 58:12, 69:17, 70:11, 70:22, 72:12, 72:14, 72:19, 72:20, 73:3, 76:11, 79:13, 80:9, 85:10, 90:23, 90:25, 94:21, 95:3, 95:8, 96:14, 98:12, 98:22, 99:9, 100:12, 102:10, 103:25, 108:14, 109:6, 115:3, 120:14, 121:5, 121:9, 124:18, 126:2, 127:10, 129:17, 130:12, 134:22, 139:20, 141:25, 142:13, 143:15, 147:1, 147:7, 147:23, 149:9, 150:7, 151:3, 151:17, 152:4, 152:10, 161:3, 161:16, 161:20, 162:1, 162:22, 164:3, 164:13, 164:21, 170:4, 170:6, 170:18, 171:23, 171:25, 173:12, 173:17, 175:1, 175:13, 175:15, 177:3, 177:10, 178:3, 178:7, 178:9, 179:3, 179:11, 179:23, 180:10, 180:13, 181:10, 181:11, 182:2, 182:6, 184:15
**one's** [1] - 69:22
**one-month** [1] - 70:11
**one-sentence** [2] - 21:4, 21:12
**ongoing** [1] - 32:13
**open** [5] - 8:8, 39:16, 71:18, 158:5, 170:2
**operatives** [1] - 151:11
**opine** [2] - 137:17, 140:24
**opinion** [4] - 9:19, 100:18, 141:22, 176:16
**opinions** [2] - 11:3, 139:19
**opportunity** [7] - 5:10, 21:9, 79:22, 80:6, 139:15, 171:11, 171:16
**opposed** [6] - 39:11, 46:9, 48:2, 130:3, 134:10, 137:15
**opposing** [4] - 89:13,

113:17, 114:3, 130:15
**opposite** [3] - 130:17, 130:23, 131:18
**opposition** [2] - 108:3, 180:13
**optimistic** [1] - 18:15
**oranges** [1] - 97:3
**orchestrate** [2] - 31:5, 31:8
**orchestrated** [1] - 30:12
**Order** [1] - 70:3
**order** [37] - 7:23, 9:23, 10:12, 13:7, 13:11, 16:22, 33:6, 37:2, 37:3, 44:16, 52:4, 55:21, 55:23, 68:2, 70:6, 71:2, 75:12, 87:9, 87:12, 93:1, 94:14, 95:2, 102:3, 118:2, 124:12, 124:16, 151:18, 153:16, 160:16, 182:15, 183:12, 183:22, 183:24, 185:18
**ordered** [12] - 37:1, 53:16, 60:9, 60:21, 62:2, 63:8, 64:22, 67:5, 71:3, 134:20, 142:25
**orders** [3] - 61:19, 66:10, 67:24
**organized** [1] - 37:23
**oriented** [1] - 92:18
**original** [1] - 16:10
**Osama** [1] - 105:4
**otherwise** [5] - 40:4, 75:8, 87:25, 116:10, 141:6
**outfit** [1] - 177:10
**outgrowth** [1] - 161:13
**outrageously** [1] - 15:21
**outright** [1] - 136:10
**outset** [1] - 47:14
**outside** [3] - 67:8, 120:20, 152:4
**overly** [2] - 18:15, 27:13
**overseas** [1] - 151:1
**overtake** [1] - 17:12
**overtly** [1] - 148:6
**overwhelming** [2] - 150:19, 153:3
**own** [15] - 24:5, 26:7, 45:14, 61:17, 76:22, 116:1, 117:15,

120:18, 121:14, 123:2, 124:4, 137:21, 140:3, 147:20, 184:18
**owned** [1] - 52:16
**ownership** [1] - 64:13
**Oz** [3] - 124:7, 124:8, 124:9

## P

**p.m** [3] - 1:6, 8:25, 89:23
**pablum** [1] - 82:6
**packed** [1] - 44:24
**page** [11] - 5:18, 38:1, 48:1, 48:2, 48:6, 110:9, 120:5, 165:16, 165:18, 168:12
**Page** [21] - 16:7, 24:6, 27:7, 27:10, 44:2, 47:6, 51:6, 60:7, 61:7, 75:1, 103:8, 110:9, 128:24, 133:11, 133:13, 165:18, 173:5, 176:7, 176:9, 176:10, 176:12
**page-saver** [2] - 48:1, 48:6
**Pages** [2] - 1:8, 48:15
**pages** [14] - 28:12, 38:5, 39:12, 40:5, 40:17, 46:15, 47:4, 47:5, 47:7, 48:2, 53:25, 57:14, 178:14
**pain** [3] - 43:2, 43:17, 45:9
**paint** [4] - 33:15, 73:10, 85:1, 105:21
**painted** [1] - 84:25
**panthers** [1] - 109:2
**Panthers** [1] - 109:7
**paper** [2] - 48:5, 161:22
**papers** [6] - 6:21, 6:22, 132:8, 136:21, 175:17
**paragraph** [5] - 77:5, 83:1, 128:25, 144:19, 145:9
**Paragraph** [14] - 51:7, 76:12, 76:19, 76:25, 77:6, 77:7, 77:14, 77:20, 78:4, 78:25, 83:3, 144:4, 165:18, 165:19
**paragraphs** [3] - 79:12, 140:2, 143:23

**paralegal** [3] - 3:13, 21:19, 22:1
**paraphrasing** [1] - 41:5
**parenthetical** [2] - 21:4, 21:12
**part** [41] - 10:12, 13:1, 41:24, 44:1, 45:12, 52:22, 61:9, 61:13, 64:12, 67:22, 80:18, 80:20, 80:22, 80:23, 81:12, 81:15, 81:19, 82:11, 82:21, 83:22, 83:23, 84:1, 84:3, 84:6, 86:3, 86:9, 86:11, 86:13, 86:23, 88:24, 96:25, 110:13, 123:23, 124:15, 138:17, 139:3, 146:23, 162:13, 166:8, 180:4
**parte** [2] - 54:24, 104:13
**particular** [20] - 5:15, 5:16, 8:13, 8:25, 16:20, 23:18, 32:17, 46:6, 46:14, 62:24, 69:16, 99:19, 129:4, 129:12, 154:20, 155:21, 160:10, 161:1, 161:6, 166:10
**particularized** [1] - 154:19
**particularly** [1] - 168:14
**parties** [4] - 9:25, 178:10, 183:20, 183:23
**partner** [2] - 147:16, 152:13
**Partners** [1] - 173:4
**parts** [1] - 82:18
**party** [18] - 8:6, 34:17, 65:15, 70:24, 99:15, 101:25, 107:10, 107:16, 114:4, 129:19, 130:12, 130:15, 130:23, 131:1, 132:18, 161:10
**pass** [1] - 158:14
**passage** [6] - 77:20, 77:24, 78:10, 78:15, 109:23, 144:20
**passing** [2] - 21:18, 22:2
**past** [6] - 39:25, 137:2, 137:4, 169:19, 179:6, 184:8
**path** [1] - 78:14

**patriot** [3] - 62:8, 137:12, 137:15
**pave** [1] - 29:24
**pay** [1] - 89:3
**paying** [1] - 67:2
**peculiar** [1] - 112:19
**pejorative** [1] - 50:11
**penalty** [1] - 67:2
**penchant** [1] - 171:23
**pending** [9] - 13:20, 14:4, 14:7, 14:19, 46:1, 71:20, 138:3, 177:3
**Pennsylvania** [1] - 1:18
**people** [33] - 11:13, 31:25, 56:3, 58:15, 58:24, 59:1, 69:9, 75:12, 81:25, 113:15, 113:21, 114:1, 114:6, 119:12, 122:24, 124:4, 124:10, 133:4, 140:24, 141:23, 143:7, 145:21, 147:13, 152:25, 157:3, 159:8, 159:12, 160:23, 160:25, 161:5, 161:12, 161:17, 162:3
**per** [3] - 48:2, 67:1, 67:2
**per-day** [1] - 67:1
**percent** [3] - 49:5, 94:23, 141:8
**perception** [1] - 48:13
**perfect** [1] - 22:15
**perfectly** [1] - 4:7
**perhaps** [10] - 31:9, 39:17, 40:14, 44:25, 46:18, 60:17, 98:4, 150:1, 164:21, 165:1
**period** [1] - 60:25
**perjured** [1] - 127:3
**permissible** [1] - 181:5
**permitted** [3] - 21:3, 21:11, 27:16
**perpetrated** [2] - 136:11, 139:9
**perpetrating** [1] - 146:16
**person** [17] - 30:8, 37:10, 37:11, 55:3, 98:24, 101:21, 112:12, 129:5, 161:1, 161:16, 161:16, 161:23, 164:16, 168:2, 172:18, 172:25

**person's** [1] - 98:19
**personal** [2] - 51:9, 136:11
**personality** [1] - 109:11
**personally** [1] - 68:3
**personnel** [1] - 28:20
**persons** [1] - 94:15
**perspective** [4] - 35:7, 154:21, 158:20, 182:5
**persuasive** [2] - 43:3, 113:14
**persuasively** [2] - 90:14, 165:4
**pertain** [1] - 75:6
**pertaining** [1] - 172:23
**petard** [2] - 116:1, 116:2
**Peyton** [1] - 9:24
**Pfizer** [1] - 176:4
**philosophy** [3] - 68:24, 69:2, 85:5
**phone** [1] - 37:10
**phonetic** [1] - 148:1
**phrase** [8] - 27:13, 59:9, 129:16, 138:22, 142:6, 155:18, 172:11, 182:1
**phrased** [2] - 51:14, 60:15
**pick** [1] - 72:8
**picking** [1] - 50:5
**picture** [1] - 97:6
**piece** [2] - 54:25, 96:3
**pieces** [2] - 177:15, 177:16
**ping** [1] - 60:2
**ping-pong** [1] - 60:2
**pinpoint** [4] - 39:12, 45:3, 46:14, 83:3
**pinpointing** [1] - 37:25
**pixels** [1] - 143:10
**place** [4] - 73:1, 115:5, 157:1, 166:10
**plaintiff** [12] - 18:14, 18:24, 19:5, 19:13, 19:18, 19:19, 19:20, 21:1, 25:25, 89:14, 98:9, 110:13
**Plaintiff** [41] - 1:5, 3:11, 15:12, 19:1, 26:9, 70:18, 75:25, 76:12, 76:20, 76:25, 77:3, 77:7, 77:15, 77:24, 78:5, 78:6, 78:12, 78:17, 78:19,

78:21, 78:23, 79:1, 79:3, 79:6, 79:8, 79:15, 79:21, 80:5, 80:9, 80:12, 83:7, 98:3, 99:4, 99:16, 105:21, 110:10, 121:22, 144:21, 149:1, 163:15, 165:5
**PLAINTIFF** [1] - 1:14
**plaintiff's** [2] - 89:11, 89:15
**Plaintiff's** [7] - 14:11, 47:2, 78:9, 79:24, 83:10, 96:3, 108:3
**Plaintiffs** [2] - 3:12, 103:14
**plan** [1] - 182:18
**planes** [9] - 12:7, 24:8, 140:9, 140:18, 140:19, 141:16, 141:18, 141:23, 143:6
**play** [6] - 25:12, 60:1, 68:23, 70:3, 109:2, 109:7
**played** [2] - 127:12, 176:22
**playing** [4] - 85:1, 109:8, 122:25, 168:2
**pleadings** [6] - 16:8, 17:4, 17:15, 20:1, 20:2, 66:18, 102:15, 106:6
**pleasant** [1] - 5:3
**plus** [1] - 172:11
**Point** [3] - 123:3, 163:13, 174:2
**point** [77] - 4:2, 6:11, 10:2, 15:4, 19:22, 25:25, 33:4, 34:24, 38:5, 39:6, 40:17, 41:1, 43:16, 46:6, 48:10, 48:25, 49:19, 53:6, 53:11, 59:15, 61:3, 61:6, 62:24, 65:6, 70:8, 70:22, 72:9, 72:14, 72:15, 73:1, 73:10, 81:1, 83:13, 90:23, 90:25, 91:1, 91:2, 91:3, 94:22, 95:8, 112:16, 112:21, 113:2, 113:6, 114:21, 115:2, 116:8, 116:9, 116:11, 120:15, 120:25, 121:3, 121:7, 121:11, 132:19, 133:23, 134:6, 135:5, 135:22, 135:25, 136:1, 138:12, 146:13, 148:12, 149:6,

151:17, 153:12, 153:22, 157:23, 159:25, 166:9, 177:24, 178:2, 178:15, 179:3, 180:24
**pointed** [8] - 90:14, 92:25, 93:3, 113:7, 121:18, 122:18, 138:5, 142:7
**pointing** [1] - 83:13
**points** [7] - 5:22, 5:25, 34:24, 61:15, 73:11, 120:14, 139:5
**poli** [1] - 118:21
**policy** [1] - 33:19
**politics** [2] - 157:3, 157:7
**pong** [1] - 60:2
**ponytail** [1] - 177:10
**portion** [4] - 8:15, 43:9, 78:1, 138:19
**portions** [2] - 81:19, 182:3
**position** [62] - 9:16, 15:9, 19:4, 19:7, 20:3, 34:22, 46:8, 51:13, 53:4, 57:9, 57:11, 62:20, 63:2, 63:3, 76:3, 80:18, 84:8, 84:9, 86:16, 86:19, 86:20, 86:24, 92:18, 92:24, 101:24, 102:4, 104:19, 115:7, 115:9, 115:24, 117:10, 123:16, 125:25, 130:12, 130:14, 130:17, 131:2, 132:7, 135:8, 135:11, 137:6, 144:25, 146:25, 148:5, 150:7, 157:11, 161:13, 163:15, 163:24, 164:8, 164:10, 164:11, 164:21, 164:22, 165:2, 165:5, 165:11, 168:23, 169:3, 183:24
**positions** [5] - 36:9, 89:14, 89:15, 130:3, 130:21
**Posse** [2] - 134:16, 134:18
**possess** [3] - 123:18, 127:19, 128:2
**possessed** [1] - 111:11
**possession** [12] - 27:24, 29:10, 30:25, 31:3, 57:8, 62:7, 64:15, 111:15, 112:9, 129:6, 129:20, 158:24

**possibilities** [2] - 164:14, 166:6
**possibility** [1] - 49:4
**possible** [4] - 68:9, 96:11, 116:6, 118:25
**possibly** [2] - 49:23, 123:18
**post** [1] - 185:17
**Post** [2] - 6:3, 6:5
**post-hearing** [1] - 185:17
**Post-It** [2] - 6:3, 6:5
**postpone** [1] - 46:24
**postponement** [1] - 71:16
**potential** [1] - 140:18
**pounding** [1] - 153:10
**powerful** [2] - 41:15, 41:16
**PowerPoint** [2] - 6:14, 6:16
**PowerPoints** [1] - 6:14
**practical** [4] - 8:17, 154:21, 155:2, 158:20
**practically** [1] - 9:3
**practice** [2] - 5:12, 121:15
**practicing** [2] - 19:14, 20:10
**praised** [1] - 10:14
**preceding** [1] - 172:3
**precise** [1] - 134:11
**preclearance** [1] - 128:22
**preclude** [1] - 154:4
**precluded** [1] - 145:23
**predicted** [1] - 183:5
**Preferred** [1] - 173:4
**prefers** [1] - 8:6
**prejudiced** [2] - 179:4, 182:14
**prejudicial** [2] - 145:22, 146:3
**Preliminary** [1] - 120:5
**preliminary** [3] - 120:10, 127:6, 133:6
**premier** [1] - 91:10
**premise** [1] - 118:11
**premises** [1] - 53:13
**preparation** [2] - 29:5, 67:22
**prepare** [1] - 67:22
**prepared** [1] - 156:23
**preparing** [1] - 165:23

**preponderance** [2] - 178:11, 178:16
**present** [7] - 12:2, 25:5, 44:19, 57:5, 84:14, 84:16, 101:18
**presentation** [3] - 6:16, 66:15, 113:14
**presentations** [1] - 6:14
**presented** [2] - 129:7, 162:16
**presenting** [2] - 84:22, 92:21
**preservation** [1] - 110:21
**preserve** [8] - 110:10, 110:17, 111:9, 112:17, 113:12, 114:2, 114:3, 132:17
**preserved** [1] - 113:25
**preserving** [1] - 113:25
**President** [8] - 78:3, 140:8, 140:14, 140:22, 140:25, 141:6, 141:17, 142:25
**Press** [1] - 147:12
**pressing** [1] - 71:8
**pressure** [1] - 144:10
**presumably** [1] - 52:3, 114:7, 126:6
**presumed** [1] - 7:13
**pretend** [1] - 52:2
**pretty** [9] - 52:21, 54:7, 91:16, 92:16, 139:24, 139:25, 140:13, 140:14, 171:14
**prevent** [1] - 123:20, 131:1
**prevented** [1] - 96:1
**previously** [2] - 60:9, 72:21
**price** [1] - 80:10
**primarily** [2] - 15:17, 23:17
**primary** [1] - 12:10
**primate** [1] - 119:6
**prime** [1] - 17:16
**principle** [2] - 129:14, 130:1
**principles** [1] - 131:7
**Priscilla** [1] - 9:24
**prison** [4] - 18:4, 18:5, 167:9
**prisoner** [1] - 170:15
**private** [7] - 58:23, 75:6, 121:14, 127:23,

128:19, 128:21, 186:7
**privilege** [26] - 34:20, 52:8, 52:12, 70:25, 84:21, 85:20, 91:15, 91:25, 96:18, 102:2, 103:22, 103:24, 105:24, 106:3, 106:8, 106:10, 106:13, 106:14, 106:16, 106:18, 106:19, 106:20, 107:17, 107:20, 111:17
**privileged** [1] - 75:8
**privileges** [1] - 177:1
**privy** [1] - 58:18
**pro** [1] - 14:17
**Pro** [3] - 64:21, 71:3, 147:23
**probable** [5] - 53:20, 64:15, 64:17, 66:20, 133:9
**probe** [5] - 84:9, 86:19, 86:20, 89:14, 89:15
**problem** [2] - 41:4, 122:7
**problematic** [1] - 21:20
**problems** [2] - 45:20, 47:11
**procedure** [1] - 125:1
**Procedure** [2] - 177:19, 184:8
**proceed** [3] - 21:21, 23:21, 144:23
**proceeding** [17] - 14:19, 32:12, 32:17, 101:25, 130:3, 130:4, 130:5, 130:13, 130:20, 130:21, 130:24, 130:25, 134:14, 134:17
**proceedings** [11] - 64:18, 70:24, 91:14, 106:22, 107:5, 107:6, 136:5, 136:20, 147:23, 186:14, 186:18
**process** [6] - 45:9, 61:25, 65:17, 69:11, 119:14, 153:24
**produce** [10] - 27:12, 27:15, 27:17, 27:23, 28:21, 60:10, 64:22, 65:4, 73:6, 73:13
**produced** [13] - 9:25, 10:10, 16:24, 37:1, 37:2, 42:15, 69:14, 71:3, 146:6, 147:22,

176:24, 176:25, 180:14
**producing** [2] - 33:19, 72:5
**product** [3] - 42:22, 52:8, 177:1
**production** [3] - 34:5, 34:18, 159:2
**professional** [2] - 79:23, 157:2
**professionally** [1] - 169:21
**professor** [2] - 130:11, 131:3
**progeny** [1] - 176:6
**program** [1] - 57:1
**progress** [3] - 31:19, 36:23, 111:22
**progressed** [1] - 33:2
**prohibited** [1] - 9:9
**prohibiting** [1] - 20:24
**prolong** [1] - 16:17
**proof** [5] - 15:16, 23:21, 99:23, 178:10, 178:19
**proper** [1] - 162:8
**properly** [1] - 31:6
**property** [9] - 76:14, 79:16, 79:18, 79:25, 80:7, 80:13, 80:14, 80:16, 116:15
**proponent** [1] - 8:4
**proposition** [9] - 19:12, 20:9, 21:8, 103:23, 104:3, 110:18, 129:19, 132:17, 182:1
**prosecute** [1] - 147:11
**prospective** [1] - 79:14
**protect** [1] - 133:8
**protected** [3] - 91:14, 91:22, 107:3
**protective** [4] - 7:23, 9:23, 71:2, 102:2
**protracted** [2] - 30:6, 39:20
**prove** [31] - 15:13, 16:14, 17:23, 18:9, 18:11, 18:14, 18:25, 19:1, 19:6, 19:19, 19:20, 21:1, 23:14, 24:11, 24:15, 25:2, 25:9, 25:16, 85:19, 97:24, 98:4, 98:10, 99:4, 99:5, 99:16, 99:17, 101:15,

121:20, 146:10, 153:5, 179:19
**proved** [2] - 78:3, 169:9
**proves** [1] - 69:1
**provide** [14] - 44:9, 44:10, 44:12, 47:18, 51:11, 54:19, 56:13, 61:23, 84:24, 99:18, 117:15, 118:9, 154:15, 157:13
**provided** [18] - 49:14, 49:16, 49:17, 54:21, 56:12, 57:15, 78:16, 118:2, 134:15, 154:14, 154:17, 155:1, 155:3, 156:6, 156:16, 156:22, 157:20, 176:21
**providing** [1] - 80:14
**province** [1] - 99:24
**proving** [8] - 19:13, 23:9, 25:11, 26:2, 26:4, 96:16, 103:22, 122:18
**provisions** [2] - 38:17, 133:16
**provocative** [1] - 140:13
**prudent** [1] - 36:2, 36:5
**public** [15] - 8:1, 8:7, 8:8, 10:1, 13:9, 16:12, 23:9, 23:10, 23:11, 23:12, 26:10, 105:6, 107:2, 160:5, 160:8
**publication** [2] - 79:19, 80:4
**publications** [2] - 76:25, 83:7
**publicly** [1] - 162:6
**publish** [2] - 16:13
**published** [15] - 15:22, 18:1, 26:10, 77:15, 77:24, 78:5, 78:12, 78:16, 78:19, 78:21, 78:23, 79:1, 79:6, 143:4, 144:20
**publisher** [4] - 7:13, 12:15, 83:18
**publishing** [2] - 7:21, 76:20
**punishment** [1] - 167:11
**pure** [3] - 13:13, 24:19
**purported** [2] - 143:25, 144:15
**purportedly** [1] - 120:21

22

purporting [1] - 143:13
purpose [4] - 73:19, 101:16, 151:23, 180:4
purposely [1] - 142:16
purposes [5] - 45:6, 58:1, 88:24, 111:4, 114:3
pursuant [2] - 10:12, 13:10
pursue [4] - 121:24, 121:25, 122:2, 124:10
pursuing [2] - 79:15, 137:13
push [2] - 33:8, 44:22
pushed [1] - 33:9
put [26] - 6:13, 6:17, 7:23, 17:10, 33:15, 53:12, 55:2, 58:16, 85:24, 86:5, 86:6, 88:1, 104:11, 110:23, 112:10, 113:21, 124:4, 136:18, 141:9, 154:12, 156:5, 156:25, 159:6, 161:21, 181:20, 185:21
putting [2] - 145:23, 154:5

**Q**

Qaeda [1] - 74:14
quadrants [1] - 48:2
questioned [1] - 30:16
questioning [1] - 182:12
Questions [1] - 160:15
questions [22] - 5:15, 5:16, 6:12, 6:19, 15:7, 21:20, 29:18, 39:19, 43:24, 47:8, 48:25, 50:7, 92:15, 94:17, 101:6, 101:21, 101:22, 160:10, 160:12, 171:8, 171:9
quick [1] - 138:11
quickly [1] - 65:24
quite [12] - 8:7, 29:1, 41:22, 41:25, 50:9, 50:10, 63:22, 64:5, 64:7, 108:22, 137:21
quizzed [1] - 101:18
quote [21] - 51:8, 61:14, 74:7, 74:8,

74:11, 77:17, 77:18, 78:17, 78:23, 78:24, 133:15, 136:8, 136:10, 144:3, 144:18, 146:5, 146:7, 147:12, 147:19, 147:20
quoted [2] - 78:15, 121:8
quotes [5] - 77:20, 78:1, 78:10, 144:5, 171:23
quoting [2] - 51:8, 145:10

**R**

radio [1] - 109:11
radioactive [1] - 111:14
Rafael [4] - 59:1, 98:20, 98:21, 100:6
raging [1] - 160:24
raided [1] - 53:13
raise [9] - 28:23, 34:5, 34:6, 35:5, 55:24, 61:3, 61:15, 130:16, 171:16
raised [5] - 16:1, 27:25, 100:17, 130:12, 136:1
raises [1] - 129:24
raising [3] - 34:4, 126:9, 153:12
ran [1] - 133:4
range [1] - 155:8
rather [9] - 20:15, 29:17, 70:3, 70:4, 78:8, 79:2, 79:8, 94:17, 152:14
RD [1] - 176:8
RDR [2] - 2:1, 186:22
re [1] - 89:4
re-creation [1] - 89:4
reach [6] - 31:10, 31:14, 87:21, 105:19, 105:20, 123:2
reached [4] - 67:3, 142:23, 152:25, 158:1
reaction [3] - 39:15, 180:16, 180:18
read [35] - 5:9, 6:21, 6:22, 7:16, 18:5, 19:11, 28:5, 29:5, 40:23, 49:9, 62:23, 65:25, 68:11, 68:13, 72:9, 72:10, 73:5, 73:8, 74:16, 74:21, 74:24, 81:3,

90:9, 94:19, 95:9, 96:20, 103:12, 104:17, 124:6, 143:3, 143:14, 165:22, 167:4, 170:3
reading [6] - 30:8, 66:17, 72:23, 108:24, 143:14, 168:18
reads [1] - 144:5
ready [2] - 67:21, 107:14
real [2] - 156:24, 172:5
reality [3] - 33:17, 92:17, 162:18
realize [1] - 17:12
realized [1] - 139:6
realizes [1] - 63:4
realizing [1] - 120:22
really [24] - 9:18, 12:15, 13:14, 15:23, 17:2, 22:12, 33:4, 33:23, 34:16, 34:24, 44:14, 44:21, 44:24, 46:6, 70:9, 70:17, 101:7, 106:7, 107:8, 129:11, 153:22, 158:9, 166:13, 176:20
reason [13] - 11:9, 11:23, 12:17, 41:23, 58:3, 71:25, 110:6, 128:14, 137:25, 138:4, 161:15, 177:15, 184:10
reasonable [1] - 30:8
reasonably [1] - 132:18
reasoning [2] - 63:16, 111:8
reasons [4] - 45:16, 45:21, 101:12, 124:16
receive [1] - 78:6
received [2] - 24:5, 54:18
receives [1] - 44:5
receiving [1] - 134:10
recent [4] - 56:22, 117:9, 118:7, 173:21
recently [4] - 43:15, 52:23, 65:21, 120:22
recess [1] - 186:13
reciprocal [1] - 21:10
recitation [1] - 140:1
reckless [13] - 15:21, 16:12, 17:8, 17:24, 18:9, 19:6, 20:17, 22:23, 24:22, 25:20, 26:12, 80:3
recklessness [18] -

15:16, 15:19, 15:22, 19:2, 19:20, 21:2, 21:14, 22:9, 23:2, 23:13, 23:20, 23:22, 24:12, 24:19, 25:12, 25:17, 26:2, 26:3
recognized [2] - 79:3, 119:13
recollection [8] - 37:19, 38:6, 50:8, 50:9, 50:17, 144:24, 155:4, 166:5
recommend [2] - 149:20, 150:13
recommendation [5] - 12:25, 13:5, 13:7, 13:10, 93:7
recommendations [1] - 139:20
recommending [1] - 93:9
reconsider [1] - 139:18
record [23] - 8:1, 9:1, 9:2, 10:2, 39:2, 40:23, 45:2, 45:6, 53:12, 58:16, 61:25, 65:25, 66:14, 102:15, 103:5, 111:3, 121:12, 156:5, 166:14, 178:23, 183:6, 183:25
RECORDING [1] - 1:11
recordings [1] - 136:9
records [6] - 42:15, 42:18, 59:5, 74:11, 75:6, 75:7
Rectifier [1] - 176:5
redacted [2] - 10:10
reevaluate [1] - 69:9
reference [4] - 20:2, 66:10, 133:14, 134:14
referenced [3] - 59:17, 60:11, 64:19
references [1] - 47:5
referencing [1] - 153:1
referred [2] - 56:21, 179:7
referring [1] - 145:19
refers [2] - 82:21, 114:14
reflect [1] - 38:10
refrain [1] - 99:13
refrained [1] - 135:22
refresh [1] - 144:24
refuse [1] - 86:22
refused [3] - 65:7,

71:15, 107:13
refusing [1] - 27:15
refute [1] - 96:25
refuting [2] - 38:7, 184:12
regard [25] - 7:11, 12:13, 13:21, 16:11, 39:3, 42:3, 45:2, 45:5, 58:8, 58:18, 58:19, 62:4, 84:23, 102:5, 136:23, 137:20, 149:14, 149:15, 149:22, 159:5, 159:17, 163:3, 176:16, 176:23
regarding [2] - 85:7
regardless [1] - 19:19
registration [1] - 96:22
regrettably [1] - 159:13
regular [1] - 151:25
regulations [1] - 33:19
rejected [3] - 7:15, 90:8, 90:12
relate [3] - 138:18, 146:17, 148:6
related [7] - 116:12, 131:14, 147:2, 147:15, 148:12, 156:11, 160:16
relates [5] - 121:7, 143:20, 146:20, 146:21, 146:23
relating [1] - 141:16
relationship [3] - 29:22, 137:8, 137:11
relative [1] - 50:3
relax [1] - 10:23
relevance [1] - 101:11
relevancy [4] - 15:10, 15:11, 15:16, 138:15
relevant [8] - 12:3, 28:22, 43:23, 67:24, 68:1, 72:6, 96:16, 137:23
reliability [1] - 76:24
relive [1] - 174:6
reluctant [1] - 61:3
rely [2] - 12:21, 25:17
relying [4] - 13:5, 16:10, 16:12, 86:3
remains [1] - 57:9
remarkable [2] - 20:8, 110:18
remedial [1] - 148:13

**remedying** [2] - 148:13, 148:15
**remember** [12] - 29:9, 29:17, 39:17, 47:15, 54:7, 56:10, 56:15, 64:1, 108:24, 121:8, 167:5
**remembering** [1] - 167:14
**reminds** [1] - 118:20
**remotely** [1] - 29:11
**removed** [1] - 63:5
**render** [1] - 79:25
**rendered** [1] - 149:1
**repeat** [4] - 34:11, 53:18, 177:22, 184:16
**repeatedly** [1] - 145:19
**rephrase** [2] - 82:9, 120:12
**reply** [7] - 5:17, 45:14, 45:19, 119:19, 119:20, 128:24, 133:14
**report** [12] - 12:25, 13:4, 13:7, 13:10, 93:7, 106:20, 106:24, 136:19, 145:5, 147:3, 147:4, 147:12
**reporter** [5] - 7:25, 8:20, 8:24, 65:9, 91:11
**Reporter** [2] - 2:1, 186:22
**reporter's** [5] - 84:21, 85:20, 105:24, 106:8, 107:17
**reporters** [1] - 48:3
**reporting** [6] - 106:2, 106:13, 106:14, 106:21, 106:25, 107:2
**reports** [1] - 139:20
**representation** [11] - 40:16, 49:7, 49:11, 49:20, 54:10, 55:18, 56:2, 56:7, 68:8, 68:12, 166:11
**representations** [1] - 35:24, 36:13, 48:11, 48:12, 48:13, 50:12, 50:16, 50:18, 87:24, 88:12, 89:12, 89:13, 164:2
**represented** [7] - 36:10, 72:21, 81:20, 82:23, 103:21, 166:15, 169:14
**representing** [6] - 39:24, 56:8, 103:13, 136:14, 165:10,

181:14
**represents** [1] - 85:11
**republished** [1] - 82:6
**reputation** [1] - 69:12
**request** [11] - 11:21, 27:12, 27:14, 34:4, 34:18, 60:12, 61:13, 65:7, 123:5, 123:13, 155:20
**requested** [5] - 33:10, 45:1, 57:3, 100:22, 133:17
**requests** [1] - 59:19
**require** [5] - 10:16, 101:5, 104:18, 133:19, 133:25
**required** [15] - 37:1, 71:6, 84:7, 92:8, 107:10, 113:22, 133:16, 134:5, 134:7, 134:9, 135:6, 135:9, 135:10, 135:13
**requirement** [2] - 26:13, 135:7
**requisite** [1] - 118:9
**research** [2] - 22:13, 22:17
**resetting** [1] - 45:12
**resisted** [1] - 45:11
**resolution** [1] - 67:3
**resolved** [1] - 96:23
**resources** [1] - 75:5
**respect** [20] - 9:7, 24:3, 33:7, 40:9, 41:2, 44:23, 52:11, 66:4, 69:11, 69:12, 88:13, 89:9, 93:13, 100:8, 105:9, 105:10, 133:1, 137:9, 157:6
**respected** [1] - 127:12
**respectfully** [1] - 13:25
**respecting** [1] - 52:8
**respond** [4] - 22:3, 65:24, 138:9, 149:5
**responded** [2] - 65:12, 160:13
**responds** [1] - 107:1
**response** [13] - 34:1, 34:9, 34:10, 44:20, 56:24, 60:11, 65:7, 121:11, 160:10, 172:13, 178:18, 183:15, 184:3
**responses** [2] - 145:3, 181:5

**responsibly** [1] - 112:11
**responsive** [1] - 75:7
**rest** [3] - 10:23, 11:16, 185:21
**restaurant** [1] - 170:1
**resting** [1] - 149:19
**result** [9] - 57:7, 92:18, 96:7, 104:1, 142:10, 150:24, 151:9, 160:7, 173:23
**result-oriented** [1] - 92:18
**resulted** [1] - 81:25
**results** [2] - 24:8, 141:5
**retain** [1] - 153:14
**retained** [1] - 136:7
**retort** [1] - 102:25
**retrieve** [1] - 133:17
**retrospect** [2] - 53:23, 132:8
**return** [3] - 53:17, 154:25, 159:11
**returned** [4] - 63:8, 63:9, 63:10, 64:17, 67:8, 120:21, 120:23, 164:24
**reveal** [2] - 144:11, 181:19
**revealed** [2] - 107:12, 162:6
**reverse** [2] - 144:15, 169:7
**reverse-engineer** [1] - 144:15
**reversed** [1] - 149:2
**review** [12] - 8:7, 32:11, 46:14, 67:22, 67:23, 67:24, 98:7, 122:11, 128:13, 136:7, 139:14, 152:24
**reviewed** [3] - 87:16, 113:9, 163:18
**reviewing** [2] - 54:11, 55:20
**revisit** [1] - 139:12
**revoke** [1] - 31:3
**revoked** [1] - 31:2
**revolving** [1] - 147:21
**rhetoric** [4] - 8:13, 9:15, 70:14, 157:19
**riches** [1] - 78:14
**rid** [1] - 40:25
**rig** [1] - 145:7
**rigged** [1] - 145:15
**rip** [1] - 184:23
**RISEN** [1] - 1:7

**Risen** [37] - 3:2, 7:13, 7:18, 12:4, 16:2, 17:7, 17:24, 18:3, 18:4, 22:11, 22:20, 22:25, 81:13, 82:12, 82:16, 84:18, 87:4, 87:6, 91:10, 96:21, 96:25, 97:13, 105:10, 107:10, 107:13, 138:20, 146:13, 149:16, 150:25, 153:2, 169:4, 169:10, 172:21, 176:25, 180:2
**Risen's** [10] - 10:7, 24:5, 58:2, 69:17, 72:20, 81:6, 95:9, 133:3, 142:5, 143:9
**risk** [1] - 128:23
**risked** [1] - 162:25
**road** [2] - 29:24, 124:14
**robots** [1] - 132:5
**rock** [1] - 15:3
**role** [2] - 43:4, 127:12
**room** [5] - 43:18, 140:24, 141:23, 160:23, 160:24
**Rosh** [1] - 4:17
**round** [3] - 119:11
**royal** [1] - 84:25
**rubric** [1] - 146:15
**rude** [1] - 22:2
**ruined** [1] - 109:16
**rule** [9] - 8:8, 13:24, 45:7, 59:4, 74:22, 74:24, 96:8, 99:10, 184:4
**ruled** [7] - 13:22, 69:22, 88:15, 113:3, 127:8, 139:20
**Rules** [1] - 177:19
**rules** [4] - 92:9, 99:9, 177:19
**ruling** [11] - 7:1, 12:24, 28:5, 45:18, 66:20, 88:7, 88:21, 100:13, 100:14, 139:12, 179:7
**rulings** [5] - 66:10, 139:12, 139:18, 160:4, 181:8
**Run** [1] - 166:24
**run** [1] - 32:24
**run-of-the-mill** [1] - 32:24
**running** [1] - 180:20
**ruse** [2] - 159:20, 184:15
**résumé** [1] - 92:7

**S**

**sacrosanct** [1] - 35:13
**sad** [1] - 36:11
**safe** [1] - 186:11
**safety** [3] - 36:15, 36:16, 40:3
**sake** [5] - 14:9, 22:10, 93:20, 160:22, 179:5
**sale** [2] - 80:7, 80:9
**sales** [1] - 79:18
**salesman** [1] - 167:10
**Samuel** [1] - 172:8
**San** [1] - 13:22
**sanction** [6] - 59:25, 65:2, 67:1, 70:18, 93:3, 93:5
**sanctioned** [1] - 64:23
**sanctions** [22] - 5:14, 13:1, 26:17, 26:24, 26:25, 61:13, 93:19, 100:22, 108:4, 153:24, 159:6, 160:16, 161:9, 161:14, 162:10, 176:2, 176:18, 178:20, 179:4, 182:10, 182:14
**Sandy** [1] - 3:17
**SANFORD** [1] - 1:20
**sat** [1] - 40:22
**SAT** [1] - 132:9
**satisfied** [1] - 64:17
**satisfy** [1] - 153:4
**sauce** [2] - 107:21, 107:22
**saver** [2] - 48:1, 48:6
**saving** [1] - 171:24
**saw** [7] - 4:3, 11:7, 20:1, 62:17, 68:4, 160:25, 166:23
**Sawgrass** [1] - 109:6
**scam** [5] - 77:25, 79:2, 144:21
**scenario** [5] - 22:24, 23:1, 96:11, 130:4, 130:20
**schedule** [2] - 71:9, 71:19
**scheduled** [3] - 11:6, 11:10, 45:13
**scheduling** [1] - 45:20
**school** [1] - 6:4
**Schuster** [12] - 7:13,

7:15, 7:21, 9:24, 10:6, 10:8, 10:14, 11:20, 12:11, 18:1, 73:17, 82:4

**Schuster's** [1] - 9:7
**Schwartz** [21] - 54:25, 56:18, 57:17, 59:16, 71:11, 118:8, 118:13, 154:13, 154:24, 155:9, 155:16, 155:25, 156:4, 156:9, 156:17, 156:25, 157:6, 158:1, 158:9, 159:11, 168:21
**Schwartz's** [1] - 156:14
**sci** [1] - 118:21
**scored** [1] - 132:9
**screen** [1] - 142:13
**se** [1] - 14:17
**seal** [11] - 8:10, 8:15, 8:19, 9:3, 9:11, 9:20, 13:6, 43:6, 54:19, 56:19
**sealed** [3] - 8:21, 10:4, 13:10
**sealing** [4] - 8:5, 9:13
**search** [8] - 47:9, 64:11, 65:14, 65:19, 72:2, 72:16, 74:10, 104:22
**searched** [6] - 42:5, 53:14, 72:22, 117:11, 164:16, 164:17
**searching** [8] - 43:10, 51:9, 56:4, 56:8, 58:1, 75:6, 156:17, 163:22
**seated** [1] - 3:4
**Seattle** [1] - 42:12
**second** [9] - 75:1, 75:3, 110:10, 111:15, 121:11, 129:23, 130:14, 162:13, 165:19
**secondly** [2] - 124:3, 149:22
**seconds** [6] - 21:22, 22:7, 50:21, 54:8, 137:2, 137:5
**secret** [8] - 8:11, 27:17, 31:2, 96:5, 97:12, 98:8, 104:20, 149:23
**secretly** [1] - 166:13
**secrets** [6] - 70:25, 96:2, 96:9, 102:1, 103:22, 103:24
**section** [7] - 58:13,

74:16, 74:17, 74:21, 119:7, 144:3, 144:5
**sections** [1] - 45:4
**security** [17] - 91:10, 97:24, 111:20, 126:6, 126:11, 127:13, 127:16, 127:18, 128:1, 128:6, 128:9, 128:18, 132:25, 141:9, 142:21, 153:16, 162:7
**Security** [2] - 8:11, 150:11
**see** [34] - 6:2, 12:20, 21:25, 27:20, 32:1, 32:2, 38:21, 42:18, 43:2, 45:4, 45:5, 45:8, 50:14, 55:23, 68:11, 68:15, 104:13, 110:5, 116:18, 120:7, 124:13, 125:4, 126:23, 127:5, 128:8, 128:25, 144:16, 145:13, 149:25, 150:1, 150:19, 154:16, 169:2, 186:6
**seeking** [2] - 116:10, 121:10
**seem** [2] - 56:10, 139:1
**segregate** [1] - 138:5
**segregated** [1] - 138:1
**segregation** [1] - 65:17
**seize** [1] - 53:20
**seized** [2] - 63:8, 66:19
**self** [1] - 43:4
**self-appointed** [1] - 43:4
**sell** [8] - 12:11, 22:11, 79:22, 82:5, 83:18, 105:17, 148:3, 169:12
**semantical** [1] - 134:4
**semantics** [1] - 168:12
**seminal** [2] - 173:12, 173:14
**Senate** [1] - 62:5
**senators** [1] - 59:1
**send** [3] - 8:24, 47:1, 93:22
**sending** [1] - 143:11
**sensational** [2] - 12:12, 83:19
**sensationalism** [1] - 169:13

**sensationalize** [1] - 82:3
**sense** [6] - 50:11, 112:4, 134:22, 144:17, 159:23, 166:22
**sensitivity** [1] - 127:9
**sent** [4] - 104:13, 155:23, 156:1, 156:2
**sentence** [3] - 21:4, 21:12, 165:25
**separate** [1] - 26:13
**September** [4] - 56:17, 57:4, 60:11, 137:22
**sequester** [1] - 123:19
**serious** [6] - 7:20, 26:11, 32:12, 40:20, 59:7, 101:21
**seriously** [2] - 54:2, 141:22
**serve** [1] - 67:18
**served** [4] - 28:19, 33:17, 71:23, 71:25
**server** [2] - 125:10, 127:23
**serves** [1] - 34:17
**service** [5] - 14:15, 14:16, 64:13, 75:4, 152:20
**services** [3] - 79:23, 80:7, 80:15
**set** [7] - 24:17, 45:24, 92:10, 93:22, 157:23, 178:23, 184:12
**setting** [2] - 121:15, 157:19
**seven** [1] - 40:22
**several** [6] - 14:22, 19:12, 105:14, 115:24, 118:8, 118:16
**severe** [1] - 164:4
**sham** [1] - 61:11
**shared** [1] - 152:13
**sharpen** [1] - 46:4
**Shepherd** [3] - 174:7, 178:22, 179:1
**shepherd** [3] - 175:9, 175:10, 175:12
**sheriff** [1] - 134:15
**Sheriff's** [2] - 102:8, 134:19
**sheriff's** [1] - 136:6
**shift** [1] - 129:23
**Shineman** [1] - 173:7
**shocked** [1] - 110:19
**shoot** [2] - 12:6, 140:18

**shoot-down** [1] - 12:6
**shooting** [3] - 140:8, 140:23, 141:22
**short** [1] - 40:15
**shortcut** [1] - 103:4
**shorten** [1] - 48:4
**shot** [1] - 24:8
**Show** [2] - 109:17, 110:3
**show** [19] - 3:20, 11:4, 12:1, 12:3, 18:8, 23:25, 25:23, 25:24, 26:1, 26:9, 76:4, 91:4, 96:20, 105:10, 138:20, 153:2, 169:12, 181:20, 181:23
**showed** [2] - 9:19, 41:2
**shown** [2] - 26:14, 53:19
**shows** [10] - 7:16, 7:22, 12:9, 12:14, 81:7, 92:11, 93:12, 157:12
**shut** [4] - 70:5, 97:23, 122:6, 122:8
**sic** [4] - 55:19, 78:4, 116:25, 180:10
**sick** [2] - 41:25, 164:25
**side** [19] - 5:15, 10:25, 21:25, 22:1, 47:2, 54:15, 54:16, 57:24, 59:9, 59:12, 59:13, 93:21, 104:1, 116:5, 122:20, 153:1, 154:12, 162:17, 171:15
**side's** [3] - 9:16, 89:13, 183:24
**sides** [1] - 107:3
**signal** [1] - 8:24
**signed** [5] - 61:8, 94:15, 98:15, 98:17, 98:25
**significant** [3] - 10:16, 122:6, 171:6
**similar** [3] - 38:6, 46:22, 137:13
**Simon** [13] - 7:13, 7:15, 7:21, 9:7, 9:24, 10:5, 10:7, 10:14, 11:19, 12:10, 18:1, 73:16, 82:4
**Simonton** [1] - 176:15
**simple** [4] - 51:4, 157:20, 180:20, 182:5

**simpler** [1] - 102:24
**simply** [15] - 8:19, 10:24, 14:2, 19:13, 46:13, 46:25, 81:6, 86:18, 125:2, 149:21, 151:14, 168:23, 178:15, 181:2
**sincere** [1] - 162:6
**sincerity** [1] - 150:8
**single** [4] - 9:15, 123:24, 169:25, 177:24
**sit** [5] - 42:13, 68:20, 68:22, 87:13, 88:2
**sitting** [2] - 3:13, 92:15
**situation** [1] - 111:24
**six** [1] - 155:8
**sky** [1] - 140:19
**sliced** [1] - 105:3
**small** [15] - 20:4, 61:2, 80:20, 81:15, 84:1, 86:13, 96:25, 113:16, 123:22, 124:15, 138:17, 138:19, 139:3, 146:23, 180:4
**smart** [2] - 124:19, 184:20
**smell** [1] - 178:4
**smoothly** [1] - 21:21
**Snow** [3] - 111:25, 112:2, 134:20
**Snowden** [4] - 126:24, 137:14, 162:7
**so-and-so** [2] - 106:25, 107:1
**so-called** [6] - 86:21, 95:8, 105:24, 106:8, 106:12, 150:24
**Social** [1] - 8:11
**software** [348] - 15:11, 16:11, 16:22, 16:23, 16:24, 18:23, 20:4, 22:18, 22:20, 22:21, 24:9, 24:10, 27:12, 27:15, 27:19, 28:18, 28:24, 29:4, 29:8, 29:11, 29:16, 30:1, 30:3, 30:7, 30:10, 32:3, 33:22, 34:3, 36:1, 36:4, 36:7, 36:10, 37:8, 37:18, 38:2, 38:3, 38:12, 38:18, 39:11, 39:25, 40:7, 40:16, 42:5, 43:11, 43:25, 45:5, 47:9, 48:22, 48:23, 49:1, 49:2, 49:3, 49:5, 49:8, 49:11, 49:22,

49:24, 49:25, 50:3, 50:4, 50:12, 50:23, 50:24, 51:11, 51:14, 51:16, 53:2, 53:3, 55:21, 56:5, 56:13, 57:2, 57:5, 57:6, 57:8, 57:12, 57:15, 58:1, 58:2, 58:5, 58:19, 60:13, 61:17, 62:1, 63:5, 63:9, 64:13, 64:23, 65:4, 65:13, 65:19, 66:18, 67:6, 67:7, 67:9, 67:12, 67:25, 68:4, 69:3, 69:14, 69:17, 70:10, 70:13, 70:17, 70:19, 70:23, 71:1, 71:2, 71:5, 71:12, 72:5, 72:12, 72:14, 72:19, 72:24, 72:25, 73:3, 73:19, 74:5, 74:12, 74:13, 75:25, 76:5, 76:14, 76:23, 77:3, 77:8, 79:16, 79:23, 79:25, 80:19, 81:2, 81:6, 81:10, 81:13, 81:18, 82:1, 82:13, 82:18, 82:21, 83:10, 83:24, 84:8, 84:23, 86:10, 86:17, 86:25, 87:16, 87:17, 87:18, 88:3, 88:8, 88:9, 88:11, 88:20, 89:19, 89:24, 90:13, 90:16, 90:21, 91:8, 92:19, 93:21, 93:24, 94:3, 95:16, 95:18, 95:20, 95:21, 97:10, 97:13, 97:14, 97:18, 97:25, 101:9, 102:1, 102:5, 102:7, 104:20, 104:21, 105:2, 105:5, 110:11, 110:14, 110:17, 113:8, 113:9, 114:5, 114:15, 114:19, 114:22, 115:7, 116:14, 116:19, 117:12, 117:16, 117:17, 117:21, 117:24, 118:1, 118:3, 118:5, 118:17, 120:13, 120:18, 120:20, 120:23, 121:5, 121:6, 121:10, 122:7, 122:14, 122:16, 123:4, 123:8, 123:11, 123:12, 123:13, 123:25, 124:15, 125:3, 125:13, 126:16, 127:14,

127:19, 128:2, 128:13, 129:9, 131:20, 134:2, 135:10, 135:11, 136:6, 137:12, 137:23, 138:1, 138:16, 138:18, 138:23, 138:25, 139:1, 139:7, 140:4, 140:9, 140:19, 141:1, 141:4, 141:8, 141:9, 141:19, 142:4, 142:5, 142:9, 142:13, 142:18, 142:19, 143:13, 143:16, 143:20, 143:21, 143:25, 145:1, 145:2, 145:7, 145:11, 145:15, 145:17, 145:20, 145:24, 146:1, 146:2, 146:4, 146:18, 146:20, 146:22, 146:23, 146:24, 147:3, 147:15, 147:17, 147:21, 147:22, 148:2, 148:7, 148:16, 149:11, 149:12, 149:13, 149:24, 150:18, 150:21, 151:5, 151:7, 151:9, 151:10, 151:11, 151:18, 151:23, 153:6, 153:8, 153:9, 153:11, 153:15, 153:24, 154:4, 154:9, 154:22, 156:18, 158:12, 158:13, 158:15, 158:21, 158:24, 163:19, 163:20, 163:23, 164:17, 164:24, 165:20, 166:2, 168:14, 169:6, 177:17, 179:11, 179:25, 180:3, 180:9, 181:4, 181:11, 181:16, 181:21, 182:12, 182:13, 182:24, 183:9

**software's** [4] - 110:24, 112:19, 121:19, 123:22

**sold** [5] - 22:18, 87:18, 141:4, 142:4, 142:18

**solitary** [1] - 167:10

**Somali** [2] - 78:2

**someone** [8] - 4:4, 24:19, 35:10, 51:19,

59:24, 119:16, 161:25, 181:23

**sometime** [1] - 109:20

**sometimes** [12] - 26:12, 81:21, 106:14, 121:16, 128:23, 139:18, 139:19, 157:3, 159:8, 177:12, 183:23, 184:3

**somewhat** [4] - 4:20, 11:3, 106:18, 116:16

**somewhere** [2] - 155:8, 173:19

**son** [4] - 14:10, 71:24, 152:18, 170:21

**son-in-law** [3] - 14:10, 71:24, 152:18

**sooner** [3] - 5:10, 44:22, 91:8

**sophisticated** [1] - 153:7

**sorry** [14] - 10:20, 63:21, 65:8, 65:11, 74:20, 77:12, 88:15, 95:6, 99:8, 100:5, 106:17, 139:10, 144:3, 177:21

**sort** [14] - 6:4, 8:23, 25:25, 39:7, 40:2, 44:7, 53:9, 108:21, 111:8, 111:13, 160:15, 160:21, 178:17

**sorts** [1] - 49:6

**sought** [1] - 136:4

**sound** [1] - 157:19

**sounding** [2] - 130:10, 131:3

**sounds** [4] - 22:15, 53:2, 91:15, 162:9

**source** [1] - 144:11

**sources** [23] - 84:18, 84:24, 85:18, 86:21, 92:21, 95:11, 95:12, 96:17, 96:23, 97:10, 97:13, 97:14, 97:25, 105:23, 121:21, 145:16, 150:24, 150:25, 152:3, 163:5, 184:17

**sourcing** [1] - 143:9

**south** [1] - 60:5

**South** [2] - 30:4, 109:1

**Southern** [3] - 71:22, 160:1, 173:7

**SOUTHERN** [1] - 1:1

**SPEAKER** [1] - 167:23

**speaking** [4] - 9:3, 28:8, 116:10

**speaks** [3] - 51:18, 52:7, 102:25

**Special** [4] - 55:19, 55:20, 58:9, 58:10

**special** [1] - 63:7

**specific** [15] - 11:1, 15:25, 20:6, 56:7, 57:3, 86:1, 90:20, 101:6, 132:18, 132:24, 134:10, 135:7, 154:17, 157:21, 174:15

**specifically** [5] - 20:24, 71:1, 102:2, 104:21, 143:24

**specifics** [2] - 9:18, 11:5

**speed** [1] - 7:5

**Spence** [2] - 177:7, 177:12

**spend** [1] - 186:2

**spent** [3] - 6:17, 157:2, 171:6

**spoliated** [1] - 161:10

**spoliation** [12] - 93:10, 159:6, 171:11, 171:19, 173:21, 173:22, 173:23, 174:3, 176:18, 178:11, 178:20, 179:8

**stable** [1] - 42:18

**stadium** [3] - 109:1, 109:3, 109:7

**stage** [2] - 13:3, 148:19

**stand** [3] - 88:1, 104:2, 136:18

**standard** [1] - 25:12

**standing** [3] - 102:17, 102:21, 160:23

**standpoint** [2] - 8:17, 43:7

**stands** [1] - 103:23

**star** [2] - 118:21, 167:25

**start** [3] - 6:20, 45:23, 76:11

**started** [3] - 32:22, 35:10, 129:14

**starting** [4] - 3:10, 47:6, 69:13, 77:14

**startling** [1] - 20:11

**starts** [1] - 128:25

**state** [10] - 70:25, 87:15, 96:2, 96:5, 96:9, 97:12, 98:8,

102:1, 103:22, 103:24

**Statement** [1] - 120:6

**statement** [23] - 26:9, 26:15, 40:2, 51:16, 51:18, 52:25, 54:5, 57:22, 80:18, 96:21, 96:22, 105:13, 110:23, 118:7, 120:10, 123:24, 130:4, 163:14, 163:17, 165:5, 165:19, 165:22, 165:25

**statements** [15] - 12:8, 24:10, 36:9, 49:6, 50:15, 79:20, 80:4, 81:1, 91:13, 130:2, 132:2, 137:21, 137:22, 138:21, 166:14

**STATES** [2] - 1:1, 1:11

**States** [7] - 2:2, 22:19, 62:12, 91:11, 144:7, 174:10, 186:23

**status** [6] - 6:20, 7:4, 13:19, 14:7, 41:2, 153:8

**statute** [2] - 4:5, 174:12

**statutes** [1] - 126:3

**stay** [1] - 42:20

**staying** [1] - 6:11

**step** [1] - 182:20

**stepped** [1] - 127:11

**steps** [2] - 142:25, 148:13

**Sterling** [3] - 18:4, 107:12

**Stern** [1] - 109:11

**stick** [1] - 62:9

**sticker** [1] - 6:5

**stickers** [1] - 6:4

**still** [29] - 13:20, 24:23, 25:19, 28:13, 29:7, 29:9, 31:1, 33:9, 50:8, 54:1, 54:6, 54:9, 54:11, 55:18, 56:4, 57:23, 58:4, 60:7, 71:18, 71:20, 84:8, 86:17, 140:4, 156:6, 175:24, 177:3, 180:3, 186:11

**stipulate** [1] - 11:21

**stipulated** [1] - 7:17

**stipulation** [2] - 182:22, 183:8

**stipulations** [1] - 183:21

**Stock** [1] - 176:8
**STOCK** [1] - 176:8
**stole** [1] - 171:4
**stop** [5] - 4:6, 42:9, 116:24, 140:19, 141:18
**stored** [1] - 161:2
**story** [14] - 17:25, 22:22, 24:23, 25:20, 35:1, 41:10, 50:10, 50:11, 61:18, 108:24, 120:19, 144:13, 170:20, 177:15
**straight** [1] - 164:11
**strangelove** [1] - 169:7
**strategic** [1] - 33:12
**strategy** [7] - 150:14, 152:6, 181:6, 181:18, 181:19, 182:9, 182:18
**straws** [1] - 178:5
**stray** [1] - 169:20
**strenuously** [1] - 175:23
**stricken** [1] - 174:12
**strident** [2] - 9:16, 50:9
**strikes** [2] - 20:15, 110:18
**stroke** [2] - 42:17, 172:2
**struck** [2] - 152:7, 178:6
**struggle** [1] - 152:20
**stuff** [15] - 17:7, 28:11, 34:14, 41:15, 52:16, 59:2, 62:6, 66:2, 68:18, 68:20, 88:17, 115:1, 124:7, 125:9, 134:21
**stumped** [1] - 170:6
**stupidity** [1] - 78:7
**subdirectory** [2] - 156:19, 158:17
**subject** [14] - 7:24, 9:23, 51:10, 51:15, 53:1, 53:3, 64:18, 68:1, 102:1, 103:21, 105:25, 123:5, 123:13, 154:6
**submission** [2] - 26:24, 50:6
**submissions** [2] - 5:9, 87:16
**submit** [14] - 21:9, 23:11, 43:23, 44:3, 44:13, 44:14, 45:1, 45:3, 45:18, 47:17, 48:5, 126:22, 179:11, 185:3

**submitted** [7] - 43:5, 46:9, 46:23, 95:10, 119:21, 155:17, 178:13
**subpoena** [6] - 6:24, 34:18, 65:12, 71:24, 73:16, 101:4
**subpoenaed** [2] - 124:9, 152:22
**subpoenas** [4] - 28:19, 33:17, 33:22, 71:23
**subpoint** [1] - 15:4
**subsequent** [4] - 64:18, 148:1, 158:3, 183:13
**substance** [1] - 37:17
**substantive** [3] - 12:24, 12:25, 13:8
**substitute** [5] - 19:6, 21:2, 23:20, 26:2, 26:4
**subterfuge** [1] - 175:25
**successful** [4] - 22:12, 23:3, 24:23, 172:12
**successfully** [2] - 77:8, 130:16
**succinct** [3] - 163:14, 165:4, 178:15
**such-and-such** [2] - 107:1
**sudden** [2] - 42:24, 67:17
**suddenly** [1] - 126:17
**sue** [1] - 106:10
**sued** [1] - 147:2
**sues** [1] - 76:12
**sufficient** [2] - 7:18, 12:4
**sufficiently** [2] - 68:4, 139:14
**suggest** [3] - 6:10, 29:11, 112:7
**suggested** [1] - 10:6
**suggestion** [4] - 46:9, 46:16, 47:25, 101:4
**suggests** [1] - 140:6
**suing** [3] - 157:4, 159:9, 159:10
**suit** [2] - 110:13, 136:14
**Suite** [3] - 1:15, 1:18, 1:22
**summarily** [1] - 100:15

**summarized** [2] - 120:25, 121:1
**summarizing** [1] - 185:18
**summary** [14] - 5:13, 44:20, 45:14, 46:1, 71:17, 89:4, 92:22, 95:10, 148:22, 154:6, 179:6, 180:12, 185:3
**summon** [1] - 89:20
**Sunset** [1] - 109:15
**superfluous** [1] - 53:10
**supervision** [1] - 31:7
**supplement** [1] - 20:20
**supplemental** [5] - 57:19, 57:20, 93:22, 160:9, 160:13
**supplemented** [1] - 39:2
**support** [7] - 20:25, 26:17, 26:23, 95:10, 108:4, 143:20, 178:18
**supports** [2] - 19:21, 113:2
**supposed** [6] - 7:3, 30:20, 82:13, 83:25, 86:10, 101:13
**supposedly** [2] - 61:16, 116:14
**surely** [1] - 4:3
**surmounts** [1] - 33:5
**surprise** [1] - 109:10
**surprised** [1] - 108:13
**surroundings** [1] - 137:3
**surveil** [2] - 133:9
**surveillance** [2] - 127:4, 137:20
**swinging** [2] - 152:6, 178:5
**sworn** [1] - 66:11
**system** [4] - 4:20, 35:14, 89:16, 184:21

---

**T**

**T-O-U-H-Y** [1] - 65:9
**table** [1] - 183:22
**tactic** [2] - 85:16, 184:15
**tactical** [5] - 85:1, 92:11, 105:20, 149:25, 176:22
**tail** [1] - 85:3

**tails** [6] - 84:13, 85:3, 85:17, 92:22, 95:23, 121:17
**taint** [1] - 32:17
**tale** [2] - 152:5
**talk-show** [1] - 138:20
**talks** [2] - 143:5, 144:4
**tape** [1] - 152:5
**target** [1] - 150:23
**targets** [2] - 141:16, 141:20
**team** [3] - 41:11, 59:10, 59:21
**tech** [1] - 144:14
**technical** [1] - 143:7
**technique** [1] - 74:23
**techniques** [2] - 76:14, 79:17
**technologies** [1] - 76:15
**technology** [8] - 77:4, 77:19, 77:22, 79:17, 80:10, 83:10, 83:12, 144:15
**Ted** [1] - 54:25
**Tel** [1] - 128:15
**Television** [1] - 136:10
**television** [1] - 109:14
**teller** [2] - 167:1, 167:4
**temperament** [1] - 112:1
**ten** [5] - 18:19, 64:6, 76:11, 125:23, 126:20
**Tenet** [1] - 104:8
**term** [5] - 91:5, 156:9, 165:10, 166:17
**termination** [1] - 104:2
**terms** [5] - 9:16, 44:24, 159:2, 180:14
**terrorism** [1] - 105:3
**terrorist** [1] - 78:2
**terrorists** [1] - 133:9
**test** [15] - 72:3, 72:4, 73:9, 76:23, 86:25, 88:11, 93:25, 94:3, 94:4, 95:20, 143:21, 146:1, 146:2, 149:17
**testified** [4] - 41:12, 107:15, 179:13, 179:14
**testifies** [1] - 66:5
**testify** [23] - 68:18, 70:3, 75:13, 85:22, 85:23, 87:11, 94:16,

98:1, 107:11, 107:13, 145:20, 145:21, 179:24, 180:1, 181:1, 181:3, 181:9, 181:10, 181:16, 182:12, 182:23, 183:9
**testifying** [2] - 51:20, 154:5
**testimony** [24] - 11:25, 14:5, 17:9, 24:5, 25:5, 29:6, 30:5, 42:22, 45:4, 46:19, 66:8, 66:11, 84:15, 85:21, 86:6, 96:25, 136:22, 136:24, 159:3, 177:20, 180:8, 183:13, 184:5
**tests** [2] - 145:7, 145:15
**that'll** [2] - 48:4, 180:12
**THE** [426] - 1:10, 1:11, 1:14, 1:17, 3:1, 3:3, 3:7, 3:9, 3:14, 3:19, 3:24, 4:12, 4:15, 4:18, 4:22, 4:25, 5:6, 7:7, 8:3, 9:11, 10:19, 10:21, 11:12, 12:19, 12:24, 14:23, 15:18, 16:5, 16:15, 18:6, 18:10, 18:19, 18:22, 18:24, 19:3, 19:5, 19:9, 20:6, 20:21, 21:17, 22:9, 23:6, 23:19, 24:14, 25:1, 25:4, 25:7, 25:9, 25:14, 26:16, 26:22, 27:3, 27:7, 27:10, 28:23, 31:8, 31:15, 33:25, 34:16, 35:17, 37:5, 37:14, 37:16, 37:24, 38:9, 39:7, 40:13, 41:21, 43:5, 43:9, 43:19, 45:10, 46:4, 46:12, 47:16, 47:22, 48:9, 48:20, 51:5, 51:22, 51:24, 52:2, 52:10, 52:17, 53:8, 54:4, 55:6, 55:8, 55:10, 55:13, 55:16, 55:18, 56:2, 56:10, 57:16, 57:21, 60:1, 60:5, 60:7, 60:20, 61:2, 61:23, 62:10, 62:13, 62:16, 62:19, 63:15, 63:17, 63:21, 63:25, 64:3, 64:6, 64:10, 64:20, 65:8, 65:23, 66:8, 66:15, 66:22, 66:24, 67:14,

27

67:19, 67:21, 68:7,
68:14, 68:16, 68:24,
69:16, 70:8, 72:8,
73:15, 73:18, 73:22,
74:2, 74:9, 74:19,
74:21, 74:24, 75:2,
75:20, 77:5, 77:10,
77:12, 80:17, 80:22,
80:24, 81:3, 81:5,
82:7, 82:9, 82:20,
83:4, 83:6, 83:20,
83:22, 84:2, 84:4,
84:6, 85:4, 85:7, 85:9,
85:13, 86:1, 86:7,
86:14, 86:23, 87:5,
87:7, 87:13, 88:2,
88:6, 88:16, 88:19,
88:24, 89:8, 89:11,
90:2, 90:6, 90:8,
90:12, 90:24, 91:1,
91:3, 91:13, 91:18,
91:22, 91:25, 92:2,
93:6, 93:9, 93:15,
93:20, 94:6, 94:8,
94:13, 95:5, 95:13,
95:16, 97:2, 97:5,
97:7, 97:9, 98:2,
98:15, 98:19, 98:21,
98:24, 99:3, 99:7,
99:9, 99:13, 99:15,
100:3, 100:6, 100:19,
100:21, 100:25,
101:3, 102:16,
102:21, 102:24,
103:4, 103:8, 103:12,
103:17, 104:6,
104:18, 105:12,
106:2, 106:12,
106:17, 106:19,
106:23, 107:7,
107:21, 107:25,
108:2, 108:8, 108:12,
108:17, 108:20,
109:5, 109:6, 110:3,
110:8, 111:8, 112:2,
112:4, 112:16, 114:2,
114:13, 114:19,
114:22, 115:2,
115:13, 115:17,
115:20, 116:1, 116:8,
118:22, 118:25,
119:4, 119:19,
119:24, 120:1, 120:3,
120:9, 121:3, 121:22,
122:5, 122:13,
122:22, 122:24,
123:3, 123:18,
124:20, 124:23,
124:25, 125:11,
125:16, 125:18,
125:20, 125:23,

126:1, 126:13,
126:15, 127:13,
127:18, 127:24,
128:5, 128:9, 128:12,
128:24, 129:3,
129:11, 129:23,
130:8, 131:11,
131:14, 131:17,
132:4, 132:6, 132:16,
132:22, 133:11,
133:13, 134:6,
134:22, 134:24,
135:1, 135:3, 135:5,
135:16, 135:19,
135:21, 136:25,
138:11, 139:10,
140:12, 141:3, 142:2,
143:19, 143:23,
144:23, 145:9,
146:12, 147:5, 148:4,
148:21, 149:6, 150:1,
150:5, 151:2, 151:16,
151:18, 151:22,
152:8, 153:10, 154:7,
154:14, 154:17,
155:1, 155:6, 155:9,
155:14, 155:25,
156:8, 156:11,
157:15, 157:18,
158:7, 158:20, 160:9,
162:9, 163:10,
163:13, 164:5, 164:7,
164:20, 165:7,
165:16, 165:18,
166:25, 167:6,
167:13, 167:18,
167:20, 167:24,
168:3, 168:6, 168:11,
169:19, 170:8,
170:10, 170:13,
170:15, 170:18,
171:4, 171:6, 172:5,
172:9, 172:11,
172:16, 173:7,
173:14, 173:20,
174:2, 174:5, 174:15,
174:18, 174:20,
174:23, 174:25,
175:3, 175:5, 175:9,
175:12, 175:16,
177:8, 177:21,
177:23, 178:7,
178:24, 179:2,
179:15, 179:19,
179:23, 180:15,
180:23, 181:14,
181:22, 182:7, 183:1,
183:3, 183:5, 183:17,
183:19, 184:3,
184:25, 185:5, 185:7,
185:9, 185:12,

185:15, 186:3, 186:6
**theater** [1] - 119:10
**theirs** [1] - 84:16
**theirselves** [1] - 85:1
**themselves** [4] -
17:13, 84:25, 85:24,
144:16
**theory** [1] - 129:24
**there'd** [2] - 141:6,
141:11
**therefore** [15] - 13:4,
17:7, 50:18, 70:14,
88:9, 88:10, 111:10,
118:6, 134:9, 135:12,
138:24, 146:22,
168:13, 170:20,
182:20
**thereto** [1] - 172:23
**thesis** [2] - 10:15,
133:3
**they've** [11] - 32:12,
33:22, 42:15, 93:6,
93:19, 102:4, 149:9,
149:19, 152:7,
152:23, 178:6
**thinking** [4] - 3:24,
41:17, 109:17, 164:24
**thinks** [4] - 49:17,
115:14, 119:1, 145:24
**third** [4] - 9:25,
107:10, 107:16,
131:22
**Third** [1] - 176:10
**thirteenth** [1] - 172:2
**thoughts** [5] - 9:21,
42:1, 97:17, 138:12,
180:19
**threat** [2] - 78:3,
144:12
**threatened** [2] -
150:25, 163:1
**three** [6] - 49:16,
49:24, 56:3, 64:7,
121:25, 122:2
**threshold** [3] -
34:22, 144:24, 176:17
**threw** [2] - 172:18,
172:25
**throughout** [4] -
41:17, 43:17, 45:9,
84:12
**throw** [4] - 13:2,
107:15, 161:1, 161:6
**throwing** [2] -
149:20, 161:10
**thrust** [1] - 140:5
**thumb** [1] - 176:23
**Thursday** [1] - 117:6
**tied** [5] - 53:14, 63:6,
63:18, 96:5, 107:5

**time-consuming** [1]
- 65:14
**timely** [2] - 14:18,
34:2
**timing** [1] - 43:21
**Tina** [3] - 7:14, 9:24,
11:20
**tired** [2] - 40:24, 41:4
**title** [2] - 170:4,
170:18
**tittle** [1] - 118:15
**Titus** [1] - 176:9
**today** [28] - 7:10,
18:4, 26:25, 33:23,
44:21, 51:20, 54:11,
73:10, 86:17, 87:13,
88:2, 89:18, 101:10,
110:2, 117:3, 117:4,
117:5, 124:16, 129:8,
132:8, 163:18,
165:22, 181:7, 181:9,
181:18, 181:19,
184:12
**today's** [2] - 29:6,
133:2
**Toensing** [1] -
128:20
**tomorrow** [1] -
185:17
**took** [8] - 14:1, 36:9,
53:15, 67:7, 101:24,
130:17, 140:15,
185:15
**top** [4] - 31:2, 32:24,
120:5, 149:23
**top-secret** [2] - 31:2,
149:23
**topic** [2] - 43:25,
108:23
**tortious** [2] - 76:17,
79:13
**tossed** [1] - 161:3
**total** [2] - 70:1, 70:2
**totally** [5] - 42:2,
129:10, 133:4, 133:5,
151:12
**TOTH** [1] - 1:20,
170:14
**Toth** [5] - 3:18,
108:16, 145:12,
170:13, 171:21
**tough** [1] - 92:16
**Touhy** [5] - 33:19,
59:19, 65:7, 65:9,
152:24
**toward** [1] - 51:7
**town** [1] - 186:11
**track** [6] - 46:3,
70:12, 153:24,
154:22, 158:10,

158:11
**trade** [1] - 8:11
**TRANSCRIBED** [2] -
1:11, 2:1
**transcript** [20] - 8:16,
8:21, 29:5, 30:9, 38:1,
38:9, 38:15, 39:12,
40:5, 44:2, 47:20,
47:23, 47:24, 47:25,
48:6, 48:21, 50:6,
96:20, 96:21, 166:10
**transcription** [1] -
186:18
**transcripts** [2] -
9:14, 67:23
**transfer** [2] - 46:1,
71:20
**transferred** [1] - 10:9
**travels** [1] - 186:11
**tree** [4] - 53:14, 63:6,
63:19, 63:24
**TREMAINE** [1] - 1:17
**Tremaine** [1] - 3:16
**tremendous** [2] -
32:23, 184:20
**Trepp** [9] - 78:24,
79:8, 82:23, 105:1,
147:8, 147:16,
147:17, 147:22,
149:16
**trial** [32] - 14:11,
17:14, 41:11, 45:24,
71:16, 71:18, 84:14,
86:21, 92:22, 94:1,
116:4, 152:16, 154:6,
177:6, 177:11, 179:9,
179:10, 179:16,
179:24, 180:24,
181:7, 181:15, 182:8,
182:12, 182:16,
182:22, 183:8,
183:14, 184:1, 184:7,
184:17
**tricked** [1] - 164:23
**tried** [7] - 31:20,
104:7, 113:24, 124:3,
131:23, 152:17,
159:15
**trigger** [1] - 61:4
**triggered** [1] - 86:2
**trouble** [1] - 18:2
**true** [18] - 15:22,
23:3, 24:20, 24:23,
25:21, 29:2, 65:7,
95:14, 138:17,
146:17, 150:16,
151:5, 161:6, 164:6,
164:13, 165:13,
180:2, 184:13
**Trulock** [2] - 103:10,

103:18
**Trump** [1] - 106:25
**trust** [1] - 132:6
**truth** [7] - 17:10, 17:11, 17:22, 20:18, 26:12, 139:2, 169:4
**try** [17] - 28:17, 36:15, 46:4, 48:5, 51:18, 52:18, 86:8, 99:13, 105:21, 112:12, 116:5, 119:14, 121:16, 129:16, 146:25, 154:8, 158:10
**trying** [38] - 9:7, 21:24, 23:7, 30:23, 31:5, 33:8, 33:9, 33:12, 36:22, 38:17, 54:24, 55:1, 59:4, 62:4, 65:25, 68:17, 73:10, 82:15, 92:10, 92:24, 112:6, 112:7, 119:9, 127:21, 131:19, 132:1, 137:7, 138:24, 148:2, 153:24, 155:12, 157:9, 157:11, 158:8, 173:10, 178:4, 182:8, 183:14
**Tuesday** [2] - 11:19, 21:9
**turn** [40] - 15:3, 16:22, 30:1, 31:4, 47:4, 52:20, 52:23, 60:17, 62:5, 62:6, 67:5, 88:22, 111:12, 111:15, 120:4, 120:13, 123:8, 123:9, 123:12, 123:14, 124:13, 126:18, 126:19, 128:24, 133:16, 133:20, 134:1, 134:8, 134:10, 134:21, 135:9, 135:10, 135:12, 137:7, 137:11, 138:2, 158:24, 160:9, 163:22, 174:5
**turned** [61] - 7:3, 7:14, 8:14, 10:6, 11:2, 17:1, 17:6, 29:3, 29:12, 29:16, 30:3, 30:11, 30:17, 30:19, 36:12, 38:4, 38:19, 38:21, 39:25, 40:16, 42:4, 47:13, 49:11, 49:22, 49:23, 49:24, 50:13, 51:12, 52:14, 55:21, 59:14, 69:3, 70:13, 72:22, 88:17,

111:1, 113:13, 115:1, 115:4, 115:11, 115:14, 116:25, 117:21, 123:10, 124:25, 134:17, 136:3, 154:9, 158:13, 163:19, 163:21, 165:20, 166:2, 166:3, 166:4, 168:9, 172:21
**turning** [9] - 21:25, 34:20, 39:11, 43:11, 43:25, 47:10, 70:18, 121:4, 133:21
**Turnoff** [1] - 87:10
**turnover** [2] - 31:17, 34:7
**turns** [6] - 15:21, 22:25, 23:2, 24:22, 25:19, 25:21
**TV** [2] - 3:20, 177:12
**Twain** [1] - 172:1
**Twain's** [1] - 172:5
**Twelfth** [2] - 2:3, 186:23
**twelve** [1] - 172:4
**twice** [1] - 116:3
**two** [37] - 22:3, 29:4, 29:14, 35:10, 36:12, 39:1, 40:1, 54:14, 54:17, 55:4, 55:6, 58:10, 58:11, 58:14, 64:3, 65:13, 72:7, 72:15, 113:17, 113:18, 117:22, 122:1, 123:6, 123:14, 126:20, 130:20, 136:7, 136:13, 147:3, 161:5, 161:12, 164:14, 175:1, 175:6, 175:14, 179:12, 181:5
**two-proceeding** [1] - 130:20
**type** [1] - 155:2
**types** [1] - 146:15
**typical** [1] - 130:3
**typically** [2] - 130:19, 133:1

## U

**ultimate** [1] - 93:12
**ultimately** [9] - 10:7, 10:8, 60:16, 143:5, 147:10, 147:17, 147:22, 147:25, 148:10
**unable** [1] - 96:8
**unambiguous** [2] - 100:4, 101:9

**unanimous** [2] - 148:18, 159:25
**unavailable** [1] - 75:9
**unchanged** [1] - 57:10
**unclassified** [1] - 125:10
**unclear** [2] - 49:2, 141:3
**unconstitutional** [1] - 64:12
**uncover** [1] - 151:19
**uncovered** [1] - 151:10
**under** [43] - 4:20, 7:23, 8:10, 8:19, 9:3, 9:11, 9:20, 13:6, 14:13, 17:19, 18:20, 23:4, 23:5, 24:16, 28:21, 33:18, 35:20, 43:6, 51:7, 53:21, 54:19, 56:19, 71:9, 74:21, 74:24, 75:22, 85:20, 87:2, 91:22, 92:8, 93:10, 94:5, 95:22, 96:9, 101:5, 104:4, 110:11, 112:18, 129:7, 129:14, 131:9, 146:15, 175:19
**under-seal** [2] - 9:11, 9:20
**undercover** [1] - 23:11
**underlying** [1] - 125:13
**underscore** [1] - 148:17
**understood** [4] - 79:15, 96:15, 131:24, 172:5
**unduly** [2] - 179:4, 182:14
**unequivocal** [7] - 40:16, 48:14, 49:11, 49:19, 50:10, 165:4, 166:11
**unequivocally** [8] - 29:3, 29:12, 39:24, 66:5, 68:25, 72:21, 163:19, 163:20
**unfolding** [1] - 14:25
**unfortunately** [1] - 152:7
**UNIDENTIFIED** [1] - 167:23
**unilaterally** [2] - 101:4, 123:4
**unimportant** [1] -

145:24
**UNITED** [2] - 1:1, 1:11
**united** [1] - 2:2
**United** [6] - 22:19, 62:12, 91:11, 144:7, 174:10, 186:23
**unless** [9] - 4:20, 9:12, 69:1, 99:18, 123:19, 161:22, 161:23, 166:8
**unlike** [1] - 62:22
**unlikely** [1] - 136:14
**unmask** [1] - 117:16
**unrelated** [2] - 57:13, 145:11
**untrue** [2] - 35:13, 69:6
**up** [51] - 7:5, 12:20, 14:14, 17:7, 17:25, 22:11, 22:22, 25:18, 29:22, 34:11, 39:17, 41:11, 45:21, 54:5, 68:18, 69:8, 72:8, 83:15, 83:16, 83:17, 83:21, 85:21, 92:10, 98:23, 99:22, 101:13, 104:25, 105:17, 107:18, 109:1, 110:6, 127:7, 134:16, 138:13, 142:16, 150:9, 157:4, 158:17, 159:9, 159:10, 160:12, 169:25, 170:2, 170:21, 183:13, 184:11, 184:24, 184:25, 186:7
**updating** [1] - 14:6
**US** [3] - 55:4, 55:11, 174:21
**USC** [1] - 126:14
**uses** [1] - 138:22
**uttered** [1] - 20:8

## V

**vacation** [1] - 67:17
**vacuum** [1] - 85:19
**vague** [2] - 11:3, 27:12
**valuable** [1] - 116:14
**value** [8] - 79:16, 80:13, 80:14, 84:7, 86:15, 89:10, 89:12, 89:13
**valve** [3] - 36:15, 36:16, 40:3
**Van** [1] - 176:7
**various** [12] - 5:15,

6:25, 14:12, 45:12, 77:7, 81:7, 126:2, 140:2, 140:24, 142:21, 145:5, 152:25
**Vegas** [3] - 64:20, 64:21, 66:25
**veracity** [1] - 120:11
**verdict** [1] - 149:1
**verify** [1] - 47:12
**version** [3] - 48:6, 123:15, 172:1
**versus** [13] - 3:2, 28:6, 93:2, 103:10, 103:18, 174:8, 175:10, 175:12, 176:4, 176:7, 176:8, 176:9, 176:11
**viable** [3] - 24:23, 25:19, 25:22
**victim** [1] - 22:15
**Victoria** [1] - 128:20
**video** [12] - 43:1, 43:3, 43:9, 43:23, 44:3, 44:15, 45:2, 45:3, 46:9, 74:13, 77:9, 162:3
**video-compression** [1] - 74:13
**videoed** [1] - 43:1
**videotaped** [2] - 44:9, 47:8
**view** [13] - 4:9, 13:8, 15:8, 15:10, 19:22, 21:1, 45:10, 60:17, 72:6, 134:11, 144:8, 148:13, 148:18
**views** [2] - 89:2, 96:11
**vignette** [1] - 41:10
**violated** [2] - 37:4, 88:23
**violating** [1] - 177:1
**virtually** [2] - 128:18, 148:5
**volume** [1] - 136:9
**vs** [1] - 1:6

## W

**wait** [3] - 54:4, 142:2, 143:19
**Wait** [1] - 76:1
**waiting** [4] - 142:10, 152:22, 159:21
**waive** [4] - 96:18, 129:5, 129:9, 129:20
**waived** [7] - 33:22, 34:2, 34:3, 124:17, 129:1, 129:9, 129:10

**waiver** [3] - 33:25, 34:8, 35:3
**Walker** [1] - 89:7
**Walter** [1] - 55:7
**Wandner** [8] - 28:6, 28:10, 93:2, 119:15, 122:19, 173:11, 173:23, 174:6
**wants** [4] - 45:4, 66:4, 102:10, 146:11
**Warren** [6] - 78:24, 79:8, 82:23, 147:8, 147:16
**Washington** [11] - 1:19, 14:8, 14:20, 29:22, 105:15, 128:20, 137:9, 144:10, 155:13, 157:1, 159:8
**Watch** [2] - 35:11
**water** [1] - 18:2
**ways** [5] - 31:20, 44:15, 65:13, 122:2, 143:15
**wear** [2] - 32:14, 177:9
**Wear** [2] - 148:1, 152:19
**Wednesday** [2] - 45:13, 117:8
**week** [2] - 45:1, 45:15
**weeks** [6] - 14:22, 109:19, 109:20, 154:10, 155:8
**weighing** [1] - 16:23
**weight** [1] - 66:7
**well-written** [1] - 93:1
**west** [2] - 60:3, 75:20
**Western** [2] - 14:7, 14:19
**Westlaw** [1] - 173:5
**whatsoever** [2] - 56:14, 158:22
**wheels** [1] - 29:25
**whispering** [1] - 22:1
**whistle** [1] - 137:24
**whistle-blowing** [1] - 137:24
**whistleblower** [5] - 126:24, 136:14, 137:13, 137:18, 162:22
**whole** [16] - 6:3, 16:20, 17:7, 22:22, 41:23, 45:6, 47:13, 91:6, 92:11, 97:6, 135:5, 139:7, 147:9, 149:20, 160:6, 176:15

**wholly** [1] - 26:13
**wife** [2] - 119:1, 128:20
**wild** [2] - 148:13, 149:8
**wildly** [1] - 22:23
**willfully** [1] - 80:2
**William** [2] - 55:9, 55:10
**willing** [3] - 182:24, 183:7, 183:10
**willy** [1] - 9:13
**willy-nilly** [1] - 9:13
**win** [9] - 84:13, 85:4, 85:17, 92:22, 95:23, 95:25, 97:16, 121:17
**window** [1] - 106:11
**wish** [5] - 5:4, 68:24, 69:2, 82:15, 110:1
**withdraw** [1] - 105:24
**withdrew** [1] - 11:21
**withheld** [2] - 62:3, 184:19
**witness** [7] - 14:11, 41:12, 68:19, 136:18, 153:15, 179:16, 179:20
**witnesses** [4] - 25:6, 70:1, 84:15, 162:12
**Wizard** [1] - 124:7
**woke** [1] - 22:11
**woman** [2] - 171:2
**wonderful** [1] - 109:10
**wondering** [1] - 7:4
**Woody** [8] - 166:24, 167:16, 169:22, 169:24, 170:4, 170:11, 170:20, 171:1
**word** [8] - 31:8, 48:3, 53:6, 53:10, 146:2, 165:24, 167:4
**words** [7] - 15:20, 16:14, 35:19, 37:17, 130:22, 163:14, 168:8
**work-product** [1] - 177:1
**works** [10] - 16:11, 81:22, 83:24, 84:23, 86:10, 86:17, 117:17, 134:18, 140:4, 145:24
**world** [4] - 32:25, 58:14, 133:2, 169:8
**worry** [1] - 185:21
**worsening** [1] - 42:19
**worst** [1] - 167:11
**worth** [2] - 153:22, 161:22

**worthless** [1] - 80:1
**worthy** [1] - 9:11
**wound** [3] - 157:4, 159:9, 159:10
**Wow** [1] - 39:18
**wrap** [1] - 184:25
**Wright** [1] - 3:16
**WRIGHT** [1] - 1:17
**write** [4] - 16:2, 22:16, 22:17, 113:15
**writes** [1] - 55:1
**writing** [3] - 55:2, 185:18, 185:21
**written** [11] - 18:3, 32:7, 56:21, 71:11, 90:3, 90:7, 93:1, 98:13, 139:19, 161:22, 180:2
**wrote** [17] - 7:19, 16:2, 23:1, 56:18, 56:20, 82:16, 100:18, 102:7, 155:9, 155:16, 156:4, 156:20, 158:7, 169:4, 173:11, 174:7, 176:3
**Wyoming** [1] - 177:8

**Y**

**Year** [9] - 3:7, 3:8, 3:25, 4:3, 4:4, 4:7, 4:14, 186:11, 186:12
**year** [10] - 5:4, 42:20, 63:18, 64:3, 111:6, 126:17, 126:19, 126:20, 140:6, 162:1
**Year's** [4] - 4:10, 4:21, 108:25, 109:8
**years** [22] - 19:15, 20:12, 30:24, 31:5, 35:8, 36:23, 42:16, 54:6, 62:4, 64:6, 64:7, 87:10, 111:20, 126:7, 126:9, 126:20, 126:21, 137:7, 162:21, 177:13
**yesterday** [3] - 20:1, 42:10, 127:8
**York** [4] - 6:23, 11:2, 168:1, 173:8
**young** [3] - 98:11, 98:13, 98:14
**yourself** [4] - 31:15, 36:15, 127:12, 139:24

**Z**

**Zorro** [1] - 63:23